App. i

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | |
|---|---|
| **Purl, M.D.**, et al., § | |
| § | |
| *Plaintiffs*, § | |
| § | |
| v. § | **Civil Action No. 2:24-cv-228-Z** |
| § | |
| **United States Department of** § | |
| **Health and Human Services**, et al., § | |
| § | |
| *Defendants*. § | |

### APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Pursuant to Local Rule 7.1(i), Plaintiffs file this appendix in support of their motion for preliminary injunction.

### INDEX

| Document | Page Numbers |
|---|---|
| Declaration of Carmen Purl, M.D. | App. 001–007 |
| Secretary Xavier Becerra, (@SecBecerra), X (Apr. 29, 2024, 11:32 PM) | App. 008 |
| Guidance on Nondiscrimination Protections under the Church Amendments (reviewed by OCR Feb. 3, 2023) | App. 009–013 |

Respectfully submitted this 12th day of November, 2024.

/s/ *Natalie D. Thompson*
**Natalie D. Thompson**
TX Bar No. 24088529
DC Bar No. 90026665
Matthew S. Bowman
DC Bar No. 993261
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
Telephone: (202) 393-8690
Facsimile: (202) 347-3622
nthomspon@ADFlegal.org
mbowman@ADFlegal.org

Julie Marie Blake
VA Bar No. 97891
ALLIANCE DEFENDING FREEDOM
44180 Riverside Parkway
Lansdowne, Virginia 20176
Telephone: (571) 707-4655
Facsimile: (571) 707-4790
jblake@ADFlegal.org

*Counsel for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | |
|---|---|
| **Purl, M.D.**, et al., § | |
| § | |
| *Plaintiffs*, § | |
| § | |
| v. § | Civil Action No. 2:24-cv-228-Z |
| § | |
| **United States Department of** § | |
| **Health and Human Services**, et al., § | |
| § | |
| *Defendants*. § | |

## DECLARATION OF CARMEN PURL, M.D.

I, Carmen Purl, M.D., declare as follows:

1. I am over 18 years old and am competent to make this declaration. All information in this declaration is based on personal knowledge as set forth below. I am the sole owner of Carmen Purl, M.D., PLLC, d/b/a Dr. Purl's Fast Care Walk In Clinic ("the Clinic"), a private family medicine practice. I have knowledge of the information contained in this declaration in connection with this role and am competent to testify to the same on behalf of the Clinic.

2. I am a family practice physician and have been licensed to practice medicine by the State of Texas since 1986. I received my board certification in family medicine in 1988.

3. Through the Clinic, I employ three nurse practitioners and approximately 15 other support personnel.

4. As licensed healthcare professionals, my employees and I are subject to the mandatory reporting requirements of Texas law. Within 48 hours, we have a duty to report known or suspected abuse or neglect of a child or a vulnerable adult

(such as individuals with a disability or who are elderly) to appropriate law enforcement authorities, such as Child Protective Services (CPS), which is a division of the Texas Department of Family and Protective Services. Licensed health care professionals are subject to penalties if we fail to report known or suspected abuse in accordance with Texas law. I also believe there is a moral and ethical obligation to protect and advocate for our patients, including by reporting suspected abuse or crime.

5. In my nearly four decades of medical practice, I have treated many patients who have been victims of abuse and neglect. Most often these are children, but I have also treated women and elderly patients who were victims of abuse. In my experience, victims of abuse are likely to be brought to a walk-in clinic like mine, rather than a setting in which the treating physician has a longer relationship with the patient. There have been instances in which, based on my medical examination of and conversation with the patient, I believed that abuse was imminent; in these circumstances I have had the endangered patient remain at the Clinic and called the local police. Other times, the evidence of patterns of abuse is less readily apparent and only discovered later, such as upon examination of X-rays that show old fractures or other indications of physical trauma. As appropriate, I have reported my findings to local law enforcement or CPS.

6. In my experience, a greater proportion of my patients in a walk-in clinic setting are children, young women, and pregnant women, as compared to other care settings. Many pregnant women come to the Clinic seeking a pregnancy test to confirm their pregnancy to facilitate their application for Texas's Medicaid for Pregnant Women or CHIP Perinatal programs, which provide health insurance coverage for low-income mothers. I consider both a pregnant woman and her unborn child to be human persons, and both are entitled to medical care and deserve the protection of the law. I believe based on both medicine and conscience that elective

abortions harm patients' health and public health. I also believe that medical interventions trying to achieve "gender transition" of children, such as cross-sex hormones, are harmful to the child, are never medically necessary, and are a matter of concern for public health.

7. As a primary-care physician, I routinely collect necessary information from a female patient, including her last menstrual period (LMP), age of menarche, the number of pregnancies she has had, the number of live births, and if there is a discrepancy between the number of pregnancies and births, whether any pregnancy was terminated by spontaneous abortion (miscarriage) or induced abortion. In my experience, a thorough gynecologic history, whether prepared by me, my nurse practitioner employees, or other medical professionals, will include most or all of this patient information.

8. In my practice, I regularly provide care for pregnant women and girls. I have treated hundreds of girls under the age of consent who were either pregnant or reported sexual activity. During my career, I have delivered babies from mothers as young as 12 years old.

9. I estimate that I have personally treated more than 100 pediatric patients who were victims of sexual abuse. The number of such patients treated by personnel at the Clinic easily includes several hundred. Based on my decades of interactions with other family practitioners, I believe these numbers are typical of most family practices.

10. I have previously served as the medical director of an emergency room department where I also practiced as an emergency physician. In that capacity, I encountered an even higher frequency of women and children who were victims of sexual abuse or assault. In such instances, I referred the patient for examination by a Sexual Assault Nurse Examiner (SANE) for a medical procedure that collects evidence and provides care for victims of sexual assault or domestic violence, and

can include collection of blood, urine, body swabs, photos of the victim, clothing, hair, and other evidence related to the sexual assault or history of sexual abuse.

11. In the fall-to-spring "flu season," each day the Clinic can receive approximately 10 to 20 walk-in pediatric patients exhibiting flu symptoms of fever, chills, cough, sore throat, runny nose, etc. In the routine course of treating such pediatric patients, it is common for us to discover other medically significant information about them.

12. I have not had occasion to treat a pediatric patient expressing gender dysphoria or undergoing a medicalized gender transition. But as a part of routine patient intake, a practitioner like myself must obtain a list of all medications, supplements, and hormones a patient is taking, as well as a history of all prior surgical procedures. Such information could present me or Clinic staff with information that a child was receiving gonadotropin-releasing hormone (GnRH) agonists (commonly known as "puberty blockers") or cross-sex hormones (such as testosterone given to females or estrogen to natal males), or had surgical procedures such as a mastectomy or vaginoplasty. That routine medical information could indicate the child was being subjected to treatments or procedures that are prohibited by Texas law and could constitute child abuse.

13. If CPS receives information about known or suspected child abuse, its normal investigative procedures include requesting copies of the victim's medical records. The CPS record request is for the patient's entire unredacted chart; in accordance with my understanding of my obligation to facilitate a CPS investigation under Texas law, my practice is to comply with these records requests and provide the full, unredacted patient files. The Clinic receives approximately 10 to 12 such record requests from CPS each year, or roughly one request per month.

14. I fear that in many instances providing full, unredacted patient medical records in response to a demand from a law enforcement entity such as CPS

**App. 004**

would put the Clinic and me in violation of the 2024 Rule. Most patient charts include at least some information related to the patient's reproductive system or reproductive health. Such information is even more likely to be documented in the chart of a patient alleged to be the victim of crime or abuse. Disclosing patient information in violation of the 2024 Rule would subject me, the Clinic, and its staff to significant civil and criminal penalties. But if I were to refuse to comply with the demands of state law enforcement to provide patient medical records, I could be liable for that failure and would be in violation of my ethical and moral duty as a physician to safeguard my patients and the public health. It would also violate these ethical and moral duties if I refused to cooperate with a non-mandatory request for information from CPS or another agency charged with protecting the public.

15. The compliance cost estimates in the 2024 Rule underestimate the actual costs the Clinic and I will incur. At a minimum, and because I operate a rural practice far from any in-person training, I would need to locate online training for my employees and myself to ensure compliance with the 2024 Rule. In my experience, such training—if it is available—ranges from approximately $100 to $300 per person.

16. Training Clinic personnel for compliance with the 2024 Rule will require that I close the Clinic for at least several hours. In a typical hour, the Clinic treats 3-4 primary care patients per provider (there are usually two providers working) as well as 5-6 walk-in patients. Primary care appointments are reimbursed (by, for example, private insurance or Medicare) at approximately $120/visit. The cash fee for a walk-in appointment is $85. That means closing the clinic for even one hour to conduct training would cost at least $1,385 in patient fees, copays, and insurance reimbursements. And I anticipate that the training would require closure for several hours, not just one.

17. My review of the Department of Health and Human Services website has discovered no training resources, templates, examples, or other aids to facilitate compliance with the 2024 Rule by the December 23, 2024, deadline. Likewise, I have not been able to find any commercial educational resources that offer updated courses that would satisfy the 2024 Rule.

18. I estimate that it would take me 5–8 hours to analyze the 2024 Rule and prepare training materials for my staff. I estimate I will also have to obtain legal guidance to update the Clinic's notice of privacy practices, which will require another 5–8 hours of my time, not to mention the cost of legal counsel. Based on the opportunity cost of not personally seeing patients during this time, I would lose between $360 and $480 per hour spent on these compliance-related activities.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 8th day of November 2024 at Dumas, Texas.

_____
Carmen Purl, M.D.



x.com/SecBecerra/status/1782432173665960400

Post

Reply

**Secretary Xavier Becerra**
@SecBecerra

Today, HHS announced a rule that prevents the weaponization of your medical information when you are, say, undergoing IVF, receiving support for miscarriage management, or seeking other lawful care.

We're making it clear: you have the right to privacy—Dobbs did not take it away.

11:32 AM · Apr 22, 2024 · **22.4K** Views

14 52 96 2

🇺🇸 An official website of the United States government
   Here's how you know ⌄



HHS </> > Conscience and Religious Freedom Home </conscience/index.html> > C…

Navigate to: ➕

# Guidance on Nondiscrimination Protections under the Church Amendments

The Office for Civil Rights (OCR) of the U.S. Department of Health and Human Services enforces the Church Amendments, codified at 42 U.S.C. 300a-7.  Among these provisions, the Church Amendments protect health care personnel from discrimination related to their employment or staff privileges because they refused to perform or assist in the performance of abortion, sterilization, and biomedical or behavioral research activities because of their religious beliefs or moral convictions. [1]  For example, a hospital that receives funds under the Public Health Service Act (PHS Act) cannot have a policy of refusing to hire a health care professional at a hospital on the basis that they currently or in the past have refused to perform an abortion because of their religious beliefs or moral convictions.

These same protections from discrimination related to employment or staff privileges also extend to health care personnel who perform or assist in the performance of a lawful abortion or sterilization.

**Protections Against Discrimination**

Section (c)(1) of the Church Amendments, in part, prohibits entities that receive a grant, contract, loan, or loan guarantee under the PHS Act (hereafter referred to as "covered recipients") from discriminating in the employment, promotion, or termination of employment of any physician or other health care personnel because the physician or other health care personnel performed or assisted in the performance of a lawful sterilization procedure or abortion.  It also prohibits discrimination in the extension of staff or other privileges to any physician or other health care personnel because the individual performed or assisted in the performance of a lawful sterilization procedure or abortion.  These provisions also provide protection for those who refuse to perform or assist in the performance of abortion, sterilization, and biomedical or behavioral research activities because of their religious beliefs or moral convictions.  PHS Act covered recipients include but are not limited to recipients of funds under the Ryan White HIV/AIDS Program, the Title X Program, and Health Resources and Services Administration-funded health centers.

The purpose of this document is to remind recipients of grants, loans, contracts, or loan guarantees under the PHS Act of their nondiscrimination obligations under section (c)(1) of the Church Amendments with regard to health care personnel who perform or assist in the performance of abortion or sterilization.

**Defining Lawful Abortion**

In specifying its nondiscrimination protections, Section (c)(1) of the Church Amendments refers to the "performance of a lawful sterilization procedure or abortion," and this includes abortions that are "lawful" under federal law.  Decades of precedent make clear that it is unconstitutional for a state to prohibit a patient from ending a pregnancy prior to fetal viability. *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 879 (1992);*MKB Mgmt. Corp. v. Stenehjem*, 795 F.3d

**App. 010**

768 (8th Cir. 2015); *McCormack v. Herzog*, 788 F.3d 1017 (9th Cir. 2015); *Jane L. v. Bangerter*, 102 F.3d 1112 (10th Cir. 1996); *Sojourner T v. Edwards*, 974 F.2d 27 (5th Cir. 1992). Further, the U.S. Supreme Court has recognized that, under the federal Constitution, a state statute that "has the effect of placing a substantial obstacle in the path of a woman's choice [to have a lawful abortion] cannot be considered a permissible means of serving its legitimate ends." *June Med. Servs, LLC v. Russo*, 140 S. Ct. 2103, 2120 (2020), *quoting Whole Women's Health v. Hellerstedt*, 136 S. Ct. 2292, 2310 (2016), *quoting. Casey*, 505 U.S. at 877 (1992) (plurality opinion).

A lawful abortion may also include an abortion for which federal funds may be used to end pregnancies that are the result of rape or incest, or those necessary to save the life of the pregnant person. This includes abortions for which federal funds can be provided in the Medicaid and Children's Health Insurance (commonly referred to as CHIP) programs under the Hyde Amendment. *See* Consolidated Appropriations Act, 2021, Division H, Title II, § 507, Pub. L. 116 260, 134 Stat 1182, 1622 (Dec. 27, 2020). It may also include those for which federal funds can be provided through federally operated programs, including the Indian Health Service and the Veterans Health Administration. *See, e.g.*, 25 U.S.C. § 1676.

Lawful abortions under the Church Amendments also include abortions performed in order to stabilize a patient when required under the Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C. 1395dd(e)(1). Under EMTALA, hospitals with a dedicated emergency department that receive Medicare funds must, as a condition of participation in the Medicare program, provide a medical screening examination to individuals who request such an examination to determine if a patient has an emergency medical condition. If the patient has an emergency medical condition, the hospital must provide medical care to stabilize the individual within the capability of the hospital, or provide for an appropriate transfer to another facility with the capabilities to stabilize the medical condition. Emergency medical conditions involving pregnant patients may include, but are not limited to, ectopic pregnancy, miscarriage, or pre-eclampsia. Stabilizing treatment for these conditions may include, but are not limited to, dilation and curettage, laparoscopic procedures involving fallopian tubes or uterus, or a hysterectomy. See this guidance

<https://www.cms.gov/medicareprovider-enrollment-and-certificationsurveycertificationgeninfopolicy-and-memos-states-and/reinforcement-emtala-obligations-specific-patients-who-are-pregnant-or-are-experiencing-pregnancy-0> from the Centers for Medicare & Medicaid Services for more information about EMTALA obligations. To file a complaint under EMTALA, please contact the appropriate state survey agency: https://www.cms.gov/Medicare/Provider Enrollment and Certification/SurveyCertificationGenInfo/ContactInformation <https://www.cms.gov/medicare/provider-enrollment-and-certification/surveycertificationgeninfo/contactinformation>.

## Examples of Church Amendment Section (c)(1) Prohibitions Regarding Personnel Participating in Lawful Abortions:

- Covered recipients, such as a hospital in State A that receives funding under the Ryan White Act, cannot deny or withdraw admitting privileges to a physician on the basis that the physician performs lawful abortions in State B or any other state.
- A covered hospital cannot terminate a doctor who performs an abortion before viability on the basis that the abortion violated state law, if the state law at issue violates the Federal Constitution. An abortion that violates an unconstitutional state law may be a lawful abortion under the Church Amendments.
- A HRSA funded health center cannot refuse to hire, or terminate from employment, a nurse on the basis that the nurse assisted in the performance of an abortion for which federal Medicaid funds were lawfully provided.
- A state university medical center that receives federal funds from the National Institutes of Health for research cannot deny employment privileges to a physician employed by the university because the physician performed lawful abortions at a previous job.

## Enforcement of the Church Amendments

If OCR receives a complaint alleging a violation of the Church Amendments, it will coordinate the handling of complaints with the Departmental funding component(s) from which the entity, to which a complaint has been filed, receives funding.[2]

If you believe that you or another party has experienced discrimination under the Church Amendments, visit the OCR complaint portal at https://ocrportal.hhs.gov/ocr/smartscreen/main.jsf <https://ocrportal.hhs.gov/ocr/smartscreen/main.jsf> to file a complaint with OCR online. To read more about the Church Amendments and other laws that OCR enforces, please visit our website at https:www.hhs.gov/ocr </ocr/index.html>.

*DISCLAIMER: The contents of this document do not have the force and effect of law and are not meant to bind the public in any way. This document is intended only to provide clarity to the public regarding existing requirements under the law or the Departments' policies.*

View a PDF of this guidance   September 17, 2021   PDF </sites/default/files/church-guidance.pdf>

---

# Footnotes

1. 42 U.S.C. 300a-7(c)
   back to note 1

2. 45 C.F.R. 88.2.
   back to note 2

---

Content created by Office for Civil Rights (OCR)
Content last reviewed February 3, 2023

**App. 013**