**UNITED STATES OF AMERICA**
**NORTHERN DISTRICT OF TEXAS**
**AMARILLO DIVISION**

| | |
|---|---|
| Carmen Purl, M.D.; and Carmen Purl, M.D., PLLC d/b/a Dr. Purl's Fast Care Walk In Clinic, | |
| *Plaintiffs*, | Civil Action No. 2:24-cv-228-Z |
| v. | |
| United States Department of Health and Human Services; Xavier Becerra, in his official capacity as Secretary of the United States Department of Health and Human Services; Office for Civil Rights of the United States Department of Health and Human Services; and Melanie Fontes Rainer, in her official capacity as Director of the Office for Civil Rights of the United States Department of Health and Human Services, | |
| *Defendants*, | |

### APPENDIX IN SUPPORT OF INTERVENOR-DEFENDANTS' MOTION TO INTERVENE

| Ex. | Exhibit Description | Bates Number |
|:---:|---|:---:|
| A | Declaration of Dr. Christine Petrin | Appx. 006 |
| B | Declaration of Dr. Beth Oller | Appx. 012 |

| Exhibit No. | Exhibit Description | Bates Number |
|---|---|---|
| C | Declaration of Shelly Mitchell | Appx. 017 |
| D | Declaration of Edward Johnson | Appx. 022 |
| E | Declaration of Janel Heinrich | Appx. 029 |
| F | Health Insurance Portability and Accountability Act, Pub. L. 104-191, 110 Stat. 1936 | Appx. 037 |
| G | Administrative Procedure Act, 5 U.S.C. § 706(2) | Appx. 162 |
| H | HIPAA Privacy Rule to Support Reproductive Health Care Privacy, 89 Fed. Reg. 32976-01 (Apr. 26, 2024) | Appx. 164 |
| I | Ohio Const. art. XVIII | Appx. 323 |
| J | Wis. Stat. Ch. 66 | Appx. 338 |
| K | Texas's Memo. In Support of Mot.to Intervene, *Commonwealth of Pennsylvania et al. v. Devos et al.*, 1:20-cv-01468 (D.D.C. Jan. 19, 2021), ECF No. 130-1 | Appx. 795 |
| L | 45 C.F.R. § 160.103 | Appx. 816 |
| M | 42 U.S.C. § 1320d-5 | Appx. 826 |
| N | 42 U.S.C. § 1320d-6(b) | Appx. 832 |
| O | Am. Med. Ass'n, *Opinion 1.1.1: Patient-Physician Relationships*, Code of Medical Ethics (Aug. 2022), https://code-medical-ethics.ama-assn.org/sites/default/files/2022-08/1.1.1%20Patient-physician%20relationships--background%20reports_0.pdf | Appx. 834 |
| P | Am. Med. Ass'n, *Opinion 3.1.1: Privacy in Health Care, Code of Medical Ethics*, https://code-medical-ethics.ama-assn.org/sites/amacoedb/files/2024-12/3.1.1.pdf (last visited Jan. 17, 2025) | Appx. 841 |
| Q | Megan Messerly et al., *Anti-abortion groups have 2 asks. RFK Jr. is listening*, Politico (Nov. 20, 2024), https://www.politico.com/news/2024/11/20/anti-abortion-rfk-jr-00190552 | Appx. 842 |
| R | Tyler Arnold, *Trump's HHS nominee Robert F. Kennedy Jr. reassures pro-life senators with policy plans*, Catholic News Agency (Dec. 19, 2024), https://www.catholicnewsagency.com/news/261111/trump-hhs-nominee-robert-kennedy-jr-reassures-pro-life-senators | Appx. 848 |

| Exhibit No. | Exhibit Description | Bates Number |
|---|---|---|
| S | Eric Cortellessa, *How Far Would Trump Go*, TIME (Apr. 30, 2024), https://time.com/magazine/us/6979410/may-27th-2024-vol-203-no-17-u-s/ | Appx. 853 |
| T | Members of Congress, Comment on Proposed HIPAA Privacy Rule To Support Reproductive Health Care Privacy 9 (June 16, 2023), https://www.regulations.gov/comment/HHS-OCR-2023-0006-0171 | Appx. 865 |
| U | Excerpt, The Heritage Foundation, *Mandate for Leadership: The Conservative Promise* 497 (2023), https://tinyurl.com/55dbtvkx | Appx. 876 |
| V | Amanda Becker, *How Trump's nominees could make Project 2025 a reality*, News from the States (Jan. 2, 2025), https://www.newsfromthestates.com/article/how-trump-nominees-could-make-project-2025-reality | Appx. 879 |

Date:   January 17, 2025

Respectfully submitted,

*/s/ Ryan P. Brown*
Ryan Patrick Brown
RYAN BROWN ATTORNEY AT LAW
P.L.L.C
1222 S. Fillmore
Amarillo, Texas 79101
(806) 372-5711 (phone)
ryan@ryanbrownattorneyatlaw.com

*Counsel to Intervenor-Defendants*

-and-

Shannon Rose Selden – *Pro Hac Vice Pending*
Adam Aukland Peck – *Pro Hac Vice Pending*
DEBEVOISE & PLIMPTON LLP
66 Hudson Boulevard
New York, New York 10001
(212) 909-6000 (phone)
(212) 909-6836 (fax)
srselden@debevoise.com
aauklandpeck@debevoise.com

*Counsel to Intervenor-Defendants*

Carrie Y. Flaxman – *Pro Hac Vice Pending*
Madeline H. Gitomer – *Pro Hac Vice Pending*
Emma R. Leibowitz – *Pro Hac Vice Pending*
DEMOCRACY FORWARD
P.O. Box 34553
Washington, DC 20043
(202) 448-9090 (phone)
cflaxman@democracyforward.org
mgitomer@democracyforward.org
eleibowitz@democracyforward.org

-and-

Anna A. Moody – *Pro Hac Vice Pending*
Gabriel A. Kohan – *Pro Hac Vice Pending*
DEBEVOISE & PLIMPTON LLP
801 Pennsylvania Avenue NW
Washington, DC 20004
(202) 383-8000 (phone)
(202) 383-8118 (fax)
amoody@debevoise.com
gakohan@debevoise.com

*Counsel to Intervenor-Defendants*

*Counsel to Intervenor-Defendants*

-and-

Aisha Rich – *Pro Hac Vice Pending*
PUBLIC RIGHTS PROJECT
490 43rd Street, Unit #115
Oakland, California 94609
(510) 214-6960 (phone)
aisha@publicrightsproject.org

*Counsel to City of Columbus and City of Madison*

### <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 17, 2025, a copy of the foregoing was filed electronically

via the Court's ECF system, which effects service upon counsel of record.

<u>*/s/ Ryan P. Brown*</u>
Ryan Patrick Brown

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**AMARILLO DIVISION**

| | |
|---|---|
| Carmen Purl, M.D.; and Carmen Purl, M.D., PLLC d/b/a Dr. Purl's Fast Care Walk In Clinic, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 2:24-cv-228-Z |
| United States Department of Health and Human Services; Xavier Becerra, in his official capacity as Secretary of the United States Department of Health and Human Services; Office for Civil Rights of the United States Department of Health and Human Services; and Melanie Fontes Rainer, in her official capacity as Director of the Office for Civil Rights of the United States Department of Health and Human Services, | |
| *Defendants*. | |

## <u>DECLARATION OF DR. CHRISTINE PETRIN</u>

I, Christine Petrin, hereby declare under penalty of perjury as prescribed in 28 U.S.C. § 1746 that the following is true and correct:

1.    My name is Christine Petrin. I am over eighteen years old, of sound mind, and fully competent to make this declaration.  I also have personal knowledge of the factual statements contained herein.  I provide this declaration in support of the motion to intervene.

2.    I am a primary care physician at Settlement Health and a Clinical Instructor of Internal Medicine & Pediatrics at Mount Sinai Hospital, both in New York, New York.  My driving mission as a physician is to improve the lives of children, adults, and their communities.

1

3.      I received my medical degree from Tulane University School of Medicine in New Orleans, Louisiana.  I did a dual medical residency in internal medicine and pediatrics at MedStar Georgetown University Hospital in Washington, D.C., where I was the Chief Resident.

4.      Since February 2024, I have served as the President and Chair of the Board of Doctors for America (DFA).  I previously served as both Vice Chair and Secretary of the Board and have been a member of DFA since 2018.

<u>DFA and its Members</u>

5.      DFA is a nonprofit organization organized under Section 501(c)(3) of the Internal Revenue Code.  Founded in 2009, DFA works on behalf of its members to improve the health of patients, communities, and the nation.  One of our guiding principles is that clinicians must take a leading role in improving health care and ending health disparities, and we provide our members with the tools to do so.  We advocate on our members' behalf for policies that allow them to provide equitable and accessible care to patients.

6.       DFA is comprised of more than 27,000 medical professionals, medical students, and health care advocates who live in all fifty states and the District of Columbia, work in various practice settings, including in hospitals, academia, and in private practice, and represent all areas of specialization.

7.      DFA members have access to various DFA resources, including continuing medical education and other training, events, and advocacy tools.  DFA also drafts resources to keep our members up to date on the latest developments in health policy.

8.      DFA members, including myself, serve in various capacities in the organization, including on the Board of Directors, and drive our organizational focus areas: health justice and equity; access to affordable care; and community health and prevention.  In each of these

Appx. 007

buckets, DFA provides education and training to its members and engages in advocacy at the state and federal levels.  Through these efforts, we work to improve outcomes for the patients we serve.

9.    DFA's health justice and equity work involves efforts to reduce health disparities among marginalized communities and populations.  As part of that work, DFA works to protect access to reproductive health care services for all patients.  DFA is also one of two founding organizational members of the Reproductive Health Coalition, a group of 120 medical-professional associations and allied organizations that collectively represent over 150 million voices in medicine, health care, and other groups.

<u>DFA Members and HIPAA</u>

10.    Many DFA members are "health care providers" and "covered entities" subject to the Health Insurance Portability and Accountability Act ("HIPAA") and its regulations, including the 2024 HIPAA Reproductive Health Rule ("2024 Rule").

11.    As professionals who are required to comply with HIPAA, these DFA members are impacted by any changes to the law and its regulations, which covered entities have relied on for decades.  These DFA members are required to have in place and adhere to HIPAA policies and procedures (and are subject to the internal HIPAA policies of the entities they work for), receive at least annual training on what HIPAA requires, and offer patients information about their rights under HIPAA.

12.    Day-to-day, our clinician members rely on HIPAA to guide when and how patient information may and may not be used or disclosed.  The presence of national baseline requirements regarding the use and disclosure of patient information helps DFA members stay confident that they are appropriately safeguarding patient information and adhering to their

Appx. 008

ethical obligations to do so.  In response to administrative subpoenas and investigative demands, for example, medical practices can rely on the three preconditions under HIPAA that must be met prior to disclosing medical information in order to appropriately protect patient information.

13.     DFA and its members believe that the privacy protections that HIPAA affords are integral to maintaining trust between clinicians and their patients—a key but fragile component of providing quality care.  We believe that privacy is necessary for the efficient and effective delivery of health care because trust and confidentiality are at the very core of the provider-patient relationship, and those relationships and the health care system as a whole, are built upon the willingness of individuals to share the most intimate details of their lives with their health care providers.  HIPAA is a key tool for assuring patients that their medical information will be protected, which increases patient trust, encourages patients to be open with their clinicians, and, in turn, allows us to give them the best possible care.

14.     If HIPAA and its underlying rules were in any way threatened, it would inject significant confusion into our jobs and impair the provider-patient relationship necessary to deliver adequate health care.  Without a federal standard to govern the use and disclosure of medical information, I do not know how clinicians could reliably share information without becoming expert in numerous state laws.  That would be time-consuming, costly, and unworkable, including because medical professionals would need to completely rebuild their privacy compliance programs, of which HIPAA has been the foundation for decades, thereby incurring unexpected and potentially significant compliance costs.

15.     The 2024 Rule specifically put in place important restrictions on using and sharing patient information about their reproductive health care, providing DFA's members with clarity on how they can use and disclose this particularly sensitive patient information.  Many

4

DFA members provide reproductive health services on a regular basis, while others provide such care as necessary.  Members who do not provide reproductive health care may obtain sensitive information about their patients' reproductive health care in the course of providing treatment, and record that information in the medical record.

16.    DFA members have been increasingly concerned that patient medical information may be sought and used improperly for non-health care purposes following the *Dobbs* decision, including from investigations into doctors providing legal and necessary health care and patients obtaining it.  The 2024 Rule has helped mitigate these risks to providers like many of DFA members and strengthened the doctor-patient relationship because it allows them to explain to patients how their reproductive health information is protected from misuse.  If the 2024 Rule is vacated, it is likely that some patients seeking reproductive health care would forgo such care, and that patients will withhold critical reproductive health information relevant for proper medical treatment from their clinicians.

17.    Without the protections of the 2024 Rule, providers would have less ability to protect the sensitive medical information they receive from misuse, and our members would face increased challenges in their ethical and professional duties to provide effective care to their patients.  Patients would not be willing to share relevant medical information with their providers for fear it may not be protected.  Other patients may forgo care altogether.  The provider-patient relationship, based on trust, would be fractured.  And, fundamentally, that would negatively affect patient care.  In turn, DFA would need to expend significant resources to account for this sea change in patient protection privacy—updating its materials and reorienting its advocacy work.

Appx. 010

Executed on January 12, 2025

Dr. Christine Petrin

6

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION**

Carmen Purl, M.D.; and Carmen Purl,
M.D., PLLC d/b/a Dr. Purl's Fast Care
Walk In Clinic,

         *Plaintiffs*,

    v.

United States Department of Health and
Human Services; Xavier Becerra, in his
official capacity as Secretary of the United
States Department of Health and Human
Services; Office for Civil Rights of the
United States Department of Health and
Human Services; and Melanie Fontes Rainer,
in her official capacity as Director of the
Office for Civil Rights of the United States
Department of Health and Human Services,

         *Defendants*.

Civil Action No. 2:24-cv-228-Z

<u>**DECLARATION OF DR. BETH OLLER**</u>

    I, Beth Oller, hereby declare under penalty of perjury as prescribed in 28 U.S.C. § 1746

that the following is true and correct:

    1.     My name is Beth Oller.  I am over eighteen years old, of sound mind, and fully

competent to make this declaration.  I also have personal knowledge of the factual statements

contained herein.  I submit this declaration in support of Doctors for America's ("DFA") motion

to intervene.

    2.     I have a Bachelor of Science in Nursing from the University of Kansas and

received my medical degree from the University of Kansas School of Medicine.  I did my

residency at the Wesley Family Medicine Residency Program in Wichita, Kansas.  Since I

1

completed my residency more than fifteen years ago, I have practiced medicine in Rooks
County, Kansas—a rural part of the state with approximately 5,000 residents.

3.      I am currently a primary care provider at the Rooks County Health Center.  I treat
hundreds of patients.  For more than a decade before that, I ran a small private practice in Rooks
County.

4.      I have been a member of DFA since 2022.  I became a member of DFA when I
became increasingly concerned that the Supreme Court would overturn the constitutional
protections related to abortion.

5.      Since then, I have relied on DFA's resources to educate myself and advocate for
laws and policies that increase access to reproductive and other health care.  For example,
Kansas is one of only a few states that has not expanded Medicaid.  I have used DFA's resources
to understand how I can directly support efforts to change that.  I have also attended several DFA
webinars and use DFA's communications to stay up to date on the laws and policies relevant to
my practice.

6.      As a family medicine physician, I care for patients of all ages.  My daily practice
involves everything from conducting yearly check-ups to treating common illnesses such as
colds and the flu and screening and treating for conditions such as high blood pressure or
diabetes.

7.      I also provide a range of reproductive healthcare.  For example, I provide birth
control and talk with my patients about family planning, refer pregnant patients to nearby
obstetricians and may provide them with interim care, help my patients manage miscarriages,
and treat moms (and their babies) post-birth.  For more than a decade of my career, I also
delivered babies.  My patients often provide me with their medical histories, which can include

sensitive information my patients intend to keep otherwise confidential, such as whether they have had an abortion.

8.      As a physician, I am subject to and must comply with the Health Insurance Portability and Accountability Act ("HIPAA") and its privacy rules.

9.      I use HIPAA and its privacy rules, including the 2024 HIPAA Reproductive Health Rule ("2024 Rule"), as tools to improve my work.  My ethical and professional duties are to provide the care my patients need.  An important part of satisfying those duties is making sure my patients know that they can trust me and that my clinic is safe for them.

10.      HIPAA and its privacy rules provide a backstop when I need to explain to my patients how their information may or may not be shared, including with family members who—especially in the small community in which I practice—may ask for it.  It's a foundational protection that my patients know and understand, and it's crucial to maintaining the confidentiality of my patients' records and, in turn, their trust.

11.      This trust is essential to my practice.  If patients don't believe that I'll keep their information private, they won't come to my office or they won't tell me everything I need to know to provide them with optimal care.  For example, if a patient who has miscarried before doesn't feel safe sharing that fact with me, I can't give her correct advice on how much time she should wait before trying to get pregnant again.

12.      In the context of providing reproductive health, this trust has been increasingly threatened since the *Dobbs* decision.  The 2024 Rule gives my patients an extra assurance that their particularly sensitive information will be kept private.  Without it, I would be concerned that my patients considering abortion care, for example, would no longer come to me to learn about their options.

3

13.     HIPAA and its privacy rules also help me work effectively with the other providers my patients see.  To provide comprehensive, quality care to my patients—and for my patients' other providers to do the same—we must share patient information.  Where I work in rural Kansas, that might even require me to share and receive patient information across state lines.  HIPAA and its privacy rules allow all providers to operate under a common baseline of patient privacy protections.

14.     If HIPAA was struck down, it would sow chaos in the medical profession and negatively impact my patients. HIPAA and its privacy rules are the building blocks on which other patient privacy laws and policies are crafted.  If the law or the 2024 Rule were thrown out, health care providers would need to update their policies based on the patchwork of state laws that would emerge (many of which had previously relied on HIPAA and its privacy rules) and their own assessments of the proper balance between patient privacy and other concerns.  And different practices might reach different conclusions, making it hard to share information among providers.  That would cause complications in my own practice when, for example, I had to send critical health information from a patient's neurologist in Nebraska or get information from a patient's OB-GYN three hours away in Wichita.

15.     Undermining HIPAA and its privacy rules, including the 2024 Rule, would be detrimental to patient health and public health generally.  HIPAA is the foundation of patient privacy, and my patients understand that their information is protected by federal law.  If HIPAA or the 2024 Rule were to be overturned, it would deeply harm the level of trust my patients have in me, threatening my relationships with them and inhibiting my ability to provide care for them.

4

Executed on January 14, 2025

Dr. Beth Oller

Appx. 016

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | |
|---|---|
| Carmen Purl, M.D.; and Carmen Purl, M.D., PLLC d/b/a Dr. Purl's Fast Care Walk In Clinic, <br><br> *Plaintiffs*, <br><br> v. <br><br> United States Department of Health and Human Services; Xavier Becerra, in his official capacity as Secretary of the United States Department of Health and Human Services; Office for Civil Rights of the United States Department of Health and Human Services; and Melanie Fontes Rainer, in her official capacity as Director of the Office for Civil Rights of the United States Department of Health and Human Services, <br><br> *Defendants*. | Civil Action No. 2:24-cv-228-Z |

## <u>DECLARATION OF SHELLY MITCHELL</u>

I, Shelly Mitchell, hereby declare under penalty of perjury as prescribed in 28 U.S.C.

§ 1746 that the following is true and correct:

1.      My name is Shelly Mitchell. I am over eighteen years old, of sound mind, and

fully competent to make this declaration. I also have personal knowledge of the factual

statements contained herein. I provide this declaration in support of the motion for intervention.

2.      I am the Health Information Manager and HIPAA Privacy and Security Officer

for the Columbus Department of Public Health ("Columbus Public Health"). Columbus Public

Health is a city department charged with protecting the health and improving the lives of all the

residents of Columbus, Ohio.

3.      I have worked for Columbus Public Health for nearly 24 years. As Columbus

Public Health's HIPAA Privacy and Security Officer, I have developed and keep up to date our

1

HIPAA compliance program. This includes ensuring that our HIPAA policies are enforced and that our patients' private health information remains secure. My responsibilities include providing HIPAA training to the roughly 600 employees of Columbus Public Health.

4.      Columbus Public Health operates a number of outpatient clinics where medical providers treat thousands of patients each year.  All clinics accept and bill both private and public insurers for patients who have health insurance.

5.      Columbus Public Health's clinics and many of its employees are "health care providers," and the clinics are a "covered entity" subject to the Health Insurance Portability and Accountability Act ("HIPAA") and its regulations, including the HIPAA 2000 Privacy Rule ("2000 Privacy Rule") and the 2024 HIPAA Reproductive Health Rule ("2024 Rule," and together, the "HIPAA Rules"). As a covered entity, Columbus Public Health is impacted by any changes to HIPAA and its regulations, which it has relied upon for more than 20 years. Because it is a HIPAA covered entity, Columbus Public Health clinics are required to have in place and adhere to HIPAA policies and procedures, provide at least annual training on what HIPAA requires, and offer patients information about their rights under HIPAA.

6.      I develop and update the annual HIPAA training materials and ensure that they reflect any changes to HIPAA rules and regulations. In addition to training, I provide updates on HIPAA compliance to all employees through a periodic department-wide newsletter.

7.      Columbus Public Health and our clinic providers have an interest in protecting the HIPAA Rules. The HIPAA Rules are a critical tool to support patient trust in their medical providers and to protect the confidentiality of sensitive patient information. Columbus Public Health clinicians rely on HIPAA to guide when and how patient information can and cannot be used or disclosed.

8.    The presence of national baseline requirements regarding the use and disclosure of patient information helps Columbus Public Health employees be confident that they are appropriately safeguarding patient information and adhering to their ethical obligations.

9.    Patients are often worried about their medical information being improperly disclosed or used to harm them. The HIPAA Privacy Rules help strengthen the provider-patient relationship and assure patients that they can trust their providers to safeguard their medical information.

10.    The 2000 Privacy Rule is foundational to our work at Columbus Public Health. The rule was promulgated shortly after I began my service at Columbus Public Health, and it serves as the basis for how patient information can be used and disclosed. Our providers have relied on it for more than 20 years. Columbus Public Health shaped its compliance programs around the 2000 Privacy Rule's requirements, and our employees have spent decades explaining to patients the rights and protections it affords them.

11.    If the 2000 Privacy Rule is vacated, it would create significant confusion across Columbus Public Health and impair the provider-patient relationship necessary for our clinics to deliver adequate health care. The legal basis underpinning our privacy policies would be gone, and we would need to think through our privacy compliance program from scratch. It would be difficult to understand how patient information would be protected. I would need to re-develop our privacy policies and training and re-train 600 employees on the impact of the HIPAA rules being struck down.

12.    This work would be time-consuming and costly. We would incur significant unexpected costs in both time and money to re-develop all of our patient privacy and compliance

3

systems and to analyze how we are able to use and share patient information in the absence of HIPAA.

13.     The 2024 Rule is also important to our work at Columbus Public Health. Columbus Public Health clinics and providers offer reproductive health care. The 2024 Rule put in place important restrictions on using and sharing patient information about their reproductive health care, giving Columbus Public Health's providers clarity on how they can use and disclose this sensitive patient information.

14.     Since the finalization of the 2024 Rule in April 2024, and in anticipation of the December 23, 2024 compliance deadline, I tracked developments regarding new requirements and spent numerous hours ensuring that our processes reflect the 2024 Rule's requirements. In preparation for the compliance deadline, I created our HIPAA attestation form and met with the managers affected by the 2024 Rule to discuss changes to our practices.

15.     If the 2024 Rule is vacated, our providers would have less ability to protect the sensitive medical information they receive from misuse and would face increased challenges in their ethical and professional duties to provide effective care to our residents. Additionally, Columbus Public Health would need to re-educate leadership and once again revise our processes to reflect those changes.

*(signature on following page)*

4

Executed on January 16, 2025

_Shelly Mitchell_
SHELLY MITCHELL

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION**

Carmen Purl, M.D.; and Carmen Purl,
M.D., PLLC d/b/a Dr. Purl's Fast Care
Walk In Clinic,

      *Plaintiffs*,

    v.

United States Department of Health and
Human Services; Xavier Becerra, in his
official capacity as Secretary of the United
States Department of Health and Human
Services; Office for Civil Rights of the
United States Department of Health and
Human Services; and Melanie Fontes Rainer,
in her official capacity as Director of the
Office for Civil Rights of the United States
Department of Health and Human Services,

      *Defendants*.

Civil Action No. 2:24-cv-228-Z

## <u>DECLARATION OF EDWARD JOHNSON</u>

I, Edward Johnson, hereby declare under penalty of perjury as prescribed in 28 U.S.C.

§ 1746 that the following is true and correct:

1.     My name is Edward Johnson. I am over eighteen years old, of sound mind, and

fully competent to make this declaration. I also have personal knowledge of the factual

statements contained herein. I provide this declaration in support of the motion for intervention.

2.     I am currently the Assistant Public Health Commissioner for External Affairs and

Acting Chief Health Equity Officer for the Columbus Department of Public Health ("Columbus

Public Health"). I have served as an Assistant Public Health Commissioner for close to three

years.

3.     Prior to my role as Assistant Public Health Commissioner, I served Columbus

Public Health as the Director of Public Health Policy for over four years.

1

4.      As Columbus Public Health's Assistant Public Health Commissioner for External Affairs and Acting Chief Health Equity Officer, I assist the Health Commissioner with representing the needs and concerns of Columbus' residents to protect their health and improve their lives.

Columbus Public Health

5.      The City of Columbus, Ohio, is a municipal corporation organized under Ohio law. Columbus has all the powers of local self-government and home rule under the constitution and laws of the state of Ohio, which are exercised in the manner prescribed by the Charter of the City of Columbus.

6.      Columbus, located in Franklin County, is the capital of Ohio. It is the largest city in the state and the fourteenth largest city in the United States, with a population of over 905,000, according to 2020 Census estimates.

7.      Columbus provides a wide range of services on behalf of its residents, including health services for families and children, public health, public assistance, and emergency medical care.

8.      Columbus's public health department, Columbus Public Health, is a city agency charged with protecting the health and improving the lives of all the residents of Columbus, Ohio. Columbus Public Health works to ensure that the Columbus community is protected from disease and other public health threats and that Columbus residents are empowered to live healthier lives.

9.      Columbus Public Health employs close to 600 employees who operate more than 90 different public health programs and provide critical services to residents. These programs and services include testing and treatment for sexually transmitted infections, including human

2

immunodeficiency virus ("HIV"), women's health and wellness services, postpartum and newborn home visiting, immunizations, dental services, and medication assisted treatment for substance use, among others.

10.     Columbus Public Health operates 9 outpatient clinics where doctors and nurse practitioners treat approximately 10,000 patients each year. Many of Columbus Public Health's employees work in these clinics, which include the Women's Health and Wellness Center and the Sexual Health and Wellness Center.

11.     All Columbus Public Health clinics accept and bill both private and public insurers for patients who have health insurance. Clinic staff members assist uninsured patients with enrolling in Medicaid. Clinics also provide free services for uninsured and underinsured patients.

12.     Columbus Public Health's Women's Health and Wellness Center provides confidential reproductive health care for women, their partners and teens; testing, treatment and prevention education for sexually transmitted infections; well woman annual exams and cancer screenings; contraceptive services, including long-acting methods (implant and IUD); reproductive life planning; pregnancy testing; and other medical services.

13.     A critical part of the Women's Health and Wellness Center's work relates to the provision of reproductive health care services. These services enable every Columbus resident to make and carry out their own reproductive decisions, consistent with Article I, Section 22 of the Ohio Constitution.

14.     Columbus's Sexual Health and Wellness Clinic offers testing and treatment for sexually transmitted infections, medication to prevent HIV infections, preconception health and

3

pregnancy testing, emergency contraception, and wellness services such as diabetes and cholesterol screenings, among others.

<u>Columbus Public Health and HIPAA Privacy Protections</u>

15.    Columbus Public Health's clinics are subject to HIPAA. Columbus Public Health is impacted by any changes to HIPAA and its regulations, which it has relied upon for decades.

16.    Columbus Public Health takes its HIPAA obligations seriously and employs a dedicated Health Information Manager and HIPAA Privacy and Security Officer.

17.    HIPAA and its relevant regulations, including the 2000 Privacy Rule and the 2024 HIPAA Reproductive Health Rule ("2024 Rule"), support the work of Columbus Public Health. National baseline requirements regarding the use and disclosure of patient information allow Columbus Public Health clinicians to be confident that they are appropriately protecting their patients' medical information.

18.    The privacy protections that HIPAA affords are critical to establishing and maintaining trust between our doctors and nurses and their patients. The delivery of quality health care depends on individuals being willing to share the most intimate details of their lives with their health care providers. HIPAA is a key tool providers can use to assure patients that their medical information will be kept safe. This increases patient trust, encourages patients to be open, and, in turn, allows clinicians to give them the best possible care.

19.    This is especially so for health care services provided by Columbus Public Health. Our clinics are often providers of last resort, serving patients who have no other options to receive care. Many of the clinics' patients come from historically marginalized communities. Medical mistrust can be even more common in communities of color and other communities that have been negatively affected by historical and current health care disparities.

4

20.     Many Columbus Public Health patients use our services because of the confidentiality they expect to receive from a community-based health center. Many of our patients seek treatment for sexually transmitted infections, substance abuse, and other forms of health care they fear may subject them to stigma. Even if they have family doctors, some patients—survivors of intimate partner violence, sex trafficking, and other vulnerable patients—seek our care because of the guarantee of confidentiality we can provide.

21.     Without the protection of HIPAA rules, some of our patients would be less likely to seek care.

22.     Fostering trust between clinicians and patients is also important to our public health mission. Accurate medical records assist Columbus Public Health in identifying problematic trends in public health and in evaluating the effectiveness of various public health programs. Policies that undermine the willingness of patients to share complete and accurate health information with providers undermine the overall objective of public health departments and can have negative impacts on a department's efforts to address community health concerns, like communicable diseases and vaccinations.

23.     If the 2000 Privacy Rule is vacated, it would create significant confusion for Columbus Public Health and harm the relationship between our clinicians and their patients. A trusting patient-provider relationship is necessary to deliver quality health care and to adequately address public health concerns across the City of Columbus. Without a federal standard to govern the use and disclosure of medical information, it is not clear to me know how Columbus Public Health clinicians could reliably share information without acquiring expertise in numerous state laws.

Appx. 026

24.     The 2024 Rule placed important restrictions on using and disclosing information about a patient's reproductive health care. Columbus Public Health's Women's Health and Wellness Center and Sexual Health and Wellness Center provide reproductive health services on a regular basis. The 2024 Rule provided Columbus Public Health's clinics with clarity on how to manage this particularly sensitive patient information. If the 2024 Rule is vacated, it is likely that some patients seeking reproductive health care would forgo such care, and that other patients would withhold critical reproductive health information relevant for proper medical treatment from their clinicians.

25.     Without the protections of the 2000 and 2024 Privacy Rules, it would be more difficult for Columbus Public Health providers to protect the sensitive medical information they receive from misuse. In turn, they may lose the trust of their patients, who would fear the release of their private information and be unwilling to be honest with providers or may choose not to seek treatment all together. Without the 2000 and 2024 Privacy Rules, Columbus Public Health will face increased challenges to providing effective care to patients and to identifying and addressing troubling health trends in the community. In addition, Columbus Public Health would need to expend significant resources to account for and address this development in patient privacy.

*(signature on following page)*

Executed on January 16, 2025

_____
EDWARD JOHNSON

7

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | |
|---|---|
| Carmen Purl, M.D.; and Carmen Purl, M.D., PLLC d/b/a Dr. Purl's Fast Care Walk In Clinic, <br><br> *Plaintiffs*, <br><br> v. <br><br> United States Department of Health and Human Services; Xavier Becerra, in his official capacity as Secretary of the United States Department of Health and Human Services; Office for Civil Rights of the United States Department of Health and Human Services; and Melanie Fontes Rainer, in her official capacity as Director of the Office for Civil Rights of the United States Department of Health and Human Services, <br><br> *Defendants*. | Civil Action No. 2:24-cv-228-Z |

## DECLARATION OF JANEL HEINRICH

I, JANEL HEINRICH, hereby declare under penalty of perjury as prescribed in 28 U.S.C. § 1746 that the following is true and correct:

1.       My name is Janel Heinrich. I am over eighteen years old, of sound mind, and fully competent to make this declaration. I also have personal knowledge of the factual statements contained herein. I provide this declaration in support of the motion for intervention.

2.       I am currently the Director of Public Health Madison and Dane County. I have held that position since I was appointed to it pursuant to Wis. Stat. § 62.51 and Wis. Stat. § 251.06(4)(a) by the Mayor of the City of Madison and the Dane County Executive and confirmed by a vote of the Common Council of Madison and County Board. I have served in this position for more than 14 years.

1

3.      In my position as the Director of Public Health, I serve as the "local health

officer" for the City of Madison and the County of Dane under Wis. Stat. § 251.06. This position

carries many responsibilities, including but not limited to administering the department,

enforcing state public health statutes, and providing information to the public "as to the causes,

nature and prevention of prevalent diseases, and the preservation and improvement of health."

### Madison and Public Health Madison and Dane County

4.      The City of Madison, Wisconsin, is a municipal corporation organized under

Wisconsin law. Wis. Stat. Ch. 66. Madison has all the powers of local self-government and home

rule under the constitution and laws of the state of Wisconsin.

5.      Madison, located in Dane County, is the capital of Wisconsin. It is the second

largest city in the state, with a population of over 269,000, according to 2020 Census estimates.

6.      Madison provides a wide range of services on behalf of its residents, including

health services for families and children, public health, and emergency medical care. It carries

out these essential duties in part through Public Health Madison and Dane County.

7.      Public Health Madison and Dane County is an agency with the mission of

"working with the community to enhance, protect, and promote the health of the environment

and the well-being of all people." We work to ensure that the Madison and Dane County

community is protected from disease and other public health threats and that our residents are

empowered to live healthier lives.

8.      Public Health Madison and Dane County employs over 200 people operating

several public health programs and providing critical services to residents. These programs and

services include sexual and reproductive health testing, testing and treatment for tuberculosis,

cancer screening, immunizations, treatment for sexually transmitted infections, Nurse Family

Partnership providing home visits for maternal and infant health, communicable disease testing, among others.

9.      Because our mission encompasses the health of the entire community, our programs not only provide treatment to our community, but also prevention and improvement of health outcomes.

10.     Public Health Madison and Dane County operates a number of outpatient clinics where staff treat thousands of patients per year. At least 2000 patients sought sexual or reproductive health services in the past year.

11.     Public Health Madison and Dane County clinics accept and bill public insurers for patients who have health insurance. Clinics provide services to both uninsured and underinsured patients.

12.     Public Health Madison and Dane County serves the community regardless of ability to pay. Our clinics are often providers of last resort, serving the city's most vulnerable populations.

13.     A critical part of our work relates to the provision of reproductive and sexual health care services. These services enable every Madison resident to make and carry out their own reproductive decisions consistent with Wisconsin law.

14.     Public Health Madison and Dane County operates a sexual health clinic, where we provide reproductive health care; testing, treatment and prevention education for sexually transmitted infections; immunizations; contraceptive services; pregnancy testing; and other medical services.

3

## **Public Health and HIPAA Privacy Protections**

15.     Public Health Madison and Dane County is a covered entity under Health Insurance Portability and Accountability Act ("HIPAA") and its regulations. Public Health Madison and Dane County is impacted by any changes to HIPAA and its regulations, which it has relied upon for decades.

16.     Patient privacy is foundational to Public Health Madison and Dane County's work. We regularly train all our employees on HIPAA compliance, regardless of whether they work in a clinical setting.

17.     HIPAA and its regulations, including the 2000 Privacy Rule and the 2024 Rule, have made the work of Public Health Madison and Dane County stronger and better. The presence of national baseline requirements regarding the use and disclosure of patient information helps Public Health Madison and Dane County providers stay confident that they are appropriately safeguarding patient information and adhering to their ethical obligations to do so.

18.     In the event of requests for information from third parties, for example, Public Health Madison and Dane County can rely on HIPAA to disclose medical information in a way that appropriately protects patient information.

19.     Our patients expect confidentiality as part of our services, and we have a reputation of trust in our community. This reputation is built, in part, by the infrastructure created to comply with the 2000 Privacy Rule in our clinics. Our clinicians, patients and community have relied on the protections established by these practices for more than two decades.

20.     HIPAA's privacy protections help us maintain trust between our clinicians and our patients. Privacy is necessary for the efficient and effective delivery of health care because trust and confidentiality are at the very core of the provider-patient relationship, and those

relationships and the health care system as a whole, are built upon the willingness of individuals to share the most intimate details of their lives with their health care providers. If patients are not confident in the privacy of their medical information, they will not disclose as much to their providers.

21.     HIPAA is a key tool for assuring patients that their medical information will be protected, which increases patient trust, encourages patients to be open and honest with their clinicians, and, in turn, allows us to give them the best possible care.

22.     This is especially so for health care services provided by Public Health Madison and Dane County. As providers of last resort, we serve patients who often have no other options to receive care. Many of the clinics' patients come from historically marginalized communities, including immigrant community members. Medical mistrust can be even more common in communities of color and other communities that have been negatively affected by historical and current health care disparities.

23.     Public Health Madison and Dane County provides services to all, no matter what their background or circumstances. Many of our patients are only willing to seek care with us because of the confidentiality they expect to receive from a community-based health center, especially patients who seek treatment for sexually transmitted infections and other forms of health care they fear may subject them to stigma.

24.     Even if they have family doctors, some patients – survivors of intimate partner violence, minors facing difficult or even dangerous circumstances, and other vulnerable patients, for example – seek our care because of the guarantee of confidentiality we can provide.

25.     Public Health Madison and Dane County is trusted in our community and we have support for the work we do. The HIPAA privacy rules are part and parcel to this reputation.

They help us maintain trusting relationships between patients from historically disadvantaged communities and their clinical providers. The importance of this trust relationship is heightened for us as a governmental entity, where many may hold fears associated with seeking help from or sharing information with the government.

26.     Fostering trust between clinicians and patients is important to Public Health Madison and Dane County both as a provider of direct services and as the public health authority for the City of Madison. Accurate medical records assist communities in identifying troubling public health trends and in evaluating the effectiveness of various public health efforts. Policies that undermine the willingness of individuals to provide complete and accurate health information to providers undermine the overall objective of public health departments and can have negative impacts on a department's efforts to address community health concerns, like communicable diseases and vaccinations.

27.     If the 2000 Privacy Rule is vacated, it would create significant confusion for Public Health Madison and Dane County and impair the provider-patient relationship necessary to deliver adequate health care as well as to adequately address public health concerns in the City of Madison. Without a federal standard to govern the use and disclosure of medical information, I do not know how Public Health Madison and Dane County clinicians could reliably share information without becoming expert in numerous state laws. We would have to re-develop protocols and re-train all of our staff. That would be time-consuming, costly, and unworkable, including because Public Health Madison and Dane County may need to completely rebuild its privacy compliance programs, of which HIPAA has been the foundation for decades, thereby incurring unexpected and potentially significant compliance costs.

Appx. 034

28.    The 2024 Rule put in place important restrictions on sharing patient information about their reproductive health care, providing Public Health Madison and Dane County's clinics with clarity on how they can use and disclose this particularly sensitive patient information. Public Health Madison and Dane County's Sexual Health Clinic provides reproductive health services on a regular basis. Clinics and clinicians may obtain sensitive information about their patients' medical care in the course of providing treatment wholly unrelated to reproductive or sexual health and record that information in the medical record. If the 2024 Rule is vacated, it is likely that some patients seeking reproductive health care would forgo such care, and that patients will withhold critical reproductive health information relevant for proper medical treatment from their clinicians.

29.    Without the protections of the 2000 and 2024 Rules, Public Health Madison and Dane County providers would have less ability to protect sensitive medical information they receive from misuse. Public Health Madison and Dane County will face increased challenges to provide effective care to patients and to identify and address troubling health trends in the community. Patients would not be willing to share relevant medical information with their providers for fear it may not be protected. Other patients may forgo care altogether. Without these protections, health care professionals, such as those employed by Public Health Madison and Dane County, lose the trust of their patients and cannot deliver high-quality care. In turn, Public Health Madison and Dane County would need to expend significant resources to account for and address this development in patient privacy.

*(signature on following page)*

7

Executed on January 16, 2025

JANEL HEINRICH

8

Appx. 036

PL 104–191, August 21, 1996, 110 Stat 1936

UNITED STATES PUBLIC LAWS

104th Congress - Second Session

Convening January 3, 1996

Additions and Deletions are not identified in this document.

8848

PL 104–191 (HR 3103)

August 21, 1996

HEALTH INSURANCE PORTABILITY AND ACCOUNTABILITY ACT

An Act to amend the Internal Revenue Code of 1986 to improve portability and continuity of health insurance coverage in the group and individual markets, to combat waste, fraud, and abuse in health insurance and health care delivery, to promote the use of medical savings accounts, to improve access to long-term care services and coverage, to simplify the administration of health insurance, and for other purposes.

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,

<< 42 USCA § 210 NOTE >>

SECTION 1. SHORT TITLE; TABLE OF CONTENTS.

(a) SHORT TITLE.—This Act may be cited as the "Health Insurance Portability and Accountability Act of 1996".

(b) TABLE OF CONTENTS.—The table of contents of this Act is as follows:

Sec. 1. Short title; table of contents.

TITLE I—HEALTH CARE ACCESS, PORTABILITY, AND RENEWABILITY

Subtitle A—Group Market Rules

PART 1—PORTABILITY, ACCESS, AND RENEWABILITY REQUIREMENTS

Sec. 101. Through the Employee Retirement Income Security Act of 1974.

"PART 7—GROUP HEALTH PLAN PORTABILITY, ACCESS, AND RENEWABILITY REQUIREMENTS

"Sec. 701. Increased portability through limitation on preexisting condition exclusions.
"Sec. 702. Prohibiting discrimination against individual participants and beneficiaries based on health status.
"Sec. 703. Guaranteed renewability in multiemployer plans and multiple employer welfare arrangements.
"Sec. 704. Preemption; State flexibility; construction.
"Sec. 705. Special rules relating to group health plans.
"Sec. 706. Definitions.
"Sec. 707. Regulations.".

Sec. 102. Through the Public Health Service Act.

"TITLE XXVII—ASSURING PORTABILITY, AVAILABILITY,
AND RENEWABILITY OF HEALTH INSURANCE COVERAGE

"PART A—GROUP MARKET REFORMS

"Subpart 1—Portability, Access, and Renewability Requirements
"Sec. 2701. Increased portability through limitation on preexisting condition exclusions.
"Sec. 2702. Prohibiting discrimination against individual participants and beneficiaries based on health status.

"Subpart 2—Provisions Applicable Only to Health Insurance Issuers
"Sec. 2711. Guaranteed availability of coverage for employers in the group market.

"Sec. 2712. Guaranteed renewability of coverage for employers in the group market.
"Sec. 2713. Disclosure of information.

"Subpart 3—Exclusion of Plans; Enforcement; Preemption
"Sec. 2721. Exclusion of certain plans.
"Sec. 2722. Enforcement.
"Sec. 2723. Preemption; State flexibility; construction.

"PART C—DEFINITIONS; MISCELLANEOUS PROVISIONS
"Sec. 2791. Definitions.
"Sec. 2792. Regulations.".

Sec. 103. Reference to implementation through the Internal Revenue Code of 1986.

Sec. 104. Assuring coordination.

Subtitle B—Individual Market Rules

Sec. 111. Amendment to Public Health Service Act.

"PART B—INDIVIDUAL MARKET RULES
"Sec. 2741. Guaranteed availability of individual health insurance coverage to certain individuals with prior group coverage.
"Sec. 2742. Guaranteed renewability of individual health insurance coverage.
"Sec. 2743. Certification of coverage.
"Sec. 2744. State flexibility in individual market reforms.
"Sec. 2745. Enforcement.
"Sec. 2746. Preemption.
"Sec. 2747. General exceptions.".

Subtitle C—General and Miscellaneous Provisions

Sec. 191. Health coverage availability studies.

Sec. 192. Report on Medicare reimbursement of telemedicine.

Sec. 193. Allowing federally-qualified HMOs to offer high deductible plans.

Sec. 194. Volunteer services provided by health professionals at free clinics.

Sec. 195. Findings; severability.

Case 2:24-cv-00228-Z    Document 50-1    Filed 01/17/25    Page 39 of 882    PageID 48824

TITLE II—PREVENTING HEALTH CARE FRAUD AND ABUSE;
ADMINISTRATIVE SIMPLIFICATION; MEDICAL LIABILITY REFORM

Sec. 200. References in title.

Subtitle A—Fraud and Abuse Control Program

Sec. 201. Fraud and abuse control program.

Sec. 202. Medicare integrity program.

Sec. 203. Beneficiary incentive programs.

Sec. 204. Application of certain health antifraud and abuse sanctions to fraud and abuse against Federal health care programs.

Sec. 205. Guidance regarding application of health care fraud and abuse sanctions.

Subtitle B—Revisions to Current Sanctions for Fraud and Abuse

Sec. 211. Mandatory exclusion from participation in Medicare and State health care programs.

Sec. 212. Establishment of minimum period of exclusion for certain individuals and entities subject to permissive exclusion from Medicare and State health care programs.

Sec. 213. Permissive exclusion of individuals with ownership or control interest in sanctioned entities.

Sec. 214. Sanctions against practitioners and persons for failure to comply with statutory obligations.

Sec. 215. Intermediate sanctions for Medicare health maintenance organizations.

Sec. 216. Additional exception to anti-kickback penalties for risk-sharing arrangements.

Sec. 217. Criminal penalty for fraudulent disposition of assets in order to obtain medicaid benefits.

Sec. 218. Effective date.

Subtitle C—Data Collection

Sec. 221. Establishment of the health care fraud and abuse data collection program.

Subtitle D—Civil Monetary Penalties

Sec. 231. Social Security Act civil monetary penalties.

Sec. 232. Penalty for false certification for home health services.

Subtitle E—Revisions to Criminal Law

Sec. 241. Definitions relating to Federal health care offense.

Sec. 242. Health care fraud.

Sec. 243. Theft or embezzlement.

Sec. 244. False statements.

Sec. 245. Obstruction of criminal investigations of health care offenses.

Sec. 246. Laundering of monetary instruments.

Sec. 247. Injunctive relief relating to health care offenses.

Sec. 248. Authorized investigative demand procedures.

Sec. 249. Forfeitures for Federal health care offenses.

Sec. 250. Relation to ERISA authority.

Subtitle F—Administrative Simplification

Sec. 261. Purpose.

Sec. 262. Administrative simplification.

"PART C—ADMINISTRATIVE SIMPLIFICATION

"Sec. 1171. Definitions.
"Sec. 1172. General requirements for adoption of standards.
"Sec. 1173. Standards for information transactions and data elements.
"Sec. 1174. Timetables for adoption of standards.
"Sec. 1175. Requirements.
"Sec. 1176. General penalty for failure to comply with requirements and standards.
"Sec. 1177. Wrongful disclosure of individually identifiable health information.
"Sec. 1178. Effect on State law.
"Sec. 1179. Processing payment transactions.".

Sec. 263. Changes in membership and duties of National Committee on Vital and Health Statistics.

Sec. 264. Recommendations with respect to privacy of certain health information.

Subtitle G—Duplication and Coordination of Medicare-Related Plans.

Sec. 271. Duplication and coordination of Medicare-related plans.

TITLE III—TAX–RELATED HEALTH PROVISIONS

Sec. 300. Amendment of 1986 Code.

Subtitle A—Medical Savings Accounts

Sec. 301. Medical savings accounts.

Subtitle B—Increase in Deduction for Health Insurance Costs of Self–Employed Individuals

Sec. 311. Increase in deduction for health insurance costs of self-employed individuals.

Subtitle C—Long–Term Care Services and Contracts

PART I—GENERAL PROVISIONS

Sec. 321. Treatment of long-term care insurance.

Sec. 322. Qualified long-term care services treated as medical care.

Sec. 323. Reporting requirements.

PART II—CONSUMER PROTECTION PROVISIONS

Sec. 325. Policy requirements.

Sec. 326. Requirements for issuers of qualified long-term care insurance contracts.

Sec. 327. Effective dates.

Subtitle D—Treatment of Accelerated Death Benefits

Sec. 331. Treatment of accelerated death benefits by recipient.

Sec. 332. Tax treatment of companies issuing qualified accelerated death benefit riders.

Subtitle E—State Insurance Pools

Sec. 341. Exemption from income tax for State-sponsored organizations providing health coverage for high-risk individuals.

Sec. 342. Exemption from income tax for State-sponsored workmen's compensation reinsurance organizations.

Subtitle F—Organizations Subject to Section 833

Sec. 351. Organizations subject to section 833.

Subtitle G—IRA Distributions to the Unemployed

Sec. 361. Distributions from certain plans may be used without additional tax to pay financially devastating medical expenses.

Subtitle H—Organ and Tissue Donation Information Included With Income Tax Refund Payments

Sec. 371. Organ and tissue donation information included with income tax refund payments.

TITLE IV—APPLICATION AND ENFORCEMENT OF GROUP HEALTH PLAN REQUIREMENTS

Subtitle A—Application and Enforcement of Group Health Plan Requirements

Sec. 401. Group health plan portability, access, and renewability requirements.

Sec. 402. Penalty on failure to meet certain group health plan requirements.

Subtitle B—Clarification of Certain Continuation Coverage Requirements

Sec. 421. COBRA clarifications.

TITLE V—REVENUE OFFSETS

Sec. 500. Amendment of 1986 Code.

Subtitle A—Company–Owned Life Insurance

Sec. 501. Denial of deduction for interest on loans with respect to company-owned life insurance.

Subtitle B—Treatment of Individuals Who Lose United States Citizenship

Sec. 511. Revision of income, estate, and gift taxes on individuals who lose United States citizenship.

Sec. 512. Information on individuals losing United States citizenship.

Sec. 513. Report on tax compliance by United States citizens and residents living abroad.

Subtitle C—Repeal of Financial Institution Transition Rule to Interest Allocation Rules

Sec. 521. Repeal of financial institution transition rule to interest allocation rules.

TITLE I—HEALTH CARE ACCESS, PORTABILITY, AND RENEWABILITY

Subtitle A—Group Market Rules

PART 1—PORTABILITY, ACCESS, AND RENEWABILITY REQUIREMENTS

SEC. 101. THROUGH THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974.

(a) IN GENERAL.—Subtitle B of title I of the Employee Retirement Income Security Act of 1974 is amended by adding at the end the following new part:

<< 29 USCA Ch. 18 >>

"PART 7—GROUP HEALTH PLAN PORTABILITY, ACCESS, AND RENEWABILITY REQUIREMENTS

<< 29 USCA § 1181 >>

"SEC. 701. INCREASED PORTABILITY THROUGH LIMITATION ON PREEXISTING CONDITION EXCLUSIONS.

"(a) LIMITATION ON PREEXISTING CONDITION EXCLUSION PERIOD; CREDITING FOR PERIODS OF PREVIOUS COVERAGE.—Subject to subsection (d), a group health plan, and a health insurance issuer offering group health insurance coverage, may, with respect to a participant or beneficiary, impose a preexisting condition exclusion only if—

"(1) such exclusion relates to a condition (whether physical or mental), regardless of the cause of the condition, for which medical advice, diagnosis, care, or treatment was recommended or received within the 6–month period ending on the enrollment date;

"(2) such exclusion extends for a period of not more than 12 months (or 18 months in the case of a late enrollee) after the enrollment date; and

"(3) the period of any such preexisting condition exclusion is reduced by the aggregate of the periods of creditable coverage (if any, as defined in subsection (c)(1)) applicable to the participant or beneficiary as of the enrollment date.

"(b) DEFINITIONS.—For purposes of this part—

"(1) PREEXISTING CONDITION EXCLUSION.—

"(A) IN GENERAL.—The term 'preexisting condition exclusion' means, with respect to coverage, a limitation or exclusion of benefits relating to a condition based on the fact that the condition was present before the date of enrollment for such coverage, whether or not any medical advice, diagnosis, care, or treatment was recommended or received before such date.

"(B) TREATMENT OF GENETIC INFORMATION.—Genetic information shall not be treated as a condition described in subsection (a)(1) in the absence of a diagnosis of the condition related to such information.

"(2) ENROLLMENT DATE.—The term 'enrollment date' means, with respect to an individual covered under a group health plan or health insurance coverage, the date of enrollment of the individual in the plan or coverage or, if earlier, the first day of the waiting period for such enrollment.

"(3) LATE ENROLLEE.—The term 'late enrollee' means, with respect to coverage under a group health plan, a participant or beneficiary who enrolls under the plan other than during—

"(A) the first period in which the individual is eligible to enroll under the plan, or

"(B) a special enrollment period under subsection (f).

"(4) WAITING PERIOD.—The term 'waiting period' means, with respect to a group health plan and an individual who is a potential participant or beneficiary in the plan, the period that must pass with respect to the individual before the individual is eligible to be covered for benefits under the terms of the plan.

"(c) RULES RELATING TO CREDITING PREVIOUS COVERAGE.—

"(1) CREDITABLE COVERAGE DEFINED.—For purposes of this part, the term 'creditable coverage' means, with respect to an individual, coverage of the individual under any of the following:

"(A) A group health plan.

"(B) Health insurance coverage.

"(C) Part A or part B of title XVIII of the Social Security Act.

"(D) Title XIX of the Social Security Act, other than coverage consisting solely of benefits under section 1928.

"(E) Chapter 55 of title 10, United States Code.

"(F) A medical care program of the Indian Health Service or of a tribal organization.

"(G) A State health benefits risk pool.

"(H) A health plan offered under chapter 89 of title 5, United States Code.

"(I) A public health plan (as defined in regulations).

"(J) A health benefit plan under section 5(e) of the Peace Corps Act (22 U.S.C. 2504(e)).

Such term does not include coverage consisting solely of coverage of excepted benefits (as defined in section 706(c)).

"(2) NOT COUNTING PERIODS BEFORE SIGNIFICANT BREAKS IN COVERAGE.—

"(A) IN GENERAL.—A period of creditable coverage shall not be counted, with respect to enrollment of an individual under a group health plan, if, after such period and before the enrollment date, there was a 63–day period during all of which the individual was not covered under any creditable coverage.

"(B) WAITING PERIOD NOT TREATED AS A BREAK IN COVERAGE.—For purposes of subparagraph (A) and subsection (d)(4), any period that an individual is in a waiting period for any coverage under a group health plan (or for group health insurance coverage) or is in an affiliation period (as defined in subsection (g)(2)) shall not be taken into account in determining the continuous period under subparagraph (A).

"(3) METHOD OF CREDITING COVERAGE.—

"(A) STANDARD METHOD.—Except as otherwise provided under subparagraph (B), for purposes of applying subsection (a)(3), a group health plan, and a health insurance issuer offering group health insurance coverage, shall count a period of creditable coverage without regard to the specific benefits covered during the period.

"(B) ELECTION OF ALTERNATIVE METHOD.—A group health plan, or a health insurance issuer offering group health insurance coverage, may elect to apply subsection (a)(3) based on coverage of benefits within each of several classes or categories of benefits specified in regulations rather than as provided under subparagraph (A). Such election shall be made on a uniform basis for all participants and beneficiaries. Under such election a group health plan or issuer shall count a period of creditable coverage with respect to any class or category of benefits if any level of benefits is covered within such class or category.

"(C) PLAN NOTICE.—In the case of an election with respect to a group health plan under subparagraph (B) (whether or not health insurance coverage is provided in connection with such plan), the plan shall—

"(i) prominently state in any disclosure statements concerning the plan, and state to each enrollee at the time of enrollment under the plan, that the plan has made such election, and

"(ii) include in such statements a description of the effect of this election.

"(4) ESTABLISHMENT OF PERIOD.—Periods of creditable coverage with respect to an individual shall be established through presentation of certifications described in subsection (e) or in such other manner as may be specified in regulations.

"(d) EXCEPTIONS.—

"(1) EXCLUSION NOT APPLICABLE TO CERTAIN NEWBORNS.—Subject to paragraph (4), a group health plan, and a health insurance issuer offering group health insurance coverage, may not impose any preexisting condition exclusion in the case of an individual who, as of the last day of the 30–day period beginning with the date of birth, is covered under creditable coverage.

"(2) EXCLUSION NOT APPLICABLE TO CERTAIN ADOPTED CHILDREN.—Subject to paragraph (4), a group health plan, and a health insurance issuer offering group health insurance coverage, may not impose any preexisting condition exclusion in the case of a child who is adopted or placed for adoption before attaining 18 years of age and who, as of the last day of the 30–day period beginning on the date of the adoption or placement for adoption, is covered under creditable coverage. The previous sentence shall not apply to coverage before the date of such adoption or placement for adoption.

"(3) EXCLUSION NOT APPLICABLE TO PREGNANCY.—A group health plan, and health insurance issuer offering group health insurance coverage, may not impose any preexisting condition exclusion relating to pregnancy as a preexisting condition.

"(4) LOSS IF BREAK IN COVERAGE.—Paragraphs (1) and (2) shall no longer apply to an individual after the end of the first 63–day period during all of which the individual was not covered under any creditable coverage.

"(e) CERTIFICATIONS AND DISCLOSURE OF COVERAGE.—

"(1) REQUIREMENT FOR CERTIFICATION OF PERIOD OF CREDITABLE COVERAGE.—

"(A) IN GENERAL.—A group health plan, and a health insurance issuer offering group health insurance coverage, shall provide the certification described in subparagraph (B)—

"(i) at the time an individual ceases to be covered under the plan or otherwise becomes covered under a COBRA continuation provision,

"(ii) in the case of an individual becoming covered under such a provision, at the time the individual ceases to be covered under such provision, and

"(iii) on the request on behalf of an individual made not later than 24 months after the date of cessation of the coverage described in clause (i) or (ii), whichever is later.

The certification under clause (i) may be provided, to the extent practicable, at a time consistent with notices required under any applicable COBRA continuation provision.

"(B) CERTIFICATION.—The certification described in this subparagraph is a written certification of—

"(i) the period of creditable coverage of the individual under such plan and the coverage (if any) under such COBRA continuation provision, and

"(ii) the waiting period (if any) (and affiliation period, if applicable) imposed with respect to the individual for any coverage under such plan.

"(C) ISSUER COMPLIANCE.—To the extent that medical care under a group health plan consists of group health insurance coverage, the plan is deemed to have satisfied the certification requirement under this paragraph if the health insurance issuer offering the coverage provides for such certification in accordance with this paragraph.

"(2) DISCLOSURE OF INFORMATION ON PREVIOUS BENEFITS.—In the case of an election described in subsection (c)(3)(B) by a group health plan or health insurance issuer, if the plan or issuer enrolls an individual for coverage under the plan and the individual provides a certification of coverage of the individual under paragraph (1)—

"(A) upon request of such plan or issuer, the entity which issued the certification provided by the individual shall promptly disclose to such requesting plan or issuer information on coverage of classes and categories of health benefits available under such entity's plan or coverage, and

"(B) such entity may charge the requesting plan or issuer for the reasonable cost of disclosing such information.

"(3) REGULATIONS.—The Secretary shall establish rules to prevent an entity's failure to provide information under paragraph (1) or (2) with respect to previous coverage of an individual from adversely affecting any subsequent coverage of the individual under another group health plan or health insurance coverage.

"(f) SPECIAL ENROLLMENT PERIODS.—

"(1) INDIVIDUALS LOSING OTHER COVERAGE.—A group health plan, and a health insurance issuer offering group health insurance coverage in connection with a group health plan, shall permit an employee who is eligible, but not enrolled, for coverage under the terms of the plan (or a dependent of such an employee if the dependent is eligible, but not enrolled, for coverage under such terms) to enroll for coverage under the terms of the plan if each of the following conditions is met:

"(A) The employee or dependent was covered under a group health plan or had health insurance coverage at the time coverage was previously offered to the employee or dependent.

"(B) The employee stated in writing at such time that coverage under a group health plan or health insurance coverage was the reason for declining enrollment, but only if the plan sponsor or issuer (if applicable) required such a statement at such time and provided the employee with notice of such requirement (and the consequences of such requirement) at such time.

"(C) The employee's or dependent's coverage described in subparagraph (A)—

"(i) was under a COBRA continuation provision and the coverage under such provision was exhausted; or

"(ii) was not under such a provision and either the coverage was terminated as a result of loss of eligibility for the coverage (including as a result of legal separation, divorce, death, termination of employment, or reduction in the number of hours of employment) or employer contributions toward such coverage were terminated.

"(D) Under the terms of the plan, the employee requests such enrollment not later than 30 days after the date of exhaustion of coverage described in subparagraph (C)(i) or termination of coverage or employer contribution described in subparagraph (C)(ii).

"(2) FOR DEPENDENT BENEFICIARIES.—

"(A) IN GENERAL.—If—

"(i) a group health plan makes coverage available with respect to a dependent of an individual,

"(ii) the individual is a participant under the plan (or has met any waiting period applicable to becoming a participant under the plan and is eligible to be enrolled under the plan but for a failure to enroll during a previous enrollment period), and

"(iii) a person becomes such a dependent of the individual through marriage, birth, or adoption or placement for adoption,

the group health plan shall provide for a dependent special enrollment period described in subparagraph (B) during which the person (or, if not otherwise enrolled, the individual) may be enrolled under the plan as a dependent of the individual, and in the case of the birth or adoption of a child, the spouse of the individual may be enrolled as a dependent of the individual if such spouse is otherwise eligible for coverage.

"(B) DEPENDENT SPECIAL ENROLLMENT PERIOD.—A dependent special enrollment period under this subparagraph shall be a period of not less than 30 days and shall begin on the later of—

"(i) the date dependent coverage is made available, or

"(ii) the date of the marriage, birth, or adoption or placement for adoption (as the case may be) described in subparagraph (A)(iii).

"(C) NO WAITING PERIOD.—If an individual seeks to enroll a dependent during the first 30 days of such a dependent special enrollment period, the coverage of the dependent shall become effective—

"(i) in the case of marriage, not later than the first day of the first month beginning after the date the completed request for enrollment is received;

"(ii) in the case of a dependent's birth, as of the date of such birth; or

"(iii) in the case of a dependent's adoption or placement for adoption, the date of such adoption or placement for adoption.

"(g) USE OF AFFILIATION PERIOD BY HMOS AS ALTERNATIVE TO PREEXISTING CONDITION EXCLUSION.—

"(1) IN GENERAL.—In the case of a group health plan that offers medical care through health insurance coverage offered by a health maintenance organization, the plan may provide for an affiliation period with respect to coverage through the organization only if—

"(A) no preexisting condition exclusion is imposed with respect to coverage through the organization,

"(B) the period is applied uniformly without regard to any health status-related factors, and

"(C) such period does not exceed 2 months (or 3 months in the case of a late enrollee).

"(2) AFFILIATION PERIOD.—

"(A) DEFINED.—For purposes of this part, the term 'affiliation period' means a period which, under the terms of the health insurance coverage offered by the health maintenance organization, must expire before the health insurance coverage becomes effective. The organization is not required to provide health care services or benefits during such period and no premium shall be charged to the participant or beneficiary for any coverage during the period.

"(B) BEGINNING.—Such period shall begin on the enrollment date.

"(C) RUNS CONCURRENTLY WITH WAITING PERIODS.—An affiliation period under a plan shall run concurrently with any waiting period under the plan.

"(3) ALTERNATIVE METHODS.—A health maintenance organization described in paragraph (1) may use alternative methods, from those described in such paragraph, to address adverse selection as approved by the State insurance commissioner or official or officials designated by the State to enforce the requirements of part A of title XXVII of the Public Health Service Act for the State involved with respect to such issuer.

<< 29 USCA § 1182 >>

"SEC. 702. PROHIBITING DISCRIMINATION AGAINST INDIVIDUAL PARTICIPANTS AND BENEFICIARIES BASED ON HEALTH STATUS.

  "(a) IN ELIGIBILITY TO ENROLL.—
  "(1) IN GENERAL.—Subject to paragraph (2), a group health plan, and a health insurance issuer offering group health insurance coverage in connection with a group health plan, may not establish rules for eligibility (including continued eligibility) of any individual to enroll under the terms of the plan based on any of the following health status-related factors in relation to the individual or a dependent of the individual:
    "(A) Health status.
    "(B) Medical condition (including both physical and mental illnesses).
    "(C) Claims experience.
    "(D) Receipt of health care.
    "(E) Medical history.
    "(F) Genetic information.
    "(G) Evidence of insurability (including conditions arising out of acts of domestic violence).
    "(H) Disability.
  "(2) NO APPLICATION TO BENEFITS OR EXCLUSIONS.—To the extent consistent with section 701, paragraph (1) shall not be construed—
    "(A) to require a group health plan, or group health insurance coverage, to provide particular benefits other than those provided under the terms of such plan or coverage, or
    "(B) to prevent such a plan or coverage from establishing limitations or restrictions on the amount, level, extent, or nature of the benefits or coverage for similarly situated individuals enrolled in the plan or coverage.
  "(3) CONSTRUCTION.—For purposes of paragraph (1), rules for eligibility to enroll under a plan include rules defining any applicable waiting periods for such enrollment.
  "(b) IN PREMIUM CONTRIBUTIONS.—
  "(1) IN GENERAL.—A group health plan, and a health insurance issuer offering health insurance coverage in connection with a group health plan, may not require any individual (as a condition of enrollment or continued enrollment under the plan) to pay a premium or contribution which is greater than such premium or contribution for a similarly situated individual enrolled in the plan on the basis of any health status-related factor in relation to the individual or to an individual enrolled under the plan as a dependent of the individual.
  "(2) CONSTRUCTION.—Nothing in paragraph (1) shall be construed—
    "(A) to restrict the amount that an employer may be charged for coverage under a group health plan; or
    "(B) to prevent a group health plan, and a health insurance issuer offering group insurance coverage, from establishing premium discounts or rebates or modifying otherwise applicable copayments or deductibles in return for adherence to programs of health promotion and disease prevention.

<< 29 USCA § 1183 >>

"SEC. 703. GUARANTEED RENEWABILITY IN MULTIEMPLOYER PLANS AND MULTIPLE EMPLOYER WELFARE ARRANGEMENTS.

  "A group health plan which is a multiemployer plan or which is a multiple employer welfare arrangement may not deny an employer whose employees are covered under such a plan continued access to the same or different coverage under the terms of such a plan, other than—
    "(1) for nonpayment of contributions;
    "(2) for fraud or other intentional misrepresentation of material fact by the employer;
    "(3) for noncompliance with material plan provisions;
    "(4) because the plan is ceasing to offer any coverage in a geographic area;

"(5) in the case of a plan that offers benefits through a network plan, there is no longer any individual enrolled through the employer who lives, resides, or works in the service area of the network plan and the plan applies this paragraph uniformly without regard to the claims experience of employers or any health status-related factor in relation to such individuals or their dependents; and

"(6) for failure to meet the terms of an applicable collective bargaining agreement, to renew a collective bargaining or other agreement requiring or authorizing contributions to the plan, or to employ employees covered by such an agreement.

<< 29 USCA § 1184 >>

"SEC. 704. PREEMPTION; STATE FLEXIBILITY; CONSTRUCTION.

"(a) CONTINUED APPLICABILITY OF STATE LAW WITH RESPECT TO HEALTH INSURANCE ISSUERS.—

"(1) IN GENERAL.—Subject to paragraph (2) and except as provided in subsection (b), this part shall not be construed to supersede any provision of State law which establishes, implements, or continues in effect any standard or requirement solely relating to health insurance issuers in connection with group health insurance coverage except to the extent that such standard or requirement prevents the application of a requirement of this part.

"(2) CONTINUED PREEMPTION WITH RESPECT TO GROUP HEALTH PLANS.—Nothing in this part shall be construed to affect or modify the provisions of section 514 with respect to group health plans.

"(b) SPECIAL RULES IN CASE OF PORTABILITY REQUIREMENTS.—

"(1) IN GENERAL.—Subject to paragraph (2), the provisions of this part relating to health insurance coverage offered by a health insurance issuer supersede any provision of State law which establishes, implements, or continues in effect a standard or requirement applicable to imposition of a preexisting condition exclusion specifically governed by section 701 which differs from the standards or requirements specified in such section.

"(2) EXCEPTIONS.—Only in relation to health insurance coverage offered by a health insurance issuer, the provisions of this part do not supersede any provision of State law to the extent that such provision—

"(A) substitutes for the reference to '6–month period' in section 701(a)(1) a reference to any shorter period of time;

"(B) substitutes for the reference to '12 months' and '18 months' in section 701(a)(2) a reference to any shorter period of time;

"(C) substitutes for the references to '63 days' in sections 701(c)(2)(A) and (d)(4)(A) a reference to any greater number of days;

"(D) substitutes for the reference to '30–day period' in sections 701(b)(2) and (d)(1) a reference to any greater period;

"(E) prohibits the imposition of any preexisting condition exclusion in cases not described in section 701(d) or expands the exceptions described in such section;

"(F) requires special enrollment periods in addition to those required under section 701(f); or

"(G) reduces the maximum period permitted in an affiliation period under section 701(g)(1)(B).

"(c) RULES OF CONSTRUCTION.—Nothing in this part shall be construed as requiring a group health plan or health insurance coverage to provide specific benefits under the terms of such plan or coverage.

"(d) DEFINITIONS.—For purposes of this section—

"(1) STATE LAW.—The term 'State law' includes all laws, decisions, rules, regulations, or other State action having the effect of law, of any State. A law of the United States applicable only to the District of Columbia shall be treated as a State law rather than a law of the United States.

"(2) STATE.—The term 'State' includes a State, the Northern Mariana Islands, any political subdivisions of a State or such Islands, or any agency or instrumentality of either.

<< 29 USCA § 1185 >>

"SEC. 705. SPECIAL RULES RELATING TO GROUP HEALTH PLANS.

"(a) GENERAL EXCEPTION FOR CERTAIN SMALL GROUP HEALTH PLANS.—The requirements of this part shall not apply to any group health plan (and group health insurance coverage offered in connection with a group health plan) for any plan year if, on the first day of such plan year, such plan has less than 2 participants who are current employees.

"(b) EXCEPTION FOR CERTAIN BENEFITS.—The requirements of this part shall not apply to any group health plan (and group health insurance coverage) in relation to its provision of excepted benefits described in section 706(c)(1).

"(c) EXCEPTION FOR CERTAIN BENEFITS IF CERTAIN CONDITIONS MET.—

"(1) LIMITED, EXCEPTED BENEFITS.—The requirements of this part shall not apply to any group health plan (and group health insurance coverage offered in connection with a group health plan) in relation to its provision of excepted benefits described in section 706(c)(2) if the benefits—

"(A) are provided under a separate policy, certificate, or contract of insurance; or

"(B) are otherwise not an integral part of the plan.

"(2) NONCOORDINATED, EXCEPTED BENEFITS.—The requirements of this part shall not apply to any group health plan (and group health insurance coverage offered in connection with a group health plan) in relation to its provision of excepted benefits described in section 706(c)(3) if all of the following conditions are met:

"(A) The benefits are provided under a separate policy, certificate, or contract of insurance.

"(B) There is no coordination between the provision of such benefits and any exclusion of benefits under any group health plan maintained by the same plan sponsor.

"(C) Such benefits are paid with respect to an event without regard to whether benefits are provided with respect to such an event under any group health plan maintained by the same plan sponsor.

"(3) SUPPLEMENTAL EXCEPTED BENEFITS.—The requirements of this part shall not apply to any group health plan (and group health insurance coverage) in relation to its provision of excepted benefits described in section 706(c)(4) if the benefits are provided under a separate policy, certificate, or contract of insurance.

"(d) TREATMENT OF PARTNERSHIPS.—For purposes of this part—

"(1) TREATMENT AS A GROUP HEALTH PLAN.—Any plan, fund, or program which would not be (but for this subsection) an employee welfare benefit plan and which is established or maintained by a partnership, to the extent that such plan, fund, or program provides medical care (including items and services paid for as medical care) to present or former partners in the partnership or to their dependents (as defined under the terms of the plan, fund, or program), directly or through insurance, reimbursement, or otherwise, shall be treated (subject to paragraph (2)) as an employee welfare benefit plan which is a group health plan.

"(2) EMPLOYER.—In the case of a group health plan, the term 'employer' also includes the partnership in relation to any partner.

"(3) PARTICIPANTS OF GROUP HEALTH PLANS.—In the case of a group health plan, the term 'participant' also includes—

"(A) in connection with a group health plan maintained by a partnership, an individual who is a partner in relation to the partnership, or

"(B) in connection with a group health plan maintained by a self-employed individual (under which one or more employees are participants), the self-employed individual,

if such individual is, or may become, eligible to receive a benefit under the plan or such individual's beneficiaries may be eligible to receive any such benefit.

<< 29 USCA § 1186 >>

"SEC. 706. DEFINITIONS.

"(a) GROUP HEALTH PLAN.—For purposes of this part—

"(1) IN GENERAL.—The term 'group health plan' means an employee welfare benefit plan to the extent that the plan provides medical care (as defined in paragraph (2) and including items and services paid for as medical care) to employees or their dependents (as defined under the terms of the plan) directly or through insurance, reimbursement, or otherwise.

"(2) MEDICAL CARE.—The term 'medical care' means amounts paid for—

"(A) the diagnosis, cure, mitigation, treatment, or prevention of disease, or amounts paid for the purpose of affecting any structure or function of the body,

"(B) amounts paid for transportation primarily for and essential to medical care referred to in subparagraph (A), and

"(C) amounts paid for insurance covering medical care referred to in subparagraphs (A) and (B).

"(b) DEFINITIONS RELATING TO HEALTH INSURANCE.—For purposes of this part—

"(1) HEALTH INSURANCE COVERAGE.—The term 'health insurance coverage' means benefits consisting of medical care (provided directly, through insurance or reimbursement, or otherwise and including items and services paid for as medical care) under any hospital or medical service policy or certificate, hospital or medical service plan contract, or health maintenance organization contract offered by a health insurance issuer.

"(2) HEALTH INSURANCE ISSUER.—The term 'health insurance issuer' means an insurance company, insurance service, or insurance organization (including a health maintenance organization, as defined in paragraph (3)) which is licensed to engage in the business of insurance in a State and which is subject to State law which regulates insurance (within the meaning of section 514(b)(2)). Such term does not include a group health plan.

"(3) HEALTH MAINTENANCE ORGANIZATION.—The term 'health maintenance organization' means—

"(A) a federally qualified health maintenance organization (as defined in section 1301(a) of the Public Health Service Act (42 U.S.C. 300e(a))),

"(B) an organization recognized under State law as a health maintenance organization, or

"(C) a similar organization regulated under State law for solvency in the same manner and to the same extent as such a health maintenance organization.

"(4) GROUP HEALTH INSURANCE COVERAGE.—The term 'group health insurance coverage' means, in connection with a group health plan, health insurance coverage offered in connection with such plan.

"(c) EXCEPTED BENEFITS.—For purposes of this part, the term 'excepted benefits' means benefits under one or more (or any combination thereof) of the following:

"(1) BENEFITS NOT SUBJECT TO REQUIREMENTS.—

"(A) Coverage only for accident, or disability income insurance, or any combination thereof.

"(B) Coverage issued as a supplement to liability insurance.

"(C) Liability insurance, including general liability insurance and automobile liability insurance.

"(D) Workers' compensation or similar insurance.

"(E) Automobile medical payment insurance.

"(F) Credit-only insurance.

"(G) Coverage for on-site medical clinics.

"(H) Other similar insurance coverage, specified in regulations, under which benefits for medical care are secondary or incidental to other insurance benefits.

"(2) BENEFITS NOT SUBJECT TO REQUIREMENTS IF OFFERED SEPARATELY.—

"(A) Limited scope dental or vision benefits.

"(B) Benefits for long-term care, nursing home care, home health care, community-based care, or any combination thereof.

"(C) Such other similar, limited benefits as are specified in regulations.

"(3) BENEFITS NOT SUBJECT TO REQUIREMENTS IF OFFERED AS INDEPENDENT, NONCOORDINATED BENEFITS.—

"(A) Coverage only for a specified disease or illness.

"(B) Hospital indemnity or other fixed indemnity insurance.

"(4) BENEFITS NOT SUBJECT TO REQUIREMENTS IF OFFERED AS SEPARATE INSURANCE POLICY.—Medicare supplemental health insurance (as defined under section 1882(g)(1) of the Social Security Act), coverage supplemental to the coverage provided under chapter 55 of title 10, United States Code, and similar supplemental coverage provided to coverage under a group health plan.

"(d) OTHER DEFINITIONS.—For purposes of this part—

"(1) COBRA CONTINUATION PROVISION.—The term 'COBRA continuation provision' means any of the following:

"(A) Part 6 of this subtitle.

"(B) Section 4980B of the Internal Revenue Code of 1986, other than subsection (f)(1) of such section insofar as it relates to pediatric vaccines.

"(C) Title XXII of the Public Health Service Act.

"(2) HEALTH STATUS–RELATED FACTOR.—The term 'health status-related factor' means any of the factors described in section 702(a)(1).

"(3) NETWORK PLAN.—The term 'network plan' means health insurance coverage offered by a health insurance issuer under which the financing and delivery of medical care (including items and services paid for as medical care) are provided, in whole or in part, through a defined set of providers under contract with the issuer.

"(4) PLACED FOR ADOPTION.—The term 'placement', or being 'placed', for adoption, has the meaning given such term in section 609(c)(3)(B).

<< 29 USCA § 1187 >>

"SEC. 707. REGULATIONS.

"The Secretary, consistent with section 104 of the Health Care Portability and Accountability Act of 1996, may promulgate such regulations as may be necessary or appropriate to carry out the provisions of this part. The Secretary may promulgate any interim final rules as the Secretary determines are appropriate to carry out this part.".

<< 29 USCA § 1132 >>

(b) ENFORCEMENT WITH RESPECT TO HEALTH INSURANCE ISSUERS.—Section 502(b) of such Act (29 U.S.C. 1132(b)) is amended by adding at the end the following new paragraph:

"(3) The Secretary is not authorized to enforce under this part any requirement of part 7 against a health insurance issuer offering health insurance coverage in connection with a group health plan (as defined in section 706(a)(1)). Nothing in this paragraph shall affect the authority of the Secretary to issue regulations to carry out such part.".

(c) DISCLOSURE OF INFORMATION TO PARTICIPANTS AND BENEFICIARIES.—

<< 29 USCA § 1024 >>

(1) IN GENERAL.—Section 104(b)(1) of such Act (29 U.S.C. 1024(b)(1)) is amended in the matter following subparagraph (B)—

(A) by striking "102(a)(1)," and inserting "102(a)(1) (other than a material reduction in covered services or benefits provided in the case of a group health plan (as defined in section 706(a)(1))),"; and

(B) by adding at the end the following new sentences: "If there is a modification or change described in section 102(a)(1) that is a material reduction in covered services or benefits provided under a group health plan (as defined in section 706(a)(1)), a summary description of such modification or change shall be furnished to participants and beneficiaries not later than 60 days after the date of the adoption of the modification or change. In the alternative, the plan sponsors may provide such description at regular intervals of not more than 90 days. The Secretary shall issue regulations within 180 days after the date of enactment of the Health Insurance Portability and Accountability Act of 1996, providing alternative mechanisms to delivery by mail through which group health plans (as so defined) may notify participants and beneficiaries of material reductions in covered services or benefits.".

<< 29 USCA § 1022 >>

(2) PLAN DESCRIPTION AND SUMMARY.—Section 102(b) of such Act (29 U.S.C. 1022(b)) is amended—

(A) by inserting "in the case of a group health plan (as defined in section 706(a)(1)), whether a health insurance issuer (as defined in section 706(b)(2)) is responsible for the financing or administration (including payment of claims) of the plan and (if so) the name and address of such issuer;" after "type of administration of the plan;"; and

(B) by inserting "including the office at the Department of Labor through which participants and beneficiaries may seek assistance or information regarding their rights under this Act and the Health Insurance Portability and Accountability Act of 1996 with respect to health benefits that are offered through a group health plan (as defined in section 706(a)(1))" after "benefits under the plan".

Appx. 050

14

<< 29 USCA § 1003 >>

(d) TREATMENT OF HEALTH INSURANCE ISSUERS OFFERING HEALTH INSURANCE COVERAGE TO NONCOVERED PLANS.—Section 4(b) of such Act (29 U.S.C. 1003(b)) is amended by adding at the end (after and below paragraph (5)) the following:

"The provisions of part 7 of subtitle B shall not apply to a health insurance issuer (as defined in section 706(b)(2)) solely by reason of health insurance coverage (as defined in section 706(b)(1)) provided by such issuer in connection with a group health plan (as defined in section 706(a)(1)) if the provisions of this title do not apply to such group health plan.".

(e) REPORTING AND ENFORCEMENT WITH RESPECT TO CERTAIN ARRANGEMENTS.—

<< 29 USCA § 1021 >>

(1) IN GENERAL.—Section 101 of such Act (29 U.S.C. 1021) is amended—
    (A) by redesignating subsection (g) as subsection (h), and
    (B) by inserting after subsection (f) the following new subsection:
"(g) REPORTING BY CERTAIN ARRANGEMENTS.—The Secretary may, by regulation, require multiple employer welfare arrangements providing benefits consisting of medical care (within the meaning of section 706(a)(2)) which are not group health plans to report, not more frequently than annually, in such form and such manner as the Secretary may require for the purpose of determining the extent to which the requirements of part 7 are being carried out in connection with such benefits.".

<< 29 USCA § 1132 >>

(2) ENFORCEMENT.—
    (A) IN GENERAL.—Section 502 of such Act (29 U.S.C. 1132) is amended—
      (i) in subsection (a)(6), by striking "under subsection (c)(2) or (i) or (l)" and inserting "under paragraph (2), (4), or (5) of subsection (c) or under subsection (i) or (l)"; and
      (ii) in the last 2 sentences of subsection (c), by striking "For purposes of this paragraph" and all that follows through "The Secretary and" and inserting the following:
"(5) The Secretary may assess a civil penalty against any person of up to $1,000 a day from the date of the person's failure or refusal to file the information required to be filed by such person with the Secretary under regulations prescribed pursuant to section 101(g).
"(6) The Secretary and".
    (B) TECHNICAL AND CONFORMING AMENDMENT.—Section 502(c)(1) of such Act (29 U.S.C. 1132(c)(1)) is amended by adding at the end the following sentence: "For purposes of this paragraph, each violation described in subparagraph (A) with respect to any single participant, and each violation described in subparagraph (B) with respect to any single participant or beneficiary, shall be treated as a separate violation.".

<< 29 USCA § 1136 >>

(3) COORDINATION.—Section 506 of such Act (29 U.S.C. 1136) is amended by adding at the end the following new subsection:
"(c) COORDINATION OF ENFORCEMENT WITH STATES WITH RESPECT TO CERTAIN ARRANGEMENTS.—A State may enter into an agreement with the Secretary for delegation to the State of some or all of the Secretary's authority under sections 502 and 504 to enforce the requirements under part 7 in connection with multiple employer welfare arrangements, providing medical care (within the meaning of section 706(a)(2)), which are not group health plans.".
  (f) CONFORMING AMENDMENTS.—

<< 29 USCA § 1144 >>

(1) Section 514(b) of such Act (29 U.S.C. 1144(b)) is amended by adding at the end the following new paragraph:

"(9) For additional provisions relating to group health plans, see section 704.".

  (2)(A) Part 6 of subtitle B of title I of such Act (29 U.S.C. 1161 et seq.) is amended by striking the heading and inserting the following:

<< 29 USCA Ch. 18 >>

  "PART 6—CONTINUATION COVERAGE AND ADDITIONAL STANDARDS FOR GROUP HEALTH PLANS".

  (B) The table of contents in section 1 of such Act is amended by striking the item relating to the heading for part 6 of subtitle B of title I and inserting the following:

  "PART 6—CONTINUATION COVERAGE AND ADDITIONAL STANDARDS FOR GROUP HEALTH PLANS".

  (3) The table of contents in section 1 of such Act (as amended by the preceding provisions of this section) is amended by inserting after the items relating to part 6 the following new items:

  "PART 7—GROUP HEALTH PLAN PORTABILITY, ACCESS, AND RENEWABILITY REQUIREMENTS

"Sec. 701. Increased portability through limitation on preexisting condition exclusions.

"Sec. 702. Prohibiting discrimination against individual participants and beneficiaries based on health status.

"Sec. 703. Guaranteed renewability in multiemployer plans and multiple employer welfare arrangements.

"Sec. 704. Preemption; State flexibility; construction.

"Sec. 705. Special rules relating to group health plans.

"Sec. 706. Definitions.

"Sec. 707. Regulations.".

<< 29 USCA §§ 1003 nt, 1021 nt, 1022 nt, 1024 nt, 1132 nt, 1136 nt, 1144 nt >>

<< 29 USCA §§ 1181 NOTE, 1182 nt, 1183 nt, 1184 nt, 1185 nt, 1186 nt, 1187 nt >>

(g) EFFECTIVE DATES.—

  (1) IN GENERAL.—Except as provided in this section, this section (and the amendments made by this section) shall apply with respect to group health plans for plan years beginning after June 30, 1997.

  (2) DETERMINATION OF CREDITABLE COVERAGE.—

    (A) PERIOD OF COVERAGE.—

      (i) IN GENERAL.—Subject to clause (ii), no period before July 1, 1996, shall be taken into account under part 7 of subtitle B of title I of the Employee Retirement Income Security Act of 1974 (as added by this section) in determining creditable coverage.

      (ii) SPECIAL RULE FOR CERTAIN PERIODS.—The Secretary of Labor, consistent with section 104, shall provide for a process whereby individuals who need to establish creditable coverage for periods before July 1, 1996, and who would have such coverage credited but for clause (i) may be given credit for creditable coverage for such periods through the presentation of documents or other means.

    (B) CERTIFICATIONS, ETC.—

      (i) IN GENERAL.—Subject to clauses (ii) and (iii), subsection (e) of section 701 of the Employee Retirement Income Security Act of 1974 (as added by this section) shall apply to events occurring after June 30, 1996.

      (ii) NO CERTIFICATION REQUIRED TO BE PROVIDED BEFORE JUNE 1, 1997.—In no case is a certification required to be provided under such subsection before June 1, 1997.

      (iii) CERTIFICATION ONLY ON WRITTEN REQUEST FOR EVENTS OCCURRING BEFORE OCTOBER 1, 1996. —In the case of an event occurring after June 30, 1996, and before October 1, 1996, a certification is not required to be provided under such subsection unless an individual (with respect to whom the certification is otherwise required to be made) requests such certification in writing.

(C) TRANSITIONAL RULE.—In the case of an individual who seeks to establish creditable coverage for any period for which certification is not required because it relates to an event occurring before June 30, 1996—

 (i) the individual may present other credible evidence of such coverage in order to establish the period of creditable coverage; and

 (ii) a group health plan and a health insurance issuer shall not be subject to any penalty or enforcement action with respect to the plan's or issuer's crediting (or not crediting) such coverage if the plan or issuer has sought to comply in good faith with the applicable requirements under the amendments made by this section.

 (3) SPECIAL RULE FOR COLLECTIVE BARGAINING AGREEMENTS.—Except as provided in paragraph (2), in the case of a group health plan maintained pursuant to one or more collective bargaining agreements between employee representatives and one or more employers ratified before the date of the enactment of this Act, part 7 of subtitle B of title I of Employee Retirement Income Security Act of 1974 (other than section 701(e) thereof) shall not apply to plan years beginning before the later of—

 (A) the date on which the last of the collective bargaining agreements relating to the plan terminates (determined without regard to any extension thereof agreed to after the date of the enactment of this Act), or

 (B) July 1, 1997.

For purposes of subparagraph (A), any plan amendment made pursuant to a collective bargaining agreement relating to the plan which amends the plan solely to conform to any requirement of such part shall not be treated as a termination of such collective bargaining agreement.

 (4) TIMELY REGULATIONS.—The Secretary of Labor, consistent with section 104, shall first issue by not later than April 1, 1997, such regulations as may be necessary to carry out the amendments made by this section.

 (5) LIMITATION ON ACTIONS.—No enforcement action shall be taken, pursuant to the amendments made by this section, against a group health plan or health insurance issuer with respect to a violation of a requirement imposed by such amendments before January 1, 1998, or, if later, the date of issuance of regulations referred to in paragraph (4), if the plan or issuer has sought to comply in good faith with such requirements.

SEC. 102. THROUGH THE PUBLIC HEALTH SERVICE ACT.

 (a) IN GENERAL.—The Public Health Service Act is amended by adding at the end the following new title:

<< 42 USCA Ch. 6A >>

"TITLE XXVII—ASSURING PORTABILITY, AVAILABILITY,
AND RENEWABILITY OF HEALTH INSURANCE COVERAGE

"PART A—GROUP MARKET REFORMS

"Subpart 1—Portability, Access, and Renewability Requirements

<< 42 USCA § 300gg >>

"SEC. 2701. INCREASED PORTABILITY THROUGH LIMITATION ON PREEXISTING CONDITION EXCLUSIONS.

 "(a) LIMITATION ON PREEXISTING CONDITION EXCLUSION PERIOD; CREDITING FOR PERIODS OF PREVIOUS COVERAGE.—Subject to subsection (d), a group health plan, and a health insurance issuer offering group health insurance coverage, may, with respect to a participant or beneficiary, impose a preexisting condition exclusion only if—

 "(1) such exclusion relates to a condition (whether physical or mental), regardless of the cause of the condition, for which medical advice, diagnosis, care, or treatment was recommended or received within the 6–month period ending on the enrollment date;

 "(2) such exclusion extends for a period of not more than 12 months (or 18 months in the case of a late enrollee) after the enrollment date; and

"(3) the period of any such preexisting condition exclusion is reduced by the aggregate of the periods of creditable coverage (if any, as defined in subsection (c)(1)) applicable to the participant or beneficiary as of the enrollment date.

"(b) DEFINITIONS.—For purposes of this part—

"(1) PREEXISTING CONDITION EXCLUSION.—

"(A) IN GENERAL.—The term 'preexisting condition exclusion' means, with respect to coverage, a limitation or exclusion of benefits relating to a condition based on the fact that the condition was present before the date of enrollment for such coverage, whether or not any medical advice, diagnosis, care, or treatment was recommended or received before such date.

"(B) TREATMENT OF GENETIC INFORMATION.—Genetic information shall not be treated as a condition described in subsection (a)(1) in the absence of a diagnosis of the condition related to such information.

"(2) ENROLLMENT DATE.—The term 'enrollment date' means, with respect to an individual covered under a group health plan or health insurance coverage, the date of enrollment of the individual in the plan or coverage or, if earlier, the first day of the waiting period for such enrollment.

"(3) LATE ENROLLEE.—The term 'late enrollee' means, with respect to coverage under a group health plan, a participant or beneficiary who enrolls under the plan other than during—

"(A) the first period in which the individual is eligible to enroll under the plan, or

"(B) a special enrollment period under subsection (f).

"(4) WAITING PERIOD.—The term 'waiting period' means, with respect to a group health plan and an individual who is a potential participant or beneficiary in the plan, the period that must pass with respect to the individual before the individual is eligible to be covered for benefits under the terms of the plan.

"(c) RULES RELATING TO CREDITING PREVIOUS COVERAGE.—

"(1) CREDITABLE COVERAGE DEFINED.—For purposes of this title, the term 'creditable coverage' means, with respect to an individual, coverage of the individual under any of the following:

"(A) A group health plan.

"(B) Health insurance coverage.

"(C) Part A or part B of title XVIII of the Social Security Act.

"(D) Title XIX of the Social Security Act, other than coverage consisting solely of benefits under section 1928.

"(E) Chapter 55 of title 10, United States Code.

"(F) A medical care program of the Indian Health Service or of a tribal organization.

"(G) A State health benefits risk pool.

"(H) A health plan offered under chapter 89 of title 5, United States Code.

"(I) A public health plan (as defined in regulations).

"(J) A health benefit plan under section 5(e) of the Peace Corps Act (22 U.S.C. 2504(e)).

Such term does not include coverage consisting solely of coverage of excepted benefits (as defined in section 2791(c)).

"(2) NOT COUNTING PERIODS BEFORE SIGNIFICANT BREAKS IN COVERAGE.—

"(A) IN GENERAL.—A period of creditable coverage shall not be counted, with respect to enrollment of an individual under a group health plan, if, after such period and before the enrollment date, there was a 63–day period during all of which the individual was not covered under any creditable coverage.

"(B) WAITING PERIOD NOT TREATED AS A BREAK IN COVERAGE.—For purposes of subparagraph (A) and subsection (d)(4), any period that an individual is in a waiting period for any coverage under a group health plan (or for group health insurance coverage) or is in an affiliation period (as defined in subsection (g)(2)) shall not be taken into account in determining the continuous period under subparagraph (A).

"(3) METHOD OF CREDITING COVERAGE.—

"(A) STANDARD METHOD.—Except as otherwise provided under subparagraph (B), for purposes of applying subsection (a)(3), a group health plan, and a health insurance issuer offering group health insurance coverage, shall count a period of creditable coverage without regard to the specific benefits covered during the period.

"(B) ELECTION OF ALTERNATIVE METHOD.—A group health plan, or a health insurance issuer offering group health insurance, may elect to apply subsection (a)(3) based on coverage of benefits within each of several classes or categories of benefits specified in regulations rather than as provided under subparagraph (A). Such election shall be made on a uniform

basis for all participants and beneficiaries. Under such election a group health plan or issuer shall count a period of creditable coverage with respect to any class or category of benefits if any level of benefits is covered within such class or category.

"(C) PLAN NOTICE.—In the case of an election with respect to a group health plan under subparagraph (B) (whether or not health insurance coverage is provided in connection with such plan), the plan shall—

"(i) prominently state in any disclosure statements concerning the plan, and state to each enrollee at the time of enrollment under the plan, that the plan has made such election, and

"(ii) include in such statements a description of the effect of this election.

"(D) ISSUER NOTICE.—In the case of an election under subparagraph (B) with respect to health insurance coverage offered by an issuer in the small or large group market, the issuer—

"(i) shall prominently state in any disclosure statements concerning the coverage, and to each employer at the time of the offer or sale of the coverage, that the issuer has made such election, and

"(ii) shall include in such statements a description of the effect of such election.

"(4) ESTABLISHMENT OF PERIOD.—Periods of creditable coverage with respect to an individual shall be established through presentation of certifications described in subsection (e) or in such other manner as may be specified in regulations.
"(d) EXCEPTIONS.—

"(1) EXCLUSION NOT APPLICABLE TO CERTAIN NEWBORNS.—Subject to paragraph (4), a group health plan, and a health insurance issuer offering group health insurance coverage, may not impose any preexisting condition exclusion in the case of an individual who, as of the last day of the 30–day period beginning with the date of birth, is covered under creditable coverage.

"(2) EXCLUSION NOT APPLICABLE TO CERTAIN ADOPTED CHILDREN.—Subject to paragraph (4), a group health plan, and a health insurance issuer offering group health insurance coverage, may not impose any preexisting condition exclusion in the case of a child who is adopted or placed for adoption before attaining 18 years of age and who, as of the last day of the 30-day period beginning on the date of the adoption or placement for adoption, is covered under creditable coverage. The previous sentence shall not apply to coverage before the date of such adoption or placement for adoption.

"(3) EXCLUSION NOT APPLICABLE TO PREGNANCY.—A group health plan, and health insurance issuer offering group health insurance coverage, may not impose any preexisting condition exclusion relating to pregnancy as a preexisting condition.

"(4) LOSS IF BREAK IN COVERAGE.—Paragraphs (1) and (2) shall no longer apply to an individual after the end of the first 63–day period during all of which the individual was not covered under any creditable coverage.
"(e) CERTIFICATIONS AND DISCLOSURE OF COVERAGE.—

"(1) REQUIREMENT FOR CERTIFICATION OF PERIOD OF CREDITABLE COVERAGE.—

"(A) IN GENERAL.—A group health plan, and a health insurance issuer offering group health insurance coverage, shall provide the certification described in subparagraph (B)—

"(i) at the time an individual ceases to be covered under the plan or otherwise becomes covered under a COBRA continuation provision,

"(ii) in the case of an individual becoming covered under such a provision, at the time the individual ceases to be covered under such provision, and

"(iii) on the request on behalf of an individual made not later than 24 months after the date of cessation of the coverage described in clause (i) or (ii), whichever is later.

The certification under clause (i) may be provided, to the extent practicable, at a time consistent with notices required under any applicable COBRA continuation provision.

"(B) CERTIFICATION.—The certification described in this subparagraph is a written certification of—

"(i) the period of creditable coverage of the individual under such plan and the coverage (if any) under such COBRA continuation provision, and

"(ii) the waiting period (if any) (and affiliation period, if applicable) imposed with respect to the individual for any coverage under such plan.

"(C) ISSUER COMPLIANCE.—To the extent that medical care under a group health plan consists of group health insurance coverage, the plan is deemed to have satisfied the certification requirement under this paragraph if the health insurance issuer offering the coverage provides for such certification in accordance with this paragraph.

"(2) DISCLOSURE OF INFORMATION ON PREVIOUS BENEFITS.—In the case of an election described in subsection (c)(3)(B) by a group health plan or health insurance issuer, if the plan or issuer enrolls an individual for coverage under the plan and the individual provides a certification of coverage of the individual under paragraph (1)—

"(A) upon request of such plan or issuer, the entity which issued the certification provided by the individual shall promptly disclose to such requesting plan or issuer information on coverage of classes and categories of health benefits available under such entity's plan or coverage, and

"(B) such entity may charge the requesting plan or issuer for the reasonable cost of disclosing such information.

"(3) REGULATIONS.—The Secretary shall establish rules to prevent an entity's failure to provide information under paragraph (1) or (2) with respect to previous coverage of an individual from adversely affecting any subsequent coverage of the individual under another group health plan or health insurance coverage.

"(f) SPECIAL ENROLLMENT PERIODS.—

"(1) INDIVIDUALS LOSING OTHER COVERAGE.—A group health plan, and a health insurance issuer offering group health insurance coverage in connection with a group health plan, shall permit an employee who is eligible, but not enrolled, for coverage under the terms of the plan (or a dependent of such an employee if the dependent is eligible, but not enrolled, for coverage under such terms) to enroll for coverage under the terms of the plan if each of the following conditions is met:

"(A) The employee or dependent was covered under a group health plan or had health insurance coverage at the time coverage was previously offered to the employee or dependent.

"(B) The employee stated in writing at such time that coverage under a group health plan or health insurance coverage was the reason for declining enrollment, but only if the plan sponsor or issuer (if applicable) required such a statement at such time and provided the employee with notice of such requirement (and the consequences of such requirement) at such time.

"(C) The employee's or dependent's coverage described in subparagraph (A)—

"(i) was under a COBRA continuation provision and the coverage under such provision was exhausted; or

"(ii) was not under such a provision and either the coverage was terminated as a result of loss of eligibility for the coverage (including as a result of legal separation, divorce, death, termination of employment, or reduction in the number of hours of employment) or employer contributions toward such coverage were terminated.

"(D) Under the terms of the plan, the employee requests such enrollment not later than 30 days after the date of exhaustion of coverage described in subparagraph (C)(i) or termination of coverage or employer contribution described in subparagraph (C)(ii).

"(2) FOR DEPENDENT BENEFICIARIES.—

"(A) IN GENERAL.—If—

"(i) a group health plan makes coverage available with respect to a dependent of an individual,

"(ii) the individual is a participant under the plan (or has met any waiting period applicable to becoming a participant under the plan and is eligible to be enrolled under the plan but for a failure to enroll during a previous enrollment period), and

"(iii) a person becomes such a dependent of the individual through marriage, birth, or adoption or placement for adoption,

the group health plan shall provide for a dependent special enrollment period described in subparagraph (B) during which the person (or, if not otherwise enrolled, the individual) may be enrolled under the plan as a dependent of the individual, and in the case of the birth or adoption of a child, the spouse of the individual may be enrolled as a dependent of the individual if such spouse is otherwise eligible for coverage.

"(B) DEPENDENT SPECIAL ENROLLMENT PERIOD.—A dependent special enrollment period under this subparagraph shall be a period of not less than 30 days and shall begin on the later of—

"(i) the date dependent coverage is made available, or

"(ii) the date of the marriage, birth, or adoption or placement for adoption (as the case may be) described in subparagraph (A)(iii).

"(C) NO WAITING PERIOD.—If an individual seeks to enroll a dependent during the first 30 days of such a dependent special enrollment period, the coverage of the dependent shall become effective—

"(i) in the case of marriage, not later than the first day of the first month beginning after the date the completed request for enrollment is received;

"(ii) in the case of a dependent's birth, as of the date of such birth; or

"(iii) in the case of a dependent's adoption or placement for adoption, the date of such adoption or placement for adoption.

"(g) USE OF AFFILIATION PERIOD BY HMOS AS ALTERNATIVE TO PREEXISTING CONDITION EXCLUSION.—

"(1) IN GENERAL.—A health maintenance organization which offers health insurance coverage in connection with a group health plan and which does not impose any preexisting condition exclusion allowed under subsection (a) with respect to any particular coverage option may impose an affiliation period for such coverage option, but only if—

"(A) such period is applied uniformly without regard to any health status-related factors; and

"(B) such period does not exceed 2 months (or 3 months in the case of a late enrollee).

"(2) AFFILIATION PERIOD.—

"(A) DEFINED.—For purposes of this title, the term 'affiliation period' means a period which, under the terms of the health insurance coverage offered by the health maintenance organization, must expire before the health insurance coverage becomes effective. The organization is not required to provide health care services or benefits during such period and no premium shall be charged to the participant or beneficiary for any coverage during the period.

"(B) BEGINNING.—Such period shall begin on the enrollment date.

"(C) RUNS CONCURRENTLY WITH WAITING PERIODS.—An affiliation period under a plan shall run concurrently with any waiting period under the plan.

"(3) ALTERNATIVE METHODS.—A health maintenance organization described in paragraph (1) may use alternative methods, from those described in such paragraph, to address adverse selection as approved by the State insurance commissioner or official or officials designated by the State to enforce the requirements of this part for the State involved with respect to such issuer.

<< 42 USCA § 300gg–1 >>

"SEC. 2702. PROHIBITING DISCRIMINATION AGAINST INDIVIDUAL PARTICIPANTS AND BENEFICIARIES BASED ON HEALTH STATUS.

"(a) IN ELIGIBILITY TO ENROLL.—

"(1) IN GENERAL.—Subject to paragraph (2), a group health plan, and a health insurance issuer offering group health insurance coverage in connection with a group health plan, may not establish rules for eligibility (including continued eligibility) of any individual to enroll under the terms of the plan based on any of the following health status-related factors in relation to the individual or a dependent of the individual:

"(A) Health status.

"(B) Medical condition (including both physical and mental illnesses).

"(C) Claims experience.

"(D) Receipt of health care.

"(E) Medical history.

"(F) Genetic information.

"(G) Evidence of insurability (including conditions arising out of acts of domestic violence).

"(H) Disability.

"(2) NO APPLICATION TO BENEFITS OR EXCLUSIONS.—To the extent consistent with section 701, paragraph (1) shall not be construed—

"(A) to require a group health plan, or group health insurance coverage, to provide particular benefits other than those provided under the terms of such plan or coverage, or

"(B) to prevent such a plan or coverage from establishing limitations or restrictions on the amount, level, extent, or nature of the benefits or coverage for similarly situated individuals enrolled in the plan or coverage.

"(3) CONSTRUCTION.—For purposes of paragraph (1), rules for eligibility to enroll under a plan include rules defining any applicable waiting periods for such enrollment.

"(b) IN PREMIUM CONTRIBUTIONS.—

"(1) IN GENERAL.—A group health plan, and a health insurance issuer offering health insurance coverage in connection with a group health plan, may not require any individual (as a condition of enrollment or continued enrollment under the plan) to pay a premium or contribution which is greater than such premium or contribution for a similarly situated individual enrolled

in the plan on the basis of any health status-related factor in relation to the individual or to an individual enrolled under the plan as a dependent of the individual.

"(2) CONSTRUCTION.—Nothing in paragraph (1) shall be construed—

"(A) to restrict the amount that an employer may be charged for coverage under a group health plan; or

"(B) to prevent a group health plan, and a health insurance issuer offering group health insurance coverage, from establishing premium discounts or rebates or modifying otherwise applicable copayments or deductibles in return for adherence to programs of health promotion and disease prevention.

<< 42 USCA Ch. 6A >>

"Subpart 2—Provisions Applicable Only to Health Insurance Issuers

<< 42 USCA § 300gg–11 >>

"SEC. 2711. GUARANTEED AVAILABILITY OF COVERAGE FOR EMPLOYERS IN THE GROUP MARKET.

"(a) ISSUANCE OF COVERAGE IN THE SMALL GROUP MARKET.—

"(1) IN GENERAL.—Subject to subsections (c) through (f), each health insurance issuer that offers health insurance coverage in the small group market in a State—

"(A) must accept every small employer (as defined in section 2791(e)(4)) in the State that applies for such coverage; and

"(B) must accept for enrollment under such coverage every eligible individual (as defined in paragraph (2)) who applies for enrollment during the period in which the individual first becomes eligible to enroll under the terms of the group health plan and may not place any restriction which is inconsistent with section 2702 on an eligible individual being a participant or beneficiary.

"(2) ELIGIBLE INDIVIDUAL DEFINED.—For purposes of this section, the term 'eligible individual' means, with respect to a health insurance issuer that offers health insurance coverage to a small employer in connection with a group health plan in the small group market, such an individual in relation to the employer as shall be determined—

"(A) in accordance with the terms of such plan,

"(B) as provided by the issuer under rules of the issuer which are uniformly applicable in a State to small employers in the small group market, and

"(C) in accordance with all applicable State laws governing such issuer and such market.

"(b) ASSURING ACCESS IN THE LARGE GROUP MARKET.—

"(1) REPORTS TO HHS.—The Secretary shall request that the chief executive officer of each State submit to the Secretary, by not later December 31, 2000, and every 3 years thereafter a report on—

"(A) the access of large employers to health insurance coverage in the State, and

"(B) the circumstances for lack of access (if any) of large employers (or one or more classes of such employers) in the State to such coverage.

"(2) TRIENNIAL REPORTS TO CONGRESS.—The Secretary, based on the reports submitted under paragraph (1) and such other information as the Secretary may use, shall prepare and submit to Congress, every 3 years, a report describing the extent to which large employers (and classes of such employers) that seek health insurance coverage in the different States are able to obtain access to such coverage. Such report shall include such recommendations as the Secretary determines to be appropriate.

"(3) GAO REPORT ON LARGE EMPLOYER ACCESS TO HEALTH INSURANCE COVERAGE.—The Comptroller General shall provide for a study of the extent to which classes of large employers in the different States are able to obtain access to health insurance coverage and the circumstances for lack of access (if any) to such coverage. The Comptroller General shall submit to Congress a report on such study not later than 18 months after the date of the enactment of this title.

"(c) SPECIAL RULES FOR NETWORK PLANS.—

"(1) IN GENERAL.—In the case of a health insurance issuer that offers health insurance coverage in the small group market through a network plan, the issuer may—

"(A) limit the employers that may apply for such coverage to those with eligible individuals who live, work, or reside in the service area for such network plan; and

"(B) within the service area of such plan, deny such coverage to such employers if the issuer has demonstrated, if required, to the applicable State authority that—

  "(i) it will not have the capacity to deliver services adequately to enrollees of any additional groups because of its obligations to existing group contract holders and enrollees, and

  "(ii) it is applying this paragraph uniformly to all employers without regard to the claims experience of those employers and their employees (and their dependents) or any health status-related factor relating to such employees and dependents.

  "(2) 180–DAY SUSPENSION UPON DENIAL OF COVERAGE.—An issuer, upon denying health insurance coverage in any service area in accordance with paragraph (1)(B), may not offer coverage in the small group market within such service area for a period of 180 days after the date such coverage is denied.

"(d) APPLICATION OF FINANCIAL CAPACITY LIMITS.—

  "(1) IN GENERAL.—A health insurance issuer may deny health insurance coverage in the small group market if the issuer has demonstrated, if required, to the applicable State authority that—

    "(A) it does not have the financial reserves necessary to underwrite additional coverage; and

    "(B) it is applying this paragraph uniformly to all employers in the small group market in the State consistent with applicable State law and without regard to the claims experience of those employers and their employees (and their dependents) or any health status-related factor relating to such employees and dependents.

  "(2) 180–DAY SUSPENSION UPON DENIAL OF COVERAGE.—A health insurance issuer upon denying health insurance coverage in connection with group health plans in accordance with paragraph (1) in a State may not offer coverage in connection with group health plans in the small group market in the State for a period of 180 days after the date such coverage is denied or until the issuer has demonstrated to the applicable State authority, if required under applicable State law, that the issuer has sufficient financial reserves to underwrite additional coverage, whichever is later. An applicable State authority may provide for the application of this subsection on a service-area-specific basis.

"(e) EXCEPTION TO REQUIREMENT FOR FAILURE TO MEET CERTAIN MINIMUM PARTICIPATION OR CONTRIBUTION RULES.—

  "(1) IN GENERAL.—Subsection (a) shall not be construed to preclude a health insurance issuer from establishing employer contribution rules or group participation rules for the offering of health insurance coverage in connection with a group health plan in the small group market, as allowed under applicable State law.

  "(2) RULES DEFINED.—For purposes of paragraph (1)—

    "(A) the term 'employer contribution rule' means a requirement relating to the minimum level or amount of employer contribution toward the premium for enrollment of participants and beneficiaries; and

    "(B) the term 'group participation rule' means a requirement relating to the minimum number of participants or beneficiaries that must be enrolled in relation to a specified percentage or number of eligible individuals or employees of an employer.

"(f) EXCEPTION FOR COVERAGE OFFERED ONLY TO BONA FIDE ASSOCIATION MEMBERS.—Subsection (a) shall not apply to health insurance coverage offered by a health insurance issuer if such coverage is made available in the small group market only through one or more bona fide associations (as defined in section 2791(d)(3)).

<< 42 USCA § 300gg–12 >>

"SEC. 2712. GUARANTEED RENEWABILITY OF COVERAGE FOR EMPLOYERS IN THE GROUP MARKET.

  "(a) IN GENERAL.—Except as provided in this section, if a health insurance issuer offers health insurance coverage in the small or large group market in connection with a group health plan, the issuer must renew or continue in force such coverage at the option of the plan sponsor of the plan.

  "(b) GENERAL EXCEPTIONS.—A health insurance issuer may nonrenew or discontinue health insurance coverage offered in connection with a group health plan in the small or large group market based only on one or more of the following:

  "(1) NONPAYMENT OF PREMIUMS.—The plan sponsor has failed to pay premiums or contributions in accordance with the terms of the health insurance coverage or the issuer has not received timely premium payments.

  "(2) FRAUD.—The plan sponsor has performed an act or practice that constitutes fraud or made an intentional misrepresentation of material fact under the terms of the coverage.

"(3) VIOLATION OF PARTICIPATION OR CONTRIBUTION RULES.—The plan sponsor has failed to comply with a material plan provision relating to employer contribution or group participation rules, as permitted under section 2711(e) in the case of the small group market or pursuant to applicable State law in the case of the large group market.

"(4) TERMINATION OF COVERAGE.—The issuer is ceasing to offer coverage in such market in accordance with subsection (c) and applicable State law.

"(5) MOVEMENT OUTSIDE SERVICE AREA.—In the case of a health insurance issuer that offers health insurance coverage in the market through a network plan, there is no longer any enrollee in connection with such plan who lives, resides, or works in the service area of the issuer (or in the area for which the issuer is authorized to do business) and, in the case of the small group market, the issuer would deny enrollment with respect to such plan under section 2711(c)(1)(A).

"(6) ASSOCIATION MEMBERSHIP CEASES.—In the case of health insurance coverage that is made available in the small or large group market (as the case may be) only through one or more bona fide associations, the membership of an employer in the association (on the basis of which the coverage is provided) ceases but only if such coverage is terminated under this paragraph uniformly without regard to any health status-related factor relating to any covered individual.

"(c) REQUIREMENTS FOR UNIFORM TERMINATION OF COVERAGE.—

"(1) PARTICULAR TYPE OF COVERAGE NOT OFFERED.—In any case in which an issuer decides to discontinue offering a particular type of group health insurance coverage offered in the small or large group market, coverage of such type may be discontinued by the issuer in accordance with applicable State law in such market only if—

"(A) the issuer provides notice to each plan sponsor provided coverage of this type in such market (and participants and beneficiaries covered under such coverage) of such discontinuation at least 90 days prior to the date of the discontinuation of such coverage;

"(B) the issuer offers to each plan sponsor provided coverage of this type in such market, the option to purchase all (or, in the case of the large group market, any) other health insurance coverage currently being offered by the issuer to a group health plan in such market; and

"(C) in exercising the option to discontinue coverage of this type and in offering the option of coverage under subparagraph (B), the issuer acts uniformly without regard to the claims experience of those sponsors or any health status-related factor relating to any participants or beneficiaries covered or new participants or beneficiaries who may become eligible for such coverage.

"(2) DISCONTINUANCE OF ALL COVERAGE.—

"(A) IN GENERAL.—In any case in which a health insurance issuer elects to discontinue offering all health insurance coverage in the small group market or the large group market, or both markets, in a State, health insurance coverage may be discontinued by the issuer only in accordance with applicable State law and if—

"(i) the issuer provides notice to the applicable State authority and to each plan sponsor (and participants and beneficiaries covered under such coverage) of such discontinuation at least 180 days prior to the date of the discontinuation of such coverage; and

"(ii) all health insurance issued or delivered for issuance in the State in such market (or markets) are discontinued and coverage under such health insurance coverage in such market (or markets) is not renewed.

"(B) PROHIBITION ON MARKET REENTRY.—In the case of a discontinuation under subparagraph (A) in a market, the issuer may not provide for the issuance of any health insurance coverage in the market and State involved during the 5–year period beginning on the date of the discontinuation of the last health insurance coverage not so renewed.

"(d) EXCEPTION FOR UNIFORM MODIFICATION OF COVERAGE.—At the time of coverage renewal, a health insurance issuer may modify the health insurance coverage for a product offered to a group health plan—

"(1) in the large group market; or

"(2) in the small group market if, for coverage that is available in such market other than only through one or more bona fide associations, such modification is consistent with State law and effective on a uniform basis among group health plans with that product.

"(e) APPLICATION TO COVERAGE OFFERED ONLY THROUGH ASSOCIATIONS.—In applying this section in the case of health insurance coverage that is made available by a health insurance issuer in the small or large group market to employers only through one or more associations, a reference to 'plan sponsor' is deemed, with respect to coverage provided to an employer member of the association, to include a reference to such employer.

<< 42 USCA § 300gg–13 >>

"SEC. 2713. DISCLOSURE OF INFORMATION.

  "(a) DISCLOSURE OF INFORMATION BY HEALTH PLAN ISSUERS.—In connection with the offering of any health insurance coverage to a small employer, a health insurance issuer—
    "(1) shall make a reasonable disclosure to such employer, as part of its solicitation and sales materials, of the availability of information described in subsection (b), and
    "(2) upon request of such a small employer, provide such information.
  "(b) INFORMATION DESCRIBED.—
    "(1) IN GENERAL.—Subject to paragraph (3), with respect to a health insurance issuer offering health insurance coverage to a small employer, information described in this subsection is information concerning—
      "(A) the provisions of such coverage concerning issuer's right to change premium rates and the factors that may affect changes in premium rates;
      "(B) the provisions of such coverage relating to renewability of coverage;
      "(C) the provisions of such coverage relating to any preexisting condition exclusion; and
      "(D) the benefits and premiums available under all health insurance coverage for which the employer is qualified.
    "(2) FORM OF INFORMATION.—Information under this subsection shall be provided to small employers in a manner determined to be understandable by the average small employer, and shall be sufficient to reasonably inform small employers of their rights and obligations under the health insurance coverage.
    "(3) EXCEPTION.—An issuer is not required under this section to disclose any information that is proprietary and trade secret information under applicable law.

<< 42 USCA Ch. 6A >>

"Subpart 3—Exclusion of Plans; Enforcement; Preemption

<< 42 USCA § 300gg–21 >>

"SEC. 2721. EXCLUSION OF CERTAIN PLANS.

  "(a) EXCEPTION FOR CERTAIN SMALL GROUP HEALTH PLANS.—The requirements of subparts 1 and 2 shall not apply to any group health plan (and health insurance coverage offered in connection with a group health plan) for any plan year if, on the first day of such plan year, such plan has less than 2 participants who are current employees.
  "(b) LIMITATION ON APPLICATION OF PROVISIONS RELATING TO GROUP HEALTH PLANS.—
    "(1) IN GENERAL.—The requirements of subparts 1 and 2 shall apply with respect to group health plans only—
      "(A) subject to paragraph (2), in the case of a plan that is a nonfederal governmental plan, and
      "(B) with respect to health insurance coverage offered in connection with a group health plan (including such a plan that is a church plan or a governmental plan).
    "(2) TREATMENT OF NONFEDERAL GOVERNMENTAL PLANS.—
      "(A) ELECTION TO BE EXCLUDED.—If the plan sponsor of a nonfederal governmental plan which is a group health plan to which the provisions of subparts 1 and 2 otherwise apply makes an election under this subparagraph (in such form and manner as the Secretary may by regulations prescribe), then the requirements of such subparts insofar as they apply directly to group health plans (and not merely to group health insurance coverage) shall not apply to such governmental plans for such period except as provided in this paragraph.
      "(B) PERIOD OF ELECTION.—An election under subparagraph (A) shall apply—
        "(i) for a single specified plan year, or
        "(ii) in the case of a plan provided pursuant to a collective bargaining agreement, for the term of such agreement.

An election under clause (i) may be extended through subsequent elections under this paragraph.
      "(C) NOTICE TO ENROLLEES.—Under such an election, the plan shall provide for—

"(i) notice to enrollees (on an annual basis and at the time of enrollment under the plan) of the fact and consequences of such election, and

"(ii) certification and disclosure of creditable coverage under the plan with respect to enrollees in accordance with section 2701(e).

"(c) EXCEPTION FOR CERTAIN BENEFITS.—The requirements of subparts 1 and 2 shall not apply to any group health plan (or group health insurance coverage) in relation to its provision of excepted benefits described in section 2791(c)(1).

"(d) EXCEPTION FOR CERTAIN BENEFITS IF CERTAIN CONDITIONS MET.—

"(1) LIMITED, EXCEPTED BENEFITS.—The requirements of subparts 1 and 2 shall not apply to any group health plan (and group health insurance coverage offered in connection with a group health plan) in relation to its provision of excepted benefits described in section 2791(c)(2) if the benefits—

"(A) are provided under a separate policy, certificate, or contract of insurance; or

"(B) are otherwise not an integral part of the plan.

"(2) NONCOORDINATED, EXCEPTED BENEFITS.—The requirements of subparts 1 and 2 shall not apply to any group health plan (and group health insurance coverage offered in connection with a group health plan) in relation to its provision of excepted benefits described in section 2791(c)(3) if all of the following conditions are met:

"(A) The benefits are provided under a separate policy, certificate, or contract of insurance.

"(B) There is no coordination between the provision of such benefits and any exclusion of benefits under any group health plan maintained by the same plan sponsor.

"(C) Such benefits are paid with respect to an event without regard to whether benefits are provided with respect to such an event under any group health plan maintained by the same plan sponsor.

"(3) SUPPLEMENTAL EXCEPTED BENEFITS.—The requirements of this part shall not apply to any group health plan (and group health insurance coverage) in relation to its provision of excepted benefits described in section 27971(c)(4) if the benefits are provided under a separate policy, certificate, or contract of insurance.

"(e) TREATMENT OF PARTNERSHIPS.—For purposes of this part—

"(1) TREATMENT AS A GROUP HEALTH PLAN.—Any plan, fund, or program which would not be (but for this subsection) an employee welfare benefit plan and which is established or maintained by a partnership, to the extent that such plan, fund, or program provides medical care (including items and services paid for as medical care) to present or former partners in the partnership or to their dependents (as defined under the terms of the plan, fund, or program), directly or through insurance, reimbursement, or otherwise, shall be treated (subject to paragraph (2)) as an employee welfare benefit plan which is a group health plan.

"(2) EMPLOYER.—In the case of a group health plan, the term 'employer' also includes the partnership in relation to any partner.

"(3) PARTICIPANTS OF GROUP HEALTH PLANS.—In the case of a group health plan, the term 'participant' also includes—

"(A) in connection with a group health plan maintained by a partnership, an individual who is a partner in relation to the partnership, or

"(B) in connection with a group health plan maintained by a self-employed individual (under which one or more employees are participants), the self-employed individual,

if such individual is, or may become, eligible to receive a benefit under the plan or such individual's beneficiaries may be eligible to receive any such benefit.

<< 42 USCA § 300gg–22 >>

"SEC. 2722. ENFORCEMENT.

"(a) STATE ENFORCEMENT.—

"(1) STATE AUTHORITY.—Subject to section 2723, each State may require that health insurance issuers that issue, sell, renew, or offer health insurance coverage in the State in the small or large group markets meet the requirements of this part with respect to such issuers.

Case 2:24-cv-00228-Z    Document 50-1    Filed 01/17/25    Page 63 of 882    PageID 48848

"(2) FAILURE TO IMPLEMENT PROVISIONS.—In the case of a determination by the Secretary that a State has failed to substantially enforce a provision (or provisions) in this part with respect to health insurance issuers in the State, the Secretary shall enforce such provision (or provisions) under subsection (b) insofar as they relate to the issuance, sale, renewal, and offering of health insurance coverage in connection with group health plans in such State.

"(b) SECRETARIAL ENFORCEMENT AUTHORITY.—

"(1) LIMITATION.—The provisions of this subsection shall apply to enforcement of a provision (or provisions) of this part only—

"(A) as provided under subsection (a)(2); and

"(B) with respect to group health plans that are non-Federal governmental plans.

"(2) IMPOSITION OF PENALTIES.—In the cases described in paragraph (1)—

"(A) IN GENERAL.—Subject to the succeeding provisions of this subsection, any non-Federal governmental plan that is a group health plan and any health insurance issuer that fails to meet a provision of this part applicable to such plan or issuer is subject to a civil money penalty under this subsection.

"(B) LIABILITY FOR PENALTY.—In the case of a failure by—

"(i) a health insurance issuer, the issuer is liable for such penalty, or

"(ii) a group health plan that is a non-Federal governmental plan which is—

"(I) sponsored by 2 or more employers, the plan is liable for such penalty, or

"(II) not so sponsored, the employer is liable for such penalty.

"(C) AMOUNT OF PENALTY.—

"(i) IN GENERAL.—The maximum amount of penalty imposed under this paragraph is $100 for each day for each individual with respect to which such a failure occurs.

"(ii) CONSIDERATIONS IN IMPOSITION.—In determining the amount of any penalty to be assessed under this paragraph, the Secretary shall take into account the previous record of compliance of the entity being assessed with the applicable provisions of this part and the gravity of the violation.

"(iii) LIMITATIONS.—

"(I) PENALTY NOT TO APPLY WHERE FAILURE NOT DISCOVERED EXERCISING REASONABLE DILIGENCE.—No civil money penalty shall be imposed under this paragraph on any failure during any period for which it is established to the satisfaction of the Secretary that none of the entities against whom the penalty would be imposed knew, or exercising reasonable diligence would have known, that such failure existed.

"(II) PENALTY NOT TO APPLY TO FAILURES CORRECTED WITHIN 30 DAYS.—No civil money penalty shall be imposed under this paragraph on any failure if such failure was due to reasonable cause and not to willful neglect, and such failure is corrected during the 30–day period beginning on the first day any of the entities against whom the penalty would be imposed knew, or exercising reasonable diligence would have known, that such failure existed.

"(D) ADMINISTRATIVE REVIEW.—

"(i) OPPORTUNITY FOR HEARING.—The entity assessed shall be afforded an opportunity for hearing by the Secretary upon request made within 30 days after the date of the issuance of a notice of assessment. In such hearing the decision shall be made on the record pursuant to section 554 of title 5, United States Code. If no hearing is requested, the assessment shall constitute a final and unappealable order.

"(ii) HEARING PROCEDURE.—If a hearing is requested, the initial agency decision shall be made by an administrative law judge, and such decision shall become the final order unless the Secretary modifies or vacates the decision. Notice of intent to modify or vacate the decision of the administrative law judge shall be issued to the parties within 30 days after the date of the decision of the judge. A final order which takes effect under this paragraph shall be subject to review only as provided under subparagraph (E).

"(E) JUDICIAL REVIEW.—

"(i) FILING OF ACTION FOR REVIEW.—Any entity against whom an order imposing a civil money penalty has been entered after an agency hearing under this paragraph may obtain review by the United States district court for any district in which such entity is located or the United States District Court for the District of Columbia by filing a notice of appeal in such court within 30 days from the date of such order, and simultaneously sending a copy of such notice by registered mail to the Secretary.

"(ii) CERTIFICATION OF ADMINISTRATIVE RECORD.—The Secretary shall promptly certify and file in such court the record upon which the penalty was imposed.

"(iii) STANDARD FOR REVIEW.—The findings of the Secretary shall be set aside only if found to be unsupported by substantial evidence as provided by section 706(2)(E) of title 5, United States Code.

"(iv) APPEAL.—Any final decision, order, or judgment of the district court concerning such review shall be subject to appeal as provided in chapter 83 of title 28 of such Code.

"(F) FAILURE TO PAY ASSESSMENT; MAINTENANCE OF ACTION.—

"(i) FAILURE TO PAY ASSESSMENT.—If any entity fails to pay an assessment after it has become a final and unappealable order, or after the court has entered final judgment in favor of the Secretary, the Secretary shall refer the matter to the Attorney General who shall recover the amount assessed by action in the appropriate United States district court.

"(ii) NONREVIEWABILITY.—In such action the validity and appropriateness of the final order imposing the penalty shall not be subject to review.

"(G) PAYMENT OF PENALTIES.—Except as otherwise provided, penalties collected under this paragraph shall be paid to the Secretary (or other officer) imposing the penalty and shall be available without appropriation and until expended for the purpose of enforcing the provisions with respect to which the penalty was imposed.

<< 42 USCA § 300gg–23 >>

"SEC. 2723. PREEMPTION; STATE FLEXIBILITY; CONSTRUCTION.

"(a) CONTINUED APPLICABILITY OF STATE LAW WITH RESPECT TO HEALTH INSURANCE ISSUERS.—

"(1) IN GENERAL.—Subject to paragraph (2) and except as provided in subsection (b), this part and part C insofar as it relates to this part shall not be construed to supersede any provision of State law which establishes, implements, or continues in effect any standard or requirement solely relating to health insurance issuers in connection with group health insurance coverage except to the extent that such standard or requirement prevents the application of a requirement of this part.

"(2) CONTINUED PREEMPTION WITH RESPECT TO GROUP HEALTH PLANS.—Nothing in this part shall be construed to affect or modify the provisions of section 514 of the Employee Retirement Income Security Act of 1974 with respect to group health plans.

"(b) SPECIAL RULES IN CASE OF PORTABILITY REQUIREMENTS.—

"(1) IN GENERAL.—Subject to paragraph (2), the provisions of this part relating to health insurance coverage offered by a health insurance issuer supersede any provision of State law which establishes, implements, or continues in effect a standard or requirement applicable to imposition of a preexisting condition exclusion specifically governed by section 701 which differs from the standards or requirements specified in such section.

"(2) EXCEPTIONS.—Only in relation to health insurance coverage offered by a health insurance issuer, the provisions of this part do not supersede any provision of State law to the extent that such provision—

"(i) substitutes for the reference to '6–month period' in section 2701(a)(1) a reference to any shorter period of time;

"(ii) substitutes for the reference to '12 months' and '18 months' in section 2701(a)(2) a reference to any shorter period of time;

"(iii) substitutes for the references to '63' days in sections 2701(c)(2)(A) and 2701(d)(4)(A) a reference to any greater number of days;

"(iv) substitutes for the reference to '30-day period' in sections 2701(b)(2) and 2701(d)(1) a reference to any greater period;

"(v) prohibits the imposition of any preexisting condition exclusion in cases not described in section 2701(d) or expands the exceptions described in such section;

"(vi) requires special enrollment periods in addition to those required under section 2701(f); or

"(vii) reduces the maximum period permitted in an affiliation period under section 2701(g)(1)(B).

"(c) RULES OF CONSTRUCTION.—Nothing in this part shall be construed as requiring a group health plan or health insurance coverage to provide specific benefits under the terms of such plan or coverage.

"(d) DEFINITIONS.—For purposes of this section—

"(1) STATE LAW.—The term 'State law' includes all laws, decisions, rules, regulations, or other State action having the effect of law, of any State. A law of the United States applicable only to the District of Columbia shall be treated as a State law rather than a law of the United States.

"(2) STATE.—The term 'State' includes a State (including the Northern Mariana Islands), any political subdivisions of a State or such Islands, or any agency or instrumentality of either.

<< 42 USCA Ch. 6A >>

"PART C—DEFINITIONS; MISCELLANEOUS PROVISIONS

<< 42 USCA § 300gg–91 >>

"SEC. 2791. DEFINITIONS.

"(a) GROUP HEALTH PLAN.—

"(1) DEFINITION.—The term 'group health plan' means an employee welfare benefit plan (as defined in section 3(1) of the Employee Retirement Income Security Act of 1974) to the extent that the plan provides medical care (as defined in paragraph (2)) and including items and services paid for as medical care) to employees or their dependents (as defined under the terms of the plan) directly or through insurance, reimbursement, or otherwise.

"(2) MEDICAL CARE.—The term 'medical care' means amounts paid for—

"(A) the diagnosis, cure, mitigation, treatment, or prevention of disease, or amounts paid for the purpose of affecting any structure or function of the body,

"(B) amounts paid for transportation primarily for and essential to medical care referred to in subparagraph (A), and

"(C) amounts paid for insurance covering medical care referred to in subparagraphs (A) and (B).

"(3) TREATMENT OF CERTAIN PLANS AS GROUP HEALTH PLAN FOR NOTICE PROVISION.—A program under which creditable coverage described in subparagraph (C), (D), (E), or (F) of section 2701(c)(1) is provided shall be treated as a group health plan for purposes of applying section 2701(e).

"(b) DEFINITIONS RELATING TO HEALTH INSURANCE.—

"(1) HEALTH INSURANCE COVERAGE.—The term 'health insurance coverage' means benefits consisting of medical care (provided directly, through insurance or reimbursement, or otherwise and including items and services paid for as medical care) under any hospital or medical service policy or certificate, hospital or medical service plan contract, or health maintenance organization contract offered by a health insurance issuer.

"(2) HEALTH INSURANCE ISSUER.—The term 'health insurance issuer' means an insurance company, insurance service, or insurance organization (including a health maintenance organization, as defined in paragraph (3)) which is licensed to engage in the business of insurance in a State and which is subject to State law which regulates insurance (within the meaning of section 514(b)(2) of the Employee Retirement Income Security Act of 1974). Such term does not include a group health plan.

"(3) HEALTH MAINTENANCE ORGANIZATION.—The term 'health maintenance organization' means—

"(A) a Federally qualified health maintenance organization (as defined in section 1301(a)),

"(B) an organization recognized under State law as a health maintenance organization, or

"(C) a similar organization regulated under State law for solvency in the same manner and to the same extent as such a health maintenance organization.

"(4) GROUP HEALTH INSURANCE COVERAGE.—The term 'group health insurance coverage' means, in connection with a group health plan, health insurance coverage offered in connection with such plan.

"(5) INDIVIDUAL HEALTH INSURANCE COVERAGE.—The term 'individual health insurance coverage' means health insurance coverage offered to individuals in the individual market, but does not include short-term limited duration insurance.

"(c) EXCEPTED BENEFITS.—For purposes of this title, the term 'excepted benefits' means benefits under one or more (or any combination thereof) of the following:

"(1) BENEFITS NOT SUBJECT TO REQUIREMENTS.—

"(A) Coverage only for accident, or disability income insurance, or any combination thereof.

"(B) Coverage issued as a supplement to liability insurance.

"(C) Liability insurance, including general liability insurance and automobile liability insurance.

"(D) Workers' compensation or similar insurance.

"(E) Automobile medical payment insurance.

"(F) Credit-only insurance.

"(G) Coverage for on-site medical clinics.

"(H) Other similar insurance coverage, specified in regulations, under which benefits for medical care are secondary or incidental to other insurance benefits.

"(2) BENEFITS NOT SUBJECT TO REQUIREMENTS IF OFFERED SEPARATELY.—

"(A) Limited scope dental or vision benefits.

"(B) Benefits for long-term care, nursing home care, home health care, community-based care, or any combination thereof.

"(C) Such other similar, limited benefits as are specified in regulations.

"(3) BENEFITS NOT SUBJECT TO REQUIREMENTS IF OFFERED AS INDEPENDENT, NONCOORDINATED BENEFITS.—

"(A) Coverage only for a specified disease or illness.

"(B) Hospital indemnity or other fixed indemnity insurance.

"(4) BENEFITS NOT SUBJECT TO REQUIREMENTS IF OFFERED AS SEPARATE INSURANCE POLICY.—Medicare supplemental health insurance (as defined under section 1882(g)(1) of the Social Security Act), coverage supplemental to the coverage provided under chapter 55 of title 10, United States Code, and similar supplemental coverage provided to coverage under a group health plan.

"(d) OTHER DEFINITIONS.—

"(1) APPLICABLE STATE AUTHORITY.—The term 'applicable State authority' means, with respect to a health insurance issuer in a State, the State insurance commissioner or official or officials designated by the State to enforce the requirements of this title for the State involved with respect to such issuer.

"(2) BENEFICIARY.—The term 'beneficiary' has the meaning given such term under section 3(8) of the Employee Retirement Income Security Act of 1974.

"(3) BONA FIDE ASSOCIATION.—The term 'bona fide association' means, with respect to health insurance coverage offered in a State, an association which—

"(A) has been actively in existence for at least 5 years;

"(B) has been formed and maintained in good faith for purposes other than obtaining insurance;

"(C) does not condition membership in the association on any health status-related factor relating to an individual (including an employee of an employer or a dependent of an employee);

"(D) makes health insurance coverage offered through the association available to all members regardless of any health status-related factor relating to such members (or individuals eligible for coverage through a member);

"(E) does not make health insurance coverage offered through the association available other than in connection with a member of the association; and

"(F) meets such additional requirements as may be imposed under State law.

"(4) COBRA CONTINUATION PROVISION.—The term 'COBRA continuation provision' means any of the following:

"(A) Section 4980B of the Internal Revenue Code of 1986, other than subsection (f)(1) of such section insofar as it relates to pediatric vaccines.

"(B) Part 6 of subtitle B of title I of the Employee Retirement Income Security Act of 1974, other than section 609 of such Act.

"(C) Title XXII of this Act.

"(5) EMPLOYEE.—The term 'employee' has the meaning given such term under section 3(6) of the Employee Retirement Income Security Act of 1974.

"(6) EMPLOYER.—The term 'employer' has the meaning given such term under section 3(5) of the Employee Retirement Income Security Act of 1974, except that such term shall include only employers of two or more employees.

"(7) CHURCH PLAN.—The term 'church plan' has the meaning given such term under section 3(33) of the Employee Retirement Income Security Act of 1974.

"(8) GOVERNMENTAL PLAN.—(A) The term 'governmental plan' has the meaning given such term under section 3(32) of the Employee Retirement Income Security Act of 1974 and any Federal governmental plan.

"(B) FEDERAL GOVERNMENTAL PLAN.—The term 'Federal governmental plan' means a governmental plan established or maintained for its employees by the Government of the United States or by any agency or instrumentality of such Government.

"(C) NON–FEDERAL GOVERNMENTAL PLAN.—The term 'non-Federal governmental plan' means a governmental plan that is not a Federal governmental plan.

"(9) HEALTH STATUS–RELATED FACTOR.—The term 'health status-related factor' means any of the factors described in section 2702(a)(1).

"(10) NETWORK PLAN.—The term 'network plan' means health insurance coverage of a health insurance issuer under which the financing and delivery of medical care (including items and services paid for as medical care) are provided, in whole or in part, through a defined set of providers under contract with the issuer.

"(11) PARTICIPANT.—The term 'participant' has the meaning given such term under section 3(7) of the Employee Retirement Income Security Act of 1974.

"(12) PLACED FOR ADOPTION DEFINED.—The term 'placement', or being 'placed', for adoption, in connection with any placement for adoption of a child with any person, means the assumption and retention by such person of a legal obligation for total or partial support of such child in anticipation of adoption of such child. The child's placement with such person terminates upon the termination of such legal obligation.

"(13) PLAN SPONSOR.—The term 'plan sponsor' has the meaning given such term under section 3(16)(B) of the Employee Retirement Income Security Act of 1974.

"(14) STATE.—The term 'State' means each of the several States, the District of Columbia, Puerto Rico, the Virgin Islands, Guam, American Samoa, and the Northern Mariana Islands.

"(e) DEFINITIONS RELATING TO MARKETS AND SMALL EMPLOYERS.—For purposes of this title:

"(1) INDIVIDUAL MARKET.—

"(A) IN GENERAL.—The term 'individual market' means the market for health insurance coverage offered to individuals other than in connection with a group health plan.

"(B) TREATMENT OF VERY SMALL GROUPS.—

"(i) IN GENERAL.—Subject to clause (ii), such terms includes coverage offered in connection with a group health plan that has fewer than two participants as current employees on the first day of the plan year.

"(ii) STATE EXCEPTION.—Clause (i) shall not apply in the case of a State that elects to regulate the coverage described in such clause as coverage in the small group market.

"(2) LARGE EMPLOYER.—The term 'large employer' means, in connection with a group health plan with respect to a calendar year and a plan year, an employer who employed an average of at least 51 employees on business days during the preceding calendar year and who employs at least 2 employees on the first day of the plan year.

"(3) LARGE GROUP MARKET.—The term 'large group market' means the health insurance market under which individuals obtain health insurance coverage (directly or through any arrangement) on behalf of themselves (and their dependents) through a group health plan maintained by a large employer.

"(4) SMALL EMPLOYER.—The term 'small employer' means, in connection with a group health plan with respect to a calendar year and a plan year, an employer who employed an average of at least 2 but not more than 50 employees on business days during the preceding calendar year and who employs at least 2 employees on the first day of the plan year.

"(5) SMALL GROUP MARKET.—The term 'small group market' means the health insurance market under which individuals obtain health insurance coverage (directly or through any arrangement) on behalf of themselves (and their dependents) through a group health plan maintained by a small employer.

"(6) APPLICATION OF CERTAIN RULES IN DETERMINATION OF EMPLOYER SIZE.—For purposes of this subsection—

"(A) APPLICATION OF AGGREGATION RULE FOR EMPLOYERS.—all persons treated as a single employer under subsection (b), (c), (m), or (o) of section 414 of the Internal Revenue Code of 1986 shall be treated as 1 employer.

"(B) EMPLOYERS NOT IN EXISTENCE IN PRECEDING YEAR.—In the case of an employer which was not in existence throughout the preceding calendar year, the determination of whether such employer is a small or large employer shall be based on the average number of employees that it is reasonably expected such employer will employ on business days in the current calendar year.

Case 2:24-cv-00228-Z    Document 50-1    Filed 01/17/25    Page 68 of 882    PageID 48853

"(C) PREDECESSORS.—Any reference in this subsection to an employer shall include a reference to any predecessor of such employer.

<< 42 USCA § 300gg–92 >>

"SEC. 2792. REGULATIONS.

  "The Secretary, consistent with section 104 of the Health Care Portability and Accountability Act of 1996, may promulgate such regulations as may be necessary or appropriate to carry out the provisions of this title. The Secretary may promulgate any interim final rules as the Secretary determines are appropriate to carry out this title.".

<< 42 USCA § 300e >>

  (b) APPLICATION OF RULES BY CERTAIN HEALTH MAINTENANCE ORGANIZATIONS.—Section 1301 of such Act (42 U.S.C. 300e) is amended by adding at the end the following new subsection:
  "(d) An organization that offers health benefits coverage shall not be considered as failing to meet the requirements of this section notwithstanding that it provides, with respect to coverage offered in connection with a group health plan in the small or large group market (as defined in section 2791(e)), an affiliation period consistent with the provisions of section 2701(g).".

<< 42 USCA §§ 300gg NOTE, 300gg–1 nt, 300gg–11 nt, 300gg–12 nt, 300gg–
13 nt, 300gg–21 nt, 300gg–22 nt, 300gg–23 nt, 300gg–91 nt, 300gg–92 nt >>

  (c) EFFECTIVE DATE.—
  (1) IN GENERAL.—Except as provided in this subsection, part A of title XXVII of the Public Health Service Act (as added by subsection (a)) shall apply with respect to group health plans, and health insurance coverage offered in connection with group health plans, for plan years beginning after June 30, 1997.
  (2) DETERMINATION OF CREDITABLE COVERAGE.—
  (A) PERIOD OF COVERAGE.—
  (i) IN GENERAL.—Subject to clause (ii), no period before July 1, 1996, shall be taken into account under part A of title XXVII of the Public Health Service Act (as added by this section) in determining creditable coverage.
  (ii) SPECIAL RULE FOR CERTAIN PERIODS.—The Secretary of Health and Human Services, consistent with section 104, shall provide for a process whereby individuals who need to establish creditable coverage for periods before July 1, 1996, and who would have such coverage credited but for clause (i) may be given credit for creditable coverage for such periods through the presentation of documents or other means.
  (B) CERTIFICATIONS, ETC.—
  (i) IN GENERAL.—Subject to clauses (ii) and (iii), subsection (e) of section 2701 of the Public Health Service Act (as added by this section) shall apply to events occurring after June 30, 1996.
  (ii) NO CERTIFICATION REQUIRED TO BE PROVIDED BEFORE JUNE 1, 1997.—In no case is a certification required to be provided under such subsection before June 1, 1997.
  (iii) CERTIFICATION ONLY ON WRITTEN REQUEST FOR EVENTS OCCURRING BEFORE OCTOBER 1, 1996.
  —In the case of an event occurring after June 30, 1996, and before October 1, 1996, a certification is not required to be provided under such subsection unless an individual (with respect to whom the certification is otherwise required to be made) requests such certification in writing.
  (C) TRANSITIONAL RULE.—In the case of an individual who seeks to establish creditable coverage for any period for which certification is not required because it relates to an event occurring before June 30, 1996—
  (i) the individual may present other credible evidence of such coverage in order to establish the period of creditable coverage; and
  (ii) a group health plan and a health insurance issuer shall not be subject to any penalty or enforcement action with respect to the plan's or issuer's crediting (or not crediting) such coverage if the plan or issuer has sought to comply in good faith with the applicable requirements under the amendments made by this section.

(3) SPECIAL RULE FOR COLLECTIVE BARGAINING AGREEMENTS.—Except as provided in paragraph (2)(B), in the case of a group health plan maintained pursuant to 1 or more collective bargaining agreements between employee representatives and one or more employers ratified before the date of the enactment of this Act, part A of title XXVII of the Public Health Service Act (other than section 2701(e) thereof) shall not apply to plan years beginning before the later of—

   (A) the date on which the last of the collective bargaining agreements relating to the plan terminates (determined without regard to any extension thereof agreed to after the date of the enactment of this Act), or

   (B) July 1, 1997.

For purposes of subparagraph (A), any plan amendment made pursuant to a collective bargaining agreement relating to the plan which amends the plan solely to conform to any requirement of such part shall not be treated as a termination of such collective bargaining agreement.

   (4) TIMELY REGULATIONS.—The Secretary of Health and Human Services, consistent with section 104, shall first issue by not later than April 1, 1997, such regulations as may be necessary to carry out the amendments made by this section and section 111.

   (5) LIMITATION ON ACTIONS.—No enforcement action shall be taken, pursuant to the amendments made by this section, against a group health plan or health insurance issuer with respect to a violation of a requirement imposed by such amendments before January 1, 1998, or, if later, the date of issuance of regulations referred to in paragraph (4), if the plan or issuer has sought to comply in good faith with such requirements.

<< 42 USCA § 300bb–8 >>

   (d) MISCELLANEOUS CORRECTION.—Section 2208(1) of the Public Health Service Act (42 U.S.C. 300bb–8(1)) is amended by striking "section 162(i)(2)" and inserting "5000(b)".

SEC. 103. REFERENCE TO IMPLEMENTATION THROUGH THE INTERNAL REVENUE CODE OF 1986.

   For provisions amending the Internal Revenue Code of 1986 to provide for application and enforcement of rules for group health plans similar to those provided under the amendments made by section 101(a), see section 401.

<< 42 USCA § 300gg–92 NOTE >>

SEC. 104. ASSURING COORDINATION.

   The Secretary of the Treasury, the Secretary of Health and Human Services, and the Secretary of Labor shall ensure, through the execution of an interagency memorandum of understanding among such Secretaries, that—

   (1) regulations, rulings, and interpretations issued by such Secretaries relating to the same matter over which two or more such Secretaries have responsibility under this subtitle (and the amendments made by this subtitle and section 401) are administered so as to have the same effect at all times; and

   (2) coordination of policies relating to enforcing the same requirements through such Secretaries in order to have a coordinated enforcement strategy that avoids duplication of enforcement efforts and assigns priorities in enforcement.

Subtitle B—Individual Market Rules

SEC. 111. AMENDMENT TO PUBLIC HEALTH SERVICE ACT.

   (a) IN GENERAL.—Title XXVII of the Public Health Service Act, as added by section 102(a) of this Act, is amended by inserting after part A the following new part:

<< 42 USCA Ch. 6A >>

"PART B—INDIVIDUAL MARKET RULES

<< 42 USCA § 300gg–41 >>

"SEC. 2741. GUARANTEED AVAILABILITY OF INDIVIDUAL HEALTH INSURANCE COVERAGE TO CERTAIN INDIVIDUALS WITH PRIOR GROUP COVERAGE.

"(a) GUARANTEED AVAILABILITY.—

"(1) IN GENERAL.—Subject to the succeeding subsections of this section and section 2744, each health insurance issuer that offers health insurance coverage (as defined in section 2791(b)(1)) in the individual market in a State may not, with respect to an eligible individual (as defined in subsection (b)) desiring to enroll in individual health insurance coverage—

"(A) decline to offer such coverage to, or deny enrollment of, such individual; or

"(B) impose any preexisting condition exclusion (as defined in section 2701(b)(1)(A)) with respect to such coverage.

"(2) SUBSTITUTION BY STATE OF ACCEPTABLE ALTERNATIVE MECHANISM.—The requirement of paragraph (1) shall not apply to health insurance coverage offered in the individual market in a State in which the State is implementing an acceptable alternative mechanism under section 2744.

"(b) ELIGIBLE INDIVIDUAL DEFINED.—In this part, the term 'eligible individual' means an individual—

"(1)(A) for whom, as of the date on which the individual seeks coverage under this section, the aggregate of the periods of creditable coverage (as defined in section 2701(c)) is 18 or more months and (B) whose most recent prior creditable coverage was under a group health plan, governmental plan, or church plan (or health insurance coverage offered in connection with any such plan);

"(2) who is not eligible for coverage under (A) a group health plan, (B) part A or part B of title XVIII of the Social Security Act, or (C) a State plan under title XIX of such Act (or any successor program), and does not have other health insurance coverage;

"(3) with respect to whom the most recent coverage within the coverage period described in paragraph (1)(A) was not terminated based on a factor described in paragraph (1) or (2) of section 2712(b) (relating to nonpayment of premiums or fraud);

"(4) if the individual had been offered the option of continuation coverage under a COBRA continuation provision or under a similar State program, who elected such coverage; and

"(5) who, if the individual elected such continuation coverage, has exhausted such continuation coverage under such provision or program.

"(c) ALTERNATIVE COVERAGE PERMITTED WHERE NO STATE MECHANISM.—

"(1) IN GENERAL.—In the case of health insurance coverage offered in the individual market in a State in which the State is not implementing an acceptable alternative mechanism under section 2744, the health insurance issuer may elect to limit the coverage offered under subsection (a) so long as it offers at least two different policy forms of health insurance coverage both of which—

"(A) are designed for, made generally available to, and actively marketed to, and enroll both eligible and other individuals by the issuer; and

"(B) meet the requirement of paragraph (2) or (3), as elected by the issuer.

For purposes of this subsection, policy forms which have different cost-sharing arrangements or different riders shall be considered to be different policy forms.

"(2) CHOICE OF MOST POPULAR POLICY FORMS.—The requirement of this paragraph is met, for health insurance coverage policy forms offered by an issuer in the individual market, if the issuer offers the policy forms for individual health insurance coverage with the largest, and next to largest, premium volume of all such policy forms offered by the issuer in the State or applicable marketing or service area (as may be prescribed in regulation) by the issuer in the individual market in the period involved.

"(3) CHOICE OF 2 POLICY FORMS WITH REPRESENTATIVE COVERAGE.—

"(A) IN GENERAL.—The requirement of this paragraph is met, for health insurance coverage policy forms offered by an issuer in the individual market, if the issuer offers a lower-level coverage policy form (as defined in subparagraph (B)) and a higher-level coverage policy form (as defined in subparagraph (C)) each of which includes benefits substantially similar to other individual health insurance coverage offered by the issuer in that State and each of which is covered under a method described in section 2744(c)(3)(A) (relating to risk adjustment, risk spreading, or financial subsidization).

"(B) LOWER–LEVEL OF COVERAGE DESCRIBED.—A policy form is described in this paragraph if the actuarial value of the benefits under the coverage is at least 85 percent but not greater than 100 percent of a weighted average (described in subparagraph (D)).

"(C) HIGHER–LEVEL OF COVERAGE DESCRIBED.—A policy form is described in this subparagraph if—

"(i) the actuarial value of the benefits under the coverage is at least 15 percent greater than the actuarial value of the coverage described in subparagraph (B) offered by the issuer in the area involved; and

"(ii) the actuarial value of the benefits under the coverage is at least 100 percent but not greater than 120 percent of a weighted average (described in subparagraph (D)).

"(D) WEIGHTED AVERAGE.—For purposes of this paragraph, the weighted average described in this subparagraph is the average actuarial value of the benefits provided by all the health insurance coverage issued (as elected by the issuer) either by that issuer or by all issuers in the State in the individual market during the previous year (not including coverage issued under this section), weighted by enrollment for the different coverage.

"(4) ELECTION.—The issuer elections under this subsection shall apply uniformly to all eligible individuals in the State for that issuer. Such an election shall be effective for policies offered during a period of not shorter than 2 years.

"(5) ASSUMPTIONS.—For purposes of paragraph (3), the actuarial value of benefits provided under individual health insurance coverage shall be calculated based on a standardized population and a set of standardized utilization and cost factors.

"(d) SPECIAL RULES FOR NETWORK PLANS.—

"(1) IN GENERAL.—In the case of a health insurance issuer that offers health insurance coverage in the individual market through a network plan, the issuer may—

"(A) limit the individuals who may be enrolled under such coverage to those who live, reside, or work within the service area for such network plan; and

"(B) within the service area of such plan, deny such coverage to such individuals if the issuer has demonstrated, if required, to the applicable State authority that—

"(i) it will not have the capacity to deliver services adequately to additional individual enrollees because of its obligations to existing group contract holders and enrollees and individual enrollees, and

"(ii) it is applying this paragraph uniformly to individuals without regard to any health status-related factor of such individuals and without regard to whether the individuals are eligible individuals.

"(2) 180–DAY SUSPENSION UPON DENIAL OF COVERAGE.—An issuer, upon denying health insurance coverage in any service area in accordance with paragraph (1)(B), may not offer coverage in the individual market within such service area for a period of 180 days after such coverage is denied.

"(e) APPLICATION OF FINANCIAL CAPACITY LIMITS.—

"(1) IN GENERAL.—A health insurance issuer may deny health insurance coverage in the individual market to an eligible individual if the issuer has demonstrated, if required, to the applicable State authority that—

"(A) it does not have the financial reserves necessary to underwrite additional coverage; and

"(B) it is applying this paragraph uniformly to all individuals in the individual market in the State consistent with applicable State law and without regard to any health status-related factor of such individuals and without regard to whether the individuals are eligible individuals.

"(2) 180–DAY SUSPENSION UPON DENIAL OF COVERAGE.—An issuer upon denying individual health insurance coverage in any service area in accordance with paragraph (1) may not offer such coverage in the individual market within such service area for a period of 180 days after the date such coverage is denied or until the issuer has demonstrated, if required under applicable State law, to the applicable State authority that the issuer has sufficient financial reserves to underwrite additional coverage, whichever is later. A State may provide for the application of this paragraph on a service-area-specific basis.

"(e) MARKET REQUIREMENTS.—

"(1) IN GENERAL.—The provisions of subsection (a) shall not be construed to require that a health insurance issuer offering health insurance coverage only in connection with group health plans or through one or more bona fide associations, or both, offer such health insurance coverage in the individual market.

"(2) CONVERSION POLICIES.—A health insurance issuer offering health insurance coverage in connection with group health plans under this title shall not be deemed to be a health insurance issuer offering individual health insurance coverage solely because such issuer offers a conversion policy.

"(f) CONSTRUCTION.—Nothing in this section shall be construed—

"(1) to restrict the amount of the premium rates that an issuer may charge an individual for health insurance coverage provided in the individual market under applicable State law; or

"(2) to prevent a health insurance issuer offering health insurance coverage in the individual market from establishing premium discounts or rebates or modifying otherwise applicable copayments or deductibles in return for adherence to programs of health promotion and disease prevention.

<< 42 USCA § 300gg–42 >>

"SEC. 2742. GUARANTEED RENEWABILITY OF INDIVIDUAL HEALTH INSURANCE COVERAGE.

"(a) IN GENERAL.—Except as provided in this section, a health insurance issuer that provides individual health insurance coverage to an individual shall renew or continue in force such coverage at the option of the individual.

"(b) GENERAL EXCEPTIONS.—A health insurance issuer may nonrenew or discontinue health insurance coverage of an individual in the individual market based only on one or more of the following:

"(1) NONPAYMENT OF PREMIUMS.—The individual has failed to pay premiums or contributions in accordance with the terms of the health insurance coverage or the issuer has not received timely premium payments.

"(2) FRAUD.—The individual has performed an act or practice that constitutes fraud or made an intentional misrepresentation of material fact under the terms of the coverage.

"(3) TERMINATION OF PLAN.—The issuer is ceasing to offer coverage in the individual market in accordance with subsection (c) and applicable State law.

"(4) MOVEMENT OUTSIDE SERVICE AREA.—In the case of a health insurance issuer that offers health insurance coverage in the market through a network plan, the individual no longer resides, lives, or works in the service area (or in an area for which the issuer is authorized to do business) but only if such coverage is terminated under this paragraph uniformly without regard to any health status-related factor of covered individuals.

"(5) ASSOCIATION MEMBERSHIP CEASES.—In the case of health insurance coverage that is made available in the individual market only through one or more bona fide associations, the membership of the individual in the association (on the basis of which the coverage is provided) ceases but only if such coverage is terminated under this paragraph uniformly without regard to any health status-related factor of covered individuals.

"(c) REQUIREMENTS FOR UNIFORM TERMINATION OF COVERAGE.—

"(1) PARTICULAR TYPE OF COVERAGE NOT OFFERED.—In any case in which an issuer decides to discontinue offering a particular type of health insurance coverage offered in the individual market, coverage of such type may be discontinued by the issuer only if—

"(A) the issuer provides notice to each covered individual provided coverage of this type in such market of such discontinuation at least 90 days prior to the date of the discontinuation of such coverage;

"(B) the issuer offers to each individual in the individual market provided coverage of this type, the option to purchase any other individual health insurance coverage currently being offered by the issuer for individuals in such market; and

"(C) in exercising the option to discontinue coverage of this type and in offering the option of coverage under subparagraph (B), the issuer acts uniformly without regard to any health status-related factor of enrolled individuals or individuals who may become eligible for such coverage.

"(2) DISCONTINUANCE OF ALL COVERAGE.—

"(A) IN GENERAL.—Subject to subparagraph (C), in any case in which a health insurance issuer elects to discontinue offering all health insurance coverage in the individual market in a State, health insurance coverage may be discontinued by the issuer only if—

"(i) the issuer provides notice to the applicable State authority and to each individual of such discontinuation at least 180 days prior to the date of the expiration of such coverage, and

"(ii) all health insurance issued or delivered for issuance in the State in such market are discontinued and coverage under such health insurance coverage in such market is not renewed.

WESTLAW    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

"(B) PROHIBITION ON MARKET REENTRY.—In the case of a discontinuation under subparagraph (A) in the individual market, the issuer may not provide for the issuance of any health insurance coverage in the market and State involved during the 5–year period beginning on the date of the discontinuation of the last health insurance coverage not so renewed.

"(d) EXCEPTION FOR UNIFORM MODIFICATION OF COVERAGE.—At the time of coverage renewal, a health insurance issuer may modify the health insurance coverage for a policy form offered to individuals in the individual market so long as such modification is consistent with State law and effective on a uniform basis among all individuals with that policy form.

"(e) APPLICATION TO COVERAGE OFFERED ONLY THROUGH ASSOCIATIONS.—In applying this section in the case of health insurance coverage that is made available by a health insurance issuer in the individual market to individuals only through one or more associations, a reference to an 'individual' is deemed to include a reference to such an association (of which the individual is a member).

<< 42 USCA § 300gg–43 >>

"SEC. 2743. CERTIFICATION OF COVERAGE.

"The provisions of section 2701(e) shall apply to health insurance coverage offered by a health insurance issuer in the individual market in the same manner as it applies to health insurance coverage offered by a health insurance issuer in connection with a group health plan in the small or large group market.

<< 42 USCA § 300gg–44 >>

"SEC. 2744. STATE FLEXIBILITY IN INDIVIDUAL MARKET REFORMS.

"(a) WAIVER OF REQUIREMENTS WHERE IMPLEMENTATION OF ACCEPTABLE ALTERNATIVE MECHANISM.—

"(1) IN GENERAL.—The requirements of section 2741 shall not apply with respect to health insurance coverage offered in the individual market in the State so long as a State is found to be implementing, in accordance with this section and consistent with section 2746(b), an alternative mechanism (in this section referred to as an 'acceptable alternative mechanism')—

"(A) under which all eligible individuals are provided a choice of health insurance coverage;

"(B) under which such coverage does not impose any preexisting condition exclusion with respect to such coverage;

"(C) under which such choice of coverage includes at least one policy form of coverage that is comparable to comprehensive health insurance coverage offered in the individual market in such State or that is comparable to a standard option of coverage available under the group or individual health insurance laws of such State; and

"(D) in a State which is implementing—

"(i) a model act described in subsection (c)(1),

"(ii) a qualified high risk pool described in subsection (c)(2), or

"(iii) a mechanism described in subsection (c)(3).

"(2) PERMISSIBLE FORMS OF MECHANISMS.—A private or public individual health insurance mechanism (such as a health insurance coverage pool or programs, mandatory group conversion policies, guaranteed issue of one or more plans of individual health insurance coverage, or open enrollment by one or more health insurance issuers), or combination of such mechanisms, that is designed to provide access to health benefits for individuals in the individual market in the State in accordance with this section may constitute an acceptable alternative mechanism.

"(b) APPLICATION OF ACCEPTABLE ALTERNATIVE MECHANISMS.—

"(1) PRESUMPTION.—

"(A) IN GENERAL.—Subject to the succeeding provisions of this subsection, a State is presumed to be implementing an acceptable alternative mechanism in accordance with this section as of July 1, 1997, if, by not later than April 1, 1997, the chief executive officer of a State—

"(i) notifies the Secretary that the State has enacted or intends to enact (by not later than January 1, 1998, or July 1, 1998, in the case of a State described in subparagraph (B)(ii)) any necessary legislation to provide for the implementation of a mechanism reasonably designed to be an acceptable alternative mechanism as of January 1, 1998, (or, in the case of a State described in subparagraph (B)(ii), July 1, 1998); and

"(ii) provides the Secretary with such information as the Secretary may require to review the mechanism and its implementation (or proposed implementation) under this subsection.

"(B) DELAY PERMITTED FOR CERTAIN STATES.—

"(i) EFFECT OF DELAY.—In the case of a State described in clause (ii) that provides notice under subparagraph (A)(i), for the presumption to continue on and after July 1, 1998, the chief executive officer of the State by April 1, 1998—

"(I) must notify the Secretary that the State has enacted any necessary legislation to provide for the implementation of a mechanism reasonably designed to be an acceptable alternative mechanism as of July 1, 1998; and

"(II) must provide the Secretary with such information as the Secretary may require to review the mechanism and its implementation (or proposed implementation) under this subsection.

"(ii) STATES DESCRIBED.—A State described in this clause is a State that has a legislature that does not meet within the 12–month period beginning on the date of enactment of this Act.

"(C) CONTINUED APPLICATION.—In order for a mechanism to continue to be presumed to be an acceptable alternative mechanism, the State shall provide the Secretary every 3 years with information described in subparagraph (A)(ii) or (B)(i) (II) (as the case may be).

"(2) NOTICE.—If the Secretary finds, after review of information provided under paragraph (1) and in consultation with the chief executive officer of the State and the insurance commissioner or chief insurance regulatory official of the State, that such a mechanism is not an acceptable alternative mechanism or is not (or no longer) being implemented, the Secretary—

"(A) shall notify the State of—

"(i) such preliminary determination, and

"(ii) the consequences under paragraph (3) of a failure to implement such a mechanism; and

"(B) shall permit the State a reasonable opportunity in which to modify the mechanism (or to adopt another mechanism) in a manner so that may be an acceptable alternative mechanism or to provide for implementation of such a mechanism.

"(3) FINAL DETERMINATION.—If, after providing notice and opportunity under paragraph (2), the Secretary finds that the mechanism is not an acceptable alternative mechanism or the State is not implementing such a mechanism, the Secretary shall notify the State that the State is no longer considered to be implementing an acceptable alternative mechanism and that the requirements of section 2741 shall apply to health insurance coverage offered in the individual market in the State, effective as of a date specified in the notice.

"(4) LIMITATION ON SECRETARIAL AUTHORITY.—The Secretary shall not make a determination under paragraph (2) or (3) on any basis other than the basis that a mechanism is not an acceptable alternative mechanism or is not being implemented.

"(5) FUTURE ADOPTION OF MECHANISMS.—If a State, after January 1, 1997, submits the notice and information described in paragraph (1), unless the Secretary makes a finding described in paragraph (3) within the 90–day period beginning on the date of submission of the notice and information, the mechanism shall be considered to be an acceptable alternative mechanism for purposes of this section, effective 90 days after the end of such period, subject to the second sentence of paragraph (1).

"(c) PROVISION RELATED TO RISK.—

"(1) ADOPTION OF NAIC MODELS.—The model act referred to in subsection (a)(1)(D)(i) is the Small Employer and Individual Health Insurance Availability Model Act (adopted by the National Association of Insurance Commissioners on June 3, 1996) insofar as it applies to individual health insurance coverage or the Individual Health Insurance Portability Model Act (also adopted by such Association on such date).

"(2) QUALIFIED HIGH RISK POOL.—For purposes of subsection (a)(1)(D)(ii), a 'qualified high risk pool' described in this paragraph is a high risk pool that—

"(A) provides to all eligible individuals health insurance coverage (or comparable coverage) that does not impose any preexisting condition exclusion with respect to such coverage for all eligible individuals, and

"(B) provides for premium rates and covered benefits for such coverage consistent with standards included in the NAIC Model Health Plan for Uninsurable Individuals Act (as in effect as of the date of the enactment of this title).

"(3) OTHER MECHANISMS.—For purposes of subsection (a)(1)(D)(iii), a mechanism described in this paragraph—

"(A) provides for risk adjustment, risk spreading, or a risk spreading mechanism (among issuers or policies of an issuer) or otherwise provides for some financial subsidization for eligible individuals, including through assistance to participating issuers; or

"(B) is a mechanism under which each eligible individual is provided a choice of all individual health insurance coverage otherwise available.

<< 42 USCA § 300gg–45 >>

"SEC. 2745. ENFORCEMENT.

"(a) STATE ENFORCEMENT.—

"(1) STATE AUTHORITY.—Subject to section 2746, each State may require that health insurance issuers that issue, sell, renew, or offer health insurance coverage in the State in the individual market meet the requirements established under this part with respect to such issuers.

"(2) FAILURE TO IMPLEMENT REQUIREMENTS.—In the case of a State that fails to substantially enforce the requirements set forth in this part with respect to health insurance issuers in the State, the Secretary shall enforce the requirements of this part under subsection (b) insofar as they relate to the issuance, sale, renewal, and offering of health insurance coverage in the individual market in such State.

"(b) SECRETARIAL ENFORCEMENT AUTHORITY.—The Secretary shall have the same authority in relation to enforcement of the provisions of this part with respect to issuers of health insurance coverage in the individual market in a State as the Secretary has under section 2722(b)(2) in relation to the enforcement of the provisions of part A with respect to issuers of health insurance coverage in the small group market in the State.

<< 42 USCA § 300gg–46 >>

"SEC. 2746. PREEMPTION.

"(a) IN GENERAL.—Subject to subsection (b), nothing in this part (or part C insofar as it applies to this part) shall be construed to prevent a State from establishing, implementing, or continuing in effect standards and requirements unless such standards and requirements prevent the application of a requirement of this part.

"(b) RULES OF CONSTRUCTION.—Nothing in this part (or part C insofar as it applies to this part) shall be construed to affect or modify the provisions of section 514 of the Employee Retirement Income Security Act of 1974 (29 U.S.C. 1144).

<< 42 USCA § 300gg–47 >>

"SEC. 2747. GENERAL EXCEPTIONS.

"(a) EXCEPTION FOR CERTAIN BENEFITS.—The requirements of this part shall not apply to any health insurance coverage in relation to its provision of excepted benefits described in section 2791(c)(1).

"(b) EXCEPTION FOR CERTAIN BENEFITS IF CERTAIN CONDITIONS MET.—The requirements of this part shall not apply to any health insurance coverage in relation to its provision of excepted benefits described in paragraph (2), (3), or (4) of section 2791(c) if the benefits are provided under a separate policy, certificate, or contract of insurance.".

<< 42 USCA §§ 300gg–41 NOTE, 300gg–42 nt, 300gg–43 nt, 300gg–44 nt, 300gg–45 nt, 300gg–46 nt, 300gg–47 nt >>

(b) EFFECTIVE DATE.—

(1) IN GENERAL.—Except as provided in this subsection, part B of title XXVII of the Public Health Service Act (as inserted by subsection (a)) shall apply with respect to health insurance coverage offered, sold, issued, renewed, in effect, or operated in the individual market after June 30, 1997, regardless of when a period of creditable coverage occurs.

(2) APPLICATION OF CERTIFICATION RULES.—The provisions of section 102(d)(2) of this Act shall apply to section 2743 of the Public Health Service Act in the same manner as it applies to section 2701(e) of such Act.

Subtitle C—General and Miscellaneous Provisions

<< 42 USCA § 300gg NOTE >>

SEC. 191. HEALTH COVERAGE AVAILABILITY STUDIES.

 (a) STUDIES.—
  (1) STUDY ON EFFECTIVENESS OF REFORMS.—The Secretary of Health and Human Services shall provide for a study on the effectiveness of the provisions of this title and the various State laws, in ensuring the availability of reasonably priced health coverage to employers purchasing group coverage and individuals purchasing coverage on a non-group basis.
  (2) STUDY ON ACCESS AND CHOICE.—The Secretary also shall provide for a study on—
   (A) the extent to which patients have direct access to, and choice of, health care providers, including specialty providers, within a network plan, as well as the opportunity to utilize providers outside of the network plan, under the various types of coverage offered under the provisions of this title; and
   (B) the cost and cost-effectiveness to health insurance issuers of providing access to out-of-network providers, and the potential impact of providing such access on the cost and quality of health insurance coverage offered under provisions of this title.
  (3) CONSULTATION.—The studies under this subsection shall be conducted in consultation with the Secretary of Labor, representatives of State officials, consumers, and other representatives of individuals and entities that have expertise in health insurance and employee benefits.
 (b) REPORTS.—Not later than January 1, 2000, the Secretary shall submit to the appropriate committees of Congress a report on each of the studies under subsection (a).

SEC. 192. REPORT ON MEDICARE REIMBURSEMENT OF TELEMEDICINE.

 The Health Care Financing Administration shall complete its ongoing study of Medicare reimbursement of all telemedicine services and submit a report to Congress on Medicare reimbursement of telemedicine services by not later than March 1, 1997. The report shall—
  (1) utilize data compiled from the current demonstration projects already under review and gather data from other ongoing telemedicine networks;
  (2) include an analysis of the cost of services provided via telemedicine; and
  (3) include a proposal for Medicare reimbursement of such services.

<< 42 USCA § 300e >>

SEC. 193. ALLOWING FEDERALLY–QUALIFIED HMOS TO OFFER HIGH DEDUCTIBLE PLANS.

 Section 1301(b) of the Public Health Service Act (42 U.S.C. 300e(b)) is amended by adding at the end the following new paragraph:
  "(6) A health maintenance organization that otherwise meets the requirements of this title may offer a high-deductible health plan (as defined in section 220(c)(2) of the Internal Revenue Code of 1986).".

<< 42 USCA § 233 >>

SEC. 194. VOLUNTEER SERVICES PROVIDED BY HEALTH PROFESSIONALS AT FREE CLINICS.

 Section 224 of the Public Health Service Act (42 U.S.C. 233) is amended by adding at the end the following subsection:
  "(o)(1) For purposes of this section, a free clinic health professional shall in providing a qualifying health service to an individual be deemed to be an employee of the Public Health Service for a calendar year that begins during a fiscal year for which a transfer was made under paragraph (6)(D). The preceding sentence is subject to the provisions of this subsection.
  "(2) In providing a health service to an individual, a health care practitioner shall for purposes of this subsection be considered to be a free clinic health professional if the following conditions are met:
   "(A) The service is provided to the individual at a free clinic, or through offsite programs or events carried out by the free clinic.
   "(B) The free clinic is sponsoring the health care practitioner pursuant to paragraph (5)(C).

"(C) The service is a qualifying health service (as defined in paragraph (4)).

"(D) Neither the health care practitioner nor the free clinic receives any compensation for the service from the individual or from any third-party payor (including reimbursement under any insurance policy or health plan, or under any Federal or State health benefits program). With respect to compliance with such condition:

  "(i) The health care practitioner may receive repayment from the free clinic for reasonable expenses incurred by the health care practitioner in the provision of the service to the individual.

  "(ii) The free clinic may accept voluntary donations for the provision of the service by the health care practitioner to the individual.

"(E) Before the service is provided, the health care practitioner or the free clinic provides written notice to the individual of the extent to which the legal liability of the health care practitioner is limited pursuant to this subsection (or in the case of an emergency, the written notice is provided to the individual as soon after the emergency as is practicable). If the individual is a minor or is otherwise legally incompetent, the condition under this subparagraph is that the written notice be provided to a legal guardian or other person with legal responsibility for the care of the individual.

"(F) At the time the service is provided, the health care practitioner is licensed or certified in accordance with applicable law regarding the provision of the service.

"(3)(A) For purposes of this subsection, the term 'free clinic' means a health care facility operated by a nonprofit private entity meeting the following requirements:

  "(i) The entity does not, in providing health services through the facility, accept reimbursement from any third-party payor (including reimbursement under any insurance policy or health plan, or under any Federal or State health benefits program).

  "(ii) The entity, in providing health services through the facility, either does not impose charges on the individuals to whom the services are provided, or imposes a charge according to the ability of the individual involved to pay the charge.

  "(iii) The entity is licensed or certified in accordance with applicable law regarding the provision of health services.

"(B) With respect to compliance with the conditions under subparagraph (A), the entity involved may accept voluntary donations for the provision of services.

"(4) For purposes of this subsection, the term 'qualifying health service' means any medical assistance required or authorized to be provided in the program under title XIX of the Social Security Act, without regard to whether the medical assistance is included in the plan submitted under such program by the State in which the health care practitioner involved provides the medical assistance. References in the preceding sentence to such program shall as applicable be considered to be references to any successor to such program.

"(5) Subsection (g) (other than paragraphs (3) through (5)) and subsections (h), (i), and (l) apply to a health care practitioner for purposes of this subsection to the same extent and in the same manner as such subsections apply to an officer, governing board member, employee, or contractor of an entity described in subsection (g)(4), subject to paragraph (6) and subject to the following:

"(A) The first sentence of paragraph (1) applies in lieu of the first sentence of subsection (g)(1)(A).

"(B) This subsection may not be construed as deeming any free clinic to be an employee of the Public Health Service for purposes of this section.

"(C) With respect to a free clinic, a health care practitioner is not a free clinic health professional unless the free clinic sponsors the health care practitioner. For purposes of this subsection, the free clinic shall be considered to be sponsoring the health care practitioner if—

  "(i) with respect to the health care practitioner, the free clinic submits to the Secretary an application meeting the requirements of subsection (g)(1)(D); and

  "(ii) the Secretary, pursuant to subsection (g)(1)(E), determines that the health care practitioner is deemed to be an employee of the Public Health Service.

"(D) In the case of a health care practitioner who is determined by the Secretary pursuant to subsection (g)(1)(E) to be a free clinic health professional, this subsection applies to the health care practitioner (with respect to the free clinic sponsoring the health care practitioner pursuant to subparagraph (C)) for any cause of action arising from an act or omission of the health care practitioner occurring on or after the date on which the Secretary makes such determination.

"(E) Subsection (g)(1)(F) applies to a health care practitioner for purposes of this subsection only to the extent that, in providing health services to an individual, each of the conditions specified in paragraph (2) is met.

"(6)(A) For purposes of making payments for judgments against the United States (together with related fees and expenses of witnesses) pursuant to this section arising from the acts or omissions of free clinic health professionals, there is authorized to be appropriated $10,000,000 for each fiscal year.

 "(B) The Secretary shall establish a fund for purposes of this subsection. Each fiscal year amounts appropriated under subparagraph (A) shall be deposited in such fund.

 "(C) Not later than May 1 of each fiscal year, the Attorney General, in consultation with the Secretary, shall submit to the Congress a report providing an estimate of the amount of claims (together with related fees and expenses of witnesses) that, by reason of the acts or omissions of free clinic health professionals, will be paid pursuant to this section during the calendar year that begins in the following fiscal year. Subsection (k)(1)(B) applies to the estimate under the preceding sentence regarding free clinic health professionals to the same extent and in the same manner as such subsection applies to the estimate under such subsection regarding officers, governing board members, employees, and contractors of entities described in subsection (g)(4).

 "(D) Not later than December 31 of each fiscal year, the Secretary shall transfer from the fund under subparagraph (B) to the appropriate accounts in the Treasury an amount equal to the estimate made under subparagraph (C) for the calendar year beginning in such fiscal year, subject to the extent of amounts in the fund.

 "(7)(A) This subsection takes effect on the date of the enactment of the first appropriations Act that makes an appropriation under paragraph (6)(A), except as provided in subparagraph (B)(i).

 "(B)(i) Effective on the date of the enactment of the Health Insurance Portability and Accountability Act of 1996—

 "(I) the Secretary may issue regulations for carrying out this subsection, and the Secretary may accept and consider applications submitted pursuant to paragraph (5)(C); and

 "(II) reports under paragraph (6)(C) may be submitted to the Congress.

 "(ii) For the first fiscal year for which an appropriation is made under subparagraph (A) of paragraph (6), if an estimate under subparagraph (C) of such paragraph has not been made for the calendar year beginning in such fiscal year, the transfer under subparagraph (D) of such paragraph shall be made notwithstanding the lack of the estimate, and the transfer shall be made in an amount equal to the amount of such appropriation.".

<< 42 USCA § 300gg NOTE >>

SEC. 195. FINDINGS; SEVERABILITY.

 (a) FINDINGS RELATING TO EXERCISE OF COMMERCE CLAUSE AUTHORITY.—Congress finds the following in relation to the provisions of this title:

   (1) Provisions in group health plans and health insurance coverage that impose certain preexisting condition exclusions impact the ability of employees to seek employment in interstate commerce, thereby impeding such commerce.

   (2) Health insurance coverage is commercial in nature and is in and affects interstate commerce.

   (3) It is a necessary and proper exercise of Congressional authority to impose requirements under this title on group health plans and health insurance coverage (including coverage offered to individuals previously covered under group health plans) in order to promote commerce among the States.

   (4) Congress, however, intends to defer to States, to the maximum extent practicable, in carrying out such requirements with respect to insurers and health maintenance organizations that are subject to State regulation, consistent with the provisions of the Employee Retirement Income Security Act of 1974.

<< 29 USCA §§ 1003 nt, 1021 nt, 1022 nt, 1024 nt, 1132 nt, 1136 nt,
1144 nt, 1181 nt, 1182 nt, 1183 nt, 1184 nt, 1185 nt, 1186 nt, 1187 nt >>

<< 42 USCA §§ 233 nt, 300e nt, 300bb–8 nt, 300gg–1 nt, 300gg–11 nt, 300gg–12 nt,
300gg–13 nt, 300gg–21 nt, 300gg–22 nt, 300gg–23 nt, 300gg–41 nt, 300gg–42 nt, 300gg–
43 nt, 300gg–44 nt, 300gg–45 nt, 300gg–46 nt, 300gg–47 nt, 300gg–91 nt, 300gg–92 nt >>

 (b) SEVERABILITY.—If any provision of this title or the application of such provision to any person or circumstance is held to be unconstitutional, the remainder of this title and the application of the provisions of such to any person or circumstance shall not be affected thereby.

TITLE II—PREVENTING HEALTH CARE FRAUD AND ABUSE; ADMINISTRATIVE SIMPLIFICATION

SEC. 200. REFERENCES IN TITLE.

 Except as otherwise specifically provided, whenever in this title an amendment is expressed in terms of an amendment to or repeal of a section or other provision, the reference shall be considered to be made to that section or other provision of the Social Security Act.

Subtitle A—Fraud and Abuse Control Program

SEC. 201. FRAUD AND ABUSE CONTROL PROGRAM.

<< 42 USCA § 1320a–7c >>

 (a) ESTABLISHMENT OF PROGRAM.—Title XI (42 U.S.C. 1301 et seq.) is amended by inserting after section 1128B the following new section:

"FRAUD AND ABUSE CONTROL PROGRAM

 "SEC. 1128C. (a) ESTABLISHMENT OF PROGRAM.—

 "(1) IN GENERAL.—Not later than January 1, 1997, the Secretary, acting through the Office of the Inspector General of the Department of Health and Human Services, and the Attorney General shall establish a program—

  "(A) to coordinate Federal, State, and local law enforcement programs to control fraud and abuse with respect to health plans,

  "(B) to conduct investigations, audits, evaluations, and inspections relating to the delivery of and payment for health care in the United States,

  "(C) to facilitate the enforcement of the provisions of sections 1128, 1128A, and 1128B and other statutes applicable to health care fraud and abuse,

  "(D) to provide for the modification and establishment of safe harbors and to issue advisory opinions and special fraud alerts pursuant to section 1128D, and

  "(E) to provide for the reporting and disclosure of certain final adverse actions against health care providers, suppliers, or practitioners pursuant to the data collection system established under section 1128E.

 "(2) COORDINATION WITH HEALTH PLANS.—In carrying out the program established under paragraph (1), the Secretary and the Attorney General shall consult with, and arrange for the sharing of data with representatives of health plans.

 "(3) GUIDELINES.—

  "(A) IN GENERAL.—The Secretary and the Attorney General shall issue guidelines to carry out the program under paragraph (1). The provisions of sections 553, 556, and 557 of title 5, United States Code, shall not apply in the issuance of such guidelines.

  "(B) INFORMATION GUIDELINES.—

   "(i) IN GENERAL.—Such guidelines shall include guidelines relating to the furnishing of information by health plans, providers, and others to enable the Secretary and the Attorney General to carry out the program (including coordination with health plans under paragraph (2)).

   "(ii) CONFIDENTIALITY.—Such guidelines shall include procedures to assure that such information is provided and utilized in a manner that appropriately protects the confidentiality of the information and the privacy of individuals receiving health care services and items.

   "(iii) QUALIFIED IMMUNITY FOR PROVIDING INFORMATION.—The provisions of section 1157(a) (relating to limitation on liability) shall apply to a person providing information to the Secretary or the Attorney General in conjunction with their performance of duties under this section.

 "(4) ENSURING ACCESS TO DOCUMENTATION.—The Inspector General of the Department of Health and Human Services is authorized to exercise such authority described in paragraphs (3) through (9) of section 6 of the Inspector General Act of 1978 (5 U.S.C.App.) as necessary with respect to the activities under the fraud and abuse control program established under this subsection.

"(5) AUTHORITY OF INSPECTOR GENERAL.—Nothing in this Act shall be construed to diminish the authority of any Inspector General, including such authority as provided in the Inspector General Act of 1978 (5 U.S.C.App.).

"(b) ADDITIONAL USE OF FUNDS BY INSPECTOR GENERAL.—

"(1) REIMBURSEMENTS FOR INVESTIGATIONS.—The Inspector General of the Department of Health and Human Services is authorized to receive and retain for current use reimbursement for the costs of conducting investigations and audits and for monitoring compliance plans when such costs are ordered by a court, voluntarily agreed to by the payor, or otherwise.

"(2) CREDITING.—Funds received by the Inspector General under paragraph (1) as reimbursement for costs of conducting investigations shall be deposited to the credit of the appropriation from which initially paid, or to appropriations for similar purposes currently available at the time of deposit, and shall remain available for obligation for 1 year from the date of the deposit of such funds.

"(c) HEALTH PLAN DEFINED.—For purposes of this section, the term 'health plan' means a plan or program that provides health benefits, whether directly, through insurance, or otherwise, and includes—

"(1) a policy of health insurance;

"(2) a contract of a service benefit organization; and

"(3) a membership agreement with a health maintenance organization or other prepaid health plan.".

<< 42 USCA § 1395i >>

(b) ESTABLISHMENT OF HEALTH CARE FRAUD AND ABUSE CONTROL ACCOUNT IN FEDERAL HOSPITAL INSURANCE TRUST FUND.—Section 1817 (42 U.S.C. 1395i) is amended by adding at the end the following new subsection:

"(k) HEALTH CARE FRAUD AND ABUSE CONTROL ACCOUNT.—

"(1) ESTABLISHMENT.—There is hereby established in the Trust Fund an expenditure account to be known as the 'Health Care Fraud and Abuse Control Account' (in this subsection referred to as the 'Account').

"(2) APPROPRIATED AMOUNTS TO TRUST FUND.—

"(A) IN GENERAL.—There are hereby appropriated to the Trust Fund—

"(i) such gifts and bequests as may be made as provided in subparagraph (B);

"(ii) such amounts as may be deposited in the Trust Fund as provided in sections 242(b) and 249(c) of the Health Insurance Portability and Accountability Act of 1996, and title XI; and

"(iii) such amounts as are transferred to the Trust Fund under subparagraph (C).

"(B) AUTHORIZATION TO ACCEPT GIFTS.—The Trust Fund is authorized to accept on behalf of the United States money gifts and bequests made unconditionally to the Trust Fund, for the benefit of the Account or any activity financed through the Account.

"(C) TRANSFER OF AMOUNTS.—The Managing Trustee shall transfer to the Trust Fund, under rules similar to the rules in section 9601 of the Internal Revenue Code of 1986, an amount equal to the sum of the following:

"(i) Criminal fines recovered in cases involving a Federal health care offense (as defined in section 982(a)(6)(B) of title 18, United States Code).

"(ii) Civil monetary penalties and assessments imposed in health care cases, including amounts recovered under titles XI, XVIII, and XIX, and chapter 38 of title 31, United States Code (except as otherwise provided by law).

"(iii) Amounts resulting from the forfeiture of property by reason of a Federal health care offense.

"(iv) Penalties and damages obtained and otherwise creditable to miscellaneous receipts of the general fund of the Treasury obtained under sections 3729 through 3733 of title 31, United States Code (known as the False Claims Act), in cases involving claims related to the provision of health care items and services (other than funds awarded to a relator, for restitution or otherwise authorized by law).

"(D) APPLICATION.—Nothing in subparagraph (C)(iii) shall be construed to limit the availability of recoveries and forfeitures obtained under title I of the Employee Retirement Income Security Act of 1974 for the purpose of providing equitable or remedial relief for employee welfare benefit plans, and for participants and beneficiaries under such plans, as authorized under such title.

"(3) APPROPRIATED AMOUNTS TO ACCOUNT FOR FRAUD AND ABUSE CONTROL PROGRAM, ETC.—

"(A) DEPARTMENTS OF HEALTH AND HUMAN SERVICES AND JUSTICE.—

"(i) IN GENERAL.—There are hereby appropriated to the Account from the Trust Fund such sums as the Secretary and the Attorney General certify are necessary to carry out the purposes described in subparagraph (C), to be available without further appropriation, in an amount not to exceed—

"(I) for fiscal year 1997, $104,000,000,

"(II) for each of the fiscal years 1998 through 2003, the limit for the preceding fiscal year, increased by 15 percent; and

"(III) for each fiscal year after fiscal year 2003, the limit for fiscal year 2003.

"(ii) MEDICARE AND MEDICAID ACTIVITIES.—For each fiscal year, of the amount appropriated in clause (i), the following amounts shall be available only for the purposes of the activities of the Office of the Inspector General of the Department of Health and Human Services with respect to the Medicare and medicaid programs—

"(I) for fiscal year 1997, not less than $60,000,000 and not more than $70,000,000;

"(II) for fiscal year 1998, not less than $80,000,000 and not more than $90,000,000;

"(III) for fiscal year 1999, not less than $90,000,000 and not more than $100,000,000;

"(IV) for fiscal year 2000, not less than $110,000,000 and not more than $120,000,000;

"(V) for fiscal year 2001, not less than $120,000,000 and not more than $130,000,000;

"(VI) for fiscal year 2002, not less than $140,000,000 and not more than $150,000,000; and

"(VII) for each fiscal year after fiscal year 2002, not less than $150,000,000 and not more than $160,000,000.

"(B) FEDERAL BUREAU OF INVESTIGATION.—There are hereby appropriated from the general fund of the United States Treasury and hereby appropriated to the Account for transfer to the Federal Bureau of Investigation to carry out the purposes described in subparagraph (C), to be available without further appropriation—

"(i) for fiscal year 1997, $47,000,000;

"(ii) for fiscal year 1998, $56,000,000;

"(iii) for fiscal year 1999, $66,000,000;

"(iv) for fiscal year 2000, $76,000,000;

"(v) for fiscal year 2001, $88,000,000;

"(vi) for fiscal year 2002, $101,000,000; and

"(vii) for each fiscal year after fiscal year 2002, $114,000,000.

"(C) USE OF FUNDS.—The purposes described in this subparagraph are to cover the costs (including equipment, salaries and benefits, and travel and training) of the administration and operation of the health care fraud and abuse control program established under section 1128C(a), including the costs of—

"(i) prosecuting health care matters (through criminal, civil, and administrative proceedings);

"(ii) investigations;

"(iii) financial and performance audits of health care programs and operations;

"(iv) inspections and other evaluations; and

"(v) provider and consumer education regarding compliance with the provisions of title XI.

"(4) APPROPRIATED AMOUNTS TO ACCOUNT FOR MEDICARE INTEGRITY PROGRAM.—

"(A) IN GENERAL.—There are hereby appropriated to the Account from the Trust Fund for each fiscal year such amounts as are necessary to carry out the Medicare Integrity Program under section 1893, subject to subparagraph (B) and to be available without further appropriation.

"(B) AMOUNTS SPECIFIED.—The amount appropriated under subparagraph (A) for a fiscal year is as follows:

"(i) For fiscal year 1997, such amount shall be not less than $430,000,000 and not more than $440,000,000.

"(ii) For fiscal year 1998, such amount shall be not less than $490,000,000 and not more than $500,000,000.

"(iii) For fiscal year 1999, such amount shall be not less than $550,000,000 and not more than $560,000,000.

"(iv) For fiscal year 2000, such amount shall be not less than $620,000,000 and not more than $630,000,000.

"(v) For fiscal year 2001, such amount shall be not less than $670,000,000 and not more than $680,000,000.

"(vi) For fiscal year 2002, such amount shall be not less than $690,000,000 and not more than $700,000,000.

"(vii) For each fiscal year after fiscal year 2002, such amount shall be not less than $710,000,000 and not more than $720,000,000.

"(5) ANNUAL REPORT.—Not later than January 1, the Secretary and the Attorney General shall submit jointly a report to Congress which identifies—

"(A) the amounts appropriated to the Trust Fund for the previous fiscal year under paragraph (2)(A) and the source of such amounts; and

"(B) the amounts appropriated from the Trust Fund for such year under paragraph (3) and the justification for the expenditure of such amounts.

"(6) GAO REPORT.—Not later than January 1 of 2000, 2002, and 2004, the Comptroller General of the United States shall submit a report to Congress which—

"(A) identifies—

"(i) the amounts appropriated to the Trust Fund for the previous two fiscal years under paragraph (2)(A) and the source of such amounts; and

"(ii) the amounts appropriated from the Trust Fund for such fiscal years under paragraph (3) and the justification for the expenditure of such amounts;

"(B) identifies any expenditures from the Trust Fund with respect to activities not involving the Medicare program under title XVIII;

"(C) identifies any savings to the Trust Fund, and any other savings, resulting from expenditures from the Trust Fund; and

"(D) analyzes such other aspects of the operation of the Trust Fund as the Comptroller General of the United States considers appropriate.".

SEC. 202. MEDICARE INTEGRITY PROGRAM.

(a) ESTABLISHMENT OF MEDICARE INTEGRITY PROGRAM.—Title XVIII is amended by adding at the end the following new section:

<< 42 USCA § 1395ddd >>

"MEDICARE INTEGRITY PROGRAM

"SEC. 1893. (a) ESTABLISHMENT OF PROGRAM.—There is hereby established the Medicare Integrity Program (in this section referred to as the 'Program') under which the Secretary shall promote the integrity of the Medicare program by entering into contracts in accordance with this section with eligible entities to carry out the activities described in subsection (b).

"(b) ACTIVITIES DESCRIBED.—The activities described in this subsection are as follows:

"(1) Review of activities of providers of services or other individuals and entities furnishing items and services for which payment may be made under this title (including skilled nursing facilities and home health agencies), including medical and utilization review and fraud review (employing similar standards, processes, and technologies used by private health plans, including equipment and software technologies which surpass the capability of the equipment and technologies used in the review of claims under this title as of the date of the enactment of this section).

"(2) Audit of cost reports.

"(3) Determinations as to whether payment should not be, or should not have been, made under this title by reason of section 1862(b), and recovery of payments that should not have been made.

"(4) Education of providers of services, beneficiaries, and other persons with respect to payment integrity and benefit quality assurance issues.

"(5) Developing (and periodically updating) a list of items of durable medical equipment in accordance with section 1834(a)(15) which are subject to prior authorization under such section.

"(c) ELIGIBILITY OF ENTITIES.—An entity is eligible to enter into a contract under the Program to carry out any of the activities described in subsection (b) if—

"(1) the entity has demonstrated capability to carry out such activities;

"(2) in carrying out such activities, the entity agrees to cooperate with the Inspector General of the Department of Health and Human Services, the Attorney General, and other law enforcement agencies, as appropriate, in the investigation and deterrence of fraud and abuse in relation to this title and in other cases arising out of such activities;

"(3) the entity complies with such conflict of interest standards as are generally applicable to Federal acquisition and procurement; and

"(4) the entity meets such other requirements as the Secretary may impose.

In the case of the activity described in subsection (b)(5), an entity shall be deemed to be eligible to enter into a contract under the Program to carry out the activity if the entity is a carrier with a contract in effect under section 1842.

"(d) PROCESS FOR ENTERING INTO CONTRACTS.—The Secretary shall enter into contracts under the Program in accordance with such procedures as the Secretary shall by regulation establish, except that such procedures shall include the following:

"(1) Procedures for identifying, evaluating, and resolving organizational conflicts of interest that are generally applicable to Federal acquisition and procurement.

"(2) Competitive procedures to be used—

"(A) when entering into new contracts under this section;

"(B) when entering into contracts that may result in the elimination of responsibilities of an individual fiscal intermediary or carrier under section 202(b) of the Health Insurance Portability and Accountability Act of 1996; and

"(C) at any other time considered appropriate by the Secretary,

except that the Secretary may continue to contract with entities that are carrying out the activities described in this section pursuant to agreements under section 1816 or contracts under section 1842 in effect on the date of the enactment of this section.

"(3) Procedures under which a contract under this section may be renewed without regard to any provision of law requiring competition if the contractor has met or exceeded the performance requirements established in the current contract.

The Secretary may enter into such contracts without regard to final rules having been promulgated.

"(e) LIMITATION ON CONTRACTOR LIABILITY.—The Secretary shall by regulation provide for the limitation of a contractor's liability for actions taken to carry out a contract under the Program, and such regulation shall, to the extent the Secretary finds appropriate, employ the same or comparable standards and other substantive and procedural provisions as are contained in section 1157.".

(b) ELIMINATION OF FI AND CARRIER RESPONSIBILITY FOR CARRYING OUT ACTIVITIES SUBJECT TO PROGRAM.—

<< 42 USCA § 1395h >>

(1) RESPONSIBILITIES OF FISCAL INTERMEDIARIES UNDER PART A.—Section 1816 (42 U.S.C. 1395h) is amended by adding at the end the following new subsection:

"(l) No agency or organization may carry out (or receive payment for carrying out) any activity pursuant to an agreement under this section to the extent that the activity is carried out pursuant to a contract under the Medicare Integrity Program under section 1893.".

<< 42 USCA § 1395u >>

(2) RESPONSIBILITIES OF CARRIERS UNDER PART B.—Section 1842(c) (42 U.S.C. 1395u(c)) is amended by adding at the end the following new paragraph:

"(6) No carrier may carry out (or receive payment for carrying out) any activity pursuant to a contract under this subsection to the extent that the activity is carried out pursuant to a contract under the Medicare Integrity Program under section 1893. The previous sentence shall not apply with respect to the activity described in section 1893(b)(5) (relating to prior authorization of certain items of durable medical equipment under section 1834(a)(15)).".

<< 42 USCA § 1395b–5 >>

SEC. 203. BENEFICIARY INCENTIVE PROGRAMS.

(a) CLARIFICATION OF REQUIREMENT TO PROVIDE EXPLANATION OF MEDICARE BENEFITS.—The Secretary of Health and Human Services (in this section referred to as the "Secretary") shall provide an explanation of benefits under the Medicare program under title XVIII of the Social Security Act with respect to each item or service for which payment may be

made under the program which is furnished to an individual, without regard to whether or not a deductible or coinsurance may be imposed against the individual with respect to the item or service.

  (b) PROGRAM TO COLLECT INFORMATION ON FRAUD AND ABUSE.—

  (1) ESTABLISHMENT OF PROGRAM.—Not later than 3 months after the date of the enactment of this Act, the Secretary shall establish a program under which the Secretary shall encourage individuals to report to the Secretary information on individuals and entities who are engaging in or who have engaged in acts or omissions which constitute grounds for the imposition of a sanction under section 1128, 1128A, or 1128B of the Social Security Act, or who have otherwise engaged in fraud and abuse against the Medicare program under title XVIII of such act for which there is a sanction provided under law. The program shall discourage provision of, and not consider, information which is frivolous or otherwise not relevant or material to the imposition of such a sanction.

  (2) PAYMENT OF PORTION OF AMOUNTS COLLECTED.—If an individual reports information to the Secretary under the program established under paragraph (1) which serves as the basis for the collection by the Secretary or the Attorney General of any amount of at least $100 (other than any amount paid as a penalty under section 1128B of the Social Security Act), the Secretary may pay a portion of the amount collected to the individual (under procedures similar to those applicable under section 7623 of the Internal Revenue Code of 1986 to payments to individuals providing information on violations of such Code).

  (c) PROGRAM TO COLLECT INFORMATION ON PROGRAM EFFICIENCY.—

  (1) ESTABLISHMENT OF PROGRAM.—Not later than 3 months after the date of the enactment of this Act, the Secretary shall establish a program under which the Secretary shall encourage individuals to submit to the Secretary suggestions on methods to improve the efficiency of the Medicare program.

  (2) PAYMENT OF PORTION OF PROGRAM SAVINGS.—If an individual submits a suggestion to the Secretary under the program established under paragraph (1) which is adopted by the Secretary and which results in savings to the program, the Secretary may make a payment to the individual of such amount as the Secretary considers appropriate.

SEC. 204. APPLICATION OF CERTAIN HEALTH ANTIFRAUD AND ABUSE SANCTIONS TO FRAUD AND ABUSE AGAINST FEDERAL HEALTH CARE PROGRAMS.

<< 42 USCA § 1320a–7b >>

  (a) IN GENERAL.—Section 1128B (42 U.S.C. 1320a–7b) is amended as follows:

  (1) In the heading, by striking "MEDICARE OR STATE HEALTH CARE PROGRAMS" and inserting "FEDERAL HEALTH CARE PROGRAMS".

  (2) In subsection (a)(1), by striking "a program under title XVIII or a State health care program (as defined in section 1128(h))" and inserting "a Federal health care program (as defined in subsection (f))".

  (3) In subsection (a)(5), by striking "a program under title XVIII or a State health care program" and inserting "a Federal health care program".

  (4) In the second sentence of subsection (a)—

   (A) by striking "a State plan approved under title XIX" and inserting "a Federal health care program", and

   (B) by striking "the State may at its option (notwithstanding any other provision of that title or of such plan)" and inserting "the administrator of such program may at its option (notwithstanding any other provision of such program)".

  (5) In subsection (b), by striking "title XVIII or a State health care program" each place it appears and inserting "a Federal health care program".

  (6) In subsection (c), by inserting "(as defined in section 1128(h))" after "a State health care program".

  (7) By adding at the end the following new subsection:

"(f) For purposes of this section, the term 'Federal health care program' means—

  "(1) any plan or program that provides health benefits, whether directly, through insurance, or otherwise, which is funded directly, in whole or in part, by the United States Government (other than the health insurance program under chapter 89 of title 5, United States Code); or

  "(2) any State health care program, as defined in section 1128(h).".

<< 42 USCA § 1320a–7b NOTE >>

(b) EFFECTIVE DATE.—The amendments made by this section shall take effect on January 1, 1997.

SEC. 205. GUIDANCE REGARDING APPLICATION OF HEALTH CARE FRAUD AND ABUSE SANCTIONS.

Title XI (42 U.S.C. 1301 et seq.), as amended by section 201, is amended by inserting after section 1128C the following new section:

<< 42 USCA § 1320a–7d >>

"GUIDANCE REGARDING APPLICATION OF HEALTH CARE FRAUD AND ABUSE SANCTIONS

"SEC. 1128d. (a) SOLICITATION AND PUBLICATION OF MODIFICATIONS TO EXISTING SAFE HARBORS AND NEW SAFE HARBORS.—

"(1) IN GENERAL.—

"(A) SOLICITATION OF PROPOSALS FOR SAFE HARBORS.—Not later than January 1, 1997, and not less than annually thereafter, the Secretary shall publish a notice in the Federal Register soliciting proposals, which will be accepted during a 60–day period, for—

"(i) modifications to existing safe harbors issued pursuant to section 14(a) of the Medicare and Medicaid Patient and Program Protection Act of 1987 (42 U.S.C. 1320a–7b note);

"(ii) additional safe harbors specifying payment practices that shall not be treated as a criminal offense under section 1128B(b) and shall not serve as the basis for an exclusion under section 1128(b)(7);

"(iii) advisory opinions to be issued pursuant to subsection (b); and

"(iv) special fraud alerts to be issued pursuant to subsection (c).

"(B) PUBLICATION OF PROPOSED MODIFICATIONS AND PROPOSED ADDITIONAL SAFE HARBORS.—After considering the proposals described in clauses (i) and (ii) of subparagraph (A), the Secretary, in consultation with the Attorney General, shall publish in the Federal Register proposed modifications to existing safe harbors and proposed additional safe harbors, if appropriate, with a 60–day comment period. After considering any public comments received during this period, the Secretary shall issue final rules modifying the existing safe harbors and establishing new safe harbors, as appropriate.

"(C) REPORT.—The Inspector General of the Department of Health and Human Services (in this section referred to as the 'Inspector General') shall, in an annual report to Congress or as part of the year-end semiannual report required by section 5 of the Inspector General Act of 1978 (5 U.S.C.App.), describe the proposals received under clauses (i) and (ii) of subparagraph (A) and explain which proposals were included in the publication described in subparagraph (B), which proposals were not included in that publication, and the reasons for the rejection of the proposals that were not included.

"(2) CRITERIA FOR MODIFYING AND ESTABLISHING SAFE HARBORS.—In modifying and establishing safe harbors under paragraph (1)(B), the Secretary may consider the extent to which providing a safe harbor for the specified payment practice may result in any of the following:

"(A) An increase or decrease in access to health care services.

"(B) An increase or decrease in the quality of health care services.

"(C) An increase or decrease in patient freedom of choice among health care providers.

"(D) An increase or decrease in competition among health care providers.

"(E) An increase or decrease in the ability of health care facilities to provide services in medically underserved areas or to medically underserved populations.

"(F) An increase or decrease in the cost to Federal health care programs (as defined in section 1128B(f)).

"(G) An increase or decrease in the potential overutilization of health care services.

"(H) The existence or nonexistence of any potential financial benefit to a health care professional or provider which may vary based on their decisions of—

"(i) whether to order a health care item or service; or

"(ii) whether to arrange for a referral of health care items or services to a particular practitioner or provider.

"(I) Any other factors the Secretary deems appropriate in the interest of preventing fraud and abuse in Federal health care programs (as so defined).

"(b) ADVISORY OPINIONS.—

"(1) ISSUANCE OF ADVISORY OPINIONS.—The Secretary, in consultation with the Attorney General, shall issue written advisory opinions as provided in this subsection.

"(2) MATTERS SUBJECT TO ADVISORY OPINIONS.—The Secretary shall issue advisory opinions as to the following matters:

"(A) What constitutes prohibited remuneration within the meaning of section 1128B(b).

"(B) Whether an arrangement or proposed arrangement satisfies the criteria set forth in section 1128B(b)(3) for activities which do not result in prohibited remuneration.

"(C) Whether an arrangement or proposed arrangement satisfies the criteria which the Secretary has established, or shall establish by regulation for activities which do not result in prohibited remuneration.

"(D) What constitutes an inducement to reduce or limit services to individuals entitled to benefits under title XVIII or title XIX within the meaning of section 1128B(b).

"(E) Whether any activity or proposed activity constitutes grounds for the imposition of a sanction under section 1128, 1128A, or 1128B.

"(3) MATTERS NOT SUBJECT TO ADVISORY OPINIONS.—Such advisory opinions shall not address the following matters:

"(A) Whether the fair market value shall be, or was paid or received for any goods, services or property.

"(B) Whether an individual is a bona fide employee within the requirements of section 3121(d)(2) of the Internal Revenue Code of 1986.

"(4) EFFECT OF ADVISORY OPINIONS.—

"(A) BINDING AS TO SECRETARY AND PARTIES INVOLVED.—Each advisory opinion issued by the Secretary shall be binding as to the Secretary and the party or parties requesting the opinion.

"(B) FAILURE TO SEEK OPINION.—The failure of a party to seek an advisory opinion may not be introduced into evidence to prove that the party intended to violate the provisions of sections 1128, 1128A, or 1128B.

"(5) REGULATIONS.—

"(A) IN GENERAL.—Not later than 180 days after the date of the enactment of this section, the Secretary shall issue regulations to carry out this section. Such regulations shall provide for—

"(i) the procedure to be followed by a party applying for an advisory opinion;

"(ii) the procedure to be followed by the Secretary in responding to a request for an advisory opinion;

"(iii) the interval in which the Secretary shall respond;

"(iv) the reasonable fee to be charged to the party requesting an advisory opinion; and

"(v) the manner in which advisory opinions will be made available to the public.

"(B) SPECIFIC CONTENTS.—Under the regulations promulgated pursuant to subparagraph (A)—

"(i) the Secretary shall be required to issue to a party requesting an advisory opinion by not later than 60 days after the request is received; and

"(ii) the fee charged to the party requesting an advisory opinion shall be equal to the costs incurred by the Secretary in responding to the request.

"(6) APPLICATION OF SUBSECTION.—This subsection shall apply to requests for advisory opinions made on or after the date which is 6 months after the date of enactment of this section and before the date which is 4 years after such date of enactment.

"(c) SPECIAL FRAUD ALERTS.—

"(1) IN GENERAL.—

"(A) REQUEST FOR SPECIAL FRAUD ALERTS.—Any person may present, at any time, a request to the Inspector General for a notice which informs the public of practices which the Inspector General considers to be suspect or of particular concern under the Medicare program under title XVIII or a State health care program, as defined in section 1128(h) (in this subsection referred to as a 'special fraud alert').

"(B) ISSUANCE AND PUBLICATION OF SPECIAL FRAUD ALERTS.—Upon receipt of a request described in subparagraph (A), the Inspector General shall investigate the subject matter of the request to determine whether a special fraud alert should be issued. If appropriate, the Inspector General shall issue a special fraud alert in response to the request. All special fraud alerts issued pursuant to this subparagraph shall be published in the Federal Register.

"(2) CRITERIA FOR SPECIAL FRAUD ALERTS.—In determining whether to issue a special fraud alert upon a request described in paragraph (1), the Inspector General may consider—

"(A) whether and to what extent the practices that would be identified in the special fraud alert may result in any of the consequences described in subsection (a)(2); and

"(B) the volume and frequency of the conduct that would be identified in the special fraud alert.".

Subtitle B—Revisions to Current Sanctions for Fraud and Abuse

<< 42 USCA § 1320a–7 >>

## SEC. 211. MANDATORY EXCLUSION FROM PARTICIPATION IN MEDICARE AND STATE HEALTH CARE PROGRAMS.

(a) INDIVIDUAL CONVICTED OF FELONY RELATING TO HEALTH CARE FRAUD.—

(1) IN GENERAL.—Section 1128(a) (42 U.S.C. 1320a–7(a)) is amended by adding at the end the following new paragraph:

"(3) FELONY CONVICTION RELATING TO HEALTH CARE FRAUD.—Any individual or entity that has been convicted for an offense which occurred after the date of the enactment of the Health Insurance Portability and Accountability Act of 1996, under Federal or State law, in connection with the delivery of a health care item or service or with respect to any act or omission in a health care program (other than those specifically described in paragraph (1)) operated by or financed in whole or in part by any Federal, State, or local government agency, of a criminal offense consisting of a felony relating to fraud, theft, embezzlement, breach of fiduciary responsibility, or other financial misconduct.".

(2) CONFORMING AMENDMENT.—Paragraph (1) of section 1128(b) (42 U.S.C. 1320a–7(b)) is amended to read as follows:

"(1) CONVICTION RELATING TO FRAUD.—Any individual or entity that has been convicted for an offense which occurred after the date of the enactment of the Health Insurance Portability and Accountability Act of 1996, under Federal or State law—

"(A) of a criminal offense consisting of a misdemeanor relating to fraud, theft, embezzlement, breach of fiduciary responsibility, or other financial misconduct—

"(i) in connection with the delivery of a health care item or service, or

"(ii) with respect to any act or omission in a health care program (other than those specifically described in subsection (a)(1)) operated by or financed in whole or in part by any Federal, State, or local government agency; or

"(B) of a criminal offense relating to fraud, theft, embezzlement, breach of fiduciary responsibility, or other financial misconduct with respect to any act or omission in a program (other than a health care program) operated by or financed in whole or in part by any Federal, State, or local government agency.".

(b) INDIVIDUAL CONVICTED OF FELONY RELATING TO CONTROLLED SUBSTANCE.—

(1) IN GENERAL.—Section 1128(a) (42 U.S.C. 1320a–7(a)), as amended by subsection (a), is amended by adding at the end the following new paragraph:

"(4) FELONY CONVICTION RELATING TO CONTROLLED SUBSTANCE.—Any individual or entity that has been convicted for an offense which occurred after the date of the enactment of the Health Insurance Portability and Accountability Act of 1996, under Federal or State law, of a criminal offense consisting of a felony relating to the unlawful manufacture, distribution, prescription, or dispensing of a controlled substance.".

(2) CONFORMING AMENDMENT.—Section 1128(b)(3) (42 U.S.C. 1320a–7(b)(3)) is amended—

(A) in the heading, by striking "CONVICTION" and inserting "MISDEMEANOR CONVICTION"; and

(B) by striking "criminal offense" and inserting "criminal offense consisting of a misdemeanor".

<< 42 USCA § 1320a–7 >>

SEC. 212. ESTABLISHMENT OF MINIMUM PERIOD OF EXCLUSION FOR CERTAIN INDIVIDUALS AND ENTITIES SUBJECT TO PERMISSIVE EXCLUSION FROM MEDICARE AND STATE HEALTH CARE PROGRAMS.

Section 1128(c)(3) (42 U.S.C. 1320a–7(c)(3)) is amended by adding at the end the following new subparagraphs:

"(D) In the case of an exclusion of an individual or entity under paragraph (1), (2), or (3) of subsection (b), the period of the exclusion shall be 3 years, unless the Secretary determines in accordance with published regulations that a shorter period is appropriate because of mitigating circumstances or that a longer period is appropriate because of aggravating circumstances.

"(E) In the case of an exclusion of an individual or entity under subsection (b)(4) or (b)(5), the period of the exclusion shall not be less than the period during which the individual's or entity's license to provide health care is revoked, suspended, or surrendered, or the individual or the entity is excluded or suspended from a Federal or State health care program.

"(F) In the case of an exclusion of an individual or entity under subsection (b)(6)(B), the period of the exclusion shall be not less than 1 year.".

<< 42 USCA § 1320a–7 >>

SEC. 213. PERMISSIVE EXCLUSION OF INDIVIDUALS WITH OWNERSHIP OR CONTROL INTEREST IN SANCTIONED ENTITIES.

Section 1128(b) (42 U.S.C. 1320a–7(b)) is amended by adding at the end the following new paragraph:

"(15) INDIVIDUALS CONTROLLING A SANCTIONED ENTITY.—

(A) Any individual—

"(i) who has a direct or indirect ownership or control interest in a sanctioned entity and who knows or should know (as defined in section 1128A(i)(6)) of the action constituting the basis for the conviction or exclusion described in subparagraph (B); or

"(ii) who is an officer or managing employee (as defined in section 1126(b)) of such an entity.

"(B) For purposes of subparagraph (A), the term 'sanctioned entity' means an entity—

"(i) that has been convicted of any offense described in subsection (a) or in paragraph (1), (2), or (3) of this subsection; or

"(ii) that has been excluded from participation under a program under title XVIII or under a State health care program.".

<< 42 USCA § 1320c–5 >>

SEC. 214. SANCTIONS AGAINST PRACTITIONERS AND PERSONS FOR FAILURE TO COMPLY WITH STATUTORY OBLIGATIONS.

(a) MINIMUM PERIOD OF EXCLUSION FOR PRACTITIONERS AND PERSONS FAILING TO MEET STATUTORY OBLIGATIONS.—

(1) IN GENERAL.—The second sentence of section 1156(b)(1) (42 U.S.C. 1320c–5(b)(1)) is amended by striking "may prescribe" and inserting "may prescribe, except that such period may not be less than 1 year)".

(2) CONFORMING AMENDMENT.—Section 1156(b)(2) (42 U.S.C. 1320c–5(b)(2)) is amended by striking "shall remain" and inserting "shall (subject to the minimum period specified in the second sentence of paragraph (1)) remain".

(b) REPEAL OF "UNWILLING OR UNABLE" CONDITION FOR IMPOSITION OF SANCTION.—Section 1156(b)(1) (42 U.S.C. 1320c–5(b)(1)) is amended—

(1) in the second sentence, by striking "and determines" and all that follows through "such obligations,"; and

(2) by striking the third sentence.

SEC. 215. INTERMEDIATE SANCTIONS FOR MEDICARE HEALTH MAINTENANCE ORGANIZATIONS.

<< 42 USCA § 1395mm >>

(a) APPLICATION OF INTERMEDIATE SANCTIONS FOR ANY PROGRAM VIOLATIONS.—

(1) IN GENERAL.—Section 1876(i)(1) (42 U.S.C. 1395mm(i)(1)) is amended by striking "the Secretary may terminate" and all that follows and inserting "in accordance with procedures established under paragraph (9), the Secretary may at any time

terminate any such contract or may impose the intermediate sanctions described in paragraph (6)(B) or (6)(C) (whichever is applicable) on the eligible organization if the Secretary determines that the organization—

"(A) has failed substantially to carry out the contract;

"(B) is carrying out the contract in a manner substantially inconsistent with the efficient and effective administration of this section; or

"(C) no longer substantially meets the applicable conditions of subsections (b), (c), (e), and (f).".

(2) OTHER INTERMEDIATE SANCTIONS FOR MISCELLANEOUS PROGRAM VIOLATIONS.—Section 1876(i)(6) (42 U.S.C. 1395mm(i)(6)) is amended by adding at the end the following new subparagraph:

"(C) In the case of an eligible organization for which the Secretary makes a determination under paragraph (1), the basis of which is not described in subparagraph (A), the Secretary may apply the following intermediate sanctions:

"(i) Civil money penalties of not more than $25,000 for each determination under paragraph (1) if the deficiency that is the basis of the determination has directly adversely affected (or has the substantial likelihood of adversely affecting) an individual covered under the organization's contract.

"(ii) Civil money penalties of not more than $10,000 for each week beginning after the initiation of procedures by the Secretary under paragraph (9) during which the deficiency that is the basis of a determination under paragraph (1) exists.

"(iii) Suspension of enrollment of individuals under this section after the date the Secretary notifies the organization of a determination under paragraph (1) and until the Secretary is satisfied that the deficiency that is the basis for the determination has been corrected and is not likely to recur.".

(3) PROCEDURES FOR IMPOSING SANCTIONS.—Section 1876(i) (42 U.S.C. 1395mm(i)) is amended by adding at the end the following new paragraph:

"(9) The Secretary may terminate a contract with an eligible organization under this section or may impose the intermediate sanctions described in paragraph (6) on the organization in accordance with formal investigation and compliance procedures established by the Secretary under which—

"(A) the Secretary first provides the organization with the reasonable opportunity to develop and implement a corrective action plan to correct the deficiencies that were the basis of the Secretary's determination under paragraph (1) and the organization fails to develop or implement such a plan;

"(B) in deciding whether to impose sanctions, the Secretary considers aggravating factors such as whether an organization has a history of deficiencies or has not taken action to correct deficiencies the Secretary has brought to the organization's attention;

"(C) there are no unreasonable or unnecessary delays between the finding of a deficiency and the imposition of sanctions; and

"(D) the Secretary provides the organization with reasonable notice and opportunity for hearing (including the right to appeal an initial decision) before imposing any sanction or terminating the contract.".

(4) CONFORMING AMENDMENTS.—Section 1876(i)(6)(B) (42 U.S.C. 1395mm(i)(6)(B)) is amended by striking the second sentence.

(b) AGREEMENTS WITH PEER REVIEW ORGANIZATIONS.—Section 1876(i)(7)(A) (42 U.S.C. 1395mm(i)(7)(A)) is amended by striking "an agreement" and inserting "a written agreement".

<< 42 USCA § 1395mm NOTE >>

(c) EFFECTIVE DATE.—The amendments made by this section shall apply with respect to contract years beginning on or after January 1, 1997.

SEC. 216. ADDITIONAL EXCEPTION TO ANTI–KICKBACK PENALTIES FOR RISK-SHARING ARRANGEMENTS.

<< 42 USCA § 1320a–7b >>

(a) IN GENERAL.—Section 1128B(b)(3) (42 U.S.C. 1320a–7b(b)(3)) is amended—

(1) by striking "and" at the end of subparagraph (D);

(2) by striking the period at the end of subparagraph (E) and inserting "; and"; and

(3) by adding at the end the following new subparagraph:

"(F) any remuneration between an organization and an individual or entity providing items or services, or a combination thereof, pursuant to a written agreement between the organization and the individual or entity if the organization is an eligible

organization under section 1876 or if the written agreement, through a risk-sharing arrangement, places the individual or entity at substantial financial risk for the cost or utilization of the items or services, or a combination thereof, which the individual or entity is obligated to provide.".

<< 42 USCA § 1320a–7b NOTE >>

(b) NEGOTIATED RULEMAKING FOR RISK–SHARING EXCEPTION.—

(1) ESTABLISHMENT.—

(A) IN GENERAL.—The Secretary of Health and Human Services (in this subsection referred to as the "Secretary") shall establish, on an expedited basis and using a negotiated rulemaking process under subchapter 3 of chapter 5 of title 5, United States Code, standards relating to the exception for risk-sharing arrangements to the antikickback penalties described in section 1128B(b)(3)(F) of the Social Security Act, as added by subsection (a).

(B) FACTORS TO CONSIDER.—In establishing standards relating to the exception for risk-sharing arrangements to the anti-kickback penalties under subparagraph (A), the Secretary—

(i) shall consult with the Attorney General and representatives of the hospital, physician, other health practitioner, and health plan communities, and other interested parties; and

(ii) shall take into account—

(I) the level of risk appropriate to the size and type of arrangement;

(II) the frequency of assessment and distribution of incentives;

(III) the level of capital contribution; and

(IV) the extent to which the risk-sharing arrangement provides incentives to control the cost and quality of health care services.

(2) PUBLICATION OF NOTICE.—In carrying out the rule-making process under this subsection, the Secretary shall publish the notice provided for under section 564(a) of title 5, United States Code, by not later than 45 days after the date of the enactment of this Act.

(3) TARGET DATE FOR PUBLICATION OF RULE.—As part of the notice under paragraph (2), and for purposes of this subsection, the "target date for publication" (referred to in section 564(a)(5) of such title) shall be January 1, 1997.

(4) ABBREVIATED PERIOD FOR SUBMISSION OF COMMENTS.—In applying section 564(c) of such title under this subsection, "15 days" shall be substituted for "30 days".

(5) APPOINTMENT OF NEGOTIATED RULEMAKING COMMITTEE AND FACILITATOR.—The Secretary shall provide for—

(A) the appointment of a negotiated rulemaking committee under section 565(a) of such title by not later than 30 days after the end of the comment period provided for under section 564(c) of such title (as shortened under paragraph (4)), and

(B) the nomination of a facilitator under section 566(c) of such title by not later than 10 days after the date of appointment of the committee.

(6) PRELIMINARY COMMITTEE REPORT.—The negotiated rule-making committee appointed under paragraph (5) shall report to the Secretary, by not later than October 1, 1996, regarding the committee's progress on achieving a consensus with regard to the rulemaking proceeding and whether such consensus is likely to occur before one month before the target date for publication of the rule. If the committee reports that the committee has failed to make significant progress toward such consensus or is unlikely to reach such consensus by the target date, the Secretary may terminate such process and provide for the publication of a rule under this subsection through such other methods as the Secretary may provide.

(7) FINAL COMMITTEE REPORT.—If the committee is not terminated under paragraph (6), the rulemaking committee shall submit a report containing a proposed rule by not later than one month before the target publication date.

(8) INTERIM, FINAL EFFECT.—The Secretary shall publish a rule under this subsection in the Federal Register by not later than the target publication date. Such rule shall be effective and final immediately on an interim basis, but is subject to change and revision after public notice and opportunity for a period (of not less than 60 days) for public comment. In connection with such rule, the Secretary shall specify the process for the timely review and approval of applications of entities to be certified as provider-sponsored organizations pursuant to such rules and consistent with this subsection.

(9) PUBLICATION OF RULE AFTER PUBLIC COMMENT.—The Secretary shall provide for consideration of such comments and republication of such rule by not later than 1 year after the target publication date.

<< 42 USCA § 1320a–7b NOTE >>

(c) EFFECTIVE DATE.—The amendments made by subsection (a) shall apply to written agreements entered into on or after January 1, 1997, without regard to whether regulations have been issued to implement such amendments.

<< 42 USCA § 1320a–7b >>

SEC. 217. CRIMINAL PENALTY FOR FRAUDULENT DISPOSITION OF ASSETS IN ORDER TO OBTAIN MEDICAID BENEFITS.

Section 1128B(a) (42 U.S.C. 1320a–7b(a)) is amended—
(1) by striking "or" at the end of paragraph (4);
(2) by adding "or" at the end of paragraph (5); and
(3) by inserting after paragraph (5) the following new paragraph:
"(6) knowingly and willfully disposes of assets (including by any transfer in trust) in order for an individual to become eligible for medical assistance under a State plan under title XIX, if disposing of the assets results in the imposition of a period of ineligibility for such assistance under section 1917(c),".

<< 42 USCA §§ 1320a–7 NOTE, 1320a–7b nt, 1320c–5 nt, 1395mm nt >>

SEC. 218. EFFECTIVE DATE.

Except as otherwise provided, the amendments made by this subtitle shall take effect January 1, 1997.

Subtitle C—Data Collection

SEC. 221. ESTABLISHMENT OF THE HEALTH CARE FRAUD AND ABUSE DATA COLLECTION PROGRAM.

(a) IN GENERAL.—Title XI (42 U.S.C. 1301 et seq.), as amended by sections 201 and 205, is amended by inserting after section 1128D the following new section:

<< 42 USCA § 1320a–7e >>

"HEALTH CARE FRAUD AND ABUSE DATA COLLECTION PROGRAM

"SEC. 1128E. (a) GENERAL PURPOSE.—Not later than January 1, 1997, the Secretary shall establish a national health care fraud and abuse data collection program for the reporting of final adverse actions (not including settlements in which no findings of liability have been made) against health care providers, suppliers, or practitioners as required by subsection (b), with access as set forth in subsection (c), and shall maintain a database of the information collected under this section.

"(b) REPORTING OF INFORMATION.—

"(1) IN GENERAL.—Each Government agency and health plan shall report any final adverse action (not including settlements in which no findings of liability have been made) taken against a health care provider, supplier, or practitioner.

"(2) INFORMATION TO BE REPORTED.—The information to be reported under paragraph (1) includes:

"(A) The name and TIN (as defined in section 7701(a)(41) of the Internal Revenue Code of 1986) of any health care provider, supplier, or practitioner who is the subject of a final adverse action.

"(B) The name (if known) of any health care entity with which a health care provider, supplier, or practitioner, who is the subject of a final adverse action, is affiliated or associated.

"(C) The nature of the final adverse action and whether such action is on appeal.

"(D) A description of the acts or omissions and injuries upon which the final adverse action was based, and such other information as the Secretary determines by regulation is required for appropriate interpretation of information reported under this section.

"(3) CONFIDENTIALITY.—In determining what information is required, the Secretary shall include procedures to assure that the privacy of individuals receiving health care services is appropriately protected.

"(4) TIMING AND FORM OF REPORTING.—The information required to be reported under this subsection shall be reported regularly (but not less often than monthly) and in such form and manner as the Secretary prescribes. Such information shall first be required to be reported on a date specified by the Secretary.

  "(5) TO WHOM REPORTED.—The information required to be reported under this subsection shall be reported to the Secretary.

"(c) DISCLOSURE AND CORRECTION OF INFORMATION.—

  "(1) DISCLOSURE.—With respect to the information about final adverse actions (not including settlements in which no findings of liability have been made) reported to the Secretary under this section with respect to a health care provider, supplier, or practitioner, the Secretary shall, by regulation, provide for—

    "(A) disclosure of the information, upon request, to the health care provider, supplier, or licensed practitioner, and

    "(B) procedures in the case of disputed accuracy of the information.

  "(2) CORRECTIONS.—Each Government agency and health plan shall report corrections of information already reported about any final adverse action taken against a health care provider, supplier, or practitioner, in such form and manner that the Secretary prescribes by regulation.

"(d) ACCESS TO REPORTED INFORMATION.—

  "(1) AVAILABILITY.—The information in the database maintained under this section shall be available to Federal and State government agencies and health plans pursuant to procedures that the Secretary shall provide by regulation.

  "(2) FEES FOR DISCLOSURE.—The Secretary may establish or approve reasonable fees for the disclosure of information in such database (other than with respect to requests by Federal agencies). The amount of such a fee shall be sufficient to recover the full costs of operating the database. Such fees shall be available to the Secretary or, in the Secretary's discretion to the agency designated under this section to cover such costs.

"(e) PROTECTION FROM LIABILITY FOR REPORTING.—No person or entity, including the agency designated by the Secretary in subsection (b)(5) shall be held liable in any civil action with respect to any report made as required by this section, without knowledge of the falsity of the information contained in the report.

"(f) COORDINATION WITH NATIONAL PRACTITIONER DATA BANK.—The Secretary shall implement this section in such a manner as to avoid duplication with the reporting requirements established for the National Practitioner Data Bank under the Health Care Quality Improvement Act of 1986 (42 U.S.C. 11101 et seq.).

  "(g) DEFINITIONS AND SPECIAL RULES.—For purposes of this section:

  "(1) FINAL ADVERSE ACTION.—

    "(A) IN GENERAL.—The term 'final adverse action' includes:

      "(i) Civil judgments against a health care provider, supplier, or practitioner in Federal or State court related to the delivery of a health care item or service.

      "(ii) Federal or State criminal convictions related to the delivery of a health care item or service.

      "(iii) Actions by Federal or State agencies responsible for the licensing and certification of health care providers, suppliers, and licensed health care practitioners, including—

        "(I) formal or official actions, such as revocation or suspension of a license (and the length of any such suspension), reprimand, censure or probation,

        "(II) any other loss of license or the right to apply for, or renew, a license of the provider, supplier, or practitioner, whether by operation of law, voluntary surrender, non-renewability, or otherwise, or

        "(III) any other negative action or finding by such Federal or State agency that is publicly available information.

      "(iv) Exclusion from participation in Federal or State health care programs (as defined in sections 1128B(f) and 1128(h), respectively).

      "(v) Any other adjudicated actions or decisions that the Secretary shall establish by regulation.

    "(B) EXCEPTION.—The term does not include any action with respect to a malpractice claim.

  "(2) PRACTITIONER.—The terms 'licensed health care practitioner', 'licensed practitioner', and 'practitioner' mean, with respect to a State, an individual who is licensed or otherwise authorized by the State to provide health care services (or any individual who, without authority holds himself or herself out to be so licensed or authorized).

  "(3) GOVERNMENT AGENCY.—The term 'Government agency' shall include:

    "(A) The Department of Justice.

"(B) The Department of Health and Human Services.

"(C) Any other Federal agency that either administers or provides payment for the delivery of health care services, including, but not limited to the Department of Defense and the Veterans' Administration.

"(D) State law enforcement agencies.

"(E) State medicaid fraud control units.

"(F) Federal or State agencies responsible for the licensing and certification of health care providers and licensed health care practitioners.

"(4) HEALTH PLAN.—The term 'health plan' has the meaning given such term by section 1128C(c).

"(5) DETERMINATION OF CONVICTION.—For purposes of paragraph (1), the existence of a conviction shall be determined under paragraph (4) of section 1128(i).".

<< 42 USCA § 1395u >>

(b) IMPROVED PREVENTION IN ISSUANCE OF MEDICARE PROVIDER NUMBERS.—Section 1842(r) (42 U.S.C. 1395u(r)) is amended by adding at the end the following new sentence: "Under such system, the Secretary may impose appropriate fees on such physicians to cover the costs of investigation and recertification activities with respect to the issuance of the identifiers.".

Subtitle D—Civil Monetary Penalties

SEC. 231. SOCIAL SECURITY ACT CIVIL MONETARY PENALTIES.

<< 42 USCA § 1320a–7a >>

(a) GENERAL CIVIL MONETARY PENALTIES.—Section 1128A (42 U.S.C. 1320a–7a) is amended as follows:

(1) In the third sentence of subsection (a), by striking "programs under title XVIII" and inserting "Federal health care programs (as defined in section 1128B(f)(1))".

(2) In subsection (f)—

(A) by redesignating paragraph (3) as paragraph (4); and

(B) by inserting after paragraph (2) the following new paragraph:

"(3) With respect to amounts recovered arising out of a claim under a Federal health care program (as defined in section 1128B(f)), the portion of such amounts as is determined to have been paid by the program shall be repaid to the program, and the portion of such amounts attributable to the amounts recovered under this section by reason of the amendments made by the Health Insurance Portability and Accountability Act of 1996 (as estimated by the Secretary) shall be deposited into the Federal Hospital Insurance Trust Fund pursuant to section 1817(k)(2)(C).".

(3) In subsection (i)—

(A) in paragraph (2), by striking "title V, XVIII, XIX, or XX of this Act" and inserting "a Federal health care program (as defined in section 1128B(f))",

(B) in paragraph (4), by striking "a health insurance or medical services program under title XVIII or XIX of this Act" and inserting "a Federal health care program (as so defined)", and

(C) in paragraph (5), by striking "title V, XVIII, XIX, or XX" and inserting "a Federal health care program (as so defined)".

(4) By adding at the end the following new subsection:

"(m)(1) For purposes of this section, with respect to a Federal health care program not contained in this Act, references to the Secretary in this section shall be deemed to be references to the Secretary or Administrator of the department or agency with jurisdiction over such program and references to the Inspector General of the Department of Health and Human Services in this section shall be deemed to be references to the Inspector General of the applicable department or agency.

"(2)(A) The Secretary and Administrator of the departments and agencies referred to in paragraph (1) may include in any action pursuant to this section, claims within the jurisdiction of other Federal departments or agencies as long as the following conditions are satisfied:

"(i) The case involves primarily claims submitted to the Federal health care programs of the department or agency initiating the action.

"(ii) The Secretary or Administrator of the department or agency initiating the action gives notice and an opportunity to participate in the investigation to the Inspector General of the department or agency with primary jurisdiction over the Federal health care programs to which the claims were submitted.

"(B) If the conditions specified in subparagraph (A) are fulfilled, the Inspector General of the department or agency initiating the action is authorized to exercise all powers granted under the Inspector General Act of 1978 (5 U.S.C.App.) with respect to the claims submitted to the other departments or agencies to the same manner and extent as provided in that Act with respect to claims submitted to such departments or agencies.".

(b) EXCLUDED INDIVIDUAL RETAINING OWNERSHIP OR CONTROL INTEREST IN PARTICIPATING ENTITY. —Section 1128A(a) (42 U.S.C. 1320a–7a(a)) is amended—

(1) by striking "or" at the end of paragraph (1)(D);

(2) by striking ", or" at the end of paragraph (2) and inserting a semicolon;

(3) by striking the semicolon at the end of paragraph (3) and inserting "; or"; and

(4) by inserting after paragraph (3) the following new paragraph:

"(4) in the case of a person who is not an organization, agency, or other entity, is excluded from participating in a program under title XVIII or a State health care program in accordance with this subsection or under section 1128 and who, at the time of a violation of this subsection—

"(A) retains a direct or indirect ownership or control interest in an entity that is participating in a program under title XVIII or a State health care program, and who knows or should know of the action constituting the basis for the exclusion; or

"(B) is an officer or managing employee (as defined in section 1126(b)) of such an entity;".

(c) MODIFICATIONS OF AMOUNTS OF PENALTIES AND ASSESSMENTS.—Section 1128A(a) (42 U.S.C. 1320a–7a(a)), as amended by subsection (b), is amended in the matter following paragraph (4)—

(1) by striking "$2,000" and inserting "$10,000";

(2) by inserting "; in cases under paragraph (4), $10,000 for each day the prohibited relationship occurs" after "false or misleading information was given"; and

(3) by striking "twice the amount" and inserting "3 times the amount".

(d) CLARIFICATION OF LEVEL OF KNOWLEDGE REQUIRED FOR IMPOSITION OF CIVIL MONETARY PENALTIES.—

(1) IN GENERAL.—Section 1128A(a) (42 U.S.C. 1320a–7a(a)) is amended—

(A) in paragraphs (1) and (2), by inserting "knowingly" before "presents" each place it appears; and

(B) in paragraph (3), by striking "gives" and inserting "knowingly gives or causes to be given".

(2) DEFINITION OF STANDARD.—Section 1128A(i) (42 U.S.C. 1320a–7a(i)), as amended by subsection (h)(2), is amended by adding at the end the following new paragraph:

"(7) The term 'should know' means that a person, with respect to information—

"(A) acts in deliberate ignorance of the truth or falsity of the information; or

"(B) acts in reckless disregard of the truth or falsity of the information,

and no proof of specific intent to defraud is required.".

(e) CLAIM FOR ITEM OR SERVICE BASED ON INCORRECT CODING OR MEDICALLY UNNECESSARY SERVICES.—Section 1128A(a)(1) (42 U.S.C. 1320a–7a(a)(1)), as amended by subsection (b), is amended—

(1) in subparagraph (A) by striking "claimed," and inserting "claimed, including any person who engages in a pattern or practice of presenting or causing to be presented a claim for an item or service that is based on a code that the person knows or should know will result in a greater payment to the person than the code the person knows or should know is applicable to the item or service actually provided,";

(2) in subparagraph (C), by striking "or" at the end;

(3) in subparagraph (D), by striking the semicolon and inserting ", or"; and

(4) by inserting after subparagraph (D) the following new subparagraph:

"(E) is for a pattern of medical or other items or services that a person knows or should know are not medically necessary;".

<< 42 USCA § 1320c–5 >>

(f) SANCTIONS AGAINST PRACTITIONERS AND PERSONS FOR FAILURE TO COMPLY WITH STATUTORY OBLIGATIONS.—Section 1156(b)(3) (42 U.S.C. 1320c–5(b)(3)) is amended by striking "the actual or estimated cost" and inserting "up to $10,000 for each instance".

<< 42 USCA § 1395mm >>

(g) PROCEDURAL PROVISIONS.—Section 1876(i)(6) (42 U.S.C. 1395mm(i)(6)), as amended by section 215(a)(2), is amended by adding at the end the following new subparagraph:

"(D) The provisions of section 1128A (other than subsections (a) and (b)) shall apply to a civil money penalty under subparagraph (B)(i) or (C)(i) in the same manner as such provisions apply to a civil money penalty or proceeding under section 1128A(a).".

<< 42 USCA § 1320a–7a >>

(h) PROHIBITION AGAINST OFFERING INDUCEMENTS TO INDIVIDUALS ENROLLED UNDER PROGRAMS OR PLANS.—

(1) OFFER OF REMUNERATION.—Section 1128A(a) (42 U.S.C. 1320a–7a(a)), as amended by subsection (b), is amended—

(A) by striking "or" at the end of paragraph (3);

(B) by striking the semicolon at the end of paragraph (4) and inserting "; or"; and

(C) by inserting after paragraph (4) the following new paragraph:

"(5) offers to or transfers remuneration to any individual eligible for benefits under title XVIII of this Act, or under a State health care program (as defined in section 1128(h)) that such person knows or should know is likely to influence such individual to order or receive from a particular provider, practitioner, or supplier any item or service for which payment may be made, in whole or in part, under title XVIII, or a State health care program (as so defined);".

(2) REMUNERATION DEFINED.—Section 1128A(i) (42 U.S.C. 1320a–7a(i)) is amended by adding at the end the following new paragraph:

"(6) The term 'remuneration' includes the waiver of coinsurance and deductible amounts (or any part thereof), and transfers of items or services for free or for other than fair market value. The term 'remuneration' does not include—

"(A) the waiver of coinsurance and deductible amounts by a person, if—

"(i) the waiver is not offered as part of any advertisement or solicitation;

"(ii) the person does not routinely waive coinsurance or deductible amounts; and

"(iii) the person—

"(I) waives the coinsurance and deductible amounts after determining in good faith that the individual is in financial need; or

"(II) fails to collect coinsurance or deductible amounts after making reasonable collection efforts; or

"(III) provides for any permissible waiver as specified in section 1128B(b)(3) or in regulations issued by the Secretary;

"(B) differentials in coinsurance and deductible amounts as part of a benefit plan design as long as the differentials have been disclosed in writing to all beneficiaries, third party payers, and providers, to whom claims are presented and as long as the differentials meet the standards as defined in regulations promulgated by the Secretary not later than 180 days after the date of the enactment of the Health Insurance Portability and Accountability Act of 1996; or

"(C) incentives given to individuals to promote the delivery of preventive care as determined by the Secretary in regulations so promulgated.".

<< 42 USCA §§ 1320a–7a NOTE, 1320c–5 nt, 1395mm nt >>

(i) EFFECTIVE DATE.—The amendments made by this section shall apply to acts or omissions occurring on or after January 1, 1997.

SEC. 232. PENALTY FOR FALSE CERTIFICATION FOR HOME HEALTH SERVICES.

<< 42 USCA § 1320a–7a >>

(a) IN GENERAL.—Section 1128A(b) (42 U.S.C. 1320a–7a(b)) is amended by adding at the end the following new paragraph:

"(3)(A) Any physician who executes a document described in subparagraph (B) with respect to an individual knowing that all of the requirements referred to in such subparagraph are not met with respect to the individual shall be subject to a civil monetary penalty of not more than the greater of—

"(i) $5,000, or

"(ii) three times the amount of the payments under title XVIII for home health services which are made pursuant to such certification.

"(B) A document described in this subparagraph is any document that certifies, for purposes of title XVIII, that an individual meets the requirements of section 1814(a)(2)(C) or 1835(a)(2)(A) in the case of home health services furnished to the individual.".

<< 42 USCA § 1320a–7a NOTE >>

(b) EFFECTIVE DATE.—The amendment made by subsection (a) shall apply to certifications made on or after the date of the enactment of this Act.

Subtitle E—Revisions to Criminal Law

SEC. 241. DEFINITIONS RELATING TO FEDERAL HEALTH CARE OFFENSE.

<< 18 USCA § 24 >>

(a) IN GENERAL.—Chapter 1 of title 18, United States Code, is amended by adding at the end the following:

"§ 24. Definitions relating to Federal health care offense

"(a) As used in this title, the term 'Federal health care offense' means a violation of, or a criminal conspiracy to violate—

"(1) section 669, 1035, 1347, or 1518 of this title;

"(2) section 287, 371, 664, 666, 1001, 1027, 1341, 1343, or 1954 of this title, if the violation or conspiracy relates to a health care benefit program.

"(b) As used in this title, the term 'health care benefit program' means any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract.".

<< 18 USCA Ch. 1 >>

(b) CLERICAL AMENDMENT.—The table of sections at the beginning of chapter 2 of title 18, United States Code, is amended by inserting after the item relating to section 23 the following new item:

"24. Definitions relating to Federal health care offense.".

SEC. 242. HEALTH CARE FRAUD.

(a) OFFENSE.—

(1) IN GENERAL.—Chapter 63 of title 18, United States Code, is amended by adding at the end the following:

<< 18 USCA § 1347 >>

"§ 1347. Health care fraud

"Whoever knowingly and willfully executes, or attempts to execute, a scheme or artifice—

"(1) to defraud any health care benefit program; or

"(2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program,

in connection with the delivery of or payment for health care benefits, items, or services, shall be fined under this title or imprisoned not more than 10 years, or both. If the violation results in serious bodily injury (as defined in section 1365 of this title), such person shall be fined under this title or imprisoned not more than 20 years, or both; and if the violation results in death, such person shall be fined under this title, or imprisoned for any term of years or for life, or both.".

(2) CLERICAL AMENDMENT.—The table of sections at the beginning of chapter 63 of title 18, United States Code, is amended by adding at the end the following:

<< 18 USCA Ch. 63 >>

"1347. Health care fraud.".

<< 42 USCA § 1395i NOTE >>

(b) CRIMINAL FINES DEPOSITED IN FEDERAL HOSPITAL INSURANCE TRUST FUND.—The Secretary of the Treasury shall deposit into the Federal Hospital Insurance Trust Fund pursuant to section 1817(k)(2)(C) of the Social Security Act (42 U.S.C. 1395i) an amount equal to the criminal fines imposed under section 1347 of title 18, United States Code (relating to health care fraud).

SEC. 243. THEFT OR EMBEZZLEMENT.

<< 18 USCA § 669 >>

(a) IN GENERAL.—Chapter 31 of title 18, United States Code, is amended by adding at the end the following:

"§ 669. Theft or embezzlement in connection with health care

"(a) Whoever knowingly and willfully embezzles, steals, or otherwise without authority converts to the use of any person other than the rightful owner, or intentionally misapplies any of the moneys, funds, securities, premiums, credits, property, or other assets of a health care benefit program, shall be fined under this title or imprisoned not more than 10 years, or both; but if the value of such property does not exceed the sum of $100 the defendant shall be fined under this title or imprisoned not more than one year, or both.

"(b) As used in this section, the term 'health care benefit program' has the meaning given such term in section 24(b) of this title.".

<< 18 USCA Ch. 31 >>

(b) CLERICAL AMENDMENT.—The table of sections at the beginning of chapter 31 of title 18, United States Code, is amended by adding at the end the following:

"669. Theft or embezzlement in connection with health care.".

SEC. 244. FALSE STATEMENTS.

<< 18 USCA § 1035 >>

(a) IN GENERAL.—Chapter 47 of title 18, United States Code, is amended by adding at the end the following:

"§ 1035. False statements relating to health care matters

"(a) Whoever, in any matter involving a health care benefit program, knowingly and willfully—

"(1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact; or

"(2) makes any materially false, fictitious, or fraudulent statements or representations, or makes or uses any materially false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry,

in connection with the delivery of or payment for health care benefits, items, or services, shall be fined under this title or imprisoned not more than 5 years, or both.

"(b) As used in this section, the term 'health care benefit program' has the meaning given such term in section 24(b) of this title.".

<< 18 USCA Ch. 47 >>

(b) CLERICAL AMENDMENT.—The table of sections at the beginning of chapter 47 of title 18, United States Code, is amended by adding at the end the following new item:

"1035. False statements relating to health care matters.".

SEC. 245. OBSTRUCTION OF CRIMINAL INVESTIGATIONS OF HEALTH CARE OFFENSES.

<< 18 USCA § 1518 >>

(a) IN GENERAL.—Chapter 73 of title 18, United States Code, is amended by adding at the end the following:

"§ 1518. Obstruction of criminal investigations of health care offenses

"(a) Whoever willfully prevents, obstructs, misleads, delays or attempts to prevent, obstruct, mislead, or delay the communication of information or records relating to a violation of a Federal health care offense to a criminal investigator shall be fined under this title or imprisoned not more than 5 years, or both.

"(b) As used in this section the term 'criminal investigator' means any individual duly authorized by a department, agency, or armed force of the United States to conduct or engage in investigations for prosecutions for violations of health care offenses.".

<< 18 USCA Ch. 73 >>

(b) CLERICAL AMENDMENT.—The table of sections at the beginning of chapter 73 of title 18, United States Code, is amended by adding at the end the following new item:

"1518. Obstruction of criminal investigations of health care offenses.".

<< 18 USCA § 1956 >>

SEC. 246. LAUNDERING OF MONETARY INSTRUMENTS.

Section 1956(c)(7) of title 18, United States Code, is amended by adding at the end the following:

"(F) Any act or activity constituting an offense involving a Federal health care offense.".

<< 18 USCA § 1345 >>

SEC. 247. INJUNCTIVE RELIEF RELATING TO HEALTH CARE OFFENSES.

(a) IN GENERAL.—Section 1345(a)(1) of title 18, United States Code, is amended—

(1) by striking "or" at the end of subparagraph (A);

(2) by inserting "or" at the end of subparagraph (B); and

(3) by adding at the end the following:

"(C) committing or about to commit a Federal health care offense.".

(b) FREEZING OF ASSETS.—Section 1345(a)(2) of title 18, United States Code, is amended by inserting "or a Federal health care offense" after "title)".

WESTLAW  © 2025 Thomson Reuters. No claim to original U.S. Government Works.

SEC. 248. AUTHORIZED INVESTIGATIVE DEMAND PROCEDURES.

<< 18 USCA § 3486 >>

(a) IN GENERAL.—Chapter 223 of title 18, United States Code, is amended by adding after section 3485 the following:

"§ 3486. Authorized investigative demand procedures

"(a) AUTHORIZATION.—(1) In any investigation relating to any act or activity involving a Federal health care offense, the Attorney General or the Attorney General's designee may issue in writing and cause to be served a subpoena—

"(A) requiring the production of any records (including any books, papers, documents, electronic media, or other objects or tangible things), which may be relevant to an authorized law enforcement inquiry, that a person or legal entity may possess or have care, custody, or control; or

"(B) requiring a custodian of records to give testimony concerning the production and authentication of such records.

"(2) A subpoena under this subsection shall describe the objects required to be produced and prescribe a return date within a reasonable period of time within which the objects can be assembled and made available.

"(3) The production of records shall not be required under this section at any place more than 500 miles distant from the place where the subpoena for the production of such records is served.

"(4) Witnesses summoned under this section shall be paid the same fees and mileage that are paid witnesses in the courts of the United States.

"(b) SERVICE.—A subpoena issued under this section may be served by any person who is at least 18 years of age and is designated in the subpoena to serve it. Service upon a natural person may be made by personal delivery of the subpoena to him. Service may be made upon a domestic or foreign corporation or upon a partnership or other unincorporated association which is subject to suit under a common name, by delivering the subpoena to an officer, to a managing or general agent, or to any other agent authorized by appointment or by law to receive service of process. The affidavit of the person serving the subpoena entered on a true copy thereof by the person serving it shall be proof of service.

"(c) ENFORCEMENT.—In the case of contumacy by or refusal to obey a subpoena issued to any person, the Attorney General may invoke the aid of any court of the United States within the jurisdiction of which the investigation is carried on or of which the subpoenaed person is an inhabitant, or in which he carries on business or may be found, to compel compliance with the subpoena. The court may issue an order requiring the subpoenaed person to appear before the Attorney General to produce records, if so ordered, or to give testimony concerning the production and authentication of such records. Any failure to obey the order of the court may be punished by the court as a contempt thereof. All process in any such case may be served in any judicial district in which such person may be found.

"(d) IMMUNITY FROM CIVIL LIABILITY.—Notwithstanding any Federal, State, or local law, any person, including officers, agents, and employees, receiving a summons under this section, who complies in good faith with the summons and thus produces the materials sought, shall not be liable in any court of any State or the United States to any customer or other person for such production or for nondisclosure of that production to the customer.

"(e) LIMITATION ON USE.—(1) Health information about an individual that is disclosed under this section may not be used in, or disclosed to any person for use in, any administrative, civil, or criminal action or investigation directed against the individual who is the subject of the information unless the action or investigation arises out of and is directly related to receipt of health care or payment for health care or action involving a fraudulent claim related to health; or if authorized by an appropriate order of a court of competent jurisdiction, granted after application showing good cause therefor.

"(2) In assessing good cause, the court shall weigh the public interest and the need for disclosure against the injury to the patient, to the physician-patient relationship, and to the treatment services.

"(3) Upon the granting of such order, the court, in determining the extent to which any disclosure of all or any part of any record is necessary, shall impose appropriate safeguards against unauthorized disclosure.".

<< 18 USCA Ch. 223 >>

(b) CLERICAL AMENDMENT.—The table of sections at the beginning of chapter 223 of title 18, United States Code, is amended by inserting after the item relating to section 3485 the following new item:

"3486. Authorized investigative demand procedures.".

<< 18 USCA § 1510 >>

  (c) CONFORMING AMENDMENT.—Section 1510(b)(3)(B) of title 18, United States Code, is amended by inserting "or a Department of Justice subpoena (issued under section 3486 of title 18)," after "subpoena".

SEC. 249. FORFEITURES FOR FEDERAL HEALTH CARE OFFENSES.

<< 18 USCA § 982 >>

  (a) IN GENERAL.—Section 982(a) of title 18, United States Code, is amended by adding after paragraph (5) the following new paragraph:
  "(6) The court, in imposing sentence on a person convicted of a Federal health care offense, shall order the person to forfeit property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense.".
  (b) CONFORMING AMENDMENT.—Section 982(b)(1)(A) of title 18, United States Code, is amended by inserting "or (a) (6)" after "(a)(1)".

<< 42 USCA § 1395i NOTE >>

(c) PROPERTY FORFEITED DEPOSITED IN FEDERAL HOSPITAL INSURANCE TRUST FUND.—
  (1) IN GENERAL.—After the payment of the costs of asset forfeiture has been made and after all restoration payments (if any) have been made, and notwithstanding any other provision of law, the Secretary of the Treasury shall deposit into the Federal Hospital Insurance Trust Fund pursuant to section 1817(k)(2)(C) of the Social Security Act, as added by section 301(b), an amount equal to the net amount realized from the forfeiture of property by reason of a Federal health care offense pursuant to section 982(a)(6) of title 18, United States Code.
  (2) COSTS OF ASSET FORFEITURE.—For purposes of paragraph (1), the term "payment of the costs of asset forfeiture" means—
  (A) the payment, at the discretion of the Attorney General, of any expenses necessary to seize, detain, inventory, safeguard, maintain, advertise, sell, or dispose of property under seizure, detention, or forfeited, or of any other necessary expenses incident to the seizure, detention, forfeiture, or disposal of such property, including payment for—
    (i) contract services;
    (ii) the employment of outside contractors to operate and manage properties or provide other specialized services necessary to dispose of such properties in an effort to maximize the return from such properties; and
    (iii) reimbursement of any Federal, State, or local agency for any expenditures made to perform the functions described in this subparagraph;
  (B) at the discretion of the Attorney General, the payment of awards for information or assistance leading to a civil or criminal forfeiture involving any Federal agency participating in the Health Care Fraud and Abuse Control Account;
  (C) the compromise and payment of valid liens and mortgages against property that has been forfeited, subject to the discretion of the Attorney General to determine the validity of any such lien or mortgage and the amount of payment to be made, and the employment of attorneys and other personnel skilled in State real estate law as necessary;
  (D) payment authorized in connection with remission or mitigation procedures relating to property forfeited; and
  (E) the payment of State and local property taxes on forfeited real property that accrued between the date of the violation giving rise to the forfeiture and the date of the forfeiture order.
  (3) RESTORATION PAYMENT.—Notwithstanding any other provision of law, if the Federal health care offense referred to in paragraph (1) resulted in a loss to an employee welfare benefit plan within the meaning of section 3(1) of the Employee Retirement Income Security Act of 1974, the Secretary of the Treasury shall transfer to such employee welfare benefit plan,

from the amount realized from the forfeiture of property referred to in paragraph (1), an amount equal to such loss. For purposes of paragraph (1), the term "restoration payment" means the amount transferred to an employee welfare benefit plan pursuant to this paragraph.

<< 29 USCA § 1136 NOTE >>

SEC. 250. RELATION TO ERISA AUTHORITY.

  Nothing in this subtitle shall be construed as affecting the authority of the Secretary of Labor under section 506(b) of the Employee Retirement Income Security Act of 1974, including the Secretary's authority with respect to violations of title 18, United States Code (as amended by this subtitle).

Subtitle F—Administrative Simplification

<< 42 USCA § 1320d NOTE >>

SEC. 261. PURPOSE.

  It is the purpose of this subtitle to improve the Medicare program under title XVIII of the Social Security Act, the medicaid program under title XIX of such Act, and the efficiency and effectiveness of the health care system, by encouraging the development of a health information system through the establishment of standards and requirements for the electronic transmission of certain health information.

SEC. 262. ADMINISTRATIVE SIMPLIFICATION.

  (a) IN GENERAL.—Title XI (42 U.S.C. 1301 et seq.) is amended by adding at the end the following:

<< 42 USCA Ch. 7 >>

"PART C—ADMINISTRATIVE SIMPLIFICATION

<< 42 USCA § 1320d >>

"DEFINITIONS

"SEC. 1171. For purposes of this part:
  "(1) CODE SET.—The term 'code set' means any set of codes used for encoding data elements, such as tables of terms, medical concepts, medical diagnostic codes, or medical procedure codes.
  "(2) HEALTH CARE CLEARINGHOUSE.—The term 'health care clearinghouse' means a public or private entity that processes or facilitates the processing of nonstandard data elements of health information into standard data elements.
  "(3) HEALTH CARE PROVIDER.—The term 'health care provider' includes a provider of services (as defined in section 1861(u)), a provider of medical or other health services (as defined in section 1861(s)), and any other person furnishing health care services or supplies.
  "(4) HEALTH INFORMATION.—The term 'health information' means any information, whether oral or recorded in any form or medium, that—
    "(A) is created or received by a health care provider, health plan, public health authority, employer, life insurer, school or university, or health care clearinghouse; and
    "(B) relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual.
  "(5) HEALTH PLAN.—The term 'health plan' means an individual or group plan that provides, or pays the cost of, medical care (as such term is defined in section 2791 of the Public Health Service Act). Such term includes the following, and any combination thereof:
    "(A) A group health plan (as defined in section 2791(a) of the Public Health Service Act), but only if the plan—
      "(i) has 50 or more participants (as defined in section 3(7) of the Employee Retirement Income Security Act of 1974); or

"(ii) is administered by an entity other than the employer who established and maintains the plan.

"(B) A health insurance issuer (as defined in section 2791(b) of the Public Health Service Act).

"(C) A health maintenance organization (as defined in section 2791(b) of the Public Health Service Act).

"(D) Part A or part B of the Medicare program under title XVIII.

"(E) The medicaid program under title XIX.

"(F) A Medicare supplemental policy (as defined in section 1882(g)(1)).

"(G) A long-term care policy, including a nursing home fixed indemnity policy (unless the Secretary determines that such a policy does not provide sufficiently comprehensive coverage of a benefit so that the policy should be treated as a health plan).

"(H) An employee welfare benefit plan or any other arrangement which is established or maintained for the purpose of offering or providing health benefits to the employees of 2 or more employers.

"(I) The health care program for active military personnel under title 10, United States Code.

"(J) The veterans health care program under chapter 17 of title 38, United States Code.

"(K) The Civilian Health and Medical Program of the Uniformed Services (CHAMPUS), as defined in section 1072(4) of title 10, United States Code.

"(L) The Indian health service program under the Indian Health Care Improvement Act (25 U.S.C. 1601 et seq.).

"(M) The Federal Employees Health Benefit Plan under chapter 89 of title 5, United States Code.

"(6) INDIVIDUALLY IDENTIFIABLE HEALTH INFORMATION.—The term 'individually identifiable health information' means any information, including demographic information collected from an individual, that—

"(A) is created or received by a health care provider, health plan, employer, or health care clearinghouse; and

"(B) relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual, and—

"(i) identifies the individual; or

"(ii) with respect to which there is a reasonable basis to believe that the information can be used to identify the individual.

"(7) STANDARD.—The term 'standard', when used with reference to a data element of health information or a transaction referred to in section 1173(a)(1), means any such data element or transaction that meets each of the standards and implementation specifications adopted or established by the Secretary with respect to the data element or transaction under sections 1172 through 1174.

"(8) STANDARD SETTING ORGANIZATION.—The term 'standard setting organization' means a standard setting organization accredited by the American National Standards Institute, including the National Council for Prescription Drug Programs, that develops standards for information transactions, data elements, or any other standard that is necessary to, or will facilitate, the implementation of this part.

<< 42 USCA § 1320d–1 >>

"GENERAL REQUIREMENTS FOR ADOPTION OF STANDARDS

"SEC. 1172. (a) APPLICABILITY.—Any standard adopted under this part shall apply, in whole or in part, to the following persons:

"(1) A health plan.

"(2) A health care clearinghouse.

"(3) A health care provider who transmits any health information in electronic form in connection with a transaction referred to in section 1173(a)(1).

"(b) REDUCTION OF COSTS.—Any standard adopted under this part shall be consistent with the objective of reducing the administrative costs of providing and paying for health care.

"(c) ROLE OF STANDARD SETTING ORGANIZATIONS.—

"(1) IN GENERAL.—Except as provided in paragraph (2), any standard adopted under this part shall be a standard that has been developed, adopted, or modified by a standard setting organization.

"(2) SPECIAL RULES.—

"(A) DIFFERENT STANDARDS.—The Secretary may adopt a standard that is different from any standard developed, adopted, or modified by a standard setting organization, if—

"(i) the different standard will substantially reduce administrative costs to health care providers and health plans compared to the alternatives; and

"(ii) the standard is promulgated in accordance with the rulemaking procedures of subchapter III of chapter 5 of title 5, United States Code.

"(B) NO STANDARD BY STANDARD SETTING ORGANIZATION.—If no standard setting organization has developed, adopted, or modified any standard relating to a standard that the Secretary is authorized or required to adopt under this part—

"(i) paragraph (1) shall not apply; and

"(ii) subsection (f) shall apply.

"(3) CONSULTATION REQUIREMENT.—

"(A) IN GENERAL.—A standard may not be adopted under this part unless—

"(i) in the case of a standard that has been developed, adopted, or modified by a standard setting organization, the organization consulted with each of the organizations described in subparagraph (B) in the course of such development, adoption, or modification; and

"(ii) in the case of any other standard, the Secretary, in complying with the requirements of subsection (f), consulted with each of the organizations described in subparagraph (B) before adopting the standard.

"(B) ORGANIZATIONS DESCRIBED.—The organizations referred to in subparagraph (A) are the following:

"(i) The National Uniform Billing Committee.

"(ii) The National Uniform Claim Committee.

"(iii) The Workgroup for Electronic Data Interchange.

"(iv) The American Dental Association.

"(d) IMPLEMENTATION SPECIFICATIONS.—The Secretary shall establish specifications for implementing each of the standards adopted under this part.

"(e) PROTECTION OF TRADE SECRETS.—Except as otherwise required by law, a standard adopted under this part shall not require disclosure of trade secrets or confidential commercial information by a person required to comply with this part.

"(f) ASSISTANCE TO THE SECRETARY.—In complying with the requirements of this part, the Secretary shall rely on the recommendations of the National Committee on Vital and Health Statistics established under section 306(k) of the Public Health Service Act (42 U.S.C. 242k(k)), and shall consult with appropriate Federal and State agencies and private organizations. The Secretary shall publish in the Federal Register any recommendation of the National Committee on Vital and Health Statistics regarding the adoption of a standard under this part.

"(g) APPLICATION TO MODIFICATIONS OF STANDARDS.—This section shall apply to a modification to a standard (including an addition to a standard) adopted under section 1174(b) in the same manner as it applies to an initial standard adopted under section 1174(a).

<< 42 USCA § 1320d–2 >>

"STANDARDS FOR INFORMATION TRANSACTIONS AND DATA ELEMENTS

"SEC. 1173. (a) STANDARDS TO ENABLE ELECTRONIC EXCHANGE.—

"(1) IN GENERAL.—The Secretary shall adopt standards for transactions, and data elements for such transactions, to enable health information to be exchanged electronically, that are appropriate for—

"(A) the financial and administrative transactions described in paragraph (2); and

"(B) other financial and administrative transactions determined appropriate by the Secretary, consistent with the goals of improving the operation of the health care system and reducing administrative costs.

"(2) TRANSACTIONS.—The transactions referred to in paragraph (1)(A) are transactions with respect to the following:

"(A) Health claims or equivalent encounter information.

"(B) Health claims attachments.

"(C) Enrollment and disenrollment in a health plan.

"(D) Eligibility for a health plan.

"(E) Health care payment and remittance advice.

"(F) Health plan premium payments.

"(G) First report of injury.

"(H) Health claim status.

"(I) Referral certification and authorization.

"(3) ACCOMMODATION OF SPECIFIC PROVIDERS.—The standards adopted by the Secretary under paragraph (1) shall accommodate the needs of different types of health care providers.

"(b) UNIQUE HEALTH IDENTIFIERS.—

"(1) IN GENERAL.—The Secretary shall adopt standards providing for a standard unique health identifier for each individual, employer, health plan, and health care provider for use in the health care system. In carrying out the preceding sentence for each health plan and health care provider, the Secretary shall take into account multiple uses for identifiers and multiple locations and specialty classifications for health care providers.

"(2) USE OF IDENTIFIERS.—The standards adopted under paragraph (1) shall specify the purposes for which a unique health identifier may be used.

"(c) CODE SETS.—

"(1) IN GENERAL.—The Secretary shall adopt standards that—

"(A) select code sets for appropriate data elements for the transactions referred to in subsection (a)(1) from among the code sets that have been developed by private and public entities; or

"(B) establish code sets for such data elements if no code sets for the data elements have been developed.

"(2) DISTRIBUTION.—The Secretary shall establish efficient and low-cost procedures for distribution (including electronic distribution) of code sets and modifications made to such code sets under section 1174(b).

"(d) SECURITY STANDARDS FOR HEALTH INFORMATION.—

"(1) SECURITY STANDARDS.—The Secretary shall adopt security standards that—

"(A) take into account—

"(i) the technical capabilities of record systems used to maintain health information;

"(ii) the costs of security measures;

"(iii) the need for training persons who have access to health information;

"(iv) the value of audit trails in computerized record systems; and

"(v) the needs and capabilities of small health care providers and rural health care providers (as such providers are defined by the Secretary); and

"(B) ensure that a health care clearinghouse, if it is part of a larger organization, has policies and security procedures which isolate the activities of the health care clearinghouse with respect to processing information in a manner that prevents unauthorized access to such information by such larger organization.

"(2) SAFEGUARDS.—Each person described in section 1172(a) who maintains or transmits health information shall maintain reasonable and appropriate administrative, technical, and physical safeguards—

"(A) to ensure the integrity and confidentiality of the information;

"(B) to protect against any reasonably anticipated—

"(i) threats or hazards to the security or integrity of the information; and

"(ii) unauthorized uses or disclosures of the information; and

"(C) otherwise to ensure compliance with this part by the officers and employees of such person.

"(e) ELECTRONIC SIGNATURE.—

"(1) STANDARDS.—The Secretary, in coordination with the Secretary of Commerce, shall adopt standards specifying procedures for the electronic transmission and authentication of signatures with respect to the transactions referred to in subsection (a)(1).

"(2) EFFECT OF COMPLIANCE.—Compliance with the standards adopted under paragraph (1) shall be deemed to satisfy Federal and State statutory requirements for written signatures with respect to the transactions referred to in subsection (a)(1).

"(f) TRANSFER OF INFORMATION AMONG HEALTH PLANS.—The Secretary shall adopt standards for transferring among health plans appropriate standard data elements needed for the coordination of benefits, the sequential processing of claims, and other data elements for individuals who have more than one health plan.

<< 42 USCA § 1320d–3 >>

"TIMETABLES FOR ADOPTION OF STANDARDS

"SEC. 1174. (a) INITIAL STANDARDS.—The Secretary shall carry out section 1173 not later than 18 months after the date of the enactment of the Health Insurance Portability and Accountability Act of 1996, except that standards relating to claims attachments shall be adopted not later than 30 months after such date.

"(b) ADDITIONS AND MODIFICATIONS TO STANDARDS.—

"(1) IN GENERAL.—Except as provided in paragraph (2), the Secretary shall review the standards adopted under section 1173, and shall adopt modifications to the standards (including additions to the standards), as determined appropriate, but not more frequently than once every 12 months. Any addition or modification to a standard shall be completed in a manner which minimizes the disruption and cost of compliance.

"(2) SPECIAL RULES.—

"(A) FIRST 12–MONTH PERIOD.—Except with respect to additions and modifications to code sets under subparagraph (B), the Secretary may not adopt any modification to a standard adopted under this part during the 12–month period beginning on the date the standard is initially adopted, unless the Secretary determines that the modification is necessary in order to permit compliance with the standard.

"(B) ADDITIONS AND MODIFICATIONS TO CODE SETS.—

"(i) IN GENERAL.—The Secretary shall ensure that procedures exist for the routine maintenance, testing, enhancement, and expansion of code sets.

"(ii) ADDITIONAL RULES.—If a code set is modified under this subsection, the modified code set shall include instructions on how data elements of health information that were encoded prior to the modification may be converted or translated so as to preserve the informational value of the data elements that existed before the modification. Any modification to a code set under this subsection shall be implemented in a manner that minimizes the disruption and cost of complying with such modification.

<< 42 USCA § 1320d–4 >>

"REQUIREMENTS

"SEC. 1175. (a) CONDUCT OF TRANSACTIONS BY PLANS.—

"(1) IN GENERAL.—If a person desires to conduct a transaction referred to in section 1173(a)(1) with a health plan as a standard transaction—

"(A) the health plan may not refuse to conduct such transaction as a standard transaction;

"(B) the insurance plan may not delay such transaction, or otherwise adversely affect, or attempt to adversely affect, the person or the transaction on the ground that the transaction is a standard transaction; and

"(C) the information transmitted and received in connection with the transaction shall be in the form of standard data elements of health information.

"(2) SATISFACTION OF REQUIREMENTS.—A health plan may satisfy the requirements under paragraph (1) by—

"(A) directly transmitting and receiving standard data elements of health information; or

"(B) submitting nonstandard data elements to a health care clearinghouse for processing into standard data elements and transmission by the health care clearinghouse, and receiving standard data elements through the health care clearinghouse.

"(3) TIMETABLE FOR COMPLIANCE.—Paragraph (1) shall not be construed to require a health plan to comply with any standard, implementation specification, or modification to a standard or specification adopted or established by the Secretary under sections 1172 through 1174 at any time prior to the date on which the plan is required to comply with the standard or specification under subsection (b).

"(b) COMPLIANCE WITH STANDARDS.—

"(1) INITIAL COMPLIANCE.—

"(A) IN GENERAL.—Not later than 24 months after the date on which an initial standard or implementation specification is adopted or established under sections 1172 and 1173, each person to whom the standard or implementation specification applies shall comply with the standard or specification.

"(B) SPECIAL RULE FOR SMALL HEALTH PLANS.—In the case of a small health plan, paragraph (1) shall be applied by substituting '36 months' for '24 months'. For purposes of this subsection, the Secretary shall determine the plans that qualify as small health plans.

"(2) COMPLIANCE WITH MODIFIED STANDARDS.—If the Secretary adopts a modification to a standard or implementation specification under this part, each person to whom the standard or implementation specification applies shall comply with the modified standard or implementation specification at such time as the Secretary determines appropriate, taking into account the time needed to comply due to the nature and extent of the modification. The time determined appropriate under the preceding sentence may not be earlier than the last day of the 180–day period beginning on the date such modification is adopted. The Secretary may extend the time for compliance for small health plans, if the Secretary determines that such extension is appropriate.

"(3) CONSTRUCTION.—Nothing in this subsection shall be construed to prohibit any person from complying with a standard or specification by—

"(A) submitting nonstandard data elements to a health care clearinghouse for processing into standard data elements and transmission by the health care clearinghouse; or

"(B) receiving standard data elements through a health care clearinghouse.

<< 42 USCA § 1320d–5 >>

"GENERAL PENALTY FOR FAILURE TO COMPLY WITH REQUIREMENTS AND STANDARDS

"SEC. 1176. (a) GENERAL PENALTY.—

"(1) IN GENERAL.—Except as provided in subsection (b), the Secretary shall impose on any person who violates a provision of this part a penalty of not more than $100 for each such violation, except that the total amount imposed on the person for all violations of an identical requirement or prohibition during a calendar year may not exceed $25,000.

"(2) PROCEDURES.—The provisions of section 1128A (other than subsections (a) and (b) and the second sentence of subsection (f)) shall apply to the imposition of a civil money penalty under this subsection in the same manner as such provisions apply to the imposition of a penalty under such section 1128A.

"(b) LIMITATIONS.—

"(1) OFFENSES OTHERWISE PUNISHABLE.—A penalty may not be imposed under subsection (a) with respect to an act if the act constitutes an offense punishable under section 1177.

"(2) NONCOMPLIANCE NOT DISCOVERED.—A penalty may not be imposed under subsection (a) with respect to a provision of this part if it is established to the satisfaction of the Secretary that the person liable for the penalty did not know, and by exercising reasonable diligence would not have known, that such person violated the provision.

"(3) FAILURES DUE TO REASONABLE CAUSE.—

"(A) IN GENERAL.—Except as provided in subparagraph (B), a penalty may not be imposed under subsection (a) if—

"(i) the failure to comply was due to reasonable cause and not to willful neglect; and

"(ii) the failure to comply is corrected during the 30–day period beginning on the first date the person liable for the penalty knew, or by exercising reasonable diligence would have known, that the failure to comply occurred.

"(B) EXTENSION OF PERIOD.—

"(i) NO PENALTY.—The period referred to in subparagraph (A)(ii) may be extended as determined appropriate by the Secretary based on the nature and extent of the failure to comply.

"(ii) ASSISTANCE.—If the Secretary determines that a person failed to comply because the person was unable to comply, the Secretary may provide technical assistance to the person during the period described in subparagraph (A)(ii). Such assistance shall be provided in any manner determined appropriate by the Secretary.

"(4) REDUCTION.—In the case of a failure to comply which is due to reasonable cause and not to willful neglect, any penalty under subsection (a) that is not entirely waived under paragraph (3) may be waived to the extent that the payment of such penalty would be excessive relative to the compliance failure involved.

<< 42 USCA § 1320d–6 >>

"WRONGFUL DISCLOSURE OF INDIVIDUALLY IDENTIFIABLE HEALTH INFORMATION

"SEC. 1177. (a) OFFENSE.—A person who knowingly and in violation of this part—

"(1) uses or causes to be used a unique health identifier;

"(2) obtains individually identifiable health information relating to an individual; or

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

"(3) discloses individually identifiable health information to another person,

shall be punished as provided in subsection (b).

"(b) PENALTIES.—A person described in subsection (a) shall—

"(1) be fined not more than $50,000, imprisoned not more than 1 year, or both;

"(2) if the offense is committed under false pretenses, be fined not more than $100,000, imprisoned not more than 5 years, or both; and

"(3) if the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm, be fined not more than $250,000, imprisoned not more than 10 years, or both.

<< 42 USCA § 1320d–7 >>

"EFFECT ON STATE LAW

"SEC. 1178. (a) GENERAL EFFECT.—

"(1) GENERAL RULE.—Except as provided in paragraph (2), a provision or requirement under this part, or a standard or implementation specification adopted or established under sections 1172 through 1174, shall supersede any contrary provision of State law, including a provision of State law that requires medical or health plan records (including billing information) to be maintained or transmitted in written rather than electronic form.

"(2) EXCEPTIONS.—A provision or requirement under this part, or a standard or implementation specification adopted or established under sections 1172 through 1174, shall not supersede a contrary provision of State law, if the provision of State law—

"(A) is a provision the Secretary determines—

"(i) is necessary—

"(I) to prevent fraud and abuse;

"(II) to ensure appropriate State regulation of insurance and health plans;

"(III) for State reporting on health care delivery or costs; or

"(IV) for other purposes; or

"(ii) addresses controlled substances; or

"(B) subject to section 264(c)(2) of the Health Insurance Portability and Accountability Act of 1996, relates to the privacy of individually identifiable health information.

"(b) PUBLIC HEALTH.—Nothing in this part shall be construed to invalidate or limit the authority, power, or procedures established under any law providing for the reporting of disease or injury, child abuse, birth, or death, public health surveillance, or public health investigation or intervention.

"(c) STATE REGULATORY REPORTING.—Nothing in this part shall limit the ability of a State to require a health plan to report, or to provide access to, information for management audits, financial audits, program monitoring and evaluation, facility licensure or certification, or individual licensure or certification.

<< 42 USCA § 1320d–8 >>

"PROCESSING PAYMENT TRANSACTIONS BY FINANCIAL INSTITUTIONS

"SEC. 1179. To the extent that an entity is engaged in activities of a financial institution (as defined in section 1101 of the Right to Financial Privacy Act of 1978), or is engaged in authorizing, processing, clearing, settling, billing, transferring, reconciling, or collecting payments, for a financial institution, this part, and any standard adopted under this part, shall not apply to the entity with respect to such activities, including the following:

"(1) The use or disclosure of information by the entity for authorizing, processing, clearing, settling, billing, transferring, reconciling or collecting, a payment for, or related to, health plan premiums or health care, where such payment is made by any means, including a credit, debit, or other payment card, an account, check, or electronic funds transfer.

"(2) The request for, or the use or disclosure of, information by the entity with respect to a payment described in paragraph (1)—

"(A) for transferring receivables;

"(B) for auditing;

"(C) in connection with—

  "(i) a customer dispute; or

  "(ii) an inquiry from, or to, a customer;

  "(D) in a communication to a customer of the entity regarding the customer's transactions, payment card, account, check, or electronic funds transfer;

  "(E) for reporting to consumer reporting agencies; or

  "(F) for complying with—

  "(i) a civil or criminal subpoena; or

  "(ii) a Federal or State law regulating the entity.".

 (b) CONFORMING AMENDMENTS.—

<< 42 USCA § 1395cc >>

 (1) REQUIREMENT FOR MEDICARE PROVIDERS.—Section 1866(a)(1) (42 U.S.C. 1395cc(a)(1)) is amended—

  (A) by striking "and" at the end of subparagraph (P);

  (B) by striking the period at the end of subparagraph (Q) and inserting "; and"; and

  (C) by inserting immediately after subparagraph (Q) the following new subparagraph:

  "(R) to contract only with a health care clearinghouse (as defined in section 1171) that meets each standard and implementation specification adopted or established under part C of title XI on or after the date on which the health care clearinghouse is required to comply with the standard or specification.".

<< 42 USCA Ch. 7 >>

 (2) TITLE HEADING.—Title XI (42 U.S.C. 1301 et seq.) is amended by striking the title heading and inserting the following:

  "TITLE XI—GENERAL PROVISIONS, PEER REVIEW, AND ADMINISTRATIVE SIMPLIFICATION".

<< 42 USCA § 242k >>

SEC. 263. CHANGES IN MEMBERSHIP AND DUTIES OF NATIONAL COMMITTEE ON VITAL AND HEALTH STATISTICS.

 Section 306(k) of the Public Health Service Act (42 U.S.C. 242k(k)) is amended—

  (1) in paragraph (1), by striking "16" and inserting "18";

  (2) by amending paragraph (2) to read as follows:

 "(2) The members of the Committee shall be appointed from among persons who have distinguished themselves in the fields of health statistics, electronic interchange of health care information, privacy and security of electronic information, population-based public health, purchasing or financing health care services, integrated computerized health information systems, health services research, consumer interests in health information, health data standards, epidemiology, and the provision of health services. Members of the Committee shall be appointed for terms of 4 years.";

  (3) by redesignating paragraphs (3) through (5) as paragraphs (4) through (6), respectively, and inserting after paragraph (2) the following:

 "(3) Of the members of the Committee—

  "(A) 1 shall be appointed, not later than 60 days after the date of the enactment of the Health Insurance Portability and Accountability Act of 1996, by the Speaker of the House of Representatives after consultation with the Minority Leader of the House of Representatives;

  "(B) 1 shall be appointed, not later than 60 days after the date of the enactment of the Health Insurance Portability and Accountability Act of 1996, by the President pro tempore of the Senate after consultation with the Minority Leader of the Senate; and

  "(C) 16 shall be appointed by the Secretary.";

  (4) by amending paragraph (5) (as so redesignated) to read as follows:

"(5) The Committee—

"(A) shall assist and advise the Secretary—

"(i) to delineate statistical problems bearing on health and health services which are of national or international interest;

"(ii) to stimulate studies of such problems by other organizations and agencies whenever possible or to make investigations of such problems through subcommittees;

"(iii) to determine, approve, and revise the terms, definitions, classifications, and guidelines for assessing health status and health services, their distribution and costs, for use (I) within the Department of Health and Human Services, (II) by all programs administered or funded by the Secretary, including the Federal–State–local cooperative health statistics system referred to in subsection (e), and (III) to the extent possible as determined by the head of the agency involved, by the Department of Veterans Affairs, the Department of Defense, and other Federal agencies concerned with health and health services;

"(iv) with respect to the design of and approval of health statistical and health information systems concerned with the collection, processing, and tabulation of health statistics within the Department of Health and Human Services, with respect to the Cooperative Health Statistics System established under subsection (e), and with respect to the standardized means for the collection of health information and statistics to be established by the Secretary under subsection (j)(1);

"(v) to review and comment on findings and proposals developed by other organizations and agencies and to make recommendations for their adoption or implementation by local, State, national, or international agencies;

"(vi) to cooperate with national committees of other countries and with the World Health Organization and other national agencies in the studies of problems of mutual interest;

"(vii) to issue an annual report on the state of the Nation's health, its health services, their costs and distributions, and to make proposals for improvement of the Nation's health statistics and health information systems; and

"(viii) in complying with the requirements imposed on the Secretary under part C of title XI of the Social Security Act;

"(B) shall study the issues related to the adoption of uniform data standards for patient medical record information and the electronic exchange of such information;

"(C) shall report to the Secretary not later than 4 years after the date of the enactment of the Health Insurance Portability and Accountability Act of 1996 recommendations and legislative proposals for such standards and electronic exchange; and

"(D) shall be responsible generally for advising the Secretary and the Congress on the status of the implementation of part C of title XI of the Social Security Act."; and

"(5) by adding at the end the following:

"(7) Not later than 1 year after the date of the enactment of the Health Insurance Portability and Accountability Act of 1996, and annually thereafter, the Committee shall submit to the Congress, and make public, a report regarding the implementation of part C of title XI of the Social Security Act. Such report shall address the following subjects, to the extent that the Committee determines appropriate:

"(A) The extent to which persons required to comply with part C of title XI of the Social Security Act are cooperating in implementing the standards adopted under such part.

"(B) The extent to which such entities are meeting the security standards adopted under such part and the types of penalties assessed for noncompliance with such standards.

"(C) Whether the Federal and State Governments are receiving information of sufficient quality to meet their responsibilities under such part.

"(D) Any problems that exist with respect to implementation of such part.

"(E) The extent to which timetables under such part are being met.".

<< 42 USCA § 1320d–2 >>

SEC. 264. RECOMMENDATIONS WITH RESPECT TO PRIVACY OF CERTAIN HEALTH INFORMATION.

(a) IN GENERAL.—Not later than the date that is 12 months after the date of the enactment of this Act, the Secretary of Health and Human Services shall submit to the Committee on Labor and Human Resources and the Committee on Finance of the Senate and the Committee on Commerce and the Committee on Ways and Means of the House of Representatives detailed recommendations on standards with respect to the privacy of individually identifiable health information.

(b) SUBJECTS FOR RECOMMENDATIONS.—The recommendations under subsection (a) shall address at least the following:

(1) The rights that an individual who is a subject of individually identifiable health information should have.

(2) The procedures that should be established for the exercise of such rights.

(3) The uses and disclosures of such information that should be authorized or required.

(c) REGULATIONS.—

(1) IN GENERAL.—If legislation governing standards with respect to the privacy of individually identifiable health information transmitted in connection with the transactions described in section 1173(a) of the Social Security Act (as added by section 262) is not enacted by the date that is 36 months after the date of the enactment of this Act, the Secretary of Health and Human Services shall promulgate final regulations containing such standards not later than the date that is 42 months after the date of the enactment of this Act. Such regulations shall address at least the subjects described in subsection (b).

(2) PREEMPTION.—A regulation promulgated under paragraph (1) shall not supercede a contrary provision of State law, if the provision of State law imposes requirements, standards, or implementation specifications that are more stringent than the requirements, standards, or implementation specifications imposed under the regulation.

(d) CONSULTATION.—In carrying out this section, the Secretary of Health and Human Services shall consult with—

(1) the National Committee on Vital and Health Statistics established under section 306(k) of the Public Health Service Act (42 U.S.C. 242k(k)); and

(2) the Attorney General.


Subtitle G—Duplication and Coordination of Medicare–Related Plans


SEC. 271. DUPLICATION AND COORDINATION OF MEDICARE–RELATED PLANS.

<< 42 USCA § 1395ss >>

(a) TREATMENT OF CERTAIN HEALTH INSURANCE POLICIES AS NONDUPLICATIVE.—Section 1882(d)(3)(A) (42 U.S.C. 1395ss(d)(3)(A)) is amended—

(1) in clause (iii), by striking "clause (i)" and inserting "clause (i)(II)"; and

(2) by adding at the end the following:

"(iv) For purposes of this subparagraph, a health insurance policy (other than a Medicare supplemental policy) providing for benefits which are payable to or on behalf of an individual without regard to other health benefit coverage of such individual is not considered to 'duplicate' any health benefits under this title, under title XIX, or under a health insurance policy, and subclauses (I) and (III) of clause (i) do not apply to such a policy.

"(v) For purposes of this subparagraph, a health insurance policy (or a rider to an insurance contract which is not a health insurance policy) is not considered to 'duplicate' health benefits under this title or under another health insurance policy if it—

"(I) provides health care benefits only for long-term care, nursing home care, home health care, or community-based care, or any combination thereof,

"(II) coordinates against or excludes items and services available or paid for under this title or under another health insurance policy, and

"(III) for policies sold or issued on or after the end of the 90–day period beginning on the date of enactment of the Health Insurance Portability and Accountability Act of 1996 discloses such coordination or exclusion in the policy's outline of coverage.

For purposes of this clause, the terms 'coordinates' and 'coordination' mean, with respect to a policy in relation to health benefits under this title or under another health insurance policy, that the policy under its terms is secondary to, or excludes from payment, items and services to the extent available or paid for under this title or under another health insurance policy.

"(vi)(I) An individual entitled to benefits under part A or enrolled under part B of this title who is applying for a health insurance policy (other than a policy described in subclause (III)) shall be furnished a disclosure statement described in clause (vii) for the type of policy being applied for. Such statement shall be furnished as a part of (or together with) the application for such policy.

"(II) Whoever issues or sells a health insurance policy (other than a policy described in subclause (III)) to an individual described in subclause (I) and fails to furnish the appropriate disclosure statement as required under such subclause shall be

fined under title 18, United States Code, or imprisoned not more than 5 years, or both, and, in addition to or in lieu of such a criminal penalty, is subject to a civil money penalty of not to exceed $25,000 (or $15,000 in the case of a person other than the issuer of the policy) for each such violation.

"(III) A policy described in this subclause (to which subclauses (I) and (II) do not apply) is a Medicare supplemental policy or a health insurance policy identified under 60 Federal Register 30880 (June 12, 1995) as a policy not required to have a disclosure statement.

"(IV) Any reference in this section to the revised NAIC model regulation (referred to in subsection (m)(1)(A)) is deemed a reference to such regulation as revised by section 171(m)(2) of the Social Security Act Amendments of 1994 (Public Law 103–432) and as modified by substituting, for the disclosure required under section 16D(2), disclosure under subclause (I) of an appropriate disclosure statement under clause (vii).

"(vii) The disclosure statement described in this clause for a type of policy is the statement specified under subparagraph (D) of this paragraph (as in effect before the date of the enactment of the Health Insurance Portability and Accountability Act of 1996) for that type of policy, as revised as follows:

"(I) In each statement, amend the second line to read as follows:

‘THIS IS NOT MEDICARE SUPPLEMENT INSURANCE’.

"(II) In each statement, strike the third line and insert the following: ‘Some health care services paid for by Medicare may also trigger the payment of benefits under this policy.’.

"(III) In each statement not described in subclause (V), strike the boldface matter that begins ‘This insurance’ and all that follows up to the next paragraph that begins ‘Medicare’.

"(IV) In each statement not described in subclause (V), insert before the boxed matter (that states ‘Before You Buy This Insurance’) the following: ‘This policy must pay benefits without regard to other health benefit coverage to which you may be entitled under Medicare or other insurance.’.

"(V) In a statement relating to policies providing both nursing home and non-institutional coverage, to policies providing nursing home benefits only, or policies providing home care benefits only, amend the sentence that begins ‘Federal law’ to read as follows: ‘Federal law requires us to inform you that in certain situations this insurance may pay for some care also covered by Medicare.’.

"(viii)(I) Subject to subclause (II), nothing in this subparagraph shall restrict or preclude a State's ability to regulate health insurance policies, including any health insurance policy that is described in clause (iv), (v), or (vi)(III).

"(II) A State may not declare or specify, in statute, regulation, or otherwise, that a health insurance policy (other than a Medicare supplemental policy) or rider to an insurance contract which is not a health insurance policy, that is described in clause (iv), (v), or (vi)(III) and that is sold, issued, or renewed to an individual entitled to benefits under part A or enrolled under part B ‘duplicates' health benefits under this title or under a Medicare supplemental policy.”.

(b) CONFORMING AMENDMENTS.—Section 1882(d)(3) (42 U.S.C. 1395ss(d)(3)) is amended—

(1) in subparagraph (C)—

(A) by striking "with respect to (i)" and inserting "with respect to", and

(B) by striking ", (ii) the sale" and all that follows up to the period at the end; and

(2) by striking subparagraph (D).

<< 42 USCA § 1395ss NOTE >>

(c) TRANSITIONAL PROVISION.—

(1) NO PENALTIES.—Subject to paragraph (3), no criminal or civil money penalty may be imposed under section 1882(d)(3)(A) of the Social Security Act for any act or omission that occurred during the transition period (as defined in paragraph (4)) and that relates to any health insurance policy that is described in clause (iv) or (v) of such section (as amended by subsection (a)).

(2) LIMITATION ON LEGAL ACTION.—Subject to paragraph (3), no legal action shall be brought or continued in any Federal or State court insofar as such action—

(A) includes a cause of action which arose, or which is based on or evidenced by any act or omission which occurred, during the transition period; and

(B) relates to the application of section 1882(d)(3)(A) of the Social Security Act to any act or omission with respect to the sale, issuance, or renewal of any health insurance policy that is described in clause (iv) or (v) of such section (as amended by subsection (a)).

  (3) DISCLOSURE CONDITION.—In the case of a policy described in clause (iv) of section 1882(d)(3)(A) of the Social Security Act that is sold or issued on or after the effective date of statements under section 171(d)(3)(C) of the Social Security Act Amendments of 1994 and before the end of the 30–day period beginning on the date of the enactment of this Act, paragraphs (1) and (2) shall only apply if disclosure was made in accordance with section 1882(d)(3)(C)(ii) of the Social Security Act (as in effect before the date of the enactment of this Act).

  (4) TRANSITION PERIOD.—In this subsection, the term "transition period" means the period beginning on November 5, 1991, and ending on the date of the enactment of this Act.

<< 42 USCA § 1395ss NOTE >>

  (d) EFFECTIVE DATE.—(1) Except as provided in this subsection, the amendment made by subsection (a) shall be effective as if included in the enactment of section 4354 of the Omnibus Budget Reconciliation Act of 1990.

  (2)(A) Clause (vi) of section 1882(d)(3)(A) of the Social Security Act, as added by subsection (a), shall only apply to individuals applying for—

  (i) a health insurance policy described in section 1882(d)(3)(A)(iv) of such Act (as added by subsection (a)), after the date of the enactment of this Act, or

  (ii) another health insurance policy after the end of the 30–day period beginning on the date of the enactment of this Act.

  (B) A seller or issuer of a health insurance policy may substitute, for the disclosure statement described in clause (vii) of such section, the statement specified under section 1882(d)(3)(D) of the Social Security Act (as in effect before the date of the enactment of this Act), without the revision specified in such clause.

## TITLE III—TAX–RELATED HEALTH PROVISIONS

### SEC. 300. AMENDMENT OF 1986 CODE.

  Except as otherwise expressly provided, whenever in this title an amendment or repeal is expressed in terms of an amendment to, or repeal of, a section or other provision, the reference shall be considered to be made to a section or other provision of the Internal Revenue Code of 1986.

### Subtitle A—Medical Savings Accounts

### SEC. 301. MEDICAL SAVINGS ACCOUNTS.

<< 26 USCA § 220 >>

<< 26 USCA § 221 >>

  (a) IN GENERAL.—Part VII of subchapter B of chapter 1 (relating to additional itemized deductions for individuals) is amended by redesignating section 220 as section 221 and by inserting after section 219 the following new section:

<< 26 USCA § 220 >>

"SEC. 220. MEDICAL SAVINGS ACCOUNTS.

  "(a) DEDUCTION ALLOWED.—In the case of an individual who is an eligible individual for any month during the taxable year, there shall be allowed as a deduction for the taxable year an amount equal to the aggregate amount paid in cash during such taxable year by such individual to a medical savings account of such individual.

  "(b) LIMITATIONS.—

  "(1) IN GENERAL.—The amount allowable as a deduction under subsection (a) to an individual for the taxable year shall not exceed the sum of the monthly limitations for months during such taxable year that the individual is an eligible individual.

"(2) MONTHLY LIMITATION.—The monthly limitation for any month is the amount equal to $\frac{1}{12}$ of—

"(A) in the case of an individual who has self-only coverage under the high deductible health plan as of the first day of such month, 65 percent of the annual deductible under such coverage, and

"(B) in the case of an individual who has family coverage under the high deductible health plan as of the first day of such month, 75 percent of the annual deductible under such coverage.

"(3) SPECIAL RULE FOR MARRIED INDIVIDUALS.—In the case of individuals who are married to each other, if either spouse has family coverage—

"(A) both spouses shall be treated as having only such family coverage (and if such spouses each have family coverage under different plans, as having the family coverage with the lowest annual deductible), and

"(B) the limitation under paragraph (1) (after the application of subparagraph (A) of this paragraph) shall be divided equally between them unless they agree on a different division.

"(4) DEDUCTION NOT TO EXCEED COMPENSATION.—

"(A) EMPLOYEES.—The deduction allowed under subsection (a) for contributions as an eligible individual described in subclause (I) of subsection (c)(1)(A)(iii) shall not exceed such individual's wages, salaries, tips, and other employee compensation which are attributable to such individual's employment by the employer referred to in such subclause.

"(B) SELF–EMPLOYED INDIVIDUALS.—The deduction allowed under subsection (a) for contributions as an eligible individual described in subclause (II) of subsection (c)(1)(A)(iii) shall not exceed such individual's earned income (as defined in section 401(c)(1)) derived by the taxpayer from the trade or business with respect to which the high deductible health plan is established.

"(C) COMMUNITY PROPERTY LAWS NOT TO APPLY.—The limitations under this paragraph shall be determined without regard to community property laws.

"(5) COORDINATION WITH EXCLUSION FOR EMPLOYER CONTRIBUTIONS.—No deduction shall be allowed under this section for any amount paid for any taxable year to a medical savings account of an individual if—

"(A) any amount is contributed to any medical savings account of such individual for such year which is excludable from gross income under section 106(b), or

"(B) if such individual's spouse is covered under the high deductible health plan covering such individual, any amount is contributed for such year to any medical savings account of such spouse which is so excludable.

"(6) DENIAL OF DEDUCTION TO DEPENDENTS.—No deduction shall be allowed under this section to any individual with respect to whom a deduction under section 151 is allowable to another taxpayer for a taxable year beginning in the calendar year in which such individual's taxable year begins.

"(c) DEFINITIONS.—For purposes of this section—

"(1) ELIGIBLE INDIVIDUAL.—

"(A) IN GENERAL.—The term 'eligible individual' means, with respect to any month, any individual if—

"(i) such individual is covered under a high deductible health plan as of the 1st day of such month,

"(ii) such individual is not, while covered under a high deductible health plan, covered under any health plan—

"(I) which is not a high deductible health plan, and

"(II) which provides coverage for any benefit which is covered under the high deductible health plan, and

"(iii)(I) the high deductible health plan covering such individual is established and maintained by the employer of such individual or of the spouse of such individual and such employer is a small employer, or

"(II) such individual is an employee (within the meaning of section 401(c)(1)) or the spouse of such an employee and the high deductible health plan covering such individual is not established or maintained by any employer of such individual or spouse.

"(B) CERTAIN COVERAGE DISREGARDED.—Subparagraph (A)(ii) shall be applied without regard to—

"(i) coverage for any benefit provided by permitted insurance, and

"(ii) coverage (whether through insurance or otherwise) for accidents, disability, dental care, vision care, or long-term care.

"(C) CONTINUED ELIGIBILITY OF EMPLOYEE AND SPOUSE ESTABLISHING MEDICAL SAVINGS ACCOUNTS.—If, while an employer is a small employer—

"(i) any amount is contributed to a medical savings account of an individual who is an employee of such employer or the spouse of such an employee, and

"(ii) such amount is excludable from gross income under section 106(b) or allowable as a deduction under this section,

such individual shall not cease to meet the requirement of subparagraph (A)(iii)(I) by reason of such employer ceasing to be a small employer so long as such employee continues to be an employee of such employer.

"(D) LIMITATIONS ON ELIGIBILITY.—

"For limitations on number of taxpayers who are eligible to have medical savings accounts, see subsection (i).

"(2) HIGH DEDUCTIBLE HEALTH PLAN.—

"(A) IN GENERAL.—The term 'high deductible health plan' means a health plan—

"(i) in the case of self-only coverage, which has an annual deductible which is not less than $1,500 and not more than $2,250,

"(ii) in the case of family coverage, which has an annual deductible which is not less than $3,000 and not more than $4,500, and

"(iii) the annual out-of-pocket expenses required to be paid under the plan (other than for premiums) for covered benefits does not exceed—

"(I) $3,000 for self-only coverage, and

"(II) $5,500 for family coverage.

"(B) SPECIAL RULES.—

"(i) EXCLUSION OF CERTAIN PLANS.—Such term does not include a health plan if substantially all of its coverage is coverage described in paragraph (1)(B).

"(ii) SAFE HARBOR FOR ABSENCE OF PREVENTIVE CARE DEDUCTIBLE.—A plan shall not fail to be treated as a high deductible health plan by reason of failing to have a deductible for preventive care if the absence of a deductible for such care is required by State law.

"(3) PERMITTED INSURANCE.—The term 'permitted insurance' means—

"(A) Medicare supplemental insurance,

"(B) insurance if substantially all of the coverage provided under such insurance relates to—

"(i) liabilities incurred under workers' compensation laws,

"(ii) tort liabilities,

"(iii) liabilities relating to ownership or use of property, or

"(iv) such other similar liabilities as the Secretary may specify by regulations,

"(C) insurance for a specified disease or illness, and

"(D) insurance paying a fixed amount per day (or other period) of hospitalization.

"(4) SMALL EMPLOYER.—

"(A) IN GENERAL.—The term 'small employer' means, with respect to any calendar year, any employer if such employer employed an average of 50 or fewer employees on business days during either of the 2 preceding calendar years. For purposes of the preceding sentence, a preceding calendar year may be taken into account only if the employer was in existence throughout such year.

"(B) EMPLOYERS NOT IN EXISTENCE IN PRECEDING YEAR.—In the case of an employer which was not in existence throughout the 1st preceding calendar year, the determination under subparagraph (A) shall be based on the average number of employees that it is reasonably expected such employer will employ on business days in the current calendar year.

"(C) CERTAIN GROWING EMPLOYERS RETAIN TREATMENT AS SMALL EMPLOYER.—The term 'small employer' includes, with respect to any calendar year, any employer if—

"(i) such employer met the requirement of subparagraph (A) (determined without regard to subparagraph (B)) for any preceding calendar year after 1996,

"(ii) any amount was contributed to the medical savings account of any employee of such employer with respect to coverage of such employee under a high deductible health plan of such employer during such preceding calendar year and such amount was excludable from gross income under section 106(b) or allowable as a deduction under this section, and

"(iii) such employer employed an average of 200 or fewer employees on business days during each preceding calendar year after 1996.

"(D) SPECIAL RULES.—

"(i) CONTROLLED GROUPS.—For purposes of this paragraph, all persons treated as a single employer under subsection (b), (c), (m), or (o) of section 414 shall be treated as 1 employer.

"(ii) PREDECESSORS.—Any reference in this paragraph to an employer shall include a reference to any predecessor of such employer.

"(5) FAMILY COVERAGE.—The term 'family coverage' means any coverage other than self-only coverage.

"(d) MEDICAL SAVINGS ACCOUNT.—For purposes of this section—

"(1) MEDICAL SAVINGS ACCOUNT.—The term 'medical savings account' means a trust created or organized in the United States exclusively for the purpose of paying the qualified medical expenses of the account holder, but only if the written governing instrument creating the trust meets the following requirements:

"(A) Except in the case of a rollover contribution described in subsection (f)(5), no contribution will be accepted—

"(i) unless it is in cash, or

"(ii) to the extent such contribution, when added to previous contributions to the trust for the calendar year, exceeds 75 percent of the highest annual limit deductible permitted under subsection (c)(2)(A)(ii) for such calendar year.

"(B) The trustee is a bank (as defined in section 408(n)), an insurance company (as defined in section 816), or another person who demonstrates to the satisfaction of the Secretary that the manner in which such person will administer the trust will be consistent with the requirements of this section.

"(C) No part of the trust assets will be invested in life insurance contracts.

"(D) The assets of the trust will not be commingled with other property except in a common trust fund or common investment fund.

"(E) The interest of an individual in the balance in his account is nonforfeitable.

"(2) QUALIFIED MEDICAL EXPENSES.—

"(A) IN GENERAL.—The term 'qualified medical expenses' means, with respect to an account holder, amounts paid by such holder for medical care (as defined in section 213(d)) for such individual, the spouse of such individual, and any dependent (as defined in section 152) of such individual, but only to the extent such amounts are not compensated for by insurance or otherwise.

"(B) HEALTH INSURANCE MAY NOT BE PURCHASED FROM ACCOUNT.—

"(i) IN GENERAL.—Subparagraph (A) shall not apply to any payment for insurance.

"(ii) EXCEPTIONS.—Clause (i) shall not apply to any expense for coverage under—

"(I) a health plan during any period of continuation coverage required under any Federal law,

"(II) a qualified long-term care insurance contract (as defined in section 7702B(b)), or

"(III) a health plan during a period in which the individual is receiving unemployment compensation under any Federal or State law.

"(C) MEDICAL EXPENSES OF INDIVIDUALS WHO ARE NOT ELIGIBLE INDIVIDUALS.—Subparagraph (A) shall apply to an amount paid by an account holder for medical care of an individual who is not an eligible individual for the month in which the expense for such care is incurred only if no amount is contributed (other than a rollover contribution) to any medical savings account of such account holder for the taxable year which includes such month. This subparagraph shall not apply to any expense for coverage described in subclause (I) or (III) of subparagraph (B)(ii).

"(3) ACCOUNT HOLDER.—The term 'account holder' means the individual on whose behalf the medical savings account was established.

"(4) CERTAIN RULES TO APPLY.—Rules similar to the following rules shall apply for purposes of this section:

"(A) Section 219(d)(2) (relating to no deduction for rollovers).

"(B) Section 219(f)(3) (relating to time when contributions deemed made).

"(C) Except as provided in section 106(b), section 219(f)(5) (relating to employer payments).

"(D) Section 408(g) (relating to community property laws).

"(E) Section 408(h) (relating to custodial accounts).

"(e) TAX TREATMENT OF ACCOUNTS.—

"(1) IN GENERAL.—A medical savings account is exempt from taxation under this subtitle unless such account has ceased to be a medical savings account. Notwithstanding the preceding sentence, any such account is subject to the taxes imposed by section 511 (relating to imposition of tax on unrelated business income of charitable, etc. organizations).

"(2) ACCOUNT TERMINATIONS.—Rules similar to the rules of paragraphs (2) and (4) of section 408(e) shall apply to medical savings accounts, and any amount treated as distributed under such rules shall be treated as not used to pay qualified medical expenses.

"(f) TAX TREATMENT OF DISTRIBUTIONS.—

 "(1) AMOUNTS USED FOR QUALIFIED MEDICAL EXPENSES.—Any amount paid or distributed out of a medical savings account which is used exclusively to pay qualified medical expenses of any account holder shall not be includible in gross income.

 "(2) INCLUSION OF AMOUNTS NOT USED FOR QUALIFIED MEDICAL EXPENSES.—Any amount paid or distributed out of a medical savings account which is not used exclusively to pay the qualified medical expenses of the account holder shall be included in the gross income of such holder.

 "(3) EXCESS CONTRIBUTIONS RETURNED BEFORE DUE DATE OF RETURN.—

  "(A) IN GENERAL.—If any excess contribution is contributed for a taxable year to any medical savings account of an individual, paragraph (2) shall not apply to distributions from the medical savings accounts of such individual (to the extent such distributions do not exceed the aggregate excess contributions to all such accounts of such individual for such year) if—

   "(i) such distribution is received by the individual on or before the last day prescribed by law (including extensions of time) for filing such individual's return for such taxable year, and

   "(ii) such distribution is accompanied by the amount of net income attributable to such excess contribution.


Any net income described in clause (ii) shall be included in the gross income of the individual for the taxable year in which it is received.

  "(B) EXCESS CONTRIBUTION.—For purposes of subparagraph (A), the term 'excess contribution' means any contribution (other than a rollover contribution) which is neither excludable from gross income under section 106(b) nor deductible under this section.

 "(4) ADDITIONAL TAX ON DISTRIBUTIONS NOT USED FOR QUALIFIED MEDICAL EXPENSES.—

  "(A) IN GENERAL.—The tax imposed by this chapter on the account holder for any taxable year in which there is a payment or distribution from a medical savings account of such holder which is includible in gross income under paragraph (2) shall be increased by 15 percent of the amount which is so includible.

  "(B) EXCEPTION FOR DISABILITY OR DEATH.—Subparagraph (A) shall not apply if the payment or distribution is made after the account holder becomes disabled within the meaning of section 72(m)(7) or dies.

  "(C) EXCEPTION FOR DISTRIBUTIONS AFTER MEDICARE ELIGIBILITY.—Subparagraph (A) shall not apply to any payment or distribution after the date on which the account holder attains the age specified in section 1811 of the Social Security Act.

 "(5) ROLLOVER CONTRIBUTION.—An amount is described in this paragraph as a rollover contribution if it meets the requirements of subparagraphs (A) and (B).

  "(A) IN GENERAL.—Paragraph (2) shall not apply to any amount paid or distributed from a medical savings account to the account holder to the extent the amount received is paid into a medical savings account for the benefit of such holder not later than the 60th day after the day on which the holder receives the payment or distribution.

  "(B) LIMITATION.—This paragraph shall not apply to any amount described in subparagraph (A) received by an individual from a medical savings account if, at any time during the 1–year period ending on the day of such receipt, such individual received any other amount described in subparagraph (A) from a medical savings account which was not includible in the individual's gross income because of the application of this paragraph.

 "(6) COORDINATION WITH MEDICAL EXPENSE DEDUCTION.—For purposes of determining the amount of the deduction under section 213, any payment or distribution out of a medical savings account for qualified medical expenses shall not be treated as an expense paid for medical care.

 "(7) TRANSFER OF ACCOUNT INCIDENT TO DIVORCE.—The transfer of an individual's interest in a medical savings account to an individual's spouse or former spouse under a divorce or separation instrument described in subparagraph (A) of section 71(b)(2) shall not be considered a taxable transfer made by such individual notwithstanding any other provision of this subtitle, and such interest shall, after such transfer, be treated as a medical savings account with respect to which such spouse is the account holder.

 "(8) TREATMENT AFTER DEATH OF ACCOUNT HOLDER.—

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

"(A) TREATMENT IF DESIGNATED BENEFICIARY IS SPOUSE.—If the account holder's surviving spouse acquires such holder's interest in a medical savings account by reason of being the designated beneficiary of such account at the death of the account holder, such medical savings account shall be treated as if the spouse were the account holder.

"(B) OTHER CASES.—

"(i) IN GENERAL.—If, by reason of the death of the account holder, any person acquires the account holder's interest in a medical savings account in a case to which subparagraph (A) does not apply—

"(I) such account shall cease to be a medical savings account as of the date of death, and

"(II) an amount equal to the fair market value of the assets in such account on such date shall be includible if such person is not the estate of such holder, in such person's gross income for the taxable year which includes such date, or if such person is the estate of such holder, in such holder's gross income for the last taxable year of such holder.

"(ii) SPECIAL RULES.—

"(I) REDUCTION OF INCLUSION FOR PRE–DEATH EXPENSES.—The amount includible in gross income under clause (i) by any person (other than the estate) shall be reduced by the amount of qualified medical expenses which were incurred by the decedent before the date of the decedent's death and paid by such person within 1 year after such date.

"(II) DEDUCTION FOR ESTATE TAXES.—An appropriate deduction shall be allowed under section 691(c) to any person (other than the decedent or the decedent's spouse) with respect to amounts included in gross income under clause (i) by such person.

"(g) COST–OF–LIVING ADJUSTMENT.—In the case of any taxable year beginning in a calendar year after 1998, each dollar amount in subsection (c)(2) shall be increased by an amount equal to—

"(1) such dollar amount, multiplied by

"(2) the cost-of-living adjustment determined under section 1(f)(3) for the calendar year in which such taxable year begins by substituting 'calendar year 1997' for 'calendar year 1992' in subparagraph (B) thereof.

If any increase under the preceding sentence is not a multiple of $50, such increase shall be rounded to the nearest multiple of $50.

"(h) REPORTS.—The Secretary may require the trustee of a medical savings account to make such reports regarding such account to the Secretary and to the account holder with respect to contributions, distributions, and such other matters as the Secretary determines appropriate. The reports required by this subsection shall be filed at such time and in such manner and furnished to such individuals at such time and in such manner as may be required by the Secretary.

"(i) LIMITATION ON NUMBER OF TAXPAYERS HAVING MEDICAL SAVINGS ACCOUNTS.—

"(1) IN GENERAL.—Except as provided in paragraph (5), no individual shall be treated as an eligible individual for any taxable year beginning after the cut-off year unless—

"(A) such individual was an active MSA participant for any taxable year ending on or before the close of the cut-off year, or

"(B) such individual first became an active MSA participant for a taxable year ending after the cut-off year by reason of coverage under a high deductible health plan of an MSA-participating employer.

"(2) CUT–OFF YEAR.—For purposes of paragraph (1), the term 'cut-off year' means the earlier of—

"(A) calendar year 2000, or

"(B) the first calendar year before 2000 for which the Secretary determines under subsection (j) that the numerical limitation for such year has been exceeded.

"(3) ACTIVE MSA PARTICIPANT.—For purposes of this subsection—

"(A) IN GENERAL.—The term 'active MSA participant' means, with respect to any taxable year, any individual who is the account holder of any medical savings account into which any contribution was made which was excludable from gross income under section 106(b), or allowable as a deduction under this section, for such taxable year.

"(B) SPECIAL RULE FOR CUT–OFF YEARS BEFORE 2000.—In the case of a cut-off year before 2000—

"(i) an individual shall not be treated as an eligible individual for any month of such year or an active MSA participant under paragraph (1)(A) unless such individual is, on or before the cut-off date, covered under a high deductible health plan, and

"(ii) an employer shall not be treated as an MSA-participating employer unless the employer, on or before the cut-off date, offered coverage under a high deductible health plan to any employee.

"(C) CUT–OFF DATE.—For purposes of subparagraph (B)—

"(i) IN GENERAL.—Except as otherwise provided in this subparagraph, the cut-off date is October 1 of the cut-off year.

"(ii) EMPLOYEES WITH ENROLLMENT PERIODS AFTER OCTOBER 1.—In the case of an individual described in subclause (I) of subsection (c)(1)(A)(iii), if the regularly scheduled enrollment period for health plans of the individual's employer occurs during the last 3 months of the cut-off year, the cut-off date is December 31 of the cut-off year.

"(iii) SELF–EMPLOYED INDIVIDUALS.—In the case of an individual described in subclause (II) of subsection (c)(1)(A)(iii), the cut-off date is November 1 of the cut-off year.

"(iv) SPECIAL RULES FOR 1997.—If 1997 is a cut-off year by reason of subsection (j)(1)(A)—

  "(I) each of the cut-off dates under clauses (i) and (iii) shall be 1 month earlier than the date determined without regard to this clause, and

  "(II) clause (ii) shall be applied by substituting '4 months' for '3 months'.

"(4) MSA–PARTICIPATING EMPLOYER.—For purposes of this subsection, the term 'MSA-participating employer' means any small employer if—

  "(A) such employer made any contribution to the medical savings account of any employee during the cut-off year or any preceding calendar year which was excludable from gross income under section 106(b), or

  "(B) at least 20 percent of the employees of such employer who are eligible individuals for any month of the cut-off year by reason of coverage under a high deductible health plan of such employer each made a contribution of at least $100 to their medical savings accounts for any taxable year ending with or within the cut-off year which was allowable as a deduction under this section.

"(5) ADDITIONAL ELIGIBILITY AFTER CUT–OFF YEAR.—If the Secretary determines under subsection (j)(2)(A) that the numerical limit for the calendar year following a cut-off year described in paragraph (2)(B) has not been exceeded—

  "(A) this subsection shall not apply to any otherwise eligible individual who is covered under a high deductible health plan during the first 6 months of the second calendar year following the cut-off year (and such individual shall be treated as an active MSA participant for purposes of this subsection if a contribution is made to any medical savings account with respect to such coverage), and

  "(B) any employer who offers coverage under a high deductible health plan to any employee during such 6–month period shall be treated as an MSA-participating employer for purposes of this subsection if the requirements of paragraph (4) are met with respect to such coverage.

For purposes of this paragraph, subsection (j)(2)(A) shall be applied for 1998 by substituting '750,000' for '600,000'.

"(j) DETERMINATION OF WHETHER NUMERICAL LIMITS ARE EXCEEDED.—

  "(1) DETERMINATION OF WHETHER LIMIT EXCEEDED FOR 1997.—The numerical limitation for 1997 is exceeded if, based on the reports required under paragraph (4), the number of medical savings accounts established as of—

  "(A) April 30, 1997, exceeds 375,000, or

  "(B) June 30, 1997, exceeds 525,000.

  "(2) DETERMINATION OF WHETHER LIMIT EXCEEDED FOR 1998 OR 1999.—

  "(A) IN GENERAL.—The numerical limitation for 1998 or 1999 is exceeded if the sum of—

  "(i) the number of MSA returns filed on or before April 15 of such calendar year for taxable years ending with or within the preceding calendar year, plus

  "(ii) the Secretary's estimate (determined on the basis of the returns described in clause (i)) of the number of MSA returns for such taxable years which will be filed after such date,

exceeds 600,000 (750,000 in the case of 1999). For purposes of the preceding sentence, the term 'MSA return' means any return on which any exclusion is claimed under section 106(b) or any deduction is claimed under this section.

  "(B) ALTERNATIVE COMPUTATION OF LIMITATION.—The numerical limitation for 1998 or 1999 is also exceeded if the sum of—

  "(i) 90 percent of the sum determined under subparagraph (A) for such calendar year, plus

  "(ii) the product of 2.5 and the number of medical savings accounts established during the portion of such year preceding July 1 (based on the reports required under paragraph (4)) for taxable years beginning in such year,

exceeds 750,000.

  "(3) PREVIOUSLY UNINSURED INDIVIDUALS NOT INCLUDED IN DETERMINATION.—

"(A) IN GENERAL.—The determination of whether any calendar year is a cut-off year shall be made by not counting the medical savings account of any previously uninsured individual.

"(B) PREVIOUSLY UNINSURED INDIVIDUAL.—For purposes of this subsection, the term 'previously uninsured individual' means, with respect to any medical savings account, any individual who had no health plan coverage (other than coverage referred to in subsection (c)(1)(B)) at any time during the 6–month period before the date such individual's coverage under the high deductible health plan commences.

"(4) REPORTING BY MSA TRUSTEES.—

"(A) IN GENERAL.—Not later than August 1 of 1997, 1998, and 1999, each person who is the trustee of a medical savings account established before July 1 of such calendar year shall make a report to the Secretary (in such form and manner as the Secretary shall specify) which specifies—

"(i) the number of medical savings accounts established before such July 1 (for taxable years beginning in such calendar year) of which such person is the trustee,

"(ii) the name and TIN of the account holder of each such account, and

"(iii) the number of such accounts which are accounts of previously uninsured individuals.

"(B) ADDITIONAL REPORT FOR 1997.—Not later than June 1, 1997, each person who is the trustee of a medical savings account established before May 1, 1997, shall make an additional report described in subparagraph (A) but only with respect to accounts established before May 1, 1997.

"(C) PENALTY FOR FAILURE TO FILE REPORT.—The penalty provided in section 6693(a) shall apply to any report required by this paragraph, except that—

"(i) such section shall be applied by substituting '$25' for '$50', and

"(ii) the maximum penalty imposed on any trustee shall not exceed $5,000.

"(D) AGGREGATION OF ACCOUNTS.—To the extent practicable, in determining the number of medical savings accounts on the basis of the reports under this paragraph, all medical savings accounts of an individual shall be treated as 1 account and all accounts of individuals who are married to each other shall be treated as 1 account.

"(5) DATE OF MAKING DETERMINATIONS.—Any determination under this subsection that a calendar year is a cut-off year shall be made by the Secretary and shall be published not later than October 1 of such year.".

<< 26 USCA § 62 >>

(b) DEDUCTION ALLOWED WHETHER OR NOT INDIVIDUAL ITEMIZES OTHER DEDUCTIONS.—Subsection (a) of section 62 is amended by inserting after paragraph (15) the following new paragraph:

"(16) MEDICAL SAVINGS ACCOUNTS.—The deduction allowed by section 220.".

(c) EXCLUSIONS FOR EMPLOYER CONTRIBUTIONS TO MEDICAL SAVINGS ACCOUNTS.—

<< 26 USCA § 106 >>

(1) EXCLUSION FROM INCOME TAX.—The text of section 106 (relating to contributions by employer to accident and health plans) is amended to read as follows:

"(a) GENERAL RULE.—Except as otherwise provided in this section, gross income of an employee does not include employer-provided coverage under an accident or health plan.

"(b) CONTRIBUTIONS TO MEDICAL SAVINGS ACCOUNTS.—

"(1) IN GENERAL.—In the case of an employee who is an eligible individual, amounts contributed by such employee's employer to any medical savings account of such employee shall be treated as employer-provided coverage for medical expenses under an accident or health plan to the extent such amounts do not exceed the limitation under section 220(b)(1) (determined without regard to this subsection) which is applicable to such employee for such taxable year.

"(2) NO CONSTRUCTIVE RECEIPT.—No amount shall be included in the gross income of any employee solely because the employee may choose between the contributions referred to in paragraph (1) and employer contributions to another health plan of the employer.

"(3) SPECIAL RULE FOR DEDUCTION OF EMPLOYER CONTRIBUTIONS.—Any employer contribution to a medical savings account, if otherwise allowable as a deduction under this chapter, shall be allowed only for the taxable year in which paid.

"(4) EMPLOYER MSA CONTRIBUTIONS REQUIRED TO BE SHOWN ON RETURN.—Every individual required to file a return under section 6012 for the taxable year shall include on such return the aggregate amount contributed by employers to the medical savings accounts of such individual or such individual's spouse for such taxable year.

"(5) MSA CONTRIBUTIONS NOT PART OF COBRA COVERAGE.—Paragraph (1) shall not apply for purposes of section 4980B.

"(6) DEFINITIONS.—For purposes of this subsection, the terms 'eligible individual' and 'medical savings account' have the respective meanings given to such terms by section 220.

"(7) CROSS REFERENCE.—

"For penalty on failure by employer to make comparable contributions to the medical savings accounts of comparable employees, see section 4980E.".

(2) EXCLUSION FROM EMPLOYMENT TAXES.—

<< 26 USCA § 3231 >>

(A) RAILROAD RETIREMENT TAX.—Subsection (e) of section 3231 is amended by adding at the end the following new paragraph:

"(10) MEDICAL SAVINGS ACCOUNT CONTRIBUTIONS.—The term 'compensation' shall not include any payment made to or for the benefit of an employee if at the time of such payment it is reasonable to believe that the employee will be able to exclude such payment from income under section 106(b).".

<< 26 USCA § 3306 >>

(B) UNEMPLOYMENT TAX.—Subsection (b) of section 3306 is amended by striking "or" at the end of paragraph (15), by striking the period at the end of paragraph (16) and inserting "; or", and by inserting after paragraph (16) the following new paragraph:

"(17) any payment made to or for the benefit of an employee if at the time of such payment it is reasonable to believe that the employee will be able to exclude such payment from income under section 106(b).".

<< 26 USCA § 3401 >>

(C) WITHHOLDING TAX.—Subsection (a) of section 3401 is amended by striking "or" at the end of paragraph (19), by striking the period at the end of paragraph (20) and inserting "; or", and by inserting after paragraph (20) the following new paragraph:

"(21) any payment made to or for the benefit of an employee if at the time of such payment it is reasonable to believe that the employee will be able to exclude such payment from income under section 106(b)."

<< 26 USCA § 6051 >>

(3) EMPLOYER CONTRIBUTIONS REQUIRED TO BE SHOWN ON W–2.—Subsection (a) of section 6051 is amended by striking "and" at the end of paragraph (9), by striking the period at the end of paragraph (10) and inserting ", and", and by inserting after paragraph (10) the following new paragraph:

"(11) the amount contributed to any medical savings account (as defined in section 220(d)) of such employee or such employee's spouse.".

(4) PENALTY FOR FAILURE OF EMPLOYER TO MAKE COMPARABLE MSA CONTRIBUTIONS.—

<< 26 USCA § 4980E >>

(A) IN GENERAL.—Chapter 43 is amended by adding after section 4980D the following new section:

"SEC. 4980E. FAILURE OF EMPLOYER TO MAKE COMPARABLE MEDICAL SAVINGS ACCOUNT CONTRIBUTIONS.

   "(a) GENERAL RULE.—In the case of an employer who makes a contribution to the medical savings account of any employee with respect to coverage under a high deductible health plan of the employer during a calendar year, there is hereby imposed a tax on the failure of such employer to meet the requirements of subsection (d) for such calendar year.
   "(b) AMOUNT OF TAX.—The amount of the tax imposed by subsection (a) on any failure for any calendar year is the amount equal to 35 percent of the aggregate amount contributed by the employer to medical savings accounts of employees for taxable years of such employees ending with or within such calendar year.
   "(c) WAIVER BY SECRETARY.—In the case of a failure which is due to reasonable cause and not to willful neglect, the Secretary may waive part or all of the tax imposed by subsection (a) to the extent that the payment of such tax would be excessive relative to the failure involved.
   "(d) EMPLOYER REQUIRED TO MAKE COMPARABLE MSA CONTRIBUTIONS FOR ALL PARTICIPATING EMPLOYEES.—
     "(1) IN GENERAL.—An employer meets the requirements of this subsection for any calendar year if the employer makes available comparable contributions to the medical savings accounts of all comparable participating employees for each coverage period during such calendar year.
     "(2) COMPARABLE CONTRIBUTIONS.—
       "(A) IN GENERAL.—For purposes of paragraph (1), the term 'comparable contributions' means contributions—
         "(i) which are the same amount, or
         "(ii) which are the same percentage of the annual deductible limit under the high deductible health plan covering the employees.
       "(B) PART–YEAR EMPLOYEES.—In the case of an employee who is employed by the employer for only a portion of the calendar year, a contribution to the medical savings account of such employee shall be treated as comparable if it is an amount which bears the same ratio to the comparable amount (determined without regard to this subparagraph) as such portion bears to the entire calendar year.
     "(3) COMPARABLE PARTICIPATING EMPLOYEES.—For purposes of paragraph (1), the term 'comparable participating employees' means all employees—
       "(A) who are eligible individuals covered under any high deductible health plan of the employer, and
       "(B) who have the same category of coverage.

For purposes of subparagraph (B), the categories of coverage are self-only and family coverage.
     "(4) PART–TIME EMPLOYEES.—
       "(A) IN GENERAL.—Paragraph (3) shall be applied separately with respect to part-time employees and other employees.
       "(B) PART–TIME EMPLOYEE.—For purposes of subparagraph (A), the term 'part-time employee' means any employee who is customarily employed for fewer than 30 hours per week.
   "(e) CONTROLLED GROUPS.—For purposes of this section, all persons treated as a single employer under subsection (b), (c), (m), or (o) of section 414 shall be treated as 1 employer.
   "(f) DEFINITIONS.—Terms used in this section which are also used in section 220 have the respective meanings given such terms in section 220.".

<< 26 USCA Ch. 43 >>

   (B) CLERICAL AMENDMENT.—The table of sections for chapter 43 is amended by adding after the item relating to section 4980D the following new item:

"Sec. 4980E. Failure of employer to make comparable medical savings account contributions.".

<< 26 USCA § 125 >>

(d) MEDICAL SAVINGS ACCOUNT CONTRIBUTIONS NOT AVAILABLE UNDER CAFETERIA PLANS.—Subsection (f) of section 125 of such Code is amended by inserting "106(b)," before "117".

<< 26 USCA § 4973 >>

(e) TAX ON EXCESS CONTRIBUTIONS.—Section 4973 (relating to tax on excess contributions to individual retirement accounts, certain section 403(b) contracts, and certain individual retirement annuities) is amended—

(1) by inserting "MEDICAL SAVINGS ACCOUNTS," after "ACCOUNTS," in the heading of such section,

(2) by striking "or" at the end of paragraph (1) of subsection (a),

(3) by redesignating paragraph (2) of subsection (a) as paragraph (3) and by inserting after paragraph (1) the following:

"(2) a medical savings account (within the meaning of section 220(d)), or", and

(4) by adding at the end the following new subsection:

"(d) EXCESS CONTRIBUTIONS TO MEDICAL SAVINGS ACCOUNTS.—For purposes of this section, in the case of medical savings accounts (within the meaning of section 220(d)), the term 'excess contributions' means the sum of—

"(1) the aggregate amount contributed for the taxable year to the accounts (other than rollover contributions described in section 220(f)(5)) which is neither excludable from gross income under section 106(b) nor allowable as a deduction under section 220 for such year, and

"(2) the amount determined under this subsection for the preceding taxable year, reduced by the sum of—

"(A) the distributions out of the accounts which were included in gross income under section 220(f)(2), and

"(B) the excess (if any) of—

"(i) the maximum amount allowable as a deduction under section 220(b)(1) (determined without regard to section 106(b)) for the taxable year, over

"(ii) the amount contributed to the accounts for the taxable year.

For purposes of this subsection, any contribution which is distributed out of the medical savings account in a distribution to which section 220(f)(3) applies shall be treated as an amount not contributed.".

<< 26 USCA § 4975 >>

(f) TAX ON PROHIBITED TRANSACTIONS.—

(1) Section 4975 (relating to tax on prohibited transactions) is amended by adding at the end of subsection (c) the following new paragraph:

"(4) SPECIAL RULE FOR MEDICAL SAVINGS ACCOUNTS.—An individual for whose benefit a medical savings account (within the meaning of section 220(d)) is established shall be exempt from the tax imposed by this section with respect to any transaction concerning such account (which would otherwise be taxable under this section) if, with respect to such transaction, the account ceases to be a medical savings account by reason of the application of section 220(e)(2) to such account.".

(2) Paragraph (1) of section 4975(e) is amended to read as follows:

"(1) PLAN.—For purposes of this section, the term 'plan' means—

"(A) a trust described in section 401(a) which forms a part of a plan, or a plan described in section 403(a), which trust or plan is exempt from tax under section 501(a),

"(B) an individual retirement account described in section 408(a),

"(C) an individual retirement annuity described in section 408(b),

"(D) a medical savings account described in section 220(d), or

"(E) a trust, plan, account, or annuity which, at any time, has been determined by the Secretary to be described in any preceding subparagraph of this paragraph.".

<< 26 USCA § 6693 >>

(g) FAILURE TO PROVIDE REPORTS ON MEDICAL SAVINGS ACCOUNTS.—

(1) Subsection (a) of section 6693 (relating to failure to provide reports on individual retirement accounts or annuities) is amended to read as follows:

"(a) REPORTS.—

"(1) IN GENERAL.—If a person required to file a report under a provision referred to in paragraph (2) fails to file such report at the time and in the manner required by such provision, such person shall pay a penalty of $50 for each failure unless it is shown that such failure is due to reasonable cause.

"(2) PROVISIONS.—The provisions referred to in this paragraph are—

"(A) subsections (i) and (l) of section 408 (relating to individual retirement plans), and

"(B) section 220(h) (relating to medical savings accounts).".

<< 26 USCA § 848 >>

(h) EXCEPTION FROM CAPITALIZATION OF POLICY ACQUISITION EXPENSES.—Subparagraph (B) of section 848(e)(1) (defining specified insurance contract) is amended by striking "and" at the end of clause (ii), by striking the period at the end of clause (iii) and inserting ", and", and by adding at the end the following new clause:

"(iv) any contract which is a medical savings account (as defined in section 220(d)).".

<< 26 USCA Ch. 1 >>

(i) CLERICAL AMENDMENT.—The table of sections for part VII of subchapter B of chapter 1 is amended by striking the last item and inserting the following:

"Sec. 220. Medical savings accounts.

"Sec. 221. Cross reference.".

<< 26 USCA §§ 62 NOTE, 106 nt, 125 nt, 220 nt, 848 nt, 3231 nt, 3306 nt, 3401 nt, 4973 nt, 4975 nt, 6051 nt, 6693 nt >>

<< 26 USCA § 4980E nt >>

(j) EFFECTIVE DATE.—The amendments made by this section shall apply to taxable years beginning after December 31, 1996.

<< 26 USCA § 220 NOTE >>

(k) MONITORING OF PARTICIPATION IN MEDICAL SAVINGS ACCOUNTS.—The Secretary of the Treasury or his delegate shall—

(1) during 1997, 1998, 1999, and 2000, regularly evaluate the number of individuals who are maintaining medical savings accounts and the reduction in revenues to the United States by reason of such accounts, and

(2) provide such reports of such evaluations to Congress as such Secretary determines appropriate.

<< 26 USCA § 220 NOTE >>

(l) STUDY OF EFFECTS OF MEDICAL SAVINGS ACCOUNTS ON SMALL GROUP MARKET.—The Comptroller General of the United States shall enter into a contract with an organization with expertise in health economics, health insurance markets, and actuarial science to conduct a comprehensive study regarding the effects of medical savings accounts in the small group market on—

(1) selection, including adverse selection,

(2) health costs, including any impact on premiums of individuals with comprehensive coverage,

(3) use of preventive care,

(4) consumer choice,

(5) the scope of coverage of high deductible plans purchased in conjunction with such accounts, and

(6) other relevant items.

A report on the results of the study conducted under this subsection shall be submitted to the Congress no later than January 1, 1999.

Subtitle B—Increase in Deduction for Health Insurance Costs of Self–Employed Individuals

SEC. 311. INCREASE IN DEDUCTION FOR HEALTH INSURANCE COSTS OF SELF–EMPLOYED INDIVIDUALS.

<< 26 USCA § 162 >>

(a) IN GENERAL.—Paragraph (1) of section 162(l) is amended to read as follows:

"(1) ALLOWANCE OF DEDUCTION.—

"(A) IN GENERAL.—In the case of an individual who is an employee within the meaning of section 401(c)(1), there shall be allowed as a deduction under this section an amount equal to the applicable percentage of the amount paid during the taxable year for insurance which constitutes medical care for the taxpayer, his spouse, and dependents.

"(B) APPLICABLE PERCENTAGE.—For purposes of subparagraph (A), the applicable percentage shall be determined under the following table:

| "For taxable years beginning in calendar year— | The applicable percentage is— |
|---|---|
| 1997.................................................................................................... | 40 percent |
| 1998 through 2002............................................................................... | 45 percent |
| 2003.................................................................................................... | 50 percent |
| 2004.................................................................................................... | 60 percent |
| 2005.................................................................................................... | 70 percent |
| 2006 or thereafter................................................................................ | 80 percent.". |

<< 26 USCA § 104 >>

(b) EXCLUSION FOR AMOUNTS RECEIVED UNDER CERTAIN SELF–INSURED PLANS.—Paragraph (3) of section 104(a) is amended by inserting "(or through an arrangement having the effect of accident or health insurance)" after "health insurance".

<< 26 USCA §§ 104 NOTE, 162 nt >>

(c) EFFECTIVE DATE.—The amendments made by this section shall apply to taxable years beginning after December 31, 1996.

Subtitle C—Long–Term Care Services and Contracts

PART I—GENERAL PROVISIONS

SEC. 321. TREATMENT OF LONG–TERM CARE INSURANCE.

<< 26 USCA § 7702B >>

(a) GENERAL RULE.—Chapter 79 (relating to definitions) is amended by inserting after section 7702A the following new section:

"SEC. 7702B. TREATMENT OF QUALIFIED LONG–TERM CARE INSURANCE.

"(a) IN GENERAL.—For purposes of this title—

  "(1) a qualified long-term care insurance contract shall be treated as an accident and health insurance contract,

  "(2) amounts (other than policyholder dividends, as defined in section 808, or premium refunds) received under a qualified long-term care insurance contract shall be treated as amounts received for personal injuries and sickness and shall be treated as reimbursement for expenses actually incurred for medical care (as defined in section 213(d)),

  "(3) any plan of an employer providing coverage under a qualified long-term care insurance contract shall be treated as an accident and health plan with respect to such coverage,

  "(4) except as provided in subsection (e)(3), amounts paid for a qualified long-term care insurance contract providing the benefits described in subsection (b)(2)(A) shall be treated as payments made for insurance for purposes of section 213(d)(1)(D), and

  "(5) a qualified long-term care insurance contract shall be treated as a guaranteed renewable contract subject to the rules of section 816(e).

"(b) QUALIFIED LONG–TERM CARE INSURANCE CONTRACT.—For purposes of this title—

  "(1) IN GENERAL.—The term 'qualified long-term care insurance contract' means any insurance contract if—

    "(A) the only insurance protection provided under such contract is coverage of qualified long-term care services,

    "(B) such contract does not pay or reimburse expenses incurred for services or items to the extent that such expenses are reimbursable under title XVIII of the Social Security Act or would be so reimbursable but for the application of a deductible or coinsurance amount,

    "(C) such contract is guaranteed renewable,

    "(D) such contract does not provide for a cash surrender value or other money that can be—

      "(i) paid, assigned, or pledged as collateral for a loan, or

      "(ii) borrowed,

other than as provided in subparagraph (E) or paragraph (2)(C),

    "(E) all refunds of premiums, and all policyholder dividends or similar amounts, under such contract are to be applied as a reduction in future premiums or to increase future benefits, and

    "(F) such contract meets the requirements of subsection (g).

  "(2) SPECIAL RULES.—

    "(A) PER DIEM, ETC. PAYMENTS PERMITTED.—A contract shall not fail to be described in subparagraph (A) or (B) of paragraph (1) by reason of payments being made on a per diem or other periodic basis without regard to the expenses incurred during the period to which the payments relate.

    "(B) SPECIAL RULES RELATING TO MEDICARE.—

      "(i) Paragraph (1)(B) shall not apply to expenses which are reimbursable under title XVIII of the Social Security Act only as a secondary payor.

      "(ii) No provision of law shall be construed or applied so as to prohibit the offering of a qualified long-term care insurance contract on the basis that the contract coordinates its benefits with those provided under such title.

    "(C) REFUNDS OF PREMIUMS.—Paragraph (1)(E) shall not apply to any refund on the death of the insured, or on a complete surrender or cancellation of the contract, which cannot exceed the aggregate premiums paid under the contract. Any refund on a complete surrender or cancellation of the contract shall be includible in gross income to the extent that any deduction or exclusion was allowable with respect to the premiums.

"(c) QUALIFIED LONG–TERM CARE SERVICES.—For purposes of this section—

  "(1) IN GENERAL.—The term 'qualified long-term care services' means necessary diagnostic, preventive, therapeutic, curing, treating, mitigating, and rehabilitative services, and maintenance or personal care services, which—

    "(A) are required by a chronically ill individual, and

    "(B) are provided pursuant to a plan of care prescribed by a licensed health care practitioner.

  "(2) CHRONICALLY ILL INDIVIDUAL.—

"(A) IN GENERAL.—The term 'chronically ill individual' means any individual who has been certified by a licensed health care practitioner as—

"(i) being unable to perform (without substantial assistance from another individual) at least 2 activities of daily living for a period of at least 90 days due to a loss of functional capacity,

"(ii) having a level of disability similar (as determined under regulations prescribed by the Secretary in consultation with the Secretary of Health and Human Services) to the level of disability described in clause (i), or

"(iii) requiring substantial supervision to protect such individual from threats to health and safety due to severe cognitive impairment.

Such term shall not include any individual otherwise meeting the requirements of the preceding sentence unless within the preceding 12–month period a licensed health care practitioner has certified that such individual meets such requirements.

"(B) ACTIVITIES OF DAILY LIVING.—For purposes of subparagraph (A), each of the following is an activity of daily living:

"(i) Eating.

"(ii) Toileting.

"(iii) Transferring.

"(iv) Bathing.

"(v) Dressing.

"(vi) Continence.

A contract shall not be treated as a qualified long-term care insurance contract unless the determination of whether an individual is a chronically ill individual takes into account at least 5 of such activities.

"(3) MAINTENANCE OR PERSONAL CARE SERVICES.—The term 'maintenance or personal care services' means any care the primary purpose of which is the provision of needed assistance with any of the disabilities as a result of which the individual is a chronically ill individual (including the protection from threats to health and safety due to severe cognitive impairment).

"(4) LICENSED HEALTH CARE PRACTITIONER.—The term 'licensed health care practitioner' means any physician (as defined in section 1861(r)(1) of the Social Security Act) and any registered professional nurse, licensed social worker, or other individual who meets such requirements as may be prescribed by the Secretary.

"(d) AGGREGATE PAYMENTS IN EXCESS OF LIMITS.—

"(1) IN GENERAL.—If the aggregate of—

"(A) the periodic payments received for any period under all qualified long-term care insurance contracts which are treated as made for qualified long-term care services for an insured, and

"(B) the periodic payments received for such period which are treated under section 101(g) as paid by reason of the death of such insured,

exceeds the per diem limitation for such period, such excess shall be includible in gross income without regard to section 72. A payment shall not be taken into account under subparagraph (B) if the insured is a terminally ill individual (as defined in section 101(g)) at the time the payment is received.

"(2) PER DIEM LIMITATION.—For purposes of paragraph (1), the per diem limitation for any period is an amount equal to the excess (if any) of—

"(A) the greater of—

"(i) the dollar amount in effect for such period under paragraph (4), or

"(ii) the costs incurred for qualified long-term care services provided for the insured for such period, over

"(B) the aggregate payments received as reimbursements (through insurance or otherwise) for qualified long-term care services provided for the insured during such period.

"(3) AGGREGATION RULES.—For purposes of this subsection—

"(A) all persons receiving periodic payments described in paragraph (1) with respect to the same insured shall be treated as 1 person, and

"(B) the per diem limitation determined under paragraph (2) shall be allocated first to the insured and any remaining limitation shall be allocated among the other such persons in such manner as the Secretary shall prescribe.

"(4) DOLLAR AMOUNT.—The dollar amount in effect under this subsection shall be $175 per day (or the equivalent amount in the case of payments on another periodic basis).

"(5) INFLATION ADJUSTMENT.—In the case of a calendar year after 1997, the dollar amount contained in paragraph (4) shall be increased at the same time and in the same manner as amounts are increased pursuant to section 213(d)(10).

"(6) PERIODIC PAYMENTS.—For purposes of this subsection, the term 'periodic payment' means any payment (whether on a periodic basis or otherwise) made without regard to the extent of the costs incurred by the payee for qualified long-term care services.

"(e) TREATMENT OF COVERAGE PROVIDED AS PART OF A LIFE INSURANCE CONTRACT.—Except as otherwise provided in regulations prescribed by the Secretary, in the case of any long-term care insurance coverage (whether or not qualified) provided by a rider on or as part of a life insurance contract—

"(1) IN GENERAL.—This section shall apply as if the portion of the contract providing such coverage is a separate contract.

"(2) APPLICATION OF 7702.—Section 7702(c)(2) (relating to the guideline premium limitation) shall be applied by increasing the guideline premium limitation with respect to a life insurance contract, as of any date—

"(A) by the sum of any charges (but not premium payments) against the life insurance contract's cash surrender value (within the meaning of section 7702(f)(2)(A)) for such coverage made to that date under the contract, less

"(B) any such charges the imposition of which reduces the premiums paid for the contract (within the meaning of section 7702(f)(1)).

"(3) APPLICATION OF SECTION 213.—No deduction shall be allowed under section 213(a) for charges against the life insurance contract's cash surrender value described in paragraph (2), unless such charges are includible in income as a result of the application of section 72(e)(10) and the rider is a qualified long-term care insurance contract under subsection (b).

"(4) PORTION DEFINED.—For purposes of this subsection, the term 'portion' means only the terms and benefits under a life insurance contract that are in addition to the terms and benefits under the contract without regard to long-term care insurance coverage.

"(f) TREATMENT OF CERTAIN STATE–MAINTAINED PLANS.—

"(1) IN GENERAL.—If—

"(A) an individual receives coverage for qualified long-term care services under a State long-term care plan, and

"(B) the terms of such plan would satisfy the requirements of subsection (b) were such plan an insurance contract,

such plan shall be treated as a qualified long-term care insurance contract for purposes of this title.

"(2) STATE LONG–TERM CARE PLAN.—For purposes of paragraph (1), the term 'State long-term care plan' means any plan—

"(A) which is established and maintained by a State or an instrumentality of a State,

"(B) which provides coverage only for qualified long-term care services, and

"(C) under which such coverage is provided only to—

"(i) employees and former employees of a State (or any political subdivision or instrumentality of a State),

"(ii) the spouses of such employees, and

"(iii) individuals bearing a relationship to such employees or spouses which is described in any of paragraphs (1) through (8) of section 152(a).".

<< 26 USCA § 807 >>

(b) RESERVE METHOD.—Clause (iii) of section 807(d)(3)(A) is amended by inserting "(other than a qualified long-term care insurance contract, as defined in section 7702B(b))" after "insurance contract".

(c) LONG–TERM CARE INSURANCE NOT PERMITTED UNDER CAFETERIA PLANS OR FLEXIBLE SPENDING ARRANGEMENTS.—

<< 26 USCA § 125 >>

(1) CAFETERIA PLANS.—Section 125(f) is amended by adding at the end the following new sentence: "Such term shall not include any product which is advertised, marketed, or offered as long-term care insurance.".

<< 26 USCA § 106 >>

(2) FLEXIBLE SPENDING ARRANGEMENTS.—Section 106 (relating to contributions by employer to accident and health plans), as amended by section 301(c), is amended by adding at the end the following new subsection:

"(c) INCLUSION OF LONG–TERM CARE BENEFITS PROVIDED THROUGH FLEXIBLE SPENDING ARRANGEMENTS.—

"(1) IN GENERAL.—Effective on and after January 1, 1997, gross income of an employee shall include employer-provided coverage for qualified long-term care services (as defined in section 7702B(c)) to the extent that such coverage is provided through a flexible spending or similar arrangement.

"(2) FLEXIBLE SPENDING ARRANGEMENT.—For purposes of this subsection, a flexible spending arrangement is a benefit program which provides employees with coverage under which—

"(A) specified incurred expenses may be reimbursed (subject to reimbursement maximums and other reasonable conditions), and

"(B) the maximum amount of reimbursement which is reasonably available to a participant for such coverage is less than 500 percent of the value of such coverage.

In the case of an insured plan, the maximum amount reasonably available shall be determined on the basis of the underlying coverage."

(d) CONTINUATION COVERAGE RULES NOT TO APPLY.—

<< 26 USCA § 4980B >>

(1) Paragraph (2) of section 4980B(g) is amended by adding at the end the following new sentence: "Such term shall not include any plan substantially all of the coverage under which is for qualified long-term care services (as defined in section 7702B(c))."

<< 29 USCA § 1167 >>

(2) Paragraph (1) of section 607 of the Employee Retirement Income Security Act of 1974 is amended by adding at the end the following new sentence: "Such term shall not include any plan substantially all of the coverage under which is for qualified long-term care services (as defined in section 7702B(c) of such Code)."

<< 42 USCA § 300bb–8 >>

(3) Paragraph (1) of section 2208 of the Public Health Service Act is amended by adding at the end the following new sentence: "Such term shall not include any plan substantially all of the coverage under which is for qualified long-term care services (as defined in section 7702B(c) of such Code)."

<< 26 USCA Ch. 79 >>

(e) CLERICAL AMENDMENT.—The table of sections for chapter 79 is amended by inserting after the item relating to section 7702A the following new item:

"Sec. 7702B. Treatment of qualified long-term care insurance.".

<< 26 USCA §§ 106 nt, 125 nt, 807 nt, 4980B nt >>

<< 26 USCA § 7702B NOTE >>

<< 29 USCA § 1167 nt >>

<< 42 USCA § 300bb–8 nt >>

(f) EFFECTIVE DATES.—

(1) GENERAL EFFECTIVE DATE.—

(A) IN GENERAL.—Except as provided in subparagraph (B), the amendments made by this section shall apply to contracts issued after December 31, 1996.

(B) RESERVE METHOD.—The amendment made by subsection (b) shall apply to contracts issued after December 31, 1997.

(2) CONTINUATION OF EXISTING POLICIES.—In the case of any contract issued before January 1, 1997, which met the long-term care insurance requirements of the State in which the contract was sitused at the time the contract was issued—

(A) such contract shall be treated for purposes of the Internal Revenue Code of 1986 as a qualified long-term care insurance contract (as defined in section 7702B(b) of such Code), and

(B) services provided under, or reimbursed by, such contract shall be treated for such purposes as qualified long-term care services (as defined in section 7702B(c) of such Code).

In the case of an individual who is covered on December 31, 1996, under a State long-term care plan (as defined in section 7702B(f)(2) of such Code), the terms of such plan on such date shall be treated for purposes of the preceding sentence as a contract issued on such date which met the long-term care insurance requirements of such State.

(3) EXCHANGES OF EXISTING POLICIES.—If, after the date of enactment of this Act and before January 1, 1998, a contract providing for long-term care insurance coverage is exchanged solely for a qualified long-term care insurance contract (as defined in section 7702B(b) of such Code), no gain or loss shall be recognized on the exchange. If, in addition to a qualified long-term care insurance contract, money or other property is received in the exchange, then any gain shall be recognized to the extent of the sum of the money and the fair market value of the other property received. For purposes of this paragraph, the cancellation of a contract providing for long-term care insurance coverage and reinvestment of the cancellation proceeds in a qualified long-term care insurance contract within 60 days thereafter shall be treated as an exchange.

(4) ISSUANCE OF CERTAIN RIDERS PERMITTED.—For purposes of applying sections 101(f), 7702, and 7702A of the Internal Revenue Code of 1986 to any contract—

(A) the issuance of a rider which is treated as a qualified long-term care insurance contract under section 7702B, and

(B) the addition of any provision required to conform any other long-term care rider to be so treated,

shall not be treated as a modification or material change of such contract.

(5) APPLICATION OF PER DIEM LIMITATION TO EXISTING CONTRACTS.—The amount of per diem payments made under a contract issued on or before July 31, 1996, with respect to an insured which are excludable from gross income by reason of section 7702B of the Internal Revenue Code of 1986 (as added by this section) shall not be reduced under subsection (d)(2)(B) thereof by reason of reimbursements received under a contract issued on or before such date. The preceding sentence shall cease to apply as of the date (after July 31, 1996) such contract is exchanged or there is any contract modification which results in an increase in the amount of such per diem payments or the amount of such reimbursements.

<< 26 USCA § 7702B NOTE >>

(g) LONG–TERM CARE STUDY REQUEST.—The Chairman of the Committee on Ways and Means of the House of Representatives and the Chairman of the Committee on Finance of the Senate shall jointly request the National Association of Insurance Commissioners, in consultation with representatives of the insurance industry and consumer organizations, to formulate, develop, and conduct a study to determine the marketing and other effects of per diem limits on certain types of long-term care policies. If the National Association of Insurance Commissioners agrees to the study request, the National Association of Insurance Commissioners shall report the results of its study to such committees not later than 2 years after accepting the request.

SEC. 322. QUALIFIED LONG–TERM CARE SERVICES TREATED AS MEDICAL CARE.

<< 26 USCA § 213 >>

  (a) GENERAL RULE.—Paragraph (1) of section 213(d) (defining medical care) is amended by striking "or" at the end of subparagraph (B), by redesignating subparagraph (C) as subparagraph (D), and by inserting after subparagraph (B) the following new subparagraph:

  "(C) for qualified long-term care services (as defined in section 7702B(c)), or".

  (b) TECHNICAL AMENDMENTS.—

  (1) Subparagraph (D) of section 213(d)(1) (as redesignated by subsection (a)) is amended by inserting before the period "or for any qualified long-term care insurance contract (as defined in section 7702B(b))".

  (2)(A) Paragraph (1) of section 213(d) is amended by adding at the end the following new flush sentence:

"In the case of a qualified long-term care insurance contract (as defined in section 7702B(b)), only eligible long-term care premiums (as defined in paragraph (10)) shall be taken into account under subparagraph (D)."

<< 26 USCA § 162 >>

  (B) Paragraph (2) of section 162(l) is amended by adding at the end the following new subparagraph:

  "(C) LONG–TERM CARE PREMIUMS.—In the case of a qualified long-term care insurance contract (as defined in section 7702B(b)), only eligible long-term care premiums (as defined in section 213(d)(10)) shall be taken into account under paragraph (1)."

<< 26 USCA § 213 >>

  (C) Subsection (d) of section 213 is amended by adding at the end the following new paragraphs:

  "(10) ELIGIBLE LONG–TERM CARE PREMIUMS.—

  "(A) IN GENERAL.—For purposes of this section, the term 'eligible long-term care premiums' means the amount paid during a taxable year for any qualified long-term care insurance contract (as defined in section 7702B(b)) covering an individual, to the extent such amount does not exceed the limitation determined under the following table:

| "In the case of an individual with an attained age before the close of the taxable year of: | The limitation is: |
|---|---|
| 40 or less | $ 200 |
| More than 40 but not more than 50 | 375 |
| More than 50 but not more than 60 | 750 |
| More than 60 but not more than 70 | 2,000 |
| More than 70 | 2,500. |

  "(B) INDEXING.—

  "(i) IN GENERAL.—In the case of any taxable year beginning in a calendar year after 1997, each dollar amount contained in subparagraph (A) shall be increased by the medical care cost adjustment of such amount for such calendar year. If any increase determined under the preceding sentence is not a multiple of $10, such increase shall be rounded to the nearest multiple of $10.

  "(ii) MEDICAL CARE COST ADJUSTMENT.—For purposes of clause (i), the medical care cost adjustment for any calendar year is the percentage (if any) by which—

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

"(I) the medical care component of the Consumer Price Index (as defined in section 1(f)(5)) for August of the preceding calendar year, exceeds

"(II) such component for August of 1996.

The Secretary shall, in consultation with the Secretary of Health and Human Services, prescribe an adjustment which the Secretary determines is more appropriate for purposes of this paragraph than the adjustment described in the preceding sentence, and the adjustment so prescribed shall apply in lieu of the adjustment described in the preceding sentence.

"(11) CERTAIN PAYMENTS TO RELATIVES TREATED AS NOT PAID FOR MEDICAL CARE.—An amount paid for a qualified long-term care service (as defined in section 7702B(c)) provided to an individual shall be treated as not paid for medical care if such service is provided—

"(A) by the spouse of the individual or by a relative (directly or through a partnership, corporation, or other entity) unless the service is provided by a licensed professional with respect to such service, or

"(B) by a corporation or partnership which is related (within the meaning of section 267(b) or 707(b)) to the individual.

For purposes of this paragraph, the term 'relative' means an individual bearing a relationship to the individual which is described in any of paragraphs (1) through (8) of section 152(a). This paragraph shall not apply for purposes of section 105(b) with respect to reimbursements through insurance.".

(3) Paragraph (6) of section 213(d) is amended—

(A) by striking "subparagraphs (A) and (B)" and inserting "subparagraphs (A), (B), and (C)", and

(B) by striking "paragraph (1)(C)" in subparagraph (A) and inserting "paragraph (1)(D)".

(4) Paragraph (7) of section 213(d) is amended by striking "subparagraphs (A) and (B)" and inserting "subparagraphs (A), (B), and (C)".

<< 26 USCA §§ 162 NOTE, 213 nt >>

(c) EFFECTIVE DATE.—The amendments made by this section shall apply to taxable years beginning after December 31, 1996.

SEC. 323. REPORTING REQUIREMENTS.

<< 26 USCA § 6050Q >>

(a) IN GENERAL.—Subpart B of part III of subchapter A of chapter 61 is amended by adding at the end the following new section:

"SEC. 6050Q. CERTAIN LONG–TERM CARE BENEFITS.

"(a) REQUIREMENT OF REPORTING.—Any person who pays long-term care benefits shall make a return, according to the forms or regulations prescribed by the Secretary, setting forth—

"(1) the aggregate amount of such benefits paid by such person to any individual during any calendar year,

"(2) whether or not such benefits are paid in whole or in part on a per diem or other periodic basis without regard to the expenses incurred during the period to which the payments relate,

"(3) the name, address, and TIN of such individual, and

"(4) the name, address, and TIN of the chronically ill or terminally ill individual on account of whose condition such benefits are paid.

"(b) STATEMENTS TO BE FURNISHED TO PERSONS WITH RESPECT TO WHOM INFORMATION IS REQUIRED. —Every person required to make a return under subsection (a) shall furnish to each individual whose name is required to be set forth in such return a written statement showing—

"(1) the name of the person making the payments, and

"(2) the aggregate amount of long-term care benefits paid to the individual which are required to be shown on such return.

The written statement required under the preceding sentence shall be furnished to the individual on or before January 31 of the year following the calendar year for which the return under subsection (a) was required to be made.

"(c) LONG–TERM CARE BENEFITS.—For purposes of this section, the term 'long-term care benefit' means—

"(1) any payment under a product which is advertised, marketed, or offered as long-term care insurance, and

"(2) any payment which is excludable from gross income by reason of section 101(g).".

<< 26 USCA § 6724 >>

(b) PENALTIES.—

(1) Subparagraph (B) of section 6724(d)(1) is amended by redesignating clauses (ix) through (xiv) as clauses (x) through (xv), respectively, and by inserting after clause (viii) the following new clause:

"(ix) section 6050Q (relating to certain long-term care benefits),".

(2) Paragraph (2) of section 6724(d) is amended by redesignating subparagraphs (Q) through (T) as subparagraphs (R) through (U), respectively, and by inserting after subparagraph (P) the following new subparagraph:

"(Q) section 6050Q(b) (relating to certain long-term care benefits),".

<< 26 USCA Ch. 61 >>

(c) CLERICAL AMENDMENT.—The table of sections for subpart B of part III of subchapter A of chapter 61 is amended by adding at the end the following new item:

"Sec. 6050Q. Certain long-term care benefits.".

<< 26 USCA § 6050Q NOTE >>

<< 26 USCA § 6724 nt >>

(d) EFFECTIVE DATE.—The amendments made by this section shall apply to benefits paid after December 31, 1996.

PART II—CONSUMER PROTECTION PROVISIONS

<< 26 USCA § 7702B >>

SEC. 325. POLICY REQUIREMENTS.

Section 7702B (as added by section 321) is amended by adding at the end the following new subsection:

"(g) CONSUMER PROTECTION PROVISIONS.—

"(1) IN GENERAL.—The requirements of this subsection are met with respect to any contract if the contract meets—

"(A) the requirements of the model regulation and model Act described in paragraph (2),

"(B) the disclosure requirement of paragraph (3), and

"(C) the requirements relating to nonforfeitability under paragraph (4).

"(2) REQUIREMENTS OF MODEL REGULATION AND ACT.—

"(A) IN GENERAL.—The requirements of this paragraph are met with respect to any contract if such contract meets—

"(i) MODEL REGULATION.—The following requirements of the model regulation:

"(I) Section 7A (relating to guaranteed renewal or noncancellability), and the requirements of section 6B of the model Act relating to such section 7A.

"(II) Section 7B (relating to prohibitions on limitations and exclusions).

"(III) Section 7C (relating to extension of benefits).

"(IV) Section 7D (relating to continuation or conversion of coverage).

"(V) Section 7E (relating to discontinuance and replacement of policies).

"(VI) Section 8 (relating to unintentional lapse).

"(VII) Section 9 (relating to disclosure), other than section 9F thereof.

"(VIII) Section 10 (relating to prohibitions against post-claims underwriting).

"(IX) Section 11 (relating to minimum standards).

"(X) Section 12 (relating to requirement to offer inflation protection), except that any requirement for a signature on a rejection of inflation protection shall permit the signature to be on an application or on a separate form.

"(XI) Section 23 (relating to prohibition against preexisting conditions and probationary periods in replacement policies or certificates).

"(ii) MODEL ACT.—The following requirements of the model Act:

"(I) Section 6C (relating to preexisting conditions).

"(II) Section 6D (relating to prior hospitalization).

"(B) DEFINITIONS.—For purposes of this paragraph—

"(i) MODEL PROVISIONS.—The terms 'model regulation' and 'model Act' mean the long-term care insurance model regulation, and the long-term care insurance model Act, respectively, promulgated by the National Association of Insurance Commissioners (as adopted as of January 1993).

"(ii) COORDINATION.—Any provision of the model regulation or model Act listed under clause (i) or (ii) of subparagraph (A) shall be treated as including any other provision of such regulation or Act necessary to implement the provision.

"(iii) DETERMINATION.—For purposes of this section and section 4980C, the determination of whether any requirement of a model regulation or the model Act has been met shall be made by the Secretary.

"(3) DISCLOSURE REQUIREMENT.—The requirement of this paragraph is met with respect to any contract if such contract meets the requirements of section 4980C(d).

"(4) NONFORFEITURE REQUIREMENTS.—

"(A) IN GENERAL.—The requirements of this paragraph are met with respect to any level premium contract, if the issuer of such contract offers to the policyholder, including any group policyholder, a nonforfeiture provision meeting the requirements of subparagraph (B).

"(B) REQUIREMENTS OF PROVISION.—The nonforfeiture provision required under subparagraph (A) shall meet the following requirements:

"(i) The nonforfeiture provision shall be appropriately captioned.

"(ii) The nonforfeiture provision shall provide for a benefit available in the event of a default in the payment of any premiums and the amount of the benefit may be adjusted subsequent to being initially granted only as necessary to reflect changes in claims, persistency, and interest as reflected in changes in rates for premium paying contracts approved by the Secretary for the same contract form.

"(iii) The nonforfeiture provision shall provide at least one of the following:

"(I) Reduced paid-up insurance.

"(II) Extended term insurance.

"(III) Shortened benefit period.

"(IV) Other similar offerings approved by the Secretary.

"(5) CROSS REFERENCE.—

"For coordination of the requirements of this subsection with State requirements, see section 4980C(f).".

SEC. 326. REQUIREMENTS FOR ISSUERS OF QUALIFIED LONG–TERM CARE INSURANCE CONTRACTS.

<< 26 USCA § 4980C >>

(a) IN GENERAL.—Chapter 43 is amended by adding at the end the following new section:

"SEC. 4980C. REQUIREMENTS FOR ISSUERS OF QUALIFIED LONG–TERM CARE INSURANCE CONTRACTS.

"(a) GENERAL RULE.—There is hereby imposed on any person failing to meet the requirements of subsection (c) or (d) a tax in the amount determined under subsection (b).

"(b) AMOUNT.—

"(1) IN GENERAL.—The amount of the tax imposed by subsection (a) shall be $100 per insured for each day any requirement of subsection (c) or (d) is not met with respect to each qualified long-term care insurance contract.

"(2) WAIVER.—In the case of a failure which is due to reasonable cause and not to willful neglect, the Secretary may waive part or all of the tax imposed by subsection (a) to the extent that payment of the tax would be excessive relative to the failure involved.

"(c) RESPONSIBILITIES.—The requirements of this subsection are as follows:

"(1) REQUIREMENTS OF MODEL PROVISIONS.—

"(A) MODEL REGULATION.—The following requirements of the model regulation must be met:

"(i) Section 13 (relating to application forms and replacement coverage).

"(ii) Section 14 (relating to reporting requirements), except that the issuer shall also report at least annually the number of claims denied during the reporting period for each class of business (expressed as a percentage of claims denied), other than claims denied for failure to meet the waiting period or because of any applicable preexisting condition.

"(iii) Section 20 (relating to filing requirements for marketing).

"(iv) Section 21 (relating to standards for marketing), including inaccurate completion of medical histories, other than sections 21C(1) and 21C(6) thereof, except that—

"(I) in addition to such requirements, no person shall, in selling or offering to sell a qualified long-term care insurance contract, misrepresent a material fact; and

"(II) no such requirements shall include a requirement to inquire or identify whether a prospective applicant or enrollee for long-term care insurance has accident and sickness insurance.

"(v) Section 22 (relating to appropriateness of recommended purchase).

"(vi) Section 24 (relating to standard format outline of coverage).

"(vii) Section 25 (relating to requirement to deliver shopper's guide).

"(B) MODEL ACT.—The following requirements of the model Act must be met:

"(i) Section 6F (relating to right to return), except that such section shall also apply to denials of applications and any refund shall be made within 30 days of the return or denial.

"(ii) Section 6G (relating to outline of coverage).

"(iii) Section 6H (relating to requirements for certificates under group plans).

"(iv) Section 6I (relating to policy summary).

"(v) Section 6J (relating to monthly reports on accelerated death benefits).

"(vi) Section 7 (relating to incontestability period).

"(C) DEFINITIONS.—For purposes of this paragraph, the terms 'model regulation' and 'model Act' have the meanings given such terms by section 7702B(g)(2)(B).

"(2) DELIVERY OF POLICY.—If an application for a qualified long-term care insurance contract (or for a certificate under such a contract for a group) is approved, the issuer shall deliver to the applicant (or policyholder or certificateholder) the contract (or certificate) of insurance not later than 30 days after the date of the approval.

"(3) INFORMATION ON DENIALS OF CLAIMS.—If a claim under a qualified, long-term care insurance contract is denied, the issuer shall, within 60 days of the date of a written request by the policyholder or certificateholder (or representative)—

"(A) provide a written explanation of the reasons for the denial, and

"(B) make available all information directly relating to such denial.

"(d) DISCLOSURE.—The requirements of this subsection are met if the issuer of a long-term care insurance policy discloses in such policy and in the outline of coverage required under subsection (c)(1)(B)(ii) that the policy is intended to be a qualified long-term care insurance contract under section 7702B(b).

"(e) QUALIFIED LONG–TERM CARE INSURANCE CONTRACT DEFINED.—For purposes of this section, the term 'qualified long-term care insurance contract' has the meaning given such term by section 7702B.

"(f) COORDINATION WITH STATE REQUIREMENTS.—If a State imposes any requirement which is more stringent than the analogous requirement imposed by this section or section 7702B(g), the requirement imposed by this section or section 7702B(g) shall be treated as met if the more stringent State requirement is met.".

<< 26 USCA Ch. 43 >>

(b) CONFORMING AMENDMENT.—The table of sections for chapter 43 is amended by adding at the end the following new item:

"Sec. 4980C. Requirements for issuers of qualified long-term care insurance contracts.".

<< 26 USCA § 4980C NOTE >>

SEC. 327. EFFECTIVE DATES.

  (a) IN GENERAL.—The provisions of, and amendments made by, this part shall apply to contracts issued after December 31, 1996. The provisions of section 321(f) (relating to transition rule) shall apply to such contracts.
  (b) ISSUERS.—The amendments made by section 326 shall apply to actions taken after December 31, 1996.

Subtitle D—Treatment of Accelerated Death Benefits

SEC. 331. TREATMENT OF ACCELERATED DEATH BENEFITS BY RECIPIENT.

<< 26 USCA § 101 >>

  (a) IN GENERAL.—Section 101 (relating to certain death benefits) is amended by adding at the end the following new subsection:
  "(g) TREATMENT OF CERTAIN ACCELERATED DEATH BENEFITS.—
  "(1) IN GENERAL.—For purposes of this section, the following amounts shall be treated as an amount paid by reason of the death of an insured:
    "(A) Any amount received under a life insurance contract on the life of an insured who is a terminally ill individual.
    "(B) Any amount received under a life insurance contract on the life of an insured who is a chronically ill individual.
  "(2) TREATMENT OF VIATICAL SETTLEMENTS.—
    "(A) IN GENERAL.—If any portion of the death benefit under a life insurance contract on the life of an insured described in paragraph (1) is sold or assigned to a viatical settlement provider, the amount paid for the sale or assignment of such portion shall be treated as an amount paid under the life insurance contract by reason of the death of such insured.
    "(B) VIATICAL SETTLEMENT PROVIDER.—
      "(i) IN GENERAL.—The term 'viatical settlement provider' means any person regularly engaged in the trade or business of purchasing, or taking assignments of, life insurance contracts on the lives of insureds described in paragraph (1) if—
        "(I) such person is licensed for such purposes (with respect to insureds described in the same subparagraph of paragraph (1) as the insured) in the State in which the insured resides, or
        "(II) in the case of an insured who resides in a State not requiring the licensing of such persons for such purposes with respect to such insured, such person meets the requirements of clause (ii) or (iii), whichever applies to such insured.
      "(ii) TERMINALLY ILL INSUREDS.—A person meets the requirements of this clause with respect to an insured who is a terminally ill individual if such person—
        "(I) meets the requirements of sections 8 and 9 of the Viatical Settlements Model Act of the National Association of Insurance Commissioners, and
        "(II) meets the requirements of the Model Regulations of the National Association of Insurance Commissioners (relating to standards for evaluation of reasonable payments) in determining amounts paid by such person in connection with such purchases or assignments.
      "(iii) CHRONICALLY ILL INSUREDS.—A person meets the requirements of this clause with respect to an insured who is a chronically ill individual if such person—
        "(I) meets requirements similar to the requirements referred to in clause (ii)(I), and
        "(II) meets the standards (if any) of the National Association of Insurance Commissioners for evaluating the reasonableness of amounts paid by such person in connection with such purchases or assignments with respect to chronically ill individuals.
  "(3) SPECIAL RULES FOR CHRONICALLY ILL INSUREDS.—In the case of an insured who is a chronically ill individual—
    "(A) IN GENERAL.—Paragraphs (1) and (2) shall not apply to any payment received for any period unless—

"(i) such payment is for costs incurred by the payee (not compensated for by insurance or otherwise) for qualified long-term care services provided for the insured for such period, and

"(ii) the terms of the contract giving rise to such payment satisfy—

"(I) the requirements of section 7702B(b)(1)(B), and

"(II) the requirements (if any) applicable under subparagraph (B).

For purposes of the preceding sentence, the rule of section 7702B(b)(2)(B) shall apply.

"(B) OTHER REQUIREMENTS.—The requirements applicable under this subparagraph are—

"(i) those requirements of section 7702B(g) and section 4980C which the Secretary specifies as applying to such a purchase, assignment, or other arrangement,

"(ii) standards adopted by the National Association of Insurance Commissioners which specifically apply to chronically ill individuals (and, if such standards are adopted, the analogous requirements specified under clause (i) shall cease to apply), and

"(iii) standards adopted by the State in which the policyholder resides (and if such standards are adopted, the analogous requirements specified under clause (i) and (subject to section 4980C(f)) standards under clause (ii), shall cease to apply).

"(C) PER DIEM PAYMENTS.—A payment shall not fail to be described in subparagraph (A) by reason of being made on a per diem or other periodic basis without regard to the expenses incurred during the period to which the payment relates.

"(D) LIMITATION ON EXCLUSION FOR PERIODIC PAYMENTS.—

"For limitation on amount of periodic payments which are treated as described in paragraph (1), see section 7702B(d).".

"(4) DEFINITIONS.—For purposes of this subsection—

"(A) TERMINALLY ILL INDIVIDUAL.—The term 'terminally ill individual' means an individual who has been certified by a physician as having an illness or physical condition which can reasonably be expected to result in death in 24 months or less after the date of the certification.

"(B) CHRONICALLY ILL INDIVIDUAL.—The term 'chronically ill individual' has the meaning given such term by section 7702B(c)(2); except that such term shall not include a terminally ill individual.

"(C) QUALIFIED LONG–TERM CARE SERVICES.—The term 'qualified long-term care services' has the meaning given such term by section 7702B(c).

"(D) PHYSICIAN.—The term 'physician' has the meaning given to such term by section 1861(r)(1) of the Social Security Act (42 U.S.C. 1395x(r)(1)).

"(5) EXCEPTION FOR BUSINESS–RELATED POLICIES.—This subsection shall not apply in the case of any amount paid to any taxpayer other than the insured if such taxpayer has an insurable interest with respect to the life of the insured by reason of the insured being a director, officer, or employee of the taxpayer or by reason of the insured being financially interested in any trade or business carried on by the taxpayer.".

<< 26 USCA § 101 NOTE >>

(b) EFFECTIVE DATE.—The amendment made by subsection (a) shall apply to amounts received after December 31, 1996.

SEC. 332. TAX TREATMENT OF COMPANIES ISSUING QUALIFIED ACCELERATED DEATH BENEFIT RIDERS.

<< 26 USCA § 818 >>

(a) QUALIFIED ACCELERATED DEATH BENEFIT RIDERS TREATED AS LIFE INSURANCE.—Section 818 (relating to other definitions and special rules) is amended by adding at the end the following new subsection:

"(g) QUALIFIED ACCELERATED DEATH BENEFIT RIDERS TREATED AS LIFE INSURANCE.—For purposes of this part—

"(1) IN GENERAL.—Any reference to a life insurance contract shall be treated as including a reference to a qualified accelerated death benefit rider on such contract.

"(2) QUALIFIED ACCELERATED DEATH BENEFIT RIDERS.—For purposes of this subsection, the term 'qualified accelerated death benefit rider' means any rider on a life insurance contract if the only payments under the rider are payments meeting the requirements of section 101(g).

"(3) EXCEPTION FOR LONG–TERM CARE RIDERS.—Paragraph (1) shall not apply to any rider which is treated as a long-term care insurance contract under section 7702B.".

(b) EFFECTIVE DATE.—

<< 26 USCA § 818 NOTE >>

(1) IN GENERAL.—The amendment made by this section shall take effect on January 1, 1997.

(2) ISSUANCE OF RIDER NOT TREATED AS MATERIAL CHANGE.—For purposes of applying sections 101(f), 7702, and 7702A of the Internal Revenue Code of 1986 to any contract—

(A) the issuance of a qualified accelerated death benefit rider (as defined in section 818(g) of such Code (as added by this Act)), and

(B) the addition of any provision required to conform an accelerated death benefit rider to the requirements of such section 818(g),

shall not be treated as a modification or material change of such contract.

Subtitle E—State Insurance Pools

SEC. 341. EXEMPTION FROM INCOME TAX FOR STATE–SPONSORED ORGANIZATIONS PROVIDING HEALTH COVERAGE FOR HIGH–RISK INDIVIDUALS.

<< 26 USCA § 501 >>

(a) IN GENERAL.—Subsection (c) of section 501 (relating to list of exempt organizations) is amended by adding at the end the following new paragraph:

"(26) Any membership organization if—

"(A) such organization is established by a State exclusively to provide coverage for medical care (as defined in section 213(d)) on a not-for-profit basis to individuals described in subparagraph (B) through—

"(i) insurance issued by the organization, or

"(ii) a health maintenance organization under an arrangement with the organization,

"(B) the only individuals receiving such coverage through the organization are individuals—

"(i) who are residents of such State, and

"(ii) who, by reason of the existence or history of a medical condition—

"(I) are unable to acquire medical care coverage for such condition through insurance or from a health maintenance organization, or

"(II) are able to acquire such coverage only at a rate which is substantially in excess of the rate for such coverage through the membership organization,

"(C) the composition of the membership in such organization is specified by such State, and

"(D) no part of the net earnings of the organization inures to the benefit of any private shareholder or individual.".

<< 26 USCA § 501 NOTE >>

(b) EFFECTIVE DATE.—The amendment made by this section shall apply to taxable years beginning after December 31, 1996.

SEC. 342. EXEMPTION FROM INCOME TAX FOR STATE–SPONSORED WORKMEN'S COMPENSATION REINSURANCE ORGANIZATIONS.

<< 26 USCA § 501 >>

(a) IN GENERAL.—Subsection (c) of section 501 (relating to list of exempt organizations), as amended by section 341, is amended by adding at the end the following new paragraph:

"(27) Any membership organization if—

"(A) such organization is established before June 1, 1996, by a State exclusively to reimburse its members for losses arising under workmen's compensation acts,

"(B) such State requires that the membership of such organization consist of—

"(i) all persons who issue insurance covering workmen's compensation losses in such State, and

"(ii) all persons and governmental entities who self-insure against such losses, and

"(C) such organization operates as a non-profit organization by—

"(i) returning surplus income to its members or workmen's compensation policyholders on a periodic basis, and

"(ii) reducing initial premiums in anticipation of investment income.".

<< 26 USCA § 501 NOTE >>

(b) EFFECTIVE DATE.—The amendment made by this section shall apply to taxable years ending after the date of the enactment of this Act.

Subtitle F—Organizations Subject to Section 833

SEC. 351. ORGANIZATIONS SUBJECT TO SECTION 833.

<< 26 USCA § 833 >>

(a) IN GENERAL.—Section 833(c) (relating to organization to which section applies) is amended by adding at the end the following new paragraph:

"(4) TREATMENT AS EXISTING BLUE CROSS OR BLUE SHIELD ORGANIZATION.—

"(A) IN GENERAL.—Paragraph (2) shall be applied to an organization described in subparagraph (B) as if it were a Blue Cross or Blue Shield organization.

"(B) APPLICABLE ORGANIZATION.—An organization is described in this subparagraph if it—

"(i) is organized under, and governed by, State laws which are specifically and exclusively applicable to not-for-profit health insurance or health service type organizations, and

"(ii) is not a Blue Cross or Blue Shield organization or health maintenance organization.".

<< 26 USCA § 833 NOTE >>

(b) EFFECTIVE DATE.—The amendment made by this section shall apply to taxable years ending after December 31, 1996.

Subtitle G—IRA Distributions to the Unemployed

SEC. 361. DISTRIBUTIONS FROM CERTAIN PLANS MAY BE USED WITHOUT ADDITIONAL TAX TO PAY FINANCIALLY DEVASTATING MEDICAL EXPENSES.

<< 26 USCA § 72 >>

(a) IN GENERAL.—Section 72(t)(3)(A) is amended by striking "(B),".

(b) DISTRIBUTIONS FOR PAYMENT OF HEALTH INSURANCE PREMIUMS OF CERTAIN UNEMPLOYED INDIVIDUALS.—Paragraph (2) of section 72(t) is amended by adding at the end the following new subparagraph:

"(D) DISTRIBUTIONS TO UNEMPLOYED INDIVIDUALS FOR HEALTH INSURANCE PREMIUMS.—

"(i) IN GENERAL.—Distributions from an individual retirement plan to an individual after separation from employment—

"(I) if such individual has received unemployment compensation for 12 consecutive weeks under any Federal or State unemployment compensation law by reason of such separation,

"(II) if such distributions are made during any taxable year during which such unemployment compensation is paid or the succeeding taxable year, and

"(III) to the extent such distributions do not exceed the amount paid during the taxable year for insurance described in section 213(d)(1)(D) with respect to the individual and the individual's spouse and dependents (as defined in section 152).

"(ii) DISTRIBUTIONS AFTER REEMPLOYMENT.—Clause (i) shall not apply to any distribution made after the individual has been employed for at least 60 days after the separation from employment to which clause (i) applies.

"(iii) SELF–EMPLOYED INDIVIDUALS.—To the extent provided in regulations, a self-employed individual shall be treated as meeting the requirements of clause (i)(I) if, under Federal or State law, the individual would have received unemployment compensation but for the fact the individual was self-employed.".

(c) CONFORMING AMENDMENT.—Subparagraph (B) of section 72(t)(2) is amended by striking "or (C)" and inserting ", (C), or (D)".

<< 26 USCA § 72 NOTE >>

(d) EFFECTIVE DATE.—The amendments made by this section shall apply to distributions after December 31, 1996.

Subtitle H—Organ and Tissue Donation Information Included With Income Tax Refund Payments

<< 26 USCA § 6402 NOTE >>

SEC. 371. ORGAN AND TISSUE DONATION INFORMATION INCLUDED WITH INCOME TAX REFUND PAYMENTS.

(a) IN GENERAL.—The Secretary of the Treasury shall, to the extent practicable, include with the mailing of any payment of a refund of individual income tax made during the period beginning on February 1, 1997, and ending on June 30, 1997, a copy of the document described in subsection (b).

(b) TEXT OF DOCUMENT.—The Secretary of the Treasury shall, after consultation with the Secretary of Health and Human Services and organizations promoting organ and tissue (including eye) donation, prepare a document suitable for inclusion with individual income tax refund payments which—

(1) encourages organ and tissue donation;

(2) includes a detachable organ and tissue donor card; and

(3) urges recipients to—

(A) sign the organ and tissue donor card;

(B) discuss organ and tissue donation with family members and tell family members about the recipient's desire to be an organ and tissue donor if the occasion arises; and

(C) encourage family members to request or authorize organ and tissue donation if the occasion arises.

TITLE IV—APPLICATION AND ENFORCEMENT OF GROUP HEALTH PLAN REQUIREMENTS

Subtitle A—Application and Enforcement of Group Health Plan Requirements

SEC. 401. GROUP HEALTH PLAN PORTABILITY, ACCESS, AND RENEWABILITY REQUIREMENTS.

(a) IN GENERAL.—The Internal Revenue Code of 1986 is amended by adding at the end the following new subtitle:

<< 26 USCA Ch. 100 >>

"Subtitle K—Group Health Plan Portability, Access, and Renewability Requirements

"Chapter 100. Group health plan portability, access, and renewability requirements.

"CHAPTER 100—GROUP HEALTH PLAN PORTABILITY, ACCESS, AND RENEWABILITY REQUIREMENTS

"Sec. 9801. Increased portability through limitation on preexisting condition exclusions.

"Sec. 9802. Prohibiting discrimination against individual participants and beneficiaries based on health status.

"Sec. 9803. Guaranteed renewability in multiemployer plans and certain multiple employer welfare arrangements.

"Sec. 9804. General exceptions.

"Sec. 9805. Definitions.

"Sec. 9806. Regulations.

<< 26 USCA § 9801 >>

"SEC. 9801. INCREASED PORTABILITY THROUGH LIMITATION ON PREEXISTING CONDITION EXCLUSIONS.

  "(a) LIMITATION ON PREEXISTING CONDITION EXCLUSION PERIOD; CREDITING FOR PERIODS OF PREVIOUS COVERAGE.—Subject to subsection (d), a group health plan may, with respect to a participant or beneficiary, impose a preexisting condition exclusion only if—

    "(1) such exclusion relates to a condition (whether physical or mental), regardless of the cause of the condition, for which medical advice, diagnosis, care, or treatment was recommended or received within the 6–month period ending on the enrollment date;

    "(2) such exclusion extends for a period of not more than 12 months (or 18 months in the case of a late enrollee) after the enrollment date; and

    "(3) the period of any such preexisting condition exclusion is reduced by the length of the aggregate of the periods of creditable coverage (if any) applicable to the participant or beneficiary as of the enrollment date.

  "(b) DEFINITIONS.—For purposes of this section—

    "(1) PREEXISTING CONDITION EXCLUSION.—

      "(A) IN GENERAL.—The term 'preexisting condition exclusion' means, with respect to coverage, a limitation or exclusion of benefits relating to a condition based on the fact that the condition was present before the date of enrollment for such coverage, whether or not any medical advice, diagnosis, care, or treatment was recommended or received before such date.

      "(B) TREATMENT OF GENETIC INFORMATION.—For purposes of this section, genetic information shall not be treated as a condition described in subsection (a)(1) in the absence of a diagnosis of the condition related to such information.

    "(2) ENROLLMENT DATE.—The term 'enrollment date' means, with respect to an individual covered under a group health plan, the date of enrollment of the individual in the plan or, if earlier, the first day of the waiting period for such enrollment.

    "(3) LATE ENROLLEE.—The term 'late enrollee' means, with respect to coverage under a group health plan, a participant or beneficiary who enrolls under the plan other than during—

      "(A) the first period in which the individual is eligible to enroll under the plan, or

      "(B) a special enrollment period under subsection (f).

    "(4) WAITING PERIOD.—The term 'waiting period' means, with respect to a group health plan and an individual who is a potential participant or beneficiary in the plan, the period that must pass with respect to the individual before the individual is eligible to be covered for benefits under the terms of the plan.

  "(c) RULES RELATING TO CREDITING PREVIOUS COVERAGE.—

    "(1) CREDITABLE COVERAGE DEFINED.—For purposes of this part, the term 'creditable coverage' means, with respect to an individual, coverage of the individual under any of the following:

      "(A) A group health plan.

      "(B) Health insurance coverage.

      "(C) Part A or part B of title XVIII of the Social Security Act.

      "(D) Title XIX of the Social Security Act, other than coverage consisting solely of benefits under section 1928.

      "(E) Chapter 55 of title 10, United States Code.

      "(F) A medical care program of the Indian Health Service or of a tribal organization.

      "(G) A State health benefits risk pool.

      "(H) A health plan offered under chapter 89 of title 5, United States Code.

      "(I) A public health plan (as defined in regulations).

      "(J) A health benefit plan under section 5(e) of the Peace Corps Act (22 U.S.C. 2504(e)).

Such term does not include coverage consisting solely of coverage of excepted benefits (as defined in section 9805(c)).

"(2) NOT COUNTING PERIODS BEFORE SIGNIFICANT BREAKS IN COVERAGE.—

"(A) IN GENERAL.—A period of creditable coverage shall not be counted, with respect to enrollment of an individual under a group health plan, if, after such period and before the enrollment date, there was a 63–day period during all of which the individual was not covered under any creditable coverage.

"(B) WAITING PERIOD NOT TREATED AS A BREAK IN COVERAGE.—For purposes of subparagraph (A) and subsection (d)(4), any period that an individual is in a waiting period for any coverage under a group health plan or is in an affiliation period shall not be taken into account in determining the continuous period under subparagraph (A).

"(C) AFFILIATION PERIOD.—

"(i) IN GENERAL.—For purposes of this section, the term 'affiliation period' means a period which, under the terms of the health insurance coverage offered by the health maintenance organization, must expire before the health insurance coverage becomes effective. During such an affiliation period, the organization is not required to provide health care services or benefits and no premium shall be charged to the participant or beneficiary.

"(ii) BEGINNING.—Such period shall begin on the enrollment date.

"(iii) RUNS CONCURRENTLY WITH WAITING PERIODS.—Any such affiliation period shall run concurrently with any waiting period under the plan.

"(3) METHOD OF CREDITING COVERAGE.—

"(A) STANDARD METHOD.—Except as otherwise provided under subparagraph (B), for purposes of applying subsection (a)(3), a group health plan shall count a period of creditable coverage without regard to the specific benefits for which coverage is offered during the period.

"(B) ELECTION OF ALTERNATIVE METHOD.—A group health plan may elect to apply subsection (a)(3) based on coverage of any benefits within each of several classes or categories of benefits specified in regulations rather than as provided under subparagraph (A). Such election shall be made on a uniform basis for all participants and beneficiaries. Under such election a group health plan shall count a period of creditable coverage with respect to any class or category of benefits if any level of benefits is covered within such class or category.

"(C) PLAN NOTICE.—In the case of an election with respect to a group health plan under subparagraph (B), the plan shall—

"(i) prominently state in any disclosure statements concerning the plan, and state to each enrollee at the time of enrollment under the plan, that the plan has made such election, and

"(ii) include in such statements a description of the effect of this election.

"(4) ESTABLISHMENT OF PERIOD.—Periods of creditable coverage with respect to an individual shall be established through presentation of certifications described in subsection (e) or in such other manner as may be specified in regulations.

"(d) EXCEPTIONS.—

"(1) EXCLUSION NOT APPLICABLE TO CERTAIN NEWBORNS.—Subject to paragraph (4), a group health plan may not impose any preexisting condition exclusion in the case of an individual who, as of the last day of the 30–day period beginning with the date of birth, is covered under creditable coverage.

"(2) EXCLUSION NOT APPLICABLE TO CERTAIN ADOPTED CHILDREN.—Subject to paragraph (4), a group health plan may not impose any preexisting condition exclusion in the case of a child who is adopted or placed for adoption before attaining 18 years of age and who, as of the last day of the 30–day period beginning on the date of the adoption or placement for adoption, is covered under creditable coverage. The previous sentence shall not apply to coverage before the date of such adoption or placement for adoption.

"(3) EXCLUSION NOT APPLICABLE TO PREGNANCY.—For purposes of this section, a group health plan may not impose any preexisting condition exclusion relating to pregnancy as a preexisting condition.

"(4) LOSS IF BREAK IN COVERAGE.—Paragraphs (1) and (2) shall no longer apply to an individual after the end of the first 63–day period during all of which the individual was not covered under any creditable coverage.

"(e) CERTIFICATIONS AND DISCLOSURE OF COVERAGE.—

"(1) REQUIREMENT FOR CERTIFICATION OF PERIOD OF CREDITABLE COVERAGE.—

"(A) IN GENERAL.—A group health plan shall provide the certification described in subparagraph (B)—

"(i) at the time an individual ceases to be covered under the plan or otherwise becomes covered under a COBRA continuation provision,

"(ii) in the case of an individual becoming covered under such a provision, at the time the individual ceases to be covered under such provision, and

"(iii) on the request on behalf of an individual made not later than 24 months after the date of cessation of the coverage described in clause (i) or (ii), whichever is later.

The certification under clause (i) may be provided, to the extent practicable, at a time consistent with notices required under any applicable COBRA continuation provision.

"(B) CERTIFICATION.—The certification described in this subparagraph is a written certification of—

"(i) the period of creditable coverage of the individual under such plan and the coverage under such COBRA continuation provision, and

"(ii) the waiting period (if any) (and affiliation period, if applicable) imposed with respect to the individual for any coverage under such plan.

"(C) ISSUER COMPLIANCE.—To the extent that medical care under a group health plan consists of health insurance coverage offered in connection with the plan, the plan is deemed to have satisfied the certification requirement under this paragraph if the issuer provides for such certification in accordance with this paragraph.

"(2) DISCLOSURE OF INFORMATION ON PREVIOUS BENEFITS.—

"(A) IN GENERAL.—In the case of an election described in subsection (c)(3)(B) by a group health plan, if the plan enrolls an individual for coverage under the plan and the individual provides a certification of coverage of the individual under paragraph (1)—

"(i) upon request of such plan, the entity which issued the certification provided by the individual shall promptly disclose to such requesting plan information on coverage of classes and categories of health benefits available under such entity's plan, and

"(ii) such entity may charge the requesting plan or issuer for the reasonable cost of disclosing such information.

"(3) REGULATIONS.—The Secretary shall establish rules to prevent an entity's failure to provide information under paragraph (1) or (2) with respect to previous coverage of an individual from adversely affecting any subsequent coverage of the individual under another group health plan or health insurance coverage.

"(f) SPECIAL ENROLLMENT PERIODS.—

"(1) INDIVIDUALS LOSING OTHER COVERAGE.—A group health plan shall permit an employee who is eligible, but not enrolled, for coverage under the terms of the plan (or a dependent of such an employee if the dependent is eligible, but not enrolled, for coverage under such terms) to enroll for coverage under the terms of the plan if each of the following conditions is met:

"(A) The employee or dependent was covered under a group health plan or had health insurance coverage at the time coverage was previously offered to the employee or individual.

"(B) The employee stated in writing at such time that coverage under a group health plan or health insurance coverage was the reason for declining enrollment, but only if the plan sponsor (or the health insurance issuer offering health insurance coverage in connection with the plan) required such a statement at such time and provided the employee with notice of such requirement (and the consequences of such requirement) at such time.

"(C) The employee's or dependent's coverage described in subparagraph (A)—

"(i) was under a COBRA continuation provision and the coverage under such provision was exhausted; or

"(ii) was not under such a provision and either the coverage was terminated as a result of loss of eligibility for the coverage (including as a result of legal separation, divorce, death, termination of employment, or reduction in the number of hours of employment) or employer contributions toward such coverage were terminated.

"(D) Under the terms of the plan, the employee requests such enrollment not later than 30 days after the date of exhaustion of coverage described in subparagraph (C)(i) or termination of coverage or employer contribution described in subparagraph (C)(ii).

"(2) FOR DEPENDENT BENEFICIARIES.—

"(A) IN GENERAL.—If—

"(i) a group health plan makes coverage available with respect to a dependent of an individual,

"(ii) the individual is a participant under the plan (or has met any waiting period applicable to becoming a participant under the plan and is eligible to be enrolled under the plan but for a failure to enroll during a previous enrollment period), and

WESTLAW  © 2025 Thomson Reuters. No claim to original U.S. Government Works.

"(iii) a person becomes such a dependent of the individual through marriage, birth, or adoption or placement for adoption,

the group health plan shall provide for a dependent special enrollment period described in subparagraph (B) during which the person (or, if not otherwise enrolled, the individual) may be enrolled under the plan as a dependent of the individual, and in the case of the birth or adoption of a child, the spouse of the individual may be enrolled as a dependent of the individual if such spouse is otherwise eligible for coverage.

  "(B) DEPENDENT SPECIAL ENROLLMENT PERIOD.—The dependent special enrollment period under this subparagraph shall be a period of not less than 30 days and shall begin on the later of—

  "(i) the date dependent coverage is made available, or

  "(ii) the date of the marriage, birth, or adoption or placement for adoption (as the case may be) described in subparagraph (A)(iii).

  "(C) NO WAITING PERIOD.—If an individual seeks coverage of a dependent during the first 30 days of such a dependent special enrollment period, the coverage of the dependent shall become effective—

  "(i) in the case of marriage, not later than the first day of the first month beginning after the date the completed request for enrollment is received;

  "(ii) in the case of a dependent's birth, as of the date of such birth; or

  "(iii) in the case of a dependent's adoption or placement for adoption, the date of such adoption or placement for adoption.

<< 26 USCA § 9802 >>

"SEC. 9802. PROHIBITING DISCRIMINATION AGAINST INDIVIDUAL PARTICIPANTS AND BENEFICIARIES BASED ON HEALTH STATUS.

 "(a) IN ELIGIBILITY TO ENROLL.—

  "(1) IN GENERAL.—Subject to paragraph (2), a group health plan may not establish rules for eligibility (including continued eligibility) of any individual to enroll under the terms of the plan based on any of the following factors in relation to the individual or a dependent of the individual:

  "(A) Health status.

  "(B) Medical condition (including both physical and mental illnesses).

  "(C) Claims experience.

  "(D) Receipt of health care.

  "(E) Medical history.

  "(F) Genetic information.

  "(G) Evidence of insurability (including conditions arising out of acts of domestic violence).

  "(H) Disability.

  "(2) NO APPLICATION TO BENEFITS OR EXCLUSIONS.—To the extent consistent with section 9801, paragraph (1) shall not be construed—

  "(A) to require a group health plan to provide particular benefits (or benefits with respect to a specific procedure, treatment, or service) other than those provided under the terms of such plan; or

  "(B) to prevent such a plan from establishing limitations or restrictions on the amount, level, extent, or nature of the benefits or coverage for similarly situated individuals enrolled in the plan or coverage.

  "(3) CONSTRUCTION.—For purposes of paragraph (1), rules for eligibility to enroll under a plan include rules defining any applicable waiting periods for such enrollment.

 "(b) IN PREMIUM CONTRIBUTIONS.—

  "(1) IN GENERAL.—A group health plan may not require any individual (as a condition of enrollment or continued enrollment under the plan) to pay a premium or contribution which is greater than such premium or contribution for a similarly situated individual enrolled in the plan on the basis of any factor described in subsection (a)(1) in relation to the individual or to an individual enrolled under the plan as a dependent of the individual.

  "(2) CONSTRUCTION.—Nothing in paragraph (1) shall be construed—

  "(A) to restrict the amount that an employer may be charged for coverage under a group health plan; or

"(B) to prevent a group health plan from establishing premium discounts or rebates or modifying otherwise applicable copayments or deductibles in return for adherence to programs of health promotion and disease prevention.

<< 26 USCA § 9803 >>

"SEC. 9803. GUARANTEED RENEWABILITY IN MULTIEMPLOYER PLANS AND CERTAIN MULTIPLE EMPLOYER WELFARE ARRANGEMENTS.

"(a) IN GENERAL.—A group health plan which is a multiemployer plan (as defined in section 414(f)) or which is a multiple employer welfare arrangement may not deny an employer continued access to the same or different coverage under such plan, other than—

"(1) for nonpayment of contributions;

"(2) for fraud or other intentional misrepresentation of material fact by the employer;

"(3) for noncompliance with material plan provisions;

"(4) because the plan is ceasing to offer any coverage in a geographic area;

"(5) in the case of a plan that offers benefits through a network plan, because there is no longer any individual enrolled through the employer who lives, resides, or works in the service area of the network plan and the plan applies this paragraph uniformly without regard to the claims experience of employers or a factor described in section 9802(a)(1) in relation to such individuals or their dependents; or

"(6) for failure to meet the terms of an applicable collective bargaining agreement, to renew a collective bargaining or other agreement requiring or authorizing contributions to the plan, or to employ employees covered by such an agreement.

"(b) MULTIPLE EMPLOYER WELFARE ARRANGEMENT.—For purposes of subsection (a), the term 'multiple employer welfare arrangement' has the meaning given such term by section 3(40) of the Employee Retirement Income Security Act of 1974, as in effect on the date of the enactment of this section.

<< 26 USCA § 9804 >>

"SEC. 9804. GENERAL EXCEPTIONS.

"(a) EXCEPTION FOR CERTAIN PLANS.—The requirements of this chapter shall not apply to—

"(1) any governmental plan, and

"(2) any group health plan for any plan year if, on the first day of such plan year, such plan has less than 2 participants who are current employees.

"(b) EXCEPTION FOR CERTAIN BENEFITS.—The requirements of this chapter shall not apply to any group health plan in relation to its provision of excepted benefits described in section 9805(c)(1).

"(c) EXCEPTION FOR CERTAIN BENEFITS IF CERTAIN CONDITIONS MET.—

"(1) LIMITED, EXCEPTED BENEFITS.—The requirements of this chapter shall not apply to any group health plan in relation to its provision of excepted benefits described in section 9805(c)(2) if the benefits—

"(A) are provided under a separate policy, certificate, or contract of insurance; or

"(B) are otherwise not an integral part of the plan.

"(2) NONCOORDINATED, EXCEPTED BENEFITS.—The requirements of this chapter shall not apply to any group health plan in relation to its provision of excepted benefits described in section 9805(c)(3) if all of the following conditions are met:

"(A) The benefits are provided under a separate policy, certificate, or contract of insurance.

"(B) There is no coordination between the provision of such benefits and any exclusion of benefits under any group health plan maintained by the same plan sponsor.

"(C) Such benefits are paid with respect to an event without regard to whether benefits are provided with respect to such an event under any group health plan maintained by the same plan sponsor.

"(3) SUPPLEMENTAL EXCEPTED BENEFITS.—The requirements of this chapter shall not apply to any group health plan in relation to its provision of excepted benefits described in section 9805(c)(4) if the benefits are provided under a separate policy, certificate, or contract of insurance.

<< 26 USCA § 9805 >>

"SEC. 9805. DEFINITIONS.

"(a) GROUP HEALTH PLAN.—For purposes of this chapter, the term 'group health plan' has the meaning given to such term by section 5000(b)(1).

"(b) DEFINITIONS RELATING TO HEALTH INSURANCE.—For purposes of this chapter—

"(1) HEALTH INSURANCE COVERAGE.—

"(A) IN GENERAL.—Except as provided in subparagraph (B), the term 'health insurance coverage' means benefits consisting of medical care (provided directly, through insurance or reimbursement, or otherwise) under any hospital or medical service policy or certificate, hospital or medical service plan contract, or health maintenance organization contract offered by a health insurance issuer.

"(B) NO APPLICATION TO CERTAIN EXCEPTED BENEFITS.—In applying subparagraph (A), excepted benefits described in subsection (c)(1) shall not be treated as benefits consisting of medical care.

"(2) HEALTH INSURANCE ISSUER.—The term 'health insurance issuer' means an insurance company, insurance service, or insurance organization (including a health maintenance organization, as defined in paragraph (3)) which is licensed to engage in the business of insurance in a State and which is subject to State law which regulates insurance (within the meaning of section 514(b)(2) of the Employee Retirement Income Security Act of 1974, as in effect on the date of the enactment of this section). Such term does not include a group health plan.

"(3) HEALTH MAINTENANCE ORGANIZATION.—The term 'health maintenance organization' means—

"(A) a federally qualified health maintenance organization (as defined in section 1301(a) of the Public Health Service Act (42 U.S.C. 300e(a))),

"(B) an organization recognized under State law as a health maintenance organization, or

"(C) a similar organization regulated under State law for solvency in the same manner and to the same extent as such a health maintenance organization.

"(c) EXCEPTED BENEFITS.—For purposes of this chapter, the term 'excepted benefits' means benefits under one or more (or any combination thereof) of the following:

"(1) BENEFITS NOT SUBJECT TO REQUIREMENTS.—

"(A) Coverage only for accident, or disability income insurance, or any combination thereof.

"(B) Coverage issued as a supplement to liability insurance.

"(C) Liability insurance, including general liability insurance and automobile liability insurance.

"(D) Workers' compensation or similar insurance.

"(E) Automobile medical payment insurance.

"(F) Credit-only insurance.

"(G) Coverage for on-site medical clinics.

"(H) Other similar insurance coverage, specified in regulations, under which benefits for medical care are secondary or incidental to other insurance benefits.

"(2) BENEFITS NOT SUBJECT TO REQUIREMENTS IF OFFERED SEPARATELY.—

"(A) Limited scope dental or vision benefits.

"(B) Benefits for long-term care, nursing home care, home health care, community-based care, or any combination thereof.

"(C) Such other similar, limited benefits as are specified in regulations.

"(3) BENEFITS NOT SUBJECT TO REQUIREMENTS IF OFFERED AS INDEPENDENT, NONCOORDINATED BENEFITS.—

"(A) Coverage only for a specified disease or illness.

"(B) Hospital indemnity or other fixed indemnity insurance.

"(4) BENEFITS NOT SUBJECT TO REQUIREMENTS IF OFFERED AS SEPARATE INSURANCE POLICY.—Medicare supplemental health insurance (as defined under section 1882(g)(1) of the Social Security Act), coverage supplemental to the coverage provided under chapter 55 of title 10, United States Code, and similar supplemental coverage provided to coverage under a group health plan.

"(d) OTHER DEFINITIONS.—For purposes of this chapter—

"(1) COBRA CONTINUATION PROVISION.—The term 'COBRA continuation provision' means any of the following:

"(A) Section 4980B, other than subsection (f)(1) thereof insofar as it relates to pediatric vaccines.

"(B) Part 6 of subtitle B of title I of the Employee Retirement Income Security Act of 1974 (29 U.S.C. 1161 et seq.), other than section 609 of such Act.

"(C) Title XXII of the Public Health Service Act.

"(2) GOVERNMENTAL PLAN.—The term 'governmental plan' has the meaning given such term by section 414(d).

"(3) MEDICAL CARE.—The term 'medical care' has the meaning given such term by section 213(d) determined without regard to—

"(A) paragraph (1)(C) thereof, and

"(B) so much of paragraph (1)(D) thereof as relates to qualified long-term care insurance.

"(4) NETWORK PLAN.—The term 'network plan' means health insurance coverage of a health insurance issuer under which the financing and delivery of medical care are provided, in whole or in part, through a defined set of providers under contract with the issuer.

"(5) PLACED FOR ADOPTION DEFINED.—The term 'placement', or being 'placed', for adoption, in connection with any placement for adoption of a child with any person, means the assumption and retention by such person of a legal obligation for total or partial support of such child in anticipation of adoption of such child. The child's placement with such person terminates upon the termination of such legal obligation.

<< 26 USCA § 9806 >>

"SEC. 9806. REGULATIONS.

"The Secretary, consistent with section 104 of the Health Care Portability and Accountability Act of 1996, may promulgate such regulations as may be necessary or appropriate to carry out the provisions of this chapter. The Secretary may promulgate any interim final rules as the Secretary determines are appropriate to carry out this chapter.".

<< 26 USCA Ch. 1 >>

(b) CLERICAL AMENDMENT.—The table of subtitles of such Code is amended by adding at the end the following new item:

"Subtitle K. Group health plan portability, access, and renewability requirements.".

<< 26 USCA §§ 9801 NOTE, 9802 nt, 9803 nt, 9804 nt, 9805 nt, 9806 nt >>

(c) EFFECTIVE DATE.—

(1) IN GENERAL.—The amendments made by this section shall apply to plan years beginning after June 30, 1997.

(2) DETERMINATION OF CREDITABLE COVERAGE.—

(A) PERIOD OF COVERAGE.—

(i) IN GENERAL.—Subject to clause (ii), no period before July 1, 1996, shall be taken into account under chapter 100 of the Internal Revenue Code of 1986 (as added by this section) in determining creditable coverage.

(ii) SPECIAL RULE FOR CERTAIN PERIODS.—The Secretary of the Treasury, consistent with section 104, shall provide for a process whereby individuals who need to establish creditable coverage for periods before July 1, 1996, and who would have such coverage credited but for clause (i) may be given credit for creditable coverage for such periods through the presentation of documents or other means.

(B) CERTIFICATIONS, ETC.—

(i) IN GENERAL.—Subject to clauses (ii) and (iii), subsection (e) of section 9801 of the Internal Revenue Code of 1986 (as added by this section) shall apply to events occurring after June 30, 1996.

(ii) NO CERTIFICATION REQUIRED TO BE PROVIDED BEFORE JUNE 1, 1997.—In no case is a certification required to be provided under such subsection before June 1, 1997.

(iii) CERTIFICATION ONLY ON WRITTEN REQUEST FOR EVENTS OCCURRING BEFORE OCTOBER 1, 1996. —In the case of an event occurring after June 30, 1996, and before October 1, 1996, a certification is not required to be provided under such subsection unless an individual (with respect to whom the certification is otherwise required to be made) requests such certification in writing.

(C) TRANSITIONAL RULE.—In the case of an individual who seeks to establish creditable coverage for any period for which certification is not required because it relates to an event occurring before June 30, 1996—

(i) the individual may present other credible evidence of such coverage in order to establish the period of creditable coverage; and

(ii) a group health plan and a health insurance issuer shall not be subject to any penalty or enforcement action with respect to the plan's or issuer's crediting (or not crediting) such coverage if the plan or issuer has sought to comply in good faith with the applicable requirements under the amendments made by this section.

(3) SPECIAL RULE FOR COLLECTIVE BARGAINING AGREEMENTS.—Except as provided in paragraph (2), in the case of a group health plan maintained pursuant to 1 or more collective bargaining agreements between employee representatives and one or more employers ratified before the date of the enactment of this Act, the amendments made by this section shall not apply to plan years beginning before the later of—

(A) the date on which the last of the collective bargaining agreements relating to the plan terminates (determined without regard to any extension thereof agreed to after the date of the enactment of this Act), or

(B) July 1, 1997.

For purposes of subparagraph (A), any plan amendment made pursuant to a collective bargaining agreement relating to the plan which amends the plan solely to conform to any requirement added by this section shall not be treated as a termination of such collective bargaining agreement.

(4) TIMELY REGULATIONS.—The Secretary of the Treasury, consistent with section 104, shall first issue by not later than April 1, 1997, such regulations as may be necessary to carry out the amendments made by this section.

(5) LIMITATION ON ACTIONS.—No enforcement action shall be taken, pursuant to the amendments made by this section, against a group health plan or health insurance issuer with respect to a violation of a requirement imposed by such amendments before January 1, 1998, or, if later, the date of issuance of regulations referred to in paragraph (4), if the plan or issuer has sought to comply in good faith with such requirements.

SEC. 402. PENALTY ON FAILURE TO MEET CERTAIN GROUP HEALTH PLAN REQUIREMENTS.

<< 26 USCA § 4980D >>

(a) IN GENERAL.—Chapter 43 of the Internal Revenue Code of 1986 (relating to qualified pension, etc., plans) is amended by adding after section 4980C the following new section:

"SEC. 4980D. FAILURE TO MEET CERTAIN GROUP HEALTH PLAN REQUIREMENTS.

"(a) GENERAL RULE.—There is hereby imposed a tax on any failure of a group health plan to meet the requirements of chapter 100 (relating to group health plan portability, access, and renewability requirements).

"(b) AMOUNT OF TAX.—

"(1) IN GENERAL.—The amount of the tax imposed by subsection (a) on any failure shall be $100 for each day in the noncompliance period with respect to each individual to whom such failure relates.

"(2) NONCOMPLIANCE PERIOD.—For purposes of this section, the term 'noncompliance period' means, with respect to any failure, the period—

"(A) beginning on the date such failure first occurs, and

"(B) ending on the date such failure is corrected.

"(3) MINIMUM TAX FOR NONCOMPLIANCE PERIOD WHERE FAILURE DISCOVERED AFTER NOTICE OF EXAMINATION.—Notwithstanding paragraphs (1) and (2) of subsection (c)—

"(A) IN GENERAL.—In the case of 1 or more failures with respect to an individual—

"(i) which are not corrected before the date a notice of examination of income tax liability is sent to the employer, and

"(ii) which occurred or continued during the period under examination,

the amount of tax imposed by subsection (a) by reason of such failures with respect to such individual shall not be less than the lesser of $2,500 or the amount of tax which would be imposed by subsection (a) without regard to such paragraphs.

"(B) HIGHER MINIMUM TAX WHERE VIOLATIONS ARE MORE THAN DE MINIMIS.—To the extent violations for which any person is liable under subsection (e) for any year are more than de minimis, subparagraph (A) shall be applied by substituting '$15,000' for '$2,500' with respect to such person.

"(C) EXCEPTION FOR CHURCH PLANS.—This paragraph shall not apply to any failure under a church plan (as defined in section 414(e)).

"(c) LIMITATIONS ON AMOUNT OF TAX.—

"(1) TAX NOT TO APPLY WHERE FAILURE NOT DISCOVERED EXERCISING REASONABLE DILIGENCE.—No tax shall be imposed by subsection (a) on any failure during any period for which it is established to the satisfaction of the Secretary that the person otherwise liable for such tax did not know, and exercising reasonable diligence would not have known, that such failure existed.

"(2) TAX NOT TO APPLY TO FAILURES CORRECTED WITHIN CERTAIN PERIODS.—No tax shall be imposed by subsection (a) on any failure if—

"(A) such failure was due to reasonable cause and not to willful neglect, and

"(B)(i) in the case of a plan other than a church plan (as defined in section 414(e)), such failure is corrected during the 30–day period beginning on the first date the person otherwise liable for such tax knew, or exercising reasonable diligence would have known, that such failure existed, and

"(ii) in the case of a church plan (as so defined), such failure is corrected before the close of the correction period (determined under the rules of section 414(e)(4)(C)).

"(3) OVERALL LIMITATION FOR UNINTENTIONAL FAILURES.—In the case of failures which are due to reasonable cause and not to willful neglect—

"(A) SINGLE EMPLOYER PLANS.—

"(i) IN GENERAL.—In the case of failures with respect to plans other than specified multiple employer health plans, the tax imposed by subsection (a) for failures during the taxable year of the employer shall not exceed the amount equal to the lesser of—

"(I) 10 percent of the aggregate amount paid or incurred by the employer (or predecessor employer) during the preceding taxable year for group health plans, or

"(II) $500,000.

"(ii) TAXABLE YEARS IN THE CASE OF CERTAIN CONTROLLED GROUPS.—For purposes of this subparagraph, if not all persons who are treated as a single employer for purposes of this section have the same taxable year, the taxable years taken into account shall be determined under principles similar to the principles of section 1561.

"(B) SPECIFIED MULTIPLE EMPLOYER HEALTH PLANS.—

"(i) IN GENERAL.—In the case of failures with respect to a specified multiple employer health plan, the tax imposed by subsection (a) for failures during the taxable year of the trust forming part of such plan shall not exceed the amount equal to the lesser of—

"(I) 10 percent of the amount paid or incurred by such trust during such taxable year to provide medical care (as defined in section 9805(d)(3)) directly or through insurance, reimbursement, or otherwise, or

"(II) $500,000.

For purposes of the preceding sentence, all plans of which the same trust forms a part shall be treated as one plan.

"(ii) SPECIAL RULE FOR EMPLOYERS REQUIRED TO PAY TAX.—If an employer is assessed a tax imposed by subsection (a) by reason of a failure with respect to a specified multiple employer health plan, the limit shall be determined under subparagraph (A) (and not under this subparagraph) and as if such plan were not a specified multiple employer health plan.

"(4) WAIVER BY SECRETARY.—In the case of a failure which is due to reasonable cause and not to willful neglect, the Secretary may waive part or all of the tax imposed by subsection (a) to the extent that the payment of such tax would be excessive relative to the failure involved.

"(d) TAX NOT TO APPLY TO CERTAIN INSURED SMALL EMPLOYER PLANS.—

"(1) IN GENERAL.—In the case of a group health plan of a small employer which provides health insurance coverage solely through a contract with a health insurance issuer, no tax shall be imposed by this section on the employer on any failure which is solely because of the health insurance coverage offered by such issuer.

"(2) SMALL EMPLOYER.—

"(A) IN GENERAL.—For purposes of paragraph (1), the term 'small employer' means, with respect to a calendar year and a plan year, an employer who employed an average of at least 2 but not more than 50 employees on business days during the preceding calendar year and who employs at least 2 employees on the first day of the plan year. For purposes of the preceding sentence, all persons treated as a single employer under subsection (b), (c), (m), or (o) of section 414 shall be treated as one employer.

"(B) EMPLOYERS NOT IN EXISTENCE IN PRECEDING YEAR.—In the case of an employer which was not in existence throughout the preceding calendar year, the determination of whether such employer is a small employer shall be based on the average number of employees that it is reasonably expected such employer will employ on business days in the current calendar year.

"(C) PREDECESSORS.—Any reference in this paragraph to an employer shall include a reference to any predecessor of such employer.

"(3) HEALTH INSURANCE COVERAGE; HEALTH INSURANCE ISSUER.—For purposes of paragraph (1), the terms 'health insurance coverage' and 'health insurance issuer' have the respective meanings given such terms by section 9805.

"(e) LIABILITY FOR TAX.—The following shall be liable for the tax imposed by subsection (a) on a failure:

"(1) Except as otherwise provided in this subsection, the employer.

"(2) In the case of a multiemployer plan, the plan.

"(3) In the case of a failure under section 9803 (relating to guaranteed renewability) with respect to a plan described in subsection (f)(2)(B), the plan.

"(f) DEFINITIONS.—For purposes of this section—

"(1) GROUP HEALTH PLAN.—The term 'group health plan' has the meaning given such term by section 9805(a).

"(2) SPECIFIED MULTIPLE EMPLOYER HEALTH PLAN.—The term 'specified multiple employer health plan' means a group health plan which is—

"(A) any multiemployer plan, or

"(B) any multiple employer welfare arrangement (as defined in section 3(40) of the Employee Retirement Income Security Act of 1974, as in effect on the date of the enactment of this section).

"(3) CORRECTION.—A failure of a group health plan shall be treated as corrected if—

"(A) such failure is retroactively undone to the extent possible, and

"(B) the person to whom the failure relates is placed in a financial position which is as good as such person would have been in had such failure not occurred.".

<< 26 USCA Ch. 43 >>

(b) CLERICAL AMENDMENT.—The table of sections for chapter 43 of such Code is amended by adding after the item relating to section 4980C the following new item:

"Sec. 4980D. Failure to meet certain group health plan requirements.".

<< 26 USCA § 4980D NOTE >>

(c) EFFECTIVE DATE.—The amendments made by this section shall apply to failures under chapter 100 of the Internal Revenue Code of 1986 (as added by section 401 of this Act).

Subtitle B—Clarification of Certain Continuation Coverage Requirements

SEC. 421. COBRA CLARIFICATIONS.

(a) PUBLIC HEALTH SERVICE ACT.—

<< 42 USCA § 300bb–2 >>

(1) PERIOD OF COVERAGE.—Section 2202(2) of the Public Health Service Act (42 U.S.C. 300bb–2(2)) is amended—

  (A) in subparagraph (A)—

   (i) by transferring the sentence immediately preceding clause (iv) so as to appear immediately following such clause (iv); and

   (ii) in the last sentence (as so transferred)—

    (I) by striking "an individual" and inserting "a qualified beneficiary";

    (II) by striking "at the time of a qualifying event described in section 2203(2)" and inserting "at any time during the first 60 days of continuation coverage under this title";

    (III) by striking "with respect to such event,"; and

    (IV) by inserting "(with respect to all qualified beneficiaries)" after "29 months";

  (B) in subparagraph (D)(i), by inserting before ", or" the following: "(other than such an exclusion or limitation which does not apply to (or is satisfied by) such beneficiary by reason of chapter 100 of the Internal Revenue Code of 1986, part 7 of subtitle B of title I of the Employee Retirement Income Security Act of 1974, or title XXVII of this Act)"; and

  (C) in subparagraph (E), by striking "at the time of a qualifying event described in section 2203(2)" and inserting "at any time during the first 60 days of continuation coverage under this title".

<< 42 USCA § 300bb–6 >>

  (2) NOTICES.—Section 2206(3) of the Public Health Service Act (42 U.S.C. 300bb–6(3)) is amended by striking "at the time of a qualifying event described in section 2203(2)" and inserting "at any time during the first 60 days of continuation coverage under this title".

<< 42 USCA § 300bb–8 >>

  (3) BIRTH OR ADOPTION OF A CHILD.—Section 2208(3)(A) of the Public Health Service Act (42 U.S.C. 300bb–8(3)(A)) is amended by adding at the end thereof the following new flush sentence:

"Such term shall also include a child who is born to or placed for adoption with the covered employee during the period of continuation coverage under this title.".

(b) EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974.—

<< 29 USCA § 1162 >>

  (1) PERIOD OF COVERAGE.—Section 602(2) of the Employee Retirement Income Security Act of 1974 (29 U.S.C. 1162(2)) is amended—

  (A) in the last sentence of subparagraph (A)—

   (i) by striking "an individual" and inserting "a qualified beneficiary";

   (ii) by striking "at the time of a qualifying event described in section 603(2)" and inserting "at any time during the first 60 days of continuation coverage under this part";

   (iii) by striking "with respect to such event"; and

   (iv) by inserting "(with respect to all qualified beneficiaries)" after "29 months";

  (B) in subparagraph (D)(i), by inserting before ", or" the following: "(other than such an exclusion or limitation which does not apply to (or is satisfied by) such beneficiary by reason of chapter 100 of the Internal Revenue Code of 1986, part 7 of this subtitle, or title XXVII of the Public Health Service Act)"; and

  (C) in subparagraph (E), by striking "at the time of a qualifying event described in section 603(2)" and inserting "at any time during the first 60 days of continuation coverage under this part".

Case 2:24-cv-00228-Z    Document 50-1    Filed 01/17/25    Page 151 of 882    PageID 48936

<< 29 USCA § 1166 >>

  (2) NOTICES.—Section 606(a)(3) of the Employee Retirement Income Security Act of 1974 (29 U.S.C. 1166(a)(3)) is amended by striking "at the time of a qualifying event described in section 603(2)" and inserting "at any time during the first 60 days of continuation coverage under this part".

<< 29 USCA § 1167 >>

  (3) BIRTH OR ADOPTION OF A CHILD.—Section 607(3)(A) of the Employee Retirement Income Security Act of 1974 (29 U.S.C. 1167(3)) is amended by adding at the end thereof the following new flush sentence:

  "Such term shall also include a child who is born to or placed for adoption with the covered employee during the period of continuation coverage under this part.".

<< 26 USCA § 4980B >>

(c) INTERNAL REVENUE CODE OF 1986.—
  (1) PERIOD OF COVERAGE.—Section 4980B(f)(2)(B) of the Internal Revenue Code of 1986 is amended—
    (A) in the last sentence of clause (i)—
      (i) by striking "at the time of a qualifying event described in paragraph (3)(B)" and inserting "at any time during the first 60 days of continuation coverage under this section";
      (ii) by striking "with respect to such event"; and
      (iii) by inserting "(with respect to all qualified beneficiaries)" after "29 months";
    (B) in clause (iv)(I), by inserting before ", or" the following: "(other than such an exclusion or limitation which does not apply to (or is satisfied by) such beneficiary by reason of chapter 100 of this title, part 7 of subtitle B of title I of the Employee Retirement Income Security Act of 1974, or title XXVII of the Public Health Service Act)"; and
    (C) in clause (v), by striking "at the time of a qualifying event described in paragraph (3)(B)" and inserting "at any time during the first 60 days of continuation coverage under this section".
  (2) NOTICES.—Section 4980B(f)(6)(C) of the Internal Revenue Code of 1986 is amended by striking "at the time of a qualifying event described in paragraph (3)(B)" and inserting "at any time during the first 60 days of continuation coverage under this section".
  (3) BIRTH OR ADOPTION OF A CHILD.—Section 4980B(g)(1)(A) of the Internal Revenue Code of 1986 is amended by adding at the end thereof the following new flush sentence:

  "Such term shall also include a child who is born to or placed for adoption with the covered employee during the period of continuation coverage under this section.".

<< 26 USCA § 4980B NOTE >>

<< 29 USCA §§ 1162 nt, 1166 nt, 1167 nt >>

<< 42 USCA §§ 300bb–2 nt, 300bb–6 nt, 300bb–8 nt >>

  (d) EFFECTIVE DATE.—The amendments made by this section shall become effective on January 1, 1997, regardless of whether the qualifying event occurred before, on, or after such date.

<< 26 USCA § 4980B NOTE >>

  (e) NOTIFICATION OF CHANGES.—Not later than November 1, 1996, each group health plan (covered under title XXII of the Public Health Service Act, part 6 of subtitle B of title I of the Employee Retirement Income Security Act of 1974, and section 4980B(f) of the Internal Revenue Code of 1986) shall notify each qualified beneficiary who has elected continuation coverage under such title, part or section of the amendments made by this section.

TITLE V—REVENUE OFFSETS

SEC. 500. AMENDMENT OF 1986 CODE.

 Except as otherwise expressly provided, whenever in this title an amendment or repeal is expressed in terms of an amendment to, or repeal of, a section or other provision, the reference shall be considered to be made to a section or other provision of the Internal Revenue Code of 1986.

Subtitle A—Company–Owned Life Insurance

SEC. 501. DENIAL OF DEDUCTION FOR INTEREST ON LOANS WITH RESPECT TO COMPANY–OWNED LIFE INSURANCE.

<< 26 USCA § 264 >>

 (a) IN GENERAL.—Paragraph (4) of section 264(a) is amended—

 (1) by inserting ", or any endowment or annuity contracts owned by the taxpayer covering any individual," after "the life of any individual", and

 (2) by striking all that follows "carried on by the taxpayer" and inserting a period.

 (b) EXCEPTION FOR CONTRACTS RELATING TO KEY PERSONS; PERMISSIBLE INTEREST RATES.—Section 264 is amended—

 (1) by striking "Any" in subsection (a)(4) and inserting "Except as provided in subsection (d), any", and

 (2) by adding at the end the following new subsection:

"(d) SPECIAL RULES FOR APPLICATION OF SUBSECTION (a)(4).—

 "(1) EXCEPTION FOR KEY PERSONS.—Subsection (a)(4) shall not apply to any interest paid or accrued on any indebtedness with respect to policies or contracts covering an individual who is a key person to the extent that the aggregate amount of such indebtedness with respect to policies and contracts covering such individual does not exceed $50,000.

 "(2) INTEREST RATE CAP ON KEY PERSONS AND PRE–1986 CONTRACTS.—

 "(A) IN GENERAL.—No deduction shall be allowed by reason of paragraph (1) or the last sentence of subsection (a) with respect to interest paid or accrued for any month beginning after December 31, 1995, to the extent the amount of such interest exceeds the amount which would have been determined if the applicable rate of interest were used for such month.

 "(B) APPLICABLE RATE OF INTEREST.—For purposes of subparagraph (A)—

 "(i) IN GENERAL.—The applicable rate of interest for any month is the rate of interest described as Moody's Corporate Bond Yield Average–Monthly Average Corporates as published by Moody's Investors Service, Inc., or any successor thereto, for such month.

 "(ii) PRE–1986 CONTRACTS.—In the case of indebtedness on a contract purchased on or before June 20, 1986—

 "(I) which is a contract providing a fixed rate of interest, the applicable rate of interest for any month shall be the Moody's rate described in clause (i) for the month in which the contract was purchased, or

 "(II) which is a contract providing a variable rate of interest, the applicable rate of interest for any month in an applicable period shall be such Moody's rate for the third month preceding the first month in such period.

 For purposes of subclause (II), the taxpayer shall elect an applicable period for such contract on its return of tax imposed by this chapter for its first taxable year ending on or after October 13, 1995. Such applicable period shall be for any number of months (not greater than 12) specified in the election and may not be changed by the taxpayer without the consent of the Secretary.

 "(3) KEY PERSON.—For purposes of paragraph (1), the term 'key person' means an officer or 20–percent owner, except that the number of individuals who may be treated as key persons with respect to any taxpayer shall not exceed the greater of—

 "(A) 5 individuals, or

 "(B) the lesser of 5 percent of the total officers and employees of the taxpayer or 20 individuals.

 "(4) 20–PERCENT OWNER.—For purposes of this subsection, the term '20–percent owner' means—

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

"(A) if the taxpayer is a corporation, any person who owns directly 20 percent or more of the outstanding stock of the corporation or stock possessing 20 percent or more of the total combined voting power of all stock of the corporation, or

"(B) if the taxpayer is not a corporation, any person who owns 20 percent or more of the capital or profits interest in the employer.

"(5) AGGREGATION RULES.—

"(A) IN GENERAL.—For purposes of paragraph (4)(A) and applying the $50,000 limitation in paragraph (1)—

"(i) all members of a controlled group shall be treated as one taxpayer, and

"(ii) such limitation shall be allocated among the members of such group in such manner as the Secretary may prescribe.

"(B) CONTROLLED GROUP.—For purposes of this paragraph, all persons treated as a single employer under subsection (a) or (b) of section 52 or subsection (m) or (o) of section 414 shall be treated as members of a controlled group.".

<< 26 USCA § 264 NOTE >>

(c) EFFECTIVE DATES.—

(1) IN GENERAL.—The amendments made by this section shall apply to interest paid or accrued after October 13, 1995.

(2) TRANSITION RULE FOR EXISTING INDEBTEDNESS.—

(A) IN GENERAL.—In the case of—

(i) indebtedness incurred before January 1, 1996, or

(ii) indebtedness incurred before January 1, 1997 with respect to any contract or policy entered into in 1994 or 1995,

the amendments made by this section shall not apply to qualified interest paid or accrued on such indebtedness after October 13, 1995, and before January 1, 1999.

(B) QUALIFIED INTEREST.—For purposes of subparagraph (A), the qualified interest with respect to any indebtedness for any month is the amount of interest (otherwise deductible) which would be paid or accrued for such month on such indebtedness if—

(i) in the case of any interest paid or accrued after December 31, 1995, indebtedness with respect to no more than 20,000 insured individuals were taken into account, and

(ii) the lesser of the following rates of interest were used for such month:

(I) The rate of interest specified under the terms of the indebtedness as in effect on October 13, 1995 (and without regard to modification of such terms after such date).

(II) The applicable percentage of the rate of interest described as Moody's Corporate Bond Yield Average–Monthly Average Corporates as published by Moody's Investors Service, Inc., or any successor thereto, for such month.

For purposes of clause (i), all persons treated as a single employer under subsection (a) or (b) of section 52 of the Internal Revenue Code of 1986 or subsection (m) or (o) of section 414 of such Code shall be treated as 1 person. Subclause (II) of clause (ii) shall not apply to any month before January 1, 1996.

(C) APPLICABLE PERCENTAGE.—For purposes of subparagraph (B), the applicable percentage is as follows:

| For calendar year: | The percentage is: |
| --- | --- |
| 1996............................................................................................................ | 100 percent |
| 1997............................................................................................................ | 90 percent |
| 1998............................................................................................................ | 80 percent. |

(3) SPECIAL RULE FOR GRANDFATHERED CONTRACTS.—This section shall not apply to any contract purchased on or before June 20, 1986, except that section 264(d)(2) of the Internal Revenue Code of 1986 shall apply to interest paid or accrued after October 13, 1995.

<< 26 USCA § 264 NOTE >>

(d) SPREAD OF INCOME INCLUSION ON SURRENDER, ETC. OF CONTRACTS.—

 (1) IN GENERAL.—If any amount is received under any life insurance policy or endowment or annuity contract described in paragraph (4) of section 264(a) of the Internal Revenue Code of 1986—

   (A) on the complete surrender, redemption, or maturity of such policy or contract during calendar year 1996, 1997, or 1998, or

   (B) in full discharge during any such calendar year of the obligation under the policy or contract which is in the nature of a refund of the consideration paid for the policy or contract,

then (in lieu of any other inclusion in gross income) such amount shall be includible in gross income ratably over the 4–taxable year period beginning with the taxable year such amount would (but for this paragraph) be includible. The preceding sentence shall only apply to the extent the amount is includible in gross income for the taxable year in which the event described in subparagraph (A) or (B) occurs.

 (2) SPECIAL RULES FOR APPLYING SECTION 264.—A contract shall not be treated as—

   (A) failing to meet the requirement of section 264(c)(1) of the Internal Revenue Code of 1986, or

   (B) a single premium contract under section 264(b)(1) of such Code,

solely by reason of an occurrence described in subparagraph (A) or (B) of paragraph (1) of this subsection or solely by reason of no additional premiums being received under the contract by reason of a lapse occurring after October 13, 1995.

 (3) SPECIAL RULE FOR DEFERRED ACQUISITION COSTS.—In the case of the occurrence of any event described in subparagraph (A) or (B) of paragraph (1) of this subsection with respect to any policy or contract—

   (A) section 848 of the Internal Revenue Code of 1986 shall not apply to the unamortized balance (if any) of the specified policy acquisition expenses attributable to such policy or contract immediately before the insurance company's taxable year in which such event occurs, and

   (B) there shall be allowed as a deduction to such company for such taxable year under chapter 1 of such Code an amount equal to such unamortized balance.

Subtitle B—Treatment of Individuals Who Lose United States Citizenship

SEC. 511. REVISION OF INCOME, ESTATE, AND GIFT TAXES ON INDIVIDUALS WHO LOSE UNITED STATES CITIZENSHIP.

<< 26 USCA § 877 >>

 (a) IN GENERAL.—Subsection (a) of section 877 is amended to read as follows:

"(a) TREATMENT OF EXPATRIATES.—

 "(1) IN GENERAL.—Every nonresident alien individual who, within the 10–year period immediately preceding the close of the taxable year, lost United States citizenship, unless such loss did not have for one of its principal purposes the avoidance of taxes under this subtitle or subtitle B, shall be taxable for such taxable year in the manner provided in subsection (b) if the tax imposed pursuant to such subsection exceeds the tax which, without regard to this section, is imposed pursuant to section 871.

 "(2) CERTAIN INDIVIDUALS TREATED AS HAVING TAX AVOIDANCE PURPOSE.—For purposes of paragraph (1), an individual shall be treated as having a principal purpose to avoid such taxes if—

   "(A) the average annual net income tax (as defined in section 38(c)(1)) of such individual for the period of 5 taxable years ending before the date of the loss of United States citizenship is greater than $100,000, or

   "(B) the net worth of the individual as of such date is $500,000 or more.

In the case of the loss of United States citizenship in any calendar year after 1996, such $100,000 and $500,000 amounts shall be increased by an amount equal to such dollar amount multiplied by the cost-of-living adjustment determined under section 1(f)(3) for such calendar year by substituting '1994' for '1992' in subparagraph (B) thereof. Any increase under the preceding sentence shall be rounded to the nearest multiple of $1,000.".

(b) EXCEPTIONS.—

 (1) IN GENERAL.—Section 877 is amended by striking subsection (d), by redesignating subsection (c) as subsection (d), and by inserting after subsection (b) the following new subsection:

"(c) TAX AVOIDANCE NOT PRESUMED IN CERTAIN CASES.—

"(1) IN GENERAL.—Subsection (a)(2) shall not apply to an individual if—

"(A) such individual is described in a subparagraph of paragraph (2) of this subsection, and

"(B) within the 1–year period beginning on the date of the loss of United States citizenship, such individual submits a ruling request for the Secretary's determination as to whether such loss has for one of its principal purposes the avoidance of taxes under this subtitle or subtitle B.

"(2) INDIVIDUALS DESCRIBED.—

"(A) DUAL CITIZENSHIP, ETC.—An individual is described in this subparagraph if—

"(i) the individual became at birth a citizen of the United States and a citizen of another country and continues to be a citizen of such other country, or

"(ii) the individual becomes (not later than the close of a reasonable period after loss of United States citizenship) a citizen of the country in which—

"(I) such individual was born,

"(II) if such individual is married, such individual's spouse was born, or

"(III) either of such individual's parents were born.

"(B) LONG–TERM FOREIGN RESIDENTS.—An individual is described in this subparagraph if, for each year in the 10–year period ending on the date of loss of United States citizenship, the individual was present in the United States for 30 days or less. The rule of section 7701(b)(3)(D)(ii) shall apply for purposes of this subparagraph.

"(C) RENUNCIATION UPON REACHING AGE OF MAJORITY.—An individual is described in this subparagraph if the individual's loss of United States citizenship occurs before such individual attains age 18½.

"(D) INDIVIDUALS SPECIFIED IN REGULATIONS.—An individual is described in this subparagraph if the individual is described in a category of individuals prescribed by regulation by the Secretary.".

(2) TECHNICAL AMENDMENT.—Paragraph (1) of section 877(b) of such Code is amended by striking "subsection (c)" and inserting "subsection (d)".

(c) TREATMENT OF PROPERTY DISPOSED OF IN NONRECOGNITION TRANSACTIONS; TREATMENT OF DISTRIBUTIONS FROM CERTAIN CONTROLLED FOREIGN CORPORATIONS.—Subsection (d) of section 877, as redesignated by subsection (b), is amended to read as follows:

"(d) SPECIAL RULES FOR SOURCE, ETC.—For purposes of subsection (b)—

"(1) SOURCE RULES.—The following items of gross income shall be treated as income from sources within the United States:

"(A) SALE OF PROPERTY.—Gains on the sale or exchange of property (other than stock or debt obligations) located in the United States.

"(B) STOCK OR DEBT OBLIGATIONS.—Gains on the sale or exchange of stock issued by a domestic corporation or debt obligations of United States persons or of the United States, a State or political subdivision thereof, or the District of Columbia.

"(C) INCOME OR GAIN DERIVED FROM CONTROLLED FOREIGN CORPORATION.—Any income or gain derived from stock in a foreign corporation but only—

"(i) if the individual losing United States citizenship owned (within the meaning of section 958(a)), or is considered as owning (by applying the ownership rules of section 958(b)), at any time during the 2–year period ending on the date of the loss of United States citizenship, more than 50 percent of—

"(I) the total combined voting power of all classes of stock entitled to vote of such corporation, or

"(II) the total value of the stock of such corporation, and

"(ii) to the extent such income or gain does not exceed the earnings and profits attributable to such stock which were earned or accumulated before the loss of citizenship and during periods that the ownership requirements of clause (i) are met.

"(2) GAIN RECOGNITION ON CERTAIN EXCHANGES.—

"(A) IN GENERAL.—In the case of any exchange of property to which this paragraph applies, notwithstanding any other provision of this title, such property shall be treated as sold for its fair market value on the date of such exchange, and any gain shall be recognized for the taxable year which includes such date.

"(B) EXCHANGES TO WHICH PARAGRAPH APPLIES.—This paragraph shall apply to any exchange during the 10–year period described in subsection (a) if—

"(i) gain would not (but for this paragraph) be recognized on such exchange in whole or in part for purposes of this subtitle,

"(ii) income derived from such property was from sources within the United States (or, if no income was so derived, would have been from such sources), and

"(iii) income derived from the property acquired in the exchange would be from sources outside the United States.

"(C) EXCEPTION.—Subparagraph (A) shall not apply if the individual enters into an agreement with the Secretary which specifies that any income or gain derived from the property acquired in the exchange (or any other property which has a basis determined in whole or part by reference to such property) during such 10–year period shall be treated as from sources within the United States. If the property transferred in the exchange is disposed of by the person acquiring such property, such agreement shall terminate and any gain which was not recognized by reason of such agreement shall be recognized as of the date of such disposition.

"(D) SECRETARY MAY EXTEND PERIOD.—To the extent provided in regulations prescribed by the Secretary, subparagraph (B) shall be applied by substituting the 15–year period beginning 5 years before the loss of United States citizenship for the 10–year period referred to therein.

"(E) SECRETARY MAY REQUIRE RECOGNITION OF GAIN IN CERTAIN CASES.—To the extent provided in regulations prescribed by the Secretary—

"(i) the removal of appreciated tangible personal property from the United States, and

"(ii) any other occurrence which (without recognition of gain) results in a change in the source of the income or gain from property from sources within the United States to sources outside the United States,

shall be treated as an exchange to which this paragraph applies.

"(3) SUBSTANTIAL DIMINISHING OF RISKS OF OWNERSHIP.—For purposes of determining whether this section applies to any gain on the sale or exchange of any property, the running of the 10–year period described in subsection (a) shall be suspended for any period during which the individual's risk of loss with respect to the property is substantially diminished by—

"(A) the holding of a put with respect to such property (or similar property),

"(B) the holding by another person of a right to acquire the property, or

"(C) a short sale or any other transaction.

"(4) TREATMENT OF PROPERTY CONTRIBUTED TO CONTROLLED FOREIGN CORPORATIONS.—

"(A) IN GENERAL.—If—

"(i) an individual losing United States citizenship contributes property to any corporation which, at the time of the contribution, is described in subparagraph (B), and

"(ii) income derived from such property was from sources within the United States (or, if no income was so derived, would have been from such sources),

during the 10–year period referred to in subsection (a), any income or gain on such property (or any other property which has a basis determined in whole or part by reference to such property) received or accrued by the corporation shall be treated as received or accrued directly by such individual and not by such corporation. The preceding sentence shall not apply to the extent the property has been treated under subparagraph (C) as having been sold by such corporation.

"(B) CORPORATION DESCRIBED.—A corporation is described in this subparagraph with respect to an individual if, were such individual a United States citizen—

"(i) such corporation would be a controlled foreign corporation (as defined in 957), and

"(ii) such individual would be a United States shareholder (as defined in section 951(b)) with respect to such corporation.

"(C) DISPOSITION OF STOCK IN CORPORATION.—If stock in the corporation referred to in subparagraph (A) (or any other stock which has a basis determined in whole or part by reference to such stock) is disposed of during the 10–year period referred to in subsection (a) and while the property referred to in subparagraph (A) is held by such corporation, a pro rata share of such property (determined on the basis of the value of such stock) shall be treated as sold by the corporation immediately before such disposition.

"(D) ANTI–ABUSE RULES.—The Secretary shall prescribe such regulations as may be necessary to prevent the avoidance of the purposes of this paragraph, including where—

"(i) the property is sold to the corporation, and

"(ii) the property taken into account under subparagraph (A) is sold by the corporation.

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

"(E) INFORMATION REPORTING.—The Secretary shall require such information reporting as is necessary to carry out the purposes of this paragraph.".

(d) CREDIT FOR FOREIGN TAXES IMPOSED ON UNITED STATES SOURCE INCOME.—

(1) Subsection (b) of section 877 is amended by adding at the end the following new sentence: "The tax imposed solely by reason of this section shall be reduced (but not below zero) by the amount of any income, war profits, and excess profits taxes (within the meaning of section 903) paid to any foreign country or possession of the United States on any income of the taxpayer on which tax is imposed solely by reason of this section."

(2) Subsection (a) of section 877, as amended by subsection (a), is amended by inserting "(after any reduction in such tax under the last sentence of such subsection)" after "such subsection".

(e) COMPARABLE ESTATE AND GIFT TAX TREATMENT.—

(1) ESTATE TAX.—

<< 26 USCA § 2107 >>

(A) IN GENERAL.—Subsection (a) of section 2107 is amended to read as follows:

"(a) TREATMENT OF EXPATRIATES.—

"(1) RATE OF TAX.—A tax computed in accordance with the table contained in section 2001 is hereby imposed on the transfer of the taxable estate, determined as provided in section 2106, of every decedent nonresident not a citizen of the United States if, within the 10–year period ending with the date of death, such decedent lost United States citizenship, unless such loss did not have for one of its principal purposes the avoidance of taxes under this subtitle or subtitle A.

"(2) CERTAIN INDIVIDUALS TREATED AS HAVING TAX AVOIDANCE PURPOSE.—

"(A) IN GENERAL.—For purposes of paragraph (1), an individual shall be treated as having a principal purpose to avoid such taxes if such individual is so treated under section 877(a)(2).

"(B) EXCEPTION.—Subparagraph (A) shall not apply to a decedent meeting the requirements of section 877(c)(1).".

(B) CREDIT FOR FOREIGN DEATH TAXES.—Subsection (c) of section 2107 is amended by redesignating paragraph (2) as paragraph (3) and by inserting after paragraph (1) the following new paragraph:

"(2) CREDIT FOR FOREIGN DEATH TAXES.—

"(A) IN GENERAL.—The tax imposed by subsection (a) shall be credited with the amount of any estate, inheritance, legacy, or succession taxes actually paid to any foreign country in respect of any property which is included in the gross estate solely by reason of subsection (b).

"(B) LIMITATION ON CREDIT.—The credit allowed by subparagraph (A) for such taxes paid to a foreign country shall not exceed the lesser of—

"(i) the amount which bears the same ratio to the amount of such taxes actually paid to such foreign country in respect of property included in the gross estate as the value of the property included in the gross estate solely by reason of subsection (b) bears to the value of all property subjected to such taxes by such foreign country, or

"(ii) such property's proportionate share of the excess of—

"(I) the tax imposed by subsection (a), over

"(II) the tax which would be imposed by section 2101 but for this section.

"(C) PROPORTIONATE SHARE.—For purposes of subparagraph (B), a property's proportionate share is the percentage of the value of the property which is included in the gross estate solely by reason of subsection (b) bears to the total value of the gross estate.".

(C) EXPANSION OF INCLUSION IN GROSS ESTATE OF STOCK OF FOREIGN CORPORATIONS.—Paragraph (2) of section 2107(b) is amended by striking "more than 50 percent of" and all that follows and inserting "more than 50 percent of—

"(A) the total combined voting power of all classes of stock entitled to vote of such corporation, or

"(B) the total value of the stock of such corporation,".

<< 26 USCA § 2501 >>

(2) GIFT TAX.—

(A) IN GENERAL.—Paragraph (3) of section 2501(a) is amended to read as follows:

"(3) EXCEPTION.—

  "(A) CERTAIN INDIVIDUALS.—Paragraph (2) shall not apply in the case of a donor who, within the 10–year period ending with the date of transfer, lost United States citizenship, unless such loss did not have for one of its principal purposes the avoidance of taxes under this subtitle or subtitle A.

  "(B) CERTAIN INDIVIDUALS TREATED AS HAVING TAX AVOIDANCE PURPOSE.—For purposes of subparagraph (A), an individual shall be treated as having a principal purpose to avoid such taxes if such individual is so treated under section 877(a)(2).

  "(C) EXCEPTION FOR CERTAIN INDIVIDUALS.—Subparagraph (B) shall not apply to a decedent meeting the requirements of section 877(c)(1).

  "(D) CREDIT FOR FOREIGN GIFT TAXES.—The tax imposed by this section solely by reason of this paragraph shall be credited with the amount of any gift tax actually paid to any foreign country in respect of any gift which is taxable under this section solely by reason of this paragraph.".

 (f) COMPARABLE TREATMENT OF LAWFUL PERMANENT RESIDENTS WHO CEASE TO BE TAXED AS RESIDENTS.—

<< 26 USCA § 877 >>

  (1) IN GENERAL.—Section 877 is amended by redesignating subsection (e) as subsection (f) and by inserting after subsection (d) the following new subsection:

"(e) COMPARABLE TREATMENT OF LAWFUL PERMANENT RESIDENTS WHO CEASE TO BE TAXED AS RESIDENTS.—

  "(1) IN GENERAL.—Any long-term resident of the United States who—

   "(A) ceases to be a lawful permanent resident of the United States (within the meaning of section 7701(b)(6)), or

   "(B) commences to be treated as a resident of a foreign country under the provisions of a tax treaty between the United States and the foreign country and who does not waive the benefits of such treaty applicable to residents of the foreign country,

shall be treated for purposes of this section and sections 2107, 2501, and 6039F in the same manner as if such resident were a citizen of the United States who lost United States citizenship on the date of such cessation or commencement.

  "(2) LONG–TERM RESIDENT.—For purposes of this subsection, the term 'long-term resident' means any individual (other than a citizen of the United States) who is a lawful permanent resident of the United States in at least 8 taxable years during the period of 15 taxable years ending with the taxable year during which the event described in subparagraph (A) or (B) of paragraph (1) occurs. For purposes of the preceding sentence, an individual shall not be treated as a lawful permanent resident for any taxable year if such individual is treated as a resident of a foreign country for the taxable year under the provisions of a tax treaty between the United States and the foreign country and does not waive the benefits of such treaty applicable to residents of the foreign country.

  "(3) SPECIAL RULES.—

   "(A) EXCEPTIONS NOT TO APPLY.—Subsection (c) shall not apply to an individual who is treated as provided in paragraph (1).

   "(B) STEP–UP IN BASIS.—Solely for purposes of determining any tax imposed by reason of this subsection, property which was held by the long-term resident on the date the individual first became a resident of the United States shall be treated as having a basis on such date of not less than the fair market value of such property on such date. The preceding sentence shall not apply if the individual elects not to have such sentence apply. Such an election, once made, shall be irrevocable.

  "(4) AUTHORITY TO EXEMPT INDIVIDUALS.—This subsection shall not apply to an individual who is described in a category of individuals prescribed by regulation by the Secretary.

  "(5) REGULATIONS.—The Secretary shall prescribe such regulations as may be appropriate to carry out this subsection, including regulations providing for the application of this subsection in cases where an alien individual becomes a resident of the United States during the 10–year period after being treated as provided in paragraph (1).".

  (2) CONFORMING AMENDMENTS.—

<< 26 USCA § 2107 >>

(A) Section 2107 is amended by striking subsection (d), by redesignating subsection (e) as subsection (d), and by inserting after subsection (d) (as so redesignated) the following new subsection:

"(e) CROSS REFERENCE.—

"For comparable treatment of long-term lawful permanent residents who ceased to be taxed as residents, see section 877(e).".

<< 26 USCA § 2501 >>

(B) Paragraph (3) of section 2501(a) (as amended by subsection (e)) is amended by adding at the end the following new subparagraph:

"(E) CROSS REFERENCE.—

"For comparable treatment of long-term lawful permanent residents who ceased to be taxed as residents, see section 877(e).".

<< 26 USCA §§ 877 NOTE, 2107 nt, 2501 nt >>

(g) EFFECTIVE DATE.—

(1) IN GENERAL.—The amendments made by this section shall apply to—

(A) individuals losing United States citizenship (within the meaning of section 877 of the Internal Revenue Code of 1986) on or after February 6, 1995, and

(B) long-term residents of the United States with respect to whom an event described in subparagraph (A) or (B) of section 877(e)(1) of such Code occurs on or after February 6, 1995.

(2) RULING REQUESTS.—In no event shall the 1–year period referred to in section 877(c)(1)(B) of such Code, as amended by this section, expire before the date which is 90 days after the date of the enactment of this Act.

(3) SPECIAL RULE.—

(A) IN GENERAL.—In the case of an individual who performed an act of expatriation specified in paragraph (1), (2), (3), or (4) of section 349(a) of the Immigration and Nationality Act (8 U.S.C. 1481(a)(1)–(4)) before February 6, 1995, but who did not, on or before such date, furnish to the United States Department of State a signed statement of voluntary relinquishment of United States nationality confirming the performance of such act, the amendments made by this section and section 512 shall apply to such individual except that the 10–year period described in section 877(a) of such Code shall not expire before the end of the 10–year period beginning on the date such statement is so furnished.

(B) EXCEPTION.—Subparagraph (A) shall not apply if the individual establishes to the satisfaction of the Secretary of the Treasury that such loss of United States citizenship occurred before February 6, 1994.

SEC. 512. INFORMATION ON INDIVIDUALS LOSING UNITED STATES CITIZENSHIP.

<< 26 USCA § 6039F >>

(a) IN GENERAL.—Subpart A of part III of subchapter A of chapter 61 is amended by inserting after section 6039E the following new section:

"SEC. 6039F. INFORMATION ON INDIVIDUALS LOSING UNITED STATES CITIZENSHIP.

"(a) IN GENERAL.—Notwithstanding any other provision of law, any individual who loses United States citizenship (within the meaning of section 877(a)) shall provide a statement which includes the information described in subsection (b). Such statement shall be—

"(1) provided not later than the earliest date of any act referred to in subsection (c), and

"(2) provided to the person or court referred to in subsection (c) with respect to such act.

"(b) INFORMATION TO BE PROVIDED.—Information required under subsection (a) shall include—

"(1) the taxpayer's TIN,

"(2) the mailing address of such individual's principal foreign residence,

"(3) the foreign country in which such individual is residing,

"(4) the foreign country of which such individual is a citizen,

"(5) in the case of an individual having a net worth of at least the dollar amount applicable under section 877(a)(2)(B), information detailing the assets and liabilities of such individual, and

"(6) such other information as the Secretary may prescribe.

"(c) ACTS DESCRIBED.—For purposes of this section, the acts referred to in this subsection are—

"(1) the individual's renunciation of his United States nationality before a diplomatic or consular officer of the United States pursuant to paragraph (5) of section 349(a) of the Immigration and Nationality Act (8 U.S.C. 1481(a)(5)),

"(2) the individual's furnishing to the United States Department of State a signed statement of voluntary relinquishment of United States nationality confirming the performance of an act of expatriation specified in paragraph (1), (2), (3), or (4) of section 349(a) of the Immigration and Nationality Act (8 U.S.C. 1481(a)(1)–(4)),

"(3) the issuance by the United States Department of State of a certificate of loss of nationality to the individual, or

"(4) the cancellation by a court of the United States of a naturalized citizen's certificate of naturalization.

"(d) PENALTY.—Any individual failing to provide a statement required under subsection (a) shall be subject to a penalty for each year (of the 10–year period beginning on the date of loss of United States citizenship) during any portion of which such failure continues in an amount equal to the greater of—

"(1) 5 percent of the tax required to be paid under section 877 for the taxable year ending during such year, or

"(2) $1,000,

unless it is shown that such failure is due to reasonable cause and not to willful neglect.

"(e) INFORMATION TO BE PROVIDED TO SECRETARY.—Notwithstanding any other provision of law—

"(1) any Federal agency or court which collects (or is required to collect) the statement under subsection (a) shall provide to the Secretary—

"(A) a copy of any such statement, and

"(B) the name (and any other identifying information) of any individual refusing to comply with the provisions of subsection (a),

"(2) the Secretary of State shall provide to the Secretary a copy of each certificate as to the loss of American nationality under section 358 of the Immigration and Nationality Act which is approved by the Secretary of State, and

"(3) the Federal agency primarily responsible for administering the immigration laws shall provide to the Secretary the name of each lawful permanent resident of the United States (within the meaning of section 7701(b)(6)) whose status as such has been revoked or has been administratively or judicially determined to have been abandoned.

Notwithstanding any other provision of law, not later than 30 days after the close of each calendar quarter, the Secretary shall publish in the Federal Register the name of each individual losing United States citizenship (within the meaning of section 877(a)) with respect to whom the Secretary receives information under the preceding sentence during such quarter.

"(f) REPORTING BY LONG–TERM LAWFUL PERMANENT RESIDENTS WHO CEASE TO BE TAXED AS RESIDENTS.—In lieu of applying the last sentence of subsection (a), any individual who is required to provide a statement under this section by reason of section 877(e)(1) shall provide such statement with the return of tax imposed by chapter 1 for the taxable year during which the event described in such section occurs.

"(g) EXEMPTION.—The Secretary may by regulations exempt any class of individuals from the requirements of this section if he determines that applying this section to such individuals is not necessary to carry out the purposes of this section.".

<< 26 USCA Ch. 61 >>

(b) CLERICAL AMENDMENT.—The table of sections for such subpart A is amended by inserting after the item relating to section 6039E the following new item:

"Sec. 6039F. Information on individuals losing United States citizenship.".

<< 26 USCA § 6039F NOTE >>

(c) EFFECTIVE DATE.—The amendments made by this section shall apply to—

(1) individuals losing United States citizenship (within the meaning of section 877 of the Internal Revenue Code of 1986) on or after February 6, 1995, and

(2) long-term residents of the United States with respect to whom an event described in subparagraph (A) or (B) of section 877(e)(1) of such Code occurs on or after such date.

In no event shall any statement required by such amendments be due before the 90th day after the date of the enactment of this Act.

SEC. 513. REPORT ON TAX COMPLIANCE BY UNITED STATES CITIZENS AND RESIDENTS LIVING ABROAD.

Not later than 90 days after the date of the enactment of this Act, the Secretary of the Treasury shall prepare and submit to the Committee on Ways and Means of the House of Representatives and the Committee on Finance of the Senate a report—

(1) describing the compliance with subtitle A of the Internal Revenue Code of 1986 by citizens and lawful permanent residents of the United States (within the meaning of section 7701(b)(6) of such Code) residing outside the United States, and

(2) recommending measures to improve such compliance (including improved coordination between executive branch agencies).

Subtitle C—Repeal of Financial Institution Transition Rule to Interest Allocation Rules

<< 26 USCA § 864 NOTE >>

SEC. 521. REPEAL OF FINANCIAL INSTITUTION TRANSITION RULE TO INTEREST ALLOCATION RULES.

(a) IN GENERAL.—Paragraph (5) of section 1215(c) of the Tax Reform Act of 1986 (Public Law 99–514, 100 Stat. 2548) is hereby repealed.

(b) EFFECTIVE DATE.—

(1) IN GENERAL.—The amendment made by this section shall apply to taxable years beginning after December 31, 1995.

(2) SPECIAL RULE.—In the case of the first taxable year beginning after December 31, 1995, the pre-effective date portion of the interest expense of the corporation referred to in such paragraph (5) of such section 1215(c) for such taxable year shall be allocated and apportioned without regard to such amendment. For purposes of the preceding sentence, the pre-effective date portion is the amount which bears the same ratio to the interest expense for such taxable year as the number of days during such taxable year before the date of the enactment of this Act bears to 366.

Approved August 21, 1996.

PL 104–191, 1996 HR 3103

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Unconstitutional or Preempted  Limitation Recognized by  Krafsur v. Davenport,   6th Cir.(Tenn.),   Dec. 04, 2013

KeyCite Yellow Flag - Negative Treatment

Proposed Legislation

United States Code Annotated
  Title 5. Government Organization and Employees (Refs & Annos)
    Part I. The Agencies Generally
      Chapter 7. Judicial Review (Refs & Annos)

5 U.S.C.A. § 706

§ 706. Scope of review

Currentness

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall--

  **(1)** compel agency action unlawfully withheld or unreasonably delayed; and

  **(2)** hold unlawful and set aside agency action, findings, and conclusions found to be--

    **(A)** arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

    **(B)** contrary to constitutional right, power, privilege, or immunity;

    **(C)** in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

    **(D)** without observance of procedure required by law;

    **(E)** unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

    **(F)** unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

**CREDIT(S)**

(Pub.L. 89-554, Sept. 6, 1966, 80 Stat. 393.)


Notes of Decisions (5750)

5 U.S.C.A. § 706, 5 USCA § 706
Current through P.L. 118-158. Some statute sections may be more current, see credits for details.

---

**End of Document**                                                © 2025 Thomson Reuters. No claim to original U.S. Government Works.

89 FR 32976-01, 2024 WL 1801644(F.R.)

RULES and REGULATIONS

DEPARTMENT OF HEALTH AND HUMAN SERVICES

Office of the Secretary

45 CFR Parts 160 and 164

RIN 0945-AA20

HIPAA Privacy Rule To Support Reproductive Health Care Privacy

Friday, April 26, 2024

AGENCY: Office for Civil Rights (OCR), Office of the Secretary, Department of Health and Human Services.

**\*32976**  ACTION: Final rule.

SUMMARY: The Department of Health and Human Services (HHS or "Department") is issuing this final rule to modify the Standards for Privacy of Individually Identifiable Health Information ("Privacy Rule") under the Health Insurance Portability and Accountability Act of 1996 (HIPAA) and the Health Information Technology for Economic and Clinical Health Act of 2009 (HITECH Act). The Department is issuing this final rule after careful consideration of all public comments received in response to the notice of proposed rulemaking (NPRM) for the HIPAA Privacy Rule to Support Reproductive Health Care Privacy ("2023 Privacy Rule NPRM") and public comments received on proposals to revise provisions of the HIPAA Privacy Rule in the NPRM for the Confidentiality of Substance Use Disorder (SUD) Patient Records ("2022 Part 2 NPRM").

DATES:

Effective date: This final rule is effective on June 25, 2024.

Compliance date: Persons subject to this regulation must comply with the applicable requirements of this final rule by December 23, 2024, except for the applicable requirements of 45 CFR 164.520 in this final rule. Persons subject to this regulation must comply with the applicable requirements of 45 CFR 164.520 in this final rule by February 16, 2026.

FOR FURTHER INFORMATION CONTACT: Marissa Gordon-Nguyen at (202) 240-3110 or (800) 537-7697 (TDD), or by email at OCRPrivacy@hhs.gov.

SUPPLEMENTARY INFORMATION:

**Table of Contents**

I. Executive Summary

A. Overview

B. Effective and Compliance Dates

1. 2023 Privacy Rule NPRM

2. Overview of Comments

3. Final Rule

4. Response to Public Comments

II. Statutory and Regulatory Background

A. Statutory Authority and History

1. Health Insurance Portability and Accountability Act of 1996 (HIPAA)

2. Health Information Technology for Economic and Clinical Health (HITECH) Act

B. Regulatory History

1. 2000 Privacy Rule

2. 2002 Privacy Rule

3. 2013 Omnibus Rule

4. 2024 Privacy Rule

III. Justification for This Rulemaking

A. HIPAA Encourages Trust and Confidence by Carefully Balancing Individuals' Privacy Interests With Others' Interests in Using or Disclosing PHI

1. Privacy Protections Ensure That Individuals Have Access to, and Are Comfortable Accessing, High-Quality Health Care

2. The Department's Approach to the Privacy Rule Has Long Sought To Balance the Interests of Individuals and Society

B. Developments in the Legal Environment Are Eroding Individuals' Trust in the Health Care System

C. To Protect the Trust Between Individuals and Health Care Providers, the Department Is Restricting Certain Uses and Disclosures of PHI for Particular Non-Health Care Purposes

IV. General Discussion of Public Comments

A. General Comments in Support of the Proposed Rule

B. General Comments in Opposition to the Proposed Rule

C. Other General Comments on the Proposed Rule

V. Summary of Final Rule Provisions and Public Comments and Responses

A. Section 160.103 Definitions

1. Clarifying the Definition of "Person"

2. Interpreting Terms Used in Section 1178(b) of the Social Security Act

3. Adding a Definition of "Reproductive Health Care"

4. Whether the Department Should Define Any Additional Terms

B. Section 164.502—Uses and Disclosures of Protected Health Information: General Rules

1. Clarifying When PHI May Be Used or Disclosed by Regulated Entities

2. Adding a New Category of Prohibited Uses and Disclosures

3. Clarifying Personal Representative Status in the Context of Reproductive Health Care

4. Request for Comments

C. Section 164.509—Uses and Disclosures for Which an Attestation is Required

1. Current Provision

2. Proposed Rule

3. Overview of Public Comments

4. Final Rule

5. Responses to Public Comments

D. Section 164.512—Uses and Disclosures for Which an Authorization or Opportunity To Agree or Object Is Not Required

1. Applying the Prohibition and Attestation Condition to Certain Permitted Uses and Disclosures

2. Making a Technical Correction to the Heading of 45 CFR 164.512(c) and Clarifying That Providing or Facilitating Reproductive Health Care Is Not Abuse, Neglect, or Domestic Violence

3. Clarifying the Permission for Disclosures Based on Administrative Processes

4. Request for Information on Current Processes for Receiving and Addressing Requests Pursuant to 164.512(d) Through (g)(1)

E. Section 164.520—Notice of Privacy Practices for Protected Health Information

1. Current Provision

2. CARES Act

3. Proposals in 2022 Part 2 NPRM and 2023 Privacy Rule NPRM

4. Overview of Public Comments

5. Final Rule

6. Responses to Public Comments

F. Section 164.535—Severability

G. Comments on Other Provisions of the HIPAA Rules

VI. Regulatory Impact Analysis

A. Executive Order 12866 and Related Executive Orders on Regulatory Review

1. Summary of Costs and Benefits

2. Baseline Conditions

3. Costs of the Rule

B. Regulatory Alternatives to the Final Rule

C. Regulatory Flexibility Act—Small Entity Analysis

D. Executive Order 13132—Federalism

E. Assessment of Federal Regulation and Policies on Families

F. Paperwork Reduction Act of 1995

Explanation of Estimated Annualized Burden Hours

## Table of Acronyms

| Term | Meaning |
| --- | --- |
| Part V | |
| AMA | American Medical Association. |
| API | Application Programming Interface. |
| CARES Act | Coronavirus Aid, Relief, and Economic Security Act. |
| CDC | Centers for Disease Control and Prevention. |
| CLIA | Clinical Laboratory Improvement Amendments of 1988. |
| CMS | Centers for Medicare & Medicaid Services. |
| DOD | Department of Defense. |
| Department or HHS | Department of Health and Human Services. |
| EHR | Electronic Health Record. |
| E.O. | Executive Order. |
| FDA | Food and Drug Administration. |
| FHIR® | Fast Healthcare Interoperability Resources®. |
| FTC | Federal Trade Commission. |
| GINA | Genetic Information Nondiscrimination Act of 2008. |
| Health IT | Health Information Technology. |
| HIE | Health Information Exchange. |
| HIPAA | Health Insurance Portability and Accountability Act of 1996. |
| HITECH Act | Health Information Technology for Economic and Clinical Health Act of 2009. |
| ICR | Information Collection Request. |

| | |
|---|---|
| IIHI | Individually Identifiable Health Information. |
| NCVHS | National Committee on Vital and Health Statistics. |
| NICS | National Instant Criminal Background Check System. |
| NPP | Notice of Privacy Practices. |
| NPRM | Notice of Proposed Rulemaking. |
| OCR | Office for Civil Rights. |
| OHCA | Organized Health Care Arrangement. |
| OMB | Office of Management and Budget. |
| ONC | Office of the National Coordinator for Health Information Technology. |
| PHI | Protected Health Information. |
| PRA | Paperwork Reduction Act of 1995. |
| RFA | Regulatory Flexibility Act. |
| RIA | Regulatory Impact Analysis. |
| SBA | Small Business Administration. |
| SSA | Social Security Act of 1935. |
| TPO | Treatment, Payment, or Health Care Operations. |
| UMRA | Unfunded Mandates Reform Act of 1995. |

**\*32977**

# I. Executive Summary

## A. Overview

In this final rule, the Department of Health and Human Services (HHS or "Department") modifies certain provisions of the Standards for Privacy of Individually Identifiable Health Information ("Privacy Rule"), issued pursuant to section 264 of the Administrative Simplification provisions of title II, subtitle F, of the Health Insurance Portability and Accountability Act of 1996 (HIPAA).[FN1] The Privacy Rule [FN2] is one of several rules, collectively known as the HIPAA Rules,[FN3] that protect the privacy and security of individuals' protected health information [FN4] (PHI), which is individually identifiable health information [FN5] (IIHI) transmitted by or maintained in electronic media or any other form or medium, with certain exceptions.[FN6]

The Privacy Rule requires the disclosure of PHI only in the following circumstances: when required by the Secretary to investigate a regulated entity's compliance with the Privacy Rule and to the individual pursuant to the individual's right of access and the individual's right to an accounting of disclosures.[FN7] Any other uses or disclosures described in the Privacy Rule are either permitted or prohibited, as specified in the Privacy Rule. For example, the Privacy Rule permits, but does not require, a regulated entity to disclose PHI to conduct quality improvement activities when applicable conditions are met, and it prohibits a regulated entity from selling PHI except pursuant to and in compliance with 45 CFR 164.508(a)(4).[FN8]

In accordance with its statutory mandate, the Department promulgated the Privacy Rule and continues to administer and enforce it to ensure that individuals are not afraid to seek health care from, or share important information with, their health care providers because of a concern that their sensitive information will be disclosed outside of their relationship with their health care provider. Protecting privacy promotes trust between health care providers and individuals, advancing access to and improving the quality of health care. To achieve this goal, the Department generally has applied the same privacy standards to nearly all PHI, regardless of the type of health care at issue. Notably, special protections were given to psychotherapy notes, owing in part to the particularly **\*32978** sensitive information those notes contain.[FN9]

Under its statutory authority to administer and enforce the HIPAA Rules, the Department may modify the HIPAA Rules as needed.[FN10] The Supreme Court decision in Dobbs v. Jackson Women's Health Organization [FN11] (Dobbs) overturned precedent that protected a constitutional right to abortion and altered the legal and health care landscape. This decision has far-reaching implications for reproductive health care beyond its effects on access to abortion.[FN12] This changing legal landscape increases the likelihood that an individual's PHI may be disclosed in ways that cause harm to the interests that HIPAA seeks to protect, including the trust of individuals in health care providers and the health care system.[FN13] The threat that PHI will be disclosed and used to conduct such an investigation against, or to impose liability upon, an individual or another person is likely to chill an individual's willingness to seek lawful health care treatment or to provide full information to their health care providers when obtaining that treatment, and on the willingness of health care providers to provide such care.[FN14] These developments in the legal environment increase the potential that use and disclosure of PHI about an individual's reproductive health will undermine access to and the quality of health care generally.

In order to continue to protect privacy in a manner that promotes trust between individuals and health care providers and advances access to, and improves the quality of, health care, we have determined that the Privacy Rule must be modified to limit the circumstances in which provisions of the Privacy Rule permit the use or disclosure of an individual's PHI about reproductive health care for certain non-health care purposes, where such use or disclosure could be detrimental to privacy of the individual or another person or the individual's trust in their health care providers. This determination was informed by our expertise in administering the Privacy Rule, questions we have received from members of the public and Congress, comments we received on the 2023 HIPAA Privacy Rule to Support Reproductive Health Care Privacy notice of proposed rulemaking (NPRM) ("2023 Privacy Rule NPRM"),[FN15] and our analysis of the state of privacy for IIHI.

This final rule ("2024 Privacy Rule") amends provisions of the Privacy Rule to strengthen privacy protections for highly sensitive PHI about the reproductive health care of an individual, and directly advances the purposes of HIPAA by setting minimum protections for PHI and providing peace of mind that is essential to individuals' ability to obtain lawful reproductive health care. This final rule balances the interests of society in obtaining PHI for non-health care purposes with the interests of the individual, the Federal Government, and society in protecting individual privacy, thereby improving the effectiveness of the health care system by ensuring that persons are not deterred from seeking, obtaining, providing, or facilitating reproductive health care that is lawful under the circumstances in which such health care is provided.

The Department carefully analyzed state prohibitions and restrictions on an individual's ability to obtain high-quality health care and their effects on health information privacy and the relationships between individuals and their health care providers after Dobbs; assessed trends in state legislative activity with respect to the privacy of PHI; and conducted a thorough review of the text, history, and purposes of HIPAA and the Privacy Rule. The Department also engaged in extensive discussions with HHS agencies and other Federal departments, including the Department of Justice; consulted with the National Committee on Vital and Health Statistics (NCVHS) and the Attorney General as required by section 264(d) of HIPAA, and with Indian Tribes as required by Executive Order 13175; [FN16] held listening sessions with and reviewed correspondence from stakeholders, including covered entities, states, individuals, and patient advocates; and reviewed correspondence to HHS from Members of Congress.[FN17] The modifications made to the Privacy Rule by this final rule are the result of this work.

*B. Effective and Compliance Dates*

### 1. 2023 Privacy Rule NPRM

In the 2023 Privacy Rule NPRM, the Department proposed an effective date for a final rule that would occur 60 days after publication, and a compliance date that would occur 180 days after the effective date.[FN18] Taken together, the two dates would give entities 240 days after publication to implement compliance measures. In the preamble to the proposed rule, the Department stated that it did not believe that the proposed rule would pose unique implementation challenges that would justify an extended compliance period (i.e., a period longer than the standard 180 days provided in 45 CFR 160.105).[FN19] The Department also asserted that adherence to the standard compliance period is necessary to timely address the circumstances described in the 2023 Privacy Rule NPRM.

### 2. Overview of Comments

A commenter urged the Department to move quickly to issue the final rule and to provide a 180-day compliance period  **\*32979** as proposed. Some commenters requested that the Department provide additional time for regulated entities to comply with the proposed modifications to the Privacy Rule. Several commenters requested that the Department coordinate compliance deadlines across its rulemakings, while a few commenters specifically encouraged the Department to provide additional time for compliance with the modifications to the Notice of Privacy Practices (NPP) requirements proposed in the 2023 Privacy Rule NPRM.

### 3. Final Rule

This final rule is effective on June 25, 2024. Covered entities and business associates of all sizes will have 180 days beyond the effective date of the final rule to comply with the final rule's provisions, with the exception of the NPP provisions, which we address separately below. We understand that some covered entities and business associates remain concerned that a 180-day period may not provide sufficient time to come into compliance with the modified requirements. However, we believe that providing a 180-day compliance period best comports with section 1175(b)(2) of the Social Security Act of 1935 (SSA), 42 U.S.C. 1320d-4, and our implementing provision at 45 CFR 160.104(c)(1), which require the Secretary to provide at least a 180-day period for covered entities to comply with modifications to standards and implementation specifications in the HIPAA Rules, and also that providing a 180-day compliance period best protects the privacy and security of individuals' PHI in a timely manner that reflects the urgency of addressing the changes in the legal landscape and their effects on individuals, regulated entities, and other persons, while balancing the burden imposed upon regulated entities of implementing this final rule.

Section 160.104(a) permits the Department to adopt a modification to a standard or implementation specification adopted under the Privacy Rule no more frequently than once every 12 months.[FN20] As discussed above, we are required to provide a minimum of a 180-day compliance period when adopting a modification, but we are permitted to provide a longer compliance period based on the extent of the modification and the time needed to comply with the modification in determining the compliance date for the modification.[FN21] The Department makes every effort to consider the burden and cost of implementation for regulated entities when determining an appropriate compliance date.

While we recognize that regulated entities will need to revise and implement changes to their policies and procedures in response to the modifications in this final rule, we do not believe that these changes are so significant as to require more than a 180-day compliance period. This final rule narrowly tailors the application of its changes to certain limited circumstances involving lawful reproductive health care and clarifies that regulated entities are not expected to know or be aware of laws other than those with which they are required to comply. While it adds a condition to certain requests for uses and disclosures, the affected requests already require careful review by regulated entities for compliance with previously imposed conditions. Thus, we do not believe it will be difficult for regulated entities to adjust their policies and procedures to accommodate this new requirement. The other modifications finalized in this rule are in service of implementing the two changes above and impose minimal burden on regulated entities. Additionally, the Department believes, based on its evaluation of the evolving privacy landscape, that the changes made by this final rule are of particular urgency. Accordingly, we believe that a 180-day compliance period, combined

with a 60-day effective date, is sufficient for regulated entities to make the changes required by most of the modifications in this final rule, with the exception of the NPP provisions.

We separately consider the question of the compliance date for the modifications to the NPP provisions. In the 2022 Confidentiality of Substance Use Disorder (SUD) Patient Records NPRM ("2022 Part 2 NPRM"),[FN22] the Department proposed, among other things, to revise 45 CFR 164.520 as required by section 3221 of the Coronavirus Aid, Relief, and Economic Security (CARES) Act.[FN23] The Department proposed to provide the same compliance date for both the proposed modifications to 45 CFR 164.520 and the more extensive modifications to 42 CFR part 2 ("Part 2").[FN24] The 2024 Confidentiality of Substance Use Disorder (SUD) Patient Records Final Rule ("2024 Part 2 Rule") explicitly noted that the Department was not finalizing the proposed modifications to the NPP provisions at that time, but that we planned to do so in a future HIPAA final rule.[FN25] The Department also acknowledged that some covered entities might have NPPs that would not reflect updated changes to policies and procedures addressing how Part 2 records are used and disclosed. Rather than requiring covered entities to revise their NPPs twice in a short period of time, the Department announced in the 2024 Part 2 Rule that it would exercise enforcement discretion related to the requirement that covered entities update their NPPs whenever material changes are made to privacy practices until the compliance date established by a future HIPAA final rule.[FN26] The Department is finalizing the modifications to the NPP required by section 3221 of the CARES Act in this rule and aligning the effective and compliance dates for all of the modified NPP requirements with those of the 2024 Part 2 Rule.

The compliance date of the 2024 Part 2 Rule is February 16, 2026, substantially later than the compliance date for most of this final rule, because of the significant changes required for compliance with the 2024 Part 2 Rule. Accordingly, in compliance with 45 CFR 160.104 and consistent with the NPP proposals included in the 2022 Part 2 NPRM and public comment, we are aligning the compliance date for the NPP changes required by this final rule with the compliance date for the 2024 Part 2 Rule so that covered entities regulated under both rules can implement all changes to their NPPs at the same time. Covered entities are expected to be in compliance with the modifications to 45 CFR 164.520 on February 16, 2026.

### 4. Response to Public Comments

Comment: One commenter expressed support for the proposal in the 2023 Privacy Rule NPRM to establish a 180-day compliance date and urged the Department to issue a final rule quickly. Some commenters sought an extension of the compliance date for twelve to eighteen months, explaining that extensive policy and legal work, process and software changes, documentation and training would be required to implement the 2023 Privacy Rule NPRM.

One commenter suggested phasing in the attestation requirement so that "downstream" regulated entities, such as business associates and managed care organizations, would have a later compliance date than health care providers.

 **\*32980**  Response: We appreciate the commenters' suggestions, but as discussed above, based on our assessment, we do not believe the modifications required by this final rule will require longer to implement.

Comment: Some commenters requested that the Department coordinate compliance deadlines of final rules that revise the Privacy Rule or publish one final rule addressing the proposals in the NPRMs to enable regulated entities to leverage the resources required to implement the changes to achieve compliance with all of the new requirements at one time.

One commenter explained that each NPRM would involve operational changes requiring significant resources and effort and expressed their belief that a single comprehensive final rule would allow regulated entities to make all of the required changes, including revisions to policies and procedures, development of new or revised workflows, electronic health record (EHR) updates, and technology enhancements.

Response: We appreciate the commenters' suggestion, but we do not believe that it is necessary to fully align the compliance dates for the 2024 Part 2 Rule and the 2024 Privacy Rule. By imposing separate compliance deadlines, we are able to act more quickly to protect the privacy of PHI.

However, consistent with 45 CFR 160.104 and as requested by public comment, we are applying the same compliance date for covered entities to revise their NPPs to address modifications made to 45 CFR 164.520 in response to and consistent with the CARES Act and to support reproductive health care privacy. The compliance date for the NPP provisions is February 16, 2026. [FN27] Part 2 programs, including those that are covered entities, can choose to implement the changes to their NPPs that are required by the 2024 Part 2 Rule prior to the compliance date, but there is no requirement that they do so.


## II. Statutory and Regulatory Background

### A. Statutory Authority and History

#### 1. Health Insurance Portability and Accountability Act of 1996 (HIPAA)

In 1996, Congress enacted HIPAA [FN28] to reform the health care delivery system to "improve portability and continuity of health insurance coverage in the group and individual markets." [FN29] To enable health care delivery system reform, Congress included in HIPAA requirements for standards to support the electronic exchange of health information. According to section 261, "[i]t is the purpose of this subtitle to improve [. . .] the efficiency and effectiveness of the health care system, by encouraging the development of a health information system through the establishment of standards and requirements for the electronic transmission of certain health information [. . .]." [FN30] Congress applied the Administrative Simplification provisions directly to three types of entities known as "covered entities"—health plans, health care clearinghouses, and health care providers who transmit information electronically in connection with a transaction for which HHS has adopted a standard.[FN31]

Section 262(a) of HIPAA required the Secretary to adopt uniform standards "to enable health information to be exchanged electronically." [FN32] Congress directed the Secretary to adopt standards for unique identifiers to identify individuals, employers, health plans, and health care providers across the nation [FN33] and standards for, among other things, transactions and data elements relating to health information,[FN34] the security of that information,[FN35] and verification of electronic signatures.[FN36]

Congress recognized that the standardization of certain electronic health care transactions required by HIPAA posed risks to the privacy of confidential health information and viewed individual privacy, confidentiality, and data security as critical for orderly administrative simplification.[FN37] Thus, as explained in the preamble to the 2023 Privacy Rule NPRM,[FN38] Congress provided the Department with the authority to regulate the privacy of IIHI. According to one Member of Congress, privacy standards would create an additional layer of protection beyond the oath pledged by health care providers to keep information secure and, as described by another Member, would further protect information from being used in a "malicious or discriminatory manner." [FN39] Congress intended for the law to enhance individuals' trust in health care providers, which required that the law provide additional protection for the confidentiality of IIHI. As described by a Member of Congress: "The bill would also establish strict security standards for health information because Americans clearly want to make sure that their health care records can only be used by the medical professionals that treat them. Often, we assume that because doctors take an oath of confidentiality that in fact all who touch their records operate by the same standards. Clearly, they do not." [FN40] Moreover, Congress considered that health care reform required an approach that would not compromise privacy as health information became more accessible.[FN41]

Accordingly, section 264(a) directed the Secretary to submit to Congress detailed recommendations for Federal "standards with respect to the privacy of [IIHI]" nationwide within one year of HIPAA's enactment.[FN42] The statute made clear that the Secretary had the authority to promulgate regulations if Congress did not enact legislation covering these matters within three years.[FN43] Congress directed the Secretary to ensure that the regulations promulgated "address at least" the following three subjects: (1) the rights that an individual who is a subject of IIHI should have; (2) the procedures that should be established for the exercise of such rights; and (3) the uses and disclosures of such information that should be authorized or required.[FN44]

Additionally, Congress provided a clear statement that HIPAA's provisions would "supersede any contrary **\*32981** provision of State law," with certain limited exceptions.[FN45] One exception to this general preemption authority is for "state privacy laws that are contrary to and more stringent than the corresponding federal standard, requirement, or implementation specification." [FN46] Thus, Congress intended for the Department to create privacy standards to safeguard health information while respecting the ability of states to provide individuals with additional health information privacy.

Congress required the Secretary to consult with the NCVHS,[FN47] thereby ensuring that the Secretary's decisions reflected public and expert involvement and advice in carrying out the requirements of section 264.[FN48] NCVHS sent its initial recommendations to the Secretary in a letter to the Secretary on June 27, 1997. Importantly, NCVHS advised that "strong substantive and procedural protections" should be imposed if health information were to be disclosed to law enforcement, and, where identifiable health information would be made available for non-health purposes, individuals should be afforded assurances that their data would not be used against them.[FN49] Additionally, NCVHS "unanimously" recommended that "[. . .] the Secretary and the Administration assign the highest priority to the development of a strong position on health privacy that provides the highest possible level of protection for the privacy rights of patients." [FN50] NCVHS further noted that failure to do so would "undermine public confidence in the health care system, expose patients to continuing invasions of privacy, subject record keepers to potentially significant legal liability, and interfere with the ability of health care providers and others to operate the health care delivery and payment system in an effective and efficient manner," which would undermine what Congress intended.[FN51]

NCVHS further recommended that "any rules regulating disclosures of identifiable health information be as clear and as narrow as possible. Each group of users must be required to justify their need for health information and must accept reasonable substantive and procedural limitations on access." [FN52] According to NCVHS, this would allow for the disclosures that society deemed necessary and appropriate while providing individuals with clear expectations regarding their health information privacy.

As we noted in the 2023 Privacy Rule NPRM,[FN53] Congress contemplated that the Department's rulemaking authorities under HIPAA would not be static. Congress specifically built in a mechanism to adapt such regulations as technology and health care evolve, directing that the Secretary review and modify the Administrative Simplification standards as determined appropriate, but not more frequently than once every 12 months.[FN54] That statutory directive complements the Secretary's general rulemaking authority to "make and publish such rules and regulations, not inconsistent with this chapter, as may be necessary to the efficient administration of the functions with which each is charged under this chapter." [FN55]

## 2. Health Information Technology for Economic and Clinical Health (HITECH) Act

On February 17, 2009, Congress enacted the Health Information Technology for Economic and Clinical Health Act of 2009 (HITECH Act) [FN56] to promote the widespread adoption and standardization of health information technology (health IT). The HITECH Act included additional HIPAA privacy and security requirements for covered entities and business associates and expanded certain rights of individuals with respect to their PHI.

Congress understood the importance of a relationship between a connected health IT landscape, "a necessary and vital component of health care reform," [FN57] and privacy and security standards when it enacted the HITECH Act. The Purpose statement of an accompanying House of Representatives report [FN58] on the Energy and Commerce Recovery and Reinvestment Act [FN59] recognizes that "[i]n addition to costs, concerns about the security and privacy of health information have also been regarded as an obstacle to the adoption of [health IT]." The Senate Report for S. 336 [FN60] similarly acknowledges that "[i]nformation technology systems linked securely and with strong privacy protections can improve the quality and efficiency of health care while producing significant cost savings." [FN61] As the Department explained in the 2013 regulation referred to as the "Omnibus Rule" [FN62] and discussed in greater detail below, the HITECH Act's additional HIPAA privacy and security requirements [FN63] supported Congress' goal of promoting widespread adoption and interoperability of health IT by "strengthen[ing] the privacy and security protections for health information established by HIPAA." [FN64]

In passing the HITECH Act, Congress instructed the Department that any new health IT standards adopted under section 3004 of the Public Health Service Act (PHSA) must take into account the privacy and security requirements of the HIPAA Rules. [FN65] Congress also affirmed that the existing HIPAA Rules were to remain in effect to the extent that they are consistent with the HITECH Act and directed the Secretary to revise the HIPAA Rules as necessary for consistency with the **\*32982** HITECH Act.[FN66] Congress confirmed that the new law was not intended to have any effect on authorities already granted under HIPAA to the Department, including section 264 of that statute and the regulations issued under that provision.[FN67] Congress thus affirmed the Secretary's ongoing rulemaking authority to modify the Privacy Rule's standards and implementation specifications as often as every 12 months when appropriate, including to strengthen privacy and security protections for IIHI.

## B. Regulatory History

The Secretary has delegated the authority to administer the HIPAA Rules and to make decisions regarding their implementation, interpretation, and enforcement to the HHS Office for Civil Rights (OCR).[FN68] Since the enactment of the HITECH Act, the Department has exercised its authority to modify the Privacy Rule several times—in 2013, 2014, and 2016.[FN69]

## 1. 2000 Privacy Rule

As directed by HIPAA, the Department provided a series of recommendations to Congress for a potential new law that would address the confidentiality of IIHI.[FN70] Congress did not act within its three-year self-imposed deadline. Accordingly, the Department published a proposed rule on November 3, 1999,[FN71] and issued the first final rule establishing "Standards for Privacy of Individually Identifiable Health Information" ("2000 Privacy Rule") on December 28, 2000.[FN72]

The primary goal of the Privacy Rule was to provide greater protection to individuals' privacy to engender a trusting relationship between individuals and health care providers. As announced, the final rule set standards to protect the privacy of IIHI to "begin to address growing public concerns that advances in electronic technology and evolution in the health care industry are resulting, or may result, in a substantial erosion of the privacy surrounding" health information.[FN73] On the eve of that rule's issuance, the President issued an Executive Order recognizing the importance of protecting individual privacy, explaining that "[p]rotecting the privacy of patients' protected health information promotes trust in the health care system. It improves the quality of health care by fostering an environment in which patients can feel more comfortable in providing health care professionals with accurate and detailed information about their personal health." [FN74]

Since its promulgation, the Privacy Rule has protected PHI by limiting the circumstances under which covered entities and their business associates (collectively, "regulated entities") are permitted or required to use or disclose PHI and by requiring covered entities to have safeguards in place to protect the privacy of PHI. In adopting these regulations, the Department acknowledged the need to balance several competing factors, including existing legal expectations, individuals' privacy expectations, and societal expectations.[FN75] The Department noted in the preamble that the large number of comments from individuals and groups representing individuals demonstrated the deep public concern about the need to protect the privacy of IIHI and constituted evidence of the importance of protecting privacy and the potential adverse consequences to individuals and their health if such protections are not extended.[FN76] Through its policy choices in the 2000 Privacy Rule, the Department struck a balance between competing interests—the necessity of protecting privacy and the public interest in using identifiable health information for vital public and private purposes—in a way that was also workable for the varied stakeholders.[FN77]

In the 2000 Privacy Rule, the Department established "general rules" for uses and disclosures of PHI, codified at 45 CFR 164.502.[FN78] The 2000 Privacy Rule also specified the circumstances in which a covered entity was required to obtain an individual's consent,[FN79] authorization,[FN80] or the opportunity for the individual to agree or object.[FN81] Additionally, it established rules for when a covered entity is permitted to use or disclose PHI without an individual's consent, authorization, or opportunity to agree or object.[FN82] In particular, the Privacy Rule permits certain uses and disclosures of PHI, without the individual's authorization, for identified activities that benefit the community, such as public health activities, judicial and administrative proceedings, law enforcement purposes, and research.[FN83]

The Privacy Rule also established the rights of individuals with respect to their PHI, including the right to receive adequate notice of a covered entity's privacy practices, the right to request restrictions of uses and disclosures, the right to access (i.e., to inspect and obtain a copy of) their PHI, the right to request an amendment of their PHI, and the right to receive an accounting of disclosures.[FN84]

In the 2000 Privacy Rule, the Secretary exercised her statutory authority to adopt 45 CFR 160.104(a), which reserves the Secretary's ability to modify any standard or implementation specification adopted under the Administrative Simplification provisions.[FN85] The Secretary first invoked this modification authority to amend the Privacy Rule in 2002 [FN86] and made additional modifications in 2013,[FN87] and 2016,[FN88] as described below.


## 2. 2002 Privacy Rule

After publication of the 2000 Privacy Rule, the Department received many inquiries and unsolicited comments about the Privacy Rule's effects and operation. As a result, the Department opened the 2000 Privacy Rule for further comment in February 2001, less than one month before the effective date and 25 months before the compliance date for most covered entities, and issued clarifying guidance on its implementation.[FN89] NCVHS' Subcommittee on Privacy, Confidentiality and Security held public **\*32983** hearings about the 2000 Privacy Rule. From those hearings, the Department obtained additional information about concerns related to key provisions and their potential unintended consequences for health care quality and access.[FN90] On March 27, 2002, the Department proposed modifications to the 2000 Privacy Rule to clarify the requirements and correct potential problems that could threaten access to, or quality of, health care.[FN91]

In response to comments on the proposed rule, the Department finalized modifications to the Privacy Rule on August 14, 2002 ("2002 Privacy Rule").[FN92] This final rule clarified HIPAA's requirements while maintaining strong protections for the privacy of IIHI.[FN93] These modifications addressed certain workability issues, including but not limited to clarifying distinctions between health care operations and marketing; modifying the minimum necessary standard to exclude disclosures authorized by individuals and clarify its operation; eliminating the consent requirement for uses and disclosures of PHI for treatment, payment, or health care operations (TPO) and to otherwise clarify the role of consent in the Privacy Rule; and making other modifications and conforming amendments consistent with the proposed rule. The Department also included modifications to the provisions permitting the use or disclosure of PHI for public health activities and for research activities without consent, authorization, or an opportunity to agree or object.


## 3. 2013 Omnibus Rule

Following the enactment of the HITECH Act, the Department issued an NPRM, entitled "Modifications to the HIPAA Privacy, Security, and Enforcement Rules Under the Health Information Technology for Economic and Clinical Health [HITECH] Act" ("2010 NPRM"),[FN94] which proposed to implement certain HITECH Act requirements. In 2013, the Department issued the final rule, Modifications to the HIPAA Privacy, Security, Enforcement, and Breach Notification Rules Under the Health Information Technology for Economic and Clinical Health [HITECH] Act and the Genetic Information Nondiscrimination Act, and Other Modifications to the HIPAA Rules ("2013 Omnibus Rule"),[FN95] which implemented many of the new HITECH Act requirements, including strengthening individuals' privacy rights related to their PHI.

The Department also finalized regulatory provisions that were not required by the HITECH Act, but were necessary to address the workability and effectiveness of the Privacy Rule and to increase flexibility for and decrease burden on regulated entities.[FN96] In the 2010 NPRM, the Department noted that it had not amended the Privacy Rule since 2002.[FN97] It further explained that information gleaned from contact with the public since that time, enforcement experience, and technical corrections needed to eliminate ambiguity provided the impetus for the Department's actions to make certain regulatory changes. [FN98]

For example, the Department modified its prior interpretation of the Privacy Rule requirement at 45 CFR 164.508(c)(1)(iv) that a description of a research purpose must be study specific.[FN99] The Department explained that, under its new interpretation,

the research purposes need only be described adequately such that it would be reasonable for an individual to expect that their PHI could be used or disclosed for such future research.[FN100] In the 2013 Omnibus Rule, the Department explained that this change was based on the concerns expressed by covered entities, researchers, and other commenters on the 2010 NPRM that the former requirement did not represent current research practices. The Department provided a similar explanation for its modifications to the Privacy Rule that permit certain disclosures of student immunization records to schools without an authorization.[FN101] Additionally, based on a recommendation made at an NCVHS meeting, the Department requested comment on and finalized proposed revisions to the definition of PHI to exclude information regarding an individual who has been deceased for more than 50 years.[FN102] For the latter, the Department noted that it was balancing the privacy interests of decedents' living relatives and other affected individuals against the legitimate needs of public archivists to obtain records. [FN103]

None of the changes described in the paragraph above were required by the HITECH Act. Rather, the Department determined that it was necessary to promulgate these changes pursuant to its existing general rulemaking authority under HIPAA. NCVHS and the public also recommended other changes between the publication of the 2002 Privacy Rule and the 2013 Omnibus Rule, including the creation of specific categories of PHI, such as "Sexuality and Reproductive Health Information" that would allow for special protections of such PHI.[FN104] The Department declined to propose specific protections for certain categories of PHI at that time because of concerns about the ability of regulated entities to segment PHI and the effects on care coordination. Many of those concerns are still present and so, the Department did not propose and determined not to establish a specific category of particularly sensitive PHI in this rulemaking. Instead, as discussed more fully below, the Department is finalizing a purpose-based prohibition against certain uses and disclosures.

**\*32984  4. 2024 Privacy Rule**
On April 17, 2023, the Department issued an NPRM [FN105] to modify the Privacy Rule for the purpose of prohibiting uses and disclosures of PHI for criminal, civil, or administrative investigations or proceedings against persons for seeking, obtaining, providing, or facilitating reproductive health care that is lawful under the circumstances in which it is provided. To properly execute the HIPAA statutory mandate, and in accordance with the regulatory authority granted to it by Congress, the Department continually monitors and evaluates the evolving environment for health information privacy nationally, including the interaction of the Privacy Rule and state statutes and regulations governing the privacy of health information. In keeping with the Department's practice, this final rule accommodates state autonomy to the extent consistent with the need to maintain rules for health information privacy that serve HIPAA's objectives. The regulation thus preempts state law only to the extent necessary to achieve Congress' directive to establish a standard for the privacy of IIHI for the purpose of improving the effectiveness of the health care system. As discussed below, achieving that objective requires individuals to trust that their health care providers will maintain privacy of PHI about lawful reproductive health care. In addition, NCVHS held a virtual public meeting that included a discussion about the proposed rule on June 14, 2023,[FN106] and provided recommendations to the Department based on this discussion, briefings at their July 2022 [FN107] and December 2022 [FN108] meetings, and the expertise of its members. [FN109] The resultant public record and subsequent recommendations submitted to the Department by NCVHS, along with other public comments on the 2023 Privacy Rule NPRM, informed the development of these modifications.

## III. Justification for This Rulemaking

*A. HIPAA Encourages Trust and Confidence by Carefully Balancing Individuals' Privacy Interests With Others' Interests in Using or Disclosing PHI*

**1. Privacy Protections Ensure That Individuals Have Access to, and Are Comfortable Accessing, High-Quality Health Care**
The goal of a functioning health care system is to provide high-quality health care that results in the best possible outcomes for individuals. To achieve that goal, a functioning health care system depends in part on individuals trusting health care providers. Thus, trust between individuals and health care providers is essential to an individual's health and well-being.[FN110] Protecting

the privacy of an individual's health information is "a crucial element for honest health discussions." [FN111] The original Hippocratic Oath required physicians to pledge to maintain the confidentiality of health information they learn about individuals. [FN112] Without confidence that private information will remain private, individuals—to their own detriment—are reluctant to share information with health care providers.

When proposing the 2000 Privacy Rule, the Department recognized that individuals may be deterred from seeking needed health care if they do not trust that their sensitive information will be kept private.[FN113] The Department described its policy choices as stemming from a motivation to develop and maintain a relationship of trust between individuals and health care providers. The Department explained that a fundamental assumption of the 2000 Privacy Rule was that the greatest benefits of improved privacy protection would be realized in the future as individuals gain increasing trust in their health care provider's ability to maintain the confidentiality of their health information.[FN114] As a result, the Privacy Rule strengthened protections for health information privacy, including the right of individuals to determine who has access to their health information.

Despite the Privacy Rule's rights and protections, individuals do not have confidence that their IIHI is being protected adequately. In a 2022 survey on patient privacy, the American Medical Association (AMA) found that, of 1,000 patients surveyed: (1) nearly 75% were concerned about protecting the privacy of their own health information; and (2) 59% of patients worried about health data being used by companies to discriminate against them or their loved ones.[FN115] According to the AMA, a lack of health information privacy raises many questions about circumstances that could put individuals and health care providers in legal peril, and that the "primary purpose of increasing [health information] privacy is to build public trust, not inhibit data exchange." [FN116]

The Federal Government also has a strong interest in ensuring that individuals have access to high-quality health care.[FN117] This is true at both an **\*32985** individual and population level. In the 2000 Privacy Rule, the Department noted that high-quality health care depends on an individual being able to share sensitive information with their health care provider based on the trust that the information shared will be protected and kept confidential.[FN118] An effective health care system requires an individual to share sensitive health information with their health care providers. They do so with the reasonable expectation that this information is going to be used to treat them. The prospect of the disclosure of highly sensitive PHI by regulated entities can result in medical mistrust and the deterioration of the confidential, safe environment that is necessary to provide high-quality health care, operate a functional health care system, and improve the public's health generally.[FN119] High-quality health care cannot be attained without patient candor. Health care providers rely on an individual's health information to diagnose them and provide them with appropriate treatment options and may not be able to reach an accurate diagnosis or recommend the best course of action for the individual if the individual's medical records lack complete information about their health history. However, an individual may be unwilling to seek treatment or share highly sensitive PHI when they are concerned about the confidentiality and security of PHI provided to treating health care providers.[FN120] The Department has long recognized that health care professionals who lose the trust of their patients cannot deliver high-quality care.[FN121] Similarly, if a health care provider does not trust that the PHI they include in an individual's medical records will be kept private, the health care provider may leave gaps or include inaccuracies when preparing medical records, creating a risk that ongoing or future health care would be compromised. In contrast, heightened confidentiality and privacy protections enable a health care provider to feel confident maintaining full and complete medical records.

Incomplete medical records and health care avoidance not only inhibit the quality of health care an individual receives; they are also detrimental to efforts to improve public health. The objective of public health is to prevent disease in and improve the health of populations. Barriers that undermine the willingness of individuals to seek health care in a timely manner or to provide complete and accurate health information to their health care providers undermine the overall objective of public health. For example, individuals who are not candid with their health care providers because of concerns about potential negative consequences of a loss of privacy may withhold information about a variety of health matters that have public health implications, such as communicable diseases or vaccinations.[FN122] Experience also shows that medical mistrust—especially in communities of color and other communities that have been marginalized or negatively affected by historical and current

health care disparities—can create damaging and chilling effects on individuals' willingness to seek appropriate and lawful health care for medical conditions that can worsen without treatment.[FN123]

**2. The Department's Approach to the Privacy Rule Has Long Sought To Balance the Interests of Individuals and Society**

While recognizing the importance of preserving individuals' trust, the Department has consistently taken the approach of balancing the interests of the individual in the privacy of their PHI with society's interests, including in the free flow of information that enables the provision of effective and efficient health care services. Such an approach derives from Congress's direction, in 1996, to improve the efficiency and effectiveness of the health care system by encouraging the development of a health information system while taking into account the privacy of IIHI and the uses and disclosures of such information that should be authorized or required.[FN124] In past rulemakings, the Department has made revisions to the Privacy Rule to balance an individual's privacy expectations with a covered entity's need for information for reimbursement and quality purposes.[FN125] As the Department previously explained, "Patient privacy must be balanced against other public goods, such as research and the risk of compromising such research projects if researchers could not continue to use such data." [FN126] The 2000 Privacy Rule included permissions for regulated entities to disclose PHI under certain conditions, including for judicial and administrative proceedings and law enforcement purposes, because an individual's right to privacy in information about themselves is not absolute. For example, it does not prevent reporting of public health information on communicable diseases, nor does it prevent law enforcement **\*32986** from obtaining information when due process has been observed.[FN127]

In more recent rulemakings revising the Privacy Rule, the Department has continued its efforts to build and maintain individuals' trust in the health care system while balancing the interests of individuals with those of others. For example, in explaining revisions made as part of the 2013 Omnibus Rule, the Department recognized that covered entities must balance protecting the privacy of health information with sharing health information with those responsible for ensuring public health and safety. [FN128] The Privacy Rule was also revised in 2016 ("2016 Privacy Rule") in accordance with an administration-wide effort to curb gun violence across the nation.[FN129] The 2016 Privacy Rule was tailored to authorize the disclosure of a limited set of PHI [FN130] for a narrow, specific purpose, that is, to permit only regulated entities that are state agencies or other entities designated by a state to collect and report information to the National Instant Criminal Background Check System (NICS) or a lawful authority making an adjudication or commitment as described by 18 U.S.C. 922(g)(4) to disclose to NICS the identities of individuals who are subject to a Federal "mental health prohibitor," that disqualifies them from shipping, transporting, possessing, or receiving a firearm. As explained in the 2016 Privacy Rule, the Federal mental health prohibitor applies only to the extent that the individual is involuntarily committed or determined by a court or other lawful authority to be a danger to self or others, or is unable to manage their own affairs because of a mental illness or condition.[FN131] Similar to this final rule, the 2016 Privacy Rule balanced public safety goals with individuals' privacy interests by clearly limiting permissible disclosures to those that are necessary to ensure that individuals are not discouraged from seeking lawful health care, in this case, voluntary treatment for mental health needs.[FN132] In the 2013 Omnibus Rule and 2016 Privacy Rule, the Department ensured that the disclosures were necessary for the public good and were not for the purpose of harming the individual. This approach is consistent with the NCVHS recommendations to the Secretary relating to health information privacy: "The Committee strongly supports limiting use and disclosure of identifiable information to the minimum amount necessary to accomplish the purpose. The Committee also strongly believes that when identifiable health information is made available for non-health uses, patients deserve a strong assurance that the data will not be used to harm them." [FN133]

Consistent with Congress's directive to promulgate "standards with respect to the privacy of [IIHI]" that, among other things, address the "uses and disclosures of such information that should be authorized or required," [FN134] the Department recognizes a variety of interests with respect to health information. These include individuals' interests in the privacy of their health information, society's interests in ensuring the effectiveness of the health care system, and other interests of society in using IIHI for certain non-health care purposes. As part of balancing these interests, the Department has also recognized that it may be necessary to afford additional protection to certain types of health information because those types of information are particularly sensitive and often involve highly personal health care decisions. For example, the Department affords special privacy protections to psychotherapy notes. These protections are afforded in part because of the particularly sensitive information those notes contain and in part because of the unique function of these records, which are by definition maintained

separately from an individual's medical record.[FN135] As we previously explained, the primary value of psychotherapy notes is to the specific provider, and the promise of strict confidentiality helps to ensure that the patient will feel comfortable freely and completely disclosing very personal information essential to successful treatment.[FN136] The Department elaborated that even the possibility of disclosure may impede development of the confidential relationship necessary for successful treatment because of the sensitive nature of the problems for which individuals consult psychotherapists and the potential embarrassment that may be engendered by the disclosure of confidential communications made during counseling sessions.[FN137] Therefore, to support the development and maintenance of an individual's trust and protect the relationship between an individual and their therapist, the Privacy Rule permits the disclosure of psychotherapy notes without an individual's authorization only in limited circumstances, such as to avert a serious and imminent threat to health or safety. Those limited circumstances do not include judicial and administrative proceedings or law enforcement purposes unless the disclosure is "necessary to prevent or lessen a serious and imminent threat to the health or safety of a person or the public." [FN138]

Information about an individual's reproductive health and associated health care is also especially sensitive and has long been recognized as such. As stated in the AMA's Principles of Medical Ethics, the "decision to terminate a pregnancy should be made privately within the relationship of trust between patient and physician in keeping with the patient's unique values and needs and the physician's best professional judgment." [FN139] NCVHS first noted reproductive health information as an example of a category of health information commonly considered to contain sensitive information in **\*32987** 2006.[FN140] Between 2005 and 2010, NCVHS held nine hearings that addressed questions about sensitive information in medical records and identified additional categories of sensitive information beyond those addressed in Federal and state law, including "sexuality and reproductive health information." In several letters to the Secretary during that period, NCVHS recommended that the Department identify and define categories of sensitive information, including "reproductive health." [FN141] In a 2010 letter to the Secretary, NCVHS elaborated that, after extensive testimony on sensitive categories of health information, "reproductive health" should be expanded to "sexuality and reproductive health information," because:

Information about sexuality and reproductive history is often very sensitive. Some reproductive issues may expose people to political controversy (such as protests from abortion proponents), and public knowledge of an individual's reproductive history may place [them] at risk of stigmatization." Additionally, individuals may wish to have their reproductive history segmented so that it is not viewed by family members who otherwise have access to their records. Parents may wish to delay telling their offspring about adoption, gamete donation, or the use of other forms of assisted reproduction technology in their conception, and, thus, it may be important to have the capacity to segment these records.[FN142]

The Department did not provide specific protections for certain categories of PHI upon receipt of the recommendation or as part of the 2013 Omnibus Rule because of concerns about the ability of regulated entities to segment PHI and the effects on care coordination. While we recognized the sensitive nature of reproductive health information before this rulemaking, the Department believed that the Supreme Court's recognition of a constitutional right to abortion coupled with the privacy protections afforded by the HIPAA Rules provided the necessary trust to promote access to and quality of health care. As a result of the changed legal landscape for reproductive health care broadly, including abortion, the range of circumstances in which PHI about legal reproductive health care could be sought and used in investigations or to impose liability expanded significantly. Now that states have much broader power to criminalize and regulate reproductive choices—and that some states have already exercised that power in a variety of ways [FN143]—individuals legitimately have a far greater fear that especially sensitive information about lawful health care will not be kept private. This changed environment requires additional privacy protections to help restore the Privacy Rule's carefully-struck balance between individual and societal interests. Because the concerns regarding segmentation and the negative impact on care coordination remain, the Department did not propose and is not establishing a new category of particularly sensitive PHI in this final rule. Instead, as discussed more fully below, the Department is finalizing its proposed purpose-based prohibition against certain uses and disclosures.

### B. Developments in the Legal Environment Are Eroding Individuals' Trust in the Health Care System

The Supreme Court's decision in Dobbs overturned Roe v. Wade [FN144] and Planned Parenthood of Southeastern Pennsylvania v. Casey,[FN145] thereby enabling states to significantly restrict access to abortion.[FN146] Following the Supreme Court's

decision, the legal landscape has shifted as laws significantly restricting access to abortion have in fact become effective in some jurisdictions. This change has also led to questions about both the current and future lawfulness of other types of reproductive health care, and therefore, the ability of individuals to access such health care.[FN147] Thus, this shift may interfere with the longstanding expectations of individuals, established by HIPAA and the Privacy Rule, with respect to the privacy of their PHI. [FN148] For example, while the Privacy Rule currently permits, but does not require, uses and disclosures of PHI for certain purposes,[FN149] including when another law requires a regulated entity to make the use or disclosure,[FN150] regulated entities after Dobbs may feel compelled by other applicable law to use or disclose PHI to law enforcement or other persons who may use that health information against an individual, a regulated entity, or another person who has sought, obtained, provided, or facilitated reproductive health care, even when such health care is lawful in the circumstances in which the health care is obtained.[FN151]

As a consequence of these developments in Federal and state law, an individual's expectation of privacy of their health information (irrespective of whether an individual is or was pregnant) is threatened by the potential use or disclosure of PHI to identify persons who seek, obtain, provide, or facilitate lawful reproductive health care. Thus, these developments have created an environment in which individuals are more likely to fear that their PHI will be requested from regulated entities for use against individuals, health care providers, and others, merely because such persons sought, obtained, provided, or facilitated lawful reproductive health care.[FN152] The potential increased demand for PHI for these purposes is not limited to states in which providing or obtaining certain reproductive health care is no longer legal. Rather, the changes in the legal landscape have nationwide implications, not only because of their effects on the relationship between health care providers and individuals, but also because of the potential effects on the flow of health information across state lines. For example, an individual who travels out-of-state to obtain reproductive health care that is lawful under the circumstances in which it is provided may now be reluctant to have that information disclosed to a health care provider in their home state if they  **\*32988**  fear that it may then be used against them or a loved one in their home state. A health care provider may be unable to provide appropriate health care if they are unaware of the individual's recent health history, which could have significant negative health consequences. Individuals and health care providers may also be reluctant to disclose PHI to health plans with a multi-state presence because of concerns that one of those states will seek to obtain that PHI to investigate or impose liability on the individual or the health care provider, even if there is no nexus with that state other than the presence of the health plan in that state. Such reluctance may have significant ramifications for access to reproductive health care, given the cost associated with obtaining such health care, and health care generally.

Additionally, PHI is more likely to be transmitted across state lines as the electronic exchange of PHI increases because it is easier and more efficient to send information electronically. For instance, the Trusted Exchange Framework and Common Agreement (TEFCA) initiative established under the 21st Century Cures Act and the Centers for Medicare & Medicaid Services (CMS) Interoperability and Prior Authorization Final Rule will spur greater use and disclosure of PHI by regulated entities and to health apps and others.[FN153] Different components of a health information exchange/health information network (HIE/ HIN) may be located in different states, meaning that the PHI may be transmitted across state lines, and thus affected by laws severely restricting access to reproductive health care, even where both the health care and the recipient of the PHI are located in states where access to such health care is not substantially restricted.

According to commenters, individuals are increasingly concerned about the confidentiality of discussions with their health care providers. As a result, some individuals are not confiding fully in their health care providers, increasing the risk that their medical records will not be complete and accurate, leading to decreases in health care quality and safety. This lack of openness is also likely to affect the information and treatment recommendations health care providers provide to individuals because health care providers will not be sufficiently informed to provide thorough and accurate information and guidance.[FN154]

Individuals are not alone in their fears. Indeed, according to commenters, some health care providers are afraid to provide lawful health care because they are concerned that in doing so, they risk being subjected to investigation and possible liability.[FN155] The Department is aware that some health care providers, such as clinicians and pharmacies, are hesitant to provide lawful health care or lawfully prescribe or fill prescriptions for medications that can result in pregnancy loss, even when the health care or

those prescriptions are intended to treat individuals for other health matters, because of fear of law enforcement action.[FN156] Some health care providers are also not providing individuals with information to address concerns about their reproductive health, even where their communications would be lawful, out of fear of criminal prosecution, civil suit, or loss of their clinical license.[FN157] This may result in individuals making decisions about their health care with incomplete information, which could have serious implications for health outcomes. These fears also increase the risk that individual medical records will not be maintained with completeness and accuracy, which will in turn affect the quality of health care provided to individuals and their safety. Fears about potential prosecution, even when Federal law protects the actions of health care providers, are likely to negatively affect the accuracy of medical records maintained by health care providers and thereby harm individuals.

As explained by commenters and supported by research, these impingements on the privacy of health information about reproductive health care are likely to have a disproportionately greater effect on women, individuals of reproductive age, and individuals from communities that have been historically underserved, marginalized, or subject to discrimination or systemic disadvantage by virtue of their race, disability, social or economic status, geographic location, or environment.[FN158] Historically  **32989**  underserved and marginalized individuals are also more likely to be the subjects of investigations and other activities to impose liability for seeking or obtaining reproductive health care, even where such health care is lawful under the circumstances in which it is provided.[FN159] They are also less likely to have adequate access to legal counsel to defend themselves from such actions.[FN160] These inequities may be exacerbated where individuals face multiple, intersecting disparities, such as having limited English proficiency [FN161] and disability.[FN162] Such individuals are thus especially likely to be concerned that information they share with their health care providers about their reproductive health care will not remain private. This is particularly true considering the historic lack of trust, negative experiences, and fear of discrimination that many members of historically underrepresented and marginalized communities and communities of color have in the health care system; [FN163] such individuals are more likely to be deterred from seeking or obtaining health care—or from giving their health care providers full information.

Congress contemplated that the Department would need to modify standards adopted under HIPAA's Administrative Simplification provisions and directed the Secretary to review standards adopted under 42 U.S.C. 1320d-2 periodically. [FN164] In accordance with this directive and based on the Department's expertise and analysis and the recent developments in the legal landscape, there is a compelling need to provide additional protections to PHI about lawful reproductive health care. Accordingly, consistent with Congress's directions to the Department, in HIPAA, as amended by Genetic Information Nondiscrimination Act (GINA) and the HITECH Act, to establish standards and requirements for the electronic transmission of certain health information, including the privacy thereof, for the development of a health information system, the Department is restricting certain uses and disclosures of PHI for particular non-health care purposes to provide such protections.

### C. To Protect the Trust Between Individuals and Health Care Providers, the Department Is Restricting Certain Uses and Disclosures of PHI for Particular Non-Health Care Purposes

As discussed above, Congress enacted HIPAA to improve the efficiency and effectiveness of the health care system, which includes ensuring that individuals have trust in the health care system. Congress also directed the Department to develop standards with respect to the privacy of IIHI as part of its decision to encourage the development of a health information system. To preserve such trust, and to encourage the development and use of a nationwide health information system, it is appropriate and necessary for Federal law and policy to protect the confidentiality of medical records, especially those that are highly sensitive. Accordingly, to protect the trust between individuals and health care providers, this rule restricts certain uses and disclosures of PHI for particular non-health care purposes, i.e., for using or disclosing PHI to conduct a criminal, civil, or administrative investigation into or to impose criminal, civil, or administrative liability on any person for the mere act of seeking, obtaining, providing, or facilitating  **32990**  lawful reproductive health care, or to identify any person to initiate such activities.

Information about reproductive health care is particularly sensitive and requires heightened privacy protection. The Department's approach is consistent with efforts across the Federal Government. For example, the Department of Defense (DOD) has recognized such privacy concerns. In a memorandum to DOD leaders, the Secretary of Defense directed the DOD to "[e]stablish additional privacy protections for reproductive health care information" for service members and "[d]isseminate

guidance that directs Department of Defense health care providers that they may not notify or disclose reproductive health information to commanders unless this presumption is overcome by specific exceptions set forth in policy." [FN165] The Federal Trade Commission (FTC) has also recognized that information about personal reproductive matters is "particularly sensitive" and has committed to using the full scope of its authorities to protect consumers' privacy, including the privacy of their health information and other sensitive data.[FN166] In business guidance, the FTC explained that "[t]he exposure of health information and medical conditions, especially data related to sexual activity or reproductive health, may subject people to discrimination, stigma, mental anguish, or other serious harms." [FN167]

As discussed above, the Department has long provided special protections for psychotherapy notes because of the sensitivity around this information. However, unlike psychotherapy notes, which by their very nature are easily segregated, reproductive health information is not easily segregated. Additionally, regulated entities generally do not have the ability to segment certain PHI such that regulated entities could afford special protections for specific categories of PHI.[FN168] Where such technology is available, it is generally cost prohibitive and burdensome to implement.[FN169] Therefore, the Department did not propose, and is not finalizing, a newly defined subset of PHI. Creating such a subset would create barriers to disclosing PHI for care coordination because the PHI would need to be segregated from the remaining medical record. Instead, consistent with the Privacy Rule's longstanding overall approach,[FN170] the Department is finalizing a purpose-based prohibition against certain uses and disclosures. This rule seeks to protect individuals' privacy interests in their PHI about reproductive health care and the interests of society in an effective health care system by enabling individuals and licensed health care professionals to make decisions about reproductive health care based on a complete medical record, while balancing those interests with other interests of society in obtaining PHI for certain non-health care purposes.

To assist in effectuating this prohibition, the Department is also requiring regulated entities to obtain an attestation in certain circumstances from the person requesting the use or disclosure stating that the use or disclosure is not for a prohibited purpose. A person (including a regulated entity or someone who requests PHI) who knowingly and in violation of the Administrative Simplification provisions obtains or discloses IIHI relating to another individual would be subject to potential criminal liability.[FN171] Thus, a person who knowingly and in violation of HIPAA falsifies an attestation (e.g., makes a material misrepresentation about the intended uses of the PHI requested) to obtain (or cause to be disclosed) an individual's IIHI could be subject to the criminal penalties provided by the statute.[FN172] Additionally, a regulated entity is subject to potential civil penalties for violations of the HIPAA Rules, including a failure to obtain a valid attestation before disclosing PHI, where an attestation is required.[FN173] The purpose-based prohibition, in concert with the attestation, will restrict the use and disclosure of PHI about lawful reproductive health care where the use or disclosure could harm HIPAA's overall goals of increasing trust in the health care system, improving health care quality, and protecting individual privacy. At the same time, it will allow uses and disclosures that either support those goals or do not substantially interfere with their achievement.

Consistent with the Privacy Rule's approach, the Department is clarifying that the purpose-based prohibition applies only in certain circumstances, recognizing the interests of both the Federal Government and states while also protecting the information privacy interests of persons who seek, obtain, provide, or facilitate lawful reproductive health care. Thus, the Department is finalizing a Rule of  **\*32991**  Applicability that balances the privacy interests of individuals and the interests of society in an effective health care system with those of society in the use of PHI for other non-health care purposes by limiting the new prohibition to certain circumstances.

The Department's experience administering the Privacy Rule, research cited below, our assessment of the needs of individuals and health care providers in light of recent developments to the legal landscape, public comments, and the Regulatory Impact Analysis, in Section VI below, all provide support for the changes finalized in this rulemaking. These changes will improve individuals' confidence in the confidentiality of their PHI and their trust in the health care system, creating myriad benefits for the health care system. Balancing the privacy interests of individuals and the use of PHI for other societal priorities will continue to support an effective health care system, as Congress intended. This final rule will deter the creation of inaccurate and incomplete medical records, which will help to support the provision of appropriate lawful health care. Health care providers base their treatment recommendations on PHI contained within existing medical records, as well as information shared with them

directly by the individual. Thus, where individuals withhold information from their health care providers about lawful health care, health care providers may not be in possession of all of the necessary information to make an informed recommendation for an appropriate treatment plan, which may result in negative health outcomes at both the individual and population level. It will also improve the confidence of individuals, including among the Nation's most vulnerable communities, that they can securely seek or obtain or share that they sought or obtained lawful reproductive health care without that information being used or disclosed for the purpose of investigating or imposing liability on them for seeking or obtaining that lawful health care. By improving individuals' confidence and trust in their relationships with their health care providers, it will make individuals more likely to, for example, comply with preventative health screening recommendations, which will protect against a decline in individual and population health outcomes related to missed preventative health screenings. Additional intangible benefits from increased privacy protections in this area include enhanced support for survivors of rape, incest, and sex trafficking. The new attestation requirement discussed in greater detail below will help to assure regulated entities of their ability to operationalize these changes and avoid exposure to HIPAA liability for impermissible disclosures.

## IV. General Discussion of Public Comments

The Department received more than 25,900 comments in response to its proposed rule. Overall, these comments represent the views of approximately 51,500 individuals and 350 organizations. Slightly more than half of the individuals and organizations who shared their views expressed general support for the 2023 Privacy Rule NPRM and its objectives. Less than one percent expressed mixed views. Organizational commenters included professional and trade associations, including those representing medical professionals, health plans, health care providers, health information management professionals, health information management system vendors, release-of-information vendors, employers, epidemiologists, and attorneys. The Department also received comments from advocacy organizations, including those representing patients, privacy advocates, faith-based organizations, and civil rights organizations. The NCVHS also provided comments, as did members of Congress, state, local, and Tribal government officials and public health authorities. Other commenters included health care systems, hospitals, and health care professionals.

### A. General Comments in Support of the Proposed Rule

Comment: Many commenters expressed general support for the proposed rule and urged the Department to protect the privacy of individuals by limiting uses and disclosures of PHI for certain purposes where the use or disclosure of information is about reproductive health care that is lawful under the circumstances in which such health care is provided.

Many health care providers and individuals emphasized the importance of trusting relationships between individuals and their health care providers. According to individual commenters, a trusting relationship permits individuals to participate in sensitive and difficult conversations with their health care providers and enables health care providers to furnish high-quality and appropriate health care and to maintain accurate and complete medical records, including records that contain information about reproductive health care.

Many organizations also submitted comments that expressed agreement with the Department's position on the importance of the relationship between HIPAA and the HIPAA Rules and trust between individuals and health care providers. For example, an organization commented that privacy has long been a "hallmark" of medical care and agreed with the Department that Congress recognized this principle when it enacted HIPAA. Some organizations commented that the HIPAA framework of law and rules provides individuals with the necessary trust and confidence to seek reproductive health care without fear of being prosecuted or targeted by law enforcement, including in medical emergencies.

Other commenters stated that a trusting confidential relationship between an individual and a health care provider is an essential prerequisite to the delivery of high-quality health care. They also asserted that protective privacy laws, including HIPAA, help to ensure that individuals do not forgo health care.

Many individuals asserted that the proposed safeguards are urgently needed to provide individuals with the confidence to seek health care. According to the commenters, the proposal would increase the likelihood that pregnant individuals would receive essential health care, thus improving their overall well-being. One commenter expressed support for the proposal because they believe people should not be held liable or face punishment for seeking, obtaining, providing, or facilitating lawful health care. Another commenter expressed concerns that the increase in state legislation targeting reproductive health care has placed significant burdens on physicians and increased the risk of maternal morbidity and mortality for individuals.

A few commenters also expressed agreement with the Department's assertion that the proposed restrictions would clarify legal obligations of regulated entities with respect to the disclosure of PHI for certain non-health related purposes and would enable persons requesting PHI, including health plans, to better understand when such disclosures are permitted.

Response: The Department appreciates these comments and is finalizing the proposed rule with modification, as described in greater detail below. Consistent with HIPAA's goals, this final rule will support the development and maintenance of trust between individuals and their health care providers, encouraging individuals **\*32992** to be forthright with health care providers regarding their health history and providing valuable clarity to the regulated community and individuals concerning their privacy rights with respect to lawfully provided health care. In so doing, the Department helps to support access to health care by increasing individuals' confidence in the privacy of their PHI about lawfully provided reproductive health care. We are taking these actions as a result of our ongoing evaluation of the environment, including the legal landscape, and consistent with the Privacy Rule's longstanding balance of individual privacy and societal interests in PHI for non-health care purposes.

Comment: A wide cross-section of commenters, including individuals, health care providers, patient advocacy organizations, reproductive rights organizations, state law enforcement agencies, and others all agreed that individuals who frequently experience discrimination generally also experience it when seeking health care.

Many of these commenters urged the Department to recognize that there is a trust deficit in relationships between individuals and health care providers in communities that frequently experience discrimination. Many commenters cited scholarly journals and research articles showing that women of color especially suffer poorer medical outcomes, including higher maternal mortality and denial of medical interventions or treatments.

Commenters who answered the Department's request for comment about whether members of "historically underserved and minority communities" are more likely to be the subject of investigations into or proceedings against persons in connection with seeking, obtaining, providing, or facilitating lawful reproductive health care unanimously responded in the affirmative. Some commenters expressed concern about the current legal environment's disproportionately negative effect on the privacy of women and members of marginalized and historically underserved communities and communities of color, such as immigrants who might avoid obtaining health care because of fears that their PHI could be shared with government officials. In general, commenters encouraged the Department to consider the likely negative implications of reduced health information privacy when combined with these disparities on health outcomes for members of marginalized and historically underserved communities and communities of color when crafting the final rule.

Some commenters expressed concern about the current legal environment's disproportionately negative effect on the privacy of members of marginalized and historically underserved communities and communities of color, such as women of color, immigrants and American Indians and Alaska Natives, who might withhold information from health care providers or avoid obtaining health care because of fears that their PHI could be shared with government officials or used to investigate or impose liability on them.

Among commenters that addressed this topic, many supported the Department's proposed purpose-based prohibition. Commenters stated that the proposed rule would help to mitigate medical mistrust of individuals in marginalized and historically underserved communities and communities of color and reduce the racial disparities that result from the increased criminalization of reproductive health care.

WESTLAW  © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Several commenters also addressed the issue of the availability of legal counsel among these communities. A few commenters asserted that individuals who are members of marginalized and historically underserved communities and communities of color are less likely to have access to legal counsel, despite being more likely to be subjects of investigations into or proceedings against persons in connection with obtaining providing or facilitating lawful sexual and reproductive health care and cited to related studies.

Response: We appreciate these comments and thank commenters for sharing these important considerations. As we discussed in the 2023 Privacy Rule NPRM and again here, the experiences of individuals from communities that have been historically underserved, marginalized, or subject to discrimination or systemic disadvantage by virtue of their race, disability, social or economic status, geographic location, or environment have significant negative effects on their relationships with health care providers and their willingness to seek necessary health care. We agree that the current legal landscape has exacerbated the health inequities that these individuals encounter when seeking reproductive health care services. The Department expects that the steps we have taken in this rule will meaningfully strengthen the privacy of PHI about lawful reproductive health care, and as a result, will help to mitigate the exacerbation of health disparities for members of marginalized and historically underserved communities and communities of color.

The Department is actively working to reduce health disparities. In recent months, we released a new plan to address language barriers and strengthen language access in health care,[FN174] and issued three proposed rules to address health disparities: one to revise existing regulations to strengthen prohibitions against discrimination on the basis of a disability in health care and human services programs; [FN175] another to issue new regulations to advance non-discrimination in health and human service programs for the LGBTQI+ community; [FN176] and a third to revise existing regulations to prohibit discrimination on the basis of race, color, national origin, sex, age, and disability in a range of health programs.[FN177] The Department will continue to work to address these concerns, ensure that individuals have access to and do not forgo necessary health care, and build individuals' trust that health care providers can and will protect the privacy of individuals' sensitive health information.

Comment: A few commenters agreed with the Department's position that the proposed rule would appropriately protect individuals against growing threats to their privacy with respect to PHI about reproductive health care while permitting states to conduct law enforcement activities.

Response: The Privacy Rule always has and continues to balance privacy interests and other societal interests by permitting disclosures of PHI to support **32993** public policy goals, including disclosures to support certain criminal, civil, and administrative law enforcement activities; the operation of courts and tribunals; health oversight activities; the duties of coroners and medical examiners; and the reporting of child abuse, domestic violence, and neglect to appropriate authorities. We appreciate these comments that recognized the growing threat to the privacy of PHI and the need to strike an appropriate balance between ensuring health care privacy and conducting law enforcement activities. We are finalizing the proposed rule with modification as described in greater detail below.

### B. General Comments in Opposition to the Proposed Rule

Comment: Several commenters generally opposed the proposed rule because of their opposition to certain types of reproductive health care. Many commenters opposed the proposed rule generally because they believed that it would harm women and children. Other commenters expressed concern that the proposals would increase administrative burdens and costs for health care providers; impede parental rights; prevent mandatory reporting of child abuse or abuse, domestic violence, and neglect; infringe upon states' rights; thwart law enforcement investigations; inhibit disclosures for public health activities; and protect those who engage in unlawful activities.

Response: The modifications to the Privacy Rule in this final rule directly advance Congress' directive in HIPAA to improve the efficiency and effectiveness of the health care system by encouraging the development of a health information system through the establishment of standards and requirements for the electronic transmission of certain health information,[FN178] including

a standard for the privacy of IIHI that, among other things, addresses the "uses and disclosures of such information that should be authorized or required." [FN179] As discussed in greater detail elsewhere in this final rule, a trusting relationship between individuals and health care providers is the foundation of effective health care. A primary goal of the Privacy Rule is to ensure the privacy of an individual's PHI while permitting necessary uses and disclosures of PHI that enable high-quality health care and protect the health and well-being of all individuals, including women and children, and the public.

From the outset, the Department structured the Privacy Rule to ensure that individuals do not forgo lawful health care when needed—or withhold important information from their health care providers that may affect the quality of health care they receive out of a fear that their sensitive information would be revealed outside of their relationship with their health care provider. The Department has long been committed to protecting the privacy of PHI and providing the opportunity for an authentic, trusting relationship between individuals and health care providers. As we discussed in the 2023 Privacy Rule NPRM and again here, this final rule will help engender trust between individuals and health care providers and confidence in the health care system. We believe that this confidence will eliminate some of the burdens health care providers face in providing high-quality health care, encourage health care providers to accurately document PHI in an individual's medical record, and encourage individuals to provide health care providers with their complete and accurate health history, all of which will ultimately support better health outcomes. Nothing in this final rule sets forth a particular standard of care or affects the ability of health care providers to exercise their professional judgment.

This final rule protects the relationship between individuals and health care providers by protecting the privacy of PHI in circumstances where recent legal developments have increased concerns about that information being used and disclosed to harm persons who seek, obtain, provide, or facilitate reproductive health care under circumstances in which such health care is lawful, while continuing to permit uses and disclosures that confer other social benefits. It is narrowly tailored and respects the interests of both states and the Department. The final rule continues to permit regulated entities to use or disclose PHI to comply with certain mandatory reporting laws, for public health activities, and for law enforcement purposes when the uses and disclosures are compliant with the applicable provisions of the Privacy Rule.

Further, consistent with the longstanding operation of the Privacy Rule, this final rule requires that, in certain circumstances, regulated entities obtain information from persons requesting PHI, such as law enforcement, before the regulated entities may use or disclose the requested PHI. The Department recognizes that this final rule may increase the burden on those persons making requests for PHI, such as federal and state law enforcement officials, by requiring, in certain circumstances, that regulated entities obtain more information from such persons than previously required, and may, at times, prevent regulated entities from using or disclosing PHI that they previously would have been permitted to use or disclose. For example, the Department recognizes that situations may arise where a regulated entity reasonably determines that reproductive health care was lawfully provided, while at the same time, the person requesting the PHI (e.g., law enforcement) reasonably believes otherwise. In such circumstances, where the regulated entity provided the reproductive health care, and upon receiving a request for the PHI for a purpose that implicates the prohibition, reasonably determines that the provision of reproductive health care was lawful, the final rule would prohibit the regulated entity from disclosing PHI for certain types of investigations into the provision of such health care. This constitutes a change from the current Privacy Rule, under which a regulated entity is permitted, but not required, to make a use or disclosure under 45 CFR 164.512(f) of information that is "relevant and material to a legitimate" law enforcement inquiry, provided that certain conditions are met; these conditions include, for example, that the request is specific and limited in scope to the extent reasonably practicable given the purpose for which the information is sought.[FN180] Similarly, the Department acknowledges that, where the regulated entity did not provide the reproductive health care that is the subject of the investigation or imposition of liability, the Rule of Applicability and Presumption, discussed below, may require regulated entities to obtain additional information, that is, factual information that demonstrates to the regulated entity a substantial factual basis that the reproductive health care was not lawful under the specific circumstances in which it was provided, from persons requesting PHI before using or disclosing the requested PHI.

Consistent with HIPAA and the Department's longstanding approach in the Privacy Rule, the Department is finalizing an approach that strikes an appropriate balance between the privacy interests of individuals and the interests of law enforcement,

and private parties afforded legal rights of action, in **\*32994** obtaining PHI for certain non-health care purposes. While this approach may adversely affect particular interests of law enforcement, and private parties afforded legal rights of action, in some cases, the Department believes that the final rule best balances these competing interests by enhancing privacy protections without unduly interfering with legitimate law enforcement activities and does so in a manner that is consistent with the approach taken elsewhere in the Privacy Rule. As explained above, individual privacy interests are especially strong where individuals seek lawful reproductive health care. In particular, individuals may forgo lawful health care or avoid disclosing previous lawful health care to providers because they fear that their PHI will be disclosed. The Department believes these concerns are exacerbated by the prospect of state investigations into, and resulting intimidation and criminalization of, health care providers for providing lawful reproductive health care, as well as state laws encouraging state residents to sue persons who facilitate individuals' access to legal health care. The final rule addresses these interests by protecting privacy in situations where the reproductive health care at issue is especially likely to be lawful under the circumstances in which such health care was provided. Where a regulated entity receives a request for PHI about reproductive health care that the regulated entity provided, such health care is likely to be lawful where the regulated entity reasonably determines, based on all information in its possession, that such health care was lawful under the circumstances in which it was provided. Similarly, where a regulated entity receives a request for PHI about reproductive health care that the regulated entity did not provide, such health care is likely to be lawful where law enforcement is unable to provide factual information that demonstrates to the regulated entity a substantial factual basis that the reproductive health care was not lawful under the specific circumstances in which such health care was provided.

The Department recognizes that, in some cases, the approach adopted in this final rule may inadvertently prohibit the disclosure of PHI about reproductive health care that was unlawfully provided, such as where a health care provider reasonably but incorrectly determines that the reproductive health care it provided was lawful under the circumstances in which such health care was provided. This is similar to how the Privacy Rule has always potentially prevented the use or disclosure of PHI that could be useful to law enforcement in certain circumstances because the request for PHI does not meet the conditions of the applicable permission. Nevertheless, given the importance of protecting individual privacy in this area, the Department has determined that the final rule adopts the appropriate balance between individual privacy and the interests of other persons, such as law enforcement. Specifically, the Department believes that the benefits to individual privacy of a broadly protective rule outweigh the benefits to societal interests in the use or disclosure of PHI from a narrower rule. While a narrower rule would more broadly permit disclosures related to PHI that might concern reproductive health care that is not lawful under the circumstances in which it is provided, such a rule would inadvertently permit more disclosures of PHI about lawful reproductive health care. Accordingly, the Department concludes that the final rule must be sufficiently broad to protect against such disclosures, given the paramount importance of individual privacy in this area.

Moreover, as explained above, individual privacy interests are paramount to promote free and open communication between individuals and their health care providers, thereby ensuring that individuals receive high-quality care based on their accurate medical history. Society has long recognized that information exchanged as part of a specific relationship for which trust is paramount should be entitled to heightened protection (e.g., marital privilege, attorney-client privilege, doctor-patient privilege). Similarly, this final rule seeks to address situations where privacy interests are especially important, based both on the content of the information that is protected from disclosure (concerning lawful reproductive health care) and the context in which that information is shared (concerning a trust-based relationship between individuals and their health care providers).

In contrast, the potential adverse effects of this final rule on other interests, such as those of law enforcement, are limited by the narrow scope of this final rule. This final rule does not seek to prohibit disclosures of PHI where the request is for reasons other than investigating or imposing liability on persons for the mere act of seeking, obtaining, providing, or facilitating reproductive health care that is lawful under the circumstances in which such health care is provided. For example, as explained in the NPRM and below, the final rule does not prohibit the use or disclosure of PHI for investigating alleged violations of the Federal False Claims Act or a state equivalent; conducting an audit by an Inspector General aimed at protecting the integrity of the Medicare or Medicaid program where the audit is not inconsistent with this final rule; investigating alleged violations of Federal nondiscrimination laws or abusive conduct, such as sexual assault, that occur in connection with reproductive health care; or determining whether a person or entity violated 18 U.S.C. 248 regarding freedom of access to clinic entrances. In each of these

cases, the request is not made for the purpose of investigating or imposing liability on any person for the mere act of seeking, obtaining, providing, or facilitating reproductive health care.

Even when the request is for the purpose of investigating or imposing liability on the mere act of seeking, obtaining, providing, or facilitating reproductive health care, this final rule does not seek to prohibit disclosures of PHI about reproductive health care that is not lawful under the circumstances in which it was provided. Thus, in most situations involving reproductive health care that is not lawful under the circumstances in which it is provided, this final rule will not prevent the use or disclosure of PHI to investigate or impose liability on persons for such legal violations, provided such disclosures are otherwise permitted by the Privacy Rule. Moreover, where a regulated entity did not provide the reproductive health care at issue, this final rule prohibits the use or disclosure of PHI where the person making the request does not provide sufficient information to overcome the presumption of legality. In such cases, law enforcement agencies and other persons have a reduced interest in obtaining such PHI where the information does not demonstrate to the regulated entity a substantial factual basis that the reproductive health care was not lawful under the circumstances in which such health care was provided.

This final rule does not prohibit the use or disclosure of PHI to investigate or impose liability on persons where reproductive health care is unlawful under the circumstances in which it is provided. Instead, the final rule prohibits the use or disclosure of PHI in narrowly tailored circumstances (i.e., where the use or disclosure is to conduct an investigation or impose liability on a person for the mere act of seeking, obtaining, providing, or facilitating reproductive health care that **\*32995** is lawful under the circumstances in which such health care is provided, or to identify a person for such activities). For example, once this final rule is in effect, a covered health care provider may still disclose PHI to a medical licensing board investigating a health care provider's actions related to their obligation to report suspected elder abuse, assuming the disclosure meets the conditions of an applicable Privacy Rule permission. This is because the final rule does not bar the use or disclosure of PHI for health oversight purposes, which is unrelated to the mere act of seeking, obtaining, providing, or facilitating reproductive health care.

Additionally, even where the final rule prohibits the use or disclosure of PHI to investigate potentially unlawful reproductive health care (i.e., where a regulated entity reasonably determines that the reproductive health care they provided was lawful, or where the presumption of legality is not overcome), law enforcement retains other ways of investigating reproductive health care that they suspect may have been unlawfully provided. For example, law enforcement retains the use of other traditional and otherwise lawful investigatory means for obtaining information, such as conducting witness interviews and accessing other sources of information not covered by HIPAA. The final rule is therefore tailored to protect the relationship between individuals and their health care providers specifically, while leaving unaffected law enforcement's ability to conduct investigations using information from other sources.

With respect to commenters' concerns about parental rights, this final rule also does not interfere with the ability of states to define the nature of the relationship between a minor and a parent or guardian.

Comment: A few commenters that expressed negative views asserted that the proposed rule exceeded the Department's statutory authority under HIPAA or was beyond the Department's rulemaking authority. Some commenters stated that the rulemaking was arbitrary and capricious and would make it difficult for law enforcement to investigate reproductive health care and engage in health oversight activities and would require health care providers to provide certain types of health care against which they have objections. Some commenters expressed concern about the balance of powers between the states and the federal government. Other commenters suggested that the proposals preempt state laws serving public health, safety, and welfare.

Response: As discussed above, Congress explicitly stated that the purpose of HIPAA's Administrative Simplification provisions was to improve the efficiency and effectiveness of the health care system. For the health care system to be effective, individuals must trust that information that they share with health care providers about lawful health care will remain private. Accordingly, since their inception, the HIPAA Rules have required that regulated entities narrowly tailor disclosures to law enforcement to protect an individual's privacy.[FN181] While the Department is adopting an approach in this final rule that is more protective of privacy interests than the current Privacy Rule in certain circumstances, these changes are necessary to appropriately

balance privacy interests and the interests of law enforcement, and private parties afforded legal rights of action, in light of the changing legal environment. This is discussed in detail above. In both the 2023 Privacy Rule NPRM and this final rule, the Department cited to multiple studies documenting the real-world harm to health and health care in the changing legal environment. As explained above, the Department acknowledges that this final rule may affect certain state interests in obtaining PHI to investigate potentially unlawful reproductive health care, but the Department has tailored the final rule to strike the appropriate balance between privacy interests and state interests. This final rule limits the potential harm to individuals, health care providers, and others resulting from the disclosure of PHI to investigate or punish individuals for the mere act of seeking, obtaining, providing, or facilitating reproductive health care that is lawful under the circumstances in which such health care is provided. We emphasize that nothing in this rule or any of the HIPAA Rules requires a health care provider to provide any type of health care, including any type of reproductive health care.

Comment: Several commenters asserted that the proposed rule would impede states' enforcement of their own laws, including those concerning sexual assault and sex trafficking. Many commenters opposed the proposed rule because they believed it would inhibit the ability of states to investigate or enforce laws prohibiting minors from obtaining certain types of health care and prevent the commenters from reporting minors who they believe are coerced into obtaining such health care to authorities.

Response: This rule does not prohibit the disclosure of PHI for investigating allegations of or imposing liability for sexual assault, sex trafficking, or coercing minors into obtaining reproductive health care. Rather, this final rule modifies the existing HIPAA Privacy Rule standards by prohibiting uses and disclosures of PHI to investigate or impose liability on individuals, regulated entities, or other persons for the mere act of seeking, obtaining, providing, or facilitating reproductive health care that is lawful under the circumstances in which such reproductive health care is provided, or to identify any person to investigate or impose liability on them for such purposes. Accordingly, requests for the disclosure of PHI to investigate such allegations of or impose liability for such crimes do not fall within the final rule's prohibition, and the presumption of lawfulness likewise would not be triggered because the prohibition would not apply. A regulated entity therefore would not be prohibited from disclosing an individual's PHI when subpoenaed by law enforcement for the purpose of investigating such allegations, assuming that law enforcement provided a valid attestation and met the other conditions of the applicable permission.

Moreover, as explained above, the final rule is tailored to prohibit disclosures related to lawful reproductive health care, thereby reducing the interference with law enforcement interests to create an appropriate balance with privacy interests.

Comment: Some states expressed concern that the proposed rule would intrude into areas where the HIPAA Rules have previously acknowledged state control, such as enforcement of state and local laws, regulation of the practice of health care, and reporting of abuse.

Response: This final rule balances the interests of individuals in the privacy of their PHI and of society in an effective health care system with those of society in obtaining PHI for certain non-health care purposes. The Privacy Rule always has and continues to permit disclosures of PHI to support public policy goals, including disclosures to support criminal, civil, and administrative law enforcement activities; the operation of courts and tribunals; health oversight activities; the duties of coroners and medical examiners; and the reporting of child abuse, domestic violence, and neglect to appropriate authorities. As explained above, while the final rule adopts an approach that is more **\*32996** protective of privacy interests in certain circumstances than the previous Privacy Rule, the final rule continues to balance the interests that HIPAA Rules have long sought to protect with those of society in PHI.

### *C. Other General Comments on the Proposed Rule*

Comment: Commenters urged the Department to provide enhanced privacy protections for health information that is not covered by existing frameworks or specifically addressed in the proposed rule. A few professional associations expressed support for revising the Privacy Rule to provide stronger protection for the privacy of reproductive health care information and urged the Department to modify the Privacy Rule to provide even stronger protections than those proposed in the 2023 Privacy Rule NPRM.

Response: The Department's authority under HIPAA is limited to protecting the privacy of IIHI that is maintained or transmitted by covered entities and, in some cases, their business associates. Specific modifications to the Privacy Rule to protect the privacy of PHI are described in greater detail below. Consistent with the Department's longstanding approach with respect to the Privacy Rule, the modifications we are finalizing in this rule strike a balance between protecting an individual's right to health information privacy with the interests of society in permitting the disclosure of PHI to support the investigation or imposition of liability for unlawful conduct. In particular, the final rule does not prohibit the disclosure of PHI about reproductive health care that was unlawfully provided, because an individual's privacy interests in reproductive health care that is not lawful (e.g., a particular type of reproductive health care that is provided by a nurse practitioner in a state that requires that type of reproductive health care to be provided by a physician) are comparatively lower than a state's interests in investigating and imposing liability on persons for unlawful reproductive health care. We will continue to monitor legal developments and their effects on individual privacy as we consider the need for future modifications to the Privacy Rule.

Comment: Several commenters questioned how the proposed rule would affect their current business associate and data exchange agreements.

Response: The modifications in this final rule may require regulated entities to revise existing business associate agreements where such agreements permit regulated entities to engage in activities that are no longer permitted under the revised Privacy Rule. Regulated entities must be in compliance with the provisions of this rule by December 23, 2024.

Comment: A few commenters requested clarification of whether minors and legal adults have the same protections under the Privacy Rule and whether this rule would alter existing protections.

Response: The final rule does not change how the Privacy Rule applies to adults and minors. Thus, all of the protections provided to PHI by this final rule apply equally to adults and minors. For example, under this final rule, a regulated entity is prohibited from using or disclosing a minor's PHI for the purposes prohibited under 45 CFR 164.502(a)(5)(iii). The Privacy Rule generally permits a parent to have access to the medical records about their child as their minor child's personal representative when such access is consistent with state or other law, with limited exceptions.[FN182] Additional information about how the Privacy Rule applies to minors can be found at 45 CFR 164.502(g) and on the OCR website.[FN183]

Comment: Many commenters urged the Department to take an educational approach, rather than a punitive one, with respect to enforcement against regulated entities. In addition, many commenters addressed the need for resources and education for successful implementation of the proposed changes to the Privacy Rule. They called for the Department to collaborate with and educate regulated entities, individuals, and others affected by the proposed revisions, such as law enforcement, as well as for the Department to partner with other Federal agencies and state governments to conduct the education. Some suggested that educational resources should include multiple media formats and a centralized platform.

Response: The Department frequently issues non-binding guidance and conducts outreach to help regulated entities achieve compliance. We appreciate these recommendations and will consider these topics for future guidance. Regulated entities are expected to comply with the Privacy Rule as revised once the compliance date has passed.

## V. Summary of Final Rule Provisions and Public Comments and Responses

The Department is modifying the Privacy Rule to strengthen privacy protections for individuals' PHI by adding a new category of prohibited uses and disclosures of PHI. This final rule prohibits a regulated entity from using or disclosing an individual's PHI for the purpose of conducting a criminal, civil, or administrative investigation into or imposing criminal, civil, or administrative liability on any person for the mere act of seeking, obtaining, providing, or facilitating reproductive health care that is lawful under the circumstances in which it is provided, meaning that it is either: (1) lawful under the circumstances in which such health care is provided and in the state in which it is provided; or (2) protected, required, or authorized by Federal law, including the United States Constitution, regardless of the state in which such health care is provided. In both of these circumstances,

as explained above, the interests of the individual in the privacy of their PHI and of society in ensuring an effective health care system outweighs those of society in the use of PHI for non-health care purposes. To operationalize this modification, the Department is revising or clarifying certain definitions and terms that apply to the Privacy Rule, as well as other HIPAA Rules. This final rule also prohibits a regulated entity from using or disclosing an individual's PHI for the purpose of identifying an individual, health care provider, or other person for the purpose of initiating such an investigation or proceeding against the individual, a health care provider, or other person in connection with seeking, obtaining, providing, or facilitating reproductive health care that is lawful under the circumstances in which it is provided.

To effectuate these proposals, the Department is finalizing conforming and clarifying changes to the HIPAA Rules. These changes include, but are not limited to, clarifying the definition of "person" to reflect longstanding statutory language defining the term; adopting new definitions of "public health" surveillance, investigation, or intervention, and "reproductive health care"; adding a new category of prohibited uses and disclosures; clarifying that a regulated entity may not decline to recognize a person as a personal representative for the purposes of the Privacy Rule because they provide or facilitate reproductive health care for an individual; imposing a new **\*32997** requirement that, in certain circumstances, regulated entities must first obtain an attestation that a requested use or disclosure is not for a prohibited purpose; and requiring modifications to covered entities' NPPs to inform individuals that their PHI may not be used or disclosed for a purpose prohibited under this final rule.

The Department's section-by-section description of the final rule is below.

*A. Section 160.103 Definitions*

**1. Clarifying the Definition of "Person"**

HIPAA does not define the term "person." [FN184] The HIPAA Rules have long defined "person" to mean "a natural person, trust or estate, partnership, corporation, professional association or corporation, or other entity, public or private." [FN185] This meaning was based on the definition of "person" adopted by Congress in the original SSA, as an "individual, a trust or estate, a partnership, or a corporation." [FN186]

In 2002, Congress enacted 1 U.S.C. 8, which defines "person," "human being," "child," and "individual." [FN187] The statute specifies that these definitions shall apply when "determining the meaning of any Act of Congress, or of any ruling, regulation, or interpretation of the various administrative bureaus and agencies of the United States." [FN188] The Department understands 1 U.S.C. 8 to provide definitions of "person," "individual," and "child" that do not include a fertilized egg, embryo, or fetus, and are consistent with the Department's understanding of those terms, as used in the SSA, HIPAA, and the HIPAA Rules.

The Department proposed to clarify the term "natural person" in a manner consistent with 1 U.S.C. 8.[FN189] Thus, the Department proposed to clarify that all terms subsumed within the definition of "natural person," such as "individual," [FN190] are limited to the confines of the term "person." [FN191] As discussed in the 2023 Privacy Rule NPRM, the purpose of this proposal was to better explain to regulated entities and other stakeholders the parameters of an "individual" whose PHI is protected by the HIPAA Rules.

Many individuals and organizations commented on the proposal to clarify the definition "person." Organizational commenters, including professional associations representing health care providers, advocacy groups, and academic departments, generally supported the proposal. Several commenters applauded the proposed clarification because they believed it would limit disclosures of PHI in cases where no individual has been harmed.

Most opponents of the proposed clarification were individuals participating in form letter campaigns who expressed concern that the proposal might diminish access to prenatal care. Others asserted that the proposed clarification would contradict or conflict with existing laws, such as mandatory reporting laws and Federal statutes that rely upon a different definition of "person."

The final rule adopts the proposed clarification of the definition of person, to mean a "natural person (meaning a human being who is born alive), trust or estate, partnership, corporation, professional association or corporation, or other entity, public or private." Therefore, an "individual," "child," or "victim" (e.g., a victim of crime) under the HIPAA Rules must be a natural person. As we explained in the 2023 Privacy Rule NPRM, this clarification is consistent with the SSA, HIPAA, and 1 U.S.C. 8. This clarification applies only to regulations issued pursuant to the Administrative Simplification provisions of HIPAA.[FN192]

This clarification is consistent with the Privacy Rule's longstanding definitions of "person" [FN193] and "individual," [FN194] as applied to Privacy Rule provisions permitting certain types of reports or other disclosures of PHI. For example, a regulated entity is permitted to disclose PHI about an individual who the regulated entity reasonably believes to be a victim of abuse, neglect, or domestic violence only where the individual is a "natural person." [FN195] In addition, because a "victim" necessarily is a natural person, the permission to disclose PHI to avert a serious threat to health or safety at 45 CFR 164.512(j)(i) does not permit disclosures when the perceived threat does not involve the health or safety of a natural person or the public, or when an individual has not caused serious physical harm to a natural person.

Comment: Many organizational commenters expressed support for the proposal to clarify the definition of "person."

One commenter stated that this clarification should prevent law enforcement from attempting to avoid the proposed prohibition. According to another commenter, this proposed clarification is crucial as stakeholders adapt to the current reproductive health landscape.

Several commenters expressed support for the Department's proposal but requested additional clarifications. For example, one commenter recommended that the Department clarify whether the definition would preempt state laws.

Response: We take the opportunity to emphasize here that the clarification only applies to the HIPAA Rules and explains certain terms that apply to the permissions for uses and disclosures of PHI by regulated entities. We do not believe it is necessary to further clarify the final regulatory text because the current definition remains unchanged other than to incorporate the plain wording of 1 U.S.C. 8.

Comment: A few commenters expressed opposition to the Department's proposed clarification of "person" as tantamount to eliminating legal protections for and recognition of categories of human beings based on developmental stage. Some commenters maintained that the proposed clarification of "person" was inaccurate.

Several commenters opposed the proposed clarification of "person" because it would affect the provision of prenatal care.

A few commenters asserted that the proposed clarification would prevent the collection of medical information about reproductive health care for  *32998  important purposes, such as public health and research.

Response: We are clarifying the definition of person consistent with applicable Federal law only for the purpose of applying HIPAA's Administrative Simplification provisions. This clarification will not affect how the term "person" is applied for purposes of other laws, affect any rights or protections provided by any other law, or affect standards of health care, including prenatal care.

This final rule does not affect the reporting of vital statistics, nor does it affect the ability of regulated entities to use and disclose PHI for research. The Privacy Rule's standards for uses and disclosures for public health surveillance, investigations, and interventions, or for health oversight activities, are discussed elsewhere.

Comment: Several commenters requested additional clarifications to the Department's proposed clarification of "person." A few commenters asserted that the proposed clarification would be overly expansive. Most of these same commenters disagreed with

the Department's interpretation of 1 U.S.C. 8.[FN196] Commenters asserted that the clarification was inconsistent or conflicted with other laws.

Response: The clarified definition of person that we are finalizing in this rule does not change the Department's interpretation of the term or change definitions under other law, such as state law. It also is consistent with Federal law, including 1 U.S.C. 8, which specifically applies to Federal regulations, and other examples cited by commenters. For example, both GINA and the Privacy Rule protect the genetic information of a fetus carried by a pregnant individual as the PHI of the pregnant individual. [FN197]

The other laws cited by commenters address policy concerns that are different from those health information privacy issues addressed under HIPAA and do not address personhood. Even if those statutes did adopt different understandings of who is a "person," the Department has the authority to clarify or define terms that apply to the Administrative Simplification regulations issued pursuant to HIPAA. Additionally, the definition in the final rule of 1 U.S.C. 8 is appropriate because it is consistent with the Department's longstanding interpretation of the term in the context of HIPAA's Administrative Simplification provisions and associated regulations. Many Federal and state laws operate with differing definitions of common terms, to which existing legal standards that govern how such differences are to be interpreted would apply.[FN198]

Comment: A few commenters asserted that the proposal would expand minors' access to hormone therapy or surgeries without requiring parental consent.

Response: The final rule's clarification to define the term "person" does not affect the ability of a parent to make decisions related to health care for an individual who is an unemancipated minor,[FN199] and nothing in this rule dictates a standard of care. The application of this definition is limited to the HIPAA Rules.

Comment: A few commenters asserted that the proposed clarification would help to prevent the misapplication of child abuse laws to individuals who engage in certain behaviors while pregnant (e.g., use of an illicit substance or alcohol). Several other commenters expressed concern that this definition would limit the ability of a regulated entity to apply the Privacy Rule permission to use or disclose PHI to prevent a serious and imminent threat to a fertilized egg, embryo, or fetus.

Response: Under this final rule, a regulated entity would continue to be permitted to disclose PHI about an individual who the covered entity reasonably believes is a victim of child abuse or neglect, consistent with 45 CFR 164.512(b)(1)(ii), or a victim of abuse, neglect, or domestic violence, consistent with 45 CFR 164.512(c), to a government authority, including a social service or protective services agency, authorized by law to receive reports of such abuse, neglect, or domestic violence under the circumstances set forth under 45 CFR 164.512(c) where the individual meets the clarified definition of person. The Privacy Rule permission concerning serious and imminent threats [FN200] applies to threats to a person, consistent with the definition as clarified by this final rule, or the public.

**2. Interpreting Terms Used in Section 1178(b) of the Social Security Act Reporting of Disease or Injury, Birth, or Death**

Section 1178(a) of the SSA provides that HIPAA generally preempts contrary state laws with certain limited exceptions, such as those described in section 1178(b).[FN201] Specifically, section 1178(b) excepts from HIPAA's general preemption authority laws that provide for certain public health reporting, such as the reporting of disease or injury, birth, or death.[FN202] HIPAA does not define the terms in section 1178(b) that govern the scope of this exception to HIPAA's general preemption authority, nor has the Department previously defined such terms through rulemaking.

The Department recognizes that such public health reporting activities are an important means of identifying threats to the health and safety of the public. Accordingly, when a public health authority [FN203] has furnished documentation of its authority [FN204] to collect or receive such information, the Privacy Rule permits a regulated entity, without an individual's authorization, to use or disclose PHI to specified persons for public health activities.[FN205] These activities include all of the vital statistics reporting activities described in section 1178(b), including reporting of diseases and injuries, birth, or death.[FN206]

The Department proposed to interpret in preamble key terms used in section 1178(b) to clarify when HIPAA's general preemption authority applies. Specifically, the Department proposed an interpretation of section 1178(b) that would clarify that HIPAA's general preemption authority applies to laws that require regulated entities to use or disclose PHI for a purpose that would be prohibited under the proposed rule. Under this interpretation, the Privacy Rule permission to use or disclose PHI without an individual's authorization for the reporting of disease or injury, birth, or death [FN207] would not permit the use or disclosure of PHI for a criminal, civil, or administrative investigation into or proceeding against a person in connection with seeking, obtaining,  **\*32999**  providing, or facilitating reproductive health care. The Department did not intend this clarification to prevent disclosures of PHI from regulated entities to public health authorities for public health purposes that have been and continue to be permitted under the Privacy Rule. Nor did the Department intend for this proposed clarification to prevent disclosures of PHI by regulated entities under other permissions in the Privacy Rule, such as for law enforcement purposes,[FN208] when made consistent with the conditions of the relevant permission and where the purpose of the disclosure is not one for which a use or disclosure would have been prohibited under 45 CFR 164.502(a)(5)(iii) as proposed.

The Department did not propose to define "disease or injury," "birth," or "death," because we believed that these terms, when read with the definition of "person" and in the broader context of HIPAA, would exclude information about reproductive health care without the need for further clarification.[FN209] However, the Department invited public comment on whether it would be beneficial to make such clarification.

Few commenters addressed interpretation of these terms. Some commenters expressed concern that the Department's interpretation would prevent beneficial public health reporting about certain types of reproductive health care, while others requested that the Department prohibit public health reporting about certain types of reproductive health care. Some commenters on this issue agreed with the Department's interpretation and clarification of the terms used in 1178(b). Several of these commenters requested that the Department define or clarify these terms because reporting standards are inconsistent across states.

The Department declines to add definitions for "disease or injury," "birth," or "death" to the Privacy Rule in this final rule. However, we offer the discussion below to provide additional context on our interpretation of these terms.

At the time of HIPAA's enactment, state laws provided for the reporting of disease or injury, birth, or death by covered health care providers and other persons.[FN210] State public health reporting systems were well established and involved close collaboration between the state, local, or territorial jurisdiction and the Federal Government.[FN211] Reports generally were made to public health authorities or, in some specific cases, law enforcement (e.g., reporting of gunshot wounds).[FN212] Similar public health reporting systems continue to exist today.

Reporting of "disease or injury" commonly refers to diagnosable health conditions reported for limited purposes such as workers' compensation, tort claims, or communicable or other disease or injury tracking efforts. States, territories, and Tribal governments require health care providers (e.g., physicians, laboratories) and some others (e.g., medical examiners, coroners, veterinarians, [FN213] local boards of health) to report cases of certain diseases or conditions that affect public health, such as coronavirus disease 2019 (COVID-19), malaria, and foodborne illnesses.[FN214] Such reporting enables public health practitioners to study and explain diseases and their spread, along with determining appropriate actions to prevent and respond to outbreaks.[FN215] States also require health care providers to report incidents of certain types of injuries, such as those caused by gunshots, knives, or burns.[FN216] Various Federal statutes use the phrase "disease or injury" similarly to refer to events such as workplace injuries for purposes of compensation.[FN217]

The limited meaning given to the terms "disease" and "injury" for purposes of public health reporting is clear from HIPAA's broader context. For instance, interpreting "injury" reporting to include disclosures about all instances of suspected criminal abuse would render the specific permission to report "child abuse" superfluous.[FN218] And interpreting "disease" reporting to include disclosures about any sort of disease for any purpose would both eviscerate HIPAA's general provisions protecting

PHI and make superfluous the statutory requirement to not invalidate laws providing for public health surveillance, or public health investigation or intervention. For example, "disease management activities" constitute "health care" under the Privacy Rule. As such, a broad interpretation of "disease or injury" reporting could make potentially all the health records detailing a particular individual's treatment for any disease or injury disclosable to a public health authority or others unrelated to the health care.[FN219] Consequently, the Department has long understood "disease or injury" to narrowly refer to diagnosable health conditions reported for limited purposes such as workers' compensation, tort claims or in compliance with Federal laws that require states to conduct surveillance of specific diseases and injuries related to public health or Federal funding.[FN220]

With respect to reporting of "births" and "deaths," such vital statistics are reported by health care providers to the vital registration systems operated in **\*33000** various jurisdictions [FN221] legally responsible for the registration of vital events. [FN222] State laws require birth certificates to be completed for all births, and Federal law mandates the national collection and publication of births and other vital statistics data.[FN223] Tracking and reporting death is a complex and decentralized process with a variety of systems used by more than 6,000 local vital registrars.[FN224] When HIPAA was enacted, the Model State Vital Statistics Act and Regulations, which is followed by most states,[FN225] included distinct categories for "live births," "fetal deaths," and "induced terminations of pregnancy," with instructions that abortions "shall not be reported as fetal deaths." [FN226] In light of that common understanding at the time of HIPAA's enactment, it is clear that the reporting of abortions is not included in the category of reporting of deaths for the purposes of HIPAA and does not fall within the scope of state death reporting activities that Congress specifically designated as excepted from preemption by HIPAA.

More generally, while Congress exempted certain "[p]ublic health" laws from preemption,[FN227] Congress chose not to create a general exception for criminal laws or other laws that address the disclosure of information about similar types of activities outside of the public health context.

For all these reasons, state laws requiring the use or disclosure of PHI for the purpose of investigating or imposing liability on a person for the mere act of seeking, obtaining, providing, or facilitating health care, or identifying a person for such activities, are subject to HIPAA's general preemption provision. Similarly, the Privacy Rule's public health provisions that permit the disclosure of PHI for the reporting of disease or injury, birth, or death do not include permission to use or disclose PHI for the purpose of investigating or imposing liability on a person for the mere act of seeking, obtaining, providing, or facilitating health care, or identifying a person for such activities. This general distinction between public health activities and investigation and enforcement activities is not limited to reproductive health care. Nevertheless, as discussed elsewhere in this final rule, the Department has chosen to strike a balance between privacy interests and other public policy interests. Consistent with the Department's longstanding approach that has allowed disclosures for law enforcement purposes in certain circumstances, the new prohibitions set forth in this rule apply only to lawful reproductive health care. State authorities cannot rely on the Privacy Rule's permissions for disclosures related to disease or injury, birth, or death to obtain PHI for the purpose of investigating or imposing liability for the provision of reproductive health care. However, as discussed above, state authorities may be able to invoke other permissions, such as the permission for disclosures for law enforcement purposes, to obtain such PHI where such disclosure is to investigate or impose liability on a person when the reproductive health care at issue is unlawful under the circumstances in which it is provided.

Comment: A few commenters expressed support for the Department's interpretation and clarification of the terms used in section 1178(b) of the SSA. A few commenters recommended that the Department define, rather than clarify, these terms. Some commenters requested that the Department further clarify the terms "disease or injury," "birth," and "death," to explicitly exclude information about reproductive health care. Other commenters expressed opposition to the Department's clarifications.

Response: We decline to define "disease or injury," "birth," or "death" in this final rule. The Department's understanding of these terms is consistent with the Model State Vital Statistics Act and Regulations and its application in the context of the passage of HIPAA. We believe that the 2023 Privacy Rule NPRM preamble discussion is sufficient to clarify that such reporting does not include the use or disclosure of PHI for investigating or imposing liability on a person for the mere act of seeking, obtaining, providing, or facilitating health care, including reproductive health care, or to identify a person for such activities.

Defining "Public health," as used in the terms "public health surveillance," "public health investigation," and "public health intervention."

Section 1178(b) also excepts state laws providing for "public health surveillance, or public health investigation or intervention" from HIPAA's general preemption authority.[FN228] Neither HIPAA nor the Privacy Rule currently defines "public health surveillance" or "public health investigation or intervention." Consistent with the statute, the Privacy Rule expressly permits a regulated entity to use or disclose PHI for "public health" surveillance, investigation, or intervention.[FN229] The Department proposed to define public health, as used in the terms "public health surveillance," "public health investigations," and "public health interventions," to mean population-level activities to prevent disease and promote health of populations. In preamble to the 2023 Privacy Rule NPRM, the Department described public health surveillance as the ongoing, systematic collection, analysis, and interpretation of health-related data essential to planning, implementation, and evaluation of public health practice. [FN230] The Department explained that public health investigations or interventions include monitoring real-time health status and identifying patterns to develop strategies to address chronic diseases and injuries, as well as using real-time data to identify and respond to acute outbreaks, emergencies, and other health hazards.[FN231] Public health surveillance, investigations, or interventions safeguard the health of the community by addressing ongoing or prospective population-level issues such as the spread of communicable diseases, even where these activities involve  **\*33001**  individual-level investigations or interventions.

The Department also proposed to expressly exclude certain activities from the definition of public health to distinguish between public health activities and certain criminal investigations. Specifically, the Department proposed to provide in regulatory text that the Privacy Rule's permissions to use and disclose PHI for the "public health" activities of surveillance, investigations, or interventions do not include criminal, civil, or administrative investigations into, or proceedings against, any person in connection with seeking, obtaining, providing, or facilitating reproductive health care, nor do they include identifying any person for the purpose of initiating such investigations or proceedings. The Department stated that any such actions are not public health activities that would be subject to the exception to HIPAA's general preemption authority for state laws providing for "public health surveillance, or public health investigation or intervention." [FN232]

Commenters expressed mixed views on the proposal to define "public health" in the context of "public health surveillance," "public health investigations" or "public health interventions." Commenters expressing opposition to the proposal either disagreed with the Department's assertion that public health activities do not involve uses and disclosures that would be prohibited by the rule or asserted that the proposal would prevent public health reporting of reproductive health care. Some commenters generally supported the goal of the proposal but expressed concern that inclusion of the proposed language about "population-level" activities could prevent essential public health activities that involve specific persons, such as reporting data about specific health care services provided to specific persons that have a "population-level" effect and investigating the spread of communicable diseases.

Some commenters asserted that the proposal would frustrate states' ability to enforce their laws not related to public health, such as laws banning health care such as abortion. Supporters asserted that the proposal would help to prevent PHI from being disclosed for a purpose that would be prohibited under the proposed rule. Supportive commenters also expressed concern about states obtaining PHI based on an interpretation of "public health investigations" that includes the mandatory reporting of pregnant individuals who engage in certain activities, such as substance use. Other commenters asserted that disclosures of PHI to public health authorities should be limited because of the potential for PHI to be redisclosed for purposes that otherwise would be prohibited under the Privacy Rule.

The final rule adopts the proposed definition with some modifications. The final rule maintains the proposed rule's focus on activities aimed at preventing disease and improving the health of populations. This definition does not prevent disclosures of PHI by covered entities to public health authorities for public health activities that have long been permitted under the Privacy Rule. As discussed in the 2023 Privacy Rule NPRM, since the time of HIPAA's enactment, public health activities related to surveillance, investigation, or intervention have been widely understood to refer to activities aimed at improving the health of a

population. For example, legal dictionaries define "public health" as "[t]he health of the community at large," or "[t]he healthful or sanitary condition of the general body of people or the community en masse; esp., the methods of maintaining the health of the community, as by preventive medicine or organized care for the sick." [FN233] Stedman's Medical Dictionary defines "public health" as "the art and science of community health, concerned with statistics, epidemiology, hygiene, and the prevention and eradication of epidemic diseases; an effort organized by society to promote, protect, and restore the people's health; public health is a social institution, a service, and a practice." [FN234] The Centers for Disease Control and Prevention (CDC) and the Agency for Toxic Substances and Disease Registry have described "public health surveillance" as "the ongoing systematic collection, analysis and interpretation of outcome-specific data for use in the planning, implementation, and evaluation of public health practice." [FN235] And many states similarly define "public health" to mean activities to support population health.[FN236] The Department likewise has used the term public health in this way since it first adopted the Privacy Rule.[FN237]

Public health surveillance, public health investigations, and public health interventions are activities that address population health concerns and have generalized public benefit [FN238] to the health of a population, including activities that involve specific persons. Examples of activities that prevent disease in and promote the health of populations include vaccination campaigns to eradicate communicable disease, surveillance of a community's use of emergency services after a natural disaster to improve allocation of resources to meet health needs, and investigation of the source of an outbreak of food poisoning. As explained in the preamble to the 2023 Privacy Rule NPRM,[FN239] there is a widely recognized distinction between public health activities, which primarily focus on improving the health of populations, and criminal investigations, which primarily focus on identifying and imposing liability on persons who have  *33002  violated the law.[FN240] States and other local governing authorities maintain criminal codes that are distinct and separate from public health reporting laws,[FN241] although some jurisdictions enforce required public health reporting through criminal statutes. Different governmental bodies are responsible for enforcing these separate codes, and public health officials do not typically investigate activities enforced under criminal statutes or laws.[FN242] Federal laws also generally treat public health investigations as distinct from criminal investigations.[FN243] Maintaining a clear distinction between public health investigations and criminal investigations serves HIPAA's broader purposes.[FN244]

The Department concludes that neither section 1178(b) nor the Privacy Rule's permissions to use and disclose PHI for the "public health" activities of surveillance, investigation, or intervention include conducting criminal, civil, or administrative investigations into, or imposing criminal, civil, or administrative liability on any person for the mere act of seeking, obtaining, providing, or facilitating health care, including reproductive health care, nor do they include the identification of any person for such purposes. Such actions are not public health activities. As described above, this distinction between public health activities and other investigation and enforcement activities is not limited to reproductive health care. Public health surveillance, investigations, or interventions ensure the health of the community as a whole by addressing ongoing or prospective population-level issues such as the spread of communicable diseases, even where they involve interventions involving specific individuals. Such surveillance systems provide the necessary data to examine and potentially develop interventions to improve the public's health, such as providing education or resources to support individuals' access to health care and improve health outcomes and are not affected by this final rule.[FN245] U.S. states, territories, and Tribal governments participate in bilateral agreements with the Federal Government to share data on conditions that affect public health.[FN246] The CDC's Division of Reproductive Health collects reproductive health data in support of national and state-based population surveillance systems to assess maternal complications, mortality and pregnancy-related disparities, and the numbers and characteristics of individuals who obtain legal induced abortions.[FN247] This final rule does not affect CDC's ability to collect this information now or in the future. Importantly, disclosures to public health authorities permitted by the Privacy Rule are limited to the "minimum necessary" to accomplish the public health purpose.[FN248] In some cases, regulated entities need disclose only de-identified data [FN249] to meet the public health purpose.

By contrast, efforts to conduct criminal, civil, and administrative investigations or impose criminal, civil, and administrative liability on any person for the mere act of seeking, obtaining, providing, or facilitating health care generally target specific persons for particular conduct; they are not designed to address population-level health concerns and are not limited to information authorized to be collected by a public health or similar government authority for a public health activity. Thus, the

exceptions in section 1178(b) for "public health" investigations, interventions, or surveillance do not limit the Department's ability to prohibit uses or disclosures of PHI for other purposes, such as judicial and administrative proceedings or law enforcement purposes. While the Department has chosen as a policy matter to continue to permit uses or disclosures of PHI for law enforcement and other purposes in certain contexts, it is adopting a different balance where such uses or disclosures are about reproductive health care that is lawful under the circumstances in which it was provided.

While retaining the focus on activities to prevent disease and promote the health of populations, this final rule clarifies that population-level activities "include identifying, monitoring, preventing, or mitigating ongoing or prospective threats to the health or safety of a population, which may involve the collection of protected health information." This clarification addresses commenters' concerns that regulated entities would no longer be able to report information that states need to conduct public health functions intended to protect against prospective or ongoing threats at the population level, even if at times they necessarily will focus on individuals while doing so (through contact tracing, quarantine or isolation, and the like). The Department does not intend this clarification to prevent disclosures of PHI from covered entities to public health authorities for public health activities that have long been and continue to be permitted under the Privacy Rule. These changes clarify that public health, as used in the specified terms, broadly includes activities to prevent disease in and promote the health of populations. The changes also confirm that the Department does not require a public health authority to supply an attestation to a covered entity to receive PHI of an individual where that disclosure is intended to prevent disease in or promote the health of populations.

The intended purpose of including "population-level" was to facilitate  **\*33003**  public health activities that protect large numbers of people from epidemics, environmental hazards, and the like. However, we believe that the language that clarifies that population-level activities "include identifying, monitoring, preventing, or mitigating ongoing or prospective threats to the health or safety of a population, which may involve the collection of protected health information," sufficiently serves this purpose of addressing uses and disclosures of PHI that are necessary to accomplish the overarching goals of public health.

The last sentence of the proposed definition, which described what are not public health activities, is also revised in the final rule for consistency with the general distinction between activities of public health surveillance, investigation, and intervention and activities of investigating or imposing liability on a person for the mere act of seeking, obtaining, providing, or facilitating health care, or identifying a person for such activities, as well as the standard the Department is adopting at 45 CFR 164.502(a)(5)(iii), which is discussed further in that section of this rule. Thus, while a state might assert that investigating or imposing liability on persons for the mere act of seeking, obtaining, providing, or facilitating health care satisfies the definition of "public health," their interpretation would not supersede the definition of "public health" in the context of public health surveillance, investigations, or interventions that the Department is adopting under its own Federal statutory authority to administer the HIPAA Rules.

Comment: A few organizations expressed support for the proposed definition of "public health" without further elaboration. Several commenters expressed support for the proposed definition of "public health" because it would prevent PHI from being disclosed for a prohibited purpose. A few commenters expressed support for the proposal because they believed that information reported for public health purposes could be requested, re-identified (in the case of de-identified information), or further disclosed to law enforcement for purposes for which the Department proposed to prohibit uses and disclosures.

Several commenters expressed support for the proposed definition of "public health" and the existing standard that limits public health disclosures of PHI to the minimum necessary information to achieve the purpose.

Response: Consistent with the NPRM, the Department agrees with the commenters who stated that it is important to define "public health" in the context of public health surveillance, investigation, or intervention to ensure that PHI is not disclosed for a purpose prohibited under 45 CFR 164.502(a)(5)(iii). Disclosures of PHI for public health purposes continue to be subject to the minimum necessary standard, which limits the use and disclosure of PHI to the minimum necessary to achieve the specified purpose; in some circumstances, de-identified information may suffice. However, many public health activities do

require identifiable data, such as for interventions involving individuals, to protect against prospective or ongoing threats to health or safety at the population level, and the Privacy Rule does not prohibit such uses and disclosures.

When making disclosures to public officials that are permitted under 45 CFR 164.512, if the public official represents that the information requested is the minimum necessary for the stated purpose, regulated entities are permitted, but not required, to rely on that representation, if such reliance is reasonable under the circumstances.[FN250] Such reliance may not be reasonable where the request appears to be overly broad when compared to the stated purpose of the request (e.g., where a public health authority requests the disclosure of PHI of all individuals who received treatment for uterine bleeding when the stated purpose is to investigate infection control practices by an obstetrician/gynecologist in a state where law enforcement has publicly announced its intention to investigate individuals for traveling out of state to seek or obtain reproductive health care that is lawful under the circumstances in which it is provided).

Comment: A few commenters asserted that law enforcement generally interprets public health investigations to include criminal investigations and prosecutions and the NPRM proposed definition would complicate such investigations by limiting the amount of PHI that could be disclosed to law enforcement.

Response: The Department has adopted a definition of "public health" in the context of public health surveillance, investigation, and intervention that sets clear parameters between such activities and law enforcement activities conducted to impose liability for the mere act of seeking, obtaining, providing, or facilitating health care. Public health surveillance, investigation, and intervention do not include efforts to attach liability to persons for specific acts of seeking, obtaining, providing, or facilitating health care.

This definition is consistent with the longstanding distinction made by the Department between public health activities and law enforcement activities as described above.

Comment: Several commenters expressed support for the Department's proposal generally but recommended further clarifications or revisions to it, especially regarding the limitation to "population-level" activities. A few commenters raised questions about the difference between the proposed definition of "public health" and the permission for public health activities under 45 CFR 164.512(b)(1)(i) and recommended that the Department clarify the definition to ensure that public health agencies are able to obtain health information for administrative or civil proceedings, such as quarantine or isolation in cases involving infectious diseases.

Response: The Department has modified the definition of "public health" in the context of public health surveillance, investigation, or intervention to clarify that such activities include identifying, monitoring, preventing, or mitigating ongoing or prospective threats to the health or safety of a population, which may involve the collection of PHI. This change addresses commenters' concerns that under the proposed definition, regulated entities would no longer be able to report PHI that is required to address population-level concerns.

Comment: Several commenters raised concerns that the proposed definition of "public health" would circumvent states' interests related to public health. A few commenters expressed opposition to the Department's clarification of public health because they believed that states should have the ability to conduct surveillance, investigations, or interventions concerning certain types of health care for public health purposes. Several commenters asserted that the proposal would frustrate the ability of states to enforce their laws prohibiting access to certain types of health care. Conversely, a commenter requested that the Department explicitly exclude reproductive health care from the proposed definition of "public health," so it would not be reportable to public health agencies.

Response: We disagree with commenters' assertions that this final rule will prevent the reporting of vital statistics or other public health **\*33004** activities. A covered entity may continue to use or disclose PHI for all the public health activities and purposes listed in section 1178(b). We also decline to explicitly exclude reproductive health care from the definition of "public health"

because doing so could hinder beneficial public health activities. Instead, this definition supports this final rule's prohibition against certain uses and disclosures of PHI by clarifying that public health surveillance, investigation, and intervention exclude conducting a criminal, civil, or administrative investigation into any person, or the imposing criminal, civil, or administrative liability on any person for the mere act of seeking, obtaining, providing, or facilitating health care, or identifying any person for such activities. Such excluded activities include those with the purposes that are prohibited at 45 CFR 164.502(a)(5)(iii).

Comment: A few commenters believed that defining "investigation," "intervention," or "surveillance" was unnecessary or recommended against doing so and requested that the Department clarify that such terms do not encompass any prohibited purposes. One commenter requested that the Department define these terms to expressly exclude information related to reproductive health care.

Response: We are not defining the terms "investigation," "intervention," or "surveillance" in this rule. However, we are providing extensive interpretation in the preamble to clarify that such activities in the public health context do not encompass conducting a criminal, civil, or administrative investigation into any person, or imposing criminal, civil, or administrative liability on any person for the mere act of seeking, obtaining, providing, or facilitating health care, or identifying any person for such activities, including those for which use or disclosure of PHI is prohibited by 45 CFR 164.502(a)(5)(iii).

**Reporting of Child Abuse**

In accordance with section 1178(b) of HIPAA, the Privacy Rule permits a regulated entity to use or disclose PHI to report known or suspected child abuse or neglect if the report is made to a public health authority or other appropriate government authority that is authorized by law to receive such reports.[FN251] The Privacy Rule limits disclosures of PHI made pursuant to this permission to the minimum necessary to make the report.[FN252]

As the Department explained in the 2023 Privacy Rule NPRM, at the time HIPAA was enacted, "most, if not all, states had laws that mandated reporting of child abuse or neglect to the appropriate authorities." [FN253] Additionally, when Congress enacted HIPAA, it had already addressed child abuse reporting in other laws, such as the Victims of Child Abuse Act of 1990 [FN254] and the Child Abuse Prevention and Treatment Act.[FN255] For example, 34 U.S.C. 20341(a)(1), a provision of the original Victims of Child Abuse Act of 1990 that is still in place today, requires certain professionals to report suspected abuse when working on Federal land or in a federally operated (or contracted) facility.[FN256] As used in these statutes, the term "child abuse" does not include activities related to reproductive health care, such as abortion.

In the 2023 Privacy Rule NPRM, the Department discussed that it has long interpreted "child abuse," as used in the Privacy Rule and section 1178(b) of HIPAA, to exclude conduct based solely on a person seeking, obtaining, providing, or facilitating reproductive health care.[FN257] This interpretation is consistent with the public health aims of improving access to health care for individuals, including reproductive health care, and with relevant statutes at the time HIPAA was enacted, as described above. The Department also stated that this interpretation prohibits a regulated entity from disclosing PHI in reliance on the permission for reporting "child abuse" where the alleged victim does not meet the definition of "person" or "child," consistent with both 1 U.S.C. 8 and section 1178(b). Additionally, consistent with previous rulemaking under HIPAA, the Department clarified in the preamble that it did not intend for the interpretation to disrupt longstanding state or Federal child abuse reporting requirements that apply to regulated entities.[FN258]

The Department also made several clarifications in preamble concerning our interpretation of section 1178(b) and the Privacy Rule's public health permission and how we distinguish between public health reporting and disclosures for law enforcement purposes or judicial and administrative proceedings.

Comment: Many commenters supported the Department's clarification and agreed that it would preserve trust between individuals and health care providers, but also requested additional clarification from the Department on its implementation. Few opposed the clarification; those who did expressed concerns about the potential for the clarification to prevent state-mandated reporting in certain circumstances. Many commenters expressed mixed views about the Department's interpretation.

Response: The Department is moving forward with its interpretation as described in the NPRM. As noted above, this final rule does not alter the Privacy Rule's reliance on other applicable law with respect to determining who has the authority to act on behalf of an individual who is an unemancipated minor in making decisions related to health care, including lawful reproductive health care.[FN259] The Privacy Rule does not permit a regulated entity to disclose PHI as part of a report of suspected child abuse based solely on the fact that a parent seeks reproductive health care (e.g., treatment for a sexually transmitted infection) for a child. However, the regulated entity is permitted to make such disclosure where there is suspicion of sexual abuse that could be the basis of permitted reporting.

Congress defined the term "child" in 1 U.S.C. 8, and the term "child" in the Privacy Rule is consistent with that definition. As such, the Department believes that to the extent this clarification prohibits a regulated entity from disclosing PHI to report "child abuse" under this permission in the Privacy Rule where the alleged victim does not meet the definition of "person," it is consistent with both 1 U.S.C. 8 and section 1178(b).

The Department also reaffirms its clarification that the Privacy Rule permission to report known or suspected child abuse or neglect permits a disclosure only for the purpose of making a report, and the PHI disclosed must be limited to the minimum necessary information for the purpose of making a report.[FN260] These provisions do not permit the covered entity to disclose PHI in response to a request for the use or disclosure of PHI to conduct a criminal, civil, or administrative investigation into or impose criminal, civil, or administrative liability on a  **33005**  person based on suspected child abuse. Instead, as we explained in the 2023 Privacy Rule NPRM, any disclosure of PHI in response to this type of request from an investigator, must meet the applicable Privacy Rule conditions for disclosures for judicial and administrative proceedings or law enforcement purposes, as applicable.[FN261] That is the case whether such disclosure is in follow up to the report made by the covered entity (other than to clarify the PHI provided on the report) or part of an investigation initiated based on an allegation or report made by a person other than the covered entity.[FN262]

Moreover, this clarification does not affect the ability of state authorities to invoke other permissions for disclosure under the Privacy Rule, such as the permission for disclosures for law enforcement purposes, where they are seeking PHI related to unlawful reproductive health care.[FN263] Thus, the Department's interpretation of "child abuse" continues to support the protection of children while also serving HIPAA's objectives of protecting the privacy of PHI to promote individuals' trust in the health care system and preserving the relationship between individuals and their health care providers.

Comment: A few commenters recommended that the Department expand the clarification of child abuse to broadly address providing or facilitating all health care, rather than just reproductive health care.

Response: It is beyond the scope of this rule making to expand the clarification to include the provision or facilitation of all lawful health care. We appreciate the recommendations of commenters and will take them under advisement for potential future rulemaking.

### 3. Adding a Definition of "Reproductive Health Care"

Section 160.103 of the HIPAA Rules defines "health care" as "care, services, or supplies related to the health of an individual." [FN264] The definition clarifies that the term "includes but is not limited to" several identified types of care, services, and procedures [FN265] and includes examples such as therapeutic, rehabilitative, or maintenance care, as well as sale or dispensing of drugs or devices.

The Department proposed to add and define a new term, "reproductive health care," that would be a subset of the term "health care." [FN266] The Department proposed to define "reproductive health care" as "care, services, or supplies related to the reproductive health of the individual." The Department noted in the NPRM preamble that the HIPAA Rules define "health care" broadly.[FN267]

Consistent with the definition of "health care" in the HIPAA Rules, the proposed definition of "reproductive health care" would have applied broadly and included not only reproductive health care and services furnished by a health care provider and supplies furnished in accordance with a prescription, but also care, services, or supplies furnished by other persons and non-prescription supplies purchased in connection with an individual's reproductive health. The Department proposed to use the term "reproductive health care" rather than "reproductive health services" to ensure that the term was interpreted broadly to capture all health care that could be furnished to address reproductive health, including the provision of medications and devices, whether prescription or over-the-counter.

The Department discussed in preamble some of the types of care, services, and supplies that were included in the proposed term. In keeping with the Department's intention for "reproductive health care" to be inclusive of all types of health care related to an individual's reproductive system, the 2023 Privacy Rule NPRM preamble indicated that the term would include, but not be limited to: contraception, including emergency contraception; pregnancy-related health care; fertility or infertility-related health care; and other types of care, services, or supplies used for the diagnosis and treatment of conditions related to the reproductive system. We also provided a non-exhaustive list of examples of health care within each of these categories of reproductive health care.

Consistent with the definition of "health care" adopted in 2000 in the HIPAA Rules, the Department did not propose a specific definition of "reproductive health" but invited comment on whether including a particular definition of "reproductive health" would be beneficial.

Many commenters supported the proposal and agreed that it would provide the necessary protections for individuals and others. Some referenced existing definitions used by other legal authorities and recommended the Department consider adopting or incorporating them in some manner.

Some commenters opposed the proposal to provide an inclusive definition of reproductive health care. Some commenters asserted that the proposal lacked clarity and was too open-ended, making it difficult to operationalize. Other commenters expressed concern that the proposed definition would permit minors to consent to reproductive health care without parental consent.

The final rule adopts the new term "reproductive health care" and definition with three modifications. First, we replace "care, services, or supplies related to the reproductive health of the individual" with "health care" and add a citation to the HIPAA Rules' definition of that term to clarify that reproductive health care is a subset of "health care."

Second, we specify that the term means health care "that affects the health of the individual in all matters relating to the reproductive system and to its functions and processes." In keeping with the Department's intention for "reproductive health care" to be interpreted broadly and inclusive of all types of health care related to an individual's reproductive system, this additional language clarifies that the definition encompasses the full range of health care related to an individual's reproductive health.

Third, we add a statement reaffirming that the definition should not be construed to establish a standard of care for or regulate what constitutes clinically appropriate reproductive health care.

As discussed in the NPRM, this approach is consistent with the approach the Department took when it adopted the definition of "health care" in the HIPAA Rules. At that time, the Department explained that listing specific activities would create the risk that important activities would be left out and could also create confusion.[FN268]

By describing more fully the breadth of reproductive health care, the definition may decrease the perceived burden to regulated entities of complying with the rule by helping them determine whether a request for **\*33006** the use or disclosure of PHI includes PHI that is implicated by this final rule.

To further clarify what is included in reproductive health care for regulated entities, we provide a non-exclusive list of examples that fit within the definition: contraception, including emergency contraception; preconception screening and counseling; management of pregnancy and pregnancy-related conditions, including pregnancy screening, prenatal care, miscarriage management, treatment for preeclampsia, hypertension during pregnancy, gestational diabetes, molar or ectopic pregnancy, and pregnancy termination; fertility and infertility diagnosis and treatment, including assisted reproductive technology and its components [FN269] (e.g., in vitro fertilization (IVF)); diagnosis and treatment of conditions that affect the reproductive system (e.g., perimenopause, menopause, endometriosis, adenomyosis); and other types of care, services, and supplies used for the diagnosis and treatment of conditions related to the reproductive system (e.g., mammography, pregnancy-related nutrition services, postpartum care products).

Additionally, the language in the definition stating that the definition should not be construed to set forth a standard of care or regulate what constitutes clinically appropriate reproductive health care should not be read as limiting "reproductive health care" to only health care that is determined to be appropriate by a health care professional. Rather, it may be the individual who determines whether the health care they receive, such as over-the-counter contraceptives, is appropriate. Like the definition of "health care," the definition of reproductive health care is intended to be broad. Finally, we clarify that meeting the definition is not sufficient for information about such health care to be protected under the HIPAA Rules or this final rule. Rather, the information about such health care still needs to meet the definition of PHI.[FN270]

Comment: Some commenters expressed support for the proposed definition of "reproductive health care." Several commenters specifically expressed their support for a broad definition of the term for various reasons, including: ensuring that providers of reproductive health care can continue to serve vulnerable communities and reduce health care disparities; providing clarity; and mitigating the need for clinical expertise and interpretation for each request for reproductive health information. Other commenters expressed support for the term because it would improve access to care and better reflect the breadth of services that support an individual's reproductive health, enable health care providers to continue to maintain appropriate data safeguards, and enable individuals to feel comfortable disclosing their information without fear of incrimination.

Many other commenters expressed opposition to the proposed definition because it was too expansive and would encompass procedures that they did not consider to be reproductive health care. Many commenters explicitly requested that the definition exclude certain types of health care. A few commenters recommended that the Department narrow the proposed definition to apply only to records directly involving certain specified services and clarify that the final definition does not include other procedures or treatments related to pregnancy or contraception. Another commenter expressed opposition to the proposed definition of "reproductive health care" because they believe that reproductive health information is no more sensitive than other medical information and should not be treated differently.

One commenter opposed the proposed definition of "reproductive health care" because they thought it would prevent health care providers from disclosing PHI to other health care providers for treatment, which would erode individual trust.

Several commenters requested that the Department expand the proposed definition, be more specific in its meaning (e.g., provide additional information about the types of care, services, or supplies included in the definition), or replace it with a more expansive term (e.g., "sensitive personal health care" meaning "care, services, or supplies related to the health of the individual which could expose any person to civil or criminal liability for the mere act of seeking, obtaining, providing, or facilitating such health care"). A commenter urged the Department to define the term "sexual and reproductive health care" to ensure that individuals have reproductive health care privacy, regardless of their sexual orientation or gender identity.

Commenters offered several alternative definitions or terms, such as "including but not limited to services related to contraception, sterilization, preconception care, maternity care, abortion care, and counseling regarding reproductive health care"; the definition of "reproductive health care services" at 18 U.S.C. 248(e)(5); "reproductive and sexual health care services" as defined in California Health and Safety Code section 1367.31; and limiting the definition to capture only health care that

is at risk of being investigated or prosecuted because of Dobbs. Other commenters requested additional precision or clarity in the definition. For example, a commenter recommended that the definition include the specific codes and data points that would constitute reproductive health care that would be prohibited from disclosure under the proposed rule (e.g., International Classification of Diseases (ICD) codes related to reproductive health, ABO blood type and Rh factor).

Several commenters urged the Department to narrow the proposed definition because of operational concerns, including the redirection of resources to making or obtaining legal determinations about whether a particular type of care was reproductive health care. Some explained that health information management staff generally do not have the clinical expertise to determine what would constitute "reproductive health care," while another stated that physicians would also have trouble discerning what health care would meet the proposed definition. Another commenter recommended that the Department include only PHI that is already reliably segregated in EHRs in the definition.

Many commenters requested that the Department further explain the proposed definition either in preamble or the regulatory text. One commenter suggested that in lieu of a definition of "reproductive health care," the Department include an extensive discussion of examples in the preamble and provide entities flexibility to implement policies or procedures that may be affected by the definition of "reproductive health care" in accordance with their operational structures. A few commenters also recommended that the Department provide examples in preamble discussion, rather than regulatory text. One commenter recommended that the Department provide specific examples to illustrate its meaning where there could be ambiguity. Several commenters recommended that examples be included in the regulatory text and provided specific examples of the types **\*33007** of health care they thought should be included. Some commenters recommended the Department include examples but did not specify whether they should be in the preamble or in the regulatory text, while other commenters requested that the Department include a non-exhaustive list of examples of reproductive health care in both the regulation and preamble.

Response: After consideration, we have finalized a definition grounded in the Privacy Rule's long-established term "health care." We provide a non-exhaustive list of examples in preamble above. We do not explicitly address all of the many types of health care suggested in comments to avoid creating the impression of a complete list. This is also consistent with our approach regarding the definition of "health care." We emphasize that this definition does not set or affect standards of care, nor does it affect uses and disclosures of PHI for treatment purposes. Operational concerns expressed by some commenters are addressed in response to comments on the prohibition.

### 4. Whether the Department Should Define Any Additional Terms

The Department requested comments about whether it would be helpful for the Department to define "reproductive health" or any additional terms.[FN271]

Comment: Several commenters recommended that the Department define "reproductive health" because it would ensure that all covered entities would be required to implement changes, or that the PHI of individuals receiving certain types of health care would not be disclosed to states where individuals who receive such health care is being penalized.

Several commenters urged the Department to add the definition of reproductive health adopted by the United Nations and World Health Organization, while others recommended the adoption of the definition articulated by the International Conference on Population and Development in 1994. One commenter expressed opposition to adding a definition of reproductive health as unnecessary, and another instead recommended adoption of a precise definition of "reproductive health care."

Another commenter recommended expanding the definition of PHI to include certain digital data of entities not regulated under HIPAA (e.g., information from period tracking apps). One commenter recommended revising the definition of "health oversight agency" to exclude agencies that investigate or prosecute activities related to reproductive health care. Some commenters requested that the Department define additional terms or clarify existing terms.

Rather than define additional terms, one commenter recommended that the Department ensure that all the proposed definitions would be aligned with the Office of the National Coordinator for Health Information Technology (ONC) and CMS-mandated data elements for Certified Electronic Health Record Technology products and in the electronic clinical quality measures that health care providers are required to report to CMS.

Response: We appreciate the feedback from commenters, but upon further consideration, have concluded that defining any of the additional terms or clarifying additional existing ones is not necessary to support the implementation of this final rule. We also clarify that because HIPAA only authorizes the Department to protect IIHI used or disclosed by covered entities and their business associates, we are not able to regulate information that individuals themselves store and share using consumer health apps.

### B. *Section 164.502—Uses and Disclosures of Protected Health Information: General Rules*

Section 164.502 of the Privacy Rule contains the general rules governing uses and disclosures of PHI. Paragraph (a)(1) of this section sets forth the list of permitted uses and disclosures.

### 1. Clarifying When PHI May Be Used or Disclosed by Regulated Entities

Section 164.502(a)(1)(iv) generally permits a regulated entity to use or disclose PHI pursuant to and in compliance with a valid authorization under 45 CFR 164.508, except for uses and disclosures of genetic information by a health plan for underwriting purposes prohibited under 45 CFR 164.502(a)(5)(i). Thus, an authorization that purports to allow a health plan to use or disclose PHI for that prohibited purpose is not valid under the Privacy Rule.

The Department proposed to modify 45 CFR 164.502(a)(1)(iv) to incorporate an additional limitation on the ability of a regulated entity to use and disclose PHI pursuant to an individual's authorization.[FN272] Specifically, the Department's proposal would prohibit a regulated entity from using or disclosing PHI pursuant to an individual's authorization where the purpose of the disclosure is for a criminal, civil, or administrative investigation or proceeding against any person in connection with seeking, obtaining, providing, or facilitating reproductive health care that is lawful under the circumstances in which such health care is provided, or to identify any person for the purpose of initiating such activities. As explained in the 2023 Privacy Rule NPRM, the proposed modification was intended to prevent the misuse of the general permission for a regulated entity to use or disclose PHI pursuant to an individual's authorization to bypass the proposed prohibition against using and disclosing PHI for purposes that would be prohibited by proposed 45 CFR 164.502(a)(5)(iii).

The Department explained in the proposed rule that this change to the authorization permission was necessary to protect individuals' privacy by precluding any possibility that a third party, such as a law enforcement official, could coerce or attempt to coerce an individual into signing an authorization, thereby enabling the third party to circumvent the prohibition proposed at 45 CFR 164.502(a)(5)(iii).

The Department also proposed to modify the general rules in 45 CFR 164.502(a)(1)(vi) to expressly condition certain uses and disclosures made under 45 CFR 164.512 on the receipt of an attestation pursuant to proposed 45 CFR 164.509, which is discussed below in greater detail. For clarity, the Department proposed to revise 45 CFR 164.502(a)(1)(vi) by replacing the sentence containing the conditions for certain permitted uses and disclosures with a lettered list.

Public comments about the use of authorization to use and disclose PHI for the purposes the Department proposed to prohibit in the 2023 Privacy Rule NPRM were generally divided between opposing views and supportive views, although only a few comments expressed full support for the proposal, as drafted. While many commenters shared the Department's concerns about the potential for individuals to be coerced into providing an authorization, some of these commenters nonetheless opposed the proposal because it could limit beneficial disclosures, cause uncertainty about the validity of an authorization, increase the burden on regulated entities, or seem to conflict with state laws that permit the disclosure of certain health information with the individual's explicit written consent.

The Department received no comments on its proposal to replace the **\*33008** sentence at 45 CFR 164.502(a)(1)(vi) with a lettered list. Comments on the Department's proposal to condition certain disclosures made under 45 CFR 164.512 on the receipt of an attestation as required by proposed 45 CFR 164.509 are discussed below in greater detail.

The Department is not finalizing its proposal to prohibit a regulated entity from using or disclosing an individual's PHI for the specified purposes pursuant to and in compliance with an individual's authorization. We agree with the majority of public comments discussed in detail below that generally expressed the view that the Privacy Rule's authorization requirements empower individuals to make decisions about who has access to their PHI. We acknowledge that maintaining the permission for regulated entities to obtain an individual's authorization to use and disclose PHI could leave an individual exposed to the potential for duress or coercion by a third party. It could also expose a health care provider or other person who provides or facilitates reproductive health care to liability in the event the authorization is used to affect a disclosure for a prohibited purpose in connection with lawful reproductive health care. However, we believe that continuing to permit uses and disclosures pursuant to an individual's authorization best preserves individual autonomy concerning uses and disclosures of their PHI. Consistent with our practice described above, the Department will monitor closely the interaction of the revised Privacy Rule and the evolving legal landscape to ensure an appropriate balance of protecting the privacy interests of individuals and permitting access to PHI for non-health care purposes.

As we discussed in the proposed rule, there is a relationship between the provision allowing an individual to authorize a regulated entity to use or disclose the individual's PHI to a third party and the HITECH Act requirement that a regulated entity comply with an individual's direction to transmit to another person an electronic copy of the individual's PHI in an EHR ("individual access right to direct").[FN273] Both enhance an individual's autonomy by providing them with the ability to determine who can access the individual's PHI as specified in the authorization or access request. Both also create an opportunity for coercion or attempted coercion of an individual by another person (e.g., a law enforcement official could attempt to coerce an individual into providing the law enforcement official with access to the individual's PHI by offering the individual a reduced sentence for an alleged crime). And while we remain concerned about the potential for coercion or attempted coercion, even if the Department were to finalize the proposed limitation on uses and disclosures with an authorization, the individual would retain the individual access right to direct, which is enshrined in statute. We also believe it would be inconsistent with the spirit of individual access right to direct for the Department to limit the ability of an individual to authorize a regulated entity to disclose their PHI to another person.

For the foregoing reasons, we are not finalizing this proposal, and the language in 45 CFR 164.502(a)(1)(iv) remains unchanged.

Comment: While some commenters expressed concern about the potential for coercion described in the proposed rule, they did not all agree that it would be appropriate to address this concern by prohibiting such disclosures pursuant to an authorization. Some commenters asserted that coercion concerns would not be eliminated by curtailing the ability of individuals to authorize disclosures of their PHI in certain circumstances.

Some commenters explained that prohibiting individuals from requesting disclosures of their PHI pursuant to an authorization for prohibited purposes would create a significant burden for regulated entities, primarily because of the frequent failure of persons requesting the use or disclosure of PHI to provide sufficient detail regarding the purpose of the request to allow them to determine if it would be for a prohibited purpose.

A few commenters asserted that a HIPAA authorization is the safest approach to ensuring an individual is aware of and agrees to the use or disclosure of their PHI. One of those commenters recommended that the Department permit a regulated entity to disclose PHI pursuant to a valid authorization unless the covered entity has actual knowledge that an authorization was not voluntary. A commenter recommended adding a disclaimer or warning to the authorization to provide assurances that an individual was not coerced into disclosing their PHI to law enforcement or other third party that might seek to use the PHI for improper purposes. Still another commenter recommended that the Department require the authorization to indicate the types

of sensitive information the individual intends to share. One commenter recommended that certain disclosures be accompanied by a notice of the individual's rights under the Privacy Rule.

Response: We appreciate comments concerning this proposal and the restriction of individuals' ability to maintain control over their PHI by prohibiting the use of written authorization. The Privacy Rule's written authorization requirements are the most objective means by which an individual can provide direction to a regulated entity about the use and disclosure of their PHI known to a regulated entity. The right of individuals to access their PHI and choose to disclose their PHI to another person is a cornerstone of HIPAA, and as such, we are not proceeding with this proposal. The Department will continue to monitor complaints we receive and the outcome of enforcement actions to identify potential coercion and the effect of permitting individuals to authorize the disclosure of PHI for purposes that are prohibited under 45 CFR 164.502(a)(5)(iii) on the relationship between health care providers and individuals.

We also appreciate the comments that asserted that restricting the ability of regulated entities to use an authorization to obtain PHI for the purposes prohibited in this rulemaking could create a burden for the regulated entities.

To the extent that individuals wish to authorize the use and disclosure of their PHI, particularly when a request is not clear, or when a request seeks only partial parts of a record, a written authorization provides the regulated entity with the opportunity to clarify, with both the individual and the person requesting the disclosure, the PHI that will be disclosed. State laws that require regulated entities to obtain an individual's written consent are generally considered more privacy protective, and thus are not preempted.

Comment: Several commenters expressed support for eliminating the ability of regulated entities to use or disclose PHI pursuant to an authorization in certain circumstances because of the potential for harm to individuals as proposed. One commenter described the potential negative effects of permitting uses and disclosures pursuant to an authorization in certain circumstances on individuals from historically marginalized communities. Another commenter asserted that individuals frequently do not read consent forms provided to them for signature for a variety of reasons, including proficiency. Some commenters expressed concerns that individuals who are the subject of a **\*33009** criminal investigation or prosecution would be placed in situations where it would not be possible to obtain a voluntary authorization (e.g., a custodial situation), or that law enforcement could seek to persuade an individual to provide them with access to the individual's PHI through improper means.

Response: We continue to share the concern expressed by commenters about the potential for coercion or harassment of individuals, particularly those in marginalized or underserved communities, to provide authorization for the use or disclosure of their PHI. According to many reports and data cited by the Department and commenters, such individuals more often experience negative interactions with law enforcement or other prosecutorial authorities. We urge HIPAA regulated entities to be mindful of Privacy Rule requirements that could help mitigate the potential for harm resulting from coercion or difficulties individuals may experience in understanding an authorization. For example, 45 CFR 164.508(b)(2)(v) holds invalid authorizations that include "material information [. . .] known by the covered entity to be false"; 45 CFR 164.508(c)(1)(iv) requires that every authorization include a description of each purpose of the requested use or disclosure; and 45 CFR 164.508(c)(3), requires the authorization be written in plain language.[FN274] The Department will continue to monitor complaints, questions, and enforcement outcomes for potential harm from disclosures resulting from authorizations.

Comment: A few commenters requested clarifications of how the proposal would affect other disclosures made pursuant to the Privacy Rule, including disclosures to the individual's attorney, and whether the Department intended it to apply to other consumer-initiated requests, such as part of an Application Programming Interface (API).

A commenter recommended that health care providers be permitted to refuse to release PHI to any consumer health app when the information could lead to civil or criminal repercussions for the health care provider unless the app developer signs a binding agreement that protects them.

Response: We are not finalizing the proposal, but state here that the Department did not intend to affect or disrupt the ability of covered entities to make other disclosures of PHI pursuant to a written authorization under the Privacy Rule. Additionally, as discussed above, individuals have the right to obtain a copy of their PHI and the individual access right to direct, which could involve releasing PHI to a consumer health app or an API. With respect to EHR and technology vendors and other third parties who facilitate the exchange of PHI on behalf of covered entities, we continue to stress that valid business associate agreements are required by the Privacy Rule and necessary to protect the privacy of the individuals who are the subject of the PHI. ONC also has made clear that it intends to advance technologies that support requirements already extant under the HIPAA Privacy Rule. [FN275] Additionally, the Department continues to urge covered entities that have direct contact with individuals to educate such individuals on the risks of disclosing their PHI to persons that are not regulated by HIPAA.[FN276] We will continue to ensure that regulated entities enter into business associate agreements as required by the Privacy Rule.[FN277] We will continue to monitor complaints, questions, and enforcement outcomes.

Comment: Many commenters addressed the relationship between the Department's proposal to eliminate the option for an individual to request disclosure of their information for the prohibited purposes pursuant to an authorization and the individual right of access, particularly, the right of an individual to direct a regulated entity to transmit to a third party an electronic copy of their PHI in an EHR. Several commenters recommended that the Department curtail the individual access right to direct. Some commenters expressed concern about the potential for individuals to be coerced into providing access to their PHI to third parties. A few commenters expressed concerns that some third parties sell PHI for purposes adverse to individuals' interests, including some of the purposes described in the 2023 Privacy Rule NPRM.

A few commenters provided recommendations for ways to educate individuals regarding their rights under the Privacy Rule.

Response: Although we appreciate the comments on this topic, any modifications to the individual access right to direct are beyond the scope of this rulemaking. We reiterate here that covered entities and their technology vendors that meet the definition of business associates must ensure that valid business associate agreements are in place,[FN278] and we urge them to facilitate individuals' awareness of the risks of using third-party consumer apps that are not regulated by HIPAA.[FN279] The Department continues to appreciate the identification of better education resources for individuals and health care providers and commits to providing educational resources through its website, regional offices, and webinars.

## 2. Adding a New Category of Prohibited Uses and Disclosures

Generally, the Privacy Rule prohibits the use or disclosure of PHI except as permitted or required by the Privacy Rule. Paragraph (a)(5) of section 164.502 contains specific purposes for which the Privacy Rule explicitly prohibits the use and disclosure of PHI. Section 164.502(a)(5)(i) prohibits most health plans from using or disclosing PHI that is genetic information for underwriting purposes, while 45 CFR 164.502(a)(5)(ii) prohibits a regulated entity from selling PHI, except when they have obtained a valid authorization from the individual who is the subject of the PHI.

The Department proposed to add a new paragraph, 45 CFR 164.502(a)(5)(iii), to prohibit regulated entities from using or disclosing an individual's PHI for certain additional purposes, and to describe the scope, applicability, and limitations of the prohibition. Similar to most other **\*33010** prohibitions within the Privacy Rule, this prohibition would be purpose-based, rather than a blanket prohibition against uses and disclosures of certain types of PHI.[FN280] The Department's rationale for this approach was four-fold: (1) to be consistent with the existing Privacy Rule permissible use and disclosure structure with which regulated entities are familiar, including the permission to disclose to law enforcement for certain purposes; (2) to avoid imposing a requirement on regulated entities that would necessitate the adoption and implementation of costly technology upgrades to enable data segmentation; [FN281] (3) to recognize that PHI about an individual's reproductive health care may be used or disclosed for a wide variety of purposes, and permitting the use or disclosure of PHI for some of those purposes would erode individuals' ability to trust in the health care system; and (4) to avoid any misperception that the Department is setting a standard of care or substituting its judgment for that of individuals and licensed health care professionals.

Proposed 45 CFR 164.502(a)(5)(iii)(A) would establish a new prohibition against the use or disclosure of PHI. Section (a)(5) (iii)(A)(1) would prohibit the use or disclosure of PHI where the use or disclosure is for a criminal, civil, or administrative investigation into or proceeding against any person in connection with seeking, obtaining, providing, or facilitating reproductive health care. Section 164.502(a)(5)(iii)(A)(2) would prohibit the use or disclosure of PHI to identify any person for the purpose of initiating a criminal, civil, or administrative investigation into or proceeding against any person in connection with seeking, obtaining, providing, or facilitating reproductive health care.

The Department proposed 45 CFR 164.502(a)(5)(iii)(B) to explain that "seeking, obtaining, providing, or facilitating" would include, but not be limited to, expressing interest in, inducing, using, performing, furnishing, paying for, disseminating information about, arranging, insuring, assisting, or otherwise taking action to engage in reproductive health care; or attempting any of the same. As the Department explained in the 2023 Privacy Rule NPRM, the proposed prohibition would apply to any request for PHI to facilitate a criminal, civil, or administrative investigation or proceeding against any person, or to identify any person to initiate an investigation or proceeding, where the basis for the investigation, proceeding, or identification is that the person sought, obtained, provided, or facilitated reproductive health care that is lawful under the circumstances in which such health care is provided. The Department further explained that, consistent with its HIPAA authority, the prohibition would preempt state or other laws requiring a regulated entity to use or disclose PHI in response to a court order or other type of legal process for a purpose prohibited under the proposed rule. Conversely, the prohibition would not preempt laws that require the use or disclosure of PHI for other purposes, such as: public health activities; [FN282] investigations of sexual assault committed against an individual where such use or disclosure is conditioned upon the receipt of an attestation; or investigations into human and sex trafficking, child abuse, or professional misconduct or licensing inquiries.[FN283]

The Department also proposed to subject this prohibition to a Rule of Applicability in 45 CFR 164.502(a)(5)(iii)(C). As the Department explained, the proposed prohibition in 45 CFR 164.502(a)(5)(iii) would prohibit a regulated entity from using or disclosing PHI for certain purposes against any person in connection with seeking, obtaining, providing, or facilitating reproductive health care that is "lawful under the circumstances in which such health care is provided." [FN284] The Department further explained that it proposed a framework for regulated entities to determine whether the reproductive health care at issue was lawful under the circumstances in which such health care was provided. The proposed language of the Rule of Applicability under this rule would apply where one or more of three specified conditions exist.

The first condition, as proposed in 45 CFR 164.502(a)(5)(iii)(C)(1), addressed reproductive health care provided outside of the state that authorized the investigation or proceeding where such health care is lawful in the state where it is provided. In the proposed rule, we also clarified that the proposal would apply the prohibition in a situation in which the health care is ongoing, has been completed, or has not yet been obtained, provided, or facilitated. The proposed prohibition would recognize that any interest of society in conducting an investigation or proceeding against a person would require balancing with, and generally be outweighed by, the interests of society in protecting the privacy interests of individuals when they access lawful health care. As discussed above, privacy interests are heightened with respect to reproductive health care that is lawful under the circumstances in which it is provided as compared to the interests of law enforcement, and private parties afforded legal rights of action, in investigating or imposing liability for actions related to lawful reproductive health care.

The second condition, proposed in 45 CFR 164.502(a)(5)(iii)(C)(2), addressed reproductive health care protected, required, or authorized by Federal law, regardless of the state in which such health care is provided. It would apply the prohibition to reproductive health care that is lawful under the applicable Federal law and where the investigation or proceeding is against any person in connection with seeking, obtaining, providing, or facilitating reproductive health care. It would apply, for example, where the underlying reproductive health care continues to be protected by the Constitution, such as contraception, or is expressly required or authorized under Federal law.[FN285]

The third condition, proposed in 45 CFR 164.502(a)(5)(iii)(C)(3), would apply the prohibition when the relevant criminal, civil, or administrative investigation or proceeding is in connection with any person seeking, obtaining, providing, or facilitating reproductive health care that is provided in a state consistent with and permitted by the law of that same state.

The Department also proposed a Rule of Construction in 45 CFR 164.502(a)(5)(iii)(D) that provided that the proposed prohibition should not be construed to prohibit a use or disclosure of PHI otherwise permitted by the Privacy Rule unless such use or disclosure is primarily for the purpose of investigating or imposing liability on any person for the mere act of seeking, obtaining, providing, or facilitating reproductive health care.[FN286] The Department proposed the Rule of Construction to avoid an erroneous interpretation of the prohibition  **\*33011**  standard, which otherwise could have been construed to prevent regulated entities from using or disclosing PHI for the purpose of defending themselves or others against allegations that they sought, obtained, provided, or facilitated reproductive health care that was not lawful under the circumstances in which it was provided.

Most of the comments addressing the proposed prohibition expressed support for the Department's purpose-based approach and the principle that the Privacy Rule should prohibit the use and disclosure of PHI for a criminal, civil, or administrative investigation into or proceeding against any person, or to identify any person to initiate a criminal, civil, or administrative investigation into or proceeding against any person, in connection with seeking, obtaining, providing, or facilitating lawful reproductive health care. At the same time, the Department received many comments that expressed concern about the proposal's clarity and regulated entities' ability to operationalize the Rule of Applicability and Rule of Construction. For example, commenters asserted that to the extent the proposed rule would require regulated entities to determine whether the requested PHI was about reproductive health care that was lawful under the circumstances in which it was provided, making such a determination could be unduly burdensome when the request was about reproductive health care that was not provided by the regulated entity that received the request and could expose them to legal risk in the absence of additional guidance or a safe harbor. Other commenters expressed concern that applying the prohibition would undermine the ability of states to enforce their own health care laws.

Commenters who addressed the proposed Rule of Construction also expressed confusion about how the Department intended "primarily" or "primarily for the purpose of" to be interpreted. Many either requested examples of uses and disclosures that were "primarily" for the underlying prohibited purposes. In lieu of the proposal to avoid liability based on "the mere act of" seeking, obtaining, providing, or facilitating reproductive health care, a few commenters suggested expanding the proposed definition or modifying existing permissions to explicitly exclude conduct based solely on seeking, obtaining, providing, or facilitating certain types of health care.

The Department is finalizing the proposed prohibition that restricts the ability of regulated entities to use or disclose PHI for activities with the purpose of investigating or imposing liability on any person for the mere act of seeking, obtaining, providing, or facilitating reproductive health care that is lawful under the circumstances in which it was provided, or to identify any person for such purposes, with modifications to improve clarity and ease implementation for regulated entities.

The Department is retaining its purpose-based approach in the final rule in light of concerns about the ability of regulated entities to segment certain types of data and in recognition that PHI about an individual's reproductive health may be reflected throughout an individual's longitudinal health record, in addition to being maintained by a wide variety of regulated entities.

As we discussed in the 2023 Privacy Rule NPRM, the Department recognizes that diseases and conditions that are not directly related to an individual's reproductive health may be affected by or have bearing on the individual's reproductive health and the reproductive health care they are eligible to receive, and vice versa. Thus, it may be necessary for all types of health care providers to maintain complete and accurate medical records to ensure that subsequent health care providers are adequately informed in making diagnoses or recommending courses of treatment. For example, an individual with a chronic cardiac or endocrine condition may become pregnant, placing additional strain on the individual's cardiovascular or endocrine system. In such cases, it is essential that their cardiologist or endocrinologist be informed of the pregnancy and consulted as necessary to ensure appropriate health care is provided to the individual because such conditions may have bearing on their pregnancy.

Additionally, the final rule revises the prohibition standard at 45 CFR 164.502(a)(5)(iii) by incorporating language from the proposed Rule of Construction to clarify the purposes for which the Department prohibits uses or disclosures of PHI. In 45 CFR 164.502(a)(5)(iii)(A)(1) and (2), the Department incorporates the "mere act of" language of the proposed Rule of Construction to clarify that the prohibited uses and disclosures of PHI are tied to imposing criminal, civil, or administrative liability for the "mere act of" seeking, obtaining, providing, or facilitating reproductive health care and not just "in connection to" such acts.[FN287] Section 164.502(a)(5)(iii)(A)(1) combines the criminal, civil, or administrative investigations language from the proposed prohibition standard with the proposed Rule of Construction to prohibit regulated entities from using or disclosing PHI for activities conducted for the purpose of a criminal, civil, or administrative investigation into any person for the mere act of seeking, obtaining, providing, or facilitating reproductive health care. Section 164.502(a)(5)(iii)(A)(2) separates and replaces the "or proceeding against" language from the first condition of the proposed prohibition standard with "to impose criminal, civil, or administrative liability on" and incorporates language from the proposed Rule of Construction to prohibit regulated entities from using or disclosing PHI for activities conducted for the purpose of imposing criminal, civil, or administrative liability on any person for the mere act of seeking, obtaining, providing, or facilitating reproductive health care. Similar to proposed 45 CFR 164.502(a)(5)(iii)(A)(2), 45 CFR 164.502(a)(5)(iii)(A)(3) now addresses the use or disclosure of PHI to identify any person for the activities described in the other conditions of the prohibition standard. To the extent the purpose in 45 CFR 164.502(a)(5)(iii)(A)(1) relates to activities conducted for an investigation, the purpose in 45 CFR 164.502(a)(5)(iii)(A)(2) relates to the activities to impose liability, including activities that would flow from that investigation, whether it be in the form of proceedings to consider censure, medical license revocation, the imposition of fines or other penalties, or detainment or imprisonment, or the actual imposition of such liability.

The prohibition against the uses and disclosures of PHI finalized in 45 CFR 164.502(a)(5)(iii)(A) is subject to the Rule of Applicability that the Department is finalizing in 45 CFR 164.502(a)(5)(iii)(B). As discussed in the proposed rule and finalized herein, the Rule of Applicability modifies the prohibition standard to make clear that the prohibition encompasses the use or disclosure of PHI for any activities conducted for the purpose of investigating or imposing liability on any person for the mere act of seeking, obtaining, providing, or facilitating lawful reproductive health care that the regulated entity that has received the request for PHI has reasonably determined is lawful under the circumstances in which such health care is provided. The prohibition's **\*33012** reference to the "mere act" of seeking, obtaining, providing, or facilitating lawful reproductive health care includes the reasons that the reproductive health care was sought or provided (e.g., an investigation into whether a particular abortion was necessary to save a pregnant person's life would constitute an investigation into the "mere act" of seeking, obtaining, providing, or facilitating reproductive health care). The reference to "mere act" operates the same way with respect to activities conducted to identify any individual for the purposes described above. This includes but is not limited to law enforcement investigations, third party investigations in furtherance of civil proceedings, state licensure proceedings, criminal prosecutions, and family law proceedings. Examples of criminal, civil, or administrative investigations or activities to impose liability for which regulated entities would be prohibited from using or disclosing PHI would also include a civil suit brought by a person exercising a private right of action provided for under state law against an individual or health care provider who obtained, provided, or facilitated a lawful abortion, or a law enforcement investigation into a health care provider for lawfully providing or facilitating the disposal of an embryo at the direction of the individual.

The Department acknowledges that this final rule will not prohibit the use or disclosure of PHI in all instances in which persons request the use or disclosure of PHI for an investigation or to impose liability on a person for seeking, obtaining, providing, or facilitating reproductive health care. As discussed extensively in Section III of this rule, the Privacy Rule has long balanced the privacy interests of individuals with that of society in obtaining PHI for certain non-health care purposes. Accordingly, we acknowledge that in some circumstances, an individual's privacy interest in obtaining lawful care will outweigh law enforcement's interests in the PHI for certain non-health care purposes, while in others, law enforcement's interests in the PHI will outweigh the privacy interests of individuals. As we discussed above in Section III and in the proposed rule, recent developments in the legal landscape have made information about an individual's reproductive health more likely to be sought for punitive non-health care purposes, such as targeting individuals for seeking lawful reproductive health care outside of their home state, and therefore more likely to be subject to disclosure by regulated entities if the requested disclosure is permitted under the Privacy Rule. The Department's approach in this rulemaking limits the application of the prohibition to situations in

which reproductive health care meets one of the conditions of the Rule of Applicability. Accordingly, the prohibition applies only where individuals' privacy interests outweigh the interests of law enforcement, and private parties afforded legal rights of action, in obtaining individuals' PHI for the non-health care purpose of investigating or imposing liability for reproductive health care that was not lawful under the circumstances in which it was provided.

We also acknowledge, as we did in the proposed rule, that in some circumstances, the Privacy Rule imposes greater restrictions on uses and disclosures of PHI than state privacy laws, and the prohibition may delay or hamper enforcement of certain other state laws (e.g., laws governing access to reproductive health care). Such circumstances were contemplated by Congress when it enacted HIPAA.[FN288] For example, a state law might require a covered entity to disclose PHI to law enforcement in furtherance of an investigation, while the final rule may prohibit such a disclosure. In such cases, the provisions of the Privacy Rule would preempt the application of contrary provisions of state law, and the regulated entity could not disclose the PHI.[FN289] However, as discussed above in section III, we reiterate that not all methods to investigate the lawfulness of reproductive health care are foreclosed by this rule.

The Department emphasizes that the prohibition does not apply in circumstances that fall outside of its terms. Where a person requesting PHI identifies a legal basis for the request beyond the mere act of a person having sought, obtained, provided, or facilitated reproductive health care that was lawful under the circumstances in which it was provided, the prohibition at 45 CFR 164.502(a)(5)(iii) would not apply. Similarly, if a person obtains reproductive health care that was unlawful, such health care would not be lawful under the circumstances in which it was provided, and the prohibition would not apply. Where the prohibition does not apply, the Privacy Rule permits the requested PHI to be used or disclosed, provided that the use or disclosure is otherwise permitted by the Privacy Rule (i.e., the request meets the requirements of an applicable permission and is accompanied by a valid attestation as described by 45 CFR 164.509, where required). The Department reminds the public that persons who request PHI under false pretenses may be subject to criminal penalties under HIPAA.[FN290]

The Rule of Applicability, as discussed below, vests the determination of whether the reproductive health care was lawful under the circumstances it was provided with the regulated entity that receives the request for PHI and requires that such determination be reasonable. The regulatory presumption, also discussed below, replaces the proposed requirement that a regulated entity make a determination regarding the lawfulness of the reproductive health care where someone other than the regulated entity that receives the request provided such health care. The new language requires that the reproductive health care at issue be presumed lawful under the circumstances in which such health care is provided when provided by a person other than the regulated entity receiving the request. This helps to ensure that the regulated entity is not required to make a determination about the lawfulness of such health care. The presumption may be overcome if certain conditions are met.

In the proposed rule, the Department provided examples that remain helpful in illustrating the operation of the clarified prohibition and how it continues to permit uses and disclosures for legitimate interests.[FN291] For example, the prohibition does not restrict a regulated entity from using or disclosing PHI to a health oversight agency conducting health oversight activities, such as investigating whether reproductive health care was actually provided or appropriately billed in connection with a claim for such services, or investigating substandard medical care or patient abuse.[FN292] However, as discussed above, investigating substandard medical care  **33013**  or patient abuse may not be used as a pretext for investigating reproductive health care for purposes that are otherwise prohibited by this final rule. In another example, the rule does not bar a regulated entity from using or disclosing PHI to investigate an alleged violation of the Federal False Claims Act or a state equivalent based on unusual prescribing or billing patterns for erectile dysfunction medication.

This final rule also does not prohibit the use or disclosure of PHI where the PHI is sought to investigate or impose liability on a person for submitting a false claim for reproductive health care for payment to the government. In such a case, the request is not made for the purpose of investigating or imposing liability on a person for the mere act of seeking, obtaining, providing, or facilitating reproductive health care. Instead, the purpose of the request for PHI is to investigate or impose liability on a person for an alleged violation of the Federal False Claims Act or a state equivalent.[FN293] As another example, the revised prohibition standard generally does not prohibit the disclosure of PHI to an Inspector General where the PHI is sought to conduct

an audit aimed at protecting the integrity of the Medicare or Medicaid Program where the audit is not inconsistent with this final rule. This is because the request is generally not being made for the purpose of investigating or imposing liability on a person for the mere act of providing the reproductive health care itself. The prohibition also makes clear that the use or disclosure of PHI is permitted where the purpose of the use or disclosure is to investigate alleged violations of Federal nondiscrimination laws or abusive conduct, such as sexual assault, that may occur in connection with reproductive health care. The prohibition likewise makes clear that the use or disclosure of PHI is permitted where the purpose of the use or disclosure is to penalize the provision of reproductive health care that is not lawful, as defined by the Rule of Applicability at 45 CFR 164.502(a)(5)(iii)(B), as long as a Privacy Rule permission applies.

Under the prohibition, a regulated entity could respond to a request for relevant records in a criminal or civil investigation pursuant to 18 U.S.C. 248 regarding freedom of access to clinic entrances. Investigations under this provision are conducted for the purpose of determining whether a person physically obstructed, intimidated, or interfered with persons providing "reproductive health services," [FN294] or attempted to do so. Thus, they do not involve investigating or imposing liability on a person for the mere act of seeking, obtaining, providing, or facilitating reproductive health care that was reasonably determined to be lawful under the circumstances in which such health care was provided by the regulated entity that received the request for PHI.

The final rule retains the proposal's prohibition against the use or disclosure of PHI for activities conducted for the purpose of investigating or imposing liability on "any person" for the mere act of seeking, obtaining, providing, or facilitating reproductive health care that is lawful under the circumstances in which such health care is provided, or for identifying "any person" for such activities. "Any person" means, based on the HIPAA Rules' definition of "person," [FN295] that the prohibition is not limited to use or disclosure of PHI for use against the individual; rather, the prohibition applies to the use or disclosure of PHI against a regulated entity, or any other person, including an individual or entity, who may have obtained, provided, or facilitated lawful reproductive health care.[FN296]

The Department has always and continues to recognize that there may be a public interest and benefit in disclosing PHI for limited non-health care purposes, including enforcing duly enacted laws. The Department has also always sought to balance competing interests in individual privacy and the use and disclosure of PHI for particular purposes in the Privacy Rule. We balance these competing interests by considering both the harm to individuals that results from the use or disclosure of PHI (e.g., loss of trust in the health care system, potential for financial liability or detainment) and the countervailing interests in disclosure. As discussed above, the Department finds that the final rule reflects the appropriate balance between these interests by prohibiting the use and disclosure of PHI for activities conducted for the purpose of investigating or imposing liability on "any person" for the mere act of seeking, obtaining, providing, or facilitating reproductive health care that is lawful under the circumstances in which such health care is provided, or for identifying "any person" for such activities.

Accordingly, the final rule adopts, with modifications discussed below, the proposed Rule of Applicability and re-designates it as 45 CFR 164.502(a)(5)(iii)(B). The final rule text also adds the word "only" in 45 CFR 164.502(a)(5)(iii)(B) to make clear that the prohibition's application is limited to the use or disclosure of PHI "only" where one or more of the conditions set forth in the Rule of Applicability exists.

To address concerns from commenters about how to determine whether reproductive health care is "lawful," the Department finalizes a revised Rule of Applicability at 45 CFR 164.502(a)(5)(iii)(B). Specifically, the Rule of Applicability, as finalized, requires that a regulated entity that receives a request for PHI make a reasonable determination about the lawfulness of the reproductive health care in the circumstances in which such health care was provided, where lawfulness is described by 45 CFR 164.502(a)(5)(iii)(B)(1)-(3). Thus, a regulated entity that receives the request for PHI must decide whether it would be reasonable for a similarly situated regulated entity to determine, as provided in the Rule of Applicability, that the reproductive health care is lawful under the circumstances in which such health care is provided.

To make the reasonableness determination, that is, to determine whether it would be reasonable for a similarly situated regulated entity to determine that one or more of the conditions of the Rule of Applicability applies, a regulated entity receiving the request for PHI must evaluate the facts and circumstances under which the reproductive health care was provided. Such facts and circumstances include but are not limited to the individual's diagnosis and prognosis, the time such health care was provided, the location where such health care was provided, and the particular health care provider who provided the health care. This approach is consistent with the current and longstanding practice under the Privacy Rule, whereby a covered entity is responsible for determining whether a requested use or disclosure is permitted under one or more of the permissions set forth in the Privacy Rule. For example, a regulated entity is permitted to make a use or disclosure of PHI where "required by law" pursuant to 45 CFR 164.512(a). To make a use or disclosure under that permission, the regulated entity cannot rely on assertions from the person making the request, but rather, must itself evaluate the relevant law to determine whether  **\*33014**  the use or disclosure is "required by law" and thus permitted under that permission. As discussed above, the Department recognizes that this approach may prevent uses or disclosures in support of some law enforcement investigations (e.g., where a health care provider reasonably determines that its provision of reproductive health care was lawful, but where law enforcement reasonably disagrees or does not provide sufficient factual information for a regulated entity to determine that there is a substantial factual basis that the reproductive health care was not lawful under the circumstances in which such health care was provided). However, we believe that, in these narrow circumstances, the interests of law enforcement, and private parties afforded legal rights of action, are outweighed by privacy interests and that the current approach strikes the appropriate balance between these competing interests.

The Department is retaining the proposed framework for identifying the circumstances in which reproductive health care is lawful, and thus the prohibition applies. However, we are modifying the regulatory text of the Rule of Applicability to clarify its conditions. As revised, the regulatory text combines the first and third conditions of the Rule of Applicability into a revised 45 CFR 164.502(a)(5)(iii)(B)(1) that focuses on whether the reproductive health care at issue is lawful under the circumstances in which such health care is provided. Under the revised condition, the circumstances in which the prohibition applies are determined by the law of the state in which the health care is provided.

As proposed in the 2023 Privacy Rule NPRM, the first and third conditions, when considered together, would have given the impression that the Department was drawing a distinction between reproductive health care provided in-state or out-of-state, although outcomes would have been the same. As the Department explained in the proposed rule, both the first and third conditions would have prohibited a regulated entity from using or disclosing PHI where the reproductive health care was permitted by the law of the state in which it was provided (e.g., for pregnancy termination that occurs before a state-specific gestational limit or under a relevant exception in a state law restricting pregnancy termination such as when the pregnancy is the result of rape or incest or because the life of the pregnant individual is endangered, for reproductive health care that is generally permitted but must be provided by a specific type of health care professional or in a certain place of service). The outcome of the analysis remains the same under this final rule, which combines the first and third conditions of the Rule of Applicability into one condition. Thus, the revision improves the clarity of the Rule of Applicability by focusing solely on whether the reproductive health care was lawful under the circumstances in which it was provided.

Additionally, the final rule modifies the regulatory text in 45 CFR 164.502(a)(5)(iii)(B)(2) to include an express reference to the U.S. Constitution as a source of Federal law for determining whether reproductive health care is lawful under the circumstances in which such health care is provided. The Department has always intended to include the U.S. Constitution as a source of Federal law, and the final regulatory text now explicitly reflects this. The regulatory text also makes clear that the U.S. Constitution is not the sole source of Federal law and that Federal statutes, regulations, and policies may be the relevant legal authority for determining whether the reproductive health care is protected, required, or authorized under Federal law. This final rule in no way supersedes applicable state law pertaining to the lawfulness of reproductive health care.

To address commenters' concerns about obligating regulated entities to determine whether reproductive health care that occurred outside of the regulated entity is lawful, the Department is adding a new presumption provision at 45 CFR 164.502(a)(5)(iii)(C). It presumes the reproductive health care at issue was lawful under the circumstances in which such health care was provided when it was provided by a person other than the regulated entity receiving the request. The presumption can be overcome

where the regulated entity has either actual knowledge, or factual information supplied by the person requesting the use or disclosure, that demonstrates a substantial factual basis that the reproductive health care was not lawful under the specific circumstances in which it was provided. The first ground to overcome the presumption—concerning "actual knowledge"—accounts for situations where the regulated entity has actual knowledge that the reproductive health care was not lawful. The second ground to overcome the presumption—concerning "factual information"—accounts for situations where the person making the request has demonstrated to the regulated entity that there is a substantial factual basis that the reproductive health care was unlawful under the circumstances in which such health care was provided. To satisfy the second ground, the regulated entity must obtain from the person making the request sufficient threshold factual evidence that demonstrates to the regulated entity a substantial factual basis that the reproductive health care was not lawful under the circumstances in which such health care was provided.

For example, an investigator requests information from a health plan about claims for coverage of certain reproductive health care provided by a particular health care provider. The health plan must presume that the reproductive health care was lawful unless the health plan has actual knowledge that the reproductive health care was not lawful or the investigator supplied information that demonstrates a substantial factual basis to believe that the reproductive health care was not lawful under these circumstances. The latter condition could be met where the investigator provides the regulated entity with various types of documentation. For example, persons requesting PHI could provide the regulated entity with affidavits supplied by complainants that contain the circumstances under which the reproductive health care was provided. In this example, the presumption would be overcome, and the health plan would be permitted to use or disclose the PHI, assuming that all applicable conditions of the Privacy Rule were otherwise met. In contrast, if the investigator requests the same information but only provides an anonymous report of a particular health care provider providing reproductive health care that is not lawful under the circumstances in which it is provided, the health plan would not have a substantial factual basis to believe that the reproductive health care was not lawful. Accordingly, this final rule would prohibit the health plan from disclosing the requested PHI unless the investigator provides sufficient information to overcome the presumption and the use or disclosure is otherwise permitted by the Privacy Rule. The conditions of making the use or disclosure would include, as described elsewhere in this final rule, obtaining a valid attestation if the relevant permission requires one.

The Department emphasizes that, as demonstrated by the numerous comments on this issue, this regulatory presumption is necessary for workability by the regulated entities subject to this final rule. We recognize that when a regulated entity did not provide the reproductive health care at **33015** issue, it may not have access to all of the relevant information, including medical records with the necessary information, to determine whether prior reproductive health care obtained by an individual was lawful. We clarify that regulated entities are not expected to conduct research or perform an analysis of an individual's PHI to determine whether prior reproductive health care was lawful under the circumstances in which it was provided when such health care was provided by someone other than the regulated entity that receives the request for the use or disclosure of PHI.

We also reiterate that this final rule is intended to support and clarify the privacy interests of individuals availing themselves of lawful reproductive health care, and not to thwart the interests of states in conducting lawful investigations or imposing liability on the provision of unlawful reproductive health care. While this new regulatory presumption may make it more difficult for a state to investigate whether reproductive health care was unlawful under the circumstances in which it was provided (e.g., when other sources of information that is not PHI are unavailable), as discussed above, the Department has considered these interests and determined that the effects are justified by countervailing privacy benefits. Moreover, as also explained above, society's interest in obtaining PHI in such circumstances is reduced, particularly in light of its continued ability to obtain information from other sources. The Department also emphasizes that it is not applying a blanket presumption that all reproductive health care reflected in a regulated entity's records was lawful under the circumstances in which it was provided. Instead, the presumption applies only where the reproductive health care at issue is provided by someone other than the regulated entity that received the request for use or disclosure of PHI, and it may be overcome in the circumstances identified above.

In contrast, where a request for PHI is made to the regulated entity that provided the relevant reproductive health care, the regulated entity is responsible for determining whether it provided reproductive health care that was lawful under the

circumstances in which it was provided, including, as discussed above, a review of all available relevant evidence bearing on whether the reproductive health care was lawful under the circumstances in which it was provided. If the regulated entity reasonably determines that the health care was lawfully provided, the prohibition applies, and the regulated entity may not make the use or disclosure.

To illustrate how the presumption would apply, consider a hospital that has PHI about the provision of reproductive health care by a different facility. The hospital is not expected to conduct research or perform analysis into whether reproductive health care obtained at a different facility from another health care provider was lawful under the circumstances in which such health care was provided. Accordingly, the regulated entity, if they receive a request for PHI to which the prohibition at 45 CFR 164.502(a)(5)(iii) may apply, is not expected to review the individual's PHI to determine the lawfulness of the prior reproductive health care. In such situations, the regulated entity is also not expected to research other states' laws to determine whether the reproductive health care was lawful under the circumstances in which it was provided, nor are they expected to consult with an attorney to do the same. Rather, the presumption standard allows the regulated entity to limit their review to information supplied by the person making the request for the use or disclosure of PHI where the request addresses reproductive health care provided by someone other than the regulated entity receiving the request. Thus, a regulated entity that did not provide the reproductive health care must presume that the reproductive health care was lawful under the circumstances in which it was provided unless the conditions of rebutting the presumption are met.

Consider a different example in which a law enforcement official from State A issues a subpoena to a hospital in State A to request the PHI of an individual from State A who is suspected of obtaining reproductive health care in State B that would have been unlawful under the law of State A if provided there. The hospital did not provide the reproductive health care in question, nor did the individual provide information to the hospital about who may have provided such health care. At the time the law enforcement official issues the subpoena, the individual is no longer in the hospital, nor is the individual receiving treatment at the hospital. Additionally, the law enforcement official provided no information in the subpoena that would make it reasonable for the hospital to determine that the reproductive health care at issue was not lawful in the circumstances in which it was provided, that is, to determine that the reproductive health care was not lawful under the law of State B or was not protected, required, or authorized by Federal law. In this case, the hospital did not have actual knowledge that, nor did the information supplied to it by the law enforcement official making the request demonstrate to the hospital a substantial factual basis that, the individual had previously received unlawful reproductive health care; therefore, the reproductive health care is presumed to have been provided under circumstances in which it was lawful to provide such health care. Accordingly, this final rule would prohibit the hospital from disclosing the requested PHI unless the law enforcement official provides sufficient information to overcome the presumption and the use or disclosure is otherwise permitted by the Privacy Rule. This includes, as described elsewhere in this final rule, receipt of a valid attestation if the relevant permission requires one.

Conversely, if the hospital is provided with factual information that demonstrates a substantial factual basis that the reproductive health care at issue was not lawful under the specific circumstances in which such health care was provided, the presumption would be overcome. When a presumption is overcome or rebutted, the Rule of Applicability at 45 CFR 164.502(a)(5)(iii)(B) cannot be satisfied (i.e., the regulated entity has actual knowledge, or has received factual information from the person requesting the PHI to determine that there is substantial factual basis to believe, that the reproductive health care was not lawful under the circumstances in which it was provided), and thus, the use or disclosure would not be prohibited under the final rule. As such, the Privacy Rule would permit, but would not require, the hospital to disclose the PHI in response to the subpoena where the use or disclosure meets the requirements of an applicable permission, including the receipt of a valid attestation where required.

In another example, a law enforcement agency presents a covered entity's business associate, such as a cloud service provider, with a subpoena for the PHI of an individual who received reproductive health care as part of its investigation into the health care provider who provided such health care for the provision of that health care. The PHI is encrypted, and the business associate does not have the key to decrypt it or is not permitted under the terms of its business associate agreement with the covered entity to decrypt the PHI. Thus, the business associate lacks a complete view of the individual's PHI and did not provide  **\*33016**  the underlying reproductive health care. Additionally, the business associate has no actual knowledge that the reproductive health

care was unlawful, nor did the person requesting the PHI supply it with information that demonstrates to the business associate a substantial factual basis that the reproductive health care was not lawful under the specific circumstances in which such health care was provided. In such a case, the presumption that the reproductive health care at issue was lawful applies. If the law enforcement agency does not present more information to overcome the presumption, the Privacy Rule prohibits the business associate from disclosing the requested PHI in response to the subpoena, even if the law enforcement agency has provided an attestation; in this circumstance, the attestation would not be valid because the disclosure is for a purpose that is prohibited by 45 CFR 164.502(a)(5)(iii).

The presumption serves a different purpose than the attestation, which is required when there is a request for PHI potentially related to reproductive health care for certain permitted purposes under the Privacy Rule, as discussed further below. In contrast with the attestation, the presumption applies only where a request for PHI involves a purpose prohibited under 45 CFR 164.502(a)(5)(iii) and the reproductive health care at issue was provided by someone other than the regulated entity that received the request for PHI, so the regulated entity does not have first-hand knowledge of the circumstances in which the reproductive health care was provided. Because the situations in which the presumption applies involve purposes prohibited under 45 CFR 164.502(a)(5)(iii), it is not reasonable for a regulated entity to rely, without additional information, on a statement from the person requesting the use or disclosure, including the statement required in the attestation by 45 CFR 164.509(b)(1)(ii), that the request is not made for a prohibited purpose or that the underlying reproductive health care was unlawful. Thus, such statement alone does not satisfy 45 CFR 164.502(a)(5)(iii)(C)(2). However, if a person requesting the use or disclosure of PHI provides the regulated entity with sufficient information, separate and distinct from the attestation itself, that demonstrates to the regulated entity a substantial factual basis that the reproductive health care was not lawful under the specific circumstances in which such health care was provided, the presumption would be overcome; in this scenario, the Privacy Rule would permit, but would not require, the regulated entity to disclose the PHI in response to the subpoena. The presumption may also be overcome by, for example, a spontaneous statement from the individual about the circumstances under which they obtained reproductive health care.

As we explained above, this final rule, consistent with the Department's longstanding approach to the Privacy Rule, balances competing interests between the privacy expectations of individuals and society's interests in PHI for certain non-health care purposes. For example, since its inception, the Privacy Rule has permitted a covered entity to rely, if such reliance is reasonable under the circumstances, on a requested disclosure as the minimum necessary for the stated purpose when making disclosures to public officials that are permitted under 45 CFR 164.512, if the public official represents that the information requested is the minimum necessary for the stated purpose(s).[FN297] Elsewhere in the Privacy Rule, covered entities are required to make a determination of whether it is "reasonable under the circumstances" to rely on documentation, statements, or representations from a person requesting PHI to verify the identity of the person requesting PHI and the authority of the person to access the PHI. [FN298] In the case of public officials, we have previously explained that covered entities must verify the identity of the request by examination of reasonable evidence, such as written statement of identity on agency letterhead, an identification badge, or similar proof of official status. In addition, where explicit written evidence of legal process or other authority is required before disclosure may be made, a public official's proof of identity and oral statement that the request is authorized by law are not sufficient to constitute the required reasonable evidence of the legal process or authority.[FN299] In both instances, the Privacy Rule permits regulated entities to rely on representations made by public officials where it is reasonable to do so but makes clear that in some instances, documentary or other evidentiary proof is needed.[FN300]

In this final rule, the Department has enshrined the requirement that a regulated entity make a reasonable determination of whether PHI should be disclosed in response to a request from law enforcement, or other official, in regulatory text and determined that is it not reasonable to rely solely on representations of law enforcement or other officials without a written attestation. This approach is due to the high potential for harm to the individual who is the subject of the PHI or to persons who are subject to liability for the mere act of seeking, obtaining, providing or facilitating reproductive health care.

Further, as we discussed above, even in the scenario where a state official seeks PHI to investigate whether the underlying reproductive health care was unlawful, a regulated entity's reasonable determination that the conditions of the prohibition set

forth in the Rule of Applicability are met means that the prohibition applies and the regulated entity is prohibited from using or disclosing the PHI. This does not foreclose the ability of state officials to investigate the circumstances surrounding the provision of the reproductive health care, including through the collection of information from sources that are not regulated under HIPAA, to determine whether a health care provider or other person may have acted unlawfully. Rather, this final rule prohibits the use or disclosure of PHI when it is being used to investigate or impose liability on a person for the mere act of seeking, obtaining, providing, or facilitating lawful reproductive health care, or to identify any person to initiate such activities. Indeed, the individual's privacy interests are especially strong where individuals seek lawful reproductive health care and risk either avoiding such lawful health care or being less than truthful with their health care providers because they fear that their PHI will be disclosed.

The Department is re-designating proposed 45 CFR 164.502(a)(5)(iii)(B) as 45 CFR 164.502(a)(5)(iii)(D) and modifying it in response to the **\*33017** commenters who provided examples of situations where they could reasonably expect to receive a request for PHI that might relate to "seeking, obtaining, providing, or facilitating reproductive health care." To address these concerns, the Department is revising the list of activities in 45 CFR 164.502(a)(5)(iii)(D) that explain the scope of actions taken by persons that the Department is protecting against impermissible requests for PHI. Specifically, the Department is adding the terms "administering," "authorizing," "providing coverage for," "approving," and "counseling about" to the current list of descriptive activities in the proposed rule and removing "inducing" from the list. We are removing "inducing" from the list in response to concerns from commenters that the prohibition might apply in circumstances where individuals are coerced to obtain reproductive health care. It was never the Department's intention for the prohibition on the use or disclosure of PHI to apply in such circumstances. Rather, we intended it to refer to situations in which a health care provider "induces" labor under circumstances in which such health care is lawful; however, we believe our intended meaning of "inducing" is encompassed in other terms in the list. The revised list better explains the type of activities in which a person may be engaged and about which the Department intends to prevent the use or disclosure of PHI.

The Department is not finalizing a separate Rule of Construction because the need is obviated by incorporating the key content into the prohibition itself at 45 CFR 164.502(a)(5)(iii). The Department proposed the Rule of Construction to clarify that 45 CFR 164.502(a)(5)(iii) should not be construed to prohibit a use or disclosure of PHI otherwise permitted by the Privacy Rule unless such use or disclosure is "primarily for the purpose of" investigating or imposing liability on any person for the mere act of seeking, obtaining, providing, or facilitating reproductive health care. By incorporating the Rule of Construction into the main standard and removing the proposed "primarily for the purpose of" language, the Department now more clearly conveys its intent to prohibit the use and disclosure of PHI for the specified purposes only when it relates to the "mere act of" seeking, obtaining, providing, or facilitating reproductive health care. As discussed in greater detail below in our responses to comments, this change is designed to reduce confusion for regulated entities about how to reconcile and apply the Rule of Construction with the main prohibition standard and does not change the scope of the prohibition as proposed. The revisions and restructuring of regulatory text formerly included in the Rule of Construction improve readability and reduce redundancy. Likewise, the final rule incorporates other minor wording changes to improve readability and updates regulatory text references to other paragraphs to accurately reflect the organization of this section.

Comment: Many commenters expressed support for the Department's proposal to create a new category of prohibited uses and disclosures about reproductive health care. A few of these commenters explained the rationale for their support as based on the proposed approach's balance of preventing harm to individuals from certain uses and disclosures and permitting beneficial uses and disclosures, while providing regulated entities with clarity with respect to when uses and disclosures of PHI would be permitted.

A few commenters agreed with the Department's view that a purpose-based prohibition is preferable to other approaches to protecting the privacy of individuals that would require labeling or segmenting of PHI. Other commenters focused on how the proposal would better facilitate HIPAA's goals of providing high-quality health care and encouraging the flow of information to covered entities.

Response: The approach we are taking in this final rule preserves the ability of regulated entities to use and disclose PHI for permitted purposes while also enhancing protections for PHI, to strike the appropriate balance between privacy interests and other societal interests, including law enforcement. As discussed above, the Department's approach will lead to numerous benefits associated with enhanced privacy protections.

Comment: A few commenters asserted that the Department's proposal would provide a consistent standard for all states to follow.

Response: The Department believes this final rule will provide clear standards for regulated entities, especially health care providers, by incorporating the prohibition into the Privacy Rule. However, we stress that the prohibition attaches to only requests for uses and disclosures that are for a prohibited purpose where the reproductive health care is lawful under the circumstances in which such health care is provided. Different states and localities have promulgated different standards for the lawfulness of reproductive health care.

Comment: A few commenters expressed their appreciation that the proposal encompassed a broad range of reproductive health care and explained the importance of ensuring that a final rule protects any health information about reproductive health care.

Response: As the Department acknowledged in the 2023 Privacy Rule NPRM, many routine medical examinations and treatments could involve PHI about an individual's reproductive health or reproductive organs and systems. This final rule is not limited to PHI about abortion. The Department recognized the impracticability of attempting to parse out the types of reproductive health care that should be subject to the prohibition and those that should not be. For this reason, and in keeping with the existing scheme of the Privacy Rule, the Department proposed and is finalizing a purpose-based approach to prohibiting the use and disclosure of any PHI for use against any person for seeking, obtaining, providing, or facilitating reproductive health care that is lawful under the circumstances in which such health care is provided. A regulated entity that receives a request for PHI is charged with making a reasonable determination of whether the conditions of lawfulness set forth in the Rule of Applicability apply. To further assist regulated entities in understanding the broad scope of "reproductive health care," we provide in the preamble a non-exclusive list of examples that fit within the definition.

Comment: Some commenters expressed opposition to this proposal, asserting that the proposed new category would interfere with the enforcement of state laws that restrict or regulate abortion or that the proposal would make it more difficult for regulated entities to determine whether a requested use or disclosure of PHI is permitted under the Privacy Rule because it lacked sufficient specificity.

Response: The Department is finalizing a narrowly tailored prohibition that will only apply when an individual's privacy interest in lawfully obtained reproductive health care outweighs society's interest in obtaining PHI for non-health care purposes. As discussed above, the Department has adopted an approach that strikes the appropriate balance between privacy interests and other interests, including law enforcement interests in accessing PHI to investigate or impose liability on persons for seeking, obtaining, providing, or facilitating reproductive health care that **\*33018** is unlawful under the circumstances in which such health care is provided. To help regulated entities operationalize the prohibition, the Department is finalizing an attestation requirement in 45 CFR 164.509 in which persons requesting PHI under a permission that is mostly likely to be used to request PHI for a purpose prohibited by 45 CFR 164.502(a)(5)(iii) must attest that the request is not subject to the prohibition. The Department acknowledges that requests for a purpose prohibited by 45 CFR 164.502(a)(5)(iii) may be made pursuant to another applicable permission and reminds regulated entities that they must evaluate all requests made by a third party for the use or disclosure of PHI to ensure that they are not for a prohibited purpose. Requests not subject to the prohibition would still be subject to the conditions of the relevant permissions in the Privacy Rule. When requests for PHI meet the conditions for permissions in the Privacy Rule, including conditions specified in 45 CFR 164.512, regulated entities are permitted to use and disclose PHI in accordance with such permissions.

Moreover, as we describe above, the Department is modifying the final rule to clarify that the prohibition restricts the use and disclosure of PHI for the enumerated purposes when connected to the "mere act of" seeking, obtaining, providing, or facilitating

reproductive health care. Thus, the prohibition does not prevent the use or disclosure of the PHI about reproductive health care obtained by an individual in all circumstances. Rather, it prevents the use or disclosure of PHI when the purpose of the disclosure is to investigate or impose liability on a person because they sought, obtained, provided, or facilitated reproductive health care that was lawful under the circumstances in which such health care was provided, as determined by the regulated entity that received the request for PHI. For example, a regulated entity would not be prohibited from disclosing an individual's PHI when subpoenaed by law enforcement for the purpose of investigating allegations of sexual assault by or of the individual, assuming that law enforcement provided a valid attestation and met the other conditions of the permission under which the request was made.

Comment: A commenter expressed opposition to the proposal and asserted that it relied on the assumption that it would be readily apparent or ascertainable whether particular reproductive health care was lawfully provided. According to this commenter, persons who violate the law have an interest in concealing their activity, and the proposal would impede law enforcement investigations to determine whether lawbreaking has occurred. Additionally, the commenter expressed their concern that the proposal would represent a departure from the Privacy Rule's existing approach to law enforcement investigations and proceedings.

Response: The Department is finalizing a regulatory presumption to address the narrow circumstance of when lawfulness is not readily apparent to a regulated entity who is the recipient of a request for the use or disclosure PHI when the regulated entity did not provide the underlying reproductive health care. As we explained above, this final rule is intended to support and clarify the privacy interests of individuals availing themselves of lawful reproductive health care, and not to thwart the interests of states and the Federal government in conducting lawful investigations or imposing liability on the provision of unlawful reproductive health care. While this new regulatory presumption may make it more difficult for law enforcement officials to investigate whether reproductive health care was unlawful under the circumstances in which it was provided (e.g., when other sources of information that is not PHI are unavailable), the Department has considered those interests and determined that the effects are justified by countervailing privacy benefits. We also reiterate here that the presumption is not a blanket presumption. It only applies where the reproductive health care at issue is provided by someone other than the regulated entity that received the request for the use or disclosure of PHI, and it may be overcome in the circumstances identified above.

We note that the Privacy Rule has always and continues to permit regulated entities to disclose PHI for law enforcement purposes, subject to certain conditions or limitations. In this final rule, the Department has found that changes in the legal landscape now necessitate codifying a prohibition against uses and disclosures for the purposes specified in 45 CFR 164.502(a)(5)(iii)(A), subject to the Rule of Applicability in 45 CFR 164.502(a)(5)(iii)(B). The Department is not otherwise changing the existing permissions in the Privacy Rule that permit regulated entities to use or disclose PHI for law enforcement purposes and other important non-health care purposes, except as discussed elsewhere in this rule. These purposes include when PHI is required by law to be disclosed for purposes other than those prohibited by this final rule, for public health and health oversight activities, for other law enforcement purposes not in conflict with this rulemaking, for reports of child abuse, about decedents when not prohibited by this final rule, and other purposes specified in the Privacy Rule.

In particular, in the 2023 Privacy Rule NPRM, the Department discussed the interaction of this rule with HIPAA's statutory preemption provisions [FN301] and explained that it was necessary to preempt state laws that require the use and disclosure of PHI for the purposes prohibited by this rule to give effect to the prohibition consistent with HIPAA. As discussed above, to achieve the purpose for which HIPAA was enacted, to enable the electronic exchange of identifiable health information, we must protect the privacy of that information to further individuals' trust in the health care system. As finalized, the prohibition is limited only to circumstances in which the privacy interests of an individual and the interests of society in an effective health care system outweigh society's interest in obtaining PHI for non-health care purposes.

Comment: A commenter stated that, to the extent the ability of a state to determine whether to investigate or bring a proceeding is based on information in the possession of a regulated entity, the proposed rule did not adequately address a state's need to regulate the medical profession and health care facilities.

Response: As finalized, the prohibition prevents the use and disclosure of PHI for certain purposes where a person sought, obtained, provided, or facilitated reproductive health care that is lawful under the circumstances in which such health care is provided. As discussed above, the final rule strikes the appropriate balance between privacy interests and other interests. Public officials remain free to investigate the provision of health care by seeking information from non-covered entities. Moreover, the prohibition does not prevent a state from enforcing its laws. Instead, it protects the privacy of individuals' PHI in certain circumstances.

Comment: A few commenters expressed concern that the proposed prohibition may also affect the enforcement of Federal laws.

Response: The Department has consulted extensively with other Federal agencies and officials in the **\*33019** development of this rule, including the Attorney General, and does not believe that this rule will impede the enforcement of Federal laws. As discussed above, this rule carefully balances privacy and other interests, applying only in certain narrowly tailored situations.

Comment: Numerous commenters recommended that the Department expand the scope of the proposed prohibition to include other or all types of stigmatized health care. A few commenters recommended expanding the proposed prohibition to all health care or to provide individuals the ability to prevent the disclosure of their PHI through HIEs.

Generally, commenters supporting expansion of the proposal's scope expressed the belief that it was necessary for HIPAA to promote trust between individuals and health care providers and to improve health care quality and outcomes.

Several commenters explained that persons seeking, obtaining, providing, or facilitating other types of health care are facing the same challenges as described in the proposal with respect to reproductive health care, including health care obtained outside of the health care system, and provided examples of such challenges. Many commenters also made recommendations for how the Department should address those challenges.

Response: The Department is issuing this final rule to protect the privacy of PHI when it is sought for activities to investigate or impose liability on persons for the mere act of seeking, obtaining, providing, or facilitating lawful reproductive health care. Lawfulness is based on a reasonable determination made by a regulated entity that has received a request for PHI for one of the purposes specified at 45 CFR 164.502(a)(5)(iii)(A) that at least one of the conditions in the Rule of Applicability applies. We are finalizing a prohibition that is not specific to certain procedures, laws, or types of providers. Rather, the prohibition we finalize here requires regulated entities to consider the purpose of the requested use or disclosure. To the extent that the specific types of health care referenced by commenters above meet the definition of reproductive health care, this final rule will prevent the disclosure of PHI where it is sought for activities with the purpose of investigating or imposing liability on any person for the mere act of seeking, obtaining, providing, or facilitating reproductive health care that is lawful under the circumstances in which it is provided. In adopting a purpose-based prohibition, the Department has chosen an administrable standard that reflects the appropriate balance between protecting individuals' privacy interests and allowing the use or disclosure of PHI in support of other important societal interests. Additional privacy protections for information about SUD treatment may be afforded to PHI in Part 2 records under Part 2.[FN302]

Comment: In response to the Department's specific request about whether it should require a regulated entity to obtain an individual's authorization for any uses and disclosures of "highly sensitive PHI" or otherwise address such a defined category of PHI in the Privacy Rule, a few commenters urged the Department to expand the proposed prohibition to protect all people at risk of criminal or other investigation for use of essential health care or care, services, or supplies related to the health of the individual that could expose any person to civil or criminal liability. Several commenters recommended that the Department expand the scope of the proposed prohibition to, variously, all "highly sensitive health information," "sensitive personal health care," "highly sensitive PHI," or "highly sensitive PHI and restricted health care service" because of the potential harms that could result if such health information were to be disclosed without stringent privacy safeguards.

Several commenters asserted that creating a category of or separate standard for "highly sensitive PHI" would cause significant confusion because it would be difficult to define in a commonly understood manner. According to these commenters, this would make compliance more challenging and costly and further decrease the individual's privacy. A few commenters expressed concern that creating a special category of highly sensitive PHI would further stigmatize certain types of health care.

Several commenters expressed concern that prohibiting or limiting uses or disclosures of highly sensitive PHI for certain purposes may negatively affect efforts to eliminate the need for data segmentation, such as efforts to align the Privacy Rule and Part 2; reduce or eliminate stigmatization of certain health conditions and diagnoses; and improve health care management and health care coordination.

Response: We appreciate these comments and generally agree with commenters who expressed concern that the Privacy Rule should address the shifting legal landscape to ensure that it continues to protect PHI, regardless of how the PHI is transmitted or maintained. We also agree that to the extent possible, the Privacy Rule should promote administrative efficiency and disincentivize adverse actions by health care providers grounded in fear of prosecution or legal risks borne from providing lawful health care to individuals, which may erode patients' trust and confidence in the health care system and deter them from seeking lawful health care. The Department's approach to promulgating a narrowly tailored prohibition focused on clarifying the use and disclosure of PHI for the purposes prohibited by this final rule accomplishes these goals. As we explained in the 2023 Privacy Rule NPRM and re-affirm in this final rule, recent developments in the legal environment have made information about lawful reproductive health care sought by or provided to an individual more likely to be of interest for punitive non-health care purposes, and thus more likely to be used or disclosed if sought for a purpose permitted under the Privacy Rule today. As explained, the Department has identified concerns that the use or disclosure of PHI for the prohibited purposes in this rule would erode individuals' trust in the privacy of legal reproductive health care. Such erosion would negatively affect relationships between individuals and their health care providers, result in individuals forgoing needed treatment, and make individuals less likely to share pertinent health concerns with their health care providers. Modifying the Privacy Rule to focus on and address this shifting landscape is the most efficient way to return to a regulatory landscape that is balanced and consistent with the goals of HIPAA.

We do not believe that it is necessary to modify the Privacy Rule to prohibit the use and disclosure of PHI for any criminal, civil, or administrative investigation or effort to impose criminal, civil, or administrative liability related to all health care, services, or supplies. Sections 164.512(e) and (f) already set forth the specified conditions under which regulated entities may disclose PHI for judicial and administrative proceedings and law enforcement purposes.

We decline to modify the prohibition to apply it to the use and disclosure of "highly sensitive PHI." We are persuaded by commenters who voiced concern about the feasibility of defining the phrase such that regulated entities would be able to understand and **33020** operationalize it. We also find persuasive comments about the compliance burden that would result from implementing such a prohibition. While PHI about reproductive health care may be found throughout an individual's record and may be collected or maintained by multiple types of providers, the term "reproductive health care" is defined in a manner that is clearly connected to the reproductive system, its functions, and processes.[FN303]

In contrast, applying the prohibition to all "highly sensitive PHI" or any use or disclosure of PHI that results in harm, stigma, or adverse result for an individual would be unworkable because of lack of consensus about how to define such categories and would likely create the issues with segmentation and care coordination discussed above. As discussed above, the purpose of this final rule and narrowly crafted prohibition is to adopt the appropriate balance in the Privacy Rule between protecting individuals' privacy and permitting PHI to be used and disclosed for other societal benefits. The commenters' objectives reflect a desire to protect individuals, but their discussion does not properly account for other societal interests that are supported by certain disclosures of PHI, interests that the Privacy Rule has balanced since its inception.

Comment: A commenter requested that the Department clarify that state laws may protect the privacy of health information when the Privacy Rule does not apply, such as when individuals' health information is in the possession of a person that is not a regulated entity, such as a friend or family member, or is stored on a personal cellular phone or tablet.

Response: HIPAA provides the Department with the authority to protect the privacy and security of IIHI that is maintained or transmitted by covered entities, and in some cases, their business associates. Other laws may apply where the HIPAA Rules do not. Guidance on protecting the privacy and security of health information when using a personal cell phone or tablet is available on OCR's website.[FN304]

Comment: Many commenters cited potential operational challenges with the proposed prohibition and confirmed that current health IT generally does not provide regulated entities with the ability to segment PHI into specific categories afforded special protections. A few commenters recommended that the Department work with EHR vendors to modernize health care data management platforms to better address data segmentation, while others recommended that the Department ensure interagency coordination of data segmentation policies and provide individuals with granular level of control over their PHI.

A few commenters requested that the Department address concerns about the interaction between the minimum necessary standard and this final rule.

A commenter asserted that privacy protections that do not account for individual privacy preferences would result in individuals withholding information from their health care providers, and some health care providers electing not to generate or document certain information from or about individuals.

Response: The prohibition, as finalized, should not implicate additional data segmentation concerns beyond those that already exist. We acknowledge the low adoption rate of data segmentation standards and challenges related to the technical and administrative feasibility of data segmentation (e.g., costs), and as discussed above, are finalizing a purpose-based approach to address such concerns. The Department continues its active engagement, particularly through ONC, to identify robust data sharing standards that facilitate appropriate privacy controls.

With respect to concerns about the Privacy Rule minimum necessary standard, we do not anticipate that this final rule will affect the ability of regulated entities subject to the standard to comply. First, the prohibition is applicable only for the purposed uses and disclosures specified in 45 CFR 164.502(a)(5)(iii). Regulated entities must make reasonable efforts to limit the use or disclosure of PHI pursuant to 45 CFR 164.512, other than 45 CFR 164.512(a), to the minimum amount of PHI necessary to accomplish the intended purpose of the use, disclosure, or request.[FN305] Regulated entities are required to have in place policies and procedures that outline how the entity complies with the standard.[FN306]

Comment: A few commenters requested that the Department clarify the roles and responsibilities of covered entities and business associates with respect to compliance with the proposed prohibition and attestation requirements and whether business associate agreements would need to be amended to reflect the requirements of the final rule.

Response: The prohibition standard finalized in 45 CFR 164.502(a)(5)(iii)(A) applies directly to all regulated entities; meaning, all HIPAA covered entities and business associates. We also note that the finalized presumption of lawfulness for the underlying health care, when applicable, directly applies to business associates, as does the attestation requirement in 45 CFR 164.509. As such, business associates of covered entities that hold PHI by virtue of their business associate relationship with the covered entity are subject to the express prohibition on using or disclosing PHI for the specified purposes, regardless of whether the prohibition is specified in the business associate agreement. The attestation requirement and its application to business associates are discussed in greater detail below.

Comment: A commenter expressed support for the application of the proposal to health care providers, but also recognized states' interest in ensuring that health care providers render health care in accordance with the standard of care in that state. Another commenter questioned the Department's authority under HIPAA to implement this provision.

Response: The Department is modifying the proposed definition of "Reproductive health care" to explicitly clarify that the definition does not set a standard of care for or determine what constitutes clinically appropriate reproductive health care. Additionally, as discussed above, the application of this rule is limited to reproductive health care that is lawful under the circumstances in which such health care is provided as described at 45 CFR 164.502(a)(5)(iii)(B). Lawfulness is determined by the regulated entity that receives the request for PHI, after a reasonable determination that at least one of the conditions in the Rule of Applicability apply. As explained above, the prohibition is carefully tailored to protect the privacy of individuals' health information in circumstances where the reproductive health care at issue was lawful under the circumstances such care was provided, reflecting the appropriate balance between privacy interests and other societal interests.

Comment: Many commenters recommended alternative or additional **\*33021** approaches to the purpose-based prohibition, such as eliminating or narrowing the permissions for use or disclosure of PHI without an individual's authorization or limiting disclosures to third parties subject to an individual's authorization.

A few commenters recommended that the Department revise specific Privacy Rule permissions to clarify the use and disclosure of PHI for certain administrative or law enforcement requests, instead of promulgating a new prohibition.

Response: The Department's approach to prohibit the uses and disclosures of PHI for the purposes described in this final rule is consistent with the Privacy Rule's longstanding balancing of individual privacy interests with society's interests in PHI for non-health care purposes. Adopting the correct balance is necessary to preserve and promote trust between individuals and health care providers. Instead of modifying specific permissions at 45 CFR 164.512, we are finalizing modifications that prohibit the use or disclosure of PHI to ensure the correct balance, instead of modifying specific permissions at 45 CFR 164.512. Recognizing that requests that fall under these permissions represent important public policy objectives (e.g., health oversight, law enforcement, protection of individuals subject to abuse), the Department is imposing a new attestation requirement, as described in greater detail below, to protect against harm that may arise from the use or disclosure of PHI for a purpose prohibited under 45 CFR 164.502(a)(5)(iii), which is more likely to occur when a person requesting the use or disclosure of PHI relies on certain permissions. The new attestation condition will also provide a mechanism that will enable a regulated entity to better evaluate the request. The Department declines to make additional changes at this time and will consider these topics for future guidance. The Department also declines to finalize its proposal to prevent an individual from requesting that a regulated entity use or disclose PHI pursuant to a valid authorization.

Comment: A few commenters questioned the ability of regulated entities to use or disclose PHI in compliance with mandatory reporting laws, such as laws requiring the reporting of suspected child abuse or domestic violence.

A few of these commenters questioned whether mandatory reporting requirements would change a regulated entity's duty to apply the minimum necessary standard.

A few commenters asserted that mandatory reporting laws dissuade individuals from seeking health care, prevent the development of trust between individuals and health care providers, and generally are implemented in an inequitable fashion that disproportionately apply to individuals from marginalized or historically underserved communities or communities of color.

Response: The Department acknowledges that there may be some mandatory reporting laws that require a regulated entity to determine whether a request for PHI is for a purpose prohibited by this rule. However, whether in response to a mandatory reporting law or routine request, the final rule's operation remains the same, that is, it prohibits a regulated entity from using or disclosing PHI for a prohibited purpose when the reproductive health care under investigation or at the center of the activity to impose liability is lawful under the circumstances that it was provided.

To the extent mandatory reporting requirements apply to the reporting of PHI to public health authorities for public health purposes, including PHI about reproductive health care, this final rule does not prevent a regulated entity from complying with such mandate.

To aid stakeholders in understanding how the prohibition operates with respect to public health reporting, the Department is clarifying that the term "Public health," as used in public health surveillance, investigation, and intervention, includes identifying, monitoring, preventing, or mitigating ongoing or prospective threats to the health or safety of a population, which may involve the collection of PHI. In so doing, we are clarifying that public health surveillance, investigation, and intervention are outside of the scope of activities prohibited by 45 CFR 164.502(a)(5)(iii). These changes will offer additional protection to individuals who would otherwise be subject to having their PHI disclosed for a prohibited purpose because the underlying mandatory reporting requirement did not clearly specify its relationship to public health. This final rule does not change the minimum necessary standard or the circumstances in which the Privacy Rule requires a regulated entity to apply the minimum necessary standard.

Comment: Many commenters expressed concern that the purposes for which the Department proposed to prohibit uses or disclosures would interfere with the ability of law enforcement to conduct investigations, including into coercion, child abuse, and sex trafficking and assault, would prevent states from verifying state licensure requirements, and would hamper the ability of health care professionals to report illegal behavior by other health care professionals.

Response: As discussed above, the prohibition applies only to activities conducted for the purpose of investigating or imposing liability on a person for the mere act of seeking, obtaining, providing, or facilitating reproductive health care that is provided under circumstances in which such health care is lawful. A regulated entity is permitted to disclose PHI to a person who requests PHI for other purposes if a permission applies and the underlying conditions of the relevant permission are met, including the attestation condition, if applicable.

Comment: A few commenters recommended that the Department establish a safe harbor for the use or disclosure of PHI by regulated entities for TPO.

Response: We appreciate the comment but do not believe such a safe harbor is necessary. The Privacy Rule permits the disclosure of an individual's PHI for TPO when the conditions set forth in the TPO provisions of the rule are met.[FN307] The prohibited uses and disclosures codified in this rulemaking would rarely intersect with uses and disclosures that qualify as TPO activities. As explained above, to the extent a person requesting the use or disclosure of PHI reasonably articulates a basis for a request that is not related to the mere act of seeking, obtaining, providing, or facilitating reproductive health care, a regulated entity may use or disclose the PHI where otherwise permitted by the Privacy Rule.

Comment: A commenter recommended that the Department clarify that the prohibition applies to the activities of insurers and third-party administrators of self-funded plans by adding "administering, authorizing, covering, approving, or gathering or providing information about" to the explanation of "seeking, obtaining, providing, or facilitating."

Response: The prohibition applies to all activities that a person could reasonably be expected to engage in with a regulated entity that could result in a use or disclosure of PHI that might be sought for prohibited purposes, including activities conducted or performed by or on behalf of a health **33022 plan, including a group health plan.[FN308] Accordingly, the Department has modified the scope of activities initially proposed in the 2023 Privacy Rule NPRM to better explain what it meant by seeking, obtaining, providing, or facilitating reproductive health care. The modified text is finalized at 45 CFR 164.502(a)(5)(iii)(D), [FN309] and adds administering, authorizing, providing coverage for, approving, counseling about to the non-exhaustive list of example activities.

Comment: Several commenters expressed support for the proposed Rule of Applicability. A few commenters expressed support for the proposed Rule of Applicability because it would reassure residents of the state in which the lawful health care is provided and individuals who travel to such states for lawful health care that their medical records will not be disclosed for prohibited purposes.

Response: We are finalizing a modified Rule of Applicability as described above.

Comment: Some comments expressed varying levels of support for the Department's references to "substantial interests" by states or superseding state laws. A few commenters disagreed with the Department's assertion that states lack a legitimate interest in conducting a criminal, civil, or administrative investigation or proceeding into lawful reproductive health care where the investigation is based on the mere fact that reproductive health care was or is being provided. Others asserted that the proposed rule would be unworkable and would assign health care providers and the Department the power to determine whether reproductive health care was provided lawfully, thereby affording them the authority to enforce certain state laws.

Response: As explained above, the Rule of Applicability reflects the Department's careful balancing of privacy interests and other societal interests. For the reasons explained above, the Department has determined that the privacy interest of an individual and the interest of society in an effective health care system outweigh the interests of society in seeking the use of PHI for non-health care purposes that could result in harm to the individual where a regulated entity that receives a request for PHI reasonably determines that at least one of the conditions in the Rule of Applicability applies. To help clarify this discussion further, the Department provides examples where the Rule of Applicability applies in this section of this final rule.

Comment: Several commenters recommended that the Department eliminate the distinction between health care that is lawful and health care that is not and that all forms of reproductive health care should be protected from criminalization and government investigation.

Several commenters stated that the term "lawful" would incorrectly suggest that receiving certain types of reproductive health care could be unlawful, even though most prohibitions on reproductive health care apply to providing or performing the health care, rather than receiving it. They also questioned whether the proposed Rule of Applicability would protect individuals who obtained reproductive health care in another state.

Response: We are finalizing a Rule of Applicability at 45 CFR 164.502(a)(5)(iii)(B) that ensures the privacy of PHI when it is sought to conduct an investigation into or impose liability on any person for the mere act of seeking, obtaining, providing or facilitating reproductive health care that is lawful under the circumstances in which such health care is provided, consistent with applicable Federal or state law. A regulated entity that receives a request for PHI must make a reasonable determination that at least one of the conditions in the Rule of Applicability applies. As discussed above, this approach reflects a careful balance between privacy interests and other societal interests.

Comment: Some commenters asserted that medical records should not be used for purposes outside of the health care setting in ways that could harm the subject of the records, particularly for law enforcement or other governmental purposes. One commenter expressed concern that disclosures of PHI would not be limited for all purposes, and that the proposal would not prevent a state from pursuing actions where the health care is later found to be unlawful. Another commenter asserted that disclosing PHI to law enforcement in connection with an investigation into reproductive health care is a secondary use of PHI that would be directly at odds with the purpose for which the PHI was collected, while others stated that the proposal risks deterring individuals from seeking or obtaining necessary health care.

A few commenters expressed concerns that health care providers could be inhibited from providing necessary health care, fully educating individuals about their options, or documenting the health care provided.

Response: When the Department promulgated the 2000 Privacy Rule, we acknowledged that the rule balanced the privacy interests of individuals with the interests of the public in ensuring PHI was available for non-health purposes. As we explained in the 2023 Privacy Rule NPRM, "individuals' right to privacy in information about themselves is not absolute. It does not, for instance, prevent reporting of public health information on communicable diseases or stop law enforcement from getting information when due process has been observed." [FN310] At the same time, in the 2023 Privacy Rule NPRM, the Department acknowledged that adverse consequences do result when individuals question the privacy of their health information and explained that the purpose of HIPAA is to protect the privacy of information and promote trust in the health care system to ensure that individuals do not forgo lawful health care when needed or withhold important information that may affect the quality of their health care.[FN311]

Accordingly, the Privacy Rule provides a clear framework to operationalize these principles, and this final rule is intended to balance these interests. The Privacy Rule does not protect information received or maintained by entities other than those that are regulated under HIPAA, including information that is used for a purpose other than the purpose for which it was initially requested. This final rule provides heightened protection, as necessary, to the privacy of PHI where its use or disclosure may result in harm to a person in connection with seeking, obtaining, providing, or facilitating reproductive health care that is lawful under the circumstances in which such health care is provided. With respect to other disclosures to law enforcement or to other governmental interests, the Privacy Rule includes other carefully crafted permissions that specify the conditions under which such disclosures must be made to ensure a reasonable balance between privacy and the public policies that disclosure would serve.

Comment: Several commenters asserted that the proposed Rule of Applicability would not protect all PHI pertaining to lawful health care. For example, commenters suggested that the proposed Rule of Applicability would be unlikely to protect individuals who **\*33023** obtain care outside of the health care system and urged the Department to clarify the final rule to strengthen protections for individuals who receive care in this manner. As another example, a commenter expressed concern that the proposal would not protect PHI for individuals who obtain legal reproductive health care, but as a result of complications, subsequently access health care in a state where the same reproductive health care is illegal.

Response: The definition of "reproductive health care" is discussed in greater detail above. As noted above, this final rule does not establish a standard of care, nor does it regulate what constitutes clinically appropriate health care.

Commenters who point out that different results may arise in different states are correct, but this has been true since the inception of the Privacy Rule because it sets a national floor for privacy standards, rather than a universal rule. The prohibition applies, and therefore liability attaches, when the prohibition is violated, based on the "circumstances in which such health care is provided." Thus, a regulated entity is not permitted to disclose PHI about reproductive health care that was provided in another state where such health care was provided under circumstances in which it was lawful to provide such health care, even where the individual subsequently accesses related health care in a state where it would have been unlawful to provide the underlying health care under the circumstances in which such health care was provided. HIPAA liability attaches in cases where attempts to circumvent the Privacy Rule result in impermissible or wrongful uses or disclosures.[FN312]

We remind regulated entities that the Privacy Rule permits the use or disclosure of PHI, without an individual's signed authorization, only as expressly permitted or required by the Privacy Rule. For example, where state or other applicable law prohibits certain reproductive health care but does not expressly require a regulated entity to report that an individual obtained the prohibited health care, the Privacy Rule would not permit a disclosure to law enforcement or other investigative body pursuant to the "required by law" permission (but could potentially allow it pursuant to other provisions).[FN313]

Comment: One commenter recommended the Department add language to the proposed Rule of Applicability or elsewhere to ensure that there would be protections for PHI where a health care provider believes the health care is legal, even when the person requesting the use or disclosure of PHI disputes the legality. A few commenters asserted that the health care provider

making the decision could be a party to the reproductive health care at issue, making it a conflict of interest for the health care provider to make the determination regarding the lawfulness of the reproductive health care.

Response: We do not believe additional language is necessary because, under the prohibition, the regulated entity—and not the person making the request—is responsible for reasonably determining whether health care was lawful before making a disclosure. As explained above, this framework is consistent with how the Privacy Rule's permissions are administered, whereby regulated entities must determine whether a use or disclosure is permitted under the relevant permission. For example, when evaluating whether a use or disclosure of PHI is permitted because the use or disclosure is required by law, the regulated entity must look to the relevant law to determine whether the use or disclosure falls within that permission.[FN314] Furthermore, as with other use and disclosure provisions in the Privacy Rule, regulated entities remain subject to HIPAA liability for impermissible or wrongful disclosures. Neither the statute nor the Privacy Rule provides an exception to such liability for circumstances involving conflicts of interest.

Comment: Many commenters expressed concern regarding the burden imposed upon and resources that would be required for regulated entities to determine whether the reproductive health care at issue was lawful if they did not provide the health care at issue, particularly considering the evolving nature of state law in this area. Several commenters expressed concern that the proposal incorrectly assumes that regulated entities would know where the reproductive health care at issue occurred and inquired about specific scenarios, such as where requests for PHI are received by clinical laboratories that have no face-to-face interaction with individuals and that rely on information provided by other covered entities. A few commenters asserted that requiring regulated entities to make the required legal determinations would not be conducive to building a trusting relationship between individuals and health care providers.

Some commenters offered recommendations to the Department, such as providing guidance for health care providers regarding their rights and responsibilities under a final rule, revising the proposal to clarify that there would be a presumption that reproductive health care occurred under lawful circumstances, absent compelling evidence to the contrary, particularly when an individual travels for health care, and clarifying the Rule of Applicability by including examples in the regulatory text.

Some commenters asserted that regulated entities in different states or with different interpretations of certain state requirements could reach different determinations about whether the reproductive health care was provided lawfully, in part because of the lack of clarity or consistency in the interpretation in these laws. Yet another commenter recommended that the Department add an express directive that, in the event of any ambiguity or unsettled law, the scope of what is considered lawful should be interpreted consistently with the intent of the rule to protect the privacy of PHI to the maximum extent possible. A commenter recommended that where the regulated entity decides in good faith, it should not be subject to penalties or enforcement action if their determination is incorrect or if the Department disagrees with the determination. Another commenter recommended that the Department clarify that regulated entities may use a reasonableness standard when making the determination about whether state laws conflict with the Privacy Rule and are therefore preempted by HIPAA.

A few commenters expressed concern about the potential interpretation or application of the proposed Rule of Applicability, particularly when the laws at issue are ambiguous. Commenters recommended inclusion of language that PHI need not be disclosed to a government agency or law enforcement if the health care provider deems, in good faith, that the reproductive health care is lawful under the circumstances in which it is provided, and that the Department clarify the application of preemption or provide in preamble examples of each condition of the proposed Rule of Applicability.

Response: We appreciate the many comments the Department received in response to its inquiry asking whether the proposed Rule of Applicability would be sufficiently clear to individuals and covered entities, and **\*33024** whether the provision should be made more specific or otherwise modified. Considering the many comments expressing concern about the burden associated with, the difficulty of, or the liability that could attach when someone other than the person who provided the health care must determine whether the underlying reproductive health care is lawful, the Department is adding a regulatory presumption in the final rule.

As discussed above, the regulatory presumption in 45 CFR 164.502(a)(5)(iii)(C) will permit a regulated entity receiving a PHI request that may be subject to the prohibition to presume the reproductive health care at issue was lawful under the circumstances in which such health care was provided when provided by a person other than the regulated entity receiving the request. The presumption includes a knowledge requirement such that the regulated entity must not have actual knowledge that the reproductive health care was unlawful under the circumstances in which such health care was provided or factual information supplied by the person requesting the use or disclosure of PHI that demonstrates to the regulated entity a substantial factual basis that the reproductive health care was not lawful under the specific circumstances in which such health care was provided.

Comment: A commenter asserted that the proposed rule would unlawfully thwart enforcement of Federal criminal laws on reproductive health care because the proposed rule would be limited to circumstances where reproductive health care is permitted by state law, thereby prohibiting disclosures for the purpose of enforcing Federal laws pertaining to reproductive health care when they conflict with state law. A few commenters expressed their support for the Department's proposal that the prohibition against the use or disclosure of PHI apply where certain Federal laws apply. A few commenters requested greater specificity with respect to the application of Federal and state laws on abortion.

Response: Federal laws that involve reproductive health care form the underlying basis for examining whether reproductive health care was protected, required, or authorized by Federal law under the circumstances in which it was provided, pursuant to the 45 CFR 164.502(a)(5)(iii)(B)(2). Under this final rule, Federal and state authorities retain the ability to investigate or impose liability on persons where the investigation or imposition of liability is centered upon the provision of reproductive health care that is unlawful under the circumstances in which it is provided. As discussed above, this rule reflects a careful balance between privacy interests and other societal interests, and the prohibition is tailored to cover situations where the reproductive health care was lawfully provided, whether state or Federal law is at issue.

Comment: A few commenters provided examples of and expressed concerns about the electronic availability of PHI about health care lawfully provided in one state to health care providers in another state where such health care would not have been lawful.

A few commenters requested that the Department clarify that clinical laboratory testing involving a validated laboratory-developed test used within a single laboratory certified pursuant to the Clinical Laboratory Improvement Amendments of 1988 [FN315] (CLIA) and the implementing regulations, an in vitro diagnostic test cleared or approved by the Food and Drug Administration (FDA), or a validated laboratory-developed test that is an in vitro diagnostic test cleared or approved by the FDA and used within a single CLIA-certified laboratory would fall within the scope of reproductive health care that would be "authorized by Federal law" for the purposes of the Rule of Applicability. The commenters also recommended that a clinical laboratory test furnished under the authority of a state with legal requirements that are equal to or more stringent than CLIA's statutory and regulatory requirements, and is therefore exempt from CLIA requirements, also be considered "authorized by Federal law" for the purposes of the Rule of Applicability.

Response: We interpret the language "authorized by Federal law" in the Rule of Applicability to include activities, including clinical laboratory activities, that are conducted as allowed under applicable Federal law, in circumstances where there is no conflicting state restriction on the Federally authorized activity or where applicable Federal law preempts a contrary state restriction. In such circumstances, these activities are lawfully conducted because there either is no relevant state restriction or Federal law preempts a contrary state restriction. This provision thus reflects the Department's careful balancing of privacy interests and other societal interests in disclosure. As explained above, in circumstances where reproductive health care is lawfully provided, privacy interests are heightened while other societal interests in disclosure are reduced. This final rule and the operation of HIPAA's general preemption authority do not supersede applicable state law pertaining to the lawfulness of reproductive health care.

Comment: One commenter expressed support for including the phrase "based primarily" to clarify that the proposed Rule of Construction would only address situations where the purpose of the disclosure is to investigate or impose liability because

WESTLAW    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

reproductive health care was provided, rather than for an issue related to, but not focused on the provision of such health care, such as the quality of the health care provided or whether claims for certain health care were submitted appropriately.

All other commenters recommended removing "primarily" to ensure that there is consistent implementation. In the alternative, the commenters recommended that the Department provide additional examples of scenarios in which a situation would and would not be considered "primarily for the purposes of" or "primarily based on" the provision of reproductive health care. One commenter asserted that the definition is uncertain and could be interpreted as permitting secondary or additional uses or disclosures. Another commenter explained that permitting a use or disclosure where conducting the investigation or imposing liability is only for a secondary or incidental purpose would create too much risk for individuals and health care providers and would undermine the intent of the proposed prohibition. And another stated it is foreseeable that a requesting entity could still use the PHI for one of the purposes for which the Department proposed to prohibit uses or disclosures of PHI once they have it if it was not the primary purpose of their request. A commenter expressed concern that the language could be exploited to manufacture a "primary" purpose that would be permissible to permit PHI to be used or disclosed for a prohibited purpose, particularly because the PHI would lose the protections of the Privacy Rule once it is disclosed to another person, unless that person is also a regulated entity. Another commenter asserted that the proposed rule did not define "primarily" or "mere act," nor did it provide sufficient examples to provide regulated entities with sufficient information to understand the proposal.

A commenter explained that a request for PHI is often for multiple purposes **\*33025** and recommended that the Department revise the proposed Rule of Construction to allow the proposed prohibition to apply where at least one of the purposes for which PHI is sought is to use or disclose the information for a prohibited purpose. Similarly, this commenter recommended the proposed attestation requirement in 45 CFR 164.509(b)(1) be revised to state that "one of the uses or disclosures" is not prohibited by 45 CFR 164.502(a)(5)(iii).

Response: We agree with the commenter that explained that a request for PHI may be multi-purposed. We also agree with commenters that pointed out that as proposed, the regulatory Rule of Construction appeared to create a secondary standard to consider whether a regulated entity should be prohibited from using or disclosing PHI. As discussed above, the Department is not finalizing a separate Rule of Construction and is not incorporating the phrase "primarily for the purpose of" originally proposed in 45 CFR 164.502(a)(5)(iii)(D) into the final prohibition standard. The modified prohibition standard more clearly conveys that it only prohibits the use and disclosure of PHI for the specified purposes when it relates to the mere act of seeking, obtaining, providing, or facilitating lawful reproductive health care in certain circumstances.

Comment: Commenters also recommended that the proposed Rule of Construction prohibit health care providers from reporting individuals for the sole reason of having received health care in a state where it was not lawful. They described concerns about the effect of interoperability and data sharing rules that give health care providers ready access to individuals' full medical records and urged the Department to expand the proposed Rule of Construction to mitigate the risks created by the electronic exchange of PHI.

Response: The prohibition, as finalized, is narrowly tailored to operate in a manner that protects the interests of individuals and society in protecting the privacy of PHI while still allowing the use or disclosure of PHI for certain non-health care purposes. We remind regulated entities that they are generally prohibited from disclosing PHI unless there is a specific provision of the Privacy Rule that permits (or, in limited instances, requires) such disclosure. For example, the Privacy Rule permits but does not require regulated entities to disclose PHI about an individual, without the individual's authorization, when such disclosure is required by another law and the disclosure complies with the requirements of the other law.[FN316] The permission to disclose PHI as "required by law" is limited to a "mandate contained in law that compels an entity to use or disclose PHI and that is enforceable in a court of law." [FN317] Further, where a disclosure is required by law, the disclosure is limited to the relevant requirements of such law.[FN318] Disclosures that do not meet the "required by law" definition of the HIPAA Rules,[FN319] or that exceed what is required by such law," [FN320] are not permissible disclosures under the required by law permission. Accordingly, regulated entities are prohibited from proactively disclosing PHI under the required by law permission at 45 CFR 164.512(a) absent a law requiring mandatory reporting of such PHI.

Comment: A few commenters asserted that the Department should modify the regulatory text of the proposed prohibition to eliminate the need for the proposed Rule of Construction because it is confusing and appears to set forth two different standards.

Response: For the reasons discussed above, we agree and have incorporated the Rule of Construction into the prohibition standard as described above.

Comment: A commenter expressed concerns that beneficial uses or disclosures, such as for conducting investigations into health care fraud, would be too limited and would not address criminal, civil and administrative proceedings, which are not related to receiving, obtaining, facilitating, or providing reproductive health services where the receipt or provision of these services could serve as evidence of another crime.

Response: We disagree with concerns that beneficial uses or disclosures would be too limited under the changes. If PHI is requested for a purpose that is not prohibited and the request complies with the conditions of an applicable permission, including the requirements of the attestation condition are met, where applicable, the regulated entity is permitted to comply with the request.

Comment: Another commenter cited studies to assert that the proposed Rule of Construction would continue to permit health care providers to proactively report on individuals. The commenter also stated that the proposed rule would not clarify how it would interact with mandatory reporting laws that could expose individuals and health care providers to investigations based on the provision of reproductive health care.

Response: The Privacy Rule does not permit a regulated entity to disclose PHI for law enforcement purposes, proactively or otherwise, without an individual's authorization when the disclosure is not made pursuant to process or as otherwise required by law.[FN321] This is true currently and remains true under this final rule.

As discussed above, HIPAA generally preempts state laws requiring the use or disclosure of PHI, except in limited circumstances. Where such mandatory reporting laws are not preempted by HIPAA, regulated entities are limited to disclosing the minimum amount of PHI necessary to comply with the mandatory reporting requirement or the relevant requirements of such law.[FN322]

Comment: Several commenters responded to the question about whether it would be beneficial for the Department to further clarify or provide examples of uses or disclosures of PHI that would be permitted under a final rule. All of these commenters agreed that it would be beneficial for the Department to do so. Of those, several commenters specified that the Department should provide such examples in the final regulatory text. A few commenters who requested examples be provided within the regulatory text also recommended that the language make clear that the examples are illustrative.

Response: The Department declines to include examples of uses or disclosures of PHI that would be permitted in this rule, in regulatory text. We have provided illustrative examples above.

### 3. Clarifying Personal Representative Status in the Context of Reproductive Health Care

Section 164.502(g) of the Privacy Rule contains the standard for personal **\*33026** representatives and generally requires a regulated entity to treat an individual's personal representative as the individual if that person has authority under applicable law (e.g., state law, court order) to act on behalf of the individual in making decisions related to health care.[FN323] For example, the Privacy Rule would treat a legal guardian of an individual who has been declared incompetent by a court as the personal representative of that individual, if consistent with applicable law.[FN324] In this and certain other provisions, the Department seeks to maintain the longstanding balance HIPAA strikes between the interest of a state or other authorities to regulate health and safety and protect vulnerable individuals [FN325] with the goal of maintaining the privacy protections established in the Privacy Rule.[FN326]

In the 2023 Privacy Rule NPRM, the Department expressed concern that some regulated entities may interpret the Privacy Rule as providing them with the ability to refuse to recognize as an individual's personal representative a person who makes reproductive health care decisions, on behalf of the individual, with which the regulated entity disagrees.[FN327] Under these circumstances, current section 45 CFR 164.502(g)(5) of the Privacy Rule could be interpreted to permit a regulated entity to assert that, by virtue of the personal representative's involvement in the reproductive health care of the individual, the regulated entity believes that the personal representative is subjecting the individual to abuse. Further, this regulated entity might exercise its professional judgment and decide that it is in the best interest of the individual to not recognize the personal representative's authority to make health care decisions for that individual.

To protect the balance of interests struck by the Privacy Rule, the Department proposed to modify 45 CFR 164.502 by adding a new paragraph (g)(5)(iii). Proposed 45 CFR 164.502(g)(5)(iii) would ensure that a regulated entity could not deny personal representative status to a person where such status would otherwise be consistent with state and other applicable law primarily because that person provided or facilitated reproductive health care for an individual. The Department expressed its belief that this proposal was narrowly tailored and respected the interests of states and the Department by not unduly interfering with the ability of states to define the nature of the relationship between an individual and another person, including between a minor and a parent, upon whom the state deems it appropriate to bestow personal representative status. The proposal would, however, maintain the existing HIPAA standard by ensuring personal representative status, when otherwise consistent with state law, would not be affected by the type of underlying health care sought.

Several commenters supported the Department's proposal to clarify that the covered entity's reasonable basis for electing not to treat a person as a personal representative of an individual, despite state law or other requirements of the Privacy Rule, cannot be primarily because the person has provided or facilitated reproductive health care. Other commenters expressed concern about their ability to determine what constitutes reproductive health care, as would be required to ascertain whether the covered entity had a reasonable basis to elect not to treat a person as an individual's personal representative. These commenters requested that the Department provide additional clarity in regulatory text or through examples. Other commenters questioned how the Department's proposal would align with existing state law on parental rights.

As discussed throughout this final rule, reproductive health care is uniquely sensitive and must be treated accordingly. Thus, we are finalizing 45 CFR 164.502(g)(5) with additional modifications as follows. This final rule precludes the denial of personal representative status where the basis of the denial is that the person provided or facilitated reproductive health care instead of the proposed standard that would have precluded denial "primarily" based on these actions. This change clarifies that the covered entity does not have to determine whether the reproductive health care is the "primary" basis for denying a person personal representative status. Additionally, the final rule adds the term "reasonable" before "belief" to align with 45 CFR 164.502(g)(5)(i)(A), clarifying that the basis of the covered entity's belief must be reasonable in the circumstances. We are also renumbering paragraphs. Collectively, these changes clarify that it is not reasonable to elect not to treat a person as an individual's personal representative because the person provides or facilitates reproductive health care for and at the request of the individual. The Department is making these changes in response to comments received on the 2023 Privacy Rule NPRM, which are further discussed below.

Comment: Several commenters supported the Department's proposal to clarify that the covered entity's basis for electing not to treat a person as a personal representative of an individual, despite state law or other requirements of the Privacy Rule, cannot be primarily because the person has provided or facilitated reproductive health care.

Response: As explained throughout this final rule, reproductive health care is uniquely sensitive and must be treated as such. Accordingly, we are finalizing this proposal with modifications as described above.

Comment: A commenter expressed concerns that regulated entities would have difficulty determining whether the "primary" basis for the belief that the individual has been or may be subjected to domestic violence, abuse, or neglect by such person, or

that treating such person as the personal representative could endanger the individual related to the provision or facilitation of the reproductive health care, in some circumstances. The commenter requested that the Department provide additional clarity in the regulatory text or through examples.

Response: As discussed above, we have removed the term "primary" before "basis" and reorganized the provision. We believe this change clarifies that the covered entity does not have to determine whether the provision or facilitation of reproductive health care is the "primary" basis for believing that a person who is an individual's personal representative under applicable law has abused, neglected, or endangered the individual, or may do so in the future, such that the covered entity would be permitted to deny the person personal representative status.

Comment: A few commenters requested that the Department clarify that other existing provisions pertaining to personal representatives continue to apply, including the provision that a covered entity should not treat a parent or guardian as a personal representative where state law does not require a minor to obtain parental consent to lawfully obtain health care.

Response: As discussed above, the Privacy Rule generally requires a covered entity to treat a person who, under applicable law, has the authority to act on behalf of an individual in making decisions related to health care **\*33027** as the individual's personal representative with respect to PHI relevant to such personal representation, with limited exception.[FN328] In this final rule, we are clarifying those limited exceptions apply to this general rule.[FN329] We did not propose, nor are we making any additional changes to the Privacy Rule's provisions on personal representatives. Nothing in this final rule is intended to alter any other use or disclosure permissions for personal representatives, nor does it interfere with the ability of states to define the nature of the relationship between a minor and a parent or guardian.

Comment: A commenter asserted that the proposal could lead to situations in which someone pretending to be a personal representative of the individual would consent to reproductive health care for the individual. According to a few commenters, the proposal would make it easier for a person abusing an individual to obtain access to an individual's PHI because of the limits imposed on the reasonable belief provisions by the proposal. Another commenter asserted that the proposal would hinder state investigations into crimes that affect an individual's reproductive health where such crimes are committed by a person meeting a state's definition of a personal representative.

Response: The Department has no reason to believe, and commenters provided no evidence to suggest, that the final rule will lead to abuse or undermine parental consent. Rather, the final rule will protect sensitive PHI by clarifying that a regulated entity must treat a person as a personal representative of an individual with respect to PHI relevant to such personal representation if such person is, under applicable law, authorized to act on behalf of the individual in making decisions related to health care. This includes a court-appointed guardian, a person with a power of attorney, or other persons with legal authority to make health care decisions. Further, under 45 CFR 164.514(h), a covered entity must verify the identity of a person requesting PHI and the authority of any such person to have access to PHI, if the identity is not already known to the covered entity.

Additionally, the final rule allows a covered entity to elect not to treat a person as a personal representative of an individual if the covered entity, in the exercise of professional judgment, has a reasonable belief that the individual has been or may be subjected to domestic violence, abuse, or neglect by such person, or that treating such person as the personal representative could endanger the individual. The final rule only clarifies that the reasonable basis cannot be the provision or facilitation of reproductive health care by the person authorized by applicable law.

Comment: A few commenters recommended that the Department define and interpret personal representative status in the context of reproductive health care consistent with its current interpretation.

Response: We appreciate the comments but decline to specifically define "personal representative" in the context of reproductive health care. We are reducing compliance burdens by eliminating the need for covered entities to determine whether the provision or facilitation of reproductive health care was the "primary" basis for their belief that an individual has been or may be

subjected to domestic violence, abuse, or neglect, or may be endangered by a person authorized by applicable law to act as an individual's personal representative if the covered entity treats the person as such, with respect to PHI relevant to such personal representation.

Comment: A covered entity recommended that the Department set reasonable threshold standards that covered entities would be required to meet if they deny personal representative status to a person because of any legal, social, or professional liability that could attach based on such denials. The commenter further recommended that the Department set objective universal thresholds for denials that are clear, concise, and easily defined.

Response: We appreciate the comment but decline to set a reasonable threshold standard that covered entities would be required to meet if they deny personal representative status to a person. As discussed above, the Department gives covered entities discretion to elect not to treat a person as a personal representative of an individual if the covered entity has a reasonable belief that the individual has been subjected to domestic violence, abuse, or neglect by or would be in danger from a person seeking to act as the personal representative, except where the basis of the denial is that the person provided or facilitated reproductive health care.

Response: As discussed above, a personal representative, with authority under applicable law, stands in the shoes of the individual and has the ability to act for the individual and exercise the individual's rights. Thus, with very limited exceptions, covered entities must provide the personal representative access to the individual's PHI in accordance with 45 CFR 164.524 to the extent such information is relevant to such representation.

### 4. Request for Comments
The Department requested comment on whether to eliminate or narrow any existing permissions to use or disclose "highly sensitive PHI." [FN330] Most of the comments on this question are discussed in the context of the prohibition.

### C. *Section 164.509—Uses and Disclosures for Which an Attestation Is Required*

### 1. Current Provision
The Privacy Rule currently separates uses and disclosures into three categories: required, permitted, and prohibited. Permitted uses and disclosures are further subdivided into those to carry out TPO; [FN331] those for which an individual's authorization is required; [FN332] those requiring an opportunity for the individual to agree or object; [FN333] and those for which an authorization or opportunity to agree or object is not required.[FN334] For an individual's authorization to be valid, the Privacy Rule requires that it contain certain specific information to ensure that an individual authorizing a regulated entity to use or disclose their PHI to another person knows and understands to what it is they are agreeing.[FN335]

### 2. Proposed Rule
As we described in the 2023 Privacy Rule NPRM, a regulated entity presented with a request for PHI would need to discern whether using or disclosing PHI in response to the request would be prohibited. To facilitate compliance with the proposed prohibition at 45 CFR 164.502(a)(5)(iii) while also providing a pathway for regulated entities to disclose PHI for certain permitted purposes, the Department proposed to require that a covered entity obtain an attestation from a person requesting the use or disclosure of PHI in certain circumstances.[FN336]

**\*33028**  Specifically, the Department proposed to add a new section 45 CFR 164.509, "Uses and disclosures for which an attestation is required." This proposed condition would require a regulated entity to obtain certain assurances from the person requesting PHI potentially related to reproductive health care before the PHI is used or disclosed, in the form of a signed and dated written statement attesting that the use or disclosure would not be for a purpose prohibited under 45 CFR 164.502(a)(5)(iii), where the person is making the request under the Privacy Rule permissions at 45 CFR 164.512(d) (disclosures for

health oversight activities), (e) (disclosures for judicial and administrative proceedings), (f) (disclosures for law enforcement purposes), or (g)(1) (disclosures about decedents to coroners and medical examiners).

The proposed new section included a description of the proposed attestation contents, including a statement that the use or disclosure is not for a purpose the Department proposed to prohibit as described at 45 CFR 164.502(a)(5)(iii). The 2023 Privacy Rule NPRM also included a discussion about how the Department anticipated the proposed attestation requirement would work in concert with Privacy Rule permissions. Additionally, the proposed attestation provision would also include the general requirements for a valid attestation, and defects of an invalid attestation.[FN337] The Department also proposed to require that an attestation be written in plain language [FN338] and to prohibit it from being "combined with" any other document. Further, the Department's proposal would explicitly permit the attestation to be in an electronic format, as well as electronically signed by the person requesting the disclosure.[FN339] Under the proposal, the attestation would be facially valid when the document meets the required elements of the attestation proposal and includes an electronic signature that is valid under applicable Federal and state law.[FN340]

Additionally, the proposal specified that each use or disclosure request would require a new attestation.

The Department proposed that a regulated entity would be able to rely on the attestation provided that it is objectively reasonable under the circumstances for the regulated entity to believe the statement required by 45 CFR 164.509(c)(1)(iv) that the requested disclosure of PHI is not for a purpose prohibited by 45 CFR 164.502(a)(5)(iii), rather than requiring a regulated entity to investigate the validity of an attestation.[FN341] We explained that it would not be objectively reasonable for a regulated entity to rely on the representation of the person requesting PHI about whether the reproductive health care was provided under circumstances in which it was lawful to provide such health care. This is because we believed that the regulated entity, not the person requesting the disclosure of PHI, has the information about the provision of such health care that is necessary to make this determination. Therefore, we explained that this determination would need to be made by the regulated entity prior to using or disclosing PHI in response to a request for a use or disclosure of PHI that would require an attestation under the proposal.

The attestation proposal also would require a regulated entity to cease use or disclosure of PHI if the regulated entity develops reason to believe, during the course of the use or disclosure, that the representations contained within the attestation were materially incorrect, leading to uses or disclosures for a prohibited purpose.[FN342] Relatedly, the 2023 Privacy Rule NPRM included a discussion of the consequences of material misrepresentations that cause the impermissible use or disclosure of IIHI relating to another individual under HIPAA.

To reduce the burden on regulated entities implementing this proposed attestation, the Department requested comment on whether it should develop a model attestation that a regulated entity may use when developing its own attestation templates. The Department did not propose to require that regulated entities use the model attestation.

### 3. Overview of Public Comments
Most commenters expressed support for the proposal to require an attestation for certain uses and disclosures. Some commenters questioned why the Department did not extend the attestation requirement directly to business associates, consistent with the general prohibition and recommended that the attestation requirements be applied to business associates.

Some of those commenters that supported the proposal to require an attestation expressed concern or made additional recommendations about its components, content, and scope, and the consequences for covered entities that make inadvertent disclosures of PHI without an attestation. A small number of opposing commenters also expressed concerns about the effectiveness and administrative burden of the proposed attestation requirement.

About half of the commenters concerned about the administrative burden of the attestation expressed support for limiting the applicability of the proposed attestation to certain types of uses and disclosures of information, while the other half recommended

expanding the scope of the proposed attestation requirement to mitigate burdens on covered entities or to increase privacy protections for individuals.

Many commenters expressed concern about the Department's statement in the 2023 Privacy Rule NPRM that it would not be objectively reasonable for a regulated entity to rely on the representation of a person requesting the use or disclosure of PHI about whether the PHI sought was related to lawful health care. Specifically, commenters asserted that regulated entities may have difficulties determining whether an attestation is "objectively reasonable" and were unlikely to possess the information necessary to determine the purpose of a person's request for the use or disclosure of PHI.

 **\*33029**  Most commenters urged the Department to expand the proposal beyond requests for PHI potentially related to reproductive health care to requests for any PHI because of the associated administrative burden of identifying and segmenting PHI about reproductive health care from other types of PHI. These commenters asserted that the burden would be significant because such PHI can be found throughout the medical record. Commenters also expressed concerns about the ability of EHRs to segment data.

Most commenters recommended that the Department add to or modify the content of the proposed attestation, including to add a statement that the recipient pledges not to redisclose PHI to another party for any of the prohibited purposes or that the request is for the minimum amount of information necessary. Many supported the inclusion of a signed declaration under penalty of perjury and a statement regarding the penalties for perjury to add a layer of accountability.

**4. Final Rule**

As we explained in the 2023 Privacy Rule NPRM, it may be difficult for regulated entities to distinguish between requests for the use and disclosure of PHI based on whether the request is for a permitted or prohibited purpose, which could lead regulated entities to deny use or disclosure requests for permitted purposes. Additionally, absent an enforcement mechanism, it is likely that persons requesting the use or disclosure of PHI could seek to use Privacy Rule permissions for purposes that are prohibited under the new 45 CFR 164.502(a)(5)(iii). Accordingly, the Department is finalizing the proposed attestation requirement, with modification, as described below. We intend to publish a model attestation prior to the compliance date for this final rule.

First, the Department is renumbering the attestation provision such that the requirement is now 45 CFR 164.509(a)(1) and modifying that requirement to hold business associates directly liable for compliance with the attestation requirement. This change was made to address concerns raised by commenters who questioned why the Department did not extend the attestation requirement directly to business associates, consistent with the general prohibition and with revisions made to the HIPAA Rules in the 2013 Omnibus Rule, as required by the HITECH Act. The Department has authority to take enforcement action against business associates only for requirements for which the business associate is directly liable.[FN343] Thus, under the proposed attestation requirement, a business associate would only have been required to comply with the proposed 45 CFR 164.509 if such obligation was explicitly included within its business associate agreement.[FN344]

Both covered entities and business associates process requests for PHI. The Privacy Rule permits regulated entities to determine whether a business associate can respond to such requests or whether they are required to defer to the covered entity.[FN345] As noted by commenters, while many PHI requests processed by a business associate pursuant to 45 CFR 164.512(d)-(g)(1) are processed on behalf of the covered entity, persons may elect to request PHI directly from the business associate. Thus, the Department has determined that it is appropriate to hold both covered entities and business associates directly liable for compliance with the attestation requirement. Expanding the attestation requirement to apply to business associates will ensure that the business associate is directly liable for compliance with it, regardless of whether compliance with 45 CFR 164.509 is explicitly included in a BAA.

The Department is also adopting the proposed attestation requirement that a regulated entity obtain an attestation only for PHI "potentially related to reproductive health care." As discussed in the 2023 Privacy Rule NPRM, this will limit the number of requests that require an attestation, and therefore, the burden of the attestation requirement on regulated entities

and persons requesting PHI. The Department reminds regulated entities that they are permitted, but not required, to respond to law enforcement requests for PHI where the purpose of the request is not one for which regulated entities are prohibited from disclosing PHI. By narrowing the scope of the attestation to PHI "potentially related to reproductive health care," the attestation requirement will not unnecessarily interfere with or delay law enforcement investigations that do not involve PHI "potentially related to reproductive health care." While in practice this scope may be wide, we believe the privacy interests of individuals who have obtained reproductive health care necessitates the inclusion of "potentially related" PHI. We are concerned that extending the attestation requirement to all PHI could unnecessarily delay law enforcement investigations that are not for a purpose prohibited under 45 CFR 164.502(a)(5)(iii). We acknowledge commenters' concerns about the ability of regulated entities to operationalize the attestation condition and note that the requirement to obtain an attestation applies where the request is for PHI "potentially related to reproductive health care," as opposed to PHI "related to reproductive health care." Consistent with the Department's instructions to regulated entities since the Privacy Rule's inception, we have taken a flexible approach to allow scalability based on a regulated entity's activities and size. All regulated entities must take appropriate steps to address privacy concerns. Regulated entities should weigh the costs and benefits of alternative approaches when determining the scope and extent of their compliance activities, including when developing policies and procedures to comply with the Privacy Rule.[FN346] The Department will assess the progress of regulated entities' compliance with this requirement and promulgate guidance as appropriate. The Department also notes that with limited exceptions, the Privacy Rule generally permits but does not require the use or disclosure of PHI when the conditions set by the Privacy Rule for the specific use or disclosure of PHI are met.

The Department is adopting the proposed requirement that an attestation be obtained where a request is made under the Privacy Rule permissions at 45 CFR 164.512(d) (disclosures for health oversight activities), (e) (disclosures for judicial and administrative proceedings), (f) (disclosures for law enforcement purposes), or (g)(1) (disclosures about decedents to coroners and medical examiners). This requirement will help ensure that these Privacy Rule permissions cannot be used to circumvent the new prohibition at 45 **33030** CFR 164.502(a)(5)(iii) and continue permitting essential disclosures, while also limiting the attestation's burden on regulated entities by providing a standard mechanism by which the regulated entity can ascertain whether a requested use or disclosure is prohibited under this final rule. The attestation requirement is intended to reduce the burden of determining whether the PHI request is for a purpose prohibited under 45 CFR 164.502(a)(5)(iii), but it does not absolve regulated entities of the responsibility of making this determination, nor does it absolve regulated entities of the responsibility for ensuring that such requests meet the other conditions of the relevant permission.

We are modifying the proposal by revising 45 CFR 164.509(a)(1) to clarify that a regulated entity may not use or disclose PHI where the use or disclosure does not meet all of the Privacy Rule's applicable conditions, including the attestation requirement. While this is consistent with the existing requirements of the Privacy Rule, we determined that it was necessary to reiterate this requirement here based on comments we received. Thus, when this final rule is read holistically, a regulated entity is not permitted to use or disclose PHI where such disclosure does not meet all of the Privacy Rule's applicable conditions, including the attestation requirement.

We are also modifying the proposal by adding 45 CFR 164.509(a)(2) to clarify that the use or disclosure of PHI based on a defective attestation does not meet the attestation requirement. For example, the attestation requirement would not be met if a regulated entity relies on an attestation where it is not reasonable to do so because the attestation would be defective under 45 CFR 164.509(b)(2)(v). Accordingly, it would be a violation of the Privacy Rule if the regulated entity makes a use or disclosure in response to a defective attestation.

The Department is modifying the proposal to prohibit inclusion in the attestation of any elements that are not specifically required by 45 CFR 164.509(c). This provision addresses concerns that regulated entities might require persons requesting PHI to provide information beyond that which is required under 45 CFR 164.509(c). Such additional requirements could make it burdensome for persons requesting PHI to submit a valid attestation when they make a request pursuant to 45 CFR 164.512(d), (e), (f), or (g)(1). Additionally, a person requesting PHI is not required to use the specific attestation form provided by a regulated entity, as long as the attestation provided by such person is compliant with the requirements of 45 CFR 164.509.

Additionally, the Department is modifying the proposed prohibition on compound attestations. Specifically, the final rule prohibits the attestation from being "combined with" any other document. The modification clarifies that while an attestation may not be combined with other "forms," additional documentation to support the information provided in the attestation may be submitted. This additional documentation may not replace or substitute for any of the attestation's required elements. The attestation itself must be clearly labeled, distinct from any surrounding text, and completed in its entirety, but documentation to support the statement at 45 CFR 164.509(c)(1)(iv) or to overcome the presumption at 45 CFR 164.502(a)(5)(iii)(C) may be appended to the attestation. Thus, a regulated entity must ensure that the required elements of the attestation are met, and should review any additional documents provided by the person making the request when making the required determinations.

A regulated entity may use this information—the information on the attestation combined with any additional documentation provided by the person making the request for PHI—to make a reasonable determination that the attestation is true, consistent with 45 CFR 164.509(b)(2)(v). For example, an attestation would not be impermissibly "combined with" a subpoena if it is attached to it, provided that the attestation is clearly labeled as such. As another example, an electronic attestation would not be impermissibly "combined with" another document where the attestation is on the same screen as the other document, provided that the attestation is clearly and distinctly labeled as such.

The Department is finalizing the proposed content requirements with modifications as follows. Specifically, the Department is finalizing the proposal that an attestation must include that the person requesting the disclosure confirm the types of PHI that they are requesting; clearly identify the name of the individual whose PHI is being requested, if practicable, or if not practicable, the class of individuals whose PHI is being requested; and confirm, in writing, that the use or disclosure is not for a purpose prohibited under 45 CFR 164.502(a)(5)(iii). For purposes of the "class of individuals" described in 45 CFR 164.509(c)(1)(i)(B), the Department clarifies that the requesting entity may describe such a class in general terms—for example, as all individuals who were treated by a certain health care provider or for whom a certain health care provider submitted claims, all individuals who received a certain procedure, or all individuals with given health insurance coverage.

As we proposed, we are finalizing a requirement that the attestation include a clear statement that the use or disclosure is not for a purpose prohibited under 45 CFR 164.502(a)(5)(iii). This requirement may be satisfied with a series of checkboxes that identifies why the use or disclosure is not prohibited under 45 CFR 164.502(a)(5)(iii) (i.e., the use or disclosure is not for a purpose specified in 45 CFR 164.502(a)(5)(iii)(A); or the use or disclosure is for a purpose that would be prohibited under 45 CFR 164.502(a)(5)(iii)(A), but the reproductive health care at issue was not lawful under the circumstances in which it was provided so the Rule of Applicability is not satisfied, and thus the prohibition does not apply).

The Department is adding another new required element, a statement that the attestation is signed with the understanding that a person who knowingly and in violation of HIPAA obtains or discloses IIHI relating to another individual, or discloses IIHI to another person, may be subject to criminal liability.[FN347] We believe that adding this language satisfies the intent that led us to consider including a penalty of perjury requirement and with applicable law. The statement does not impose new liability on persons who sign an attestation; instead, including the statement in the attestation ensures that persons who request the use or disclosure of PHI for which an attestation is required are on notice of and acknowledge the consequences of making such requests under false pretenses.

The Department is also finalizing the proposed requirement that the attestation must be written in plain language. Additionally, the Department is finalizing its proposal to permit the attestation to be in electronic format and for it to be electronically signed by the person requesting the disclosure where such electronic signature is valid under applicable law.[FN348] The Department declines to mandate a specific electronic format for the attestation.

As we proposed, an attestation will be limited to the specific use or disclosure. Accordingly, each use or disclosure  **\*33031** request for PHI will require a new attestation.

There is no exception to the minimum necessary standard for uses and disclosures made pursuant to an attestation under 45 CFR 164.509.[FN349] Thus, a regulated entity will have to limit a use or disclosure to the minimum necessary when provided in response to a request that would be subject to the proposed attestation requirement, unless one of the specified exceptions to the minimum necessary standard in 45 CFR 164.502(b)(2) applies. Where the person requesting the PHI is also a regulated entity, that person will also need to make reasonable efforts to limit their request to the minimum necessary to accomplish the intended purpose of the use, disclosure, or request.[FN350]

The Department is not requiring a regulated entity to investigate the validity of an attestation provided by a person requesting a use or disclosure of PHI. Rather, a regulated entity is generally permitted to rely on the attestation if, under the circumstances, a regulated entity reasonably determines that the request is not for investigating or imposing liability for the mere act of seeking, obtaining, providing, or facilitating allegedly unlawful reproductive health care. In addition, a regulated entity is generally permitted to rely on the attestation and any accompanying material if, under the circumstances, a regulated entity reasonably could conclude (e.g., upon examination of adequate supporting documentation provided by the person making the request) that the requested disclosure of PHI is not for a purpose prohibited by 45 CFR 164.502(a)(5)(iii), consistent with the approach taken in the Privacy Rule [FN351] and elsewhere in this final rule. If such reliance is not reasonable, then the regulated entity may not rely on the attestation. This is a change from the proposed language, which permitted reliance based on an "objectively reasonable" standard. The proposed standard was modified because a reasonable person standard is inherently objective.[FN352] Thus, including "objectively" in the description of the standard was redundant.

For requests involving allegedly unlawful reproductive health care, the extent to which a regulated entity may reasonably rely on an attestation depends in part on whether the regulated entity provided the reproductive health care at issue. Under the final rule, it would not be reasonable for a regulated entity to rely on the representation made by a person requesting the use or disclosure of PHI that the reproductive health care was unlawful under the circumstances in which it was provided unless such representation meets the conditions set forth in the presumption at 45 CFR 164.502(a)(5)(iii)(C). As discussed above, under the presumption, reproductive health care is presumed to be lawful under the circumstances in which such health care is provided unless a regulated entity has actual knowledge, or information from the person making the request that demonstrates to the regulated entity a substantial factual basis that the reproductive health care was not lawful under the specific circumstances in which such health care was provided. Where the reproductive health care at issue was provided by a person other than the regulated entity receiving the request for the use or disclosure of PHI and the presumption is overcome, the regulated entity is permitted to use or disclose PHI in response to the request upon receipt of an attestation where it is reasonable to rely on the representations made in the attestation. It is not reasonable for the regulated entity to rely solely on a statement of the person requesting the use or disclosure of PHI that the reproductive health care was unlawful under the circumstances in which such health care was provided. Instead, the person requesting the use or disclosure of PHI must provide the regulated entity with information such that it would constitute actual knowledge or that demonstrates to the regulated entity a substantial factual basis that the reproductive health care was not lawful under the specific circumstances in which such health care was provided. A regulated entity that receives a request for PHI involving reproductive health care provided by that regulated entity should review the relevant PHI in its possession and other related information (e.g., license of health care provider that provided the health care, operating license for the facility in which such health care was provided) to determine whether the reproductive health care was lawful under the circumstances in which it was provided prior to using or disclosing PHI in response to a request for PHI that requires an attestation. Where the request is about reproductive health care that is provided by the regulated entity receiving the request, it would not be reasonable for a regulated entity to automatically rely on a representation made by a person requesting the use or disclosure of PHI about whether the reproductive health care was provided under the circumstances in which it was lawful to provide such health care. Rather, the regulated entity must review the individual's PHI to consider the circumstances under which it provided the reproductive health care to determine whether such reliance is reasonable. Therefore, where the request involves the use or disclosure of PHI potentially related to reproductive health care that was provided by the recipient of the request, the regulated entity must make the determination about whether it provided the health care lawfully prior to using or disclosing PHI in response to a request that requires an attestation.

For example, if a law enforcement official requested PHI potentially related to reproductive health care to investigate a person for the mere act of seeking, obtaining, providing or facilitating allegedly unlawful reproductive health care, it would not be reasonable for a regulated entity that receives such a request to rely solely on a signed attestation that states that the reproductive health care was not lawful under the circumstances in which it was provided, as set forth in 45 CFR 164.502(a)(5)(iii)(B), and therefore, that the requested disclosure is not for a purpose prohibited under 45 CFR 164.502(a)(5)(iii)(A). This is regardless of whether the regulated entity receiving the request for PHI provided the reproductive health care at issue. Assuming that the attestation is not facially deficient, a regulated entity must consider the totality of the circumstances surrounding the attestation and whether it is reasonable to rely on the attestation in those circumstances. To determine whether it is reasonable to rely on the attestation, a regulated entity should consider, among other things: who is requesting the use or disclosure of PHI; the permission upon which the person making the request is relying; the **\*33032** information provided to satisfy other conditions of the relevant permission; the PHI requested and its relationship to the stated purpose of the request; and, where the reproductive health care was supplied by another person, whether the regulated entity has: (1) actual knowledge that the reproductive health care was not lawful under the circumstances in which it was provided; or (2) factual information supplied by the person requesting the use or disclosure of PHI that would demonstrate to a reasonable regulated entity a substantial factual basis that the reproductive health care was not lawful under the specific circumstances in which such health care was provided.

For example, a regulated entity receives an attestation from a Federal law enforcement official, along with a court ordered warrant demanding PHI potentially related to reproductive health care. The law enforcement official represents that the request is about reproductive health care that was not lawful under the circumstances in which such health care was provided, but the official will not divulge more information because they allege that doing so would jeopardize an ongoing criminal investigation. In this example, if the regulated entity itself provided the reproductive health care and, based on the information in its possession, reasonably determines that such health care was lawful under the circumstances in which it was provided, the regulated entity may not disclose the requested PHI.

If the regulated entity did not provide the reproductive health care, it may not disclose the requested PHI absent additional factual information because the official requesting the PHI has not provided sufficient information to overcome the presumption at 45 CFR 164.502(a)(5)(iii)(C). Further, it also would not be reasonable under the circumstances for the regulated entity to rely on the attestation that the information would be used for a purpose prohibited by 45 CFR 164.502(a)(5)(iii) because of the presumption that the reproductive health care was lawfully provided.

However, in cases where the presumption of lawfulness applies, the regulated entity would be permitted to make the disclosure, for example, where the law enforcement official provides additional factual information for the regulated entity to determine that there is a substantial factual basis that the reproductive health care was not lawful under the circumstances in which such health care was provided. As another example, a regulated entity could rebut the presumption of lawfulness by relying on a sworn statement by a law enforcement official that the PHI is necessary for an investigation into violations of specific criminal codes unrelated to the provision of reproductive health care (e.g., billing fraud) or an affidavit from an individual that the individual obtained unlawful reproductive health care from a different health care provider and the requested PHI is relevant to that investigation. Similarly, if a regulated entity receives an attestation from a Federal law enforcement official, along with a court-ordered warrant demanding PHI potentially related to reproductive health care, that both specify that the purpose of the request is not for a purpose prohibited by 45 CFR 164.502(a)(5)(iii), the regulated entity may rely on the attestation and warrant, subject to the requirements of 45 CFR 164.512(f)(1)(ii)(A).

Lastly, this final rule requires a regulated entity to cease use or disclosure of PHI if the regulated entity, during the course of the use or disclosure, discovers information reasonably showing that the representations contained within the attestation are materially incorrect, leading to uses or disclosures for a prohibited purpose.[FN353] As we explained in the 2023 Privacy Rule NPRM, pursuant to HIPAA, a person who knowingly and in violation of the Administrative Simplification provisions obtains or discloses IIHI relating to another individual or discloses IIHI to another person would be subject to criminal liability. [FN354] Thus, a person who knowingly and in violation of HIPAA [FN355] falsifies an attestation (e.g., makes material misrepresentations about the intended uses of the PHI requested) to obtain (or cause to be disclosed) an individual's IIHI could

be subject to criminal penalties as outlined in the statute.[FN356] Additionally, a disclosure made based on an attestation that contains material misrepresentations after the regulated entity becomes aware of such misrepresentations constitutes an impermissible disclosure, which requires notifications of a breach to the individual, the Secretary, and in some cases, the media. [FN357]

The attestation requirement does not replace the conditions of the Privacy Rule's permissions for a regulated entity to disclose PHI, including in response to a subpoena, discovery request, or other lawful process, or administrative request. Instead, the attestation is designed to work with the permissions and their requirements. If PHI is disclosed pursuant to 45 CFR 164.512(e)(1) (ii) or (f)(1)(ii)(C), a regulated entity will need to verify that the requirements of each provision are met, in addition to satisfying the requirements of the new attestation provision under 45 CFR 164.509. Furthermore, the requirements of 45 CFR 164.528, the right to an accounting of disclosures of PHI made by a covered entity, are not affected by the attestation requirement. Thus, disclosures made pursuant to a permission under 45 CFR 164.512(d), (e), (f), or (g) must be included in the accounting, including when they are made pursuant to an attestation.

### 5. Responses to Public Comments

Comment: Most commenters supported the proposal to require an attestation for certain uses and disclosures. A few commenters recognized the benefits of the attestation requirement, despite the potential increase in administrative burden for regulated entities.

Many commenters opposed the proposal for what they described as administrative burden, questionable effectiveness, and lack of clarity. A few commenters stated that the requirements imposed an inappropriate compliance burden on covered entities that would need to determine whether a PHI request was "potentially related" to sensitive personal health care, and, along with a health care provider who otherwise supported the attestation, they recommended instead that the Department impose requirements on the person requesting the use or disclosure of PHI. Many commenters expressed concerns about the ability of covered entities to operationalize the proposed requirement with the limitation to PHI potentially related to reproductive health care because it would require the ability to segment PHI, which the Department previously acknowledged is generally unavailable. A few commenters questioned the effectiveness of the proposed attestation **\*33033** requirement, as compared to its potential burden, enforceability, and effects on access to maternal and specialty health care.

Response: We agree with commenters that the attestation requirement will bolster the privacy of PHI and acknowledge that implementation of this important safeguard requires additional administrative activities by regulated entities. The Department considered removing the limitation on the application of the attestation condition to PHI "potentially related to reproductive health care," but we are concerned that expanding it to apply to all requests for PHI made for specified purposes would impose even more burden on regulated entities. The requirement is to determine whether the requested PHI is "potentially related to reproductive health care," not whether it is "related to reproductive health care." Thus, regulated entities are not required to make an affirmative determination that the requested PHI is in fact related to reproductive health care before requiring a person requesting PHI to provide an attestation. We note that the focus of the attestation requirement has been limited to PHI potentially related to reproductive health care because the changes to the legal landscape have heighted privacy concerns about reproductive health care that is lawful under the circumstances in which such health care is provided. We also note that the provision of an attestation itself is not determinant of whether the request is for a prohibited purpose. Rather, regulated entities must consider whether a request for PHI is for a prohibited purpose, regardless of whether the request is made for a purpose for which the Privacy Rule requires an attestation.

The Department is limited to applying the HIPAA Rules to those entities covered by HIPAA (i.e., health plans, health care clearinghouses, and health care providers that conduct covered transactions) and to business associates, as provided under the HITECH Act. Accordingly, the Department is limited to imposing obligations on persons requesting the use or disclosure of PHI to those who are also regulated entities.

The attestation condition has been drafted to promote the privacy of information about lawful reproductive health care, including maternal and specialty health care, while still permitting certain uses of PHI. Regulated entities, including covered entities that specialize in providing reproductive health care may determine, based on their assessment of what PHI is potentially related to reproductive health care, that an attestation must accompany all requests they receive for the use or disclosure of any PHI made pursuant to and in compliance with 45 CFR 164.512(d)-(g)(1). Further, the attestation requirement only applies to the specified requests for PHI and should not affect any intake of new patients or provision of maternal health care.

The Department is not requiring a regulated entity to investigate the veracity of the information provided in support of an attestation because doing so would impose a significant administrative burden on regulated entities and persons requesting the use or disclosure of PHI without proportional benefit. Additionally, requiring such an investigation by the regulated entity may cause unnecessary delays to law enforcement activities. Rather, the Department is finalizing a regulated entity's ability to rely on the attestation provided that it is reasonable under the circumstances for the regulated entity to believe the statement required by 45 CFR 164.509(c)(1)(iv) that the requested disclosure of PHI is not for a purpose prohibited by 45 CFR 164.502(a)(5)(iii). If such reliance is not reasonable, then the regulated entity may not rely on the attestation.

A regulated entity that receives a request for PHI potentially related to reproductive health care for purposes specified in 45 CFR 164.512(d), (e), (f), or (g)(1) may accept information, in addition to the attestation, from the person requesting the PHI to support its ability to make the determinations required by 45 CFR 164.502(a)(5)(iii) and 45 CFR 164.509(b)(v).

For example, it likely would not be reasonable for a regulated entity to rely on an attestation from a public official who represents that their request is for a purpose that is not prohibited, if the request for PHI is overly broad for its purported purpose and the public official has publicly stated that they will be investigating health care providers for providing reproductive health care. In such cases, regulated entities should consider the circumstances surrounding an attestation to determine whether they can reasonably rely on the attestation. Although we have modified the regulatory text by removing "objectively," the standard remains unchanged in practice because a reasonableness standard is an objective standard. As we also discussed above, it is not reasonable for a regulated entity that provided the reproductive health care at issue to rely on a representation made by a person requesting the use or disclosure of PHI that the reproductive health care at issue was unlawful under the circumstance in which such health care was provided. A regulated entity that makes a disclosure where it was not reasonable to rely on the representation made by the person requesting the use or disclosure may be subject to enforcement action by OCR.

Additionally, as discussed in greater detail above, a person who knowingly and in violation of the Administrative Simplification provisions obtains or discloses IIHI relating to another individual or discloses IIHI to another person would be subject to criminal liability.[FN358] We believe that this provision serves as a deterrent for those who otherwise might request PHI in violation of this final rule. It also will continue to permit essential disclosures while ensuring that Privacy Rule permissions cannot be used to circumvent the new prohibition, thereby enhancing the privacy of individuals' PHI and protecting other important interests.

Comment: Several commenters opposed the attestation proposal because they believed that the proposal would make it more difficult for law enforcement to request PHI and for entities to respond to such requests, potentially putting them in situations where they need to choose between complying with a court order and impermissibly disclosing PHI. A few individuals stated that the proposal would have a chilling effect on the ability of a state to conduct investigations or proceedings for which the use or disclosure of PHI could be beneficial, particularly in cases involving rape, incest, sex trafficking, domestic violence, abuse, and neglect.

Response: We acknowledge that the attestation provision may require regulated entities to obtain additional information from persons requesting PHI in certain circumstances. As discussed above, this condition is consistent with the operation of the Privacy Rule since its inception, which has always required regulated entities to obtain additional information from persons requesting PHI in certain circumstances, such as where the use or disclosure is one for which an authorization or opportunity to agree or object is not required.[FN359] However, as also discussed above, any burden the attestation may impose on persons requesting PHI is outweighed by the privacy interests that this final rule is designed to protect.

A person requesting PHI pursuant to 45 CFR 164.512(d)-(g)(1) may elect to provide an attestation with their request, even if a determination has not **\*33034** yet been made concerning whether such request is for PHI potentially related to reproductive health care. Similarly, the Privacy Rule does not require a regulated entity to respond to requests for PHI.

Comment: Some commenters were concerned about the effect of the attestation requirement on the electronic exchange of PHI and recommended approaches for incorporating attestations into a HIE environment. A commenter expressed concern that the requirement for an attestation would delay or prevent automated data exchange using Fast Healthcare Interoperability Resources® (FHIR®) APIs and might impede innovation. They requested guidance on how to implement the attestation condition in an HIE environment without impeding regulated exchanges or industry innovations using extensive data exchange via FHIR APIs. Commenters also recommended that the Department issue guidance on implementing attestation policies in circumstances not required by this rule that would not constitute information blocking. A commenter encouraged the Department to implement processes that limit the liability of health care providers for the actions of third parties. For example, the commenter requested that the Department clarify that a refusal to disclose PHI absent an attestation is protected from a finding of information blocking.

Response: We do not believe that this final rule prevents the disclosure of PHI via a HIE. We disagree that this requirement prevents the exchange of data using FHIR APIs under these permissions or for automated health data exchange more broadly. PHI can be disclosed as requested if the regulated entity obtains a valid attestation and the request meets the conditions of an applicable permission. The attestation requirement does not affect any requests via FHIR API that fall outside of the 45 CFR 164.512(d)-(g)(1) permissions. For example, a disclosure of PHI from a covered health care provider to another health care provider for care coordination purposes would not require an attestation because the disclosure would not be for a purpose addressed by 45 CFR 164.512(d)-(g)(1). The importance of ensuring the protection of an individual's interests in the privacy of their PHI and society in improving the effectiveness of the health care system far outweigh any potential administrative burdens or delays in the electronic exchange of PHI for non-health care purposes. Further, compliance with applicable law does not constitute information blocking.[FN360] Thus, we do not believe additional regulatory language is necessary at this time. OCR regularly collaborates with other Federal agencies, including ONC, to develop guidance on compliance with Federal standards and to address questions that arise about the ability of regulated entities to comply with applicable laws.

The permissions for which the Department is requiring that a regulated entity obtain an attestation prior to using or disclosing PHI are already conditioned upon meeting certain requirements, which generally require manual review. The Department acknowledges that certain persons may need to adjust their workflows to account for the attestation requirement. While there may be some delays until new processes are implemented, any disruptions will decrease over time. Thus, we do not anticipate that this final rule will contribute to additional delays in the disclosure of PHI.

The Department is finalizing a new regulatory presumption that permits a regulated entity to presume reproductive health care provided by another person was lawful unless the regulated entity has actual knowledge or factual information supplied by the person requesting the use or disclosure of PHI that demonstrates to the regulated entity a substantial factual basis that the reproductive health care was not lawful under the specific circumstances in which such health care was provided. This presumption will facilitate the determination by the regulated entity about whether a request for the use or disclosure of PHI would be subject to the prohibition, and thus will reduce the risk of an impermissible use or disclosure of the requested PHI, thereby reducing the liability of regulated entities that receive requests for PHI to which the prohibition may apply, but where they did not provide the reproductive health care at issue.

Comment: Many commenters questioned the Department's rationale for not extending the attestation requirement directly to business associates, consistent with the general prohibition. Some commenters recommended that the attestation requirement be applied to business associates because persons requesting the use or disclosure of PHI may directly approach a business associate for this PHI (and the business associate agreement may permit such disclosures or be silent regarding whether the business

associate may respond to them). Commenters also requested clarification of the responsibilities of business associates with respect to attestations and questioned whether the proposal would require amendment of their business associate agreements.

Response: As discussed above, we agree with the commenters that the attestation requirement should apply directly to business associates because they receive direct requests for PHI and are subject to the general prohibition in the same manner as covered entities. Therefore, we are modifying 45 CFR 164.509 to ensure that it expressly applies to both covered entities and their business associates.

Comment: Although a few commenters expressed support for limiting the attestation condition to requests regarding "PHI potentially related to reproductive health care," many commenters recommended that the proposed requirement to obtain an attestation be broadly applied to requests for any PHI. Many stated that it would be easier and more efficient for regulated entities if all requests related to a prohibited purpose required the attestation, regardless of the PHI being requested. According to these commenters, this would allow the regulated entity to avoid making any determinations regarding the PHI. A few explained that expanding the requirement to all PHI would appropriately place the burden of demonstrating that the requested disclosure was permissible on the person making request.

Several commenters asserted that information related to reproductive health care is potentially found in every department, record, and system, including those that may not have a readily apparent relationship to reproductive health care. As a result, according to these commenters, it would be onerous and costly to separate different types of health information in a medical record. According to other commenters, the volume of records requests received by health systems would render any requirement on a health care provider to redact PHI from an individual's medical record in the absence of an attestation overly burdensome and increase the risk of unauthorized disclosure. Some  **\*33035**  commenters explained that staff managing health information generally do not have the legal or medical training to determine whether a PHI request may be for PHI potentially related to reproductive health care, particularly given the breadth of most requests (e.g., for all medical records of an entity, of a particular health care provider or a particular individual). These commenters also raised concerns that the lack of legal or medical training could lead to inconsistent application of the rule, the inadvertent disclosure of PHI potentially related to reproductive health care, or delay the use or disclosure of PHI, even when the individual has not sought or obtained reproductive health care. Many commenters asserted that determining whether a request for the use or disclosure of PHI includes PHI potentially related to reproductive health care is difficult and a significant burden on health information professionals, particularly where the covered entity did not provide or facilitate the health care. According to some commenters, some business associates, such as cloud services providers, may not have the ability to determine whether the PHI that they maintain includes PHI potentially related to reproductive health care.

Some commenters posited that the result of this requirement would be that health care providers would refuse to provide any PHI in response to a request for the use or disclosure PHI on any matter that could possibly be construed as potentially related to reproductive health care. They and others stated that limiting the proposed prohibition to one category of PHI would require regulated entities to label or segment certain PHI within medical records, which would be impractical and costly because EHRs are unable to reliably segregate or flag PHI retrospectively.

Response: We acknowledge the comments from regulated entities that expressed concerns about the effects of the limitation of the attestation requirement to PHI potentially related to reproductive health care. However, the Department is concerned that extending the attestation requirement to all PHI could result in unintended consequences, such as the potential delay of law enforcement investigations that do not require PHI potentially related to reproductive health care. By contrast, an attestation requirement is necessary for PHI potentially related to reproductive health care because of recent changes to the legal landscape that make it more likely that PHI will be sought for punitive non-health care purposes, and thus more likely to be subject to disclosure by regulated entities if the requested disclosure is permissible under the Privacy Rule, thereby harming the interests that HIPAA seeks to protect. Accordingly, the Department is not modifying the attestation requirement that a regulated entity obtain an attestation only for PHI potentially related to reproductive health care.

The Department acknowledges that the attestation requirement may increase the burden on regulated entities, but we disagree that regulated entities are unable to make the required assessments of attestations. Regulated entities currently conduct similar assessments when determining whether PHI may be disclosed to a personal representative, when making disclosures that are required by law or for public health purposes, and for various other permitted purposes. Regulated entities also regularly review medical records to comply with minimum necessary requirements. The Department is cognizant that an expanded attestation requirement could significantly increase burden if it were to expand this requirement to all disclosures in the absence of the sensitivities described in this final rule.

Comment: Many commenters supported the proposal to limit the requirement to obtain an attestation with a request for uses and disclosures for certain permissions, namely that have the greatest potential to be connected with a purpose for which the Department proposed to prohibit the use and disclosure of PHI. Some commenters expressed their belief that the Department had identified the appropriate permissions for which the attestation would provide additional safeguards.

Many commenters suggested modifications, primarily expansions or clarifications of the types of permitted uses and disclosures that would be subject to the attestation. Generally, commenters explained their belief that their recommended modifications would either mitigate the burden of the requirement to ascertain the purposes of the requested disclosure or increase privacy protections for individuals.

Commenters recommended multiple ways to expand the attestation requirement, such as extending it to all permissions in 45 CFR 164.512; disclosures required by law, for public health activities, and to avert a serious threat to health or safety; disclosures for treatment purposes to a person not regulated by HIPAA or disclosures to any person who might use the PHI for a prohibited purpose; and any disclosure at the discretion of the covered entity.

Response: The Department declines to expand the permissions for which an attestation is required at this time. The Department specifically chose to limit the attestation condition to the permissions at 45 CFR 164.512(d)-(g)(1) because these permissions have the greatest potential to result in the use or disclosure of an individual's PHI for a purpose prohibited at 45 CFR 164.502(a)(5)(iii). In the context of other permissions, where the risk of improper use or disclosure is less, the benefits of an attestation condition would be outweighed by the administrative burden of compliance. Accordingly, any disclosures made pursuant to 45 CFR 164.512(b), which includes disclosures for public health surveillance, investigations, or interventions, do not require an attestation. However, we note that requests made pursuant to other permissions of the rule remain subject to and must be evaluated for compliance with the prohibition at 45 CFR 164.502(a)(5)(iii).

Comment: A commenter stated that no attestation should be needed for judicial and administrative proceedings because current requirements are adequate. Instead, the commenter requested that the Department consider expanding procedural protections.

Response: We are finalizing the requirement that regulated entities obtain an attestation as a condition of a use or disclosure of PHI for judicial and administrative proceedings. As previously discussed, the attestation requirement ensures that certain Privacy Rule permissions are not used to circumvent the prohibition. The attestation requirement also reduces the burden on regulated entities because it is specifically designed to facilitate compliance with the prohibition under 45 CFR 164.502(a)(5)(iii) by helping regulated entities determine whether the use or disclosure of the requested PHI is permitted. Although a court order, qualified protective order, satisfactory assurance, or subpoena may have a restriction that prevents information requested from being further disclosed, it protects PHI only after it has been used or disclosed. Thus, the regulated entity's use or disclosure of PHI could still violate the prohibition at 45 CFR 164.502(a)(5)(iii), even if that disclosure is made in response to a court order, qualified protective order, satisfactory assurance, or subpoena. The attestation requirement helps to mitigate the risk of violations in these circumstances.

Comment: A few commenters expressed concerns about their ability to implement the attestation requirement  **33036**  in circumstances where the use or disclosure is triggered by a mandatory reporting law or verbal request and recommended that no attestation should be required in any case where disclosure of PHI is required by law. According to the commenters, an

attestation requirement could require a significant change to operational workflows for permitted disclosures and significantly impede operations for state and local agencies that conduct death investigations and perform public health studies and initiatives.

Response: The Privacy Rule at 45 CFR 164.512(a) permits certain uses and disclosures of PHI that are required by law, including notification of certain deaths by a covered health care provider to a medical examiner, when those uses and disclosures are limited to the requirements of such law. The attestation condition does not apply to the mandatory disclosures made pursuant to 45 CFR 164.512(a). Other mandatory reporting that is subject to 45 CFR 164.512(a)(2) has always been subject to the additional requirements of 45 CFR 164.512(c), (e), or (f). Further, mandatory reporting for public health activities pursuant to 45 CFR 164.512(b) do not require an attestation.

The attestation condition applies if the regulated entity is making a use or disclosure to a coroner or medical examiner pursuant to 45 CFR 164.512(g)(1). We understand that this may require regulated entities to adjust their workflows to comply with this requirement. For example, regulated entities could consider having an electronic attestation form readily available for persons that request the use or disclosure of PHI potentially related to reproductive health care because doing so may reduce delays in the regulated entity's response time related to the attestation condition. Thus, this condition will not significantly impede operations for persons who request information because the interruptions will decrease as they adjust their workflows to accommodate the new condition.

We remind regulated entities that the prohibition in 45 CFR 164.502(a)(5)(iii) applies, regardless of whether the request for PHI is made pursuant to a permission for which an attestation is required or another permission.

Comment: Many commenters urged the Department to implement a reasonable, good faith standard or a safe harbor for situations in which a regulated entity discloses PHI and the person requesting the PHI either uses or rediscloses it for a purpose that would be prohibited under the proposed rule. Some commenters were concerned that a covered entity will be liable for inadvertent disclosures of PHI and sought the benefit of the affirmative defense afforded at 45 CFR 160.410(b)(2).

Response: The Department declines to add a "good faith" standard or safe harbor to this final rule. As discussed above, the Department is not finalizing a separate Rule of Construction and is not incorporating the phrase "primarily for the purpose of" into the final prohibition standard.

As we explained in the 2023 Privacy Rule NPRM, 45 CFR 164.509 requires a new attestation for each use or disclosure request; a single attestation would not be sufficient to permit multiple uses or disclosures. This requirement is unlike the authorization, where generally, when a regulated entity receives a valid authorization, they may continue to use or disclose PHI to the person requesting the use or disclosure of PHI pursuant to that authorization after the initial disclosure, provided that such subsequent uses and disclosures are valid and related to that authorization. We understand that this may constitute an additional administrative burden for both the regulated entity and the person or entity requesting the information; however, requiring an attestation for each use or disclosure is necessary to ensure that certain Privacy Rule permissions are not used to circumvent the new prohibition at 45 CFR 164.502(a)(5)(iii), and to permit essential disclosures.

Comment: Some commenters expressed support for permitting a regulated entity to rely on an attestation if "it appears objectively reasonable" or "when objectively reasonable" and not requiring covered entities to investigate the accuracy of an attestation, thereby mitigating liability to the regulated entity, if not fully protecting an individual. Many commenters expressed concern that it would not be objectively reasonable for a regulated entity to rely on a representation made by the person requesting the use or disclosure of PHI that the PHI sought was related to unlawful health care. The commenters requested a guarantee that a health care provider's reliance on a "facially valid" attestation would be objectively reasonable without requiring the entity to investigate the intentions of the person requesting the use or disclosure of PHI and the validity of their attestation. A commenter recommended that the final rule direct regulated entities to take attestations at face value and hold harmless regulated entities in the event of a false attestation.

Commenters offered several reasons for these recommendations, including the burden on covered entities where they are required to determine: (1) the veracity of every attestation; (2) whether an attestation is required; and (3) whether the statement that the request for the use or disclosure is not for a purpose prohibited under 45 CFR 164.502(a)(5)(iii) is objectively reasonable.

Response: To assist in effectuating the prohibition, this Final Rule requires an attestation in some circumstances. We recognize the potential burden on regulated entities to investigate the validity of every attestation and do not require that they conduct a full investigation in each instance. However, as discussed above, if an attestation, on its face, meets the requirements at 45 CFR 164.509(c), a regulated entity must consider the totality of the circumstances surrounding the attestation and whether it is reasonable to rely on the attestation in those circumstances. To determine whether it is reasonable to rely on the attestation, a regulated entity should consider, among other things: who is requesting the use or disclosure of PHI; the permission upon which the person making the request is relying; the information provided to satisfy other conditions of the relevant permission; the PHI requested and its relationship to the purpose of the request (i.e., does the request meet the minimum necessary standard in relation to the purpose of the request); and, where the presumption at 45 CFR 164.502(a)(5)(iii)(C) applies, information provided by the person requesting the use or disclosure of PHI to overcome that presumption.

For example, as discussed above, it may not be reasonable for a regulated entity to rely on an attestation filed by a public official that a request for PHI potentially related to reproductive health care is not for a prohibited purpose when that public official has publicly stated their interest in investigating or imposing liability on those who seek, obtain, provide, or facilitate certain types of lawful reproductive health care. If a regulated entity concludes that it would not reasonable to rely on the attestation in this instance, the regulated entity would be prohibited from disclosing the requested PHI unless and until the public official provided additional information that enables the regulated entity to assess the veracity of its attestation. In contrast, it may be reasonable to rely on the representation of a public official that a request for PHI potentially related to reproductive **\*33037** health care is not for a prohibited purpose if the stated purpose for the request is to investigate insurance fraud and the official making the request is expressly authorized by law to conduct insurance fraud investigations as part of their legal mandate. Therefore, as discussed above, the Department is balancing these considerations by finalizing language that generally permits a regulated entity to rely on the attestation if it is reasonable for the regulated entity to believe the statement that the requested disclosure of PHI is not for a purpose prohibited by 45 CFR 164.502(a)(5)(iii).[FN361] To further assist regulated entities in determining whether it is reasonable to rely on the attestation, the requirement that the attestation include a clear statement that the use or disclosure is not for a prohibited purpose under 45 CFR 164.502(a)(5)(iii) may be satisfied with a statement that identifies why the use or disclosure is not prohibited, which could be checkboxes that indicate that the use or disclosure is not for a purpose described in 45 CFR 164.502(a)(5)(iii)(A), or that the reproductive health care does not satisfy the Rule of Applicability at 45 CFR 164.502(a)(5)(iii)(B).

Where the request for the use or disclosure of PHI is made of the regulated entity that provided the reproductive health care at issue, the regulated entity should ensure that the reproductive health care was not lawful under the circumstances in which such health care was provided before using or disclosing the requested PHI. If the reproductive health care at issue was provided under circumstances in which such health care was lawful, the regulated entity must obtain an attestation and determine whether it is reasonable to rely on the attestation that the use or disclosure is not being requested to conduct an investigation into or impose liability on any person for the mere act of seeking, obtaining, providing, or facilitating such reproductive health care. If the reproductive health care at issue was provided under circumstances in which such health care was unlawful, the regulated entity is permitted, but not required, to disclose the PHI if the disclosure is meets the conditions of an applicable Privacy Rule permission, which may include an attestation.

Regulated entities will not generally be held liable for disclosing PHI to a person who signed the attestation under false pretenses, provided that the requirements of 45 CFR 164.509 are met, and it is reasonable under the circumstances for the regulated entity to believe the statement that the requested disclosure of PHI is not for a purpose prohibited by 45 CFR 164.502(a)(5)(iii).

Comment: A commenter recommended that the rule clarify the relationship between the attestation and 45 CFR 164.514(h) regarding verification requirements. They requested that the Department consider making explicit in the Final Rule that reliance on legal process would not be appropriate in the absence of an attestation.

Response: The verification requirement under 45 CFR 164.514(h) [FN362] is separate from the attestation requirement, and a regulated entity must still comply with 45 CFR 164.514(h) when processing an attestation. The final rule makes clear that the attestation requirement will apply if the request for PHI potentially related to reproductive health care is made pursuant to permissions under 45 CFR 164.512(d)-(g)(1), which may include disclosing PHI pursuant to a legal process.

Comment: Some commenters stated that it is difficult to determine the purpose of a request for the use or disclosure of PHI because many requests include only a general purpose. A commenter asserted that staff would need to screen all incoming requests, a task that may require legal or clinical expertise. Further, some commenters stated that regulated entities may experience conflict with persons requesting the use or disclosure of PHI about signing the form.

Response: This final rule prohibits the use and disclosure of PHI for certain purposes and conditions disclosures for certain purposes upon the receipt of an attestation. Thus, it is incumbent upon the regulated entity receiving the request to determine whether disclosure is in compliance with the Privacy Rule. To help the regulated entity make such a determination, the Department is adding to the required elements of the attestation a description of the purpose of the request that is sufficient for the regulated entity to determine whether the prohibition at 45 CFR164.502(a)(5)(iii) may apply to the request. Requests for the use or disclosure of PHI for the specified purposes are likely subject to heightened scrutiny by the regulated entity currently because of other conditions imposed upon such disclosures by the Privacy Rule, so additional expertise will not always be required when processing a request for the use or disclosure of PHI and the accompanying attestation. For example, under the Privacy Rule, a regulated entity must determine whether a request for the use or disclosure of PHI for a judicial or administrative proceeding made using a subpoena, discovery request, or other lawful process, that is not accompanied by an order of a court or administrative tribunal contains "satisfactory assurances" that reasonable efforts have been made by the person making the request either: (1) to ensure that the individual who is the subject of the PHI that has been requested has been given notice of the request; [FN363] or (2) to secure a qualified protective order that meets certain requirements specified in the Privacy Rule.[FN364] The Privacy Rule further details how regulated entities are to determine whether they have received "satisfactory assurances" for both options described above.[FN365] Such requirements ensure that a regulated entity must already carefully review requests for such purposes, such that the attestation condition likely poses minimal additional burden for such requests. In any event, the Department believes that these administrative burdens are outweighed by the privacy interests that this final rule seeks to protect.

Comment: Many commenters asserted that it would be reasonable to require affirmative verification under penalty of perjury that the request for the use or disclosure of PHI is not for a purpose prohibited under 45 CFR 164.502(a)(5)(iii) because it would signal an intent to penalize requests **33038** made to contravene the prohibition; would incentivize persons requesting the use or disclosure of PHI to consider whether their request is for a purpose prohibited under 45 CFR 164.502(a)(5)(iii); deter unlawful "fishing expeditions" or conceal improper intent; and add a layer of accountability. Another commenter stated this heightened standard would enable the covered entity to reasonably rely in good faith on the substance of the attestation without further investigation, delay, cost, burden, or dispute. According to the commenter, a person making a request for the use or disclosure of PHI in good faith should have minimal to no concern when providing a statement signed under penalty of perjury. Another commenter supported a requirement that a person requesting the use or disclosure of PHI provide an affirmative verification made under penalty of perjury that the use or disclosure is not for purpose prohibited under 45 CFR 164.502(a)(5)(iii) because it would suggest that evidence obtained falsely would not be admissible in a legal proceeding. A commenter asserted that it is important to ensure that the proposed attestations would be as effective as possible, and including a signed declaration made under penalty of perjury is critical to ensuring their effectiveness in the current legal environment. A commenter endorsed adding a statement regarding perjury to the proposed attestation because it would place the person requesting the use or disclosure of PHI on notice of the criminal penalties if the person were to violate the proposed requirement.

A commenter asserted that the penalty of perjury requirement is a common signature standard for legal and administrative proceedings and expressed support for expanding it to other proceedings. The commenter also expressed support for considering other options because of concerns that the application and consequences of making a statement under a penalty of perjury may lack clarity outside of certain proceedings.

Response: We appreciate commenters' suggestions; however, the Department ultimately decided that the addition of a penalty of perjury would be unnecessary in light of the statutory criminal and civil penalties under HIPAA. 42 U.S.C. 1320d-6 provides that any person who knowingly and in violation of the Administrative Simplification provisions obtains IIHI relating to another individual or discloses IIHI to another person is subject to criminal liability.[FN366] A regulated entity is also subject to civil penalties for violations of requirements of the HIPAA Rules.[FN367] Thus, a person that requests PHI who knowingly falsifies an attestation (e.g., makes material misrepresentations as to the intended uses of the PHI requested) to obtain PHI or cause PHI to be disclosed would be in violation of HIPAA and could be subject to criminal penalties.[FN368]

Comment: Some commenters expressed support for requiring that the attestation include a statement that a person signing an attestation is doing so under penalty of perjury, but they also questioned its ability to prevent a person from requesting the use or disclosure of PHI for a purpose prohibited under 45 CFR 164.502(a)(5)(iii) and recommended additional requirements or alternatives. One commenter expressed concern that there would be no disincentive for the recipient to submit an attestation signed under false pretenses in the absence of enforceable penalties. A different commenter questioned the efficacy of a penalty of perjury requirement because the person requesting the use or disclosure may not be the person that uses the PHI for a purpose prohibited under 45 CFR 164.502(a)(5)(iii); it might be another person who uses the information for a purpose prohibited under that provision. According to the commenter, no criminal or other penalty would attach because that other person did not sign the attestation. The commenter also expressed concern that an attestation signed on behalf of an entity may not be enforceable because the person who signed the attestation did not have authority to bind the entity.

Commenters variously recommended that the Department include language that the person requesting the use or disclosure of PHI would not further use or disclose the PHI for a purpose prohibited under 45 CFR 164.502(a)(5)(iii) and that the requested information is the minimum necessary, or require a search warrant or data use agreement instead of an attestation. A commenter recommended that the Department provide individuals with an actionable remedy, such as the right to receive a portion of any civil money penalty assessed to the regulated entity or the right to "claw back" the disclosure from the receiving entity if the party that signed the attestation later violates its terms.

Response: The Department understands and shares commenters' concerns about redisclosures that would be prohibited by this rule if the disclosure was made by a regulated entity. However, HIPAA limits the Department's authority to regulating PHI maintained or transmitted by a regulated entity, that is a covered entity or their business associate. Accordingly, a person that is not a regulated entity generally may use or disclose such information without further limitation by the HIPAA Rules.

Requiring search warrants or data use agreements as a condition of the use or disclosure of PHI is beyond the scope of this final rule.

With respect to the commenter's concern about situations in which a person who does not have the appropriate authority requests PHI on behalf of a public official, the Privacy Rule generally requires that a regulated entity verify the identity and legal authority of persons requesting PHI prior to making the disclosure.[FN369] Where a disclosure of PHI is to a public official or person acting on behalf of a public official who has the authority to request the information, a regulated entity may verify the authority of that public official by relying on, if reliance is reasonable under the circumstances, either a written statement of legal authority under which the information is requested (or an oral statement, if the written statement is impracticable).[FN370] Alternatively, a regulated entity may presume the public official's legal authority if a request is made pursuant to legal process, warrant, subpoena, order, or other legal process issued by a grand jury or judicial administrative tribunal.[FN371] We remind regulated entities that a determination that a public official has the authority to make a request for the use or disclosure does not mean that the Privacy Rule permits them to obtain any and all information that the official requests. In such circumstances,

the regulated entity should carefully review the conditions of the applicable permission to ensure that they are met. Where the condition involves a warrant, subpoena, or similar instrument, the regulated entity must also review the scope of the authority granted by the warrant, subpoena, or order to determine the extent of the PHI that it is permitted to disclose.[FN372] Further, a regulated entity may rely, if such reliance is reasonable under the **\*33039** circumstances, on a requested disclosure by a public official as the minimum necessary if the public official represents that the requested PHI is the minimum necessary for the stated purpose.[FN373]

HIPAA specifies the remedies available to the Federal Government where persons violate the statute's Administrative Simplification provisions: civil monetary penalties [FN374] and criminal fines and imprisonment.[FN375] HIPAA does not include a private right of action.

Comment: One commenter asked the Department to clarify that anyone providing a false attestation would be held accountable for false statements with appropriate or significant civil fines or criminal penalties for the material misrepresentation. Another commenter specifically recommended that the Department consider it a material misrepresentation for a person to sign an attestation without an objectively reasonable basis to suspect that the reproductive health care of interest was unlawful under the circumstances in which such health care was provided. The commenter asserted that the attestation should include specific language that any person who is requesting the use or disclosure of PHI because they believe the reproductive health care was not lawful under the circumstances in which such health care was provided must have a reasonable basis for that belief (e.g., a statement from a witness) and that the absence of an articulable, fact-based reasonable suspicion would constitute a material misrepresentation. According to the commenter, such a requirement would prevent fishing expeditions because persons requesting the use or disclosure of PHI would be required to have an actual, objective reason for believing that a person provided health care in violation of state or Federal law.

Response: The Department agrees that it would be a material misrepresentation if a person who signs an attestation does not have an objectively reasonable basis to suspect that the reproductive health care was provided under circumstances in which it was unlawful, and that an objectively reasonable basis of suspicion requires specific and articulable facts associated with the individual whose PHI is requested and the health care they received. We decline to include a statement of this position on the attestation because it is encompassed in the language that requires persons making a request for PHI to attest that they are not making the request for a prohibited purpose and the language ensuring that persons making such requests are aware of the potential liability for knowingly and in violation of HIPAA obtaining IIHI relating to an individual or disclosing IIHI to another person.

Comment: Some commenters urged the Department to include additional provisions to monitor and enforce the attestation condition, including requiring that a court order, written attestation, or valid authorization accompany requests for the use or disclosure of PHI for legal or administrative proceedings or law enforcement investigations.

Response: The attestation condition does not replace the conditions of the Privacy Rule's permissions for a regulated entity to disclose PHI in response to a subpoena, discovery request, or other lawful process,[FN376] or administrative request.[FN377] Instead, it is designed to work with these permissions and associated condition. For PHI to be disclosed pursuant to 45 CFR 164.512(e)(1)(ii) and (f)(1)(ii)(C), a regulated entity must verify that the relevant conditions are met and also satisfy the attestation condition at 45 CFR 164.509. We do not believe it is necessary to include additional requirements to monitor and enforce implementation of the attestation condition because a person who knowingly and in violation of the Administrative Simplification provisions obtains or discloses IIHI relating to another individual or discloses IIHI to another person would be subject to criminal liability.[FN378]

Comment: Almost all commenters responding to the Department's request for comment expressed support for a Department-developed model attestation or sample language that could be used by regulated entities to reduce the implementation burden of the attestation condition. A large health care provider expressed appreciation for options that would simplify the process for reviewing requests for the use or disclosure of PHI made pursuant to 45 CFR 164.512(d)-(g)(1). Other commenters asserted

that a standard form would reduce unnecessary variation, support a consistent approach, decrease implementation costs, and make it easier for a regulated entity to identify requests for the use or disclosure of PHI for purposes prohibited under 45 CFR 164.502(a)(5)(iii).

Several commenters suggested that a universal or standardized attestation form would reduce the burden of the attestation requirement, especially for smaller health care providers, and reduce delays in the disclosure of PHI resulting from the need for legal review or unfamiliarity with the format of an attestation provided by a person requesting the use or disclosure of PHI. One of these commenters stated this would also support electronic data exchange by standardizing attestation fields and the format. Most commenters expressed opposition to a Department-required format and recommended that the Department permit covered entities to modify the language of the attestation.

Some commenters requested that the model attestation include a plain language explanation and a tip sheet or guidance for completion. They also requested that the model be an electronic, fillable form with a clear heading and that the editing capabilities be limited to the specific required fields. Some commenters recommended that the model attestation contain an outline of penalties for misuse of PHI.

A commenter requested that the Department guarantee that a health care provider's good faith reliance on a model attestation form would be objectively reasonable.

Response: We appreciate these recommendations and intend to publish model attestation language before the compliance date of this final rule. As discussed above, if an attestation, on its face, meets the requirements at 45 CFR 164.509(c), a regulated entity must consider the totality of the circumstances surrounding the attestation and whether it is reasonable to rely on the attestation in those circumstances.

Comment: In response to the Department's request for comment on how the proposed attestation would affect a regulated entity's process for responding to regular or routine requests from certain persons, a few commenters explained their current workflows and the resource requirements for managing these requests.

Some commenters suggested that an attestation requirement might require changes to workflows and discussed the changes that might be made.

Response: The Department appreciates these insights into how regulated entities currently respond to certain requests for the use or disclosure of PHI. We confirm that a person requesting the use or disclosure of PHI  **33040**  pursuant to 45 CFR 164.512(d), (e), (f), or (g)(1) must provide the regulated entity a signed and truthful attestation where the request is for PHI potentially related to reproductive health care before the regulated entity is permitted to use or disclose the requested PHI. The Department will consider developing guidance and technical assistance as needed on these topics in the future as necessary to ensure compliance with the Privacy Rule, including both the prohibition at 45 CFR 164.502(a)(5)(iii) and 164.509. It may benefit a regulated entity to require such documentation where the requested use or disclosure is for TPO or in response to a valid authorization or individual right of access request.

Comment: A few commenters recommended imposing obligations to limit redisclosures of PHI for certain purposes.

A few commenters stated that a person requesting the use or disclosure of PHI could seek a court order or provide a written attestation to permit the regulated entity to make the disclosure in question in the event they were unable to obtain an authorization.

Response: While we understand commenters' concerns regarding the uses and disclosures of health information by entities not covered by the Privacy Rule, the Department is limited to applying the HIPAA Rules to those entities covered by HIPAA (i.e.,

health plans, health care clearinghouses, and health care providers that conduct covered transactions) and to business associates, as provided under the HITECH Act.

In the 2023 Privacy Rule NPRM, the Department considered permitting regulated entities to make uses or disclosures of PHI only after obtaining a valid authorization. However, the Department rejected the approach because requiring an authorization in all circumstances would not reflect the appropriate balance between individual privacy interests and other societal interests in disclosure. In particular, individuals may decline to authorize disclosure of PHI even in circumstances where their privacy interests are reduced and societal interests in disclosure are heightened, such as where the reproductive health care was unlawful under the circumstances in which it was provided.

Comment: Some commenters requested that the Department provide educational resources for regulated entities to implement the attestation. A commenter encouraged the Department to strongly enforce the attestation provision.

Response: We appreciate these recommendations and commit to providing additional resources to assist regulated entities with implementation of this rule.

Comment: In response to the Department's request for comment on alternative documentation that could assist regulated entities in complying with the proposed limitations on the use and disclosure of PHI, some commenters recommended that an attestation always be required, even if additional documentation is mandated, because the attestation would place the person requesting the use or disclosure of PHI on notice of the prohibition and to hold them accountable if they use the PHI for a purpose prohibited by 45 CFR 164.502(a)(5)(iii), in addition to helping a covered entity to determine whether the PHI is being requested for a legitimate or prohibited purpose. Others agreed because of the risk of coercion when authorizations are sought from individuals for certain purposes.

Some commenters suggested that the Department require that a court order, written attestation, or valid authorization accompany a request for the use or disclosure of any PHI for legal or administrative proceedings or law enforcement investigations because there are circumstances under which it would be unlikely for a person to obtain an authorization. Some commenters recommended that the Department not require an attestation when the disclosure of PHI is required by law, or when so ordered by a court of competent jurisdiction. A commenter proposed that the Department permit regulated entities to make the specified uses and disclosures with a written attestation, a HIPAA authorization, or alternative documentation described by the Department, including a court order, to minimize the administrative burden.

Response: The Department appreciates the approaches recommended by commenters to ensure that PHI requested is not for a prohibited purpose. We also believe that the attestation will place the person requesting the use or disclosure of PHI on notice of the prohibition and serve to hold them accountable if they use the PHI for a purpose prohibited by 45 CFR 164.502(a)(5)(iii). However, we have limited the attestation requirement to requests for PHI that is potentially related to reproductive health care. In addition, as discussed above, because the Privacy Rule's authorization requirements empower individuals to make decisions about who has access to their PHI, we are not adopting the proposed exception to the permission to use or disclose PHI pursuant to a valid authorization, nor are we adopting the other recommendations made by commenters. The Department is not finalizing its proposal to prohibit the disclosure of PHI for a purpose prohibited by 45 CFR 164.502(a)(5)(iii) pursuant to an authorization. Accordingly, the final rule permits the disclosure of an individual's PHI to another person pursuant to a valid authorization, even if the disclosure would otherwise be prohibited under this rule. Therefore, a regulated entity may disclose PHI for a purpose that otherwise would be prohibited under 45 CFR 164.502(a)(5)(iii) by obtaining a valid authorization or pursuant to the individual right of access. We reiterate that in all cases, the conditions of the underlying permission must be met before a regulated entity is permitted to use or disclose the requested PHI.

**D. *Section 164.512*—*Uses and Disclosures for Which an Authorization or Opportunity To Agree or Object Is Not Required***

**1. Applying the Prohibition and Attestation Condition to Certain Permitted Uses and Disclosures**

Section 164.512 of the Privacy Rule contains the standards for uses and disclosures for which an authorization or opportunity to agree or object is not required. Many of the uses and disclosures addressed by 45 CFR 164.512 relate to government or administrative functions and are described in the 2000 Privacy Rule preamble as "national priority purposes." [FN379] These permissions for uses and disclosures were not required by HIPAA; instead they represented the Secretary's previous balancing of the privacy interests and expectations of individuals and the interests of communities in making certain information available for community purposes, such as for certain public health, health care oversight, and research purposes.[FN380] As discussed previously, the Department, in its implementation of HIPAA, has sought to ensure that individuals do not forgo health care when needed—or withhold important information from their health care providers that may affect the quality of health care they receive—out of a fear that their sensitive information would be revealed outside of their relationships with their health care providers.

To clarify that the proposal at 45 CFR 164.502(a)(5)(iii) would prohibit the use and disclosure of PHI in some **\*33041** circumstances where such uses or disclosures are currently permitted, the Department proposed to cite the proposed prohibition at the beginning of the introductory text of 45 CFR 164.512 and condition certain disclosures on the receipt of the attestation proposed at 45 CFR 164.509.[FN381] The proposed modification would add the clause, "Except as provided by 45 CFR 164.502(a)(5)(iii), [. . .]" and add "and 45 CFR 164.509" to "subject to the applicable requirements of this section." This would create a new requirement to obtain an attestation from the person requesting the use and disclosure of PHI as a condition of making certain types of permitted uses and disclosures of PHI. Thus, under the proposal and subject to the Department finalizing the prohibition at paragraph (a)(5)(iii) of 45 CFR 164.502, uses and disclosures of PHI for certain purposes would be prohibited unless a regulated entity first obtained an attestation from the person requesting the use and disclosure under proposed 45 CFR 164.509.

The Department also proposed to replace "orally" with "verbally" at the end of the introductory paragraph for clarity.

**Overview of Public Comments**

While many commenters addressed the proposals to add a prohibition on the use and disclosure of PHI and to require an attestation in certain circumstances, few commenters addressed the proposal to modify the introductory paragraph to 45 CFR 164.512. Such commenters either expressed support for it or requested additional guidance on the Department's intention or the proposal's operation.

The Department is adopting its proposal without modification. As discussed above, this change creates a new requirement for a regulated entity to obtain an attestation from a person requesting the use or disclosure of PHI as a condition of making certain types of permitted uses and disclosures of PHI. For example, the Privacy Rule currently permits uses and disclosures for health care oversight,[FN382] judicial and administrative proceedings,[FN383] law enforcement purposes,[FN384] and about decedents to coroners and medical examiners,[FN385] provided specified conditions are met. When read in conjunction with the new prohibition at 45 CFR 164.502(a)(5)(iii), uses and disclosures of PHI for these purposes will be subject to an additional condition that the regulated entity first obtain an attestation from the person requesting the use and disclosure under the new attestation requirement at 45 CFR 164.509.

The Department assumes that there will be instances in which state or other law requires a regulated entity to use or disclose PHI for health care oversight, judicial and administrative proceedings, law enforcement purposes, or about decedents to coroners and medical examiners for a purpose not related to one of the prohibited purposes in 45 CFR 164.502(a)(5)(iii). The Department believes that a regulated entity will be able to comply with such laws and the attestation requirement. For example, a regulated entity may continue to disclose PHI without an individual's authorization to a state medical board, a prosecutor, or a coroner, in accordance with the Privacy Rule, when the request is accompanied by the required attestation. As a result, a regulated entity generally may continue to assist the state in carrying out its health care oversight, judicial and administrative functions, law enforcement, and coroner duties with the use or disclosure of PHI once a facially valid attestation has been provided to the regulated entity from whom PHI is sought. However, where an attestation is required but not obtained, a state seeking information about an individual's reproductive health or reproductive health care would need to obtain such information from

an entity not regulated under the Privacy Rule [FN386] or demonstrate that the regulated entity has actual knowledge that the reproductive health care was not lawful under the circumstances in which such health care was provided, thereby reversing the presumption described at 45 CFR 164.502(a)(5)(iii)(C).

Additionally, we are replacing "orally" with "verbally" for clarity. No substantive change is intended.

Comment: One commenter expressed support for the Department's proposed revision to 45 CFR 164.512, while another commenter requested additional examples or detail in preamble about what the Department intends by this revision.

Response: The Department intends that the uses and disclosures of PHI made in accordance with 45 CFR 164.512 would be subject to both the 45 CFR 164.502(a)(5)(iii) prohibition and the 45 CFR 164.509 attestation, when applicable, specifically uses or disclosures made for health oversight activities,[FN387] judicial and administrative proceedings,[FN388] law enforcement purposes,[FN389] and about decedents to coroners and medical examiners.[FN390] For example, a regulated entity may disclose PHI for law enforcement purposes, subject to the conditions of the permission at 45 CFR 164.512(f), where the purpose of the request for the use or disclosure is to investigate a sexual assault and the person requesting the PHI provides the regulated entity with a valid attestation signifying that the purpose of the request is not for a prohibited purpose. Similarly, where a request meets the requirements of 45 CFR 164.502(a)(5)(iii), a regulated entity may disclose PHI for law enforcement purposes, subject to the conditions of the permission at 45 CFR 164.512(f), where the purpose of the request for the use or disclosure is to investigate the unlawful provision of reproductive health care with a valid attestation signifying that the purpose of the request is not one that is prohibited (i.e., that the purpose of the use or disclosure is not to investigate or impose liability on any person for the lawful provision of reproductive health care). As another example, a regulated entity may disclose PHI to a state Medicaid agency in accordance with 45 CFR 164.512(d) where the purpose of the request is to ensure that the regulated entity is providing the reproductive health care for which the regulated entity has submitted claims for payment to Medicaid after obtaining an attestation that meets the requirements of 45 CFR 164.509 from the state Medicaid agency.

Comment: One commenter requested clarification regarding the intersection between the Department's proposed Rule of Construction at 45 CFR 164.502(a)(5)(iii)(D) and its proposal at 45 CFR 164.512.

Response: The Department is not adopting the proposed Rule of Construction. Rather, the language of the proposal has been integrated into the prohibition standard at 45 CFR 164.502(a)(5)(iii)(A). The finalized prohibition standard requires a **\*33042** regulated entity to ensure that they obtain a valid attestation from a person requesting the use or disclosure of PHI for health oversight activities, judicial and administrative proceedings, law enforcement purposes, or about decedents to coroners or medical examiners, assuring the regulated entity that the purpose of the request is not for a purpose prohibited under 45 CFR 164.502(a)(5)(iii).

## 2. Making a Technical Correction to the Heading of 45 CFR 164.512(c) and Clarifying That Providing or Facilitating Reproductive Health Care Is Not Abuse, Neglect, or Domestic Violence

Paragraph (c) of 45 CFR 164.512 permits a regulated entity to disclose PHI, under specified conditions, to an authorized government agency where the regulated entity reasonably believes the individual is a victim of abuse, neglect, or domestic violence. The regulatory text includes a serial comma, which clearly indicates that the provision addresses victims of three different types of crimes, but the heading of this standard does not include the serial comma.

For grammatical clarity, the Department proposed to add the serial comma after the word "neglect" in the heading of the standard contained at 45 CFR 164.512(c).[FN391]

The Department also proposed to add a new paragraph (c)(3) to 45 CFR 164.512(c), with the heading "Rule of construction," to clarify that the permission to use or disclose PHI in reports of abuse, neglect, or domestic violence does not permit uses or disclosures based primarily on the provision or facilitation of reproductive health care to the individual.[FN392] The Department intended the proposed provision to safeguard the privacy of individuals' PHI against claims that uses and disclosures of that PHI

are warranted because the provision or facilitation of reproductive health care, in and of itself, may constitute abuse, neglect, or domestic violence.

A few commenters supported the proposal because it would clarify that providing or facilitating access to health care is not itself abuse, neglect, or violence, while others expressed opposition to the proposal because they believed it would prevent health care providers from reporting abuse based on the provision of reproductive health care, including potentially coerced reproductive health care. Commenters both supported and opposed the inclusion of the phrase "based primarily."

The Department is finalizing the proposal to add the serial comma after the word "neglect" in the heading of the standard contained at 45 CFR 164.512(c).

As we explained in the 2023 Privacy Rule NPRM, the Department is concerned that recent state actions may lead regulated entities to believe that they are permitted to make disclosures of PHI when they believe that persons who provide or facilitate access to reproductive health care are perpetrators of a crime simply because they provide or facilitate access to reproductive health care. Thus, the Department is clarifying that providing or facilitating access to lawful reproductive health care itself is not abuse, neglect, or domestic violence for purposes of the Privacy Rule. This is consistent with the Department's understanding that the provision or facilitation of lawful health care is not itself abuse, neglect, or domestic violence. Such clarification has not previously been required, but recent developments in the legal landscape have made it necessary for us to codify this interpretation in the context of reproductive health care.

Accordingly, the Department is finalizing the proposed Rule of Construction at 45 CFR 164.512(c)(3), with modification as follows. The modification clarifies the circumstances under which regulated entities that are mandatory reporters of abuse, neglect, or domestic violence are permitted to make such reports. Specifically, we are replacing "based primarily on" with language specifying that the prohibition at 45 CFR 164.502(a)(5)(iii) cannot be circumvented by the permission to use or disclose PHI to report abuse, neglect, or domestic violence where the "sole basis of" the report is the provision or facilitation of reproductive health care. Thus, the Department makes clear that it may be reasonable for a covered entity that is a mandatory reporter to believe that an individual is the victim of abuse, neglect, or domestic violence and to make such report to the government authority authorized by law to receive such reports in circumstances where the provision of reproductive health care to the individual is but one factor prompting the suspicion. For example, it would not be reasonable for a covered entity to believe that an individual is the victim of domestic violence solely because the individual's spouse facilitated the covered entity's provision of reproductive health care to the individual.

Comment: A few commenters supported the Department's proposal. One commenter asserted that providing or facilitating access to any type of health care is not in and of itself abuse, neglect, or domestic violence and urged the Department to expand the scope of this language, particularly if the prohibition is similarly expanded in the final rule.

Response: The Department appreciates the comments about the modifications to 45 CFR 164.512(c). As discussed above, the scope of the prohibition is limited to reproductive health care. The proposed and final regulations are narrowly tailored and limited in scope to not increase regulatory burden beyond appropriate public policy objectives. Thus, we decline to expand the scope of this provision, as well.

Comment: A large coalition expressed concerns about mandatory domestic violence and sexual assault reporting laws. According to the coalition, mandatory reporting laws reduce the willingness of domestic violence survivors to seek help, including health care, and that the reports themselves worsen the situation for most survivors. The coalition asserted that permitting the disclosure of PHI to law enforcement and other agencies for reports of abuse, neglect, or domestic violence isolates survivors of such abuse and puts them at risk of losing their children. These commenters recommended that the Department prevent such disclosures.

Some commenters expressed opposition to the proposal because they believe it would put victims of domestic abuse at risk because it would prevent health care providers from reporting abuse, including child abuse, based on the provision or facilitation of reproductive health care. A commenter asserted that the proposal would circumvent the exception prohibiting disclosures to abusive persons at 45 CFR 164.512(b)(1)(ii). According to another commenter, the change would chill the willingness of covered entities to cooperate with investigations and judicial proceedings concerning individuals who may have used reproductive health care, regardless of the matter being adjudicated.

According to another commenter, the proposal is aimed at undermining state laws and shielding persons who provide or facilitate reproductive health care. Commenters expressed concern that the proposal would prohibit reports of abuse, neglect, or domestic violence because such reports are made for the purpose of investigating or prosecuting a person for providing or facilitating **\*33043** unlawful reproductive health care, and for committing sexual assault.

Response: The Department appreciates the concerns raised by the commenters. Since publication of the final Privacy Rule in 2000, the Department has acknowledged that covered entities, including covered health care providers, may have legal obligations to report PHI in certain circumstances, including about suspected victims of abuse, neglect, or domestic violence. The Department did not propose to modify the Privacy Rule's permission to disclose PHI at 45 CFR 164.512(c). The Department declines to expand its proposal to eliminate the permission for covered entities to disclose PHI to public health authorities, law enforcement, and other government authority authorized by law to receive reports of abuse, neglect, or domestic violence.

Additionally, the Department does not agree that covered entities will be prevented from reporting PHI about victims of abuse, neglect, or domestic violence. The new language at 45 CFR 164.512(c)(3) is narrowly tailored to reduce the conflation between lawfully provided reproductive health care and the view that such lawful health care, on its own, is abuse. Readers are referred to the preamble discussion of 45 CFR 164.502(a)(5)(iii) that describes the scope of disclosure changes which are being made applicable to 45 CFR 164.512(c).

The Department does not agree that the modifications circumvent the exception prohibiting disclosures to abusive persons at 45 CFR 164.512(b)(1)(ii). The new language at 45 CFR 164.512(c)(3) does not modify or change the current Privacy Rule provision for disclosures to a public health authority or other appropriate government authority authorized by law to receive reports of child abuse or neglect. We believe the commenter is referring to 45 CFR 164.512(c)(2), which requires a covered entity to inform an individual that a report has been or will be made, and 45 CFR 164.512(c)(2)(ii), which removes the requirement to inform the individual when the covered entity would be informing a personal representative and the covered entity reasonably believes the personal representative is responsible for the abuse, neglect, or other injury, and that informing such person would not be in the best interests of the individual as determined by the covered entity, in the exercise of professional judgment. Because the new language at 45 CFR 164.512(c)(3) operates as a limitation on disclosure, it is not possible for the new provision to permit disclosures in more circumstances than previously permitted, and therefore does not circumvent the existing provision.

Comment: A commenter recommended that the Department clarify that the proposed Rule of Applicability would not prohibit disclosure and use of such records when they are sought for a defensive purpose by revising the proposed Rule of Construction at 45 CFR 164.512(c)(3) to more explicitly state that it permits such use or disclosure.

Response: The adopted Rule of Construction at 45 CFR 164.512(c)(3) applies to disclosures permitted by 45 CFR 164.512(c), which are explicitly to a government authority, including a social service or protective services agency, authorized by law to receive reports of abuse, neglect, or domestic violence. The Department is not aware of a disclosure that otherwise meets the requirements specified at 45 CFR 164.512(c)(1) that would constitute a disclosure for defensive purposes. Rather, disclosures of PHI for defensive purposes, such as a disclosure to defend against a prosecution for criminal prosecution for allegations of providing unlawful health care, are permitted by 45 CFR 164.512(f), as well as for health care operations when obtaining legal services. To the extent that a disclosure for a defensive purpose meets the applicable requirements and is permitted, the Department confirms that the final rule language generally would not prohibit a disclosure.

Comment: A few commenters requested clarification of the standard for determining what would constitute a report of abuse, neglect, or domestic violence that is based primarily on the provision of reproductive health care. Commenters also requested clarification about the interaction between the proposed prohibition and the permission at 45 CFR 164.512(c).

Response: The Privacy Rule permits but does not require the reporting of abuse, neglect, or domestic violence under certain conditions.[FN393] Under the final rule, the Department is clarifying that this permission does not apply where the sole basis of the report is the provision or facilitation of reproductive health care. With this modification, the Department makes clear that it may be reasonable for a covered entity that is a mandatory reporter to believe that an individual is the victim of abuse, neglect, or domestic violence and to make such report to the government authority authorized by law to receive such reports in circumstances where the provision or facilitation of reproductive health care is but one factor prompting the suspicion. We also note, as discussed above with respect to 45 CFR 164.512(b)(1)(i), this permission allows a covered entity to report known or suspected abuse, neglect, or domestic violence only for the purpose of making a report. The PHI disclosed must be limited to the minimum necessary information for the purpose of making a report.[FN394] These provisions do not permit the covered entity to disclose PHI in response to a request for the use or disclosure of PHI to conduct a criminal, civil, or administrative investigation into or impose criminal, civil, or administrative liability on a person based on suspected abuse, neglect, or domestic violence. Thus, any disclosure of PHI in response to a request from an investigator, whether in follow up to the report made by the covered entity (other than to clarify the PHI provided on the report) or as part of an investigation initiated based on an allegation or report made by a person other than the covered entity, must meet the conditions of disclosures for law enforcement purposes or judicial and administrative proceedings.[FN395]

### 3. Clarifying the Permission for Disclosures Based on Administrative Processes

Under 45 CFR 164.512(f)(1), a regulated entity may disclose PHI pursuant to an administrative request, provided that: (1) the information sought is relevant and material to a legitimate law enforcement inquiry; (2) the request is specific and limited in scope to the extent reasonably practicable in light of the purpose for which the information is sought; and (3) de-identified information could not reasonably be used. Examples of administrative requests include administrative subpoena or summons, a civil or an authorized investigative demand, or similar process authorized under law. The examples of administrative requests provided in the regulatory text include only requests that are enforceable in a court of law, and the catchall "or similar process authorized by law" similarly is intended to include only requests that, by law, require a response. This interpretation is consistent with the Privacy Rule's definition of "required by law," which enumerates these and other examples of administrative requests that constitute "a mandate contained in law that compels an entity to make a use or disclosure of protected health **\*33044** information and that is enforceable in a court of law."

As we explained in the 2023 Privacy Rule NPRM, the Department has become aware that some regulated entities may be interpreting 45 CFR 164.512(f)(1) in a manner that is inconsistent with the Department's intent. Therefore, the Department proposed to clarify the types of administrative processes that this provision was intended to address.[FN396]

Specifically, the Department proposed to insert language to clarify that the administrative processes that give rise to a permitted disclosure include only requests that, by law, require a regulated entity to respond. Accordingly, the proposal would specify that PHI may be disclosed pursuant to an administrative request "for which a response is required by law." The Department does not consider this to be a substantive change because the proposal was consistent with express language of the preamble discussion on this topic in the 2000 Privacy Rule.[FN397] The Department intends that the express inclusion of this language will ensure that regulated entities more fully appreciate the permitted uses and disclosures pursuant to 45 CFR 164.512(f)(1)(ii)(C).

The Department received few comments on the proposal to clarify the permission at 45 CFR 164.512(f)(1)(ii)(C). Comments were mixed, with some support, some opposition, and some requesting additional modifications or additional examples or guidance.

While the Department received few comments on this clarification, the Department is aware of reports that covered entities are misinterpreting the intention of the requirements of 45 CFR 164.512(f)(1)(ii)(C) that disclosures of PHI to law enforcement be

necessary and limited in scope. For example, a congressional inquiry recently highlighted concerns about disclosures of PHI to law enforcement from retail pharmacy chains. The inquiry found that some pharmacy staff are providing PHI directly to law enforcement without advice from their legal departments in part because their staff "face extreme pressure to immediately respond to law enforcement demands." [FN398] Based on this inquiry, these disclosures often are made without a warrant or subpoena issued by a court.[FN399]

The Department is adopting the clarification as proposed because regulated entities are misinterpreting the requirements of 45 CFR 164.512(f)(1)(ii)(C) that ensure that disclosures of PHI to law enforcement are necessary and limited in scope. Accordingly, the Department is adding to 45 CFR 164.512(f)(1)(ii)(C) language that specifies that PHI may be disclosed pursuant to an administrative request "for which a response is required by law." Thus, the regulatory text now clearly states that the administrative processes for which a disclosure is permitted are limited to only requests that, by law, require a regulated entity to respond, consistent with preamble discussion on this topic in the 2000 Privacy Rule.[FN400]

Comment: A few commenters supported the Department's proposed clarification of 45 CFR 164.512(f)(1)(ii)(C). A commenter recommended that the Department revise the language to refer to an administrative subpoena or summons, a civil or other "expressly" authorized demand, or other similar process. The commenter recommended that, at a minimum, the Department prohibit disclosures in response to oral requests, require all informal administrative requests be in writing, and require qualifying administrative requests to obtain express supervisory approval.

A commenter asserted, without providing examples, that there are many disclosures currently made under Federal agencies' interpretations of the Privacy Act of 1974 [FN401] that would not be permitted under the NPRM proposal.

Response: The Department appreciates the comments on this clarification. The Department understands the commenter's request to add language identifying specific processes but declines to make the suggested modification at this time. The Department is concerned that references to specific items or actions could be understood to not apply to similarly situated administrative requests understood by different names. In guidance for law enforcement, the Department has provided its interpretation that administrative requests must be accompanied by a written statement.[FN402]

In addition, the Department does not control whether a verbal or other non-written request is sufficient to meet the standards of various jurisdictions for an administrative process that would require a responding covered entity to be legally required to respond. The Department understands that valid, justiciable reasons for responding to a verbal or other non-written request may exist, such as an emergent situation that requires an immediate response to avoid an adverse outcome. The Department believes the additional text sufficiently clarifies the misunderstandings of some regulated entities about what constitutes administrative process for the purposes of this permission.

### 4. Request for Information on Current Processes for Receiving and Addressing Requests Pursuant to 164.512(d) Through (g)(1)

The Department requested information and comments on certain considerations to help inform development of the final rule.[FN403] In particular, the Department asked how regulated entities currently receive and address requests for PHI when requested pursuant to the Privacy Rule permissions at 45 CFR 164.512(d), (e), (f), or (g)(1), and what effect expanding the scope of the proposed prohibition to include any health care would have on the proposed attestation requirement and the ability of regulated entities to implement it. Comments submitted in response to the question about the effects of expanding the scope of the proposed prohibition have been included in prior discussions of the specific policy issues elsewhere, as applicable.

Comment: Several commenters responded to this request for information concerning current processes for receiving certain requests pursuant to 45 CFR 164.512 by providing specific information about how they receive such requests. Some requests for PHI are received in hard copy, either by mail or hand delivery, while others are received via email. Still **33045** others are received through the regulated entities online portal or facsimile. In emergency circumstances, such requests may be received verbally. Commenters generally receive assurances through hard copy, email, their patient portal, and fax. A few commenters

seek assurances for every subsequent related request, while another commenter stated that it does not require or obtain assurances for every subsequent related request if the subsequent request is related to the initial request for which the initial assurance was received.

A commenter asserted that the privacy interests at stake outweigh potential administrative burdens and provided examples of state laws that are more privacy protective than the Privacy Rule. The commenter explained that the privacy landscape is constantly evolving, as do the HIPAA Rules, and as such, regulated entities must adapt in response.

Response: The Department appreciates the information provided by commenters explaining the processes by which regulated entities currently receive requests for the use or disclosure of PHI for certain purposes and the workflows of regulated entities to ensure that such requests comply with the conditions of the applicable Privacy Rule permissions. We reviewed and considered this information when evaluating the burden of the proposed modifications to the Privacy Rule during the development of this final rule.

*E. Section 164.520—Notice of Privacy Practices for Protected Health Information*

**1. Current Provision**

The Privacy Rule generally requires that a covered entity provide individuals with an NPP to ensure that they understand how a covered entity may use and disclose their PHI, as well as their rights and the covered entity's legal duties with respect to PHI. [FN404] Section 164.520(b)(1)(ii) of the Privacy Rule describes the required contents of the NPP, including descriptions of the types of permitted uses and disclosures of their PHI. More specifically, the NPP must describe the ways in which the covered entity may use and disclose PHI for TPO, as well as each of the other purposes for which the covered entity is permitted or required to use or disclose PHI without the individual's written authorization. Additionally, the NPP must state the covered entity's duties to protect privacy, provide a copy of the NPP, and abide by the terms of the current notice. The NPP must also describe individuals' rights, including the right to complain to HHS and to the covered entity if they believe their privacy rights have been violated, as well as other statements if the covered entity uses PHI for certain activities, such as fundraising. The Privacy Rule does not, however, currently require a covered entity to provide information about specific prohibited uses and disclosures of PHI.

**2. CARES Act**

Section 3221(i) of the CARES Act directs the Secretary to modify the NPP provisions at 45 CFR 164.520 to include new requirements for covered entities that create or maintain PHI that is also a record of SUD treatment provided by a Part 2 program (i.e., covered entities that are Part 2 programs and covered entities that receive Part 2 records from a Part 2 program). The CARES Act amended 42 U.S.C. 290dd-2 to require the Department to revise Part 2 to more closely align with the Privacy Rule.

**3. Proposals in 2022 Part 2 NPRM and 2023 Privacy Rule NPRM**

The Department proposed in December 2022 to modify both the Patient Notice requirements at 42 CFR 2.22 and the NPP requirements at 45 CFR 164.520 to provide consistent notice requirements for all Part 2 records. Revisions to the Patient Notice requirements were addressed and finalized in the 2024 Part 2 Rule, while modifications to the NPP provisions proposed in the 2022 Part 2 NPRM were deferred to a future rulemaking. The Department also separately proposed to modify the NPP provisions to support reproductive health care privacy as part of the 2023 Privacy Rule NPRM.

As part of the 2022 Part 2 NPRM, the Department proposed several changes to the NPP provisions. We proposed in a new paragraph (2) to 45 CFR 164.520(a) that individuals with Part 2 records that are created or maintained by covered entities would have a right to adequate notice of uses and disclosures, their rights, and the responsibilities of covered entities with respect to such records. The Department also proposed to remove 45 CFR 164.520(a)(3), the exception for providing inmates a copy of the NPP, which would require covered entities that serve correctional facilities to provide inmates with a copy of the NPP.

Additionally, the Department proposed revising 45 CFR 164.520(b)(1) to specifically clarify that covered entities that maintain or receive Part 2 records would need to provide an NPP that is written in plain language and contains the notice's required elements. We also proposed to modify 45 CFR 164.520(b)(1)(i) to replace "medical" with "health" information.

The Department also proposed in the 2022 Part 2 NPRM to incorporate changes proposed to the NPP requirements in the 2021 Privacy Rule NPRM,[FN405] such as adding a requirement to include the email address for a designated person who would be available to answer questions about the covered entity's privacy practices; adding a permission for a covered entity to provide information in its NPP concerning the individual access right to direct copies of PHI to third parties when the PHI is not in an EHR and the ability to request the transmission using an authorization; and removing the requirement for a covered entity to obtain a written acknowledgment of receipt of the NPP. The Department is finalizing certain changes proposed in the 2022 Part 2 NPRM and the 2023 Privacy Rule NPRM that directly support the two final rules.

In both the 2022 Part 2 NPRM and 2023 Privacy Rule NPRM, the Department proposed to modify 45 CFR 164.520(b)(1) (ii), which requires covered entities to describe for individuals the purposes for which a covered entity is permitted to use and disclose PHI. Consistent with the CARES Act, we proposed in the 2022 Part 2 NPRM to modify paragraph (C) to clarify that where uses and disclosures are prohibited or materially limited by other applicable law, "other applicable law" would include Part 2, while the Department proposed to clarify at paragraph (D) that the requirement for a covered entity to include in the NPP sufficient detail to place an individual on notice of the uses and disclosures that are permitted or required by the Privacy Rule and other applicable laws, including Part 2.

The Department further proposed to require in 45 CFR 164.520(b)(1)(iii), which requires covered entities to include descriptions of certain activities in which the covered entity intends to engage, in a new paragraph (D) the inclusion of a statement that Part 2 records created or maintained by the covered entity will not be used in certain proceedings against the individual without the individual's written consent or a court order consistent with 42 CFR part 2. Additionally, we proposed to require in a new paragraph (E) that covered entities that intend to use Part 2 records for fundraising include a statement that **\*33046** such records may be used or disclosed for fundraising purposes only if the individual grants written consent as provided in 42 CFR 2.31.

In 45 CFR 164.520(b)(1)(v)(C), which addresses a covered entity's right to change the terms of its notice, we also proposed to simplify and modify the regulatory text to clarify that this right is limited to circumstances where such changes are not material or contrary to law. The Department also proposed to add a new paragraph (4) to 45 CFR 164.520(d) to prohibit construing permissions for covered entities participating in organized health care arrangements [FN406] (OHCAs) to disclose PHI between participants as negating obligations relating to Part 2 records.

The 2023 Privacy Rule NPRM also proposed modifications to the NPP requirements.[FN407] Specifically, the Department proposed to modify 45 CFR 164.520(b)(1)(ii) by adding a new paragraph (F) to require a covered entity to describe and provide an example of the types of uses or disclosures prohibited by 45 CFR 164.502(a)(5)(iii), and to do so in sufficient detail for an individual to understand the prohibition. We also proposed adding a new paragraph (G) to 45 CFR 164.502(b)(1)(ii) to describe each type of use and disclosure for which an attestation is required under 45 CFR 164.509, with an example. Additionally, the Department requested comment on whether it would benefit individuals for the Department to require that covered entities include a statement in the NPP that would explain that the recipient of the PHI would not be bound by the proposed prohibition because the Privacy Rule would no longer apply after PHI is disclosed for a permitted purpose to an entity other than a regulated entity (e.g., disclosed to a non-covered health care provider for treatment purposes).

## 4. Overview of Public Comments

We received many comments on the proposed NPP changes in both the 2022 Part 2 NPRM and the 2023 Privacy Rule NPRM. Some of the comments on the 2022 Part 2 NPRM addressed both the NPP and the Patient Notice. Comments concerning the Patient Notice are discussed in the 2024 Part 2 Rule.[FN408] Commenters on the NPP proposals in the 2022 Part 2 NPRM urged the Department to coordinate revisions to the NPP provisions across its proposed and final rules. Commenters also requested guidance about their ability to use a single form to satisfy both the NPP and Patient Notice requirements. Commenters

generally expressed support for the Department's proposals to modify 45 CFR 164.520(a) and 164.520(b)(1) to apply the NPP requirements to certain entities, in coordination with changes required by the CARES Act and consistent with Part 2.

Commenters to the 2022 Part 2 NPRM generally did not express opposition to the Department's proposed changes to paragraph (b)(iii) of 45 CFR 164.520, although some did request additional guidance. We received no comments on our proposed modifications to add a new paragraph concerning OHCAs to 45 CFR 164.520(d).

Most commenters expressed support for the Department's 2023 Privacy Rule NPRM proposals to revise the NPP requirements. Many also recommended additional modifications to the NPP requirements or clarifications to the requirements. Most also recommended that the Department add a requirement that NPPs include a statement that would explain that the recipient of PHI would not be bound by the proposed prohibition because the Privacy Rule would no longer apply after PHI is disclosed for a permitted purpose to an entity other than a regulated entity (e.g., disclosed to a non-covered health care provider for treatment purposes).

### 5. Final Rule

The Department published the 2024 Part 2 Rule on February 16, 2024. It included modifications to the Patient Notice in 42 CFR 2.22 and reserved modifications to the HIPAA NPP for a forthcoming HIPAA rule. We address the modifications proposed in the 2022 Part 2 NPRM here, in concert with the modifications proposed in the 2023 Privacy Rule NPRM.

As required by the CARES Act and in alignment with the Privacy Rule, we are modifying the NPP provisions in multiple ways. First, we are requiring in 45 CFR 164.520(a)(2) that covered entities that create or maintain Part 2 records provide notice to individuals of the ways in which those covered entities may use and disclose such records, and of the individual's rights and the covered entities' responsibilities with respect to such records. Second, we are revising 45 CFR 164.520(b)(1) to clarify that a covered entity that receives or maintains records subject to Part 2 must provide an NPP that is written in plain language and that contains the elements required. For clarity, we have reordered wording within this paragraph to refer to "receiving or maintaining" records, rather than "maintaining or receiving" records as initially proposed.

Third, the Department is modifying 45 CFR 164.520(b)(1)(ii) to revise paragraphs (C) and (D), and to add paragraphs (F), (G), and (H) to clarify certain statements and add new statements that must be included in an NPP. Consistent with the CARES Act, we are modifying paragraph (C) to clarify that where NPP's descriptions of uses or disclosures that are permitted for TPO or without an authorization must reflect "other applicable law" that is more stringent than the Privacy Rule, other applicable law includes Part 2. Likewise, we are modifying paragraph (D) to clarify that Part 2 is specifically included in the "other applicable law" referenced in the requirement to describe uses and disclosures that are permitted for TPO or without an authorization sufficiently to place an individual on notice of the uses and disclosures that are permitted or required by the Privacy Rule and other applicable law.

New paragraphs (F) and (G) provide individuals with additional information about how their PHI may or may not be disclosed for purposes addressed in this rule, furthering trust in the relationship between regulated entities and individuals by ensuring that individuals are aware that certain uses and disclosures of PHI are prohibited. Specifically, paragraph (F) requires that the NPP contain a description, including at least one example, of the types of uses and disclosures prohibited under 45 CFR 164.502(a)(5)(iii) in sufficient detail for an individual to understand the prohibition, while paragraph (G) requires that the NPP contain a description, including at least one example, of the types of uses and disclosures for which an attestation is required under new 45 CFR 164.509.

Additionally, based on feedback from commenters, we are requiring in a new paragraph (H) that covered entities include a statement explaining to individuals that PHI disclosed pursuant to the Privacy Rule may be subject to redisclosure and no longer protected by the Privacy Rule. This will help individuals to make informed decisions about to whom they provide access to or authorize the disclosure of their PHI.

Under new paragraph (D) of 45 CFR 164.520(b)(1)(iii), the Department is requiring that covered entities provide notice to individuals that a Part 2 record, or testimony relaying the content of such record, may not be used or disclosed in a civil, criminal, administrative, or legislative proceeding against the individual absent written **\*33047** consent from the individual or a court order, consistent with the requirements of 42 CFR part 2.

The Department is also finalizing a requirement at 45 CFR 164.520(b)(1)(iii)(E) that a covered entity must provide individuals with a clear and conspicuous opportunity to elect not to receive any fundraising communications before using Part 2 records for fundraising purposes for the benefit of the covered entity.

Lastly, we are finalizing our proposal to add a new paragraph (4) in 45 CFR 164.520(d) regarding joint notice by separate covered entities. This modification clarifies that Part 2 requirements continue to apply to Part 2 records maintained by covered entities that are part of OHCAs.

We are not finalizing in this rule the proposal to remove the exception to the NPP requirements for inmates of correctional facilities in this rule because it would be better addressed within the context of care coordination.

## 6. Responses to Public Comments

Comment: Commenters on both the 2022 Part 2 NPRM and the 2023 Privacy Rule NPRM urged the Department to coordinate any changes made to the NPP provisions based on proposals made in the separate rulemakings. According to the commenters, coordinating the changes to the NPP requirements would help to ensure consistency, reduce the administrative burden on covered entities, and ensure individual understanding of the permitted uses and disclosures of their PHI, including PHI that is also a Part 2 record. A few commenters on the 2022 Part 2 NPRM explained the different concerns that updates to the NPP pose to covered entities of differing sizes, based on resource constraints directly related to their size. Several commenters on the 2023 Privacy Rule NPRM requested that the Department provide sample language and examples or provide an updated model NPP.

Response: As part of this rulemaking, the Department is finalizing modifications to certain NPP requirements that were proposed in the 2022 Part 2 NPRM and the 2023 Privacy Rule NPRM. Thus, these changes serve to implement certain requirements of the CARES Act and to support reproductive health care privacy. The Department appreciates the recommendations and will consider them for future guidance.

Comment: A few commenters on the 2022 Part 2 NPRM requested that the Department clarify whether they would be permitted to use a single document or form when providing notice statements to individuals to ensure compliance by regulated entities and understanding of the notices by individuals. A few commenters agreed that a single NPP would reduce the administrative burden on regulated entities or be the most effective way to convey privacy information to individuals and asked for confirmation that this was permitted. A commenter requested that the Department update the Patient Notice in a manner such that the NPP header may be used in the combined notice if they are permitted to use a combined NPP/Patient Notice.

Response: As we have provided previously in guidance on the Privacy Rule and Part 2, notices issued by covered entities for different purposes may be separate or combined, as long as all of the required elements for both are included.[FN409] Thus, it is acceptable under both the Privacy Rule and Part 2 to meet the notice requirements of the Privacy Rule, Part 2, and state law by either providing separate notices or combining the required notices into a single notice, as long as all of the required elements are included.

Comment: A few commenters on the 2022 Part 2 NPRM and most of the commenters on the 2023 Privacy Rule NPRM suggested the proposed approach to modifying both the Patient Notice and NPP would bolster transparency and the public's understanding of how their health information is used or disclosed and collected. Many commenters on the 2023 Privacy Rule NPRM provided recommendations for ways in which the Department could improve the NPP, including requiring that the NPP be in plain language.

Response: The Department appreciates the comments on its proposal to modify the NPP to align with changes made in the Patient Notice and in support of reproductive health care privacy. The modifications will bolster transparency and public understanding of how information is used, disclosed, and protected. Covered entities have long been required under 45 CFR 164.520(b)(1) to provide an NPP that is written in plain language. Discussion of this requirement can be found in the preamble to the 2000 Privacy Rule.[FN410] The Department's model NPP forms, available in both English and Spanish, provide one example of how the plain language requirement may be met.[FN411]As discussed above, we are modifying 45 CFR 164.520 to clarify that this requirement applies to covered entities that use and disclose Part 2 records. Additional resources on writing in plain language can be found at https://plainlanguage.gov. Additionally, covered entities are required to comply with all Federal nondiscrimination laws, including laws that address language access requirements. Information about such requirements is available at www.hhs.gov/hipaa.

Comment: Commenters expressed concerns about the interplay of the Part 2 Patient Notice requirements with the NPP, the burden on covered entities to modify the NPP, and including the attestation requirement in the NPP.

Response: We have sought to align the requirements for the Patient Notice as closely as possible with the NPP requirements and to modify the NPP requirements to allow for a combined Patient Notice and NPP. The changes the Department is making to the NPP empower the individual and improve health outcomes by improving the likelihood that health care providers will make accurate diagnoses and informed treatment recommendations to individuals. These changes to the NPP provide the individual with clear information and reassurance about their privacy rights and their ability to discuss their reproductive health and related health care because they inform an individual that their PHI may not be used or disclosed for certain purposes prohibited by new 45 CFR 164.502(a)(5)(iii). As such, the qualitative benefits of providing individuals with information about how their PHI may be used and disclosed under the Privacy Rule outweigh the quantitative burdens for covered entities to revise their NPPs. Accordingly, we are finalizing the modifications proposed to the NPP as part of the 2023 Privacy Rule NPRM.

Comment: A majority of the commenters on the 2023 Privacy Rule NPRM who expressed support for revising the NPP also recommended that the Department require that the NPP include an explanation that the prohibition or Privacy Rule generally would no longer apply to PHI that has been disclosed for a permitted purpose to a person that is not a regulated entity. A few commenters opposed the addition as unnecessary or expressed concern about the potential length of the NPP. A **\*33048** few of the commenters opposed adding such a statement because they believed it could deter individuals from seeking reproductive health care, increase individuals' mistrust of health care providers, or not add to individuals' understanding of their rights and protections under the Privacy Rule.

Response: In response to comments and in support of transparency for individuals, the Department is finalizing a new requirement to include in the NPP a statement adequate to put the individual on notice of the potential for information disclosed pursuant to the Privacy Rule to be subject to redisclosure by the recipient and no longer protected by the Privacy Rule. This change will provide additional clarity to individuals directly and assist covered entities in explaining the limitations of the Privacy Rule to individuals. We believe that any concerns about the negative effects of these modifications on length are outweighed by their benefits to the individual.

Comment: Several commenters to the 2023 Privacy Rule NPRM requested the Department provide additional time for compliance with the new NPP requirements and exercise enforcement discretion for a period of time after the compliance date.

Response: As noted above, we are finalizing certain modifications to the NPP provisions that were proposed in the 2022 Part 2 NPRM rule and other modifications to the same provisions that were proposed in the 2023 Privacy Rule NPRM. To ease the burden on covered entities and in compliance with 45 CFR 160.104, the Department is finalizing a compliance date of February 16, 2026, for the NPP provisions. The rationale for this compliance date is discussed in greater detail in the discussion of Effective and Compliance Dates.

*F. Section 164.535—Severability*

In the NPRM, the Department included a discussion of severability that explained how we believed the proposed rule should be interpreted if any provision was held to be invalid or facially unenforceable. We are finalizing a new 45 CFR 164.535 to codify this interpretation. The Department intends that, if a specific regulatory provision in this rule is found to be invalid or unenforceable, the remaining provisions of the rule will remain in effect because they would still function sensibly.

For example, the changes this final rule makes to the NPP requirements in 45 CFR 164.520 (including the changes finalizing proposals from the 2022 Part 2 NPRM) shall remain in full force and effect to the extent that they are not directly related to a provision in this rulemaking that is held to be invalid or unenforceable such that notice of that provision is no longer necessary. Conversely, if the NPP requirements are held to be invalid or unenforceable, the other modifications shall remain in full force and effect to the extent that they are not directly related to the NPP requirements.

As another example, we also intend that the revision in 45 CFR 160.103 to the definition of "person" shall remain in full force and effect if any other provision is held to be invalid or unenforceable because the new modified definition is not solely related to supporting reproductive health care privacy and is consistent with the Department's longstanding interpretation of the term and with regulated entities' current understanding and practices.

Similarly, we are finalizing technical corrections to the heading at 45 CFR 164.512(c) and a clarifying revision at 45 CFR 164.512(f) regarding the permission for disclosures based on administrative processes. Those changes are intended to remain in full force and effect even if other parts of this final rule are held to be invalid or unenforceable.

As another example, we also intend, if the addition in 45 CFR 160.103 of the definition of "public health," as used in the terms "public health surveillance," "public health investigation," and "public health intervention" is held to be invalid and unenforceable, the other modifications to the rules shall remain in full force and effect to the extent that they are not directly related to the definition of public health.

We further intend that if the rule is held to be invalid and unenforceable with respect to its application to some types of health care, it should be upheld with respect to other types (e.g., pregnancy or abortion-related care).

We also intend that any provisions of the Privacy Rule that are unchanged by this final rule shall remain in full force and effect if any provision of this final rule is held to be invalid or unenforceable.

These examples are illustrative and not exhaustive.

We received no comments on the language addressing severability in the 2023 Privacy Rule NPRM.


### G. Comments on Other Provisions of the HIPAA Rules

Comment: A few commenters expressed concerns that the Department may grant exceptions to preemption and recommended that the Department clarify the standards for which exceptions to preemption would be made and consider strengthening these standards wherever possible or remove the potential for exceptions entirely.

One commenter expressed concern that the proposed rule could dissuade regulated entities from providing de-identified data for research, while another commenter recommended that the Department prohibit the sharing of de-identified reproductive health care data except in limited circumstances to prevent the re-identification of reproductive health data by third parties, such as law enforcement or data brokers

Response: The process for requesting exceptions to preemption and the standards for granting such requests are at 45 CFR 160.201 et seq. We did not propose any modifications to these provisions as part of the 2023 Privacy Rule NPRM, and as such, do not finalize modifications in this final rule.

The Department does not believe that this final rule will dissuade regulated entities from providing de-identified data for research or other purposes. Under the Privacy Rule, health information that meets the standard and implementation specifications for de-identification under 45 CFR 164.514 is considered not to be IIHI.[FN412] HIPAA confers on the Department the authority to set standards for the privacy of IIHI, including for de-identification. We did not propose to modify the de-identification standard as part of the 2023 Privacy Rule NPRM, and as such, do not finalize modifications in this final rule.

Comment: A commenter posited that the proposed rule's preemption of contrary state laws was not sufficiently clear and recommended that the Department reinforce the preemption provision in the final rule.

Response: The Department did not propose changes to the preemption provisions of the HIPAA Rules, which are based in statute, [FN413] and believes that the provisions, in combination with our discussion of preemption in the preamble, are sufficient.

## VI. Regulatory Impact Analysis

### A. Executive Order 12866 and Related Executive Orders on Regulatory Review

The Department of Health and Human Services (HHS or "Department") has examined the effects of this final rule under Executive Order (E.O.) 12866, Regulatory Planning and Review,[FN414] as **\*33049** amended by E.O. 14094,[FN415] E.O. 13563, Improving Regulation and Regulatory Review,[FN416] the Regulatory Flexibility Act [FN417] (RFA), and the Unfunded Mandates Reform Act of 1995 [FN418] (UMRA). E.O.s 12866 and 13563 direct the Department to assess all costs and benefits of available regulatory alternatives and, when regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety, and other advantages; distributive effects; and equity). This final rule is significant under section 3(f)(1) of E.O. 12866, as amended.

The RFA requires us to analyze regulatory options that would minimize any significant effect of a rule on small entities. As discussed in greater detail below, this analysis concludes, and the Secretary certifies, that the rule will not result in a significant economic effect on a substantial number of small entities.

The UMRA (section 202(a)) generally requires us to prepare a written statement, which includes an assessment of anticipated costs and benefits, before proposing "any rule that includes any Federal mandate that may result in the expenditure by State, local, and tribal governments, in the aggregate, or by the private sector, of $100,000,000 or more (adjusted annually for inflation) in any 1 year." [FN419] The current threshold after adjustment for inflation is $177 million, using the most current (2023) Implicit Price Deflator for the Gross Domestic Product. UMRA does not address the total cost of a rule. Rather, it focuses on certain categories of cost, mainly Federal mandate costs resulting from imposing enforceable duties on state, local, or Tribal governments or the private sector; or increasing the stringency of conditions in, or decreasing the funding of, state, local, or Tribal governments under entitlement programs. This final rule imposes mandates that would result in the expenditure by state, local, and Tribal governments, in the aggregate, or by the private sector, of more than $177 million in any one year. The impact analysis in this final rule addresses such effects both qualitatively and quantitatively. In general, each regulated entity, including government entities that meet the definition of covered entity (e.g., state Medicaid agencies), is required to adopt new policies and procedures for responding to requests for the use or disclosure of protected health information (PHI) for which an attestation is required and to train its workforce members on the new requirements. Additionally, although the Department has not quantified the costs, state, local, and Tribal law enforcement agencies must analyze requests that they initiate for the use or disclosure of PHI and provide regulated entities with an attestation that the request is not for a prohibited purpose in instances where the request is made for health oversight activities, judicial and administrative proceedings, law enforcement purposes, or about decedents to coroners and medical examiners, and is for PHI potentially related to reproductive health care. One-time costs for all regulated entities to change their policies will increase costs above the UMRA threshold in one year. The Department initially estimated that ongoing expenses for the new attestation condition would not increase significantly, but we sought additional data to inform our estimates. Although Medicaid makes Federal matching funds available for states for certain administrative costs, these are limited to costs specific to operating the Medicaid program. There are no Federal funds directed at Health Insurance Portability and Accountability Act of 1996 (HIPAA) compliance activities.

Pursuant to Subtitle E of the Small Business Regulatory Enforcement Fairness Act of 1996,[FN420] the Office of Management and Budget's (OMB's) Office of Information and Regulatory Affairs has determined that this final rule meets the criteria set forth in 5 U.S.C. 804(2) because it is projected to have an annualized effect on the economy of more than $100,000,000. Because of the large number of covered entities that are subject to this final rule and the large number of individuals with health plan coverage, any rule modifying the HIPAA Privacy Rule that requires updating policies and procedures and the Notice of Privacy Practices (NPP) and distributing the NPP to a percentage of individuals is likely to meet the threshold in 5 U.S.C. 804(2).

The Justification for this Rulemaking and Summary of Final Rule Provisions section at the beginning of this preamble contain a summary of this rule and describe the reasons it is needed. The Department presents a detailed analysis below.

## 1. Summary of Costs and Benefits

The Department identified six general categories of quantifiable costs arising from these proposals: (1) responding to requests for the use or disclosure of PHI for which an attestation is required; (2) revising business associate agreements; (3) updating the NPP and posting it online; (4) developing new or modified policies and procedures; (5) revising training programs for workforce members; and (6) requesting an exception from HIPAA's general preemption authority. The first five categories apply primarily to covered entities, while the sixth category applies to states and other interested persons.

The Department estimates that the first-year costs attributable to this final rule total approximately $595.0 million. These costs are associated with covered entities responding to requests for the use or disclosure of PHI that are conditioned upon an attestation; revising business associate agreements; revising policies and procedures; updating, posting, and mailing the NPP; and revising training programs for workforce members, and with states or other persons requesting exceptions from preemption. These costs also include increased estimates for wages, postage, and the number of NPPs distributed by health plans as compared to the baseline of existing annual cost and burden estimates for these activities in the approved HIPAA information collection. For years two through five, estimated annual costs of approximately $20.9 million are attributable to ongoing costs related to the attestation requirement. Table 1 reports the present value and annualized estimates of the costs of this final rule covering a 5-year time horizon. Using a 7% discount rate, the Department estimates this final rule will result in annualized costs of $151.8 million; and using a 3% discount rate, these annualized costs are $142.6 million.

### Table 1—Accounting Table, Costs of the Rule

| | | | | | [$ Millions] | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Costs | Primary estimate dollars | Year | | Discount rate (%) | | Period covered | | |
| Present Value | $678.6 | 2022 | Undiscounted | | | 2024-2028 | | |
| Present Value | 622.3 | 2022 | | | 7 | 2024-2028 | | |
| Present Value | 653.1 | 2022 | | | 3 | 2024-2028 | | |

| | | | | |
|---|---|---|---|---|
| Annualized | 151.8 | 2022 | 7 | 2024-2028 |
| Annualized | 142.6 | 2022 | 3 | 2024-2028 |

**\*33050**  The changes to the Privacy Rule will likely result in important benefits and some costs that the Department is unable to fully quantify at this time. As explained further below, unquantified benefits include improved trust and confidence between individuals and health care providers; enhanced privacy and improved access to reproductive health care and information, which may prevent increases in maternal mortality and morbidity; increased accuracy and completeness in patient medical records, which may prevent poor health outcomes; enhanced support for survivors of rape, incest, and sex trafficking; and maintenance of family economic stability by allowing families to determine the timing and spacing of whether or when to be pregnant. Additionally, allowing regulated entities to accept an attestation for requests for the use or disclosure of PHI potentially related to reproductive health care, and to presume that reproductive health care provided by another person was lawful under the circumstances it was provided, will reduce potential liability for regulated entities by providing some assurance with respect to whether the requested disclosure is prohibited.

**Table 2—Potential Non-Quantified Benefits for Covered Entities and Individuals**

**Benefits**

Improve access to complete information about lawful reproductive health care options, including for individuals who are pregnant or considering a pregnancy (i.e., improve health literacy), by reducing concerns about disclosure of PHI.

Maintain or reduce levels of maternal mortality and morbidity by ensuring that individuals and their clinicians can freely communicate and have access to complete information needed for quality lawful health care, including coordination of care.

Decrease barriers to accessing prenatal health care by maintaining privacy for individuals who seek a complete range of lawful reproductive health care options.

Enhance mental health and emotional well-being of pregnant individuals by reducing fear of potential disclosures of their PHI to investigate or impose liability on a person for the mere act of seeking, obtaining, providing, or facilitating lawful health care.

Improve or maintain trust between individuals and health care providers by reducing the potential for health care providers to report PHI in a manner that could harm the individuals' interests.

Prevent or reduce re-victimization of pregnant individuals who have survived rape or incest by protecting their PHI from undue scrutiny.

Improve or maintain families' economic well-being by not exposing individuals or their family members to costly investigations or activities to impose liability for seeking, obtaining or facilitating lawful reproductive health care.

Maintain the economic well-being of regulated entities by not exposing regulated entities or workforce members to costly investigations or activities to impose liability on them for engaging in lawful activities.

Ensure individuals' ability to obtain full and complete information and make lawful decisions concerning fertility- or infertility-related health care that may include selection or disposal of embryos without risk of PHI disclosure for criminal, civil, or administrative investigations or activities to impose liability for engaging in lawful activities.

The Department also recognizes that there may be some costs that are not readily quantifiable, notably, the potential burden on persons requesting PHI to investigate or impose liability on persons for seeking, obtaining, providing, or facilitating reproductive health care that is not lawful under the circumstances in which such health care is provided. As discussed elsewhere in this final rule, we acknowledge that, in certain limited circumstances, the final rule may, prevent persons from obtaining an individual's PHI, such as where the request is directed to the health care provider that provided the reproductive health care and that

health care provider reasonably determines that such health care was provided lawfully. However, the existing permission for disclosures for law enforcement does not create a mandate for disclosure to law enforcement agencies. Rather, it establishes the conditions under which a regulated entity may disclose PHI if it so chooses. Accordingly, consistent with how the Privacy Rule has operated since its inception, persons whose requests for PHI are declined by regulated entities may incur additional costs if they choose to pursue their investigations through other methods and obtain evidence from non-covered entities. We have not previously quantified the costs to such persons for obtaining an individual's PHI, such as where a law enforcement official is required to prepare a formal administrative request or obtain a qualified protective order and we do not do so here. We do not view the attestation requirement as changing this calculus and have designed the attestation to impose a minimal burden on requests for PHI related to lawful conduct by health care providers by offering a model attestation form. Despite the minimal formality of providing a signed attestation, some state law enforcement agencies may experience the requirement as a burden, and we acknowledge that potential as a non-quantifiable cost.

## 2. Baseline Conditions

The Privacy Rule, in conjunction with the Security and Breach Notification Rules, protects the privacy and security of individuals' PHI, that is, individually identifiable health information (IIHI) transmitted by or maintained in electronic media or any other form or **\*33051** medium, with certain exceptions. It limits the circumstances under which regulated entities are permitted or required to use or disclose PHI and requires covered entities to have safeguards in place to protect the privacy of PHI. The Privacy Rule also establishes certain rights for individuals with respect to their PHI and sets limits and conditions on the uses and disclosures that may be made of such information without an individual's authorization.

As explained in the preamble, the Department has the authority under HIPAA to modify the Privacy Rule to prohibit the use or disclosure of PHI for activities to conduct a criminal, civil, or administrative investigation into or impose criminal, civil, or administrative liability on any person for the mere act of seeking, obtaining, providing, or facilitating reproductive health care that is lawful under the circumstances in which it was provided, as well as to identify any person for the purpose of initiating such activities. The Privacy Rule has been modified several times since it was first issued in 2000 to address statutory requirements, changed circumstances, and concerns and issues raised by stakeholders regarding the effects of the Privacy Rule on regulated entities, individuals, and others. Recently, as the preamble discusses, changed circumstances resulting from new inconsistencies in the regulation of reproductive health care nationwide and the negative effects on individuals' expectations for privacy and their relationships with their health care providers, as well as the additional burdens imposed on regulated entities, require the modifications made by this final rule.

For purposes of this Regulatory Impact Analysis (RIA), this final rule adopts the list of covered entities and cost assumptions identified in the Department's 2023 Information Collection Request (ICR).[FN421] The Department also relies on certain estimates and assumptions from the 1999 Privacy Rule NPRM [FN422] that remain relevant, and the 2013 Omnibus Rule, [FN423] as referenced in the analysis that follows.

The Department quantitatively analyzes and monetizes the effect that this final rule may have on regulated entities' actions to: revise business associate agreements between covered entities and their business associates, including release-of-information contractors; create new forms; respond to certain types of requests for PHI; update their NPPs; adopt policies and procedures to implement the requirements of this final rule; and train their employees on the updated policies and procedures. The Department analyzes the remaining benefits and burdens qualitatively because of the uncertainty inherent in predicting other concrete actions that such a diverse scope of regulated entities might take in response to this rule.

### Analytic Assumptions

The Department bases its assumptions for calculating estimated costs and benefits on several publicly available datasets, including data from the U.S. Census, the U.S. Department of Labor, Bureau of Labor Statistics, Centers for Medicare & Medicaid Services, and the Agency for Healthcare Research and Quality. For the purposes of this analysis, the Department assumes that benefits plus indirect costs equal approximately 100 percent of pre-tax wages and adjusts the hourly wage rates by multiplying

by two, for a fully loaded hourly wage rate. The Department adopts this as the estimate of the hourly value of time for changes in time use for on-the-job activities.

Implementing the regulatory changes likely will require covered entities to engage workforce members or consultants for certain activities. The Department assumes that a lawyer will draft or review the new attestation form, revisions to business associate agreements, revisions to the NPP, and required changes to HIPAA policies and procedures. The Department expects that a training specialist will revise the necessary HIPAA training and that a web designer will post the updated NPP. The Department further anticipates that a workforce member at the pay level of medical records specialist will confirm receipt of required attestations. To the extent that these assumptions affect the Department's estimate of costs, the Department solicited comment on its assumptions, particularly assumptions in which the Department identifies the level of workforce member (e.g., clerical staff, professional) that will be engaged in activities and the amount of time that particular types of workforce members spend conducting activities related to this RIA as further described below. Table 3 also lists pay rates for occupations referenced in the explanation of estimated information collection burdens in Section F of this RIA and related tables.

The Department received several comments about the occupations engaged in certain activities and the time burden associated with them. We reviewed these submissions and used the provided information to revise the estimate for the cost of processing requests for the use or disclosure of PHI that require an attestation. For more details, please see the sections discussing the costs of the rule below.

The Department received no comment on the hourly value of time; therefore, we retain all relevant assumptions laid out in the 2023 Privacy Rule NPRM, as described above (see Table 3 for a list of occupations and corresponding wages).[FN424]

### Table 3—Occupational Pay Rates

| Occupation code and title | Mean hourly wage | Fully loaded hourly wage |
|---|---|---|
| 00-0000 All Occupations | $29.76 | $59.52 |
| 43-3021 Billing and Posting Clerks | 21.54 | 43.08 |
| 29-0000 Healthcare Practitioners and Technical Occupations | 46.52 | 93.04 |
| 29-9021 Health Information Technologists and Medical Registrars | 31.38 | 62.76 |
| 29-9099 Healthcare Practitioners and Technical Workers, All Other | 32.78 | 65.56 |
| 15-1212 Information Security Analysts | 57.63 | 115.26 |
| 23-1011 Lawyers | 78.74 | 157.48 |
| 13-1111 Management Analysts | 50.32 | 100.64 |
| 11-9111 Medical and Health Services Manager | 61.53 | 123.06 |
| 29-2072 Medical Records Specialist | 24.56 | 49.12 |
| 43-0000 Office and Administrative Support Occupations | 21.90 | 43.80 |

| | | |
|---|---|---|
| 11-2030 Public Relations and Fundraising Managers | 68.56 | 137.12 |
| 13-1151 Training and Development Specialist | 33.59 | 67.18 |
| 43-4171 Receptionists and Information Clerks | 16.64 | 33.28 |
| 15-1255 Web and Digital Interface Designers | 48.91 | 97.82 |

**\*33052**  The Department assumes that most covered entities will be able to incorporate changes to their workforce training into existing HIPAA training programs rather than conduct a separate training because the total time frame for compliance from date of finalization would be 240 days.[FN425]

**Covered Entities Affected**

The Department received no substantive comments on the number or type of HIPAA covered entities affected by this rule; therefore, we retain the methodology and entity estimates as described in the 2023 Privacy Rule NPRM and the baseline conditions section above.

To the extent that covered entities engage business associates to perform activities under the rule, the Department assumes that any additional costs will be borne by the covered entities through their contractual agreements with business associates. The Department's estimate that each revised business associate agreement will require no more than 1 hour of a lawyer's labor assumes that the hourly burden could be split between the covered entity and the business associate. Thus, the Department calculated estimated costs based on the potential number of business associate agreements that will be revised rather than the number of covered entities or business associates with revised business associate agreements.

The Department requested data on the number of business associates (which may include health care clearinghouses acting in their role as business associates of other covered entities) that would be affected by the rule and the extent to which they may experience costs or other burdens not already accounted for in the estimates of burdens for revising business associate agreements. The Department also requested comment on the number of business associate agreements that would need to be revised, if any. We did not receive any actionable comments on the number of affected business associates, the number of business associate agreements, or any specific costs that business associates might bear. For more details, see the section on business associate agreements below.

The Department requested public comment on these estimates, including estimates for third party administrators and pharmacies where the Department has provided additional explanation. The Department additionally requested detailed comment on any situations, other than those identified here, in which covered entities would be affected by this rulemaking. We did not receive any substantive comments related to these issues.

### Table 4—Estimated Number and Type of Covered Entities

| Covered entities | | | |
|---|---|---|---|
| NAICS code | Type of entity | Firms | Establishments |
| 524114 | Health and Medical Insurance Carriers | 880 | 5,379 |
| 524292 | Third Party Administrators | 456 | 783 |

| 622 | Hospitals | 3,293 | | 7,012 |
|-----|-----------|-------|-----|-------|
| 44611 | Pharmacies | 19,540 | [a] 67,753 | |
| 6211-6213 | Office of Drs. & Other Professionals | 433,267 | | 505,863 |
| 6215 | Medical Diagnostic & Imaging | 7,863 | | 17,265 |
| 6214 | Outpatient Care | 16,896 | | 39,387 |
| 6219 | Other Ambulatory Care | 6,623 | | 10,059 |
| 623 | Skilled Nursing & Residential Facilities | 38,455 | | 86,653 |
| 6216 | Home Health Agencies | 21,829 | | 30,980 |
| 532283 | Home Health Equipment Rental | 611 | | 3,197 |
| Total | | 549,713 | | 774,331 |

## *33053  Individuals Affected

The Department believes that the population of individuals potentially affected by the rule is approximately 76 million overall, [FN426] representing nearly one-fourth of the U.S. population, including approximately 6 million pregnant individuals annually and an unknown number of individuals facing a potential pregnancy or pregnancy risk due to sexual activity, contraceptive avoidance or failure, rape (including statutory rape), and incest. According to Federal data, 78 percent of sexually active females received reproductive health care in 2015-2017.[FN427]

The Department received comments related to the number of individuals affected by the rule, some of which are summarized below. One commenter asserted that the Department had overestimated the number of affected individuals and urged reducing the estimate to 78 percent of sexually active females (52.72 million). The same commenter also argued that even this revised number might be an overestimate, and that the number of individuals directly affected by the rule would be closer to 50,400 a year. Another commenter suggested that the number of individuals potentially affected by the proposed rule is much larger than the estimate and that the estimate should include any individual who was ever capable of bearing children and their family members.

Another commenter asserted that the Department was underestimating the number of individuals that would be affected by the proposed rule but did not include an estimate of their own.

After reviewing the comments, the Department is finalizing the estimates of the number of individuals that will be affected by this final rule as described above, which includes updates for 2022 data. The Department considers a key category of individuals affected by this final rule those who have the potential to become pregnant because pregnancies may occur and result in a need for reproductive health care nationwide. Pregnancy, concern about potential pregnancy, and the need for reproductive health care do not recognize state boundaries or regulatory timelines.

Commenters recommended data points above and below the Department's proposed estimate of 74 million affected individuals. We believe that the number of affected individuals is far greater than the total who are survivors of sexual assault or sex trafficking (as recommended by a commenter), yet less than the number of all individuals who have ever been of childbearing age and their family members (as recommended by another commenter). We recognize that the age range for the proposed estimate of females, 10-44, imperfectly reflects the number of females of childbearing age; however, the number of females over age 44 who could become pregnant may be offset by the number of females aged 10-13 who are not yet capable of childbearing.

We use the number of females of potentially childbearing age as a proxy for the number of individuals affected by the final rule as shown in Table 5 below.

### Table 5—Estimated Number of Individuals Affected

| Females of potentially childbearing age [428] | Population estimate |
|---|---|
| 10 to 14 years | 10,327,799 |
| 15 to 19 years | 10,618,136 |
| 20 to 24 years | 10,957,463 |
| 25 to 29 years | 10,762,368 |
| 30 to 34 years | 11,440,546 |
| 35 to 39 years | 11,013,337 |
| 40 to 44 years | 10,771,942 |
| Total | 75,891,591 |

### 3. Costs of the Rule

Below, the Department provides the basis for its estimated quantifiable costs resulting from the changes to specific provisions of the Privacy Rule. Many of the estimates are based on assumptions formed through the Office for Civil Rights' (OCR's) experience with its compliance and enforcement program and accounts from stakeholders received at outreach events. The Department has quantified recurring burdens for this final rule for obtaining an attestation from a person requesting the use or disclosure of PHI potentially related to reproductive health care for health oversight activities, judicial and administrative proceedings, law enforcement purposes, and about decedents to coroners or medical examiners.

The Department requested information or data points from commenters to further refine its estimates and assumptions. We examine the most substantive comments received in the cost section below. Additionally, we received comments that are also discussed below on topics that are not directly addressed in the cost section.

A commenter asserted that the Department did not account for the additional costs associated with major depressive disorders that would arise from the increase in abortions due to the rule. The Department does not believe that is a valid benchmark for the effects of this final rule, in part because we reject the premise, which is not backed by medical evidence or data, that this final rule will result in an increase in pregnancy terminations or depression.[FN429] Further, researchers have raised numerous concerns about the methodology of the 2011 study cited in  **\*33054**  the comment.[FN430] Accordingly, we are not including the costs associated with treatment of depression in the cost section.

### a. Costs Associated With Requests for Exception From Preemption

The Department anticipates that states with laws that restrict access to reproductive health care are likely to seek an exception to the requirements of this final rule that preempt state law. Given the pace at which state laws governing access to reproductive health care are changing, the Department is finalizing its proposed estimate that a potential increase of 26 states [FN431] will incur costs to develop a request to except a provision of state law from HIPAA's general preemption authority to submit to the Secretary.[FN432] Based on existing burden estimates for this activity,[FN433] the Department is finalizing its estimate that each exception request will require approximately 16 hours of labor at the rate of a general health care practitioner and that

approximately 26 states will make such requests. Thus, the Department estimates that states will spend a total of 416 hours requesting exception from preemption and monetize this as a one-time cost of $38,705 [= 16 x 26 x $93.04].

**b. Estimated Costs From Adding a Requirement for an Attestation for Disclosures for Certain Purposes**

Multiple commenters asserted that the projected attestation cost in the proposed rule was incorrect and underestimated the true cost of implementing the proposed requirement. One commenter asserted that the proposed rule underestimated the time to review medical records for PHI about reproductive health care and recommended that it be increased significantly. The same commenter also suggested that the Department adopt a requirement to obtain an individual's authorization, instead of an attestation, because it would reduce costs. Other commenters asserted that the proposed cost estimates for the attestation requirement did not account for associated administrative burdens, urged the Department to require an attestation for every request for PHI to decrease overall costs by establishing a procedural norm, or requested that the Department provide grants and trainings to regulated entities to offset the costs of the attestation provision. Finally, another commenter requested that the Department release a model attestation form to decrease the cost burden for covered entities.

A few commenters asserted that the Department mis-identified the types of staff that would performing specific components of the attestation requirement. One posited that both a lawyer and a medical professional would need to review medical records for the use or disclosure of PHI in response to the proposed revisions to the Privacy Rule. Another asserted that the person reviewing PHI in response to a request for the use or disclosure of PHI would be a medical records clerk.

The Department has modified the attestation requirement in response to public comments. As discussed above, this final rule requires regulated entities to obtain an attestation that the request for the use or disclosure of PHI is not for a purpose prohibited by 45 CFR 164.502(a)(5)(iii) when the request is for certain purposes (health oversight activities, judicial and administrative proceedings, law enforcement purposes, and about decedents to coroners and medical examiners) and is for PHI potentially related to reproductive health care. Where the request is for a purpose that implicates 45 CFR 164.502(a)(5)(iii) and the reproductive health care was provided by someone other than the regulated entity that received the request, such health care is presumed lawful under the circumstances in which it was provided unless the conditions of 45 CFR 164.502(a)(5)(iii)(C) are met. We expect the presumption of lawfulness to lower the burden for regulated entities to process requests for the use or disclosure of PHI for which an attestation is required; however, we also acknowledge that the proposed estimate did not fully represent the number of likely requests for the use or disclosure of PHI. The Department declines to require a valid authorization for these requests, as opposed to an attestation, and no grants to offset costs will be needed because of the lower estimated burden per request. The revised cost estimates include review of each request for the use or disclosure of PHI for health oversight activities, judicial and administrative proceedings, law enforcement purposes, and about decedents to coroners and medical examiners, to determine if an attestation has been provided and administrative burdens associated with obtaining the attestation.

This final rule necessitates that regulated entities establish a process for responding to requests for the use or disclosure of PHI for which an attestation is required, such as reviewing and screening requests that are not accompanied by a valid authorization and are not a right of access request. We anticipate that across all regulated entities, this final rule will result in approximately 2,794,201 requests that regulated entities need to review in connection with the permissions under 45 CFR 164.512(d)-(g)(1). The Department estimates 5 minutes of average processing time per attestation based on the average wage of a mix of several occupations: medical and health services managers, medical records specialists, and health practitioners.[FN434] For example, a medical records specialist may forward certain requests for the use or disclosure of PHI (for health oversight activities, judicial and administrative proceedings, law enforcement purposes, and about decedents to coroners and medical examiners) to a manager to review whether the request pertains to the lawfulness of reproductive health care. A health practitioner may review a number of records subject to a request for whether they contain PHI potentially related to reproductive health care. We calculate the annual cost for initial processing of the estimated 2,794,201 requests requiring attestations to total $20,585,500 [2,794,201 x (5/60) x $88.41]. For almost all of these requests, we believe that a brief review will be sufficient for a regulated entity to make a final disclosure determination.

For a small number of these requests, approximately 1,300, we assume that the brief review will not be sufficient; we assume that these requests will require legal review. This figure is an estimate of the number of requests that are generated to investigate or impose liability on a person for the mere act of seeking or obtaining lawful reproductive health care, including from a health care **\*33055** provider in a state other than the state where the regulated entity is located. The Department's estimate assumes that approximately 26 states may seek to restrict access to out-of-state reproductive health care, including reproductive health care that is lawful under the circumstances in which it provided, and will initiate an average of 50 such requests annually. The Department estimates on average 1 hour of review for such requests based on the wage of a lawyer.[FN435] We calculate the annual legal review cost for the estimated 1,300 requests totals $204,724 [1,300 x 1 x $157.48]. This additional review increases the cost of processing attestations to $20,790,224.

We anticipate that approximately one-quarter of requests that result in legal reviews, approximately 325, will require additional managerial review by the regulated entity before making a disclosure decision. The Department estimates on average 3 hours of additional review for each of these requests based on the wage of medical and health insurance managers.[FN436] We calculate a total cost for additional actions for these requests of $119,984 [325 x 3 x $123.06]. The total annual estimated cost of processing attestations, including all additional legal and managerial reviews, is $20,910,207.

Upon consideration of the estimated cost for regulated entities to create a new attestation form, the Department is planning to develop a model form to be available prior to the compliance date of this final rule. This will save an estimated total of $60,970,823 [= 774,331 x (30/60) x $157.48], based on 30 minutes of labor by a lawyer.

### c. Costs Arising From Revised Business Associate Agreements

The Department anticipates that a certain percentage of business associate agreements will likely need to be updated to reflect a determination made by parties about their respective responsibilities when either party receives requests for disclosures of PHI under 45 CFR 164.512(d), (e), (f), or (g)(1). For example, each of the parties to the business associate agreement may need to notify the other party when they have knowledge that a request is for an unlawful purpose and allocate their respective responsibilities for handling these less frequent requests. The Department is finalizing its proposed estimate that each new or significantly modified contract between a business associate and its subcontractors will require, on average, one hour of labor by a lawyer at the wage reported in Table 3. We believe that approximately 35 percent of 1 million business associates, or 350,000 entities, will decide to create or significantly modify subcontracts, resulting in total costs of $55,118,000 [= 350,000 x $157.48].

A few commenters asserted that the Department's estimates for business associates' costs were incorrect and that it should consider additional costs. A commenter recommended that the Department adopt a non-enforcement period to allow business associates to achieve compliance and limit legal costs. Another commenter stated that the Department did not adequately identify the costs that would be associated with increased legal scrutiny of business associates as a result of the proposed rule. And another commenter urged the Department to consider the additional costs for renegotiated contracts as a result of the proposed rule. Lastly, a commenter requested that the Department apply the attestation requirement to business associates because it would reduce the costs of the rule.

The Department has reviewed the comments and is adopting the 2023 Privacy Rule NPRM cost analysis in this final rule. Business associate costs are adequately captured by the estimate for revising agreements. Applying costs directly to business associates (as opposed to covered entities) is distributional and will not alter the total impact of the rule. The Department declines to create an additional non-enforcement period for this provision of the final rule beyond the 180 days from the date of publication for the final rule to the compliance date.[FN437] The estimated cost for responding to requests for PHI for which an attestation is required accounts for increased scrutiny of a small number of requests for PHI, and the estimated costs for updating business associate agreements accounts for renegotiation of an average of one release of information vendor contract for nearly half of all covered entities.

### d. Costs Arising From Changes to the Notice of Privacy Practices

The final rule modifies the NPP to notify individuals that covered entities cannot use or disclose PHI for certain purposes and that in certain circumstances, covered entities must obtain an attestation from a person requesting the PHI that affirms that the use or disclosure is not for a purpose prohibited under 45 CFR 164.502(a)(5)(iii). The final rule also modifies the NPP to align with changes proposed in the 2022 Part 2 NPRM. This includes requiring covered entities that create or maintain Part 2 records to provide a notice that: addresses such records; references Part 2 as "other applicable law" that is more stringent than the Privacy Rule; explains that covered entities may not use or disclose a Part 2 record in a civil, criminal, administrative, or legislative proceeding against the individual absent written consent from the individual or a court order; and clarifies the applicability of Part 2 for organized health care arrangements that hold Part 2 records. Additionally, the final rule further modifies language for fundraising by covered entities that use or disclose Part 2 records to require a clear and conspicuous opt-out opportunity for patients. Finally, the modifications require the NPP to explain that PHI disclosed to a person other than a regulated entity is no longer subject to the requirements of the Privacy Rule.

The Department believes the burden associated with revising the NPP consists of costs related to developing and drafting the revised NPP for covered entities. The Department estimates that the updating and revising the language in the NPP will require 50 minutes of professional legal services at the wage reported in Table 3. Across all covered entities, the Department estimates a cost of $101,618,038 [= 774,331 x (50/60) x $157.48]. The Department does not anticipate any new costs for health care providers associated with distribution of the revised notice other than posting it on the entity's website (if it has one) because health care providers have an ongoing obligation to provide the notice to first-time patients that is already accounted for in cost estimates for the HIPAA Rules. Health plans that post their NPP online will incur minimal costs by posting the updated notice and then including the updated NPP in the next annual mailing to subscribers.[FN438] Health plans that do not provide an annual mailing will potentially incur an additional $12,743,700 in capital expenses for mailing the revised NPP to an estimated 10 percent of the 150,000,000 health plan subscribers who receive a mailed, paper copy of the notice, as well as the labor expense for an administrative support staff member at the rate shown in Table 3 to complete the mailing, for approximately $2,737,500 [= 62,500 hours x $43.80]. The Department further estimates the cost of posting the revised NPP on the  **33056** covered entity's website will be 15 minutes of a web designer's time at the wage reported in Table 3. Across all covered entities, the Department estimates a cost of online posting as $18,936,265 [= 774,331 x (15/60) x $97.82].

A commenter expressed concern that the Department was underestimating the cost of mailing updates associated with changes to NPP policies.

The Department is already accounting for the cost of mailing updated NPPs within the estimated capital costs, which include printing copies of NPPs that are provided in person and those that are mailed, and postage for health plans that will need to conduct a mailing that is off-cycle from its regular schedule. We estimate that half of NPPs will need to be mailed and that health plans may include the updated NPP with their next regular mailing to individuals.

**e. Estimated Costs for Developing New or Modified Policies and Procedures**

The Department anticipates that covered entities will need to develop new or modified policies and procedures for the new requirements for attestations, the new category of prohibited uses and disclosures, modifications to certain uses and disclosures permitted under 45 CFR 164.512, and clarification of personal representative qualifications. The Department is finalizing its proposed estimate that the costs associated with developing such policies and procedures will be the labor of a lawyer for 2.5 hours and that this expense represents the largest area of cost for compliance with this final rule, for a total of $304,854,115 [= 774,331 x 2.5 x $157.48].

A few commenters stated that the estimate for covered entities to draft new policies was incorrect and provided additional information or alternatives to reduce costs. A commenter stated that the time burden for drafting new policies was insufficient and did not accurately represent the amount of time it would take a covered entity to draft a policy that complied with the proposed rule. Another commenter urged the Department to include the costs for organizations to update their privacy policies because of the proposed rule. A few commenters requested that the Department provide organizations with additional time to develop new policies that comply with the final rule.

The Department considered the concerns raised by commenters about the burdens of the requirements to revise the Privacy Rule and made several additional modifications in this final rule to reduce burdens on regulated entities. For example, regulated entities are not required to develop policies to routinely evaluate whether reproductive health care that was provided by someone else was lawful. Instead, regulated entities will need to develop policies to ensure that regulated entities identify requests for health oversight activities, judicial and administrative proceedings, law enforcement purposes, and about decedents to coroners or medical examiners and procedures for obtaining the required attestation if it is not provided with the request for the use or disclosure of PHI. Additional policies will be required to address requests for the above purposes that could result in a prohibited use or disclosure, such as requests from law enforcement for the use or disclosure of PHI that assert, without any other information, that reproductive health care was provided unlawfully. The updating of privacy policies is included in the overall cost of updating policies and the estimate for updating the NPP. Because of changes in the final rule that simplify compliance with the new requirements, the Department is not adjusting the time burden for revising or creating new policies and procedures.

### f. Costs Associated With Training Workforce Members

The Department anticipates that covered entities will be able to incorporate new content into existing HIPAA training requirements and that the costs associated with doing so will be attributed to the labor of a training specialist for an estimated 90 minutes for a total of $78,029,335 [= 774,331 x (90/60) x $67.18].

A few commenters addressed training costs within the proposed rule, including one who asserted that such costs could be reduced by ensuring that the effective date for all of the provisions of the rule is the same. Another commenter stated that covered entities would incur both a one time and yearly training cost, with the yearly training cost accounting for most of the total training cost in year 1.

The Department is finalizing the cost estimate for training workforce members as proposed, which includes the cost of a training specialist to update the covered entity's HIPAA training program with new content to include in training for workforce members within the first year. Any further recurring component is likely to be implemented into regularly scheduled employee training and will thus not be directly attributable to this rule.

### g. Total Quantifiable Costs

The Department summarizes in Table 6 the estimated nonrecurring costs that covered entities and states will experience in the first year of implementing the regulatory changes. The Department anticipates that these costs will be for requesting exceptions from preemption of contrary state law, implementing the attestation requirement, revising business associate agreements, revising the NPP, mailing and posting it online, revising policies and procedures, and updating HIPAA training programs.

#### Table 6—New Nonrecurring Costs of Compliance With the Final Rule

| Nonrecurring costs | Burden hours/ action x hourly wage | Respondents | Total costs (millions) |
| --- | --- | --- | --- |
| Exception Requests | 16 x $93.04 | 26 States | $0.04 |
| BA Agreements, Revising | 1 x $157.48 | 350,000 BAAs | 55 |
| NPP, Updating | 50/60 x $157.48 | 774,331 Covered entities | 102 |

| | | | |
|---|---|---|---|
| NPP, Mailing | 0.25/60 x $43.80 | 15,000,000 Subscribers | 3 |
| NPP, Posting Online | 15/60 x $97.82 | 774,331 Covered entities | 19 |
| Policies & Procedures | 150/60 x $157.48 | 774,331 Covered entities | 305 |
| Training | 90/60 x $67.18 | 774,331 Covered entities | 78 |
| Capital Expenses, Mailing NPPs—Health Plans | $.85/NPP | 15,000,000 Subscribers | 13 |
| Total Nonrecurring Burden | | ........................................................... [a] | 574 |

**\*33057** Table 7 summarizes the recurring costs that the Department anticipates covered entities will incur annually as a result of the regulatory changes. These new costs are based on responding to requests for uses and disclosures of PHI that are conditioned upon an attestation.

### Table 7—Recurring Annual Costs of Compliance With the Final Rule [a]

| Recurring costs | Burden hours x wage | Respondents | Total annual cost |
|---|---|---|---|
| | | | (millions) |
| Disclosures for which an attestation is required | 232,850 x $88.41 | 2,794,201 | $20,585,500 |
| Attestation investigation review | 1,300 x $157.48 | 1,300 | 204,724 |
| Attestation additional actions | 975 x 123.06 | 325 | 119,984 |
| Total Recurring Annual Burden | | ................................... | 20,910,207 |

## Costs Borne by the Department

The covered entities that are operated by the Department will be affected by the changes in a similar manner to other covered entities, and such costs have been factored into the estimates above.

The Department expects that it will incur costs related to drafting and disseminating a model attestation form and information about the regulatory changes to covered entities, including health care providers and health plans. In addition, the Department anticipates that it may incur a 26-fold increase in the number of requests for exceptions from preemption of contrary state law in the first year after a final rule becomes effective, at an estimated total cost of approximately $146,319 to analyze and develop responses for an average cost of $7,410 per request. This increase is based on the number of states that have enacted or are likely to enact laws restricting access to reproductive health care [FN439] and may seek to obtain individuals' PHI to enforce those laws. This estimate assumes that the Department receives and reviews exception requests from the 26 states, that half require a more complex analysis, and that all requests result in a written response within one year of the final rule's publication.

## Benefits of the Final Rule

The benefits of this final rule to individuals and families are likely substantial, and yet are not fully quantifiable because the area of health care this final rule addresses is among the most sensitive and life-altering if privacy is violated. Additionally, the value of privacy, which cannot be recovered once lost, and trust that privacy will be protected by others, is difficult to quantify fully. Health privacy has many significant benefits, such as promoting effective communication between individuals and health care

providers, preventing discrimination, enhancing autonomy, supporting medical research, and protecting the individual from unwanted exposure of sensitive health information.[FN440]

Notably, reproductive health care may include circumstances resulting in a pregnancy, considerations concerning maternal and fetal health, family genetic conditions, information concerning sexually transmitted infections, and the relationship between prospective parents (including victimization due to rape, incest, or sex trafficking). Involuntary or poorly-timed disclosures can irreparably harm relationships and reputations, and even result in job loss or other negative consequences in the workplace, [FN441] as well as investigation, civil litigation or proceedings, and prosecution for lawful activities.[FN442] Additionally, fear of potential penalties or liability that may result from disclosing information to a health care provider about accessing reproductive health care may cast a long shadow, decreasing trust between individuals and health care providers, discouraging and deterring access to other valuable and necessary health care, or compromising ongoing or subsequent care if an individual's medical records are not accurate or complete.[FN443] This final rule will prevent or reduce the harms discussed here, resulting in non-quantifiable benefits to individuals and their families, friends, and health care providers. In particular, the role of trust in the health care system and its importance to the provision of high-quality health care is discussed extensively in Section III of this preamble.

The Department anticipates that this final rule will increase health literacy by improving access to complete information about health care options for individuals.[FN444] For example, the prohibition on the use and disclosure of PHI for purposes of investigating or imposing liability on an individual, a person assisting them, or their health care provider for lawful health care will increase individuals' access to complete information about their health care options because they will have increased confidence to share information about their life, including their health, with health care providers. In turn, the receipt of more complete information from patients will enable  *33058  health care providers to provide more accurate and relevant medical information about lawful reproductive health care, and the new prohibition will enable them to do so without fear of serious and costly professional repercussions.

This final rule will also contribute to increased access to prenatal health care at the critical early stages of pregnancy by affording individuals the assurance that they may obtain lawful reproductive health care without fearing that records related to that care would be subject to disclosure. For example, if a sexually active individual fears they or their health care providers could be subject to prosecution as a result of disclosure of their PHI, the individual may avoid informing health care providers about symptoms or asking questions of medical experts and may consequently fail to receive necessary support and health care for a pregnancy diagnosis.[FN445] Similarly, this final rule will likely contribute to a decreased rate of maternal mortality and morbidity by improving access to information about health services.[FN446]

Additionally, this final rule will enhance the mental health and emotional well-being of individuals seeking or obtaining lawful reproductive health care by reducing fear that their PHI will be disclosed to investigate or impose liability on the individual, their health care provider, or any persons facilitating the individual's access to lawful reproductive health care. This is especially important for individuals who need access to reproductive health care because they are survivors of rape, incest, or sex trafficking. For at least some such individuals, certain types of reproductive health care, including abortion, often remain legal even if pregnancy termination is not available to the broader population under state law. The Department expects that this final rule will help to prevent or reduce re-victimization of pregnant individuals who have been subject to rape, incest, or sex trafficking by protecting their PHI from disclosure.

Activities conducted to investigate and impose liability that rely on that information may be costly to defend against and thus are financially draining for the target of those activities and for persons who are not the target of the activity but whose information may be used as evidence against others. Witnesses or targets of such activities may lose time from work and incur steep legal bills that create unmanageable debt or otherwise harm the economic stability of the individual, their family, and their health care provider. In the absence of this final rule, much of the costs may be for defending against the unwanted use or disclosure of PHI. Thus, the Department expects that this final rule will contribute to families' economic well-being by reducing the risk of exposure to costly activities to investigate or impose liability on persons for lawful activities as a result of disclosures of PHI.

This final rule will also contribute to improved continuity of care and ongoing and subsequent health care for individuals, thereby improving health outcomes. If a health care provider believes that PHI is likely to be disclosed without the individual's or the health care provider's knowledge or consent, possibly to initiate or be used in criminal or civil proceedings against the individual, their health care provider, or others, the health care provider is more likely to omit information about an individual's medical history or condition, leave gaps, or include inaccuracies when preparing the individual's medical records. And if an individual's medical records lack complete information about the individual's health history, a subsequent health care provider may not be able to conduct an appropriate health assessment to reach a sound diagnosis and recommend the best course of action for the individual. Alternatively, health care providers may withhold from the individual full and complete information about their treatment options because of liability concerns stemming from fears about the privacy of an individual's PHI.[FN447] Heightened confidentiality and privacy protections enable a health care provider to feel confident maintaining full and complete patient records. Without complete patient records, an individual is less likely to receive appropriate ongoing or future health care, including correct diagnoses, and will be impeded in making informed treatment decisions.

**Comparison of Benefits and Costs**

A few commenters stated that the 2023 Privacy Rule NPRM reflected the staffing costs of covered entities in full. One posited that covered entities will receive more requests for PHI because of changes in the legal environment after Dobbs, which will require some regulated entities that may not typically get such requests to adjust according to the changes in the law and how it is enforced. Another commenter stated that the proposed rule did not account for higher staffing costs from more highly qualified employees. The commenters did not provide any relevant data or discussion of methodology for how these costs should be quantified. Therefore, the Department did not include any additional labor costs in the economic analysis based on this comment.

A few additional commenters expressed general concerns related to electronic health record (EHR) systems and data storage. One urged the Department to include costs associated with updating EHR systems to ensure compliance and to allow for data segmentation. Another asserted that the current classifications for different types of PHI are not clear enough for effective data segmentation, contributing to increased costs. As a result, they recommended that the Department provide clearer guidelines on the different types of PHI. The Department did not attempt to estimate additional data maintenance or EHR-related costs because any adjustments will be part of the regular cost of business for regulated entities.

A commenter stated that the Department did not quantify the costs associated with violations of the rule by regulated entities, such as incurring a monetary penalty after impermissibly responding to a court order. The Department does not quantify the costs of noncompliance as part of its analysis. Whether a violation will result in a monetary penalty is dependent on numerous factors and the aim of the Department's enforcement is to bring regulated entities into compliance.

A few commenters asserted that the proposed rule would make it more difficult for law enforcement to investigate criminals for crimes related to sex and recommended that the Department quantify this cost. The Department acknowledges that the final rule may result in some changes to procedures for handling law enforcement requests for PHI; however, the burden on regulated entities is calculated in its cost estimates. The Department is unable to quantify the burdens to law enforcement resulting from this final rule. However, to address concerns about victims' ability to disclose their PHI related to reproductive health care, the final rule  **\*33059**  permits individuals to authorize disclosures for any purpose, including law enforcement investigations. Therefore, the Department is not including costs to law enforcement in the quantified costs and benefits analysis. The Department expects the totality of the benefits of this final rule to outweigh the costs, particularly in light of the privacy benefits for individuals who could become pregnant (nearly one-fourth of the U.S. population in any given year) and seek access to lawful health care without the risk of their PHI being used or disclosed in furtherance of activities to conduct criminal, civil, or administrative investigations or impose liability without their authorization. The Department expects covered entities and individuals to benefit from covered entities' increased confidence to be able to provide lawful health care according to professional standards.

The Department's qualitative benefit-cost analysis asserts that the regulatory changes in this final rule will support an individual's privacy with respect to lawful health care, enhance the relationship between health care providers and individuals, strengthen maternal well-being and family stability, and support victims of rape, incest, and sex trafficking. The regulatory changes will also aid health care providers in developing and maintaining a high level of trust with individuals and maintaining complete and accurate medical records to aid ongoing and subsequent health care. Greater levels of trust will further enable individuals to develop and maintain relationships with health care providers, which would enhance continuity of health care for all individuals receiving care from the health care provider, not only individuals in need of reproductive health care.

The financial costs of this final rule will accrue primarily to covered entities, particularly health care providers and health plans in the first year after implementation of a final rule, with recurring costs accruing annually at a lower rate.

### *B. Regulatory Alternatives to the Final Rule*

In addition to regulatory proposals in the 2023 Privacy Rule NPRM that are not adopted here, the Department considered several alternatives to the policies finalized in this rule.

### Define Public Health in the Context of Public Health Surveillance, Intervention, or Investigation

The Department considered alternatives to the proposed definition of "public health" in the context of public health surveillance, investigation, and intervention, particularly the reference to population-level activities. Specifically, the Department considered whether to add "individual-level" to further distinguish public health surveillance, investigation, and intervention from other activities but did not adopt this approach because it would add a new undefined term that would generate more complexity without adding clarity. The Department also considered removing "population-level" from the definition in this final rule, but we are not adopting that approach because it might lead people to believe that the focus of public health is not on activities benefiting the population as a whole. Additionally, the Department considered defining "public health" surveillance, investigation, or intervention only in the negative—that is, by listing activities that are excluded—but decided not to adopt this approach to ensure that stakeholders understand what public health surveillance, investigation, or intervention means.

### Modify Prohibition To Presume That Reproductive Health Care Is Lawful Absent Actual Knowledge

The Department considered adding a provision that would allow regulated entities to presume that certain requests for PHI are about reproductive health care that was lawful under the circumstances in which such health care was provided where it was provided by someone other than the regulated entity receiving the PHI request, unless the regulated entity had actual knowledge that such health care was not lawful under the circumstances in which it was provided. However, in consultation with Federal partners, the Department decided to finalize a second exception to the presumption to permit uses or disclosures of PHI where privacy interests are reduced, as compared to the societal interest in the PHI for certain non-health care purposes. This exception is available where factual information supplied by the person requesting the use or disclosure of PHI demonstrates to the regulated entity a substantial factual basis that the reproductive health care was not lawful under the specific circumstances in which such health care was provided.

### Administrative Requests by Law Enforcement

The Department received reports that not all regulated entities are interpreting the administrative request provision correctly and proposed a clarification at 45 CFR 164.512(f)(1)(ii)(C). To address concerns that disclosures currently made under Federal agencies' interpretations of the Privacy Act of 1974 [FN448] would not be permitted under the NPRM proposal, the Department considered adding qualifying language to paragraph 45 CFR 164.512(f)(1)(ii)(C) to state that PHI may be disclosed by a Federal agency in response to an administrative request from law enforcement where the Federal agency is authorized, but not required, to disclose under applicable law (see, e.g., the Privacy Act and OMB 1975 Guidelines [FN449]). However, the Department determined that the contemplated change was not necessary because the intent of the Privacy Rule was adequately captured in the clarification proposed in the NPRM and finalized in this rule at 45 CFR 164.512(f)(1)(ii)(C). As finalized, this provision

permits disclosures to law enforcement in response to "an administrative request for which response is required by law, including an administrative subpoena or summons, a civil or an authorized investigative demand, or similar process authorized under law."

**Scope of Prohibited Conduct**

In response to public comments on the 2023 Privacy Rule NPRM, the Department considered several approaches to outlining prohibited conduct. One approach was creating a category of "highly sensitive PHI" and prohibiting its use and disclosure in certain proceedings based on the mere act of, for example, obtaining, providing, or aiding that category of health care. The Department did not adopt this category based on many concerns expressed in public comments. For example, distinguishing between the sensitivity of different types of PHI would require complicated subjective determinations, and prohibiting or limiting uses or disclosures of highly sensitive PHI for certain purposes could negatively affect efforts to eliminate data segmentation and further stigmatize the types of health care included in the "highly sensitive" category.

Another approach the Department considered was to require an attestation for all requested uses and discloses of PHI under 45 CFR 164.512(d)-(g)(1), rather than limiting the requirement to only requested uses and disclosures of PHI potentially related to reproductive health care under such provisions. This would have reduced the burden on **\*33060** regulated entities to screen requested PHI for whether it contained information potentially related to reproductive health care and increased the burden on persons requesting PHI to evaluate and attest to all requests for use and disclosure of PHI under 45 CFR 164.512(d)-(g)(1). However, in recognition of the importance of oversight and law enforcement entities' ability to obtain PHI for legitimate inquiries, the Department decided not to require an attestation for all requests under these provisions.

**Requiring an Attestation Under Penalty of Perjury**

The Department requested comments about the possibility of adding a required penalty of perjury statement to strengthen the attestation requirement but did not propose this statement in the 2023 Privacy Rule NPRM. After reviewing public comments on this topic, the Department considered adding a requirement that the attestation be signed by the person requesting the use or disclosure of PHI under penalty of perjury but did not adopt such a requirement in the final rule. As discussed in greater detail above, a person who knowingly and in violation of the Administrative Simplification provisions of HIPAA obtains or discloses IIHI relating to another individual or discloses IIHI to another person is subject to criminal liability.[FN450] Thus, a person who knowingly and in violation of HIPAA [FN451] falsifies an attestation (e.g., makes material misrepresentations about the intended uses of the PHI requested) to obtain (or cause to be disclosed) an individual's IIHI could be subject to criminal penalties as outlined in the statute. The Department believes such penalties are sufficient to hold persons who knowingly submit false attestations accountable for their actions and deter such submissions entirely.

**Right To Request Restrictions**

In the 2023 Privacy Rule NPRM, the Department requested comments regarding the right of individuals to request restrictions of uses and disclosures of their PHI. We did not propose any changes to this provision in the 2023 Privacy Rule NPRM, nor are we proposing or finalizing any modifications to it at this time. We appreciate the comments we received regarding expanding the rights to request disclosures and will take them under advisement when we consider future modifications to the Privacy Rule.

*C. Regulatory Flexibility Act—Small Entity Analysis*

The Department has examined the economic implications of this final rule as required by the RFA. If a rule has a significant economic impact on a substantial number of small entities, the RFA requires agencies to analyze regulatory options that would reduce the economic effect of the rule on small entities.

For purposes of the RFA, small entities include small businesses, nonprofit organizations, and small governmental jurisdictions. The Act defines "small entities" as (1) a proprietary firm meeting the size standards of the Small Business Administration (SBA), (2) a nonprofit organization that is not dominant in its field, and (3) a small government jurisdiction of less than 50,000

population. A few commenters raised concerns about the effects of the proposed rule on small or rural providers and requested additional analysis, guidance, or technical assistance from the Department to aid these entities. The Department did not receive any public comments on the small business analysis assumptions used in the NPRM. Accordingly, we are not changing the baseline assumptions for this final rule. We have updated our analysis of small entities for consistency with revisions to the RIA for the costs and savings for covered entities. The Department has determined that roughly 90 percent or more of all health care providers meet the SBA size standard for a small business or are a nonprofit organization. Therefore, the Department estimates that there are 696,898 small entities affected by the final rule.[FN452] The SBA size standard for health care providers ranges between a maximum of $16 million and $47 million in annual receipts, depending upon the type of entity.[FN453]

With respect to health insurers, the SBA size standard is a maximum of $47 million in annual receipts, and for third party administrators it is $45.5 million.[FN454] While some insurers are classified as nonprofit, it is possible they are dominant in their market. For example, a number of Blue Cross/Blue Shield insurers are organized as nonprofit entities; yet they dominate the health insurance market in the states where they are licensed.[FN455]

For the reasons stated below, we do not expect that the cost of compliance will be significant for small entities. Nor do we expect that the cost of compliance will fall disproportionately on small entities. Although many of the covered entities affected by this final rule are small entities, they will not bear a disproportionate cost burden compared to the other entities subject to the rule. The projected total costs are discussed in detail in the RIA. The Department does not view this as a substantial burden because the result of the changes will be annualized costs per covered entity of approximately $184 [= $142.6 million [FN456]/774,331 covered entities]. In the context of the RFA, HHS generally considers an economic impact exceeding 3 percent of annual revenue to be significant, and 5 percent or more of the affected small entities within an identified industry to represent a substantial number. The quantified impact of $184 per covered entity would only apply to covered entities whose annual revenue is $6,133 or less. We believe almost all, if not all covered entities have annual revenues that exceed this amount. Accordingly, the Department has determined that this final rule is unlikely to affect a substantial number of small entities that meet the RFA threshold. Thus, this analysis concludes, and the Secretary certifies, that the rule will not result in a significant economic effect on a substantial number of small entities.

### D. *Executive Order 13132—Federalism*

As required by E.O. 13132 on Federalism, the Department has examined the provisions in both the proposed and final regulation for their effects on the relationship between the Federal Government and the states. In the Department's view, the final regulation may have federalism implications because it may have direct effects on the states, the relationship between the Federal Government and states, and on the distribution of power and responsibilities among various **\*33061** levels of government relating to the disclosure of PHI.

The changes from this final rule flow from and are consistent with the underlying statute, which authorizes the Secretary to issue regulations that govern the privacy of PHI. The statute provides that, with limited exceptions, such regulations supersede contrary provisions of state law unless the provision of state law imposes more stringent privacy protections than the Federal law.[FN457]

Section 3(b) of E.O. 13132 recognizes that national action limiting the policymaking discretion of states will be imposed only where there is constitutional and statutory authority for the action and the national activity is appropriate when considering a problem of national significance. The privacy of PHI is of national concern by virtue of the scope of interstate health commerce. As described in the preamble to the proposed rule and this final rule, recent state actions affecting reproductive health care have undermined the longstanding expectation among individuals in all states that their highly sensitive reproductive health information will remain private and not be used against them for seeking or obtaining legal health care. These state actions thus directly threaten the trust that is essential to ensuring access to, and quality of, lawful health care. HIPAA's provisions reflect this position by authorizing the Secretary to promulgate regulations to implement the Privacy Rule.

Section 4(a) of E.O. 13132 expressly contemplates preemption when there is a conflict between exercising state and Federal authority under a Federal statute. Section 4(b) of the E.O. authorizes preemption of state law in the Federal rulemaking context when "the exercise of State authority directly conflicts with the exercise of Federal authority under the Federal statute." The approach in this regulation is consistent with the standards in the E.O. because it supersedes state authority only when such authority is inconsistent with standards established pursuant to the grant of Federal authority under the statute.

State and local laws that impinge on the privacy protections for PHI of individuals who obtain lawful reproductive health care undermine Congress' directive to develop a health information system for the purpose of improving the effectiveness of the health care system, which requires that all individuals who receive health care legally are assured a minimum level of privacy for their PHI. Congress established specific, narrow exceptions to preemption that did not include the use or disclosure of an individual's medical records for law enforcement purposes generally. Nor did Congress include a specific exception to preemption that would permit states to use PHI against that individual, health care providers, or third parties merely for seeking, obtaining, providing, or facilitating lawful health care.[FN458] Both the personal and public interest is served by protecting PHI so as not to undermine an individual's access to and quality of lawful health care services and their trust in the health care system.

The Department anticipates that the most significant direct costs on state and local governments would be the cost for state and local government-operated covered entities to revise business associate agreements, revise policies and procedures, update the NPP, update training programs, and process requests for disclosures for which an attestation is required. These costs would be similar in kind to those borne by non-government operated covered entities. In addition, the Department anticipates that approximately half of the states may choose to file a request for an exception to preemption. The longstanding regulatory provisions that govern preemption exception requests under the HIPAA Rules would remain undisturbed by this rule.[FN459] However, based on the legal developments in some states that are described elsewhere in this preamble, the Department anticipates that in the first year of implementation of a final rule, more states will submit requests for exceptions from preemption than have done so in the past. The RIA above addresses these costs in detail.

Pursuant to the requirements set forth in section 8(a) of E.O. 13132, and by the signature affixed to the final rule, the Department certifies that it has complied with the requirements of E.O. 13132, including review and consideration of comments from state and local government officials and the public about the interaction of this rule with state activity, for the final rule in a meaningful and timely manner.

### E. Assessment of Federal Regulation and Policies on Families

Section 654 of the Treasury and General Government Appropriations Act of 1999 [FN460] requires Federal departments and agencies to determine whether a proposed policy or regulation could affect family well-being. If the determination is affirmative, then the Department or agency must prepare an impact assessment to address criteria specified in the law. This final rule is expected to strengthen the stability of the family and marital commitment because it protects individual privacy in the context of sensitive decisions about family planning. The rule may be carried out only by the Federal Government because it would modify Federal health privacy law, ensuring that American families have confidence in the privacy of their information about lawful reproductive health care, regardless of the state where they are located when health care is provided. Such health care privacy is vital for individuals who may become pregnant or who are capable of becoming pregnant.

### F. Paperwork Reduction Act of 1995

Under the Paperwork Reduction Act of 1995 [FN461] (PRA), agencies are required to submit to OMB for review and approval any reporting or record-keeping requirements inherent in a proposed or final rule and are required to publish such proposed requirements for public comment. To fairly evaluate whether an information collection should be approved by the OMB, section 3506(c)(2)(A) of the PRA requires that the Department solicit comment on the following issues:

1. Whether the information collection is necessary and useful to carry out the proper functions of the agency;

2. The accuracy of the agency's estimate of the information collection burden;

3. The quality, utility, and clarity of the information to be collected; and

4. Recommendations to minimize the information collection burden on the affected public, including automated collection techniques.

The PRA requires consideration of the time, effort, and financial resources necessary to meet the information collection requirements referenced in this section. The Department considered public comments on its assumptions and burden estimates in the 2023 Privacy Rule NPRM and addresses those comments above in the discussion of benefits and costs of this final rule.

In this RIA, the Department is revising certain information collection requirements associated with this final rule and, as such, is revising the information collection last prepared in **\*33062** 2023 and approved under OMB control #0945-0003. The revised information collection describes all new and adjusted information collection requirements for covered entities pursuant to the implementing regulation for HIPAA at 45 CFR parts 160 and 164, the HIPAA Privacy, Security, Breach Notification, and Enforcement Rules ("HIPAA Rules").

The estimated annual labor burden presented by the regulatory modifications in the first year of implementation, including nonrecurring and recurring burdens, is 4,584,224 burden hours at a cost of $582,242,165 [FN462] and $20,910,207 of estimated annual labor costs in years two through five. The overall total burden for respondents to comply with the information collection requirements of all of the HIPAA Privacy, Security, and Breach Notification Rules, including nonrecurring and recurring burdens presented by program changes, is 953,982,236 burden hours at a cost of $107,336,705,941, plus $197,364,010 in capital costs for a total estimated annual burden of $107,534,069,951 in the first year following the effective date of the final rule. Details describing the burden analysis for the proposals associated with this RIA are presented below and explained further in the ICR associated with this final rule.

**Explanation of Estimated Annualized Burden Hours**

Below is a summary of the significant program changes and adjustments made since the approved 2023 ICR; because the ICR addresses regulatory burdens associated with the full suite of HIPAA Rules, the changes and adjustments include updated data and estimates for some provisions of the HIPAA Rules that are not affected by this final rule. These program changes and adjustments form the bases for the burden estimates presented in the ICR associated with this RIA.

**Adjusted Estimated Annual Burdens of Compliance**

(1) Increasing the number of covered entities from 700,000 to 774,331 based on program change.

(2) Increasing the number of respondents requesting exceptions to state law preemption from 1 to 27 based on an expected reaction by states that have enacted restrictions on reproductive health care access.

(3) Increasing the burden hours by a factor of two for responding to individuals' requests for restrictions on disclosures of their PHI under 45 CFR 164.522 to represent a doubling of the expected requests.

(4) Updating the number of breaches for which notification is required to reflect data in OCR's 2022 Report to Congress [FN463] and related burdens.

(5) Increasing the number of estimated uses and disclosures for research purposes.

(6) Increasing the total number of NPPs distributed by health plans by 50% to total 300,000,000 due to the increase in number of Americans with health coverage.

**New Burdens Resulting from Program Changes**

In addition to these changes, the Department added new annual burdens as a result of program changes in the final rule:

(1) A nonrecurring burden of 1 hour for each of 350,000 business associate agreements that is likely to be revised as a result of the changes to handling requests for PHI under 45 CFR 164.512(d), (e), (f), and (g)(1), to allocate responsibilities between covered entities and their release-of-information contractors.

(2) A recurring burden of 5 minutes per request for staff to determine whether an attestation is required for disclosure under 45 CFR 164.509.

(3) A recurring burden of 1 hour per request for legal review of whether certain requests identified by staff as potentially requiring an attestation pertain to the lawfulness of reproductive health care.

(4) A recurring burden of 3 hours per request for a percentage of requests requiring legal review that might require additional manager review to determine whether the requirements at 45 CFR 164.509 are met.

(5) A nonrecurring burden of 50 minutes per covered entity to update the required content of its NPP.

(6) A nonrecurring burden of 15 minutes per covered entity for posting an updated NPP online.

(7) A nonrecurring burden of 2.5 hours for each covered entity to update its policies and procedures.

(8) A nonrecurring burden of 90 minutes for each covered entity to update the content of its HIPAA training program.

**List of Subjects**

*45 CFR Part 160*

Health care, Health records, Preemption, Privacy, Public health, Reproductive health care.

*45 CFR Part 164*

Health care, Health records, Privacy, Public health, Reporting and recordkeeping requirements, Reproductive health care.

For the reasons stated in the preamble, the Department of Health and Human Services amends 45 CFR subtitle A, subchapter C, parts 160 and 164 as set forth below:

**PART 160—GENERAL ADMINISTRATIVE REQUIREMENTS**

1. The authority citation for part 160 continues to read as follows:

Authority: 42 U.S.C. 1302(a); 42 U.S.C. 1320d-1320d-9; sec. 264, Pub. L. 104-191, 110 Stat. 2033-2034 (42 U.S.C. 1320d-2 (note)); 5 U.S.C. 552; secs. 13400-13424, Pub. L. 111-5, 123 Stat. 258-279; and sec. 1104 of Pub. L. 111-148, 124 Stat. 146-154.

45 CFR § 160.103

2. Amend § 160.103 by:

a. Revising the definition of "Person"; and

b. Adding in alphabetical order the definitions of "Public health" and "Reproductive health care".

The revision and additions read as follows:

45 CFR § 160.103

## § 160.103 Definitions.

* * * * *

Person means a natural person (meaning a human being who is born alive), trust or estate, partnership, corporation, professional association or corporation, or other entity, public or private.

* * * * *

Public health, as used in the terms "public health surveillance," "public health investigation," and "public health intervention," means population-level activities to prevent disease in and promote the health of populations. Such activities include identifying, monitoring, preventing, or mitigating ongoing or prospective threats to the health or safety of a population, which may involve the collection of protected health information. But such activities do not include those with any of the following purposes:

(1) To conduct a criminal, civil, or administrative investigation into any person for the mere act of seeking, obtaining, providing, or facilitating health care.

(2) To impose criminal, civil, or administrative liability on any person for the mere act of seeking, obtaining, providing, or facilitating health care.

**\*33063** (3) To identify any person for any of the activities described at paragraphs (1) or (2) of this definition.

Reproductive health care means health care, as defined in this section, that affects the health of an individual in all matters relating to the reproductive system and to its functions and processes. This definition shall not be construed to set forth a standard of care for or regulate what constitutes clinically appropriate reproductive health care.

* * * * *

## PART 164—SECURITY AND PRIVACY

3. The authority citation for part 164 continues to read as follows:

Authority: 42 U.S.C. 1302(a); 42 U.S.C. 1320d-1320d-9; sec. 264, Pub. L. 104-191, 110 Stat. 2033-2034 (42 U.S.C. 1320d-2(note)); and secs. 13400-13424, Pub. L. 111-5, 123 Stat. 258-279.

45 CFR § 164.502

4. Amend § 164.502 by

a. Revising paragraph (a)(1)(vi);

b. Adding paragraph (a)(5)(iii); and

c. Revising paragraph (g)(5).

The addition and revisions read as follows:

45 CFR § 164.502

## § 164.502 Uses and disclosures of protected health information: General rules.

(a) * * *

(1) * * *

(vi) As permitted by and in compliance with any of the following:

(A) This section.

(B) Section 164.512 and, where applicable, § 164.509.

(C) Section 164.514(e), (f), or (g).

 * * * * *

(5) * * *

(iii) Reproductive health care—(A) Prohibition. Subject to paragraphs (a)(5)(iii)(B) and (C) of this section, a covered entity or business associate may not use or disclose protected health information for any of the following activities:

(1) To conduct a criminal, civil, or administrative investigation into any person for the mere act of seeking, obtaining, providing, or facilitating reproductive health care.

(2) To impose criminal, civil, or administrative liability on any person for the mere act of seeking, obtaining, providing, or facilitating reproductive health care.

(3) To identify any person for any purpose described in paragraphs (a)(5)(iii)(A)(1) or (2) of this section.

(B) Rule of applicability. The prohibition at paragraph (a)(5)(iii)(A) of this section applies only where the relevant activity is in connection with any person seeking, obtaining, providing, or facilitating reproductive health care, and the covered entity or business associate that received the request for protected health information has reasonably determined that one or more of the following conditions exists:

(1) The reproductive health care is lawful under the law of the state in which such health care is provided under the circumstances in which it is provided.

(2) The reproductive health care is protected, required, or authorized by Federal law, including the United States Constitution, under the circumstances in which such health care is provided, regardless of the state in which it is provided.

(3) The presumption at paragraph (a)(5)(iii)(C) of this section applies.

(C) Presumption. The reproductive health care provided by another person is presumed lawful under paragraph (a)(5)(iii)(B) (1) or (2) of this section unless the covered entity or business associate has any of the following:

(1) Actual knowledge that the reproductive health care was not lawful under the circumstances in which it was provided.

(2) Factual information supplied by the person requesting the use or disclosure of protected health information that demonstrates a substantial factual basis that the reproductive health care was not lawful under the specific circumstances in which it was provided.

(D) Scope. For the purposes of this subpart, seeking, obtaining, providing, or facilitating reproductive health care includes, but is not limited to, any of the following: expressing interest in, using, performing, furnishing, paying for, disseminating information about, arranging, insuring, administering, authorizing, providing coverage for, approving, counseling about, assisting, or otherwise taking action to engage in reproductive health care; or attempting any of the same.

 * * * * *

(g) * * *

(5) Implementation specification: Abuse, neglect, endangerment situations. Notwithstanding a State law or any requirement of this paragraph to the contrary, a covered entity may elect not to treat a person as the personal representative, provided that the conditions at paragraphs (g)(5)(i) and (ii) of this section are met:

(i) Paragraphs (g)(5)(i)(A) and (B) of this section both apply.

(A) The covered entity has a reasonable belief that any of the following is true:

(1) The individual has been or may be subjected to domestic violence, abuse, or neglect by such person.

(2) Treating such person as the personal representative could endanger the individual.

(B) The covered entity, in the exercise of professional judgment, decides that it is not in the best interest of the individual to treat the person as the individual's personal representative.

(ii) The covered entity does not have a reasonable belief under paragraph (g)(5)(i)(A) of this section if the basis for their belief is the provision or facilitation of reproductive health care by such person for and at the request of the individual.

 * * * * *45 CFR § 164.509

5. Add § 164.509 to read as follows:

 45 CFR § 164.509

## § 164.509 Uses and disclosures for which an attestation is required.

(a) Standard: Attestations for certain uses and disclosures of protected health information to persons other than covered entities or business associates. (1) A covered entity or business associate may not use or disclose protected health information potentially related to reproductive health care for purposes specified in § 164.512(d), (e), (f), or (g)(1), without obtaining an attestation that is valid under paragraph (b)(1) of this section from the person requesting the use or disclosure and complying with all applicable conditions of this part.

(2) A covered entity or business associate that uses or discloses protected health information potentially related to reproductive health care for purposes specified in § 164.512(d), (e), (f), or (g)(1), in reliance on an attestation that is defective under paragraph (b)(2) of this section, is not in compliance with this section.

(b) Implementation specifications: General requirements—(1) Valid attestations. (i) A valid attestation is a document that meets the requirements of paragraph (c)(1) of this section.

(ii) A valid attestation verifies that the use or disclosure is not otherwise prohibited by § 164.502(a)(5)(iii).

(iii) A valid attestation may be electronic, provided that it meets the requirements in paragraph (c)(1) of this section, as applicable.

(2) Defective attestations. An attestation is not valid if the document submitted has any of the following defects:

(i) The attestation lacks an element or statement required by paragraph (c) of this section.

(ii) The attestation contains an element or statement not required by paragraph (c) of this section

(iii) The attestation violates paragraph (b)(3) of this section.

 **33064**  (iv) The covered entity or business associate has actual knowledge that material information in the attestation is false.

(v) A reasonable covered entity or business associate in the same position would not believe that the attestation is true with respect to the requirement at paragraph (c)(1)(iv) of this section.

(3) Compound attestation. An attestation may not be combined with any other document except where such other document is needed to satisfy the requirements at paragraph (c)(iv) of this section or at § 164.502(a)(5)(iii)(C), as applicable.

(c) Implementation specifications: Content requirements and other obligations—(1) Required elements. A valid attestation under this section must contain the following elements:

(i) A description of the information requested that identifies the information in a specific fashion, including one of the following:

(A) The name of any individual(s) whose protected health information is sought, if practicable.

(B) If including the name(s) of any individual(s) whose protected health information is sought is not practicable, a description of the class of individuals whose protected health information is sought.

(ii) The name or other specific identification of the person(s), or class of persons, who are requested to make the use or disclosure.

(iii) The name or other specific identification of the person(s), or class of persons, to whom the covered entity is to make the requested use or disclosure.

(iv) A clear statement that the use or disclosure is not for a purpose prohibited under § 164.502(a)(5)(iii).

(v) A statement that a person may be subject to criminal penalties pursuant to 42 U.S.C. 1320d-6 if that person knowingly and in violation of HIPAA obtains individually identifiable health information relating to an individual or discloses individually identifiable health information to another person.

(vi) Signature of the person requesting the protected health information, which may be an electronic signature, and date. If the attestation is signed by a representative of the person requesting the information, a description of such representative's authority to act for the person must also be provided.

(2) Plain language requirement. The attestation must be written in plain language.

(d) Material misrepresentations. If, during the course of using or disclosing protected health information in reasonable reliance on a facially valid attestation, a covered entity or business associate discovers information reasonably showing that any representation made in the attestation was materially false, leading to a use or disclosure for a purpose prohibited under § 164.502(a)(5)(iii), the covered entity or business associate must cease such use or disclosure.

* * * * * 45 CFR § 164.512

6. Amend § 164.512 by:

a. Revising the introductory text and the paragraph (c) paragraph heading;

b. Adding paragraph (c)(3); and

c. Revising paragraph (f)(1)(ii)(C) introductory text.

The revisions and addition read as follows:

45 CFR § 164.512

**§ 164.512 Uses and disclosures for which an authorization or opportunity to agree or object is not required.**

Except as provided by § 164.502(a)(5)(iii), a covered entity may use or disclose protected health information without the written authorization of the individual, as described in § 164.508, or the opportunity for the individual to agree or object as described in § 164.510, in the situations covered by this section, subject to the applicable requirements of this section and § 164.509. When the covered entity is required by this section to inform the individual of, or when the individual may agree to, a use or disclosure permitted by this section, the covered entity's information and the individual's agreement may be given verbally.

* * * * *

(c) Standard: Disclosures about victims of abuse, neglect, or domestic violence—* * *

(3) Rule of construction. Nothing in this section shall be construed to permit disclosures prohibited by § 164.502(a)(5)(iii) when the sole basis of the report of abuse, neglect, or domestic violence is the provision or facilitation of reproductive health care.

* * * * *

(f) * * *

(1) * * *

(ii) * * *

(C) An administrative request for which response is required by law, including an administrative subpoena or summons, a civil or an authorized investigative demand, or similar process authorized under law, provided that:

* * * * *45 CFR § 164.520

7. Amend § 164.520 by:

a. Revising and republish paragraphs (a) and (b); and

b. Adding paragraph (d)(4).

The revisions and additions read as follows:

 45 CFR § 164.520

**§ 164.520 Notice of privacy practices for protected health information.**

* * * * *

(a) Standard: Notice of privacy practices—(1) Right to notice. Except as provided by paragraph (a)(3) or (4) of this section, an individual has a right to adequate notice of the uses and disclosures of protected health information that may be made by the covered entity, and of the individual's rights and the covered entity's legal duties with respect to protected health information.

(2) Notice requirements for covered entities creating or maintaining records subject to 42 U.S.C. 290dd-2. As provided in 42 CFR 2.22, an individual who is the subject of records protected under 42 CFR part 2 has a right to adequate notice of the uses and disclosures of such records, and of the individual's rights and the covered entity's legal duties with respect to such records.

(3) Exception for group health plans. (i) An individual enrolled in a group health plan has a right to notice:

(A) From the group health plan, if, and to the extent that, such an individual does not receive health benefits under the group health plan through an insurance contract with a health insurance issuer or HMO; or

(B) From the health insurance issuer or HMO with respect to the group health plan through which such individuals receive their health benefits under the group health plan.

(ii) A group health plan that provides health benefits solely through an insurance contract with a health insurance issuer or HMO, and that creates or receives protected health information in addition to summary health information as defined in § 164.504(a)

or information on whether the individual is participating in the group health plan, or is enrolled in or has disenrolled from a health insurance issuer or HMO offered by the plan, must:

(A) Maintain a notice under this section; and

(B) Provide such notice upon request to any person. The provisions of paragraph (c)(1) of this section do not apply to such group health plan.

(iii) A group health plan that provides health benefits solely through an insurance contract with a health insurance issuer or HMO, and does not create or receive protected health information other than summary health information as defined in § 164.504(a) or information on whether an individual is participating in the group health plan, or is enrolled in or has disenrolled from a health insurance issuer or HMO **\*33065** offered by the plan, is not required to maintain or provide a notice under this section.

(4) Exception for inmates. An inmate does not have a right to notice under this section, and the requirements of this section do not apply to a correctional institution that is a covered entity.

(b) Implementation specifications: Content of notice—(1) Required elements. The covered entity, including any covered entity receiving or maintaining records subject to 42 U.S.C. 290dd-2, must provide a notice that is written in plain language and that contains the elements required by this paragraph.

(i) Header. The notice must contain the following statement as a header or otherwise prominently displayed:

"THIS NOTICE DESCRIBES HOW MEDICAL INFORMATION ABOUT YOU MAY BE USED AND DISCLOSED AND HOW YOU CAN GET ACCESS TO THIS INFORMATION. PLEASE REVIEW IT CAREFULLY."

(ii) Uses and disclosures. The notice must contain:

(A) A description, including at least one example, of the types of uses and disclosures that the covered entity is permitted by this subpart to make for each of the following purposes: treatment, payment, and health care operations.

(B) A description of each of the other purposes for which the covered entity is permitted or required by this subpart to use or disclose protected health information without the individual's written authorization.

(C) If a use or disclosure for any purpose described in paragraphs (b)(1)(ii)(A) or (B) of this section is prohibited or materially limited by other applicable law, such as 42 CFR part 2, the description of such use or disclosure must reflect the more stringent law as defined in § 160.202 of this subchapter.

(D) For each purpose described in paragraph (b)(1)(ii)(A) or (B) of this section, the description must include sufficient detail to place the individual on notice of the uses and disclosures that are permitted or required by this subpart and other applicable law, such as 42 CFR part 2.

(E) A description of the types of uses and disclosures that require an authorization under § 164.508(a)(2)-(a)(4), a statement that other uses and disclosures not described in the notice will be made only with the individual's written authorization, and a statement that the individual may revoke an authorization as provided by § 164.508(b)(5).

(F) A description, including at least one example, of the types of uses and disclosures prohibited under § 164.502(a)(5)(iii) in sufficient detail for an individual to understand the prohibition.

(G) A description, including at least one example, of the types of uses and disclosures for which an attestation is required under § 164.509.

(H) A statement adequate to put the individual on notice of the potential for information disclosed pursuant to this subpart to be subject to redisclosure by the recipient and no longer protected by this subpart

(iii) Separate statements for certain uses or disclosures. If the covered entity intends to engage in any of the following activities, the description required by paragraph (b)(1)(ii)(A) or (B) of this section must include a separate statement informing the individual of such activities, as applicable:

(A) In accordance with § 164.514(f)(1), the covered entity may contact the individual to raise funds for the covered entity and the individual has a right to opt out of receiving such communications;

(B) In accordance with § 164.504(f), the group health plan, or a health insurance issuer or HMO with respect to a group health plan, may disclose protected health information to the sponsor of the plan;

(C) If a covered entity that is a health plan, excluding an issuer of a long-term care policy falling within paragraph (1)(viii) of the definition of health plan, intends to use or disclose protected health information for underwriting purposes, a statement that the covered entity is prohibited from using or disclosing protected health information that is genetic information of an individual for such purposes;

(D) Substance use disorder treatment records received from programs subject to 42 CFR part 2, or testimony relaying the content of such records, shall not be used or disclosed in civil, criminal, administrative, or legislative proceedings against the individual unless based on written consent, or a court order after notice and an opportunity to be heard is provided to the individual or the holder of the record, as provided in 42 CFR part 2. A court order authorizing use or disclosure must be accompanied by a subpoena or other legal requirement compelling disclosure before the requested record is used or disclosed; or

(E) If a covered entity that creates or maintains records subject to 42 CFR part 2 intends to use or disclose such records for fundraising for the benefit of the covered entity, the individual must first be provided with a clear and conspicuous opportunity to elect not to receive any fundraising communications.

(iv) Individual rights. The notice must contain a statement of the individual's rights with respect to protected health information and a brief description of how the individual may exercise these rights, as follows:

(A) The right to request restrictions on certain uses and disclosures of protected health information as provided by § 164.522(a), including a statement that the covered entity is not required to agree to a requested restriction, except in case of a disclosure restricted under § 164.522(a)(1)(vi);

(B) The right to receive confidential communications of protected health information as provided by § 164.522(b), as applicable;

(C) The right to inspect and copy protected health information as provided by § 164.524;

(D) The right to amend protected health information as provided by § 164.526;

(E) The right to receive an accounting of disclosures of protected health information as provided by § 164.528; and

(F) The right of an individual, including an individual who has agreed to receive the notice electronically in accordance with paragraph (c)(3) of this section, to obtain a paper copy of the notice from the covered entity upon request.

(v) Covered entity's duties. The notice must contain:

(A) A statement that the covered entity is required by law to maintain the privacy of protected health information, to provide individuals with notice of its legal duties and privacy practices, and to notify affected individuals following a breach of unsecured protected health information;

(B) A statement that the covered entity is required to abide by the terms of the notice currently in effect; and

(C) For the covered entity to apply a change in a privacy practice that is described in the notice to protected health information that the covered entity created or received prior to issuing a revised notice, in accordance with § 164.530(i)(2)(ii), a statement that it reserves the right to change the terms of its notice and to make the new notice provisions effective for all protected health information that it maintains. The statement must also describe how it will provide individuals with a revised notice.

(vi) Complaints. The notice must contain a statement that individuals may complain to the covered entity and **\*33066** to the Secretary if they believe their privacy rights have been violated, a brief description of how the individual may file a complaint with the covered entity, and a statement that the individual will not be retaliated against for filing a complaint.

(vii) Contact. The notice must contain the name, or title, and telephone number of a person or office to contact for further information as required by § 164.530(a)(1)(ii).

(viii) Effective date. The notice must contain the date on which the notice is first in effect, which may not be earlier than the date on which the notice is printed or otherwise published.

(2) Optional elements. (i) In addition to the information required by paragraph (b)(1) of this section, if a covered entity elects to limit the uses or disclosures that it is permitted to make under this subpart, the covered entity may describe its more limited uses or disclosures in its notice, provided that the covered entity may not include in its notice a limitation affecting its right to make a use or disclosure that is required by law or permitted by § 164.512(j)(1)(i).

(ii) For the covered entity to apply a change in its more limited uses and disclosures to protected health information created or received prior to issuing a revised notice, in accordance with § 164.530(i)(2)(ii), the notice must include the statements required by paragraph (b)(1)(v)(C) of this section.

(3) Revisions to the notice. The covered entity must promptly revise and distribute its notice whenever there is a material change to the uses or disclosures, the individual's rights, the covered entity's legal duties, or other privacy practices stated in the notice. Except when required by law, a material change to any term of the notice may not be implemented prior to the effective date of the notice in which such material change is reflected.

\* \* \* \* \*

(d) \* \* \*

\* \* \* \* \*

(4) The permission in paragraph (d) of this section for covered entities that participate in an organized health care arrangement to issue a joint notice may not be construed to remove any obligations or duties of entities creating or maintaining records subject to 42 U.S.C. 290dd–2, or to remove any rights of patients who are the subjects of such records.

\* \* \* \* \*45 CFR § 164.535

8. Add § 164.535 to read as follows:

45 CFR § 164.535

## § 164.535 Severability.

If any provision of the HIPAA Privacy Rule to Support Reproductive Health Care Privacy is held to be invalid or unenforceable facially, or as applied to any person, plaintiff, or circumstance, it shall be construed to give maximum effect to the provision permitted by law, unless such holding shall be one of utter invalidity or unenforceability, in which case the provision shall

be severable from this part and shall not affect the remainder thereof or the application of the provision to other persons not similarly situated or to other dissimilar circumstances.

\* \* \* \* \*

Xavier Becerra,

Secretary, Department of Health and Human Services.

[FR Doc. 2024-08503 Filed 4-22-24; 4:15 pm]

BILLING CODE 4153-01-P

### Footnotes

1    Subtitle F of title II of HIPAA (Pub. L. 104-191, 110 Stat. 1936 (Aug. 21, 1996)) added a new part C to title XI of the Social Security Act of 1935 (SSA), Public Law 74-271, 49 Stat. 620 (Aug. 14, 1935), (see sections 1171-1179 of the SSA (codified at 42 U.S.C. 1320d-1320d-8)), as well as promulgating section 264 of HIPAA (codified at 42 U.S.C. 1320d-2 note), which authorizes the Secretary to promulgate regulations with respect to the privacy of individually identifiable health information. The Privacy Rule has subsequently been amended pursuant to the Genetic Information Nondiscrimination Act of 2008 (GINA), title I, section 105, Public Law 110-233, 122 Stat. 881 (May 21, 2008) (codified at 42 U.S.C. 2000ff), and the Health Information Technology for Economic and Clinical Health (HITECH) Act of 2009, Public Law 111-5, 123 Stat. 226 (Feb. 17, 2009) (codified at 42 U.S.C. 1390w-4(O)(2)).

2    45 CFR parts 160 and 164, subparts A and E. For a history of the Privacy Rule, see infra Section II.B., "Regulatory History."

3    See also the HIPAA Security Rule, 45 CFR parts 160 and 164, subparts A and C; the HIPAA Breach Notification Rule, 45 CFR part 164, subpart D; and the HIPAA Enforcement Rule, 45 CFR part 160, subparts C, D, and E.

4    45 CFR 160.103 (definition of "Protected health information").

5    42 U.S.C. 1320d. See also 45 CFR 160.103 (definition of "Individually identifiable health information").

6    At times throughout this final rule, the Department uses the terms "health information" or "individuals' health information" to refer generically to health information pertaining to an individual or individuals. In contrast, the Department's use of the term "IIHI" refers to a category of health information defined in HIPAA, and "PHI" is used to refer specifically to a category of IIHI that is defined by and subject to the privacy and security standards promulgated in the HIPAA Rules.

7    See 45 CFR 164.502(2) and (4).

8    See 45 CFR 164.512(i) and 164.502(a)(5)(ii).

9    See 45 CFR 164.501 and 164.508(a)(2).

10    Section 1174(b)(1) of Public Law 104-191 (codified at 42 U.S.C. 1320d-3).

11    597 U.S. 215 (2022).

12    See Melissa Suran, "Treating Cancer in Pregnant Patients After Roe v Wade Overturned," JAMA (Sept. 29, 2022), https://jamanetwork-com.hhsnih.idm.oclc.org/journals/jama/fullarticle/2797062?resultClick=1 and Rita Rubin, "How Abortion Bans Could Affect Care for Miscarriage and Infertility," JAMA (June 28, 2022), https://jamanetwork-com.hhsnih.idm.oclc.org/journals/jama/fullarticle/2793921?resultClick=1.

13    See infra National Committee on Vital and Health Statistics (NCVHS) discussion, Section II.A.1., expressing concern for harm caused by disclosing identifiable health information for non-health care purposes.

14    See Whitney S. Rice et al. " 'Post-Roe' Abortion Policy Context Heightens Imperative for Multilevel, Comprehensive, Integrated Health Education," (Sept. 29, 2022), https://journals.sagepub.com/doi/full/10.1177/10901981221125399 ("New ethical and legal complexities around patient counseling are emerging, particularly in states limiting or eliminating abortion access, due to more extreme abortion restrictions. Clinicians in such contexts may be forced to adhere to legal requirements of states which run counter to well-being and desires of patients, violating the medical principles of beneficence and respect for patient autonomy").

15    88 FR 23506 (Apr. 17, 2023).

16    See 65 FR 67249 (Nov. 11, 2000). See also Presidential Memorandum on Tribal Consultation and Strengthening Nation-to-Nation Relationships (Jan. 26, 2021), https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/26/memorandum-on-tribal-consultation-and-strengthening-nation-to-nation-relationships/ and Dep't of Health and Human Servs., Tribal Consultation Policy, https://www.hhs.gov/sites/default/files/iea/tribal/tribalconsultation/hhs-consultation-policy.pdf. See also 88 FR 23506 (Apr. 17, 2023) (notice of Tribal consultation). The Department consulted with representatives of Tribal Nations on May 17, 2023. During the consultation, the representatives raised issues of health inequities and privacy of health information, specifically among American Indians and Alaskan Natives after Dobbs.

17    Letter from U.S. Senator Tammy Baldwin et al. to HHS Sec'y Xavier Becerra (Mar. 7, 2023) (addressing HIPAA privacy regulations and Dobbs v. Jackson Women's Health Organization). Letter from U.S. Senator Patty Murray et al. to HHS Sec'y Xavier Becerra (Sept. 13, 2022) (addressing HIPAA privacy regulations and Dobbs v. Jackson Women's Health Organization). Letter from U.S. Representative Earl Blumenauer et al. to HHS Sec'y Xavier Becerra (Aug. 30, 2022) (addressing HIPAA privacy regulations and Dobbs v. Jackson Women's Health Organization). Letter from U.S. Senator Michael F. Bennet et al. to HHS Sec'y Xavier Becerra (July 1, 2022) (addressing HIPAA privacy regulations and Dobbs v. Jackson Women's Health Organization).

18    See 88 FR 23506, 23510 (Apr. 17, 2023).

19    See id.

20    45 CFR 160.104(a).

21    45 CFR 160.104(c)(2).

22    87 FR 74216 (Dec. 2, 2022).

23    Public Law 116-136, 134 Stat. 281 (Mar. 27, 2020).

24    89 FR 12472 (Feb. 16, 2024).

25    Id. at 12482, 12528, and 12530.

26    Id. at 12482, 12528, and 12530.

27    89 FR 12472 (Feb. 16, 2024).

28   Public Law 104-191, 110 Stat. 1936 (Aug. 21, 1996).

29   See H.R. Rep. No. 104-496, at 66-67 (1996).

30   42 U.S.C. 1320d note (Statutory Notes and Related Subsidiaries: Purpose). Subtitle F also amended related provisions of the SSA.

31   See section 262 of Public Law 104-191, adding section 1172 to the SSA (codified at 42 U.S.C. 1320d-1). See also section 13404 of the American Recovery and Reinvestment Act of 2009, Public Law 111-5, 123 Stat. 115 (Feb. 17, 2009) (codified at 42 U.S.C. 17934) (applying privacy provisions and penalties to business associates of covered entities).

32   42 U.S.C. 1320d2(a)(1).

33   42 U.S.C. 1320d-2(b)(1).

34   42 U.S.C. 1320d-2(a), (c), and (f).

35   42 U.S.C. 1320d-2(d).

36   42 U.S.C. 1320d-2(e).

37   On a resolution waiving points of order against the Conference Report to H.R. 3103, members debated an "erosion of privacy" balanced against the administrative simplification provisions. Thus, from HIPAA's inception, privacy has been a central concern to be addressed as legislative changes eased disclosures of PHI. See 142 Cong. Rec. H9777 and H9780; see also H.R. Rep. No. 104-736, at 177 and 264 (1996); 142 Cong. Rec. H9780 (daily ed. Aug. 1, 1996) (statement of Rep. Sawyer); 142 Cong. Rec. H9792 (daily ed. Aug. 1, 1996) (statement of Rep. McDermott); and 142 Cong. Rec. S9515-16 (daily ed. Aug. 2, 1996) (statement of Sen. Simon).

38   88 FR 23506, 23511 (Apr. 17, 2023).

39   See statement of Rep. Sawyer, supra note 37. See also statement of Sen. Simon, supra note 37.

40   Statement of Rep. Sawyer, supra note 37.

41   See H.R. Rep. No. 104-496 Part 1, at 99-100 (Mar. 25, 1996).

42   42 U.S.C. 1320d-2 note.

43   Id.

44   Id.

45   42 U.S.C. 1320d-7.

46   65 FR 82580 (the exception applies under section 1178(a)(2)(B) of the SSA and section 264(c)(2) of HIPAA).

47   NCVHS serves as the Secretary's statutory public advisory body for health data, statistics, privacy, and national health information policy and HIPAA. NCVHS also advises the Secretary, "reports regularly to Congress on HIPAA implementation, and serves as a forum for interaction between HHS and interested private sector groups on a range of health data issues." Nat'l Comm. On Vital and Health Statistics, "About NCVHS," https://ncvhs.hhs.gov/; see also "NCVHS 60th Anniversary Symposium and History," U.S. Dep't of Health and Human Servs., at 28-29 (Feb. 2011), https://ncvhs.hhs.gov/wp-content/uploads/2014/05/60_years_of_difference.pdf.

48   See section 264(a) and (d) of Public Law 104-191 (codified at 42 U.S.C. 1320d-2 note).

49    Letter from NCVHS Chair Don E. Detmer to HHS Sec'y Donna E. Shalala (June 27, 1997) (forwarding NCVHS recommendations), https://ncvhs.hhs.gov/rrp/june-27-1997-letter-to-the-secretary-with-recommendations-on-health-privacy-and-confidentiality/.

50    Id. at Principal Findings and Recommendations.

51    Id.

52    Id. at Third-Party Disclosures.

53    88 FR 23506, 23513 (Apr. 17, 2023).

54    See section 1174(b)(1) of Public Law 104-191 (codified at 42 U.S.C. 1320d-3).

55    Section 1102 of the SSA (codified at 42 U.S.C. 1302).

56    Title XIII of Division A and Title IV of Division B of the American Recovery and Reinvestment Act of 2009, Public Law 111-5, 123 Stat. 115 (Feb. 17, 2009) (codified at 42 U.S.C. 201 note).

57    C. Stephen Redhead, Cong. Rsch. Serv., R40161, "The Health Information Technology for Economic and Clinical Health (HITECH) Act," (2009), https://crsreports.congress.gov/product/pdf/R/R40161/9 ("[Health IT], which generally refers to the use of computer applications in medical practice, is widely viewed as a necessary and vital component of health care reform.").

58    H.R. Rep. No. 111-7, at 74 (2009), accompanying H.R. 629, 111th Cong.

59    H.R. 629, Energy and Commerce Recovery and Reinvestment Act of 2009, introduced in the House on January 22, 2009, contained nearly identical provisions to subtitle D of the HITECH Act.

60    Congress enacted the American Recovery and Reinvestment Act of 2009, which included the HITECH Act, on February 17, 2009. While it was the House version of the bill, H.R. 1, that was enacted, the Senate version, S. 336, contained nearly identical provisions to subtitle D of the HITECH Act.

61    S. Rep. No. 111-3 accompanying S. 336, 111th Cong., at 59 (2009).

62    78 FR 5566 (Jan. 25, 2013).

63    Subtitle D of title XIII of the HITECH Act (codified at 42 U.S.C. 17921, 42 U.S.C. 17931-17941, and 42 U.S.C. 17951-17953).

64    78 FR 5566, 5568 (Jan. 25, 2013).

65    Section 3009(a)(1)(B) of the PHSA, as added by section 13101 of the HITECH Act (codified at 42 U.S.C. 300jj-19(a)(1)).

66    Section 13421(b) of the HITECH Act (codified at 42 U.S.C. 17951).

67    Section 3009(a)(1)(A) of the PHSA, as added by section 13101 of the HITECH Act (codified at 42 U.S.C. 300jj-19(a)(1)).

68    See U.S. Dep't of Health and Hum. Servs., Off. of the Sec'y, Off. for Civil Rights; Statement of Delegation of Authority, 65 FR 82381 (Dec. 28, 2000); U.S. Dep't of Health and Hum. Servs., Off. of the Sec'y, Off. for Civil Rights; Delegation of Authority, 74 FR 38630 (Aug. 4, 2009); U.S. Dep't of Health and Hum. Servs., Off. of the Sec'y, Statement of Organization, Functions and Delegations of Authority, 81 FR 95622 (Dec. 28, 2016).

69    See 78 FR 5566 (Jan. 25, 2013); 79 FR 7290 (Feb. 6, 2014); 81 FR 382 (Jan. 6, 2016).

70    See U.S. Dep't of Health and Hum. Servs., Off. of the Assistant Sec'y for Plan. and Evaluation, "Recommendations of the Secretary of Health and Human Services, pursuant to section 264 of the Health Insurance Portability and Accountability Act of 1996," Section I.A. (Sept. 1997), https://aspe.hhs.gov/reports/confidentiality-individually-identifiable-health-information.

71    64 FR 59918 (Nov. 3, 1999).

72    65 FR 82462 (Dec. 28, 2000).

73    Id.

74    See Executive Order 13181 (Dec. 20, 2000), 65 FR 81321.

75    See 65 FR 82462, 82471 (Dec. 28, 2000).

76    See id. at 82472.

77    See id.

78    65 FR 82462 (Dec. 28, 2000).

79    45 CFR 164.506 was originally titled "Consent for uses or disclosures to carry out treatment, payment, or health care operations."

80    45 CFR 164.508.

81    45 CFR 164.510.

82    45 CFR 164.512.

83    See 64 FR 59918, 59955 (Nov. 3, 1999).

84    See 45 CFR 164.520, 164.522, 164.524, 164.526, and 164.528.

85    See 65 FR 82462, 82800 (Dec. 28, 2000).

86    See 67 FR 53182 (Aug. 14, 2002).

87    78 FR 5566 (Jan. 25, 2013).

88    81 FR 382 (Jan. 6, 2016).

89    66 FR 12738 (Feb. 28, 2001).

90    67 FR 53182, 53183 (Aug. 14, 2002).

91    67 FR 14775 (Mar. 27, 2002).

92    67 FR 53182 (Aug. 14, 2002). See the final rule for changes in the entirety. The 2002 Privacy Rule was issued before the compliance date for the 2000 Privacy Rule. Thus, covered entities never implemented the 2000 Privacy Rule. Instead, they implemented the 2000 Privacy Rule as modified by the 2002 Privacy Rule.

93    See 67 FR 53182 (Aug. 14, 2002).

94    75 FR 40868 (July 14, 2010).

95    78 FR 5566 (Jan. 25, 2013). In addition to finalizing requirements of the HITECH Act that were proposed in the 2010 NPRM, the Department adopted modifications to the Enforcement Rule not previously adopted in an earlier interim final rule, 74 FR 56123 (Oct. 30, 2009), and to the Breach Notification Rule not previously adopted in an interim final rule, 74 FR 42739 (Aug. 24, 2009). The Department also finalized previously proposed Privacy Rule modifications as required by GINA, 74 FR 51698 (Oct. 7, 2009).

96    See 78 FR 5566 (Jan. 25, 2013) (explaining that the Department was using its general authority under HIPAA to make a number of changes to the Privacy Rule that were intended to increase workability and flexibility, decrease burden, and better harmonize the requirements with those under other Departmental regulations). The Department's general authority to modify the Privacy Rule is codified in HIPAA section 264(c), and OCR conducts rulemaking under HIPAA based on authority granted by the Secretary.

97    See 75 FR 40868, 40871 (July 14, 2010).

98    75 FR 40868, 40871 (July 14, 2010).

99    See 78 FR 5566, 5611 (Jan. 25, 2013).

100    See id. at 5612.

101    Id. at 5616-17. See also 45 CFR 164.512(b)(1).

102    78 FR 5566, 5614 (Jan. 25, 2013). See also 45 CFR 164.502(f) and the definition of "Protected health information" at 45 CFR 160.103, excluding IIHI regarding a person who has been deceased for more than 50 years.

103    In addition to the rulemakings discussed here, the Department has modified the Privacy Rule for workability purposes and in response to changes in circumstances on two other occasions, and it issued another notice of proposed rulemaking in 2021 for the same reasons. See 79 FR 7289 (Feb. 6, 2014), 81 FR 382 (Jan. 6, 2016), and 86 FR 6446 (Jan. 21, 2021).

104    See Letter from NCVHS Chair Simon P. Cohn to HHS Sec'y Michael O. Leavitt (June 22, 2006), https://ncvhs.hhs.gov/rrp/june-22-2006-letter-to-the-secretary-recommendations-regarding-privacy-and-confidentiality-in-the-nationwide-health-information-network/; Letter from NCVHS Chair Simon P. Cohn to HHS Sec'y Michael O. Leavitt (Feb. 20, 2008) (listing categories of health information that are commonly considered to contain sensitive information), https://ncvhs.hhs.gov/wp-content/uploads/2014/05/080220lt.pdf; Letter from NCVHS Chair Justine M. Carr to HHS Sec'y Kathleen Sebelius (Nov. 10, 2010) (forwarding NCVHS recommendations), https://ncvhs.hhs.gov/wp-content/uploads/2014/05/101110lt.pdf.

105    88 FR 23506.

106    See Meeting of NCVHS (June 14, 2023), https://ncvhs.hhs.gov/meetings/full-committee-meeting-13/.

107    See Meeting of NCVHS, Briefing on Legislative Developments in Data Privacy (July 21, 2022), https://ncvhs.hhs.gov/meetings/full-committee-meeting-11/.

108    See Meeting of NCVHS, Briefing by Cason Schmit (Dec. 7, 2022), https://ncvhs.hhs.gov/meetings/full-committee-meeting-12/.

109    Letter from NCVHS Chair Jacki Monson to HHS Sec'y Xavier Becerra (June 14, 2023) (forwarding NCVHS recommendations), https://ncvhs.hhs.gov/wp-content/uploads/2023/06/NCVHS-Comments-on-HIPAA-Reproduction-Health-NPRM-Final-508.pdf.

110    See Jennifer Richmond et al., "Development and Validation of the Trust in My Doctor, Trust in Doctors in General, and Trust in the Health Care Team Scales," 298 Social Science & Medicine 114827 (2022), https://www.sciencedirect.com/science/article/abs/pii/S0277953622001332?via%3Dihub; see also Fallon E. Chipidza et al., "Impact of the Doctor-Patient Relationship," The Primary Care Companion for CNS Disorders (Oct. 2015), https://www.psychiatrist.com/pcc/delivery/patient-physician-communication/impact-doctor-patient-relationship/. See Testimony (transcribed) of William G. Plested, III, M.D., Member, Board of Trustees, American Medical Association, Hearing on Confidentiality of Patient Medical Records before House of Representatives Committee on Ways and Means, Subcommittee on Health (Feb. 17, 2000), https://www.govinfo.gov/content/pkg/CHRG-106hhrg66897/html/CHRG-106hhrg66897.htm. ("Trust is the foundation of the patient/physician relationship.")

111    See Am. Med. Ass'n, "Patient Perspectives Around Data Privacy," (2022), https://www.ama-assn.org/system/files/ama-patient-data-privacy-survey-results.pdf.

112    See John C. Moskop et al., "From Hippocrates to HIPAA: Privacy and Confidentiality in Emergency Medicine—Part I: Conceptual, Moral, and Legal Foundations," 45 Ann Emerg. Med.1 (Jan. 2005) (quoting the Oath of Hippocrates, "What I may see or hear in the course of the treatment or even outside of the treatment in regard to the life of men, which on no account one must spread abroad, I will keep to myself [. . .]."), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7132445/#bib1.

113    See 64 FR 59918, 60006 (Nov. 3, 1999) (In the 1999 Privacy Rule NPRM, the Department discussed confidentiality as an important component of trust between individuals and health care providers and cited a 1994 consumer privacy survey that indicated that a lack of privacy may deter patients from obtaining preventive care and treatment.). See id. at 60019.

114    See 64 FR 59918, 60006 (Nov. 3, 1999).

115    See "Patient Perspectives Around Data Privacy," supra note 111.

116    Id. at 2.

117    See Testimony (transcribed) of Peter R. Orszag, Director, Congressional Budget Office, Hearing on Comparative Clinical Effectiveness before House of Representatives Committee on Ways and Means, Subcommittee on Health, 2007 WL 1686358 (June 12, 2007) ("because federal health insurance programs play a large role in financing medical care and represent a significant expenditure, the federal government itself has an interest in evaluations of the effectiveness of different health care approaches"); Statement of Sen. Durenberger introducing S.1836, American Health Quality Act of 1991 and reading bill text, 137 Cong. Rec. S26720 (Oct. 17, 1991) ("[T]he Federal Government has a demonstrated interest in assessing the quality of care, access to care, and the costs of care through the evaluative activities of several Federal agencies.").

118    See 65 FR 82462, 82463 (Dec. 28, 2000).

119    See, e.g., Brooke Rockwern et al., Medical Informatics Committee and Ethics, Professionalism and Human Rights Committee of the American College of Physicians, "Health Information Privacy, Protection, and Use in the Expanding Digital Health Ecosystem: A Position Paper of the American College of Physicians," 174 Ann Intern Med. 994 (Jul. 2021) (discussing the need for trust in the health care system as necessary to mitigate a global pandemic); Johanna Birkh[auml]uer et. al, "Trust in the Health Care Professional and Health Outcome: A Meta-Analysis," 12 PLoS One e0170988 (Feb. 7, 2017). See also Eric Boodman, "In a doctor's suspicion after a miscarriage, a glimpse of expanding medical mistrust," STAT News (June 29, 2022), https://www.statnews.com/2022/06/29/doctor-suspicion-after-miscarriage-glimpse-of-expanding-medical-mistrust/ (Sarah Prager, professor of obstetrics and gynecology at the University of Washington, stating that it is a bad precedent if clinical spaces become unsafe for patients because, "[a health care provider's] ability to take care of patients relies on trust, and that will be impossible moving forward.").

120    See "Development and Validation of the Trust in My Doctor, Trust in Doctors in General, and Trust in the Health Care Team Scales," supra note 110; Bradley E. Iott et al., "Trust and Privacy: How Patient Trust in Providers is Related to Privacy Behaviors and Attitudes," 2019 AMIA Annu Symp Proc 487 (Mar. 2020), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7153104/; Pamela Sankar et al., "Patient Perspectives of Medical Confidentiality: a Review of the Literature," 18 J. of Gen. Internal Med. 659 (Aug. 2003), https://pubmed.ncbi.nlm.nih.gov/12911650/.

121    See 65 FR 82462, 82468 (Dec. 28, 2000).

122    See Letter from NCVHS Chair Simon P. Cohn, supra note 104, at 2 (2006) (with forwarded NCVHS recommendations, "Individual trust in the privacy and confidentiality of their personal health information also promotes public health, because individuals with potentially contagious or communicable diseases are not inhibited from seeking treatment.").

123    See Texas Dep't of State Health Servs., "Texas Maternal Mortality and Morbidity Review Committee and Department of State Health Services Joint Biennial Report 2022," at 41 (Dec. 2022) https://www.dshs.texas.gov/sites/default/files/legislative/2022-Reports/2022-MMMRC-DSHS-Joint-Biennial-Report.pdf; Lynn M. Paltrow et al., "Arrests of and forced interventions on pregnant women in the United States, 1973-2005: implications for women's legal status and public health," 38 J. Health Pol. Pol'y Law 299 (2013) (finding that hospital staff are most likely to report pregnant low-income and patients of color, especially Black women, to the authorities.); Terri-ann Monique Thompson et al., "Racism Runs Through It: Examining the Sexual and Reproductive Health Experience of Black Women in the South," 41 Health Affairs 195 (Feb. 2022) (discussing how individual racism affects reproductive health care use by undermining the patient-doctor relationship), https://www.healthaffairs.org/doi/10.1377/hlthaff.2021.01422); Joli Hunt, "Maternal Mortality among Black Women in the United States," Ballard Brief (July 2021), https://ballardbrief.byu.edu/issue-briefs/maternal-mortality-among-black-women-in-the-united-states/ (discussing the disproportionately high rate of Black maternal mortality and morbidity); Austin Frakt, "Bad Medicine: The Harm that Comes from Racism," The New York Times (July 8, 2020), https://www.nytimes.com/2020/01/13/upshot/bad-medicine-the-harm-that-comes-from-racism.html.

124    42 U.S.C. 1320d note and 1320d-2 note.

125    See 67 FR 53182, 53216 (Aug. 14, 2002).

126    Id. at 53226.

127    65 FR 82462, 82464 (Dec. 28, 2000).

128    See 78 FR 5566, 5616 (Jan. 25, 2013).

129    81 FR 382 (Jan. 6, 2016); see, e.g., 78 FR 4297 (Jan. 22, 2013) and 78 FR 4295 (Jan. 22, 2013); see also Colleen Curtis, "President Obama Announces New Measures to Prevent Gun Violence," The White House President Barack Obama (Jan. 16, 2013), https://obamawhitehouse.archives.gov/blog/2013/01/16/president-obama-announces-new-measures-prevent-gun-violence.

130    This PHI includes limited demographic and certain other information needed for the purposes of reporting to NICS. 45 CFR 164.512(k)(7)(iii)(A). In preamble, the Department explained that generally the information described at 45 CFR 164.512(k)(7)(iii)(A) would be limited to the data elements required to create a NICS record and certain other elements to the extent that they are necessary to exclude false matches: Social Security number, State of residence, height, weight, place of birth, eye color, hair color, and race. 81 FR 382, 390 (Jan. 6, 2016).

131    81 FR 382, 386-388 (Jan. 6, 2016).

132    Id. The Department addressed concerns about the possible chilling effect on individuals seeking health care by explaining that (1) the permission is limited to only those covered entities that order the involuntary commitments or make the other adjudications that cause individuals to be subject to the Federal mental health prohibitor, or that serve as repositories of

such information for NICS reporting purposes; (2) the specified regulated entities are permitted to disclose NICS data only to designated repositories or the NICS; (3) the information that may be disclosed is limited to certain demographic or other information that is necessary for NICS reporting; and (4) the rulemaking did not expand the permission to encompass State law prohibitor information.

133    Letter from NCVHS Chair Don E. Detmer to HHS Sec'y Donna E. Shalala (June 27, 1997) (forwarding NCVHS recommendations), https://ncvhs.hhs.gov/rrp/june-27-1997-letter-to-the-secretary-with-recommendations-on-health-privacy-and-confidentiality/.

134    42 U.S.C. 1320d-2 note.

135    See 45 CFR 164.501 (definition of "Psychotherapy notes").

136    See 64 FR 59918, 59941 (Nov. 3, 1999).

137    See id.

138    45 CFR 164.508(a)(2).

139    Council on Ethical and Judicial Affairs, "Ethics, Amendment to Opinion 4.2.7, Abortion H-140.823," Am. Med. Ass'n (2022), https://policysearch.ama-assn.org/policyfinder/detail/`4.2.7Abortion`?uri=®AMADoc®HOD.xml-H-140.823.xml.

140    See Letter from NCVHS Chair Simon P. Cohn (2006), supra note 104.

141    See Letter from NCVHS Chair Simon P. Cohn (2006), supra note 104; Letter from NCVHS Chair Simon P. Cohn (2008), supra note 104; Letter from NCVHS Chair Justine M. Carr (2010), supra note 104.

142    See Letter from NCVHS Chair Justine M. Carr (2010), supra note 104.

143    See LePage v. Center for Reproductive Medicine, SC-2022-0515 (Feb. 16, 2024).

144    410 U.S. 113 (1973).

145    505 U.S. 833 (1992).

146    Dobbs, 597 U.S. 299-302.

147    See, e.g., Carmel Shachar et al., "Informational Privacy After Dobbs," 75 Ala. L. Rev. 1 (2023), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4570500 and Andrzej Kulczycki, "Dobbs: Navigating the New Quagmire and Its Impacts on Abortion and Reproductive Health Care," Health Education & Behavior (2022), https://doi.org/10.1177/10901981221125430.

148    See, e.g., Kayte Spector-Bagdady & Michelle M. Mello, "Protecting the Privacy of Reproductive Health Information After the Fall of Roe v. Wade," 3 JAMA Network e222656 (June 30, 2022), https://jamanetwork.com/journals/jama-health-forum/fullarticle/2794032; Lisa G. Gill, "What does the overturn of Roe v. Wade mean for you?," Consumer Reports (June 24, 2022), https://www.consumerreports.org/health-privacy/what-does-the-overturn-of-roe-v-wade-mean-for-you-a1957506408/.

149    45 CFR 164.502(a)(1).

150    45 CFR 164.512(a).

151  See Laura J. Faherty et al. "Consensus Guidelines and State Policies: The Gap Between Principle and Practice at the Intersection of Substance Use and Pregnancy," American Journal of Obstetrics & Gynecology Maternal-Fetal Medicine (Aug. 2020) (discussing a concern raised by multiple organizations that pregnant women will hesitate to seek prenatal care and addiction treatment during pregnancy because their concerns that disclosing substance use to health care providers will increase the likelihood that they will face legal penalties); see also "Informational Privacy After Dobbs," supra note 147.

152  See, e.g., Yvonne Lindgren et al., "Reclaiming Tort Law to Protect Reproductive Rights," 75 Alabama L. Rev. 355 (2023), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4435834.

153  See section 3001(c) of the PHSA, as amended by section 4003(b) of the 21st Century Cures Act, Public Law 114-255, 130 Stat. 1165 (codified at 42 U.S.C. 300jj-11(c)). For more information, see Office of the Nat'l Coordinator for Health Info. Tech., "Trusted Exchange Framework and Common Agreement (TEFCA)," https://www.healthit.gov/topic/interoperability/policy/trusted-exchange-framework-and-common-agreement-tefca; See also 89 FR 8758 (Feb. 8, 2024); "CMS Interoperability and Prior Authorization Final Rule CMS-0057-F," Centers for Medicare & Medicaid (Jan. 17, 2024), https://www.cms.gov/newsroom/fact-sheets/cms-interoperability-and-prior-authorization-final-rule-cms-0057-f.

154  See    Eric    Boodman,    "In    a    doctor's    suspicion    after    a    miscarriage, a    glimpse    of    expanding    medical    mistrust,"    STAT    News    (June    29, 2022),    https://www.statnews.com/2022/06/29/doctor-suspicion-after-miscarriage-glimpse-of-expanding-medical-mistrust/
#:#:text=Inadoctor'ssuspicionafter,glimpseofexpandingmedicalmistrust&text=Theideathatshe,usedcontraceptivesandtrustedthem.

155  See also Melissa Suran, "As Laws Restricting Health Care Surge, Some US Physicians Choose Between Fight or Flight," JAMA, 329(22):1899-1903 (May 17, 2023) (discussing a maternal-fetal medicine specialist who stated that she moved to another state because of legislation that restricts evidence-based health care and prevents her from fulfilling her ethical obligation to protect her patients' health.), https://pubmed.ncbi.nlm.nih.gov/37195699/.

156  See Off. for Civil Rights, "HHS Office for Civil Rights Resolves Complaints with CVS and Walgreens to Ensure Timely Access to Medications for Women and Support Persons with Disabilities," U.S. Dep't of Health and Human Servs. (June 16, 2023), https://www.hhs.gov/civil-rights/for-providers/compliance-enforcement/agreements/cvs-walgreens/index.html. See also Kathryn Starzyk et al., "More than half of patients with a rheumatic disease or immunologic condition undergoing methotrexate treatment reside in states in which the overturning of Roe v. Wade can jeopardize access to medications with abortifacient potential," 75 Arthritis Rheumatol 328 (Feb. 2023); see also Celine Castronuovo, "Many Female Arthritis Drug Users Face Restrictions After Dobbs," Bloomberg Law (Nov. 14, 2022) (noting that 16 out of 524 patients responding to a survey indicated that they've had trouble getting methotrexate, their arthritis medication, since the Dobbs decision.) https://news.bloomberglaw.com/health-law-and-business/many-female-arthritis-drug-users-face-restrictions-after-dobbs; Interview with Donald Miller, PharmD, "Methotrexate access becomes challenging for some patients following Supreme Court decision on abortion," Pharmacy Times (July 20, 2022), https://www.pharmacytimes.com/view/methotrexate-access-becomes-challenging-for-patients-following-supreme-court-decision-on-abortion; Jamie Ducharme, "Abortion restrictions may be making it harder for patients to get a cancer and arthritis drug," Time (July 6, 2022), https://time.com/6194179/abortion-restrictions-methotrexate-cancer-arthritis/; Katie Shepherd & Frances Stead Sellers, "Abortion bans complicate access to drugs for cancer, arthritis, even ulcers," The Washington Post (Aug. 8, 2022), https://www.washingtonpost.com/health/2022/08/08/abortion-bans-methotrexate-mifepristone-rheumatoid-arthritis/.

157  See Michelle Oberman & Lisa Soleymani Lehmann, "Doctors' duty to provide abortion information," J. of Law and Biosciences. (Sept. 1, 2023) https://www.ncbi.nlm.nih.gov/pmc/articles/PMC10474560/; Whitney Arey et al., "Abortion Access and Medically Complex Pregnancies Before and After Texas Senate Bill 8," 141 Obstet Gynecol. 995 (May 1, 2023) (concluding that "Abortion restrictions limit shared decision making, compromise patient care, and

put pregnant people's health at risk."); "1 Year Without Roe," Center for American Progress (Jun. 23, 2023) (where a physician detailed her fear about speaking freely with her patients after Dobbs "worried a vigilante posing as a new patient would attempt to bait her into talking about abortion and attempt to sue her, and she sometimes skirts the topic of abortion when speaking with patients about their health care options.")

158    See Christine Dehlendorf et al., "Disparities in Abortion Rates: A Public Health Approach," Am. J. of Pub. Health (Oct. 2013), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3780732/. See also Kiara Alfonseca, "Why Abortion Restrictions Disproportionately Impact People of Color," ABC News (June 24, 2022), https://abcnews.go.com/ Health/abortion-restrictions-disproportionately-impact-people-color/story?id=84467809; Dulce Gonzalez et al., Robert Wood Johnson Foundation, "Perceptions of Discrimination and Unfair Judgment While Seeking Health Care" (Mar. 31, 2021), https://www.rwjf.org/en/insights/our-research/2021/03/perceptions-of-discrimination-and-unfair-judgment-while-seeking-health-care.html; Susan A. Cohen, "Abortion and Women of Color: The Bigger Picture," 11 Guttmacher Pol'y Rev. (Aug. 6, 2008), https://www.guttmacher.org/gpr/2008/08/abortion-and-women-color-bigger-picture; "The Disproportionate Harm of Abortion Bans: Spotlight on Dobbs v. Jackson Women's Health," Center for Reproductive Rights (Nov. 29, 2021), https://reproductiverights.org/supreme-court-case-mississippi-abortion-ban-disproportionate-harm/ ("Abuses such as forced sterilization of Black, Indigenous, and other people of color and individuals with disabilities specifically exacerbate medical mistrust within reproductive healthcare.").

159    See Brief of Amici Curiae for Organizations Dedicated to the Fight for Reproductive Justice—Mississippi in Action, et al. at *35-36, Dobbs, 597 U.S. 215 (discussing the likelihood that individuals, particularly those from marginalized communities who terminate their pregnancies and anyone who assists them may be disproportionally likely to face criminal investigation or arrest, given the rates of incarceration of persons from such communities.); see also Elizabeth Yuko, "Women of Color Will Face More Criminalized Pregnancies in Post-'Roe' America," Rolling Stone (Jul. 7, 2020) ("Historically, we've seen the criminalization of people of color, young people, and people with lower incomes who've had miscarriages and other types of pregnancy losses that the state deemed were their fault [. . .] These groups are the most likely to be reported to law enforcement and investigated"); see also Sentencing Project, State-by-State Data, https:// www.sentencingproject.org/research/us-criminal-justice-data/ (last visited Feb. 16, 2024) (U.S. Total: Imprisonment rate per 100,000 residents—355; Black/White disparity—4.8:1; Latinx/White disparity—1.3:1); Racial Disparities in Incarceration, Vera Institute of Justice (Aug. 21, 2023), https://trends.vera.org/ (Prison population rate per 100,000 residents ages 15 to 64. U.S. total incarceration rate 2021 Q2—298, Asian American/Pacific Islander incarceration rate 2021 Q2—100, Black/African American incarceration rate 2021 Q2—1,310, Latinx incarceration rate 2021 Q2—671, Native American incarceration rate 2021 Q2—1,021, White incarceration rate 2021 Q2—281).

160    See Columbia Law Sch. Hum. Rts. Inst. & Ne. Univ. Sch. of Law Program on Hum. Rts. and the Glob. Econ.," Equal Access to Justice: Ensuring Meaningful Access to Counsel in Civil Cases, Including Immigration Proceedings" (July 2014), https://hri.law.columbia.edu/sites/default/files/publications/equal_access_to_justice_-_cerd_shadow_report.pdf. See also Lauren Hoffman et al., Ctr. For Am. Progress, "Report: State Abortion Bans Will Harm Women and Families' Economic Security Across the US" (Aug. 25, 2022), https://www.americanprogress.org/article/state-abortion-bans-will-harm-women-and-families-economic-security-across-the-us/.

161    See Myasar Ihmud, "Lost in Translation: Language Barriers to Accessing Justice in the American Court System," UIC Law Review (2023) (discussing "access to justice for [limited English proficient (LEP)] individuals is hindered because they are unable to communicate with the court or understand the proceedings. Case law shows that, when unable to communicate with the court, LEP litigants are unable to defend themselves appropriately in criminal or immigration hearings, protect their homes, or keep custody of their children."), https://repository.law.uic.edu/cgi/viewcontent.cgi? article=2908&context=lawreview; see also "Language Access & Cultural Sensitivity," Legal Services Corporation (last visited Feb. 21, 2024) (describing how legal aid organizations should plan for providing meaningful access to language services. As of 2013, "close to 25 million people, about 8 percent of the population, has limited English proficiency."), https://www.lsc.gov/i-am-grantee/model-practices-innovations/language-access-cultural-sensitivity.

162   See, e.g., Gautam Gulati et al., "The experience of law enforcement officers interfacing with suspects who have an
      intellectual disability—A systematic review," International Journal of Law and Psychiatry (Sept.-Oct. 2020) ("It is
      not uncommon for people with [intellectual disability] to be suspects or accused persons when interfacing with Law
      Enforcement Officers (LEOs) and therefore face arrest, interview and/or custody."), https://www.sciencedirect.com/
      science/article/pii/S016025272030073X.

163   See Leslie Read et al., The Deloitte Ctr. for Health Solutions, "Rebuilding Trust in Health Care: What Do Consumers
      Want—and Need—Organizations to Do?," at 3 (Aug. 5, 2021) (With focus groups of 525 individuals in the United States
      who identify as Black, Hispanic, Asian, or Native American, "[f]ifty-five percent reported a negative experience where
      they lost trust in a health care provider."), https://www2.deloitte.com/us/en/insights/industry/health-care/trust-in-health-
      care-system.html; Liz Hamel et al., Kaiser Family Foundation, "The Undefeated Survey on Race and Health," at 23
      (Oct. 2020) (Percent who say they can trust the health care system to do what is right for them or their community almost
      all of the time or most of the time: Black adults: 44%; Hispanic adults: 50%; White adults: 55%), https://files.kff.org/
      attachment/Report-Race-Health-and-COVID-19-The-Views-and-Experiences-of-Black-Americans.pdf; U.S. Dep't of
      Health and Hum. Servs., Assistant Sec'y for Pol. & Eval., Off. of Health Pol., "Issue Brief: Health Insurance Coverage
      and Access to Care for LGBTQ+ Individuals: Current Trends and Key Challenges," at 9 (June 2021) (A 2021 survey
      found that 18 percent of LGBTQ+ individuals reported avoiding going to a doctor or seeking health care out of concern
      that they would face discrimination or poor treatment because of their sexual orientation or gender identity.), https://
      aspe.hhs.gov/sites/default/files/2021-07/lgbt-health-ib.pdf; Abigail A. Sewell, "Disaggregating Ethnoracial Disparities
      in Physician Trust," Soc. Science Rsch. (Nov. 2015), https://pubmed.ncbi.nlm.nih.gov/26463531/; Irena Stepanikova et
      al., "Patients' Race, Ethnicity, Language, and Trust in a Physician," J. of Health and Soc. Behavior (Dec. 2006), https://
      pubmed.ncbi.nlm.nih.gov/17240927/.

164   Congress' directions regarding the issuance of standards for the privacy of IIHI are codified at 42 U.S.C. 1320d-2 note.
      See also 45 CFR 160.104(a).

165   Dep't of Defense, Memorandum Re: Ensuring Access to Reproductive Health Care, at 1 (Oct. 20, 2022) (removed
      emphasis on "not" in original), https://media.defense.gov/2022/Oct/20/2003099747/-1/-1/1/MEMORANDUM-
      ENSURING-ACCESS-TO-REPRODUCTIVE-HEALTH-CARE.PDF.

166   Kristin Cohen, "Location, health, and other sensitive information: FTC committed to fully enforcing the law
      against illegal use and sharing of highly sensitive data", Federal Trade Commission Business Blog (July
      11, 2022), https://www.ftc.gov/business-guidance/blog/2022/07/location-health-and-other-sensitive-information-ftc-
      committed-fully-enforcing-law-against-illegal (last accessed Nov. 15, 2022).

167   Id.

168   See Daniel M. Walker et al., "Interoperability in a Post-Roe Era Sustaining Progress While Protecting Reproductive
      Health Information," JAMA (Nov. 1, 2022) (discussing that segregation of records for reproductive health care
      is more difficult than for SUD treatment records because "reproductive health services are often provided in the
      same settings as other primary and acute care and thus could be inferred or directly reflected in many parts of the
      record."), https://jamanetwork-com.ezproxyhhs.nihlibrary.nih.gov/journals/jama/fullarticle/2797865; See, e.g., 87 FR
      74216, 74221 (Dec. 2, 2022) (noting that 42 CFR part 2 previously required the separation of SUD treatment records
      previous from other health records, which led to the creation of data "silos" that hampered the integration of SUD
      treatment records into covered entities' electronic record systems and billing processes. When considering amendments
      to the relevant statute, some lawmakers argued that the silos perpetuated negative stereotypes about persons with SUD
      and inhibited coordination of care during the opioid epidemic.). See also Health Info. Tech. Advisory Comm., "Health
      Information Technology Advisory Committee (HITAC) Annual Report for Fiscal Year 2019," 2019 ONC Ann. Rep.,
      at 37 (Feb. 19, 2020), https://www.healthit.gov/sites/default/files/page/2020-03/HITACAnnualReportforFY19_508.pdf

("The new certification criteria that support the sharing of data via third-party apps will help advance the use of data segmentation, but adoption of this capability by the industry is not yet widespread.").

169    See 88 FR 23746, 23898 (Apr. 18, 2023) (explaining that while there are standards for security labels for document-based exchange that the Office of the National Coordinator for Health Information Technology (ONC) adopted in full in 2020 for the criteria in 45 CFR 170.315(b)(7) and (b)(8) to support the application of security labels at a granular level for sending in and receiving, standards to define the technical requirements for the actions described by the security label vocabularies do not yet exist. In the 21st Century Cures Act: Interoperability, Information Blocking, and the ONC Health IT Certification Program Final Rule, published in 2020, ONC estimated a cost of the certification criteria and standards adopted for security labels in 45 CFR 170.315(b)(7) and (b)(8). The Department estimated the total cost to developers could range from $2,910,400 to $6,933,600 and that it would be a onetime cost. (85 FR 25926) The criteria do not include the ability for health IT to take the actions described by the security labels. Additionally, ONC did not require that health IT be certified to the criteria described above, making it essentially voluntary. Accordingly, the estimates for health IT developer and health care provider costs were likely significantly lower than they would have been if health IT were required to be certified to the criteria for participation. Thus, the total cost of implementing full segmentation capabilities is likely substantially higher than the per-product cost estimates provided by the Department in that rule). See also 88 FR 23746, 23875 (Apr. 18, 2023) (discussing examples of challenges or technical limitations to electronic health information segmentation that have been described to ONC).

170    See 64 FR 59918, at 59924, 59939, and 59955 (Nov. 3, 1999).

171    See 42 U.S.C. 1320d-6(a).

172    See 42 U.S.C. 1320d-6(b).

173    See 42 U.S.C. 1320d-5. See also 45 CFR part 160, subparts A, D, and E.

174    Press Release, "Breaking Language Barriers: Biden-Harris Administration Announces New Plan to Address Language Barriers and Strengthen Language Access," U.S. Dep't of Health and Human Servs. (Nov. 15, 2023), https://www.hhs.gov/about/news/2023/11/15/breaking-language-barriers-biden-harris-administration-announces-new-plan-address-language-barriers-strengthen-language-access.html.

175    Press Release, "HHS Issues New Proposed Rule to Strengthen Prohibitions Against Discrimination on the Basis of a Disability in Health Care and Human Services Programs," U.S. Dep't of Health and Human Servs. (Sept. 7, 2023), https://www.hhs.gov/about/news/2023/09/07/hhs-issues-new-proposed-rule-to-strengthen-prohibitions-against-discrimination-on-basis-of-disability-in-health-care-and-human-services-programs.html.

176    Press Release, "HHS Issues Proposed Rule to Advance Non-discrimination in Health and Human Service Programs for LGBTQI+ Community," U.S. Dep't of Health and Human Servs. (July 11, 2023), https://www.hhs.gov/about/news/2023/07/11/hhs-issues-proposed-rule-advance-non-discrimination-health-human-service-programs-lgbtqi-community.html.

177    Press Release, "HHS Announces Proposed Rule to Strengthen Nondiscrimination in Health Care," U.S. Dep't of Health and Human Servs. (July 25, 2022), https://www.hhs.gov/about/news/2022/07/25/hhs-announces-proposed-rule-to-strengthen-nondiscrimination-in-health-care.html.

178    See 42 U.S.C. 1320d note.

179    See 42 U.S.C. 1320d-2 note.

180    See 45 CFR 164.512(f)(1)(ii)(C).

181    See, e.g., 45 CFR 164.512(f) and 164.514(d)(3)(iii).

182    See 45 CFR 164.502(g) (describing personal representatives) and 164.524(a)(3) (describing reviewable grounds for denial of access to PHI by a personal representative).

183    Off. for Civil Rights, "Health Information Privacy," U.S. Dep't of Health and Human Servs., https://www.hhs.gov/hipaa/index.html.

184    See 42 U.S.C. 1320d-1320d-8.

185    45 CFR 160.103.

186    See section 1101(3) of Public Law 74-271, 49 Stat. 620 (Aug. 14, 1935) (codified at 42 U.S.C. 1301(3)).

187    1 U.S.C. 8(a). The Department is not opining on whether any state law confers a particular legal status upon a fertilized egg, embryo, or fetus. Rather, the Department cites to this statute to help define the scope of privacy protections that attach pursuant to HIPAA and its implementing regulations.

188    Id.

189    88 FR 23506, 23523 (Apr. 17, 2023).

190    45 CFR 160.103 (definition of "Individual").

191    See Sharon T. Phelan, "The Prenatal Record and the Initial Prenatal Visit," The Glob. Libr. of Women's Med. (last updated Jan. 2008) (PHI about the fetus is included in the mother's PHI), https://www.glowm.com/section-view/heading/ThePrenatalRecordandtheInitialPrenatalVisit/item/107#.Y7WRKofMKUl.

192    See 42 U.S.C. 1320d.

193    45 CFR 160.103 (definition of "Person"). The Department first defined the term "person" in the HIPAA Rules as part of the 2003 Civil Money Penalties: Procedures for Investigations, Imposition of Penalties, and Hearings Interim Final Rule (2003 Interim Final Rule) to distinguish a "natural person" who could testify in the context of administrative proceedings from an "entity" (defined therein as a "legal person") on whose behalf a person would testify. See 45 CFR 160.502 of the 2003 Interim Final Rule, 68 FR 18895, 18898 (Apr. 17, 2003) (Person is defined to mean a natural person or a legal person).

194    45 CFR 160.103 (definition of "Individual"). The definition of "individual" in the HIPAA Rules was first adopted in the 2000 Privacy Rule.

195    See 45 CFR 164.512(c)(1). This provision explicitly excludes reports of child abuse, which are addressed by 45 CFR 164.512(b)(1).

196    1 U.S.C. 8(a).

197    Public Law 110-233, 122 Stat. 881. See generally Off. for Civil Rights, "Health Information Privacy, Genetic Information," U.S. Dep't of Health and Human Servs. (Content last reviewed June 16, 2017), https://www.hhs.gov/hipaa/for-professionals/special-topics/genetic-information/index.html#:#:text=TheGeneticInformationNondiscriminationAct,intotwosections'orTitles.

198    See 45 CFR 164.524. See also William Baude & Stephen E. Sachs, "The Law of Interpretation," 130 Harv. L. Rev. 1079 (2017).

199    45 CFR 164.502(g).

200    See 45 CFR 164.512(j)(1)(i).

201    42 U.S.C. 1320d-7(a)

202    42 U.S.C. 1320d-7(b).

203    45 CFR 164.501 (definition of "Public health authority").

204    45 CFR 164.514(h).

205    This is unchanged by this final rule.

206    See 45 CFR 164.512(b). The Privacy Rule addresses its interactions with laws governing excepted public health activities in two sections: 45 CFR 164.512(a), Standard: Uses and disclosures required by law, and 45 CFR 164.512(b), Standard: Uses and disclosures for public health activities.

207    45 CFR 164.512(b).

208    45 CFR 164.512(f).

209    88 FR 23506, 23523 (Apr. 17, 2023).

210    The 1996-98 Report of the NCVHS to the Secretary describes various types of activities considered to be public health during the era in which HIPAA was enacted, such as the collection of public health surveillance data on health status and health outcomes and vital statistics information. See Nat'l Comm. On Vital and Health Stats., Report of The National Committee on Vital and Health Statistics, 1996-98, (Dec. 1999), https://ncvhs.hhs.gov/wp-content/uploads/2018/03/90727nv-508.pdf.

211    Id.

212    Id.

213    Richard N. Danila et al., "Legal Authority for Infectious Disease Reporting in the United States: Case Study of the 2009 H1N1 Influenza Pandemic," 105 a.m. J. Public Health 13 (Jan. 2015).

214    See "Reportable Diseases," MedlinePlus, https://medlineplus.gov/ency/article/001929.htm (accessed Oct. 19, 2022). See also Nat'l Notifiable Diseases Surveillance Sys., "What is Case Surveillance?," Ctrs. for Disease Control and Prevention (July 20, 2022), https://www.cdc.gov/nndss/about/index.html.

215    See "Reportable Diseases," supra note 215. Such reporting is a type of public health surveillance activity.

216    See Victims Rts. Law Ctr., "Mandatory Reporting of Non-Accidental Injuries: A State-by-State Guide" (May 2014), http://4e5ae7d17e.nxcli.net/wp-content/uploads/2021/01/Mandatory-Reporting-of-Non-Accidental-Injury-Statutes-by-State.pdf.

217    See, e.g., 38 U.S.C. 1110 (referring to an "injury suffered or disease contracted"); 10 U.S.C. 972 (discussing time lost as a result of "disease or injury"); 38 U.S.C. 3500 (providing education for certain children whose parent suffered "a disease or injury" incurred or aggravated in the Armed Forces); see also 5 U.S.C. 8707 (insurance provision discussing compensation as a result of "disease or injury"); 33 U.S.C. 765 (discussing retirement for disability as a result of "disease or injury"); 15 U.S.C. 2607(c) (requiring chemical manufacturers to maintain records of "occupational disease or injury").

218    45 CFR 164.512(b)(ii).

219    See 65 FR 82462, 82571 (Dec. 28, 2000) (recognizing that "disease management activities" often constitute "health care" under HIPAA); Id. at 82777 (discussing the importance of privacy for information about cancer, a "disease" that causes an "indisputable" "societal burden"); Id. at 82778 (discussing the importance of privacy for information about sexually transmitted diseases, including Human Immunodeficiency Virus/Acquired Immunodeficiency Syndrome (HIV/AIDS)); Id. at 82463-64 (noting that numerous states adopted laws protecting health information relating to certain health conditions such as communicable diseases, cancer, HIV/AIDS, and other stigmatized conditions.); Id. at 82731 (finding that there are no persuasive reasons to provide information contained within disease registries with special treatment as compared with other information that may be used to make decisions about an individual).

220    See, e.g., 65 FR 82462, 82517 (Dec. 28, 2000) (discussing tort litigation as information that could implicate IIHI); Id. at 82542 (discussing workers' compensation); Id. at 82527 (separately addressing disclosures about "abuse, neglect or domestic violence" and limiting such disclosures to only two circumstances, even if expressly authorized by state statute or regulation).

221    See "Public Health Professionals Gateway, Public Health Systems & Best Practices, Health Department Governance," Ctrs. for Disease Control and Prevention (Nov. 25, 2022), https://www.cdc.gov/publichealthgateway/sitesgovernance/index.html.

222    See the list of events included in vital events, Nat'l Ctr. for Health Stats., "About the National Vital Statistics System," Ctrs. for Disease Control and Prevention (Jan. 4, 2016), https://www.cdc.gov/nchs/nvss/about_nvss.htm.

223    See Nat'l Ctr. for Health Stats., "Birth Data," Ctrs. for Disease Control and Prevention (Dec. 6, 2022), https://www.cdc.gov/nchs/nvss/births.htm.

224    See Ctrs. For Disease Control and Surveillance, "How Tracking Deaths Protects Health," (July 2018), https://www.cdc.gov/surveillance/pdfs/Tracking-Deaths-protects-healthh.pdf.

225    See Nat'l Ctr. for Health Stats., Ctrs. for Disease Control and Prevention, "State Definitions and Reporting Requirements: For Live Births, Fetal Deaths, and Induced Terminations of Pregnancy," at 5 (1997), https://www.cdc.gov/nchs/data/misc/itop97.pdf.

226    Nat'l Ctr. for Health Stats., Ctrs. for Disease Control and Prevention, "Model State Vital Statistics Act and Regulations," at 8 (1992), https://www.cdc.gov/nchs/data/misc/mvsact92b.pdf.

227    42 U.S.C. 1178(b) (codified in HIPAA at 42 U.S.C. 1320d-7).

228    Section 1178(a) of HIPAA.

229    See 45 CFR 164.512(b)(1)(i); Off. for Civil Rights, "Disclosures for Public Health Activities," U.S. Dep't of Health and Human Servs., https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/disclosures-public-health-activities/index.html (accessed Oct. 19, 2022).

230    See "Introduction to Public Health Surveillance," Ctrs. for Disease Control and Prevention (Nov. 15, 2018), https://www.cdc.gov/training/publichealth101/surveillance.html.

231    See "Public Health Professionals Gateway, Ten Essential Public Health Services," Ctrs. for Disease Control and Prevention (Dec. 1, 2022), https://www.cdc.gov/publichealthgateway/publichealthservices/essentialhealthservices.html.

232    Section 1178(a) of SSA.

233    "Health, Public Health," Black's Law Dictionary (11th ed. 2019).

234    "Public Health," Stedman's Medical Dictionary 394520.

235    Jonathan Weinstein, In Re Miguel M., 55 N.Y.L. Sch. L. Rev. 389, 390 (2010) (citing Stephen B. Thacker, "Historical Development," in Principles and Practice of Public Health Surveillance 1 (Steven M. Teutsch & R. Elliott Churchill eds., 2d ed., 2000)), https://digitalcommons.nyls.edu/cgi/viewcontent.cgi?article=1599&context=nyls_law_review.

236    See, e.g., Richard A. Goodman et al., "Forensic Epidemiology: Law at the Intersection of Public Health and Criminal Investigations," 31 J. of Law, Med. & Ethics 684, 689-90 (2003); La. Rev. Stat. Ann. Sec. 40:3.1 (2011) (defining threats to public health as nuisances "including but not limited to communicable, contagious, and infectious diseases, as well as illnesses, diseases, and genetic disorders or abnormalities"); N.C. Gen. Stat. sec. 130A-141.1(a) (2010) (defining public health investigations as the "surveillance of an illness, condition, or symptoms that may indicate the existence of a communicable disease or condition").

237    See, e.g., 65 FR 82462, 82464 (Dec. 28, 2000) (noting that reporting of public health information on communicable diseases is not prevented by individuals' right to information privacy); Id. at 82467 (discussing the importance of accurate medical records in recognizing troubling public health trends and in assessing the effectiveness of public health efforts); Id. at 82473 (discussing disclosure to "a department of public health"); Id. at 82525 (recognizing that it may be necessary to disclose PHI about communicable diseases when conducting a public health intervention or investigation); Id. at 82526 (recognizing that an entity acts as a "public health authority" when, in its role as a component of the public health department, it conducts infectious disease surveillance); Stephen B. Thacker, Epidemiology Program Office, Ctrs. for Disease Control and Prevention, "HIPAA Privacy Rule and Public Health: Guidance from CDC and the U.S. Department of Health and Human Services," 52 MMWR 1 (Apr. 11, 2003), https://www.cdc.gov/mmwr/preview/mmwrhtml/m2e411a1.htm (describing what traditionally are considered to be "public health activities" that require PHI).

238    See Miguel M. v. Barron, 950 NE2d 107, at 111 (2011) (explaining "[t]he apparent purpose of the public health exception is to facilitate government activities that protect large numbers of people from epidemics, environmental hazards, and the like, or that advance public health by accumulating valuable statistical information.").

239    88 FR 23510, 23525 (Apr. 17, 2023).

240    See Miguel M. v. Barron at 111, supra note 239 (concluding that "[t]o disclose private information about particular people, for the purpose of preventing those people from harming themselves or others, effects a very substantial invasion of privacy without the sort of generalized public benefit that would come from, for example, tracing the course of an infectious disease.").

241    For example, traditional public health reporting laws grew from colonial requirements that physicians report disease. These requirements transitioned to state regulatory requirements imposed by public health departments on authority granted to them by states. See Ctrs. for Disease Control and Prevention, "Public Health Law 101, Disease Reporting and Public Health Surveillance," at 12 and 14 (Jan. 16, 2009), https://www.cdc.gov/phlp/docs/phl101/PHL101-Unit-5-16Jan09-Secure.pdf. See also, e.g., Code of Georgia 31-12-2 (2021) (authority to require disease reporting).

242    See "Public Health," supra note 235 ("Many cities have a 'public health department' or other agency responsible for maintaining the public health; Federal laws dealing with health are administered by the Department of Health and Human Services."); see also "Forensic Epidemiology: Law at the Intersection of Public Health and Criminal Investigations," supra note 237, at 689.

243    See Camara v. Municipal Ct. of City & Cty. of S.F., 387 U.S. 523, 535-37 (1967) (discussing administrative inspections under the Fourth Amendment, such as those aimed at addressing "conditions which are hazardous to public health and safety," and not "aimed at the discovery of evidence of crime"); 42 U.S.C. 241(d)(D) (prohibiting disclosure of private

information from research subjects in "criminal" and other proceedings); 42 U.S.C. 290dd-2(c) (prohibiting substance abuse records from being used in criminal proceedings).

244    See "Forensic Epidemiology: Law at the Intersection of Public Health and Criminal Investigations," supra note 237, at 687 (discussing reasons why "an association of public health with law enforcement" may be "to the detriment of routine public health practice"). See also 45 CFR 164.512(b)(1)(i) (including "public health investigations" as an activity carried out by a public health authority that is authorized by law to carry out public health activities).

245    See "Improving the Role of Health Departments in Activities Related to Abortion," Am. Pub. Health Ass'n (Oct. 26, 2021), https://www.apha.org/Policies-and-Advocacy/Public-Health-Policy-Statements/Policy-Database/2022/01/07/Improving-Health-Department-Role-in-Activities-Related-to-Abortion.

246    See "Reportable diseases," supra note 215. See also "What is Case Surveillance?," supra note 215.

247    See "Reproductive Health, About Us," Ctrs. for Disease Control and Prevention (Apr. 20, 2022), https://www.cdc.gov/reproductivehealth/drh/about-us/index.htm; and "Reproductive Health, CDCs Abortion Surveillance System FAQs," Ctrs. for Disease Control and Prevention (Nov. 17, 2022), https://www.cdc.gov/reproductivehealth/data_stats/abortion.htm.

248    See 45 CFR 164.502(b).

249    See 45 CFR 164.514(a).

250    45 CFR 164.514(d)(3)(iii)(A); see also 45 CFR 164.514(h)(2)(ii) and (iii).

251    See 45 CFR 164.512(b)(1)(ii).

252    See 45 CFR 164.502(b) and 164.514(d).

253    65 FR 82462, 82527 (Dec. 28, 2000).

254    Public Law 101-647, 104 Stat. 4789 (codified at 18 U.S.C. 3509).

255    Public Law 93-247, 88 Stat. (codified at 42 U.S.C. 5101 note).

256    See 34 U.S.C. 20341(a)(1), originally enacted as part of the Victims of Child Abuse Act of 1990 and codified at 42 U.S.C. 13031, which was editorially reclassified as 34 U.S.C. 20341, Crime Control and Law Enforcement. For the purposes of such mandated reporting, see 34 U.S.C. 20341(c)(1) for definition of "child abuse."

257    88 FR 23506, 23526 (Apr. 17, 2023).

258    65 FR 82462, 82527 (Dec. 28, 2000).

259    See 45 CFR 164.502(g).

260    See 45 CFR 164.502(b) and 164.514(d).

261    See 45 CFR 164.512(e) and (f).

262    See 45 CFR 164.512(e) and (f).

263    65 FR 82462, 82527 (Dec. 28, 2000).

264    45 CFR 160.103 (definition of "Health care").

265    These groupings are (1) "[p]reventive, diagnostic, therapeutic, rehabilitative, maintenance, or palliative care, and counseling, service, assessment, or procedure with respect to the physical or mental condition, or functional status, of an individual or that affects the structure or function of the body" and (2) "[the s]ale or dispensing of a drug, device, equipment, or other item in accordance with a prescription." It would also include supplies purchased over the counter or furnished to the individual by a person that does not meet the definition of a health care provider under the HIPAA Rules. 45 CFR 164.103 (definition of "Health care provider").

266    88 FR 23506, 23527-28 (Apr. 17, 2023).

267    88 FR 23506, 23527 (Apr. 17, 2023).

268    65 FR 82571 (Dec. 28, 2000).

269    See "What is Assisted Reproductive Technology?" Centers for Disease Control and Prevention (Oct. 8, 2019), https://www.cdc.gov/art/whatis.html and "Fact Sheet: In Vitro Fertilization (IVF) Use Across the United States," U.S. Dep't of Health and Human Servs. (Mar. 13, 2024), https://www.hhs.gov/about/news/2024/03/13/fact-sheet-in-vitro-fertilization-ivf-use-across-united-states.html.

270    45 CFR 160.103 (definition of "Protected health information").

271    88 FR 23506, 23528 (Apr. 17, 2023).

272    88 FR 23506, 23528-29 (Apr. 17, 2023).

273    42 U.S.C. 17935(e).

274    In the preamble to the 2000 Privacy Rule, we explained that a covered entity could meet HIPAA plain language requirements by organizing material to serve the reader; writing short sentences in the active voice; using pronouns; using common, everyday language; and dividing material into short sections. 65 FR 82462, 82548 (Dec. 28, 2000).

275    89 FR 1192, 1302 (Jan. 9, 2024). See also Off. for Civil Rights, "Information Blocking Regulations Work In Concert with HIPAA Rules and Other Privacy Laws to Support Health Information Privacy," U.S. Dep't of Health and Human Servs. (Apr. 12, 2023), https://www.healthit.gov/buzz-blog/information-blocking/information-blocking-regulations-work-in-concert-with-hipaa-rules-and-other-privacy-laws-to-support-health-information-privacy.

276    See, e.g., Off. for Civil Rights, "Resource for Health Care Providers on Educating Patients about Privacy and Security Risks to Protected Health Information when Using Remote Communication Technologies for Telehealth," U.S. Dep't of Health and Human Servs., https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/resource-health-care-providers-educating-patients/index.html.

277    See 45 CFR 164.502(a)(3) and (e). See also 45 CFR 164.504(e).

278    For information about what a business associate is and the requirements for business associate agreements, see Off. for Civil Rights, "Business Associate Contracts," U.S. Dep't of Health and Human Servs. (Jan. 25, 2013), https://www.hhs.gov/hipaa/for-professionals/covered-entities/sample-business-associate-agreement-provisions/index.html.

279    Off. for Civil Rights, "Protecting the Privacy and Security of Your Health Information When Using Your Personal Cell Phone or Tablet," U.S. Dep't of Health and Human Servs. (June 29, 2022), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/cell-phone-hipaa/index.html.

280    88 FR 23506, 23529-33 (Apr. 17, 2023).

281    The Department does not oppose efforts to implement or employ technology that is capable of segmenting data. Rather, the Department's proposal was informed by the recognition that the technology deployed by most regulated entities today is not capable of doing so.

282    See supra discussion of "Public health" for more information on what constitutes a "public health activity" under the Privacy Rule.

283    88 FR 23506, 23532 (Apr. 17, 2023).

284    Id. at 23510, 23522, and 23531.

285    See Griswold v. Connecticut, 381 U.S. 479 (1965); Eisenstadt v. Baird, 405 U.S. 438 (1972); Dobbs, 597 U.S. 345 (Kavanaugh, J., concurring) (Dobbs "does not threaten or cast doubt on" the precedents providing constitutional protection for contraception).

286    See proposed 45 CFR 164.502(a)(5)(iii)(D). See also 88 FR 23506, 23552-53 (Apr. 17, 2023).

287    Section 164.502(a)(5)(iii)(A)(3) incorporates the same language by reference to 45 CFR 164.502(a)(5)(iii)(A)(1) and (A)(2).

288    42 U.S.C. 1320d-7(a)(1) (providing the general rule that, with limited exceptions, a provision or requirement under HIPAA supersedes any contrary provision of state law); see also section 264(c)(2) of Public Law 104-191 (codified at 42 U.S.C. 1320d-2 note) and 45 CFR 160.203.

289    See final 45 CFR 164.509, and discussion below.

290    See 42 U.S.C. 1320d-6.

291    88 FR 23506, 23532-33 (Apr. 17, 2023).

292    See 45 CFR 164.512(d)(1)(i) through (iv) for health oversight activities for which the Privacy Rule permits uses and disclosures of PHI. See also the National Association of Medicaid Fraud Control Units, described at https:// www.naag.org/about-naag/namfcu/. All 53 federally certified Medicaid Fraud Control Units voluntarily subscribe to this organization. This final rule does not interfere with any State's ability to meet their statutory obligations to combat health care fraud related to Medicaid.

293    31 U.S.C. 3729-3733.

294    18 U.S.C. 248(e)(5) (definition of "Reproductive health services").

295    45 CFR 160.103 (definition of "Person").

296    Note that in Section V.A.1, the Department is clarifying the definition of "person," although that clarification does not affect the analysis in this paragraph.

297    See 45 CFR 164.514(d)(3)(iii)(A) and 65 FR 82462, 82545, and 82547 (Dec. 28, 2000).

298    45 CFR 164.514(h)(2) and 65 FR 82462, 82546-47 (Dec. 28, 2000).

299    See 45 CFR 164.514(h) and 65 FR 82462, 82546-47 (Dec. 28, 2000).

300    See 65 FR 82462, 82545 (Dec. 28, 2000) ("[. . .] covered entities making disclosures to public officials that are permitted under § 164.512 may rely on the representations of a public official that the information requested is the minimum necessary."); see also id. at 82547 (further discussing verification of identity and authority of persons requesting PHI

in 45 CFR 164.514(h) and the requirements in 45 CFR 164.512 for the circumstances under which covered entities must make reasonable determinations about the sufficiency of proof of identify and authority based on documentary evidence, contrasted with a reasonable reliance on verbal representations when necessary to avert a pending emergency or imminent threat to the health or safety of a person or the public pursuant to 45 CFR 164.512(j)(1)(i)).

301    See 88 FR 23506, 23530 (Apr. 17, 2023).

302    See 42 CFR part 2 and the 2024 Part 2 Rule for more information about Part 2 and the protections afforded to Part 2 records.

303    See the finalized definition of "Reproductive health care" at 45 CFR 160.103.

304    See Off. for Civil Rights, "Protecting the Privacy and Security of Your Health Information When Using Your Personal Cell Phone or Tablet," U.S. Dep't of Health and Human Servs. (June 29, 2022), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/cell-phone-hipaa/index.html.

305    See 45 CFR 164.502(b). Uses and disclosures of PHI pursuant to 45 CFR 164.512(a) are limited to the relevant requirements of such law. 45 CFR 164.512(a)(1).

306    45 CFR 164.514(b).

307    See 45 CFR 164.506.

308    See 45 CFR 160.103 (definitions of "health plan" and "group health plan").

309    In the 2023 Privacy Rule NPRM, we proposed the Scope of prohibition in 45 CFR 164.502(a)(5)(iii)(B).

310    88 FR 23506, 23509 (Apr. 17, 2023) (citing 65 FR 82464 (Dec. 28, 2000)).

311    Id.

312    See 42 U.S.C. 1320d-5 and 6.

313    See 45 CFR 164.512(a).

314    See 45 CFR 164.512(a).

315    Public Law 100-578, 102 Stat. 2903 (Oct. 31, 1988) (codified at 42 U.S.C. 201 note).

316    See 45 CFR 164.512(a)(1).

317    See 45 CFR 164.103 (definition of "Required by law"). The definition provides additional explanation about what constitutes a mandate contained in law.

318    See 45 CFR 164.512(a)(1).

319    See 45 CFR 164.103 (definition of "Required by law").

320    The Privacy Rule permits but does not require covered entities to disclose PHI in response to an order of a court or administrative tribunal. The Privacy Rule also permits but does not require covered entities to disclose PHI in response to a subpoena, discovery request, or other lawful process, but only when certain conditions are met. See 45 CFR 164.512(e)(1). These provisions cannot be used to make disclosures to law enforcement officials that are restricted by 45 CFR 164.512(f). See 45 CFR 164.512(e)(2).

321    45 CFR 164.512(f)(1).

322    Whether the regulated entity is limited by the minimum necessary standard or the relevant requirements of the law that requires the reporting depends upon whether the regulated entity is making the disclosure pursuant to 45 CFR 164.512(a) or some other permission under 45 CFR 164.512. See 45 CFR 164.502(b)(v).

323    See 45 CFR 164.502(g).

324    See 45 CFR 164.502(g)(3)(i). See also Off. for Civil Rights, "Personal Representatives," U.S. Dep't of Health and Human Servs., https://www.hhs.gov/hipaa/for-individuals/personal-representatives/index.html.

325    See, e.g., 45 CFR 164.510(b)(3) and 164.512(j)(1)(i)(A).

326    See 65 FR 82462, 82471 (Dec. 28, 2000).

327    88 FR 23506, 23533-34 (Apr. 17, 2023).

328    See 45 CFR 164.502(g).

329    See 45 CFR 164.502(g)(3)(i).

330    88 FR 23506, 23534 (Apr. 17, 2023).

331    45 CFR 164.506.

332    45 CFR 164.508.

333    45 CFR 164.510.

334    45 CFR 164.512.

335    45 CFR 164.508(b).

336    88 FR 23506, 23534-37 (Apr. 17, 2023).

337    Pursuant to 45 CFR 164.530(j), regulated entities would be required to maintain a written or electronic copy of the attestation.

338    The Federal plain language guidelines under the Plain Writing Act of 2010 only applies to Federal agencies, but it serves as a helpful resource. See 5 U.S.C. 105 and "Federal plain language guidelines," U.S. Gen. Servs. Admin., https://www.plainlanguage.gov/guidelines/.

339    Proposed 45 CFR 164.509(b)(1)(iv) and (c)(1)(iv).

340    While not explicitly stated in the Privacy Rule, the Department previously issued guidance clarifying that authorizations are permitted to be submitted and signed electronically. See Off. for Civil Rights, "Is a copy, facsimile, or electronically transmitted version of a signed authorization valid under the Privacy Rule?," U.S. Dep't of Health and Human Servs., HIPAA FAQ #475 (Jan. 9, 2023), https://www.hhs.gov/hipaa/for-professionals/faq/475/is-a-copy-of-a-signed-authorization-valid/index.html and Off. for Civil Rights, "How do HIPAA authorizations apply to an electronic health information exchange environment?," U.S. Dep't of Health and Human Servs., HIPAA FAQ #554 (July 26, 2013), https://www.hhs.gov/hipaa/for-professionals/faq/554/how-do-hipaa-authorizations-apply-to-electronic-health-information/index.html.

341    This approach is consistent with 45 CFR 164.514(h), which requires a regulated entity to verify the identity and legal authority of a public official or a person acting on behalf of a public official, and describes the type of documentation

upon which a regulated entity may rely, if such reliance is reasonable under the circumstances, to do so. See also 45 CFR 164.514(d)(3)(iii)(A), which permits a covered entity to rely, if such reliance is reasonable under the circumstances, on a requested disclosure as the minimum necessary for the stated purpose when making disclosures to public officials that are permitted under 45 CFR 164.512, if the public official represents that the information requested is the minimum necessary for the stated purpose(s).

342    Proposed 45 CFR 164.509(d).

343    Business associates became directly liable for compliance with certain requirements of the HIPAA Rules under the HITECH Act. Consistent with the HITECH Act, the 2013 Omnibus Rule identified the portions of the HIPAA Rules that apply directly to business associates and for which business associates are directly liable. Prior to the HITECH Act and the Omnibus Rule, these requirements applied to business associates and their subcontractors indirectly through the requirements under 45 CFR 164.504(e) and 164.314(a), which require that covered entities by contract require business associates to limit uses and disclosures and implement HIPAA Security Rule-like safeguards. See 78 FR 5566 (Jan. 25, 2013). See also Off. for Civil Rights, "Direct Liability of Business Associates Fact Sheet," U.S. Dep't of Health and Human Servs. (July 16, 2021), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/business-associates/factsheet/index.html.

344    45 CFR 164.504(e) and 164.314(a).

345    45 CFR 164.504(e)(2)(i)(E).

346    65 FR 82462, 82471, and 82875 (Dec. 28, 2000).

347    See 42 U.S.C. 1320d-6(a).

348    45 CFR 164.509(b)(1)(iii) and (c)(1)(vi).

349    45 CFR 164.502(b). The minimum necessary standard of the Privacy Rule applies to all uses and disclosures where a request does not meet one of the specified exceptions in paragraph (b)(2).

350    45 CFR 164.502(b)(1).

351    This approach is consistent with 45 CFR 164.514(h), which requires a covered entity to verify the identity and legal authority of a public official or a person acting on behalf of the public official and describes the type of documentation upon which regulated entities can rely, if such reliance is reasonable under the circumstances, to do so. See also 45 CFR 164.514(d)(3)(iii)(A), which permits a covered entity to rely, if such reliance is reasonable under the circumstances, on a requested disclosure as the minimum necessary for the stated purpose when making disclosures to public officials that are permitted under 45 CFR 164.512, if the public official represents that the information requested is the minimum necessary for the stated purpose(s).

352    E.g., Restatement (Second) Torts § 283, comment b (Am. L. Inst. 1965).

353    45 CFR 164.509(d).

354    See 42 U.S.C. 1320d-6(a).

355    A person (including an employee or other individual) shall be considered to have obtained or disclosed individually identifiable health information in violation of this part if the information is maintained by a covered entity (as defined in the HIPAA privacy regulation described in section 1320d-9(b)(3) of this title) and the individual obtained or disclosed such information without authorization. Id.

356    See 42 U.S.C. 1320d-6(b).

357    45 CFR 164.400 et seq. The HIPAA Breach Notification Rule, 45 CFR 164.400-414, requires HIPAA covered entities and their business associates to provide notification following a breach of unsecured PHI.

358    See 42 U.S.C. 1320d-6(a).

359    See 45 CFR 164.512.

360    See 42 U.S.C. 300jj-52(a)(1) (excluding from the definition of "information blocking" practices that are likely to interfere with, prevent, or materially discourage access, exchange, or use of electronic health information if they are "required by law"; 85 FR 25642, 25794 (May 1, 2020) (explaining that "required by law" specifically refers to interferences that are explicitly required by state or Federal law). See also 89 FR 1192, 1351 (Jan. 9, 2024) (affirming that where applicable law prohibits access, exchange, or use of information, practices in compliance with such law are not considered to be information blocking and citing to compliance with the Privacy Rule as an example of an applicable law).

361    This approach is consistent with 45 CFR 164.514(h), which requires a regulated entity to verify the identity and legal authority of a public official or a person acting on behalf of the public official and describes the type of documentation upon which the regulated entity can rely, if such reliance is reasonable under the circumstances, to do so. See also 45 CFR 164.514(d)(3)(iii)(A), which permits a covered entity to rely, if such reliance is reasonable under the circumstances, on a requested disclosure as the minimum necessary for the stated purpose when making disclosures to public officials that are permitted under 45 CFR 164.512, if the public official represents that the information requested is the minimum necessary for the stated purpose(s).

362    45 CFR 164.514(h)(1) requires a regulated entity to verify both the identity of the person requesting PHI and the authority of any such person to have access to PHI, if the identity or authority of such person is not known to the regulated entity. 45 CFR 164.514(h)(2)(ii) describes the information upon which a regulated entity may rely, if such reliance is reasonable under the circumstances, to verify the identity of a public official requesting PHI or a person acting on behalf of a public official, while 45 CFR 164.514(h)(2)(iii) describes the information upon which a regulated entity may rely, if such reliance is reasonable under the circumstances, to verify the authority of the public official requesting PHI or a person acting on behalf of a public official.

363    45 CFR 164.512(e)(1)(ii)(A).

364    45 CFR 164.512(e)(1)(ii)(B).

365    45 CFR 164.512(e)(1)(iii) and (iv).

366    See 42 U.S.C. 1320d-6(a).

367    See 42 U.S.C. 1320d-5. See also 45 CFR part 160, subparts A, D, and E.

368    See 42 U.S.C. 1320d-6(b).

369    See 45 CFR 164.514(h); see also 65 FR 82462, 82541, and 82547 (Dec. 28, 2000).

370    45 CFR 164.514(h)(2)(iii)(A).

371    45 CFR 164.514(h)(2)(iii)(B).

372    45 CFR 164.512(a)(1).

373    45 CFR 164.514(d)(3)(iii)(A).

374    42 U.S.C. 1320d-5.

375    42 U.S.C. 1320d-6.

376    45 CFR 165.512(e)(1)(ii).

377    45 CFR 164.512(f)(1)(ii)(C).

378    See 42 U.S.C. 1320d-6(a).

379    65 FR 82462, 82524 (Dec. 28, 2000).

380    See id. at 82471.

381    88 FR 23506, 23537-38 (Apr. 17, 2023).

382    45 CFR 164.512(d).

383    45 CFR 164.512(e).

384    45 CFR 164.512(f).

385    45 CFR 164.512(g)(1).

386    The Privacy Rule only applies to PHI, which is IIHI that is maintained or transmitted by, for, or on behalf of a covered entity. Thus, it does not apply to individuals' health information when it is in the possession of a person that is not a regulated entity, such as a friend, family member, or is stored on a personal cellular telephone or tablet. See Off. for Civil Rights, "Protecting the Privacy and Security of Your Health Information When Using Your Personal Cell Phone or Tablet," U.S. Dep't of Health and Human Servs. (June 29, 2022), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/cell-phone-hipaa/index.html.

387    45 CFR 164.512(d).

388    45 CFR 164.512(e).

389    45 CFR 164.512(f).

390    45 CFR 164.512(g)(1).

391    88 FR 23506, 23538 (Apr. 17, 2023).

392    Id.

393    45 CFR 164.512(c).

394    See 45 CFR 164.502(b) and 164.514(d).

395    See 45 CFR 164.512(e) and (f).

396    88 FR 23506, 23538-39 (Apr. 17, 2023).

397    See 65 FR 82462, 82531 (Dec. 28, 2000).

398    See U.S. Senate Committee on Finance News Release (Dec. 12, 2023), https://www.finance.senate.gov/chairmans-news/wyden-jayapal-and-jacobs-inquiry-finds-pharmacies-fail-to-protect-the-privacy-of-americans-medical-records-hhs-must-update-health-privacy-rules (describing legislative inquiry

into pharmacy chains and release of health information in response to law enforcement). See also Letter from Sen. Wyden and Reps. Jayapal and Jacobs to HHS Sec'y Xavier Becerra (Dec. 12, 2023), https://www.finance.senate.gov/imo/media/doc/hhs_pharmacy_surveillance_letter_signed.pdf (describing findings from Congressional oversight, including survey of chain pharmacies about their processes for responding to law enforcement requests for PHI).

399    See U.S. Senate Committee on Finance News Release, supra note 399 and Letter from Sen. Wyden and Reps. Jayapal and Jacobs, supra note 399; see also Remy Tumin, "Pharmacies Shared Patient Records Without a Warrant, an Inquiry Finds," The New York Times (Dec. 13, 2023), https://www.nytimes.com/2023/12/13/us/pharmacy-records-abortion-privacy.html.

400    See 65 FR 82462, 82531 (Dec. 28, 2000).

401    Public Law 93-579, 88 Stat. 1896 (Dec. 31, 1974) (codified at 5 U.S.C. 552a).

402    Off. for Civil Rights, "Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule: A Guide for Law Enforcement," https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/special/emergency/final_hipaa_guide_law_enforcement.pdf.

403    88 FR 23506, 23539 (Apr. 17, 2023).

404    45 CFR 164.520. Unlike many provisions of the Privacy Rule, 45 CFR 164.520 applies only to covered entities, as opposed to both covered entities and their business associates.

405    86 FR 6446 (Jan. 21, 2021).

406    45 CFR 160.103 (definition of "Organized health care arrangement").

407    88 FR 23506, 23539 (Apr. 17, 2023).

408    89 FR 12472 (Feb. 16, 2024).

409    See also 82 FR 6052, 6082-83 (Jan. 18, 2017); Off. for Civil Rights, "Notice of Privacy Practices for Protected Health Information," U.S. Dep't of Health and Human Servs. (July 26, 2013), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/privacy-practices-for-protected-health-information/index.html.

410    65 FR 82462, 82548-49 (Dec. 28, 2000).

411    Off. for Civil Rights, "Model Notices of Privacy Practices," U.S. Dep't of Health and Human Servs. (Apr. 8, 2013), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/model-notices-privacy-practices/index.html.

412    45 CFR 164.502(d)(2).

413    See 45 CFR part 160, subpart B—Preemption of State Law.

414    58 FR 51735 (Oct. 4, 1993).

415    88 FR 21879 (Apr. 11, 2023).

416    76 FR 3821 (Jan. 21, 2011).

417    Public Law 96-354, 94 Stat. 1164 (codified at 5 U.S.C. 601-612).

418    Public Law 104-4, 109 Stat. 48 (codified at 2 U.S.C. 1501).

419    *Id.* at sec. 202 (codified at 2 U.S.C. 1532(a)).

420    Also referred to as the Congressional Review Act, 5 U.S.C. 801 *et seq.*

421    88 FR 3997 (Jan. 23, 2023).

422    64 FR 59918 (Nov. 3, 1999).

423    78 FR 5566 (Jan. 25, 2013).

424    For each occupation performing activities as a result of the final rule, the Department identifies a pre-tax hourly wage using a database maintained by the Bureau of Labor Statistics. See U.S. Dep't of Labor, "Occupational Employment and Wages" (May 2022), https://www.bls.gov/oes/current/oes_nat.htm.

425    This includes 60 days from publication of a final rule to the effective date and an additional 180 days until the compliance date.

       a Number of pharmacy establishments is taken from industry statistics.

426    See U.S. Census Bureau, American Community Survey S0101, AGE AND SEX 2022: ACS 5-Year Estimates Subject Tables (females aged 10-44), https://data.census.gov/table/ACSST1Y2022.S0101. The U.S. Census Bureau uses the term "sex" to equate to an individual's biological sex. "Sex—Definition," U.S. Census Bureau (accessed Mar. 20, 2024), https://www.census.gov/glossary/?term=Sex.

427    See "Reproductive and Sexual Health," Sexually active females who received reproductive health services (FP-7.1), Healthypeople.gov, https://wayback.archive-it.org/5774/20220415172039/https://www.healthypeople.gov/2020/leading-health-indicators/2020-lhi-topics/Reproductive-and-Sexual-Health/data.

428    See American Community Survey S0101, AGE AND SEX 2022: ACS 5-Year Estimates Subject Tables (females aged 10-44), supra note 427.

429    See M. Antonia Biggs et al., "Women's Mental Health and Well-being 5 Years After Receiving or Being Denied an Abortion: A Prospective, Longitudinal Cohort Study," 74(2) JAMA Psychiatry 169, 177 (2017), https://jamanetwork.com/journals/jamapsychiatry/fullarticle/2592320. See also Julia R. Steinberg et al., "The association between first abortion and first-time non-fatal suicide attempt: a longitudinal cohort study of Danish population registries," 6(12) The Lancet Psychiatry 1031-1038 (Dec. 2019).

430    See Julia R. Steinberg et al., "Fatal flaws in a recent meta-analysis on abortion and mental health," 86(5) Contraception 430-7 (Nov. 2012), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3646711/ (discussing errors and significant shortcomings of the studies included in the 2011 meta-analysis that render its conclusions invalid).

431    See Lawrence O. Gostin et al., "One Year After Dobbs—Vast Changes to the Abortion Legal Landscape," 4(8) JAMA Health Forum (2023), https://jamanetwork.com/journals/jama-health-forum/fullarticle/2808205 (counting 21 states with post-Dobbs limits that are more restrictive than Roe v. Wade allowed) and Laura Deal, "State Laws Restricting or Prohibiting Abortion," Congressional Research Service (Jan. 22, 2024), https://crsreports.congress.gov/product/pdf/R/R47595. Because of the pace of change in this area, the Department relies on a higher number than JAMA's 2023 figure as a basis for its cost estimates.

432    See 45 CFR 160.201 *et seq.* for information about exceptions to HIPAA's general preemption authority and the process for requesting such an exception and the criteria for granting it.

433 "Information Collection: Process for Requesting Exception Determinations (states or persons)," U.S. Gen. Servs. Admin. & Off. of Mgmt. and Budget, https://www.reginfo.gov/public/do/PRAViewIC?ref_nbr=201909-0945-001&icID=10428.

434 See supra, Table 3 of this RIA.

435 Id.

436 Id.

437 This includes 60 days from the date of publication to the effective date, plus 120 days from the effective date to the compliance date.

438 45 CFR 164.520(c)(1)(v)(A).

a Totals may not add up due to rounding.

a Totals may not add up due to rounding.

439 See "One Year After Dobbs—Vast Changes to the Abortion Legal Landscape," supra note 432 (counting 21 states with post-Dobbs limits that are more restrictive than Roe v. Wade allowed) and "State Laws Restricting or Prohibiting Abortion," supra note 432. Because of the pace of change in this area, the Department relies on a higher number than JAMA's 2023 figure as a basis for its cost estimates.

440 See "Trust and Privacy: How Patient Trust in Providers is Related to Privacy Behaviors and Attitudes," supra note 120; Paige Nong et al., "Discrimination, trust, and withholding information from providers: Implications for missing data and inequity," SSM—Population Health (Apr. 7, 2022), https://www.sciencedirect.com/science/article/pii/S2352827322000714; See also S.J. Nass et al., "Beyond the HIPAA Privacy Rule: Enhancing Privacy, Improving Health Through Research," Institute of Medicine (US) Committee on Health Research and the Privacy of Health Information: The HIPAA Privacy Rule (2009), https://www.ncbi.nlm.nih.gov/books/NBK9579/.

441 See Danielle Keats Citron & Daniel J. Solove, "Privacy Harms," GWU Legal Studies Research Paper No. 2021-11, GWU Law School Public Law Research Paper No. 2021-11, 102 B.U. L. Rev. 793, 830-861 (Feb. 9, 2021), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3782222.

442 See "Reclaiming Tort Law to Protect Reproductive Rights," supra note 152.

443 See Div. of Reproductive Health, Nat'l Ctr. for Chronic Disease Prevention and Health Promotion, "Women With Chronic Conditions Struggle to Find Medications After Abortion Laws Limit Access," Ctrs. for Disease Control and Prevention (Jan. 4, 2023), https://www.cdc.gov/teenpregnancy/health-care-providers/index.htm; see also Brittni Frederiksen et al., "Abortion Bans May Limit Essential Medications for Women with Chronic Conditions," Kaiser Family Foundation (Nov. 17, 2022), https://www.kff.org/womens-health-policy/issue-brief/abortion-bans-may-limit-essential-medications-for-women-with-chronic-conditions/.

444 See Lynn M. Yee et al., "Association of Health Literacy Among Nulliparous Individuals and Maternal and Neonatal Outcomes," JAMA Network Open (Sept. 1, 2021), https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2783674.

445 See "Texas Maternal Mortality and Morbidity Review Committee and Department of State Health Services Joint Biennial Report 2022," supra note 123.

446 See Helen Levy & Alex Janke, "Health Literacy and Access to Care," J. of Health Commc'n (2016), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4924568/; see also Brief for Zurawski, Zurawski v. State of Texas (No.

D-1-GN-23-000968) (W.D. Tex. 2023), https://reproductiverights.org/wp-content/uploads/2023/03/Zurawski-v-State-of-Texas-Complaint.pdf.

447    See Brief for Zurawski, at 10, supra note 447.

448    Public Law 93-579, 88 Stat. 1896 (Dec. 31, 1974) (codified at 5 U.S.C. 552a).

449    40 FR 28948, 28955 (July 9, 1975).

450    42 U.S.C. 1320d-6(a).

451    A person (including an employee or other individual) shall be considered to have obtained or disclosed individually identifiable health information in violation of this part if the information is maintained by a covered entity (as defined in the HIPAA privacy regulation described in section 1320d-9(b)(3) of this title) and the individual obtained or disclosed such information without authorization. Id.

452    696,898 = 774,331 x .90.

453    See U.S. Small Business Administration, Table of Small Business Size Standards (Mar. 17, 2023), https://www.sba.gov/sites/sbagov/files/2023-06/TableofSizeStandards_EffectiveMarch17'2023-2'.pdf.

454    Id.

455    Kaiser Family Foundation, "Market Share and Enrollment of Largest Three Insurers—Large Group Market" (2019), https://www.kff.org/other/state-indicator/market-share-and-enrollment-of-largest-three-insurers-large-group-market/?currentTimeframe=0&sortModel=#`colId`:`Location`,`sort`:`asc``.

456    This figure represents annualized costs discounted at a 3% rate.

457    42 U.S.C. 1320d-7(a)(1).

458    42 U.S.C. 1320d-7(a)(2)(A).

459    45 CFR 160.201 through 160.205.

460    Public Law 105-277, 112 Stat. 2681 (Oct. 21, 1998).

461    Public Law 104-13, 109 Stat. 163 (May 22, 1995).

462    This includes an increase of 416 burden hours and $36,442 in costs added to the existing information collection for requesting exemption determinations under 45 CFR 160.204.

463    See Off. for Civil Rights, "Annual Report to Congress on Breaches of Unsecured Protected Health Information," U.S. Dep't of Health and Human Servs. (2022), https://www.hhs.gov/hipaa/for-professionals/breach-notification/reports-congress/index.html.

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Baldwin's Ohio Revised Code Annotated
    Constitution of the State of Ohio
        Article XVIII. Municipal Corporations

OH Const. Art. XVIII, Refs & Annos

Currentness

Const. Art. XVIII, Refs & Annos, OH CONST Art. XVIII, Refs & Annos
Current through Files 1 to 59 of the 135th General Assembly (2023-2024).

**End of Document**                                 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW  © 2025 Thomson Reuters. No claim to original U.S. Government Works.    Appx. 323    1

O Const XVIII Sec. 1 Classification of cities and villages;..., OH CONST Art. XVIII...

Case 2:24-cv-00228-2    Document 50-1    Filed 01/17/25    Page 324 of 882    PageID 49109

Baldwin's Ohio Revised Code Annotated
    Constitution of the State of Ohio
        Article XVIII. Municipal Corporations (Refs & Annos)

OH Const. Art. XVIII, § 1

O Const XVIII Sec. 1 Classification of cities and villages; transition

Currentness

Municipal corporations are hereby classified into cities and villages. All such corporations having a population of five thousand or over shall be cities; all others shall be villages. The method of transition from one class to the other shall be regulated by law.

**CREDIT(S)**

(1912 constitutional convention, adopted eff. 11-15-12)

Notes of Decisions (26)

Const. Art. XVIII, § 1, OH CONST Art. XVIII, § 1
Current through Files 1 to 59 of the 135th General Assembly (2023-2024).

**End of Document**    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW  © 2025 Thomson Reuters. No claim to original U.S. Government Works.  Appx. 324    1

O Const XVIII Sec. 2 General laws for incorporation and..., OH CONST Art. XVIII...

Case 2:24-cv-00228-Z    Document 50-1    Filed 01/17/25    Page 325 of 882    PageID 49110

Baldwin's Ohio Revised Code Annotated
   Constitution of the State of Ohio
      Article XVIII. Municipal Corporations (Refs & Annos)

OH Const. Art. XVIII, § 2

O Const XVIII Sec. 2 General laws for incorporation and government of municipalities; additional laws; referendum

Currentness

General laws shall be passed to provide for the incorporation and government of cities and villages; and additional laws may also be passed for the government of municipalities adopting the same; but no such additional law shall become operative in any municipality until it shall have been submitted to the electors thereof, and affirmed by a majority of those voting thereon, under regulations to be established by law.

**CREDIT(S)**

(1912 constitutional convention, adopted eff. 11-15-12)

Notes of Decisions (25)

Const. Art. XVIII, § 2, OH CONST Art. XVIII, § 2
Current through Files 1 to 59 of the 135th General Assembly (2023-2024).

**End of Document**
© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Baldwin's Ohio Revised Code Annotated
    Constitution of the State of Ohio
        Article XVIII. Municipal Corporations (Refs & Annos)

OH Const. Art. XVIII, § 3

O Const XVIII Sec. 3 Municipal powers of local self-government

Currentness

Subject to the requirements of Section 1 of Article V of this constitution, municipalities shall have authority to exercise all powers of local self-government and to adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with general laws.

**CREDIT(S)**

(2022 HJR 4, am. eff. 11-8-22; 1912 constitutional convention, adopted eff. 11-15-12)

Notes of Decisions (1557)

Const. Art. XVIII, § 3, OH CONST Art. XVIII, § 3
Current through Files 1 to 59 of the 135th General Assembly (2023-2024).

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

---

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

O Const XVIII Sec. 4 Municipality may acquire public..., OH CONST Art. XVIII,...

Case 2:24-cv-00228-Z   Document 50-1   Filed 01/17/25   Page 327 of 882   PageID 49112

Baldwin's Ohio Revised Code Annotated
    Constitution of the State of Ohio
        Article XVIII. Municipal Corporations (Refs & Annos)

OH Const. Art. XVIII, § 4

O Const XVIII Sec. 4 Municipality may acquire public utility or contract for utility services

Currentness

Any municipality may acquire, construct, own, lease and operate within or without its corporate limits, any public utility the products or service of which is or is to be supplied to the municipality or its inhabitants, and may contract with others for any such product or service. The acquisition of any such public utility may be by condemnation or otherwise, and a municipality may acquire thereby the use of, or full title to, the property and franchise of any company or person supplying to the municipality or its inhabitants the service or produce of any such utility.

**CREDIT(S)**

(1912 constitutional convention, adopted eff. 11-15-12)

Notes of Decisions (246)

Const. Art. XVIII, § 4, OH CONST Art. XVIII, § 4
Current through Files 1 to 59 of the 135th General Assembly (2023-2024).

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

O Const XVIII Sec. 5 Referendum on acquiring or..., OH CONST Art. XVIII,...

Case 2:24-cv-00228-Z    Document 50-1    Filed 01/17/25    Page 328 of 882    PageID 49113

Baldwin's Ohio Revised Code Annotated
    Constitution of the State of Ohio
        Article XVIII. Municipal Corporations (Refs & Annos)

OH Const. Art. XVIII, § 5

O Const XVIII Sec. 5 Referendum on acquiring or operating municipal utility

Currentness

Any municipality proceeding to acquire, construct, own, lease or operate a public utility, or to contract with any person or company therefor, shall act by ordinance and no such ordinance shall take effect until after thirty days from its passage. If within said thirty days a petition signed by ten per centum of the electors of the municipality shall be filed with the executive authority thereof demanding a referendum on such ordinance it shall not take effect until submitted to the electors and approved by a majority of those voting thereon. The submission of any such question shall be governed by all the provisions of section 8 of this article as to the submission of the question of choosing a charter commission.

**CREDIT(S)**

(1912 constitutional convention, adopted eff. 11-15-12)

Notes of Decisions (49)

Const. Art. XVIII, § 5, OH CONST Art. XVIII, § 5
Current through Files 1 to 59 of the 135th General Assembly (2023-2024).

**End of Document** 

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:24-cv-00228-2   Document 50-1   Filed 01/17/25   Page 329 of 882   PageID 49114

🚩 KeyCite Yellow Flag - Negative Treatment

Unconstitutional or Preempted  Limitation Recognized by  Duke Energy Ohio, Inc. v. Hamilton,  Ohio App. 12 Dist.,  Oct. 25, 2021

Baldwin's Ohio Revised Code Annotated
    Constitution of the State of Ohio
        Article XVIII. Municipal Corporations (Refs & Annos)

OH Const. Art. XVIII, § 6

O Const XVIII Sec. 6 Sale of surplus product of municipal utility; limitation

Currentness

Any municipality, owning or operating a public utility for the purpose of supplying the service or product thereof to the municipality or its inhabitants, may also sell and deliver to others any transportation service of such utility and the surplus product of any other utility in an amount not exceeding in either case fifty per cent of the total service or product supplied by such utility within the municipality, provided that such fifty per cent limitation shall not apply to the sale of water or sewage services.

**CREDIT(S)**

(128 v 1355, am. eff. 11-3-59; 1912 constitutional convention, adopted eff. 11-15-12)

Notes of Decisions (60)

Const. Art. XVIII, § 6, OH CONST Art. XVIII, § 6
Current through Files 1 to 59 of the 135th General Assembly (2023-2024).

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Baldwin's Ohio Revised Code Annotated
    Constitution of the State of Ohio
        Article XVIII. Municipal Corporations (Refs & Annos)

OH Const. Art. XVIII, § 7

O Const XVIII Sec. 7 Municipal charter

Currentness

Any municipality may frame and adopt or amend a charter for its government and may, subject to the provisions of section 3 of this article, exercise thereunder all powers of local self-government.

**CREDIT(S)**

(1912 constitutional convention, adopted eff. 11-15-12)

Notes of Decisions (348)

Const. Art. XVIII, § 7, OH CONST Art. XVIII, § 7
Current through Files 1 to 59 of the 135th General Assembly (2023-2024).

**End of Document**                                         © 2025 Thomson Reuters. No claim to original U.S. Government Works.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

O Const XVIII Sec. 8 Referenda on whether to frame..., OH CONST Art. XVIII,...

Case 2:24-cv-00228-Z    Document 50-1    Filed 01/17/25    Page 331 of 882    PageID 49116

Baldwin's Ohio Revised Code Annotated
  Constitution of the State of Ohio
    Article XVIII. Municipal Corporations (Refs & Annos)

OH Const. Art. XVIII, § 8

O Const XVIII Sec. 8 Referenda on whether to frame charter and on adoption of proposed charter

Currentness

The legislative authority of any city or village may by a two-thirds vote of its members, and upon petition of ten per centum of the electors shall forthwith, provide by ordinance for the submission to the electors, of the question, "Shall a commission be chosen to frame a charter." The ordinance providing for the submission of such question shall require that it be submitted to the electors at the next regular municipal election if one shall occur not less than sixty nor more than one hundred and twenty days after its passage; otherwise it shall provide for the submission of the question at a special election to be called and held within the time aforesaid. The ballot containing such question shall bear no party designation, and provision shall be made thereon for the election from the municipality at large of fifteen electors who shall constitute a commission to frame a charter; provided that a majority of the electors voting on such question shall have voted in the affirmative. Any charter so framed shall be submitted to the electors of the municipality at an election to be held at a time fixed by the charter commission and within one year from the date of its election, provision for which shall be made by the legislative authority of the municipality in so far as not prescribed by general law. Not less than thirty days prior to such election the clerk of the municipality shall mail a copy of the proposed charter to each elector whose name appears upon the poll or registration books of the last regular or general election held therein. If such proposed charter is approved by a majority of the electors voting thereon it shall become the charter of such municipality at the time fixed therein.

**CREDIT(S)**

(1912 constitutional convention, adopted eff. 11-15-12)

Notes of Decisions (95)

Const. Art. XVIII, § 8, OH CONST Art. XVIII, § 8
Current through Files 1 to 59 of the 135th General Assembly (2023-2024).

End of Document                              © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Baldwin's Ohio Revised Code Annotated
    Constitution of the State of Ohio
        Article XVIII. Municipal Corporations (Refs & Annos)

OH Const. Art. XVIII, § 9

O Const XVIII Sec. 9 Amendment of charter; referendum

Currentness

Amendments to any charter framed and adopted as herein provided may be submitted to the electors of a municipality by a two-thirds vote of the legislative authority thereof, and upon petitions signed by ten per centum of the electors of the municipality setting forth any such proposed amendment, shall be submitted by such legislative authority. The submission of proposed amendments to the electors shall be governed by the requirements of section 8 as to the submission of the question of choosing a charter commission; and copies of proposed amendments may be mailed to the electors as hereinbefore provided for copies of a proposed charter, or, pursuant to laws passed by the General Assembly, notice of proposed amendments may be given by newspaper advertising. If any such amendment is approved by a majority of the electors voting thereon, it shall become a part of the charter of the municipality. A copy of said charter or any amendment thereto shall be certified to the secretary of state, within thirty days after adoption by a referendum vote.

**CREDIT(S)**

(1970 SJR 31, am. eff. 1-1-71; 1912 constitutional convention, adopted eff. 11-15-12)

Notes of Decisions (75)

Const. Art. XVIII, § 9, OH CONST Art. XVIII, § 9
Current through Files 1 to 59 of the 135th General Assembly (2023-2024).

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

O Const XVIII Sec. 10 Acquiring property exceeding public..., OH CONST Art. XVIII...

Case 2:24-cv-00228-Z    Document 50-1    Filed 01/17/25    Page 333 of 882    PageID 49118

Baldwin's Ohio Revised Code Annotated
  Constitution of the State of Ohio
    Article XVIII. Municipal Corporations (Refs & Annos)

OH Const. Art. XVIII, § 10

O Const XVIII Sec. 10 Acquiring property exceeding public needs

Currentness

A municipality appropriating or otherwise acquiring property for public use may in furtherance of such public use appropriate or acquire an excess over that actually to be occupied by the improvement, and may sell such excess with such restrictions as shall be appropriate to preserve the improvement made. Bonds may be issued to supply the funds in whole or in part to pay for the excess property so appropriated or otherwise acquired, but said bonds shall be a lien only against the property so acquired for the improvement and excess, and they shall not be a liability of the municipality nor be included in any limitation of the bonded indebtedness of such municipality prescribed by law.

**CREDIT(S)**

(1912 constitutional convention, adopted eff. 11-15-12)

Notes of Decisions (24)

Const. Art. XVIII, § 10, OH CONST Art. XVIII, § 10
Current through Files 1 to 59 of the 135th General Assembly (2023-2024).

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

O Const XVIII Sec. 11 Assessment of benefitted property..., OH CONST Art. XVIII...

Case 2:24-cv-00228-Z    Document 50-1    Filed 01/17/25    Page 334 of 882    PageID 49119

Baldwin's Ohio Revised Code Annotated
    Constitution of the State of Ohio
        Article XVIII. Municipal Corporations (Refs & Annos)

OH Const. Art. XVIII, § 11

O Const XVIII Sec. 11 Assessment of benefitted property to pay for improvements

Currentness

Any municipality appropriating private property for a public improvement may provide money therefor in part by assessments upon benefited property not in excess of the special benefits conferred upon such property by the improvements. Said assessments, however, upon all the abutting, adjacent, and other property in the district benefited, shall in no case be levied for more than fifty per centum of the cost of such appropriation.

**CREDIT(S)**

(1912 constitutional convention, adopted eff. 11-15-12)

Notes of Decisions (3)

Const. Art. XVIII, § 11, OH CONST Art. XVIII, § 11
Current through Files 1 to 59 of the 135th General Assembly (2023-2024).

**End of Document**                                        © 2025 Thomson Reuters. No claim to original U.S. Government Works.

O Const XVIII Sec. 12 Mortgage bonds to finance..., OH CONST Art. XVIII,...

Case 2:24-cv-00228-2    Document 50-1    Filed 01/17/25    Page 335 of 882    PageID 49120

Baldwin's Ohio Revised Code Annotated
    Constitution of the State of Ohio
        Article XVIII. Municipal Corporations (Refs & Annos)

OH Const. Art. XVIII, § 12

O Const XVIII Sec. 12 Mortgage bonds to finance municipal utilities

Currentness

Any municipality which acquires, constructs or extends any public utility and desires to raise money for such purposes may issue mortgage bonds therefor beyond the general limit of bonded indebtedness prescribed by law; provided that such mortgage bonds issued beyond the general limit of bonded indebtedness prescribed by law shall not impose any liability upon such municipality but shall be secured only upon the property and revenues of such public utility, including a franchise stating the terms upon which, in case of foreclosure, the purchaser may operate the same, which franchise shall in no case extend for a longer period than twenty years from the date of the sale of such utility and franchise on foreclosure.

**CREDIT(S)**

(1912 constitutional convention, adopted eff. 11-15-12)

Notes of Decisions (20)

Const. Art. XVIII, § 12, OH CONST Art. XVIII, § 12
Current through Files 1 to 59 of the 135th General Assembly (2023-2024).

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

O Const XVIII Sec. 13 Laws limiting municipal power to..., OH CONST Art. XVIII...

Case 2:24-cv-00228-Z    Document 50-1    Filed 01/17/25    Page 336 of 882    PageID 49121

Baldwin's Ohio Revised Code Annotated
   Constitution of the State of Ohio
      Article XVIII. Municipal Corporations (Refs & Annos)

OH Const. Art. XVIII, § 13

O Const XVIII Sec. 13 Laws limiting municipal power to tax and incur debts; financial reports; audits

Currentness

Laws may be passed to limit the power of municipalities to levy taxes and incur debts for local purposes, and may require reports from municipalities as to their financial condition and transactions, in such form as may be provided by law, and may provide for the examination of the vouchers, books and accounts of all municipal authorities, or of public undertakings conducted by such authorities.

### CREDIT(S)

(1912 constitutional convention, adopted eff. 11-15-12)

Notes of Decisions (85)

Const. Art. XVIII, § 13, OH CONST Art. XVIII, § 13
Current through Files 1 to 59 of the 135th General Assembly (2023-2024).

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Baldwin's Ohio Revised Code Annotated
    Constitution of the State of Ohio
        Article XVIII. Municipal Corporations (Refs & Annos)

OH Const. Art. XVIII, § 14

O Const XVIII Sec. 14 Municipal elections

Currentness

All elections and submissions of questions provided for in this article shall be conducted by the election authorities prescribed by general law. The percentage of electors required to sign any petition provided for herein shall be based upon the total vote cast at the last preceding general municipal election.

**CREDIT(S)**

(1912 constitutional convention, adopted eff. 11-15-12)

Notes of Decisions (6)

Const. Art. XVIII, § 14, OH CONST Art. XVIII, § 14
Current through Files 1 to 59 of the 135th General Assembly (2023-2024).

---

**End of Document**                              © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
    Municipalities (Ch. 59 to 68)
        Chapter 66. General Municipality Law

W.S.A. Ch. 66, Refs & Annos

Currentness

**Editors' Notes**

**REORGANIZATION OF CHAPTER**

<St.1997, Chapter 66, General Municipality Law, was reorganized by 1999 Act 150, effective Jan. 1, 2001. Section renumbering lines and repeal notes provide, where appropriate, the disposition of subject matter of the chapter's sections prior to the reorganization.>

W. S. A. Ch. 66, Refs & Annos, WI ST Ch. 66, Refs & Annos
Current through 2023 Act 272, published April 10, 2024.

---

End of Document                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Red Flag - Severe Negative Treatment

KeyCite Red Flag Negative Treatment  66.01.    Renumbered in part and repealed in part by 1999 Act 150, §§ 18 to 25, eff. Jan. 1, 2001

West's Wisconsin Statutes Annotated
    Municipalities (Ch. 59 to 68)
        Chapter 66. General Municipality Law (Refs & Annos)

W.S.A. 66.01

66.01. Renumbered in part and repealed in part by 1999 Act 150, §§ 18 to 25, eff. Jan. 1, 2001

Currentness

**Credits**

<<For credits, see Historical Note field.>>

W. S. A. 66.01, WI ST 66.01

Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**                                        © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
  Municipalities (Ch. 59 to 68)
    Chapter 66. General Municipality Law (Refs & Annos)
      Subchapter I. General Powers; Administration

W.S.A. 66.0101

66.0101. Home rule; manner of exercise

Currentness

(1) Under article XI, section 3, of the constitution, the method of determination of the local affairs and government of cities and villages shall be as prescribed in this section.

(1m) In this section, "charter ordinance" means an ordinance that enacts, amends or repeals the charter, or any part of the charter, of a city or village or that makes the election under sub. (4).

(2)(a) A city or village may enact a charter ordinance. A charter ordinance shall be designated as a charter ordinance, requires a two-thirds vote of the members-elect of the legislative body of the city or village, and is subject to referendum as provided in this section.

(b) A charter ordinance that amends or repeals a city or village charter shall designate specifically the portion of the charter that is amended or repealed. A charter ordinance that makes the election under sub. (4) shall designate specifically each enactment of the legislature or portion of the enactment that is made inapplicable to the city or village by the election.

(3) A charter ordinance shall be published as a class 1 notice, under ch. 985, and shall be recorded by the clerk in a permanent book kept for that purpose, with a statement of the manner of its adoption. A certified copy of the charter ordinance shall be filed by the clerk with the secretary of state. The secretary of state shall keep a separate index of all charter ordinances, arranged alphabetically by city and village and summarizing each ordinance, and annually shall issue the index of charter ordinances filed during the 12 months prior to July 1.

(4) A city or village may elect under this section that any law relating to the local affairs and government of the city or village other than those enactments of the legislature of statewide concern as shall with uniformity affect every city or every village shall not apply to the city or village, and when the election takes effect, the law ceases to be in effect in the city or village.

(5) A charter ordinance does not take effect until 60 days after its passage and publication. If within the 60--day period a petition conforming to the requirements of s. 8.40 and signed by a number of electors of the city or village equal to not less than 7 percent of the votes cast in the city or village for governor at the last general election is filed in the office of the clerk of the city or village demanding that the ordinance be submitted to a vote of the electors, it may not take effect until it is submitted to a referendum and approved by a majority of the electors voting in the referendum. The petition and the proceedings for its submission are governed by s. 9.20(2) to (6).

(6) A charter ordinance may be initiated under s. 9.20(1) to (6), but alternative adoption of the charter ordinance by the legislative body is subject to referendum under sub. (5).

(7) A charter ordinance may be submitted to a referendum by the legislative body, under s. 9.20(4) to (6), without initiative petition, and becomes effective when approved by a majority of the electors voting in the referendum.

(8) A charter ordinance enacted or approved by a vote of the electors controls over any prior or subsequent act of the legislative body of the city or village. If the electors of any city or village by a majority vote have adopted or determined to continue to operate under either ch. 62 or 64, or have determined the method of selection of members of the governing board, the question shall not again be submitted to the electors, nor action taken on the question, within a period of 2 years. Any election to change or amend the charter of any city or village, other than a special election as provided in s. 9.20(4), shall be held at the time provided by statute for holding the spring election.

(9)(a) The legislative body of a city or village, by resolution adopted by a two-thirds vote of its members-elect may, and upon petition complying with s. 9.20 shall, submit to the electors under s. 9.20(4) to (6) the question of holding a charter convention under one or more plans proposed in the resolution or petition.

(b) The ballot shall be in substantially the following form:

Shall a charter convention be held?

                    YES ☐                                         NO ☐

If a charter convention is held what plan do you favor?

                    PLAN 1 ☐                                      PLAN 2 ☐

[Repeat for each plan proposed.]

Mark an [X] in the square to the RIGHT of the plan that you select.

(c) If a majority of the electors voting vote for a charter convention, the convention shall be held pursuant to the plan favored by a majority of the total votes cast for all plans. If no plan receives a majority, the 2 plans receiving the highest number of votes shall be again submitted to the electors and a convention shall be held pursuant to the plan favored by a majority of the votes cast.

(d) A charter convention may adopt a charter or amendments to the existing charter. The charter or charter amendments adopted by the convention shall be certified, as soon as practicable, by the presiding officer and secretary of the convention to the city or village clerk and shall be submitted to the electors as provided under s. 9.20(4) to (6), without the alternative provided in s. 9.20(4) to (6), and take effect when approved by a majority of the electors voting.

(10) Nothing in this section shall be construed to impair the right of cities or villages under existing or future authority to enact ordinances or resolutions other than charter ordinances.

(11) Sections 62.13 and 62.50 and chapter 589, laws of 1921, and chapter 423, laws of 1923, shall be construed as enactments of statewide concern for the purpose of providing uniform regulation of police, fire, and combined protective services departments.

(12) Every charter ordinance enacted under s. 66.01, 1943 stats., which was adopted by the governing body prior to December 31, 1944, and which also was published prior to that date in the official newspaper of the city or village, or, if there was none, in a newspaper having general circulation in the city or village, shall be valid as of the date of the original publication notwithstanding the failure to publish the ordinance under s. 10.43(5) and (6), 1943 stats.

**Credits**

<<For credits, see Historical Note field.>>

Notes of Decisions (58)

W. S. A. 66.0101, WI ST 66.0101
Current through 2023 Act 272, published April 10, 2024.

---

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
  Municipalities (Ch. 59 to 68)
    Chapter 66. General Municipality Law (Refs & Annos)
      Subchapter I. General Powers; Administration

W.S.A. 66.0103

66.0103. Code of ordinances

Currentness

(1) The governing body of a city, village, town or county may authorize the preparation of a code of some or all of its general ordinances. The code may be enacted by an ordinance that incorporates the code by reference. A copy of the code shall be available for public inspection not less than 2 weeks before it is enacted. After the code is enacted, a copy shall be maintained and available for public inspection in the office of the city, village, town or county clerk.

(2) Publication of a code enacted under sub. (1), in book or pamphlet form, meets the publication requirements of ss. 59.14, 60.80, 61.50(1) and 62.11(4)(a).

**Credits**

<<For credits, see Historical Note field.>>

Notes of Decisions (5)

W. S. A. 66.0103, WI ST 66.0103
Current through 2023 Act 272, published April 10, 2024.

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:24-cv-00228-2   Document 50-1   Filed 01/17/25   Page 344 of 882   PageID 49129

KeyCite Yellow Flag - Negative Treatment

Proposed Legislation

West's Wisconsin Statutes Annotated

Municipalities (Ch. 59 to 68)

Chapter 66. General Municipality Law (Refs & Annos)

Subchapter I. General Powers; Administration

W.S.A. 66.0104

66.0104. Prohibiting ordinances that place certain limits or requirements on a landlord

Currentness

(1) In this section:

(ah) "Habitability violation" means any of the following conditions if the condition constitutes an ordinance violation:

1. The rental property or rental unit lacks hot or cold running water.

2. Heating facilities serving the rental property or rental unit are not in safe operating condition or are not capable of maintaining a temperature, in all living areas of the property or unit, of at least 67 degrees Fahrenheit during all seasons of the year in which the property or unit may be occupied. Temperatures in living areas shall be measured at the approximate center of the room, midway between floor and ceiling.

3. The rental property or rental unit is not served by electricity, or the electrical wiring, outlets, fixtures, or other components of the electrical system are not in safe operating condition.

4. Any structural or other conditions in the rental property or rental unit that constitute a substantial hazard to the health or safety of the tenant, or create an unreasonable risk of personal injury as a result of any reasonably foreseeable use of the property or unit other than negligent use or abuse of the property or unit by the tenant.

5. The rental property or rental unit is not served by plumbing facilities in good operating condition.

6. The rental property or rental unit is not served by sewage disposal facilities in good operating condition.

7. The rental property or rental unit lacks working smoke detectors or carbon monoxide detectors.

8. The rental property or rental unit is infested with rodents or insects.

9. The rental property or rental unit contains excessive mold.

(ax) "Premises" has the meaning given in s. 704.01(3).

(b) "Rental agreement" has the meaning given in s. 704.01(3m).

(c) "Tenancy" has the meaning given in s. 704.01(4).

(2)(a) No city, village, town, or county may enact an ordinance that places any of the following limitations on a residential landlord:

1. Prohibits a landlord from, or places limitations on a landlord with respect to, obtaining and using or attempting to obtain and use any of the following information with respect to a tenant or prospective tenant:

a. Monthly household income.

b. Occupation.

c. Rental history.

d. Credit information.

e. Court records, including arrest and conviction records, to which there is public access.

f. Social security number or other proof of identity.

2. Limits how far back in time a prospective tenant's credit information, conviction record, or previous housing may be taken into account by a landlord.

3. Prohibits a landlord from, or places limitations on a landlord with respect to, entering into a rental agreement for a premises with a prospective tenant during the tenancy of the current tenant of the premises.

4. Prohibits a landlord from, or places limitations on a landlord with respect to, showing a premises to a prospective tenant during the tenancy of the current tenant of the premises.

(b) No city, village, town, or county may enact an ordinance that places requirements on a residential landlord with respect to security deposits or earnest money or pretenancy or posttenancy inspections that are additional to the requirements under administrative rules related to residential rental practices.

(c) No city, village, town, or county may enact an ordinance that limits a residential tenant's responsibility, or a residential landlord's right to recover, for any damage or waste to, or neglect of, the premises that occurs during the tenant's occupancy of the premises, or for any other costs, expenses, fees, payments, or damages for which the tenant is responsible under the rental agreement or applicable law.

(d)1.a. No city, village, town, or county may enact an ordinance that requires a landlord to communicate to tenants any information that is not required to be communicated to tenants under federal or state law.

b. Subdivision 1.a. does not apply to an ordinance that has a reasonable and clearly defined objective of regulating the manufacture of illegal narcotics.

2. No city, village, town, or county may enact an ordinance that requires a landlord to communicate to the city, village, town, or county any information concerning the landlord or a tenant, unless any of the following applies:

a. The information is required under federal or state law.

b. The information is required of all residential real property owners.

(e) No city, village, town, or county may enact an ordinance that does any of the following:

1. Requires that a rental property or rental unit be inspected except upon a complaint by any person, as part of a program of inspections under subd. 1m., under s. 66.0119, or as required under state or federal law.

1m. A city, village, town, or county may establish a rental property inspection program under this subdivision. Under the program, the governing body of the city, village, town, or county may designate districts in which there is evidence of blight, high rates of building code complaints or violations, deteriorating property values, or increases in single-family home conversions to rental units. A city, village, town, or county may require that a rental property or rental unit located in a district designated under this subdivision be initially inspected and periodically inspected. If no habitability violation is discovered during a program inspection or if a habitability violation is discovered during a program inspection and the violation is corrected within a period of not less than 30 days established by the city, village, town, or county, the city, village, town, or county may not perform a program inspection of the property for at least 5 years. If a habitability violation is discovered during a program inspection and the violation is not corrected within the period established by the city, village, town, or county, the city, village, town, or county may require the rental property or unit to be inspected annually under the program. If a habitability violation is discovered during an inspection conducted upon a complaint and the violation is not corrected within a period of not less than 30 days established by the city, village, town, or county, the city, village, town, or county may require the rental property or unit to be inspected annually under the program. If, at a rental property or unit subject to annual program inspections, no habitability violation is discovered during 2 consecutive annual program inspections, the city, village, town, or county, except as provided in this subdivision, may not perform a program inspection of the property for at least 5 years. No rental property or unit that is less than 8 years old may be inspected under this subdivision. A city, village, town, or county may provide a period of less than 30 days for the correction of a habitability violation under this subdivision if the violation exposes a tenant to imminent danger. A city, village, town, or county shall provide an extension to the period for correction of a habitability violation upon a showing of good cause. A city, village, town, or county shall provide in a notice of a habitability violation an explanation

of the violation including a specification of the violation and the exact location of the violation. No inspection of a rental unit may be conducted under this subdivision if the occupant of the unit does not consent to allow access unless the inspection is under a special inspection warrant under s. 66.0119.

2. Charges a fee for conducting an inspection of a residential rental property unless all of the following are satisfied:

a. The amount of the fee does not exceed $75 for an inspection of a vacant unit under subd. 1m. or an inspection of the exterior and common areas of a property under subd. 1m., $90 for any other initial program inspection under subd. 1m., or $150 for any other 2nd or subsequent program inspection under subd. 1m. No fee may be charged for a program inspection under subd. 1m. if no habitability violation is discovered during the inspection or, if a violation is discovered during the inspection, the violation is corrected within the period established by the city, village, town, or county under subd. 1m. No fee may be charged for an inspection of the exterior and common areas if the property owner voluntarily allows access for the inspection and no habitability violation is discovered during the inspection or, if a violation is discovered during the inspection, the violation is corrected within the period established by the city, village, town, or county under subd. 1m. No fee may be charged for a reinspection that occurs after a habitability violation has been corrected. No fee may be charged to a property owner if a program inspection does not occur because an occupant of the property does not allow access to the property. Annually, a city, village, town, or county may increase the fee amounts under this subd. 2. a. by not more than the percentage change in the U.S. consumer price index for all urban consumers, U.S. city average, as determined by the federal department of labor, for the previous year or 2 percent, whichever is greater.

am. The amount of the fee does not exceed $150 for an inspection under s. 66.0119, except that if a habitability violation is discovered during the inspection and the violation is not corrected within a period of not less than 30 days established by the city, village, town, or county, the fee may not exceed $300. No fee may be charged for an inspection under s. 66.0119 if no habitability violation is discovered. Annually, a city, village, town, or county may increase the fee amounts under this subd. 2. am. by not more than the percentage change in the U.S. consumer price index for all urban consumers, U.S. city average, as determined by the federal department of labor, for the previous year or 2 percent, whichever is greater.

b. The fee is charged at the time that the inspection is actually performed.

3. Charges a fee for a subsequent reinspection of a residential rental property that is more than twice the fee charged for an initial reinspection.

4. Except as provided in this subdivision, requires that a rental property or rental unit be certified, registered, or licensed or requires that a residential rental property owner register or obtain a certification or license related to owning or managing the residential rental property. A city, village, town, or county may require that a rental unit or residential rental property owner be registered if the registration requires only one name of an owner or authorized contact person and an address, telephone number, and, if available, an electronic mail address or other information necessary to receive communications by other electronic means at which the person may be contacted. No city, village, town, or county, except a 1st class city, may charge a fee for registration under this subdivision except a one-time registration fee that reflects the actual costs of operating a registration program, but that does not exceed $10 per building, and a one-time fee for the registration of a change of ownership or management of a building or change of contact information for a building that reflects the actual and direct costs of registration, but that does not exceed $10 per building.

(f) No city, village, town, or county may impose an occupancy or transfer of tenancy fee on a rental unit.

WESTLAW    © 2025 Thomson Reuters. No claim to original U.S. Government Works.    Appx. 347    4

(2m) If a city, village, town, or county has in effect an ordinance that authorizes the inspection of a rental property or rental unit upon a complaint from an inspector or other employee or elected official of the city, village, town, or county, the city, village, town, or county shall maintain for each inspection performed upon a complaint from an employee or official a record of the name of the person making the complaint, the nature of the complaint, and any inspection conducted upon the complaint.

(3)(a) If a city, village, town, or county has in effect on December 21, 2011, an ordinance that is inconsistent with sub. (2)(a) or (b), the ordinance does not apply and may not be enforced.

(b) If a city, village, town, or county has in effect on March 1, 2014, an ordinance that is inconsistent with sub. (2)(c) or (d), the ordinance does not apply and may not be enforced.

(c) If a city, village, town, or county has in effect on March 2, 2016, an ordinance that is inconsistent with sub. (2)(e) or (f), the ordinance does not apply and may not be enforced.

**Credits**

<<For credits, see Historical Note field.>>

Notes of Decisions (4)

W. S. A. 66.0104, WI ST 66.0104
Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
  Municipalities (Ch. 59 to 68)
    Chapter 66. General Municipality Law (Refs & Annos)
      Subchapter I. General Powers; Administration

W.S.A. 66.0105

66.0105. Jurisdiction of overlapping extraterritorial powers

Currentness

The extraterritorial powers granted to cities and villages by statute, including ss. 30.745, 62.23(2) and (7a), 66.0415, 236.10 and 254.57, may not be exercised within the corporate limits of another city or village. Wherever these statutory extraterritorial powers overlap, the jurisdiction over the overlapping area shall be divided on a line all points of which are equidistant from the boundaries of each municipality concerned so that not more than one municipality shall exercise power over any area.

**Credits**
<<For credits, see Historical Note field.>>

Notes of Decisions (4)

W. S. A. 66.0105, WI ST 66.0105
Current through 2023 Act 272, published April 10, 2024.

**End of Document**    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

West's Wisconsin Statutes Annotated
   Municipalities (Ch. 59 to 68)
      Chapter 66. General Municipality Law (Refs & Annos)
         Subchapter I. General Powers; Administration

W.S.A. 66.0107

66.0107. Power of municipalities to prohibit criminal conduct

Currentness

(1) The board or council of any town, village or city may:

(a) Prohibit all forms of gambling and fraudulent devices and practices.

(b) Seize anything devised solely for gambling or found in actual use for gambling and destroy the device after a judicial determination that it was used solely for gambling or found in actual use for gambling.

(bm) Enact and enforce an ordinance to prohibit the possession of marijuana, as defined in s. 961.01(14), subject to the exceptions in s. 961.41(3g)(intro.), and provide a forfeiture for a violation of the ordinance; except that if a complaint is issued regarding an allegation of possession of more than 25 grams of marijuana, or possession of any amount of marijuana following a conviction in this state for possession of marijuana, the subject of the complaint may not be prosecuted under this paragraph for the same action that is the subject of the complaint unless the charges are dismissed or the district attorney declines to prosecute the case.

(bn) Enact and enforce an ordinance to prohibit the possession of a controlled substance specified in s. 961.14(4)(tb) and provide a forfeiture for a violation of the ordinance, except that if a complaint is issued regarding an allegation of possession of a controlled substance specified in s. 961.14(4)(tb) following a conviction in this state for possession of a controlled substance, the subject of the complaint may not be prosecuted under this paragraph for the same action that is the subject of the complaint unless the charges are dismissed or the district attorney declines to prosecute the case.

(bp) Enact and enforce an ordinance to prohibit conduct that is the same as that prohibited by s. 961.573(1) or (2), 961.574(1) or (2), or 961.575(1) or (2) and provide a forfeiture for violation of the ordinance.

(2) Except as provided in sub. (3), nothing in this section may be construed to preclude cities, villages and towns from prohibiting conduct which is the same as or similar to that prohibited by chs. 941 to 948.

(3) The board or council of a city, village or town may not, by ordinance, prohibit conduct which is the same as or similar to conduct prohibited by s. 944.21.

**Credits**

<<For credits, see Historical Note field.>>

Notes of Decisions (11)

W. S. A. 66.0107, WI ST 66.0107
Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**                     © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
  Municipalities (Ch. 59 to 68)
    Chapter 66. General Municipality Law (Refs & Annos)
      Subchapter I. General Powers; Administration

W.S.A. 66.0109

66.0109. Penalties under county and municipal ordinances

Currentness

If a statute requires that the penalty under any county or municipal ordinance conform to the penalty provided by statute the ordinance may impose only a forfeiture and may provide for imprisonment if the forfeiture is not paid.

**Credits**

<<For credits, see Historical Note field.>>

Notes of Decisions (3)

W. S. A. 66.0109, WI ST 66.0109
Current through 2023 Act 272, published April 10, 2024.

**End of Document**                                      © 2025 Thomson Reuters. No claim to original U.S. Government Works.

66.011. Repealed by 1991 Act 315, § 69, eff. June 24, 1992, WI ST 66.011

Case 2:24-cv-00228-Z    Document 50-1    Filed 01/17/25    Page 353 of 882    PageID 49138

KeyCite Red Flag - Severe Negative Treatment

KeyCite Red Flag Negative Treatment  66.011.    Repealed by 1991 Act 315, §  69, eff. June 24, 1992

West's Wisconsin Statutes Annotated
  Municipalities (Ch. 59 to 68)
    Chapter 66. General Municipality Law (Refs & Annos)
      Subchapter I. General Powers; Administration

W.S.A. 66.011

66.011. Repealed by 1991 Act 315, § 69, eff. June 24, 1992

Currentness

**Credits**

<<For credits, see Historical Note field.>>

W. S. A. 66.011, WI ST 66.011
Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

  © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
  Municipalities (Ch. 59 to 68)
    Chapter 66. General Municipality Law (Refs & Annos)
      Subchapter I. General Powers; Administration

W.S.A. 66.0111

66.0111. Bond or cash deposit under municipal ordinances

Currentness

(1) If a person is arrested for the violation of a city, village or town ordinance and the action is to be in circuit court, the chief of police or police officer designated by the chief, marshal or clerk of court may accept from the person a bond, in an amount not to exceed the maximum penalty for the violation, with sufficient sureties, or a cash deposit, for appearance in the court having jurisdiction of the offense. A receipt shall be issued for the bond or cash deposit.

(2)(a) If the person released fails to appear, personally or by an authorized attorney or agent, before the court at the time fixed for hearing the case, the bond and money deposited, or an amount that the court determines to be an adequate penalty, plus costs, including any applicable fees prescribed in ch. 814, may be declared forfeited by the court or may be ordered applied to the payment of any penalty which is imposed after an ex parte hearing, together with the costs. In either event, any surplus shall be refunded to the person who made the deposit.

(b) This subsection does not apply to violations of parking ordinances. Bond or cash deposit given for appearance to answer a charge under any parking ordinance may be forfeited in the manner determined by the governing body.

(3) This section shall not be construed as a limitation upon the general power of cities, villages and towns in all cases of alleged violations of city, village or town ordinances to authorize the acceptance of bonds or cash deposits or upon the general power to accept stipulations for forfeiture of bonds or deposits or pleas where arrest was had without warrant or where action has not been started in court.

(4) This section does not apply to ordinances enacted under ch. 349.

**Credits**
<<For credits, see Historical Note field.>>

**Editors' Notes**

**COMMENTS--1999 ACT 150, § 271**

Note: Reference to bail is deleted and replaced by reference to cash deposit. This is consistent with other statutes dealing with municipal ordinances, which generally do not use the term bail, but rather refer to cash deposit or a variation of that term.

Notes of Decisions (5)

W. S. A. 66.0111, WI ST 66.0111
Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
  Municipalities (Ch. 59 to 68)
    Chapter 66. General Municipality Law (Refs & Annos)
      Subchapter I. General Powers; Administration

W.S.A. 66.0113

66.0113. Citations for certain ordinance violations

Currentness

**(1) Adoption; content.** (a) Except as provided in sub. (5), the governing body of a county, town, city, village, town sanitary district or public inland lake protection and rehabilitation district may by ordinance adopt and authorize the use of a citation under this section to be issued for violations of ordinances, including ordinances for which a statutory counterpart exists.

(b) An ordinance adopted under par. (a) shall prescribe the form of the citation which shall provide for the following:

1. The name and address of the alleged violator.

2. The factual allegations describing the alleged violation.

3. The time and place of the offense.

4. The section of the ordinance violated.

5. A designation of the offense in a manner that can be readily understood by a person making a reasonable effort to do so.

6. The time at which the alleged violator may appear in court and a statement describing whether the appearance is mandatory.

7. A statement which in essence informs the alleged violator:

a. That the alleged violator may make a cash deposit of a specified amount to be mailed to a specified official within a specified time.

b. That if the alleged violator makes such a deposit, he or she need not appear in court unless appearance is mandated by the court or he or she is subsequently summoned.

c. That, if the alleged violator makes a cash deposit and does not appear in court, he or she either will be deemed to have tendered a plea of no contest and submitted to a forfeiture, plus costs, fees, and surcharges imposed under ch. 814, not to exceed the amount of the deposit or will be summoned into court to answer the complaint if the court does not accept the plea of no contest.

d. That, if the alleged violator does not make a cash deposit and does not appear in court at the time specified, the court may issue a summons or a warrant for the defendant's arrest or consider the nonappearance to be a plea of no contest and enter judgment under sub. (3)(d), or the municipality may commence an action against the alleged violator to collect the forfeiture, plus costs, fees, and surcharges imposed under ch. 814.

e. That if the court finds that the violation involves an ordinance that prohibits conduct that is the same as or similar to conduct prohibited by state statute punishable by fine or imprisonment or both, and that the violation resulted in damage to the property of or physical injury to a person other than the alleged violator, the court may summon the alleged violator into court to determine if restitution shall be ordered under s. 800.093.

8. A direction that if the alleged violator elects to make a cash deposit, the alleged violator shall sign an appropriate statement which accompanies the citation to indicate that he or she read the statement required under subd. 7. and shall send the signed statement with the cash deposit.

9. Such other information as may be deemed necessary.

(c) An ordinance adopted under par. (a) shall contain a schedule of cash deposits that are to be required for the various ordinance violations, plus costs, fees, and surcharges imposed under ch. 814, for which a citation may be issued. The ordinance shall also specify the court, clerk of court, or other official to whom cash deposits are to be made and shall require that receipts be given for cash deposits.

**(2) Issuance; filing.** (a) Citations authorized under this section may be issued by law enforcement officers of the county, town, city, village, town sanitary district or public inland lake protection and rehabilitation district. In addition, the governing body of a county, town, city, village, town sanitary district or public inland lake protection and rehabilitation district may designate by ordinance or resolution other county, town, city, village, town sanitary district or public inland lake protection and rehabilitation district officials who may issue citations with respect to ordinances which are directly related to the official responsibilities of the officials. Officials granted the authority to issue citations may delegate, with the approval of the governing body, the authority to employees. Authority delegated to an official or employee shall be revoked in the same manner by which it is conferred.

(b) The issuance of a citation by a person authorized to do so under par. (a) shall be deemed adequate process to give the appropriate court jurisdiction over the subject matter of the offense for the purpose of receiving cash deposits, if directed to do so, and for the purposes of sub. (3)(b) and (c). Issuance and filing of a citation does not constitute commencement of an action. Issuance of a citation does not violate s. 946.68.

**(3) Violator's options; procedure on default.** (a) The person named as the alleged violator in a citation may appear in court at the time specified in the citation or may mail or deliver personally a cash deposit in the amount, within the time, and to the court, clerk of court, or other official specified in the citation. If a person makes a cash deposit, the person may nevertheless appear in court at the time specified in the citation, but the cash deposit may be retained for application against any forfeiture or restitution, plus costs, fees, and surcharges imposed under ch. 814 that may be imposed.

(b) If a person appears in court in response to a citation, the citation may be used as the initial pleading, unless the court directs that a formal complaint be made, and the appearance confers personal jurisdiction over the person. The person may plead guilty, no contest, or not guilty. If the person pleads guilty or no contest, the court shall accept the plea, enter a judgment of guilty, and impose a forfeiture, plus costs, fees, and surcharges imposed under ch. 814. If the court finds that the violation meets the conditions in s. 800.093(1), the court may order restitution under s. 800.093. A plea of not guilty shall put all matters in the case at issue, and the matter shall be set for trial.

(c) If the alleged violator makes a cash deposit and fails to appear in court, the citation may serve as the initial pleading and the violator shall be considered to have tendered a plea of no contest and submitted to a forfeiture, plus costs, fees, and surcharges imposed under ch. 814, not exceeding the amount of the deposit. The court may either accept the plea of no contest and enter judgment accordingly or reject the plea. If the court finds that the violation meets the conditions in s. 800.093(1), the court may summon the alleged violator into court to determine if restitution shall be ordered under s. 800.093. If the court accepts the plea of no contest, the defendant may move within 10 days after the date set for the appearance to withdraw the plea of no contest, open the judgment, and enter a plea of not guilty if the defendant shows to the satisfaction of the court that the failure to appear was due to mistake, inadvertence, surprise, or excusable neglect. If the plea of no contest is accepted and not subsequently changed to a plea of not guilty, no additional costs, fees, or surcharges may be imposed against the violator under s. 814.78. If the court rejects the plea of no contest, an action for collection of the forfeiture, plus costs, fees, and surcharges imposed under ch. 814, may be commenced. A city, village, town sanitary district, or public inland lake protection and rehabilitation district may commence action under s. 66.0114(1) and a county or town may commence action under s. 778.10. The citation may be used as the complaint in the action for the collection of the forfeiture, plus costs, fees, and surcharges imposed under ch. 814.

(d) If the alleged violator does not make a cash deposit and fails to appear in court at the time specified in the citation, the court may issue a summons or warrant for the defendant's arrest or consider the nonappearance to be a plea of no contest and enter judgment accordingly if service was completed as provided under par. (e) or the county, town, city, village, town sanitary district, or public inland lake protection and rehabilitation district may commence an action for collection of the forfeiture, plus costs, fees, and surcharges imposed under ch. 814. A city, village, town sanitary district, or public inland lake protection and rehabilitation district may commence action under s. 66.0114(1) and a county or town may commence action under s. 778.10. The citation may be used as the complaint in the action for the collection of the forfeiture, plus costs, fees, and surcharges imposed under ch. 814. If the court considers the nonappearance to be a plea of no contest and enters judgment accordingly, the court shall promptly mail a copy or notice of the judgment to the defendant. The judgment shall allow the defendant not less than 20 days from the date of the judgment to pay any forfeiture, plus costs, fees, and surcharges imposed under ch. 814. If the defendant moves to open the judgment within 6 months after the court appearance date fixed in the citation, and shows to the satisfaction of the court that the failure to appear was due to mistake, inadvertence, surprise, or excusable neglect, the court shall reopen the judgment, accept a not guilty plea and set a trial date.

(e) A judgment may be entered under par. (d) if the summons or citation was served as provided under s. 968.04(3)(b)2. or by personal service by a county, town, city, village, town sanitary district or public inland lake protection and rehabilitation district employee.

**(4) Relationship to other laws.** The adoption and authorization for use of a citation under this section does not preclude the governing body from adopting any other ordinance or providing for the enforcement of any other law or ordinance relating to the same or any other matter. The issuance of a citation under this section does not preclude proceeding under any other ordinance or law relating to the same or any other matter. Proceeding under any other ordinance or law relating to the same or any other matter does not preclude the issuance of a citation under this section.

**(5) Municipal court.** If the action is to be in municipal court, the citation under s. 800.02(2) shall be used.


**Credits**

<<For credits, see Historical Note field.>>


Notes of Decisions (4)

W. S. A. 66.0113, WI ST 66.0113

Current through 2023 Act 272, published April 10, 2024.

---

End of Document                           © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
  Municipalities (Ch. 59 to 68)
    Chapter 66. General Municipality Law (Refs & Annos)
      Subchapter I. General Powers; Administration

W.S.A. 66.0114

66.0114. Actions for violation of ordinances

Currentness

**(1) Collection of forfeitures and penalties.** (a) An action for violation of an ordinance or bylaw enacted by a city, village, town sanitary district or public inland lake protection and rehabilitation district is a civil action. All forfeitures and penalties imposed by an ordinance or bylaw of the city, village, town sanitary district or public inland lake protection and rehabilitation district, except as provided in ss. 345.20 to 345.53, may be collected in an action in the name of the city or village before the municipal court or in an action in the name of the city, village, town sanitary district or public inland lake protection and rehabilitation district before a court of record. If the action is in municipal court, the procedures under ch. 800 apply and the procedures under this section do not apply. If the action is in a court of record, it shall be commenced by warrant or summons under s. 968.04 or, if applicable, by citation under s. 778.25 or 778.26. A law enforcement officer may arrest the offender in all cases without warrant under s. 968.07. If the action is commenced by warrant the affidavit may be the complaint. The affidavit or complaint is sufficient if it alleges that the defendant has violated an ordinance or bylaw, specifying the ordinance or bylaw by section, chapter, title or otherwise with sufficient plainness to identify the ordinance or bylaw. The judge may release a defendant without a cash deposit or may permit him or her to execute an unsecured appearance bond upon arrest. In arrests without a warrant or summons a statement on the records of the court of the offense charged is the complaint unless the court directs that a formal complaint be issued. In all actions under this paragraph the defendant's plea shall be guilty, not guilty or no contest and shall be entered as not guilty on failure to plead. A plea of not guilty on failure to plead puts all matters in the case at issue, any other provision of law notwithstanding. The defendant may enter a not guilty plea by certified mail.

(b) Local ordinances, except as provided in this paragraph or ss. 345.20 to 345.53, may contain a provision for stipulation of guilt or no contest of any or all violations under those ordinances, may designate the manner in which the stipulation is to be made, and may fix the penalty to be paid. When a person charged with a violation for which stipulation of guilt or no contest is authorized makes a timely stipulation and pays the required penalty, plus costs, fees, and surcharges imposed under ch. 814, to the designated official, the person need not appear in court and no witness fees or other additional costs, fees, or surcharges may be imposed under ch. 814 unless the local ordinance so provides. A court appearance is required for a violation of a local ordinance in conformity with s. 346.63(1).

(bm) The official receiving the penalties shall remit all moneys collected to the treasurer of the city, village, town sanitary district, or public inland lake protection and rehabilitation district in whose behalf the sum was paid, except that all jail surcharges imposed under ch. 814 shall be remitted to the county treasurer, within 20 days after their receipt by the official. If timely remittance is not made, the treasurer may collect the payment of the officer by action, in the name of the office, and upon the official bond of the officer, with interest at the rate of 12 percent per year from the date on which it was due. In the case of any other costs, fees, and surcharges imposed under ch. 814, the treasurer of the city, village, town sanitary district, or public inland lake protection and rehabilitation district shall remit to the secretary of administration the amount required by law to be paid on the actions entered during the preceding month on or before the first day of the next succeeding month. The governing body of the city, village, town sanitary district, or public inland lake protection and rehabilitation district shall by ordinance designate the official to receive the penalties and the terms under which the official qualifies.

(c) If the circuit court finds a defendant guilty in a forfeiture action based on a violation of an ordinance, the court shall render judgment as provided under ss. 800.09 and 800.095. If the court finds the violation meets the conditions in s. 800.093(1)(a) and (b), the court may hold a hearing to determine if restitution shall be ordered under s. 800.093.

**(2) Appeals.** Appeals in actions in courts of record to recover forfeitures and penalties imposed by any ordinance or bylaw of a city, village, town sanitary district or public inland lake protection and rehabilitation district may be taken either by the defendant or by the city, village, town sanitary district or public inland lake protection and rehabilitation district. Appeals from circuit court in actions to recover forfeitures for ordinances enacted under ch. 349 shall be to the court of appeals. An appeal by the defendant shall include a bond to the city, village, town sanitary district or public inland lake protection and rehabilitation district with surety, to be approved by the judge, conditioned that if judgment is affirmed in whole or in part the defendant will pay the judgment and all costs and damages awarded against the defendant on the appeal. If the judgment is affirmed in whole or in part, execution may issue against both the defendant and the surety.

**(3) Costs and fees; forfeitures to go to treasury.** (a) Fees in forfeiture actions in circuit court for violations of ordinances are prescribed in s. 814.63(1) and (2).

(b) All forfeitures and penalties recovered for the violation of an ordinance or bylaw of a city, village, town, town sanitary district, or public inland lake protection and rehabilitation district shall be paid into the city, village, town, town sanitary district, or public inland lake protection and rehabilitation district treasury for the use of the city, village, town, town sanitary district, or public inland lake protection and rehabilitation district, except as provided in par. (c) and sub. (1)(bm). The judge shall report and pay into the treasury, quarterly, or at more frequent intervals if required, all moneys collected belonging to the city, village, town, town sanitary district, or public inland lake protection and rehabilitation district. The report shall be certified and filed in the office of the treasurer. The judge is entitled to duplicate receipts, one of which he or she shall file with the city, village, or town clerk, or with the town sanitary district or the public inland lake protection and rehabilitation district.

(c) The entire amount in excess of $150 of any forfeiture imposed for the violation of any traffic regulation in conformity with ch. 348 shall be transmitted to the county treasurer if the violation occurred on an interstate highway, a state trunk highway, or a highway over which the local highway authority does not have primary maintenance responsibility. The county treasurer shall then make payment to the secretary of administration as provided in s. 59.25(3)(L).

**Credits**
<<For credits, see Historical Note field.>>

Notes of Decisions (61)

W. S. A. 66.0114, WI ST 66.0114
Current through 2023 Act 272, published April 10, 2024.

---

End of Document                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
Municipalities (Ch. 59 to 68)
Chapter 66. General Municipality Law (Refs & Annos)
Subchapter I. General Powers; Administration

W.S.A. 66.0115

66.0115. Outstanding unpaid forfeitures

Currentness

(1) In this section, "municipality" means a county, city, village or town. Except as provided under sub. (2), any municipality may refuse to issue any license or permit to a person who has not paid an overdue forfeiture resulting from a violation of an ordinance of the municipality. Any municipality, by written agreement between itself and any other city, village or town within the county in which the municipality is located, may refuse to issue any license or permit to a person who has not paid an overdue forfeiture resulting from a violation of an ordinance of any municipality which is a party to the agreement. No municipality may refuse to issue a license or permit to a person who is appealing the imposition of a forfeiture.

(2) A municipality may not refuse to issue any of the following licenses under sub. (1):

(a) A marriage license issued under s. 765.12.

(b) A hunting or fishing license issued under ch. 29.

(c) A dog license issued under s. 174.07.

**Credits**
<<For credits, see Historical Note field.>>

Notes of Decisions (1)

W. S. A. 66.0115, WI ST 66.0115
Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**                     © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
  Municipalities (Ch. 59 to 68)
    Chapter 66. General Municipality Law (Refs & Annos)
      Subchapter I. General Powers; Administration

W.S.A. 66.0117

66.0117. Judgment against local governmental units

Currentness

(1) In this section:

(a) "Local governmental unit" means a city, village, town, county, school district, technical college district, town sanitary district or public inland lake protection and rehabilitation district.

(b) "Statement" means all of the following:

1. A certified transcript of a judgment.

2. A judgment creditor's affidavit of the amount due on a judgment, of payments made on the judgment and that the judgment has not been appealed.

(2)(a) If a final judgment for the payment of money is recovered against a local governmental unit, or an officer of the local governmental unit, when the judgment is to be paid by the local governmental unit, the judgment creditor may file a statement with the clerk of circuit court. The clerk of circuit court shall send a copy of the statement to the appropriate municipal clerk.

(b) If a statement is filed under par. (a), the amount due, with costs and interest to the time when the money will be available for payment, shall be added to the next tax levy, and shall, when received, be paid to satisfy the judgment. If the judgment is appealed after filing the transcript with the clerk of circuit court, and before the tax is collected, the money shall not be collected on that levy. If the municipal clerk fails to include the proper amount in the first tax levy, he or she shall include it or the portion required to complete it in the next levy.

(3) In the case of school districts, town sanitary districts or public inland lake protection and rehabilitation districts a statement shall be filed with the clerk of the town, village or city in which the district or any part of it lies, and levy shall be made against the taxable property of the district.

(4) No process for the collection of a judgment shall issue until after the time when the money, if collected upon the first tax levy under sub. (2)(b), is available for payment, and then only by leave of court upon motion.

(5) If by reason of dissolution or other cause, pending action, or after judgment, a statement cannot be filed with the clerk described in sub. (2)(a) or (3), it shall be filed with the clerk or clerks whose duty it is to make up the tax roll for the property liable.


**Credits**

<<For credits, see Historical Note field.>>


**Editors' Notes**

### COMMENTS--1999 ACT 150, § 29

Note: Creates a definition for s. 66.0117, relating to judgments against local governmental units. The definition differs from the current language of s. 66.09 by removing a community center from the list of local governmental bodies to which the law applies. It appears that a community center is not treated as a local governmental unit anywhere else in the statutes. The term community center first appeared in this section when separate statutes were consolidated and revised in chapter 396, laws of 1921.


Notes of Decisions (23)

W. S. A. 66.0117, WI ST 66.0117
Current through 2023 Act 272, published April 10, 2024.

---

End of Document                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

> West's Wisconsin Statutes Annotated
>     Municipalities (Ch. 59 to 68)
>         Chapter 66. General Municipality Law (Refs & Annos)
>             Subchapter I. General Powers; Administration

W.S.A. 66.0119

66.0119. Special inspection warrants

Currentness

(1)(a) "Inspection purposes" includes such purposes as building, housing, electrical, plumbing, heating, gas, fire, health, safety, environmental pollution, water quality, waterways, use of water, food, zoning, property assessment, meter and obtaining data required to be submitted in an initial site report or feasibility report under subch. III of ch. 289 or s. 291.23, 291.25, 291.29 or 291.31 or an environmental impact statement related to one of those reports. "Inspection purposes" also includes purposes for obtaining information specified in s. 196.02(5m) by or on behalf of the public service commission.

(b) "Peace officer" means a state, county, city, village, town, town sanitary district or public inland lake protection and rehabilitation district officer, agent or employee charged under statute or municipal ordinance with powers or duties involving inspection of real or personal property, including buildings, building premises and building contents, and means a local health officer, as defined in s. 250.01(5), or his or her designee.

(c) "Public building" has the meaning given in s. 101.01(12).

(2) A peace officer may apply for, obtain and execute a special inspection warrant issued under this section. Except in cases of emergency where no special inspection warrant is required, special inspection warrants shall be issued for inspection of personal or real properties which are not public buildings or for inspection of portions of public buildings which are not open to the public only upon showing that consent to entry for inspection purposes has been refused.

(3) The following forms for use under this section are illustrative and not mandatory:

AFFIDAVIT

STATE OF WISCONSIN

... County

In the ... court of the ... of ...

A. F., being duly sworn, says that on the ... day of ..., ... (year), in said county, in and upon certain premises in the (city, town or village) of ... and more particularly described as follows: (describe the premises) there now exists a necessity to determine if said premises comply with (section ... of the Wisconsin statutes) or (section ... of ordinances of said municipality) or both. The facts tending to establish the grounds for issuing a special inspection warrant are as follows: (set forth brief statement of

reasons for inspection, frequency and approximate date of last inspection, if any, which shall be deemed probable cause for issuance of warrant).

Wherefore, the said A. F. prays that a special inspection warrant be issued to search such premises for said purpose.

...(Signed) A. F.

Subscribed and sworn to before me this ... day of ..., ... (year)

... Judge of the ... Court.

## SPECIAL INSPECTION WARRANT

STATE OF WISCONSIN

... County

In the ... court of the ... of ...

THE STATE OF WISCONSIN, To the sheriff or any constable or any peace officer of said county:

Whereas, A. B. has this day complained (in writing) to the said court upon oath that on the ... day of ..., ... (year), in said county, in and upon certain premises in the (city, town or village) of ... and more particularly described as follows: (describe the premises) there now exists a necessity to determine if said premises comply with (section ... of the Wisconsin statutes) or (section ... of ordinances of said municipality) or both and prayed that a special inspection warrant be issued to search said premises.

Now, therefore, in the name of the state of Wisconsin you are commanded forthwith to search the said premises for said purposes.

Dated this ... day of ..., ... (year),

... Judge of the ... Court.

## ENDORSEMENT ON WARRANT

Received by me ..., ... (year), at ... o'clock ... M.

... Sheriff (or peace officer).

## RETURN OF OFFICER

STATE OF WISCONSIN

... Court

... County.

I hereby certify that by virtue of the within warrant I searched the named premises and found the following things (describe findings).

Dated this ... day of ..., ... (year)

... Sheriff (or peace officer).

**Credits**

<<For credits, see Historical Note field.>>


Notes of Decisions (4)


W. S. A. 66.0119, WI ST 66.0119
Current through 2023 Act 272, published April 10, 2024.

---

End of Document
© 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
    Municipalities (Ch. 59 to 68)
        Chapter 66. General Municipality Law (Refs & Annos)
            Subchapter I. General Powers; Administration

W.S.A. 66.012

66.012. Renumbered 66.0215 and amended by 1999 Act 150, § 31, eff. Jan. 1, 2001

Currentness

**Credits**

<<For credits, see Historical Note field.>>

W. S. A. 66.012, WI ST 66.012
Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
  Municipalities (Ch. 59 to 68)
    Chapter 66. General Municipality Law (Refs & Annos)
      Subchapter I. General Powers; Administration

W.S.A. 66.0121

66.0121. Orders; action; proof of demand

Currentness

No action may be brought upon a city, village, town or school district order until 30 days after a demand for the payment of the order has been made. If an action is brought and the defendant fails to appear and defend the action, judgment shall not be entered without affirmative proof of the demand. If judgment is entered without proof of the demand, the judgment is void.

**Credits**
<<For credits, see Historical Note field.>>

W. S. A. 66.0121, WI ST 66.0121
Current through 2023 Act 272, published April 10, 2024.

**End of Document**                                © 2025 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW  © 2025 Thomson Reuters. No claim to original U.S. Government Works.     Appx. 369     1

West's Wisconsin Statutes Annotated
  Municipalities (Ch. 59 to 68)
    Chapter 66. General Municipality Law (Refs & Annos)
      Subchapter I. General Powers; Administration

W.S.A. 66.0123

66.0123. Recreation authority

Currentness

(1) In this section, "governmental unit" means a town board or school board.

(2) A governmental unit may, after compliance with s. 65.90, provide funds for the establishment, operation and maintenance of a department of public recreation.

(3)(a) A governmental unit may delegate the power to establish, maintain and operate a department of public recreation to a recreation board, which shall consist of 3 members and shall be appointed by the chairperson or other presiding officer of the governmental unit. The first appointments shall be made so that one member serves one year, one serves 2 years and one serves 3 years. After the first appointments, terms are 3 years.

(b) When 2 or more of the governmental units desire to conduct, jointly, a department of public recreation, the joint recreation board shall consist of not less than 3 members selected by the presiding officers of the governmental units acting jointly. Appointments shall be made for terms as provided in par. (a).

(c) The members of a recreation board shall serve gratuitously.

(d) A recreation board may conduct the activities of the department of public recreation, expend funds, employ a supervisor of recreation, employ assistants, purchase equipment and supplies and generally supervise the administration, maintenance and operation of the department of public recreation and recreational activities authorized by the recreation board.

(4)(a) A recreation board may conduct public recreation activities on property purchased or leased by a governmental unit for recreational purposes and under its own custody, on other public property under the custody of any other public authority, body or board with the consent of the public authority, body or board, or on private property with the consent of its owner. The recreation board, with the approval of the appointing authority, may accept gifts and bequests of land, money or other personal property, and use the gifts and bequests in whole or in part, the income from the gifts and bequests or the proceeds from the sale of any such property in the establishment, maintenance and operation of recreational activities.

(b) A recreation board shall annually submit to the governmental unit a report of the board's activities, including receipts and expenditures. The report shall be submitted not less than 15 days before the annual meeting of the governmental unit.

(c) An audit shall be made of the accounts of the recreation board in the same manner as provided for audits for towns or school districts as the case may be.

(d) The persons selected by the recreation board shall furnish a surety bond in an amount fixed by the governmental unit.

**Credits**

<<For credits, see Historical Note field.>>

W. S. A. 66.0123, WI ST 66.0123

Current through 2023 Act 272, published April 10, 2024.

| End of Document | © 2025 Thomson Reuters. No claim to original U.S. Government Works. |
|---|---|

⚑ KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

> West's Wisconsin Statutes Annotated
>   Municipalities (Ch. 59 to 68)
>     Chapter 66. General Municipality Law (Refs & Annos)
>       Subchapter I. General Powers; Administration

W.S.A. 66.0125

66.0125. Community relations--social development commissions

Currentness

**(1) Definitions.** In this section:

(a) "Status as a victim of domestic abuse, sexual assault, or stalking," for purposes of discrimination in housing, has the meaning given in s. 106.50(1m)(u).

(b) "Local governmental unit" means a city, village, town, school district, or county.

**(2) Creation.** Each local governmental unit is authorized and urged to either establish by ordinance a community relations-social development commission or to participate in a commission established on an intergovernmental basis within the county under enabling ordinances adopted by the participating local governmental units. A school district may establish or participate in a commission by resolution. An intergovernmental commission may be established in cooperation with a nonprofit corporation located in the county and composed primarily of public and private welfare agencies devoted to any of the purposes set forth in this section. An ordinance or resolution establishing a commission shall substantially embody the language of sub. (3). Each local governmental unit may appropriate money to defray the expenses of the commission. If the commission is established on an intergovernmental basis within the county, the provisions of s. 66.0301, relating to local cooperation, apply as optional authority and may be utilized by participating local governmental units to effectuate the purposes of this section, but a contract between local governmental units is not necessary for the joint exercise of any power authorized for the joint performance of any duty required in this section.

**(3) Purpose and functions of commission.** (a) The purpose of the commission is to study, analyze, and recommend solutions for the major social, economic, and cultural problems that affect people residing or working within the local governmental unit, including problems of the family, youth, education, the aging, juvenile delinquency, health and zoning standards, discrimination in employment and public accommodations and facilities on the basis of sex, class, race, religion, sexual orientation, or ethnic or minority status and discrimination in housing on the basis of sex, class, race, religion, sexual orientation, ethnic or minority status, or status as a victim of domestic abuse, sexual assault, or stalking.

(b) The commission may:

1. Include within its studies problems related to pornography, industrial strife and the inciting or fomenting of class, race or religious hatred and prejudice.

2. Encourage and foster participation in the fine arts.

(c) The commission shall:

1. Recommend to the local governmental unit's governing body and chief executive or administrative officer the enactment of such ordinances or other action as they deem necessary:

a. To establish and keep in force proper health standards for the community and beneficial zoning for the community area in order to facilitate the elimination of, and prevent the start and spread of, blighted areas.

b. To ensure to all residents of a local governmental unit, regardless of sex, race, sexual orientation, or color, the right to enjoy equal employment opportunities and to ensure to those residents, regardless of sex, race, sexual orientation, color, or status as a victim of domestic abuse, sexual assault, or stalking, the right to possess equal housing opportunities.

2. Cooperate with state and federal agencies and nongovernmental organizations having similar or related functions.

3. Examine the need for, initiate, participate in and promote publicly and privately sponsored studies and programs in any field of human relationship that will aid in accomplishing the purposes and duties of the commission.

4. Have authority to conduct public hearings within the local governmental unit and to administer oaths to persons testifying before it.

5. Employ such staff as is necessary to implement the duties assigned to it.

(4) Composition of commission. The commission shall be nonpartisan and composed of citizens residing in the local governmental unit, including representatives of the clergy and minority groups. The composition of the commission and the method of appointing and removing commission members shall be determined by the governing body of the local governmental unit creating or participating in the commission. Notwithstanding s. 59.10(4) or 66.0501(2), a member of the local governmental unit's governing body may serve on the commission, except that a county board member in a county having a population over 750,000 may not accept compensation for serving on the commission. Of the persons first appointed, one-third shall hold office for one year, one-third for 2 years, and one-third for 3 years from the first day of February next following their appointment, and until their respective successors are appointed and qualified. All succeeding terms shall be for 3 years. Any vacancy shall be filled for the unexpired term in the same manner as original appointments. Every person appointed as a member of the commission shall take and file the official oath.

(5) Organization. The commission shall meet in January, April, July and October of each year, and may meet at such additional times as the members determine or the chairperson directs. Annually, it shall elect from its membership a chairperson, vice chairperson and secretary. A majority of the commission shall constitute a quorum. Members of the commission shall receive no

compensation, but each member shall be entitled to actual and necessary expenses incurred in the performance of commission duties. The commission may appoint consulting committees consisting of either members or nonmembers or both, the appointees of which shall be reimbursed their actual and necessary expenses. All expense accounts shall be paid by the commission on certification by the chairperson or acting chairperson.

**(6) Open meetings.** All meetings of the commission and its consulting committees shall be publicly held and open to all citizens at all times as required by subch. V of ch. 19.

**(7) Designation of commissions as cooperating agencies under federal law.** (a) The commission may be the official agency of the local governmental unit to accept assistance under title II of the federal economic opportunity act of 1964. [1] No assistance shall be accepted with respect to any matter to which objection is made by the legislative body creating the commission, but if the commission is established on an intergovernmental basis and objection is made by any participating legislative body, assistance may be accepted with the approval of a majority of the legislative bodies participating in the commission.

(b) The commission may be the official agency of the local governmental unit to accept assistance from the community relations service of the U.S. department of justice under title X of the federal civil rights act of 1964 [2] to provide assistance to communities in resolving disputes, disagreements or difficulties relating to discriminatory practices based on sex, race, color or national origin which may impair the rights of persons in the local governmental unit under the constitution or laws of the United States or which affect or may affect interstate commerce.

**(8) Other powers of the county board of supervisors.** County boards may appropriate county funds for the operation of community relations-social development commissions established or reconstituted under this section, including those participated in on an equal basis by nonprofit corporations located in the county and comprised primarily of public and private welfare agencies devoted to any of the purposes set forth in this section. The legislature finds that the expenditure of county funds for the establishment or support of such commissions is for a public purpose.

**(9) Intent.** It is the intent of this section to promote fair and friendly relations among all the people in this state, and to that end race, creed, sexual orientation, or color ought not to be made tests in the matter of the right of any person to earn a livelihood or to enjoy the equal use of public accommodations and facilities and race, creed, sexual orientation, color, or status as a victim of domestic abuse, sexual assault, or stalking ought not to be made tests in the matter of the right of any person to sell, lease, occupy, or use real estate.

**(10) Short title.** This section shall be known and may be cited as "The Wisconsin Bill of Human Rights".

**Credits**
<<For credits, see Historical Note field.>>

Notes of Decisions (5)

WESTLAW    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

---

## Footnotes

1    42 U.S.C.A. § 2781 et seq. (repealed).

2    42 U.S.C.A. § 2000 et seq.

W. S. A. 66.0125, WI ST 66.0125

Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
  Municipalities (Ch. 59 to 68)
    Chapter 66. General Municipality Law (Refs & Annos)
      Subchapter I. General Powers; Administration

W.S.A. 66.0127

66.0127. Municipal hospital board

Currentness

(1) In a city, village or town in which a municipal hospital is located, the board of trustees or other governing board of the municipal hospital may, except as otherwise provided by ordinance, do any of the following:

(a) Prescribe rules of order for the regulation of its own meetings and deliberations.

(b) Promulgate rules relating to the government, operation and maintenance of the hospital and relating to the employees of the hospital.

(c) Contract for and purchase all fuel, food and other supplies reasonably necessary for the operation and maintenance of the hospital.

(d) Promulgate rules for the admission to and government of patients at the hospital.

(e) Contract for the construction, installation or making of additions or improvements to or alterations of the hospital if the additions, improvements or alterations have been ordered and funds have been provided by the city council or village or town board.

(f) Employ all necessary employees at the hospital.

(g) Audit all accounts and claims against the hospital or against the board of trustees and, if approved, the city, village or town clerk and treasurer shall pay the accounts and claims in the manner provided by s. 66.0607.

(2) All expenditures made under this section shall be within the limits authorized by the governing body of the municipality.

**Credits**

<<For credits, see Historical Note field.>>

**Editors' Notes**

COMMENTS--1999 ACT 150, § 486

Note: Section 66.50(1)(f) provides that the board of trustees or other governing board of a municipal hospital may engage all necessary employees for a period not to exceed one year under any one contract and at a salary not exceeding the sum of $25 per week, excluding board and laundry, unless a larger salary is expressly authorized by the city council or village or town board. Renumbered s. 66.0127(1)(f) removes these limits on the terms of employee contracts and on employee salaries.

Notes of Decisions (4)

W. S. A. 66.0127, WI ST 66.0127
Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

West's Wisconsin Statutes Annotated
　　Municipalities (Ch. 59 to 68)
　　　Chapter 66. General Municipality Law (Refs & Annos)
　　　　Subchapter I. General Powers; Administration

W.S.A. 66.0129

66.0129. Hospital facilities lease from nonprofit corporation

Currentness

**(1) Powers and duties of governing body.** For the purpose of providing adequate hospital facilities in the state of Wisconsin to serve cities, villages and towns and the hospital service area; providing all lands, buildings, improvements, facilities or equipment or other capital items necessary or desirable in connection with the hospital; ultimately acquiring the hospital by the city, village or town; acquiring lands for future hospital development; and refinancing indebtedness created by a nonprofit corporation for acquiring lands or providing hospital buildings or additions or improvements to the hospital buildings, the governing body of a city, village or town may:

(a) Without limitation by any other statute, sell and convey title to a nonprofit corporation any land and any existing buildings on the land owned by the city, village or town for that consideration and upon the terms and conditions that the governing body of the city, village or town determines are in the public interest.

(b) Lease to a nonprofit corporation for terms not exceeding 40 years each any land and existing buildings on the land that are owned by the city, village or town upon the terms, conditions and rentals that the governing body of the city, village or town determines are in the public interest.

(c) Lease or sublease from the nonprofit corporation, for terms not exceeding 40 years, and make available for public use, any lands or any land and existing buildings conveyed or leased to the corporation under pars. (a) and (b), and any new buildings erected upon the land or upon any other land owned by the corporation, upon the terms, conditions and rentals, subject to available appropriations, and ultimate acquisition, that the governing body of the city, village or town determines are in the public interest. With respect to any property conveyed to the nonprofit corporation under par. (a), the lease from the nonprofit corporation may be subject or subordinated to one or more mortgages of the property granted by the corporation.

(d) Apply all net revenues derived from the operation of any lands or buildings to the payment of rentals due and to become due under any lease or sublease made under par. (c).

(e) Pledge and assign all or part of the revenues derived from the operation of any lands or new buildings as security for the payment of rentals due and to become due under any lease or sublease of the new buildings made under par. (c).

(f) Covenant and agree in any lease or sublease made under par. (c) to impose fees, rentals or other charges for the use and occupancy or other operation of the new buildings in an amount which together with other moneys of the city, village or town available for that purpose will produce net revenue sufficient to pay the rentals due and to become due under the lease or sublease.

(g) Apply all or any part of the revenues derived from the operation of any lands or existing buildings to the payment of rentals due and to become due under a lease or sublease made under par. (c).

(h) Pledge and assign all or any part of the revenues derived from the operation of any lands or existing buildings to the payment of rentals due and to become due under a lease or sublease made under par. (c).

(i) Covenant and agree in a lease or sublease made under par. (c) to impose fees, rentals or other charges for the use and occupancy or other operation of any lands or existing buildings in an amount calculated to produce net revenues sufficient to pay the rentals due and to become due under the lease or sublease.

(j) Operate the hospital, until it is ultimately acquired, in a manner that provides revenues sufficient to pay the costs of operation and maintenance of the hospital and the payments due the nonprofit corporation.

**(2) Municipal liability.** The city, village or town shall be liable for accrued rentals and for any other default under any lease or sublease made under sub. (1)(c) and may be sued therefor on contract.

**(3) No debt inclusion.** Nothing under this section shall be considered to incur any municipal debt. No obligation under this section shall be included in arriving at constitutional debt limitations.

**(4) Powers and duties of nonprofit corporation.** In addition to all other powers granted to nonprofit corporations, the nonprofit corporation has the following additional powers and duties when leasing hospital facilities to a city, village or town:

(a) To acquire by purchase, gift or lease real property and buildings on the property from a city, village or town or other person, to construct hospital facilities on the property and to lease the real property and buildings to a city, village or town for terms not exceeding 40 years, and to transfer the land and buildings to the city, village or town upon termination of the lease.

(b) To borrow money and pledge income and rentals as security.

**(5) Bids for construction.** The nonprofit corporation shall let all contracts exceeding $1,000 for the construction, maintenance or repair of hospital facilities to the lowest responsible bidder after advertising for bids by the publication of a class 2 notice under ch. 985. Section 66.0901 applies to bids and contracts under this subsection.

**(6) Definitions.** Unless the context otherwise requires, in this section:

(a) "Buildings", "new buildings" and "existing buildings" include all buildings, structures, improvements, facilities, equipment or other capital items which the governing body of the city, village or town determines are necessary or desirable for the purpose of providing hospital facilities.


(b) "Nonprofit corporation" means a nonstock corporation organized under ch. 181 that is a nonprofit corporation, as defined in s. 181.0103(17).


**Credits**

<<For credits, see Historical Note field.>>


Notes of Decisions (1)

W. S. A. 66.0129, WI ST 66.0129
Current through 2023 Act 272, published April 10, 2024.

---

End of Document                                                      © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
  Municipalities (Ch. 59 to 68)
    Chapter 66. General Municipality Law (Refs & Annos)
      Subchapter I. General Powers; Administration

W.S.A. 66.013

66.013. Renumbered 66.0201 and amended by 1999 Act 150, § 33, eff. Jan. 1, 2001

Currentness

**Credits**

<<For credits, see Historical Note field.>>

W. S. A. 66.013, WI ST 66.013
Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
    Municipalities (Ch. 59 to 68)
        Chapter 66. General Municipality Law (Refs & Annos)
            Subchapter I. General Powers; Administration

W.S.A. 66.0131

66.0131. Local governmental purchasing

Currentness

**(1) Definitions.** In this section:

(a) "Local governmental unit" means a political subdivision of this state, a special purpose district in this state, an agency or corporation of a political subdivision or special purpose district, or a combination or subunit of any of the foregoing.

(b) "Recycled or recovered content" has the meaning given in s. 16.70(13).

**(2) Intergovernmental purchases without bids.** Notwithstanding any statute requiring bids for public purchases, any local governmental unit may make purchases from another unit of government, including the state or federal government, without the intervention of bids.

**(3) Purchase of recycled materials.** (a)1. A local governmental unit shall, to the extent practicable, make purchasing selections using specifications developed by state agencies under s. 16.72(2)(e) to maximize the purchase of products utilizing recycled or recovered materials.

2. Each local governmental unit shall ensure that the average recycled or recovered content of all paper purchased by the local governmental unit measured as a proportion, by weight, of the fiber content of all paper products purchased in a year, is not less than the following:

a. By 1991, 10 percent of all purchased paper.

b. By 1993, 25 percent of all purchased paper.

c. By 1995, 40 percent of all purchased paper.

**(4) Purchase of recyclable materials.** A local governmental unit shall, to the extent practicable, make purchasing selections using specifications prepared by state agencies under s. 16.72(2)(f).

**(5) Life cycle cost estimate.** A local governmental unit shall award each order or contract for materials, supplies or equipment on the basis of life cycle cost estimates whenever that action is appropriate. The terms, conditions and evaluation criteria to be applied shall be incorporated into the solicitation of bids or proposals. The life cycle cost formula may include, but is not limited to, the applicable costs of energy efficiency, acquisition and conversion, money, transportation, warehousing and distribution, training, operation and maintenance, and disposition or resale.

**Credits**
<<For credits, see Historical Note field.>>

Notes of Decisions (1)

W. S. A. 66.0131, WI ST 66.0131
Current through 2023 Act 272, published April 10, 2024.

End of Document                              © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
    Municipalities (Ch. 59 to 68)
        Chapter 66. General Municipality Law (Refs & Annos)
            Subchapter I. General Powers; Administration

W.S.A. 66.0133

66.0133. Energy savings performance contracting

Currentness

**(1) Definitions.** In this section:

(a) "Energy conservation measure" means a facility alteration or training, service, or operations program designed to reduce energy consumption or operating costs, conserve water resources, improve metering accuracy, or ensure state or local building code compliance.

(b) "Local governmental unit" has the meaning given in s. 19.42(7u).

(bg) "Operational savings" means savings from costs eliminated or avoided as a result of installing equipment or providing services.

(c) "Performance contract" means a contract for the evaluation and recommendation of energy conservation and facility improvement measures, and for the implementation of these measures.

(d) "Qualified provider" means a person, other than a local governmental unit, who is experienced in the design, implementation and installation of energy conservation and facility improvement measures and who has the ability to provide labor and material payment and performance bonds equal to the maximum amount of any payments due under a performance contract entered into by the person.

**(2) Authorization; report.** (a)1. Except as provided under subd. 2., any local governmental unit may, in accordance with this section, enter into a performance contract with a qualified provider to reduce energy or operating costs, realize operational savings, conserve water resources, ensure state or local building code compliance, or enhance the protection of property of the local governmental unit.

2. A performance contract with a qualified provider under this section may not allow a local governmental unit to increase the square footage of a facility unless the increase is necessary to make mechanical, electrical, or plumbing improvements in order to achieve reductions in energy consumption or to conserve water resources.

(b) Prior to entering into a performance contract for the implementation of any energy conservation or facility improvement measure, a local governmental unit shall obtain a report from a qualified provider containing recommendations concerning the

amount the local governmental unit should spend on energy conservation and facility improvement measures. The report shall contain estimates of all costs of installation, modifications, or remodeling, including costs of design, engineering, maintenance, repairs and financing. In addition, the report shall contain a guarantee specifying a minimum amount by which energy or operating costs of the local governmental unit will be reduced or energy or water metering accuracy will be improved, if the installation, modification or remodeling is performed by that qualified provider.

(c) If, after review of the report under par. (b), the local governmental unit finds that the amount it would spend on the energy conservation and facility improvement measures recommended in the report is not likely to exceed the amount to be saved in energy and operation costs, or the benefits to be obtained by improved metering accuracy, over the remaining useful life of the facility to which the measures apply, the local governmental unit may enter into the contract.

**(3) Notice.** Notwithstanding ss. 27.065(5)(a), 30.32, 38.18, 43.17(9)(a), 59.52(29)(a), 59.70(11), 60.47(2) to (4), 60.77(6)(a), 61.54, 61.57, 62.15(1), 62.155, 66.0131(2), 66.0923(10), 66.0925(10), 66.0927(11), 66.1333(5)(a)2., 200.11(5)(d) and 200.47(2), before entering into a performance contract under this section, a local governmental unit shall solicit bids or competitive sealed proposals from qualified providers. A local governmental unit may only enter into a performance contract with a qualified provider if the contract is awarded by the governing body of the local governmental unit and if the qualified provider agrees to sign the performance contract and all contracts with subcontractors, including subcontractors who provide billing services under the performance contract. The governing body shall give at least 10 days' notice of the meeting at which the body intends to award a performance contract. The notice shall include a statement of the intent of the governing body to award the performance contract, the names of all potential parties to the proposed performance contract, and a description of the energy conservation and facility improvement measures included in the performance contract and an explanation of how these measures will generate operational savings sufficient to pay for the cost of the measures. At the meeting, the governing body shall review and evaluate the bids or proposals submitted by all qualified providers and may award the performance contract to the qualified provider that best meets the needs of the local governmental unit, which need not be the lowest cost provider.

**(4) Installment payment and lease-purchase agreements.** A local governmental unit may enter into an installment payment contract or lease-purchase agreement for the purchase and installation of energy conservation or facility improvement measures.

**(5) Payment schedule; savings.** Each performance contract shall provide that all payments to a qualified provider, except obligations on termination of the contract before its expiration, shall be made no later than the date on which the contract expires. Energy savings shall be guaranteed by the qualified provider for the entire term of the performance contract and may not be guaranteed by a third party. Unless otherwise agreed by the parties, every performance contract shall assume an annual increase of 3 percent in the cost of relevant utility services incurred by the local governmental unit.

**(6) Terms of contracts.** A performance contract may extend beyond the fiscal year in which it becomes effective, subject to appropriation of moneys, if required by law, for costs incurred in future fiscal years.

**(7) Allocation of obligations.** Subject to appropriations as provided in sub. (6), each local governmental unit shall allocate sufficient moneys for each fiscal year to make payment of any amounts payable by the local governmental unit under performance contracts during that fiscal year.

**(8) Bonds.** Each qualified provider under a performance contract shall provide labor and material payment and performance bonds in an amount equivalent to the maximum amount of any payments due under the contract, including payments for work performed by other persons that is necessary to achieve the required guaranteed energy or operational savings.

WESTLAW    © 2025 Thomson Reuters. No claim to original U.S. Government Works.    2

**(9) Use of moneys.** Unless otherwise provided by law or ordinance, if a local governmental unit has funding designated for operating and capital expenditures, the local governmental unit may use moneys designated for operating or capital expenditures to make payments under any performance contract, including installment payments or payments under lease-purchase agreements.

**(10) Monitoring; reports.** During the entire term of each performance contract, the qualified provider entering into the contract shall monitor the reductions in energy consumption and cost savings attributable to the energy conservation and facility improvement measures installed under the contract, and shall periodically prepare and provide a report to the local governmental unit entering into the contract documenting the reductions in energy consumption and cost savings to the local governmental unit.

**(11) Energy conservation measures.** Energy conservation measures under this section may include the following:

(a) Insulation of a building structure or systems within a building.

(b) Storm windows or doors, caulking or weather stripping, multiglazed windows or doors, heat-absorbing or heat-reflective glazed and coated window or door systems, additional glazing, reductions in glass area, or other window and door system modifications that reduce energy consumption.

(c) Automated or computerized energy control and facility management systems or computerized maintenance management systems.

(d) Heating, ventilating or air conditioning system modifications or replacements.

(e) Replacement or modification of lighting fixtures to increase the energy efficiency of the lighting system without increasing the overall illumination of a facility, unless an increase in illumination is necessary to conform to the applicable state or local building code for the lighting system after the proposed modifications are made.

(f) Energy recovery systems.

(g) Utility management systems and services.

(h) Cogeneration systems that produce steam or forms of energy such as heat, as well as electricity, for use primarily within a building or complex of buildings.

(i) Life safety improvements or systems required to comply with the federal Americans with Disabilities Act.

(ig) Replacement or improvement of energy or water metering systems.

Case 2:24-cv-00228-Z    Document 50-1    Filed 01/17/25    Page 387 of 882    PageID 49172

(im) Measures to improve indoor or outdoor water conservation, including measures related to water recycling and reuse, and systems or equipment that implement those measures.

(ir) Measures to improve indoor air quality to meet applicable state and local building code requirements.

(j) Any other facility improvement measure that is designed to provide long-term energy or operating cost reductions or compliance with state or local building codes.

**Credits**

<<For credits, see Historical Note field.>>

W. S. A. 66.0133, WI ST 66.0133
Current through 2023 Act 272, published April 10, 2024.

---

                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

West's Wisconsin Statutes Annotated
    Municipalities (Ch. 59 to 68)
        Chapter 66. General Municipality Law (Refs & Annos)
            Subchapter I. General Powers; Administration

W.S.A. 66.0134

66.0134. Labor peace agreements prohibited

Currentness

**(1) Definitions.** In this section:

(a) "Federal labor laws" means the federal Labor Management Relations Act, 29 USC 141 to 144, and the federal National Labor Relations Act, 29 USC 151 to 169.

(b) "Local governmental unit" means a city, village, town, county, school district, including a 1st class city school district, technical college district, sewerage district, drainage district, or any other special purpose district in this state, or any other public or quasi-public corporation, officer, board, or other public body, an agency or corporation of a political subdivision or special purpose district, or a combination or subunit of any of the foregoing.

**(2) Agreements prohibited.** Neither the state nor a local governmental unit may enact a statute or ordinance; adopt a policy or regulation; or impose a contract, zoning, permitting, or licensing requirement, or any other condition including a condition of any regulatory approval; that would require any person to accept any provision that is a mandatory or nonmandatory subject of collective bargaining under state or federal labor laws.

**(3) Waiver prohibited.** Neither the state nor a local governmental unit, nor any of its employees, may require any person to waive the person's rights under state or federal labor laws, or compel or attempt to compel a person to agree to waive the person's rights under state or federal labor laws as a condition of any regulatory approval or other approval by the local governmental unit.

**(4) Agreements void.** Any agreement entered into, renewed, modified, or extended on or after April 18, 2018, between any person and any labor organization in violation of this section is void.

**Credits**
<<For credits, see Historical Note field.>>

W. S. A. 66.0134, WI ST 66.0134
Current through 2023 Act 272, published April 10, 2024.

**End of Document**                                      © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
  Municipalities (Ch. 59 to 68)
    Chapter 66. General Municipality Law (Refs & Annos)
      Subchapter I. General Powers; Administration

W.S.A. 66.0135

66.0135. Interest on late payments

Currentness

**(1) Definitions.** In this section:

(a) "Agency" means any office, department, board, commission or other body under the control of the governing body of a local governmental unit which expends moneys or incurs obligations on behalf of the local governmental unit.

(b) "Good faith dispute" means any of the following:

1. A contention by an agency, principal contractor or subcontractor that goods delivered or services rendered were of a lesser quantity or quality than ordered or specified by contract, were faulty or were installed improperly.

2. Any other reason giving cause for the withholding of payment by an agency, principal contractor or subcontractor until the dispute is settled.

(c) "Local governmental unit" means a political subdivision of this state, a special purpose district in this state, an agency or corporation of a political subdivision or special purpose district, or a combination or subunit of any of the foregoing.

(d) "Subcontractor" has the meaning given in s. 66.0901(1)(d).

**(2) Interest payable to principal contractors.** (a) Except as provided in sub. (4) or as otherwise specifically provided, an agency that does not pay timely the amount due on an order or contract shall pay interest on the balance due from the 31st day after receipt of a properly completed invoice or receipt and acceptance of the property or service under the order or contract, whichever is later, or, if the agency does not comply with sub. (7), from the 31st day after receipt of an improperly completed invoice or receipt and acceptance of the property or service under the order or contract, whichever is later, at the rate specified in s. 71.82(1)(a) compounded monthly.

(b) For the purposes of par. (a), a payment is timely if the payment is mailed, delivered or transferred by the later of the following:

1. The date specified on a properly completed invoice for the amount specified in the order or contract.

2. Within 30 days after receipt of a properly completed invoice or receipt and acceptance of the property or service under the order or contract, or, if the agency does not comply with sub. (7), within 30 days after receipt of an improperly completed invoice or receipt and acceptance of the property or service under the order or contract, whichever is later.

**(3) Interest payable to subcontractors.** (a) Except as provided in sub. (4)(e) or as otherwise specifically provided, principal contractors that engage subcontractors to perform part of the work on an order or contract from an agency shall pay subcontractors for satisfactory work in a timely fashion. A payment is timely if it is mailed, delivered or transferred to the subcontractor no later than 7 days after the principal contractor's receipt of any payment from the agency.

(b) If a subcontractor is not paid in a timely fashion, the principal contractor shall pay interest on the balance due from the 8th day after the principal contractor's receipt of any payment from the agency, at the rate specified in s. 71.82(1)(a) compounded monthly.

(c) Subcontractors receiving payment under this subsection shall pay lower-tier subcontractors, and be liable for interest on late payments, in the same manner as principal contractors are required to pay subcontractors in pars. (a) and (b).

**(4) Exceptions.** Subsection (2) does not apply to any of the following:

(a) Any portion of an order or contract for which the payment, from federal moneys, has not been received.

(b) An order or contract that is subject to late payment interest or another late payment charge required by another law or rule specifically authorized by law.

(c) An order or contract between 2 or more agencies of the same local governmental unit.

(d) An order or contract which provides for the time of payment and the consequences of nontimely payment, if any deviation from the deadlines established in sub. (2) appears in the original bid or proposal.

(e) An order or contract under which the amount due is subject to a good faith dispute if, before the date on which payment is not timely, notice of the dispute is sent by 1st class mail, personally delivered or sent in accordance with the procedure specified in the order or contract.

**(5) Appropriation from which paid.** An agency that pays interest under this section shall pay the interest only from the appropriation for administration of the program under which the order or contract was made or entered into, unless otherwise directed by the governing body of the local governmental unit.

**(6) Attorney fees.** Notwithstanding s. 814.04(1), in an action to recover interest due under this section, the court shall award the prevailing party reasonable attorney fees.

WESTLAW  © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**(7) Improper invoices.** If an agency receives an improperly completed invoice, the agency shall notify the sender of the invoice within 10 working days after it receives the invoice of the reason that it is improperly completed.

**Credits**

<<For credits, see Historical Note field.>>

W. S. A. 66.0135, WI ST 66.0135
Current through 2023 Act 272, published April 10, 2024.

---

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

West's Wisconsin Statutes Annotated
    Municipalities (Ch. 59 to 68)
        Chapter 66. General Municipality Law (Refs & Annos)
            Subchapter I. General Powers; Administration

W.S.A. 66.0137

66.0137. Provision of insurance

Currentness

**(1) Definition.** In this section:

(ac) "Board of Regents" means the Board of Regents of the University of Wisconsin System.

(af) "Dies in the line of duty" means a death that occurs, or occurred, as a direct and proximate result of a personal injury sustained by, or a single exposure to a hazardous material or condition experienced by, a law enforcement officer, fire fighter, or emergency medical services practitioner while he or she was engaged in a line of duty activity or that arose out of and as a result of such an individual's performance of a line of duty activity.

(ah) "Emergency medical services practitioner" has the meaning given in s. 256.01(5), except that in this section it applies only to an individual who is employed directly by a political subdivision or by a joint emergency medical services department operated jointly by 2 or more political subdivisions.

(am) "Law enforcement officer" means all of the following:

1. Any person employed by a political subdivision for the purpose of detecting and preventing crime and enforcing laws or ordinances and who is authorized to make arrests for violations of the laws or ordinances that the person is employed to enforce.

2. Any jailer who, under the direction of a sheriff under s. 59.27(1), keeps persons in a county jail.

3. A Marquette University police officer, as defined in s. 175.42(1)(b).

4. A state patrol officer, as that term is defined in s. 252.01(7).

5. A state capitol police officer.

6. A University of Wisconsin System police officer.

7. An officer of the division of criminal investigation.

8. A department of natural resources conservation warden.

9. A county sheriff, undersheriff, or deputy sheriff.

10. A chief of police.

11. A special agent employed by the department of revenue who is authorized to act under s. 73.031.

12. A state fair park police officer duly appointed under s. 42.01(2).

(ap) "Line of duty activity" means any employment-related action taken by a law enforcement officer, fire fighter, or emergency medical services practitioner that is required or authorized by law, rule, regulation, or condition of employment and for which compensation is provided by his or her employing agency or would have been eligible to have been provided by the employing agency if the law enforcement officer, fire fighter, or emergency medical services practitioner had been on duty when he or she took the action in question.

(as) "Local governmental unit" means a political subdivision, school district (as enumerated in s. 67.01(5)), sewerage district, drainage district, and, without limitation because of enumeration, any other political subdivision of the state.

(b) "Municipality" means any city, village, or town.

(c) "Political subdivision" means any municipality or county.

(2) **Liability and worker's compensation insurance.** The state or a local governmental unit may procure risk management services and liability insurance covering the state or local governmental unit and its officers, agents and employees and worker's compensation insurance covering officers and employees of the state or local governmental unit. A local governmental unit may participate in and pay the cost of risk management services and liability and worker's compensation insurance through a municipal insurance mutual organized under s. 611.23.

(3) **Health insurance for unemployed persons.** Any political subdivision may purchase health or dental insurance for unemployed persons residing in the political subdivision who are not eligible for medical assistance under s. 49.46, 49.468, 49.47, or 49.471(4)(a).

(4) **Self-insured health plans.** If a city, including a 1st class city, or a village provides health care benefits under its home rule power, or if a town provides health care benefits, to its officers and employees on a self-insured basis, the self-insured plan shall

comply with ss. 49.493(3)(d), 631.89, 631.90, 631.93(2), 632.722, 632.729, 632.746(10)(a)2. and (b)2., 632.747(3), 632.798, 632.85, 632.853, 632.855, 632.861, 632.867, 632.87(4) to (6), 632.885, 632.89, 632.895(9) to (17), 632.896, and 767.513(4).

**(4m) Joint self-insured plans and stop loss insurance.** (a) Notwithstanding sub. (1)(as), in this subsection, "local governmental unit" means a city, village, town, county, or school district.

(b) A local governmental unit and one or more other local governmental units, that together have at least 100 employees, may jointly provide health care benefits to their officers and employees on a self insured basis.

(bm) A technical college district and one or more other technical college districts, that together have at least 100 employees, may jointly do any of the following:

1. Provide health care benefits to their officers and employees on a self-insured basis.

2. Procure stop loss insurance.

3. Self-insure stop loss risk.

(c) Any plan under par. (b) or (bm)1. shall comply with the provisions listed in sub. (4).

**(4t) Health insurance for protective services employees.** If a 1st class city offers health care insurance to employees who are police officers, fire fighters, or emergency medical services practitioners, as defined in s. 256.01(5), the 1st class city shall also offer to the employees who are police officers, fire fighters, or emergency medical services practitioners a high-deductible health plan.

**(5) Hospital, accident and life insurance.** (a) In this subsection, "local governmental unit" includes the school district operating under ch. 119.

(b) The state or a local governmental unit may provide for the payment of premiums or cost sharing for hospital, surgical and other health and accident insurance and life insurance for employees and officers, their spouses, and dependent children. A local governmental unit may also provide for the payment of premiums or cost sharing for hospital and surgical care for its retired employees. In addition, a local governmental unit may, by ordinance or resolution, elect to offer to all of its employees a health care coverage plan through a program offered by the group insurance board under ch. 40. A local governmental unit that elects to participate under s. 40.51(7) is subject to the applicable sections of ch. 40 instead of this subsection.

(c)1. Except as provided in subds. 2. and 3., if a municipality provides for the payment of premiums for hospital, surgical, and other health insurance for its fire fighters, it shall continue to pay such premiums for the surviving spouse and dependent children of the fire fighter who dies in the line of duty.

1m. Except as provided in subds. 2. and 3., if a political subdivision, the state, the Board of Regents, or Marquette University provides for the payment of premiums for hospital, surgical, and other health insurance for its law enforcement officers or

66.0137. Provision of insurance. WI ST 66.0137

Case 2:24-cv-00228-Z    Document 50-1    Filed 01/17/25    Page 396 of 882    PageID 49181

emergency medical services practitioners, it shall continue to pay such premiums for the surviving spouse and dependent children of the law enforcement officer or emergency medical services practitioner who dies in the line of duty.

2. A political subdivision, the state, the Board of Regents, or Marquette University may not be required to pay the premiums described in subd. 1. or 1m. for a surviving spouse upon the remarriage of the surviving spouse or upon the surviving spouse reaching the age of 65.

3. An individual is not a dependent child for the purposes of subd. 1. or 1m. after the individual reaches the age of 26.

4. Except as needed to administer this paragraph, a political subdivision, the state, the Board of Regents, and Marquette University shall keep confidential any personally identifiable information, as defined in s. 19.62(5), of a surviving spouse and dependent children for whom the political subdivision, the state, the Board of Regents, or university makes a payment under this paragraph.

(d) If a political subdivision pays the premiums described in par. (c)1. or 1m., annually, in order to receive reimbursement, the political subdivision shall report to the department of revenue by March 15 of each year the amounts paid in the previous calendar year.

**Credits**

<<For credits, see Historical Note field.>>

Notes of Decisions (15)

W. S. A. 66.0137, WI ST 66.0137
Current through 2023 Act 272, published April 10, 2024.

---

End of Document                                           © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
  Municipalities (Ch. 59 to 68)
    Chapter 66. General Municipality Law (Refs & Annos)
      Subchapter I. General Powers; Administration

W.S.A. 66.0139

66.0139. Disposal of abandoned property

Currentness

(1) In this section, "political subdivision" means a city, village, town or county.

(2) A political subdivision may dispose of any personal property which has been abandoned, or remained unclaimed for a period of 30 days, after the taking of possession of the property by an officer of the political subdivision by any means determined to be in the best interest of the political subdivision. If the property is not disposed of in a sale open to the public, the political subdivision shall maintain an inventory of the property, a record of the date and method of disposal, including the consideration received for the property, if any, and the name and address of the person taking possession of the property. The inventory shall be kept as a public record for a period of not less than 2 years from the date of disposal of the property. Any means of disposal other than public auction shall be specified by ordinance. If the disposal is in the form of a sale, all receipts from the sale, after deducting the necessary expenses of keeping the property and conducting the sale, shall be paid into the treasury of the political subdivision.

(3) A political subdivision may safely dispose of abandoned or unclaimed flammable, explosive, or incendiary substances, materials, or devices that pose a danger to life or property in their storage, transportation, or use immediately after taking possession of the substances, materials, or devices without a public auction. The political subdivision, by ordinance or resolution, may establish disposal procedures. Procedures may include provisions authorizing an attempt to return to the rightful owner substances, materials, or devices that have a commercial value in normal business usage and do not pose an immediate threat to life or property. If enacted, a disposal procedure shall include a presumption that if the substance, material, or device appears to be or is reported stolen, an attempt will be made to return the substance, material, or device to the rightful owner.

(4) Except as provided in s. 968.20(3), a 1st class city shall dispose of abandoned or unclaimed dangerous weapons or ammunition without a public auction 12 months after taking possession of them if the owner has not requested their return. Disposal procedures shall be established by ordinance or resolution and may include provisions authorizing an attempt to return to the rightful owner any dangerous weapons or ammunition which appear to be stolen or are reported stolen. If enacted, a disposal procedure shall include a presumption that if the dangerous weapons or ammunition appear to be or are reported stolen an attempt will be made to return the dangerous weapons or ammunition to the rightful owner. The dangerous weapons or ammunition are subject to sub. (5).

(5) A political subdivision may retain or dispose of any abandoned, unclaimed or seized dangerous weapon or ammunition only under s. 968.20.

**Credits**

<<For credits, see Historical Note field.>>

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Notes of Decisions (2)

W. S. A. 66.0139, WI ST 66.0139
Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
    Municipalities (Ch. 59 to 68)
        Chapter 66. General Municipality Law (Refs & Annos)
            Subchapter I. General Powers; Administration

W.S.A. 66.014

66.014. Renumbered 66.0203 and amended by 1999 Act 150, § 36, eff. Jan. 1, 2001

Currentness

**Credits**

<<For credits, see Historical Note field.>>

W. S. A. 66.014, WI ST 66.014
Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
  Municipalities (Ch. 59 to 68)
    Chapter 66. General Municipality Law (Refs & Annos)
      Subchapter I. General Powers; Administration

W.S.A. 66.0141

66.0141. Accident record systems

Currentness

Every city, village and town having a population of 5,000 or more shall maintain a traffic accident record system whereby traffic accidents occurring within the city, village or town may be located within 100 feet of the occurrence and shall provide a copy of the record quarterly to the county traffic safety commission under s. 83.013(1)(a).

**Credits**

<<For credits, see Historical Note field.>>

W. S. A. 66.0141, WI ST 66.0141
Current through 2023 Act 272, published April 10, 2024.

End of Document                                   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
  Municipalities (Ch. 59 to 68)
    Chapter 66. General Municipality Law (Refs & Annos)
      Subchapter I. General Powers; Administration

W.S.A. 66.0143

66.0143. Local appeals for exemption from state mandates

Currentness

**(1) Definitions.** In this section:

(a) "Political subdivision" means a city, village, town, or county.

(b) "State mandate" means a state law that requires a political subdivision to engage in an activity or provide a service, or to increase the level of its activities or services.

**(2) Appeals for exemptions.** (a) A political subdivision may file a request with the department of revenue for a waiver from a state mandate, except for a state mandate that is related to any of the following:

1. Health.

2. Safety.

(b) An administrative agency, or the department of revenue, may grant a political subdivision a waiver from a state mandate as provided in par. (c).

(c) The political subdivision shall specify in its request for a waiver its reason for requesting the waiver. Upon receipt of a request for a waiver, the department of revenue shall forward the request to the administrative agency that is responsible for administrating the state mandate. The agency shall determine whether to grant the waiver and shall notify the political subdivision and the department of revenue of its decision in writing. If no agency is responsible for administrating the state mandate, the department of revenue shall determine whether to grant the waiver and shall notify the political subdivision of its decision in writing.

**(3) Duration of waivers.** A waiver is effective for 4 years. The administrative agency may renew the waiver for additional 4-year periods. If a waiver is granted by the department of revenue, the department may renew the waiver under this subsection.

**(4) Evaluation.** By July 1, 2004, the department of revenue shall submit a report to the governor, and to the appropriate standing committees of the legislature under s. 13.172(3). The report shall specify the number of waivers requested under this section, a

description of each waiver request, the reason given for each waiver request, and the financial effects on the political subdivision of each waiver that was granted.

**Credits**

<<For credits, see Historical Note field.>>

W. S. A. 66.0143, WI ST 66.0143
Current through 2023 Act 272, published April 10, 2024.

**End of Document**                                              © 2025 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Proposed Legislation

West's Wisconsin Statutes Annotated

    Municipalities (Ch. 59 to 68)

        Chapter 66. General Municipality Law (Refs & Annos)

           Subchapter I. General Powers; Administration

W.S.A. 66.0144

66.0144. Advisory referenda

Currentness

No city, village, or town may conduct a referendum for advisory purposes, except as provided under s. 66.0305(6), 66.0307(4)(e), 66.0420(12)(b)2., 66.0422(3)(b), or 196.204(2m)(b) 2. or for an advisory referendum regarding capital expenditures proposed to be funded by the property tax levy of the city, village, or town.

**Credits**

<<For credits, see Historical Note field.>>

W. S. A. 66.0144, WI ST 66.0144

Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.   

KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

West's Wisconsin Statutes Annotated
  Municipalities (Ch. 59 to 68)
    Chapter 66. General Municipality Law (Refs & Annos)
      Subchapter I. General Powers; Administration

W.S.A. 66.0145

66.0145. No preferences in hiring or contracting

Currentness

(1) In this section, "political subdivision" means a county, city, village, or town.

(2) Unless required to secure federal aid, no political subdivision may discriminate against, or grant preferential treatment on the basis of, race, color, ancestry, national origin, or sexual orientation in making employment decisions regarding employees of a political subdivision or contracting for public works.

**Credits**
<<For credits, see Historical Note field.>>

W. S. A. 66.0145, WI ST 66.0145
Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
   Municipalities (Ch. 59 to 68)
     Chapter 66. General Municipality Law (Refs & Annos)
      Subchapter I. General Powers; Administration

W.S.A. 66.015

66.015. Renumbered 66.0205 and amended by 1999 Act 150, § 37, eff. Jan. 1, 2001

Currentness

**Credits**

<<For credits, see Historical Note field.>>

W. S. A. 66.015, WI ST 66.015
Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
    Municipalities (Ch. 59 to 68)
        Chapter 66. General Municipality Law (Refs & Annos)
            Subchapter I. General Powers; Administration

W.S.A. 66.016

66.016. Renumbered 66.0207 and amended by 1999 Act 150, § 38, eff. Jan. 1, 2001

Currentness

**Credits**

<<For credits, see Historical Note field.>>

W. S. A. 66.016, WI ST 66.016
Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
    Municipalities (Ch. 59 to 68)
        Chapter 66. General Municipality Law (Refs & Annos)
            Subchapter I. General Powers; Administration

W.S.A. 66.017

66.017. Renumbered 66.0209 and amended by 1999 Act 150, § 39, eff. Jan. 1, 2001

Currentness

**Credits**

<<For credits, see Historical Note field.>>

W. S. A. 66.017, WI ST 66.017
Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:24-cv-00228-Z    Document 50-1    Filed 01/17/25    Page 408 of 882    PageID 49193

West's Wisconsin Statutes Annotated
  Municipalities (Ch. 59 to 68)
    Chapter 66. General Municipality Law (Refs & Annos)
      Subchapter I. General Powers; Administration

W.S.A. 66.018

66.018. Renumbered 66.0211 and amended by 1999 Act 150, § 40, eff. Jan. 1, 2001

Currentness

**Credits**

<<For credits, see Historical Note field.>>

W. S. A. 66.018, WI ST 66.018
Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**                                            © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated

Municipalities (Ch. 59 to 68)

Chapter 66. General Municipality Law (Refs & Annos)

Subchapter I. General Powers; Administration

W.S.A. 66.019

66.019. Renumbered 66.0213 and amended by 1999 Act 150, § 41, eff. Jan. 1, 2001

Currentness

**Credits**

<<For credits, see Historical Note field.>>

W. S. A. 66.019, WI ST 66.019

Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:24-cv-00228-Z    Document 50-1    Filed 01/17/25    Page 410 of 882    PageID 49195

West's Wisconsin Statutes Annotated
  Municipalities (Ch. 59 to 68)
    Chapter 66. General Municipality Law (Refs & Annos)
      Subchapter I. General Powers; Administration

W.S.A. 66.02

66.02. Renumbered 66.0229 and amended by 1999 Act 150, § 42, eff. Jan. 1, 2001

Currentness

**Credits**

<<For credits, see Historical Note field.>>

W. S. A. 66.02, WI ST 66.02
Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
  Municipalities (Ch. 59 to 68)
    Chapter 66. General Municipality Law (Refs & Annos)
      Subchapter II. Incorporation; Municipal Boundaries

W.S.A. 66.0201

66.0201. Incorporation of villages and cities; purpose and definitions

Currentness

**(1) Purpose.** It is the policy of this state that the development of territory from town to incorporated status proceed in an orderly and uniform manner and that toward this end each proposed incorporation of territory as a village or city be reviewed as provided in ss. 66.0201 to 66.0213 to assure compliance with certain minimum standards which take into account the needs of both urban and rural areas.

**(2) Definitions.** In ss. 66.0201 to 66.0213, unless the context requires otherwise:

(am) "Board" means the incorporation review board.

(ar) "Department" means the department of administration.

(bm) "Isolated municipality" means any existing or proposed village or city entirely outside any metropolitan community at the time of its incorporation.

(c) "Metropolitan community" means the territory consisting of any city having a population of 25,000 or more, or any 2 incorporated municipalities whose boundaries are within 5 miles of each other whose populations aggregate 25,000, plus all the contiguous area which has a population density of 100 persons or more per square mile, or which the department has determined on the basis of population trends and other pertinent facts will have a minimum density of 100 persons per square mile within 3 years.

(d) "Metropolitan municipality" means any existing or proposed village or city entirely or partly within a metropolitan community.

(dm) "Population" means the population of a local unit as shown by the last federal census or by any subsequent population estimate certified as acceptable by the department.

**Credits**
<<For credits, see Historical Note field.>>

Notes of Decisions (5)

W. S. A. 66.0201, WI ST 66.0201
Current through 2023 Act 272, published April 10, 2024.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

 KeyCite Red Flag - Severe Negative Treatment

Unconstitutional or Preempted  Held Unconstitutional by  State ex rel. Kuehne v. Burdette,  Wis.App.,  Apr. 14, 2009

West's Wisconsin Statutes Annotated

Municipalities (Ch. 59 to 68)

Chapter 66. General Municipality Law (Refs & Annos)

Subchapter II. Incorporation; Municipal Boundaries

W.S.A. 66.0203

66.0203. Procedure for incorporation of villages and cities

Currentness

**(1) Notice of intention.** At least 10 days and not more than 20 days before the circulation of an incorporation petition, a notice setting forth that the petition is to be circulated and including an accurate description of the territory involved shall be published within the county in which the territory is located as a class 1 notice, under ch. 985.

**(2) Petition.** (a) The petition for incorporation of a village or city shall be in writing signed by 50 or more persons who are both electors and freeholders in the territory to be incorporated if the population of the proposed village or city includes 300 or more persons; otherwise by 25 or more persons who are both electors and freeholders in the territory to be incorporated.

(b) The petition shall be addressed to and filed with the circuit court of a county in which all or a major part of the territory to be incorporated is located. The incorporation petition is void unless filed within 6 months of the date of publication of the notice of intention to circulate.

(c) The petition shall designate a representative of the petitioners, and an alternate, who shall be an elector or freeholder in the territory, and state that person's address; describe the territory to be incorporated with sufficient accuracy to determine its location and have attached to the petition a scale map reasonably showing the boundaries of the territory; specify the current resident population of the territory by number in accordance with the definition given in s. 66.0201(2)(dm); set forth facts substantially establishing the required standards for incorporation; and request the circuit court to order a referendum and to certify the incorporation of the village or city when it is found that all requirements have been met.

(e) No person who has signed a petition may withdraw his or her name from the petition. No additional signatures may be added after a petition is filed.

(f) The circulation of the petition shall commence not less than 10 days nor more than 20 days after the date of publication of the notice of intention to circulate.

**(3) Hearing; costs.** (a) Upon the filing of the petition the circuit court shall by order fix a time and place for a hearing giving preference to the hearing over other matters on the court calendar.

(b) The court may by order allow costs and disbursements as provided for actions in circuit court in any proceeding under this subsection.

(c) The court may, upon notice to all parties who have appeared in the hearing and after a hearing on the issue of bond, order the petitioners or any of the opponents to post bond in an amount that it considers sufficient to cover disbursements.

**(4) Notice.** (a) Notice of the filing of the petition and of the date of the hearing on the petition before the circuit court shall be published in the territory to be incorporated, as a class 2 notice, under ch. 985, and given by certified or registered mail to the clerk of each town in which the territory is located and to the clerk of each metropolitan municipality of the metropolitan community in which the territory is located. The mailing shall be not less than 10 days before the time set for the hearing.

(b) The notice shall contain:

1. A description of the territory sufficiently accurate to determine its location and a statement that a scale map reasonably showing the boundaries of the territory is on file with the circuit court.

2. The name of each town in which the territory is located.

3. The name and post-office address of the representative of the petitioners.

**(4m) Incorporations involving portions of 2 towns.** If the territory designated in the petition is comprised of portions of only 2 towns, the territory may not be incorporated unless the town board of each town adopts a resolution approving the incorporation.

**(5) Parties.** Any governmental unit entitled to notice pursuant to sub. (4), any school district which lies at least partly in the territory or any other person found by the court to be a party in interest may become a party to the proceeding prior to the time set for the hearing.

**(6) Annexation resolution.** Any municipality whose boundaries are contiguous to the territory may also file with the circuit court a certified copy of a resolution adopted by a two-thirds vote of the elected members of the governing body indicating a willingness to annex the territory designated in the incorporation petition. The resolution shall be filed at or prior to the hearing on the incorporation petition, or any adjournment granted for this purpose by the court.

**(7) Action.** (a) No action to contest the validity of an incorporation on any grounds, whether procedural or jurisdictional, may be commenced after 60 days from the date of issuance of the certificate of incorporation by the secretary of administration.

(b) An action contesting an incorporation shall be given preference in the circuit court.

**(8) Function of the circuit court.** (a) After the filing of the petition and proof of notice, the circuit court shall conduct a hearing at the time and place specified in the notice, or at a time and place to which the hearing is duly adjourned.

Case 2:24-cv-00228-Z    Document 50-1    Filed 01/17/25    Page 415 of 882    PageID 49200

(b) On the basis of the hearing the circuit court shall find if the standards under s. 66.0205 are met. If the court finds that the standards are not met, the court shall dismiss the petition. Subject to par. (c), if the court finds that the standards are met the court shall refer the petition to the board. Upon payment of any fee imposed under s. 16.53(14), the board shall determine whether the standards under s. 66.0207 are met.

(c)1. The court shall determine whether an annexation proceeding that affects any territory included in the incorporation petition has been initiated under s. 66.0217, 66.0219, or 66.0223. A court shall consider an annexation proceeding under s. 66.0223 to have been initiated upon the posting of a meeting notice by a city or village that states that the city or village is considering enacting an ordinance under s. 66.0223.

2. If the court determines that an annexation proceeding described under subd. 1. was initiated before the publication of the notice under sub. (1), the court shall refer the petition to the board when the annexation proceeding is final. If the annexation is determined to be valid, the court shall exclude the annexed territory from the territory proposed to be incorporated when it refers the petition to the board.

3. If the court determines that an annexation proceeding described under subd. 1. was initiated after, and within 30 days after, the publication of the notice under sub. (1), the annexation may not proceed until the validity of the incorporation has been determined. If the incorporation is determined to be valid and complete, the annexation is void. If the incorporation is determined to be invalid, the annexation may proceed.

4. If the court determines that an annexation proceeding described under subd. 1. was initiated on the same date as the publication of the notice under sub. (1), the court shall determine which procedure was begun first on that date and that action may proceed and the other action may not proceed unless the first action fails.

5. If the court determines that an annexation proceeding described under subd. 1. was initiated more than 30 days after the publication of the notice under sub. (1), the annexation is void.

**(9) Function of the board.** (a) Upon receipt of the petition from the circuit court and payment of any fee imposed under s. 16.53(14), the board shall make any necessary investigation to apply the standards under s. 66.0207.

(b) Within 30 days after the receipt by the board of the petition from the circuit court and payment of any fee imposed under s. 16.53(14), whichever is later, any party in interest may request a hearing. Upon receipt of the request, the board shall schedule a hearing at a place in or convenient to the territory sought to be incorporated.

(c) Notice of the hearing shall be given in the territory to be incorporated by publishing a class 2 notice, under ch. 985, and by mailing the notice to the designated representative of the petitioners or any 5 petitioners and to all town and municipal clerks entitled to receive mailed notice of the petition under sub. (4).

(d) Subject to par. (dm), unless the court sets a different time limit, the board shall prepare its findings and determination, citing the supporting evidence, within 180 days after receipt of the referral from the court and payment of any fee imposed under s. 16.53(14), whichever is later. The findings and determination shall be forwarded by the board to the circuit court. Copies of the

findings and determination shall be sent by certified or registered mail to the designated representative of the petitioners, and to all town and municipal clerks entitled to receive mailed notice of the petition under sub. (4).

(dm) The time period specified or set by the court under par. (d) shall be stayed for a reasonable period of time to allow for alternative dispute resolution of any disagreements between interested parties that result from the filing of an incorporation petition if all interested parties agree to this stay and provide written notice of their agreement to the board and to the circuit court.

(e) The determination of the board made in accordance with the standards under ss. 66.0205, 66.0207 and 66.0217(6)(c) shall be one of the following:

1. The petition as submitted is dismissed.

2. The petition as submitted is granted.

3. The petition as submitted is dismissed with a recommendation that a new petition be submitted to include more or less territory as specified in the department's findings and determination.

(f)1. If the board determines that the petition shall be dismissed under par. (e)1., the circuit court shall issue an order dismissing the petition. Except as provided in subd. 2., if the board grants the petition, the circuit court shall order an incorporation referendum as provided in s. 66.0211.

2. If sub. (4m) applies, the court shall dismiss the petition if the court does not find that the resolutions required under sub. (4m) have been adopted. Paragraph (g) does not apply to this subdivision.

(g) The findings of both the court and the board shall be based upon facts as they existed at the time of the filing of the petition.

(h) Except for an incorporation petition which describes the territory recommended by the board under sub. (9)(e)3., no petition for the incorporation of the same or substantially the same territory may be entertained for one year following the date of dismissal under par. (f) of the petition or the date of any election at which incorporation was rejected by the electors.

(i) If the board fails to make a determination within the time limit under par. (d), the board shall refund the fees imposed by the board under s. 16.53(14) and shall then make a determination as quickly as possible.

**(10) Certain towns may become a city or village.** A town that is adjacent to a village that contains an electronics and information technology manufacturing zone that is designated under s. 238.396(1m) may become a city or village if the town holds, and approves, an incorporation referendum as described in s. 66.0211(3). None of the other procedures contained in ss. 66.0201 to 66.0213 need to be fulfilled, and no approval by the board under s. 66.0207 is necessary for the town to become a city or village.

**Credits**
<<For credits, see Historical Note field.>>

Notes of Decisions (40)

W. S. A. 66.0203, WI ST 66.0203
Current through 2023 Act 272, published April 10, 2024.

**End of Document**
© 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
   Municipalities (Ch. 59 to 68)
      Chapter 66. General Municipality Law (Refs & Annos)
         Subchapter II. Incorporation; Municipal Boundaries

W.S.A. 66.0205

66.0205. Standards to be applied by the circuit court

Currentness

Before referring the incorporation petition as provided in s. 66.0203(2) to the board, the court shall determine whether the petition meets the formal and signature requirements and shall further find that the following minimum requirements are met:

**(1) Isolated village.** Area, one-half square mile; resident population, 150.

**(2) Isolated city.** Area, one square mile; resident population, 1,000; density, at least 500 persons in any one square mile.

**(3) Metropolitan village.** Area, 2 square miles; resident population, 2,500; density, at least 500 persons in any one square mile.

**(4) Metropolitan city.** Area, 3 square miles; resident population, 5,000; density, at least 750 persons in any one square mile.

**(5) Standards when near 1st, 2nd or 3rd class city.** If the proposed boundary of a metropolitan village or city is within 10 miles of the boundary of a 1st class city or 5 miles of a 2nd or 3rd class city, the minimum area requirements are 4 and 6 square miles for villages and cities, respectively.

**Credits**
<<For credits, see Historical Note field.>>

Notes of Decisions (9)

W. S. A. 66.0205, WI ST 66.0205
Current through 2023 Act 272, published April 10, 2024.

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
  Municipalities (Ch. 59 to 68)
    Chapter 66. General Municipality Law (Refs & Annos)
      Subchapter II. Incorporation; Municipal Boundaries

W.S.A. 66.0207

66.0207. Standards to be applied by the board

Currentness

**(1) Requirements.** The board may approve for referendum only those proposed incorporations which meet the following requirements:

(a) *Characteristics of territory.* The entire territory of the proposed village or city shall be reasonably homogeneous and compact, taking into consideration natural boundaries, natural drainage basin, soil conditions, present and potential transportation facilities, previous political boundaries, boundaries of school districts, shopping and social customs. An isolated municipality shall have a reasonably developed community center, including some or all features such as retail stores, churches, post office, telecommunications exchange and similar centers of community activity.

(b) *Territory beyond the core.* The territory beyond the most densely populated one-half square mile specified in s. 66.0205(1) or the most densely populated square mile specified in s. 66.0205(2) shall have an average of more than 30 housing units per quarter section or an assessed value, as defined in s. 66.0217(1)(a) for real estate tax purposes, more than 25 percent of which is attributable to existing or potential mercantile, manufacturing or public utility uses. The territory beyond the most densely populated square mile as specified in s. 66.0205(3) or (4) shall have the potential for residential or other urban land use development on a substantial scale within the next 3 years. The board may waive these requirements to the extent that water, terrain or geography prevents the development.

**(2) Additional considerations.** In addition to complying with each of the applicable standards set forth in sub. (1) and s. 66.0205 in order to be approved for referendum, a proposed incorporation must be in the public interest as determined by the board upon consideration of the following:

(a) *Tax revenue.* The present and potential sources of tax revenue appear sufficient to defray the anticipated cost of governmental services at a local tax rate which compares favorably with the tax rate in a similar area for the same level of services.

(b) *Level of services.* The level of governmental services desired or needed by the residents of the territory compared to the level of services offered by the proposed village or city and the level available from a contiguous municipality which files a certified copy of a resolution as provided in s. 66.0203(6).

(c) *Impact on the remainder of the town.* The impact, financial and otherwise, upon the remainder of the town from which the territory is to be incorporated.

(d) *Impact on the metropolitan community.* The effect upon the future rendering of governmental services both inside the territory proposed for incorporation and elsewhere within the metropolitan community. There shall be an express finding that the proposed incorporation will not substantially hinder the solution of governmental problems affecting the metropolitan community.

**Credits**

<<For credits, see Historical Note field.>>

Notes of Decisions (67)

W. S. A. 66.0207, WI ST 66.0207
Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
  Municipalities (Ch. 59 to 68)
    Chapter 66. General Municipality Law (Refs & Annos)
      Subchapter II. Incorporation; Municipal Boundaries

W.S.A. 66.0209

66.0209. Review of incorporation-related orders and decisions

Currentness

(1) The order of the circuit court made under s. 66.0203(8) or (9)(f) may be appealed to the court of appeals.

(2) The decision of the board made under s. 66.0203(9) is subject to judicial review under ch. 227.

(3) Where a proceeding for judicial review is commenced under sub. (2), appeal under sub. (1) may not be taken and the time in which the appeal may be taken does not commence to run until judgment is entered in the proceeding for judicial review.

(4) An incorporation referendum ordered by the circuit court under s. 66.0203(9)(f) may not be stayed pending the outcome of further litigation, unless the court of appeals or the supreme court, upon an appeal or upon the filing of an original action in the supreme court, concludes that a strong probability exists that the order of the circuit court or the decision of the board will be set aside.

**Credits**
<<For credits, see Historical Note field.>>

Notes of Decisions (5)

W. S. A. 66.0209, WI ST 66.0209
Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**                               © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:24-cv-00228-Z    Document 50-1    Filed 01/17/25    Page 422 of 882    PageID 49207

🚩 KeyCite Red Flag - Severe Negative Treatment

KeyCite Red Flag Negative Treatment  66.021.    Renumbered in part and repealed in part by 1999 Act 150, §§  44 to 63, eff. Jan. 1, 2001

West's Wisconsin Statutes Annotated
    Municipalities (Ch. 59 to 68)
        Chapter 66. General Municipality Law (Refs & Annos)
        Subchapter II. Incorporation; Municipal Boundaries

W.S.A. 66.021

66.021. Renumbered in part and repealed in part by 1999 Act 150, §§ 44 to 63, eff. Jan. 1, 2001

Currentness

**Credits**

<<For credits, see Historical Note field.>>

W. S. A. 66.021, WI ST 66.021

Current through 2023 Act 272, published April 10, 2024.

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
    Municipalities (Ch. 59 to 68)
        Chapter 66. General Municipality Law (Refs & Annos)
            Subchapter II. Incorporation; Municipal Boundaries

W.S.A. 66.0211

66.0211. Incorporation referendum procedure

Currentness

**(1) Order.** The circuit court's order for an incorporation referendum shall specify the voting place and the date of the referendum, which shall be not less than 6 weeks from the date of the order, and name 3 inspectors of election. If the order is for a city incorporation referendum the order shall further specify that 7 alderpersons shall be elected at large from the proposed city. The city council at its first meeting shall determine the number and boundaries of wards in compliance with s. 5.15(1) and (2), and the combination of wards into aldermanic districts. The number of alderpersons per aldermanic district shall be determined by charter ordinance.

**(2) Notice of referendum.** Notice of the referendum shall be given by publication of the order of the circuit court in a newspaper having general circulation in the territory. Publication shall be once a week for 4 successive weeks. The first publication may not be more than 4 weeks before the referendum.

**(3) Return.** An incorporation referendum shall be conducted in the same manner as an annexation referendum under s. 66.0217(7) to the extent applicable except that the ballot shall contain the words "For a city [village]" and "Against a city [village]". The inspectors shall make a return to the circuit court.

**(4) Costs.** If the referendum is against incorporation, the costs of the election shall be borne by the towns involved in the proportion that the number of electors of each town within the territory proposed to be incorporated, voting in the referendum, bears to the total number of electors in the territory voting in the referendum. If the referendum is for a village or city, the costs shall be charged against the municipality in the apportionment of town assets.

**(5) Certification of incorporation.** If a majority of the votes in an incorporation referendum are cast in favor of a village or city, the clerk of the circuit court shall certify the fact to the secretary of administration and supply the secretary of administration with a copy of a description of the legal boundaries of the village or city and the associated population and a copy of a plat of the village or city. Within 10 days of receipt of the description and plat, the secretary of administration shall forward 2 copies to the department of transportation and one copy each to the department of administration and the department of revenue. The secretary of administration shall issue a certificate of incorporation and record the certificate.

**Credits**
<<For credits, see Historical Note field.>>

Notes of Decisions (5)

W. S. A. 66.0211, WI ST 66.0211

Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**                                  © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
   Municipalities (Ch. 59 to 68)
      Chapter 66. General Municipality Law (Refs & Annos)
         Subchapter II. Incorporation; Municipal Boundaries

W.S.A. 66.0213

66.0213. Powers of new village or city: elections; adjustment of taxes; reorganization as village

Currentness

**(1) Village or city powers.** A village or city incorporated under ss. 66.0201 to 66.0213 is a body corporate and politic, with powers and privileges of a municipal corporation at common law and conferred by these statutes.

**(2) Existing ordinances.** Ordinances in force in the territory incorporated or any part of the territory, to the extent not inconsistent with chs. 61 and 62, continue in force until altered or repealed.

**(3) Interim officers.** All officers of the village or town embracing the territory that is incorporated as a village or city continue in their powers and duties until the first meeting of the board of trustees or common council at which a quorum is present. Until a village or city clerk is chosen and qualified all oaths of office and other papers shall be filed with the circuit court with which the petition was filed. The court shall deliver the oaths and other papers with the petition to the village or city clerk when that clerk qualifies.

**(4) First village or city election.** (a) Within 10 days after incorporation of the village or city, the county clerk of the county in which the petition was filed shall fix a time for the first election, and where appropriate designate the polling place or places, and name 3 inspectors of election for each place. The time for the election shall be fixed no less than 40 nor more than 50 days after the date of the certificate of incorporation issued by the secretary of administration, irrespective of any other provision in the statutes. Nomination papers shall conform to ch. 8 to the extent applicable. Nomination papers shall be signed by not less than 5 percent nor more than 10 percent of the total votes cast at the referendum election, and be filed no later than 15 days before the time fixed for the election. Ten days' previous notice of the election shall be given by the county clerk by publication in the newspapers selected under s. 66.0211(2) and by posting notices in 3 public places in the village or city, but failure to give notice does not invalidate the election.

(b) The election shall be conducted as prescribed by ch. 6. The inspectors shall make returns to the county clerk who shall, within 14 days after the election, canvass the returns and declare the result. The clerk shall notify the officers-elect and issue certificates of election. If the first election is on the first Tuesday in April the officers elected and their appointees shall commence and hold their offices as for a regular term. Otherwise they shall commence within 14 days and hold their offices until the regular village or city election and the qualification of their successors and the terms of their appointees expire as soon as successors qualify.

**(5) Taxes levied before incorporation; how collected and divided.** If a village or city is incorporated after the assessment of taxes in any year and before the collection of the taxes, the tax assessed shall be collected by the town treasurer of the town or the town treasurers of the different towns of which the village or city formerly constituted a part, and all moneys collected from the tax levied for town purposes shall be divided between the village or city and the town or the towns, as provided by s. 66.0235(13)(a)1., for the division of property owned jointly by towns and villages.

**(6) Reorganization of city as village.** If the population of any city falls below 1,000 as determined by the United States census, the council may upon filing of a petition conforming to the requirements of s. 8.40 containing the signatures of at least 15 percent of the electors submit at any general or city election the question whether the city shall reorganize as a village. If three-fifths of the votes cast on the question are for reorganization the mayor and council shall record the return in the office of the register of deeds, file a certified copy with the clerk of the circuit court, and immediately call an election, to be conducted as are village elections, for the election of village officers. Upon the qualification of the officers, the board of trustees shall declare the city reorganized as a village, and the reorganization is effective. The clerk shall certify a copy of the declaration to the secretary of administration who shall file the declaration and endorse a memorandum of the declaration on the record of the certificate of incorporation of the city. Rights and liabilities of the city continue in favor of or against the village. Ordinances, so far as within the power of the village, remain in force until changed.

**Credits**

<<For credits, see Historical Note field.>>

Notes of Decisions (20)

W. S. A. 66.0213, WI ST 66.0213
Current through 2023 Act 272, published April 10, 2024.

---

                                   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW  © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
Municipalities (Ch. 59 to 68)
Chapter 66. General Municipality Law (Refs & Annos)
Subchapter II. Incorporation; Municipal Boundaries

W.S.A. 66.0215

66.0215. Incorporation of certain towns adjacent to 1st class cities

Currentness

**(1) Petition.** If the resident population of a town exceeds 5,000 as shown by the last federal census or by a census under sub. (2), if the town is adjacent to a 1st class city and contains an equalized valuation in excess of $20,000,000 and if a petition signed by 100 or more persons, each an elector and taxpayer of the town, containing the signatures of at least 50 percent of the owners of real estate in the town and requesting submission of the question to the electors of the town, is filed with the clerk of the town, the procedure for becoming a 4th class city is initiated.

**(2) Referendum.** At the next regular meeting of the town board following the filing of the petition under sub. (1), the board by resolution shall provide for a referendum by the electors of the town. The resolution shall conform to the requirements of s. 5.15(1) and (2) and shall determine the numbers and boundaries of each ward of the proposed city and the time of voting, which may not be earlier than 6 weeks after the adoption of the resolution. The resolution may direct that a census be taken of the resident population of the territory on a day not more than 10 weeks previous to the date of the election, exhibiting the name of every head of a family and the name of every person who is a resident in good faith of the territory on that day, and the lot or quarter section of land on which that person resides, which shall be verified by the affixed affidavit of the person taking the census.

**(3) Notice of referendum.** Notice of the referendum shall be given by publication of the resolution in a newspaper published in the town, if there is one, otherwise in a newspaper designated in the resolution, once a week for 4 successive weeks, the first publication to be not more than 4 weeks before the referendum.

**(4) Voting procedure.** The referendum shall be conducted in the same manner as elections for supervisors of the town board. The question appearing on the ballot shall be "Shall the town of ... become a 4th class city?". Below the question shall appear 2 squares. To the left of one square shall appear the words "For a city" and to the left of the other square shall appear the words "Against a city". The inspectors shall make a return to the clerk of the town.

**(5) Certificate of incorporation.** If a majority of the votes are cast in favor of a city the clerk shall certify the fact to the secretary of administration, together with the result of the census, if any, and 4 copies of a description of the legal boundaries of the town and 4 copies of a plat of the town. The secretary of administration shall then issue a certificate of incorporation, and record the certificate in a book kept for that purpose. Two copies of the description and plat shall be forwarded by the secretary of administration to the department of transportation and one copy to the department of revenue.

**(6) City powers.** A city incorporated under this section is a body corporate and politic, with the powers and privileges of a municipal corporation at common law and conferred by ch. 62.

**(7) Existing ordinances.** Ordinances in force in the territory or any part of the territory, to the extent not inconsistent with ch. 62, continue in force until altered or repealed.

**(8) Interim officers.** All officers of the town embracing the territory incorporated as a city continue in their powers and duties until the first meeting of the common council at which a quorum is present. Until a city clerk is chosen and qualified all oaths of office and other papers shall be filed with the town clerk, with whom the petition was filed, who shall deliver them with the petition to the city clerk when the city clerk is qualified.

**(9) First city election.** Within 10 days after incorporation of the city, the town board and the town clerk who received the petition shall fix a time for the first city election, designate the polling place or places, and name 3 inspectors of election for each place. Ten days' previous notice of the election shall be given by the clerk by publication in the newspapers selected under sub. (3) and by posting notices in 3 public places in the city. Failure to give notice does not invalidate the election. The election shall be conducted as is prescribed by chs. 5 to 12. The inspectors shall make returns to the board which shall, within 14 days after the election, canvass the returns and declare the result. The clerk shall notify the officers-elect and issue certificates of election. If the first election is on the first Tuesday in April the officers elected and their appointees commence and hold their offices as for a regular term. Otherwise they commence within 14 days and hold until the regular city election and the qualification of their successors, and the term of their appointees expires as soon as successors qualify.

**Credits**

<<For credits, see Historical Note field.>>

Notes of Decisions (10)

W. S. A. 66.0215, WI ST 66.0215
Current through 2023 Act 272, published April 10, 2024.

---

End of Document          © 2025 Thomson Reuters. No claim to original U.S. Government Works.

66.0216. Repealed by 2015 Act 196, § 62, eff. March 2, 2016, WI ST 66.0216

Case 2:24-cv-00228-Z    Document 50-1    Filed 01/17/25    Page 429 of 882    PageID 49214

KeyCite Red Flag - Severe Negative Treatment

KeyCite Red Flag Negative Treatment  66.0216.   Repealed by 2015 Act 196, §  62, eff. March 2, 2016

West's Wisconsin Statutes Annotated

Municipalities (Ch. 59 to 68)

Chapter 66. General Municipality Law (Refs & Annos)

Subchapter II. Incorporation; Municipal Boundaries

W.S.A. 66.0216

66.0216. Repealed by 2015 Act 196, § 62, eff. March 2, 2016

Currentness

**Credits**

<<For credits, see Historical Note field.>>

W. S. A. 66.0216, WI ST 66.0216

Current through 2023 Act 272, published April 10, 2024.

**End of Document**                              © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
    Municipalities (Ch. 59 to 68)
        Chapter 66. General Municipality Law (Refs & Annos)
            Subchapter II. Incorporation; Municipal Boundaries

W.S.A. 66.02162

66.02162. Incorporation of certain towns contiguous to 3rd class cities or villages

Currentness

**(1) Conditions.** A town board may initiate the procedure for incorporating its town as a village under this section by adopting a resolution providing for a referendum by the electors of the town on the question of whether the town should become a village if on the date of the adoption of the resolution any of the following is satisfied:

(a) All of the following conditions apply:

1. The most recent federal decennial census shows that the resident population of the town exceeds 6,300.

2. The town is contiguous to a 3rd class city.

3. The most recent data available from the department of revenue show that the equalized value for the town exceeds $600,000,000.

4. In one of the 5 years before the year in which the town board adopts the resolution, the town's equalized value increased more than 7 percent, compared to the town's equalized value for the prior year.

5. The town board of the town is authorized to exercise village powers.

6. The town has entered into, and is bound by, at least 2 separate cooperative boundary agreements under s. 66.0307 with at least 2 municipalities.

7. The town has created at least one tax incremental financing district as authorized under s. 60.23(32).

8. The town has established at least one town sanitary district under subch. IX of ch. 60.

(b) All of the following conditions apply:

1. The most recent federal decennial census shows that the resident population of the town exceeds 2,300.

2. The most recent data available from the department of revenue show that the equalized value for the town exceeds $190,000,000.

3. The area of the town exceeds 40 square miles.

4. The town is contiguous to a village to which all of the following conditions apply:

a. The most recent federal decennial census shows that the resident population of the village is less than 300.

b. The area of the village is less than 2 square miles.

c. The aggregate net tax rate of the village, as determined by the department of revenue under s. 70.114(3), is greater than 36 mills.

5. The village under subd. 4. and the town are located in a county for which the most recent federal decennial census shows that the resident population is less than 150,000.

**(2) Referendum resolution.** The resolution of the town board required under sub. (1) shall do all of the following:

(a) Certify that the requirements under sub. (1) are satisfied.

(b) Contain a description of the territory to be incorporated sufficiently accurate to determine its location and a statement that a scale map reasonably showing the boundaries of the territory is on file with the town clerk.

(c) Determine the numbers and boundaries of each ward of the proposed village, conforming to the requirements of s. 5.15(1) and (2).

(d) Determine the date of the referendum, which may not be earlier than 6 weeks after the adoption of the resolution.

**(3) Notice of referendum.** The town clerk shall publish the resolution adopted under sub. (1) in a newspaper published in the town. If no newspaper is published in the town, the town clerk shall publish the resolution in a newspaper designated in the resolution. The town clerk shall publish the resolution once a week for 4 successive weeks, the first publication to be not more than 4 weeks before the referendum.

**(4) Voting procedure.** The referendum shall be conducted in the same manner as elections for town board supervisors. The question appearing on the ballot shall be: "Shall the town of .... become a village?" Below the question shall appear 2 squares. To the left of one square shall appear the words "For a village," and to the left of the other square shall appear the words "Against a village." The inspectors shall make a return to the town clerk.

**(5) Certificate of incorporation.** If a majority of the votes are cast in favor of a village, the town clerk shall certify that fact to the secretary, together with 4 copies of a description of the legal boundaries of the town, and 4 copies of a plat of the town. The town clerk shall also send the secretary an incorporation fee of $1,000. Upon receipt of the town clerk's certification, the incorporation fee, and other required documents, the secretary shall issue a certificate of incorporation and record the certificate in a book kept for that purpose. The secretary shall provide 2 copies of the description and plat to the department of transportation and one copy to the department of revenue. The town clerk shall also transmit a copy of the certification and the resolution under sub. (1) to the county clerk.

**(6) Action.** No action to contest the validity of an incorporation under this section on any grounds, whether procedural or jurisdictional, may be commenced after 60 days from the date of issuance of the certificate of incorporation by the secretary. In any such action, the burden of proof as to all issues is upon the person bringing the action to show that the incorporation is not valid. An action contesting an incorporation shall be given preference in the circuit court.

**(7) Village powers.** A village incorporated under this section is a body corporate and politic, with the powers and privileges of a municipal corporation at common law and conferred by ch. 61.

**(8) Existing ordinances.** Ordinances in force in the territory or any part of the territory, to the extent not inconsistent with this section or ch. 61, continue in force until altered or repealed.

**(9) Existing intergovernmental and cooperative boundary agreements.** Intergovernmental cooperation agreements entered into under s. 66.0301 and cooperative boundary agreements approved under s. 66.0307, to which a town incorporating under this section is a party, that are still in effect on the effective date of the incorporation, shall continue in force until altered or repealed, to the extent allowed under the agreements. When incorporated under this section, a village shall be considered the town's successor with respect to such agreements.

**(10) Interim officers, first village election.** Section 66.0215(8) and (9), as it applies to a town that is incorporated as a city under s. 66.0215, applies to a town that is incorporated as a village under this section.

**(11) Sunset.** This section does not apply after June 30, 2020.

**Credits**

<<For credits, see Historical Note field.>>

W. S. A. 66.02162, WI ST 66.02162

Current through 2023 Act 272, published April 10, 2024.

---

End of Document
© 2025 Thomson Reuters. No claim to original U.S. Government Works.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated

Municipalities (Ch. 59 to 68)

Chapter 66. General Municipality Law (Refs & Annos)

Subchapter II. Incorporation; Municipal Boundaries

W.S.A. 66.02165

66.02165. Limitations on newly created incorporated village or city

Currentness

For a 5-year period after incorporation under this subchapter, a newly incorporated city or village may not add or contract to add any remaining town territory of the town from which the newly incorporated city or village was created by use of consolidation, a boundary agreement, or annexation other than annexation by unanimous approval under s. 66.0217(2), except that the city or village and town territory remaining after incorporation may consolidate as permitted under s. 66.0230.

**Credits**

<<For credits, see Historical Note field.>>

W. S. A. 66.02165, WI ST 66.02165

Current through 2023 Act 272, published April 10, 2024.

---

End of Document                              © 2025 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

West's Wisconsin Statutes Annotated
 Municipalities (Ch. 59 to 68)
  Chapter 66. General Municipality Law (Refs & Annos)
   Subchapter II. Incorporation; Municipal Boundaries

W.S.A. 66.0217

66.0217. Annexation initiated by electors and property owners

Currentness

**(1) Definitions.** In this section, unless the context clearly requires otherwise:

(a) "Assessed value" means the value for general tax purposes as shown on the tax roll for the year next preceding the filing of any petition for annexation.

(b) "Department" means the department of administration.

(c) "Legal description" means a complete description of land to be annexed without internal references to any other document, and shall be described in one of the following ways:

1. By metes and bounds commencing at a monument at the section or quarter section corner or at the end of a boundary line of a recorded private claim or federal reservation in which the annexed land is located and in one of the following ways:

a. By government lot.

b. By recorded private claim.

c. By quarter section, section, township and range.

2. If the land is located in a recorded and filed subdivision or in an area subject to a certified survey map, by reference as described in s. 236.28 or s. 236.34(3).

(d) "Owner" means the holder of record of an estate in possession in fee simple, or for life, in land or real property, or a vendee of record under a land contract for the sale of an estate in possession in fee simple or for life but does not include the vendor under a land contract. A tenant in common or joint tenant is an owner to the extent of his or her interest.

(e) "Petition" includes the original petition and any counterpart of the original petition.

(f) "Real property" means land and the improvements to the land.

(g) "Scale map" means a map that accurately reflects the legal description of the property to be annexed and the boundary of the annexing city or village, and that includes a graphic scale on the face of the map.

**(2) Direct annexation by unanimous approval.** Except as provided in this subsection and sub. (14), and subject to ss. 66.0301(6)(d) and 66.0307(7), if a petition for direct annexation signed by all of the electors residing in the territory and the owners of all of the real property in the territory is filed with the city or village clerk, and with the town clerk of the town or towns in which the territory is located, together with a scale map and a legal description of the property to be annexed, an annexation ordinance for the annexation of the territory may be enacted by a two-thirds vote of the elected members of the governing body of the city or village without compliance with the notice requirements of sub. (4). In an annexation under this subsection, subject to sub. (6), the person filing the petition with the city or village clerk and the town clerk shall, within 5 days of the filing, mail a copy of the scale map and a legal description of the territory to be annexed to the department and the governing body shall review the advice of the department, if any, before enacting the annexation ordinance. No territory may be annexed by a city or village under this subsection unless the territory to be annexed is contiguous to the annexing city or village.

**(3) Other methods of annexation.** Subject to ss. 66.0301(6)(d) and 66.0307(7), and except as provided in sub. (14), territory contiguous to a city or village may be annexed to the city or village in the following ways:

(a) *Direct annexation by one-half approval.* A petition for direct annexation may be filed with the city or village clerk if it has been signed by either of the following:

1. A number of qualified electors residing in the territory subject to the proposed annexation equal to at least the majority of votes cast for governor in the territory at the last gubernatorial election, and either of the following:

a. The owners of one-half of the land in area within the territory.

b. The owners of one-half of the real property in assessed value within the territory.

2. If no electors reside in the territory subject to the proposed annexation, by either of the following:

a. The owners of one-half of the land in area within the territory.

b. The owners of one-half of the real property in assessed value within the territory.

(b) *Annexation by referendum.* A petition for a referendum on the question of annexation may be filed with the city or village clerk signed by a number of qualified electors residing in the territory equal to at least 20 percent of the votes cast for governor

in the territory at the last gubernatorial election, and the owners of at least 50 percent of the real property either in area or assessed value. The petition shall conform to the requirements of s. 8.40.

**(4) Notice of proposed annexation.** (a) An annexation under sub. (3) shall be initiated by publishing in the territory proposed for annexation a class 1 notice, under ch. 985, of intention to circulate an annexation petition. The notice shall contain:

1. A statement of intention to circulate an annexation petition.

2. A legal description of the territory proposed to be annexed and a copy of a scale map.

3. The name of the city or village to which the annexation is proposed.

4. The name of the town or towns from which the territory is proposed to be detached.

5. The name and post-office address of the person causing the notice to be published who shall be an elector or owner in the area proposed to be annexed.

6. A statement that a copy of the scale map may be inspected at the office of the town clerk for the territory proposed to be annexed and the office of the city or village clerk for the city or village to which the territory is proposed to be annexed.

(b) The person who has the notice published shall serve a copy of the notice, within 5 days after its publication, upon the clerk of each municipality affected, upon the clerk of each school district affected and upon each owner of land in a town if that land will be in a city or village after the annexation. Service may be either by personal service or by certified mail with return receipt requested. If required under sub. (6)(a), a copy of the notice shall be mailed to the department as provided in that paragraph.

**(5) Annexation petition.** (a) An annexation petition under this section shall state the purpose of the petition, contain a legal description of the territory proposed to be annexed and have attached a scale map. The petition shall also specify the population of the territory. In this paragraph, "population" means the population of the territory as shown by the last federal census, by any subsequent population estimate certified as acceptable by the department or by an actual count certified as acceptable by the department.

(b) No person who has signed a petition may withdraw his or her name from the petition. No additional signatures may be added after a petition is filed.

(c) The circulation of the petition shall commence not less than 10 days nor more than 20 days after the date of publication of the notice of intention to circulate. The annexation petition is void unless filed within 6 months of the date of publication of the notice.

**(6) Department review of annexations.** (a) *Annexations within populous counties.* No annexation proceeding within a county having a population of 50,000 or more is valid unless the person publishing a notice of annexation under sub. (4) mails a copy of the notice to the clerk of each municipality affected and the department, together with any fee imposed under s. 16.53(14), within

5 days of the publication. The department shall within 20 days after receipt of the notice mail to the clerk of the town within which the territory lies and to the clerk of the proposed annexing village or city a notice that states whether in its opinion the annexation is in the public interest or is against the public interest and that advises the clerks of the reasons the annexation is in or against the public interest as defined in par. (c). The annexing municipality shall review the advice before final action is taken.

(b) *Alternative dispute resolution.* The department shall make available on its public website a list of persons who identify themselves to the department as professionals qualified to facilitate alternative dispute resolution of annexation, boundary, and land use disputes. Persons identifying themselves to the department as qualified professionals shall submit to the department a brief description of their qualifications, including membership in relevant professional associations and certifications in areas such as planning and alternative dispute resolution. The department may edit the descriptions for inclusion on the list using any criteria that, in the department's determination, is appropriate. The department may include with the list a disclaimer that the department is not responsible for the accuracy of the descriptions, and that inclusion of a person on the list does not represent endorsement by the department. The department may include links from the list to other websites, such as those of relevant professional associations and county dispute resolution centers.

(c) *Definition of public interest.* For purposes of this subsection "public interest" is determined by the department after consideration of the following:

1. Whether the governmental services, including zoning, to be supplied to the territory could clearly be better supplied by the town or by some other village or city whose boundaries are contiguous to the territory proposed for annexation which files with the circuit court a certified copy of a resolution adopted by a two-thirds vote of the elected members of the governing body indicating a willingness to annex the territory upon receiving an otherwise valid petition for the annexation of the territory.

2. The shape of the proposed annexation and the homogeneity of the territory with the annexing village or city and any other contiguous village or city.

(d) *Direct annexation by unanimous approval.* 1. Upon the request of the town affected by the annexation, the department shall review an annexation under sub. (2) to determine whether the annexation violates any of the following, provided that the town submits its request to the department within 30 days of the enactment of the annexation ordinance:

a. The requirement under sub. (2) regarding the contiguity of the territory to be annexed with the annexing city or village.

b. The requirement under sub. (14)(b).

2. Following its review, and within 20 days of receiving the town's request, the department shall send a copy of its findings to any affected landowner, the town affected by the annexation, and the annexing city or village. If the department does not complete its review and send a copy of its findings within 20 days of receiving the town's request, the effect on the town and the annexing city or village shall be the same as if the department found no violation of the requirements specified in subd. 1. If the department finds that an annexation violates any requirement specified in subd. 1., the town from which territory is annexed may, within 45 days of its receipt of the department's findings, challenge the annexation in circuit court.

3. If the town commences an action to challenge the annexation and the circuit court rules against the town, the town shall pay the court costs and the city's or village's reasonable attorney fees incurred in defending the annexation. If the town commences

an action to challenge the annexation and the circuit court rules in the town's favor and upholds the town's challenge, the city or village shall pay the court costs and the town's reasonable attorney fees incurred in challenging the annexation.

**(7) Referendum.** (a) *Notice.* 1. Within 60 days after the filing of the petition under sub. (3), the common council or village board may accept or reject the petition and if rejected no further action may be taken on the petition. Acceptance may consist of adoption of an annexation ordinance. Failure to reject the petition obligates the city or village to pay the cost of any referendum favorable to annexation.

2. If the petition is not rejected the clerk of the city or village with whom the annexation petition is filed shall give written notice of the petition by personal service or registered mail with return receipt requested to the clerk of any town from which territory is proposed to be detached and shall give like notice to any person who files a written request with the clerk. The notice shall indicate whether the petition is for direct annexation or whether it requests a referendum on the question of annexation.

3. If the notice indicates that the petition is for a referendum on the question of annexation, the clerk of the city or village shall file the notice as provided in s. 8.37. If the notice indicates that the petition is for a referendum on the question of annexation, the town clerk shall give notice as provided in par. (c) of a referendum of the electors residing in the area proposed for annexation to be held not less than 70 days nor more than 100 days after the date of personal service or mailing of the notice required under this paragraph. If the notice indicates that the petition is for direct annexation, no referendum shall be held unless within 30 days after the date of personal service or mailing of the notice required under this paragraph, a petition conforming to the requirements of s. 8.40 requesting a referendum is filed with the town clerk as provided in s. 8.37, signed by at least 20 percent of the electors residing in the area proposed to be annexed. If a petition requesting a referendum is filed, the clerk shall give notice as provided in par. (c) of a referendum of the electors residing in the area proposed for annexation to be held not less than 70 days nor more than 100 days after the receipt of the petition and shall mail a copy of the notice to the clerk of the city or village to which the annexation is proposed. The referendum shall be held at a convenient place within the town to be specified in the notice.

(b) *Clerk to act.* If more than one town is involved, the city or village clerk shall determine as nearly as is practicable which town contains the most electors in the area proposed to be annexed and shall indicate in the notice required under par. (a) that determination. The clerk of the town so designated shall perform the duties required under this subsection and the election shall be conducted in the town as are other elections.

(c) *Publication of notice.* The notice shall be published in a newspaper of general circulation in the area proposed to be annexed on the publication day next preceding the referendum election and one week prior to that publication.

(d) *How conducted.* The referendum shall be conducted by the town election officials but the town board may reduce the number of election officials for that election. The ballots shall contain the words "For annexation" and "Against annexation" and shall otherwise conform to the provisions of s. 5.64(2). The election shall be conducted as are other town elections in accordance with chs. 6 and 7 to the extent applicable.

(e) *Canvass; statement to be filed.* The election inspectors shall make a statement of the holding of the election showing the whole number of votes cast, and the number cast for and against annexation, attach their affidavit to the statement and immediately file it in the office of the town clerk. They shall file a certified statement of the results in the office of the clerk of each other municipality affected.

Case 2:24-cv-00228-Z    Document 50-1    Filed 01/17/25    Page 439 of 882    PageID 49224

(f) *Costs.* If the referendum is against annexation, the costs of the election shall be borne by the towns involved in the proportion that the number of electors of each town within the territory proposed to be annexed, voting in the referendum, bears to the total number of electors in that territory, voting in the referendum.

(g) *Effect.* If the result of the referendum is against annexation, all previous proceedings are nullified. If the result of the referendum is for annexation, failure of any town official to perform literally any duty required by this section does not invalidate the annexation.

**(8) Annexation ordinance.** (a) An ordinance for the annexation of the territory described in the annexation petition under sub. (3) may be enacted by a two-thirds vote of the elected members of the governing body not less than 20 days after the publication of the notice of intention to circulate the petition and not later than 120 days after the date of filing with the city or village clerk of the petition for annexation or of the referendum election if favorable to the annexation. If the annexation is subject to sub. (6) the governing body shall first review the reasons given by the department that the proposed annexation is against the public interest. An ordinance under this subsection may temporarily designate the classification of the annexed area for zoning purposes until the zoning ordinance is amended as prescribed in s. 62.23(7)(d). Before introduction of an ordinance containing a temporary classification, the proposed classification shall be referred to and recommended by the plan commission. The authority to make a temporary classification is not effective when the county ordinance prevails during litigation as provided in s. 59.69(7).

(b) The ordinance may annex the territory to an existing ward or may create an additional ward.

(c) The annexation is effective upon enactment of the annexation ordinance. The board of school directors in a 1st class city is not required to administer the schools in any territory annexed to the city until July 1 following the annexation.

**(9) Filing requirements; surveys.** (a) The clerk of a city or village which has annexed territory shall file immediately with the secretary of administration a certified copy of the ordinance, certificate and plat, and shall send one copy to each company that provides any utility service in the area that is annexed. The city or village shall also file with the county clerk or board of election commissioners the report required by s. 5.15(4)(b). The clerk shall record the ordinance with the register of deeds and file a signed copy of the ordinance with the clerk of any affected school district. Failure to file, record or send does not invalidate the annexation and the duty to file, record or send is a continuing one. The ordinance that is filed, recorded or sent shall describe the annexed territory and the associated population. The information filed with the secretary of administration shall be utilized in making recommendations for adjustments to entitlements under the federal revenue sharing program and distribution of funds under ch. 79. The clerk shall certify annually to the secretary of administration and record with the register of deeds a legal description of the total boundaries of the municipality as those boundaries existed on December 1, unless there has been no change in the 12 months preceding.

(b) Within 10 days of receipt of the ordinance, certificate and plat, the secretary of administration shall forward 2 copies of the ordinance, certificate and plat to the department of transportation, one copy to the department of administration, one copy to the department of revenue, one copy to the department of public instruction, one copy to the department, one copy to the department of natural resources, one copy to the department of agriculture, trade and consumer protection and 2 copies to the clerk of the municipality from which the territory was annexed.

(c) Any city or village may direct a survey of its present boundaries to be made, and when properly attested the survey and plat may be filed in the office of the register of deeds in the county in which the city or village is located. Upon filing, the survey and plat are prima facie evidence of the facts set forth in the survey and plat.

**(10) Qualifications of electors and owners; elector determination.** (a) Under this section, qualifications as to electors and owners shall be determined as of the date of filing a petition, except that all qualified electors residing in the territory proposed for annexation on the day of a referendum election may vote in the election. Residence and ownership shall be bona fide and not acquired for the purpose of defeating or invalidating the annexation proceedings.

(b) For purposes of this section, if a number of electors cannot be determined on the basis of reported election statistics, the number shall be determined in accordance with s. 60.74(6).

**(11) Action to contest annexation.** (a) An action on any grounds, whether procedural or jurisdictional, to contest the validity of an annexation shall be commenced within the time after adoption of the annexation ordinance provided by s. 893.73(2). During the action, the application of, and jurisdiction over, any county zoning in the area annexed is as provided under s. 59.69(7).

(b) An action contesting an annexation shall be given preference in the circuit court. The court and the parties are encouraged to consider the application of s. 802.12 to an action contesting an annexation.

(c) Except as provided in sub. (6)(d) 2., no action on any grounds, whether procedural or jurisdictional, to contest the validity of an annexation under sub. (2), may be brought by any town.

**(12) Validity of plats.** If an annexation is declared invalid but before the declaration and subsequent to the annexation a plat is submitted and is approved as required in s. 236.10(1)(a), the plat is validly approved despite the invalidity of the annexation.

**(13) Effective date of annexations.** Because the creation of congressional, legislative, supervisory and aldermanic districts of equal population is a matter of statewide concern, any annexation action that affects a tract of land that is the subject of an ordinance enacted or resolution adopted by any city during the period from January 1, 1990, to April 1, 1991, or any later date, expressing an intent to not exercise the city's authority to annex territory before April 1, 1991, or the specified later date, taken by a municipality during the period beginning on April 1 of the year commencing after each federal decennial census of population and ending on June 30 of the year commencing after that census, is effective on July 1 of the year commencing after that census or at such later date as may be specified in the annexation ordinance. This subsection first applies to annexations effective after March 31, 1991.

**(14) Limitations on annexation authority.** (a)1. Except as provided in subd. 2., no territory may be annexed by a city or village under this section unless the city or village agrees to pay annually to the town, for 5 years, an amount equal to the amount of property taxes that the town levied on the annexed territory, as shown by the tax roll under s. 70.65, in the year in which the annexation is final.

2. No payments under subd. 1. must be made if the city or village, and the town, enter into a boundary agreement under s. 66.0225, 66.0301, or 66.0307.

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

(b)1. No territory may be annexed by a city or village under this section if no part of the city or village is located in the same county as the territory that is subject to the proposed annexation unless one of the following applies:

a. The town board adopts a resolution approving the proposed annexation.

b. The annexation is by unanimous approval under sub. (2).

2. Any subsequent annexation by the city or village in the county of the territory annexed under subd. 1. shall either be approved by the town board or be annexed by unanimous approval under sub. (2).

**(15) Law applicable.** Section 66.0203(8)(c) applies to annexations under this section.

**Credits**

<<For credits, see Historical Note field.>>

**Editors' Notes**

### LAW REVISION COMMITTEE PREFATORY NOTE--2017 ACT 360

This bill is a remedial legislation proposal, requested by the Legislative Technology Services Bureau and introduced by the Law Revision Committee under s. 13.83(1)(c)4. and 5., stats. After careful consideration of the various provisions of the bill, the Law Revision Committee has determined that this bill makes minor substantive changes in the statutes, and that these changes are desirable as a matter of public policy.

Notes of Decisions (255)

W. S. A. 66.0217, WI ST 66.0217
Current through 2023 Act 272, published April 10, 2024.

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
  Municipalities (Ch. 59 to 68)
    Chapter 66. General Municipality Law (Refs & Annos)
      Subchapter II. Incorporation; Municipal Boundaries

W.S.A. 66.0219

66.0219. Annexation by referendum initiated by city or village

Currentness

As a complete alternative to any other annexation procedure, and subject to sub. (10) and ss. 66.0301(6)(d) and 66.0307(7), unincorporated territory which contains electors and is contiguous to a city or village may be annexed to the city or village under this section. The definitions in s. 66.0217(1) apply to this section.

**(1) Procedure for annexation.** (a) The governing body of the city or village to which it is proposed to annex territory shall, by resolution adopted by two-thirds of the members-elect, declare its intention to apply to the circuit court for an order for an annexation referendum, and shall publish the resolution in a newspaper having general circulation in the area proposed to be annexed, as a class 1 notice, under ch. 985. The governing body shall prepare a scale map of the territory to be annexed, showing it in relation to the annexing city or village. The resolution shall contain a description of the territory to be affected, sufficiently accurate to determine its location, the name of the municipalities directly affected and the name and post-office address of the municipal official responsible for the publication of the resolution. A copy of the resolution together with the scale map shall be served upon the clerk of the town or towns from which the territory is to be detached within 5 days of the date of publication of the resolution. Service may be either by personal service or by registered mail and if by registered mail an affidavit shall be on file with the annexing body indicating the date on which the resolution was mailed. The annexation is considered commenced upon publication of the resolution.

(b) Application to the circuit court shall be by petition subscribed by the officers designated by the governing body, and shall have attached the scale map, a certified copy of the resolution of the governing body and an affidavit of the publication and filing required under par. (a). The petition shall be filed in the circuit court not less than 30 days but no more than 45 days after the publication of the notice of intention.

**(2) Protest to court by electors; hearing.** (a) If, prior to the date set for hearing upon an application filed under sub. (1)(b), there is filed with the court a petition signed by a number of qualified electors residing in the territory equal to at least a majority of the votes cast for governor in the territory at the last gubernatorial election or the owners of more than one-half of the real property in assessed value in the territory, protesting against the annexation of the territory, the court shall deny the application for an annexation referendum. If a number of electors cannot be determined on the basis of reported election statistics, the number shall be determined in accordance with s. 60.74(6).

(b) If a petition protesting the annexation is found insufficient the court shall proceed to hear all parties interested for or against the application. The court may adjourn the hearing from time to time, direct a survey to be made and refer any question for examination and report. A town whose territory is involved in the proposed annexation shall, upon application, be a party and is entitled to be heard on any relevant matter.

**(3) Dismissal.** If for any reason the proceedings are dismissed, the court may order entry of judgment against the city or village for disbursements or any part of disbursements incurred by the parties opposing the annexation.

**(4) Referendum election; when ordered and held.** (a) If the court, after the hearing, is satisfied that the description of the territory or any survey is accurate and that the provisions of this section have been complied with, it shall make an order so declaring and shall direct a referendum election within the territory described in the order, on the question of whether the area should be annexed. Such order shall be filed as provided in s. 8.37. The order shall direct 3 electors named in the order residing in the town in which the territory proposed to be annexed lies, to perform the duties of inspectors of election.

(b) The referendum election shall be held not less than 70 days nor more than 100 days after the filing of the order as provided in s. 8.37, in the territory proposed for annexation, by the electors of that territory as provided in s. 66.0217(7), so far as applicable. The ballots shall contain the words "For Annexation" and "Against Annexation". The certification of the election inspectors shall be filed with the clerk of the court, and the clerk of any municipality involved, but need not be filed or recorded with the register of deeds.

(c) All costs of the referendum election shall be borne by the petitioning city or village.

**(5) Determination by vote.** (a) If a majority of the votes cast at the referendum election is against annexation, no other proceeding under this section affecting the same territory or part of the same territory may be commenced by the same municipality until 6 months after the date of the referendum election.

(b) If a majority of the votes cast at the referendum election is for annexation, the territory shall be annexed to the petitioning city or village upon compliance with s. 66.0217(9).

**(6) Temporary zoning of area proposed to be annexed.** An interim zoning ordinance to become effective only upon approval of the annexation at the referendum election may be enacted by the governing body of the city or village. The ordinance may temporarily designate the classification of the annexed area for zoning purposes until the zoning ordinance is amended as prescribed in s. 62.23(7)(d). The proposed interim zoning ordinance shall be referred to and recommended by the plan commission prior to introduction. Authority to make a temporary classification is not effective when the county zoning ordinance prevails during litigation as provided in s. 59.69(7).

**(7) Appeal.** An appeal from the order of the circuit court is limited to contested issues determined by the circuit court. An appeal shall not stay the conduct of the referendum election, if one is ordered, but the statement of the election results and the copies of the certificate and plat may not be filed with the secretary of administration until the appeal has been determined.

**(8) Law applicable.** Sections 66.0203(8)(c) and 66.0217(11) apply to annexations under this section.

**(9) Territory excepted.** This section does not apply to any territory located in an area for which a certificate of incorporation was issued before February 24, 1959, by the secretary of state, even if the incorporation of the territory is later held to be invalid by a court.

**(10) Limitations on annexation authority.** (a)1. Except as provided in subd. 2., no territory may be annexed by a city or village under this section unless the city or village agrees to pay annually to the town, for 5 years, an amount equal to the amount of property taxes that the town levied on the annexed territory, as shown by the tax roll under s. 70.65, in the year in which the annexation is final.

2. No payments under subd. 1. must be made if the city or village, and the town, enter into a boundary agreement under s. 66.0225, 66.0301, or 66.0307.

(b) No territory may be annexed by a city or village under this section if no part of the city or village is located in the same county as the territory that is subject to the proposed annexation unless all of the following occur:

1. The town board adopts a resolution approving the proposed annexation.

2. The county board of the county in which the territory is located adopts a resolution approving the proposed annexation.

**Credits**
<<For credits, see Historical Note field.>>

Notes of Decisions (5)

W. S. A. 66.0219, WI ST 66.0219
Current through 2023 Act 272, published April 10, 2024.

End of Document                           © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
    Municipalities (Ch. 59 to 68)
        Chapter 66. General Municipality Law (Refs & Annos)
            Subchapter II. Incorporation; Municipal Boundaries

W.S.A. 66.022

66.022. Renumbered 66.0227 and amended by 1999 Act 150, § 66, eff. Jan. 1, 2001

Currentness

**Credits**

<<For credits, see Historical Note field.>>

W. S. A. 66.022, WI ST 66.022
Current through 2023 Act 272, published April 10, 2024.

---

End of Document                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
  Municipalities (Ch. 59 to 68)
    Chapter 66. General Municipality Law (Refs & Annos)
      Subchapter II. Incorporation; Municipal Boundaries

W.S.A. 66.0221

66.0221. Annexation of and creation of town islands

Currentness

(1) Upon its own motion and subject to sub. (3) and ss. 66.0301(6)(d) and 66.0307(7), a city or village, by a two-thirds vote of the entire membership of its governing body, may enact an ordinance annexing territory which comprises a portion of a town or towns and which was completely surrounded by territory of the city or village on December 2, 1973. The ordinance shall include all surrounded town areas except those that are exempt by mutual agreement of all of the governing bodies involved. The annexation ordinance shall contain a legal description of the territory and the name of the town or towns from which the territory is detached. Upon enactment of the ordinance, the city or village clerk immediately shall file 6 certified copies of the ordinance with the secretary of administration, together with 6 copies of a scale map. The city or village shall also file with the county clerk or board of election commissioners the report required by s. 5.15(4)(b). The secretary of administration shall forward 2 copies of the ordinance and scale map to the department of transportation, one copy to the department of natural resources, one copy to the department of revenue and one copy to the department of administration. This subsection does not apply if the town island was created only by the annexation of a railroad right-of-way or drainage ditch. This subsection does not apply to land owned by a town government which has existing town government buildings located on the land. No town island may be annexed under this subsection if the island consists of over 65 acres or contains over 100 residents. Section 66.0217(11) applies to annexations under this subsection. Except as provided in sub. (2), after December 2, 1973, no city or village may, by annexation, create a town area which is completely surrounded by the city or village.

(2) A city or village may, by annexation, create a town area that is completely surrounded by the city or village if a cooperative plan for boundary change under s. 66.0301(6) or 66.0307, to which the town and the annexing city or village are parties, applies to the territory that is annexed.

(3)(a)1. Except as provided in subd. 2., no territory may be annexed by a city or village under this section unless the city or village agrees to pay annually to the town, for 5 years, an amount equal to the amount of property taxes that the town levied on the annexed territory, as shown by the tax roll under s. 70.65, in the year in which the annexation is final.

2. No payments under subd. 1. must be made if the city or village, and the town, enter into a boundary agreement under s. 66.0225, 66.0301, or 66.0307.

(b) No territory may be annexed by a city or village under this section if no part of the city or village is located in the same county as the territory that is subject to the proposed annexation unless all of the following occur:

1. The town board adopts a resolution approving the proposed annexation.

2. The county board of the county in which the territory is located adopts a resolution approving the proposed annexation.

**Credits**

<<For credits, see Historical Note field.>>

**Editors' Notes**

### LAW REVISION COMMITTEE PREFATORY NOTE--2017 ACT 360

This bill is a remedial legislation proposal, requested by the Legislative Technology Services Bureau and introduced by the Law Revision Committee under s. 13.83(1)(c)4. and 5., stats. After careful consideration of the various provisions of the bill, the Law Revision Committee has determined that this bill makes minor substantive changes in the statutes, and that these changes are desirable as a matter of public policy.

Notes of Decisions (10)

W. S. A. 66.0221, WI ST 66.0221
Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**
© 2025 Thomson Reuters. No claim to original U.S. Government Works.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
  Municipalities (Ch. 59 to 68)
    Chapter 66. General Municipality Law (Refs & Annos)
      Subchapter II. Incorporation; Municipal Boundaries

W.S.A. 66.0223

66.0223. Annexation of territory owned by a city or village

Currentness

(1) In addition to other methods provided by law and subject to sub. (2) and ss. 66.0301(6)(d) and 66.0307(7), territory owned by and lying near but not necessarily contiguous to a village or city may be annexed to a village or city by ordinance enacted by the board of trustees of the village or the common council of the city, provided that in the case of noncontiguous territory the use of the territory by the city or village is not contrary to any town or county zoning regulation. The ordinance shall contain the exact description of the territory annexed and the names of the towns from which detached, and attaches the territory to the village or city upon the filing of 7 certified copies of the ordinance with the secretary of administration, together with 7 copies of a plat showing the boundaries of the territory attached. The city or village shall also file with the county clerk or board of election commissioners the report required by s. 5.15(4)(b). Two copies of the ordinance and plat shall be forwarded by the secretary of administration to the department of transportation, one copy to the department of administration, one copy to the department of natural resources, one copy to the department of revenue and one copy to the department of public instruction. Within 10 days of filing the certified copies, a copy of the ordinance and plat shall be mailed or delivered to the clerk of the county in which the annexed territory is located. Sections 66.0203(8)(c) and 66.0217(11) apply to annexations under this section.

(2) No territory may be annexed by a city or village under this section if no part of the city or village is located in the same county as the territory that is subject to the proposed annexation unless all of the following occur:

(a) The town board adopts a resolution approving the proposed annexation.

(b) The county board of the county in which the territory is located adopts a resolution approving the proposed annexation.

(c) The city or village, and the town, enter into a boundary agreement under s. 66.0225, 66.0301, or 66.0307.

**Credits**
<<For credits, see Historical Note field.>>

**Editors' Notes**

**LAW REVISION COMMITTEE PREFATORY NOTE--2017 ACT 360**

This bill is a remedial legislation proposal, requested by the Legislative Technology Services Bureau and introduced by the Law Revision Committee under s. 13.83(1)(c)4. and 5., stats. After careful consideration of the various

provisions of the bill, the Law Revision Committee has determined that this bill makes minor substantive changes in the statutes, and that these changes are desirable as a matter of public policy.


Notes of Decisions (2)

W. S. A. 66.0223, WI ST 66.0223
Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
  Municipalities (Ch. 59 to 68)
    Chapter 66. General Municipality Law (Refs & Annos)
      Subchapter II. Incorporation; Municipal Boundaries

W.S.A. 66.0225

66.0225. Stipulated boundary agreements in contested boundary actions

Currentness

**(1) Definitions.** In this section, "municipality" means a city, village, or town.

**(2) Contested annexations.** Any 2 municipalities whose boundaries are immediately adjacent at any point and who are parties to an action, proceeding, or appeal in court for the purpose of testing the validity of an annexation may enter into a written stipulation, compromising and settling the litigation and determining the portion of the common boundary line between the municipalities that is the subject of the annexation. The court having jurisdiction of the litigation, whether the circuit court, the court of appeals, or the supreme court, may enter a final judgment incorporating the provisions of the stipulation and fixing the common boundary line between the municipalities involved. A stipulation changing boundaries of municipalities shall be approved by the governing body of each municipality and s. 66.0217(9) and (11) shall apply. A change of municipal boundaries under this section is subject to a referendum of the electors residing within the territory whose jurisdiction is subject to change under the stipulation, if within 30 days after the publication of the stipulation to change boundaries in a newspaper of general circulation in that territory, a petition for a referendum conforming to the requirements of s. 8.40 signed by at least 20 percent of the electors residing within that territory is filed with the clerk of the municipality from which the greater area is proposed to be removed and is filed as provided in s. 8.37. The referendum shall be conducted as are annexation referenda. If the referendum election fails, all proceedings under this section are void.

**(3) Contested boundary actions.** (a) In this subsection, "boundary action" means an action, proceeding, or appeal in court contesting the validity of an annexation, consolidation, detachment, or incorporation.

(b) If 2 municipalities whose boundaries are immediately adjacent at any point are parties to a boundary action, the municipalities may enter into an agreement under s. 66.0301(6) or s. 66.0307 as part of a stipulation to settle the boundary action. The court may approve and make part of the final judgment a stipulation that includes an agreement under s. 66.0301(6) or s. 66.0307.

**(4) Authority for certain stipulations.** A stipulation that is court-approved under this section before January 19, 2008, that affects the location of a boundary between municipalities, is not invalid as lacking authority to affect the location of the boundary.

**Credits**
<<For credits, see Historical Note field.>>

W. S. A. 66.0225, WI ST 66.0225
Current through 2023 Act 272, published April 10, 2024.

End of Document                                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Proposed Legislation

West's Wisconsin Statutes Annotated
Municipalities (Ch. 59 to 68)
Chapter 66. General Municipality Law (Refs & Annos)
Subchapter II. Incorporation; Municipal Boundaries

W.S.A. 66.0227

66.0227. Detachment of territory

Currentness

Subject to ss. 66.0301(6)(d) and 66.0307(7), territory may be detached from a city or village and attached to a city, village or town to which it is contiguous as follows:

(1) A petition signed by a majority of the owners of three-fourths of the taxable land in area within the territory to be detached or, if there is no taxable land in the territory, by all owners of land in the territory, shall be filed with the clerk of the city or village from which detachment is sought, within 120 days after the date of publication of a class 1 notice, under ch. 985, of intention to circulate a petition of detachment.

(2) An ordinance detaching the territory may be enacted within 60 days after the filing of the petition, by a vote of three-fourths of all the members of the governing body of the detaching city or village and its terms accepted within 60 days after enactment, by an ordinance enacted by a vote of three-fourths of all the members of the governing body of the city, village or town to which the territory is to be attached. The failure of a governing body to adopt the ordinance under this subsection is a rejection of the petition and all proceedings are void.

(3) The governing body of a city, village or town involved may, or if a petition conforming to the requirements of s. 8.40 signed by a number of qualified electors equal to at least 5 percent of the votes cast for governor in the city, village or town at the last gubernatorial election, demanding a referendum, is presented to it within 30 days after the passage of either of the ordinances under sub. (2) shall, submit the question to the electors of the city, village or town whose electors petitioned for detachment, at a referendum election called for that purpose not less than 70 days nor more than 100 days after the filing of the petition, or after the enactment of either ordinance. The petition shall be filed as provided in s. 8.37. If a number of electors cannot be determined on the basis of reported election statistics, the number shall be determined in accordance with s. 60.74(6). The governing body of the municipality shall appoint 3 election inspectors who are resident electors to supervise the referendum. The ballots shall contain the words "For Detachment" and "Against Detachment". The inspectors shall certify the results of the election by their attached affidavits and file a copy with the clerk of each town, village or city involved, and none of the ordinances may take effect nor be in force unless a majority of the electors approve the question. The referendum election shall be conducted in accordance with chs. 6 and 7 to the extent applicable.

(4) If an area that has been subject to a city or village zoning ordinance is detached from one municipality and attached to another under this section, the zoning ordinance and any regulations, approvals, and conditions imposed under the ordinance continue in effect until the ordinance or the particular regulation, approval, or condition is specifically changed by official action of the

governing body of the municipality. If the detachment or attachment is contested in the courts, the zoning ordinance and any regulations, approvals, and conditions imposed under the ordinance of the detaching municipality continue in effect, and the detaching city or village retains jurisdiction over the zoning in the area affected until final disposition of the court action. This subsection does not expand or modify the authority of a municipality to change a zoning ordinance, any regulation, approval, or condition imposed under a zoning ordinance, or any nonconforming use.

(5) The ordinance, certificate and plat shall be filed and recorded in the same manner as annexations under s. 66.0217(9)(a). The requirements for the secretary of administration are the same as in s. 66.0217 (9)(b).

(6) Because the creation of congressional, legislative, supervisory and aldermanic districts of equal population is a matter of statewide concern, any detachment action that affects a tract of land that is the subject of an ordinance enacted or resolution adopted by a city during the period from January 1, 1990, to April 1, 1991, or any later date, expressing an intent to not exercise the city's authority to annex territory before April 1, 1991, or the specified later date, taken by a municipality during the period beginning on April 1 of the year commencing after each federal decennial census of population and ending on June 30 of the year commencing after that census, is effective on July 1 of the year commencing after that census or at a later date as specified in the detachment ordinance. This subsection first applies to detachments effective after March 31, 1991.

**Credits**

<<For credits, see Historical Note field.>>

Notes of Decisions (2)

W. S. A. 66.0227, WI ST 66.0227
Current through 2023 Act 272, published April 10, 2024.

---

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
  Municipalities (Ch. 59 to 68)
    Chapter 66. General Municipality Law (Refs & Annos)
      Subchapter II. Incorporation; Municipal Boundaries

W.S.A. 66.0229

66.0229. Consolidation

Currentness

**(1) General procedures.** Subject to ss. 66.0301(6)(d) and 66.0307(7), a town, village or city may be consolidated with a contiguous town, village or city, by ordinance, passed by a two-thirds vote of all the members of each board or council, fixing the terms of the consolidation and ratified by the electors at a referendum held in each municipality. The ballots shall bear the words, "for consolidation", and "against consolidation", and if a majority of the votes cast in each municipality are for consolidation, the ordinances shall take effect and have the force of a contract. The ordinance and the result of the referendum shall be certified as provided in s. 66.0211(5); if a town the certification shall be preserved as provided in ss. 66.0211(5) and 66.0235, respectively. Consolidation does not affect the preexisting rights or liabilities of any municipality and actions on those rights or liabilities may be commenced or completed as if there were no consolidation. A consolidation ordinance proposing the consolidation of a town and a city or village shall, within 10 days after its adoption and prior to its submission to the voters for ratification at a referendum, be submitted to the circuit court and the department of administration for a determination of whether the proposed consolidation is in the public interest. The circuit court shall determine whether the proposed ordinance meets the formal requirements of this section and shall then refer the matter to the department of administration, which shall find as prescribed in s. 66.0203 whether the proposed consolidation is in the public interest in accordance with the standards in s. 66.0207. The department's findings have the same status as incorporation findings under ss. 66.0203 to 66.0213.

**(2) Town of Rochester in Racine county and the village of Rochester may consolidate.** The town of Rochester, in Racine County, and the village of Rochester may consolidate if all of the procedures contained sub. (1) are fulfilled, except that the consolidation ordinance need not be submitted to the circuit court for a determination and the department of administration for a public interest finding, as otherwise required, and the consolidation may be completed without any circuit court determination or department of administration findings.

**Credits**
<<For credits, see Historical Note field.>>

Notes of Decisions (30)

W. S. A. 66.0229, WI ST 66.0229
Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
  Municipalities (Ch. 59 to 68)
    Chapter 66. General Municipality Law (Refs & Annos)
      Subchapter II. Incorporation; Municipal Boundaries

W.S.A. 66.023

66.023. Renumbered 66.0307 and amended by 1999 Act 150, § 67, eff. Jan. 1, 2001

Currentness

**Credits**

<<For credits, see Historical Note field.>>

W. S. A. 66.023, WI ST 66.023
Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
  Municipalities (Ch. 59 to 68)
    Chapter 66. General Municipality Law (Refs & Annos)
      Subchapter II. Incorporation; Municipal Boundaries

W.S.A. 66.0230

66.0230. Town consolidation with a city or village

Currentness

(1)(a) In addition to the method described in s. 66.0229(1) and subject to subs. (2), (3), and (4) and to ss. 66.0301(6)(d) and 66.0307(7), all or part of a town may consolidate with a contiguous city or village by ordinance passed by a two-thirds vote of all of the members of each board or council and ratified by the electors at a referendum held in each municipality.

(b) With regard to the referendum, the ballots shall bear the words "for consolidation," and "against consolidation," and if a majority of the votes cast in each municipality are for consolidation the ordinances shall take effect and have the force of a contract. The ordinance and the result of the referendum shall be certified as provided in s. 66.0211(5).

(c) Consolidation does not affect the preexisting rights or liabilities of any municipality and actions on those rights or liabilities may be commenced or completed as if there were no consolidation.

(2) All or part of a town may consolidate with a city or village under sub. (1) if all of the following apply:

(a) The town, and the city or village, adopt identical resolutions that describe the level of services that residents of the proposed city or village will receive, or have access to, in at least all of the following areas:

1. Public parks services.

2. Public health services.

3. Animal control services.

4. Library services.

5. Fire and emergency rescue services.

6. Law enforcement services.

(b) The town, and the city or village, adopt identical resolutions that relate to the ownership or leasing of government buildings.

(c) The city or village with which the town wishes to consolidate enters into a separate boundary agreement, subject to approval of the town board of the town to be consolidated, with every city, village, and town that borders the proposed consolidated city or village. Each boundary agreement shall determine the boundaries between the parties to the agreement. The boundary agreement shall state the term of the agreement and shall contain the procedures under which the agreement may be amended during its term. A boundary agreement entered into under this paragraph is a binding contract upon the parties.

(d) The consolidating town, and city or village, agree to adopt a comprehensive plan under s. 66.1001 for the consolidated city or village, and the comprehensive plan takes effect on the effective date of the consolidation.

(e) At least some part of the consolidated city or village receives sewage disposal services.

(3) If less than an entire town consolidates with a city or village under sub. (1), the consolidation may not take effect unless the town enters into an agreement with a city, village, or town that has a common boundary with the remnant of the town that is not consolidated under which the town remnant becomes part of the city, village, or town with the common boundary. If a town remnant becomes part of a city or village, an agreement described under this subsection shall be included in each boundary agreement under sub. (2)(c) that is entered into by a city, village, or town that borders the remnant. An agreement entered into under this subsection is a binding contract upon the parties.

(4) In this section, a municipality that borders or has a common boundary with another municipality includes municipalities that intersect at only one point.

**Credits**

<<For credits, see Historical Note field.>>

W. S. A. 66.0230, WI ST 66.0230

Current through 2023 Act 272, published April 10, 2024.

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
  Municipalities (Ch. 59 to 68)
    Chapter 66. General Municipality Law (Refs & Annos)
      Subchapter II. Incorporation; Municipal Boundaries

W.S.A. 66.0231

66.0231. Notice of certain litigation affecting municipal status or boundaries

Currentness

If a proceeding under ss. 61.187, 61.189, 61.74, 62.075, 66.0201 to 66.0213, 66.0215, 66.02162, 66.0217, 66.0221, 66.0223, 66.0227, 66.0301(6), or 66.0307 or other sections relating to an incorporation, annexation, consolidation, dissolution or detachment of territory of a city or village is contested by instigation of legal proceedings, the clerk of the city or village involved in the proceedings shall file with the secretary of administration 4 copies of a notice of the commencement of the action. The clerk shall file with the secretary of administration 4 copies of any judgments rendered or appeals taken in such cases. The notices or copies of judgments that are required under this section may also be filed by an officer or attorney of any party of interest. If any judgment has the effect of changing the municipal boundaries, the city or village clerk shall also file with the county clerk or board of election commissioners the report required by s. 5.15(4)(b). The secretary of administration shall forward to the department of transportation 2 copies and to the department of revenue and the department of administration one copy each of any notice of action or judgment filed with the secretary of administration under this section.

**Credits**

<<For credits, see Historical Note field.>>

**Editors' Notes**

### LAW REVISION COMMITTEE PREFATORY NOTE--2017 ACT 360

This bill is a remedial legislation proposal, requested by the Legislative Technology Services Bureau and introduced by the Law Revision Committee under s. 13.83(1)(c)4. and 5., stats. After careful consideration of the various provisions of the bill, the Law Revision Committee has determined that this bill makes minor substantive changes in the statutes, and that these changes are desirable as a matter of public policy.

W. S. A. 66.0231, WI ST 66.0231

Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
  Municipalities (Ch. 59 to 68)
    Chapter 66. General Municipality Law (Refs & Annos)
      Subchapter II. Incorporation; Municipal Boundaries

W.S.A. 66.0233

66.0233. Town participation in actions to test alterations of town boundaries

Currentness

In a proceeding in which territory may be attached to or detached from a town, the town is an interested party, and the town board may institute, maintain or defend an action brought to test the validity of the proceedings, and may intervene or be impleaded in the action.

**Credits**

<<For credits, see Historical Note field.>>

Notes of Decisions (18)

W. S. A. 66.0233, WI ST 66.0233
Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**                                             © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
    Municipalities (Ch. 59 to 68)
        Chapter 66. General Municipality Law (Refs & Annos)
            Subchapter II. Incorporation; Municipal Boundaries

W.S.A. 66.0235

66.0235. Adjustment of assets and liabilities on division of territory

Currentness

**(1) Definition.** In this section, "local governmental unit" means town sanitary districts, school districts, technical college districts, towns, villages and cities.

**(2) Basis.** (a) Except as otherwise provided in this section or in s. 60.79(2)(c) when territory is transferred, in any manner provided by law, from one local governmental unit to another, there shall be assigned to the latter local governmental unit such proportion of the assets and liabilities of the first local governmental unit as the assessed valuation of all taxable property in the territory transferred bears to the assessed valuation of all the taxable property of the entire local governmental unit from which the territory is taken according to the last assessment roll of the local governmental unit. The clerk of a local governmental unit to which territory is transferred, within 30 days of the effective date of the transfer, shall certify to the clerk of the local governmental unit from which territory was transferred and to the clerk of the school district in which the territory is located a metes and bounds description of the land area involved. Upon receipt of the description the clerk of the local governmental unit from which the territory was transferred shall certify to the department of revenue and to the clerk of the school district in which the territory is located the latest assessed value of the real and personal property located within the transferred territory, and shall make any further reports as needed by the department of revenue in the performance of duties required by law.

(b) When the transfer of territory from one local governmental unit to another results from the incorporation of a new city or village, the proportion of the assets and liabilities assigned to the new city or village shall be based on the average assessed valuation for the preceding 5 years of the property transferred in proportion to the average assessed valuation for the preceding 5 years of all the taxable property of the entire local governmental unit from which the territory is taken, according to the assessment rolls of the local governmental unit for those years. The certification by the clerk of the local governmental unit from which territory was transferred because of the incorporation shall include the assessed value of the real and personal property within the territory transferred for each of the last 5 years. The preceding 5 years shall include the assessment rolls for the 5 calendar years prior to the incorporation.

**(2c) School districts.** (a) *Standard procedure.* 1. When territory is transferred in any manner provided by law from one school district to another, there shall be assigned to each school district involved such proportion of the assets and liabilities of the school districts involved as the equalized valuation of all taxable property in the territory transferred bears to the equalized valuation of all taxable property of the school district from which the territory is taken. The equalized valuation shall be certified by the department of revenue upon application by the clerk of the school district to which the territory is transferred.

2. The clerk of any school district to which territory is transferred, within 30 days of the effective date of the transfer, shall certify to the clerk of the local governmental unit from which the territory was transferred a metes and bounds description of the land area involved. Upon receipt of the description the clerk of the local governmental unit from which the territory was

transferred shall certify to the department of revenue the latest assessed value of the real and personal property located within the transferred territory, file one copy of the certification with the school district clerk and one copy with the department of public instruction and make any further reports as needed by the department of revenue in the performance of duties required by law.

(b) *Alternative procedure.* Two or more school districts may, by identical resolutions adopted by a three-fourths vote of the members of each school board concerned, establish an alternative method to govern any adjustment of their assets and liabilities. The authority of this paragraph applies wherever the boards find that the adoption of the resolution is necessary to provide a more equitable method than is provided in par. (a). The resolutions shall be adopted no later than 120 days after the effective date of the transfer of territory and may be adopted prior to the transfer. The resolutions adopted shall be recorded in the office of the register of deeds.

**(2m) Attachment and detachment within 5 years.** If territory is attached to or consolidated with a school district, and the territory or any part of the territory is detached from the district within 5 years after the attachment or consolidation, the school district to which it is transferred is entitled, in the apportionment of assets and liabilities, only to the assets or liabilities or proportionate part apportioned to the school district as the result of the original attachment or consolidation.

**(3) Real estate.** (a) The title to real estate may not be transferred under this section except by agreement, but the value of real estate shall be included in determining the assets of the local governmental unit owning the real estate and in making the adjustment of assets and liabilities.

(b) The right to possession and control of school buildings and sites passes to the school district in which they are situated immediately upon the attachment or detachment of any school district territory becoming effective, except that in 1st class city school districts the right to possession and control of school buildings and sites passes on July 1 following the adoption of the ordinance authorized by s. 66.0217(8). The asset value of school buildings and sites shall be the value of the use of the buildings and sites, which shall be determined at the time of adjustment of assets and liabilities.

(c) When as a result of an annexation a school district is left without a school building, any moneys are received by the school district as a result of the division of assets and liabilities required by this section, which are derived from values that were capital assets, the moneys and interest on the moneys shall be held in trust by the school district and dispensed only for procuring new capital assets or remitted to an operating district as the remainder of the suspended district becomes a part of the operating district, and may not be used to meet current operating expenditures. The boards involved shall, as part of their duties in division of assets and liabilities in school districts, make a written report of the allocation of assets and liabilities to the state superintendent of public instruction and any local superintendent of schools whose territory is involved in the division of assets.

**(4) Public utilities.** A public utility plant, including any dam, power house, power transmission line and other structures and property operated and used in connection with the plant, belongs to the local governmental unit in which the major portion of the patrons of the utility reside. The value of the utility, unless fixed by agreement of all parties interested shall be determined and fixed by the public service commission upon notice to the local governmental units interested, in the manner provided by law. The commission shall certify the amount of the compensation to the clerks of each local governmental unit interested and that amount shall be used by the apportionment board in adjusting assets and liabilities.

**(5) Apportionment board.** The boards or councils of the local governmental units, or committees selected for that purpose, acting together, constitute an apportionment board. When a local governmental unit is dissolved because all of its territory is transferred the board or council of the local governmental unit existing at the time of dissolution shall, for the purpose of this

section, continue to exist as the governing body of the local governmental unit until there has been an apportionment of assets by agreement of the interested local governmental units or by an order of the circuit court. After an agreement for apportionment of assets has been entered into between the interested local governmental units, or an order of the circuit court becomes final, a copy of the apportionment agreement, or of the order, certified to by the clerks of the interested local governmental units, shall be filed with the department of revenue, the department of natural resources, the department of transportation, the state superintendent of public instruction, the department of administration, and with any other department or agency of the state from which the town may be entitled by law to receive funds or certifications or orders relating to the distribution or disbursement of funds, with the county treasurer, with the treasurer of any local governmental unit, or with any other entity from which payment would have become due if the dissolved local governmental unit had continued in existence. Subject to ss. 79.006 and 86.303(4), payments of forest crop taxes under s. 77.05, of transportation aids under s. 20.395, of state aids for school purposes under ch. 121, payments for managed forest land under subch. VI of ch. 77 and all payments due from a department or agency of the state, from a county, from a local governmental unit, or from any other entity from which payments would have become due if the dissolved local governmental unit had continued in existence, shall be paid to the interested local governmental unit as provided by the agreement for apportionment of assets or by any order of apportionment by the circuit court and the payments have the same force and effect as if made to the dissolved local governmental unit.

**(6) Meeting.** The board or council of the local governmental unit to which the territory is transferred shall fix a time and place for meeting and give a written notice of the meeting to the clerk of the local governmental unit from which the territory is taken at least 5 days prior to the date of the meeting. The apportionment may be made only by a majority of the members from each local governmental unit who attend, and in case of committees, the action shall be affirmed by the board or council represented by the committee.

**(7) Adjustment, how made.** (a) The apportionment board shall determine, except for public utilities, assets and liabilities from the best information obtainable and shall assign to the local governmental unit to which the territory is transferred its proper proportion of assets and liabilities by assigning the excess of liabilities over assets, or by assigning any particular asset or liability to either local governmental unit, or in another manner that meets the requirements of the particular case.

(b) If a proportionate share of any indebtedness existing by reason of municipal bonds or other obligations outstanding is assigned to a local governmental unit, that local governmental unit shall levy and collect upon all its taxable property, in one sum or in annual installments, the amount necessary to pay the principal and interest when due, and shall pay the amount collected to the treasurer of the local governmental unit which issued the bonds or incurred the obligations. The treasurer shall apply the moneys received strictly to the payment of the principal and interest.

(c) If the asset apportioned consists of an aid or tax to be distributed in the future according to population, the apportionment board shall certify to the officer, agency or department responsible for making the distribution each local governmental unit's proportionate share of the asset as determined in accordance with sub. (2). The officer, agency or department shall distribute the aid or tax directly to the several local governmental units according to the certification until the next federal census.

**(8) Appeal to court.** If the apportionment board is unable to agree, the circuit court of the county in which either local governmental unit is situated may, upon the petition of either local governmental unit, make the adjustment of assets and liabilities under this section, including review of any alternative method provided in sub. (2c)(b) and the correctness of the findings made under sub. (2c)(b).

**(9) Transcript of records.** If territory is detached from a local governmental unit, the proper officer of the local governmental unit from which the territory was detached shall furnish, upon demand by the proper officer of the local governmental unit

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.
3

created from the detached territory or to which it is annexed, an authenticated transcript of all public records in that officer's office pertaining to the detached territory. The local governmental unit receiving the transcript shall pay for the transcript.

**(10) State trust fund loans.** When territory transferred in any manner provided by law from one local governmental unit to another is liable for state trust fund loans secured under subch. II of ch. 24, the clerk of the local governmental unit to which territory is transferred shall within 30 days of the effective date of the transfer certify a metes and bounds description of the transferred area to the clerk of the local governmental unit from which the land was transferred. The clerk of the local governmental unit from which territory was transferred shall then certify to the board of commissioners of public lands the effective date of the transfer of territory, the last preceding assessed valuation of the territory liable for state trust fund loans before transfer of a part of the territory and the assessed valuation of the territory transferred. The board shall in making its annual certifications of the amounts due on account of state trust fund loans distribute annual charges for interest and principal on outstanding loans covered by this subsection in the proportion that the assessed valuation of the territory transferred bears to the assessed valuation of the area liable for state trust fund loans as constituted immediately before the transfer of territory. A transfer of territory effective subsequent to January 1 of any year may not be considered until the succeeding year.

**(10a) Corrections.** The provisions of sub. (10) are applicable to school districts. Any errors, omissions or other defects in the tax certifications and levies in connection with the repayment of state trust fund loans by school districts for the year 1950 and all subsequent years may be corrected by the school district clerk in the tax levy certifications for following years.

**(11) Designating districts.** (a) Whenever a transfer of territory from one school district to another results in a change in the name of a school district which is liable for one or more state trust fund loans secured under subch. II of ch. 24, the clerk of the school district to which the territory was transferred shall, within 30 days of the effective date of such transfer, certify to the board of commissioners of public lands and the county clerk:

1. The name of the school district from which territory was transferred;

2. The effective date of such transfer;

3. The name of the school district to which the transfer was made immediately prior to the effective date of the transfer;

4. The name of the school district to which the transfer was made immediately after the effective date of the transfer.

(b) In making the annual certifications of the amounts due on account of state trust fund loans the board of commissioners of public lands shall use the new name of the school district. A transfer of territory effective subsequent to January 1 of any year may not be considered by it until the succeeding year.

**(12) Time of transfer.** When the governmental classification of a school district is changed, all of the assets and liabilities and the title to all school property shall vest in the new district by operation of law upon the effective date of the change.

**(13) Taxes and assessment.** (a) *General property taxes.* 1. Subject to subd. 2., if any territory is annexed, detached or incorporated in any year, general property taxes levied against the territory shall be collected by the treasurer of the local governmental unit in which the territory was located on January 1 of such year, and all moneys collected from the tax levied for

local municipal purposes shall be allocated to each of the local governmental units on the basis of the portion of the calendar year the territory was located in each of the local governmental units, and paid accordingly.

2. If a city or village is incorporated after January 1 and before April 1, the procedures described in subd. 1. shall be applied as if the city or village was incorporated on January 1 of the year in which it was incorporated and the territory shall be treated for purposes of ch. 70 as if the incorporation had occurred on January 1.

(aa) *Apportionment when town is nonexistent.* If the town in which territory was located on January 1 is nonexistent when the city or village determines its budget, any taxes certified to the town or required by law to be levied against the territory shall be included in the budget of the city or village and levied against the territory, together with the city or village tax for local municipal purposes.

(b) *Special taxes and assessments.* If territory is transferred from one local governmental unit to another by annexation, detachment, consolidation or incorporation, or returns to its former status by reason of court determination, any special tax or assessment outstanding against property in the territory shall be collected by the treasurer of the local governmental unit in which the property is located, according to the terms of the ordinance or resolution levying the tax or assessment. The special tax or assessment, when collected, shall be paid to the treasurer of the local governmental unit which levied the special tax or assessment, or if the local governmental unit is nonexistent, the collecting treasurer shall apply the collected funds to any obligation for which purpose the tax or assessment was levied and which remains outstanding. If no obligation is outstanding, the collected funds shall be paid into the school fund of the school district in which the territory is located.

(bb) *Apportionment when court returns territory to former status.* If territory which has been annexed, consolidated, detached or incorporated returns to its former status by reason of a final court determination, there shall be an apportionment of general property taxes and current aids and shared revenues between the local governmental units, and no other apportionment of assets and liabilities. The basis of the apportionment shall be determined by the apportionment board subject to appeal to the circuit court. The apportionment shall to the extent practicable equitably adjust the taxes, aids and revenues between the local governmental units involved on the basis of the portion of the calendar year the territory was located in the respective local governmental units.

(c) *Certification by clerk.* The clerk of the local governmental unit which assessed the special and general tax and special assessment shall certify to the clerk of the local governmental unit to which the territory was attached or returned, a list of all the property located in the attached or returned territory to which is charged any uncollected taxes and assessments. The certification shall be made within 30 days after the effective date of the transfer of the property, but failure to certify does not affect the validity of the claim.

**Credits**

<<For credits, see Historical Note field.>>

Notes of Decisions (49)

W. S. A. 66.0235, WI ST 66.0235
Current through 2023 Act 272, published April 10, 2024.

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:24-cv-00228-Z    Document 50-1    Filed 01/17/25    Page 465 of 882    PageID 49250

West's Wisconsin Statutes Annotated
  Municipalities (Ch. 59 to 68)
    Chapter 66. General Municipality Law (Refs & Annos)
      Subchapter II. Incorporation; Municipal Boundaries

W.S.A. 66.024

66.024. Renumbered 66.0219 and amended by 1999 Act 150, § 68, eff. Jan. 1, 2001

Currentness

**Credits**

<<For credits, see Historical Note field.>>

W. S. A. 66.024, WI ST 66.024
Current through 2023 Act 272, published April 10, 2024.

---

    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:24-cv-00228-Z    Document 50-1    Filed 01/17/25    Page 466 of 882    PageID 49251

West's Wisconsin Statutes Annotated

Municipalities (Ch. 59 to 68)

Chapter 66. General Municipality Law (Refs & Annos)

Subchapter II. Incorporation; Municipal Boundaries

W.S.A. 66.025

66.025. Renumbered 66.0223 and amended by 1999 Act 150, § 69, eff. Jan. 1, 2001

Currentness

**Credits**

<<For credits, see Historical Note field.>>

W. S. A. 66.025, WI ST 66.025

Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**                                           © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
  Municipalities (Ch. 59 to 68)
    Chapter 66. General Municipality Law (Refs & Annos)
      Subchapter II. Incorporation; Municipal Boundaries

W.S.A. 66.026

66.026. Renumbered 66.0231 and amended by 1999 Act 150, § 70, eff. Jan. 1, 2001

Currentness

**Credits**

<<For credits, see Historical Note field.>>

W. S. A. 66.026, WI ST 66.026
Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
  Municipalities (Ch. 59 to 68)
    Chapter 66. General Municipality Law (Refs & Annos)
      Subchapter II. Incorporation; Municipal Boundaries

W.S.A. 66.027

66.027. Renumbered 66.0225 and amended by 1999 Act 150, § 71, eff. Jan. 1, 2001

Currentness

**Credits**

<<For credits, see Historical Note field.>>

W. S. A. 66.027, WI ST 66.027
Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
  Municipalities (Ch. 59 to 68)
    Chapter 66. General Municipality Law (Refs & Annos)
      Subchapter II. Incorporation; Municipal Boundaries

W.S.A. 66.028

66.028. Renumbered 66.0305 and amended by 1999 Act 150, § 72, eff. Jan. 1, 2001

Currentness

**Credits**

<<For credits, see Historical Note field.>>

W. S. A. 66.028, WI ST 66.028
Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated

Municipalities (Ch. 59 to 68)

Chapter 66. General Municipality Law (Refs & Annos)

Subchapter II. Incorporation; Municipal Boundaries

W.S.A. 66.029

66.029. Renumbered 66.0233 and amended by 1999 Act 150, § 73, eff. Jan. 1, 2001

Currentness

**Credits**

<<For credits, see Historical Note field.>>

W. S. A. 66.029, WI ST 66.029
Current through 2023 Act 272, published April 10, 2024.

---

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
  Municipalities (Ch. 59 to 68)
    Chapter 66. General Municipality Law (Refs & Annos)
      Subchapter II. Incorporation; Municipal Boundaries

W.S.A. 66.0295

66.0295. Renumbered 66.1001 and amended by 1999 Act 150, § 74, eff. Jan. 1, 2001; 1999 Act 186, § 42, eff. Jan. 1, 2001

Currentness

**Credits**

<<For credits, see Historical Note field.>>

W. S. A. 66.0295, WI ST 66.0295
Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
    Municipalities (Ch. 59 to 68)
        Chapter 66. General Municipality Law (Refs & Annos)
            Subchapter II. Incorporation; Municipal Boundaries

W.S.A. 66.03

66.03. Renumbered 66.0235 and amended by 1999 Act 150, § 75, eff. Jan. 1, 2001

Currentness

**Credits**

<<For credits, see Historical Note field.>>

W. S. A. 66.03, WI ST 66.03
Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

West's Wisconsin Statutes Annotated
    Municipalities (Ch. 59 to 68)
        Chapter 66. General Municipality Law (Refs & Annos)
            Subchapter III. Intergovernmental Cooperation

W.S.A. 66.0301

66.0301. Intergovernmental cooperation

Currentness

(1)(a) Except as provided in pars. (b) and (c), in this section "municipality" means the state or any department or agency thereof, or any city, village, town, county, or school district, the opportunity schools and partnership programs under subch. IX of ch. 115 and subch. II of ch. 119, the superintendent of schools opportunity schools and partnership program under s. 119.33, or any public library system, public inland lake protection and rehabilitation district, sanitary district, farm drainage district, metropolitan sewerage district, sewer utility district, solid waste management system created under s. 59.70(2), local exposition district created under subch. II of ch. 229, local professional baseball park district created under subch. III of ch. 229, local professional football stadium district created under subch. IV of ch. 229, local cultural arts district created under subch. V of ch. 229, long-term care district under s. 46.2895, water utility district, mosquito control district, municipal electric company, county or city transit commission, commission created by contract under this section, taxation district, regional planning commission, housing authority created under s. 66.1201, redevelopment authority created under s. 66.1333, community development authority created under s. 66.1335, or city-county health department.

(b) If the purpose of the intergovernmental cooperation is the establishment of a joint transit commission, "municipality" means any city, village, town or county.

(c) For purposes of sub. (6), "municipality" means any city, village, or town.

(2) Subject to s. 59.794(2), and in addition to the provisions of any other statutes specifically authorizing cooperation between municipalities, unless those statutes specifically exclude action under this section, any municipality may contract with other municipalities and with federally recognized Indian tribes and bands in this state, for the receipt or furnishing of services or the joint exercise of any power or duty required or authorized by law. If municipal or tribal parties to a contract have varying powers or duties under the law, each may act under the contract to the extent of its lawful powers and duties. A contract under this subsection may bind the contracting parties for the length of time specified in the contract. This section shall be interpreted liberally in favor of cooperative action between municipalities and between municipalities and Indian tribes and bands in this state. If a municipality is required to establish or maintain an agency, department, commission, or any other office or position to carry out a municipal responsibility, and the municipality joins with another municipality by entering into an intergovernmental cooperation contract under this subsection to jointly carry out the responsibility, the jointly established or maintained agency, department, commission, or any other office or position to which the contract applies fulfills, subject to sub. (7), the municipality's obligation to establish or maintain such entities or positions until the contract entered into under this subsection expires or is terminated by the parties. In addition, if 2 or more municipalities enter into an intergovernmental cooperation contract and create a commission under this section to jointly or regionally administer a function or project, the

commission shall be considered, subject to sub. (7), to be a single entity that represents, and may act on behalf of, the joint interests of the signatories to the contract entered into under this section.

(3) Any contract under sub. (2) may provide a plan for administration of the function or project, which may include but is not limited to provisions as to proration of the expenses involved, deposit and disbursement of funds appropriated, submission and approval of budgets, creation of a commission, selection and removal of commissioners, and formation and letting of contracts.

(4) A commission created by contract under sub. (2) may finance the acquisition, development, remodeling, construction and equipment of land, buildings and facilities for regional projects under s. 66.0621. Participating municipalities acting jointly or separately may finance the projects, or an agreed share of the cost of the projects, under ch. 67.

(5) No commission created by contract under sub. (2) may, directly or indirectly, do any of the following:

(a) Acquire, construct or lease facilities used or useful in the business of a public utility engaged in production, transmission, delivery or furnishing of heat, light, power, natural gas or communications service, by any method except those set forth under this chapter or ch. 196, 197 or 198.

(b) Establish, lay out, construct, improve, discontinue, relocate, widen or maintain any road or highway outside the corporate limits of a village or city or acquire lands for those purposes except upon approval of the department of transportation and the county board of the county and the town board of the town in which the road is to be located.

(6)(a) Any 2 municipalities whose boundaries are immediately adjacent at any point may enter into a written agreement determining all or a portion of the common boundary line between the municipalities. An agreement under this subsection may include only the provisions authorized under this section and s. 66.0305, and one or more of the following:

1. That specified boundary lines apply on the effective date of the agreement.

2. That specified boundary line changes shall occur during the term of the agreement and the approximate dates by which the changes shall occur.

3. That specified boundary line changes may occur during the term of the agreement and the approximate dates by which the changes may occur.

4. That a required boundary line change under subd. 2. or an optional boundary line change under subd. 3. is subject to the occurrence of conditions set forth in the agreement.

5. That specified boundary lines may not be changed during the term of the agreement.

(b) The maximum term of an agreement under this subsection is 10 years. When an agreement expires, all provisions of the agreement expire, except that any boundary determined under the agreement remains in effect until subsequently changed.

(c)1. Before an agreement under this subsection may take effect, and subject to par. (e), it must be approved by the governing body of each municipality by the adoption of a resolution. Before each municipality may adopt a resolution, each shall hold a public hearing on the agreement or both municipalities shall hold a joint public hearing on the agreement. Before the public hearing may be held, each municipality shall give notice of the pending agreement and public hearing by publishing a class 1 notice, under ch. 985, and by giving notice to each property owner whose property is currently located in that municipality and in, or immediately adjacent to, the territory whose jurisdiction will change. Notice shall be given at least 20 days before the public hearing and notice to property owners shall be made by certified mail.

2. An agreement under this subsection is subject to a referendum of the electors residing within the territory whose jurisdiction is subject to change as a result of the agreement. After each municipality approves the agreement by adoption of a resolution, each municipality shall publish the agreement in the territory whose jurisdiction is subject to change as a result of the agreement as a class 1 notice, under ch. 985. A referendum shall be held if, within 30 days after the publication of the agreement, a petition for a referendum conforming to the requirements of s. 8.40, signed by at least 20 percent of the electors residing within the territory whose jurisdiction is subject to change as a result of the agreement is filed, in accordance with s. 8.37, with the clerk of each municipality that is a party to the agreement. The referendum shall be conducted jointly by the municipalities and shall otherwise be conducted as are annexation referenda. If the agreement is approved in the referendum, it may take effect. If the agreement is not approved in the referendum, it may not take effect.

(d) An agreement under this subsection may provide that, during the term of the agreement, no other procedure for altering a municipality's boundaries may be used to alter a boundary that is affected by the agreement, except an annexation conducted under s. 281.43(1m), regardless of whether the boundary is proposed to be maintained or changed or is allowed to be changed under the agreement. After the agreement has expired, the boundary may be altered.

(e) A boundary change included in an agreement under this subsection shall be accomplished by the enactment of an ordinance by the governing body designated to do so in the agreement. The filing and recording requirements under s. 66.0217(9)(a), as they apply to cities and villages under s. 66.0217(9)(a), apply to municipalities under this subsection. The requirements for the secretary of administration under s. 66.0217(9)(b), as they apply under that section, apply to the secretary of administration when he or she receives an ordinance that is filed under this subsection.

(f) No action to contest the validity of an agreement under this subsection may be commenced after 60 days from the date the agreement becomes effective.

(g) This subsection is the exclusive authority under this section for entering into an agreement that determines all or a portion of the common boundary line between municipalities.

(h) An agreement under this section that has been entered into before January 19, 2008, that affects the location of a boundary between municipalities, is not invalid as lacking authority under this section to affect the location of the boundary.

(7) With regard to a contract entered into under sub. (2) between 2 or more counties, which relates to the provision of services or facilities under a contract with an officer or agency of the state, the contract may not take effect unless it is approved in writing by the officer or chief of the agency that has authority over the contract for the provision of services or facilities. The contract must be approved or disapproved in writing by the officer or chief of the agency with regard to the matters within the scope of the contract for the provision of services or facilities within 90 days after receipt of the contract. Any disapproval shall detail

the specific respects in which the proposed contract fails to demonstrate that the signatories intend to fulfill their contractual responsibilities or obligations. If the officer or chief of the agency fails to approve or disapprove of the contract entered into under sub. (2) within 90 days after receipt, the contract shall be considered approved by the officer or chief of the agency.

**Credits**

<<For credits, see Historical Note field.>>

Notes of Decisions (34)

W. S. A. 66.0301, WI ST 66.0301
Current through 2023 Act 272, published April 10, 2024.

---

End of Document © 2025 Thomson Reuters. No claim to original U.S. Government Works.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
Municipalities (Ch. 59 to 68)
Chapter 66. General Municipality Law (Refs & Annos)
Subchapter III. Intergovernmental Cooperation

W.S.A. 66.0303

66.0303. Municipal interstate cooperation

Currentness

(1) In this section, "municipality" has the meaning given in s. 66.0301(1)(a), except that with regard to agreements described in s. 66.0304, "municipality" includes a political subdivision, as defined in s. 66.0304(1)(f).

(2) A municipality may contract with municipalities of another state or with federally recognized American Indian tribes or bands located in another state for the receipt or furnishing of services or the joint exercise of any power or duty required or authorized by statute to the extent that laws of the other state or of the United States permit the joint exercise.

(3)(a) Except as provided in par. (b) and s. 66.0825(18), an agreement made under this section shall, prior to and as a condition precedent to taking effect, be submitted to the attorney general who shall determine whether the agreement is in proper form and compatible with the laws of this state. The attorney general shall approve any agreement submitted under this paragraph unless the attorney general finds that it does not meet the conditions set forth in this section and details in writing addressed to the concerned municipal governing bodies the specific respects in which the proposed agreement fails to meet the requirements of law. Failure to disapprove an agreement submitted under this paragraph within 90 days of its submission constitutes approval. The attorney general, upon submission of an agreement, shall transmit a copy of the agreement to the governor who shall consult with any state department or agency affected by the agreement. The governor shall forward to the attorney general any comments the governor may have concerning the agreement.

(b) An agreement under this section between a municipality of this state and a municipality of another state that relates to the receipt, furnishing, or joint exercise of fire fighting or emergency medical services need not be submitted to or approved by the attorney general before the agreement may take effect.

(4) An agreement entered into under this section has the status of an interstate compact, but in any case or controversy involving performance or interpretation of or liability under the agreement, the municipalities party to the agreement are real parties in interest and the state may commence an action to recoup or otherwise make itself whole for any damages or liability which it may incur by reason of being joined as a party. The action by the state may be maintained against any municipality whose act or omission caused or contributed to the incurring of damage or liability by the state.

**Credits**

<<For credits, see Historical Note field.>>

W. S. A. 66.0303, WI ST 66.0303
Current through 2023 Act 272, published April 10, 2024.

**End of Document**                                      © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
  Municipalities (Ch. 59 to 68)
    Chapter 66. General Municipality Law (Refs & Annos)
      Subchapter III. Intergovernmental Cooperation

W.S.A. 66.0304

66.0304. Conduit revenue bonds

Currentness

**(1) Definitions.** In this section:

(a) "Agreement" means a contract entered into under this section by the political subdivisions which form a commission. The contract may be amended according to the terms of the contract, and the amended contract remains an agreement.

(b) "Bond" means any bond, note or other obligation issued or entered into or acquired under this section, including any refunding bond or certificate of participation or lease-purchase, installment sale, or other financing agreement.

(c) "Commission" means an entity created by two or more political subdivisions, who contract with each other under s. 66.0301(2) or 66.0303(2), for the purpose of issuing bonds under this section.

(d) "Member" means a party to an agreement.

(e) "Participant" means any public or private entity or unincorporated association, including a federally recognized Indian tribe or band, that contracts with a commission for the purpose of financing or refinancing a project that is owned, sponsored, or controlled by the public or private entity or unincorporated association.

(f) "Political subdivision" means any city, village, town, or county in this state or any city, village, town, county, district, authority, agency, commission, or other similar governmental entity in another state or office, department, authority, or agency of any such other state or territory of the United States.

(g) "Project" means any capital improvement, purchase of receivables, property, assets, commodities, bonds or other revenue streams or related assets, working capital program, or liability or other insurance program, located within or outside of this state.

(ge) "Public official" means an individual who holds, or has held, a local public office, as that term is defined in s. 19.42(7w), for a political subdivision in this state.

(h) "Revenue" means all moneys and fees received from any source by a commission.

**(2) Attorney general review.** (a) Before an agreement may take effect, the proposed agreement shall be submitted to the attorney general who shall determine whether the agreement is in proper form and compatible with the laws of this state. Subject to sub. (3)(d), the attorney general shall approve any agreement submitted under this subsection unless the attorney general finds that it does not meet the conditions set forth in this section and details in writing addressed to the concerned political subdivisions' governing bodies the specific respects in which the proposed agreement fails to meet the requirements of law. Failure to disapprove an agreement submitted under this subsection within 90 days of its submission constitutes approval. The attorney general, upon submission of an agreement, shall transmit a copy of the agreement to the governor, who may consult with any state department or agency. The governor shall forward to the attorney general any comments the governor may have concerning the agreement.

(b) No approval is required under this subsection for an amendment to an agreement to take effect, unless the amendment is to add a member or unless otherwise required by the terms of the agreement. A commission may not be dissolved under sub. (4m) without the approval of the attorney general, who shall certify to the commission and the participants that the dissolution resolution provides for the payment of any outstanding bonds or other obligations of the commission.

**(3) Creation and organization.** (a) Two or more political subdivisions may create a commission for the purpose of issuing bonds by entering into an agreement to do so under s. 66.0301(2) or 66.0303(2), except that upon its creation all of the initial members of a commission shall be political subdivisions that are located in this state. A commission that is created as provided in this section is a unit of government, and a body corporate and politic, that is separate and distinct from, and independent of, the state and the political subdivisions which are parties to the agreement.

(b) A commission shall be governed by a board, the members of which shall be appointed under the terms of the agreement. A majority of the board members shall be public officials or current or former employees of a political subdivision that is located in this state. Board members may be reimbursed for their actual and necessary expenses incurred in performing their duties to the extent provided in the agreement or the bylaws of the commission.

(c) An additional political subdivision may become a member of a commission, and a member may withdraw from a commission, as provided in the agreement. For an agreement to be valid, at least one commission member shall be a political subdivision that is located in this state and a commission shall consist of at least 2 political subdivisions. A commission may not take any action under this paragraph that would invalidate an agreement.

(d) No commission may be created under this section unless its agreement is submitted to the attorney general, under sub. (2), before October 1, 2010. Only one commission may be formed under this section. If more than one agreement is submitted to the attorney general before October 1, 2010, the attorney general must give preference to the agreement that submits with its documents a demonstration of support for its agreement from at least one statewide organization located in this state which represents the interests of political subdivisions and has political subdivisions among its membership.

**(4) Powers of a commission.** A commission has all of the powers necessary or convenient to carry out the purposes and provisions of this section. In addition to all other powers granted by this section, a commission may do any of the following:

(a) Adopt bylaws for the regulation of its affairs and the conduct of its business.

(b) Sue and be sued in its own name, plead and be impleaded.

WESTLAW    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

(c) Acquire, buy, sell, lease as lessor or lessee, encumber, mortgage, hypothecate, pledge, assign, or transfer any property or interest in property that is located within or outside of this state.

(d) Enter into contracts related to the issuance of bonds.

(e) Issue bonds or refunding bonds, subject to sub. (5), to finance or refinance a project, including funding a reserve fund or capitalized interest, payment of costs of issuance and other costs related to the financing or refinancing, or credit enhancement, and enter into agreements related to the issuance of bonds, including liquidity and credit facilities, remarketing agreements, insurance policies, guaranty agreements, letter of credit or reimbursement agreements, indexing agreements, interest rate swap agreements, currency exchange agreements, commodity swap agreements, and other hedge agreements and any other like agreements, in each case with such payment, interest rate, currency security, remedy, and other terms and conditions as the commission determines.

(f) Employ or appoint agents, employees, finance professionals, and special advisers as the commission finds necessary and fix their compensation.

(g) Accept gifts, loans, or other aid.

(h) Establish and collect fees, plus administrative expenses, from participants who benefit from the commission's services, or services provided by an outside entity, and distribute the fees and expenses as provided in the agreement.

(i) Make loans to, lease property from or to, or enter into any other kind of an agreement with a participant or other entity, in connection with financing or refinancing a project.

(j) Mortgage, pledge, or otherwise encumber the commission's property or its interest in projects.

(k) Assign or pledge any portion of its interests in projects, mortgages, deeds of trust, indentures of mortgage or trust, leases, purchase or sale agreements or other financing agreements, or similar instruments, bonds, notes, and security interests in property, of a participant, or contracts entered into or acquired in connection with bonds.

(L) Issue, obtain, or aid in obtaining, from any person, any insurance or guarantee to, or for, the payment or repayment of interest or principal, or both, on any loan, lease, bond, or other obligation evidencing or securing such a loan, lease, bond, or obligation that is entered into under this section.

(m) Apply on its own behalf or on behalf of a participant to any unit of government for an allocation of volume cap, tax credit, subsidy, grant, loan, credit enhancement, or any other federal, state, or local program in connection with the financing or refinancing of a project.

(n) Invest any bond proceeds or any money held for payment or security of the bonds, or any contract entered into under this section, in any securities or obligations permitted by the resolution, trust agreement, indenture, or other agreement providing for issuance of the bonds or the contract.


(o) At the request of a participant, combine and pledge revenues of multiple projects for repayment of one or more series of bonds issued under this section.


(p) Purchase bonds issued by or on behalf of, or held by, any participant, any state or a department, authority, or agency of the state, or any political subdivision. Bonds purchased under this paragraph may be held by the commission or sold, in whole or in part, separately or together with other bonds issued by the commission.


**(4m) Dissolution of a commission.** Subject to sub. (2)(b) and subject to providing for the payment of its bonds, including interest on the bonds, and the performance of its other contractual obligations, a commission may be dissolved, by resolution, as provided in the agreement. If the commission is dissolved, the property of the commission shall be transferred to the political subdivisions who are parties to the agreement creating the commission as provided in the agreement.


**(5) Issuance of bonds.** (a) A commission may not issue bonds unless the issuance is first authorized by a bond resolution. A bond issued under this section shall meet all of the following requirements:


1. The face of the bond shall include the date of issuance and the date of maturity.


2. The face of the bond shall include the statements required under subs. (9)(c) and (11)(d).


3. The date of maturity may not exceed 50 years from the date of issuance.


4. The bond shall bear a rate of interest, either fixed or variable, specified by the resolution. Any variable rate of interest shall be made subject to a maximum rate.


5. Interest and principal shall be paid at the time and place specified in the resolution.


6. Bonds in a single issue may be composed of a single denomination or 2 or more denominations, as provided in the resolution.


7. The bond shall be payable in lawful money of the United States or, if provided in the resolution, another currency.


8. Bonds shall be registered as provided in the resolution.


9. Bonds shall be in the form, and executed in the manner, provided in the resolution.

(am) Notwithstanding par. (a), as an alternative to specifying the matters required to be specified in the bond resolution under par. (a), the resolution may specify members of the board or officers or employees of the commission, by name or position, to whom the commission delegates authority to determine which of the matters under specified par. (a), and any other matters that the commission deems appropriate, for inclusion in the trust agreement, indenture, or other agreement providing for issuance of the bonds as finally executed. A resolution under this paragraph shall specify at least all of the following:

1. The maximum principal amount of bonds to be issued.

2. The maximum term of the bonds.

3. The maximum interest rate to be borne by the bonds.

(b) A bond issued under this section may include, or be subject to, any of the following:

1. Early mandatory or optional redemption or purchase in lieu of redemption or tender, as provided in the resolution.

2. A provision providing a right to tender.

3. A trust agreement or indenture containing any terms, conditions, and covenants that the commission determines to be necessary or appropriate, but such terms, conditions, and covenants may not be in conflict with the resolution.

(c) The commission may purchase any bond issued under this section. Subject to the terms of any agreement with the bondholders, the commission may hold, pledge, resell, or cancel any bond purchased under this paragraph, except that a purchase under this paragraph may not effect an extinguishment of a bond unless the commission cancels the bond or otherwise certifies its intention that the bond be extinguished.

(d) The proceeds of a bond issued under this section may be used for one or more projects located within or outside of this state.

(e) The commission shall send notification to the department of revenue, on a form prescribed by the department, whenever a bond is issued under this section.

**(6) Sale of bonds.** (a) The sale of bonds under this section shall be conducted as provided in the bond resolution.

(b) A sale may be public or private. Bonds may be sold at the price or prices, and upon the conditions, determined by the commission. The commission shall give due consideration to the recommendations of the participants in the project when determining the conditions of sale.

(c) Bonds that are sold under this section may be serial bonds or term bonds, or both.

(d) If at the time of sale definitive bonds are not available, the commission may issue interim certificates exchangeable for definitive bonds.

(e) The commission shall disclose to any person who purchases a tax-exempt bond issued under this section that the interest received on such a bond is exempt from taxation, as provided in ss. 71.05(1)(c)10., 71.26(1m)(k), 71.36(1m), and 71.45(1t)(k).

**(7) Bond security.** (a) The commission may secure bonds by a trust agreement or indenture by and between the commission and one or more corporate trustees. A bond resolution, trust agreement, or indenture may contain provisions for pledging properties, revenues, and other collateral; holding and disbursing funds; protecting and enforcing the rights and remedies of bondholders; restricting individual rights of action by bondholders; and amendments, and any other provisions the commission determines to be reasonable and proper for the security of the bondholders or contracts entered into under this section in connection with the bonds.

(b) A pledge of property, revenues, or other collateral by a commission to secure the payment of the principal or redemption price of, or interest on, any bonds, or any reimbursement or similar agreement with any provider of credit enhancement for bonds, or any swap or other agreement entered into in connection with bonds, is binding on the parties and on any successors. The collateral shall immediately be subject to the pledge, and the pledge shall constitute a lien and security interest which shall attach immediately to the collateral and be effective, binding, and enforceable against the pledgor, its successors, purchasers of the collateral, creditors, and all others, to the extent set forth, and in accordance with, the pledge document irrespective of whether those parties have notice of the pledge and without the need for any physical delivery, recordation, filing, or further act.

**(8) No personal liability.** No board member of the commission is liable personally on the bonds or subject to any personal liability or accountability by reason of the issuance of the bonds, unless the personal liability or accountability is the result of willful misconduct.

**(9) Bonds not public debt.** (a) Unless otherwise expressly provided in the bond resolution, each issue of bonds by the commission shall be the limited obligation of the commission payable solely from amounts received by the commission from revenues derived from the project to be financed or refinanced or from any contract entered into or investment made in connection with the bonds and pledged to the payment of the bonds.

(b) The state and the political subdivisions who are parties to the agreement creating a commission under this section are not liable on bonds or any other contract entered into under this section, or for any other debt, obligation, or liability of the commission, whether in tort, contract, or otherwise.

(c) The bonds are not a debt of the state or the political subdivisions contracting to create a commission under this section. A bond issue under this section does not obligate the state or a political subdivision to levy any tax or make any appropriation for payment of the bonds. All bonds issued by a commission are payable solely from the funds pledged for their payment in accordance with the bond resolution or trust agreement or indenture providing for their issuance. All bonds shall contain, on their face, a statement regarding the obligations of the state, the political subdivisions who are parties to the agreement creating the commission, and the commission as set forth in this paragraph.

**(10) Audits, fiscal year.** (a) The board of a commission shall adopt a calendar year as its fiscal year for accounting purposes. The board shall annually prepare a budget for the commission.

WESTLAW  © 2025 Thomson Reuters. No claim to original U.S. Government Works.

(b) A commission shall maintain an accounting system in accordance with generally accepted accounting principles and shall have its financial statements and debt covenants audited annually by an independent certified public accountant, except that the commission by a unanimous vote may decide to have an audit performed under this paragraph every 2 years.

(c) A copy of the budget and audit shall be sent to the governing body of each political subdivision which is a party to the agreement that created the commission and filed with the secretary of administration and the legislative audit bureau.

**(11) Limitations.** (a) A commission may not issue bonds to finance a capital improvement project in any state or territory of the United States unless a political subdivision within whose boundaries the project is to be located has approved the financing of the project. A commission may not issue bonds to finance a capital improvement project in this state unless all of the political subdivisions within whose boundaries the project is to be located has approved the financing of the project. An approval under this paragraph may be made by the governing body of the political subdivision or, except for a 1st class city or a county in which a 1st class city is located, by the highest ranking executive or administrator of the political subdivision.

(b) This section provides a complete alternative method, to all other methods provided by law, to exercise the powers authorized in this section, including the issuance of bonds, the entering into of contracts related to those bonds, and the financing or refinancing of projects.

(bm) A project may be located outside of the United States or outside a territory of the United States if the borrower, including a co-borrower, of proceeds of bonds issued to finance or refinance the project in whole or in part is incorporated and has its principal place of business in the United States or a territory of the United States. To the extent that this paragraph applies to a borrower, it also applies to a participant if the participant is a nongovernmental entity.

(c) Any action brought to challenge the validity of the issuance of a bond under this section, or the enforceability of a contract entered into under this section, must be commenced in circuit court within 30 days of the commission adopting a resolution authorizing the issuance of the bond or the execution of the contract.

(d) Bonds issued under this section shall not be invalid for any irregularity or defect in the proceedings for their sale or issuance. The bonds shall contain a statement that they have been authorized and issued pursuant to the laws of this state. The statement shall be conclusive evidence of the validity of the bonds.

**(12) State Pledge.** The state pledges to and agrees with the bondholders, and persons that enter into contracts with a commission under this section, that the state will not limit, impair, or alter the rights and powers vested in a commission by this section, including the rights and powers under sub. (4), before the commission has met and discharged the bonds, and any interest due on the bonds, and has fully performed its contracts, unless adequate provision is made by law for the protection of the bondholders or those entering into contracts with a commission. The commission may include this pledge in a contract with bondholders.

**Credits**
<<For credits, see Historical Note field.>>

W. S. A. 66.0304, WI ST 66.0304

Case 2:24-cv-00228-Z    Document 50-1    Filed 01/17/25    Page 486 of 882    PageID 49271

Current through 2023 Act 272, published April 10, 2024.

**End of Document**                                     © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
Municipalities (Ch. 59 to 68)
Chapter 66. General Municipality Law (Refs & Annos)
Subchapter III. Intergovernmental Cooperation

W.S.A. 66.0305

66.0305. Political subdivision revenue sharing

Currentness

**(1) Definition.** In this section, "political subdivision" means a city, village, town, or county.

**(2) Political subdivision revenue sharing agreement.** Subject to the requirements of this section, any 2 or more political subdivisions may, by a majority vote of a quorum of their governing bodies, enter into an agreement to share all or a specified part of revenues derived from taxes and special charges, as defined in s. 74.01(4). One or more political subdivisions may enter into agreements under this section with federally recognized American Indian tribes or bands.

**(3) Public hearing.** At least 30 days before entering into an agreement under sub. (2), a political subdivision shall hold a public hearing on the proposed agreement. Notice of the hearing shall be published as a class 3 notice under ch. 985.

**(4) Specifications.** (a) An agreement entered into under sub. (2) shall meet all of the following conditions:

1. The term of the agreement shall be for at least 10 years.

2. The boundaries of the area within which the revenues are to be shared in the agreement shall be specified.

3. The formula or other means of determining the amount of revenues to be shared under the agreement shall be specified.

4. The date upon which revenues agreed to be shared under the agreement shall be paid to the appropriate political subdivision shall be specified.

5. The method by which the agreement may be invalidated after the expiration of the minimum period specified in par. (a)1. shall be specified.

(b) An agreement entered into under sub. (2) may address any other appropriate matters, including any agreements with respect to services or agreements with respect to municipal boundaries under s. 66.0225, 66.0301(6), or 66.0307.

**(5) Contiguous boundaries.** No political subdivision may enter into an agreement under sub. (2) with one or more political subdivisions unless the political subdivision is contiguous to at least one other political subdivision that enters into the agreement.

**(6) Advisory referendum.** (a) Within 30 days after the hearing under sub. (3), the governing body of a participating political subdivision may adopt a resolution calling for an advisory referendum on the agreement. An advisory referendum shall be held if, within 30 days after the hearing under sub. (3), a petition, signed by a number of qualified electors equal to at least 10 percent of the votes cast for governor in the political subdivision at the last gubernatorial election, is filed with the clerk of a participating political subdivision, requesting an advisory referendum on the revenue sharing plan. The petition shall conform to the requirements of s. 8.40 and shall be filed as provided in s. 8.37. If an advisory referendum is held, the political subdivision's governing body may not vote to approve the agreement under sub. (2) until the report under par. (d) is filed.

(b) The advisory referendum shall be held not less than 70 days nor more than 100 days after adoption of the resolution under par. (a) calling for the referendum or not less than 70 days nor more than 100 days after receipt of the petition under par. (a) by the municipal or county clerk. The municipal or county clerk shall give notice of the referendum by publishing a notice in a newspaper of general circulation in the political subdivision, both on the publication day next preceding the advisory referendum election and one week prior to that publication date.

(c) The advisory referendum shall be conducted by the political subdivision's election officials. The governing body of the political subdivision may specify the number of election officials for the referendum. The ballots shall contain the words "For the revenue sharing agreement" and "Against the revenue sharing agreement" and shall otherwise conform to the provisions of s. 5.64(2). The election shall be conducted as are other municipal or county elections in accordance with chs. 6 and 7, insofar as applicable.

(d) The election inspectors shall report the results of the election, showing the total number of votes cast and the numbers cast for and against the revenue sharing. The election inspectors shall attach their affidavit to the report and immediately file the report in the office of the municipal or county clerk.

(e) The costs of the advisory referendum election shall be borne by the political subdivision that holds the election.

**Credits**
<<For credits, see Historical Note field.>>

W. S. A. 66.0305, WI ST 66.0305
Current through 2023 Act 272, published April 10, 2024.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Proposed Legislation

> West's Wisconsin Statutes Annotated
>> Municipalities (Ch. 59 to 68)
>>> Chapter 66. General Municipality Law (Refs & Annos)
>>>> Subchapter III. Intergovernmental Cooperation

W.S.A. 66.0307

66.0307. Boundary change pursuant to approved cooperative plan

Currentness

**(1) Definitions.** In this section:

(af) "Comprehensive plan" means an adopted plan that contains the elements under s. 66.1001(2) or, if a municipality has not adopted a plan that contains those elements, a master plan adopted under s. 62.23(2) or (3).

(am) "Department" means the department of administration.

(b) "Municipality" means a city, village or town.

**(2) Boundary change authority.** Any combination of municipalities may determine the boundary lines between themselves under a cooperative plan that is approved by the department under this section. A single city or village and a single town may use the mediated agreement procedure under sub. (4m) to determine a common boundary line under a cooperative plan that is approved by the department under this section. No boundary of a municipality may be changed or maintained under this section unless the municipality is a party to the cooperative agreement. The cooperative plan shall provide one or more of the following:

(a) That specified boundary line changes shall occur during the planning period and the approximate dates by which the changes shall occur.

(b) That specified boundary line changes may occur during the planning period and the approximate dates by which the changes may occur.

(c) That a required boundary line change under par. (a) or an optional boundary line change under par. (b) shall be subject to the occurrence of conditions set forth in the plan.

(d) That specified boundary lines may not be changed during the planning period.

**(3) Cooperative plan.** (a) *Who may prepare plan.* The municipalities that propose to set the boundary lines between themselves under this section shall prepare a cooperative plan.

(b) *Purpose of plan.* The cooperative plan shall be made with the general purpose of guiding and accomplishing a coordinated, adjusted and harmonious development of the territory covered by the plan consistent with the comprehensive plan of each participating municipality.

(c) *Content of plan; consistency with comprehensive plan.* The cooperative plan shall describe how it is consistent with each participating municipality's comprehensive plan.

(d) *Content of plan; boundaries and services.* The cooperative plan shall:

1. Identify any boundary change and any existing boundary that may not be changed during the planning period.

2. Identify any conditions that must be met before a boundary change may occur.

3. Include a schedule of the period during which a boundary change shall or may occur.

4. Include a statement explaining how any part of the plan related to the location of boundaries meets the approval criteria under sub. (5)(c) 5.

4m. Identify all highways within the territory covered by the plan of which each participating municipality has jurisdiction.

5. Describe the services to be provided to the territory covered by the plan, identify the providers of those services and indicate whether the provision of any service has received preliminary approval of any relevant governmental regulatory authority.

6. Include a schedule for delivery of the services described under subd. 5.

7. Include a statement explaining how provision under the plan for the delivery of necessary municipal services to the territory covered by the plan meets the approval criterion under sub. (5)(c)3.

8. Designate the municipalities that are participating in the cooperative plan and that are required to ratify any boundary changes by enacting an ordinance under sub. (10).

(e) *Content of plan; compatibility with existing law.* The cooperative plan shall describe how the plan is consistent with current state and federal laws, county shoreland zoning ordinances under s. 59.692, municipal regulations and administrative rules that apply to the territory affected by the plan.

(f) *Content of plan; planning period.* The cooperative plan shall specify the duration of the proposed planning period, which shall be for a period of 10 years, except that the duration of the proposed planning period may be for a period greater than 10 years if a duration greater than 10 years is approved by the department.

(g) *Content of plan; zoning agreement.* The cooperative plan shall include all agreements under sub. (7m).

(h) *Existing plans may be used.* A cooperative plan may be based on, contain elements of or duplicate any existing plan for the same territory.

**(4) Procedure for adopting cooperative plan.** (a) *Authorizing resolution.* Each municipality that intends to participate in the preparation of a cooperative plan under this section shall adopt a resolution authorizing participation in the preparation of the plan. Notice of each resolution shall be given in writing, within 5 days after the resolution is adopted, to all of the following:

1. The department, the department of natural resources, the department of agriculture, trade and consumer protection and the department of transportation.

2. The clerks of any municipality, school district, technical college district, sewerage district or sanitary district which has any part of its territory within 5 miles of a participating municipality.

3. The clerk of each county in which a participating municipality is located.

4. Any county zoning agency under s. 59.69(2) or regional planning commission whose jurisdiction includes a participating municipality.

(b) *Public hearing.* At least 60 days after adoption under par. (a) of the last resolution by a participating municipality and at least 60 days before submitting a cooperative plan to the department for review and approval under sub. (5), the participating municipalities shall hold a joint hearing on the proposed plan. Notice of the hearing shall be given by each participating municipality by class 3 notice under ch. 985.

(c) *Comment on plan.* Any person may comment on the plan during the hearing and may submit written comments before, at or within 20 days following the hearing. All comments shall be considered by each participating municipality. A county zoning agency under s. 59.69(2) or regional planning commission whose jurisdiction includes any participating municipality shall comment in writing on the plan's effect on the master plan adopted by the regional planning commission under s. 66.0309(9), or development plan adopted by the county board or county planning agency under s. 59.69(3), and on the delivery of municipal services, and may comment on any other aspect of the plan. A county in the regional planning commission's jurisdiction may submit comments on the effect of the cooperative plan on the master plan adopted under s. 66.0309(9) and on the delivery of county services or on any other matter related to the plan.

(d) *Adoption of final plan.* 1. Subject to subd. 2., after the public hearing under par. (b) and consideration of comments made on the proposed cooperative plan, the plan participants may revise the plan in response to the comments and may, by resolution adopted by each participating municipality, adopt a final version of the plan.

2. If within 30 days after the public hearing under par. (b) a petition opposing the plan, signed by a number of qualified electors equal to at least 10 percent of the votes cast for governor in the municipality at the last gubernatorial election, is filed with the clerk of a participating municipality, the final version of the plan may be adopted in that municipality only by an affirmative vote of three-fourths of the members of the municipality's governing body who are present and voting. The petition shall conform to the requirements of s. 8.40.

(e) *Advisory referendum.* 1. Within 30 days after adoption of a final plan under par. (d), the governing body of a participating municipality may adopt a resolution calling for an advisory referendum on the plan. An advisory referendum shall be held if, within 30 days after adoption of the final plan under par. (d), a petition, signed by a number of qualified electors equal to at least 10 percent of the votes cast for governor in the municipality at the last gubernatorial election, is filed with the clerk of a participating municipality and as provided in s. 8.37, requesting an advisory referendum on the cooperative plan. The petition shall conform to the requirements of s. 8.40.

2. The advisory referendum shall be held not less than 70 days nor more than 100 days after adoption of the resolution under subd. 1. calling for the referendum or not less than 70 days nor more than 100 days after receipt of the petition by the municipal clerk. The municipal clerk shall give notice of the referendum by publishing a notice in a newspaper of general circulation in the municipality, both on the publication day next preceding the advisory referendum election and one week prior to that publication date.

3. The advisory referendum shall be conducted by the municipal election officials. The governing body of the municipality may specify the number of election officials for the referendum. The ballots shall contain the words "For the cooperative plan" and "Against the cooperative plan" and shall otherwise conform to the provisions of s. 5.64(2). The election shall be conducted as are other municipal elections in accordance with chs. 6 and 7, insofar as applicable.

4. The election inspectors shall report the results of the election, showing the total number of votes cast and the numbers cast for and against the cooperative plan. The election inspectors shall attach their affidavit to the report and immediately file the report in the office of the municipal clerk. The election inspector shall file a certified report of the results in the office of the clerk of each municipality that is a party to the cooperative plan.

5. The costs of the advisory referendum election shall be borne by the municipality that holds the election.

(f) *Submittal of final plan to department.* If no advisory referendum is held under par. (e), the plan participants may submit the final version of the cooperative plan to the department for approval under sub. (5) at least 60 days but not more than 180 days after the public hearing under par. (b). If an advisory referendum is held under par. (e), each participating municipality shall determine, by resolution, whether to submit the final version of the cooperative plan to the department for approval under sub. (5). The resolution shall be adopted within 60 days after the last advisory referendum is held. If any of the plan participants fails or refuses to approve submittal of the cooperative plan to the department, the plan may not be submitted. Any written comment received by a participating municipality on any version of the cooperative plan shall be submitted to the department at the time that the cooperative plan is submitted. If the cooperative plan is not submitted to and approved by the department, it may not be implemented under this section by any of the participating municipalities.

**(4m) Mediated agreement procedure.** (a)1. As an alternative to the parties mutually invoking the procedure under this section, a city, village, or town may petition the department for mediation of a cooperative plan under this paragraph.

2. A city or village may petition for mediation if all of the following apply:

a. The city or village adopts an authorizing resolution under sub. (4)(a)(intro.) and requests in writing an adjacent town to adopt an authorizing resolution under sub. (4)(a)(intro.) and the town fails to adopt the resolution within 60 days after the request is received by the town.

b. The city or village has adopted a comprehensive plan.

3. A town may petition for mediation if all of the following apply:

a. The town adopts an authorizing resolution under sub. (4)(a)(intro.) and requests in writing an adjacent city or village to adopt an authorizing resolution under sub. (4)(a)(intro.) and the city or village fails to adopt the resolution within 60 days after the request is received by the city or village.

b. The town has adopted a comprehensive plan.

(b) A municipality that is authorized under par. (a) to petition the department for mediation and elects to do so shall submit the petition within 90 days after the municipality has adopted the authorizing resolution described in par. (a)2. a. or 3. a. Upon receipt of a petition for mediation, the department shall notify the nonpetitioning adjacent municipality identified in the petition that the petition has been submitted. Within 45 days after receipt of notice from the department that a petition has been submitted, the nonpetitioning municipality shall notify the department whether it agrees to engage in mediation to develop a cooperative plan under this section. Failure of the nonpetitioning municipality to timely notify the department is considered notice that the municipality does not agree to engage in mediation. The department shall send written notice of the nonpetitioning municipality's decision, on whether it will participate, to the petitioning municipality. If the nonpetitioning municipality refuses to engage in mediation, the petitioning municipality may not submit a petition under this paragraph involving the same nonpetitioning municipality for a period of 3 years after the department sends notice of the refusal.

(c)1. If a nonpetitioning town refuses under par. (b) to engage in mediation, the town may not contest any annexation of its territory to the petitioning city or village that is commenced during the shorter of the following periods:

a. The period of 270 days beginning after the town refuses under par. (b) to engage in mediation.

b. The period beginning on the date the town refuses under par. (b) to engage in mediation and ending on the date the town agrees to engage in mediation.

2. If a nonpetitioning city or village refuses under par. (b) to engage in mediation, an annexation of territory of the petitioning town to the nonpetitioning city or village that is commenced during the shorter of the following periods shall be reviewed by the department in the manner described under s. 66.0217(6), regardless of the population of the county in which the annexation

proceeding is commenced, and, notwithstanding s. 66.0217(11)(c), may be contested by the town if the department determines that the annexation is not in the public interest:

a. The period of 270 days beginning after the city or village refuses under par. (b) to engage in mediation.

b. The period on the date the city or village refuses under par. (b) to engage in mediation and ending on the date the city or village agrees to engage in mediation.

(d)1. If both the petitioning municipality and nonpetitioning municipality agree to engage in mediation to develop a cooperative plan under this section, the municipalities shall select a mediator. The department may assist the municipalities in selecting a mediator. If the municipalities are unable to agree on the selection of a mediator, the department shall furnish a list of 5 mediators to the municipalities. The municipalities shall alternatively strike a name from the list until one name remains, who shall be the mediator.

2. The mediator shall assist the parties through recognized mediation techniques to develop and reach agreement on a cooperative plan under this section. Unless the participating municipalities agree to extend the mediation period, the mediation period expires after 270 days. Unless they agree otherwise, the participating municipalities are equally responsible for the costs of the mediation.

(e) Before the participating municipalities engage in mediation under this subsection, each shall adopt a resolution under sub. (4)(a)(intro.) and provide the required notice of the resolution. Notwithstanding sub. (4)(b), if the participating municipalities agree on a cooperative plan under this subsection, a public hearing on the plan shall be held under sub. (4)(b) no sooner than 45 days after agreement is reached and at least 45 days before submitting the plan to the department for review and approval under sub. (5).

(f) If any litigation contesting annexation of territory of the petitioning or nonpetitioning town to the city or village is commenced during the 3-year period after the department receives the petition for mediation under par. (b), the judge shall under s. 802.12(2), unless the nonpetitioning municipality objects, order the parties to select a settlement alternative under s. 802.12(1)(i) as a means to attempt settlement.

**(5) Department review and approval of local or cooperative plan.** (a) *Generally.* The department shall make a written determination of whether to approve a cooperative plan within 90 days after receiving the plan unless the department and the parties to the plan agree to a longer determination period. The department shall consider written comments on the plan received by a municipality under sub. (4)(c) that is submitted to the department under sub. (4)(f) or from any other source. The department may request information relating to the cooperative plan, including any comprehensive plan or land use plan currently being utilized by any participating municipality, from that municipality, and from any county or regional planning commission. The department may seek and consider comments from any state agency on whether the cooperative plan is consistent with state laws and administrative rules under the agency's jurisdiction. Any state agency requested to comment on a cooperative plan shall comply with the request. The department shall issue its determination of whether to approve the cooperative plan in writing, supported by specific findings based on the criteria under par. (c). The approval or disapproval of a cooperative plan by the department under this section is not a contested case, as defined in s. 227.01(3), for purposes of ch. 227.

(b) *Hearing.* Any person may request a public hearing before the department on a cooperative plan submitted to the department for approval. A request for a public hearing shall be in writing and shall be submitted to the department within 10 days after the cooperative plan is received by the department. If requested, the department shall, and on its own motion the department may, hold a public hearing on the cooperative plan. If requested to hold a public hearing, the department is required to hold only one hearing, regardless of the number of requests for a hearing. Any public hearing under this paragraph shall be held in a municipality that is a party to the cooperative plan.

(c) *Approval of cooperative plan.* A cooperative plan shall be approved by the department if the department determines that all of the following apply:

1. The content of the plan under sub. (3)(c) to (e) is sufficient to enable the department to make the determinations under subds. 2. to 5.

2. The cooperative plan is consistent with each participating municipality's comprehensive plan and with current state laws, municipal regulations, and administrative rules that apply to the territory affected by the plan.

3. Adequate provision is made in the cooperative plan for the delivery of necessary municipal services to the territory covered by the plan.

5. The shape of any boundary maintained or any boundary change under the cooperative plan is not the result of arbitrariness and reflects due consideration for compactness of area. Considerations relevant to the criteria under this subdivision include quantity of land affected by the boundary maintenance or boundary change and compatibility of the proposed boundary maintenance or boundary change with natural terrain including general topography, major watersheds, soil conditions and such features as rivers, lakes and major bluffs.

6. Any proposed planning period exceeding 10 years is consistent with the plan.

(d) *Return and resubmittal of plan.* The department may return a cooperative plan, with comments, if the department determines that the cooperative plan, if revised, may constitute a plan that can be approved by the department. If a cooperative plan is returned under this paragraph, each participating municipality may revise the plan, as directed by the department, adopt the revised plan by resolution and resubmit the plan to the department within 90 days after the plan is returned. After receiving a resubmitted cooperative plan, the department shall make a determination on approval within 30 days.

**(6) Binding elements of cooperative plan.** If a cooperative plan is approved by the department under sub. (5) or an amended plan is approved under sub. (8), provisions in the plan to maintain existing boundaries, the boundary changes in the plan, the schedule for those changes, the plan for delivery of services, including road maintenance, and the schedule for those services are binding on the parties to the plan and have the force and effect of a contract.

**(7) Other boundary procedures.** (a) *Other procedures after hearing.* After the joint hearing under sub. (4)(b) is held, no other procedure, except the procedure under s. 281.43(1m), for altering a municipality's boundaries may be used to alter a boundary included in the proposed cooperative plan under sub. (3)(d)1. until the boundary is no longer included in the proposed

cooperative plan, the municipality withdraws from the proposed cooperative plan or the proposed cooperative plan fails to receive approval from the department, whichever occurs first.

(b) *Other boundary procedures during the planning period.* During the planning period specified under sub. (3)(f), no other procedure for altering a municipality's boundaries may be used to alter a boundary that is included in the cooperative plan under sub. (3)(d)1., except if an annexation is conducted under s. 281.43(1m), regardless of whether the boundary is proposed to be maintained or changed or is allowed to be changed under the plan. After the planning period has expired, the boundary may be altered.

**(7m) Zoning in town territory.** (a) If a town is a party to a cooperative plan with a city or village, the town and city or village may agree, as part of the cooperative plan, to authorize the town, city, or village to enact a zoning ordinance under s. 60.61, 61.35, or 62.23 for all or a portion of the town territory covered by the plan. The exercise of zoning authority by a town under this paragraph is not subject to s. 60.61(3) or 60.62(3).

(b)1. If a county zoning ordinance applies to the town territory covered by a cooperative plan subject to an agreement under par. (a), that ordinance and any regulations, approvals, and conditions imposed under the ordinance continue in effect until the ordinance or the particular regulation, approval, or condition is specifically changed by official action of the town, city, or village with authority to enact a zoning ordinance under the agreement under par. (a). This subdivision does not expand or modify the authority of a town, city, or village to change a zoning ordinance, any regulation, approval, or condition imposed under a zoning ordinance, or any nonconforming use.

2. If a zoning ordinance is enacted under par. (a), that zoning ordinance and any regulations, approvals, and conditions imposed under the ordinance continue in effect after the planning period ceases until the ordinance or the particular regulation, approval, or condition is specifically changed under other applicable law.

(c) This subsection does not affect zoning ordinances adopted under s. 59.692 or 87.30 or ch. 91.

**(8) Amendments to cooperative plan.** (a) *Authority to amend plan.* A cooperative plan may be amended during the planning period if all the parties to the plan agree to the amendment and if the amendment is approved by the department.

(b) *When full procedure required.* An amendment to a cooperative plan that proposes to change a municipality's boundary or to change the approved planning period shall follow the same procedure as that required for an original plan.

(c) *When expedited procedure may occur.* An amendment to a cooperative plan that does not propose to change a boundary or the planning period shall follow the same procedure as that required for an original plan except that the hearing under sub. (4)(b) is not required unless objection to the amendment is made in writing by any person to the clerk of a participating municipality. An amendment under this paragraph shall be adopted by resolution of each of the participating municipalities. Notice of the amendment and adopting resolution shall follow the procedures specified in sub. (4)(a). Notice that the amendment will be submitted directly to the department unless objection is made in writing shall be given by each participating municipality by a class 3 notice under ch. 985. If no written objection to the amendment is received within 7 days after the last required notice is published, the amendment may be submitted directly to the department for approval. If written objection is timely made, the public hearing and other requirements under sub. (4)(b) and (c) apply.

**(9) Court review of department decision.** The decision of the department under sub. (5)(c) or (d) or (8) to approve or not to approve a cooperative plan or an amendment to a plan is subject to judicial review under ch. 227.


**(10) Boundary change ordinance; filing and recording requirements.** A boundary change under a cooperative plan shall be accomplished by the enactment of an ordinance by the governing body designated to do so in the plan. The filing and recording requirements under s. 66.0217(9)(a), as they apply to cities and villages under s. 66.0217(9)(a), apply to municipalities under this subsection. The requirements for the secretary of administration are the same as those required in s. 66.0217(9)(b).


**(11) Time for bringing action.** No action to contest the validity of a cooperative plan under this section or an amendment to a cooperative plan, regardless of the grounds for the action, may be commenced after 60 days from the date on which the department approves the cooperative plan under sub. (5) or the amendment under sub. (8), respectively. No action relating to compliance with a binding element of a cooperative plan may be commenced later than 180 days after the failure to comply.


**Credits**

<<For credits, see Historical Note field.>>


Notes of Decisions (2)

W. S. A. 66.0307, WI ST 66.0307
Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated

Municipalities (Ch. 59 to 68)

Chapter 66. General Municipality Law (Refs & Annos)

Subchapter III. Intergovernmental Cooperation

W.S.A. 66.0309

66.0309. Creation, organization, powers and duties of regional planning commissions

Currentness

**(1) Definitions.** In this section:

(a) "Governing body" means the town, village or county board or the legislative body of a city.

(b) "Local governmental units" or "local units" means cities, villages, towns and counties.

(c) "Population" means the population of a local unit as shown by the last federal census or by any subsequent population estimate under s. 16.96.

**(2) Creation of regional planning commissions.** (a) A regional planning commission may be created by the governor, or a state agency or official as the governor designates, upon petition in the form of a resolution by the governing body of a local governmental unit and the holding of a public hearing on the petition. If the petition is joined in by the governing bodies of all the local units in the proposed region, including the county board of any county, part or all of which is in the proposed region, the governor may dispense with the hearing. Notice of any public hearing shall be given by the governor by mail at least 10 days in advance to the clerk of each local unit in the proposed region.

(b) If the governor finds that there is a need for a regional planning commission, and if the governing bodies of local units within the proposed region which include over 50 percent of the population and equalized assessed valuation of the region as determined by the last previous equalization of assessments, consent to the formation of such regional planning commission, the governor may create the regional planning commission by order and designate the area and boundaries of the commission's jurisdiction taking into account the elements of homogeneity based upon, but not limited to, such considerations as topographic and geographic conformations, extent of urban development, the existence of special or acute agricultural, forestry, conservation or other rural problems, uniformity of social or economic interests and values, park and recreational needs, civil defense, or the existence of physical, social and economic problems of a regional character.

(c) Territory included within a regional planning commission that consists of one county or less in area also may be included in the creation of a multicounty regional planning commission. The creation does not require that the existing regional planning commission consisting of one county or less in area be terminated or altered, but upon creation of the multicounty commission, the existing commission shall cease to have authority to make charges upon participating local governmental units under sub. (14) and shall adopt a name other than "regional planning commission".

**(2m) Limitation on territory.** No regional planning commission may be created to include territory located in 3 or more uniform state districts as established by 1970 executive order 22 dated August 24, 1970. Any existing regional planning commission which includes territory located in 3 or more uniform state districts shall be dissolved no later than December 31, 1972.

**(3) Composition of regional planning commissions.** (a) The membership composition of a regional planning commission which includes a city of the first class shall be as follows:

1. One member appointed by the county board of each county, part or all of which is initially within the region or is later added.

2. Two members from each participating county shall be appointed by the governor. At least one appointee shall be a person, selected from a list of 2 or more persons nominated by the county board, who has experience in local government in elective or appointive offices or who is professionally engaged in advising local governmental units in the fields of land-use planning, transportation, law, finance, engineering or recreation and natural resources development. The governor in making appointments under this subdivision shall give due weight to the place of residence of the appointees within the various counties encompassed by the region.

(b) For any region which does not include a 1st class city, the membership composition of a regional planning commission shall be in accordance with resolutions approved by the governing bodies of a majority of the local units in the region, and these units shall have in the aggregate at least half the population of the region. For the purposes of this determination a county, part or all of which is within the region, shall be counted as a local unit, but the population of an approving county shall not be counted. In the absence of the necessary approval by the local units, the membership composition of a commission shall be determined as follows:

1. For regions which include land in more than one county par. (a) shall apply.

2. For regions that include land in only one county, the commission shall consist of the following:

a. Three members appointed by the county board.

b. Three members appointed by the governing body of each city, village and town in the region having a population of 20,000 or more. If there is no city, village or town having a population of 20,000 or more, the governor shall appoint one member from each city, village or town with a population of 5,000 or more within the region. All governor appointees under this subd. 2.b. shall be persons who have experience in local government in elective or appointive offices or who are professionally engaged in advising local governmental units in the fields of land-use planning, transportation, law, finance or engineering.

c. Three members appointed at large by the governor. All governor appointees under this subd. 2.c. shall be persons who have experience in local government in elective or appointive offices or who are professionally engaged in advising local governmental units in the fields of land-use planning, transportation, law, finance or engineering.

(c) Terms of office for regional planning commission members shall be as follows:

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

1. If the composition of the commission is approved by local units under par. (b), the terms shall be as prescribed in the resolutions of approval.

2. For members of all other commissions the term is 6 years after the initial term. At the first meeting of the commission it shall be determined by lot which of the initial members shall have 2, 4 and 6-year terms, respectively, and each group shall be as nearly equal as may be.

(d) All regional planning commission members shall be electors of the state and reside within the region.

**(4) Compensation; expenses.** A per diem compensation may be paid members of regional planning commissions. This shall not affect in any way remuneration received by any state or local official who, in addition to serving as a state or local official, serves also as a member of the regional planning commission. All members may be reimbursed for actual expenses incurred as members of the commission in carrying out the work of the commission.

**(5) Chairperson; rules of procedure; records.** Each regional planning commission shall elect its own chairperson and executive committee and shall establish its own rules of procedure, and may create and fill other offices as it may determine necessary. The commission may authorize the executive committee to act for it on all matters under rules adopted by it. The commission shall meet at least once each year. It shall keep a record of its resolutions, transactions, findings and determinations, which shall be a public record.

**(6) Director and employees.** The regional planning commission shall appoint a director and such employees as it deems necessary for its work and may hire such experts and consultants for part-time or full-time service as may be necessary for the prosecution of its responsibilities.

**(7) Advisory committees or councils; appointment.** The regional planning commission may appoint advisory committees or councils whose membership may consist of individuals whose experience, training or interest in the program may qualify them to lend valuable assistance to the regional planning commission by acting in an advisory capacity in consulting with the regional planning commission on all phases of the commission's program. Members of advisory bodies shall receive no compensation for their services but may be reimbursed for actual expenses incurred in the performance of their duties.

**(8) Functions, general and special.** (a)1. The regional planning commission may take any of the following actions:

a. Conduct all types of research studies, collect and analyze data, prepare maps, charts and tables, and conduct all necessary studies for the accomplishment of its other duties.

b. Consistent with the elements specified in s. 66.1001, make plans for the physical, social and economic development of the region, and, consistent with the elements specified in s. 66.1001, adopt by resolution any plan or the portion of any plan so prepared as its official recommendation for the development of the region.

c. Publicize and advertise its purposes, objectives and findings, and distribute reports concerning these items.

d. Provide advisory services on regional planning problems to the local government units within the region and to other public and private agencies in matters relative to its functions and objectives, and may act as a coordinating agency for programs and activities of local units and agencies as they relate to its objectives.

2. All public officials shall, upon request, furnish to the regional planning commission, within a reasonable time, available information as it requires for its work. In general, the regional planning commission shall have all powers necessary to enable it to perform its functions and promote regional planning. The functions of the regional planning commission shall be solely advisory to the local governments and local government officials comprising the region.

(b) The regional planning commission shall make an annual report of its activities to the legislative bodies of the local governmental units within the region, and shall submit 2 copies of the report to the legislative reference bureau.

**(9) Preparation of master plan for region.** The regional planning commission shall have the function and duty of making and adopting a master plan for the physical development of the region. The master plan, with the accompanying maps, plats, charts, programs and descriptive and explanatory matter, shall show the commission's recommendations for physical development and shall contain at least the elements described in s. 66.1001. The regional planning commission may amend, extend or add to the master plan or carry any part or subject matter into greater detail.

**(10) Adoption of master plan for region.** The master plan shall be made with the general purpose of guiding and accomplishing a coordinated, adjusted and harmonious development of the region which will, in accordance with existing and future needs, best promote public health, safety, morals, order, convenience, prosperity or the general welfare, as well as efficiency and economy in the process of development. The regional planning commission may adopt the master plan as a whole by a single resolution, or, as the work of making the whole master plan progresses, may by resolution adopt a part or parts of the master plan, any part to correspond with one or more of the elements specified in s. 66.1001. The resolution shall refer expressly to the maps, plats, charts, programs and descriptive and explanatory matter, and other matters intended by the regional planning commission to form the whole or any part of the plan, and the action taken shall be recorded on the adopted plan or part of the adopted plan by the identifying signature of the chairperson of the regional planning commission and a copy of the plan or part of the adopted plan shall be certified to the legislative bodies of the local governmental units within the region. The purpose and effect of adoption of the master plan shall be solely to aid the regional planning commission and the local governments and local government officials comprising the region in the performance of their functions and duties.

**(11) Matters referred to regional planning commission.** The officer or public body of a local governmental unit within the region having final authority may refer to the regional planning commission, for its consideration and report, the location or acquisition of land for any of the items or facilities that are included in the adopted regional master plan. Within 20 days after the matter is referred to the regional planning commission or a longer period as may be stipulated by the referring officer or public body, the commission shall report its recommendations to the referring officer or public body. The report and recommendations of the commission shall be advisory only. A state agency may authorize the regional planning commission with the consent of the commission to act for the agency in approving, examining, or reviewing plats under s. 236.12(2)(ap). A regional planning commission authorized by a local unit on November 1, 1980, to act for the local unit in approving plats may continue to so act until the commission withdraws its consent or the local unit its approval. A local unit may authorize a regional planning commission, with the consent of the commission, to conduct an advisory review of plats.

**(12) Local adoption of plans of regional commission; contracts.** (a) Any local governmental unit within the region may adopt all or any portion of the plans and other programs prepared and adopted by the regional planning commission.

(b) In addition to the other powers specified in this section a regional planning commission may enter into a contract with any local unit within the region under s. 66.0301 to make studies and offer advice on any of the following topics:

1. Land use, thoroughfares, community facilities, and public improvements.

2. Encouragement of economic and other developments.

**(13) Aid from governmental agencies; gifts and grants.** Aid, in any form, for the purpose of accomplishing the objectives of the regional planning commission may be accepted from all governmental agencies whether local, state or federal, if the conditions under which aid is furnished are not incompatible with the other provisions of this section. The regional planning commission may accept gifts and grants from public or private individuals or agencies if the conditions under which the grants are made are in accordance with the accomplishment of the objectives of the regional planning commission.

**(14) Budget and service charges.** (a) For the purpose of providing funds to meet the expenses of a regional planning commission, the commission shall annually on or before October 1 prepare and approve a budget reflecting the cost of its operation and services to the local governmental units within the region. The amount of the budget charged to any local governmental unit shall be in the proportion of the equalized value for tax purposes of the land, buildings, and other improvements on the land of the local governmental unit, within the region, to the total equalized value within the region. The amount charged to a local governmental unit shall not exceed .003 percent of equalized value under its jurisdiction and within the region, unless the governing body of the unit expressly approves the amount in excess of that percentage. All tax or other revenues raised for a regional planning commission shall be forwarded by the treasurer of the local unit to the treasurer of the commission on written order of the treasurer of the commission.

(b) Where one-half or more of the land within a county is within a region, the chairperson of the regional planning commission shall certify to the county clerk, before August 1 of each year, the proportionate amount of the budget charged to the county for the services of the regional planning commission. Unless the county board finds the charges unreasonable, and institutes the procedures under par. (d), it shall take legislative action as necessary to provide the funds called for in the certified statement.

(c) Where less than one-half of the land within a county is within a region, the chairperson of the regional planning commission shall before August 1 of each year certify to the clerk of the local governmental unit involved a statement of the proportionate charges assessed to that local governmental unit. The clerk shall extend the amount shown in the statement as a charge on the tax roll under s. 281.43(2).

(d) If any local governmental unit makes a finding by resolution within 20 days of the certification to its clerk that the charges of the regional planning commission are unreasonable, it may take any of the following actions:

1. Submit the issue to arbitration by 3 arbitrators, one to be chosen by the local governmental unit, one to be chosen by the regional planning commission, and the third to be chosen by the first 2 arbitrators. If the arbitrators are unable to agree, the vote of 2 shall be the decision. The arbitrators may affirm or modify the report, and shall submit their decision in writing to the local governmental unit and the regional planning commission within 30 days of their appointment unless the time is extended by agreement of the commission and the local governmental unit. The decision is binding. An election to arbitrate is a waiver of

the right to proceed by action. Two-thirds of the expenses of arbitration shall be paid by the party requesting arbitration and the balance by the other.

2. If a local governmental unit does not elect to arbitrate, it may institute a proceeding for judicial review under ch. 227.

(e) By agreement between the regional planning commission and a local governmental unit, special compensation to the commission for unique and special services provided to the local governmental unit may be arranged.

(f) The regional planning commission may accept from any local governmental unit supplies, the use of equipment, facilities and office space and the services of personnel as part or all of the financial support assessed against the local governmental unit.

**(15) Dissolution of regional planning commissions.** Upon receipt of certified copies of resolutions recommending the dissolution of a regional planning commission adopted by the governing bodies of a majority of the local units in the region, including the county board of any county, part or all of which is within the region, and upon a finding that all outstanding indebtedness of the commission has been paid and all unexpended funds returned to the local units which supplied them, or that adequate provision has been made for the outstanding indebtedness or unexpended funds, the governor shall issue a certificate of dissolution of the commission which shall then cease to exist.

**(16) Withdrawal.** Within 90 days of the issuance by the governor of an order creating a regional planning commission, any local unit of government within the boundaries of the region may withdraw from the jurisdiction of the commission by a two-thirds vote of the members-elect of the governing body after a public hearing. Notice of withdrawal shall be given to the commission by registered mail not more than 3 nor less than 2 weeks before withdrawal and by publication of a class 2 notice, under ch. 985. A local unit may withdraw from a regional planning commission at the end of any fiscal year by a two-thirds vote of the members-elect of the governing body taken at least 6 months before the effective date of the withdrawal. However, the local unit shall be responsible for its allocated share of the contractual obligations of the regional planning commission continuing beyond the effective date of its withdrawal.

**Credits**
<<For credits, see Historical Note field.>>

Notes of Decisions (25)

W. S. A. 66.0309, WI ST 66.0309
Current through 2023 Act 272, published April 10, 2024.

---

End of Document
© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:24-cv-00228-Z    Document 50-1    Filed 01/17/25    Page 504 of 882    PageID 49289

West's Wisconsin Statutes Annotated
  Municipalities (Ch. 59 to 68)
    Chapter 66. General Municipality Law (Refs & Annos)
      Subchapter III. Intergovernmental Cooperation

W.S.A. 66.031

66.031. Renumbered 66.0401(1) and amended by 1999 Act 150, §§ 78, 79, eff. Jan. 1, 2001

Currentness

**Credits**

<<For credits, see Historical Note field.>>

W. S. A. 66.031, WI ST 66.031
Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
   Municipalities (Ch. 59 to 68)
      Chapter 66. General Municipality Law (Refs & Annos)
         Subchapter III. Intergovernmental Cooperation

W.S.A. 66.0311

66.0311. Intergovernmental cooperation in financing and undertaking housing projects

Currentness

(1) In this section, "municipality" has the meaning given in s. 66.0301(1)(a).

(2) Any municipality, housing authority, development authority or redevelopment authority authorized under ss. 66.1201 to 66.1211 and 66.1301 to 66.1337:

(a) To issue bonds or obtain other types of financing in furtherance of its statutory purposes may cooperate with any other municipality, housing authority, development authority or redevelopment authority similarly authorized under ss. 66.1201 to 66.1211 and 66.1301 to 66.1337 for the purpose of jointly issuing bonds or obtaining other types of financing.

(b) To plan, undertake, own, construct, operate and contract with respect to any housing project in accordance with its statutory purposes under ss. 66.1201 to 66.1211 and 66.1301 to 66.1337, may cooperate for the joint exercise of such functions with any other municipality, housing authority, development authority or redevelopment authority so authorized.

**Credits**
<<For credits, see Historical Note field.>>

W. S. A. 66.0311, WI ST 66.0311
Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**                                  © 2025 Thomson Reuters. No claim to original U.S. Government Works.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
  Municipalities (Ch. 59 to 68)
    Chapter 66. General Municipality Law (Refs & Annos)
      Subchapter III. Intergovernmental Cooperation

W.S.A. 66.0312

66.0312. Local health departments; mutual assistance

Currentness

(1) In this section "local health department" has the meaning given in s. 66.0314(1)(e).

(2)(a) Subject to sub. (3), upon the request of a local health department, the personnel of any other local health department may assist the requester within the requester's jurisdiction, notwithstanding any other jurisdictional provision.

(b) If a request for assistance is made under par. (a), payment for the requested services shall be made by one of the following methods:

1. If an agreement under s. 66.0301, or any other agreement between the parties, for the payment of such services exists, the terms of the agreement shall be followed.

2. If no agreement described under subd. 1. for the payment of such services exists, the governmental unit that receives the assistance is responsible for the personnel or equipment costs incurred by the responding agency if the responding agency requests payment of those costs.

(3) This section does not apply during a state of emergency declared by the governor under s. 323.10.

**Credits**

<<For credits, see Historical Note field.>>

W. S. A. 66.0312, WI ST 66.0312
Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
Municipalities (Ch. 59 to 68)
Chapter 66. General Municipality Law (Refs & Annos)
Subchapter III. Intergovernmental Cooperation

W.S.A. 66.03125

66.03125. Fire departments; mutual assistance

Currentness

(1) In this section "fire department" has the meaning given in s. 66.0314(1)(c).

(2)(a) Subject to sub. (3), upon the request of a fire department, the personnel of any other fire department may assist the requester within the requester's jurisdiction, notwithstanding any other jurisdictional provision.

(b) If a request for assistance is made under par. (a), payment for the requested services shall be made by one of the following methods:

1. If an agreement under s. 66.0301, or any other agreement between the parties, for the payment of such services exists, the terms of the agreement shall be followed.

2. If no agreement described under subd. 1. for the payment of such services exists, the governmental unit that receives the assistance is responsible for the personnel or equipment costs incurred by the responding agency if the responding agency requests payment of those costs.

(3) This section does not apply during a state of emergency declared by the governor under s. 323.10.

**Credits**
<<For credits, see Historical Note field.>>

W. S. A. 66.03125, WI ST 66.03125
Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**                                  © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
  Municipalities (Ch. 59 to 68)
    Chapter 66. General Municipality Law (Refs & Annos)
      Subchapter III. Intergovernmental Cooperation

W.S.A. 66.0313

66.0313. Law enforcement; mutual assistance

Currentness

(1) In this section:

(a) "Law enforcement agency" has the meaning given in s. 165.83(1)(b) and includes a tribal law enforcement agency.

(b) "Tribal law enforcement agency" has the meaning given in s. 165.83(1)(e).

(2) Except as provided in sub. (4), upon the request of any law enforcement agency, including county law enforcement agencies as provided in s. 59.28(2), the law enforcement personnel of any other law enforcement agency may assist the requesting agency within the latter's jurisdiction, notwithstanding any other jurisdictional provision. For purposes of ss. 895.35 and 895.46, law enforcement personnel, while acting in response to a request for assistance, shall be deemed employees of the requesting agency and, to the extent that those sections apply to law enforcement personnel and a law enforcement agency acting under or affected by this section, ss. 895.35 and 895.46 shall apply to tribal law enforcement personnel and a tribal law enforcement agency acting under or affected by this section.

(3) The provisions of s. 66.0513 apply to this section and, to the extent that s. 66.0513 applies to law enforcement personnel and a law enforcement agency acting under or affected by this section, it applies to tribal law enforcement personnel and a tribal law enforcement agency acting under or affected by this section.

(4) A law enforcement agency, other than a tribal law enforcement agency, may not respond to a request for assistance from a tribal law enforcement agency at a location outside the law enforcement agency's territorial jurisdiction unless all of the following apply:

(a) One of the following applies:

1. The governing body of the tribe that created the tribal law enforcement agency adopts and has in effect a resolution that includes a statement that the tribe waives its sovereign immunity to the extent necessary to allow the enforcement in the courts of this state of its liability under sub. (2) and s. 66.0513 or another resolution that the department of justice determines will reasonably allow the enforcement in the courts of this state of the tribe's liability under sub. (2) and s. 66.0513.

2. The tribal law enforcement agency or the tribe that created the tribal law enforcement agency maintains liability insurance that does all of the following:

a. Covers the tribal law enforcement agency for its liability under sub. (2) and s. 66.0513.

b. Has a limit of coverage not less than $2,000,000 for any occurrence.

c. Provides that the insurer, in defending a claim against the policy, may not raise the defense of sovereign immunity of the insured up to the limits of the policy.

3. The law enforcement agency and the tribal law enforcement agency have in place an agreement under which the law enforcement agency accepts liability under sub. (2) and s. 66.0513 for instances in which it responds to a request for assistance from the tribal law enforcement agency.

(b) The tribal law enforcement agency requesting assistance has provided to the department of justice a copy of the resolution under par. (a)1., proof of insurance under par. (a)2., or a copy of the agreement under par. (a)3., and the department of justice has posted either a copy of the document or notice of the document on the Internet site it maintains for exchanging information with law enforcement agencies.

**Credits**

<<For credits, see Historical Note field.>>

Notes of Decisions (10)

W. S. A. 66.0313, WI ST 66.0313
Current through 2023 Act 272, published April 10, 2024.

---

End of Document                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
  Municipalities (Ch. 59 to 68)
    Chapter 66. General Municipality Law (Refs & Annos)
      Subchapter III. Intergovernmental Cooperation

W.S.A. 66.0314

66.0314. State of emergency; mutual assistance

Currentness

(1) In this section:

(a) "Emergency management program" means the emergency management program of a city, village, town, or county, under s. 323.14(1).

(b) "Emergency medical services program" means a program established under s. 256.12.

(c) "Fire department" means any public organization engaged in fire fighting or a private sector employer fire company or fire department organized as a nonstock, nonprofit corporation under ch. 181 or ch. 213 without the input of a municipality.

(d) "Incident command system" means a functional management system established to control, direct, and manage the roles, responsibilities, and operations of all of the agencies involved in a multi-jurisdictional or multi-agency emergency response, which may include authorities designated by a participating tribe or band.

(e) "Local health department" has the meaning given in s. 250.01(4), and also includes an entity designated by a participating tribe or band as a local health department.

(fe) "Tribe or band" means a federally recognized American Indian tribe or band in this state.

(2)(a) If the governor declares a state of emergency under s. 323.10, upon the request of a city, village, town, or county, or a person acting under an incident command system, the personnel of any emergency management program, emergency medical services program, fire department, or local health department may assist the requester within the requester's jurisdiction, notwithstanding any other jurisdictional provision.

(b) If a request for assistance is made under par. (a), the governmental unit that receives the assistance is responsible for the personnel or equipment costs incurred by the responding agency to the extent that federal, state, and other 3rd-party reimbursement is available if all of the following apply:

1. The responding agency meets the personnel and equipment requirements in the state plan under s. 323.13(1)(b).

2. The responding agency requests payment of those costs.

**Credits**

<<For credits, see Historical Note field.>>

W. S. A. 66.0314, WI ST 66.0314

Current through 2023 Act 272, published April 10, 2024.

End of Document                                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
    Municipalities (Ch. 59 to 68)
        Chapter 66. General Municipality Law (Refs & Annos)
            Subchapter III. Intergovernmental Cooperation

W.S.A. 66.0315

66.0315. Municipal cooperation; federal rivers, harbors or water resources projects

Currentness

A county, town, city or village acting under its powers and in conformity with state law may enter into an agreement with an agency of the federal government to cooperate in the construction, operation or maintenance of any federally authorized rivers, harbors or water resources management or control project or to assume any potential liability appurtenant to a project and may do all things necessary to consummate the agreement. If a project will affect more than one municipality, the municipalities affected may jointly enter into an agreement under this section with an agency of the federal government carrying any terms and provisions concerning the division of costs and responsibilities that are mutually agreed upon. The affected municipalities may by agreement submit any determinations of the division of construction costs, responsibilities, or any other liabilities among them to an arbitration board. The determination of the arbitration board shall be final. This section shall not be construed as a grant or delegation of power or authority to any county, town, city, village or other local municipality to do any work in or place any structures in or on any navigable water except as it is otherwise expressly authorized by state law to do.

**Credits**

<<For credits, see Historical Note field.>>

W. S. A. 66.0315, WI ST 66.0315
Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**                             © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
  Municipalities (Ch. 59 to 68)
    Chapter 66. General Municipality Law (Refs & Annos)
      Subchapter III. Intergovernmental Cooperation

W.S.A. 66.0316

66.0316. Renew Wisconsin performance review

Currentness

**(1) Definitions.** In this section:

(a) "Analysis" means a performance analysis of the cost and benefit of a political subdivision providing a governmental service compared to a private person providing the same service.

(b) "Chief executive officer" has the meaning given in s. 66.1106(1)(a).

(c) "Department" means the department of revenue.

(d) "Extension" has the meaning given in s. 36.05(7).

(e) "Governmental service" means a service related to any of the following:

1. Law enforcement.

2. Fire protection.

3. Emergency services.

4. Public health.

5. Solid waste collection and disposal.

6. Recycling.

7. Public transportation.

8. Public housing.

9. Animal control.

10. Libraries.

11. Recreation and culture.

12. Human services.

13. Youth services.

(f) "Political subdivision" means any city, village, town, or county with a population greater than 2,500.

**(2) Pilot program.** The department shall establish a pilot program to study governmental services delivered by and to political subdivisions. The department shall solicit political subdivisions to participate in the program. Based on the department's solicitation, the department shall select 5 political subdivisions to form councils as provided under sub. (3) and shall include in that selection at least one county and at least one city, village, or town.

**(3) Creation of council.** (a) No later than January 1, 2002, each political subdivision selected under sub. (2) shall create a council consisting of 5 members, as follows:

1. The chief executive officer of the political subdivision, or his or her designee.

2. A member who is an employee of the political subdivision.

3. A member with cost accounting experience who is a resident of the political subdivision and who is not a political subdivision officer or employee.

4. Two members, not including the member under subd. 3., who are residents of the political subdivision and who are not political subdivision officers or employees.

(b) The political subdivision's chief executive officer shall appoint the council members under par. (a)2. to 4. The chief executive officer shall appoint 2 members to initial terms of 2 years and the remaining 2 members to initial terms of 4 years. The chief executive officer shall appoint the respective successors of the members under par. (a)2. to 4. to terms of 4 years. All members under par. (a)2. to 4. shall serve until their successors are appointed and qualified.

(c) The council shall organize annually at its first meeting to elect a chairperson. Four members of the council shall constitute a quorum.

**(4) Duties of council.** The council shall conduct an analysis of governmental services provided by the political subdivision with which the council is affiliated. In conducting such an analysis, the council shall do all of the following:

(a) Establish specific benchmarks for performance, including goals related to intergovernmental cooperation to provide governmental services.

(b) Conduct research and establish new methods to promote efficiency in the delivery of governmental services.

(c) Identify and recommend collaborative agreements to be developed with other political subdivisions to deliver governmental services.

**(5) Data collection and analysis.** (a) A council may conduct an analysis of a governmental service provided by the political subdivision with which the council is affiliated on its own or after receiving any of the following:

1. A written suggestion regarding delegating a governmental service to a private person.

2. A written complaint that a governmental service provided by the political subdivision is competing with the same or a similar service provided by a private person.

3. A written suggestion by a political subdivision employee or political subdivision employee labor organization to review a governmental service delegated to a private person.

(b) After receiving a suggestion or complaint under par. (a), the council shall meet to decide whether an analysis of the governmental service indicated in the suggestion or complaint is necessary. The council may hold hearings, conduct inquiries, and gather data to make its decision. If the council decides to analyze a governmental service under this paragraph, the council shall do all of the following:

1. Determine the costs of providing the governmental service, including the cost of personnel and capital assets used in providing the service.

2. Determine how often and to what extent the governmental service is provided and the quality of the governmental service provided.

3. Make a cost-benefit determination based on the findings under subds. 1. and 2.

WESTLAW    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

4. Determine whether a private person can provide the governmental service at a cost savings to the political subdivision providing the service and at a quality at least equal to the quality of the service provided by the political subdivision.

5. If the council decides that a governmental service is not suitable for delegating to a private person, determine whether the governmental service should be retained in its present form, modified, or eliminated.

(c) After completing an analysis under par. (b), the council shall make a recommendation to the political subdivision providing the governmental service analyzed under par. (b) and publish the council's recommendation. The recommendation shall specify the recommendation's impact on the political subdivision and the political subdivision's employees.

**(6) Training and assistance.** The board of regents of the University of Wisconsin System shall direct the extension to assist councils created under this section in performing their duties under subs. (4) and (5). The board of regents shall ensure that council members are trained in how to do all of the following:

(a) Conduct an analysis of a governmental service.

(b) Determine ways to improve the efficiency of delivering a governmental service.

(c) Establish, quantify, and monitor performance standards.

(d) Prepare the reports required under sub. (7)(a) and (b).

**(7) Reports.** (a) On or before June 30, 2002, each council shall submit a report to the department describing the council's activities.

(b) On or before June 30, 2003, each council shall submit a final report to the department describing the council's activities and recommendations and the extent to which its recommendations have been adopted by the political subdivision with which the council is affiliated. A report submitted under this paragraph shall provide a detailed explanation of all analyses conducted under subs. (4) and (5).

(c) On or before July 31, 2003, the department shall submit a report concerning the activities and recommendations described in the reports submitted under pars. (a) and (b) to the legislature under s. 13.172(2) and to the governor. The department's report shall describe ways to implement such recommendations statewide.

**Credits**
<<For credits, see Historical Note field.>>

W. S. A. 66.0316, WI ST 66.0316
Current through 2023 Act 272, published April 10, 2024.

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
    Municipalities (Ch. 59 to 68)
        Chapter 66. General Municipality Law (Refs & Annos)
            Subchapter III. Intergovernmental Cooperation

W.S.A. 66.0317

66.0317. Cooperation region

Currentness

**(1) Definitions.** In this section:

(a) "Cooperation region" means a federal standard metropolitan statistical area. For purposes of this section, if only a part of a county is located in a federal standard metropolitan statistical area the entire county is considered to be located in the federal standard metropolitan statistical area.

(b) "Governmental service" has the meaning given in s. 66.0316(1)(e).

(d) "Municipality" means any city, village, or town.

**(2) Area cooperation compacts.** (a)1. Except as provided in subd. 3., beginning in 2003, a municipality shall enter into an area cooperation compact with at least 2 municipalities or counties located in the same cooperation region as the municipality, or with any combination of at least 2 such entities, to perform at least 2 governmental services.

3. A municipality that is not adjacent to at least 2 other municipalities located in the same cooperation region as the municipality may enter into a cooperation compact with any adjacent municipality or with the county in which the municipality is located to perform the number of governmental services as specified under subd. 1.

(b) An area cooperation compact shall provide a plan for any municipalities or counties that enter into the compact to collaborate to provide governmental services. The compact shall provide benchmarks to measure the plan's progress and provide outcome-based performance measures to evaluate the plan's success. Municipalities and counties that enter into the compact shall structure the compact in a way that results in significant tax savings to taxpayers within those municipalities and counties.

**Credits**
<<For credits, see Historical Note field.>>

W. S. A. 66.0317, WI ST 66.0317
Current through 2023 Act 272, published April 10, 2024.

---

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

---

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated

Municipalities (Ch. 59 to 68)

Chapter 66. General Municipality Law (Refs & Annos)

Subchapter III. Intergovernmental Cooperation

W.S.A. 66.032

66.032. Renumbered 66.0403 and amended by 1999 Act 150, § 82, eff. Jan. 1, 2001

Currentness

**Credits**

<<For credits, see Historical Note field.>>

W. S. A. 66.032, WI ST 66.032
Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:24-cv-00228-Z    Document 50-1    Filed 01/17/25    Page 520 of 882    PageID 49305

KeyCite Red Flag - Severe Negative Treatment

KeyCite Red Flag Negative Treatment   66.033.    Renumbered in part and repealed in part by 1999 Act 150, §§ 83, 84, eff. Jan. 1, 2001

West's Wisconsin Statutes Annotated

   Municipalities (Ch. 59 to 68)

      Chapter 66. General Municipality Law (Refs & Annos)

         Subchapter III. Intergovernmental Cooperation

W.S.A. 66.033

66.033. Renumbered in part and repealed in part by 1999 Act 150, §§ 83, 84, eff. Jan. 1, 2001

Currentness

**Credits**

<<For credits, see Historical Note field.>>

W. S. A. 66.033, WI ST 66.033

Current through 2023 Act 272, published April 10, 2024.

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:24-cv-00228-Z    Document 50-1    Filed 01/17/25    Page 521 of 882    PageID 49306

West's Wisconsin Statutes Annotated
  Municipalities (Ch. 59 to 68)
    Chapter 66. General Municipality Law (Refs & Annos)
      Subchapter III. Intergovernmental Cooperation

W.S.A. 66.034

66.034. Renumbered 66.1027 by 1999 Act 150, § 85, eff. Jan. 1, 2001

Currentness

**Credits**

<<For credits, see Historical Note field.>>

W. S. A. 66.034, WI ST 66.034
Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

66.035. Repealed by 1999 Act 150, § 86, eff. Jan. 1, 2001, WI ST 66.035

Case 2:24-cv-00228-Z    Document 50-1    Filed 01/17/25    Page 522 of 882    PageID 49307

KeyCite Red Flag - Severe Negative Treatment

KeyCite Red Flag Negative Treatment  66.035.   Repealed by 1999 Act 150, §  86, eff. Jan. 1, 2001

West's Wisconsin Statutes Annotated
    Municipalities (Ch. 59 to 68)
        Chapter 66. General Municipality Law (Refs & Annos)
            Subchapter III. Intergovernmental Cooperation

W.S.A. 66.035

66.035. Repealed by 1999 Act 150, § 86, eff. Jan. 1, 2001

Currentness

**Credits**

<<For credits, see Historical Note field.>>

W. S. A. 66.035, WI ST 66.035

Current through 2023 Act 272, published April 10, 2024.

**End of Document**                                            © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:24-cv-00228-Z    Document 50-1    Filed 01/17/25    Page 523 of 882    PageID 49308

West's Wisconsin Statutes Annotated
    Municipalities (Ch. 59 to 68)
        Chapter 66. General Municipality Law (Refs & Annos)
            Subchapter III. Intergovernmental Cooperation

W.S.A. 66.036

66.036. Renumbered 145.195 by 1999 Act 150, § 87, eff. Jan. 1, 2001

Currentness

**Credits**

<<For credits, see Historical Note field.>>

W. S. A. 66.036, WI ST 66.036
Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**                                      © 2025 Thomson Reuters. No claim to original U.S. Government Works.

66.037. Renumbered 66.1111 by 1999 Act 150, § 88, eff. Jan. 1, 2001, WI ST 66.037

Case 2:24-cv-00228-Z    Document 50-1    Filed 01/17/25    Page 524 of 882    PageID 49309

West's Wisconsin Statutes Annotated
  Municipalities (Ch. 59 to 68)
    Chapter 66. General Municipality Law (Refs & Annos)
      Subchapter III. Intergovernmental Cooperation

W.S.A. 66.037

66.037. Renumbered 66.1111 by 1999 Act 150, § 88, eff. Jan. 1, 2001

Currentness

**Credits**

<<For credits, see Historical Note field.>>

W. S. A. 66.037, WI ST 66.037
Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**
© 2025 Thomson Reuters. No claim to original U.S. Government Works.

66.038. Repealed by 1997 Act 252, § 90, eff. June 19, 1998, WI ST 66.038

Case 2:24-cv-00228-Z    Document 50-1    Filed 01/17/25    Page 525 of 882    PageID 49310

KeyCite Red Flag - Severe Negative Treatment

KeyCite Red Flag Negative Treatment  66.038.    Repealed by 1997 Act 252, §  90, eff. June 19, 1998

West's Wisconsin Statutes Annotated
    Municipalities (Ch. 59 to 68)
        Chapter 66. General Municipality Law (Refs & Annos)
            Subchapter III. Intergovernmental Cooperation

W.S.A. 66.038.

66.038. Repealed by 1997 Act 252, § 90, eff. June 19, 1998

Currentness

**Credits**

<<For credits, see Historical Note field.>>

W. S. A. 66.038., WI ST 66.038.
Current through 2023 Act 272, published April 10, 2024.

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Red Flag - Severe Negative Treatment

KeyCite Red Flag Negative Treatment  66.04.   Renumbered in part and repealed in part by 1999 Act 150, §§  89 to 95, eff. Jan. 1, 2001;  1999 Act 186, § 43, eff. Jan. 1, 2001;  2001 Act 30, §  25, eff. Dec. 14, 2001

West's Wisconsin Statutes Annotated
  Municipalities (Ch. 59 to 68)
    Chapter 66. General Municipality Law (Refs & Annos)
      Subchapter III. Intergovernmental Cooperation

W.S.A. 66.04

66.04. Renumbered in part and repealed in part by 1999 Act 150, §§ 89 to 95, eff. Jan. 1, 2001; 1999 Act 186, § 43, eff. Jan. 1, 2001; 2001 Act 30, § 25, eff. Dec. 14, 2001

Currentness

**Credits**

<<For credits, see Historical Note field.>>

W. S. A. 66.04, WI ST 66.04
Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

West's Wisconsin Statutes Annotated
    Municipalities (Ch. 59 to 68)
        Chapter 66. General Municipality Law (Refs & Annos)
            Subchapter IV. Regulation

W.S.A. 66.0401

66.0401. Regulation relating to solar and wind energy systems

Currentness

**(1e) Definitions.** In this section:

(a) "Application for approval" means an application for approval of a wind energy system under rules promulgated by the commission under s. 196.378(4g)(c)1.

(b) "Commission" means the public service commission.

(c) "Political subdivision" means a city, village, town, or county.

(d) "Wind energy system" has the meaning given in s. 66.0403(1)(m).

**(1m) Authority to restrict systems limited.** No political subdivision may place any restriction, either directly or in effect, on the installation or use of a wind energy system that is more restrictive than the rules promulgated by the commission under s. 196.378(4g)(b). No political subdivision may place any restriction, either directly or in effect, on the installation or use of a solar energy system, as defined in s. 13.48(2)(h)1.g., or a wind energy system, unless the restriction satisfies one of the following conditions:

(a) Serves to preserve or protect the public health or safety.

(b) Does not significantly increase the cost of the system or significantly decrease its efficiency.

(c) Allows for an alternative system of comparable cost and efficiency.

**(2) Authority to require trimming of blocking vegetation.** Subject to sub. (6)(a), a political subdivision may enact an ordinance relating to the trimming of vegetation that blocks solar energy, as defined in s. 66.0403(1)(k), from a collector surface, as defined under s. 700.41(2)(b), or that blocks wind from a wind energy system. The ordinance may include a designation of

responsibility for the costs of the trimming. The ordinance may not require the trimming of vegetation that was planted by the owner or occupant of the property on which the vegetation is located before the installation of the solar or wind energy system.

**(3) Testing activities.** A political subdivision may not prohibit or restrict any person from conducting testing activities to determine the suitability of a site for the placement of a wind energy system. A political subdivision objecting to such testing may petition the commission to impose reasonable restrictions on the testing activity.

**(4) Local procedure.** (a)1. Subject to subd. 2., a political subdivision that receives an application for approval shall determine whether it is complete and, no later than 45 days after the application is filed, notify the applicant about the determination. As soon as possible after receiving the application for approval, the political subdivision shall publish a class 1 notice, under ch. 985, stating that an application for approval has been filed with the political subdivision. If the political subdivision determines that the application is incomplete, the notice shall state the reason for the determination. An applicant may supplement and refile an application that the political subdivision has determined to be incomplete. There is no limit on the number of times that an applicant may refile an application for approval. If the political subdivision fails to determine whether an application for approval is complete within 45 days after the application is filed, the application shall be considered to be complete.

2. If a political subdivision that receives an application for approval under subd. 1. does not have in effect an ordinance described under par. (g), the 45-day time period for determining whether an application is complete, as described in subd. 1., does not begin until the first day of the 4th month beginning after the political subdivision receives the application. A political subdivision may notify an applicant at any time, after receipt of the application and before the first day of the 4th month after its receipt, that it does not intend to enact an ordinance described under par. (g).

3. On the same day that an applicant makes an application for approval under subd. 1. for a wind energy system, the applicant shall mail or deliver written notice of the application to the owners of land adjoining the site of the wind energy system.

4. A political subdivision may not consider an applicant's minor modification to the application to constitute a new application for the purposes of this subsection.

(b) A political subdivision shall make a record of its decision making on an application for approval, including a recording of any public hearing, copies of documents submitted at any public hearing, and copies of any other documents provided to the political subdivision in connection with the application for approval. The political subdivision's record shall conform to the commission's rules promulgated under s. 196.378(4g)(c)2.

(c) A political subdivision shall base its decision on an application for approval on written findings of fact that are supported by the evidence in the record under par. (b). A political subdivision's procedure for reviewing the application for approval shall conform to the commission's rules promulgated under s. 196.378(4g)(c)3.

(d) Except as provided in par. (e), a political subdivision shall approve or disapprove an application for approval no later than 90 days after the day on which it notifies the applicant that the application for approval is complete. If a political subdivision fails to act within the 90 days, or within any extended time period established under par. (e), the application is considered approved.

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.   2

(e) A political subdivision may extend the time period in par. (d) if, within that 90-day period, the political subdivision authorizes the extension in writing. Any combination of the following extensions may be granted, except that the total amount of time for all extensions granted under this paragraph may not exceed 90 days:

1. An extension of up to 45 days if the political subdivision needs additional information to determine whether to approve or deny the application for approval.

2. An extension of up to 90 days if the applicant makes a material modification to the application for approval.

3. An extension of up to 90 days for other good cause specified in writing by the political subdivision.

(f)1. Except as provided in subd. 2., a political subdivision may not deny or impose a restriction on an application for approval unless the political subdivision enacts an ordinance that is no more restrictive than the rules the commission promulgates under s. 196.378(4g)(b).

2. A political subdivision may deny an application for approval if the proposed site of the wind energy system is in an area primarily designated for future residential or commercial development, as shown in a map that is adopted, as part of a comprehensive plan, under s. 66.1001(2)(b) and (f), before June 2, 2009, or as shown in such maps after December 31, 2015, as part of a comprehensive plan that is updated as required under s. 66.1001(2)(i). This subdivision applies to a wind energy system that has a nominal capacity of at least one megawatt.

(g) A political subdivision that chooses to regulate wind energy systems shall enact an ordinance, subject to sub. (6)(b), that is no more restrictive than the applicable standards established by the commission in rules promulgated under s. 196.378(4g).

**(5) Public service commission review.** (a) A decision of a political subdivision to determine that an application is incomplete under sub. (4)(a)1., or to approve, disapprove, or impose a restriction upon a wind energy system, or an action of a political subdivision to enforce a restriction on a wind energy system, may be appealed only as provided in this subsection.

(b)1. Any aggrieved person seeking to appeal a decision or enforcement action specified in par. (a) may begin the political subdivision's administrative review process. If the person is still aggrieved after the administrative review is completed, the person may file an appeal with the commission. No appeal to the commission under this subdivision may be filed later than 30 days after the political subdivision has completed its administrative review process. For purposes of this subdivision, if a political subdivision fails to complete its administrative review process within 90 days after an aggrieved person begins the review process, the political subdivision is considered to have completed the process on the 90th day after the person began the process.

2. Rather than beginning an administrative review under subd. 1., an aggrieved person seeking to appeal a decision or enforcement action of a political subdivision specified in par. (a) may file an appeal directly with the commission. No appeal to the commission under this subdivision may be filed later than 30 days after the decision or initiation of the enforcement action.

WESTLAW    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:24-cv-00228-Z    Document 50-1    Filed 01/17/25    Page 530 of 882    PageID 49315

3. An applicant whose application for approval is denied under sub. (4)(f)2. may appeal the denial to the commission. The commission may grant the appeal notwithstanding the inconsistency of the application for approval with the political subdivision's planned residential or commercial development if the commission determines that granting the appeal is consistent with the public interest.

(c) Upon receiving an appeal under par. (b), the commission shall notify the political subdivision. The political subdivision shall provide a certified copy of the record upon which it based its decision or enforcement action within 30 days after receiving notice. The commission may request of the political subdivision any other relevant governmental records and, if requested, the political subdivision shall provide such records within 30 days after receiving the request.

(d) The commission may confine its review to the records it receives from the political subdivision or, if it finds that additional information would be relevant to its decision, expand the records it reviews. The commission shall issue a decision within 90 days after the date on which it receives all of the records it requests under par. (c), unless for good cause the commission extends this time period in writing. If the commission determines that the political subdivision's decision or enforcement action does not comply with the rules it promulgates under s. 196.378(4g) or is otherwise unreasonable, the political subdivision's decision shall be superseded by the commission's decision and the commission may order an appropriate remedy.

(e) In conducting a review under par. (d), the commission may treat a political subdivision's determination that an application under sub. (4)(a)1. is incomplete as a decision to disapprove the application if the commission determines that a political subdivision has unreasonably withheld its determination that an application is complete.

(f) Judicial review is not available until the commission issues its decision or order under par. (d). Judicial review shall be of the commission's decision or order, not of the political subdivision's decision or enforcement action. The commission's decision or order is subject to judicial review under ch. 227. Injunctive relief is available only as provided in s. 196.43.

**(6) Applicability of a political subdivision or county ordinance.** (a)1. A county ordinance enacted under sub. (2) applies only to the towns in the county that have not enacted an ordinance under sub. (2).

2. If a town enacts an ordinance under sub. (2) after a county has enacted an ordinance under sub. (2), the county ordinance does not apply, and may not be enforced, in the town, except that if the town later repeals its ordinance, the county ordinance applies in that town.

(b)1. Subject to subd. 2., a county ordinance enacted under sub. (4) applies only in the unincorporated parts of the county.

2. If a town enacts an ordinance under sub. (4), either before or after a county enacts an ordinance under sub. (4), the more restrictive terms of the 2 ordinances apply to the town, except that if the town later repeals its ordinance, the county ordinance applies in that town.

(c) If a political subdivision enacts an ordinance under sub. (4)(g) after the commission's rules promulgated under s. 196.378(4g) take effect, the political subdivision may not apply that ordinance to, or require approvals under that ordinance for, a wind energy system approved by the political subdivision under a previous ordinance or under a development agreement.

**Credits**

<<For credits, see Historical Note field.>>


Notes of Decisions (4)


W. S. A. 66.0401, WI ST 66.0401

Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**                          © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
   Municipalities (Ch. 59 to 68)
      Chapter 66. General Municipality Law (Refs & Annos)
         Subchapter IV. Regulation

W.S.A. 66.0403

66.0403. Solar and wind access permits

Currentness

**(1) Definitions.** In this section:

(a) "Agency" means the governing body of a municipality which has provided for granting a permit or the agency which the governing body of a municipality creates or designates under sub. (2). "Agency" includes an officer or employee of the municipality.

(b) "Applicant" means an owner applying for a permit under this section.

(c) "Application" means an application for a permit under this section.

(d) "Collector surface" means any part of a solar collector that absorbs solar energy for use in the collector's energy transformation process. "Collector surface" does not include frames, supports and mounting hardware.

(e) "Collector use period" means 9 a.m. to 3 p.m. standard time daily.

(f) "Impermissible interference" means the blockage of wind from a wind energy system or solar energy from a collector surface or proposed collector surface for which a permit has been granted under this section during a collector use period if such blockage is by any structure or vegetation on property, an owner of which was notified under sub. (3)(b). "Impermissible interference" does not include:

1. Blockage by a narrow protrusion, including but not limited to a pole or wire, which does not substantially interfere with absorption of solar energy by a solar collector or does not substantially block wind from a wind energy system.

2. Blockage by any structure constructed, under construction or for which a building permit has been applied for before the date the last notice is mailed or delivered under sub. (3)(b).

3. Blockage by any vegetation planted before the date the last notice is mailed or delivered under sub. (3)(b) unless a municipality by ordinance under sub. (2) defines impermissible interference to include such vegetation.

(g) "Municipality" means any county with a zoning ordinance under s. 59.69, any town with a zoning ordinance under s. 60.61, any city with a zoning ordinance under s. 62.23(7), any 1st class city or any village with a zoning ordinance under s. 61.35.

(h) "Owner" means at least one owner, as defined under s. 66.0217(1)(d), of a property or the personal representative of at least one owner.

(i) "Permit" means a solar access permit or a wind access permit issued under this section.

(j) "Solar collector" means a device, structure or a part of a device or structure a substantial purpose of which is to transform solar energy into thermal, mechanical, chemical or electrical energy.

(k) "Solar energy" means direct radiant energy received from the sun.

(L) "Standard time" means the solar time of the ninetieth meridian west of Greenwich.

(m) "Wind energy system" means equipment and associated facilities that convert and then store or transfer energy from the wind into usable forms of energy.

**(2) Permit procedure.** The governing body of every municipality may provide for granting a permit. A permit may not affect any land except land which, at the time the permit is granted, is within the territorial limits of the municipality or is subject to an extraterritorial zoning ordinance adopted under s. 62.23(7a), except that a permit issued by a city or village may not affect extraterritorial land subject to a zoning ordinance adopted by a county or a town. The governing body may appoint itself as the agency to process applications or may create or designate another agency to grant permits. The governing body may provide by ordinance that a fee be charged to cover the costs of processing applications. The governing body may adopt an ordinance with any provision it deems necessary for granting a permit under this section, including but not limited to:

(a) Specifying standards for agency determinations under sub. (5)(a).

(b) Defining an impermissible interference to include vegetation planted before the date the last notice is mailed or delivered under sub. (3)(b), provided that the permit holder shall be responsible for the cost of trimming such vegetation.

**(3) Permit applications.** (a) In a municipality which provides for granting a permit under this section, an owner who has installed or intends to install a solar collector or wind energy system may apply to an agency for a permit.

(b) An agency shall determine if an application is satisfactorily completed and shall notify the applicant of its determination. If an applicant receives notice that an application has been satisfactorily completed, the applicant shall deliver by certified mail or by hand a notice to the owner of any property which the applicant proposes to be restricted by the permit under sub. (7). The applicant shall submit to the agency a copy of a signed receipt for every notice delivered under this paragraph. The agency shall supply the notice form. The information on the form may include, without limitation because of enumeration:

1. The name and address of the applicant, and the address of the land upon which the solar collector or wind energy system is or will be located.

2. That an application has been filed by the applicant.

3. That the permit, if granted, may affect the rights of the notified owner to develop his or her property and to plant vegetation.

4. The telephone number, address and office hours of the agency.

5. That any person may request a hearing under sub. (4) within 30 days after receipt of the notice, and the address and procedure for filing the request.

**(4) Hearing.** Within 30 days after receipt of the notice under sub. (3)(b), any person who has received a notice may file a request for a hearing on the granting of a permit or the agency may determine that a hearing is necessary even if no such request is filed. If a request is filed or if the agency determines that a hearing is necessary, the agency shall conduct a hearing on the application within 90 days after the last notice is delivered. At least 30 days prior to the hearing date, the agency shall notify the applicant, all owners notified under sub. (3)(b) and any other person filing a request of the time and place of the hearing.

**(5) Permit grant.** (a) The agency shall grant a permit if the agency determines that:

1. The granting of a permit will not unreasonably interfere with the orderly land use and development plans of the municipality;

2. No person has demonstrated that she or he has present plans to build a structure that would create an impermissible interference by showing that she or he has applied for a building permit prior to receipt of a notice under sub. (3)(b), has expended at least $500 on planning or designing such a structure or by submitting any other credible evidence that she or he has made substantial progress toward planning or constructing a structure that would create an impermissible interference; and

3. The benefits to the applicant and the public will exceed any burdens.

(b) An agency may grant a permit subject to any condition or exemption the agency deems necessary to minimize the possibility that the future development of nearby property will create an impermissible interference or to minimize any other burden on any person affected by granting the permit. Such conditions or exemptions may include but are not limited to restrictions on the location of the solar collector or wind energy system and requirements for the compensation of persons affected by the granting of the permit.

**(6) Record of permit.** If an agency grants a permit:

(a) The agency shall specify the property restricted by the permit under sub. (7) and shall prepare notice of the granting of the permit. The notice shall include the identification required under s. 706.05(2)(c) for the owner and the property upon which the solar collector or wind energy system is or will be located and for any owner and property restricted by the permit under

sub. (7), and shall indicate that the property may not be developed and vegetation may not be planted on the property so as to create an impermissible interference with the solar collector or wind energy system which is the subject of the permit unless the permit affecting the property is terminated under sub. (9) or unless an agreement affecting the property is filed under sub. (10).

(b) The applicant shall record with the register of deeds of the county in which the property is located the notice under par. (a) for each property specified under par. (a) and for the property upon which the solar collector or wind energy system is or will be located.

**(7) Remedies for impermissible interference.** (a) Any person who uses property which he or she owns or permits any other person to use the property in a way which creates an impermissible interference under a permit which has been granted or which is the subject of an application shall be liable to the permit holder or applicant for damages, except as provided under par. (b), for any loss due to the impermissible interference, court costs and reasonable attorney fees unless:

1. The building permit was applied for prior to receipt of a notice under sub. (3)(b) or the agency determines not to grant a permit after a hearing under sub. (4).

2. A permit affecting the property is terminated under sub. (9).

3. An agreement affecting the property is filed under sub. (10).

(b) A permit holder is entitled to an injunction to require the trimming of any vegetation which creates or would create an impermissible interference as defined under sub. (1)(f). If the court finds on behalf of the permit holder, the permit holder shall be entitled to a permanent injunction, damages, court costs and reasonable attorney fees.

**(8) Appeals.** Any person aggrieved by a determination by a municipality under this section may appeal the determination to the circuit court for a review.

**(9) Termination of solar or wind access rights.** (a) Any right protected by a permit under this section shall terminate if the agency determines that the solar collector or wind energy system which is the subject of the permit is:

1. Permanently removed or is not used for 2 consecutive years, excluding time spent on repairs or improvements.

2. Not installed and functioning within 2 years after the date of issuance of the permit.

(b) The agency shall give the permit holder written notice and an opportunity for a hearing on a proposed termination under par. (a).

(c) If the agency terminates a permit, the agency may charge the permit holder for the cost of recording and record a notice of termination with the register of deeds, who shall record the notice with the notice recorded under sub. (6)(b) or indicate on any notice recorded under sub. (6)(b) that the permit has been terminated.

**(10) Waiver.** A permit holder by written agreement may waive all or part of any right protected by a permit. A copy of such agreement shall be recorded with the register of deeds, who shall record such copy with the notice recorded under sub. (6)(b).

**(11) Preservation of rights.** The transfer of title to any property shall not change the rights and duties under this section or under an ordinance adopted under sub. (2).

**(12) Construction.** (a) This section may not be construed to require that an owner obtain a permit prior to installing a solar collector or wind energy system.

(b) This section may not be construed to mean that acquisition of a renewable energy resource easement under s. 700.35 is in any way contingent upon the granting of a permit under this section.

**Credits**

<<For credits, see Historical Note field.>>

Notes of Decisions (3)

W. S. A. 66.0403, WI ST 66.0403
Current through 2023 Act 272, published April 10, 2024.

End of Document                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
  Municipalities (Ch. 59 to 68)
    Chapter 66. General Municipality Law (Refs & Annos)
      Subchapter IV. Regulation

W.S.A. 66.0404

66.0404. Mobile tower siting regulations

Currentness

**(1) Definitions.** In this section:

(a) "Antenna" means communications equipment that transmits and receives electromagnetic radio signals and is used in the provision of mobile services.

(b) "Application" means an application for a permit under this section to engage in an activity specified in sub. (2)(a) or a class 2 collocation.

(c) "Building permit" means a permit issued by a political subdivision that authorizes an applicant to conduct construction activity that is consistent with the political subdivision's building code.

(d) "Class 1 collocation" means the placement of a new mobile service facility on an existing support structure such that the owner of the facility does not need to construct a free standing support structure for the facility but does need to engage in substantial modification.

(e) "Class 2 collocation" means the placement of a new mobile service facility on an existing support structure such that the owner of the facility does not need to construct a free standing support structure for the facility or engage in substantial modification.

(f) "Collocation" means class 1 or class 2 collocation or both.

(g) "Distributed antenna system" means a network of spatially separated antenna nodes that is connected to a common source via a transport medium and that provides mobile service within a geographic area or structure.

(h) "Equipment compound" means an area surrounding or adjacent to the base of an existing support structure within which is located mobile service facilities.

(i) "Existing structure" means a support structure that exists at the time a request for permission to place mobile service facilities on a support structure is filed with a political subdivision.

(j) "Fall zone" means the area over which a mobile support structure is designed to collapse.

(k) "Mobile service" has the meaning given in 47 USC 153 (33).

(L) "Mobile service facility" means the set of equipment and network components, including antennas, transmitters, receivers, base stations, power supplies, cabling, and associated equipment, that is necessary to provide mobile service to a discrete geographic area, but does not include the underlying support structure.

(m) "Mobile service provider" means a person who provides mobile service.

(n) "Mobile service support structure" means a freestanding structure that is designed to support a mobile service facility.

(o) "Permit" means a permit, other than a building permit, or approval issued by a political subdivision which authorizes any of the following activities by an applicant:

1. A class 1 collocation.

2. A class 2 collocation.

3. The construction of a mobile service support structure.

(p) "Political subdivision" means a city, village, town, or county.

(q) "Public utility" has the meaning given in s. 196.01 (5).

(r) "Search ring" means a shape drawn on a map to indicate the general area within which a mobile service support structure should be located to meet radio frequency engineering requirements, taking into account other factors including topography and the demographics of the service area.

(s) "Substantial modification" means the modification of a mobile service support structure, including the mounting of an antenna on such a structure, that does any of the following:

1. For structures with an overall height of 200 feet or less, increases the overall height of the structure by more than 20 feet.

2. For structures with an overall height of more than 200 feet, increases the overall height of the structure by 10 percent or more.

3. Measured at the level of the appurtenance added to the structure as a result of the modification, increases the width of the support structure by 20 feet or more, unless a larger area is necessary for collocation.

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

4. Increases the square footage of an existing equipment compound to a total area of more than 2,500 square feet.

(t) "Support structure" means an existing or new structure that supports or can support a mobile service facility, including a mobile service support structure, utility pole, water tower, building, or other structure.

(u) "Utility pole" means a structure owned or operated by an alternative telecommunications utility, as defined in s. 196.01(1d); public utility, as defined in s. 196.01(5); telecommunications utility, as defined in s. 196.01(10); political subdivision; or cooperative association organized under ch. 185; and that is designed specifically for and used to carry lines, cables, or wires for telecommunications service, as defined in s. 182.017(1g)(cq); for video service, as defined in s. 66.0420(2)(y); for electricity; or to provide light.

**(2) New construction or substantial modification of facilities and support structures.** (a) Subject to the provisions and limitations of this section, a political subdivision may enact a zoning ordinance under s. 59.69, 60.61, or 62.23 to regulate any of the following activities:

1. The siting and construction of a new mobile service support structure and facilities.

2. With regard to a class 1 collocation, the substantial modification of an existing support structure and mobile service facilities.

(b) If a political subdivision regulates an activity described under par. (a), the regulation shall prescribe the application process which a person must complete to engage in the siting, construction, or modification activities described in par. (a). The application shall be in writing and shall contain all of the following information:

1. The name and business address of, and the contact individual for, the applicant.

2. The location of the proposed or affected support structure.

3. The location of the proposed mobile service facility.

4. If the application is to substantially modify an existing support structure, a construction plan which describes the proposed modifications to the support structure and the equipment and network components, including antennas, transmitters, receivers, base stations, power supplies, cabling, and related equipment associated with the proposed modifications.

5. If the application is to construct a new mobile service support structure, a construction plan which describes the proposed mobile service support structure and the equipment and network components, including antennas, transmitters, receivers, base stations, power supplies, cabling, and related equipment to be placed on or around the new mobile service support structure.

6. If an application is to construct a new mobile service support structure, an explanation as to why the applicant chose the proposed location and why the applicant did not choose collocation, including a sworn statement from an individual who

has responsibility over the placement of the mobile service support structure attesting that collocation within the applicant's search ring would not result in the same mobile service functionality, coverage, and capacity; is technically infeasible; or is economically burdensome to the mobile service provider.

(c) If an applicant submits to a political subdivision an application for a permit to engage in an activity described under par. (a), which contains all of the information required under par. (b), the political subdivision shall consider the application complete. If the political subdivision does not believe that the application is complete, the political subdivision shall notify the applicant in writing, within 10 days of receiving the application, that the application is not complete. The written notification shall specify in detail the required information that was incomplete. An applicant may resubmit an application as often as necessary until it is complete.

(d) Within 90 days of its receipt of a complete application, a political subdivision shall complete all of the following or the applicant may consider the application approved, except that the applicant and the political subdivision may agree in writing to an extension of the 90 day period:

1. Review the application to determine whether it complies with all applicable aspects of the political subdivision's building code and, subject to the limitations in this section, zoning ordinances.

2. Make a final decision whether to approve or disapprove the application.

3. Notify the applicant, in writing, of its final decision.

4. If the decision is to disapprove the application, include with the written notification substantial evidence which supports the decision.

(e) A political subdivision may disapprove an application if an applicant refuses to evaluate the feasibility of collocation within the applicant's search ring and provide the sworn statement described under par. (b)6.

(f) A party who is aggrieved by the final decision of a political subdivision under par. (d)2. may bring an action in the circuit court of the county in which the proposed activity, which is the subject of the application, is to be located.

(g) If an applicant provides a political subdivision with an engineering certification showing that a mobile service support structure, or an existing structure, is designed to collapse within a smaller area than the setback or fall zone area required in a zoning ordinance, that zoning ordinance does not apply to such a structure unless the political subdivision provides the applicant with substantial evidence that the engineering certification is flawed.

(h) A political subdivision may regulate the activities described under par. (a) only as provided in this section.

(i) If a political subdivision has in effect on July 2, 2013, an ordinance that applies to the activities described under par. (a) and the ordinance is inconsistent with this section, the ordinance does not apply to, and may not be enforced against, the activity.

**(3) Collocation on existing support structures.** (a) 1. A class 2 collocation is a permitted use under ss. 59.69, 60.61, and 62.23.

2. If a political subdivision has in effect on July 2, 2013, an ordinance that applies to a class 2 collocation and the ordinance is inconsistent with this section, the ordinance does not apply to, and may not be enforced against, the class 2 collocation.

3. A political subdivision may regulate a class 2 collocation only as provided in this section.

4. A class 2 collocation is subject to the same requirements for the issuance of a building permit to which any other type of commercial development or land use development is subject.

(b) If an applicant submits to a political subdivision an application for a permit to engage in a class 2 collocation, the application shall contain all of the information required under sub. (2)(b)1. to 3., in which case the political subdivision shall consider the application complete. If any of the required information is not in the application, the political subdivision shall notify the applicant in writing, within 5 days of receiving the application, that the application is not complete. The written notification shall specify in detail the required information that was incomplete. An applicant may resubmit an application as often as necessary until it is complete.

(c) Within 45 days of its receipt of a complete application, a political subdivision shall complete all of the following or the applicant may consider the application approved, except that the applicant and the political subdivision may agree in writing to an extension of the 45 day period:

1. Make a final decision whether to approve or disapprove the application.

2. Notify the applicant, in writing, of its final decision.

3. If the application is approved, issue the applicant the relevant permit.

4. If the decision is to disapprove the application, include with the written notification substantial evidence which supports the decision.

(d) A party who is aggrieved by the final decision of a political subdivision under par. (c)1. may bring an action in the circuit court of the county in which the proposed activity, which is the subject of the application, is to be located.

**(4) Limitations.** With regard to an activity described in sub. (2)(a) or a class 2 collocation, a political subdivision may not do any of the following:

(a) Impose environmental testing, sampling, or monitoring requirements, or other compliance measures for radio frequency emissions, on mobile service facilities or mobile radio service providers.

(b) Enact an ordinance imposing a moratorium on the permitting, construction, or approval of any such activities.

(c) Enact an ordinance prohibiting the placement of a mobile service support structure in particular locations within the political subdivision.

(d) Charge a mobile radio service provider a fee in excess of one of the following amounts:

1. For a permit for a class 2 collocation, the lesser of $500 or the amount charged by a political subdivision for a building permit for any other type of commercial development or land use development.

2. For a permit for an activity described in sub. (2)(a), $3,000.

(e) Charge a mobile radio service provider any recurring fee for an activity described in sub. (2)(a) or a class 2 collocation.

(f) Permit 3rd party consultants to charge the applicant for any travel expenses incurred in the consultant's review of mobile service permits or applications.

(g) Disapprove an application to conduct an activity described under sub. (2)(a) based solely on aesthetic concerns.

(gm) Disapprove an application to conduct a class 2 collocation on aesthetic concerns.

(h) Enact or enforce an ordinance related to radio frequency signal strength or the adequacy of mobile service quality.

(i) Impose a surety requirement, unless the requirement is competitively neutral, nondiscriminatory, and commensurate with the historical record for surety requirements for other facilities and structures in the political subdivision which fall into disuse. There is a rebuttable presumption that a surety requirement of $20,000 or less complies with this paragraph.

(j) Prohibit the placement of emergency power systems.

(k) Require that a mobile service support structure be placed on property owned by the political subdivision.

(L) Disapprove an application based solely on the height of the mobile service support structure or on whether the structure requires lighting.

(m) Condition approval of such activities on the agreement of the structure or mobile service facility owner to provide space on or near the structure for the use of or by the political subdivision at less than the market rate, or to provide the political subdivision other services via the structure or facilities at less than the market rate.

WESTLAW  © 2025 Thomson Reuters. No claim to original U.S. Government Works.

(n) Limit the duration of any permit that is granted.

(o) Require an applicant to construct a distributed antenna system instead of either constructing a new mobile service support structure or engaging in collocation.

(p) Disapprove an application based on an assessment by the political subdivision of the suitability of other locations for conducting the activity.

(q) Require that a mobile service support structure, existing structure, or mobile service facilities have or be connected to backup battery power.

(r) Impose a setback or fall zone requirement for a mobile service support structure that is different from a requirement that is imposed on other types of commercial structures.

(s) Consider an activity a substantial modification under sub. (1)(s)1. or 2. if a greater height is necessary to avoid interference with an existing antenna.

(t) Consider an activity a substantial modification under sub. (1)(s)3. if a greater protrusion is necessary to shelter the antenna from inclement weather or to connect the antenna to the existing structure by cable.

(u) Limit the height of a mobile service support structure to under 200 feet.

(v) Condition the approval of an application on, or otherwise require, the applicant's agreement to indemnify or insure the political subdivision in connection with the political subdivision's exercise of its authority to approve the application.

(w) Condition the approval of an application on, or otherwise require, the applicant's agreement to permit the political subdivision to place at or collocate with the applicant's support structure any mobile service facilities provided or operated by, whether in whole or in part, a political subdivision or an entity in which a political subdivision has a governance, competitive, economic, financial or other interest.

**(4e) Setback requirements.** (a) Notwithstanding sub. (4)(r), and subject to the provisions of this subsection, a political subdivision may enact an ordinance imposing setback requirements related to the placement of a mobile service support structure that applies to new construction or the substantial modification of facilities and support structures, as described in sub. (2).

(b) A setback requirement may apply only to a mobile service support structure that is constructed on or adjacent to a parcel of land that is subject to a zoning ordinance that permits single-family residential use on that parcel. A setback requirement does not apply to an existing or new utility pole, or wireless support structure in a right-of-way that supports a small wireless facility, if the pole or facility meets the height limitations in s. 66.0414(2)(e)2. and 3.

(c) The setback requirement under par. (b) for a mobile service support structure on a parcel shall be measured from the lot lines of other adjacent and nonadjacent parcels for which single-family residential use is a permitted use under a zoning ordinance.

(d) A setback requirement must be based on the height of the proposed mobile service support structure, and the setback requirement may not be a distance that is greater than the height of the proposed structure.

**(5) Applicability.** If a county enacts an ordinance as described under sub. (2) the ordinance applies only in the unincorporated parts of the county, except that if a town enacts an ordinance as described under sub. (2) after a county has so acted, the county ordinance does not apply, and may not be enforced, in the town, except that if the town later repeals its ordinance, the county ordinance applies in that town.

**Credits**

<<For credits, see Historical Note field.>>

Notes of Decisions (10)

W. S. A. 66.0404, WI ST 66.0404

Current through 2023 Act 272, published April 10, 2024.

---

       © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
  Municipalities (Ch. 59 to 68)
    Chapter 66. General Municipality Law (Refs & Annos)
      Subchapter IV. Regulation

W.S.A. 66.0405

66.0405. Removal of rubbish

Currentness

Cities, villages and towns may remove ashes, garbage, and rubbish from such classes of places in the city, village or town as the board or council directs. The removal may be from all of the places or from those whose owners or occupants desire the service. Districts may be created and removal provided for certain districts only, and different regulations may be applied to each removal district or class of property. The cost of removal may be funded by special assessment against the property served, by general tax upon the property of the respective districts, or by general tax upon the property of the city, village or town. If a city, village or town contracts for ash, garbage or rubbish removal service, it may contract with one or more service providers.

**Credits**

<<For credits, see Historical Note field.>>

**Editors' Notes**

**COMMENTS--1999 ACT 150, § 119**

Note: Amended to expressly authorize contracting with one or more service providers for removal of ash, garbage or rubbish. Express authority is extended in order to mitigate possible antitrust issues if the city, village or town determines that the service can best be provided by one service provider.

Notes of Decisions (8)

W. S. A. 66.0405, WI ST 66.0405
Current through 2023 Act 272, published April 10, 2024.

**End of Document**                                      © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
    Municipalities (Ch. 59 to 68)
        Chapter 66. General Municipality Law (Refs & Annos)
            Subchapter IV. Regulation

W.S.A. 66.0406

66.0406. Radio broadcast service facility regulations

Currentness

**(1) Definitions.** In this section:

(a) "Political subdivision" means any city, village, town, or county.

(b) "Radio broadcast services" means the regular provision of a commercial or noncommercial service involving the transmission, emission, or reception of radio waves for the transmission of sound or images in which the transmissions are intended for direct reception by the general public.

(c) "Radio broadcast service facilities" means commercial or noncommercial facilities, including antennas and antenna support structures, intended for the provision of radio broadcast services.

**(2) Limitations on local regulation.** Beginning on May 1, 2013, if a political subdivision enacts an ordinance, adopts a resolution, or takes any other action that affects the placement, construction, or modification of radio broadcast service facilities, the ordinance, resolution, or other action may not take effect unless all of the following apply:

(a) The ordinance, resolution, or other action has a reasonable and clearly defined public health or safety objective, and reflects the minimum practical regulation that is necessary to accomplish that objective.

(b) The ordinance, resolution, or other action reasonably accommodates radio broadcast services and does not prohibit, or have the effect of prohibiting, the provision of such services in the political subdivision.

**(3) Continued application of existing regulations.** If a political subdivision has in effect on May 1, 2013, an ordinance or resolution that is inconsistent with the requirements that are specified in sub. (2) for an ordinance, resolution, or other action to take effect, the existing ordinance or resolution does not apply, and may not be enforced, to the extent that it is inconsistent with the requirements that are specified in sub. (2).

**(4) Denial of placement, construction, or modification of facilities.** If a political subdivision denies a request by any person to place, construct, or modify radio broadcast service facilities in the political subdivision, the denial may be based only on the political subdivision's public health or safety concerns. The political subdivision must provide the requester with a written

WESTLAW  © 2025 Thomson Reuters. No claim to original U.S. Government Works.

denial of the requester's request, and the political subdivision must provide the requester with substantial written evidence which supports the reasons for the political subdivision's action.

**Credits**

<<For credits, see Historical Note field.>>

W. S. A. 66.0406, WI ST 66.0406
Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**
© 2025 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW  © 2025 Thomson Reuters. No claim to original U.S. Government Works.    Appx. 547    2

West's Wisconsin Statutes Annotated
 Municipalities (Ch. 59 to 68)
  Chapter 66. General Municipality Law (Refs & Annos)
   Subchapter IV. Regulation

W.S.A. 66.0407

66.0407. Noxious weeds

Currentness

(1) In this section:

(a) "Destroy" means the complete killing of weeds or the killing of weed plants above the surface of the ground by the use of chemicals, cutting, tillage, cropping system, pasturing livestock, or any or all of these in effective combination, at a time and in a manner as will effectually prevent the weed plants from maturing to the bloom or flower stage.

(b) "Noxious weed" means Canada thistle, leafy spurge, field bindweed, any weed designated as a noxious weed by the department of natural resources by rule, and any other weed the governing body of any municipality or the county board of any county by ordinance or resolution declares to be noxious within its respective boundaries.

(3) A person owning, occupying or controlling land shall destroy all noxious weeds on the land. The person having immediate charge of any public lands shall destroy all noxious weeds on the lands. The highway patrolman on all federal, state or county trunk highways shall destroy all noxious weeds on that portion of the highway which that highway patrolman patrols. The town board is responsible for the destruction of all noxious weeds on the town highways.

(4) The chairperson of each town, the president of each village and the mayor or manager of each city may annually on or before May 15 publish a class 2 notice, under ch. 985, that every person is required by law to destroy all noxious weeds, as defined in this section, on lands in the municipality which the person owns, occupies or controls. A town, village or city which has designated as its official newspaper or which uses for its official notices the same newspaper as any other town, village or city may publish the notice under this subsection in combination with the other town, village or city.

(5) This section does not apply to Canada thistle or annual noxious weeds that are located on land that the department of natural resources owns, occupies or controls and that is maintained in whole or in part as habitat for wild birds by the department of natural resources.

**Credits**
<<For credits, see Historical Note field.>>

Notes of Decisions (4)

W. S. A. 66.0407, WI ST 66.0407

Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**                                  © 2025 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

West's Wisconsin Statutes Annotated
Municipalities (Ch. 59 to 68)
Chapter 66. General Municipality Law (Refs & Annos)
Subchapter IV. Regulation

W.S.A. 66.0408

66.0408. Regulation of occupations

Currentness

**(1) Definitions.** In this section, "political subdivision" means a city, village, town, or county.

**(2) Limitations on new regulations.** (a) Except as provided in sub. (3), beginning on November 13, 2015, a political subdivision may not impose any occupational fees or licensing requirements on any profession if that profession is not subject to occupational fees or licensing requirements of the political subdivision on that date, but the political subdivision may continue to so regulate any profession that is subject to its occupational fees or licensing requirements on that date.

(b) With regard to the areas in which the department of safety and professional services may impose requirements on a contractor under s. 101.654, a political subdivision may not impose any requirements on a contractor that are more stringent than the requirements imposed by the department of safety and professional services under s. 101.654.

(c) Beginning on November 13, 2015, if the department of safety and professional services or an examining board, affiliated credentialing board, or other board in the department of safety and professional services imposes any new occupational fees or licensing requirements on any profession that was previously unregulated by the state, and if a political subdivision regulates that occupation when the state regulations take effect, the political subdivision may not continue to regulate that profession on or after the day on which the state regulations take effect and the political subdivision's regulations do not apply and may not be enforced.

(d) With regard to the areas in which any department of state government may impose occupational licensing requirements on any profession, a political subdivision may not impose any occupational licensing requirements on an individual who works in that profession that are more stringent than the requirements imposed by the department that regulates that profession.

**(3) Exception.** If a political subdivision has in effect an occupational fee or licensing requirement on the profession of photographer on November 13, 2015, that regulation does not apply and may not be enforced.

**Credits**
<<For credits, see Historical Note field.>>

W. S. A. 66.0408, WI ST 66.0408
Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**                                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

⚑  KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

West's Wisconsin Statutes Annotated
  Municipalities (Ch. 59 to 68)
    Chapter 66. General Municipality Law (Refs & Annos)
      Subchapter IV. Regulation

W.S.A. 66.0409

66.0409. Local regulation of weapons

Currentness

(1) In this section:

(a) "Firearm" has the meaning given in s. 167.31(1)(c) and includes an airgun, as defined in s. 29.001(7).

(b) "Political subdivision" means a city, village, town or county.

(c) "Sport shooting range" means an area designed and operated for the practice of weapons used in hunting, skeet shooting and similar sport shooting.

(2) Except as provided in subs. (3) and (4), no political subdivision may enact or enforce an ordinance or adopt a resolution that regulates the sale, purchase, purchase delay, transfer, ownership, use, keeping, possession, bearing, transportation, licensing, permitting, registration, or taxation of any knife or any firearm or part of a firearm, including ammunition and reloader components, unless the ordinance or resolution is the same as or similar to, and no more stringent than, a state statute.

(3)(a) Nothing in this section prohibits a county from imposing a sales tax or use tax under subch. V of ch. 77 on any knife or any firearm or part of a firearm, including ammunition and reloader components, sold in the county.

(b)1. Nothing in this section prohibits a city, village or town that is authorized to exercise village powers under s. 60.22(3) from enacting an ordinance or adopting a resolution that restricts the discharge of a firearm.

2. Notwithstanding subd. 1., any ordinance or resolution that restricts the discharge of a firearm does not apply and may not be enforced if the actor's conduct is justified or, had it been subject to a criminal penalty, would have been subject to a defense described in s. 939.45.

3. Notwithstanding subd. 1., any ordinance or resolution that restricts the honorary discharge of a firearm that involves the use of only blanks and that is part of any of the following does not apply and may not be enforced:

Case 2:24-cv-00228-2   Document 50-1   Filed 01/17/25   Page 553 of 882   PageID 49338

a. An event, including a funeral, honoring a current or former member of the military, law enforcement officer, or professional fire fighter.

b. Military honors provided at a cemetery on Memorial Day or Veterans Day.

c. Military honors provided at a veterans memorial site.

(c) Nothing in this section prohibits a political subdivision from enacting or enforcing an ordinance or adopting a resolution that prohibits the possession of a knife in a building, or part of a building, that is owned, occupied, or controlled by the political subdivision.

(4)(a) Nothing in this section prohibits a political subdivision from continuing to enforce an ordinance or resolution that is in effect on November 18, 1995, and that regulates the sale, purchase, transfer, ownership, use, keeping, possession, bearing, transportation, licensing, permitting, registration or taxation of any firearm or part of a firearm, including ammunition and reloader components, if the ordinance or resolution is the same as or similar to, and no more stringent than, a state statute.

(am) Nothing in this section prohibits a political subdivision from continuing to enforce until November 30, 1998, an ordinance or resolution that is in effect on November 18, 1995, and that requires a waiting period of not more than 7 days for the purchase of a handgun.

(b) If a political subdivision has in effect on November 17, 1995, an ordinance or resolution that regulates the sale, purchase, transfer, ownership, use, keeping, possession, bearing, transportation, licensing, permitting, registration or taxation of any firearm or part of a firearm, including ammunition and reloader components, and the ordinance or resolution is not the same as or similar to a state statute, the ordinance or resolution shall have no legal effect and the political subdivision may not enforce the ordinance or resolution on or after November 18, 1995.

(c) Nothing in this section prohibits a political subdivision from enacting and enforcing a zoning ordinance that regulates the new construction of a sport shooting range or when the expansion of an existing sport shooting range would impact public health and safety.

(5) A county ordinance that is enacted or a county resolution that is adopted by a county under sub. (2) or a county ordinance or resolution that remains in effect under sub. (4)(a) or (am) applies only in those towns in the county that have not enacted an ordinance or adopted a resolution under sub. (2) or that continue to enforce an ordinance or resolution under sub. (4)(a) or (am), except that this subsection does not apply to a sales or use tax that is imposed under subch. V of ch. 77.

(6) Unless other facts and circumstances that indicate a criminal or malicious intent on the part of the person apply, no person may be in violation of, or be charged with a violation of, an ordinance of a political subdivision relating to disorderly conduct or other inappropriate behavior for loading a firearm, or for carrying or going armed with a firearm or a knife, without regard to whether the firearm is loaded or the firearm or the knife is concealed or openly carried. Any ordinance in violation of this subsection does not apply and may not be enforced.

**Credits**

<<For credits, see Historical Note field.>>

Notes of Decisions (6)

W. S. A. 66.0409, WI ST 66.0409
Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**                                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
    Municipalities (Ch. 59 to 68)
        Chapter 66. General Municipality Law (Refs & Annos)
            Subchapter IV. Regulation

W.S.A. 66.041

66.041. Renumbered 66.0605 and amended by 1999 Act 150, § 97, eff. Jan. 1, 2001

Currentness

**Credits**

<<For credits, see Historical Note field.>>

W. S. A. 66.041, WI ST 66.041
Current through 2023 Act 272, published April 10, 2024.

---

                                   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**  © 2025 Thomson Reuters. No claim to original U.S. Government Works.  Appx. 555    1

West's Wisconsin Statutes Annotated
  Municipalities (Ch. 59 to 68)
    Chapter 66. General Municipality Law (Refs & Annos)
      Subchapter IV. Regulation

W.S.A. 66.0410

66.0410. Local regulation of ticket reselling

Currentness

**(1) Definitions.** In this section:

(a) "Political subdivision" means a city, village, town, or county.

(b) "Ticket" means a ticket that is sold to an entertainment or sporting event.

**(2) Reselling of tickets.** (a) A political subdivision may not enact an ordinance or adopt a resolution and the Board of Regents of the University of Wisconsin System may not promulgate a rule or adopt a resolution prohibiting the resale of any ticket for an amount that is equal to or less than the ticket's face value.

(b) If a political subdivision or the Board of Regents of the University of Wisconsin System has in effect on April 22, 2004 an ordinance, rule, or resolution that is inconsistent with par. (a), the ordinance, rule, or resolution does not apply and may not be enforced.

**Credits**
<<For credits, see Historical Note field.>>

W. S. A. 66.0410, WI ST 66.0410
Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
  Municipalities (Ch. 59 to 68)
    Chapter 66. General Municipality Law (Refs & Annos)
      Subchapter IV. Regulation

W.S.A. 66.0411

66.0411. Sound-producing devices; impoundment; seizure and forfeiture

Currentness

(1) In this section, "sound-producing device" does not include a piece of equipment or machinery that is designed for agricultural purposes and that is being used in the conduct of agricultural operations.

(1m)(a) Any city, village, town or county may, by ordinance, authorize a law enforcement officer, at the time of issuing a citation for a violation of s. 346.94(16) or a local ordinance in strict conformity with s. 346.94(16) or any other local ordinance prohibiting excessive noise, to impound any radio, electric sound amplification device or other sound-producing device used in the commission of the violation if the person charged with such violation is the owner of the radio, electric sound amplification device or other sound-producing device and has 2 or more prior convictions within a 3-year period of s. 346.94(16) or a local ordinance in strict conformity with s. 346.94(16) or any other local ordinance prohibiting excessive noise. The ordinance may provide for impoundment of a vehicle for not more than 5 working days to permit the city, village, town or county or its authorized agent to remove the radio, electric sound amplification device or other sound-producing device if the vehicle is owned by the person charged with the violation and the sound-producing device may not be easily removed from the vehicle. Upon removal of the sound-producing device, an impounded vehicle shall be returned to its rightful owner.

(b) The ordinance under par. (a) may provide for recovery by the city, village, town or county of the cost of impounding the sound-producing device and, if a vehicle is impounded, the cost of impounding the vehicle and removing the sound-producing device. The ordinance under par. (a) shall provide that, upon disposition of the forfeiture action for the violation of s. 346.94(16) or a local ordinance in strict conformity with s. 346.94(16) or any other local ordinance prohibiting excessive noise and payment of any forfeiture imposed, the sound-producing device shall be returned to its rightful owner.

(c) The city, village, town or county may dispose of any impounded sound-producing device or, following the procedure for an abandoned vehicle under s. 342.40, any impounded vehicle which has remained unclaimed for a period of 90 days after disposition of the forfeiture action.

(d) This subsection does not apply to a radio, electric sound amplification device or other sound-producing device on a motorcycle.

(2)(a) Notwithstanding sub. (1m), any city, village, town or county may, by ordinance, authorize a law enforcement officer, at the time of issuing a citation for a violation of s. 346.94(16) or a local ordinance in strict conformity with s. 346.94(16) or any other local ordinance prohibiting excessive noise, to seize any radio, electric sound amplification device or other sound-producing device used in the commission of the violation if the person charged with such violation is the owner of the radio, electric sound amplification device or other sound-producing device and has 3 or more prior convictions within a 3-year period of s. 346.94(16) or a local ordinance in strict conformity with s. 346.94(16) or any other local ordinance prohibiting excessive noise.

(b) The ordinance under par. (a) may provide for impoundment of a vehicle for not more than 5 working days to permit the city, village, town or county or its authorized agent to remove the radio, electric sound amplification device or other sound-producing device if the vehicle is owned by the person charged with the violation and the sound-producing device may not be easily removed from the vehicle. Upon removal of the sound-producing device, an impounded vehicle shall be returned to its rightful owner upon payment of the reasonable costs of impounding the vehicle and removing the sound-producing device.

(c) The ordinance under par. (a) shall include provisions that treat any seized sound-producing device in substantially the manner provided in ss. 973.075(3), 973.076 and 973.077 for property realized through the commission of any crime, except that the sound-producing device shall remain in the custody of the applicable law enforcement agency; a district attorney or city, village or town attorney, whichever is applicable, shall institute the forfeiture proceedings; and, if the sound-producing device is sold by the law enforcement agency, all proceeds of the sale shall be retained by the applicable city, village, town or county.

(d) The city, village, town or county may, following the procedure for an abandoned vehicle under s. 342.40, dispose of any impounded vehicle which has remained unclaimed for a period of 90 days after disposition of the forfeiture action.

(e) This subsection does not apply to a radio, electric sound amplification device or other sound-producing device on a motorcycle.

## Credits

<<For credits, see Historical Note field.>>

W. S. A. 66.0411, WI ST 66.0411

Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
Municipalities (Ch. 59 to 68)
Chapter 66. General Municipality Law (Refs & Annos)
Subchapter IV. Regulation

W.S.A. 66.0412

66.0412. Local regulation of real estate brokers, brokerage services

Currentness

**(1) Definitions.** In this section:

(a) "Broker" means a real estate broker licensed under ch. 452.

(b) "Local governmental unit" has the meaning given in s. 66.0131(1)(a).

(c) "Political subdivision" means any city, village, town, or county.

**(2) Regulation of brokers, brokerage services.** (a) A local governmental unit may not enact an ordinance or adopt a resolution that does any of the following:

1. In relation to the provision of real estate services, imposes any fees on brokers or on real estate brokerage services.

2. Imposes any regulations on the professional services provided by a broker or by a person who provides real estate brokerage services.

(b) If a local governmental unit has in effect on July 2, 2013, an ordinance or resolution that is inconsistent with par. (a), the ordinance or resolution does not apply and may not be enforced.

**Credits**
<<For credits, see Historical Note field.>>

W. S. A. 66.0412, WI ST 66.0412
Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
  Municipalities (Ch. 59 to 68)
    Chapter 66. General Municipality Law (Refs & Annos)
      Subchapter IV. Regulation

W.S.A. 66.0413

66.0413. Razing buildings

Currentness

**(1) Authority and procedure.** (a) *Definitions.* In this subsection:

1. "Building" includes any building or structure or any portion of a building or structure.

2. "Raze a building" means to demolish and remove the building and to restore the site to a dust-free and erosion-free condition.

(b) *Raze order.* The governing body, building inspector or other designated officer of a municipality may:

1. Except as provided in sub. (5), if a building is old, dilapidated, or out of repair and consequently dangerous, unsafe, unsanitary, or otherwise unfit for human habitation and unreasonable to repair, order the owner of the building to raze the building or, if the building can be made safe by reasonable repairs, order the owner to either make the building safe and sanitary or to raze the building, at the owner's option.

2. If there has been a cessation of normal construction of a building for a period of more than 2 years, order the owner of the building to raze the building.

(br) *Notice of unfitness for occupancy or use; penalty.* 1. If a building subject to an order under par. (b) is unsanitary and unfit for human habitation, occupancy or use and is not in danger of structural collapse, the building inspector or other designated officer shall post a placard on the premises containing the following notice: "This Building May Not Be Used For Human Habitation, Occupancy or Use." The building inspector or other designated officer shall prohibit use of the building for human habitation, occupancy or use until necessary repairs have been made.

2. Any person who rents, leases or occupies a building which has been condemned for human habitation, occupancy or use under subd. 1. shall be fined not less than $5 nor more than $50 or imprisoned not more than 30 days for each week of the violation, or both.

(c) *Reasonableness of repair; presumption.* Except as provided in subs. (3) and (5), if a municipal governing body, building inspector, or designated officer determines that the cost of repairs of a building described in par. (b)1. would exceed 50 percent of the assessed value of the building divided by the ratio of the assessed value to the recommended value as last published

by the department of revenue for the municipality within which the building is located, the repairs are presumed unreasonable for purposes of par. (b)1.

(d) *Service of order.* An order under par. (b) shall be served on the owner of record of the building that is subject to the order or on the owner's agent if the agent is in charge of the building in the same manner as a summons is served in circuit court. An order under par. (b) shall be served on the holder of an encumbrance of record by 1st class mail at the holder's last-known address and by publication as a class 1 notice under ch. 985. If the owner and the owner's agent cannot be found or if the owner is deceased and an estate has not been opened, the order may be served by posting it on the main entrance of the building and by publishing it as a class 1 notice under ch. 985 before the time limited in the order begins to run. The time limited in the order begins to run from the date of service on the owner or owner's agent or, if the owner and agent cannot be found, from the date that the order was posted on the building.

(e) *Effect of recording order.* If a raze order issued under par. (b) is recorded with the register of deeds in the county in which the building is located, the order is considered to have been served, as of the date the raze order is recorded, on any person claiming an interest in the building or the real estate as a result of a conveyance from the owner of record unless the conveyance was recorded before the recording of the raze order.

(f) *Failure to comply with order; razing building.* An order under par. (b) shall specify the time within which the owner of the building is required to comply with the order and shall specify repairs, if any. If the owner fails or refuses to comply within the time prescribed, the building inspector or other designated officer may proceed to raze the building through any available public agency or by contract or arrangement with private persons, or to secure the building and, if necessary, the property on which the building is located if unfit for human habitation, occupancy or use. The cost of razing or securing the building may be charged in full or in part against the real estate upon which the building is located, and if that cost is so charged it is a lien upon the real estate and may be assessed and collected as a special charge, but may not be assessed and collected as a special tax. Any portion of the cost charged against the real estate that is not reimbursed under s. 632.103(2) from funds withheld from an insurance settlement may be assessed and collected as a special tax.

(g) *Court order to comply.* A municipality, building inspector or designated officer may commence and prosecute an action in circuit court for an order of the court requiring the owner to comply with an order to raze a building issued under this subsection if the owner fails or refuses to do so within the time prescribed in the order, or for an order of the court requiring any person occupying a building whose occupancy has been prohibited under this subsection to vacate the premises, or any combination of the court orders. A hearing on actions under this paragraph shall be given preference. Court costs are in the discretion of the court.

(h) *Restraining order.* A person affected by an order issued under par. (b) may within the time provided by s. 893.76 apply to the circuit court for an order restraining the building inspector or other designated officer from razing the building or forever be barred. The hearing shall be held within 20 days and shall be given preference. The court shall determine whether the raze order is reasonable. If the order is found reasonable the court shall dissolve the restraining order. If the order is found not reasonable the court shall continue the restraining order or modify it as the circumstances require. Costs are in the discretion of the court. If the court finds that the order is unreasonable, the building inspector or other designated officer shall issue no other order under this subsection in regard to the same building until its condition is substantially changed. The remedies provided in this paragraph are exclusive remedies and anyone affected by an order issued under par. (b) is not entitled to recover any damages for the razing of the building.

(i) *Removal of personal property.* If a building subject to an order under par. (b) contains personal property or fixtures which will unreasonably interfere with the razing or repair of the building or if the razing makes necessary the removal, sale or destruction

of the personal property or fixtures, the building inspector or other designated officer may order in writing the removal of the personal property or fixtures by a date certain. The order shall be served as provided in par. (d). If the personal property or fixtures are not removed by the time specified the inspector may store, sell or, if it has no appreciable value, destroy the personal property or fixture. If the property is stored the amount paid for storage is a lien against the property and against the real estate and, to the extent that the amount is not reimbursed under s. 632.103(2) from funds withheld from an insurance settlement, shall be assessed and collected as a special tax against the real estate if the real estate is owned by the owner of the personal property and fixtures. If the property is stored the owner of the property, if known, shall be notified of the place of storage and if the property is not claimed by the owner it may be sold at the expiration of 6 months after it has been stored. The handling of the sale and the distribution of the net proceeds after deducting the cost of storage and any other costs shall be as specified in par. (j) and a report made to the circuit court as specified in par. (j). A person affected by any order made under this paragraph may appeal as provided in par. (h).

(j) *Sale of salvage.* If an order to raze a building has been issued, the governing body or other designated officer under the contract or arrangement to raze the building may sell the salvage and valuable materials at the highest price obtainable. The net proceeds of the sale, after deducting the expenses of razing the building, shall be promptly remitted to the circuit court with a report of the sale or transaction, including the items of expense and the amounts deducted, for the use of any person entitled to the net proceeds, subject to the order of the court. If there remains no surplus to be turned over to the court, the report shall so state.

(k) *Public nuisance procedure.* A building which is determined under par. (b) 1. to be old, dilapidated or out of repair and consequently dangerous, unsafe, unsanitary or otherwise unfit for human habitation and unreasonable to repair may be proceeded against as a public nuisance under ch. 823.

(L) *Effect of subsection.* 1. Acts of municipal authorities under this subsection do not increase the liability of an insurer.

2. This section does not limit powers otherwise granted to municipalities by other laws of this state.

**(2) Razing building that is a public nuisance; in rem procedure.** (a) *Definitions.* In this subsection:

1. "Building" means a building, dwelling or structure.

2. "Public nuisance" means a building that, as a result of vandalism or any other reason, has deteriorated or is dilapidated or blighted to the extent that windows, doors or other openings, plumbing or heating fixtures, or facilities or appurtenances of the building are damaged, destroyed or removed so that the building offends the aesthetic character of the immediate neighborhood and produces blight or deterioration.

3. "Raze a building" means to demolish and remove the building and to restore the site to a dust-free and erosion-free condition.

(b) *Notification of nuisance.* If the owner of a building in a city, village or town permits the building to become a public nuisance, the building inspector or other designated officer of the city, village or town shall issue a written notice of the defect that makes the building a public nuisance. The written notice shall be served on the owner of the building as provided under sub. (1)(d) and shall direct the owner to remedy the defect within 30 days following service.

(c) *Failure to remedy; court order to remedy or raze.* 1. If an owner fails to remedy or improve the defect in accordance with the written notice under par. (b) within the 30-day period specified in the written notice, the building inspector or other designated

officer shall apply to the circuit court of the county in which the building is located for an order determining that the building constitutes a public nuisance. As a part of the application for the order from the circuit court the building inspector or other designated officer shall file a verified petition which recites the giving of written notice, the defect in the building, the owner's failure to comply with the notice and other pertinent facts. A copy of the petition shall be served upon the owner of record or the owner's agent if an agent is in charge of the building and upon the holder of any encumbrance of record under sub. (1)(d). The owner shall reply to the petition within 20 days following service upon the owner. Upon application by the building inspector or other designated officer the circuit court shall set promptly the petition for hearing. Testimony shall be taken by the circuit court with respect to the allegations of the petition and denials contained in the verified answer. If the circuit court after hearing the evidence on the petition and answer determines that the building constitutes a public nuisance, the court shall issue promptly an order directing the owner of the building to remedy the defect and to make such repairs and alterations as may be required. The court shall set a reasonable period of time in which the defect shall be remedied and the repairs or alterations completed. A copy of the order shall be served upon the owner as provided in sub. (1)(d). The order of the circuit court shall state in the alternative that if the order of the court is not complied with within the time fixed by the court, the court will appoint a receiver or authorize the building inspector or other designated officer to proceed to raze the building under par. (d).

2. In an action under this subsection, the circuit court before which the action is commenced shall exercise jurisdiction in rem or quasi in rem over the property that is the subject of the action. The owner of record of the property, if known, and all other persons of record holding or claiming any interest in the property shall be made parties defendant, and service of process may be made upon them.

3. It is not a defense to an action under this subsection that the owner of record of the property is a different person or entity than the owner of record of the property on or after the date the action was commenced if a lis pendens was filed before the change of ownership.

(d) *Failure to comply with court order.* If the order of the circuit court under par. (c) is not complied with within the time fixed by the court under par. (c), the court shall authorize the building inspector or other designated officer to raze the building or shall appoint a disinterested person to act as receiver of the property to do either of the following within a reasonable period of time set by the court:

1. Remedy the defect and make any repairs and alterations necessary to meet the standards required by the building code or any health order. A receiver appointed under this subdivision, with the approval of the circuit court, may borrow money against and mortgage the property held in receivership as security in any amount necessary to remedy the defect and make the repairs and alterations. For the expenses incurred to remedy the defect and make the repairs and alterations necessary under this subdivision, the receiver has a lien upon the property. At the request of and with the approval of the owner, the receiver may sell the property at a price equal to at least the appraised value of the property plus the cost of any repairs made under this subdivision. The selling owner is liable for those costs.

2. Secure and sell the building to a buyer who demonstrates to the circuit court an ability and intent to rehabilitate the building and to have the building reoccupied in a legal manner.

(e) *Receiver; order to raze.* 1. A receiver appointed under par. (d) shall collect all rents and profits accruing from the property held in receivership and pay all costs of management, including all general and special real estate taxes or assessments and interest payments on first mortgages on the property. A receiver under par. (d) shall apply moneys received from the sale of property held in receivership to pay all debts due on the property in the order set by law and shall pay any balance to the selling owner if the circuit court approves.

2. The circuit court shall set the fees and bond of a receiver appointed under par. (d) and may discharge the receiver as the court considers appropriate.

3. Nothing in this subsection relieves the owner of property for which a receiver has been appointed under par. (d) from any civil or criminal responsibility or liability except that the receiver has civil and criminal responsibility and liability for all matters and acts directly under the receiver's authority or performed at his or her discretion.

4. If a defect is not remedied and repairs and alterations are not made within the time limit set by the circuit court under par. (d), the court shall order that the building inspector or other designated officer proceed to raze the building.

5. All costs and disbursements to raze a building under this subsection shall be as provided under sub. (1)(f).

**(3) Razing historic buildings.** (a) In this subsection:

1. "Cost of repairs" includes the estimated cost of repairs that are necessary to comply with applicable building codes, or other ordinances or regulations, governing the repair or renovation of a historic building.

1m. "Historic building" means any building or object listed on, or any building or object within and contributing to a historic district listed on, the national register of historic places in Wisconsin, the state register of historic places or a list of historic places maintained by a municipality.

2. "Municipality" means a city, village, county or town.

(b) The state historical society shall notify a municipality of any historic building located in the municipality. If a historic district lies within a municipality, the historical society shall furnish to the municipality a map delineating the boundaries of the district.

(c) If an order is issued under this section to raze and remove a historic building and restore the site to a dust-free and erosion-free condition, an application is made for a permit to raze and remove a historic building and restore the site to a dust-free and erosion-free condition or a municipality intends to raze and remove a municipally owned historic building and restore the site to a dust-free and erosion-free condition, the municipality in which the historic building is located shall notify the state historical society of the order, application or intent. No historic building may be razed and removed nor the site restored to a dust-free and erosion-free condition for 30 days after the notice is given, unless a shorter period is authorized by the state historical society. If the state historical society authorizes a shorter period, however, such a period shall be subject to any applicable local ordinance. During the 30-day period, the state historical society shall have access to the historic building to create or preserve a historic record. If the state historical society completes its creation or preservation of a historic record, or decides not to create or preserve a historic record, before the end of the 30-day period, the society may waive its right to access the building and may authorize the person who intends to raze and remove the building, and restore the site to a dust-free and erosion-free condition, to proceed before the end of such period, except that such a person shall be subject to any applicable local ordinance.

(d) If a municipal governing body, inspector of buildings or designated officer determines that the cost of repairs to a historic building would be less than 85 percent of the assessed value of the building divided by the ratio of the assessed value to the recommended value as last published by the department of revenue for the municipality within which the historic building is located, the repairs are presumed reasonable.

**(4) First class cities; other provisions.** (a) First class cities may adopt by ordinance alternate or additional provisions governing the placarding, closing, razing and removal of a building and the restoration of the site to a dust-free and erosion-free condition.

Case 2:24-cv-00228-Z    Document 50-1    Filed 01/17/25    Page 565 of 882    PageID 49350

(b) This subsection shall be liberally construed to provide 1st class cities with the largest possible power and leeway of action.

**(5) Razing certain insured dwellings.** (a) *Definitions*. In this subsection:

1. "Cost of repairs" includes the estimated cost of repairs that are necessary to comply with applicable building codes, or other ordinances or regulations, governing the repair or renovation of a dwelling.

2. "Covered damage" means damage that is covered by an insurance policy.

3. "Insured dwelling" means real property that is covered under an insurance policy and that is owned, occupied, and used primarily as a dwelling by the insured.

(b) *Insurer certification*. 1. No later than 14 days after real property has incurred damage, an insurer may provide a written certification through 1st class mail or electronic communication to a governing body, building inspector, or other designated officer of a municipality stating all of the following:

a. That the insurer reasonably believes the real property may qualify as an insured dwelling.

b. That the property owner or an insured has filed a claim for covered damage with the insurer or the insurer has reason to believe the property owner or an insured will file a claim for covered damage with the insurer.

c. That the insurer reasonably believes the claim may qualify as covered damage.

d. The date of damage to the insured dwelling, the insurance policy limits of the insured dwelling, the insurer's designated representative for the filed or anticipated claim, and the designated representative's mailing address, electronic mail address, and phone number.

2. A certification under this paragraph does not waive or limit any rights of the insurer under an insurance policy.

3. At any point prior to submitting a certification under subd. 1., an insurer may notify a governing body, building inspector, or other designated officer of a municipality that the insurer has determined the insured dwelling to be wholly destroyed. If at any point after submitting a certification under subd. 1. the insurer determines that the insured dwelling is wholly destroyed, the insurer shall notify the governing body, building inspector, or other designated officer of that determination.

(c) *Municipal assessment*. A governing body, building inspector, or other designated officer of a municipality may not issue a raze order under sub. (1)(b) for an insured dwelling for which an insurer has provided a certification under par. (b) unless the governing body, building inspector, or other designated officer does all of the following:

1. Provides notice of intent to issue a raze order to the owner of record of the insured dwelling, the holder of any encumbrance on the insured dwelling, and the insurer of the insured dwelling. The notice shall include a statement that materials may be submitted to the governing body, building inspector, or other designated officer under subd. 2. Notice under this subdivision shall be served in the manner provided under sub. (1)(d).

2. Accepts and considers materials that are submitted by any person entitled to notice under subd. 1., that assist in establishing the extent of the damage or the reasonable cost of repairs to the insured dwelling, and that are received within 30 days after provision of the notice under subd. 1. Materials that may be accepted and considered under this subdivision are limited to

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

damage estimates, evaluations of the cost of repairs, and the results of inspections of the property. When considering the materials submitted under this subdivision, the governing body, building inspector, or other designated officer shall consider the qualifications, expertise, and experience of the person that submitted the materials.

3. Conducts an on-site inspection of the insured dwelling to assess the extent of the damage.

4. Determines the estimated cost of repairs for the insured dwelling.

5. Determines that repair of the insured dwelling is not reasonable.

(d) *Cost of repair*. A municipal governing body, building inspector, or other designated officer of a municipality shall base its determination of the estimated cost of repairs for the insured dwelling under par. (c)4. on the materials accepted under par. (c)2. and similar materials produced by the municipal governing body, building inspector, or designated officer.

(e) *Reasonableness of repair*. If a municipal governing body, building inspector, or other designated officer of a municipality determines that the estimated cost of repairs of an insured dwelling does not exceed 70 percent of the insurance policy limits of the insured dwelling, the repairs are presumed reasonable.

(f) *Repair orders*. Nothing in this subsection shall preclude the governing body, building inspector, or other designated officer of a municipality from ordering the owner of an insured dwelling to make the building safe and sanitary under sub. (1)(b).

(g) *Application*. This subsection does not apply to any of the following:

1. A dwelling that the governing body, building inspector, or other designated officer of a municipality has determined to be in imminent danger of structural collapse and for which the property owner has failed to appropriately secure and limit access.

2. An insured dwelling that is the subject of a notification provided to the governing body, building inspector, or other designated officer of a municipality by an insurer pursuant to par. (b)3.

**Credits**
<<For credits, see Historical Note field.>>

Notes of Decisions (71)

W. S. A. 66.0413, WI ST 66.0413
Current through 2023 Act 272, published April 10, 2024.

---

End of Document
© 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
   Municipalities (Ch. 59 to 68)
      Chapter 66. General Municipality Law (Refs & Annos)
         Subchapter IV. Regulation

W.S.A. 66.0414

66.0414 Small wireless facilities

Currentness

**(1) Definitions.** In this section:

(a) "Antenna" means communications equipment that transmits and receives electromagnetic radio signals and is used in the provision of wireless services.

(b) "Antenna equipment" or "wireless equipment" means equipment, switches, wiring, cabling, power sources, shelters, or cabinets associated with an antenna, located at the same fixed location as the antenna, and, when collocated on a structure, is mounted or installed at the same time as such antenna.

(c) "Antenna facility" means an antenna and associated antenna equipment, including ground-mounted antenna equipment.

(d) "Applicable codes" means the state electrical wiring code, as defined in s. 101.80(4), the state plumbing code promulgated under s. 145.02(2)(a), the fire prevention code under ch. SPS 314, Wis. Adm. Code, the Wisconsin commercial building code under chs. SPS 361 to 366, Wis. Adm. Code, the Wisconsin uniform dwelling code under chs. SPS 320 to 325, Wis. Adm. Code, and local amendments to those codes enacted solely to address imminent threats of destruction of property or injury to persons.

(e) "Applicant" means a wireless provider that submits an application.

(f) "Application" means an application for a permit under this section to collocate a small wireless facility or to install, modify, or replace a utility pole.

(g) "Collocate," "collocate on," or "collocation" means the placement, mounting, replacement, modification, operation, or maintenance of a small wireless facility on, or of ground-mounted antenna equipment adjacent to, a structure.

(h) "Communications facilities" means the set of equipment and network components, including wires and cables and associated facilities, used by a communications service provider to provide communications service.

(i) "Communications network" means a network used to provide a communications service.

(j) "Communications service" means cable service, as defined in 47 USC 522(6), telecommunications service, as defined in 47 USC 153(53), information service, as defined in 47 USC 153(24), or wireless service.

(k) "Communications service provider" means a person that provides communications service.

(L) "Facility" means an antenna facility or a structure.

(m) "Fee" means a one-time charge.

(n) "Governmental pole" means a utility pole that is owned or operated by the state or by a political subdivision in a right-of-way.

(o) "Investor-owned electric utility" means a public utility whose purpose is the generation, transmission, delivery, or furnishing of electric power but does not include a public utility owned and operated wholly by a municipality or a cooperative association organized under ch. 185.

(p) "Micro wireless facility" means a small wireless facility that does not exceed 24 inches in length, 15 inches in width, and 12 inches in height and that has no exterior antenna longer than 11 inches.

(q) "Permit" means written authorization required by the state or a political subdivision to perform an action, or initiate, continue, or complete a project.

(r) "Political subdivision" means any city, village, town, or county.

(s) "Rate" means a recurring charge.

(t) "Right-of-way" means the area on, below, or above a highway, as defined in s. 340.01(22), other than a federal interstate highway; sidewalk; utility easement, other than a utility easement for a cooperative association organized under ch. 185 for purposes of providing or furnishing heat, light, power, or water to its members only; or other similar property, including property owned or controlled by the department of transportation.

(u) "Small wireless facility" means a wireless facility to which all of the following apply:

1. The wireless facility satisfies any of the following:

a. The wireless facility is mounted on a structure 50 feet or less in height including any antenna.

b. The wireless facility is mounted on a structure no more than 10 percent taller than any other adjacent structure.

WESTLAW    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

c. The wireless facility does not increase the height of an existing structure on which the wireless facility is located to a height of more than 50 feet or by 10 percent, whichever is greater.

2. Each antenna associated with the deployment of the wireless facility, excluding associated antenna equipment, is no more than 3 cubic feet in volume.

3. All other wireless equipment associated with the wireless facility specified in subd. 1., including the wireless equipment associated with the antenna and any preexisting associated equipment on the structure, is no more than 28 cubic feet in volume.

4. The wireless facility does not require registration as an antenna structure under 47 CFR part 17.

5. The wireless facility is not located on tribal land, as defined in 36 CFR 800.16(x).

6. The wireless facility does not result in human exposure to radio frequency in excess of the applicable safety standards specified in 47 CFR 1.1307.

(v) Except in par. (zp), "structure" means a utility pole or wireless support structure, whether or not it has an existing antenna facility.

(w) "Technically feasible" means that by virtue of engineering or spectrum usage the proposed placement for a small wireless facility, or its design, concealment measures, or site location can be implemented without a reduction in the functionality of the small wireless facility.

(x) "Utility pole" means a pole that is used in whole or in part by a communications service provider; used for electric distribution, lighting, traffic control, signage, or a similar function; or used for the collocation of small wireless facilities. "Utility pole" does not include a wireless support structure or electric transmission structure.

(y) "Utility pole for designated services" means a utility pole owned or operated in a right-of-way by the state, a political subdivision, or a utility district that is designed to, or used to, carry electric distribution lines, or cables or wires for telecommunications, cable, or electric service.

(z)1. "Wireless facility" means an antenna facility at a fixed location that enables wireless services between user equipment and a communications network, and includes all of the following:

a. Equipment associated with wireless services.

b. Radio transceivers, antennas, or coaxial, metallic, or fiber-optic cable located on, in, under, or otherwise adjacent to a utility pole or wireless support structure.

c. Regular and backup power supplies.

d. Equipment that is comparable to equipment specified in this subdivision regardless of technical configuration.

2. "Wireless facility" does not include any of the following:

a. The structure or improvements on, under, or within which equipment specified in subd. 1. is collocated.

b. Wireline backhaul facilities.

c. Coaxial, metallic, or fiber-optic cable that is between utility poles or wireless support structures or that is not adjacent to a particular antenna.

(za) "Wireless infrastructure provider" means any person, other than a wireless services provider, that builds or installs wireless communication transmission equipment, antenna equipment, or wireless support structures.

(zc) "Wireless provider" means a wireless infrastructure provider or a wireless services provider.

(zg) "Wireless services" means any service using licensed or unlicensed wireless spectrum, including the use of a Wi-Fi network, whether at a fixed location or by means of a mobile device.

(zL) "Wireless services provider" means any person who provides wireless services.

(zp) "Wireless support structure" means an existing freestanding structure that is capable of supporting small wireless facilities, except that "wireless support structure" does not include any of the following:

1. A utility pole.

2. A structure designed solely for the collocation of small wireless facilities.

(zt) "Wireline backhaul facility" means a facility for providing wireline backhaul service.

(zx) "Wireline backhaul service" means the transport of communications services by wire from small wireless facilities to a communications network.

**(2) Rights-of-way.** (a) *Applicability*. This subsection applies only to the activities of a wireless provider within a right-of-way.

(b) *Exclusive use prohibited*. Neither the state nor a political subdivision may enter into an exclusive arrangement with any person for the use of a right-of-way for the construction, operation, marketing, maintenance, or collocation of small wireless facilities or wireless support structures.

(c) *Rates and fees*. Subject to sub. (3)(e)3., the state or a political subdivision may charge a wireless provider a nondiscriminatory rate or fee for the use of a right-of-way with respect to the collocation of a small wireless facility or the installation, modification, or replacement of a utility pole in the right-of-way only if the state or political subdivision charges other entities for the use of the right-of-way. If the state or a political subdivision charges a wireless provider a rate or fee as described in this paragraph, all of the following apply:

1. Subject to subd. 5., the fee or rate must be limited to no more than the direct and actual cost of managing the right-of-way.

2. Except as provided in par. (d), the fee or rate must be competitively neutral with regard to other users of the right-of-way.

3. The fee or rate may not result in a double recovery by the state or political subdivision if existing fees, rates, or taxes imposed by a political subdivision on the wireless provider already recover the direct and actual cost of managing the right-of-way.

4. The fee or rate may not be in the form of a franchise or other fee based on revenue or customer counts.

5. The fee or rate may not exceed an annual amount equal to $20 multiplied by the number of small wireless facilities in the right-of-way in the state's or political subdivision's geographic jurisdiction.

6. Beginning on July 12, 2019, the state or a political subdivision may adjust a rate or fee allowed under this paragraph by 10 percent every 5 years, rounded to the nearest dollar. During each 5-year period, the adjustment may be applied incrementally or as a single adjustment.

(d) *Rate or fee adjustment*. 1. Except as provided in subd. 2., by the later of October 1, 2019, or 3 months after receiving its first request for access to the right-of-way by a wireless provider, the state or a political subdivision shall implement rates, fees, and terms for such access that comply with this subsection.

2. Agreements between a wireless provider and the state or a political subdivision that are in effect on July 12, 2019, and that relate to access to the right-of-way, remain in effect, subject to applicable termination provisions, except that by August 1, 2021, the state or political subdivision shall amend any such agreement to comply with the rates, fees, and terms required under this subsection.

(e) *Right of access*. 1. Except as otherwise provided in this subsection and subs. (3)(c)4. and 5. and (4), and notwithstanding ss. 182.017 and 196.58 and any zoning ordinance enacted by a political subdivision under s. 59.69, 60.61, 60.62, or 62.23, a wireless provider shall have the right to collocate small wireless facilities and construct, modify, maintain, and replace its own utility poles, or, with the permission of the owner, a 3rd party's utility pole, that supports small wireless facilities along, across, upon, and under a right-of-way. Such small wireless facilities and utility poles, and activities related to the installation and maintenance of the small wireless facilities and utility poles, may not obstruct or hinder travel, drainage, maintenance, or

the public health, safety, and general welfare on or around the right-of-way, or obstruct the legal use of the right-of-way for other communications providers, public utilities, cooperative associations organized under ch. 185 for the purpose of producing or furnishing heat, light, power, or water to their members only, or pipes or pipelines transmitting liquid manure. A political subdivision may enact an ordinance consistent with this subdivision.

2. Except as provided in subd. 4., the height of a utility pole installed, or modified, in a right-of-way may not exceed the greater of:

a. A height that is 10 percent taller than the tallest existing utility pole as of July 12, 2019, that is located within 500 feet of the new or modified utility pole in the same right-of-way.

b. Fifty feet above ground level.

3. The height of a small wireless facility installed, or modified, in a right-of-way may not exceed the greater of:

a. A height that is 10 percent taller than the existing utility pole or wireless support structure on which the small wireless facility is located.

b. Fifty feet above ground level.

4. A wireless provider may construct, modify, and maintain a utility pole, wireless support structure, or small wireless facility along, across, upon, and under a right-of-way that exceeds the height limits in this paragraph if the wireless provider complies with height limits under the zoning ordinances enacted by a political subdivision under s. 59.69, 60.61, 60.62, or 62.23.

5. With regard to the rights of a wireless provider to construct or modify a utility pole as described in subd. 1., a political subdivision may propose an alternate location for collocation, which the wireless provider shall use if it has the right to use the alternate structure on reasonable terms and conditions and the alternate location is technically feasible and does not impose material additional costs.

(f) *Damage and repair.* The state or a political subdivision may require a wireless provider to repair all damage that is directly caused by the activities of the wireless provider in a right-of-way involving its small wireless facilities or structures, and to return the right-of-way to its former condition before it was so damaged. If the wireless provider fails to make the required repairs within a reasonable amount of time after receiving a written request to do so from the state or a political subdivision, the state or political subdivision may make the necessary repairs and charge the liable party for the cost of the repairs. This paragraph does not prohibit a political subdivision from recovering damages under s. 86.02.

(g) *Nondiscrimination.* The state and political subdivisions must administer and regulate a right-of-way in a competitively neutral manner with regard to all users of the right-of-way.

**(3) Permitting process.** (a) *Applicability.* This subsection applies to the permitting for the collocation of small wireless facilities by a wireless provider within and outside a right-of-way and to the permitting for the installation, modification, and replacement

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works.

of associated utility poles by a wireless provider inside a right-of-way. Except as provided in this subsection and in subs. (2) and (4), neither the state nor a political subdivision may prohibit, regulate, or charge any person for the collocation of small wireless facilities.

(b) *Zoning.* Notwithstanding an ordinance enacted under s. 59.69, 60.61, 60.62, or 62.23, and except as provided in par. (c)4. and 5., small wireless facilities shall be classified as permitted uses and are not subject to a political subdivision's zoning ordinances if they are collocated in a right-of-way or outside a right-of-way if the property is not zoned exclusively for single-family residential use. For purposes of this paragraph and notwithstanding sub. (1)(u)3., the volume of a small wireless facility does not include preexisting associated wireless equipment on a structure outside the right-of-way.

(c) *Permits.* 1. Subject to subds. 4. and 5., the state or a political subdivision may require an application for a permit to collocate a small wireless facility and to construct, modify, maintain, or operate a new or replacement utility pole, provided such permit is of general applicability and does not apply exclusively to small wireless facilities. All of the following apply to such permit applications filed by an applicant:

a. Neither the state nor a political subdivision may require an applicant to perform services unrelated to the approval sought.

b. Neither the state nor a political subdivision may require an applicant that is a wireless provider to provide more information in its permit application than such a governmental unit requires from a communications service provider that is not a wireless provider and that applies for the same type of permit. The state or a political subdivision may require the types of information specified in subd. 2. in an application.

c. The state or a political subdivision shall notify an applicant in writing, within 10 days of receiving an application, whether it is complete. If an application is incomplete, the state or political subdivision shall specify why the application is incomplete. The processing deadlines under subd. 1. d., e., and f. restart at zero on the date that the applicant submits to the state or a political subdivision an application that includes information identified by the state or political subdivision to render the application complete.

d. Except as provided in subd. 1. g., if a permit application involves a new or replacement utility pole, and the state or a political subdivision fails to approve or deny the permit application under this section not later than 90 days after its receipt, the applicant may consider its permit application approved.

e. Except as provided in subd. 1. g., if a permit application proposes to collocate small wireless facilities on an existing structure and the state or a political subdivision fails to approve or deny the permit application under this section not later than 60 days after its receipt, the applicant may consider its permit application approved.

f. Except as provided in subd. 1. g., if there is any type of construction, building, or encroachment permit required by a political subdivision that relates to a permit under subd. 1. d. or e., and the political subdivision fails to approve or deny that permit application within the specified 60-day or 90-day time frame, the applicant may consider its permit application approved.

g. The applicant and the state or political subdivision may mutually agree to extend the deadline for the state or political subdivision to approve or deny a permit application under subd. 1. d., e., or f.

h. Subject to subd. 1. i., the state or a political subdivision shall approve a permit application unless it does not meet the applicable codes, sub. (2)(e)1., or the standards of an ordinance enacted pursuant to sub. (2)(e)1. If the permit application is denied for any of these reasons, the state or political subdivision shall provide the applicant with written documentation explaining the basis for the denial no later than the date that the permit application is denied. An applicant may cure the deficiencies identified in the documentation and resubmit the permit application no later than 30 days after receipt of the documentation without being required to pay an additional application fee. The state or a political subdivision shall approve or deny the revised permit application not later than 30 days after its receipt.

i. The state or a political subdivision may condition approval of a permit on compliance with reasonable and nondiscriminatory relocation, abandonment, or bonding requirements that are consistent with state law applicable to other occupiers of rights-of-way.

j. An applicant may file a consolidated permit application to collocate up to 30 small wireless facilities, or a greater number if agreed to by a political subdivision, provided that all the small wireless facilities in the application consist of substantially similar equipment and are to be placed on similar types of structures. In rendering a decision on a consolidated permit application, a political subdivision may approve a permit for some small wireless facilities and deny a permit for others, but the political subdivision may not use the denial of one or more permits as a basis to deny permits for all of the small wireless facilities in the application.

k. If an applicant's permit application is approved, the applicant shall commence the activity authorized by the permit no later than 365 days after its receipt and shall pursue work on the activity until completion. Neither the state nor a political subdivision may place any time limitation on an applicant that is related to the permit. An applicant may request that the state or a political subdivision terminate the applicant's permit.

2. The state or a political subdivision may require any of the following types of information in an application for a permit specified in subd. 1. (intro.):

a. The applicant's name, address, telephone number, e-mail address, and emergency contact information.

b. The names, addresses, telephone numbers, and e-mail addresses of all duly authorized representatives and consultants, if any, acting on behalf of the applicant with respect to the filing of the application.

c. A general description of the proposed small wireless facility and associated utility pole, if applicable. The scope and detail of such description shall be appropriate to the nature and character of the work to be performed, with special emphasis on those matters likely to be affected or impacted by the physical work proposed.

d. Site plans and detailed construction drawings to scale that identify the proposed small wireless facility and the proposed use of the right-of-way.

e. To the extent the proposed facility involves collocation on a new utility pole, existing utility pole, or existing wireless support structure, a structural report performed by a duly licensed engineer evidencing that the utility pole or wireless support structure

WESTLAW    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

will structurally support the collocation, or that the utility pole or wireless support structure may and will be modified to meet structural requirements, in accordance with applicable codes.

f. If the small wireless facility will be collocated on a utility pole or wireless support structure owned by a 3rd party, other than a governmental pole or a utility pole for designated services, a certification that the wireless provider has permission from the owner to collocate on the utility pole or wireless support structure.

g. Certification by the wireless provider that the small wireless facility will comply with relevant federal communications commission regulations concerning 1) radio frequency emissions from radio transmitters and 2) unacceptable interference with public safety spectrum, including compliance with the abatement and resolution procedures for interference with public safety spectrum established by the federal communications commission set forth in 47 CFR 22.970 to 22.973 and 47 CFR 90.672 to 90.675.

h. Certification by the wireless provider that the small wireless facility will not materially interfere with any of the following: 1) the safe operation of traffic control equipment; 2) sight lines or clear zones for transportation or pedestrians; and 3) the federal Americans with Disabilities Act or similar federal or state standards regarding pedestrian access or movement.

i. A statement that the small wireless facility shall comply with all applicable codes.

3. Neither the state nor a political subdivision may institute an express or de facto moratorium on any of the following:

a. The filing, receiving, or processing of applications.

b. The issuance of permits or other approvals, if any, for the collocation of small wireless facilities or the installation, modification, or replacement of utility poles to support small wireless facilities.

4. A political subdivision may adopt aesthetic requirements governing the deployment of small wireless facilities and associated antenna equipment and utility poles in the right-of-way, subject to the following conditions:

a. The aesthetic requirements must be 1) reasonable in that they are technically feasible and reasonably directed to avoiding or remedying unsightly or out-of-character deployments; 2) no more burdensome than those applied to other types of infrastructure deployments; and 3) objective and published in advance.

b. Any design or concealment measures are not considered a part of the small wireless facility for purpose of the size parameters in the definition of a small wireless facility under sub. (1)(u).

c. A political subdivision may deny an application for not complying with aesthetic requirements only if the denial does not prohibit or have the effect of prohibiting the provision of wireless service.

5. A political subdivision may enact an ordinance to prohibit, in a nondiscriminatory way, a communications service provider from installing structures in the right-of-way of a historic district or an underground district, except that the ordinance may not

prohibit collocations or the replacement of existing structures. In this subdivision, a historic district is an area designated as historic by the political subdivision, listed on the national register of historic places in Wisconsin, or listed on the state register of historic places. In this subdivision, an underground district is an area designated by the political subdivision in which all pipes, pipelines, ducts, wires, lines, conduits, or other equipment, which are used for the transmission, distribution, or delivery of electrical power, heat, water, gas, sewer, or telecommunications equipment, are located underground. A political subdivision may require any collocation on or replacement of an existing structure to reasonably conform to the design aesthetics of the original structure in a historic or underground district. Any design or concealment measures are not considered a part of the small wireless facility for purposes of the size restrictions in the definition of "small wireless facility" under sub. (1)(u). The requirements of an ordinance enacted under this subdivision must be objective, technically feasible, no more burdensome than requirements applied to other types of infrastructure deployment, and reasonably directed at avoiding or remedying the intangible public harm of unsightly or out-of-character deployments. A political subdivision may not apply any requirements under an ordinance enacted under this subdivision in a manner that results in an effective prohibition of wireless service.

(d) *Application fees*. 1. Except as provided in subd. 2., the state or a political subdivision may only charge an application fee that is reasonable, nondiscriminatory, and recovers no more than a governmental unit's direct cost for processing an application, except that no application fee may exceed any of the following:

a. For an application that includes 5 or fewer small wireless facilities, $500.

b. For an application that includes more than 5 small wireless facilities, $500 plus $100 for each small wireless facility in excess of 5.

c. One thousand dollars for the installation or replacement of a utility pole together with the collocation of an associated small wireless facility.

2. Beginning on July 12, 2019, the state or a political subdivision may adjust a fee allowed under subd. 1. by 10 percent every 5 years, rounded to the nearest multiple of $5. During each 5-year period, the adjustment may be applied incrementally or as a single adjustment.

3. If the federal communications commission adjusts its levels for fees that are presumptively lawful under 47 USC 253 or 332(c)(7), the state or a political subdivision may adjust any impacted fee under subd. 1. on a pro rata basis, consistent with the federal communications commission's action.

(e) *Approvals not required*. Neither the state nor a political subdivision may require applications, permits, fees, or any other approval for any of the following:

1. Routine maintenance.

2. The replacement of a small wireless facility with a small wireless facility that is substantially similar to, or the same size or smaller than, the existing small wireless facility, except that the governmental unit may require the person seeking to replace the small wireless facility to obtain a permit to work within a right-of-way to complete such a replacement. For purposes of this subdivision, a small wireless facility does not include the structure on which it is collocated.

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

3. The installation, placement, maintenance, operation, or replacement of micro wireless facilities that are strung on cables between existing utility poles in compliance with the National Electrical Safety Code.

(f) *Traffic work permits.* Nothing in this section prohibits a political subdivision from requiring a work permit for work that will unreasonably affect traffic patterns or obstruct vehicular traffic in a right-of-way, provided that such permits are issued to any applicant on a nondiscriminatory basis upon terms and conditions that apply to the activities of any other person performing work in the right-of-way that requires excavation or the closing of sidewalks or traffic lanes.

**(4) Collocation of small wireless facilities on governmental poles and utility poles for designated services.** (a) A person owning or controlling a governmental pole or a utility pole for designated services may not enter into an exclusive arrangement with any person for the right to attach to, or use, such poles.

(b) The fees or rates charged by the owner of a pole described under par. (a), and the terms and conditions for such attachment or use, may not be discriminatory.

(c) The rate a political subdivision may charge a wireless provider to collocate a small wireless facility on a utility pole for designated services shall be governed by an agreement between the political subdivision and the wireless provider. If there is a failure to agree on the rate, the public service commission shall determine the compensation pursuant to the procedures in s. 196.04 and the determination shall be reviewable under s. 196.41.

(d)1. The rate an owner of a governmental pole other than a utility pole for designated services charges another person to collocate on the owner's pole shall be sufficient to recover the actual, direct, and reasonable costs related to the applicant's application for, and use of, space on the pole, except that subject to subd. 2., the total annual rate for a collocation and any related activities may not exceed the lesser of the actual, direct, and reasonable costs related to the collocation or $250 per year per small wireless facility. If a dispute arises concerning the appropriateness of a rate charged by the state or political subdivision under this subdivision, the governmental unit bears the burden of proving that the rate is reasonably related to the actual, direct, and reasonable costs incurred by the governmental unit.

2. Beginning on July 12, 2019, the owner of a governmental pole other than a utility pole for designated services may adjust a rate allowed under subd. 1. by 10 percent every 5 years, rounded to the nearest multiple of $5. During each 5-year period, the adjustment may be applied incrementally or as a single adjustment.

3. If the federal communications commission adjusts its levels for rates that are presumptively lawful under 47 USC 253 or 332(c)(7), the state or a political subdivision may adjust any impacted rate under subd. 1. on a pro rata basis, consistent with the federal communications commission's action.

(e)1. Except as provided in subd. 2., by the later of October 1, 2019, or 3 months after receiving its first request to collocate a small wireless facility on a governmental pole, other than a utility pole for designated services, the state or a political subdivision shall implement rates, fees, and terms for the collocation of small wireless facilities on governmental poles that comply with this subsection.

2. Agreements between a wireless provider and the state or a political subdivision that are in effect on July 12, 2019, and that relate to the collocation of small wireless facilities in the right-of-way, including the collocation of small wireless facilities on governmental poles, remain in effect, subject to applicable termination provisions, except that by August 1, 2021, the state or political subdivision shall amend any such agreement to comply with the rates, fees, and terms required under this subsection.

(f) With regard to a governmental pole that supports aerial cables used for video, communications, or electric service, and with regard to utility poles for designated services, the parties shall comply with the process for make-ready work under 47 USC 224 and its implementing regulations, including 47 CFR 1.1420 and 1.1422. The good faith estimate of the person owning or controlling such poles for any make-ready work necessary to enable the pole to support the requested collocation must include pole replacement if necessary.

(g) With regard to a governmental pole that does not support aerial cables used for video, communications, or electric service, the state or political subdivision shall provide a good faith estimate for any make-ready work necessary to enable the pole to support the requested collocation, including pole replacement if necessary, not later than 60 days beginning after receipt of a complete application, except that the governmental unit may provide the applicant with access to the governmental pole that is necessary for the applicant to make that estimate. Make-ready work, including any pole replacement, must be completed within 60 days after the applicant's written acceptance of a good faith estimate provided by the governmental unit or within 60 days after the applicant makes the estimate.

(h) A person owning or controlling a governmental pole other than a utility pole for designated services may not require more make-ready work than required to meet applicable codes or industry standards. Fees for make-ready work may not include any costs that are related to preexisting conditions, prior damage, or noncompliance with currently applicable standards. Fees for make-ready work, including any pole replacement, may not exceed actual costs or the amount charged to other communications service providers for similar work, and may not include any consultant fees or expenses.

**(5) Dispute resolution.** Except as provided in sub. (4)(c), and notwithstanding ss. 182.017(8)(a) and 196.58(4)(a), a court of competent jurisdiction shall determine all disputes arising under this section. Unless otherwise agreed to by the parties to a dispute, and pending resolution of a right-of-way access rate dispute, a political subdivision controlling access to and use of a right-of-way shall allow the placement of a small wireless facility or utility pole at a temporary rate of one-half of the political subdivision's proposed annual rate, or $20, whichever is less. Rates shall be reconciled and adjusted upon final resolution of the dispute. Pending the resolution of a dispute concerning rates for collocation of small wireless facilities on governmental poles or utility poles for designated services, the person owning or controlling the pole shall allow the collocating person to collocate on its poles, at annual rates of no more than $20 per year per pole, with rates to be reconciled and adjusted upon final resolution of the dispute.

**(6) Indemnification.** A wireless provider shall indemnify and hold harmless a political subdivision against any and all liability and loss from personal injury or property damage resulting from or arising out of, in whole or in part, the use or occupancy of rights-of-way by the wireless provider or its employees, agents, or contractors arising out of the rights and privileges granted under this section. A wireless provider has no obligation to indemnify or hold harmless against any liabilities and losses as may be due to or caused by the sole negligence of the political subdivision or its employees or agents.

**(7) Federal law; contracts.** Nothing in this section adds to, replaces, or supersedes federal laws regarding utility poles owned by investor-owned electric utilities nor shall this section impose or otherwise affect any rights, controls, or contractual obligations investor-owned electric utilities may establish with respect to their utility poles.

**(8) Private property owners.** Nothing in this section is intended to authorize a person to place, maintain, modify, operate, or replace a privately owned utility pole or wireless support structure or to collocate small wireless facilities on a privately owned utility pole, a privately owned wireless support structure, or other private property without the consent of the property owner.

**(9) Communications services.** (a) This section may not be construed or interpreted to authorize any entity to provide communications service without compliance with all applicable laws or to authorize the collocation, installation, placement, operation, or maintenance of any communications facilities, including wireline backhaul facilities, other than small wireless facilities and associated utility poles.

(b) Except as it relates to small wireless facilities subject to the permit and fee requirements established under this section and except as otherwise authorized by federal or state law, a political subdivision may not do any of the following:

1. Adopt or enforce any regulation or requirement on the placement or operation of communications facilities in rights-of-way by a communications service provider authorized under federal, state, or local law to operate in rights-of-way.

2. Regulate any communications service.

3. Impose or collect any tax, fee, or other charge for the provision of additional communications services over a communications service provider's communications facilities in a right-of-way.

**Credits**
<<For credits, see Historical Note field.>>

W. S. A. 66.0414, WI ST 66.0414
Current through 2023 Act 272, published April 10, 2024.

---

                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**  © 2025 Thomson Reuters. No claim to original U.S. Government Works.   Appx. 579   13

West's Wisconsin Statutes Annotated
Municipalities (Ch. 59 to 68)
Chapter 66. General Municipality Law (Refs & Annos)
Subchapter IV. Regulation

W.S.A. 66.0415

66.0415. Offensive industry

*Currentness*

(1) Except as provided under s. 62.23 (7a)(am), the common council of a city or village board may direct the location, management and construction of, and license, regulate or prohibit, any industry, thing or place where any nauseous, offensive or unwholesome business is carried on, that is within the city or village or within 4 miles of the boundaries of the city or village, except that the Milwaukee, Menominee and Kinnickinnic rivers with their branches to the outer limits of the county of Milwaukee, and all canals connecting with these rivers, together with the lands adjacent to these rivers and canals or within 100 yards of them, are within the jurisdiction of the city of Milwaukee. A town board has the same powers as are provided in this section for cities and villages as to the area within the town that is not licensed, regulated or prohibited by a city or village under this section. A business that is conducted in violation of a city, village or town ordinance that is authorized under this section is a public nuisance. An action for the abatement or removal of the business or an injunction to prevent operation of the business may be brought and maintained by the common council or village or town board in the name of this state on the relation of the city, village or town as provided in ss. 823.01, 823.02 and 823.07, or as provided in s. 254.58. Section 97.42 does not limit the powers granted by this section. Section 95.72 does not limit the powers granted by this section to cities or villages but powers granted to towns by this section are limited by s. 95.72 and by any orders and rules promulgated under s. 95.72.

(2) To prevent nuisance, a city or village may, subject to the approval of the appropriate town board, by ordinance enact reasonable regulations governing areas where refuse, rubbish, ashes or garbage are dumped or accumulated in a town within one mile of the corporate limits of the city or village.

**Credits**

<<For credits, see Historical Note field.>>

Notes of Decisions (12)

W. S. A. 66.0415, WI ST 66.0415
Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

West's Wisconsin Statutes Annotated
    Municipalities (Ch. 59 to 68)
        Chapter 66. General Municipality Law (Refs & Annos)
            Subchapter IV. Regulation

W.S.A. 66.0416

66.0416. Certain businesses operated by minors

Currentness

(1) In this section:

(a) "Political subdivision" means a city, village, town, or county.

(b) "Stand operated by a minor" means a stand or other location at which goods other than potentially hazardous food, as defined in s. 97.30(1)(bm), are sold in occasional sales, as defined in s. 77.51(9), directly to consumers; that operates on a temporary, occasional basis; and that is operated solely by a person or persons under the age of 18 on private property with the permission of the property owner.

(2) No political subdivision may do any of the following:

(a) Enact an ordinance or adopt a resolution that prohibits a stand operated by a minor.

(b) Require a license or permit for, or impose a fee, charge, or surcharge on, any stand operated by a minor.

(c) Require a license or permit for a business that is operated by a person under the age of 18 and that is operated only occasionally. This paragraph does not apply to a business at which potentially hazardous food, as defined in s. 97.30(1)(bm), is sold.

(3) If a political subdivision has enacted an ordinance or adopted a resolution before November 27, 2019, that is inconsistent with sub. (2)(a), the ordinance or resolution does not apply and may not be enforced.

**Credits**
<<For credits, see Historical Note field.>>

W. S. A. 66.0416, WI ST 66.0416
Current through 2023 Act 272, published April 10, 2024.

Case 2:24-cv-00228-Z    Document 50-1    Filed 01/17/25    Page 582 of 882    PageID 49367

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
Municipalities (Ch. 59 to 68)
Chapter 66. General Municipality Law (Refs & Annos)
Subchapter IV. Regulation

W.S.A. 66.0417

66.0417. Local enforcement of certain food and health regulations

Currentness

(1) An employee or agent of a local health department designated by the department of agriculture, trade and consumer protection under s. 97.41 or 97.615(2) may enter, at reasonable hours, any premises for which the local health department issues a license under s. 97.41 or 97.615(2) to inspect the premises, secure samples or specimens, examine and copy relevant documents and records, or obtain photographic or other evidence needed to enforce ch. 97, relating to those premises. If samples of food are taken, the local health department shall pay or offer to pay the market value of those samples. The local health department or department of agriculture, trade and consumer protection shall examine the samples and specimens secured and shall conduct other inspections and examinations needed to determine whether there is a violation of ch. 97, rules adopted by the department under those statutes, ordinances adopted by the village, city or county or regulations adopted by the local board of health under s. 97.41(7) or 97.615.

(2)(a) Whenever, as a result of an examination, a village, city or county has reasonable cause to believe that any examined food constitutes, or that any construction, sanitary condition, operation or method of operation of the premises or equipment used on the premises creates an immediate danger to health, the administrator of the village, city or county agency responsible for the village's, city's or county's agent functions under s. 97.41 or 97.615(2) may issue a temporary order and cause it to be delivered to the licensee, or to the owner or custodian of the food, or to both. The order may prohibit the sale or movement of the food for any purpose, prohibit the continued operation or method of operation of specific equipment, require the premises to cease any other operation or method of operation which creates the immediate danger to health, or set forth any combination of these requirements. The administrator may order the cessation of all operations authorized by the license only if a more limited order does not remove the immediate danger to health. Except as provided in par. (c), no temporary order is effective for longer than 14 days from the time of its delivery, but a temporary order may be reissued for one additional 14-day period, if necessary to complete the analysis or examination of samples, specimens or other evidence.

(b) No food described in a temporary order issued and delivered under par. (a) may be sold or moved and no operation or method of operation prohibited by the temporary order may be resumed without the approval of the village, city or county, until the order has terminated or the time period specified in par. (a) has run out, whichever occurs first. If the village, city or county, upon completed analysis and examination, determines that the food, construction, sanitary condition, operation or method of operation of the premises or equipment does not constitute an immediate danger to health, the licensee, owner, or custodian of the food or premises shall be promptly notified in writing and the temporary order shall terminate upon his or her receipt of the written notice.

(c) If the analysis or examination shows that the food, construction, sanitary condition, operation or method of operation of the premises or equipment constitutes an immediate danger to health, the licensee, owner, or custodian shall be notified within the effective period of the temporary order issued under par. (a). Upon receipt of the notice, the temporary order remains in

effect until a final decision is issued under sub. (3), and no food described in the temporary order may be sold or moved and no operation or method of operation prohibited by the order may be resumed without the approval of the village, city or county.

(3) A notice issued under sub. (2)(c) shall be accompanied by notice of a hearing as provided in s. 68.11(1). The village, city or county shall hold a hearing no later than 15 days after the service of the notice, unless both parties agree to a later date. Notwithstanding s. 68.12, a final decision shall be issued under s. 68.12 within 10 days of the hearing. The decision may order the destruction of food, the diversion of food to uses which do not pose a danger to health, the modification of food so that it does not create a danger to health, changes to or replacement of equipment or construction, other changes in or cessations of any operation or method of operation of the equipment or premises, or any combination of these actions necessary to remove the danger to health. The decision may order the cessation of all operations authorized by the license only if a more limited order will not remove the immediate danger to health.

(4) A proceeding under this section, or the issuance of a license for the premises after notification of procedures under this section, does not constitute a waiver by the village, city or county of its authority to rely on a violation ch. 97 or any rule adopted under those statutes as the basis for any subsequent suspension or revocation of the license or any other enforcement action arising out of the violation.

(5)(a) Except as provided in par. (b), any person who violates this section or an order issued under this section may be fined not more than $10,000 plus the retail value of any food moved, sold or disposed of in violation of this section or the order, or imprisoned not more than one year in the county jail, or both.

(b) Any person who does either of the following may be fined not more than $5,000 or imprisoned not more than one year in a county jail, or both:

1. Assaults, restrains, threatens, intimidates, impedes, interferes with or otherwise obstructs a village, city or county inspector, employee or agent in the performance of his or her duties under this section.

2. Gives false information to a village, city or county inspector, employee or agent engaged in the performance of his or her duties under this section, with the intent to mislead the inspector, employee or agent.

**Credits**
<<For credits, see Historical Note field.>>

W. S. A. 66.0417, WI ST 66.0417
Current through 2023 Act 272, published April 10, 2024.

---

End of Document
© 2025 Thomson Reuters. No claim to original U.S. Government Works.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

West's Wisconsin Statutes Annotated
Municipalities (Ch. 59 to 68)
Chapter 66. General Municipality Law (Refs & Annos)
Subchapter IV. Regulation

W.S.A. 66.0418

66.0418. Prohibition of local regulation of certain foods, beverages

Currentness

(1) In this section "political subdivision" means a city, village, town, or county.

(2) (a) No political subdivision may enact an ordinance or adopt a resolution that prohibits or restricts the sale of food or nonalcoholic beverages based on the number of calories, portion size, or other nutritional criteria of the food or nonalcoholic beverage.

(b) If a political subdivision has enacted an ordinance or adopted a resolution before July 2, 2013, that is inconsistent with par. (a), the ordinance or resolution does not apply and may not be enforced.

**Credits**
<<For credits, see Historical Note field.>>

W. S. A. 66.0418, WI ST 66.0418
Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Proposed Legislation

West's Wisconsin Statutes Annotated

 Municipalities (Ch. 59 to 68)

  Chapter 66. General Municipality Law (Refs & Annos)

   Subchapter IV. Regulation

W.S.A. 66.0419

66.0419. Local regulation of auxiliary containers

Currentness

(1) In this section:

(a) "Auxiliary container" means a bag, cup, bottle, can, or other packaging that is designed to be reusable or single-use; that is made of cloth, paper, plastic, cardboard, corrugated material, aluminum, glass, postconsumer recycled material, or similar material or substrates, including coated, laminated, or multi-layer substrates; and that is designed for transporting or protecting merchandise, food, or beverages from a food service or retail facility.

(b) "Political subdivision" means a city, village, town, or county.

(2) No political subdivision may do any of the following:

(a) Enact or enforce an ordinance or adopt or enforce a resolution regulating the use, disposition, or sale of auxiliary containers.

(b) Prohibit or restrict auxiliary containers.

(c) Impose a fee, charge, or surcharge on auxiliary containers.

(3)(a) This section does not limit the authority of a political subdivision in operating a curbside recycling or commercial recycling program or an effective recycling program under s. 287.11 or in designating a recycling location.

(b) Subsection (2)(b) and (c) does not apply to the use of auxiliary containers on a property owned by the political subdivision.

**Credits**

<<For credits, see Historical Note field.>>

W. S. A. 66.0419, WI ST 66.0419

Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**                                         © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
   Municipalities (Ch. 59 to 68)
      Chapter 66. General Municipality Law (Refs & Annos)
         Subchapter IV. Regulation

W.S.A. 66.0420

66.0420. Video service

Currentness

**(1) Legislative findings.** The legislature finds all of the following:

(a) Video service brings important daily benefits to state residents by providing news, education, and entertainment.

(b) Uniform regulation of all video service providers by this state is necessary to ensure that state residents receive adequate and efficient video service and to protect and promote the public health, safety, and welfare.

(c) Fair competition in the provision of video service will result in new and more video programming choices for consumers in this state, and a number of providers have stated their desire to provide that service.

(d) Timely entry into the market is critical for new entrants seeking to compete with existing providers.

(e) This state's economy would be enhanced by additional investment in communications and video programming infrastructure by existing and new providers of video service.

(f) Minimal regulation of all providers of video service within a uniform framework will promote the investment described in par. (e).

(g) Ensuring that existing providers of video service are subject to the same regulatory requirements and procedures as new entrants will ensure fair competition among all providers.

(h) This section is an enactment of statewide concern for the purpose of providing uniform regulation of video service that promotes investment in communications and video infrastructures and the continued development of this state's video service marketplace within a framework that is fair and equitable to all providers.

**(2) Definitions.** In this section:

(a) "Affiliate," when used in relation to any person, means another person who owns or controls, is owned or controlled by, or is under common ownership or control with such person.

(b) "Basic local exchange service area" means the area on file with the public service commission in which a telecommunications video service provider provides basic local exchange service, as defined in s. 196.01(1g).

(c) "Cable franchise" means a franchise granted under s. 66.0419(3)(b), 2005 stats.

(d) "Cable operator" has the meaning given in 47 USC 522(5).

(e) "Cable service" has the meaning given in 47 USC 522(6).

(f) "Cable system" has the meaning given in 47 USC 522(7).

(g) Except as provided in sub. (8)(ag), "department" means the department of financial institutions.

(h) "FCC" means the federal communications commission.

(i) "Franchise fee" has the meaning given in 47 USC 542(g), and includes any compensation required under s. 66.0425.

(j)1. "Gross receipts" means all revenues received by and paid to a video service provider by subscribers residing within a municipality for video service, or received from advertisers, including all of the following:

a. Recurring charges for video service.

b. Event-based charges for video service, including pay-per-view and video-on-demand charges.

c. Rental of set top boxes and other video service equipment.

d. Service charges related to the provision of video service, including activation, installation, repair, and maintenance charges.

e. Administrative charges related to the provision of video service, including service order and service termination charges.

f. Revenues received from the provision of home shopping or similar programming.

g. All revenue, except for refunds, rebates, and discounts, derived by the video service provider for advertising over its video service network to subscribers within a municipality. If such revenue is derived under a regional or national compensation contract or arrangement between the video service provider and one or more advertisers or advertising representatives, the amount of revenue derived for a municipality shall be determined by multiplying the total revenue derived under the contract

or arrangement by the percentage resulting from dividing the number of subscribers in the municipality by the total number of regional or national subscribers that potentially receive the advertising under the contract or arrangement.

2. Notwithstanding subd. 1., "gross receipts" does not include any of the following:

a. Discounts, refunds, and other price adjustments that reduce the amount of compensation received by a video service provider.

b. Uncollectible fees, except that any uncollectible fees that are written off as bad debt but subsequently collected shall be included as gross receipts in the period collected, less the expenses of collection.

c. Late payment charges.

e. Amounts billed to video service subscribers to recover taxes, fees, surcharges or assessments of general applicability or otherwise collected by a video service provider from video service subscribers for pass through to any federal, state, or local government agency, including video service provider fees and regulatory fees paid to the FCC under 47 USC 159.

f. Revenue from the sale of capital assets or surplus equipment not used by the purchaser to receive video service from the seller of those assets or surplus equipment.

g. Charges, other than those described in subd. 1., that are aggregated or bundled with amounts described in subd. 1., including but not limited to any revenues received by a video service provider or its affiliates for telecommunications services, information services, or the provision of directory or Internet advertising, including yellow pages, white pages, banner advertisement, and electronic publishing, if a video service provider can reasonably identify such charges on books and records kept in the regular course of business or by other reasonable means.

h. Reimbursement by programmers of marketing costs actually incurred by a video service provider.

(k) "Household" means a house, apartment, mobile home, group of rooms, or single room that is intended for occupancy as separate living quarters. For purposes of this paragraph, "separate living quarters" are those in which the occupants live and eat separately from any other persons in the building and which have direct access from the outside of the building or through a common hall.

(L) "Incumbent cable operator" means a person who, immediately before January 9, 2008, was providing cable service under a cable franchise, expired cable franchise, or cable franchise extension, or under an ordinance or resolution adopted or enacted by a municipality.

(m) "Institutional network" means a network that connects governmental, educational, and community institutions.

(n) "Interim cable operator" means an incumbent cable operator that elects to continue to provide cable service under a cable franchise as specified in sub. (3)(b)2. a.

(p) "Large telecommunications video service provider" means a telecommunications video service provider that, on January 1, 2007, had more than 500,000 basic local exchange access lines in this state or an affiliate of such a telecommunication video service provider.

(r) "Municipality" means a city, village, or town.

(s) "PEG channel" means a channel designated for public, educational, or governmental use.

(sm) "Qualified cable operator" means any of the following:

1. A cable operator that has been providing cable service in this state for at least 3 years prior to applying for a video service franchise and that has never had a cable franchise revoked by a municipality.

2. An affiliate of a cable operator specified in subd. 1.

3. A cable operator that, on the date that it applies for a video service franchise, individually or together with its affiliates or parent company, is one of the 10 largest cable operators in the United States as determined by data collected and reported by the FCC or determined by information available to the public through a national trade association representing cable operators.

(t) "Service tier" means a category of video service for which a separate rate is charged.

(u) "State agency" means any board, commission, department, or office in the state government.

(um) "Telecommunications utility" has the meaning given in s. 196.01(10).

(v) "Telecommunications video service provider" means a video service provider that uses facilities for providing telecommunications service, as defined in s. 196.01(9m), also to provide video service.

(w) "Video franchise area" means the area or areas described in an application for a video service franchise under sub. (3)(d)2.

(x) "Video programming" means programming provided by, or generally considered comparable to programming provided by, a television broadcast station.

(y) "Video service" means any video programming service, cable service, or service provided via an open video system that complies with 47 USC 573, that is provided through facilities located at least in part in public rights-of-way, without regard to delivery technology, including Internet protocol technology or any other technology. "Video service" does not include any of the following:

1. Video programming provided by a commercial mobile radio service provider, as defined in s. 196.01(2g).

2. Video programming provided solely as part of and via a service that enables users to access content, information, electronic mail, or any other service offered over the public Internet.

(z) "Video service franchise" means a franchise issued under sub. (3)(f)2.

(zb) "Video service network" means wireline facilities, or any component thereof, located at least in part in the public right-of-way that deliver video service, without regard to delivery technology, including Internet protocol technology or any other technology. "Video service network" includes a cable system.

(zg) "Video service provider" means a person, including an incumbent cable operator, who is issued a video service franchise or a successor or assign of such a person.

(zm) "Video service provider fee" means the fee paid by a video service provider under sub. (7).

**(3) Authority to provide video service.** (a) *In general.* Except for an interim cable operator, and except as provided in par. (c) and sub. (11), no person may provide video service in this state unless the department has issued a video service franchise to the person and the person has provided the notice required under par. (h).

(b) *Incumbent cable operators.* 1. A municipality may not renew or extend the cable franchise of an incumbent cable operator that expires after January 9, 2008.

2. An incumbent cable operator may do one of the following:

a. Continue to provide cable service as an interim cable operator until the cable franchise expires.

b. Apply for a video service franchise. If an incumbent cable operator applies for a video service franchise, the cable franchise shall terminate and have no effect upon issuance of the video service franchise. Upon termination of the cable franchise, the municipality that granted the franchise shall, at the request of the incumbent cable operator, surrender, return, or take such other action as may be necessary to nullify any bond, letter of credit, or similar instrument intended to secure the performance of the incumbent cable operator under the cable franchise.

3. An incumbent cable operator whose cable franchise expires after January 9, 2008, may not, after expiration of the cable franchise, provide video service in this state unless the incumbent cable operator applies for a video service franchise under subd. 2. b. and, upon issuance of the video service franchise, provides the notice required under par. (h). An incumbent cable operator whose cable franchise expired before January 9, 2008, and who was providing cable service immediately before January 9, 2008, may continue to provide cable service if, no later than March 1, 2008, the incumbent cable operator applies for a video service franchise under subd. 2.b.

Case 2:24-cv-00228-Z    Document 50-1    Filed 01/17/25    Page 593 of 882    PageID 49378

(c) *Other providers.* A person, other than an incumbent cable operator, who was providing video service immediately before January 9, 2008, may provide video service without a video service franchise issued by the department. This paragraph ceases to apply to such a person if the person does not apply for a video service franchise no later than March 1, 2008.

(d) *Application.* An applicant for a video service franchise shall submit an application to the department that consists of all of the following:

1. The location and telephone number of the applicant's principal place of business, the names of the principal executive officers of the applicant, and the names of any persons authorized to represent the applicant before the department.

2. A description of the area or areas of the state in which the applicant intends to provide video service.

3. The date on which the applicant intends to begin providing video service in the video franchise area.

4. An affidavit signed by an officer or general partner of the applicant that affirms all of the following:

a. That the applicant has filed or will timely file with the FCC all forms required by the FCC in advance of offering video service.

b. That the applicant agrees to comply with this section and all applicable federal statutes and regulations.

c. That the applicant is legally, financially, and technically qualified to provide video service.

5. A description of the services that the applicant proposes to provide.

(e) *Service upon municipalities.* 1. At the time that an applicant submits an application under par. (d), or a video service provider submits a notification regarding a modification to an application under par. (j), to the department, the applicant or video service provider shall serve a copy of the application or notification on each municipality in the video franchise area.

2. a. This subdivision applies only to a municipality that, under subd. 1., is served a copy of an application or that, under subd. 1., is served a copy of a notification relating to an expansion of the area or areas of the state in which a video service provider intends to provide video service, if the municipality has not previously been served a copy of an application under subd. 1. by that video service provider.

b. If a municipality specified in subd. 2.a. has granted any cable franchise that is in effect immediately before January 9, 2008, the municipality shall, no later than 10 business days after receipt of the copy, notify the applicant in writing of the number of PEG channels for which incumbent cable operators are required to provide channel capacity in the municipality, the amount and type of monetary support for access facilities for PEG channels required of incumbent cable operators as described in sub. (7)(em), and the percentage of revenues that incumbent cable operators are required to pay the municipality as franchise fees.

(f) *Department duties.* 1. After the filing of an application, the department shall notify the applicant in writing as to whether the application is complete and, if the department has determined that the application is not complete, the department shall state the reasons for the determination.

2. After the filing of an application that the department has determined is complete, the department shall determine whether an applicant is legally, financially, and technically qualified to provide video service. If the department determines that an applicant is legally, financially, and technically qualified to provide video service, the department shall issue a video service franchise to the applicant. If the department determines that an applicant is not legally, financially, and technically qualified to provide video service, the department shall reject the application and shall state the reasons for the determination.

4. The department shall promulgate rules for determining whether an applicant is legally, financially, and technically qualified to provide video service.

(g) *Effect of video service franchise.* A video service franchise issued by the department authorizes a video service provider to occupy the public rights-of-way and to construct, operate, maintain, and repair a video service network to provide video service in the video franchise area.

(h) *Notice before providing service.* No later than 10 business days before providing video service in a municipality in a video franchise area, a video service provider shall provide notice to the department and the municipality.

(i) *Expiration and revocation of video service franchise.* The department may revoke a video service franchise issued to a video service provider if the department determines that the video service provider has failed to substantially meet a material requirement imposed upon it by the department. Before commencing a revocation proceeding, the department shall provide the video service provider written notice of the department's intention to revoke the franchise and the department's reasons for the revocation and afford the video service provider a reasonable opportunity to cure any alleged violation. The department must, before revoking any video service franchise, afford a video service provider full due process that, at a minimum, must include a proceeding before a hearing officer during which the video service provider must be afforded the opportunity for full participation, including the right to be represented by counsel, to introduce evidence, to require the production of evidence, and to question or cross-examine witnesses under oath. A transcript shall be made of any such hearing. A video service provider may bring an action to appeal the decision of the department.

(j) *Modifications.* If there is any change in the information included in an application filed by a video service provider under this subsection, the video service provider shall notify the department and update the information within 10 business days after the change, except that if the video service provider determines to expand the area or areas of the state in which the video service provider intends to provide video service, the video service provider shall apply to the department for a modified video service franchise under par. (d). A video service provider that makes a notification regarding a change in the information specified in par. (d)3., 4., or 5., shall include with the notification a fee of $100. No fee is required for a notification regarding a change in the information specified in par. (d)1.

(k) *Annual fee.* 1. A video service provider shall pay an annual fee.

2. If a video service provider has 10,000 or less subscribers, the first annual fee required under subd. 1. shall be $2,000 and each subsequent annual fee shall be $100.

**(4) Franchising authority.** For purposes of 47 USC 521 to 573, the state is the exclusive franchising authority for video service providers in this state. No municipality may require a video service provider to obtain a franchise to provide video service.

**(5) PEG channels.** (a) *Maximum number of PEG channels.* 1. If an incumbent cable operator is providing channel capacity for PEG channels to a municipality under a cable franchise in effect immediately before January 9, 2008, the municipality shall require each interim cable operator or video service provider that provides video service in the municipality to provide channel capacity for the same number of PEG channels for which channel capacity is provided immediately before January 9, 2008.

2. a. Except as provided in subd. 2. b. and c., if no incumbent cable operator is providing channel capacity for PEG channels to a municipality under a cable franchise that is in effect immediately before January 9, 2008, then, if the municipality has a population of 50,000 or more, the municipality may require each interim cable operator and video service provider that provides video service in the municipality to provide channel capacity for up to 3 PEG channels, and, if the municipality has a population of less than 50,000, the municipality may require each interim cable operator and video service provider that provides video service in the municipality to provide channel capacity for no more than 2 PEG channels.

b. If an interim cable operator or video service provider distributes video programming to more than one municipality through a single headend or video hub office and the aggregate population of the municipalities is 50,000 or more, the municipalities may not require the interim cable operator or video service provider to provide, in the aggregate, channel capacity for more than 3 PEG channels under subd. 2.a.

c. If an interim cable operator or video service provider distributes video programming to more than one municipality through a single headend or video hub office and the aggregate population of the municipalities is less than 50,000, the municipalities may not require the interim cable operator or video service provider to provide, in the aggregate, channel capacity for more than 2 PEG channels under subd. 2.a.

3. An interim cable operator or video service provider shall provide any channel capacity for PEG channels required under this paragraph on any service tier that is viewed by more than 50 percent of the interim cable operator's or video service provider's customers.

4. If a municipality is not required to provide notice to a video service provider under sub. (3)(e)2., the video service provider's duty to provide any additional channel capacity for PEG channels that is required by the municipality under this paragraph first applies on the date that the video service provider begins to provide service in the municipality, and, if the municipality is required to provide notice under sub. (3)(e)2., the video service provider's duty to provide any such additional channel capacity first applies on the date that the video service provider begins to provide video service in the municipality or on the 90th day after the video service provider receives the municipality's notice, whichever is later.

(b) *Exceptions.* 1. a. Notwithstanding par. (a), an interim cable operator or video service provider may reprogram for any other purpose any channel capacity provided for a PEG channel required by a municipality under par. (a) if the PEG channel is not substantially utilized by the municipality. If the municipality certifies to the interim cable operator or video service provider that reprogrammed channel capacity for a PEG channel will be substantially utilized by the municipality, the interim cable operator or video service provider shall, no later than 120 days after receipt of the certification, restore the channel capacity for the PEG

channel. Notwithstanding par. (a)3., an interim cable operator or video service provider may provide restored channel capacity for a PEG channel on any service tier.

b. For purposes of this subdivision, a PEG channel is substantially utilized by a municipality if the municipality provides 40 hours or more of programming on the PEG channel each week and at least 60 percent of that programming is locally produced.

2. Notwithstanding par. (a), if a municipality fails to provide the notice specified in sub. (3)(e)2. before the deadline specified in sub. (3)(e)2., no interim cable operator or video service provider is required to provide channel capacity for any PEG channel, or monetary support for access facilities for PEG channels pursuant to sub. (7)(em), until the 90th day after the municipality provides such notice.

(c) *Powers and duties of municipalities.* 1. Except as otherwise required under pars. (a) and (d) and sub. (7)(em), a municipality may not require an interim cable operator or video service provider to provide any funds, services, programming, facilities, or equipment related to public, educational, or governmental use of channel capacity.

2. The operation of any PEG channel for which a municipality requires an interim cable operator or video service provider to provide channel capacity under par. (a), and the production of any programming appearing on such a PEG channel, shall be the sole responsibility of the municipality and, except as provided in par. (d)1., the interim cable operator or video service provider shall bear only the responsibility to transmit programming appearing on the PEG channel.

3. A municipality that requires an interim cable operator or video service provider to provide channel capacity for a PEG channel under par. (a) shall do all of the following:

a. Ensure that all content and programming that the municipality provides or arranges to provide for transmission on the PEG channel is submitted to the interim cable operator or video service provider in a manner and form that is capable of being accepted and transmitted by the interim cable operator or video service provider over its video service network without changing the content or transmission signal and that is compatible with the technology or protocol, including Internet protocol television, utilized by the interim cable operator or video service provider to deliver video service.

b. Make the content and programming that the municipality provides or arranges to provide for transmission on a PEG channel available in a nondiscriminatory manner to all interim cable operators and video service providers that provide video service in the municipality.

(d) *Duties of interim cable providers and video service providers.* 1. If a municipality requires an interim cable operator or video service provider to provide capacity for PEG channels under par. (a), the interim cable operator or video service provider shall be required to provide transmission capacity sufficient to connect the interim cable operator's or video service provider's headend or video hub office to the municipality's PEG access channel origination point existing as of January 9, 2008. A municipality shall permit the interim cable operator or video service provider to determine the most economically and technologically efficient means of providing such transmission capacity. If a municipality requests that such a PEG access channel origination point be relocated, the interim cable operator or video service provider shall be required to provide only the first 200 feet of transmission line that is necessary to connect the interim cable operator or video service provider's headend or video hub office to such origination point. A municipality shall be liable for the costs of construction of such a transmission line beyond the first 200 feet and for any construction costs associated with additional origination points, but not for the costs associated with the transmission

WESTLAW    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

of PEG programming over such line. The interim cable operator or video service provider may recover its costs to provide transmission capacity under this subdivision by identifying and collecting a "PEG Transport Fee" as a separate line item on customer bills.

2. If the interconnection of the video service networks of interim cable operators or video service providers is technically necessary and feasible for the transmission of programming for any PEG channel for which channel capacity is required by a municipality under par. (a), the interim cable operators and video service providers shall negotiate in good faith for interconnection on mutually acceptable rates, terms, and conditions, except that an interim cable operator or video service provider who requests interconnection is responsible for interconnection costs, including the cost of transmitting programming from its origination point to the interconnection point. Interconnection may be accomplished by direct cable, microwave link, satellite, or any other reasonable method.

**(5m) Contracts with University of Wisconsin campuses.** If an incumbent cable operator has entered into an agreement with an institution or college campus within the University of Wisconsin System that is in effect on January 9, 2008, and that requires the incumbent cable operator to broadcast University of Wisconsin events on one of its channels, any video service provider that provides video service in the area in which the events are broadcast by the incumbent cable operator shall, upon the request of the institution or college campus, enter into an agreement with the institution or college campus that requires the video service provider to provide the same service on the same terms and conditions as the agreement between the institution or college campus and the incumbent cable operator.

**(6) Institutional networks.** Notwithstanding any franchise, ordinance, or resolution in effect on January 9, 2008, no state agency or municipality may require an interim cable operator or video service provider to provide any institutional network or equivalent capacity on its video service network.

**(7) Video service provider fee.** (a) *Duty to pay fee.* 1. Notwithstanding s. 66.0611 and except as provided in subds. 2. and 2m., a video service provider shall, on a quarterly calendar basis, calculate and pay to each municipality in which the video service provider provides video service a video service provider fee equal to the percentage of the video service provider's gross receipts that is specified in par. (b) and the monetary support for access facilities for PEG channels described in par. (em). A video service provider shall remit the fee to the municipality no later than 45 days after the end of each quarter. Except as provided in subd. 2. or par. (b)1., if the municipality is not required to provide notice under sub. (3)(e)2., the duty to remit the fee first applies to the quarter in which the video service provider begins to provide service in the municipality, and, if the municipality is required to provide notice under sub. (3)(e)2., the duty to remit the fee first applies to the quarter in which the video service provider begins to provide service in the municipality or to the quarter that includes the 45th day after the video service provider receives the municipality's notice, whichever quarter is later.

2. If a municipality fails to provide the notice specified in sub. (3)(e)2. before the deadline specified in sub. (3)(e)2., no video service provider is required to pay a video service provider fee, and no interim cable operator is required to pay a franchise fee, to the municipality until the 45th day after the end of the quarter in which the municipality provides the notice specified in sub. (3)(e)2.

2m. If a municipality requires a video service provider to pay a cost-based permit fee under a regulation under s. 182.017(1r), the video service provider may deduct the amount of the fee from any other compensation that is due to the municipality including the video service provider fee under subd. 1.

(b) *Amount of fee.* 1. Except as provided in subd. 2m., the percentage applied to a video service provider's gross receipts under par. (a)1. for each municipality shall be 5 percent or one of the following percentages, whichever is less:

a. If no incumbent cable operator was required to pay a franchise fee equal to a percentage of gross revenues to the municipality immediately before January 9, 2008, the municipality may specify a percentage of no more than 5 percent. The duty of a video service provider to pay the municipality a video service fee equal to such percentage shall first apply to the quarter that includes the 45th day after the municipality provides notice of the percentage to the video service provider.

b. If an incumbent cable operator was required to pay a franchise fee equal to a percentage of gross revenues to the municipality immediately before January 9, 2008, that percentage.

c. If more than one incumbent cable operator was required to pay a franchise fee equal to a percentage of gross revenues to the municipality immediately before January 9, 2008, the lowest such percentage.

2m. The percentage applied to a video service provider's gross receipts under par. (a)1. for a municipality shall be the percentage that applied under subd. 1. on December 31, 2018, less one of the following:

a. Beginning on January 1, 2020, 0.5 percent.

b. Beginning on January 1, 2021, 1.0 percent.

(c) *Generally accepted accounting principles.* All determinations and computations made under this subsection shall be made pursuant to generally accepted accounting principles.

(d) *Record review.* A municipality may, upon reasonable written request, for the purpose of ensuring proper and accurate payment of a video service provider fee, review the business records of a video service provider that is required to pay the municipality a video service provider fee.

(e) *Actions to enforce payment.* 1. A municipality or a video service provider may not bring an action concerning the amount of a video service provider fee allegedly due to the municipality unless the parties have first participated in and completed good faith settlement discussions. For purposes of any future litigation, all negotiations pursuant to this paragraph shall be treated as compromise negotiations under s. 904.08.

2. An action regarding a dispute over the amount of a video service provider fee paid or allegedly due under this subsection shall be commenced within 4 years following the end of the calendar quarter to which the disputed amount relates or be barred, unless the parties agree in writing to an extension of time. Notwithstanding ss. 814.01, 814.02, 814.03, and 814.035, no costs may be allowed in the action to either party.

(em) *PEG channel monetary support.* 1. This subdivision applies to an incumbent cable operator whose cable franchise is terminated under sub. (3)(b)2.b. The obligation that is actually imposed by a municipality prior to April 18, 2007, on such an

incumbent cable operator to provide monetary support for access facilities for PEG channels and that is contained in a cable franchise existing on January 9, 2008, shall continue until January 1, 2011.

2. The duty of an interim cable operator to provide monetary support for access facilities for PEG channels that is contained in a cable franchise existing on January 9, 2008, shall continue until January 1, 2011.

3. Each video service provider providing video service in a municipality shall have the same obligation to provide monetary support for access facilities for PEG channels as the incumbent cable operator with the most subscribers in the municipality as of January 9, 2008. To the extent that such incumbent cable operator provides such support in the form of a percentage of gross revenues or a per subscriber fee, any other video service provider shall pay the same percentage of gross revenues or per subscriber fee to the municipality as the incumbent cable operator. To the extent that such incumbent cable operator provides such support in the form of a lump sum payment without an offset to its franchise fee or video service provider fee, any other video service provider that commences service in the municipality shall pay the municipality a sum equal to the pro rata amount of such lump sum payment based on its proportion of video service customers in such municipality. The obligation to provide monetary support required under this subdivision shall continue until January 1, 2011.

4. For purposes of this paragraph, the proportion of video service customers of a video service provider shall be determined based on the relative number of subscribers as of the end of the prior calendar year as reported by all incumbent cable operators and holders of video service authorizations.

(f) *Itemization.* A video service provider may identify and collect the amount related to a video service provider fee and any fee imposed for monetary support for access facilities for PEG channels as described in par. (em) as a separate line item on customer bills.

(g) *Other fees.* A municipality may require the video service provider to pay any compensation under s. 66.0425, or, except as provided in a regulation under s. 182.017(1r), any permit fee, encroachment fee, degradation fee, or any other fee, for the occupation of or work within public rights-of-way.

**(8) Discrimination; access to services.** (ag) *Definition.* In this subsection, "department" means the department of agriculture, trade and consumer protection.

(am) *Discrimination prohibited.* 1. No video service provider may deny access to video service to any group of potential residential customers in the video service provider's video franchise area because of the race or income of the residents in the local area in which the group resides.

2. It is a defense to an alleged violation of subd. 1. based on income if, no later than 3 years after the date on which the video service provider began providing video service under this section, at least 30 percent of the households with access to the video service provider's video service are low-income households.

(b) *Access.* 1. A large telecommunications video service provider shall provide access to its video service to the following percentages of households within the large telecommunications video service provider's basic local exchange service area:

a. Not less than 35 percent no later than 3 years after the date on which the large telecommunications video service provider began providing video service under this section.

b. Not less than 50 percent no later than 5 years after the date on which the large telecommunications video service provider began providing video service under this section, or no later than 2 years after at least 30 percent of households with access to the large telecommunications video service provider's video service subscribe to the service for 6 consecutive months, whichever occurs later.

2. A large telecommunications video service provider shall file an annual report with the department regarding the large telecommunications video service provider's progress in complying with subd. 1.

(c) *Extensions and waivers.* A video service provider may apply to the department for an extension of any time limit specified in par. (am)2. or (b) or a waiver of a requirement to comply with par. (b). The department shall grant the extension or waiver if the video service provider demonstrates to the satisfaction of the department that the video service provider has made substantial and continuous efforts to comply with the requirements of this subsection and that the extension or waiver is necessary due to one or more of the following factors:

1. The video service provider's inability to obtain access to public and private rights-of-way under reasonable terms and conditions.

2. Developments and buildings that are not subject to competition because of exclusive service arrangements.

3. Developments and buildings that are not accessible using reasonable technical solutions under commercially reasonable terms and conditions.

4. Natural disasters.

5. Other factors beyond the control of the video service provider.

(d) *Alternative technologies.* A video service provider may satisfy the requirements of this subsection through the use of an alternative technology, other than satellite service, that does all of the following:

1. Offers service, functionality, and content demonstrably similar to the service, functionality, and content provided through the video service provider's video service network.

2. Provides access to PEG channels and messages broadcast over the emergency alert system.

(e) *Limitations.* Notwithstanding any other provision of this section, a telecommunications video service provider is not required to provide video service outside the provider's basic local exchange service area, and a video service provider that is an

incumbent cable operator is not required to provide video service outside the area in which the incumbent cable operator provided cable service at the time the department of financial institutions issued a video service franchise to the incumbent cable operator.

**(9) Customer service standards.** (a) Except as provided in par. (b), upon 90 days' advance notice, a municipality may require a video service provider to comply with the customer service standards specified in 47 CFR 76.309(c) in its provision of video service. Neither the department nor any municipality shall have the authority to impose additional or different customer service standards that are specific to the provision of video service.

(b) Except as provided in s. 100.209, no video service provider that provides video service in a municipality may be subject to any customer service standards if there is at least one other person offering cable or video service in the municipality or if the video service provider is subject to effective competition, as determined under 47 CFR 76.905, in the municipality. This paragraph does not apply to any customer service standards promulgated by rule by the department of agriculture, trade and consumer protection.

**(9m) Local broadcast stations.** (a) In this subsection, a "noncable video service provider" means a video service provider that is not a cable operator.

(b) If a local broadcast station is authorized to exercise against a cable operator the right to require mandatory carriage under 47 USC 534, or the right to grant or withhold retransmission consent under 47 USC 325(b), the local broadcast station may exercise the same right against a noncable video service provider to the same extent as the local broadcast station may exercise such right against a cable operator under federal law.

(c) A noncable video service provider shall transmit, without degradation, the signals that a local broadcast station delivers to the noncable video service provider, but is not required to utilize the same or similar reception technology as the local broadcast station or the programming providers of the local broadcast station.

(d) A noncable video service provider may not do any of the following:

1. Discriminate among or between local broadcast stations, or programming providers of local broadcast stations, with respect to the transmission of their signals.

2. Delete, change, or alter a copyright identification transmitted as part of a local broadcast station's signal.

**(10) Limitation on rate regulation.** The department or a municipality may not regulate the rates charged for any video service by an interim cable operator or video service provider that provides video service in a municipality if at least one other interim cable operator or video service provider is providing video service in the municipality and the other interim cable operator or video service provider is not an affiliate of the interim cable operator or video service provider. This subsection applies regardless of whether any affected interim cable operator or video service provider has sought a determination from the FCC regarding effective competition under 47 CFR 76.905.

**(11) Transfer of video service franchise.** A person who is issued a video service franchise may transfer the video service franchise to any successor-in-interest, including a successor-in-interest that arises through merger, sale, assignment,

restructuring, change of control, or any other transaction. No later than 15 days after the transfer is complete, the successor-in-interest shall apply for a video service franchise under sub. (3)(d) and comply with sub. (3)(e)1. The successor-in-interest may provide video service in the video franchise area during the period that the department reviews the application.

**(12) Municipal cable system costs.** (a) Except for costs for any of the following, a municipality that owns and operates a cable system, or an entity owned or operated, in whole or in part, by such a municipality, may not require nonsubscribers of the cable system to pay any of the costs of the cable system:

1. PEG channels.

2. Debt service on bonds issued under s. 66.0619 to finance the construction, renovation, or expansion of a cable system.

3. The provision of broadband service by the cable system, if the requirements of s. 66.0422(3d)(a), (b), or (c) are satisfied.

(am) Paragraph (a) does not apply to a municipality that, on March 1, 2004, was providing cable service to the public.

(b) Paragraph (a) does not apply to a municipality if all of the following conditions apply:

1. On November 1, 2003, the public service commission has determined that the municipality is an alternative telecommunications utility under s. 196.203.

2. A majority of the governing board of the municipality votes to submit the question of supporting the operation of a cable system by the municipality to the electors in an advisory referendum and a majority of the voters in the municipality voting at the advisory referendum vote to support the operation of a cable system by the municipality.

**(13) Rule-making; enforcement.** (a) The department of financial institutions may promulgate rules interpreting or establishing procedures for this section and the department of agriculture, trade and consumer protection may promulgate rules interpreting or establishing procedures for sub. (8).

(b) Except as provided in sub. (7)(e), a municipality, interim cable operator, or video service provider that is affected by a failure to comply with this section may bring an action to enforce this section. If a court finds that a municipality, interim cable operator, or video service provider has not complied with this section, the court shall order the municipality, interim cable operator, or video service provider to comply with this section. Notwithstanding ss. 814.01, 814.02, 814.03, and 814.035, no costs may be allowed in an action under this paragraph to any party.

(c) The department shall enforce this section, except sub. (8). The department may bring an action to recover any fees that are due and owing under this section or to enjoin a violation of this section, except sub. (8), or any rule promulgated under sub. (3)(f)4. An action shall be commenced under this paragraph within 3 years after the occurrence of the unlawful act or practice or be barred.

**Credits**

<<For credits, see Historical Note field.>>


Notes of Decisions (1)

W. S. A. 66.0420, WI ST 66.0420
Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
  Municipalities (Ch. 59 to 68)
    Chapter 66. General Municipality Law (Refs & Annos)
      Subchapter IV. Regulation

W.S.A. 66.042

66.042. Renumbered 66.0607 and amended by 1999 Act 150, § 109, eff. Jan. 1, 2001

Currentness

**Credits**

<<For credits, see Historical Note field.>>

W. S. A. 66.042, WI ST 66.042
Current through 2023 Act 272, published April 10, 2024.

---

End of Document                                           © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
    Municipalities (Ch. 59 to 68)
        Chapter 66. General Municipality Law (Refs & Annos)
            Subchapter IV. Regulation

W.S.A. 66.0421

66.0421. Access to video service

Currentness

**(1) Definitions.** In this section:

(c) "Video service" has the meaning given in s. 66.0420(2)(y).

(d) "Video service provider" has the meaning given in s. 66.0420(2)(zg), and also includes an interim cable operator, as defined in s. 66.0420(2)(n).

**(2) Interference prohibited.** The owner or manager of a multiunit dwelling under common ownership, control or management or of a mobile home park or the association or board of directors of a condominium may not prevent a video service provider from providing video service to a subscriber who is a resident of the multiunit dwelling, mobile home park or of the condominium or interfere with a video service provider providing video service to a subscriber who is a resident of the multiunit dwelling, mobile home park or of the condominium.

**(3) Installation in multiunit building.** Before installation, a video service provider shall consult with the owner or manager of a multiunit dwelling or with the association or board of directors of a condominium to establish the points of attachment to the building and the methods of wiring. A video service provider shall install facilities to provide video service in a safe and orderly manner and in a manner designed to minimize adverse effects to the aesthetics of the multiunit dwelling or condominium. Facilities installed to provide video service may not impair public safety, damage fire protection systems or impair fire-resistive construction or components of a multiunit dwelling or condominium.

**(4) Repair responsibility.** A video service provider is responsible for any repairs to a building required because of the construction, installation, disconnection or servicing of facilities to provide video service.

**Credits**
<<For credits, see Historical Note field.>>

W. S. A. 66.0421, WI ST 66.0421
Current through 2023 Act 272, published April 10, 2024.

**End of Document**
© 2025 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

West's Wisconsin Statutes Annotated
    Municipalities (Ch. 59 to 68)
        Chapter 66. General Municipality Law (Refs & Annos)
            Subchapter IV. Regulation

W.S.A. 66.0422

66.0422. Video service, telecommunications, and broadband facilities

Currentness

(1) In this section:

(b) "Local government" means a city, village, or town.

(c) "Telecommunications service" has the meaning given in s. 196.01(9m).

(d) "Video service" has the meaning given in s. 66.0420(2)(y).

(2) Except as provided in subs. (3), (3d), (3m), and (3n), no local government may enact an ordinance or adopt a resolution authorizing the local government to construct, own, or operate any facility for providing video service, telecommunications service, or broadband service, directly or indirectly, to the public, unless all of the following are satisfied:

(a) The local government holds a public hearing on the proposed ordinance or resolution.

(b) Notice of the public hearing is given by publication of a class 3 notice under ch. 985 in the area affected by the proposed ordinance or resolution.

(c) No less than 30 days before the public hearing, the local government prepares and makes available for public inspection a report estimating the total costs of, and revenues derived from, constructing, owning, or operating the facility and including a cost-benefit analysis of the facility for a period of at least 3 years. The costs that are subject to this paragraph include personnel costs and costs of acquiring, installing, maintaining, repairing, or operating any plant or equipment, and include an appropriate allocated portion of costs of personnel, plant, or equipment that are used to provide jointly both telecommunications services and other services.

(3) Subsection (2) does not apply to a local government if all of the following conditions apply:

(a) On November 1, 2003, the public service commission has determined that the local government is an alternative telecommunications utility under s. 196.203.

(b) A majority of the governing board of the local government votes to submit the question of supporting the operation of the facility for providing video service, telecommunications service, or Internet access service, directly or indirectly to the public, by the local government to the electors in an advisory referendum and a majority of the voters in the local government voting at the advisory referendum vote to support operation of such a facility by the local government.

(3d) Subsection (2) does not apply to a facility for providing broadband service to an area within the boundaries of a local government if any of the following are satisfied:

(a) The local government asks, in writing, each person that provides broadband service within the boundaries of the local government whether the person currently provides broadband service to the area or intends to provide broadband service within 9 months to the area and within 60 days after receiving the written request no person responds in writing to the local government that the person currently provides broadband service to the area or intends to provide broadband service to the area within 9 months.

(b) The local government determines that a person who responded to a written request under par. (a) that the person currently provides broadband service to the area did not actually provide broadband service to the area and no other person makes the response to the local government described in par. (a).

(c) The local government determines that a person who responded to a written request under par. (a) that the person intended to provide broadband service to the area within 9 months did not actually provide broadband service to the area within 9 months and no other person makes the response to the local government described in par. (a).

(3m) Subsection (2) does not apply to a facility for providing broadband service if all of the following apply:

(a) The municipality offers use of the facility on a nondiscriminatory basis to persons who provide broadband service to end users of the service.

(b) The municipality itself does not use the facility to provide broadband service to end users.

(c) The municipality determines that, at the time that the municipality authorizes the construction, ownership, or operation of the facility, whichever occurs first, the facility does not compete with more than one provider of broadband service.

(3n) Subsection (2) does not apply to a local government that, on March 1, 2004, was providing video service to the public.

(4) Notwithstanding sub. (2), a local government may enact an ordinance or adopt a resolution authorizing the local government to prepare a report specified in sub. (2)(c).

(5) If a local government enacts an ordinance or adopts a resolution that complies with the requirements of sub. (2), the local government must determine the cost incurred in preparing the report specified in sub. (2)(c). As soon as practicable after the local government generates revenue from a facility specified in sub. (2)(intro.), the local government shall use the revenues to reimburse the treasury of the local government for the cost determined under this subsection.

**Credits**

<<For credits, see Historical Note field.>>

W. S. A. 66.0422, WI ST 66.0422
Current through 2023 Act 272, published April 10, 2024.

---

End of Document                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
  Municipalities (Ch. 59 to 68)
    Chapter 66. General Municipality Law (Refs & Annos)
      Subchapter IV. Regulation

W.S.A. 66.0423

66.0423. Transient merchants

Currentness

(1) In this section:

(a) "Sale of merchandise" includes a sale in which the personal services rendered upon or in connection with the merchandise constitutes the greatest part of value for the price received, but does not include a farm auction sale conducted by or for a resident farmer of personal property used on the farm or the sale of produce or other perishable products at retail or wholesale by a resident of this state.

(b) "Transient merchant" means a person who engages in the sale of merchandise at any place in this state temporarily and who does not intend to become and does not become a permanent merchant of that place.

(2) Cities and villages, and towns not subject to an ordinance enacted under s. 59.55(4), may, by ordinance, regulate the retail sales, other than auction sales, made by transient merchants and provide penalties for violations of those ordinances.

**Credits**
<<For credits, see Historical Note field.>>

W. S. A. 66.0423, WI ST 66.0423
Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**                     © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
  Municipalities (Ch. 59 to 68)
    Chapter 66. General Municipality Law (Refs & Annos)
      Subchapter IV. Regulation

W.S.A. 66.0425

66.0425. Privileges in streets

Currentness

(1) In this section, "privilege" means the authority to place an obstruction or excavation beyond a lot line, or within a highway in a town, village, or city, other than by general ordinance affecting the whole public.

(2) A person may apply to a town or village board or the common council of a city for a privilege. A privilege may be granted if the applicant assumes primary liability for damages to person or property by reason of the granting of the privilege, is obligated to remove an obstruction or excavation upon 10 days' notice by the state or the municipality and waives the right to contest in any manner the validity of this section or the amount of compensation charged. The grantor of the privilege may require the applicant to file a bond that does not exceed $10,000; that runs to the town, village, or city and to 3rd parties that may be injured; and that secures the performance of the conditions specified in this subsection. If there is no established lot line and the application is accompanied by a blue print, the town or village board or the common council of the city may impose any conditions on the privilege that it considers advisable.

(3) Compensation for a privilege shall be paid into the general fund and shall be fixed by the governing body of a city, village or town or by the designee of the governing body.

(4) The holder of a privilege is not entitled to damages for removal of an obstruction or excavation, and if the holder does not remove the obstruction or excavation upon due notice, it shall be removed at the holder's expense.

(5) Third parties whose rights are interfered with by the granting of a privilege have a right of action against the holder of the privilege only.

(6) Subsections (1) to (5) do not apply to telecommunications carriers, as defined in s. 196.01(8m), telecommunications utilities, as defined in s. 196.01(10), alternative telecommunications utilities, as defined in s. 196.01(1d), public service corporations, or cooperatives organized under ch. 185 to render or furnish gas, light, heat, or power, or to cooperatives organized under ch. 185 or 193 to render or furnish telecommunications service, but the carriers, utilities, corporations and associations shall secure a permit from the proper official for temporary obstructions or excavations in a highway and are liable for all injuries to person or property caused by the obstructions or excavations.

(7) This section does not apply to an obstruction or excavation that is in place for less than 90 days, and for which a permit has been granted by the proper official. This section does not apply if a permit has been issued under s. 86.07(2) with respect to a manure hose, or written consent has been given under s. 86.16(1) with respect to a pipe or pipeline, transmitting liquid manure within or across the right-of-way of a highway.

(8) This section applies to an obstruction or excavation by a city, village or town in any street, alley, or public place belonging to any other municipality.

(9) Any person who violates this section may be fined not less than $25 nor more than $500 or imprisoned for not less than 10 days nor more than 6 months or both.

(10) A privilege may be granted only as provided in this section.

**Credits**

<<For credits, see Historical Note field.>>

Notes of Decisions (12)

W. S. A. 66.0425, WI ST 66.0425
Current through 2023 Act 272, published April 10, 2024.

---

    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
    Municipalities (Ch. 59 to 68)
        Chapter 66. General Municipality Law (Refs & Annos)
            Subchapter IV. Regulation

W.S.A. 66.0427

66.0427. Open excavations in populous counties

Currentness

In a town, city or village in a county with a population of 750,000 or more no excavation for building purposes, whether or not completed, may be left open for more than 6 months without proceeding with the erection of a building on the excavation. If an excavation remains open for more than 6 months, the building inspector or other designated officer of the town, village or city shall order that the erection of a building on the excavation begin forthwith or that the excavation be filled to grade. The order shall be served upon the owner of the land or the owner's agent and upon the holder of any encumbrance of record as provided in s. 66.0413(1)(d). If the owner of the land fails to comply with the order within 15 days after service of the order upon the owner, the building inspector or other designated officer shall fill the excavation to grade and the cost shall be charged against the real estate as provided in s. 66.0413(1)(f). Section 66.0413(1)(h) applies to orders issued under this section. This section does not impair the authority of a city or village to enact ordinances in this field.

**Credits**

<<For credits, see Historical Note field.>>

W. S. A. 66.0427, WI ST 66.0427
Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
    Municipalities (Ch. 59 to 68)
        Chapter 66. General Municipality Law (Refs & Annos)
            Subchapter IV. Regulation

W.S.A. 66.0429

66.0429. Street barriers; neighborhood watch signs

Currentness

(1) The governing body of a city, village or town may set aside streets or roads that are not a part of any federal, state or county trunk highway system for the safety of children in coasting or other play activities, and may obstruct or barricade the streets or roads to safeguard the children from accidents. The governing body of the city, village or town may erect and maintain on the streets or roads barriers or barricades, lights, or warning signs and is not liable for any damage caused by the erection or maintenance.

(2) A city or village which has a neighborhood watch program authorized by the law enforcement agency of the city or village and in which the residents of the city or village participate may, in a manner approved by the city council or village board, place within the right-of-way of a street or highway within its limits a neighborhood watch sign of a uniform design approved by the department of transportation. No sign under this subsection may be placed within the right-of-way of a highway designated as part of the national system of interstate and defense highways.

(3)(a) The governing body of a city may monitor or limit access to streets that are not part of any federal, state or county trunk highway system or connecting highway, as described in s. 84.02(11), for the purposes of security or public safety. The governing body of a city may authorize gates or security stations, or both, to be erected and maintained to monitor traffic or limit access on these streets. The restriction of access to streets that is authorized under this subsection does not affect a city's eligibility for state transportation aids.

(b) This subsection applies only to the city of Arcadia.

**Credits**
<<For credits, see Historical Note field.>>

Notes of Decisions (3)

W. S. A. 66.0429, WI ST 66.0429
Current through 2023 Act 272, published April 10, 2024.

---

                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW  © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
  Municipalities (Ch. 59 to 68)
    Chapter 66. General Municipality Law (Refs & Annos)
      Subchapter IV. Regulation

W.S.A. 66.0431

66.0431. Prohibiting operators from leaving keys in parked motor vehicles

Currentness

The governing body of a city, village or town may by ordinance require every passenger motor vehicle to be equipped with a lock suitable to lock either the starting lever, throttle, steering apparatus, gear shift lever or ignition system; prohibit any person from permitting a motor vehicle in the person's custody from standing or remaining unattended on any street, road, or alley or in any other public place, except an attended parking area, unless either the starting lever, throttle, steering apparatus, gear shift or ignition of the vehicle is locked and the key for that lock is removed from the vehicle; and provide forfeitures for violations of the ordinance. This section does not apply to motor vehicles operated by common carriers of passengers under ch. 194.

**Credits**

<<For credits, see Historical Note field.>>

Notes of Decisions (3)

W. S. A. 66.0431, WI ST 66.0431
Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
    Municipalities (Ch. 59 to 68)
        Chapter 66. General Municipality Law (Refs & Annos)
            Subchapter IV. Regulation

W.S.A. 66.0433

66.0433. Licenses for nonintoxicating beverages

Currentness

(1) A town board, village board or common council may grant licenses to persons it considers proper for the sale of beverages containing less than 0.5 percent of alcohol by volume to be consumed on the premises where sold and to manufacturers, wholesalers, retailers and distributors of these beverages. The fee for a license shall be not less than $5 nor more than $50, to be fixed by the board or council, except that where these beverages are sold for consumption off the premises the license fee shall be $5. The license shall be issued by the town, village or city clerk, shall designate the specific premises for which granted and shall expire the next June 30 after issuance. The full license fee shall be charged for the whole or a fraction of the year. No beverages described in this paragraph may be manufactured, sold at wholesale or retail or sold for consumption on the premises, or kept for sale at wholesale or retail or for consumption on the premises where sold, without a license issued under this paragraph.

(1m) If a place of business moves from the premises designated in the license to another location in the town, village or city within the license period, the licensee shall give notice of the change of location, and the license shall be amended accordingly without payment of an additional fee. A license is not transferable from one person to another.

(2) No license or permit may be granted to any person, unless to a domestic corporation or domestic limited liability company, not a resident of this state and of the town, village or city in which the license is applied for, nor, subject to ss. 111.321, 111.322 and 111.335, to any person who has been convicted of a felony, unless the person has been restored to civil rights.

(3) A town board, village board or common council may by resolution or ordinance adopt reasonable and necessary regulations regarding the location of licensed premises, the conduct of the licensed premises, the sale of beverages containing less than 0.5 percent of alcohol by volume and the revocation of any license.

**Credits**
<<For credits, see Historical Note field.>>

Notes of Decisions (16)

W. S. A. 66.0433, WI ST 66.0433
Current through 2023 Act 272, published April 10, 2024.

End of Document
© 2025 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

> West's Wisconsin Statutes Annotated
>     Municipalities (Ch. 59 to 68)
>         Chapter 66. General Municipality Law (Refs & Annos)
>             Subchapter IV. Regulation

W.S.A. 66.0435

66.0435. Manufactured and mobile home communities

Currentness

**(1) Definitions.** In this section:

(am) "Community" means a manufactured and mobile home community.

(b) "Licensee" means any person licensed to operate and maintain a manufactured and mobile home community under this section.

(c) "Licensing authority" means the city, town or village wherein a manufactured and mobile home community is located.

(cg) "Manufactured and mobile home community" means any plot or plots of ground upon which 3 or more manufactured homes or mobile homes, occupied for dwelling or sleeping purposes, are located, regardless of whether a charge is made for the accommodation.

(cm) "Manufactured home" has the meaning given in s. 101.91(2) and includes any additions, attachments, annexes, foundations, and appurtenances.

(d) "Mobile home" has the meaning given in s. 101.91(10) and includes any additions, attachments, annexes, foundations and appurtenances.

(h) "Person" means any natural individual, firm, trust, partnership, association, corporation or limited liability company.

(hm) "Recreational mobile home" means a prefabricated structure that is no larger than 400 square feet, or that is certified by the manufacturer as complying with the code promulgated by the American National Standards Institute as ANSI A119.5, and that is designed to be towed and used primarily as temporary living quarters for recreational, camping, travel, or seasonal purposes.

(i) "Space" means a plot of ground within a manufactured and mobile home community, designed for the accommodation of one manufactured or mobile home.

(j) "Unit" means a single manufactured or mobile home.

**(2) Granting, revoking or suspending license.** (a) It is unlawful for any person to maintain or operate a community within the limits of a city, town or village, unless the person has received a license from the city, town or village.

(b) In order to protect and promote the public health, morals and welfare and to equitably defray the cost of municipal and educational services required by persons and families using communities for living, dwelling or sleeping purposes, a city council, village board and town board may do any of the following:

1. Establish and enforce by ordinance reasonable standards and regulations for every community.

2. Require an annual license fee to operate a community and levy and collect special assessments to defray the cost of municipal and educational services furnished to a community.

3. Limit the number of units that may be located in any one community.

4. Limit the number of licenses for communities in any common school district, if the development of a community would cause the school costs to increase above the state average or if an exceedingly difficult or impossible situation exists with regard to providing adequate and proper sewage disposal in the particular area.

(c) In a town in which the town board enacts an ordinance regulating manufactured and mobile homes under this section and has also enacted and approved a county zoning ordinance under the provisions of s. 59.69, the provisions of the ordinance which is most restrictive apply with respect to the establishment and operation of a community in the town.

(d) A license granted under this section is subject to revocation or suspension for cause by the licensing authority that issued the license upon complaint filed with the clerk of the licensing authority, if the complaint is signed by a law enforcement officer, local health officer, as defined in s. 250.01(5), or building inspector, after a public hearing upon the complaint. The holder of the license shall be given 10 days' written notice of the hearing, and is entitled to appear and be heard as to why the license should not be revoked. A holder of a license that is revoked or suspended by the licensing authority may within 20 days of the date of the revocation or suspension appeal the decision to the circuit court of the county in which the community is located by filing a written notice of appeal with the clerk of the licensing authority, together with a bond executed to the licensing authority, in the sum of $500 with 2 sureties or a bonding company approved by the clerk, conditioned for the faithful prosecution of the appeal and the payment of costs adjudged against the license holder.

**(3) License and monthly municipal permit fee.**

(a) The licensing authority shall collect from the licensee an annual license fee of not less than $25 nor more than $100 for each 50 spaces or fraction of 50 spaces within each community within its limits. If the community lies in more than one municipality the amount of the license fee shall be determined by multiplying the gross fee by a fraction the numerator of which is the number of spaces in the community in a municipality and the denominator of which is the entire number of spaces in the community.

(b) The licensing authority may collect a fee of $10 for each transfer of a license.

(c) 1. In addition to the license fee provided in pars. (a) and (b), each licensing authority shall collect from each unit occupying space or lots in a community in the licensing authority, except from recreational mobile homes as provided under par. (cm), from manufactured and mobile homes that constitute improvements to real property, from recreational vehicles as defined in s. 340.01(48r), and from camping trailers as defined in s. 340.01(6m), a monthly municipal permit fee computed as follows:

a. On January 1, the assessor shall determine the total fair market value of each unit in the taxation district subject to the monthly municipal permit fee.

b. The fair market value, determined under subd. 1.a., minus the tax-exempt household furnishings thus established, shall be equated to the general level of assessment for the prior year on other real and personal property in the district.

c. The value of each unit, determined under subd. 1. b., shall be multiplied by the general property gross tax rate, less any credit rate for the property tax relief credit, established on the preceding year's assessment of general property.

d. The total annual permit fee, computed under subd. 1. c., shall be divided by 12 and shall represent the monthly municipal permit fee.

2. The monthly municipal permit fee is applicable to units moving into the tax district any time during the year. The community operator shall furnish information to the tax district clerk and the assessor on units added to the community within 5 days after their arrival, on forms prescribed by the department of revenue. As soon as the assessor receives the notice of an addition of a unit to a community, the assessor shall determine its fair market value and notify the clerk of that determination. The clerk shall equate the fair market value established by the assessor and shall apply the appropriate tax rate, divide the annual permit fee thus determined by 12 and notify the unit owner of the monthly fee to be collected from the unit owner. Liability for payment of the fee begins on the first day of the next succeeding month and continues for the months in which the unit remains in the tax district.

3. A new monthly municipal permit fee and a new valuation shall be established each January and shall continue for that calendar year.

4. The valuation established is subject to review as are other values established under ch. 70. If the board of review reduces a valuation on which previous monthly payments have been made the tax district shall refund past excess fee payments.

5. The monthly municipal permit fee shall be paid by the unit owner to the local taxing authority on or before the 10th of the month following the month for which the monthly municipal permit fee is due.

6. The licensee of a community is liable for the monthly municipal permit fee for any unit occupying space in the community as well as the owner and occupant of each such unit, except that the licensee is not liable until the licensing authority has failed, in an action under ch. 799, to collect the fee from the owner and occupant of the unit. A municipality, by ordinance, may require the community operator to collect the monthly municipal permit fee from the unit owner.

8. The credit under s. 79.10(9)(bm), as it applies to the principal dwelling on a parcel of taxable property, applies to the estimated fair market value of a unit that is the principal dwelling of the owner. The owner of the unit shall file a claim for the credit with the treasurer of the municipality in which the property is located. To obtain the credit under s. 79.10(9)(bm), the owner shall attest on the claim that the unit is the owner's principal dwelling. The treasurer shall reduce the owner's monthly municipal permit fee by the amount of any allowable credit. The treasurer shall furnish notice of all claims for credits filed under this subdivision to the department of revenue as provided under s. 79.10(1m).

9. No monthly municipal permit fee may be imposed on a financial institution, as defined in s. 69.30(1)(b), that relates to a vacant unit that has been repossessed by the financial institution.

(cm) Recreational mobile homes and recreational vehicles, as defined in s. 340.01(48r), are exempt from the monthly municipal permit fee under par. (c). The exemption under this paragraph also applies to steps and a platform, not exceeding 50 square feet, that lead to a recreational mobile home or recreational vehicle, but does not apply to any other addition, attachment, patio, or deck.

(d) This section does not apply to a community that is owned and operated by any county under the provisions of s. 59.52(16)(b).

(e) If a unit is permitted by local ordinance to be located outside of a licensed community, the monthly municipal permit fee shall be paid by the owner of the land on which it stands, and the owner of the land shall comply with the reporting requirements of par. (c). The owner of the land may collect the fee from the owner of the unit and, on or before January 10 and on or before July 10, shall transmit to the taxation district all fees owed for the 6 months ending on the last day of the month preceding the month when the transmission is required.

(f) Nothing in this subsection prohibits the regulation by local ordinance of a community.

(g) Failure to timely pay the tax prescribed in this subsection shall be treated as a default in payment of property tax and is subject to all procedures and penalties applicable under chs. 70 and 74.

(h) Each local governing body may enact an ordinance providing a forfeiture of up to $25 for failure to comply with the reporting requirements of par. (c) or (e). Each failure to report is a separate offense.

**(3m) Community operator reimbursement.** A community operator who collects a monthly municipal permit fee from a unit owner may deduct, for administrative expenses, 2 percent of the monthly fees collected.

**(4) Application for license.** Original application for a community license shall be filed with the clerk of the licensing authority. Applications shall be in writing, signed by the applicant and shall contain the following:

(a) The name and address of the applicant.

(b) The location and legal description of the community.

(c) The complete plan of the community.

**(6) Renewal of license.** Upon application by any licensee, after approval by the licensing authority and upon payment of the annual license fee, the clerk of the licensing authority shall issue a certificate renewing the license for another year, unless sooner revoked. The application for renewal shall be in writing, signed by the applicant on forms furnished by the licensing authority.

**(7) Transfer of license; fee.** Upon application for a transfer of license the clerk of the licensing authority, after approval of the application by the licensing authority, shall issue a transfer upon payment of the required $10 fee.

**(8) Distribution of fees.** The licensing authority may retain 10 percent of the monthly municipal permit fees collected in each month, without reduction for any amounts deducted under sub. (3m), to cover the cost of administration. The licensing authority shall pay to the school district in which the community is located, within 20 days after the end of each month, such proportion of the remainder of the fees collected in the preceding month as the ratio of the most recent property tax levy for school purposes bears to the total tax levy for all purposes in the licensing authority. If the community is located in more than one school district, each district shall receive a share in the proportion that its property tax levy for school purposes bears to the total school tax levy.

**(9) Municipalities; monthly municipal permit fees on recreational mobile homes and recreational vehicles.** A licensing authority may assess monthly municipal permit fees at the rates under this section on recreational mobile homes and recreational vehicles, as defined in s. 340.01(48r), except recreational mobile homes and recreational vehicles that are located in campgrounds licensed under s. 97.67, recreational mobile homes that constitute improvements to real property, and recreational mobile homes or recreational vehicles that are located on land where the principal residence of the owner of the recreational mobile home or recreational vehicle is located, regardless of whether the recreational mobile home or recreational vehicle is occupied during all or part of any calendar year.

**(10) Powers of municipalities.** The powers conferred on licensing authorities by this section are in addition to all other grants of authority and are limited only by the express language of this section.

**Credits**
<<For credits, see Historical Note field.>>

Notes of Decisions (28)

W. S. A. 66.0435, WI ST 66.0435
Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
Municipalities (Ch. 59 to 68)
Chapter 66. General Municipality Law (Refs & Annos)
Subchapter IV. Regulation

W.S.A. 66.0436

66.0436. Certificates of food protection practices for restaurants

Currentness

(1) In this section, "restaurant" has the meaning given in s. 97.01(14g).

(2) No city, village, town, or county may enact an ordinance requiring a restaurant, a person who holds a license for a restaurant, or a person who conducts, maintains, manages, or operates a restaurant to satisfy a requirement related to the issuance or possession of a certificate of food protection practices that is not found under s. 97.33.

(3)(a) Except as provided in par. (b), if a city, village, town, or county has in effect on January 1, 2015, an ordinance that the city, village, town, or county is prohibited from enacting under sub. (2), the ordinance does not apply and may not be enforced.

(b) Paragraph (a) does not apply to an ordinance of a 1st class city that was in effect on March 20, 2014.

**Credits**
<<For credits, see Historical Note field.>>

W. S. A. 66.0436, WI ST 66.0436
Current through 2023 Act 272, published April 10, 2024.

End of Document                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
  Municipalities (Ch. 59 to 68)
    Chapter 66. General Municipality Law (Refs & Annos)
      Subchapter IV. Regulation

W.S.A. 66.0437

66.0437. Drug disposal programs

Currentness

(1) In this section, "political subdivision" has the meaning given in s. 165.65(1)(e).

(2) A political subdivision may operate or authorize a person to operate a drug disposal program as provided under s. 165.65(3).

**Credits**
<<For credits, see Historical Note field.>>

W. S. A. 66.0437, WI ST 66.0437
Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
  Municipalities (Ch. 59 to 68)
    Chapter 66. General Municipality Law (Refs & Annos)
      Subchapter IV. Regulation

W.S.A. 66.0438

66.0438. Limitations on locally issued identification cards

Currentness

**(1) Definition.** In this section, "public assistance benefits" means services, benefits, payments, or other assistance provided under a program administered by the department of health services or the department of children and families under s. 253.06 or ch. 49.

**(2) Towns and counties.** (a) Except as provided in par. (b), no town or county may issue, or expend any funds for the issuance of, a photo identification card for any resident of the town or county.

(b) Notwithstanding par. (a), a town or county may issue, or expend funds for the issuance of, a photo identification card to any of the following individuals or for any of the following purposes:

1. An employee or elected official of the town or county, if the photo identification card relates to the employee's or official's job duties.

2. An employee of a vendor or contractor that contracts with the town or county, or an employee of a subcontractor that contracts with such a vendor or contractor, if the photo identification card relates to the employee's job duties for the town or county.

3. To use a transit system owned or operated by the town or county.

4. To use or access services or facilities owned by the town or county.

5. An employee of, or a student who is attending, an institution of higher education that contracts with the town or county, if the photo identification card relates to the employee's or student's job duties for the town or county.

(c) If a town or county has issued an identification card, other than a card described in par. (b), that has been used before April 27, 2016, as an identification document to establish proof of residence under s. 6.34(3)(a)3., that card is not valid for such purposes on or after April 27, 2016.

**(3) Cities and villages.** (a) If a city or village issues, or expends funds for the issuance of, a photo identification card for any resident of the city or village, the card must state clearly on its face, in 12 point type, "Not authorized for voting purposes."

(b) A photo identification card issued by, or at the direction of, a city or village, as described under par. (a), may not be used for any of the following purposes:

1. As an identification document to establish proof of residence under s. 6.34(3)(a)3.

2. As proof of identification under s. 6.79(2), 6.82(1)(a), 6.86, 6.87, or 6.875.

3. To obtain public assistance benefits.

(c) If a city or village has issued an identification card that has been used before April 27, 2016, as an identification document to establish proof of residence under s. 6.34(3)(a)3., that card is not valid for such purposes on or after April 27, 2016.

**Credits**
<<For credits, see Historical Note field.>>

W. S. A. 66.0438, WI ST 66.0438
Current through 2023 Act 272, published April 10, 2024.

End of Document                                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
  Municipalities (Ch. 59 to 68)
    Chapter 66. General Municipality Law (Refs & Annos)
      Subchapter IV. Regulation

W.S.A. 66.0439

66.0439. Environmental, occupational health, and safety credentials

Currentness

(1) No city, village, town, or county may enact an ordinance or adopt a resolution that restricts the use of a title or a representation described in s. 100.70(1)(a) to (h).

(2) If a city, village, town, or county has in effect on November 29, 2017, an ordinance that the city, village, town, or county is prohibited from enacting under sub. (1), the ordinance does not apply and may not be enforced.

**Credits**

<<For credits, see Historical Note field.>>

W. S. A. 66.0439, WI ST 66.0439
Current through 2023 Act 272, published April 10, 2024.

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
 Municipalities (Ch. 59 to 68)
  Chapter 66. General Municipality Law (Refs & Annos)
   Subchapter IV. Regulation

W.S.A. 66.0440

66.0440. Battery-powered, alarmed electric security fences

Currentness

(1) In this section:

(a) "Battery-powered, alarmed electric security fence" means an electric fence that satisfies all of the following:

1. Is equipped with an energizer that produces direct current and is powered by a commercial storage battery with a voltage of not greater than 12 volts.

2. Produces an electric charge on contact that satisfies standards provided by the International Electrotechnical Commission, as published in the latest version of the commission's standards for electric fence energizers.

3. Is connected to a system that is capable of signaling law enforcement.

4. Includes warning signage that a battery-powered, alarmed electric security fence is in operation.

5. Is surrounded by a perimeter fence or wall that is at least 5 feet in height.

6. Is no more than 10 feet in height, or 2 feet higher than the perimeter fence or wall, whichever is higher.

(b) "Political subdivision" means a city, village, town, or county.

(2) No political subdivision may do any of the following:

(a) Prohibit the installation or use of a battery-powered, alarmed electric security fence, except on property designated exclusively for residential use.

(b) Require a permit, other than an alarm system permit, for the installation or use of a battery-powered, alarmed electric security fence.

(c) Impose installation or operation requirements that are inconsistent with the standards set by the International Electrotechnical Commission for installation or operation of an electrified fence that is a component of a battery-powered, alarmed electric security fence.

(3) No person may locate a battery-powered, alarmed electric security fence on property designated exclusively for residential use.

**Credits**

<<For credits, see Historical Note field.>>

W. S. A. 66.0440, WI ST 66.0440

Current through 2023 Act 272, published April 10, 2024.

---

| End of Document | © 2025 Thomson Reuters. No claim to original U.S. Government Works. |
|---|---|

West's Wisconsin Statutes Annotated
  Municipalities (Ch. 59 to 68)
    Chapter 66. General Municipality Law (Refs & Annos)
      Subchapter IV. Regulation

W.S.A. 66.0441

66.0441. Quarries extracting certain nonmetallic minerals

Currentness

**(1) Construction.** (a) Nothing in this section may be construed to affect the authority of a political subdivision to regulate land use for a purpose other than quarry operations.

(b) Subject to pars. (c) and (d), nothing in this section may be construed to exempt a quarry from a regulation of general applicability placed by a political subdivision that applies to other property in the political subdivision that is not a quarry unless the regulation is inconsistent with this section.

(c) Nothing in this section may be construed to exempt a quarry from the application, outside of a nonmetallic mining licensing permit, of a requirement imposed by a political subdivision under ch. 349, a regulation of general applicability placed by a political subdivision that regulates access to property from roads for which the political subdivision is the maintaining authority, or a restriction on the use of roads for which the political subdivision is the maintaining authority.

(d) Nothing in this section may be construed to exempt a quarry from a restriction placed by a political subdivision regulating a nonconforming use under s. 59.69(10), 60.61(5), or 62.23(7).

**(2) Definitions.** In this section:

(a) "Active quarry" means a quarry that has operated during the preceding 12-month period.

(am) "Conditional use permit" means a form of approval, including a special exception or other special zoning permission, granted by a political subdivision pursuant to a zoning ordinance for the operation of a quarry.

(b) "Nonmetallic mining licensing ordinance" means an ordinance that is enacted by a political subdivision specifically regulating the operation of a quarry and that is not enacted pursuant to zoning authority.

(c) "Nonmetallic mining licensing permit" means a form of approval that is granted by a political subdivision pursuant to a nonmetallic mining licensing ordinance and that is specifically related to the operation of a quarry.

(d) "Permit" means a form of approval granted by a political subdivision for the operation of a quarry.

(e) "Political subdivision" means a city, village, town, or county.

(f) "Public works project" means a federal, state, county, or municipal project that involves the construction, maintenance, or repair of a public transportation facility or other public infrastructure and in which nonmetallic minerals are used.

(g) "Quarry" means the surface area from which nonmetallic minerals, including soil, clay, sand, gravel, and construction aggregate, that are used primarily for a public works project or a private construction or transportation project are extracted and processed.

(h) "Quarry operations" means the extraction and processing of minerals at a quarry and all related activities, including blasting, vehicle and equipment access to the quarry, and loading and hauling of material to and from the quarry.

**(2m) Effective dates of certain ordinances.** For purposes of sub. (3)(a)3., the date on which a town or county enacts a zoning ordinance that requires a conditional use permit for a quarry operator to conduct quarry operations is the date the ordinance becomes effective, except as follows:

(a) If a town that previously did not have a general zoning ordinance enacts a general zoning ordinance requiring a conditional use permit to conduct quarry operations and the town ceases to be covered by a county general zoning ordinance that required a conditional use permit to conduct quarry operations, a conditional use permit for a quarry in effect at the time of the transition from county zoning to town zoning shall continue in effect and the conditional use permit shall be treated as if it was originally issued by the town. For purposes of a conditional use permit subject to this paragraph, the date of the adoption of the town ordinance shall be deemed to be the date the conditional use permit was issued by the county but only with respect to requirements that were included in the county ordinance on the date the conditional use permit was issued and that were adopted in the town ordinance.

(b) If a town that has a general zoning ordinance requiring a conditional use permit to conduct quarry operations repeals its zoning ordinance and becomes subject to a county general zoning ordinance under s. 59.69(5)(c) and the county zoning ordinance requires a conditional use permit to conduct quarry operations, a conditional use permit for a quarry in effect at the time of the transition from town zoning to county zoning shall continue in effect and the conditional use permit shall be treated as if it was originally issued by the county. For purposes of a conditional use permit subject to this paragraph, the date of the adoption of the county ordinance shall be deemed to be the date the conditional use permit was issued by the town but only with respect to requirements that were included in the town ordinance on the date the conditional use permit was issued and that were adopted in the county ordinance.

**(3) Limitations on local regulation.** (a) *Permits*. 1. In this paragraph, "substantial evidence" means facts and information, other than merely personal preference or speculation, directly pertaining to the requirements that an applicant must meet to obtain a nonmetallic mining licensing permit and that a reasonable person would accept in support of a conclusion.

2. Consistent with the requirements and limitations in this subsection, except as provided in subd. 3., a political subdivision may require a quarry operator to obtain a conditional use permit or nonmetallic mining licensing permit to conduct quarry operations.

3. A political subdivision may not require a quarry operator of an active quarry to obtain a conditional use permit or nonmetallic mining licensing permit to conduct quarry operations unless prior to the establishment of quarry operations the political subdivision enacts an ordinance that requires the permit. A political subdivision that requires a quarry operator to obtain a nonmetallic mining licensing permit under this subdivision may not impose a requirement in the nonmetallic mining licensing permit pertaining to any matter regulated by an applicable zoning ordinance or addressed through conditions imposed or agreed to in a previously issued and effective conditional use permit. Any requirement imposed in a nonmetallic mining licensing permit shall be related to the purpose of the ordinance requiring the nonmetallic mining licensing permit and shall be based on substantial evidence. The duration of a nonmetallic mining licensing permit may not be shorter than 5 years.

(b) *Applicability of local limit*. If a political subdivision enacts a nonmetallic mining licensing ordinance requirement regulating the operation of a quarry that was not in effect when quarry operations began at an active quarry, the ordinance requirement does not apply to that quarry or to land that is contiguous to the land on which the quarry is located, if the contiguous land has remained continuously under common ownership, leasehold, or control with land on which the quarry is located from the time the ordinance was enacted; can be shown to have been intended for quarry operations prior to the enactment of the ordinance; and is located in the same political subdivision.

(c) *Hours of operation*. A political subdivision may not limit the times, including days of the week, that quarry operations may occur if the materials produced by the quarry will be used in a public works project that requires construction work to be performed during the night or an emergency repair.

(d) *Blasting*. 1. In this paragraph, "affected area" means an area within a certain radius of a blasting site that may be affected by a blasting operation, as determined using a formula established by the department of safety and professional services by rule that takes into account a scaled-distance factor and the weight of explosives to be used.

2. Except as provided under subds. 3. and 4. and s. 101.02(7y), a political subdivision may not limit blasting at a quarry.

3. A political subdivision may require the operator of a quarry to do any of the following:

a. Before beginning a blasting operation at the quarry, provide notice of the blasting operation to each political subdivision in which any part of the quarry is located and to owners of dwellings or other structures within the affected area.

b. Before beginning a blasting operation at the quarry, cause a 3rd party to conduct a building survey of any dwellings or other structures within the affected area.

c. Before beginning a blasting operation at the quarry, cause a 3rd party to conduct a survey of and test any wells within the affected area.

d. Provide evidence of insurance to each political subdivision in which any part of the quarry is located.

e. Provide copies of blasting logs to each political subdivision in which any part of the quarry is located.

f. Provide maps of the affected area to each political subdivision in which any part of the quarry is located.

g. Provide copies of any reports submitted to the department of safety and professional services relating to blasting at the quarry.

4. A political subdivision may suspend a permit for a violation of the requirements under s. 101.15 relating to blasting and rules promulgated by the department of safety and professional services under s. 101.15(2)(e) relating to blasting only if the department of safety and professional services determines that a violation of the requirements or rules has occurred and only for the duration of the violation as determined by the department of safety and professional services.

5. Nothing in this section exempts a quarry operator from applicable limitations on the time of day during which blasting activities may be conducted that are imposed by rules promulgated by the department of safety and professional services.

(e) *Quarry permit requirements*. 1. A political subdivision may not add a condition to a permit during the duration of the permit unless the permit holder consents.

2. If a political subdivision requires a quarry to comply with another political subdivision's ordinance as a condition for obtaining a permit, the political subdivision that grants the permit may not require the quarry operator to comply with a provision of the other political subdivision's ordinance that is enacted after the permit is granted and while the permit is in effect.

3. a. A town may not require, as a condition for granting a permit to a quarry operator, that the quarry operator satisfy a condition that a county requires in order to grant a permit that is imposed by a county ordinance enacted after the county grants a permit to the quarry operator.

b. A county may not require, as a condition for granting a permit to a quarry operator, that the quarry operator satisfy a condition that a town requires in order to grant a permit that is imposed by a town ordinance enacted after the town grants a permit to the quarry operator.

**Credits**
<<For credits, see Historical Note field.>>

W. S. A. 66.0441, WI ST 66.0441
Current through 2023 Act 272, published April 10, 2024.

---

End of Document                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
  Municipalities (Ch. 59 to 68)
    Chapter 66. General Municipality Law (Refs & Annos)
      Subchapter IV. Regulation

W.S.A. 66.0442

66.0442. Electric vehicle charging stations

Currentness

(1) In this section:

(a) "Level 1 charger" means a device with one or more charging ports and connectors for charging electric vehicles that operates on a circuit up to 120 volts and transfers alternating current electricity to a device in an electric vehicle that converts alternating current to direct current to recharge an electric vehicle battery.

(b) "Level 2 charger" has the meaning given for "AC Level 2" under 23 CFR 680.104.

(c) "Level 3 charger" means a direct current fast charger, as defined under 23 CFR 680.104, and analogous successor technologies.

(d) "Local governmental unit" means any of the following:

1. A city, village, town, or county.

2. A school district.

3. A special purpose district in this state.

4. An agency or corporation of an entity described in subd. 1. or 3.

5. A combination or subunit of an entity described in this paragraph.

(e) "Municipal utility" has the meaning given in s. 16.957(1)(q).

(2)(a) Except as provided in pars. (b) and (c), no local governmental unit may own, operate, manage, or lease an electric vehicle charging station containing a Level 1, Level 2, or Level 3 charger unless the charger is not available to the public and is used solely to charge vehicles owned or leased by the local governmental unit.

(b) A local governmental unit may own, operate, manage, or lease an electric vehicle charging station at which a Level 1 charger or Level 2 charger is available to the public if the local governmental unit makes all Level 1 chargers or Level 2 chargers installed before March 22, 2024, available for public use free of any charge.

(c) A local governmental unit may own, operate, manage, or lease an electric vehicle charging station at which a Level 1 charger or a Level 2 charger installed on or after March 22, 2024, is available to the public if the local governmental unit charges a reasonable fee for the electricity delivered or placed by all such Level 1 chargers and Level 2 chargers.

(3) Notwithstanding sub. (2) and subject to sub. (4), a local governmental unit may authorize an electric provider, as defined in s. 16.957(1)(f), or a person described in s. 196.01(5)(b)8. to own and operate an electric vehicle charging station at which a Level 1 charger, Level 2 charger, or Level 3 charger is available to the public on property owned by the local governmental unit.

(3m) An electric provider, as defined in s. 16.957(1)(f), or a person described in s. 196.01(5)(b)8. who is authorized under sub. (3) to own and operate an electric vehicle charging station at which a Level 1 charger, Level 2 charger, or Level 3 charger is available to the public on property owned by a local governmental unit, shall charge a reasonable fee for the electricity delivered or placed by all such chargers.

(4) Notwithstanding sub. (2), a municipal utility existing on March 22, 2024, may own and operate an electric vehicle charging station that is available to the public and may charge a fee for using the electric vehicle charging station that is based on the amount of kilowatt-hours of electricity that users consume if all of the following apply:

(a) The electric vehicle charging station receives any approvals from the public service commission required under ch. 196.

(b) No tax revenue subsidizes, directly or indirectly, any costs associated with the electric vehicle charging station. This paragraph does not prohibit a municipal utility from using grant money from this state that is distributed after approval by the joint committee on finance under s. 13.10 or the federal government to pay costs associated with constructing an electric vehicle charging station if the purpose of the grant is to expand the availability of electric vehicle charging infrastructure.

(c) Notwithstanding s. 66.0811(2), no revenue generated by the electric vehicle charging station is transferred to the general fund of the municipality that owns the municipal utility or otherwise directly or indirectly supplements any portion of the municipality's budget.

(5) No local governmental unit may require a private developer to install an electric vehicle charging station or allow the installation of an electric vehicle charging station on the developer's property as a condition of granting a building permit, conditional use permit, or other approval. This subsection does not apply to the enforcement of a voluntary contractual agreement between a developer and local governmental unit.

**Credits**

<<For credits, see Historical Note field.>>

WESTLAW  © 2025 Thomson Reuters. No claim to original U.S. Government Works.

W. S. A. 66.0442, WI ST 66.0442
Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**                                              © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated

Municipalities (Ch. 59 to 68)

Chapter 66. General Municipality Law (Refs & Annos)

Subchapter IV. Regulation

W.S.A. 66.044

66.044. Renumbered 66.0609 and amended by 1999 Act 150, § 113, eff. Jan. 1, 2001

Currentness

**Credits**

<<For credits, see Historical Note field.>>

W. S. A. 66.044, WI ST 66.044

Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**                              © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated

Municipalities (Ch. 59 to 68)

Chapter 66. General Municipality Law (Refs & Annos)

Subchapter IV. Regulation

W.S.A. 66.045

66.045. Renumbered 66.0425 and amended by 1999 Act 150, § 114, eff. Jan. 1, 2001

Currentness

**Credits**

<<For credits, see Historical Note field.>>

W. S. A. 66.045, WI ST 66.045
Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
  Municipalities (Ch. 59 to 68)
    Chapter 66. General Municipality Law (Refs & Annos)
      Subchapter IV. Regulation

W.S.A. 66.046

66.046. Renumbered 66.0429 and amended by 1999 Act 150, § 115, eff. Jan. 1, 2001

Currentness

**Credits**

<<For credits, see Historical Note field.>>

W. S. A. 66.046, WI ST 66.046
Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**
© 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated

Municipalities (Ch. 59 to 68)

Chapter 66. General Municipality Law (Refs & Annos)

Subchapter IV. Regulation

W.S.A. 66.047

66.047. Renumbered 66.0831 and amended by 1999 Act 150, § 116, eff. Jan. 1, 2001

Currentness

**Credits**

<<For credits, see Historical Note field.>>

W. S. A. 66.047, WI ST 66.047

Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**
© 2025 Thomson Reuters. No claim to original U.S. Government Works.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.    Appx. 638    1

West's Wisconsin Statutes Annotated

Municipalities (Ch. 59 to 68)

Chapter 66. General Municipality Law (Refs & Annos)

Subchapter IV. Regulation

W.S.A. 66.048

66.048. Renumbered 66.0915 and amended by 1999 Act 150, § 117, eff. Jan. 1, 2001

Currentness

**Credits**

<<For credits, see Historical Note field.>>

W. S. A. 66.048, WI ST 66.048
Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
  Municipalities (Ch. 59 to 68)
    Chapter 66. General Municipality Law (Refs & Annos)
      Subchapter IV. Regulation

W.S.A. 66.0485

66.0485. Renumbered 66.0141 by 1999 Act 150, § 118, eff. Jan. 1, 2001

Currentness

**Credits**

<<For credits, see Historical Note field.>>

W. S. A. 66.0485, WI ST 66.0485
Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**                               © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated

  Municipalities (Ch. 59 to 68)

    Chapter 66. General Municipality Law (Refs & Annos)

      Subchapter IV. Regulation

W.S.A. 66.049

66.049. Renumbered 66.0405 and amended by 1999 Act 150, § 119, eff. Jan. 1, 2001

Currentness

**Credits**

<<For credits, see Historical Note field.>>

W. S. A. 66.049, WI ST 66.049

Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**                                             © 2025 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Red Flag - Severe Negative Treatment

KeyCite Red Flag Negative Treatment  66.0495.   Renumbered in part and repealed in part by 1999 Act 150, §§ 120 to 133, eff. Jan. 1, 2001

West's Wisconsin Statutes Annotated
   Municipalities (Ch. 59 to 68)
      Chapter 66. General Municipality Law (Refs & Annos)
         Subchapter IV. Regulation

W.S.A. 66.0495

66.0495. Renumbered in part and repealed in part by 1999 Act 150, §§ 120 to 133, eff. Jan. 1, 2001

Currentness

**Credits**

<<For credits, see Historical Note field.>>

W. S. A. 66.0495, WI ST 66.0495
Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**                                        © 2025 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Red Flag - Severe Negative Treatment
KeyCite Red Flag Negative Treatment  66.05.    Renumbered in part and repealed in part by 1999 Act 150, §§  134 to 149, eff. Jan. 1, 2001

West's Wisconsin Statutes Annotated
    Municipalities (Ch. 59 to 68)
        Chapter 66. General Municipality Law (Refs & Annos)
            Subchapter IV. Regulation

W.S.A. 66.05

66.05. Renumbered in part and repealed in part by 1999 Act 150, §§ 134 to 149, eff. Jan. 1, 2001

Currentness

**Credits**

<<For credits, see Historical Note field.>>

W. S. A. 66.05, WI ST 66.05
Current through 2023 Act 272, published April 10, 2024.

End of Document                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

⚑ KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

> West's Wisconsin Statutes Annotated
>> Municipalities (Ch. 59 to 68)
>>> Chapter 66. General Municipality Law (Refs & Annos)
>>> Subchapter V. Officers and Employees

W.S.A. 66.0501

66.0501. Eligibility for office

Currentness

**(1) Deputy sheriffs and municipal police.** No person may be appointed deputy sheriff of any county or police officer for any city, village or town unless that person is a citizen of the United States. This section does not apply to common carriers or to a deputy sheriff not required to take an oath of office.

**(2) Eligibility of other officers.** Except as expressly authorized by statute, no member of a town, village or county board, or city council, during the term for which the member is elected, is eligible for any office or position which during that term has been created by, or the selection to which is vested in, the board or council, but the member is eligible for any elective office. The governing body may be represented on city, village or town boards and commissions where no additional compensation, except a per diem, is paid to the representatives of the governing body and may fix the tenure of these representatives notwithstanding any other statutory provision. A representative of a governing body who is a member of a city, village or town board or commission may receive a per diem only if the remaining members of the board or commission may receive a per diem. This subsection does not apply to a member of any board or council described in this subsection who resigns from the board or council before being appointed to an office or position which was not created during the member's term in office.

**(3) Appointments on consolidation of offices.** Whenever offices are consolidated, the occupants of which are members of the same statutory committee or board and which are serving in that office because of holding another office or position, the common council or village board may designate another officer or officers or make any additional appointments as may be necessary to procure the number of committee or board members provided for by statute.

**(4) Compatible offices and positions.** (a) A volunteer fire fighter, emergency medical services practitioner, or emergency medical responder in a city, village, or town whose annual compensation from one or more of those positions, including fringe benefits, does not exceed $25,000 if the city, village, or town has a population of 5,000 or less, or $15,000 if the city, village, or town has a population of more than 5,000, may also hold an elective office in that city, village, or town. It is compatible with his or her office for an elected village or town officer to receive wages under s. 60.37(4) or 61.327 for work that he or she performs for the village or town.

(b) It is compatible with his or her office for a local public official, as defined in s. 19.42(7x), to serve as an election official appointed under s. 7.30(2)(a) and be compensated for that service, as provided under s. 7.03.

**(5) Employees may be candidates.** (a) In this subsection:

1. "Political subdivision" means a city, village, town, or county.


2. "Public employee" means any individual employed by a political subdivision, other than an individual to whom s. 164.06 applies and other than an individual to whom 5 USC 1502(a)(3) applies.


(b) No political subdivision may prohibit a public employee from being a candidate for any elective public office, if that individual is otherwise qualified to be a candidate. No public employee may be required, as a condition of being a candidate for any elective public office, to take a leave of absence during his or her candidacy. This subsection does not affect the authority of a political subdivision to regulate the conduct of a public employee while the public employee is on duty or otherwise acting in an official capacity.


**Credits**

<<For credits, see Historical Note field.>>


**Editors' Notes**

### COMMENTS--1999 ACT 150, § 267

Note: Amends the prohibition, in sub. (2), of payment of additional remuneration to a representative of a governing body who sits on a city, village or town board or commission. The amendment provides that a representative of a governing body who is a member of a city, village or town board or commission may receive a per diem if the remaining members of the board or commission also may receive a per diem.


Notes of Decisions (54)

W. S. A. 66.0501, WI ST 66.0501
Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**                                   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
  Municipalities (Ch. 59 to 68)
    Chapter 66. General Municipality Law (Refs & Annos)
      Subchapter V. Officers and Employees

W.S.A. 66.05015

66.05015. Background investigation

Currentness

(1) In this section, "political subdivision" means a city, village, town, or county.

(2)(a)1. Notwithstanding ss. 111.321, 111.322, and 111.335 and with the assistance of the department of justice, a political subdivision shall conduct a background investigation of any person, including a person appointed under a civil service system competitive examination procedure established under s. 59.52(8) or ch. 63, selected to fill a position with the political subdivision and who, in fulfilling the duties of the position, will have access to federal tax information received directly from the federal Internal Revenue Service or from a source that is authorized by the federal Internal Revenue Service.

2. Notwithstanding ss. 111.321, 111.322, and 111.335, at any interval determined appropriate by the political subdivision, a political subdivision may conduct additional background investigations of any person, including a person appointed under a civil service system competitive examination procedure established under s. 59.52(8) or ch. 63, for whom an initial background investigation has been conducted under subd. 1. and background investigations of any other person, including a person appointed under a civil service system competitive examination procedure established under s. 59.52(8) or ch. 63, employed by the political subdivision who, in fulfilling the duties of his or her position, has access to federal tax information received directly from the federal Internal Revenue Service or from a source that is authorized by the federal Internal Revenue Service.

(b) A background investigation under this section may include requiring the person to be fingerprinted on 2 fingerprint cards each bearing a complete set of the person's fingerprints, or by other technologies approved by law enforcement agencies. The department of justice shall submit any such fingerprint cards to the federal bureau of investigation for the purposes of verifying the identity of the person fingerprinted and obtaining records of his or her criminal arrests and convictions.

**Credits**

<<For credits, see Historical Note field.>>

W. S. A. 66.05015, WI ST 66.05015
Current through 2023 Act 272, published April 10, 2024.

---

    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW  © 2025 Thomson Reuters. No claim to original U.S. Government Works.

🏳 KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

West's Wisconsin Statutes Annotated
  Municipalities (Ch. 59 to 68)
    Chapter 66. General Municipality Law (Refs & Annos)
      Subchapter V. Officers and Employees

W.S.A. 66.0502

66.0502. Employee residency requirements prohibited

Currentness

(1) The legislature finds that public employee residency requirements are a matter of statewide concern.

(2) In this section, "local governmental unit" means any city, village, town, county, or school district.

(3)(a) Except as provided in sub. (4), no local governmental unit may require, as a condition of employment, that any employee or prospective employee reside within any jurisdictional limit.

(b) If a local governmental unit has a residency requirement that is in effect on July 2, 2013, the residency requirement does not apply and may not be enforced.

(4)(a) This section does not affect any statute that requires residency within the jurisdictional limits of any local governmental unit or any provision of state or local law that requires residency in this state.

(b) Subject to par. (c), a local governmental unit may impose a residency requirement on law enforcement, fire, or emergency personnel that requires such personnel to reside within 15 miles of the jurisdictional boundaries of the local governmental unit.

(c) If the local governmental unit is a county, the county may impose a residency requirement on law enforcement, fire, or emergency personnel that requires such personnel to reside within 15 miles of the jurisdictional boundaries of the city, village, or town to which the personnel are assigned.

(d) A residency requirement imposed by a local governmental unit under par. (b) or (c) does not apply to any volunteer law enforcement, fire, or emergency personnel who are employees of a local governmental unit.

**Credits**
<<For credits, see Historical Note field.>>

Notes of Decisions (5)

W. S. A. 66.0502, WI ST 66.0502
Current through 2023 Act 272, published April 10, 2024.

**End of Document**
© 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
   Municipalities (Ch. 59 to 68)
      Chapter 66. General Municipality Law (Refs & Annos)
         Subchapter V. Officers and Employees

W.S.A. 66.0503

66.0503. Combination of municipal offices

Currentness

(1) The office of county supervisor may be consolidated by charter ordinance under s. 66.0101:

(a) With the office of village president in any village which has boundaries coterminous with the boundaries of any supervisory district established under s. 59.10(3).

(b) With the office of alderperson or council member in any city in which the district from which the alderperson or council member is elected is coterminous with the boundaries of any supervisory district established under s. 59.10(3).

(2) After the effective date of adoption or repeal of a charter ordinance under this section, the clerk of the municipality shall file a copy of the ordinance with the clerk of the county within which the supervisory district lies. When so consolidated, nomination papers shall contain that number of signatures required under s. 8.10 for county supervisors and shall be filed in the office of the county clerk.

(3) Removal from office of any incumbent of an office consolidated under this section vacates the office in its entirety whether effected under ss. 17.09, 17.12 and 17.13 or other pertinent statute.

(4) Compensation for an office consolidated under this section shall be separately established by the several governing bodies affected by the consolidation as though no consolidation of offices had occurred.

(5) Tenure for an officer of an office consolidated under this section shall coincide with the term for county supervisors.

**Credits**
<<For credits, see Historical Note field.>>

W. S. A. 66.0503, WI ST 66.0503
Current through 2023 Act 272, published April 10, 2024.

---

West's Wisconsin Statutes Annotated
   Municipalities (Ch. 59 to 68)
      Chapter 66. General Municipality Law (Refs & Annos)
         Subchapter V. Officers and Employees

W.S.A. 66.0504

66.0504. Address confidentiality program

Currentness

**(1) Definitions.** In this section:

(a) "Actual address" has the meaning given in s. 165.68(1)(b).

(b) "Local clerk" means an individual, and an individual's deputy or assistant, who serves as one of the following:

1. A county clerk under s. 59.23.

2. A clerk of court under s. 59.40.

3. A municipal clerk as defined in s. 5.02(10).

4. A register of deeds under s. 59.43.

(c) "Program participant" has the meaning given in s. 165.68(1)(g).

**(2) Identity protection.** (a) If a program participant submits a written request to a local clerk that he or she keep the program participant's actual address private, the local clerk may not disclose any record in his or her possession that would reveal the program participant's actual address, except pursuant to a court order.

(b) The provisions of s. 165.68(3)(b)4. a., to the extent that they apply under s. 165.68, apply to a program participant's written request under par. (a).

**Credits**
<<For credits, see Historical Note field.>>

W. S. A. 66.0504, WI ST 66.0504
Current through 2023 Act 272, published April 10, 2024.

Case 2:24-cv-00228-Z    Document 50-1    Filed 01/17/25    Page 651 of 882    PageID 49436

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

---

West's Wisconsin Statutes Annotated
  Municipalities (Ch. 59 to 68)
    Chapter 66. General Municipality Law (Refs & Annos)
      Subchapter V. Officers and Employees

W.S.A. 66.0505

66.0505. Compensation of governing bodies

Currentness

**(1) Definitions.** In this section:

(a) "Elective officer" means a member or member-elect of the governing body of a political subdivision.

(b) "Political subdivision" means any city, village, town, or county.

**(2) Establishment of salary.** An elected official of any political subdivision, who by virtue of the office held by that official is entitled to participate in the establishment of the salary attending that office, shall not during the term of the office collect salary in excess of the salary provided at the time of that official's taking office. This provision is of statewide concern and applies only to officials elected after October 22, 1961.

**(3) Refusal of salary.** (a)1. Notwithstanding the provisions of s. 59.10(1)(c), (2)(c), (3)(f) to (j), 60.32, 61.193, 61.32, or 62.09(6), an elective officer may send written notification to the clerk and treasurer of the political subdivision on whose governing body he or she serves that he or she wishes to refuse to accept the salary that he or she is otherwise entitled to receive.

2. Except as provided in subd. 3., to be valid the notification must be sent no later than the day on which the elective officer takes the oath of office and before he or she performs any services in his or her official capacity, and the notification applies only to the taxable year in which the officer's election is certified or in which the officer is appointed, if the elective officer's current taxable year ends within 3 months of his or her certification or appointment, the notification applies until the end of his or her next taxable year.

3. Except as provided in subd. 2., to be valid the notification must be sent at least 30 days before the start of the elective officer's next taxable year, and the notification applies only to that taxable year although the notification may be renewed annually as provided in this subdivision.

4. If a clerk and treasurer receive notification as described in subd. 2. or 3., the treasurer may not pay the elective officer his or her salary during the time period to which the notification applies. Upon receipt of such notification, the political subdivision's treasurer shall not pay the elective officer the salary that he or she is otherwise entitled to receive, beginning with the first pay period that commences after notification applies.

(b) An elective officer, or officer-elect, who sends the written notification described under par. (a) may not rescind the notification. If an elective officer's notification no longer applies, the political subdivision's treasurer shall pay the elective officer any salary that he or she is entitled to receive, beginning with the first pay period that commences after the expiration of the notification.


**Credits**

<<For credits, see Historical Note field.>>


Notes of Decisions (10)

W. S. A. 66.0505, WI ST 66.0505
Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

West's Wisconsin Statutes Annotated
  Municipalities (Ch. 59 to 68)
    Chapter 66. General Municipality Law (Refs & Annos)
      Subchapter V. Officers and Employees

W.S.A. 66.0506

66.0506. Referendum; increase in employee wages

Currentness

(1) In this section, "local governmental unit" means any city, village, town, county, metropolitan sewerage district, long-term care district, local cultural arts district under subch. V of ch. 229, or any other political subdivision of the state, or instrumentality of one or more political subdivisions of the state.

(2) If any local governmental unit wishes to increase the total base wages of its general municipal employees, as defined in s. 111.70(1)(fm), who are part of a collective bargaining unit under subch. IV of ch. 111, in an amount that exceeds the limit under s. 111.70(4)(mb)2., the governing body of the local governmental unit shall adopt a resolution to that effect. The resolution shall specify the amount by which the proposed total base wages increase will exceed the limit under s. 111.70(4)(mb)2. The resolution may not take effect unless it is approved in a referendum called for that purpose. The referendum shall occur in November for collective bargaining agreements that begin the following January 1. The results of a referendum apply to the total base wages only in the next collective bargaining agreement.

(3) The referendum question shall be substantially as follows: "Shall the ... [general municipal employees] in the ... [local governmental unit] receive a total increase in wages from $...[current total base wages] to $...[proposed total base wages], which is a percentage wage increase that is ... [x] percent higher than the percent of the consumer price index increase, for a total percentage increase in wages of ... [x]?"

**Credits**
<<For credits, see Historical Note field.>>

**Editors' Notes**

**VALIDITY**

<For validity of this section, see Madison Teachers, Inc. v. Walker, 2012 WL 4041495 (Wis.Cir.).>

Notes of Decisions (2)

W. S. A. 66.0506, WI ST 66.0506
Current through 2023 Act 272, published April 10, 2024.

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
  Municipalities (Ch. 59 to 68)
    Chapter 66. General Municipality Law (Refs & Annos)
      Subchapter V. Officers and Employees

W.S.A. 66.0507

66.0507. Automatic salary schedules

Currentness

Whenever the governing body of any city, village, or town enacts by ordinance a salary schedule for some or all employees and officers of the city, village or town, other than members of the city council or village or town board, the salary schedule may include an automatic adjustment for some or all of the personnel in conformity with fluctuations upwards and downwards in the cost of living, notwithstanding ss. 60.32, 61.193, 61.32, 62.09(6) and 62.13(7).

**Credits**

<<For credits, see Historical Note field.>>

W. S. A. 66.0507, WI ST 66.0507
Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**                                      © 2025 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

West's Wisconsin Statutes Annotated

Municipalities (Ch. 59 to 68)

Chapter 66. General Municipality Law (Refs & Annos)

Subchapter V. Officers and Employees

W.S.A. 66.0508

66.0508. Collective bargaining

Currentness

(1) In this section, "local governmental unit" has the meaning given in s. 66.0506(1).

(1m) Except as provided under subch. IV of ch. 111, no local governmental unit may collectively bargain with its employees.

(2) If a local governmental unit has in effect on June 29, 2011, an ordinance or resolution that is inconsistent with sub. (1m), the ordinance or resolution does not apply and may not be enforced.

(3) Each local governmental unit that is collectively bargaining with its employees shall determine the maximum total base wages expenditure that is subject to collective bargaining under s. 111.70(4)(mb)2., calculating the consumer price index change using the same method the department of revenue uses under s. 73.03(68).

**Credits**

<<For credits, see Historical Note field.>>

Notes of Decisions (3)

W. S. A. 66.0508, WI ST 66.0508
Current through 2023 Act 272, published April 10, 2024.

KeyCite Yellow Flag - Negative Treatment

Proposed Legislation

West's Wisconsin Statutes Annotated

   Municipalities (Ch. 59 to 68)

      Chapter 66. General Municipality Law (Refs & Annos)

         Subchapter V. Officers and Employees

W.S.A. 66.0509

66.0509. Civil service system; veterans preference

Currentness

(1) Any city or village may proceed under s. 61.34(1), 62.11(5) or 66.0101 to establish a civil service system of selection, tenure and status, and the system may be made applicable to all municipal personnel except the chief executive and members of the governing body, members of boards and commissions including election officials, employees subject to s. 62.13, members of the judiciary and supervisors. Any town may establish a civil service system under this subsection. For veterans there shall be no restrictions as to age, and veterans and their spouses shall be given preference points in accordance with s. 63.08(1)(fm). The system may also include uniform provisions in respect to attendance, leave regulations, compensation and payrolls for all personnel included in the system. The governing body of any city, village or town establishing a civil service system under this section may exempt from the system the librarians and assistants subject to s. 43.09(1).

(1m)(a) A local governmental unit, as defined in s. 66.0131(1)(a), that does not have a civil service system on June 29, 2011, shall establish a grievance system not later than October 1, 2011.

(b) To comply with the grievance system that is required under par. (a), a local governmental unit may establish either a civil service system under any provision authorized by law, to the greatest extent practicable, if no specific provision for the creation of a civil service system applies to that local governmental unit, or establish a grievance procedure as described under par. (d).

(c) Any civil service system that is established under any provision of law, and any grievance procedure that is created under this subsection, shall contain at least all of the following provisions:

1. A grievance procedure that addresses employee terminations.

2. Employee discipline.

3. Workplace safety.

(d) If a local governmental unit creates a grievance procedure under this subsection, the procedure shall contain at least all of the following elements:

1. A written document specifying the process that a grievant and an employer must follow.

2. A hearing before an impartial hearing officer.

3. An appeal process in which the highest level of appeal is the governing body of the local governmental unit.

(e) If an employee of a local governmental unit is covered by a civil service system on June 29, 2011, and if that system contains provisions that address the provisions specified in par. (c), the provisions that apply to the employee under his or her existing civil service system continue to apply to that employee.

(2)(a) Any town may establish a civil service system under sub. (1) and in the departments that the town board may determine. Any person who has been employed in a department for more than 5 years before the establishment of a civil service system applicable to that department is eligible to appointment without examination.

(b) Any town not having a civil service system and having exercised the option of placing assessors under civil service under s. 60.307(3) may establish a civil service system for assessors under sub. (1), unless the town has come within the jurisdiction of a county assessor under s. 70.99.

(3) When any town has established a system of civil service, the ordinance establishing the system may not be repealed for a period of 6 years after its enactment, and after the 6-year period it may be repealed only by proceedings under s. 9.20 by referendum vote. This subsection does not apply if a town comes, before the expiration of the 6 years, within the jurisdiction of a county assessor under s. 70.99.

(4) Any civil service system established under the provisions of this section shall provide for the appointment of a civil service board or commission and for the removal of the members of the board or commission for cause by the mayor with approval of the council, by the city manager and the council in a city organized under ss. 64.01 to 64.15, and by the board in a village or town.

(5) All examinations given in a civil service system established under this section, including minimum training and experience requirements, for positions in the classified service shall be job-related in compliance with appropriate validation standards and shall be subject to the approval of the board or commission appointed under sub. (4). All relevant experience, whether paid or unpaid, shall satisfy experience requirements.

**Credits**
<<For credits, see Historical Note field.>>

Notes of Decisions (12)

W. S. A. 66.0509, WI ST 66.0509
Current through 2023 Act 272, published April 10, 2024.

---

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

---

WESTLAW  © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Appx. 659

2

KeyCite Red Flag - Severe Negative Treatment

KeyCite Red Flag Negative Treatment  66.051.    Renumbered in part and repealed in part by 1999 Act 150, §§  151 to 153, eff. Jan. 1, 2001

West's Wisconsin Statutes Annotated

   Municipalities (Ch. 59 to 68)

      Chapter 66. General Municipality Law (Refs & Annos)

         Subchapter V. Officers and Employees

W.S.A. 66.051

66.051. Renumbered in part and repealed in part by 1999 Act 150, §§ 151 to 153, eff. Jan. 1, 2001

Currentness

**Credits**

<<For credits, see Historical Note field.>>

W. S. A. 66.051, WI ST 66.051

Current through 2023 Act 272, published April 10, 2024.

End of Document                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
   Municipalities (Ch. 59 to 68)
      Chapter 66. General Municipality Law (Refs & Annos)
         Subchapter V. Officers and Employees

W.S.A. 66.0510

66.0510. Benefits to officers, employees, agents

Currentness

**(1) Definitions.** In this section:

(a) "Employee benefit plan" means a plan as defined in 29 USC 1002(3).

(b) "Local governmental unit" has the definition given in s. 66.0131(1)(a).

**(2) Benefits.** If a local governmental unit provides an employee benefit plan to its officers, agents, and employees, the plan may cover only such officers, agents, and employees and their spouses and dependent children.

**Credits**
<<For credits, see Historical Note field.>>

W. S. A. 66.0510, WI ST 66.0510
Current through 2023 Act 272, published April 10, 2024.

---

End of Document                          © 2025 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

West's Wisconsin Statutes Annotated
   Municipalities (Ch. 59 to 68)
      Chapter 66. General Municipality Law (Refs & Annos)
         Subchapter V. Officers and Employees

W.S.A. 66.0511

66.0511. Law enforcement agencies; certain policies

Currentness

**(1) Definitions.** In this section:

(a) "Choke hold" means the intentional and prolonged application of force to the throat, windpipe, or carotid arteries that prevents or hinders breathing or blood flow, reduces the intake of air, or reduces blood flow to the head.

(b) "Law enforcement agency" has the meaning given under s. 165.83(1)(b).

**(2) Use of force policy.** Each person in charge of a law enforcement agency shall prepare in writing a policy or standard regulating the use of force by law enforcement officers in the performance of their duties. The law enforcement agency shall make the policy or standard publicly available on a website maintained by the law enforcement agency or, if the agency does not maintain its own site, on a website maintained by the municipality over which the law enforcement agency has jurisdiction. If the policy or standard is changed, the law enforcement agency shall ensure the website displays the updated policy or standard as soon as practically possible but no later than one year after the change is made. The law enforcement agency shall also prominently display a means of requesting a copy of the policy or standard. If a person requests a copy of the policy or standard, the law enforcement agency shall provide a copy of the current policy or standard free of charge as soon as practically possible but no later than 3 business days after the request is made. A law enforcement agency may not authorize the use of choke holds by law enforcement officers in a policy or standard under this subsection, except in life-threatening situations or in self-defense. [1]

**(3) Citizen complaint procedure.** Each person in charge of a law enforcement agency shall prepare in writing and make available for public scrutiny a specific procedure for processing and resolving a complaint by any person regarding the conduct of a law enforcement officer employed by the agency. The writing prepared under this subsection shall include a conspicuous notification of the prohibition and penalty under s. 946.66.

<Text of subsec. (4) effective July 1, 2025 and repealed by 2023 WI Act 239, § 7, on June 30, 2029.>

**(4) Human trafficking prevention and enforcement.** Each person in charge of a law enforcement agency in a county that has received a recommendation from the human trafficking council under s. 165.29(1)(d) is encouraged to designate a law enforcement officer of the law enforcement agency to coordinate the law enforcement agency's human trafficking prevention and enforcement efforts.

**Credits**

<<For credits, see Historical Note field.>>

---

**Footnotes**

---

1     Subsec. (2) shown as affected by 2021 Acts 48 and 49 and as merged by the legislative reference bureau.

W. S. A. 66.0511, WI ST 66.0511

Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**         © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
  Municipalities (Ch. 59 to 68)
    Chapter 66. General Municipality Law (Refs & Annos)
      Subchapter V. Officers and Employees

W.S.A. 66.0513

66.0513. Police, pay when acting outside county or municipality

Currentness

(1) Any chief of police, sheriff, deputy sheriff, county traffic officer or other peace officer of any city, county, village or town, who is required by command of the governor, sheriff or other superior authority to maintain the peace, or who responds to the request of the authorities of another municipality, to perform police or peace duties outside territorial limits of the city, county, village or town where the officer is employed, is entitled to the same wage, salary, pension, worker's compensation, and all other service rights for this service as for service rendered within the limits of the city, county, village or town where regularly employed.

(2) All wage and disability payments, pension and worker's compensation claims, damage to equipment and clothing, and medical expense arising under sub. (1), shall be paid by the city, county, village or town regularly employing the officer. Upon making the payment the city, county, village or town shall be reimbursed by the state, county or other political subdivision whose officer or agent commanded the services out of which the payments arose.

**Credits**
<<For credits, see Historical Note field.>>

Notes of Decisions (7)

W. S. A. 66.0513, WI ST 66.0513
Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**                                  © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
  Municipalities (Ch. 59 to 68)
    Chapter 66. General Municipality Law (Refs & Annos)
      Subchapter V. Officers and Employees

W.S.A. 66.0515

66.0515. Receipts for fees

Currentness

Every officer or employee upon receiving fees shall, if requested to do so by the person paying the fees, deliver to that person a receipt for the fees, specifying for which account each portion of the fees respectively accrued.

**Credits**
<<For credits, see Historical Note field.>>

**Editors' Notes**

### COMMENTS--1999 ACT 150, § 270

Note: Renumbers and amends s. 66.113 to provide that a municipal employee, as well as an officer, must supply a receipt for any fee received when requested to do so by the person paying the fee. The penalty for failure to supply a receipt is eliminated; violations may be prosecuted under s. 946.12, relating to misconduct in public office.

W. S. A. 66.0515, WI ST 66.0515
Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
  Municipalities (Ch. 59 to 68)
    Chapter 66. General Municipality Law (Refs & Annos)
      Subchapter V. Officers and Employees

W.S.A. 66.0517

66.0517. Weed commissioner

Currentness

**(1) Definition.** In this section, "noxious weeds" has the meaning given in s. 66.0407(1)(b).

**(2) Appointment.** (a) *Town, village and city weed commissioner.* The chairperson of each town, the president of each village and the mayor of each city may appoint one or more commissioners of noxious weeds on or before May 15 in each year. A weed commissioner shall take the official oath and the oath shall be filed in the office of the town, village or city clerk. A weed commissioner shall hold office for one year and until a successor has qualified or the town chairperson, village president or mayor determines not to appoint a weed commissioner. If more than one commissioner is appointed, the town, village or city shall be divided into districts by the officer making the appointment and each commissioner shall be assigned to a different district. The town chairperson, village president or mayor may appoint a resident of any district to serve as weed commissioner in any other district of the same town, village or city.

(b) *County weed commissioner.* A county may by resolution adopted by its county board provide for the appointment of a county weed commissioner and determine the duties, term and compensation for the county weed commissioner. When a weed commissioner has been appointed under this paragraph and has qualified, the commissioner has the powers and duties of a weed commissioner described in this section. Each town chairperson, village president or mayor may appoint one or more deputy weed commissioners, who shall work in cooperation with the county weed commissioner in the district assigned by the appointing officer.

**(3) Powers, duties and compensation.** (a) *Destruction of noxious weeds.* A weed commissioner shall investigate the existence of noxious weeds in his or her district. If a person in a district neglects to destroy noxious weeds as required under s. 66.0407(3), the weed commissioner shall destroy, or have destroyed, the noxious weeds in the most economical manner. A weed commissioner may enter upon any lands that are not exempt under s. 66.0407(5) and cut or otherwise destroy noxious weeds without being liable to an action for trespass or any other action for damages resulting from the entry and destruction, if reasonable care is exercised.

(b) *Compensation of weed commissioner.* 1. Except as provided in sub.(2)(b), a weed commissioner shall receive compensation for the destruction of noxious weeds as determined by the town board, village board, or city council upon presenting to the proper treasurer the account for noxious weed destruction, verified by oath and approved by the appointing officer. The account shall specify by separate items the amount chargeable to each piece of land, describing the land, and shall, after being paid by the treasurer, be filed with the town, village, or city clerk. The clerk shall enter the amount chargeable to each tract of land in the next tax roll in a column headed "For the Destruction of Weeds", as a tax on the lands upon which the weeds were destroyed. The tax shall be collected under ch. 74, except in case of lands which are exempt from taxation, railroad lands, or other lands for which taxes are not collected under ch. 74. A delinquent tax may be collected as is a delinquent real property tax under chs.

74 and 75 or as is a delinquent personal property tax under ch. 74. In case of railroad lands or other lands for which taxes are not collected under ch. 74, the amount chargeable against these lands shall be certified by the town, village, or city clerk to the secretary of administration who shall add the amount designated to the sum due from the company owning, occupying, or controlling the lands specified. The secretary of administration shall collect the amount chargeable as prescribed in subch. I of ch. 76 and return the amount collected to the town, city, or village from which the certification was received.

2. For the performance of duties other than the destruction of noxious weeds, a weed commissioner shall receive compensation to be determined by the town board, village board or city council.

**Credits**

<<For credits, see Historical Note field.>>

**Editors' Notes**

### COMMENTS--1999 ACT 150, § 154

Note: Creates s. 66.0517 of the statutes in order to combine the provisions regarding weed commissioners contained in ss. 66.97 to 66.99. The latter statutes are repealed in Section 620 of this bill. The new provision specifies that the appointment of a town, village or city weed commissioner is optional. The provision also differs from s. 66.97 by treating a 1st class city in the same manner as any other city. Otherwise, ss. 66.97 to 66.99 are restated.

Notes of Decisions (9)

W. S. A. 66.0517, WI ST 66.0517
Current through 2023 Act 272, published April 10, 2024.

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW  © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
   Municipalities (Ch. 59 to 68)
      Chapter 66. General Municipality Law (Refs & Annos)
         Subchapter V. Officers and Employees

W.S.A. 66.0518

66.0518. Defined benefit pension plans

Currentness

A local governmental unit, as defined in s. 66.0131(1)(a), may not establish a defined benefit pension plan for its employees unless the plan requires the employees to pay half of all actuarially required contributions for funding benefits under the plan and prohibits the local governmental unit from paying on behalf of an employee any of the employee's share of the actuarially required contributions.

**Credits**

<<For credits, see Historical Note field.>>

W. S. A. 66.0518, WI ST 66.0518
Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**                                      © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
  Municipalities (Ch. 59 to 68)
    Chapter 66. General Municipality Law (Refs & Annos)
      Subchapter V. Officers and Employees

W.S.A. 66.052

66.052. Renumbered 66.0415 and amended by 1999 Act 150, § 155, eff. Jan. 1, 2001

Currentness

**Credits**

<<For credits, see Historical Note field.>>

W. S. A. 66.052, WI ST 66.052
Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated

  Municipalities (Ch. 59 to 68)

    Chapter 66. General Municipality Law (Refs & Annos)

      Subchapter V. Officers and Employees

W.S.A. 66.053

66.053. Renumbered 66.0433 and amended by 1999 Act 150, § 156, eff. Jan. 1, 2001

Currentness

**Credits**

<<For credits, see Historical Note field.>>

W. S. A. 66.053, WI ST 66.053

Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**                                  © 2025 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Red Flag - Severe Negative Treatment

KeyCite Red Flag Negative Treatment   66.054, 66.055.   Repealed by L.1981, c. 79, § 4, eff. July 1, 1982

West's Wisconsin Statutes Annotated
  Municipalities (Ch. 59 to 68)
    Chapter 66. General Municipality Law (Refs & Annos)
      Subchapter V. Officers and Employees

W.S.A. 66.054

66.054, 66.055. Repealed by L.1981, c. 79, § 4, eff. July 1, 1982

Currentness

**Credits**

<<For credits, see Historical Note field.>>

**Editors' Notes**

### COMMENTS--L.1981, C. 79

The substance of ss. 66.054 and 66.055, relating to the regulation of the sale of fermented malt beverages, is recodified in ch. 125.

W. S. A. 66.054, WI ST 66.054

Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**                              © 2025 Thomson Reuters. No claim to original U.S. Government Works.

66.054-66.055. Repealed by L.1981, c. 79, § 4, eff. July 1, 1982, WI ST 66.055

Case 2:24-cv-00228-Z   Document 50-1   Filed 01/17/25   Page 672 of 882   PageID 49457

KeyCite Red Flag - Severe Negative Treatment

KeyCite Red Flag Negative Treatment  66.054, 66.055.   Repealed by L.1981, c. 79, §  4, eff. July 1, 1982

West's Wisconsin Statutes Annotated

Municipalities (Ch. 59 to 68)

Chapter 66. General Municipality Law (Refs & Annos)

Subchapter V. Officers and Employees

W.S.A. 66.055

66.054, 66.055. Repealed by L.1981, c. 79, § 4, eff. July 1, 1982

Currentness

**Credits**

<<For credits, see Historical Note field.>>

**Editors' Notes**

### COMMENTS--L.1981, C. 79

The substance of ss. 66.054 and 66.055, relating to the regulation of the sale of fermented malt beverages, is recodified in ch. 125.

W. S. A. 66.055, WI ST 66.055

Current through 2023 Act 272, published April 10, 2024.

End of Document                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:24-cv-00228-Z    Document 50-1    Filed 01/17/25    Page 673 of 882    PageID 49458

West's Wisconsin Statutes Annotated
  Municipalities (Ch. 59 to 68)
    Chapter 66. General Municipality Law (Refs & Annos)
      Subchapter V. Officers and Employees

W.S.A. 66.056

66.056. Renumbered 125.08 by L.1981, c. 202, § 1, eff. July 1, 1982

Currentness

**Credits**

<<For credits, see Historical Note field.>>

W. S. A. 66.056, WI ST 66.056
Current through 2023 Act 272, published April 10, 2024.

---

    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW  © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
  Municipalities (Ch. 59 to 68)
    Chapter 66. General Municipality Law (Refs & Annos)
      Subchapter V. Officers and Employees

W.S.A. 66.057

66.057. Renumbered 157.129 and amended by 1999 Act 150, § 157, eff. Jan. 1, 2001

Currentness

**Credits**

<<For credits, see Historical Note field.>>

W. S. A. 66.057, WI ST 66.057
Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated

Municipalities (Ch. 59 to 68)

Chapter 66. General Municipality Law (Refs & Annos)

Subchapter V. Officers and Employees

W.S.A. 66.058

66.058. Renumbered 66.0435(1) to (8) and amended by 1999 Act 150, §§ 158 to 160, eff. Jan. 1, 2001

Currentness

**Credits**

<<For credits, see Historical Note field.>>

W. S. A. 66.058, WI ST 66.058

Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:24-cv-00228-Z    Document 50-1    Filed 01/17/25    Page 676 of 882    PageID 49461

West's Wisconsin Statutes Annotated
 Municipalities (Ch. 59 to 68)
  Chapter 66. General Municipality Law (Refs & Annos)
   Subchapter V. Officers and Employees

W.S.A. 66.0585

66.0585. Renumbered 66.0435(9) and amended by 1999 Act 150, § 161, eff. Jan. 1, 2001

Currentness

**Credits**

<<For credits, see Historical Note field.>>

W. S. A. 66.0585, WI ST 66.0585
Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated

Municipalities (Ch. 59 to 68)

Chapter 66. General Municipality Law (Refs & Annos)

Subchapter V. Officers and Employees

W.S.A. 66.059

66.059. Renumbered 66.0619 and amended by 1999 Act 150, § 162, eff. Jan. 1, 2001

Currentness

**Credits**

<<For credits, see Historical Note field.>>

W. S. A. 66.059, WI ST 66.059

Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**                                      © 2025 Thomson Reuters. No claim to original U.S. Government Works.

66.06. Repealed by 1999 Act 150, § 163, eff. Jan. 1, 2001, WI ST 66.06...

Case 2:24-cv-00228-Z    Document 50-1    Filed 01/17/25    Page 678 of 882    PageID 49463

KeyCite Red Flag - Severe Negative Treatment

KeyCite Red Flag Negative Treatment  66.06.   Repealed by 1999 Act 150, §  163, eff. Jan. 1, 2001

West's Wisconsin Statutes Annotated

   Municipalities (Ch. 59 to 68)

      Chapter 66. General Municipality Law (Refs & Annos)

         Subchapter V. Officers and Employees

W.S.A. 66.06

66.06. Repealed by 1999 Act 150, § 163, eff. Jan. 1, 2001

Currentness

**Credits**

<<For credits, see Historical Note field.>>

W. S. A. 66.06, WI ST 66.06
Current through 2023 Act 272, published April 10, 2024.

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

West's Wisconsin Statutes Annotated
  Municipalities (Ch. 59 to 68)
    Chapter 66. General Municipality Law (Refs & Annos)
      Subchapter VI. Finance; Revenues

W.S.A. 66.0601

66.0601. Appropriations

Currentness

**(1) Prohibited appropriations.** (a) *Bonus to state institution.* No appropriation or bonus, except a donation, may be made by a town, village, or city, nor municipal liability created nor tax levied, as a consideration or inducement to the state to locate any public educational, charitable, reformatory, or penal institution.

(b) *Payments for abortions restricted.* No city, village, town, long-term care district under s. 46.2895 or agency or subdivision of a city, village or town may authorize funds for or pay to a physician or surgeon or a hospital, clinic or other medical facility for the performance of an abortion except those permitted under and which are performed in accordance with s. 20.927.

(c) *Payments for abortion-related activity restricted.* No city, village, town, long-term care district under s. 46.2895 or agency or subdivision of a city, village or town may authorize payment of funds for a grant, subsidy or other funding involving a pregnancy program, project or service if s. 20.9275(2) applies to the pregnancy program, project or service.

**(2) Celebration of holidays.** A town, county, school board, or school district may appropriate money for the purpose of initiating or participating in appropriate celebrations of any legal holiday listed in s. 995.20.

**Credits**
<<For credits, see Historical Note field.>>

W. S. A. 66.0601, WI ST 66.0601
Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**                              © 2025 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

West's Wisconsin Statutes Annotated
    Municipalities (Ch. 59 to 68)
        Chapter 66. General Municipality Law (Refs & Annos)
            Subchapter VI. Finance; Revenues

W.S.A. 66.0602

66.0602. Local levy limits

Currentness

**(1) Definitions.** In this section:

(a) "Debt service" includes debt service on debt issued or reissued to fund or refund outstanding municipal or county obligations, interest on outstanding municipal or county obligations, and related issuance costs and redemption premiums.

(ak) "Joint emergency medical services district" means a joint emergency medical services district organized by any combination of 2 or more cities, villages, or towns under s. 66.0301(2).

(am) "Joint fire department" means a joint fire department organized under s. 61.65(2)(a)3. or 62.13(1m), or a joint fire department organized by any combination of 2 or more cities, villages, or towns under s. 66.0301(2).

(au) "Municipality" means a city, village, or town.

(b) "Penalized excess" means the levy, in an amount that is at least $500 over the limit under sub. (2) for the political subdivision, not including any amount that is excepted from the limit under subs. (3), (4), and (5).

(c) "Political subdivision" means a city, village, town, or county.

(cm) "Tax incremental base" has the meaning given in s. 66.1105(2)(j).

(d) "Valuation factor" means a percentage equal to the greater of either the percentage change in the political subdivision's January 1 equalized value due to new construction less improvements removed between the previous year and the current or 0 percent. For a tax incremental district created after December 31, 2024, and for Tax Incremental District Number 10 created by the common council of the city of Evansville, and for Tax Incremental District Number 14 created by the common council of the city of Stevens Point, the valuation factor includes 90 percent of the equalized value increase due to new construction that is located in a tax incremental district, but does not include any improvements removed in a tax incremental district. [1]

(e) "Value increment" has the meaning given in s. 66.1105(2)(m).

**(2) Levy limit.** (a) Except as provided in subs. (3), (4), and (5), no political subdivision may increase its levy in any year by a percentage that exceeds the political subdivision's valuation factor. Except as provided in par. (b), the base amount in any year, to which the limit under this section applies, shall be the actual levy for the immediately preceding year. In determining its levy in any year, a city, village, or town shall subtract any tax increment that is calculated under s. 59.57(3)(a), 60.85(1)(L), or 66.1105(2)(i). The base amount in any year, to which the limit under this section applies, may not include any amount to which sub. (3)(e)8. applies.

(b) For purposes of par. (a), in 2018, and in each year thereafter, the base amount to which the limit under this section applies is the actual levy for the immediately preceding year, plus the amount of the payments under ss. 79.096 and 79.0965, and the levy limit is the base amount multiplied by the valuation factor, minus the amount of the payments under ss. 79.096 and 79.0965, except that the adjustments for payments received under s. 79.096 or 79.0965 do not apply to payments received under s. 79.096(3) or 79.0965(3) for a tax incremental district that has been terminated.

**(2m) Negative adjustment.** (a) If a political subdivision's levy for the payment of any general obligation debt service, including debt service on debt issued or reissued to fund or refund outstanding obligations of the political subdivision and interest on outstanding obligations of the political subdivision, on debt originally issued before July 1, 2005, is less in the current year than it was in the previous year, the political subdivision shall reduce its levy limit in the current year by an amount equal to the amount that its levy was reduced as described in this subsection.

(b)1. In this paragraph, "covered service" means garbage collection, fire protection, snow plowing, street sweeping, or storm water management, except that garbage collection may not be a covered service for any political subdivision that owned and operated a landfill on January 1, 2013. With regard to fire protection, "covered service" does not include the production, storage, transmission, sale and delivery, or furnishing of water for public fire protection purposes.

2. Except as provided in subd. 4., if a political subdivision receives revenues that are designated to pay for a covered service that was funded in 2013 by the levy of the political subdivision, the political subdivision shall reduce its levy limit in the current year by an amount equal to the estimated amount of fee revenue collected for providing the covered service, less any previous reductions made under this subdivision, not to exceed the amount funded in 2013 by the levy of the political subdivision.

3. Except as provided in subd. 4., if a political subdivision receives payments in lieu of taxes that are designated to pay for a covered service that was funded in 2013 by the levy of the political subdivision, the political subdivision shall reduce its levy limit in the current year by the estimated amount of payments in lieu of taxes received by the political subdivision to pay for the covered service, less any previous reductions made under this subdivision, not to exceed the amount funded in 2013 by the levy of the political subdivision.

4. The requirement under subd. 2. or 3. does not apply if the governing body of the political subdivision adopts a resolution that the levy limit should not be reduced and if the resolution is approved in a referendum. The procedure under sub. (4) applies to a referendum under this subdivision, except that the resolution and referendum question need not specify an amount of increase in the levy limit or the length of time for which the levy limit increase will apply .

WESTLAW    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**(3) Exceptions.** (a) If a political subdivision transfers to another governmental unit responsibility for providing any service that the political subdivision provided in the preceding year, the levy increase limit otherwise applicable under this section to the political subdivision in the current year is decreased to reflect the cost that the political subdivision would have incurred to provide that service, as determined by the department of revenue. The levy increase limit adjustment under this paragraph applies only if the transferor and transferee file a notice of service transfer with the department of revenue.

(b) If a political subdivision increases the services that it provides by adding responsibility for providing a service transferred to it from another governmental unit that provided the service in the preceding year, the levy increase limit otherwise applicable under this section to the political subdivision in the current year is increased to reflect the cost of that service, as determined by the department of revenue. The levy increase limit adjustment under this paragraph applies only if the transferor and transferee file a notice of service transfer with the department of revenue.

(c) If a city or village annexes territory from a town, the city's or village's levy increase limit otherwise applicable under this section is increased in the current year by an amount equal to the town levy on the annexed territory in the preceding year and the levy increase limit otherwise applicable under this section in the current year for the town from which the territory is annexed is decreased by that same amount, as determined by the department of revenue.

(d)1. If the amount of debt service for a political subdivision in the preceding year is less than the amount of debt service needed in the current year, as a result of the political subdivision adopting a resolution before July 1, 2005, authorizing the issuance of debt, the levy increase limit otherwise applicable under this section to the political subdivision in the current year is increased by the difference between these 2 amounts, as determined by the department of revenue.

2. The limit otherwise applicable under this section does not apply to amounts levied by a political subdivision for the payment of any general obligation debt service, including debt service on debt issued or reissued to fund or refund outstanding obligations of the political subdivision, interest on outstanding obligations of the political subdivision, or the payment of related issuance costs or redemption premiums, authorized on or after July 1, 2005, and secured by the full faith and credit of the political subdivision.

3. The limit otherwise applicable under this section does not apply to amounts levied by a county having a population of 750,000 or more for the payment of debt service on appropriation bonds issued under s. 59.85, including debt service on appropriation bonds issued to fund or refund outstanding appropriation bonds of the county, to pay related issuance costs or redemption premiums, or to make payments with respect to agreements or ancillary arrangements authorized under s. 59.86.

4. If the amount of a lease payment related to a lease revenue bond for a political subdivision in the preceding year is less than the amount of the lease payment needed in the current year, as a result of the issuance of a lease revenue bond before July 1, 2005, the levy increase limit otherwise applicable under this section to the political subdivision in the current year is increased by the difference between these 2 amounts.

5. The limit otherwise applicable under this section does not apply to amounts levied by a 1st class city for the payment of debt service on appropriation bonds issued under s. 62.62, including debt service on appropriation bonds issued to fund or refund outstanding appropriation bonds of the city, to pay related issuance costs or redemption premiums, or to make payments with respect to agreements or ancillary arrangements authorized under s. 62.621.

6. The limit otherwise applicable under this section does not apply to the amount that a political subdivision levies to make up any revenue shortfall for the debt service on a special assessment B bond issued under s. 66.0713(4).

(dm) For a tax incremental district created before January 1, 2025, if the department of revenue does not certify a value increment for a tax incremental district for the current year as a result of the district's termination, the levy increase limit otherwise applicable under this section in the current year to the political subdivision in which the district is located is increased by an amount equal to the political subdivision's maximum allowable levy for the immediately preceding year, multiplied by a percentage equal to 50 percent of the amount determined by dividing the value increment of the terminated tax incremental district, calculated for the previous year, by the political subdivision's equalized value, exclusive of any tax incremental district value increments, for the previous year, all as determined by the department of revenue.

(dq)1. For a tax incremental district created after December 31, 2024, and for Tax Incremental District Number 10 created by the common council of the city of Evansville, and for Tax Incremental District Number 14 created by the common council of the city of Stevens Point, if the department of revenue does not certify a value increment for the tax incremental district for the current year as a result of the district's termination, the levy increase limit otherwise applicable under this section in the current year to the political subdivision in which the district is located is increased by all of the following amounts: [2]

a. An amount equal to the political subdivision's maximum allowable levy for the immediately preceding year, multiplied by the amount determined by dividing 10 percent of the equalized value increase of the terminated tax incremental district, calculated as provided in subd. 2., by the political subdivision's equalized value, less any tax incremental district value increments, for the previous year, all as determined by the department of revenue.

b. If the life span of the tax incremental district was 75 percent or less of the length of the expected life span of the tax incremental district, measured as the period between the year the tax incremental district was created and the expected year of termination, as designated under s. 66.1105(4m)(b)2m., an additional amount equal to the political subdivision's maximum allowable levy for the immediately preceding year, multiplied by the amount determined by dividing 15 percent of the equalized value increase of the terminated tax incremental district, calculated as provided in subd. 2., by the political subdivision's equalized value, less any tax incremental district value increments, for the previous year, all as determined by the department of revenue.

2. The equalized value increase under subd. 1. and par. (dv) is calculated by adding the annual amounts reported under s. 66.1105(6m)(c)8. of the value of new construction in the district for each year that the district is active.

(ds) For a tax incremental district created before January 1, 2025, if the department of revenue recertifies the tax incremental base of a tax incremental district as a result of the district's subtraction of territory under s. 66.1105(4)(h)2., the levy limit otherwise applicable under this section shall be adjusted in the first levy year in which the subtracted territory is not part of the value increment. In that year, the political subdivision in which the district is located shall increase the levy limit otherwise applicable by an amount equal to the political subdivision's maximum allowable levy for the immediately preceding year, multiplied by a percentage equal to 50 percent of the amount determined by dividing the value increment of the tax incremental district's territory that was subtracted, calculated for the previous year, by the political subdivision's equalized value, exclusive of any tax incremental district value increments, for the previous year, all as determined by the department of revenue.

(dv) For a tax incremental district created after December 31, 2024, and for Tax Incremental District Number 10 created by the common council of the city of Evansville, and for Tax Incremental District Number 14 created by the common council

WESTLAW  © 2025 Thomson Reuters. No claim to original U.S. Government Works.

of the city of Stevens Point, if the department of revenue recertifies the tax incremental base of a tax incremental district as a result of the district's subtraction of territory under s. 66.1105(4)(h)2., the levy limit otherwise applicable under this section shall be adjusted in the first levy year in which the subtracted territory is not part of the value increment. In that year, the political subdivision in which the district is located shall increase the levy limit otherwise applicable by an amount equal to the political subdivision's maximum allowable levy for the immediately preceding year, multiplied by a percentage equal to 10 percent of the amount determined by dividing the equalized value increase, calculated as provided in par. (dq)2., attributable to the territory that was subtracted, calculated for the previous year, by the political subdivision's equalized value, exclusive of any tax incremental district value increments, for the previous year, all as determined by the department of revenue. [3]

(e) The limit otherwise applicable under this section does not apply to any of the following:

1. The amount that a county levies in that year for a county children with disabilities education board.

2. The amount that a 1st class city levies in that year for school purposes.

3. The amount that a county levies in that year under s. 82.08(2) for bridge and culvert construction and repair.

4. The amount that a county levies in that year to make payments to public libraries under s. 43.12.

5. The amount that a political subdivision levies in that year to make up any revenue shortfall for the debt service on a revenue bond issued under s. 66.0621 by the political subdivision or by a joint fire department if the joint fire department uses the proceeds of the bond to pay for a fire station and assesses the political subdivision for its share of that debt, under an agreement entered into under s. 66.0301, which is incurred by the joint fire department but is the responsibility of the political subdivision.

6. The amount that a county levies in that year for a countywide emergency medical system.

7. The amount that a village levies in that year for police protection services, but this subdivision applies only to a village's levy for the year immediately after the year in which the village changes from town status and incorporates as a village, and only if the town did not have a police force.

8. The amount that a political subdivision levies in that year to pay the unreimbursed expenses related to an emergency declared under s. 323.10, including any amounts levied in that year to replenish cash reserves that were used to pay any unreimbursed expenses related to that emergency. A levy under this subdivision that relates to a particular emergency initially shall be imposed in the year in which the emergency is declared or in the following year.

9. The political subdivision's share of any refund or rescission determined by the department of revenue and certified under s. 74.41(5).

(f)1. Subject to subd. 3., and unless a political subdivision makes an adjustment under par. (fm), if a political subdivision's allowable levy under this section in the prior year was greater than its actual levy in that year, the levy increase limit otherwise applicable under this section to the political subdivision in the next succeeding year is increased by the difference between

the prior year's allowable levy and the prior year's actual levy, as determined by the department of revenue, up to a maximum increase of 1.5 percent of the actual levy in that prior year.

3. The adjustment described in subd. 1. may occur only if the political subdivision's governing body approves of the adjustment by one of the following methods:

a. With regard to a city, village, or county, if the governing body consists of at least 5 members, by a majority vote of the governing body if the increase is 0.5 percent or less and by a three-quarters majority vote of the governing body if the increase is more than 0.5 percent, up to a maximum increase of 1.5 percent.

b. With regard to a city, village, or county, if the governing body consists of fewer than 5 members, by a majority vote of the governing body if the increase is 0.5 percent or less and by a two-thirds majority vote of the governing body if the increase is more than 0.5 percent, up to a maximum increase of 1.5 percent.

c. With a regard to a town, by a majority vote of the annual town meeting, or a special town meeting, if the town board has adopted a resolution approving of the adjustment by a majority vote of the town board if the increase is 0.5 percent or less and by a two-thirds majority vote of the town board if the increase is more than 0.5 percent, up to a maximum increase of 1.5 percent.

(fm)1. Subject to subds. 3. and 4., a political subdivision's levy increase limit otherwise applicable under this section may be increased by any amount up to the maximum adjustment specified under subd. 2.

2. The maximum adjustment allowed under subd. 1. shall be calculated by adding the difference between the political subdivision's valuation factor in the previous year and the actual percent increase in a political subdivision's levy attributable to the political subdivision's valuation factor in the previous year, for the 5 years before the current year, less any amount claimed under subd. 1. in one of the 5 preceding years, except that the calculation may not include any year before 2014, and the maximum adjustment as calculated under this subdivision may not exceed 5 percent.

3. The adjustment described in subd. 1. may occur only if the political subdivision's governing body approves of the adjustment by a two-thirds majority vote of the governing body and if the political subdivision's level of outstanding general obligation debt in the current year is less than or equal to the political subdivision's level of outstanding general obligation debt in the previous year.

4. This paragraph first applies to a levy that is imposed in 2015, and no political subdivision may make an adjustment under this paragraph if it makes an adjustment under par. (f) for the same year.

(g) If a county has provided a service in a part of the county in the preceding year and if a city, village, or town has provided that same service in another part of the county in the preceding year, and if the provision of that service is consolidated at the county level, the levy increase limit otherwise applicable under this section to the county in the current year is increased to reflect the total cost of providing that service, as determined by the department of revenue.

(h) 1. Subject to subd. 2., the limit otherwise applicable under this section does not apply to the amount that a city, village, or town levies in that year to pay for charges assessed by a joint fire department or a joint emergency medical services district,

but only to the extent that the amount levied to pay for such charges would cause the city, village, or town to exceed the limit that is otherwise applicable under this section.

2. The exception to the limit that is described under subd. 1. applies only if all of the following apply:

a. The total charges assessed by the joint fire department or the joint emergency medical services district for the current year increase, relative to the total charges assessed by the joint fire department or the joint emergency medical services district for the previous year, by a percentage that is less than or equal to the percentage change in the U.S. consumer price index for all urban consumers, U.S. city average, as determined by the U.S. department of labor, for the 12 months ending on  August 31 of the year of the levy, plus 2 percent.

b. The governing body of each city, village, and town that is served by the joint fire department or the joint emergency medical services district adopts a resolution in favor of exceeding the limit as described in subd. 1.

(i)1. If a political subdivision enters into an intergovernmental cooperation agreement under s. 66.0301 to jointly provide a service on a consolidated basis with another political subdivision, and if one of the political subdivisions increases its levy from the previous year by an amount the parties to the agreement agree is needed to provide a more equitable distribution of payments for services received, the levy increase limit otherwise applicable under this section to that political subdivision in the current year is increased by that agreed amount.

2. If a political subdivision increases its levy as described in subd. 1. the other political subdivision, which is a party to the intergovernmental cooperation agreement and has agreed to the adjustment under subd. 1., shall decrease its levy in the current year by the same amount that the first political subdivision is allowed to increase its levy under subd. 1.

(j)1. Subject to subd. 2., if a municipality experiences a shortfall in its general fund due to a loss of revenue received by the municipality from the sale of water or another commodity to a manufacturing facility as a result of the manufacturer discontinuing operations at the facility, the limit otherwise applicable under this section may be increased by the amount that the municipality levies to make up for the revenue shortfall.

2. The maximum adjustment claimed under subd. 1. shall equal the revenue received by the municipality from the sale of water or another commodity, as described in subd. 1., in the year prior to the year in which the manufacturing facility closed. A municipality may claim the adjustment in more than one year, except that the sum of all such adjustments may not exceed the revenue loss to the municipality's general fund in the year that the manufacturer discontinues operations at the facility.

(k)1. Subject to subds. 2. and 3., if the village of Shorewood reduces its levy from the amount it would have levied for 2011 if not for an error in the valuation of Tax Incremental District Number 1 in the village, to compensate for that error, the limit otherwise applicable under this section to the village in 2012 is increased by the amount of the reduction, as determined by the department of revenue. The amounts added to the village's limit for 2012 under this subdivision may not exceed the amount by which the village underutilized its limit for 2011, as determined by the department of revenue.

2. If the village of Shorewood applies funds from the village's general fund in 2011 to replace amounts not levied to compensate for an error in the valuation of Tax Incremental District Number 1 in the village, the limits otherwise applicable under this section to the village in 2012 and 2013 are increased by the amount applied from the general fund in 2011, as determined by

the department of revenue. The village's limit increases under this subdivision for 2012 and 2013 do not increase the village's limit for any subsequent year.

3. The combined amount of increased levy in 2012 and 2013 by the village of Shorewood under subd. 2. may not exceed the amount of the funds applied from the general fund to replace amounts not levied in 2011 to compensate for an error in the valuation of Tax Incremental District Number 1 in the village.

(L) If the village of Warrens reduces its levy from the amount it would have levied for 2012 if not for an error in the valuation of Tax Incremental District Number 1 in the village, to compensate for that error, the limit otherwise applicable under this section to the village in 2013 is increased by the amount of the reduction, as determined by the department of revenue. The amounts added to the village's limit for 2013 under this paragraph may not exceed the amount by which the village underutilized its limit for 2012, as determined by the department of revenue.

(Lm) If the city of Fox Lake reduces its levy from the amount it would have levied for 2012 if not for an error in the valuation of Tax Incremental District Number 1 in the city, to compensate for that error, the limit otherwise applicable under this section to the city in 2013 is increased by the amount of the reduction, as determined by the department of revenue. The amounts added to the city's limit for 2013 under this paragraph may not exceed the amount by which the city underutilized its limit for 2012, as determined by the department of revenue.

(m)1. The levy increase limit otherwise applicable under this section to a city, village, or town in the current year is increased by $1,000 for each new single-family residential dwelling unit for which a city, village, or town issues an occupancy permit in the preceding year and that is all of the following:

a. Located on a parcel of no more than 0.25 acre in a city or village, or on a parcel of no more than one acre in a town.

b. Sold in the preceding year for not more than 80 percent of the median price of a new residential dwelling unit in the city, village, or town in the preceding year.

2. Amounts levied under this paragraph may be used only for police protective services, fire protective service, or emergency medical services.

3. If a city, village, or town levies an amount under this paragraph, the city, village, or town may not decrease the amount it spends for police protective services, fire protective services, or emergency medical services below the amount the city, village, or town spent in the preceding year.

(n)1. For a political subdivision that receives a payment under s. 79.04(5)(a) or (b), the limit otherwise applicable under this section is increased by the amount that the political subdivision levies in that year to replace a revenue reduction incurred under s. 79.04(5)(a) or (b). Subject to subd. 2., the amount levied under this paragraph for a particular property may not exceed the amount paid to the political subdivision under s. 79.04(5)(a)1. or (b)1. less the amount to be paid to the political subdivision under s. 79.04(5)(a) or (b) in the year in which the levy is imposed and less any amounts previously levied under this paragraph. A revenue reduction is incurred under this paragraph when the amount received by a political subdivision under s. 79.04(5)(a) or (b) in the current year is less than the amount received under s. 79.04(5)(a) or (b) in the previous year.

WESTLAW    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2. This paragraph applies to revenue reductions for which a payment under s. 79.04(5)(a) or (b) is made after November 23, 2019. If the first payment made under s. 79.04(5)(a) or (b) after November 23, 2019, is under s. 79.04(5)(a)2. to 5. or (b)2. to 5., the amount of the payment made under s. 79.04(5)(a) or (b) in the previous year shall be used in determining the maximum amount of revenue reduction incurred.

**(4) Referendum exception.** (a) A political subdivision may exceed the levy increase limit under sub. (2) if its governing body adopts a resolution to that effect and if the resolution is approved in a referendum. For purposes of this paragraph, the political subdivision may use its best estimate of its valuation factor, based on the most current data available to it. The resolution shall specify the proposed amount of increase in the levy, the purpose for which the increase will be used, and whether the proposed amount of increase is for the next fiscal year only or if it will apply on an ongoing basis. With regard to a referendum relating to any levy in an odd-numbered year, the political subdivision may call a special referendum for the purpose of submitting the resolution to the electors of the political subdivision for approval or rejection on the same election dates as when a school board may call for a referendum under s. 121.91(3). Otherwise, the referendum shall be held at the spring primary or election or partisan primary or general election.

(b) The clerk of the political subdivision shall publish type A, B, C, D, and E notices of the referendum under s. 10.01(2). Section 5.01(1) applies in the event of failure to comply with the notice requirements of this paragraph.

(c) The referendum shall be held in accordance with chs. 5 to 12. The political subdivision shall provide the election officials with all necessary election supplies. The form of the ballot shall correspond substantially with the standard form for referendum ballots under ss. 5.64(2) and 7.08(1)(a). The question shall be submitted as follows: "Under state law, the increase in the levy of the .... (name of political subdivision) for the tax to be imposed for the next fiscal year, .... (year), is limited to ....% (based on actual data or the political subdivision's best estimate), which results in a levy of $.... Shall the .... (name of political subdivision) be allowed to exceed this limit and increase the levy for the next fiscal year, .... (year), for .... (purpose for which the increase will be used), by a total of ....% (based on actual data or the political subdivision's best estimate), which results in a levy of $....?". If the increase is for the next fiscal year only, the question shall include the percentage increase in the levy from the previous year's levy, and, if the increase is on an ongoing basis, the question shall include the amount of the increase for each fiscal year for which the increase applies.

(d) Within 14 days after the referendum, the clerk of the political subdivision shall certify the results of the referendum to the department of revenue. The levy increase limit otherwise applicable to the political subdivision under this section is increased in the next fiscal year by the percentage approved by a majority of those voting on the question. If the resolution specifies that the increase is for one year only, the amount of the increase shall be subtracted from the base used to calculate the limit for the 2nd succeeding fiscal year.

**(5) Exception, certain towns.** A town with a population of less than 3,000 may exceed the levy increase limit otherwise applicable under this section to the town if the town board adopts a resolution supporting an increase and places the question on the agenda of an annual town meeting or a special town meeting and if the annual or special town meeting adopts a resolution endorsing the town board's resolution. The limit otherwise applicable to the town under this section is increased in the next fiscal year by the percentage approved by a majority of those voting on the question. Within 14 days after the adoption of the resolution, the town clerk shall certify the results of the vote to the department of revenue.

**(6) Penalties.** Except as provided in sub. (6m), if the department of revenue determines that a political subdivision has a penalized excess in any year, the department of revenue shall do all of the following:

(a) Reduce the amount of the payment to the political subdivision under s. 79.02(1) in the following year by an amount equal to the amount of the penalized excess.

(b) Ensure that the amount of any reductions in payments under par. (a) lapses to the general fund.

(c) Ensure that the amount of the penalized excess is not included in determining the limit described under sub. (2) for the political subdivision for the following year.

(d) Ensure that, if a political subdivision's penalized excess exceeds the amount of aid payment that may be reduced under par. (a), the excess amount is subtracted from the aid payments under par. (a) in the following years until the total amount of penalized excess is subtracted from the aid payments.

**(6m) Mistakes in levies.** The department of revenue may issue a finding that a political subdivision is not liable for a penalty that would otherwise be imposed under sub. (6) if the department determines that the political subdivision's penalized excess is caused by one of the following clerical errors:

(a) The department, through mistake or inadvertence, has assessed to any county or taxation district, in the current year or in the previous year, a greater or less valuation for any year than should have been assessed, causing the political subdivision's levy to be erroneous in a way that directly causes a penalized excess.

(b) A taxation district clerk or a county clerk, through mistake or inadvertence in preparing or delivering the tax roll, causes a political subdivision's levy to be erroneous in a way that directly causes a penalized excess.

**Credits**
<<For credits, see Historical Note field.>>

**Editors' Notes**

### JOINT LEGISLATIVE COUNCIL PREFATORY NOTES--2015 ACT 256

This bill was prepared for the Joint Legislative Council's Study Committee on Review of Tax Incremental Financing.

*Industrial Zoning Requirement in Tax Incremental Districts*

Under current law, a resolution to create a tax incremental district (TID) must include a finding that not less than 50 percent, by area, of the real property within the district is at least one of the following: a blighted area; in need of rehabilitation or conservation work; suitable for industrial sites and zoned for industrial use; or suitable for mixed-use development. The resolution must also confirm that any real property within the district that is found suitable for industrial sites and is zoned for industrial use will remain zoned for industrial use for the life of the tax incremental district, and must declare that the district is a blighted area district, a rehabilitation or conservation district, an industrial district, or a mixed-use district based on the identification and classification of the property included within the district.

The bill specifies that the requirement related to maintenance of industrial zoning applies on to districts that declared to be industrial districts.

*Planning Commission Notice for TID Amendments*

Under current law, a TID's project plan may be amended for several reasons, including modification of the expenditures allowed in a TID's project plan, addition or subtraction of territory to the TID's boundaries, extension of the TID's lifespan, and donation of tax increments to another TID.

Generally, the process to amend a TID's project plan is similar to the process of creating a TID, requiring a public hearing held by the planning commission and adoption of resolutions by the planning commission, municipality, and joint review board (JRB) to approve the plan or amendment. As part of this process, the planning commission must publish a class 2 notice of its public hearing. The JRB must publish notice of its meeting as a class 1 notice, at least five days before the meeting.

Under current law, a class 2 notice consists of insertions of the notice for two consecutive weeks, with the last insertion at least a week prior to the meeting date, in the appropriate newspaper of record under ch. 985, stats. A class 1 notice, unless otherwise specified (for example, the requirement that the JRB must publish a notice five days before its meeting), requires a single insertion of the notice, at least a week prior to the meeting date, in the appropriate newspaper of record.

The bill amends the notice requirement of the planning commission from a class 2 notice to a class 1 notice with regard to notices relating to the TID amendment process.

*Obsolete References*

Over time, the statutes relating to tax incremental financing have been amended to include numerous provisions that are significantly limited in their scope, often relating to a single municipality or a particular TID. Often, these amendments offer special statutory authorization regarding creation, amendment, or lifespan of a particular district or class of districts or to TIDs in a particular municipality.

The bill repealed certain provisions of the statutes relating to tax incremental financing that the Department of Revenue (DOR) identified as obsolete.

*Timing Penalty*

Under current law, certain statutory and administrative deadlines relating to the allocation of positive tax increments to a TID combine to resolute in variation in the maximum number of positive increments that may be allocated to a TID, depending on the date on which a municipality acted to create the TID and its project plan. In particular, the maximum number of positive increments that a TID may receive is one fewer for a TID and project plan created after September 30 and before May 15 than for TIDs created on or after May 15 and before October 1.

For newly created TIDs, the bill extends a TID's lifespan and allocation period of positive tax increments by one year if the municipality that created the TID adopts the project plan for the TID after September 30 and before May 15.

*Joint Review Board Review Period*

Before a municipality's resolution to create a TID, amend a TID's project plan, or require DOR to redetermine a TID's base value may take effect, several steps are required. One of these steps is JRB approval of a municipality's

Case 2:24-cv-00228-Z    Document 50-1    Filed 01/17/25    Page 691 of 882    PageID 49476

TID resolution. A JRB consists of members who represent the overlying taxation districts. In general, the JRB must approve the resolution by a majority vote within 30 days after receiving the resolution. The review period applicable to an industry-specific TID located in a town and an environmental remediation TID is not less than 10 days nor more than 30 days.

The bill amends the maximum review period the JRB has to approve a municipality's TID resolution from 30 days to 45 days after receiving the resolution.

*Calculation of Levy Limit Exception*

Generally, under the current local levy law, and subject to a number of exceptions, a city, village, town, or county (political subdivision) may not increase its base levy (the prior year's actual levy) in any year by more than the percentage change in the political subdivision's equalized value due to new construction, less improvements removed, including new construction that occurs in a TID between the previous year and the current year, but not less than 0 percent. Also, when determining its levy limit, a municipality must exclude the amount of any tax increment generated by property in a TID located in the municipality.

There are numerous exceptions that may be used to adjust a political subdivision's levy limit. One exception authorizes an increase in a municipality's levy limit for the year that a TID terminates. If DOR does not certify a TID as a result of the district's termination, the levy limit otherwise applicable is increased by an amount equal to the municipality's maximum allowable levy for the preceding year, multiplied by a percentage equal to 50 percent of the amount determined by dividing the terminated TID's value increment by the municipality's equalized value, as determined by DOR. The increase must be applied to the municipality's levy limit in the year that the TID terminates.

The bill specifies that the municipality's equalized value for the preceding year, as used in the calculation of the levy limit exception for the year that a TID terminates, excludes the value of any TID value increments.

[Section 2] This section excludes the value of any TID increments from the calculation of the levy limit exception that applies for the year a TID terminates.

## LAW REVISION COMMITTEE NOTES–2015 ACT 191

This bill is a remedial legislation proposal, requested by the Department of Revenue and introduced by the Law Revision Committee under s. 13.83(1)(c)4. and 5., stats. After careful consideration of the various provisions of the bill, the Law Revision Committee has determined that this bill makes minor substantive changes in the statutes, and that these changes are desirable as a matter of public policy.

[Section 1] Removes the reference to the elections board, which was eliminated by 2007 Wisconsin Act 1.

## Footnotes

1    Par. (d) is shown as amended by 2023 Wis. Acts 135 and 136 and as merged by the legislative reference bureau under s. 13.92 (2) (i).

2   Subd. 1. (intro.) is shown as amended by 2023 Wis. Acts 135 and 136 and as merged by the legislative reference bureau under s. 13.92 (2) (i).

3   Par. (dv) is shown as amended by 2023 Wis. Acts 135 and 136 and as merged by the legislative reference bureau under s. 13.92 (2) (i).

W. S. A. 66.0602, WI ST 66.0602

Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**                                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

⚑ KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

West's Wisconsin Statutes Annotated
    Municipalities (Ch. 59 to 68)
        Chapter 66. General Municipality Law (Refs & Annos)
            Subchapter VI. Finance; Revenues

W.S.A. 66.0603

66.0603. Investments

Currentness

**(1g) Definition.** In this section, "governing board" has the meaning given under s. 34.01(1) but does not include a local exposition district board created under subch. II of ch. 229 or a local cultural arts district board created under subch. V of ch. 229.

**(1m) Investments.** (a) A county, city, village, town, school district, drainage district, technical college district or other governing board, other than a local professional football stadium district board created under subch. IV of ch. 229, may invest any of its funds not immediately needed in any of the following:

1. Time deposits in any credit union, bank, savings bank, trust company, or savings and loan association which is authorized to transact business in this state.

2. Bonds or securities issued or guaranteed as to principal and interest by the federal government, or by a commission, board or other instrumentality of the federal government.

3. Bonds or securities of any county, city, drainage district, technical college district, village, town or school district of this state.

3m. Bonds issued by a local exposition district under subch. II of ch. 229.

3p. Bonds issued by a local professional baseball park district created under subch. III of ch. 229.

3q. Bonds issued by a local professional football stadium district created under subch. IV of ch. 229.

3s. Bonds issued by the University of Wisconsin Hospitals and Clinics Authority.

3t. Bonds issued by a local cultural arts district under subch. V of ch. 229.

3u. Bonds issued by the Wisconsin Aerospace Authority.

4. Any security which matures or which may be tendered for purchase at the option of the holder within not more than 7 years of the date on which it is acquired, if that security has a rating which is the highest or 2nd highest rating category assigned by Standard & Poor's corporation, Moody's investors service or other similar nationally recognized rating agency or if that security is senior to, or on a parity with, a security of the same issuer which has such a rating.

5. Securities of an open-end management investment company or investment trust, if the investment company or investment trust does not charge a sales load, if the investment company or investment trust is registered under the investment company act of 1940, 15 USC 80a-1 to 80a-64, and if the portfolio of the investment company or investment trust is limited to the following:

a. Bonds and securities issued by the federal government or a commission, board or other instrumentality of the federal government.

b. Bonds that are guaranteed as to principal and interest by the federal government or a commission, board or other instrumentality of the federal government.

c. Repurchase agreements that are fully collateralized by bonds or securities under subd. 5.a. or b.

(b)1. A town, city, or village may invest surplus funds in any bonds or securities issued under the authority of the municipality, whether the bonds or securities create a general municipality liability or a liability of the property owners of the municipality for special improvements, and may sell or hypothecate the bonds or securities. Funds of an employer, as defined by s. 40.02(28), in a deferred compensation plan may also be invested and reinvested in the same manner authorized for investments under s. 881.01.

2. Funds of any school district operating under ch. 119, held in trust for pension plans intended to qualify under section 401(a) of the Internal Revenue Code, other than funds held in the public employee trust fund, may be invested and reinvested in the same manner as is authorized for investments under s. 881.01.

3. A school district may invest and reinvest funds that are held in trust, other than funds held in the public employee trust fund, solely to provide any of the following benefits, in the same manner as is authorized for investments under s. 881.01:

a. Post-employment health care benefits provided either separately or through a defined benefit pension plan.

b. Other post-employment benefits provided separately from a defined benefit pension plan.

4. A school board may not discuss or vote on establishing a trust fund to provide the benefits described in subd. 3. unless the notice of the school board meeting at which the discussion or vote may occur includes the issue as a separate agenda item.

5. A city, village, town, county, drainage district, technical college district, or other governing board as defined by s. 34.01(1) may invest and reinvest funds that are held in trust, other than funds held in the public employee trust fund, solely to provide any of the following benefits, in the same manner as is authorized for investments under s. 881.01:

a. Post-employment health care benefits provided either separately or through a defined benefit pension plan.

b. Other post-employment benefits provided separately from a defined benefit pension plan.

6. Funds that are held in trust to provide the benefits described in subds. 3. and 5. shall be held in a trust fund that is separate from all other trust funds created by, or under the control of, the local governmental unit.

(c) A local government, as defined under s. 25.50(1)(d), may invest surplus funds in the local government pooled-investment fund. Cemetery care funds, including gifts where the principal is to be kept intact, may also be invested under ch. 881.

(d) A county, city, village, town, school district, drainage district, technical college district or other governing board as defined by s. 34.01(1) may engage in financial transactions in which a public depository, as defined in s. 34.01(5), agrees to repay funds advanced to it by the local government plus interest, if the agreement is secured by bonds or securities issued or guaranteed as to principal and interest by the federal government.

(e) Subject to s. 67.11(2) with respect to funds on deposit in a debt service fund for general obligation promissory notes issued under s. 67.12(12), a county having a population of 750,000 or more, or a person to whom the county has delegated investment authority under sub. (5), may invest and reinvest in the same manner as is authorized for investments and reinvestments under s. 881.01, any of the following:

1. Moneys held in any stabilization fund established under s. 59.87(3).

2. Moneys held in a fund or account, including any reserve fund, created in connection with the issuance of appropriation bonds under s. 59.85 or general obligation promissory notes under s. 67.12(12) issued to provide funds for the payment of all or a part of the county's unfunded prior service liability.

3. Moneys appropriated or held by the county to pay debt service on appropriation bonds or general obligation promissory notes under s. 67.12(12).

4. Moneys constituting proceeds of appropriation bonds or general obligation promissory notes described in subd. 2. that are available for investment until they are spent.

5. Moneys held in an employee retirement system of the county.

(f) Subject to s. 67.11(2) with respect to funds on deposit in a debt service fund for general obligation promissory notes issued under s. 67.12(12), a 1st class city, or a person to whom the city has delegated investment authority under sub. (5), may invest and reinvest in the same manner as is authorized for investments and reinvestments under s. 881.01, any of the following:

1. Moneys held in any stabilization fund established under s. 62.622(3).

2. Moneys held in a fund or account, including any reserve fund, created in connection with the issuance of appropriation bonds under s. 62.62 or general obligation promissory notes under s. 67.12(12) issued to provide funds for the payment of all or a part of the city's unfunded prior service liability.

3. Moneys appropriated or held by the city to pay debt service on appropriation bonds or general obligation promissory notes under s. 67.12(12).

4. Moneys constituting proceeds of appropriation bonds or general obligation promissory notes described in subd. 2. that are available for investment until they are spent.

5. Moneys held in an employee retirement system of the city.

(g) A technical college district that receives funds from participation in an auction of digital broadcast spectrum administered by the federal communications commission may hold those funds in trust and may invest and reinvest those funds in the same manner authorized for investments under s. 881.01. Funds held in trust under this paragraph may only be distributed from the trust in a manner consistent with ch. 38 and in accordance with the terms of the trust. Any trust formed pursuant to this paragraph shall be separate from any other trust created by, or under the control of, the technical college district.

**(2) Delegation of investment authority.** A county, city, village, town, school district, drainage district, technical college district or other governing board, as defined in s. 34.01(1), may delegate the investment authority over any of its funds not immediately needed to a state or national bank, or trust company, which is authorized to transact business in this state if all of the following conditions are met:

(a) The institution is authorized to exercise trust powers under s. 221.0316 or ch. 223.

(b) The governing board renews annually the investment agreement under which it delegates its investment authority, and reviews annually the performance of the institution with which its funds are invested.

**(3) Additional delegation of investment authority.** (a) In addition to the authority granted under sub. (2), a school district operating under ch. 119 may delegate the investment authority over any of its funds not immediately needed and held in trust for its qualified pension plans to an investment manager who meets the requirements and qualifications specified in the trust's investment policy and who is registered as an investment adviser under the Investment Advisers Act of 1940, 15 USC 80b-3.

(b) In addition to the authority granted under sub. (2), a school district may delegate the investment authority over the funds described under sub. (1m)(b)3. to an investment manager who meets the requirements and qualifications specified in the trust's investment policy and who is registered as an investment adviser under 15 USC 80b-3.

(c)1. In addition to the authority granted under sub. (2), a city, village, town, county, drainage district, technical college district, or other governing board as defined by s. 34.01(1) may delegate the investment authority over the funds described under sub. (1m)(b)5. to an investment manager who meets the requirements and qualifications specified in the trust's investment policy and who is registered as an investment adviser under 15 USC 80b-3.

2. If a unit of government described under subd. 1. has established a trust described in sub. (1m)(b)5., it shall annually publish a written report that states the amount in the trust, the investment return earned by the trust since the last report was published, the total disbursements made from the trust since the last report was published, and the name of the investment manager if investment authority has been delegated under subd. 1.

(d)1. In addition to the authority granted under sub. (2), a technical college district may delegate the investment authority over the funds described under sub. (1m)(g) to an investment manager who meets the requirements and qualifications specified in the trust's investment policy and who is registered as an investment adviser under the Investment Advisers Act of 1940, 15 USC 80b-3.

2. If a technical college district has established a trust described in sub. (1m)(g), it shall annually publish a written report that states the amount in the trust, the investment return earned by the trust since the last report was published, the total disbursements made from the trust since the last report was published, and the name of the investment manager if investment authority has been delegated under subd. 1.

**(4) Invested fund proceeds in populous cities, use.** In a 1st class city, all interest derived from invested funds held by the city treasurer in a custodial capacity on behalf of any political entity, except for pension funds, is general revenue of the city and shall revert to the city's general fund upon the approval by the political entity evidenced by a resolution adopted for that purpose.

**(5) Delegation of investment authority in connection with pension financing in populous cities and counties.** The governing body of a county having a population of 750,000 or more, or a 1st class city, may delegate investment authority over any of the moneys described in sub. (1m)(e) or (f) to any of the following persons, which shall be responsible for the general administration and proper operation of the county's or city's employee retirement system, subject to the governing body's finding that such person has expertise in the field of investments:

(a) A public board that is organized for such purpose under county or city ordinances.

(b) A trustee, investment advisor, or investment banking or consulting firm.

**Credits**
<<For credits, see Historical Note field.>>

Notes of Decisions (10)

W. S. A. 66.0603, WI ST 66.0603
Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**                                   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.   Appx. 697   5

West's Wisconsin Statutes Annotated
    Municipalities (Ch. 59 to 68)
        Chapter 66. General Municipality Law (Refs & Annos)
            Subchapter VI. Finance; Revenues

W.S.A. 66.0605

66.0605. Local government audits and reports

Currentness

Notwithstanding any other statute, the governing body of a county, city, village or town may require or authorize a financial audit of a municipal or county officer, department, board, commission, function or activity financed in whole or part from municipal or county funds, or if any portion of the funds are the funds of the county, city, village or town. The governing body may require submission of periodic financial reports by the officer, department, board, commission, function or activity.

**Credits**

<<For credits, see Historical Note field.>>

W. S. A. 66.0605, WI ST 66.0605
Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Proposed Legislation

West's Wisconsin Statutes Annotated
  Municipalities (Ch. 59 to 68)
    Chapter 66. General Municipality Law (Refs & Annos)
      Subchapter VI. Finance; Revenues

W.S.A. 66.0607

66.0607. Withdrawal or disbursement from local treasury

Currentness

(1) Except as otherwise provided in subs. (2) to (5) and in s. 66.0608(3m), in a county, city, village, town, or school district, all disbursements from the treasury shall be made by the treasurer upon the written order of the county, city, village, town, or school clerk after proper vouchers have been filed in the office of the clerk. If the statutes provide for payment by the treasurer without an order of the clerk, the clerk shall draw and deliver to the treasurer an order for the payment before or at the time that the payment is required to be made by the treasurer. This section applies to all special and general provisions of the statutes relative to the disbursement of money from the county, city, village, town, or school district treasury except s. 67.10(2).

(2) Notwithstanding other law, a county having a population of 750,000 or more may, by ordinance, adopt any other method of allowing vouchers, disbursing funds, reconciling outstanding county orders, reconciling depository accounts, examining county orders, and accounting consistent with accepted accounting and auditing practices, if the ordinance prior to its adoption is submitted to the department of revenue, which shall submit its recommendations on the proposed ordinance to the county board of supervisors.

(3) Except as provided in subs. (2), (3m) and (5), disbursements of county, city, village, town or school district funds from demand deposits shall be by draft or order check and withdrawals from savings or time deposits shall be by written transfer order. Written transfer orders may be executed only for the purpose of transferring deposits to an authorized deposit of the public depositor in the same or another authorized public depository. The transfer shall be made directly by the public depository from which the withdrawal is made. No draft or order check issued under this subsection may be released to the payee, nor is the draft or order check valid, unless signed by the clerk and treasurer. No transfer order is valid unless signed by the clerk and the treasurer. Unless otherwise directed by ordinance or resolution adopted by the governing body, a certified copy of which shall be filed with each public depository concerned, the chairperson of the county board, mayor, village president, town chairperson or school district president shall countersign all drafts or order checks and all transfer orders. The governing body may also, by ordinance or resolution, authorize additional signatures. In lieu of the personal signatures of the clerk and treasurer and any other required signature, the facsimile signature adopted by the person and approved by the governing body may be affixed to the draft, order check or transfer order. The use of a facsimile signature does not relieve an official from any liability to which the official is otherwise subject, including the unauthorized use of the facsimile signature. A public depository is fully warranted and protected in making payment on any draft or order check or transferring pursuant to a transfer order bearing a facsimile signature affixed as provided by this subsection notwithstanding that the facsimile signature may have been affixed without the authority of the designated persons.

(3m) A county, city, village, town or school district may process periodic payments through the use of money transfer techniques, including direct deposit, electronic funds transfer and automated clearinghouse methods. The county, municipal or school district treasurer shall keep a record of the date, payee and amount of each disbursement made by a money transfer technique.

(4) Except as provided in sub. (3m), if a board, commission or committee of a county, city, village, town or school district is vested by statute with exclusive control and management of a fund, including the audit and approval of payments from the fund, independently of the governing body, payments under this section shall be made by drafts or order checks issued by the county, city, village, town or school clerk upon the filing with the clerk of certified bills, vouchers or schedules signed by the proper officers of the board, commission or committee, giving the name of the claimant or payee, and the amount and nature of each payment.

(5) In a 1st class city, municipal disbursements of public moneys shall be by draft, order, check, order check or as provided under sub. (3m). Checks or drafts shall be signed by the treasurer and countersigned by the comptroller. Orders shall be signed by the mayor and clerk and countersigned by the comptroller, as provided in the charter of the city. Disbursements of school moneys shall be as provided by s. 119.50.

(6) Withdrawal or disbursement of moneys deposited in a public depository as defined in s. 34.01(5) by a treasurer as defined in s. 34.01(7), other than the elected, appointed or acting official treasurer of a county, city, village, town or school district, shall be by endorsement, written order, draft, share draft, check or other draft signed by the person or persons designated by written authorization of the governing board as defined in s. 34.01(1). The authorization shall conform to any statute covering the disbursement of the funds. A public depository is fully warranted and protected in making payment in accordance with the latest authorization filed with it.

(7) No order may be issued by a county, city, village, town, special purpose district, school district, cooperative education service agency or technical college district clerk in excess of funds available or appropriated for the purposes for which the order is drawn, unless authorized by a resolution adopted by the affirmative vote of two-thirds of the entire membership of the governing body.

**Credits**

<<For credits, see Historical Note field.>>

Notes of Decisions (3)

W. S. A. 66.0607, WI ST 66.0607
Current through 2023 Act 272, published April 10, 2024.

---

End of Document                                           © 2025 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Proposed Legislation

West's Wisconsin Statutes Annotated

Municipalities (Ch. 59 to 68)

Chapter 66. General Municipality Law (Refs & Annos)

Subchapter VI. Finance; Revenues

W.S.A. 66.0608

66.0608. Protective services

Currentness

**(1) Definitions.** In this section:

(ak) "Emergency medical responder" has the meaning given in s. 256.01(4p).

(am) "Emergency medical responder volunteer funds" means funds of a municipality that are raised by employees of the municipality's emergency medical responder department, by volunteers, or by donation to the emergency medical responder department, for the benefit of the municipality's emergency medical responder department.

(aw) "Emergency medical services practitioner" has the meaning given in s. 256.01(5).

(b) "Emergency medical services practitioner volunteer funds" means funds of a municipality that are raised by employees of the municipality's emergency medical services practitioner department, by volunteers, or by donation to the emergency medical services practitioner department, for the benefit of the municipality's emergency medical services practitioner department.

(c) "Fire volunteer funds" means funds of a municipality that are raised by employees of the municipality's fire department, by volunteers, or by donation to the fire department, for the benefit of the municipality's fire department.

(f) "Municipality" means any city, village, or town.

(fm) "Political subdivision" means a city, village, town, or county.

(g) "Public depository" has the meaning given in s. 34.01(5).

(h) "Volunteer funds" means emergency medical services practitioner volunteer funds, fire volunteer funds, or emergency medical responder volunteer funds.

**(2m) Maintenance of effort.** (a) Beginning July 1, 2024, annually not later than July 1, except as provided in par. (c), all of the following apply:

1. A city, village, or town with a population of greater than 20,000 shall certify to the department of revenue that the city, village, or town has maintained a level of law enforcement that is at least equivalent to that provided in the city, village, or town in the previous year. The certification shall include a statement under par. (b)1. from the person in charge of providing law enforcement service for the city, village, or town, or for the city, village, or town under contract to provide this service.

2. A political subdivision shall certify to the department of revenue that the political subdivision has maintained a level of fire protective and emergency medical service that is at least equivalent to that provided in the political subdivision in the previous year. The certification shall include a statement under par. (b)2. from the person in charge of providing fire protective and emergency medical services for the political subdivision, or for the political subdivision under contract to provide this service.

3. A certification under this paragraph is not required to certify the same items under par. (b) or (c) that were certified in a prior statement.

(b)1. Except as provided in par. (c)1., [a certification under par. (a)1. shall include][1] a statement that certifies that any of the following has been maintained at a level at least equivalent to the previous year:

a. Moneys raised by tax levy by the city, village, or town and expended for employment costs of law enforcement officers, as defined in s. 165.85(2)(c).

b. The percentage of the total moneys raised by tax levy by the city, village, or town that is expended for employment costs of law enforcement officers, as defined in s. 165.85(2)(c).

c. The number of full-time equivalent law enforcement officers, as defined in s. 165.85(2)(c), employed by or assigned to the city, village, or town, not including officers whose positions are funded by grants received from the state or federal government. The person in charge of providing law enforcement service for the city, village, or town may use any reasonable method of estimating the average number of full-time equivalent law enforcement officers employed by or assigned to the city, village, or town for the year, but may consider only positions that are actually filled.

2. Except as provided in par. (c)1., [a certification under par. (a)2. shall include][2] a statement that certifies that any 2 of the following have been maintained at a level at least equivalent to the previous year:

a. The political subdivision's expenditures, not including capital expenditures or expenditures of grant moneys received from the state or federal government, for fire protective and emergency medical services.

b. The number of full-time equivalent fire fighters and emergency medical services personnel employed by or assigned to the political subdivision, not including fire fighters and emergency medical services personnel whose positions are funded by grants received from the state or federal government. For volunteer fire and emergency medical services, those volunteer fire fighters and emergency medical services personnel who responded to at least 40 percent of calls to which volunteer fire protective or

emergency medical services responded may be counted as full-time equivalent volunteer fire fighters and emergency medical services personnel under this subd. 2. b. The person in charge of providing fire protective and emergency medical services for the political subdivision may use any reasonable method of estimating the average number of full-time equivalent fire fighters and emergency medical services personnel employed by or assigned to the political subdivision for the year, but may consider only positions that are actually filled.

c. The level of training of and maintenance of licensure for fire fighters and emergency medical services personnel providing fire protective and emergency medical services within the political subdivision.

d. Response times for fire protective and emergency medical services throughout the political subdivision, adjusted for the location of calls for service.

(c)1. Except for a political subdivision that made a certification under subds. 2. to 4., if a political subdivision failed to make a certification under par. (b)1. or 2. in the previous year, in making the certification under par. (b)1. or 2., the political subdivision shall certify that the political subdivision has maintained a level of law enforcement or fire protective and emergency medical service that is at least equivalent to that provided in the most recent year that the political subdivision made a certification under par. (b)1. or 2. or to that provided in 2023, whichever year is most recent.

2. A political subdivision that has consolidated its law enforcement services or fire protective or emergency medical services with another political subdivision or entered into a contract with a private entity to provide fire protective or emergency medical services may provide a certified statement to that effect in lieu of certification under par. (b)1. or 2. This subdivision applies only to the year following consolidation or entry into a contract.

3. A political subdivision that has a newly established or joined a newly established law enforcement agency or fire protection or emergency medical service agency may provide a certified statement to that effect, in lieu of certification under par. (b)1. or 2. This subdivision applies only to the year following establishment of the agency.

4. If law enforcement services in a city, village, or town are provided solely by the county sheriff on a noncontractual basis, the city, village, or town may provide a certified statement to that effect, in lieu of certification under par. (b)1.

**(3m) Separate accounts for municipal fire, emergency medical services practitioner, and emergency medical responder volunteer funds.** (a) *General authority.* Subject to pars. (b) and (c), the governing body of a municipality may enact an ordinance that does all of the following:

1. Authorizes a particular official or employee of the municipality's fire department, emergency medical services practitioner department, or emergency medical responder department to deposit volunteer funds of the department for which the individual serves as an official or employee, in an account in the name of the fire department, emergency medical services practitioner department, or emergency medical responder department, in a public depository.

2. Gives the municipality's fire department, emergency medical services practitioner department, or emergency medical responder department, through the official or employee described under subd. 1., exclusive control over the expenditure of volunteer funds of the department for which the individual serves as an official or employee in an account described under subd. 1.

(b) *Limitations, requirements.* An ordinance enacted under par. (a) may include any of the following limitations or requirements:

1. A limit on the type and amount of funds that may be deposited into the account described under par. (a)1.

2. A limit on the amount of withdrawals from the account described under par. (a)1. that may be made, and a limit on the purposes for which such withdrawals may be made.

3. Reporting and audit requirements that relate to the account described under par. (a)1.

(c) *Ownership of funds.* Notwithstanding an ordinance enacted under par. (a), volunteer funds shall remain the property of the municipality until the funds are disbursed.

**Credits**

<<For credits, see Historical Note field.>>

---

### Footnotes

1    Missing phrase shown in brackets, corrective legislation is pending.

2    Missing phrase shown in brackets. Corrective legislation pending.

W. S. A. 66.0608, WI ST 66.0608
Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**                          © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
  Municipalities (Ch. 59 to 68)
    Chapter 66. General Municipality Law (Refs & Annos)
      Subchapter VI. Finance; Revenues

W.S.A. 66.0609

66.0609. Financial procedure; alternative system of approving claims

Currentness

(1) The governing body of a village or of a city of the 2nd, 3rd or 4th class may by ordinance enact an alternative system of approving financial claims against the municipal treasury other than claims subject to s. 893.80. The ordinance shall provide that payments may be made from the city or village treasury after the comptroller or clerk of the city or village audits and approves each claim as a proper charge against the treasury, and endorses his or her approval on the claim after having determined that all of the following conditions have been complied with:

(a) That funds are available for the claim pursuant to the budget approved by the governing body.

(b) That the item or service covered by the claim has been duly authorized by the proper official, department head or board or commission.

(c) That the item or service has been actually supplied or rendered in conformity with the authorization described in par. (b).

(d) That the claim is just and valid pursuant to law. The comptroller or clerk may require the submission of proof to support the claim as the officer considers necessary.

(2) The ordinance under sub. (1) shall require that the clerk or comptroller file with the governing body not less than monthly a list of the claims approved, showing the date paid, name of claimant, purpose and amount.

(3) The ordinance under sub. (1) shall require that the governing body of the city or village obtain an annual detailed audit of its financial transactions and accounts by a certified public accountant licensed or certified under ch. 442 and designated by the governing body.

(4) The system under sub. (1) is operative only if the comptroller or clerk is covered by a fidelity bond or insurance policy of not less than $5,000 in villages and 4th class cities, of not less than $10,000 in 3rd class cities, and of not less than $20,000 in 2nd class cities, as described in s. 61.25(intro.) or 62.09(4)(b).

(5) If an alternative procedure is adopted by ordinance in conformity with this section, the claim procedure required by ss. 61.25(6), 61.51, 62.09(10), 62.11 and 62.12 and other relevant provisions, except s. 893.80, is not applicable in the city or village.

**Credits**

<<For credits, see Historical Note field.>>

W. S. A. 66.0609, WI ST 66.0609

Current through 2023 Act 272, published April 10, 2024.

---

End of Document                                          © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated

    Municipalities (Ch. 59 to 68)

        Chapter 66. General Municipality Law (Refs & Annos)

            Subchapter VI. Finance; Revenues

W.S.A. 66.061

66.061. Renumbered 66.0815 and amended by 1999 Act 150, § 169, eff. Jan. 1, 2001

Currentness

**Credits**

<<For credits, see Historical Note field.>>

W. S. A. 66.061, WI ST 66.061

Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**                          © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated

  Municipalities (Ch. 59 to 68)

    Chapter 66. General Municipality Law (Refs & Annos)

      Subchapter VI. Finance; Revenues

W.S.A. 66.0611

66.0611. Political subdivisions prohibited from levying tax on incomes

Currentness

No county, city, village, town, or other unit of government authorized to levy taxes may assess, levy or collect any tax on income, or measured by income, and any tax so assessed or levied is void.

**Credits**

<<For credits, see Historical Note field.>>

Notes of Decisions (1)

W. S. A. 66.0611, WI ST 66.0611
Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**                                                   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
  Municipalities (Ch. 59 to 68)
    Chapter 66. General Municipality Law (Refs & Annos)
      Subchapter VI. Finance; Revenues

W.S.A. 66.0613

66.0613. Assessment on racing prohibited

Currentness

Notwithstanding subch. V of ch. 77, no county, town, city or village may levy or collect from any licensee, as defined in s. 562.01(7), any fee, tax or assessment on any wager in any race, as defined in s. 562.01(10), or on any admission to any racetrack, as defined in s. 562.01(12), except as provided in s. 562.08.

**Credits**

<<For credits, see Historical Note field.>>

W. S. A. 66.0613, WI ST 66.0613
Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

West's Wisconsin Statutes Annotated
  Municipalities (Ch. 59 to 68)
    Chapter 66. General Municipality Law (Refs & Annos)
      Subchapter VI. Finance; Revenues

W.S.A. 66.0615

66.0615. Room tax; forfeitures

Currentness

(1) In this section:

(a) "Commission" means an entity created by one municipality or by 2 or more municipalities in a zone, to coordinate tourism promotion and tourism development for the zone.

(am) "District" has the meaning given in s. 229.41(4m).

(b) "Hotel" has the meaning given in s. 77.52(2)(a)1.

(bt) "Marketplace provider" has the meaning given in s. 77.51(7i), to the extent that the marketplace provider facilitates the sale or furnishing of rooms, lodging, or other accommodations to transients under sub. (1m)(a).

(bu) "Marketplace seller" has the meaning given in s. 77.51(7j).

(c) "Motel" has the meaning given in s. 77.52(2)(a)1.

(d) "Municipality" means any city, village or town.

(de) "Occupant" means a person who rents a short-term rental through a marketplace provider.

(df) "Owner" means the person who owns the residential dwelling that has been rented.

(di) "Residential dwelling" means any building, structure, or part of the building or structure, that is used or intended to be used as a home, residence, or sleeping place by one person or by 2 or more persons maintaining a common household, to the exclusion of all others.

(dk) "Short-term rental" means a residential dwelling that is offered for rent for a fee and for fewer than 30 consecutive days.

(dm) "Sponsoring municipality" means a city, village or town that creates a district either separately or in combination with another city, village, town or county.

(e) "Tourism" means travel for recreational, business or educational purposes.

(f) "Tourism entity" means a nonprofit organization that came into existence before January 1, 2015, spends at least 51 percent of its revenues on tourism promotion and tourism development, and provides destination marketing staff and services for the tourism industry in a municipality, except that if no such organization exists, a municipality may contract with one of the following entities:

1. A nonprofit organization that spends at least 51 percent of its revenues on tourism promotion and tourism development, and provides destination marketing staff and services for the tourism industry in a municipality.

2. A nonprofit organization that was incorporated before January 1, 2015, spends 100 percent of the room tax revenue it receives from a municipality on tourism promotion and tourism development, and provides destination marketing staff and services for the tourism industry in a municipality.

(fm) "Tourism promotion and tourism development" means any of the following that are significantly used by transient tourists and reasonably likely to generate paid overnight stays at more than one establishment on which a tax under sub. (1m)(a) may be imposed, that are owned by different persons and located within a municipality in which a tax under this section is in effect; or, if the municipality has only one such establishment, reasonably likely to generate paid overnight stays at that establishment:

1. Marketing projects, including advertising media buys, creation and distribution of printed or electronic promotional tourist materials, or efforts to recruit conventions, sporting events, or motorcoach groups.

2. Transient tourist informational services.

3. Tangible municipal development, including a convention center.

(g) "Transient" has the meaning given in s. 77.52(2)(a)1.

(h) "Zone" means an area made up of 2 or more municipalities that, those municipalities agree, is a single destination as perceived by the traveling public.

(1m)(a) The governing body of a municipality may enact an ordinance, and a district, under par. (e), may adopt a resolution, imposing a tax on the sales price from selling or furnishing, at retail, except sales for resale, rooms or lodging to transients by hotelkeepers, motel operators, marketplace providers, owners of short-term rentals, and other persons or retailers selling or furnishing accommodations that are available to the public, irrespective of whether membership is required for use of the

accommodations. A tax imposed under this paragraph may be collected from the consumer or user, but may not be imposed on sales to the federal government and persons listed under s. 77.54(9a). A tax imposed under this paragraph by a municipality shall be paid to the municipality and, with regard to any tax revenue that may not be retained by the municipality, shall be forwarded by the municipality to a tourism entity or a commission if one is created under par. (c), as provided in par. (d). Except as provided in par. (am), a tax imposed under this paragraph by a municipality may not exceed 8 percent of the sales price. Except as provided in par. (am), if a tax greater than 8 percent of the sales price under this paragraph is in effect on May 13, 1994, the municipality imposing the tax shall reduce the tax to 8 percent, effective on June 1, 1994.

(am) A municipality that imposes a room tax under par. (a) is not subject to the limit on the maximum amount of tax that may be imposed under that paragraph if any of the following apply:

1. The municipality is located in a county with a population of at least 380,000 and a convention center is being constructed or renovated within that county.

2. The municipality intends to use at least 60 percent of the revenue collected from its room tax, of any room tax that is greater than 7 percent, to fund all or part of the construction or renovation of a convention center that is located in a county with a population of at least 380,000.

3. The municipality is located in a county with a population of less than 380,000 and that county is not adjacent to a county with a population of at least 380,000, and the municipality is constructing a convention center or making improvements to an existing convention center.

4. The municipality has any long-term debt outstanding with which it financed any part of the construction or renovation of a convention center.

(b)1. If a single municipality imposes a room tax under par. (a), the municipality may create a commission under par. (c). The commission shall contract with another organization to perform the functions of a tourism entity if no tourism entity exists in that municipality.

2. If 2 or more municipalities in a zone impose a room tax under par. (a), the municipalities shall enter into a contract under s. 66.0301 to create a commission under par. (c). If no tourism entity exists in any of the municipalities in the zone that have formed a commission, the commission shall contract with another organization in the zone to perform the functions of the tourism entity. Each municipality in a single zone that imposes a room tax shall levy the same percentage of tax. If the municipalities are unable to agree on the percentage of tax for the zone, the commission shall set the percentage.

3. A commission shall monitor the collection of room taxes from each municipality in a zone that has a room tax.

4. A commission shall contract with one tourism entity from the municipalities in the zone to obtain staff, support services and assistance in developing and implementing programs to promote the zone to visitors.

(c)1. If a commission is created by a single municipality, the commission shall consist of 4 to 6 members. One of the commission members shall represent the Wisconsin hotel and motel industry. Members shall be appointed under subd. 3.

Case 2:24-cv-00228-Z   Document 50-1   Filed 01/17/25   Page 713 of 882   PageID 49498

2. a. If the commission is created by more than one municipality in a zone, the commission shall consist of 3 members from each municipality in which annual tax collections exceed $1,000,000, 2 members from each municipality in which annual tax collections exceed $300,000 but are not more than $1,000,000 and one member from each municipality in which annual tax collections are $300,000 or less. Except as provided in subd. 2.b., members shall be appointed under subd. 3.

b. Two additional members, who represent the Wisconsin hotel and motel industry, shall be appointed to the commission by the chairperson of the commission, shall serve for a one-year term at the pleasure of the chairperson and may be reappointed.

3. Members of the commission shall be appointed by the principal elected official in the municipality and shall be confirmed by a majority vote of the members of the municipality's governing body who are present when the vote is taken. Commissioners shall serve for a one-year term, at the pleasure of the appointing official, and may be reappointed.

4. The commission shall meet regularly, and, from among its members, it shall elect a chairperson, vice chairperson and secretary.

5. The commission shall report any delinquencies or inaccurate reporting to the municipality that is due the tax.

(d)1. A municipality that first imposes a room tax under par. (a) after May 13, 1994, shall spend at least 70 percent of the amount collected on tourism promotion and tourism development. Any amount of room tax collected that must be spent on tourism promotion and tourism development shall either be forwarded to the commission for its municipality or zone if the municipality has created a commission, or forwarded to a tourism entity.

2. Subject to par. (dm), if a municipality collects a room tax on May 13, 1994, it may retain not more than the same percentage of the room tax that it retains on May 13, 1994. If a municipality that collects a room tax on May 1, 1994, increases its room tax after May 1, 1994, the municipality may retain not more than the same percentage of the room tax that it retains on May 1, 1994, except that if the municipality is not exempt under par. (am) from the maximum tax that may be imposed under par. (a), the municipality shall spend at least 70 percent of the increased amount of room tax that it begins collecting after May 1, 1994, on tourism promotion and development. Any amount of room tax collected that must be spent on tourism promotion and tourism development shall either be forwarded to the commission for its municipality or zone if the municipality has created a commission, or forwarded to a tourism entity.

3. A commission shall use the room tax revenue that it receives from a municipality for tourism promotion and tourism development in the zone or in the municipality.

4. The commission shall report annually to each municipality from which it receives room tax revenue the purposes for which the revenues were spent.

5. The commission may not use any of the room tax revenue to construct or develop a lodging facility.

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

6. If a municipality issued debt or bond anticipation notes before January 1, 2005, to finance the construction of a municipally owned convention center or conference center, nothing in this section may prevent the municipality from meeting all of the terms of its obligation.

7. Notwithstanding the provisions of subds. 1. and 2., any amount of room tax revenue that a municipality described under s. 77.994(3) is required to spend on tourism promotion and tourism development shall be forwarded to, and spent by, the municipality's tourism entity, unless the municipality creates a commission and forwards the revenue to the commission.

8. The governing body of a tourism entity shall include either at least one owner or operator of a lodging facility that collects the room tax described in this section and that is located in the municipality for which the room tax is collected or at least 4 owners or operators of lodging facilities that collect the room tax described in this section and that are located in the zone for which the room tax is collected. Subdivision 4., as it applies to a commission, applies to a tourism entity.

(dm) Beginning with the room tax collected on January 1, 2017, by a municipality that collected a room tax on May 13, 1994, as described in par. (d)2., and retained more than 30 percent of the room tax collected for purposes other than tourism promotion and tourism development, such a municipality may continue to retain, each year, the greater of either 30 percent of its current year revenues or one of the following amounts:

1. For fiscal year 2017, the same dollar amount of the room tax retained as the municipality retained in its 2014 fiscal year.

2. For fiscal year 2018, the same dollar amount of the room tax retained as the municipality retained in its 2013 fiscal year.

3. For fiscal year 2019, the same dollar amount of the room tax retained as the municipality retained in its 2012 fiscal year.

4. For fiscal year 2020, the same dollar amount of the room tax retained as the municipality retained in its 2011 fiscal year.

5. For fiscal year 2021 and thereafter, the same dollar amount of the room tax retained as the municipality retained in its 2010 fiscal year.

(e)1. Subject to subd. 2., a district may adopt a resolution imposing a room tax under par. (a) in an amount not to exceed 3 percent of total room charges. A majority of the authorized members of the district's board may vote that, if the balance in a special debt service reserve fund of the district is less than the requirement under s. 229.50(5), the room tax imposed by the district under this subdivision is 3 percent of total room charges beginning on the next January 1, April 1, July 1 or October 1 after the payment and this tax is irrepealable if any bonds issued by the district and secured by the special debt service reserve fund are outstanding. A room tax imposed by a district under this subdivision applies within the district's jurisdiction, as specified in s. 229.43, and the proceeds of the tax may be used only for the district's debt service on its bond obligations. If a district stops imposing and collecting a room tax, the district's sponsoring municipality may impose and collect a room tax under par. (a) on the date on which the district stops imposing and collecting its room tax.

2. In addition to the room tax that a district may impose under subd. 1, if the district's only sponsoring municipality is a 1st class city, the district may adopt a resolution imposing an additional room tax. The additional percentage of room tax under

this subdivision shall be equal to the percentage of room tax imposed by the sponsoring municipality on the date on which the sponsoring municipality agrees to stop imposing and collecting its room tax, as described under s. 229.44(15). A district shall begin collecting the additional room tax imposed under this subdivision on the date on which the sponsoring municipality stops imposing and collecting its room tax. A room tax imposed by a district under this subdivision applies only within the borders of the sponsoring municipality and may be used for any lawful purpose of the district.

3. A district adopting a resolution to impose the taxes under subd. 1. or 2. shall deliver a certified copy of the resolution to the secretary of revenue at least 120 days before its effective date.

(f)1. The department of revenue shall administer the tax that is imposed under par. (a) by a district and may take any action, conduct any proceeding and impose interest and penalties.

2. Sections 77.51(12m), (13), (14), (14g), (15a), (15b), and (17), 77.52(3), (3m), (13), (14), (18), and (19), 77.522, 77.523, 77.58(1) to (5), (6m), and (7), 77.585, 77.59, 77.60, 77.61(2), (3m), (5), (8), (9), (12) to (15), and (19m), and 77.62, as they apply to the taxes under subch. III of ch. 77, apply to the tax described under subd. 1.

3. From the appropriation under s. 20.835(4)(gg), the department of revenue shall distribute 97.45 percent of the taxes collected under this paragraph for each district to that district and shall indicate to the district the taxes reported by each taxpayer in that district, no later than the end of the month following the end of the calendar quarter in which the amounts were collected. The taxes distributed shall be increased or decreased to reflect subsequent refunds, audit adjustments and all other adjustments. Interest paid on refunds of the tax under this paragraph shall be paid from the appropriation under s. 20.835(4)(gg) at the rate under s. 77.60(1)(a). Any district that receives a report along with a payment under this subdivision or subd. 2. is subject to the duties of confidentiality to which the department of revenue is subject under s. 77.61(5).

5. Persons who are subject to the tax under this subsection, if that tax is administered by the department of revenue, shall register with the department. Any person who is required to register, including any person authorized to act on behalf of a person who is required to register, who fails to do so is guilty of a misdemeanor.

(g) Sections 77.51(10), (12m), (13), (13g), (14), (14g), (15a), (15b), and (17), 77.52 (3), (3m), (13), (14), (18), and (19), 77.522, 77.523, 77.53(7), 77.54, 77.58(6m), and 77.585, as they apply to the taxes under subch. III of ch. 77, shall apply to the tax imposed under par. (a) by a municipality.

(1r)(a) A marketplace provider shall collect the tax imposed by a municipality under sub. (1m) for a marketplace seller, unless the marketplace provider has been issued a waiver under s. 77.52(3m)(b) or (c), and forward it to the municipality, on a quarterly basis, along with a form prepared by the department of revenue as described under par. (b), except that a marketplace provider shall forward the tax to the municipality more frequently if the marketplace provider and the municipality enter into a written agreement providing for more frequent submissions. The marketplace provider shall notify the marketplace seller that the marketplace provider has collected and forwarded the taxes described in this paragraph. A municipality may not impose and collect a room tax from the marketplace seller if the municipality collects the room tax as described in this paragraph.

(b) The form prepared by the department of revenue as described under par. (a) shall contain at least the following information about the room tax imposed under sub. (1m) on the marketplace provider:

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

1. The total sales for properties located in a municipality with a room tax.

2. The total number of nights properties located in a municipality with a room tax were rented.

3. The rate of the room tax applied to the amount specified in subd. 1.

4. The total tax due for properties located in a municipality with a room tax.

(c) No later than September 29, 2021, and updated annually, the department of revenue shall create a website that contains the following information about room tax collections:

1. The name and mailing address of each municipality that imposes a room tax under sub. (1m).

2. The rate of the room tax imposed by each municipality specified in subd. 1.

(2) As a means of enforcing the collection of any room tax imposed by a municipality or a district under sub. (1m), the municipality or district may do any of the following:

(a) If a municipality or district has probable cause to believe that the correct amount of room tax has not been assessed or that the tax return is not correct, inspect and audit the records of any person subject to sub. (1m) pertaining to the furnishing or selling of accommodations to determine the correct amount of room tax due. A determination under this paragraph shall be provided in writing within 4 years after the due date of the return, unless no return has been filed.

(b) Enact a schedule of forfeitures, not to exceed 5 percent of the tax under sub. (1m) or par. (c), to be imposed on any person subject to sub. (1m) who fails to comply with a request to inspect and audit the person's records under par. (a).

(c) Determine the tax under sub. (1m) according to its best judgment if a person required to make a return fails, neglects or refuses to do so for the amount, in the manner and form and within the time prescribed by the municipality or district.

(d) Require each person who is subject to par. (c) to pay an amount of taxes that the municipality or district determines to be due under par. (c) plus interest at the rate of 1 percent per month on the unpaid balance. No refund or modification of the payment determined may be granted until the person files a correct room tax return and permits the municipality or district to inspect and audit his or her financial records under par. (a).

(e) Enact a schedule of forfeitures, not to exceed 25 percent of the room tax due for the previous year under sub. (1m) or par. (c) or $5,000, whichever is less, to be imposed for failure to pay the tax under sub. (1m). This paragraph also applies to a marketplace provider that is required to collect and remit taxes imposed by a municipality under sub. (1m), but that fails to file a return as required in sub. (1r) or pay the required tax.

(2m)(a) To enforce the collection of a room tax imposed by a district under sub. (1m), the district may exchange audit and other information relating to the room tax with the department of revenue.

(b) To enforce the collection of a room tax imposed by a municipality under sub. (1m), the municipality may jointly inspect and audit the room tax records of a person subject to sub. (1m) with other municipalities only for the purpose of conducting a joint room tax audit. A municipality may provide audit and other information to the department of revenue, and may exchange audit and other room tax related information with any municipality that took part in conducting the joint audit.

(3) The municipality shall provide by ordinance and the district shall provide by resolution for the confidentiality of information obtained under subs. (1r) and (2) but shall provide exceptions for persons using the information in the discharge of duties imposed by law or of the duties of their office or by order of a court. The municipality or district may provide for the publishing of statistics classified so as not to disclose the identity of particular returns. The municipality or district shall provide that persons violating ordinances or resolutions enacted under this subsection may be required to forfeit not less than $100 nor more than $500.

(4)(a) Except as provided in par. (d), annually, on or before May 1, on a form created and provided by the department of revenue, every municipality that imposes a tax under sub. (1m) shall certify and report to the department all of the following:

1. The amount of room tax revenue collected, and the room tax rate imposed, by the municipality in the previous year.

2. A detailed accounting of the amounts of such revenue that were forwarded in the previous year for tourism promotion and tourism development, specifying the commission or tourism entity that received the revenue. The detailed accounting shall include expenditures of at least $1,000 made by a commission or a tourism entity.

3. A list of each member of the commission and each member of the governing body of a tourism entity to which the municipality forwarded room tax revenue in the previous year, and the name of the business entity the member owns, operates, or is employed by, if any.

4. For a municipality subject to sub. (1m)(dm), the amount of the room tax retained by the municipality in each of the following fiscal years: 2010, 2011, 2012, 2013, and 2014.

(b) The department of revenue shall collect the reports described in par. (a) and shall make them available to the public.

(c) The department of revenue may impose a penalty of not more than $3,000 on a municipality that does not submit to the department the reports described in par. (a). A municipality may not use room tax revenue to pay a penalty imposed under this paragraph. The penalty shall be paid to the department of revenue.

(d) Notwithstanding the requirement in par. (a)(intro.), the information specified in par. (a)4. may be certified and reported to the department only once if the municipality submits the information not later than May 1, 2022. The department shall make such information available to the public annually in the report described in par. (a)(intro.).

**Credits**

<<For credits, see Historical Note field.>>


Notes of Decisions (6)

W. S. A. 66.0615, WI ST 66.0615
Current through 2023 Act 272, published April 10, 2024.

---

End of Document                                   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

West's Wisconsin Statutes Annotated
  Municipalities (Ch. 59 to 68)
    Chapter 66. General Municipality Law (Refs & Annos)
      Subchapter VI. Finance; Revenues

W.S.A. 66.0617

66.0617. Impact fees

Currentness

**(1) Definitions.** In this section:

(a) "Capital costs" means the capital costs to construct, expand or improve public facilities, including the cost of land, and including legal, engineering and design costs to construct, expand or improve public facilities, except that not more than 10 percent of capital costs may consist of legal, engineering and design costs unless the municipality can demonstrate that its legal, engineering and design costs which relate directly to the public improvement for which the impact fees were imposed exceed 10 percent of capital costs. "Capital costs" does not include other noncapital costs to construct, expand or improve public facilities, vehicles; or the costs of equipment to construct, expand or improve public facilities.

(b) "Developer" means a person that constructs or creates a land development.

(c) "Impact fees" means cash contributions, contributions of land or interests in land or any other items of value that are imposed on a developer by a municipality under this section.

(d) "Land development" means the construction or modification of improvements to real property that creates additional residential dwelling units within a municipality or that results in nonresidential uses that create a need for new, expanded or improved public facilities within a municipality.

(e) "Municipality" means a city, village, or town.

(f) "Public facilities" means all of the following:

1. Highways as defined in s. 340.01(22), and other transportation facilities, traffic control devices, facilities for collecting and treating sewage, facilities for collecting and treating storm and surface waters, facilities for pumping, storing, and distributing water, parks, playgrounds, and land for athletic fields, solid waste and recycling facilities, fire protection facilities, law enforcement facilities, emergency medical facilities and libraries. "Public facilities" does not include facilities owned by a school district.

Case 2:24-cv-00228-Z    Document 50-1    Filed 01/17/25    Page 720 of 882    PageID 49505

2. Notwithstanding subd. 1., with regard to impact fees that were first imposed before June 14, 2006, "public facilities" includes other recreational facilities that were substantially completed by June 14, 2006. This subdivision does not apply on or after January 1, 2018.

(g) "Service area" means a geographic area delineated by a municipality within which there are public facilities.

(h) "Service standard" means a certain quantity or quality of public facilities relative to a certain number of persons, parcels of land or other appropriate measure, as specified by the municipality.

**(2) General.** (a) A municipality may enact an ordinance under this section that imposes impact fees on developers to pay for the capital costs that are necessary to accommodate land development.

(b) Subject to par. (c), this section does not prohibit or limit the authority of a municipality to finance public facilities by any other means authorized by law, except that the amount of an impact fee imposed by a municipality shall be reduced, under sub. (6)(d), to compensate for any other costs of public facilities imposed by the municipality on developers to provide or pay for capital costs.

(c) Beginning on May 1, 1995, a municipality may impose and collect impact fees only under this section.

**(3) Public hearing; notice.** Before enacting an ordinance that imposes impact fees, or amending an existing ordinance that imposes impact fees, a municipality shall hold a public hearing on the proposed ordinance or amendment. Notice of the public hearing shall be published as a class 1 notice under ch. 985, and shall specify where a copy of the proposed ordinance or amendment and the public facilities needs assessment may be obtained.

**(4) Public facilities needs assessment.** (a) Before enacting an ordinance that imposes impact fees or amending an ordinance that imposes impact fees by revising the amount of the fee or altering the public facilities for which impact fees may be imposed, a municipality shall prepare a needs assessment for the public facilities for which it is anticipated that impact fees may be imposed. The public facilities needs assessment shall include, but not be limited to, the following:

1. An inventory of existing public facilities, including an identification of any existing deficiencies in the quantity or quality of those public facilities, for which it is anticipated that an impact fee may be imposed.

2. An identification of the new public facilities, or improvements or expansions of existing public facilities, that will be required because of land development for which it is anticipated that impact fees may be imposed. This identification shall be based on explicitly identified service areas and service standards.

3. A detailed estimate of the capital costs of providing the new public facilities or the improvements or expansions in existing public facilities identified in subd. 2., including an estimate of the cumulative effect of all proposed and existing impact fees on the availability of affordable housing within the municipality.

(b) A public facilities needs assessment or revised public facilities needs assessment that is prepared under this subsection shall be available for public inspection and copying in the office of the clerk of the municipality at least 20 days before the hearing under sub. (3).

**(5) Differential fees, impact fee zones.** (a) An ordinance enacted under this section may impose different impact fees on different types of land development.

(b) An ordinance enacted under this section may delineate geographically defined zones within the municipality and may impose impact fees on land development in a zone that differ from impact fees imposed on land development in other zones within the municipality. The public facilities needs assessment that is required under sub. (4) shall explicitly identify the differences, such as land development or the need for those public facilities, which justify the differences between zones in the amount of impact fees imposed.

**(6) Standards for impact fees.** Impact fees imposed by an ordinance enacted under this section:

(a) Shall bear a rational relationship to the need for new, expanded or improved public facilities that are required to serve land development.

(am) May not include amounts for an increase in service capacity greater than the capacity necessary to serve the development for which the fee is imposed.

(b) May not exceed the proportionate share of the capital costs that are required to serve land development, as compared to existing uses of land within the municipality.

(c) Shall be based upon actual capital costs or reasonable estimates of capital costs for new, expanded or improved public facilities.

(d) Shall be reduced to compensate for other capital costs imposed by the municipality with respect to land development to provide or pay for public facilities, including special assessments, special charges, land dedications or fees in lieu of land dedications under ch. 236 or any other items of value.

(e) Shall be reduced to compensate for moneys received from the federal or state government specifically to provide or pay for the public facilities for which the impact fees are imposed.

(f) May not include amounts necessary to address existing deficiencies in public facilities.

(fm) May not include expenses for operation or maintenance of a public facility.

(g) Except as provided under this paragraph, shall be payable by the developer or the property owner to the municipality in full upon the issuance of a building permit by the municipality. Except as provided in this paragraph, if the total amount of impact

fees due for a development will be more than $75,000, a developer may defer payment of the impact fees for a period of 4 years from the date of the issuance of the building permit or until 6 months before the municipality incurs the costs to construct, expand, or improve the public facilities related to the development for which the fee was imposed, whichever is earlier. If the developer elects to defer payment under this paragraph, the developer shall maintain in force a bond or irrevocable letter of credit in the amount of the unpaid fees executed in the name of the municipality. A developer may not defer payment of impact fees for projects that have been previously approved.

**(7) Low-cost housing.** An ordinance enacted under this section may provide for an exemption from, or a reduction in the amount of, impact fees on land development that provides low-cost housing, except that no amount of an impact fee for which an exemption or reduction is provided under this subsection may be shifted to any other development in the land development in which the low-cost housing is located or to any other land development in the municipality.

**(7r) Impact fee reports.** At the time that the municipality collects an impact fee, it shall provide to the developer from which it received the fee an accounting of how the fee will be spent.

**(8) Requirements for impact fee revenues.** Revenues from each impact fee that is imposed shall be placed in a separate segregated interest-bearing account and shall be accounted for separately from the other funds of the municipality. Impact fee revenues and interest earned on impact fee revenues may be expended only for the particular capital costs for which the impact fee was imposed, unless the fee is refunded under sub. (9).

**(9) Refund of impact fees.** Except as provided in this subsection, impact fees that are not used within 8 years after they are collected to pay the capital costs for which they were imposed shall be refunded to the payer of fees for the property with respect to which the impact fees were imposed, along with any interest that has accumulated, as described in sub. (8). Impact fees that are collected for capital costs related to lift stations or collecting and treating sewage that are not used within 10 years after they are collected to pay the capital costs for which they were imposed, shall be refunded to the payer of fees for the property with respect to which the impact fees were imposed, along with any interest that has accumulated, as described in sub. (8). The 10-year time limit for using impact fees that is specified under this subsection may be extended for 3 years if the municipality adopts a resolution stating that, due to extenuating circumstances or hardship in meeting the 10-year limit, it needs an additional 3 years to use the impact fees that were collected. The resolution shall include detailed written findings that specify the extenuating circumstances or hardship that led to the need to adopt a resolution under this subsection. For purposes of the time limits in this subsection, an impact fee is paid on the date a developer obtains a bond or irrevocable letter of credit in the amount of the unpaid fees executed in the name of the municipality under sub. (6)(g).

**(10) Appeal.** A municipality that enacts an impact fee ordinance under this section shall, by ordinance, specify a procedure under which a developer upon whom an impact fee is imposed has the right to contest the amount, collection or use of the impact fee to the governing body of the municipality.

**Credits**
<<For credits, see Historical Note field.>>

Notes of Decisions (2)

W. S. A. 66.0617, WI ST 66.0617
Current through 2023 Act 272, published April 10, 2024.

**End of Document**                              © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
    Municipalities (Ch. 59 to 68)
        Chapter 66. General Municipality Law (Refs & Annos)
            Subchapter VI. Finance; Revenues

W.S.A. 66.0619

66.0619. Public improvement bonds: issuance

Currentness

(1) A municipality, in addition to any other authority to borrow money and issue its municipal obligations, may borrow money and issue its public improvement bonds to finance the cost of construction or acquisition, including site acquisition, of any revenue-producing public improvement of the municipality. In this section, unless the context or subject matter otherwise requires:

(a) "Debt service" means the amount of principal, interest and premium due and payable with respect to public improvement bonds.

(b) "Deficiency" means the amount by which debt service required to be paid in a calendar year exceeds the amount of revenues estimated to be derived from the ownership and operation of the public improvement for the calendar year, after first subtracting from the estimated revenues the estimated cost of paying the expenses of operating and maintaining the public improvement for the calendar year.

(c) "Municipality" means a county, sanitary district, public inland lake protection and rehabilitation district, town, city or village.

(d) "Public improvement" means any public improvement which a municipality may lawfully own and operate from which the municipality expects to derive revenues.

(2) The governing body of the municipality proposing to issue public improvement bonds shall adopt a resolution authorizing their issuance. The resolution shall set forth the amount of bonds authorized, or a sum not to exceed a stated amount, and the purpose for which the bonds are to be issued. The resolution shall prescribe the terms, form and contents of the bonds and other matters that the governing body considers necessary or advisable. The bonds may be in any denomination of not less than $1,000, shall bear interest payable annually or semiannually, shall be payable not later than 20 years from the date of the bonds, at times and places that the governing body determines, and may be subject to redemption prior to maturity on terms and conditions that the governing body determines. The bonds may be issued either payable to bearer with interest coupons attached to the bonds or may be registered under s. 67.09. The bonds may be sold at public competitive sale or by private negotiation. Sections 67.08 and 67.10 apply to public improvement bonds, except insofar as they are in conflict with this section, in which case this section controls.

(2m)(a) A resolution, adopted under sub. (2) by the governing body of a municipality, need not be submitted to the electors of the municipality for approval, unless within 30 days after the resolution is adopted there is filed with the clerk of the municipality a petition, conforming to the requirements of s. 8.40 and requesting a referendum on the resolution, signed by electors numbering

at least 10 percent of the votes cast in the municipality for governor at the last general election. A resolution, adopted under sub. (2), may be submitted by the governing body of the municipality to the electors without waiting for the filing of a petition.

(b) If a referendum is to be held on a resolution, the municipal governing body shall file the resolution as provided in s. 8.37 and shall direct the municipal clerk to call a special election for the purpose of submitting the resolution to the electors for a referendum on approval or rejection. In lieu of a special election, the municipal governing body may specify that the election be held at the next succeeding spring primary or election or partisan primary or general election.

(c) The municipal clerk shall publish a class 2 notice, under ch. 985, containing a statement of the purpose of the referendum, giving the amount of the bonds proposed to be issued and the purpose for which they will be issued, and stating the time and places of holding the election and the hours during which the polls will be open.

(d) The referendum shall be held and conducted and the votes cast shall be canvassed as at regular municipal elections and the results certified to the municipal clerk. A majority of all votes cast in the municipality decides the question.

(3) The reasonable cost and value of any services rendered by the public improvement to the municipality shall be charged against the municipality and shall be paid by it in monthly installments.

(4)(a) Gross revenues derived from the ownership and operation of the public improvement shall be first pledged to debt service on issued public improvement bonds. When in excess of debt service, the revenues are subject to all of the following requirements set by resolution or ordinance of the governing body fixing:

1. The proportion of revenues of the public improvement necessary for the reasonable and proper operation and maintenance of the public improvement.

2. The proportion of revenues necessary for the payment of debt service on the public improvement bonds. The revenues shall be paid into a special fund in the treasury of the municipality known as the "Public Improvement Bond Account".

(b) At any time after one year's operation, the governing body may recompute the proportion of revenues assignable under par. (a) based upon experience of operation.

(c) All funds on deposit in a public improvement bond account, which are not immediately required for the purposes specified in this section, shall be invested in accordance with s. 66.0605.

(5) Annually, on or before August 1 the officer or department of the municipality responsible for the operation of the public improvement shall file with the governing body, or its designated representative, a detailed statement setting forth the amount of the debt service on the public improvement bonds issued for the public improvement for the succeeding calendar year and an estimate for that year of the total revenues to be derived from the ownership and operation of the public improvement and the total cost of operating and maintaining the public improvement.

(6)(a) If it is determined that there will be a deficiency for the ensuing calendar year, the municipality shall make up the deficiency, but the obligation to do so is limited to a sum which does not cause the municipality to exceed its municipal debt limits. The deficiency may be made up by the municipality from any available revenues, including a tax levy. The amount contributed by the municipality shall be deposited in the public improvement bond account and applied to the payment of debt service. Taxes levied under this paragraph are not subject to statutory limitations of rate or amount.

(b) The amount of any deficiency determined under par. (a) for the ensuing calendar year shall be related to the total debt service for that year. The ratio determines the outstanding indebtedness of the issue to be reflected as part of the municipality's indebtedness for the year.

(7) If revenue bonds have been issued by a municipality pursuant to law and an ordinance authorizing their issuance without limitation as to amount has been enacted by the governing body of the municipality, public improvement bonds may be issued under the ordinance with the same effect as though they were revenue bonds. The bonds are public improvement bonds and this section applies to the bonds, except that nothing contained in this subsection shall impair the contract between the municipality and the holders of outstanding revenue bonds. Liens created in favor of any outstanding revenue bonds issued under the ordinance apply to public improvement bonds issued under this subsection. The public improvement bonds are payable on a parity with the revenue bonds issued under the ordinance if the public improvement bonds are issued in compliance with the requirements of the ordinance for the issuance of parity bonds under the ordinance.

**Credits**

<<For credits, see Historical Note field.>>

W. S. A. 66.0619, WI ST 66.0619

Current through 2023 Act 272, published April 10, 2024.

---

End of Document                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

66.062. Repealed by 1985 Act 187, § 8, eff. April 22, 1986, WI ST 66.062

Case 2:24-cv-00228-Z    Document 50-1    Filed 01/17/25    Page 727 of 882    PageID 49512

KeyCite Red Flag - Severe Negative Treatment

KeyCite Red Flag Negative Treatment  66.062.   Repealed by 1985 Act 187, §  8, eff. April 22, 1986

West's Wisconsin Statutes Annotated
  Municipalities (Ch. 59 to 68)
    Chapter 66. General Municipality Law (Refs & Annos)
      Subchapter VI. Finance; Revenues

W.S.A. 66.062

66.062. Repealed by 1985 Act 187, § 8, eff. April 22, 1986

Currentness

**Credits**

<<For credits, see Historical Note field.>>

W. S. A. 66.062, WI ST 66.062
Current through 2023 Act 272, published April 10, 2024.

**End of Document**                              © 2025 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

West's Wisconsin Statutes Annotated
  Municipalities (Ch. 59 to 68)
    Chapter 66. General Municipality Law (Refs & Annos)
      Subchapter VI. Finance; Revenues

W.S.A. 66.0621

66.0621. Revenue obligations

Currentness

(1) In this section:

(a) "Municipality" means a city, village, town, county, commission created by contract under s. 66.0301, public inland lake protection and rehabilitation district established under s. 33.23, 33.235 or 33.24, metropolitan sewerage district created under ss. 200.01 to 200.15 and 200.21 to 200.65, town sanitary district under subch. IX of ch. 60, a local professional baseball park district created under subch. III of ch. 229, a local professional football stadium district created under subch. IV of ch. 229, a local cultural arts district created under subch. V of ch. 229 or a municipal water district or power district under ch. 198 and any other public or quasi-public corporation, officer, board or other public body empowered to borrow money and issue obligations to repay the money and obligations out of revenues. "Municipality" does not include the state or a local exposition district created under subch. II of ch. 229.

(b) "Public utility" means any revenue producing facility or enterprise owned by a municipality and operated for a public purpose as defined in s. 67.04(1)(b) including garbage incinerators, toll bridges, swimming pools, tennis courts, parks, playgrounds, golf links, bathing beaches, bathhouses, street lighting, city halls, village halls, town halls, courthouses, jails, schools, cooperative educational service agencies, hospitals, homes for the aged or indigent, child care centers, regional projects, waste collection and disposal operations, sewerage systems, local professional baseball park facilities, local professional football stadium facilities, local cultural arts facilities, and any other necessary public works projects undertaken by a municipality.

(c) "Revenue" means all moneys received from any source by a public utility and all rentals and fees and, in the case of a local professional baseball park district created under subch. III of ch. 229 includes tax revenues deposited into a special fund under s. 229.685 and payments made into a special debt service reserve fund under s. 229.74 and, in the case of a local professional football stadium district created under subch. IV of ch. 229 includes tax revenues deposited into a special fund under s. 229.825 and payments made into a special debt service reserve fund under s. 229.830.

(2) This section does not limit the authority of a municipality to acquire, own, operate and finance in the manner provided in this section a source of water and necessary transmission facilities, including all real and personal property, beyond its corporate limits. A source of water 50 miles beyond a municipality's corporate limits shall be within the municipality's authority.

(3) A municipality may, by action of its governing body, provide for purchasing, acquiring, leasing, constructing, extending, adding to, improving, conducting, controlling, operating or managing a public utility, motor bus or other systems of public

transportation from the general fund, or from the proceeds of municipal obligations, including revenue bonds. An obligation created under sub. (4) or (5) is not an indebtedness of the municipality, and shall not be included in arriving at the constitutional debt limitation.

(3m) A county in which an electronics and information technology manufacturing zone designated under s. 238.396(1m) exists may issue bonds under this section whose principal and interest are paid only through sales and use tax revenues imposed by the county under s. 77.70. The county shall be and continue without power to repeal such tax or obstruct the collection of the tax until all such payments have been made or provided for.

(4) If payment of obligations is provided by revenue bonds, the following is the procedure for payment:

(a)1. The governing body of the municipality, by ordinance or resolution, shall order the issuance and sale of bonds, executed as provided in s. 67.08(1) and payable at times not exceeding 40 years from the date of issuance, and at places, that the governing body of the municipality determines. The bonds shall be payable only out of the special redemption fund. Each bond shall include a statement that it is payable only from the special redemption fund, naming the ordinance or resolution creating it, and that it does not constitute an indebtedness of the municipality. The bonds may be issued either as registered bonds under s. 67.09 or as coupon bonds payable to bearer. Bonds shall be sold in the manner and upon the terms determined by the governing body of the municipality.

2. Interest, if any, on bonds shall be paid at least annually to bondholders. Payment of principal on the bonds shall commence not later than 3 years after the date of issue or 2 years after the estimated date that construction will be completed, whichever is later. After the commencement of the payment of principal on the bonds, at least annually, the municipality shall make principal payments and, if any, interest payments to bondholders or provide by ordinance or resolution that payments be made into a separate fund for payment to bondholders as specified in the ordinance or resolution authorizing the issuance of the bonds. The amount of the annual debt service payments made or provided for shall be reasonable in accordance with prudent municipal utility management practices.

3. All revenue bonds may contain a provision authorizing redemption of the bonds, in whole or in part, at stipulated prices, at the option of the municipality on any interest payment date. The governing body of a municipality may provide in a contract for purchasing, acquiring, leasing, constructing, extending, adding to, improving, conducting, controlling, operating or managing a public utility, that payment shall be made in bonds at not less than 95 percent of the par value of the bonds.

(b) All moneys received from bonds issued under this section shall be applied solely for purchasing, acquiring, leasing, constructing, extending, adding to, improving, conducting, controlling, operating or managing a public utility, and in the payment of the cost of subsequent necessary additions, improvements and extensions. Bonds issued under this section shall be secured by a pledge of the revenues of the public utility to the holders of the bonds and to the holders of coupons of the bonds and may be additionally secured by a mortgage lien upon the public utility to the holders of the bonds and to the holders of coupons of the bonds. If a mortgage lien is created by ordinance or resolution, the lien is perfected by publication of the ordinance or resolution or by recording of the ordinance or resolution in the records of the municipality. In addition, the municipality may record the lien by notifying the register of deeds of the county in which the public utility is located concerning its issuance of bonds. If the register of deeds receives notice from the municipality, the register of deeds shall record any mortgage lien created. The public utility remains subject to the pledge and, if created, the mortgage lien until the payment in full of the principal and interest of the bonds. Upon repayment of bonds for which a mortgage lien has been created, the register of deeds shall, upon notice from the municipality, record a satisfaction of the mortgage lien. Any holder of a bond or of coupons attached to a bond may protect and enforce this pledge and, if created, the mortgage lien and compel performance of all duties required of the

municipality by this section. A municipality may provide for additions, extensions and improvements to a public utility that it owns by additional issues of bonds under this section. The additional issues of bonds are subordinate to all prior issues of bonds under this section, but a municipality may in the ordinance or resolution authorizing bonds permit the issue of additional bonds on a parity with prior issues. A municipality may issue new bonds under this section to provide funds for refunding any outstanding municipal obligations, including interest, issued for any of the purposes stated in sub. (3). Refunding bonds issued under this section are subject to all of the following provisions:

1. Refunding bonds may be issued to refinance more than one issue of outstanding municipal obligations notwithstanding that the outstanding municipal obligations may have been issued at different times and may be secured by the revenues of more than one public utility. Public utilities may be operated as a single public utility, subject to contract rights vested in holders of bonds or promissory notes being refinanced. A determination by the governing body of a municipality that any refinancing is advantageous or necessary to the municipality is conclusive.

4. The refunding bonds are not an indebtedness of a municipality, and shall not be included in arriving at the constitutional debt limitation.

5. The governing body of a municipality may include a provision in any ordinance or resolution authorizing the issuance of refunding bonds pledging all or part of the revenues of any public utility or utilities originally financed, extended or improved from the proceeds of any of the municipal obligations being refunded, and pledging all or part of the surplus income derived from the investment of a trust created in relation to the refunding.

6. This subsection constitutes full authority for the authorization and issuance of refunding bonds and for all other acts authorized by this subsection to be done or performed and the refunding bonds may be issued under this subsection without regard to the requirements, restrictions or procedural provisions contained in any other law.

(c) The governing body of a municipality shall, in the ordinance or resolution authorizing the issuance of bonds, establish a system of funds and accounts and provide for sufficient revenues to operate and maintain the public utility and to provide fully for annual debt service requirements of bonds issued under this section. The governing body of a municipality may establish a fund or account for depreciation of assets of the public utility.

(d) If a governing body of a municipality creates a depreciation fund under par. (c) it shall use the funds set aside to restore any deficiency in the special redemption fund specified in par. (e) for the payment of the principal and interest due on the bonds and for the creation and maintenance of any reserves established by the bond ordinance or resolution to secure these payments. If the special redemption fund is sufficient for these purposes, moneys in the depreciation fund may be expended for repairs, replacements, new constructions, extensions or additions of the public utility. Accumulations of the depreciation fund may be invested and the income from the investment shall be deposited in the depreciation fund.

(e) The governing body of a municipality shall by ordinance or resolution create a special fund in the treasury of the municipality to be identified as "the .... special redemption fund" into which shall be paid the amount which is set aside for the payment of the principal and interest due on the bonds and for the creation and maintenance of any reserves established by bond ordinance or resolution to secure these payments.

(f) At the close of the public utility's fiscal year, if any surplus has accumulated in any of the funds specified in this subsection, it may be disposed of in the order set forth under s. 66.0811(2).

(g) The reasonable cost and value of any service rendered to a municipality by a public utility shall be charged against the municipality and shall be paid by it in installments.

(h) The rates for all services rendered by a public utility to a municipality or to other consumers shall be reasonable and just, taking into account and consideration the value of the public utility, the cost of maintaining and operating the public utility, the proper and necessary allowance for depreciation of the public utility, and a sufficient and adequate return upon the capital invested.

(i) The governing body of a municipality may adopt all ordinances and resolutions necessary to carry into effect this subsection. An ordinance or resolution providing for the issuance of bonds may contain such provisions or covenants, without limiting the generality of the power to adopt an ordinance or resolution, as are considered necessary or desirable for the security of bondholders or the marketability of the bonds. The provisions or covenants may include but are not limited to provisions relating to the sufficiency of the rates or charges to be made for service, maintenance and operation, improvements or additions to and sale or alienation of the public utility, insurance against loss, employment of consulting engineers and accountants, records and accounts, operating and construction budgets, establishment of reserve funds, issuance of additional bonds, and deposit of the proceeds of the sale of the bonds or revenues of the public utility in trust, including the appointment of depositories or trustees. An ordinance or resolution authorizing the issuance of bonds or other obligations payable from revenues of a public utility constitutes a contract with the holder of bonds or other obligations issued pursuant to the ordinance or resolution.

(j) The ordinance or resolution required under par. (c) may set apart bonds equal to the amount of any secured debt or charge subject to which a public utility may be purchased, acquired, leased, constructed, extended, added to or improved. The ordinance or resolution shall set aside for interest and debt service fund from the income and revenues of the public utility a sum sufficient to comply with the requirements of the instrument creating the lien, or, if the instrument does not make any provision for it, the ordinance or resolution shall fix the amount which shall be set aside into a secured debt fund from month to month for interest on the secured debt, and a fixed amount or proportion not exceeding a stated sum, which shall be not less than 1 percent of the principal, to be set aside into the fund to pay the principal of the debt. Any surplus after satisfying the debt may be transferred to the special redemption fund. Public utility bonds set aside for the debt may be issued to an amount sufficient with the amount then in the debt service fund to pay and retire the debt or any portion of it. The bonds may be issued at not less than 95 percent of the par value in exchange for, or satisfaction of, the secured debt, or may be sold in the manner provided in this paragraph, and the proceeds applied in payment of the secured debt at maturity or before maturity by agreement with the holder. The governing body of a municipality and the owners of a public utility acquired, purchased, leased, constructed, extended, added to or improved under this paragraph may contract that public utility bonds providing for the secured debt or for the whole purchase price shall be deposited with a trustee or depository and released from deposit to secure the payment of the debt.

(k) A municipality purchasing, acquiring, leasing, constructing, extending, adding to or improving, conducting, controlling, operating or managing a public utility subject to a mortgage or deed of trust by the vendor or the vendor's predecessor in title to secure the payment of outstanding and unpaid bonds made by the vendor or the vendor's predecessor in title, may readjust, renew, consolidate or extend the obligation evidenced by the outstanding bonds and continue the lien of the mortgage, securing the mortgage by issuing bonds to refund the outstanding mortgage or revenue bonds at or before their maturity. The refunding bonds are payable only out of a special redemption fund created and set aside by ordinance or resolution under par. (e). The refunding bonds shall be secured by a mortgage lien upon the public utility, and the municipality may adopt all ordinances or resolutions and take all proceedings, following the procedure under this subsection. The lien has the same priority on the

public utility as the mortgage securing the outstanding bonds, unless otherwise expressly provided in the proceedings of the governing body of the municipality.

(L)1. If the governing body of a municipality, by ordinance or resolution, declares its intentions to authorize the issuance or sale of revenue bonds under this section, the governing body may, prior to issuance of the bonds and in anticipation of their sale, authorize the issuance of bond anticipation notes by the adoption of a resolution or ordinance. The notes shall be named "bond anticipation notes". Bond anticipation notes may be issued for the purposes for which the municipality has authority to issue revenue bonds. The ordinance or resolution authorizing the bond anticipation notes shall state the purposes for which the bond anticipation notes are to be issued and shall set forth a covenant of the municipality to issue the revenue bonds in an amount sufficient to retire the outstanding bond anticipation notes. The ordinance or resolution may contain other covenants and provisions, including a description of the terms of the revenue bonds to be issued. The municipality may pledge revenues of the public utility to payment of the principal and interest on the bond anticipation notes. Prior to issuance of the bond anticipation notes, the governing body may adopt an ordinance or resolution authorizing the revenue bonds.

2. Bond anticipation notes may be issued for periods of up to 5 years and may, by ordinance or resolution of the governing body of a municipality, be refunded one or more times, if the refunding bond anticipation notes do not exceed 5 years in term and if they will be paid within 10 years after the date of issuance of the original bond anticipation notes. Bond anticipation notes shall be executed as provided in s. 67.08(1) and may be registered under s. 67.09. These notes shall state the sources from which they are payable. Bond anticipation notes are not an indebtedness of the municipality issuing them, and no lien may be created or attached with respect to any property of the municipality as a consequence of the issuance of the notes.

3. Any funds derived from the issuance and sale of revenue bonds under this section and issued subsequent to the execution and sale of bond anticipation notes constitute a trust fund, and the fund shall be expended first for the payment of principal and interest of the bond anticipation notes, and then may be expended for other purposes set forth in the ordinance or resolution authorizing the revenue bonds. No bond anticipation notes may be issued unless a financial officer of the municipality certifies to the governing body of the municipality that contracts with respect to additions, improvements and extensions are to be let and that the proceeds of the notes are required for the payment of the contracts.

4. Following the issuance of the bond anticipation notes, revenues of the public utility may be paid into a fund to pay principal and interest on the bond anticipation notes, which moneys or any part of them may, by the ordinance or resolution authorizing the issuance of bond anticipation notes, be pledged for the payment of the principal of and interest on the notes. The ordinance or resolution shall pledge to the payment of the principal of the notes the proceeds of the sale of the revenue bonds in anticipation of the sale of which the notes were authorized to be issued and may provide for use of revenue of the public utility or other available funds for payment of principal on the notes. The notes are negotiable instruments.

6. A municipality authorized to issue or sell bond anticipation notes under this paragraph may, in addition to the revenue sources or bond proceeds, appropriate funds out of its annual tax levy for the payment of the notes. The payment of the notes out of funds from a tax levy is not an obligation of the municipality to make any other appropriation.

7. Bond anticipation notes are a legal form of investment for municipal funds under s. 66.0603(1m).

(5) A municipality which may own, purchase, acquire, lease, construct, extend, add to, improve, conduct, control, operate or manage any public utility may, by action of its governing body, in lieu of issuing bonds or levying taxes and in addition to any other lawful methods of paying obligations, provide for or secure the payment of the cost of purchasing, acquiring, leasing,

constructing, extending, adding to, improving, conducting, controlling, operating or managing a public utility by pledging, assigning or otherwise hypothecating, shares of stock evidencing a controlling interest in a public utility, or the net earnings or profits derived, or to be derived, from the operation of the public utility. The municipality may enter into the contracts and may mortgage the public utility and issue obligations to carry out this subsection. A municipality may issue additional obligations under this section, but those obligations are subordinate to all prior obligations, except that the municipality may in the ordinance or resolution authorizing obligations under this subsection permit the issue of additional obligations on a parity with those previously issued.

(6)(a) Revenue bonds issued by a local professional baseball park district created under subch. III of ch. 229 are subject to the provisions in ss. 229.72 to 229.81.

(b) Revenue bonds issued by a local professional football stadium district created under subch. IV of ch. 229 are subject to the provisions in ss. 229.829 to 229.834.

(c) Revenue bonds issued by a local cultural arts district created under subch. V of ch. 229 are subject to the provisions in ss. 229.849 to 229.853.

**Credits**

<<For credits, see Historical Note field.>>

**Editors' Notes**

### COMMENTS--1999 ACT 150, § 176

Note: 1999 Wis. Act 65 authorized the creation of local cultural arts districts and provided, in s. 66.067, that local cultural arts facilities "are public utilities within the meaning of s. 66.066." Similarly, 1999 Wis. Act 167 authorized the creation of local professional football districts and provided, in s. 66.067, that local professional football stadium facilities "are public utilities within the meaning of s. 66.066." 1999 Wis. Act 150 repealed s. 66.067 and added to the definition of "public utility" under s. 66.066(1)(b) the list of facilities which s. 66.067 had identified as public utilities. At the same time, Act 150 renumbered s. 66.066(1)(b) to be s. 66.0621(1)(b). However, Act 150 did not take into account the treatments of s. 66.067 by Acts 65 and 167 and so failed to include local cultural arts facilities and professional football stadium facilities in the definition of "public utility" in the new s. 66.0621(1)(b). It appears there was no intent in the Act 150 repeal to effect any substantive change. A note to the treatment of s. 66.067 by Act 150 states that the act "[r]epeals s. 66.067, relating to permissible public works projects, since the substance of the section has been incorporated into s. 66.0621(1)(b)." Further, the prefatory note to Act 150 states:

This bill is recommended by the joint legislative council's special committee on general municipal law recodification. The special committee was directed to recodify chapter 66 of the statutes by the process of reorganization into logical subchapters, sections and subunits, repeal of unnecessary or archaic and obsolete language, relocation of those provisions more appropriately placed elsewhere in the statutes and modernization of language where appropriate. The special committee was directed to refrain from recommending substantive changes that would significantly affect relationships between governmental units or engender substantial controversy in the legislative process.

### COMMENTS--1999 ACT 150, § 176

Note: Repeals an archaic provision of the statutes regulating proceedings relating to a public utility that were begun prior to May 6, 1911.

Notes of Decisions (23)

W. S. A. 66.0621, WI ST 66.0621
Current through 2023 Act 272, published April 10, 2024.

---

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

66.0623. Refunding village, town, sanitary, and inland lake district bonds, WI ST 66.0623...

Case 2:24-cv-00228-Z    Document 50-1    Filed 01/17/25    Page 735 of 882    PageID 49520

West's Wisconsin Statutes Annotated
    Municipalities (Ch. 59 to 68)
        Chapter 66. General Municipality Law (Refs & Annos)
            Subchapter VI. Finance; Revenues

W.S.A. 66.0623

66.0623. Refunding village, town, sanitary, and inland lake district bonds

Currentness

A village, town, town sanitary district established under s. 60.71(1), or public inland lake protection and rehabilitation district established under ch. 33 that has undertaken to construct a combined sewer and water system and issued revenue bonds payable from the combined revenues of the system and that is unable to provide sufficient funds to complete the construction of the system and to meet maturing principal of the revenue bonds, may, with the consent of all of the holders of noncallable bonds, refund all or any part of its outstanding indebtedness, including revenue bonds, by issuing term bonds maturing in not more than 20 years, payable solely from the revenues of the combined sewer and water system and redeemable at par on any interest payment date. The bonds may be issued as provided in s. 66.0621(4) and shall pledge income from hydrant rentals and all sewer and water charges and may contain any covenants authorized by law, except if bonds are issued under this section to refund floating indebtedness, the bonds are subject to the prior lien and claim of all bonds issued to refund revenue bonds issued prior to the refunding.

**Credits**

<<For credits, see Historical Note field.>>

W. S. A. 66.0623, WI ST 66.0623
Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
  Municipalities (Ch. 59 to 68)
    Chapter 66. General Municipality Law (Refs & Annos)
      Subchapter VI. Finance; Revenues

W.S.A. 66.0625

66.0625. Joint issuance of mass transit bonding

Currentness

(1) In this section:

(a) "Political subdivision" means a county, city, village or town.

(b) "Public transit body" means any transit or transportation commission or authority and public corporation established by law or by interstate compact to provide mass transportation services and facilities.

(2) In addition to the provisions of any other statutes specifically authorizing cooperation between political subdivisions or public transit bodies, unless those statutes specifically exclude action under this section, any political subdivision or public transit body may, for mass transit purposes, issue bonds or, with any other political subdivision or public transit body, jointly issue bonds.

**Credits**

<<For credits, see Historical Note field.>>

W. S. A. 66.0625, WI ST 66.0625
Current through 2023 Act 272, published April 10, 2024.

---

End of Document                                     © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
  Municipalities (Ch. 59 to 68)
    Chapter 66. General Municipality Law (Refs & Annos)
      Subchapter VI. Finance; Revenues

W.S.A. 66.0626

66.0626. Special assessments or charges for contaminated well or wastewater system loans

Currentness

(1) In this section:

(a) "Contaminated private water supply" has the meaning provided in s. 281.75(1)(b).

(b) "Failing private on-site wastewater treatment system" has the meaning provided in s. 145.01(4m).

(c) "Political subdivision" means a city, village, town, or county.

(d) "Private on-site wastewater treatment system" has the meaning provided in s. 145.01(12).

(e) "Private water supply" has the meaning provided in s. 281.75(1)(f).

(f) "Well subject to abandonment" has the meaning provided in s. 281.75(1)(i).

(2) A political subdivision or its designee may, with the agreement of the owner of the private water supply, well, or wastewater treatment system, remediate a contaminated private water supply, fill and seal a well subject to abandonment, or rehabilitate, replace, or abandon a failing private on-site wastewater treatment system, that is located in the political subdivision, or may make a loan at or below the market interest rate, as defined in s. 281.59(1)(b), including an interest-free loan, to the owner of a contaminated private water supply, a well subject to abandonment, or a failing private on-site wastewater treatment system, that is located in the political subdivision, for those purposes. If a political subdivision takes any of the actions under this subsection, the political subdivision may, as a special charge under s. 66.0627 or special assessment under s. 66.0703, recover the costs of the remediation, the filling and sealing, or the rehabilitation, replacement, or abandonment, or collect the loan repayment. Notwithstanding s. 66.0627(4), a special charge imposed under this subsection may be collected in installments and may be included in the current or next tax roll for collection and settlement under ch. 74 even if the special charge is not delinquent.

**Credits**

<<For credits, see Historical Note field.>>

W. S. A. 66.0626, WI ST 66.0626
Current through 2023 Act 272, published April 10, 2024.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

West's Wisconsin Statutes Annotated
    Municipalities (Ch. 59 to 68)
        Chapter 66. General Municipality Law (Refs & Annos)
            Subchapter VI. Finance; Revenues

W.S.A. 66.0627

66.0627. Special charges for current services and certain loan repayments

Currentness

(1) In this section:

(ad) "Brownfield revitalization project" means any of the following actions when taken upon premises that are located on, or that constitute, brownfields, as defined in s. 238.13 (1)(a):

1. Site assessment.

2. Remediation.

3. Lead or asbestos abatement.

4. Demolition.

5. Standard site preparation actions not included in subds. 1. to 4.

(am) "Energy efficiency or reliability improvement" means an improvement to a premises that reduces the usage of energy, or increases the efficiency or reliability of energy usage, at the premises, including energy storage or backup power generation improvements or improvements that facilitate participation in a microgrid.

(ao) "EV infrastructure improvement" means an improvement to a premises to provide facilities for charging vehicles that are fully or partially powered by electricity.

(b) "Political subdivision" means a city, village, town, or county.

(bk) "Renewable resource application" means any of the following:

1. An improvement to a premises that allows for the production of energy through the incorporation of solar thermal electric or photovoltaic energy.

2. An improvement to a premises that allows for the small scale derivation of electricity from a renewable resource listed under s. 196.378(1)(h).

3. A manure digestion or other biomass system that produces natural gas.

(bm) "Resiliency improvement" means an improvement to a premises intended to increase resilience or improve the durability of infrastructure, including an improvement intended to improve storm and wind durability or wind resistance or to assist in fire suppression or mitigation of damage from flooding.

(c) "Service" includes snow and ice removal, weed elimination, street sprinkling, oiling and tarring, repair of sidewalks or curb and gutter, garbage and refuse disposal, recycling, storm water management, including construction of storm water management facilities, tree care, removal and disposition of dead animals under s. 60.23(20), loan repayment under s. 70.57(4)(b), soil conservation work under s. 92.115, and snow removal under s. 86.105.

(cg) "Storm water control measure" means an improvement to a premises that uses structural or nonstructural measures, practices, techniques, or devices designed to mitigate the negative impacts of storm water runoff or other surface runoff to the premises, including an infiltration system, wet detention pond, constructed wetland, grassed swale, or vegetative roofing system. "Storm water control measure" does not include a rain barrel or cistern designed for temporary storage of precipitation.

(d) "Water efficiency improvement" means an improvement to a premises that reduces the usage of water, or increases the efficiency of water usage, at the premises.

(2) Except as provided in sub. (5), the governing body of a city, village or town may impose a special charge against real property for current services rendered by allocating all or part of the cost of the service to the property served. The authority under this section is in addition to any other method provided by law.

(3)(a) Except as provided in par. (b), the governing body of the city, village or town may determine the manner of providing notice of a special charge.

(b) Before a special charge for street tarring or the repair of sidewalks, curbs or gutters may be imposed, a public hearing shall be held by the governing body on whether the service in question will be funded in whole or in part by a special charge. Any interested person may testify at the hearing. Notice of the hearing shall be by class 1 notice under ch. 985, published at least 20 days before the hearing. A copy of the notice shall be mailed at least 10 days before the hearing to each interested person whose address is known or can be ascertained with reasonable diligence. The notice under this paragraph shall state the date, time and location of the hearing, the subject matter of the hearing and that any interested person may testify.

(4) A special charge is not payable in installments. If a special charge is not paid within the time determined by the governing body, the special charge is delinquent. A delinquent special charge becomes a lien on the property against which it is imposed

as of the date of delinquency. The delinquent special charge shall be included in the current or next tax roll for collection and settlement under ch. 74.

(5) Except with respect to storm water management, including construction of storm water management facilities, no special charge may be imposed under this section to collect arrearages owed a municipal public utility.

(6) If a special charge imposed under this section is held invalid because this section is found unconstitutional, the governing body may reassess the special charge under any applicable law.

(7) Notwithstanding sub. (2), no political subdivision may enact an ordinance, or enforce an existing ordinance, that imposes a fee on the owner or occupant of property for a call for assistance that is made by the owner or occupant requesting law enforcement services that relate to any of the following:

(a) Domestic abuse, as defined in s. 813.12(1)(am).

(b) Sexual assault, as described under ss. 940.225, 948.02, and 948.025.

(c) Stalking, as described in s. 940.32.

(8)(a)1. Except as provided in subd. 2., a political subdivision may make a loan, or enter into an agreement regarding loan repayments to a 3rd party for owner-arranged or lessee-arranged financing, to an owner or lessee of a premises that is a residential property containing at least 5 dwelling units or a nonresidential property and that is located in the political subdivision for a brownfield revitalization project or for the financing or refinancing of a project for making, installing, operating, or maintaining any of the following with regard to the premises:

a. An energy efficiency or reliability improvement.

b. A water efficiency improvement.

c. A renewable resource application.

d. An EV infrastructure improvement.

e. A resiliency improvement.

f. A storm water control measure.

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2. A political subdivision may not make a loan or enter into an agreement under subd. 1. for the financing or refinancing of a project for making, installing, operating, or maintaining a resiliency improvement for a premises to which a floodplain zoning ordinance applies unless all of the following apply:

a. If the premises is a nonconforming building, as defined in s. 87.30(1d)(a)1., the building would be permanently repaired, reconstructed, or improved so as to comply with all applicable requirements of the floodplain zoning ordinance for the area of the floodplain that it occupies after completion of the resiliency improvement.

b. If the political subdivision participates in the National Flood Insurance Program, the owner or lessee of the premises agrees to maintain any flood insurance policy required under the program for the premises.

(ag)1. Subject to subd. 2., a political subdivision may make a loan, or enter into an agreement regarding loan repayments to a 3rd party for owner-arranged financing, to an owner of a premises located in the political subdivision for the purpose of replacing customer-side water service lines, as defined in s. 196.372(1)(a), containing lead.

2. If a political subdivision makes a loan under subd. 1., the political subdivision shall require each owner of a premises located in the political subdivision that is serviced by a customer-side water service line, as defined in s. 196.372(1)(a), containing lead to replace that customer-side water service line.

(am) If a political subdivision makes a loan or enters into an agreement under par. (a) 1. or (ag), the political subdivision may collect the amounts due under the loan or agreement as a special charge under this section. Notwithstanding sub. (4), a special charge imposed under this paragraph may be collected in installments and may be included in the current or next tax roll for collection and settlement under ch. 74 even if the special charge is not delinquent. If a political subdivision makes a loan, or enters into an agreement regarding loan repayments to a 3rd party, the repayment period may not exceed 30 years.

(b) A political subdivision that imposes a special charge under par. (am) may permit special charge installments to be collected by a 3rd party that has provided financing for the project under par. (a)1. and may require that the 3rd party inform the political subdivision if a special charge installment is delinquent.

(c) An installment payment authorized under par. (am) that is delinquent becomes a lien on the property that benefits from the project under par. (a)1. or (ag) as of the date of delinquency. A lien under this paragraph runs with the land and has the same priority as a special assessment lien.

(cm)1. If an installment payment authorized under par. (am) is delinquent, a lien under par. (c) may be enforced by foreclosure under s. 75.521.

2. The governing body of a county may assign the county's right to take judgment with respect to any parcel that is subject to subd. 1. to a 3rd party that is party to a loan repayment agreement under par. (a)1. or (ag). An assignment under this subdivision shall be in accordance with s. 75.106, except that s. 75.106(1) and (2)(d), (e), and (f) do not apply.

(d) A political subdivision that, under par. (a)1., makes a loan to, or enters an agreement with, an owner or lessee for a project under par. (a)1. shall require the owner or lessee to do all of the following:

1. For an energy efficiency or reliability improvement or water efficiency improvement, obtain a 3rd-party assessment of the baseline water or energy use of the owner or lessee's property and an assessment of the expected monetary savings due to the improvement or, for a renewable resource application, obtain an assessment of the renewable energy production of the application and the expected monetary benefit to be generated by the application. This subdivision does not apply to a loan or agreement for a brownfield revitalization project, a customer-side water service line replacement, an EV infrastructure improvement, a resiliency improvement, or a storm water control measure.

2. After the project under par. (a)1. is complete, provide a verification that the project was properly made, installed, or maintained or, for a loan or agreement solely for the operation of a project, that at the time the loan is made or the agreement entered into the project was in proper operational condition.

(f) A political subdivision shall require that the owner or lessee obtain the written consent of all holders of a mortgage of record on the premises as a condition of making a loan or entering into an agreement under par. (a)1.

**Credits**

<<For credits, see Historical Note field.>>

**Editors' Notes**

### COMMENTS--1999 ACT 150, § 170

Note: Restates s. 66.60(16), relating to special charges, and renumbers the provision to make it a separate section within ch. 66.

In addition:

1. Expands the examples in the definition of service to expressly include removal and disposition of dead animals under s. 60.23(20), conservation work under s. 92.115 [as renumbered by this bill] and snow removal under s. 86.105. Previously, these services were authorized to be funded by special assessment under s. 66.345, repealed by this bill. See Section 372 of this bill.

2. Expands the examples in the definition of service to expressly include recycling to reflect prevailing interpretation and current practice.

Notes of Decisions (6)

W. S. A. 66.0627, WI ST 66.0627
Current through 2023 Act 272, published April 10, 2024.

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
  Municipalities (Ch. 59 to 68)
    Chapter 66. General Municipality Law (Refs & Annos)
      Subchapter VI. Finance; Revenues

W.S.A. 66.0628

66.0628. Fees imposed by a political subdivision

Currentness

(1) In this section:

(a) "Political subdivision" means a city, village, town, or county.

(b) "Reasonable relationship" means that the cost charged by a political subdivision for a service provided to a person may not exceed the political subdivision's reasonable direct costs that are associated with any activity undertaken by the political subdivision that is related to the fee.

(2) Any fee that is imposed by a political subdivision shall bear a reasonable relationship to the service for which the fee is imposed.

(2m) A political subdivision may not impose a fee or charge related to the political subdivision enforcing an ordinance related to noxious weeds, electronic waste, or other building or property maintenance standards unless the political subdivision first notifies the person against whom the fee or charge is to be imposed that the fee or charge may be imposed. If the notice relates to a building that is not owner-occupied, the notice shall be provided to the owner by 1st class mail or electronic mail. If the owner of a property provides an electronic mail address to a political subdivision, the political subdivision may not impose a fee or charge related to the political subdivision enforcing an ordinance related to noxious weeds, electronic waste, or other building or property maintenance standards at that property unless the political subdivision first notifies the owner of the property using the electronic mail address provided. This subsection does not apply to a fee or charge related to the clearing of snow or ice from a sidewalk or to an ordinance violation that creates an immediate danger to public health, safety, or welfare.

(3) If a political subdivision enters into a contract to purchase engineering, legal, or other professional services from another person and the political subdivision passes along the cost for such professional services to another person under a separate contract between the political subdivision and that person, the rate charged that other person for the professional services may not exceed the rate customarily paid for similar services by the political subdivision.

(4)(a) Any person aggrieved by a fee imposed by a political subdivision because the person does not believe that the fee bears a reasonable relationship to the service for which the fee is imposed may appeal the reasonableness of the fee to the tax appeals commission by filing a petition with the commission within 90 days after the fee is due and payable. The commission's decision may be reviewed under s. 73.015. For appeals brought under this subsection, the filing fee required under s. 73.01(5)(a) does not apply.

(b) With regard to an appeal filed with the tax appeals commission under par. (a), the political subdivision shall bear the burden of proof to establish that a reasonable relationship exists between the fee imposed and the services for which the fee is imposed.

**Credits**

<<For credits, see Historical Note field.>>

Notes of Decisions (2)

W. S. A. 66.0628, WI ST 66.0628
Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**
© 2025 Thomson Reuters. No claim to original U.S. Government Works.

66.063. Repealed by 1985 Act 187, § 9, eff. April 22, 1986, WI ST 66.063

Case 2:24-cv-00228-Z    Document 50-1    Filed 01/17/25    Page 746 of 882    PageID 49531

KeyCite Red Flag - Severe Negative Treatment

KeyCite Red Flag Negative Treatment  66.063.    Repealed by 1985 Act 187, § 9, eff. April 22, 1986

West's Wisconsin Statutes Annotated
    Municipalities (Ch. 59 to 68)
        Chapter 66. General Municipality Law (Refs & Annos)
            Subchapter VI. Finance; Revenues

W.S.A. 66.063

66.063. Repealed by 1985 Act 187, § 9, eff. April 22, 1986

Currentness

**Credits**

<<For credits, see Historical Note field.>>

W. S. A. 66.063, WI ST 66.063

Current through 2023 Act 272, published April 10, 2024.

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated

   Municipalities (Ch. 59 to 68)

      Chapter 66. General Municipality Law (Refs & Annos)

         Subchapter VI. Finance; Revenues

W.S.A. 66.064

66.064. Renumbered 66.0807 and amended by 1999 Act 150, § 171, eff. Jan. 1, 2001

Currentness

**Credits**

<<For credits, see Historical Note field.>>

W. S. A. 66.064, WI ST 66.064

Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**                           © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:24-cv-00228-Z    Document 50-1    Filed 01/17/25    Page 748 of 882    PageID 49533

West's Wisconsin Statutes Annotated
    Municipalities (Ch. 59 to 68)
        Chapter 66. General Municipality Law (Refs & Annos)
            Subchapter VI. Finance; Revenues

W.S.A. 66.065

66.065. Renumbered 66.0803 and amended by 1999 Act 150, §§ 172 to 174, eff. Jan. 1, 2001

Currentness

**Credits**

<<For credits, see Historical Note field.>>

W. S. A. 66.065, WI ST 66.065
Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
  Municipalities (Ch. 59 to 68)
    Chapter 66. General Municipality Law (Refs & Annos)
      Subchapter VI. Finance; Revenues

W.S.A. 66.066

66.066. Renumbered in part and repealed in part by 1999 Act 150, §§
175 to 177, eff. Jan. 1, 2001; 2001 Act 30, § 36, eff. Dec. 14, 2001

Currentness

**Credits**

<<For credits, see Historical Note field.>>

W. S. A. 66.066, WI ST 66.066
Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:24-cv-00228-Z    Document 50-1    Filed 01/17/25    Page 750 of 882    PageID 49535

KeyCite Red Flag - Severe Negative Treatment

KeyCite Red Flag Negative Treatment  66.067.    Repealed by 1999 Act 150, § 178, eff. Jan. 1, 2001

> West's Wisconsin Statutes Annotated
>     Municipalities (Ch. 59 to 68)
>         Chapter 66. General Municipality Law (Refs & Annos)
>             Subchapter VI. Finance; Revenues

W.S.A. 66.067

66.067. Repealed by 1999 Act 150, § 178, eff. Jan. 1, 2001

Currentness

**Credits**

<<For credits, see Historical Note field.>>

**Editors' Notes**

### COMMENTS--1999 ACT 150, § 178

Note: Repeals s. 66.067, relating to permissible public works projects, since the substance of the section has been incorporated into s. 66.0621(1)(b).

W. S. A. 66.067, WI ST 66.067
Current through 2023 Act 272, published April 10, 2024.

---

    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
    Municipalities (Ch. 59 to 68)
        Chapter 66. General Municipality Law (Refs & Annos)
            Subchapter VI. Finance; Revenues

W.S.A. 66.068

66.068. Renumbered in part and repealed in part by 1999 Act 150, §§ 179 to 183, eff. Jan. 1, 2001

Currentness

**Credits**

<<For credits, see Historical Note field.>>

W. S. A. 66.068, WI ST 66.068
Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**                              © 2025 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Red Flag - Severe Negative Treatment

KeyCite Red Flag Negative Treatment  66.069.    Renumbered in part and repealed in part by 1999 Act 150, §§  184 to 189, eff. Jan. 1, 2001

West's Wisconsin Statutes Annotated
   Municipalities (Ch. 59 to 68)
      Chapter 66. General Municipality Law (Refs & Annos)
         Subchapter VI. Finance; Revenues

W.S.A. 66.069

66.069. Renumbered in part and repealed in part by 1999 Act 150, §§ 184 to 189, eff. Jan. 1, 2001

Currentness

**Credits**

<<For credits, see Historical Note field.>>

W. S. A. 66.069, WI ST 66.069

Current through 2023 Act 272, published April 10, 2024.

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
  Municipalities (Ch. 59 to 68)
    Chapter 66. General Municipality Law (Refs & Annos)
      Subchapter VI. Finance; Revenues

W.S.A. 66.07

66.07. Renumbered 66.0817 and amended by 1999 Act 150, § 190, eff. Jan. 1, 2001

Currentness

**Credits**

<<For credits, see Historical Note field.>>

W. S. A. 66.07, WI ST 66.07
Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**                                                © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
 Municipalities (Ch. 59 to 68)
  Chapter 66. General Municipality Law (Refs & Annos)
   Subchapter VII. Special Assessments

W.S.A. 66.0701

66.0701. Special assessments by local ordinance

Currentness

(1) Except as provided in s. 66.0721, in addition to other methods provided by law, the governing body of a town, village or 2nd, 3rd or 4th class city may, by ordinance, provide that the cost of installing or constructing any public work or improvement shall be charged in whole or in part to the property benefited, and make an assessment against the property benefited in the manner that the governing body determines. The special assessment is a lien against the property from the date of the levy.

(2) Every ordinance under this section shall contain provisions for reasonable notice and hearing. Any person against whose land a special assessment is levied under the ordinance may appeal in the manner prescribed in s. 66.0703(12) within 40 days of the date of the final determination of the governing body.

**Credits**
<<For credits, see Historical Note field.>>

Notes of Decisions (22)

W. S. A. 66.0701, WI ST 66.0701
Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
  Municipalities (Ch. 59 to 68)
    Chapter 66. General Municipality Law (Refs & Annos)
      Subchapter VII. Special Assessments

W.S.A. 66.0703

66.0703. Special assessments, generally

Currentness

(1)(a) Except as provided in s. 66.0721, as a complete alternative to all other methods provided by law, any city, town or village may, by resolution of its governing body, levy and collect special assessments upon property in a limited and determinable area for special benefits conferred upon the property by any municipal work or improvement; and may provide for the payment of all or any part of the cost of the work or improvement out of the proceeds of the special assessments.

(b) The amount assessed against any property for any work or improvement which does not represent an exercise of the police power may not exceed the value of the benefits accruing to the property. If an assessment represents an exercise of the police power, the assessment shall be upon a reasonable basis as determined by the governing body of the city, town or village.

(c) If any property that is benefited is by law exempt from assessment, the assessment shall be computed and shall be paid by the city, town or village.

(2) The cost of any work or improvement to be paid in whole or in part by special assessment on property may include the direct and indirect cost, the resulting damages, the interest on bonds or notes issued in anticipation of the collection of the assessments, a reasonable charge for the services of the administrative staff of the city, town or village and the cost of any architectural, engineering and legal services, and any other item of direct or indirect cost that may reasonably be attributed to the proposed work or improvement. The amount to be assessed against all property for the proposed work or improvement shall be apportioned among the individual parcels in the manner designated by the governing body.

(3) A parcel of land against which a special assessment has been levied for the sanitary sewer or water main laid in one of the streets that the parcel abuts is entitled to a deduction or exemption that the governing body determines to be reasonable and just under the circumstances of each case, when a special assessment is levied for the sanitary sewer or water main laid in the other street that the corner lot abuts. The governing body may allow a similar deduction or exemption from special assessments levied for any other public improvement.

(4) Before the exercise of any powers conferred by this section, the governing body shall declare by preliminary resolution its intention to exercise the powers for a stated municipal purpose. The resolution shall describe generally the contemplated purpose, the limits of the proposed assessment district, the number of installments in which the special assessments may be paid, or that the number of installments will be determined at the hearing required under sub. (7), and direct the proper municipal officer or employee to make a report on the proposal. The resolution may limit the proportion of the cost to be assessed.

(5) The report required by sub. (4) shall consist of:

(a) Preliminary or final plans and specifications.

(b) An estimate of the entire cost of the proposed work or improvement.

(c) Except as provided in par. (d), an estimate, as to each parcel of property affected, of:

1. The assessment of benefits to be levied.

2. The damages to be awarded for property taken or damaged.

3. The net amount of the benefits over damages or the net amount of the damages over benefits.

(d) A statement that the property against which the assessments are proposed is benefited, if the work or improvement constitutes an exercise of the police power. If this paragraph applies, the estimates required under par. (c) shall be replaced by a schedule of the proposed assessments.

(6) A copy of the report when completed shall be filed with the municipal clerk for public inspection. If property of the state may be subject to assessment under s. 66.0705, the municipal clerk shall file a copy of the report with the state agency which manages the property. If the assessment to the property of the state for a project, as defined under s. 66.0705(2), is $50,000 or more, the state agency shall submit a request for approval of the assessment, with its recommendation, to the building commission. The building commission shall review the assessment and shall determine within 90 days of the date on which the commission receives the report if the assessment is just and legal and if the proposed improvement is compatible with state plans for the facility which is the subject of the proposed improvement. If the building commission so determines, it shall approve the assessment. No project in which the property of the state is assessed at $50,000 or more may be commenced and no contract on the project may be let without approval of the assessment by the building commission under this subsection. The building commission shall submit a copy of its determination under this subsection to the state agency that manages the property which is the subject of the determination.

(7)(a) Upon the completion and filing of the report required by sub. (4), the city, town or village clerk shall prepare a notice stating the nature of the proposed work or improvement, the general boundary lines of the proposed assessment district including, in the discretion of the governing body, a small map, the place and time at which the report may be inspected, and the place and time at which all interested persons, or their agents or attorneys, may appear before the governing body, a committee of the governing body or the board of public works and be heard concerning the matters contained in the preliminary resolution and the report. The notice shall be published as a class 1 notice, under ch. 985, in the city, town or village and a copy of the notice shall be mailed, at least 10 days before the hearing or proceeding, to every interested person whose post-office address is known, or can be ascertained with reasonable diligence. The hearing shall commence not less than 10 nor more than 40 days after publication.

(b) The notice and hearing requirements under par. (a) do not apply if they are waived, in writing, by all the owners of property affected by the special assessment.

(8)(a) After the hearing upon any proposed work or improvement, the governing body may approve, disapprove or modify, or it may rerefer the report prepared under subs. (4) and (5) to the designated officer or employee with directions to change the plans and specifications and to accomplish a fair and equitable assessment.

(b) If an assessment of benefits is made against any property and an award of compensation or damages is made in favor of the same property, the governing body shall assess against or award in favor of the property only the difference between the assessment of benefits and the award of damages or compensation.

(c) When the governing body finally determines to proceed with the work or improvement, it shall approve the plans and specifications and adopt a resolution directing that the work or improvement be carried out and paid for in accordance with the report as finally approved.

(d) The city, town or village clerk shall publish the final resolution as a class 1 notice, under ch. 985, in the assessment district and a copy of the resolution shall be mailed to every interested person whose post-office address is known, or can be ascertained with reasonable diligence.

(e) When the final resolution is published, all work or improvements described in the resolution and all awards, compensations and assessments arising from the resolution are then authorized and made, subject to the right of appeal under sub. (12).

(9) If more than a single type of project is undertaken as part of a general improvement affecting any property, the governing body may finally combine the assessments for all purposes as a single assessment on each property affected, if each property owner may object to the assessment for any single purpose or for more than one purpose.

(10) If the actual cost of any project, upon completion or after the receipt of bids, is found to vary materially from the estimates, if any assessment is void or invalid, or if the governing body decides to reconsider and reopen any assessment, it may, after giving notice as provided in sub. (7)(a) and after a public hearing, amend, cancel or confirm the prior assessment. A notice of the resolution amending, canceling or confirming the prior assessment shall be given by the clerk as provided in sub. (8) (d). If the assessments are amended to provide for the refunding of special assessment B bonds under s. 66.0713(6), all direct and indirect costs reasonably attributable to the refunding of the bonds may be included in the cost of the public improvements being financed.

(11) If the cost of the project is less than the special assessments levied, the governing body, without notice or hearing, shall reduce each special assessment proportionately and if any assessments or installments have been paid the excess over cost shall be applied to reduce succeeding unpaid installments, if the property owner has elected to pay in installments, or refunded to the property owner.

(12)(a) A person having an interest in a parcel of land affected by a determination of the governing body, under sub. (8)(c), (10) or (11), may, within 90 days after the date of the notice or of the publication of the final resolution under sub. (8)(d), appeal the determination to the circuit court of the county in which the property is located. The person appealing shall serve a written notice of appeal upon the clerk of the city, town or village and execute a bond to the city, town or village in the sum of $150 with 2 sureties or a bonding company to be approved by the city, town or village clerk, conditioned for the faithful prosecution of the appeal and the payment of all costs that may be adjudged against that person. The clerk, if an appeal is taken, shall prepare

a brief statement of the proceedings in the matter before the governing body, with its decision on the matter, and shall transmit the statement with the original or certified copies of all the papers in the matter to the clerk of the circuit court.

(b) The appeal shall be tried and determined in the same manner as cases originally commenced in circuit court, and costs awarded as provided in s. 893.80.

(c) If a contract has been made for making the improvement the appeal does not affect the contract, and certificates or bonds may be issued in anticipation of the collection of the entire assessment for the improvement, including the assessment on any property represented in the appeal as if the appeal had not been taken.

(d) Upon appeal under this subsection, the court may, based on the improvement as actually constructed, render a judgment affirming, annulling or modifying and affirming, as modified, the action or decision of the governing body. If the court finds that any assessment or any award of damages is excessive or insufficient, the assessment or award need not be annulled, but the court may reduce or increase the assessment or award of damages and affirm the assessment or award as so modified.

(e) An appeal under this subsection is the sole remedy of any person aggrieved by a determination of the governing body, whether or not the improvement was made according to the plans and specifications, and shall raise any question of law or fact, stated in the notice of appeal, involving the making of the improvement, the assessment of benefits or the award of damages or the levy of any special assessment. The limitation in par. (a) does not apply to appeals based on fraud or on latent defects in the construction of the improvement discovered after the period of limitation.

(f) It is a condition to the maintenance of an appeal that any assessment appealed from shall be paid when the assessment or any installments become due. If there is a default in making a payment, the appeal shall be dismissed.

(13) Every special assessment levied under this section is a lien on the property against which it is levied on behalf of the municipality levying the assessment or the owner of any certificate, bond or other document issued by public authority, evidencing ownership of or any interest in the special assessment, from the date of the determination of the assessment by the governing body. The governing body shall provide for the collection of the assessments and may establish penalties for payment after the due date. The governing body shall provide that all assessments or installments that are not paid by the date specified shall be extended upon the tax roll as a delinquent special assessment, as defined under s. 74.01(3), against the property and all proceedings in relation to the collection, return and sale of property for delinquent real estate taxes apply to the special assessment, except as otherwise provided by statute.

(14) If a special assessment levied under this section is held invalid because this section is found to be unconstitutional, the governing body may reassess the special assessment under any applicable law.

**Credits**
<<For credits, see Historical Note field.>>

Notes of Decisions (224)

W. S. A. 66.0703, WI ST 66.0703

Current through 2023 Act 272, published April 10, 2024.

**End of Document**    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
  Municipalities (Ch. 59 to 68)
    Chapter 66. General Municipality Law (Refs & Annos)
      Subchapter VII. Special Assessments

W.S.A. 66.0705

66.0705. Property of public and private entities subject to special assessments

Currentness

(1)(a) The property of this state, except that held for highway right-of-way purposes or acquired and held for purposes under s. 85.08 or 85.09, and the property of every county, city, village, town, school district, sewerage district or commission, sanitary or water district or commission, or any public board or commission within this state, and of every corporation, company, or individual operating any railroad, telegraph, telecommunications, electric light, or power system, or doing any of the business mentioned in ch. 76, and of every other corporation or company is in all respects subject to all special assessments for local improvements.

(b) Certificates and improvement bonds for special assessments may be issued and the lien of the special assessments enforced against property described in par. (a), except property of the state, in the same manner and to the same extent as the property of individuals. Special assessments on property described in par. (a) may not extend to the right, easement or franchise to operate or maintain railroads, telegraph, telecommunications or electric light or power systems in streets, alleys, parks or highways. The amount represented by any certificate or improvement bond issued under this paragraph is a debt due personally from the corporation, company or individual, payable in the case of a certificate when the taxes for the year of its issue are payable, and in the case of a bond according to the terms of the bond.

(2) In this subsection, "assessment" means a special assessment on property of this state and "project" means any continuous improvement within overall project limits regardless of whether small exterior segments are left unimproved. If the assessment of a project is less than $50,000, or if the assessment of a project is $50,000 or more and the building commission approves the assessment under s. 66.0703(6), the state agency which manages the property shall pay the assessment from the revenue source which supports the general operating costs of the agency or program against which the assessment is made.

**Credits**
<<For credits, see Historical Note field.>>

Notes of Decisions (18)

W. S. A. 66.0705, WI ST 66.0705
Current through 2023 Act 272, published April 10, 2024.

End of Document                                      © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
  Municipalities (Ch. 59 to 68)
    Chapter 66. General Municipality Law (Refs & Annos)
      Subchapter VII. Special Assessments

W.S.A. 66.0707

66.0707. Assessment or special charge against property in adjacent city, village or town

Currentness

(1) A city, village or town may levy special assessments for municipal work or improvement under s. 66.0703 on property in an adjacent city, village or town, if the property abuts and benefits from the work or improvement and if the governing body of the municipality where the property is located by resolution approves the levy by resolution. The owner of the property is entitled to the use of the work or improvement on which the assessment is based on the same conditions as the owner of property within the city, village or town.

(2) A city, village or town may impose a special charge under s. 66.0627 against real property in an adjacent city, village or town that is served by current services rendered by the municipality imposing the special charge if the municipality in which the property is located approves the imposition by resolution. The owner of the property is entitled to the use and enjoyment of the service for which the special charge is imposed on the same conditions as the owner of property within the city, village or town.

(3) A special assessment or special charge under this section is a lien against the benefited property and shall be collected by the treasurer in the same manner as the taxes of the municipality and paid over by the treasurer to the treasurer of the municipality levying the assessment.

**Credits**
<<For credits, see Historical Note field.>>

**Editors' Notes**

**COMMENTS--1999 ACT 150, § 192**

Note: [The creation of subsec. (2)] Expands the scope of s. 66.65, renumbered s. 66.0707, to include special charges. Currently, the provision is limited to special assessments against property in an adjacent city, village or town that abuts and benefits from a public work or improvement. See Sections 550 and 551 of this bill [sections 550 and 551 renumber § 66.65 as subsecs. (1) and (3) of this section].

Notes of Decisions (1)

W. S. A. 66.0707, WI ST 66.0707
Current through 2023 Act 272, published April 10, 2024.

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
    Municipalities (Ch. 59 to 68)
        Chapter 66. General Municipality Law (Refs & Annos)
            Subchapter VII. Special Assessments

W.S.A. 66.0709

66.0709. Preliminary payment of improvements funded by special assessments

Currentness

(1) In this section:

(a) "Local governmental unit" has the meaning given in s. 66.0713(1)(c).

(b) "Public improvement" has the meaning given in s. 66.0713(1)(d).

(2) If it is determined that the cost of a public improvement is to be paid, in whole or in part, by special assessments against the property to be benefited by the improvement, the resolution authorizing the public improvement shall provide that the whole, or any stated proportion, or no part of the estimated aggregate cost of the public improvement, which is to be levied as special assessments, shall be paid into the treasury of the local governmental unit in cash. The public improvement may not be commenced nor any contract for the improvement let until the payment required by the resolution is paid into the treasury of the local governmental unit by the owner or persons having an interest in the property to be benefited. The payment shall be credited against the amount of the special assessments levied or to be levied against benefited property designated by the payer. If a preliminary payment is required by the resolution, the refusal of one or more owners or persons having an interest in the property to be benefited to pay any preliminary payments does not prevent the making of the improvement if the entire specified sum is obtained from the remaining owners or interested parties.

**Credits**
<<For credits, see Historical Note field.>>

W. S. A. 66.0709, WI ST 66.0709
Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**                                        © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
    Municipalities (Ch. 59 to 68)
        Chapter 66. General Municipality Law (Refs & Annos)
            Subchapter VIII. Public Utilities

W.S.A. 66.0801

66.0801. Definitions; effect on other authority

Currentness

(1) In this subchapter:

(a) "Municipal public utility" means a public utility owned or operated by a city, village or town.

(b) "Public utility" has the meaning given in s. 196.01(5).

(2) Sections 66.0803 to 66.0825 do not deprive the office of the commissioner of railroads, department of transportation or public service commission of any power under ss. 195.05 and 197.01 to 197.10 and ch. 196.

**Credits**
<<For credits, see Historical Note field.>>

**Editors' Notes**

**COMMENTS--1999 ACT 150, § 235**

Note: Restates a portion of s. 66.06, repealed by this bill, and provides a definition of municipal public utility for purposes of the subchapter. The current provision stating that the phrase resolution or ordinance, when used in specified sections, means ordinances only is deleted as unnecessary.

W. S. A. 66.0801, WI ST 66.0801
Current through 2023 Act 272, published April 10, 2024.

End of Document                                      © 2025 Thomson Reuters. No claim to original U.S. Government Works.

🏳 KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

West's Wisconsin Statutes Annotated
   Municipalities (Ch. 59 to 68)
      Chapter 66. General Municipality Law (Refs & Annos)
        Subchapter IX. Public Works and Projects

W.S.A. 66.0901

66.0901. Public works, contracts, bids

Currentness

**(1) Definitions.** In this section:

(ae) "Agreement with a labor organization" means any agreement with a labor organization, including a collective bargaining agreement, a project labor agreement, or a community workforce agreement.

(am) "Labor organization" has the meaning given in s. 5.02(8m).

(as) "Municipality" means the state or a town, city, village, school district, board of school directors, sewer district, drainage district, technical college district or other public or quasi-public corporation, officer, board or other public body charged with the duty of receiving bids for and awarding any public contracts.

(b) "Person" means an individual, partnership, association, limited liability company, corporation or joint stock company, lessee, trustee or receiver.

(bm) "Political subdivision" means a city, village, town, or county.

(c) "Public contract" means a contract for the construction, execution, repair, remodeling or improvement of a public work or building or for the furnishing of supplies or material of any kind, proposals for which are required to be advertised for by law.

(d) "Subcontractor" means a person whose relationship to the principal contractor is substantially the same as to a part of the work as the latter's relationship is to the proprietor. A "subcontractor" takes a distinct part of the work in a way that the "subcontractor" does not contemplate doing merely personal service.

**(1m) Method of bidding.** (a) Except when necessary to secure federal aid, whenever a political subdivision lets a public contract by bidding, the political subdivision shall comply with all of the following:

1. The bidding shall be on the basis of sealed competitive bids.

2. The contract shall be awarded to the lowest responsible bidder.

(b) Except when necessary to secure federal aid, a political subdivision may not use a bidding method that gives preference based on the geographic location of the bidder or that uses criteria other than the lowest responsible bidder in awarding a contract.

**(2) Bidder's proof of responsibility.** A municipality intending to enter into a public contract may, before delivering any form for bid proposals, plans, and specifications to any person, except suppliers, and others not intending to submit a direct bid, require the person to submit a full and complete statement sworn to before an officer authorized by law to administer oaths. The statement shall consist of information relating to financial ability, equipment, experience in the work prescribed in the public contract, and other matters that the municipality requires for the protection and welfare of the public in the performance of a public contract. The statement shall be in writing on a standard form of a questionnaire that is adopted and furnished by the municipality. The statement shall be filed in the manner and place designated by the municipality. The statement shall not be received less than 5 days prior to the time set for the opening of bids. The contents of the statement shall be confidential and may not be disclosed except upon the written order of the person furnishing the statement, for necessary use by the public body in qualifying the person, or in cases of actions against, or by, the person or municipality. The governing body of the municipality or the committee, board, or employee charged with, or delegated by the governing body with, the duty of receiving bids and awarding contracts shall properly evaluate the statement and shall find the maker of the statement either qualified or unqualified.

**(3) Proof of responsibility, condition precedent.** No bid shall be received from any person who has not submitted the statement as provided in sub. (2), provided that any prospective bidder who has once qualified to the satisfaction of the municipality, committee, board or employee, and who wishes to become a bidder upon subsequent public contracts under the same jurisdiction, need not separately qualify on each public contract unless required so to do by the municipality, committee, board or employee.

**(4) Rejection of bids.** If the municipality, committee, board or employee is not satisfied with the sufficiency of the answer contained in the statement provided under sub. (2), the municipality, committee, board or employee may reject or disregard the bid.

**(5) Corrections of errors in bids.** If a person submits a bid or proposal for the performance of public work under any public contract to be let by a municipality and the bidder claims that a mistake, omission or error has been made in preparing the bid, the bidder shall, before the bids are opened, make known the fact that an error, omission or mistake has been made. If the bidder makes this fact known, the bid shall be returned to the bidder unopened and the bidder may not bid upon the public contract unless it is readvertised and relet upon the readvertisement. If a bidder makes an error, omission or mistake and discovers it after the bids are opened, the bidder shall immediately and without delay give written notice and make known the fact of the mistake, omission or error which has been committed and submit to the municipality clear and satisfactory evidence of the mistake, omission or error and that it was not caused by any careless act or omission on the bidder's part in the exercise of ordinary care in examining the plans or specifications and in conforming with the provisions of this section. If the discovery and notice of a mistake, omission or error causes a forfeiture, the bidder may not recover the moneys or certified check forfeited as liquidated damages unless it is proven before a court of competent jurisdiction in an action brought for the recovery of the amount forfeited, that in making the mistake, error or omission the bidder was free from carelessness, negligence or inexcusable neglect.

**(6) Separation of contracts; classification of contractors.** In public contracts for the construction, repair, remodeling or improvement of a public building or structure, other than highway structures and facilities, a municipality may bid projects based on a single or multiple division of the work. Public contracts shall be awarded according to the division of work selected for

WESTLAW    © 2025 Thomson Reuters. No claim to original U.S. Government Works.
2

bidding. Except as provided in sub. (6m), the municipality may set out in any public contract reasonable and lawful conditions as to the hours of labor, wages, residence, character and classification of workers to be employed by any contractor, classify contractors as to their financial responsibility, competency and ability to perform work and set up a classified list of contractors. The municipality may reject the bid of any person, if the person has not been classified for the kind or amount of work in the bid.

**(6m) Prohibited practices.** A municipality may not do any of the following in a specification for bids for a public contract under this section:

(a) Require that a bidder enter into or adhere to an agreement with a labor organization.

(b) Consider as a factor in making an award under this section whether any bidder has or has not entered into an agreement with a labor organization.

(c) Require that a bidder enter into, adhere to, or enforce any agreement that requires, as a condition of employment, that the bidder or bidder's employees become or remain members of, or be affiliated with, a labor organization or pay any dues, fees, assessments, or other charges or expenses of any kind or amount, or provide anything of value, to a labor organization or a labor organization's health, welfare, retirement, or other benefit plan or program.

**(6s) Protected activity.** Nothing in this section prohibits employers or employees from entering into agreements or engaging in any other activity protected by the National Labor Relations Act, 29 USC 151 to 169.

**(7) Bidder's certificate.** When bidding on a public contract, the bidder shall incorporate and make a part of the bidder's proposal for doing any work or labor or furnishing any material in or about any public work or contract of the municipality a sworn statement by the bidder, or if not an individual by one authorized, that the bidder or authorized person has examined and carefully prepared the proposal from the plans and specifications and has checked the same in detail before submitting the proposal or bid to the municipality. As a part of the proposal, the bidder also shall submit a list of the subcontractors the bidder proposes to contract with and the class of work to be performed by each. In order to qualify for inclusion in the bidder's list a subcontractor shall first submit a bid in writing, to the general contractor at least 48 hours prior to the time of the bid closing. The list may not be added to or altered without the written consent of the municipality. A proposal of a bidder is not invalid if any subcontractor and the class of work to be performed by the subcontractor has been omitted from a proposal; the omission shall be considered inadvertent or the bidder will perform the work personally.

**(8) Settlement of disputes; defaults.** Whenever there is a dispute between a contractor or surety or the municipality as to whether there is compliance with the provisions of a public contract as to the hours of labor, wages, residence, character and classification of workers employed by the contractor, the determination of the municipality is final. If a violation of these provisions occurs, the municipality may declare the contract in default and request the surety to perform or relet upon advertisement the remaining portion of the public contract.

**(9) Estimates and release of funds.** (a) Notwithstanding sub. (1)(as), in this subsection, "municipality" does not include the department of transportation.

(b) As the work progresses under a contract involving $1,000 or more for the construction, execution, repair, remodeling or improvement of a public work or building or for the furnishing of supplies or materials, regardless of whether proposals for

the contract are required to be advertised by law, the municipality, from time to time, shall grant to the contractor an estimate of the amount and proportionate value of the work done, which entitles the contractor to receive the amount of the estimate, less the retainage, from the proper fund. The retainage shall be an amount equal to not more than 5 percent of the estimate until 50 percent of the work has been completed. At 50 percent completion, further partial payments shall be made in full to the contractor and no additional amounts may be retained unless the architect or engineer certifies that the job is not proceeding satisfactorily, but amounts previously retained shall not be paid to the contractor. At 50 percent completion or any time after 50 percent completion when the progress of the work is not satisfactory, additional amounts may be retained but the total retainage may not be more than 10 percent of the value of the work completed. Upon substantial completion of the work, an amount retained may be paid to the contractor. When the work has been substantially completed except for work which cannot be completed because of weather conditions, lack of materials or other reasons which in the judgment of the municipality are valid reasons for noncompletion, the municipality may make additional payments, retaining at all times an amount sufficient to cover the estimated cost of the work still to be completed or may pay out the entire amount retained and receive from the contractor guarantees in the form of a bond or other collateral sufficient to ensure completion of the job. For the purposes of this section, estimates may include any fabricated or manufactured materials and components specified, previously paid for by the contractor and delivered to the work or properly stored and suitable for incorporation in the work embraced in the contract.

**(11) Limitation on performance of private construction work by political subdivisions.** (a) In this subsection, "construction project" means a road, sewer, water, stormwater, wastewater, grading, parking lot, or other infrastructure-related project or the provision of construction-related services for such a project.

(b) Except for work ancillary to replacing a utility-side water service line, as defined in s. 196.372(1)(c), containing lead that is performed with the consent of a private property owner and that does not involve replacing the customer-side water service line, as defined in s. 196.372(1)(a), containing lead, a political subdivision may not use its own workforce to perform a construction project for which a private person is financially responsible.

**(12) Public building plan information.** (a) In this subsection:

1. "Public building plan information" means construction plans, designs, specifications, and related materials for construction work undertaken, or proposed to be undertaken, by a municipality pursuant to a public contract.

2. "Public plan room" means a nonprofit organization that gathers and makes available to the public for inspection and copying public building plan information.

(b) Notwithstanding s. 19.35(3), if a municipality receives a request for public building plan information from a public plan room, the municipality shall provide the requested information by electronic copy, and without charging a fee, if all of the following apply:

1. The public building plan information relates to a structure or building constructed, or proposed to be constructed, by a municipality.

2. The public plan room allows the public to register and inspect or copy the public building plan information that it obtains under this subsection without charging a fee.

(c) A municipality shall provide the requested information under par. (b) even if the municipality contracts with another person to assist the municipality with public contracts, related construction projects, or the management and storage of public building plan information.


**Credits**

<<For credits, see Historical Note field.>>


Notes of Decisions (60)

W. S. A. 66.0901, WI ST 66.0901
Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**                                        © 2025 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

West's Wisconsin Statutes Annotated
   Municipalities (Ch. 59 to 68)
      Chapter 66. General Municipality Law (Refs & Annos)
         Subchapter X. Planning, Housing and Transportation

W.S.A. 66.1001

66.1001. Comprehensive planning

Currentness

**(1) Definitions.** In this section:

(a) "Comprehensive plan" means a guide to the physical, social, and economic development of a local governmental unit that is one of the following:

1. For a county, a development plan that is prepared or amended under s. 59.69(2) or (3).

2. For a city, village, or town, a master plan that is adopted or amended under s. 62.23(2) or (3).

3. For a regional planning commission, a master plan that is adopted or amended under s. 66.0309(8), (9) or (10).

(am) "Consistent with" means furthers or does not contradict the objectives, goals, and policies contained in the comprehensive plan.

(b) "Local governmental unit" means a city, village, town, county or regional planning commission that may adopt, prepare or amend a comprehensive plan.

(c) "Political subdivision" means a city, village, town, or county that may adopt, prepare, or amend a comprehensive plan.

**(2) Contents of a comprehensive plan.** A comprehensive plan shall contain all of the following elements:

(a) *Issues and opportunities element.* Background information on the local governmental unit and a statement of overall objectives, policies, goals and programs of the local governmental unit to guide the future development and redevelopment of the local governmental unit over a 20-year planning period. Background information shall include population, household and employment forecasts that the local governmental unit uses in developing its comprehensive plan, and demographic trends, age distribution, educational levels, income levels and employment characteristics that exist within the local governmental unit.

(b) *Housing element.* A compilation of objectives, policies, goals, maps and programs of the local governmental unit to provide an adequate housing supply that meets existing and forecasted housing demand in the local governmental unit. The element shall assess the age, structural, value and occupancy characteristics of the local governmental unit's housing stock. The element shall also identify specific policies and programs that promote the development of housing for residents of the local governmental unit and provide a range of housing choices that meet the needs of persons of all income levels and of all age groups and persons with special needs, policies and programs that promote the availability of land for the development or redevelopment of low-income and moderate-income housing, and policies and programs to maintain or rehabilitate the local governmental unit's existing housing stock.

(c) *Transportation element*. A compilation of objectives, policies, goals, maps and programs to guide the future development of the various modes of transportation, including highways, transit, transportation systems for persons with disabilities, bicycles, electric scooters, electric personal assistive mobility devices, walking, railroads, air transportation, trucking and water transportation. The element shall compare the local governmental unit's objectives, policies, goals and programs to state and regional transportation plans. The element shall also identify highways within the local governmental unit by function and incorporate state, regional and other applicable transportation plans, including transportation corridor plans, county highway functional and jurisdictional studies, urban area and rural area transportation plans, airport master plans and rail plans that apply in the local governmental unit.

(d) *Utilities and community facilities element.* A compilation of objectives, policies, goals, maps and programs to guide the future development of utilities and community facilities in the local governmental unit such as sanitary sewer service, storm water management, water supply, solid waste disposal, on-site wastewater treatment technologies, recycling facilities, parks, telecommunications facilities, power-generating plants and transmission lines, cemeteries, health care facilities, child care facilities and other public facilities, such as police, fire and rescue facilities, libraries, schools and other governmental facilities. The element shall describe the location, use and capacity of existing public utilities and community facilities that serve the local governmental unit, shall include an approximate timetable that forecasts the need in the local governmental unit to expand or rehabilitate existing utilities and facilities or to create new utilities and facilities and shall assess future needs for government services in the local governmental unit that are related to such utilities and facilities.

(e) *Agricultural, natural and cultural resources element.* A compilation of objectives, policies, goals, maps and programs for the conservation, and promotion of the effective management, of natural resources such as groundwater, forests, productive agricultural areas, environmentally sensitive areas, threatened and endangered species, stream corridors, surface water, floodplains, wetlands, wildlife habitat, metallic and nonmetallic mineral resources consistent with zoning limitations under s. 295.20(2), parks, open spaces, historical and cultural resources, community design, recreational resources and other natural resources.

(f) *Economic development element.* A compilation of objectives, policies, goals, maps and programs to promote the stabilization, retention or expansion, of the economic base and quality employment opportunities in the local governmental unit, including an analysis of the labor force and economic base of the local governmental unit. The element shall assess categories or particular types of new businesses and industries that are desired by the local governmental unit. The element shall assess the local governmental unit's strengths and weaknesses with respect to attracting and retaining businesses and industries, and shall designate an adequate number of sites for such businesses and industries. The element shall also evaluate and promote the use of environmentally contaminated sites for commercial or industrial uses. The element shall also identify county, regional and state economic development programs that apply to the local governmental unit.

(g) *Intergovernmental cooperation element.* A compilation of objectives, policies, goals, maps, and programs for joint planning and decision making with other jurisdictions, including school districts, drainage districts, and adjacent local governmental

units, for siting and building public facilities and sharing public services. The element shall analyze the relationship of the local governmental unit to school districts, drainage districts, and adjacent local governmental units, and to the region, the state and other governmental units. The element shall consider, to the greatest extent possible, the maps and plans of any military base or installation, with at least 200 assigned military personnel or that contains at least 2,000 acres, with which the local governmental unit shares common territory. The element shall incorporate any plans or agreements to which the local governmental unit is a party under s. 66.0301, 66.0307 or 66.0309. The element shall identify existing or potential conflicts between the local governmental unit and other governmental units that are specified in this paragraph and describe processes to resolve such conflicts.

(h) *Land-use element.* A compilation of objectives, policies, goals, maps and programs to guide the future development and redevelopment of public and private property. The element shall contain a listing of the amount, type, intensity and net density of existing uses of land in the local governmental unit, such as agricultural, residential, commercial, industrial and other public and private uses. The element shall analyze trends in the supply, demand and price of land, opportunities for redevelopment and existing and potential land-use conflicts. The element shall contain projections, based on the background information specified in par. (a), for 20 years, in 5-year increments, of future residential, agricultural, commercial and industrial land uses including the assumptions of net densities or other spatial assumptions upon which the projections are based. The element shall also include a series of maps that shows current land uses and future land uses that indicate productive agricultural soils, natural limitations for building site development, floodplains, wetlands and other environmentally sensitive lands, the boundaries of areas to which services of public utilities and community facilities, as those terms are used in par. (d), will be provided in the future, consistent with the timetable described in par. (d), and the general location of future land uses by net density or other classifications.

(i) *Implementation element.* A compilation of programs and specific actions to be completed in a stated sequence, including proposed changes to any applicable zoning ordinances, official maps, or subdivision ordinances, to implement the objectives, policies, plans and programs contained in pars. (a) to (h). The element shall describe how each of the elements of the comprehensive plan will be integrated and made consistent with the other elements of the comprehensive plan, and shall include a mechanism to measure the local governmental unit's progress toward achieving all aspects of the comprehensive plan. The element shall include a process for updating the comprehensive plan. A comprehensive plan under this subsection shall be updated no less than once every 10 years.

**(2m) Effect of enactment of a comprehensive plan, consistency requirements.** (a) The enactment of a comprehensive plan by ordinance does not make the comprehensive plan by itself a regulation.

(b) A conditional use permit that may be issued by a political subdivision does not need to be consistent with the political subdivision's comprehensive plan.

**(3) Ordinances that must be consistent with comprehensive plans.** Except as provided in sub. (3m), beginning on January 1, 2010, if a local governmental unit enacts or amends any of the following ordinances, the ordinance shall be consistent with that local governmental unit's comprehensive plan:

(g) Official mapping ordinances enacted or amended under s. 62.23(6).

(h) Local subdivision ordinances enacted or amended under s. 236.45 or 236.46.

(j) County zoning ordinances enacted or amended under s. 59.69.

(k) City or village zoning ordinances enacted or amended under s. 62.23(7).

(L) Town zoning ordinances enacted or amended under s. 60.61 or 60.62.

(q) Shorelands or wetlands in shorelands zoning ordinances enacted or amended under s. 59.692, 61.351, 61.353, 62.231, or 62.233.

**(3m) Delay of consistency requirement.** (a) If a local governmental unit has not adopted a comprehensive plan before January 1, 2010, the local governmental unit is exempt from the requirement under sub. (3) if any of the following applies:

1. The local governmental unit has applied for but has not received a comprehensive planning grant under s. 16.965(2), and the local governmental unit adopts a resolution stating that the local governmental unit will adopt a comprehensive plan that will take effect no later than January 1, 2012.

2. The local governmental unit has received a comprehensive planning grant under s. 16.965(2) and has been granted an extension of time under s. 16.965(5) to complete comprehensive planning.

(b) The exemption under par. (a) shall continue until the following dates:

1. For a local governmental unit exempt under par. (a) 1., January 1, 2012.

2. For a local governmental unit exempt under par. (a) 2., the date on which the extension of time granted under s. 16.965(5) expires.

**(4) Procedures for adopting comprehensive plans.** A local governmental unit shall comply with all of the following before its comprehensive plan may take effect:

(a) The governing body of a local governmental unit shall adopt written procedures that are designed to foster public participation, including open discussion, communication programs, information services, and public meetings for which advance notice has been provided, in every stage of the preparation of a comprehensive plan. The written procedures shall provide for wide distribution of proposed, alternative, or amended elements of a comprehensive plan and shall provide an opportunity for written comments on the plan to be submitted by members of the public to the governing body and for the governing body to respond to such written comments. The written procedures shall describe the methods the governing body of a local governmental unit will use to distribute proposed, alternative, or amended elements of a comprehensive plan to owners of property, or to persons who have a leasehold interest in property pursuant to which the persons may extract nonmetallic mineral resources in or on property, in which the allowable use or intensity of use of the property is changed by the comprehensive plan.

(b) The plan commission or other body of a local governmental unit that is authorized to prepare or amend a comprehensive plan may recommend the adoption or amendment of a comprehensive plan only by adopting a resolution by a majority vote of the entire commission. The vote shall be recorded in the official minutes of the plan commission or other body. The resolution shall refer to maps and other descriptive materials that relate to one or more elements of a comprehensive plan. One copy of an adopted comprehensive plan, or of an amendment to such a plan, shall be sent to all of the following:

1. Every governmental body that is located in whole or in part within the boundaries of the local governmental unit.

2. The clerk of every local governmental unit that is adjacent to the local governmental unit that is the subject of the plan that is adopted or amended as described in par. (b)(intro.).

4. After September 1, 2005, the department of administration.

5. The regional planning commission in which the local governmental unit is located.

6. The public library that serves the area in which the local governmental unit is located.

(c) No comprehensive plan that is recommended for adoption or amendment under par. (b) may take effect until the political subdivision enacts an ordinance or the regional planning commission adopts a resolution that adopts the plan or amendment. The political subdivision may not enact an ordinance or the regional planning commission may not adopt a resolution under this paragraph unless the comprehensive plan contains all of the elements specified in sub. (2). An ordinance may be enacted or a resolution may be adopted under this paragraph only by a majority vote of the members-elect, as defined in s. 59.001(2m), of the governing body. One copy of a comprehensive plan enacted or adopted under this paragraph shall be sent to all of the entities specified under par. (b).

(d) No political subdivision may enact an ordinance or no regional planning commission may adopt a resolution under par. (c) unless the political subdivision or regional planning commission holds at least one public hearing at which the proposed ordinance or resolution is discussed. That hearing must be preceded by a class 1 notice under ch. 985 that is published at least 30 days before the hearing is held. The political subdivision or regional planning commission may also provide notice of the hearing by any other means it considers appropriate. The class 1 notice shall contain at least the following information:

1. The date, time and place of the hearing.

2. A summary, which may include a map, of the proposed comprehensive plan or amendment to such a plan.

3. The name of an individual employed by the local governmental unit who may provide additional information regarding the proposed ordinance.

4. Information relating to where and when the proposed comprehensive plan or amendment to such a plan may be inspected before the hearing, and how a copy of the plan or amendment may be obtained.

WESTLAW    © 2025 Thomson Reuters. No claim to original U.S. Government Works.    5

(e) At least 30 days before the hearing described in par. (d) is held, a local governmental unit shall provide written notice to all of the following:

1. An operator who has obtained, or made application for, a permit that is described under s. 295.12(3)(d).

2. A person who has registered a marketable nonmetallic mineral deposit under s. 295.20.

3. Any other property owner or leaseholder who has an interest in property pursuant to which the person may extract nonmetallic mineral resources, if the property owner or leaseholder requests in writing that the local governmental unit provide the property owner or leaseholder notice of the hearing described in par. (d).

(f) A political subdivision shall maintain a list of persons who submit a written or electronic request to receive notice of any proposed ordinance, described under par. (c), that affects the allowable use of the property owned by the person. Annually, the political subdivision shall inform residents of the political subdivision that they may add their names to the list. The political subdivision may satisfy this requirement to provide such information by any of the following means: publishing a 1st class notice under ch. 985; publishing on the political subdivision's Internet site; 1st class mail; or including the information in a mailing that is sent to all property owners. At least 30 days before the hearing described in par. (d) is held a political subdivision shall provide written notice, including a copy or summary of the proposed ordinance, to all such persons whose property, the allowable use of which, may be affected by the proposed ordinance. The notice shall be by mail or in any reasonable form that is agreed to by the person and the political subdivision, including electronic mail, voice mail, or text message. The political subdivision may charge each person on the list who receives a notice by 1st class mail a fee that does not exceed the approximate cost of providing the notice to the person.

**(5) Applicability of a regional planning commission's plan.** A regional planning commission's comprehensive plan is only advisory in its applicability to a political subdivision and a political subdivision's comprehensive plan.

**(6) Comprehensive plan may take effect.** Notwithstanding sub. (4), a comprehensive plan, or an amendment of a comprehensive plan, may take effect even if a local governmental unit fails to provide the notice that is required under sub. (4) (e) or (f), unless the local governmental unit intentionally fails to provide the notice.

**Credits**
<<For credits, see Historical Note field.>>

Notes of Decisions (5)

W. S. A. 66.1001, WI ST 66.1001
Current through 2023 Act 272, published April 10, 2024.

End of Document                                          © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Wisconsin Statutes Annotated
  Municipalities (Ch. 59 to 68)
    Chapter 66. General Municipality Law (Refs & Annos)
      Subchapter XI. Development

W.S.A. 66.1101

66.1101. Promotion of industry; industrial sites

Currentness

(1) It is declared to be the policy of the state to encourage and promote the development of industry to provide greater employment opportunities and to broaden the state's tax base to relieve the tax burden of residents and home owners. It is recognized that the availability of suitable sites is a prime factor in influencing the location of industry but that existing available sites may be encroached upon by the development of other uses unless protected from encroachment by purchase and reservation. It is further recognized that cities, villages and towns have broad power to act for the commercial benefit and the health, safety and public welfare of the public. However, to implement that power, legislation authorizing borrowing is necessary. It is, therefore, the policy of the state to authorize cities, villages and towns to borrow for the reservation and development of industrial sites, and the expenditure of funds for that purpose is determined to be a public purpose.

(2) For financing purposes, the purchase, reservation and development of industrial sites undertaken by a city, village or town is a public utility within the meaning of s. 66.0621. In financing under that section, rentals and fees are considered to be revenue. Any indebtedness created under this section shall not be included in arriving at the constitutional debt limitation.

(3) Sites purchased for industrial development under this section or under any other authority may be developed by the city, village or town by the installation of utilities and roadways but not by the construction of buildings or structures. The sites may be sold or leased for industrial purposes but only for a fair consideration to be determined by the governing body.

**Credits**
<<For credits, see Historical Note field.>>

W. S. A. 66.1101, WI ST 66.1101
Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**                              © 2025 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

West's Wisconsin Statutes Annotated
Municipalities (Ch. 59 to 68)
Chapter 66. General Municipality Law (Refs & Annos)
Subchapter XII. Housing Authorities

W.S.A. 66.1201

66.1201. Housing authorities

Currentness

**(1) Short title.** Sections 66.1201 to 66.1211 may be referred to as the "Housing Authorities Law".

**(2) Finding and declaration of necessity.** It is declared that there exist in the state insanitary or unsafe dwelling accommodations and that persons of low income are forced to reside in insanitary or unsafe accommodations; that within the state there is a shortage of safe or sanitary dwelling accommodations available at rents which persons of low income can afford and that these persons are forced to occupy overcrowded and congested dwelling accommodations; that the conditions described in this subsection cause an increase in and spread of disease and crime and constitute a menace to the health, safety, morals and welfare of the residents of the state and impair economic values; that these conditions necessitate excessive and disproportionate expenditures of public funds for crime prevention and punishment, public health and safety, fire and accident protection, and other public services and facilities; that these slum areas cannot be cleared, nor can the shortage of safe and sanitary dwellings for persons of low income be relieved, through the operation of private enterprise, and that the construction of housing projects for persons of low income would, therefore, not be competitive with private enterprise; that the clearance, replanning and reconstruction of the areas in which insanitary or unsafe housing conditions exist and the providing of safe and sanitary dwelling accommodations for persons of low income are public uses and purposes for which public money may be spent and private property acquired and are governmental functions of state concern; that it is in the public interest that work on these projects be commenced as soon as possible in order to relieve unemployment which now constitutes an emergency; and the necessity in the public interest for the provisions of this section, is declared as a matter of legislative determination.

**(2m) Discrimination.** Persons otherwise entitled to any right, benefit, facility, or privilege under ss. 66.1201 to 66.1211 may not be denied the right, benefit, facility, or privilege in any manner for any purpose nor be discriminated against because of sex, race, color, creed, sexual orientation, status as a victim of domestic abuse, sexual assault, or stalking, as defined in s. 106.50(1m) (u), or national origin.

**(3) Definitions.** In ss. 66.1201 to 66.1211, unless a different meaning clearly appears from the context:

(a) "Area of operation" includes the city for which a housing authority is created, the area within 5 miles of the territorial boundaries of the city but not beyond the county limits of the county in which the city is located and the area within the limits of the city unless the city annexes the area of operation. "Area of operation" does not include any area which lies within the territorial boundaries of any city for which another housing authority is created by this section.

(b) "Authority" or "housing authority" means any of the public corporations established pursuant to sub. (4).

(c) "Bonds" means any bonds, interim certificates, notes, debentures or other obligations of the authority issued pursuant to ss. 66.1201 to 66.1211.

(cm) "City clerk" and "mayor" mean the clerk and mayor, respectively, of the city or the officers of the city charged with the duties customarily imposed on the clerk and mayor, respectively.

(d) "Commissioner" means one of the members of an authority appointed in accordance with ss. 66.1201 to 66.1211.

(e) "Community facilities" includes real and personal property, and buildings and equipment for recreational or social assemblies, for educational, health or welfare purposes and necessary utilities, when designed primarily for the benefit and use of the housing authority or the occupants of the dwelling accommodations, or for both.

(f) "Contract" means any agreement of an authority with or for the benefit of an obligee whether contained in a resolution, trust indenture, mortgage, lease, bond or other instrument.

(g) "Council" means the common council or other body charged with governing a city.

(h) "Federal government" includes the United States of America and any agency or instrumentality, corporate or otherwise, of the United States of America.

(i) "Government" includes the state and federal governments and any subdivision, agency or instrumentality, corporate or otherwise, of either of them.

(j) "Housing projects" includes all real and personal property, building and improvements, and community facilities acquired or constructed pursuant to a single plan either to demolish, clear, remove, alter or repair insanitary or unsafe housing or to provide safe and sanitary dwelling accommodations for persons of low income, or both. "Housing projects" includes the planning of buildings and improvements, the acquisition of property, the demolition of existing structures, the construction, reconstruction, alteration and repair of the improvements and all other related work.

(js) "Mixed development" means all real and personal property, buildings and improvements, and community facilities acquired, rehabilitated, or constructed pursuant to a single plan to revitalize, redevelop, or transfer one or more properties into a mixed-use or mixed-income development primarily to serve persons of low income or persons of low income and persons of moderate income with housing, commercial, and neighborhood amenities or other support services. "Mixed development" includes the planning of buildings and improvements, the acquisition of property, the demolition of existing structures, the construction, reconstruction, alteration, and repair of the improvements, and all other related work.

(k) "Mortgage" includes deeds of trust, mortgages, building and loan contracts, land contracts or other instruments conveying real or personal property as security for bonds and conferring a right to foreclose and cause a sale of the real property or personal property.

(L) "Obligee of the authority" or "obligee" includes any bondholder, trustee or trustees for any bondholders, any lessor demising property to the authority used in connection with a housing project or any assignee of the lessor's interest or any part of the lessor's interest, and the federal government, when it is a party to any contract with the authority.

(m) "Persons of low income" means persons or families who lack the amount of income necessary, as determined by the authority undertaking the housing project, to enable them, without financial assistance, to live in decent, safe and sanitary dwellings, without overcrowding.

(mg) "Persons of moderate income" means persons or families who qualify as having moderate income, as determined by the authority. The authority may not consider a household to be a person of moderate income if the household's income exceeds 120 percent of the median income for the area, unless an applicable guideline or regulation of the federal department of housing and urban development permits the household to qualify as having moderate income.

(n) "Real property" includes lands, lands under water, structures, and any easements, franchises and incorporeal hereditaments and every estate and right in an estate, legal and equitable, including terms for years and liens by way of judgment, mortgage or otherwise.

(o) "Slum" means any area where dwellings predominate which, by reason of dilapidation, overcrowding, faulty arrangement or design, lack of ventilation, light or sanitary facilities, or any combination of these factors, are detrimental to safety, health and morals.

(p) "State public body" means any city, town, village, county, municipal corporation, commission, district, authority, other subdivision or public body of the state.

(q) "Trust indenture" includes instruments pledging the revenues of real or personal properties.

**(4) Creation of housing authorities.** (a) When a council declares by resolution that there is need for an authority to function in the city, a public body corporate and politic then exists in the city and shall be known as the "housing authority" of the city. The authority may then transact business and exercise any powers granted to it under this section.

(b) The council shall adopt a resolution declaring that there is need for a housing authority in the city if the council finds that insanitary or unsafe inhabited dwelling accommodations exist in the city or that there is a shortage of safe or sanitary dwelling accommodations in the city available to persons of low income at rentals they can afford. In determining whether dwelling accommodations are unsafe or insanitary the council may take into consideration the degree of overcrowding, the percentage of land coverage, the light, air, space and access available to the inhabitants of the dwelling accommodations, the size and arrangement of the rooms, the sanitary facilities, and the extent to which conditions exist in the buildings which endanger life or property by fire or other causes.

(c) In any suit, action or proceeding involving the validity or enforcement of or relating to any contract of the authority, the authority shall be conclusively deemed to have become established and authorized to transact business and exercise its powers under this section upon proof of the adoption of a resolution by the council declaring the need for the authority. The resolution

is sufficient if it declares that there is a need for an authority and finds that either or both of the conditions described in par. (b) exist in the city. A copy of the resolution duly certified by the city clerk is admissible evidence in any suit, action or proceeding.

**(5) Appointment, qualifications and tenure of commissioners.** (a) When the council adopts a resolution under sub. (4), it shall promptly notify the mayor. Upon receiving the notice, the mayor shall, with the confirmation of the council, appoint 5 persons as commissioners of the authority, except that the mayor of a 1st class city that has created a housing authority before May 5, 1994, shall appoint 7 commissioners, at least 2 of whom shall be residents of a housing project acquired or constructed by the authority. No commissioner may be connected in any official capacity with any political party nor may more than 2 be officers of the city in which the authority is created. The powers of each authority shall be vested in the commissioners of the authority.

(b) The first 5 commissioners who are first appointed shall be designated by the mayor to serve for terms of 1, 2, 3, 4 and 5 years respectively from the date of their appointment and the 2 additional commissioners appointed by the mayor of a 1st class city under par. (a) shall be first appointed to terms of 3 and 5 years respectively. Thereafter, the term of office shall be 5 years. A commissioner shall hold office until his or her successor has been appointed and has qualified. Vacancies shall be filled for the unexpired term in the same manner as other appointments. Three commissioners constitute a quorum, except that in an authority with 7 commissioners, 4 commissioners constitute a quorum. The mayor shall file with the city clerk a certificate of the appointment or reappointment of any commissioner and the certificate is conclusive evidence of the proper appointment of that commissioner if that commissioner has been confirmed under this paragraph and has taken and filed the official oath before entering office. The council of a city may pay commissioners a per diem and mileage and other necessary expenses incurred in the discharge of their duties at rates established by the council.

(c) When the office of the first chairperson of the authority becomes vacant, the authority shall select a chairperson from among its members. An authority shall select from among its members a vice chairperson, and it may employ a secretary, who shall be executive director, technical experts and other officers, agents and employees, permanent and temporary and shall determine their qualifications, duties and compensation. An authority may call upon the city attorney or chief law officer of the city for legal services. An authority may delegate to one or more of its agents or employees powers or duties of the authority.

**(6) Duty of the authority and its commissioners.** The authority and its commissioners shall comply or cause compliance strictly with all provisions of ss. 66.1201 to 66.1211, with the laws of the state and with any contract of the authority.

**(7) Interested commissioners or employees.** No commissioner or employee of an authority may acquire any direct or indirect interest in any housing project or in any property included in any project or have any direct or indirect interest in any contract for insurance, materials or services to be furnished or used in connection with any housing project. If a commissioner or employee of an authority owns or controls a direct or indirect interest in any property included in any housing project, that person shall immediately disclose the interest in writing to the authority and the disclosure shall be entered upon the minutes of the authority. Failure to so disclose the interest constitutes misconduct in office.

**(8) Removal of commissioners.** For inefficiency or neglect of duty or misconduct in office, a commissioner of an authority may be removed by the mayor, but a commissioner may be removed only after having been given a copy of the charges at least 10 days before the hearing on the charges and an opportunity to be heard in person or by counsel. If a commissioner is removed, a record of the proceedings, together with the charges and findings, shall be filed in the office of the city clerk. To the extent applicable, the provisions of s. 17.16 relating to removal for cause apply to any removal.

**(9) Powers of authority.** An authority is a public body and a body corporate and politic, exercising public powers, and has all the powers necessary or convenient to carry out and effectuate the purposes and provisions of ss. 66.1201 to 66.1211, including the following powers in addition to others granted in this section:

(a) Within its area of operation to prepare, carry out, acquire, lease and operate housing projects approved by the council; to provide for the construction, reconstruction, improvement, alteration or repair of any housing project or any part of a housing project.

(am) On any property wholly or partially owned by a housing authority before October 1, 2021, and within its area of operation to prepare, carry out, acquire, lease, and operate mixed developments; and to provide for the construction, reconstruction, improvement, alteration, or repair of any mixed development or any part of a mixed development. This paragraph applies only to a housing authority created by a 1st class city.

(b) To take over by purchase, lease or otherwise any housing project undertaken by any government and located within the area of operation of the authority when approved by the council; to purchase, lease, obtain options upon, acquire by gift, grant, bequest, devise, or otherwise, any real or personal property or any interest in the real or personal property.

(c) To act as agent for any government in connection with the acquisition, construction, operation or management of a housing project or any part of a housing project.

(d) To arrange or contract for the furnishing of services, privileges, works, or facilities for, or in connection with, a housing project or the occupants of a housing project.

(e) To lease or rent any dwellings, houses, accommodations, lands, buildings, structures or facilities embraced in any housing project and, subject to the limitations contained in this section, to establish and revise the rents or charges for the housing project.

(f) Within its area of operation to investigate into living, dwelling and housing conditions and into the means and methods of improving those conditions; and to engage in research and studies on the subject of housing.

(h) To acquire by eminent domain any real property, including improvements and fixtures on the real property.

(i) To own, hold, clear and improve property, to insure or provide for the insurance of the property or operations of the authority against any risks, to procure insurance or guarantees from the federal government of the payment of any debts or parts of debts secured by mortgages made or held by the authority on any property included in any housing project.

(j) To contract for the sale of, and to sell, any part or all of the interest in real estate acquired and to execute contracts of sale and conveyances as the authority considers desirable.

(k) In connection with any loan, to agree to limitations upon its right to dispose of any housing project or part of a housing project.

(L) In connection with any loan by a government, to agree to limitations upon the exercise of any powers conferred upon the authority by ss. 66.1201 to 66.1211.

(m) To invest any funds held in reserve or sinking funds, or any funds not required for immediate disbursement, in property or securities in which savings banks may legally invest funds subject to their control.

(n) To sue and be sued, to have a seal and to alter the same at pleasure, to have perpetual succession, to make and execute contracts and other instruments necessary or convenient to the exercise of the powers of the authority.

(o) To make and amend and repeal bylaws, rules and regulations not inconsistent with ss. 66.1201 to 66.1211, to carry into effect the powers and purposes of the authority.

(p) To exercise all or any part or combination of powers granted in this section. No provisions of law with respect to the acquisition or disposition of property by other public bodies are applicable to an authority unless otherwise provided.

(q) To execute bonds, notes, debentures or other evidences of indebtedness which, when executed by a housing authority, are not a debt or charge against any city, county, state or any other governmental authority, other than against the authority itself and its available property, income or other assets in accordance with the terms of an evidence of indebtedness and of this section, and no individual liability exists for any official act done by any member of the authority. No authority may levy any tax or assessment.

(r) To provide by all means available under ss. 66.1201 to 66.1211 housing projects for veterans and their families regardless of their income. The projects are not subject to the limitations of s. 66.1205.

(s) Notwithstanding the provisions of any law, to acquire sites; to prepare, carry out, acquire, lease, construct and operate housing projects to provide temporary dwelling accommodations for families regardless of income who are displaced under ss. 66.1201 to 66.1331; to further slum clearance, urban redevelopment and blight elimination; and to provide temporary dwelling accommodations for families displaced by reason of any street widening, expressway or other public works project causing the demolition of dwellings.

(t) To participate in an employee retirement or pension system of the city which has declared the need for the authority and to expend funds of the authority for this purpose.

(u) To join or cooperate with one or more authorities in the exercise, either jointly or otherwise, of any of their powers for the purpose of financing, including the issuance of bonds, notes or other obligations and giving security for these obligations, planning, undertaking, owning, constructing, operating or contracting with respect to a housing project located within the area of operation of any one or more of the authorities. For this purpose an authority may by resolution prescribe and authorize any other housing authority, joining or cooperating with it, to act on its behalf with respect to any powers, as its agent or otherwise, in the name of the authority joining or cooperating or in its own name.

(v) To establish a procedure for preserving records of the authority by the use of microfilm, another reproductive device, optical imaging, or electronic formatting if authorized under s. 19.21(4)(c). The procedure shall assure that copies of records that are

open to public inspection continue to be available to members of the public requesting them. A photographic reproduction of a record or copy of a record generated from optical disc or electronic storage is deemed the same as an original record for all purposes if it meets the applicable standards established in ss. 16.61 and 16.612.

(w) To exercise any powers of a redevelopment authority operating under s. 66.1333 if done in concert with a redevelopment authority under a contract under s. 66.0301.

(x) To, within its area of operation, either by itself or with the department of veterans affairs, undertake and carry out studies and analyses of veterans housing needs and meeting those needs and make the study results available to the public, including the building, housing and supply industries.

**(10) Eminent domain.** (a) The authority may acquire by eminent domain any real property, including fixtures and improvements, which it deems necessary to carry out the purposes of ss. 66.1201 to 66.1211 after the adoption by it of a resolution declaring that the acquisition of the property described in the resolution is in the public interest and necessary for public use. The authority may exercise the power of eminent domain pursuant to ch. 32 or pursuant to any other applicable statutory provisions.

(b) At any time at or after the filing for condemnation, and before the entry of final judgment, the authority may file with the clerk of the court in which the petition is filed a declaration of taking signed by the duly authorized officer or agent of the authority declaring that all or any part of the property described in the petition is to be taken for the use of the authority. The declaration of taking is sufficient if it sets forth all of the following:

1. A description of the property.

2. A statement of the estate or interest in the property being taken.

3. A statement of the sum of money estimated by the authority to be just compensation for the property taken, which sum shall be not less than the last assessed valuation for tax purposes of the estate or interest in the property to be taken.

(c) From the filing of the declaration of taking under par. (b) and the deposit in court of the amount of the estimated compensation stated in the declaration, title to the property specified in the declaration vests in the authority and the property is condemned and taken for the use of the authority and the right to just compensation for the property vests in the persons entitled to the compensation. Upon the filing of the declaration of taking the court shall designate a day not exceeding 30 days after the filing, except upon good cause shown, on which the person in possession shall surrender possession to the authority.

(d) The ultimate amount of compensation vests in the manner provided by law. If the amount vested exceeds the amount deposited in court by the authority, the court shall enter judgment against the authority in the amount of the deficiency together with interest at the rate of 6 percent per year on the deficiency from the date of the vesting of title to the date of the entry of the final judgment subject to abatement for use, income, rents or profits derived from the property by the owner subsequent to the vesting of title in the authority. The court shall order the authority to deposit the amount of the deficiency in court.

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

(e) At any time before the vesting of title of property in the authority the authority may withdraw or dismiss its petition with respect to any of the property described in the petition.

(f) Upon vesting of title to any property in the authority, all the right, title and interest of all persons having an interest in, or lien upon, the property are divested immediately and these persons are entitled only to receive compensation for the property.

(g) Except as provided in this subsection with reference to the declaration of taking, the proceedings shall be as provided by law for condemnation, and the deposit in court of the amount estimated by the authority upon a declaration of taking shall be disbursed as provided by law for an award in condemnation proceedings.

(h) Property already devoted to a public use may be acquired, provided that no property belonging to any municipality or to any government may be acquired without its consent and that no property belonging to a public utility corporation may be acquired without the approval of the public service commission or other officer or tribunal, if any, having regulatory power over the public utility corporation.

(i) If a housing project or mixed development involves federal financial assistance, the duration of replacement housing payments to displaced tenants under the relocation plan is as provided under 42 USC 4624. This paragraph applies only to a project or development on a property wholly or partially owned before October 1, 2021, by a housing authority created by a 1st class city.

**(11) Acquisition of land for government.** The authority may acquire, by purchase or by the exercise of its power of eminent domain under sub. (10), any property, real or personal, for any housing project being constructed or operated by a government. The authority upon such terms and conditions, with or without consideration, as it shall determine, may convey title or deliver possession of property so acquired or purchased to the government for use in connection with a housing project.

**(12) Zoning and building laws.** All housing projects of an authority shall be subject to the planning, zoning, sanitary and building laws, ordinances and regulations applicable to the locality in which the housing project is situated.

**(13) Types of bonds.** (a)1. An authority may issue any bonds for its corporate purposes, including bonds on which the principal and interest are payable by any of the following methods:

a. Exclusively from the income and revenues of the housing project financed with the proceeds of the bonds, or with those proceeds together with a grant from the federal government in aid of the project.

b. Exclusively from the income and revenues of certain designated housing projects whether or not they were financed in whole or in part with the proceeds of the bonds.

c. From its revenues generally.

2. Any of the bonds under subd. 1. may be additionally secured by a pledge of any revenues or, subject to the limitations imposed under pars. (b) and (c), a mortgage of any housing project, projects or other property of the authority.

(b) Neither the commissioners of the authority nor any person executing the bonds is liable personally on the bonds by reason of their issuance.

(c) The bonds and other obligations of the authority are not a debt of any municipality located within its boundaries or of the state and this fact shall be stated on their face. Neither the state nor any municipality is liable for the bonds or other obligations, nor are they payable out of any funds or properties other than those of the authority.

**(14) Form and sale of bonds.** (a) Bonds of an authority shall be authorized by its resolution and may be issued in one or more series and shall bear any date, mature at any time, bear interest at any rate, be in any denomination, be in the form of coupon bonds or of bonds registered under s. 67.09, carry any conversion or registration privileges, have any rank or priority, be executed in any manner, be payable in any medium of payment, at any place, and be subject to any terms of redemption, with or without premium, that the resolution, its trust indenture or mortgage may provide. Any bond reciting in substance that it has been issued by an authority to aid in financing a housing project to provide dwelling accommodations for persons of low income shall be conclusively deemed, in any suit, action or proceeding involving the validity or enforceability of the bond or the security for the bond, to have been issued for such a housing project. Bonds of an authority are issued for an essential public and governmental purpose and are public instrumentalities and, together with interest and income, are exempt from taxes.

(b) The bonds may be sold at public or private sale as the authority provides. The bonds may be sold at any price determined by the authority.

(c) The bonds shall be executed as provided in s. 67.08(1).

(d) The authority may purchase, out of available funds, any bonds issued by it at a price not more than the principal amount of the bonds and the accrued interest. Bonds payable exclusively from the revenues of a designated project or projects shall be purchased only out of any revenues available for that purpose. All bonds so purchased shall be canceled. This paragraph does not apply to the redemption of bonds.

(e) Any provision of any law to the contrary notwithstanding, any bonds, interim certificates, or other obligations issued pursuant to ss. 66.1201 to 66.1211 are fully negotiable.

**(15) Provisions of bonds, trust indentures, and mortgages.** In connection with the issuance of bonds or the incurring of any obligation under a lease and in order to secure the payment of bonds or obligations, the authority may:

(a) Pledge by resolution, trust indenture, mortgage, subject to the limitations in this subsection, or other contract any of its rents, fees, or revenues.

(b) Covenant against mortgaging any of its property or against permitting any lien on its property.

(c) Covenant with respect to limitations on its right to sell, lease or otherwise dispose of any housing project or any part of a housing project, or with respect to limitations on its right to undertake additional housing projects.

WESTLAW  © 2025 Thomson Reuters. No claim to original U.S. Government Works.

(d) Covenant against pledging any of its rents, fees and revenues or against permitting any lien on its rents, fees and revenues.

(e) Provide for the release of property, rents, fees and revenues from any pledge or mortgage, and reserve rights and powers in, or the right to dispose of, property which is subject to a pledge or mortgage.

(f) Covenant as to the bonds to be issued pursuant to any resolution, trust indenture, mortgage or other instrument and as to the issuance of bonds in escrow or otherwise, and as to the use and disposition of the proceeds of the bonds.

(g) Provide for the terms, form, registration, exchange, execution and authentication of bonds.

(h) Provide for the replacement of lost, destroyed or mutilated bonds.

(i) Covenant that the authority warrants the title to the premises.

(j) Covenant as to the rents and fees to be charged, the amount to be raised each year or other period of time by rents, fees and other revenues and as to the use and disposition to be made of the revenues.

(k) Covenant as to the use of any of its property.

(L) Create special funds which segregate all of the following:

1. The proceeds of any loan or grant or both.

2. The rents, fees and revenues of a housing project.

3. Any moneys held for the payment of the costs of operations and maintenance of any housing projects or as a reserve for the meeting of contingencies in the operation and maintenance of housing projects.

4. Any moneys held for the payment of the principal and interest on its bonds or the sums due under its leases or as a reserve for the payments.

5. Any moneys held for any other reserves or contingencies.

(Lm) Covenant as to the use and disposal of the moneys held in funds created under par. (L).

(m) Redeem the bonds, covenant for their redemption and provide the terms and conditions of the bonds.

(n) Covenant against extending the time for the payment of its bonds or interest on the bonds by any means.

(o) Prescribe the procedure, if any, by which the terms of any contract with bondholders may be amended or abrogated, the amount of bonds the holders of which must consent to a contract amendment or abrogation and the manner in which consent may be given.

(p) Covenant as to property maintenance, replacement and insurance and the use and disposition of insurance moneys.

(q) Vest in an obligee of the authority, if the authority fails to observe or perform any covenant on its part to be kept or performed, the right to cure any default and to advance any moneys necessary for that purpose. The moneys advanced may be made an additional obligation of the authority with such interest, security and priority as may be provided in any trust indenture, mortgage, lease or contract of the authority.

(r) Covenant and prescribe as to the events of default and terms and conditions upon which any of its bonds shall become or may be declared due before maturity and as to the terms and conditions upon which the declaration and its consequences may be waived.

(s) Covenant as to the rights, liabilities, powers and duties arising upon the breach by it of any covenant, condition or obligation.

(t) Covenant to surrender possession of all or any part of any housing project upon the happening of a default, as defined in the contract, and to vest in an obligee the right to take possession and to use, operate, manage and control housing projects, and to collect and receive all rents, fees and revenues arising from the housing projects in the same manner as the authority itself might do and to dispose of the moneys collected in accordance with the agreement of the authority with the obligee.

(u) Vest in a trust the right to enforce any covenant made to secure, to pay, or in relation to the bonds, to provide for the powers and duties of a trustee, to limit liabilities of a trustee and to provide the terms and conditions upon which the trustee or the bondholders or any proportion of them may enforce any covenant.

(v) Make covenants other than the covenants that are authorized in this subsection.

(w) Execute all instruments that are necessary or convenient in the exercise of its powers or in the performance of its covenants or duties.

(x) Make covenants and do any act necessary or convenient in order to secure its bonds, or, in the absolute discretion of the authority, that tend to make the bonds more marketable. An authority may not mortgage any of its property except as provided in sub. (16).

**(16) Power to mortgage when project financed with aid of government.** (a) In this subsection, "government" includes the Wisconsin Housing and Economic Development Authority.

(b) In connection with any project financed in whole or in part, or otherwise aided by a government, whether through a donation of money or property, a loan, the insurance or guarantee of a loan, or otherwise, the authority may do any of the following:

1. Mortgage its property.

2. Grant security interests in its property.

3. Issue its note or other obligation as may be required by the government.

**(17) Remedies of an obligee of authority.** An obligee of the authority, subject to its contract, may do any of the following:

(a) By mandamus, suit, action or proceeding, all of which may be joined in one action, compel the authority and its commissioners, officers, agents or employees to perform every term, provision and covenant contained in any contract of the authority, and require the carrying out of any covenants and agreements of the authority and the fulfillment of all duties imposed upon the authority by ss. 66.1201 to 66.1211.

(b) By suit, action or proceeding enjoin any unlawful acts or things, or the violation of any of the rights of the obligee of the authority.

(c) By suit, action or proceeding cause possession of any housing project or any part of a housing project to be surrendered to any obligee having the right to possession pursuant to any contract of the authority.

**(18) Additional remedies conferrable by mortgage or trust indenture.** Any authority may by its trust indenture, mortgage, lease or other contract confer upon any obligee holding or representing a specified amount in bonds, lease or other obligations, the right upon the happening of an "event of default" as defined in the instrument:

(a) By suit, action or proceeding obtain the appointment of a receiver of any housing project of the authority or any part of a housing project. Upon appointment, a receiver may enter and take possession of the housing project or any part of the housing project and operate and maintain it, and collect and receive all fees, rents, revenues or other charges arising in the same manner as the authority itself might do. The receiver shall keep the moneys in a separate account or accounts and apply the moneys in accordance with the obligations of the authority as a court directs.

(b) By suit, action or proceeding require the authority and its commissioners to account as if it and they were the trustees of an express trust.

**(19) Remedies cumulative.** All the rights and remedies in this section are in addition to all other rights and remedies that may be conferred upon an obligee of the authority by law or by any contract with the authority.

**(20) Subordination of mortgage to agreement with government.** The authority may agree in any mortgage made by it that the mortgage is subordinate to a contract for the supervision by a government of the operation and maintenance of the mortgaged

property and the construction of improvements on the mortgaged property. A purchaser at a sale of the property of an authority pursuant to a foreclosure of a mortgage or any other remedy in connection with the foreclosure shall obtain title subject to the contract.

**(21) Contracts with federal government.** In addition to the powers conferred upon the authority by other provisions of ss. 66.1201 to 66.1211, the authority may borrow money or accept grants from the federal government for any housing project that the authority may undertake, take over any land acquired by the federal government for the construction or operation of a housing project, take over or lease or manage any housing project constructed or owned by the federal government, and to these ends, enter into any contracts, mortgages, trust indentures, leases or other agreements that the federal government may require including agreements that the federal government may supervise and approve the construction, maintenance and operation of the housing project. A council may take any action necessary to secure the financial aid and the cooperation of the federal government in the undertaking, construction, maintenance and operation of any housing project which the authority may undertake.

**(22) Tax exemption and payments in lieu of taxes.** The property of an authority is public property used for essential public and governmental purposes and the property and an authority are exempt from all taxes of the state or any state public body, except that the city in which a project or projects are located may fix a sum to be paid annually in lieu of taxes by the authority for the services, improvements, or facilities furnished to the property of the authority by the city. The amount paid in lieu of taxes may not exceed the amount that would be levied as the annual tax of the city upon the project. Property of an authority includes property in which an authority operating within a 1st class city or an entity in which an authority operating within a 1st class city holds an ownership interest holds a partial ownership interest if the property is held for any of the following purposes:

(a) As part of a financing or equity plan that includes state or federal tax credits, financing, funding, or rent subsidy.

(b) A purpose related to the conversion of a housing project to a rental or housing assistance program under a contract with the federal government.

**(23) Reports.** The authority shall at least once a year file with the mayor of the city a report of its activities for the preceding year.

**(24) Bids.** (a) When a housing authority has the approval of the council for any project authorized under sub. (9)(a) or (b), the authority shall complete and approve plans, specifications, and conditions for carrying out the project, and shall advertise by publishing a class 2 notice, under ch. 985, for bids for all work which the authority must do by contract. The authority is not required to submit for bidding any contract in an amount of $25,000 or less or, if the contract is for a project on a property wholly or partially owned before October 1, 2021, by a housing authority created by a 1st class city, $50,000 or less, but if the estimated cost of the contract, except a contract for a project on a property wholly or partially owned before October 1, 2021, by an authority created by a 1st class city, is between $10,000 and $25,000, the authority shall give a class 2 notice, under ch. 985, of the proposed work before the contract is entered into. A contract subject to bidding shall be awarded to the lowest qualified and competent bidder. Section 66.0901 applies to the bidding.

(ag) As an alternative to the advertising and bidding procedure under par. (a), an authority may contract under any purchase procedure authorized for the authority by the federal government.

(am) The authority may reject any bid required under par. (a).

(b) An authority may contract for the acquisition of a housing project without submitting the contract for bids as required by par. (a) if all of the following apply:

1. The contract provides for undertaking of the housing project on land not owned at the time of the contract by the authority except the contract may provide for undertaking of the housing project on land acquired and owned by a community development authority for the purpose of ss. 66.1105, 66.1301 to 66.1329, 66.1331 or 66.1333 if the community development authority is proceeding under this paragraph as provided by s. 66.1335(4).

2. The contract provides for conveyance or lease of the project to the authority after completion of the project.

3. The authority invites developers to submit proposals to provide a completed project and evaluates proposals according to site, cost, design, the developer's experience and other criteria specified by the authority.

**(25) Liquidation and disposal of housing projects.** (a) In any city or village the council or village board by resolution or ordinance, or the electors by referendum under s. 9.20, may require the authority to liquidate and dispose of a project held and operated under ss. 66.1201 to 66.1211 or 66.1331.

(b) If liquidation and disposal of a project is provided for under par. (a) the housing authority or other designated agency shall sell the project to the highest bidder after public advertisement, or transfer it to any state public body authorized by law to acquire the project. No project may be sold for less than its fair market value as determined by a board of 3 licensed appraisers appointed by the council or village board.

(c) The arrangements for the liquidation and disposal of a project shall provide for the payment and retirement of all outstanding obligations in connection with the project, together with interest on the obligations and any premiums prescribed for the redemption of any bonds, notes or other obligations before maturity.

(d) Any proceeds remaining after payment of the obligations under par. (c) shall be distributed in accordance with the federal law applicable at the time of the liquidation and disposal of the project. If no federal law is applicable to the liquidation and disposal of the project all remaining proceeds shall be paid to the city or village.

(e) If the highest bid received is insufficient for the payment of all obligations set forth in par. (c) the project shall not be sold unless the city or village provides sufficient additional funds to discharge the obligations.

(f) In order to carry out this subsection an authority or other designated agency shall exercise any option available to it for the payment and redemption of outstanding obligations set forth in par. (c) before maturity, if the city or village provides funds for payment and redemption.

(g) No actions taken under this subsection shall affect or diminish the rights of any bondholders or other obligees of the authority.

(h) In this subsection, "outstanding obligations" or "obligations" includes bonds, notes or evidences of indebtedness, as well as aids, grants, contributions or loans made by or received from any federal, state or local political government or agency.


**(26) Dissolution of housing authority.** Any housing authority may be dissolved upon adoption of an ordinance or resolution by the council or village board concerned declaring that the need for the authority no longer exists, that all projects under the authority's jurisdiction have been disposed of, that there are no outstanding obligations or contracts and that no further business remains to be transacted by the authority.


**Credits**

<<For credits, see Historical Note field.>>


Notes of Decisions (23)

W. S. A. 66.1201, WI ST 66.1201
Current through 2023 Act 272, published April 10, 2024.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

West's Wisconsin Statutes Annotated
  Municipalities (Ch. 59 to 68)
    Chapter 66. General Municipality Law (Refs & Annos)
      Subchapter XIII. Urban Redevelopment and Renewal

W.S.A. 66.1301

66.1301. Urban redevelopment

Currentness

**(1) Short title.** Sections 66.1301 to 66.1329 may be referred to as the "Urban Redevelopment Law".

**(2) Finding and declaration of necessity.** It is declared that in the cities of the state substandard and insanitary areas exist which have resulted from inadequate planning, excessive land coverage, lack of proper light, air and open space, defective design and arrangement of buildings, lack of proper sanitary facilities, and the existence of buildings, which, by reason of age, obsolescence, inadequate or outmoded design, or physical deterioration have become economic or social liabilities, or both. These conditions are prevalent in areas where substandard, insanitary, outworn or outmoded industrial, commercial or residential buildings prevail. These conditions impair the economic value of large areas, infecting them with economic blight, and these areas are characterized by depreciated values, impaired investments, and reduced capacity to pay taxes. These conditions are chiefly in areas which are so subdivided into small parcels in divided ownerships and frequently with defective titles, that their assembly for purposes of clearance, replanning, rehabilitation and reconstruction is difficult and costly. The existence of these conditions and the failure to clear, replan, rehabilitate or reconstruct these areas results in a loss of population by the areas and further deterioration, accompanied by added costs to the communities for creation of new public facilities and services elsewhere. It is difficult and uneconomic for individual owners independently to undertake to remedy these conditions. It is desirable to encourage owners of property or holders of claims on property in these areas to join together and with outsiders in corporate groups for the purpose of the clearance, replanning, rehabilitation and reconstruction of these areas by joint action. It is necessary to create, with proper safeguards, inducements and opportunities for the employment of private investment and equity capital in the clearance, replanning, rehabilitation and reconstruction of these areas. These conditions require the employment of capital on an investment rather than a speculative basis, allowing however the widest latitude in the amortization of any indebtedness created. These conditions further require the acquisition at fair prices of adequate areas, the gradual clearance of the areas through demolition of existing obsolete, inadequate, unsafe and insanitary buildings and the redevelopment of the areas under proper supervision with appropriate planning, land use and construction policies. The clearance, replanning, rehabilitation and reconstruction of these areas on a large scale basis are necessary for the public welfare. The clearance, replanning, reconstruction and rehabilitation of these areas are public uses and purposes for which private property may be acquired. Substandard and insanitary areas constitute a menace to the health, safety, morals, welfare and reasonable comfort of the citizens of the state. These conditions require the aid of redevelopment corporations for the purpose of attaining the ends recited in this subsection. The protection and promotion of the health, safety, morals, welfare and reasonable comfort of the citizens of the state are matters of public concern. Sections 66.1301 to 66.1329 are in the public interest.

**(2m) Discrimination.** Persons entitled to any right, benefit, facility, or privilege under ss. 66.1301 to 66.1329 may not be denied the right, benefit, facility, or privilege in any manner for any purpose nor be discriminated against because of sex, race, color,

creed, sexual orientation, status as a victim of domestic abuse, sexual assault, or stalking, as defined in s. 106.50(1m)(u), or national origin.

**(3) Definitions.** In ss. 66.1301 to 66.1329, unless a different intent clearly appears from the context:

(a) "Area" means a portion of a city which its planning commission finds to be substandard or insanitary, so that the clearance, replanning, rehabilitation or reconstruction of that portion is necessary or advisable to effectuate the public purposes declared in sub. (2). "Area" includes buildings or improvements not in themselves substandard or insanitary, and real property, whether improved or unimproved, the inclusion of which is considered necessary for the effective clearance, replanning, reconstruction or rehabilitation of the area of which the buildings, improvements or real property form a part and includes vacant land which is in such proximity to other land or structures that the economic value of the other land or structures is impaired.

(d) "Development" means a specific work, repair or improvement to put into effect a development plan and includes the real property, buildings and improvements owned, constructed, managed or operated by a redevelopment corporation.

(e) "Development area" means that portion of an area to which a development plan is applicable.

(f) "Development cost" means the amount determined by the planning commission to be the actual cost of the development or of the part of the development for which the determination is made. "Development cost" includes, among other costs, all of the following:

1. The reasonable costs of planning the development, including preliminary studies and surveys, neighborhood planning, architectural and engineering services and legal and incorporation expense.

2. The actual cost, if any, of alleviating hardship to families occupying dwelling accommodations in the development area where hardship results from the execution of the development plan.

3. The reasonable costs of financing the development, including carrying charges during construction.

4. Working capital in an amount not exceeding 5 percent of development cost.

5. The actual cost of the real property included in the development, of demolition of existing structures and of utilities, landscaping and roadways.

6. The amount of special assessments subsequently paid.

7. The actual cost of construction, equipment and furnishing of buildings and improvements, including architectural, engineering and builder's fees.

8. The actual cost of reconstruction, rehabilitation, remodeling or initial repair of existing buildings and improvements.

9. Reasonable management costs until the development is ready for use.

10. The actual cost of improving that portion of the development area which is to remain as open space, together with additions to development cost that equal the actual cost of additions to or changes in the development in accordance with the original development plan or after approved changes in or amendments to the development plan.

(g) "Development plan" means a plan for the redevelopment of all or any part of an area, and includes any amendments that are approved in accordance with the requirements of s. 66.1305(1).

(h) "Local governing body" means a common council, council, commission or other board or body vested by the charter of a city or other law with jurisdiction to adopt or enact ordinances or local laws.

(n) "Mortgage" means a mortgage, trust indenture, deed of trust, building and loan contract or other instrument creating a lien on real property, and the indebtedness secured by each of them.

(o) "Neighborhood unit" means a primarily residential district having the facilities necessary for well-rounded family living, such as schools, parks, playgrounds, parking areas and local shopping districts.

(p) "Planning commission" means the official bureau, board, commission or agency of a city that is authorized to prepare, adopt, amend or modify a master plan for the development of the city.

(q) "Real property" includes lands, buildings, improvements, land under water, waterfront property, and any easements, franchises and hereditaments, corporeal or incorporeal, and every estate, interest, privilege, easement, franchise and right in or appurtenant to the real property, legal or equitable, including rights-of-way, terms for years and liens, charges, or encumbrances by mortgage, judgment or otherwise.

(r) "Redevelopment" means the clearance, replanning, reconstruction or rehabilitation of an area or part of an area, and the provision of industrial, commercial, residential or public structures or spaces as may be appropriate, including recreational and other facilities incidental or appurtenant to the structures or spaces.

(s) "Redevelopment corporation" means a corporation carrying out a redevelopment plan under ss. 66.1301 to 66.1329.

**Credits**

<<For credits, see Historical Note field.>>

Notes of Decisions (2)

W. S. A. 66.1301, WI ST 66.1301
Current through 2023 Act 272, published April 10, 2024.

**End of Document**
© 2025 Thomson Reuters. No claim to original U.S. Government Works.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, et al., | |
| *Plaintiffs*, | |
| v. | |
| ELISABETH D. DEVOS, in her official capacity as Secretary of Education, et al., | |
| *Defendants*, | |
| and | Case No. 20-cv-01468-CJN |
| FOUNDATION FOR INDIVIDUAL RIGHTS IN EDUCATION, *et al*, | |
| *Intervenor-Defendants,* | |
| and | |
| STATE OF TEXAS, | |
| *[Proposed] Intervenor-Defendant.* | |

## MEMORANDUM IN SUPPORT OF TEXAS' PARTIALLY OPPOSED

## MOTION TO INTERVENE

T<small>ABLE OF</small> C<small>ONTENTS</small>

Table of Contents ........................................................................................................ i

Background ................................................................................................................ 1

Legal Standard .......................................................................................................... 3

Argument ................................................................................................................... 4

    I.    The Court should grant intervention as of right. ............................................. 4

        A.    Texas' motion is timely ............................................................................ 4

        B.    Texas has significant protectable interests directly affected by this litigation. ............ 6

        C.    Disposition of this action may impair or impede Texas' ability to protect its interests. ................................................................................10

        D.    The parties no longer adequately represent Texas' interests. ..................................... 11

            1.    The incoming administration is hostile to the Rule and Texas' interests. ................. 11

            2.    Existing intervenors do not have the same interests as Texas. ................................... 12

    II.    In the alternative, the Court should permit permissive intervention. ............................. 14

Conclusion ............................................................................................................... 15

TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*100Reporters LLC v. U.S. Dep't of Justice*,
    307 F.R.D. 269 (D.D.C. 2014) ........................................................................... 10, 11

*Builders Ass'n of Greater Chi. v. City of Chicago*,
    170 F.R.D. 435 (N.D. Ill. 1996) ............................................................................ 12

*Cayuga Nation v. Zinke*,
    324 F.R.D. 277 (D.D.C. 2018) .............................................................................. 11

*Commonwealth of Pennsylvania v. President of the United States of Am.*,
    888 F.3d 52 (3d Cir. 2018) ..................................................................................... 19

*Daggett v. Comm'n on Gov't Ethics*,
    172 F.3d 104 (1st Cir. 1999) (Lynch, J., concurring) ........................................... 9

*Doe v. Univ. of Scis.*,
    961 F.3d 203 (3d Cir. 2020) .................................................................................. 14

*E.E.O.C. v. Nat'l Children's Ctr., Inc.*,
    146 F.3d 1042 (D.C. Cir. 1998) ........................................................................ 9, 20

*Edwards v. City of Houston*,
    78 F.3d 983 (5th Cir. 1996) .................................................................................... 8

*Envtl. Def. Fund, Inc. v. Costle*,
    79 F.R.D. 235 (D.D.C. 1978), *aff'd* (D.C. Cir. July 31, 1978) ...................... 15, 20

*Feller v. Brock*,
    802 F.2d 722 (4th Cir. 1986) ................................................................................ 16

*Forest Cty. Potawatomi Cmty. v. United States*,
    317 F.R.D. 6 (D.D.C. 2016) ............................................................................ 11, 16

*Fund For Animals, Inc. v. Norton*,
    322 F.3d 728 (D.C. Cir. 2003) ........................................................................ 16, 17

*Hodgson v. United Mine Workers of Am.*,
    473 F.2d 118 (D.C. Cir. 1972) .............................................................................. 10

*Humane Soc. of U.S. v. Clark*,
    109 F.R.D. 518 (D.D.C. 1985) .............................................................................. 20

ii

*Indep. Petrochemical Corp. v. Aetna Cas. & Sur. Co.*,
    105 F.R.D. 106 (D.D.C. 1985) ............................................................ 15

*Kleissler v. U.S. Forest Serv.*,
    157 F.3d 964, 973 (3d Cir. 1998 .......................................................... 19

*Nat. Res. Def. Council v. Costle*,
    561 F.2d 904 (D.C. Cir. 1977) ............................................................. 15

*New Hampshire v. Holder*,
    293 F.R.D. 1 (D.D.C. 2013) ................................................................. 19

*Nuesse v. Camp*,
    385 F.2d 694 (D.C. Cir. 1967) ..................................................... 9, 15, 16

*Roane v. Leonhart*,
    741 F.3d 147 (D.C. Cir. 2014) ............................................................... 9

*Sault Ste. Marie Tribe of Chippewa Indians v. Bernhardt*,
    331 F.R.D. 5 (D.D.C. 2019) ................................................................. 19

*Smith v. Marsh*,
    194 F.3d 1045 (9th Cir. 1999) ............................................................. 10

*Smoke v. Norton*,
    252 F.3d 468 (D.C. Cir. 2001) ............................................................... 9

*Smuck v. Hobson*,
    408 F.2d 175 (D.C. Cir. 1969) ............................................................. 16

*Trbovich v. United Mine Workers of Am.*,
    404 U.S. 528 (1972) ...................................................................... 16, 18

*United States v. AT&T*,
    642 F.2d 1285 (D.C. Cir. 1980) ........................................................... 16

*United States v. Facebook, Inc.*,
    456 F. Supp. 3d 105 (D.D.C. 2020) ..................................................... 8, 9

*Ute Indian Tribe of Uintah & Ouray Indian Reservation v. U.S. Dep't of the
Interior*,
    1:18-CV-00547, 2020 WL 1465886 (D.D.C. Feb. 5, 2020) ..................... 10

*W. Energy All. v. Zinke*,
    877 F.3d 1157 (10th Cir. 2017) ...................................................... 10, 16

iii

*Wash. All. of Tech. Workers v. U.S. Dep't of Homeland Sec.*,
  395 F. Supp. 3d 1 (D.D.C. 2019) ................................................................ 11, 15

*Waterkeeper All., Inc. v. Wheeler*,
  330 F.R.D. 1 (D.D.C. 2018) .............................................................................. 15

*Weinberg v. Barry*,
  604 F. Supp. 390 (D.D.C. 1985) ...................................................................... 20

## State Statutes

TEX. EDUC. CODE § 4.001 ..................................................................................... 18

## Rules

Fed. R. Civ. P. 24(b)(1)(B) .............................................................................. 20, 21

## Constitutional Provisions

Tex. Const. Article VII, § 1 ............................................................................... 12

## Other Authorities

7C Charles Alan Wright, *et al.*, Fed. Prac. & Proc. Civ. § 1917 (3d ed ...................... 19

*Accusers and Accused*, INSIDER HIGHER ED (Oct. 3, 2019),
  https://www.insidehighered.com/news/2019/10/03/students-look-federal-
  courts-challenge-title-ix-proceedings .......................................................... 14

Janet Napolitano, *"Only Yes Means Yes": An Essay on University Policies
  Regarding Sexual Violence and Sexual Assault*, 33 YALE L. & POL'Y REV.
  387, 394–395 (2015) .......................................................................................... 13

Tex. Educ. Agency, 2020 *Comprehensive Biennial Report on Texas Public
  Schools* at 297 (Dec. 4, 2020) ...................................................................... 12

Tex. Higher Educ. Coordinating Bd., *2020 Texas Public Higher Education
  Almanac* (Sept. 28, 2020) .............................................................................. 12

Appx. 799

The State of Texas ("Texas") moves to intervene in defense of the Department of Education's ("the Department") Final Rule addressing Title IX obligations, which took effect on August 14, 2020.[1] At the start of this suit, Texas' interests were aligned with the Department. On January 20, however, President elect Joe Biden will assume office and redirect the Department's policy regarding Title IX. The President elect has condemned the Final Rule, calling it "a green light to ignore sexual violence" and promising to bring it to a "quick end." *The Biden Agenda for Women*, JOEBIDEN.COM, https://joebiden.com/womens-agenda/ (last visited Jan. 15, 2021).   In light of this sea change, Texas can no longer rely on the Department to adequately represent its interests in defending the Final Rule.

## BACKGROUND

During the Obama Administration, the Department issued its misguided 2011 Dear Colleague Letter[2] and 2014 Questions and Answers on Title IX Sexual Violence ("2014 Question and Answers").[3] Although neither underwent notice and comment rulemaking, the two guidance documents put recipients in a no-win situation where either conforming or failing to conform to the guidance documents would expose them to significant risk of litigation.[4] The President-elect played a key role in the development and implementation of the Obama Administration's policies

---

[1] *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30,026 (May 19, 2020).
[2] Russlynn Ali, OCR, U.S. Dept. of Educ., Dear Colleague Letter: Sexual Violence (Apr. 4, 2011), http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf.
[3] U.S. Dept. of Educ., *Questions and Answers on Title IX and Sexual Violence* (Apr. 24, 2014), https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf.
[4] *See*, *e.g.*, Taylor Mooney, *How Betsy DeVos plans to change the rules for handling sexual misconduct on campus*, CBS NEWS (Nov. 24, 2019) ("Prior to 2011, the number of lawsuits filed against universities for failing to provide due process in Title IX cases averaged one per year. It is expected there will be over 100 such lawsuits filed in 2019 alone."), https://www.cbsnews.com/news/title-ix-sexual-misconduct-on-campus-trump-administration-changing-obama-rules-cbsn-documentary/.

1

on sexual harassment,[5] including the changes the administration advanced regarding Title IX. The President-elect, in fact, stood as the Obama Administration's spokesperson for the Dear Colleague Letter, announcing its publication to students at the University of New Hampshire in Durham. *See* Press Release, U.S. Dept. of Educ., *Vice President Biden Announces New Administration Effort to Help Nation's Schools Address Sexual Violence* (Apr. 4, 2011), https://www.ed.gov/news/press-releases/vice-president-biden-announces-new-administration-effort-help-nations-schools-ad.

In response to growing criticism, the Department rescinded the Dear Colleague Letter and the 2014 Questions and Answers in 2017.[6] It soon became apparent, however, that the withdrawal could not repair the damage caused by the two guidance documents on its own, as there was significant confusion regarding recipients' obligations to combat sexual harassment. On May 19, 2020, therefore, the Department issued the Final Rule that is the subject of this action. The Final Rule, for the first time, clearly demarcated the outer boundaries of federal fund recipients' obligations under Title IX with respect to sexual harassment. It thereby reduced their risk of liability and resolved the dilemma of how to enforce Title IX without sacrificing the rights of either the victims of sexual harassment or the accused.

At the time this lawsuit commenced, the Department understood and respected the detrimental impact that the Obama Administration's misguided guidance documents had on common providers of education like Texas. That will all change on January 20, 2021 when the President-elect is inaugurated into office. The President-elect has not altered his opinion about

---

[5] Unless otherwise stated, the term "sexual harassment" encompasses all forms of sexual harassment, including sexual violence and sexual assault. Likewise, unless otherwise stated, the term, "academic institutions" encompasses all entities covered by the new Final Rule issued by the Department, including schools, colleges, and universities, both primary and secondary.
[6] *See* Candice Jackson, OCR, U.S. Dept. of Educ., Dear Colleague Letter (Sept. 9, 2017), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf.

2

Title IX policy since advocacy of the Dear Colleague Letter. He has announced his intent to advance the same objectives for Title IX as he did during the Obama Administration, which means curtailing, if not repealing outright, the reforms contained in the Final Rule. *See The Biden Plan To End Violence Against Women*, JOEBIDEN.COM, https://joebiden.com/vawa/ (last visited Jan. 15, 2021). To that end, the President-elect has promised his supporters that the Department under his administration will put a "quick end" to the Final Rule. *The Biden Agenda for Women*, JOEBIDEN.COM, https://joebiden.com/womens-agenda/ (last visited Jan. 15, 2021). As head of the executive branch, the incoming President will have authority over the Department. His objectives will inform the Department's approach to Title IX, up to and including the Department's defense of the Final Rule and the resolution of this lawsuit. Texas therefore files this motion to intervene.

## LEGAL STANDARD

The Federal Rules provide two mechanisms for third-party intervention in a lawsuit: intervention of right under Federal Rule of Civil Procedure 24(a) and permissive intervention under Rule 24(b). For intervention of right to apply, the movant must demonstrate that: (1) the motion is timely; (2) the movant has a legally protected interest in the action; (3) the action must threaten to impair that interest; and (4) the movant's interest is not adequately represented by the existing parties. *See United States v. Facebook, Inc.*, 456 F. Supp. 3d 105, 108 (D.D.C. 2020). "[T]he inquiry" into these factors "is a flexible one, which focuses on the particular facts and circumstances surrounding each application." *Edwards v. City of Houston*, 78 F.3d 983, 999 (5th Cir. 1996). Accordingly, "intervention of right must be measured by a practical rather than technical yardstick." *Facebook*, 456 F. Supp. 3d at 108.

To qualify for permissive intervention, the movant must show: (1) an independent ground for subject matter jurisdiction; (2) a timely motion; and (3) a claim or defense that has a question

3

of law or fact in common with the main action. *Facebook*, 456 F. Supp. 3d at 108. "As its name would suggest, permissive intervention is an inherently discretionary enterprise." *E.E.O.C. v. Nat'l Children's Ctr., Inc.*, 146 F.3d 1042, 1046 (D.C. Cir. 1998). The D.C. Circuit has adopted "a liberal application in favor of permitting intervention." *Nuesse v. Camp*, 385 F.2d 694, 702 (D.C. Cir. 1967). A liberal approach to intervention is especially appropriate "where the subject matter of the lawsuit is of great public interest, the intervenor has a real stake in the outcome and the intervention may well assist the court in its determination through . . . the framing of issues." *Daggett v. Comm'n on Gov't Ethics*, 172 F.3d 104, 116–17 (1st Cir. 1999) (Lynch, J., concurring).

Texas meets the requirements for both intervention as of right and permissive intervention.

**ARGUMENT**

## I.      The Court should grant intervention as of right.

### A.      Texas' motion is timely.

In light of the impending change of Administrations, Texas moves to intervene in defense of the Final Rule. The motion is timely because it was filed close in time to the change in circumstances requiring intervention: President-elect Biden's inauguration on January 20. *See Smoke v. Norton*, 252 F.3d 468, 471 (D.C. Cir. 2001) (judging a motion to intervene timely because it was filed when "the potential inadequacy of representation came into existence").

The timeliness of a motion to intervene is "judged in consideration of all the circumstances." *Id.* (quoting *United States v. AT&T*, 642 F.2d 1285, 1295 (D.C. Cir. 1980)). Though the "time elapsed since the inception of the suit is relevant, measuring the length of time passed is not in itself the determinative test," *Roane v. Leonhart*, 741 F.3d 147, 151 (D.C. Cir. 2014) (internal citations omitted), "particularly where intervention is sought as of right." *Hodgson v. United Mine Workers of Am.*, 473 F.2d 118, 129 (D.C. Cir. 1972). Rather, "[t]he crucial date for

4

assessing the timeliness of a motion to intervene is when proposed intervenors should have been aware that their interests would not be adequately protected by the existing parties." *Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir. 1999).

During the Trump Administration, Texas had no reason to intervene. Like Texas, the previous administration defended the Final Rule as an effective means of combating sexual harassment without sacrificing either clarity or constitutional liberties. The President-elect, however, has expressed open and adamant hostility to the Final Rule, necessitating Texas' intervention if it is to protect its interests. *See infra* at I.D; *see also W. Energy All. v. Zinke*, 877 F.3d 1157, 1169 (10th Cir. 2017) (holding that "the change in the Administration raises the possibility of 'divergence of interest' or a 'shift' during litigation"). The Department will cease adequately representing Texas' interests only after January 20, 2021 when the new administration takes over and begins implementing its own policies. This is not an occasion where a non-party sat on its rights. Texas has actively monitored the present action from the beginning and exhibited proper diligence in bringing its motion.

Further, the timing of Texas' motion does not prejudice any of the existing parties. As this Court previously held, courts "do not require timeliness for its own sake." *100Reporters LLC v. U.S. Dep't of Justice*, 307 F.R.D. 269, 275 (D.D.C. 2014) (quoting *Roane,* 741 F.3d at 151); *see Ute Indian Tribe of Uintah & Ouray Indian Reservation v. U.S. Dep't of the Interior*, 1:18-CV-00547 (CJN), 2020 WL 1465886, at *1 (D.D.C. Feb. 5, 2020) ("[T]he timeliness requirement was not designed to penalize prospective intervenors for failing to act promptly."). The requirement is instead "aimed primarily at preventing potential intervenors from unduly disrupting litigation, to the unfair detriment of the existing parties." Thus, "in assessing timeliness," the court must weigh "whether any delay in seeking intervention unfairly disadvantaged the original parties."

5

*100Reporters*, 307 F.R.D. at 275 (citing *Roane*, 741 F.3d at 151); *see* 7C Charles Alan Wright, *et al.*, Fed. Prac. & Proc. § 1916 (3d ed.) ("The most important consideration in deciding whether a motion for intervention is untimely is whether the delay in moving for intervention will prejudice the existing parties to the case.").

This case is still in its relatively early stages. The Department has not yet filed its answer. *See*, *e.g.*, *Wash. All. of Tech. Workers v. U.S. Dep't of Homeland Sec.*, 395 F. Supp. 3d 1, 19 (D.D.C. 2019) (deeming intervention timely after positively noting that defendant failed to file answer even though the case commenced three years ago); *Forest Cty. Potawatomi Cmty. v. United States*, 317 F.R.D. 6, 13 (D.D.C. 2016) (ruling intervention timely nine months after litigation commenced because it was filed before any of the defendants had filed an answer). And while the parties have started filing dispositive motions over the past month, Texas' addition will not disrupt or delay the parties' schedule or force the parties to assume additional work. Texas adopts, as its own, the arguments that the Department makes in its cross-motion for summary judgment and its brief opposing Plaintiff States' motion for summary judgment – both of which will be filed before January 20, 2021. Texas merely seeks the opportunity to defend these arguments after the Biden Administration assumes office and the Department is no longer able to adequately represent Texas' interests. Texas also agrees to abide by the schedule the parties negotiated. *See Cayuga Nation v. Zinke*, 324 F.R.D. 277, 284 (D.D.C. 2018) (requiring that intervening party submits non-cumulative arguments and complies with scheduling order). Texas' intervention therefore will have minimum impact on the original parties. If anything, Texas' addition will avert a potential disruption to the case should the federal government withdraw its support of the Final Rule and refuse to defend it. The motion is timely.

**B.     Texas has significant protectable interests directly affected by this litigation.**

6

As a provider of public education, Texas has clear and substantial interests at stake in this action. Indeed, its interests are the "mirror-image" of Plaintiff States' interests. While the Plaintiff States allege that they "are being injured by the [Final Rule]," Texas "w[ould] be injured by [the Final Rule's] invalidation." *Builders Ass'n of Greater Chi. v. City of Chicago*, 170 F.R.D. 435, 440 (N.D. Ill. 1996).

Like Plaintiff States, Texas "administers a system of primary and secondary public education that is funded by both state and federal money." ECF 102 ¶ 274; *see also* Tex. Educ. Agency, 2020 *Comprehensive Biennial Report on Texas Public Schools* at 297 (Dec. 4, 2020) (reporting that Texas received $5.3 billion dollars for K-12 education), https://tea.texas.gov/ sites/default/files/comp_annual_biennial_2020.pdf. The Texas Constitution charges the Texas Legislature "to establish and make suitable provision for the support and maintenance of an efficient system of public free schools." Tex. Const. art. VII, § 1. Pursuant to this charge, Texas funds, regulates, and oversees the second largest system of K–12 public education in the nation, serving over 5.4 million students across 1,200 school districts. Tex. Educ. Agency, *Enrollment in Texas Public Schools 2019-20* at 1 (Aug. 12, 2020), https://tea.texas.gov/sites/default/files/enroll _2019-20.pdf.

Texas also funds, supports, and administers a robust network of higher education—same as Plaintiff States. *See* ECF 102 ¶ 277. Texas is home to 119 public postsecondary institutions, including 37 universities and 82 two-year colleges and technical schools. *See* Tex. Higher Educ. Coordinating Bd., *2020 Texas Public Higher Education Almanac* at 28, 47 (Sept. 28, 2020), https://reportcenter.highered.texas.gov/agency-publication/almanac/2020-texas-public-higher-ed ucation-almanac/. While most states have just one or two public university systems, Texas has six. The largest of these systems—the University of Texas—has 14 separate locations that educate

7

approximately 240,000 students each year. *See About The University of Texas System*, THE UNIVERSITY OF TEXAS SYSTEM, https://www.utsystem.edu/about (last visited Jan. 15, 2021). All told, the State's entire network of higher education enrolled just shy of 1.7 million students in 2019. *See* Tex. Higher. Educ. Coordinating Bd., at 13.

Because Texas "receives federal funding from the Department for primary and secondary education, [Texas] and its public primary and secondary education systems are subject to" the Final Rule. ECF 102 ¶ 276. Likewise, "[e]ach of the institutions in [Texas's] systems of higher education receives federal funding and, as a result, is subject to the Rule" as well. ECF 102 ¶ 279. This means that Texas and its academic institutions have an obligation to investigate and enforce alleged violations of Title IX. Texas is intensely interested in the Final Rule as a result.

First, the Final Rule clarified the definition of sexual harassment as well as the conditions that must be met before a recipient's obligations under Title IX are activated. Invalidating the Final Rule would create uncertainty, harming the Texas institutions regulated under Title IX. *See infra* Part I.C. Earlier guidance had caused a great deal of uncertainty regarding recipients' legal responsibilities under Title IX.[7] Recipients did not know how to comply with the new mandates or whether failure to do so would incur legal consequences. *See* Janet Napolitano, *"Only Yes Means Yes": An Essay on University Policies Regarding Sexual Violence and Sexual Assault*, 33 YALE L. & POL'Y REV. 387, 394–395 (2015).

---

[7] The Task Force on Federal Regulation of Higher Education specifically identified the Dear Colleague Letter and 2014 Question and Answers as guidance documents that were meant to eliminate uncertainty but only led to more confusion. *See Recalibrating Regulation of Colleges and Universities* at 14 (Feb. 12, 2015), *available at* https://www.acenet.edu/Documents/Higher-Education-Regulations-Task-Force-Report.pdf.

In an abundance of caution, many academic institutions, including those funded by Texas, elected to revise their policies to cover a greater range of conduct and make it easier for administrators to arrive at a determination of guilt. *See Doe v. Univ. of Scis.*, 961 F.3d 203, 213 (3d Cir. 2020) (describing the pressure universities faced as a result of the Dear Colleague Letter). But that led to litigation. Hundreds of lawsuits have been filed since the Dear Colleague Letter was issued—a sizeable number of which academic institutions lost or settled. *See* Jonathan Taylor, Milestone: 600+ Title IX/Due Process Lawsuits in Behalf of Accused Students, Title IX for All (Apr. 1, 2020), https://www.titleixforall.com/milestone-600-title-ix-due-process-lawsuits-in-behalf-of-accused-students.

Second, the Final Rule reduced Texas' risk of liability. While previous guidance had supported an improperly broad view of Title IX liability, the Final Rule fixed those issues. By confining Title IX liability to proper limits set by statute, the Final Rule benefits Texas. If it were invalidated, Texas institutions would be subject to litigation expenses, which, in turn, would lead to higher compliance costs and diversion of resources.

In short, earlier guidance put Texas institutions between a rock and a hard place. Not following the guidance would risk federal enforcement actions, but following the guidance would lead to lawsuits, litigation expenses, and ultimately monetary settlements. *Id.*; *see also* Greta Anderson, *More Title IX Lawsuits by Accusers and Accused*, Insider Higher Ed (Oct. 3, 2019), https://www.insidehighered.com/news/2019/10/03/students-look-federal-courts-challenge-title-ix-proceedings (describing the "high cost of addressing sexual misconduct. . . a lose-lose situation for universities"). The Final Rule, by contrast, resolves the dilemma. It provides clear guidance limiting Texas' liability and reducing expected litigation expenses.

These interests support intervention. If Plaintiff States' systems of public education give them standing to challenge the Final Rule, then Texas' system similarly gives it a protectable interest sufficient for intervention. *See Indep. Petrochemical Corp. v. Aetna Cas. & Sur. Co.*, 105 F.R.D. 106, 109 (D.D.C. 1985) (explaining that the court follows a "liberal formulation of the 'interest' test," which is more forgiving than the interest necessary to initiate a lawsuit); *Nuesse*, 385 F.2d at 700 (describing the purpose of the interest test as "involving as many apparently concerned persons as is compatible with efficiency and due process").

**C.  Disposition of this action may impair or impede Texas' ability to protect its interests.**

As explained above, the Final Rule provides important benefits to Texas, its schools, and its citizens. It both limits the scope of potential Title IX liability and also provides clarity that helps schools follow the law. But Plaintiffs ask this Court to deprive Texas of those benefits by vacating the Final Rule. *See* ECF 102 § 14. Those "practical consequences" are more than sufficient to show impairment of Texas' interests. *Nat. Res. Def. Council v. Costle*, 561 F.2d 904, 909 (D.C. Cir. 1977). When a movant benefits from a regulation, invalidation of that regulation would necessarily impair the movant's interests. *See, e.g.*, *Wash. All. of Tech. Workers v. U.S. Dep't of Homeland Sec.*, 395 F. Supp. 3d 1, 20 (D.D.C. 2019); *Waterkeeper All., Inc. v. Wheeler*, 330 F.R.D. 1, 8 (D.D.C. 2018); *Envtl. Def. Fund, Inc. v. Costle*, 79 F.R.D. 235, 242 (D.D.C. 1978), *aff'd*, (D.C. Cir. July 31, 1978).

"[R]elegat[ion] to the status of amicus curiae" would not enable Texas to protect their interests in this case and "is not an adequate substitute for participation as a party." *Nuesse*, 385 F.2d at 704 n.10. In such a scenario, no party would provide a comprehensive defense of the Final Rule to the Court. Texas would not be able to file motions or appeal if necessary. *Id.* Although Texas acted as amicus curiae earlier in the proceeding, it did so when the Department adequately

represented Texas' interests and Texas was merely supplementing the Department's arguments.

For the reasons stated below, those interests will diverge on January 20, 2021. *See infra* Part I.D.

Texas will likely be the sole party then defending the Final Rule in its entirety, making it essential

that its arguments be part of the Court's deliberations. "Participation by [Texas] as amicus curiae

is not sufficient to protect against these practical impairments." *Feller v. Brock*, 802 F.2d 722, 730

(4th Cir. 1986). Texas should be granted intervenor status.

### D.      The parties no longer adequately represent Texas' interests.

Rule 24(a)'s inadequate representation requirement is "not onerous." *Fund For Animals,

Inc. v. Norton*, 322 F.3d 728, 735 (D.C. Cir. 2003) (citing *Dimond v. District of Columbia*, 792

F.2d 179, 192 (D.C. Cir. 1986)). "[T]he burden of making that showing should be treated as

minimal." *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972). Movants

"ordinarily should be allowed to intervene unless it is clear that the party will provide adequate

representation for the absentee." *United States v. Am. Tel. & Tel. Co.*, 642 F.2d 1285, 1293 (D.C.

Cir. 1980); *see also Smuck v. Hobson*, 408 F.2d 175, 181 (D.C. Cir. 1969) (holding that the burden

is on the parties opposing intervention to demonstrate that existing representation is adequate).

After January 20, neither the Department nor the current Intervenor-Defendants will adequately

represent Texas' interests.

### 1.      The incoming administration is hostile to the Rule and Texas' interests.

As an initial matter, "the change in the Administration raises 'the possibility of divergence

of interest' or a 'shift' during litigation." *W. Energy All*, 877 F.3d at 1169. This possibility, on its

own, satisfies Rule 24(a)'s requirement of inadequate representation. *See Forest Cty. Potawatomi

Cmty.*, 317 F.R.D. at 11 (stating that all movant need show is "a *possibility* that its interests may

not be adequately represented absent intervention") (emphasis added). However, in addition to the

11

general uncertainty surrounding a change of party in the White House, the President-elect has repeatedly (and erroneously) asserted that the Final Rule is "a green light to ignore sexual violence." *The Biden Agenda for Women*, JOEBIDEN.COM, https://joebiden.com/womens-agenda/ (last visited Jan. 15, 2021).  Promising to put a "quick end" to the Final Rule, he plans to "restore [earlier] Title IX guidance for colleges, including the 2011 Dear Colleague Letter."[8] *Id*; *The Biden Plan To End Violence Against Women*, JOEBIDEN.COM, https://joebiden.com/vawa/ (last visited Jan. 15, 2021). These statements are evidence of an unavoidable, fundamental divide between Texas and the Department under the President-elect's incoming administration. Texas cannot trust that the Department will serve as an adequate representative going forward.

## 2.    Existing intervenors do not have the same interests as Texas.

Earlier in the proceedings, the Court permitted the intervention of three non-profits dedicated to promoting free speech and due process on college campuses. Although these organizations support the Final Rule, they represent "different interest[s]" than Texas. *Fund For Animals*, 322 F.3d at 737 (holding "that interests need not be wholly adverse" for representation to be inadequate). The Intervenor-Defendants advocate on behalf of students, alumni, and faculty, many of whom were subject to Title IX proceedings. Texas, in contrast, is a provider of public education, for which it and its associated academic institutions receive federal funds. Thus, whereas Intervenor-Defendants represent individuals whose rights may have been violated as a result of a Title IX action, Texas represents institutions subject to Title IX.

---

[8] The President-elect offered similar remarks in a statement he and his campaign released following the Department's announcement of the Final Rule, whereby he promised the Final Rule would "be put to a quick end in January 2021." Joe Biden, *Statement on the Trump Administration Rule to Undermine Title IX and Campus Safety* (May 6, 2020), https://medium.com/@JoeBiden /statement-by-vice-president-joe-biden-on-the-trump-administration-rule-to-undermine-title-ix-and-e5dbc545daa.

12

The differences between Texas and Intervenor-Defendants do not end there. As sovereign, Texas has an independent duty to provide "a quality education that enables [students] to achieve their potential and fully participate now and in the future in the social, economic, and educational opportunities of our state and nation." TEX. EDUC. CODE § 4.001. In doing so, Texas must respect the rights of students suffering from sexual harassment as well as those accused of misconduct. The Intervenor-Defendants, as private parties, are not subject to the same tensions. *Cf. Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 539 (1972) (concluding that government cannot adequately represent private parties because it is also entrusted with protecting vital public interests).

Because of these differences, Texas and the Intervenor-Defendants have adopted distinct legal positions, which has significant implications for the resolution of this case. Texas takes a position similar to the one advanced by the Department prior to the change in administration: namely, it emphasizes that the Final Rule is consistent with federal statutes that form the basis of Plaintiff States' suit. The Intervenor-Defendants, on the other hand, contend that the Constitution mandates many of the provisions in the Final Rule notwithstanding what is authorized by federal statute.

The Intervenor-Defendants explained in their motion to intervene that courts, including the D.C. Circuit, "look skeptically on government entities serving as adequate advocates for private parties." ECF 27 at 12 (quoting *Crossroads Grassroots Policy Strategies v. Fed. Election Comm'n*, 788 F.3d 312, 321 (D.C. Cir. 2015)). This is because governments often serve "numerous complex and conflicting interests" that have the potential to affect their approach to litigation. *Commonwealth of Pennsylvania v. President of the United States of Am.*, 888 F.3d 52, 61 (3d Cir. 2018) (citing *Kleissler v. U.S. Forest Serv.*, 157 F.3d 964, 973 (3d Cir. 1998)). The same logic

13

applies here, just in reverse. As private parties, the Intervenor-Defendants lack the complex and competing duties and concerns that define Texas' interest in Plaintiff States' challenge to the Final Rule.

**II.    In the alternative, the Court should permit permissive intervention.**

Texas satisfies all the requisites for permissive intervention. *See New Hampshire v. Holder*, 293 F.R.D. 1, 8 (D.D.C. 2013) (requiring movant to show an independent ground for subject matter jurisdiction, a timely motion, and claim or defense that has a question of law or fact in common with the main action). The Court should exercise its "wide latitude" and permit Texas to intervene in this action even if Texas does not qualify for intervention as of right. *Sault Ste. Marie Tribe of Chippewa Indians v. Bernhardt*, 331 F.R.D. 5, 9 (D.D.C. 2019).

First, Texas has an independent ground for subject matter jurisdiction, as the action raises a federal question. *See* 7C Charles Alan Wright, *et al.*, Fed. Prac. & Proc. Civ. § 1917 (3d ed.) ("[T]he need for independent jurisdictional grounds is almost entirely a problem of diversity litigation. In federal-question cases there should be no problem of jurisdiction with regard to an intervening defendant nor is there any problem when one seeking to intervene as a plaintiff relies on the same federal statute as does the original plaintiff.").

Second, Texas' motion is timely. As explained above, the need for intervention arises on January 20, so Texas has not delayed, much less prejudiced any existing parties. *See supra* Part I.A.

Third, Texas' position in support of the Final Rule involves common questions of law and fact. *Nat'l Children's Ctr.,* 146 F.3d at 1047 (noting courts in this jurisdiction "afforded this requirement considerable breadth"). Both "the main action" and Texas' defense center on whether the Final Rule is consistent with Title IX and the Administrative Procedures Act. Fed. R. Civ. P.

14

24(b)(1)(B). Those common questions of law and fact are sufficient for permissive intervention. *See Weinberg v. Barry*, 604 F. Supp. 390, 392 n.1 (D.D.C. 1985).

Finally, the Court should exercise its discretion to permit intervention because Texas offers a unique, important perspective that is currently absent from the proceeding. *See Humane Soc. of U.S. v. Clark*, 109 F.R.D. 518, 521 (D.D.C. 1985) (judging it appropriate "[i]n light of the 'scope and complexity of plaintiffs' challenge,'" to have absent interests "directly represented"). Like Plaintiff States, Texas is a common provider of education, whose schools, universities, and other academic programing are subject to Title IX. But unlike Plaintiff States, Texas believes that the Final Rule will not only facilitate enforcement of Title IX but also discourage unconstitutional practices that have violated the rights of individuals accused of misconduct. *See Envtl. Def. Fund, Inc. v. Costle*, 79 F.R.D. 235, 244 (D.D.C. 1978), *aff'd*, (D.C. Cir. July 31, 1978) (considering whether movant will "supplement the position already taken by the other parties").

Texas can provide a broad-based defense of the Final Rule, enabling the Court to fully assess its validity through adversarial proceedings, despite the new Administration's change of position on the merits. *Clark*, 109 F.R.D. at 521 (granting intervention because movant showed "willingness and ability to contribute to the full development of the factual and legal issues presented").

## CONCLUSION

For the foregoing reasons, the State of Texas respectfully requests that the Court grant its motion to intervene as a matter of right under Rule 24(a) or, in the alterative, for permissive intervention under Rule 24(b).

Date: January 19, 2021

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

Respectfully submitted.

PATRICK K. SWEETEN
Associate Deputy for Special Litigation
Texas State Bar No. 00798537

WILLIAM T. THOMPSON
Special Counsel
Texas State Bar No. 24088531

 */s/ Kathleen T. Hunker*
KATHLEEN T. HUNKER
Special Counsel
Texas State Bar No. 24118415

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC-009)
Austin, Texas 78711-2548
Tel.: (512) 936-1414
Fax: (512) 936-0545
patrick.sweeten@oag.texas.gov
kathleen.hunker@oag.texas.gov
will.thompson@oag.texas.gov

16

🚩 KeyCite Yellow Flag - Negative Treatment

Unconstitutional or Preempted  Validity Called into Doubt by  Purl v. United States Department of Health and Human Services,  N.D.Tex.,  Dec. 22, 2024

🚩 KeyCite Yellow Flag - Negative Treatment

Proposed Regulation

Code of Federal Regulations

Title 45. Public Welfare

Subtitle A. Department of Health and Human Services (Refs & Annos)

Subchapter C. Administrative Data Standards and Related Requirements (Refs & Annos)

Part 160. General Administrative Requirements (Refs & Annos)

Subpart A. General Provisions

45 C.F.R. § 160.103

§ 160.103 Definitions.

Currentness

Except as otherwise provided, the following definitions apply to this subchapter:

Act means the Social Security Act.

Administrative simplification provision means any requirement or prohibition established by:

(1) 42 U.S.C. 1320d–1320d–4, 1320d–7, 1320d–8, and 1320d–9;

(2) Section 264 of Pub.L. 104–191;

(3) Sections 13400–13424 of Public Law 111–5; or

(4) This subchapter.

ALJ means Administrative Law Judge.

ANSI stands for the American National Standards Institute.

Business associate:

(1) Except as provided in paragraph (4) of this definition, business associate means, with respect to a covered entity, a person who:

(i) On behalf of such covered entity or of an organized health care arrangement (as defined in this section) in which the covered entity participates, but other than in the capacity of a member of the workforce of such covered entity or arrangement, creates, receives, maintains, or transmits protected health information for a function or activity regulated by this subchapter, including claims processing or administration, data analysis, processing or administration, utilization review, quality assurance, patient safety activities listed at 42 CFR 3.20, billing, benefit management, practice management, and repricing; or

(ii) Provides, other than in the capacity of a member of the workforce of such covered entity, legal, actuarial, accounting, consulting, data aggregation (as defined in § 164.501 of this subchapter), management, administrative, accreditation, or financial services to or for such covered entity, or to or for an organized health care arrangement in which the covered entity participates, where the provision of the service involves the disclosure of protected health information from such covered entity or arrangement, or from another business associate of such covered entity or arrangement, to the person.

(2) A covered entity may be a business associate of another covered entity.

(3) Business associate includes:

(i) A Health Information Organization, E–prescribing Gateway, or other person that provides data transmission services with respect to protected health information to a covered entity and that requires access on a routine basis to such protected health information.

(ii) A person that offers a personal health record to one or more individuals on behalf of a covered entity.

(iii) A subcontractor that creates, receives, maintains, or transmits protected health information on behalf of the business associate.

(4) Business associate does not include:

(i) A health care provider, with respect to disclosures by a covered entity to the health care provider concerning the treatment of the individual.

(ii) A plan sponsor, with respect to disclosures by a group health plan (or by a health insurance issuer or HMO with respect to a group health plan) to the plan sponsor, to the extent that the requirements of § 164.504(f) of this subchapter apply and are met.

(iii) A government agency, with respect to determining eligibility for, or enrollment in, a government health plan that provides public benefits and is administered by another government agency, or collecting protected health information for such purposes, to the extent such activities are authorized by law.

(iv) A covered entity participating in an organized health care arrangement that performs a function or activity as described by paragraph (1)(i) of this definition for or on behalf of such organized health care arrangement, or that provides a service as described in paragraph (1)(ii) of this definition to or for such organized health care arrangement by virtue of such activities or services.

Civil money penalty or penalty means the amount determined under § 160.404 of this part and includes the plural of these terms.

CMS stands for Centers for Medicare & Medicaid Services within the Department of Health and Human Services.

Compliance date means the date by which a covered entity or business associate must comply with a standard, implementation specification, requirement, or modification adopted under this subchapter.

Covered entity means:

(1) A health plan.

(2) A health care clearinghouse.

(3) A health care provider who transmits any health information in electronic form in connection with a transaction covered by this subchapter.

Disclosure means the release, transfer, provision of access to, or divulging in any manner of information outside the entity holding the information.

EIN stands for the employer identification number assigned by the Internal Revenue Service, U.S. Department of the Treasury. The EIN is the taxpayer identifying number of an individual or other entity (whether or not an employer) assigned under one of the following:

(1) 26 U.S.C. 6011(b), which is the portion of the Internal Revenue Code dealing with identifying the taxpayer in tax returns and statements, or corresponding provisions of prior law.

(2) 26 U.S.C. 6109, which is the portion of the Internal Revenue Code dealing with identifying numbers in tax returns, statements, and other required documents.

Electronic media means:

(1) Electronic storage material on which data is or may be recorded electronically, including, for example, devices in computers (hard drives) and any removable/transportable digital memory medium, such as magnetic tape or disk, optical disk, or digital memory card;

(2) Transmission media used to exchange information already in electronic storage media. Transmission media include, for example, the Internet, extranet or intranet, leased lines, dial-up lines, private networks, and the physical movement of removable/transportable electronic storage media. Certain transmissions, including of paper, via facsimile, and of voice, via telephone, are not considered to be transmissions via electronic media if the information being exchanged did not exist in electronic form immediately before the transmission.

Electronic protected health information means information that comes within paragraphs (1)(i) or (1)(ii) of the definition of protected health information as specified in this section.

Employer is defined as it is in 26 U.S.C. 3401(d).

Family member means, with respect to an individual:

(1) A dependent (as such term is defined in 45 CFR 144.103), of the individual; or

(2) Any other person who is a first-degree, second-degree, third-degree, or fourth-degree relative of the individual or of a dependent of the individual. Relatives by affinity (such as by marriage or adoption) are treated the same as relatives by consanguinity (that is, relatives who share a common biological ancestor). In determining the degree of the relationship, relatives by less than full consanguinity (such as half-siblings, who share only one parent) are treated the same as relatives by full consanguinity (such as siblings who share both parents).

(i) First-degree relatives include parents, spouses, siblings, and children.

(ii) Second-degree relatives include grandparents, grandchildren, aunts, uncles, nephews, and nieces.

(iii) Third-degree relatives include great-grandparents, great-grandchildren, great aunts, great uncles, and first cousins.

(iv) Fourth-degree relatives include great-great grandparents, great-great grandchildren, and children of first cousins.

Genetic information means:

(1) Subject to paragraphs (2) and (3) of this definition, with respect to an individual, information about:

(i) The individual's genetic tests;

(ii) The genetic tests of family members of the individual;

(iii) The manifestation of a disease or disorder in family members of such individual; or

(iv) Any request for, or receipt of, genetic services, or participation in clinical research which includes genetic services, by the individual or any family member of the individual.

(2) Any reference in this subchapter to genetic information concerning an individual or family member of an individual shall include the genetic information of:

(i) A fetus carried by the individual or family member who is a pregnant woman; and

(ii) Any embryo legally held by an individual or family member utilizing an assisted reproductive technology.

(3) Genetic information excludes information about the sex or age of any individual.

Genetic services means:

(1) A genetic test;

(2) Genetic counseling (including obtaining, interpreting, or assessing genetic information); or

(3) Genetic education.

Genetic test means an analysis of human DNA, RNA, chromosomes, proteins, or metabolites, if the analysis detects genotypes, mutations, or chromosomal changes. Genetic test does not include an analysis of proteins or metabolites that is directly related to a manifested disease, disorder, or pathological condition.

Group health plan (also see definition of health plan in this section) means an employee welfare benefit plan (as defined in section 3(1) of the Employee Retirement Income and Security Act of 1974 (ERISA), 29 U.S.C. 1002(1)), including insured and self-insured plans, to the extent that the plan provides medical care (as defined in section 2791(a)(2) of the Public Health Service Act (PHS Act), 42 U.S.C. 300gg–91(a)(2)), including items and services paid for as medical care, to employees or their dependents directly or through insurance, reimbursement, or otherwise, that:

(1) Has 50 or more participants (as defined in section 3(7) of ERISA, 29 U.S.C. 1002(7)); or

(2) Is administered by an entity other than the employer that established and maintains the plan.

HHS stands for the Department of Health and Human Services.

Health care means care, services, or supplies related to the health of an individual. Health care includes, but is not limited to, the following:

(1) Preventive, diagnostic, therapeutic, rehabilitative, maintenance, or palliative care, and counseling, service, assessment, or procedure with respect to the physical or mental condition, or functional status, of an individual or that affects the structure or function of the body; and

(2) Sale or dispensing of a drug, device, equipment, or other item in accordance with a prescription.

Health care clearinghouse means a public or private entity, including a billing service, repricing company, community health management information system or community health information system, and "value-added" networks and switches, that does either of the following functions:

(1) Processes or facilitates the processing of health information received from another entity in a nonstandard format or containing nonstandard data content into standard data elements or a standard transaction.

(2) Receives a standard transaction from another entity and processes or facilitates the processing of health information into nonstandard format or nonstandard data content for the receiving entity.

Health care provider means a provider of services (as defined in section 1861(u) of the Act, 42 U.S.C. 1395x(u)), a provider of medical or health services (as defined in section 1861(s) of the Act, 42 U.S.C. 1395x(s)), and any other person or organization who furnishes, bills, or is paid for health care in the normal course of business.

Health information means any information, including genetic information, whether oral or recorded in any form or medium, that:

(1) Is created or received by a health care provider, health plan, public health authority, employer, life insurer, school or university, or health care clearinghouse; and

(2) Relates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual.

Health insurance issuer (as defined in section 2791(b)(2) of the PHS Act, 42 U.S.C. 300gg–91(b)(2) and used in the definition of health plan in this section) means an insurance company, insurance service, or insurance organization (including an HMO) that is licensed to engage in the business of insurance in a State and is subject to State law that regulates insurance. Such term does not include a group health plan.

Health maintenance organization (HMO) (as defined in section 2791(b)(3) of the PHS Act, 42 U.S.C. 300gg–91(b)(3) and used in the definition of health plan in this section) means a federally qualified HMO, an organization recognized as an HMO under State law, or a similar organization regulated for solvency under State law in the same manner and to the same extent as such an HMO.

Health plan means an individual or group plan that provides, or pays the cost of, medical care (as defined in section 2791(a)(2) of the PHS Act, 42 U.S.C. 300gg–91(a)(2)).

(1) Health plan includes the following, singly or in combination:

(i) A group health plan, as defined in this section.

(ii) A health insurance issuer, as defined in this section.

(iii) An HMO, as defined in this section.

(iv) Part A or Part B of the Medicare program under title XVIII of the Act.

(v) The Medicaid program under title XIX of the Act, 42 U.S.C. 1396, et seq.

(vi) The Voluntary Prescription Drug Benefit Program under Part D of title XVIII of the Act, 42 U.S.C. 1395w–101 through 1395w–152.

(vii) An issuer of a Medicare supplemental policy (as defined in section 1882(g)(1) of the Act, 42 U.S.C. 1395ss(g)(1)).

(viii) An issuer of a long-term care policy, excluding a nursing home fixed indemnity policy.

(ix) An employee welfare benefit plan or any other arrangement that is established or maintained for the purpose of offering or providing health benefits to the employees of two or more employers.

(x) The health care program for uniformed services under title 10 of the United States Code.

(xi) The veterans health care program under 38 U.S.C. chapter 17.

(xii) The Indian Health Service program under the Indian Health Care Improvement Act, 25 U.S.C. 1601, et seq.

(xiii) The Federal Employees Health Benefits Program under 5 U.S.C. 8902, et seq.

(xiv) An approved State child health plan under title XXI of the Act, providing benefits for child health assistance that meet the requirements of section 2103 of the Act, 42 U.S.C. 1397, et seq.

(xv) The Medicare Advantage program under Part C of title XVIII of the Act, 42 U.S.C. 1395w–21 through 1395w–28.

(xvi) A high risk pool that is a mechanism established under State law to provide health insurance coverage or comparable coverage to eligible individuals.

(xvii) Any other individual or group plan, or combination of individual or group plans, that provides or pays for the cost of medical care (as defined in section 2791(a)(2) of the PHS Act, 42 U.S.C. 300gg–91(a)(2)).

(2) Health plan excludes:

(i) Any policy, plan, or program to the extent that it provides, or pays for the cost of, excepted benefits that are listed in section 2791(c)(1) of the PHS Act, 42 U.S.C. 300gg–91(c)(1); and

(ii) A government-funded program (other than one listed in paragraph (1)(i)–(xvi) of this definition):

(A) Whose principal purpose is other than providing, or paying the cost of, health care; or

(B) Whose principal activity is:

(1) The direct provision of health care to persons; or

(2) The making of grants to fund the direct provision of health care to persons.

Implementation specification means specific requirements or instructions for implementing a standard.

Individual means the person who is the subject of protected health information.

Individually identifiable health information is information that is a subset of health information, including demographic information collected from an individual, and:

(1) Is created or received by a health care provider, health plan, employer, or health care clearinghouse; and

(2) Relates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual; and

(i) That identifies the individual; or

(ii) With respect to which there is a reasonable basis to believe the information can be used to identify the individual.

Manifestation or manifested means, with respect to a disease, disorder, or pathological condition, that an individual has been or could reasonably be diagnosed with the disease, disorder, or pathological condition by a health care professional with appropriate training and expertise in the field of medicine involved. For purposes of this subchapter, a disease, disorder, or pathological condition is not manifested if the diagnosis is based principally on genetic information.

Modify or modification refers to a change adopted by the Secretary, through regulation, to a standard or an implementation specification.

Organized health care arrangement means:

(1) A clinically integrated care setting in which individuals typically receive health care from more than one health care provider;

(2) An organized system of health care in which more than one covered entity participates and in which the participating covered entities:

(i) Hold themselves out to the public as participating in a joint arrangement; and

(ii) Participate in joint activities that include at least one of the following:

(A) Utilization review, in which health care decisions by participating covered entities are reviewed by other participating covered entities or by a third party on their behalf;

(B) Quality assessment and improvement activities, in which treatment provided by participating covered entities is assessed by other participating covered entities or by a third party on their behalf; or

(C) Payment activities, if the financial risk for delivering health care is shared, in part or in whole, by participating covered entities through the joint arrangement and if protected health information created or received by a covered entity is reviewed by other participating covered entities or by a third party on their behalf for the purpose of administering the sharing of financial risk.

(3) A group health plan and a health insurance issuer or HMO with respect to such group health plan, but only with respect to protected health information created or received by such health insurance issuer or HMO that relates to individuals who are or who have been participants or beneficiaries in such group health plan;

(4) A group health plan and one or more other group health plans each of which are maintained by the same plan sponsor; or

(5) The group health plans described in paragraph (4) of this definition and health insurance issuers or HMOs with respect to such group health plans, but only with respect to protected health information created or received by such health insurance issuers or HMOs that relates to individuals who are or have been participants or beneficiaries in any of such group health plans.

Person means a natural person (meaning a human being who is born alive), trust or estate, partnership, corporation, professional association or corporation, or other entity, public or private.

Protected health information means individually identifiable health information:

(1) Except as provided in paragraph (2) of this definition, that is:

(i) Transmitted by electronic media;

(ii) Maintained in electronic media; or

(iii) Transmitted or maintained in any other form or medium.

(2) Protected health information excludes individually identifiable health information:

(i) In education records covered by the Family Educational Rights and Privacy Act, as amended, 20 U.S.C. 1232g;

(ii) In records described at 20 U.S.C. 1232g(a)(4)(B)(iv);

(iii) In employment records held by a covered entity in its role as employer; and

(iv) Regarding a person who has been deceased for more than 50 years.

Public health, as used in the terms "public health surveillance," "public health investigation," and "public health intervention," means population-level activities to prevent disease in and promote the health of populations. Such activities include identifying, monitoring, preventing, or mitigating ongoing or prospective threats to the health or safety of a population, which may involve the collection of protected health information. But such activities do not include those with any of the following purposes:

(1) To conduct a criminal, civil, or administrative investigation into any person for the mere act of seeking, obtaining, providing, or facilitating health care.

(2) To impose criminal, civil, or administrative liability on any person for the mere act of seeking, obtaining, providing, or facilitating health care.

(3) To identify any person for any of the activities described at paragraphs (1) or (2) of this definition.

Reproductive health care means health care, as defined in this section, that affects the health of an individual in all matters relating to the reproductive system and to its functions and processes. This definition shall not be construed to set forth a standard of care for or regulate what constitutes clinically appropriate reproductive health care.

Respondent means a covered entity or business associate upon which the Secretary has imposed, or proposes to impose, a civil money penalty.

Secretary means the Secretary of Health and Human Services or any other officer or employee of HHS to whom the authority involved has been delegated.

Small health plan means a health plan with annual receipts of $5 million or less.

Standard means a rule, condition, or requirement:

(1) Describing the following information for products, systems, services, or practices:

(i) Classification of components;

(ii) Specification of materials, performance, or operations; or

(iii) Delineation of procedures; or

(2) With respect to the privacy of protected health information.

Standard setting organization (SSO) means an organization accredited by the American National Standards Institute that develops and maintains standards for information transactions or data elements, or any other standard that is necessary for, or will facilitate the implementation of, this part.

State refers to one of the following:

(1) For a health plan established or regulated by Federal law, State has the meaning set forth in the applicable section of the United States Code for such health plan.

(2) For all other purposes, State means any of the several States, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, American Samoa, and the Commonwealth of the Northern Mariana Islands.

Subcontractor means a person to whom a business associate delegates a function, activity, or service, other than in the capacity of a member of the workforce of such business associate.

Trading partner agreement means an agreement related to the exchange of information in electronic transactions, whether the agreement is distinct or part of a larger agreement, between each party to the agreement. (For example, a trading partner agreement may specify, among other things, the duties and responsibilities of each party to the agreement in conducting a standard transaction.)

Transaction means the transmission of information between two parties to carry out financial or administrative activities related to health care. It includes the following types of information transmissions:

(1) Health care claims or equivalent encounter information.

(2) Health care payment and remittance advice.

(3) Coordination of benefits.

(4) Health care claim status.

(5) Enrollment and disenrollment in a health plan.

(6) Eligibility for a health plan.

(7) Health plan premium payments.

(8) Referral certification and authorization.

(9) First report of injury.

(10) Health claims attachments.

(11) Health care electronic funds transfers (EFT) and remittance advice.

(12) Other transactions that the Secretary may prescribe by regulation.

Use means, with respect to individually identifiable health information, the sharing, employment, application, utilization, examination, or analysis of such information within an entity that maintains such information.

Violation or violate means, as the context may require, failure to comply with an administrative simplification provision.

Workforce means employees, volunteers, trainees, and other persons whose conduct, in the performance of work for a covered entity or business associate, is under the direct control of such covered entity or business associate, whether or not they are paid by the covered entity or business associate.

**Credits**

[67 FR 38019, May 31, 2002; 67 FR 53266, Aug. 14, 2002; 68 FR 8374, Feb. 20, 2003; 71 FR 8424, Feb. 16, 2006; 76 FR 40495, July 8, 2011; 77 FR 1589, Jan. 10, 2012; 78 FR 5687, Jan. 25, 2013; 79 FR 36432, June 27, 2014; 89 FR 33062, April 26, 2024]

SOURCE: 65 FR 50365, Aug. 17, 2000; 65 FR 82798, Dec. 28, 2000; 66 FR 12434, Feb. 26, 2001; 68 FR 18901, April 17, 2003; 71 FR 8424, Feb. 16, 2006; 74 FR 42767, Aug. 24, 2009; 74 FR 56130, Oct. 30, 2009; 76 FR 40495, July 8, 2011; 78 FR 5687, Jan. 25, 2013, unless otherwise noted.

AUTHORITY: 42 U.S.C. 1302(a); 42 U.S.C. 1320d–1320d–9; sec. 264, Pub.L. 104–191, 110 Stat. 2033–2034 (42 U.S.C. 1320d–2 (note)); 5 U.S.C. 552; secs. 13400–13424, Pub.L. 111–5, 123 Stat. 258–279; and sec. 1104 of Pub.L. 111–148, 124 Stat. 146–154.

Notes of Decisions (31)

Current through January 13, 2025, 90 FR 2871. Some sections may be more current. See credits for details.

End of Document                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

⚑ KeyCite Yellow Flag - Negative Treatment

Proposed Legislation

United States Code Annotated
  Title 42. The Public Health and Welfare
    Chapter 7. Social Security (Refs & Annos)
      Subchapter XI. General Provisions, Peer Review, and Administrative Simplification (Refs & Annos)
        Part C. Administrative Simplification

42 U.S.C.A. § 1320d-5

§ 1320d-5. General penalty for failure to comply with requirements and standards

Currentness

## (a) General penalty

### (1) In general

Except as provided in subsection (b), the Secretary shall impose on any person who violates a provision of this part--

**(A)** in the case of a violation of such provision in which it is established that the person did not know (and by exercising reasonable diligence would not have known) that such person violated such provision, a penalty for each such violation of an amount that is at least the amount described in paragraph (3)(A) but not to exceed the amount described in paragraph (3)(D);

**(B)** in the case of a violation of such provision in which it is established that the violation was due to reasonable cause and not to willful neglect, a penalty for each such violation of an amount that is at least the amount described in paragraph (3)(B) but not to exceed the amount described in paragraph (3)(D); and

**(C)** in the case of a violation of such provision in which it is established that the violation was due to willful neglect--

**(i)** if the violation is corrected as described in subsection (b)(3)(A), [1] a penalty in an amount that is at least the amount described in paragraph (3)(C) but not to exceed the amount described in paragraph (3)(D); and

**(ii)** if the violation is not corrected as described in such subsection, a penalty in an amount that is at least the amount described in paragraph (3)(D).

In determining the amount of a penalty under this section for a violation, the Secretary shall base such determination on the nature and extent of the violation and the nature and extent of the harm resulting from such violation.

### (2) Procedures

The provisions of section 1320a-7a of this title (other than subsections (a) and (b) and the second sentence of subsection (f)) shall apply to the imposition of a civil money penalty under this subsection in the same manner as such provisions apply to the imposition of a penalty under such section 1320a-7a of this title.

**(3) Tiers of penalties described**

For purposes of paragraph (1), with respect to a violation by a person of a provision of this part--

**(A)** the amount described in this subparagraph is $100 for each such violation, except that the total amount imposed on the person for all such violations of an identical requirement or prohibition during a calendar year may not exceed $25,000;

**(B)** the amount described in this subparagraph is $1,000 for each such violation, except that the total amount imposed on the person for all such violations of an identical requirement or prohibition during a calendar year may not exceed $100,000;

**(C)** the amount described in this subparagraph is $10,000 for each such violation, except that the total amount imposed on the person for all such violations of an identical requirement or prohibition during a calendar year may not exceed $250,000; and

**(D)** the amount described in this subparagraph is $50,000 for each such violation, except that the total amount imposed on the person for all such violations of an identical requirement or prohibition during a calendar year may not exceed $1,500,000.

**(b) Limitations**

**(1) Offenses otherwise punishable**

No penalty may be imposed under subsection (a) and no damages obtained under subsection (d) with respect to an act if a penalty has been imposed under section 1320d-6 of this title with respect to such act.

**(2) Failures due to reasonable cause**

**(A) In general**

Except as provided in subparagraph (B) or subsection (a)(1)(C), no penalty may be imposed under subsection (a) and no damages obtained under subsection (d) if the failure to comply is corrected during the 30-day period beginning on the first date the person liable for the penalty or damages knew, or by exercising reasonable diligence would have known, that the failure to comply occurred.

**(B) Extension of period**

**(i) No penalty**

With respect to the imposition of a penalty by the Secretary under subsection (a), the period referred to in subparagraph (A) may be extended as determined appropriate by the Secretary based on the nature and extent of the failure to comply.

**(ii) Assistance**

If the Secretary determines that a person failed to comply because the person was unable to comply, the Secretary may provide technical assistance to the person during the period described in subparagraph (A). Such assistance shall be provided in any manner determined appropriate by the Secretary.

**(3) Reduction**

In the case of a failure to comply which is due to reasonable cause and not to willful neglect, any penalty under subsection (a) and any damages under subsection (d) that is [2] not entirely waived under paragraph (3) [3] may be waived to the extent that the payment of such penalty [4] would be excessive relative to the compliance failure involved.

**(c) Noncompliance due to willful neglect**

**(1) In general**

A violation of a provision of this part due to willful neglect is a violation for which the Secretary is required to impose a penalty under subsection (a)(1).

**(2) Required investigation**

For purposes of paragraph (1), the Secretary shall formally investigate any complaint of a violation of a provision of this part if a preliminary investigation of the facts of the complaint indicate such a possible violation due to willful neglect.

**(d) Enforcement by State attorneys general**

**(1) Civil action**

Except as provided in subsection (b), in any case in which the attorney general of a State has reason to believe that an interest of one or more of the residents of that State has been or is threatened or adversely affected by any person who violates a provision of this part, the attorney general of the State, as parens patriae, may bring a civil action on behalf of such residents of the State in a district court of the United States of appropriate jurisdiction--

**(A)** to enjoin further such violation by the defendant; or

WESTLAW  © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**(B)** to obtain damages on behalf of such residents of the State, in an amount equal to the amount determined under paragraph (2).

**(2) Statutory damages**

**(A) In general**

For purposes of paragraph (1)(B), the amount determined under this paragraph is the amount calculated by multiplying the number of violations by up to $100. For purposes of the preceding sentence, in the case of a continuing violation, the number of violations shall be determined consistent with the HIPAA privacy regulations (as defined in section 1320d-9(b)(3) of this title) for violations of subsection (a).

**(B) Limitation**

The total amount of damages imposed on the person for all violations of an identical requirement or prohibition during a calendar year may not exceed $25,000.

**(C) Reduction of damages**

In assessing damages under subparagraph (A), the court may consider the factors the Secretary may consider in determining the amount of a civil money penalty under subsection (a) under the HIPAA privacy regulations.

**(3) Attorney fees**

In the case of any successful action under paragraph (1), the court, in its discretion, may award the costs of the action and reasonable attorney fees to the State.

**(4) Notice to Secretary**

The State shall serve prior written notice of any action under paragraph (1) upon the Secretary and provide the Secretary with a copy of its complaint, except in any case in which such prior notice is not feasible, in which case the State shall serve such notice immediately upon instituting such action. The Secretary shall have the right--

**(A)** to intervene in the action;

**(B)** upon so intervening, to be heard on all matters arising therein; and

**(C)** to file petitions for appeal.

**(5) Construction**

For purposes of bringing any civil action under paragraph (1), nothing in this section shall be construed to prevent an attorney general of a State from exercising the powers conferred on the attorney general by the laws of that State.

**(6) Venue; service of process**

**(A) Venue**

Any action brought under paragraph (1) may be brought in the district court of the United States that meets applicable requirements relating to venue under section 1391 of Title 28.

**(B) Service of process**

In an action brought under paragraph (1), process may be served in any district in which the defendant--

**(i)** is an inhabitant; or

**(ii)** maintains a physical place of business.

**(7) Limitation on State action while Federal action is pending**

If the Secretary has instituted an action against a person under subsection (a) with respect to a specific violation of this part, no State attorney general may bring an action under this subsection against the person with respect to such violation during the pendency of that action.

**(8) Application of CMP statute of limitation**

A civil action may not be instituted with respect to a violation of this part unless an action to impose a civil money penalty may be instituted under subsection (a) with respect to such violation consistent with the second sentence of section 1320a-7a(c)(1) of this title.

**(e) Allowing continued use of corrective action**

Nothing in this section shall be construed as preventing the Office for Civil Rights of the Department of Health and Human Services from continuing, in its discretion, to use corrective action without a penalty in cases where the person did not know (and by exercising reasonable diligence would not have known) of the violation involved.

**CREDIT(S)**

(Aug. 14, 1935, c. 531, Title XI, § 1176, as added Pub.L. 104-191, Title II, § 262(a), Aug. 21, 1996, 110 Stat. 2028; amended Pub.L. 111-5, Div. A, Title XIII, § 13410(a)(1), (d)(1) to (3), (e)(1), (2), (f), Feb. 17, 2009, 123 Stat. 271 to 276.)

Notes of Decisions (12)

## Footnotes

1       So in original. Probably should be "(b)(2)(A)".

2       So in original. Probably should be "are".

3       So in original. Probably should be "(2)".

4       So in original. The words "or damages" probably should appear after "penalty".

42 U.S.C.A. § 1320d-5, 42 USCA § 1320d-5
Current through P.L. 118-158. Some statute sections may be more current, see credits for details.

**End of Document**                              © 2025 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
  Title 42. The Public Health and Welfare
    Chapter 7. Social Security (Refs & Annos)
      Subchapter XI. General Provisions, Peer Review, and Administrative Simplification (Refs & Annos)
      Part C. Administrative Simplification

42 U.S.C.A. § 1320d-6

§ 1320d-6. Wrongful disclosure of individually identifiable health information

Currentness

**(a) Offense**

A person who knowingly and in violation of this part--

**(1)** uses or causes to be used a unique health identifier;

**(2)** obtains individually identifiable health information relating to an individual; or

**(3)** discloses individually identifiable health information to another person,

shall be punished as provided in subsection (b). For purposes of the previous sentence, a person (including an employee or other individual) shall be considered to have obtained or disclosed individually identifiable health information in violation of this part if the information is maintained by a covered entity (as defined in the HIPAA privacy regulation described in section 1320d-9(b)(3) of this title) and the individual obtained or disclosed such information without authorization.

**(b) Penalties**

A person described in subsection (a) shall--

**(1)** be fined not more than $50,000, imprisoned not more than 1 year, or both;

**(2)** if the offense is committed under false pretenses, be fined not more than $100,000, imprisoned not more than 5 years, or both; and

**(3)** if the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm, be fined not more than $250,000, imprisoned not more than 10 years, or both.

**CREDIT(S)**

(Aug. 14, 1935, c. 531, Title XI, § 1177, as added Pub.L. 104-191, Title II, § 262(a), Aug. 21, 1996, 110 Stat. 2029; amended Pub.L. 111-5, Div. A, Title XIII, § 13409, Feb. 17, 2009, 123 Stat. 271.)

Notes of Decisions (36)

42 U.S.C.A. § 1320d-6, 42 USCA § 1320d-6
Current through P.L. 118-158. Some statute sections may be more current, see credits for details.

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

*Opinion 1.1.1 Patient-Physician Relationships*

The practice of medicine, and its embodiment in the clinical encounter between a patient and a physician, is fundamentally a moral activity that arises from the imperative to care for patients and to alleviate suffering. The relationship between a patient and a physician is based on trust, which gives rise to physicians' ethical responsibility to place patients' welfare above the physician's own self-interest or obligations to others, to use sound medical judgment on patients' behalf, and to advocate for their patients' welfare.

A patient-physician relationship exists when a physician serves a patient's medical needs. Generally, the relationship is entered into by mutual consent between physician and patient (or surrogate).

However, in certain circumstances a limited patient-physician relationship may be created without the patient's (or surrogate's) explicit agreement. Such circumstances include:

(a)  When a physician provides emergency care or provides care at the request of the patient's treating physician. In these circumstances, the patient's (or surrogate's) agreement to the relationship is implicit.

(b)  When a physician provides medically appropriate care for a prisoner under court order, in keeping with ethics guidance on court-initiated treatment.

(c)  When a physician examines a patient in the context of an independent medical examination, in keeping with ethics guidance. In such situations, a limited patient-physician relationship exists.

*AMA Principles of Medical Ethics: I,II,IV,VIII*

*Background report(s)*:

CEJA Report 3-A-16, Modernized *Code of Medical Ethics*
CEJA Report 1-A-01, The Patient-Physician Relationship

CEJA Report 3-A-16 Modernized Code of Medical Ethics

***Opinion 1.1.1 Patient-Physician Relationships***

The practice of medicine, and its embodiment in the clinical encounter between a patient and a physician, is fundamentally a moral activity that arises from the imperative to care for patients and to alleviate suffering. The relationship between a patient and a physician is based on trust, which gives rise to physicians' ethical responsibility to place patients' welfare above the physician's own self-interest or obligations to others, to use sound medical judgment on patients' behalf, and to advocate for their patients' welfare.

A patient-physician relationship exists when a physician serves a patient's medical needs. Generally, the relationship is entered into by mutual consent between physician and patient (or surrogate).

However, in certain circumstances a limited patient-physician relationship may be created without the patient's (or surrogate's) explicit agreement. Such circumstances include:

(a) When a physician provides emergency care or provides care at the request of the patient's treating physician. In these circumstances, the patient's (or surrogate's) agreement to the relationship is implicit.

(b) When a physician provides medically appropriate care for a prisoner under court order, in keeping with ethics guidance on court-initiated treatment.

*(c) When a physician examines a patient in the context of an independent medical examination, in keeping with ethics guidance. In such situations, a limited patient-physician relationship exists. [new guidance cross-references guidance in Opinion 1.2.6]*

***AMA Principles of Medical Ethics: I,II,IV,VIII***

REPORT OF THE COUNCIL ON ETHICAL AND JUDICIAL AFFAIRS[*]

CEJA Report 1-A-01

Subject:         The Patient-Physician Relationship

Presented by:    Herbert Rakatansky, MD, Chair

Presented to:    Reference Committee on Amendments to Constitution and Bylaws
                 (William J. Mangold, Jr., MD, Chair)

---

1   Introduction
2
3   At the center of the history of the American Medical Association lies its *Code of Medical Ethics*.
4   The original *Code* of 1847 promulgated an ethic that emphasized conduct rather than character.  It
5   was premised on the understanding that the very nature of the physician's responsibility consisted
6   of caring for the sick and that this was a responsibility owed by all physicians to all patients.[1]
7   Also, building upon the Hippocratic tradition, physicians were called upon to hold a sense of
8   ethical obligation that rose above considerations of personal advancement.[2]  According to one
9   commentator, "the central moral commitment of the code was its dedication to something other
10  than the physician's self-interest, that something being the primacy of the welfare of the patient."[3]
11
12  The current *Code*'s focus on the relationship between physician and patient is exemplified by the
13  *Fundamental Elements of the Patient-Physician Relationship* issued in 1990.[4]  In particular,
14  physicians are to foster this partnership by providing information and allowing for autonomous
15  decision-making, acting respectfully and in a timely manner, preserving confidentiality, ensuring
16  continuity of care, and facilitating access to care.  Despite this list of features of the relationship
17  patients can expect from physicians and which physicians must strive to fulfill, the very nature of
18  the patient-physician relationship remains unexamined.
19
20  The patient-physician relationship, which is at the heart of the AMA's *Code of Medical Ethics*, is
21  the focus of this report.
22
23  Conceptualizing the patient-physician relationship
24
25  According to one medical ethicist, there is no single characterization that can properly do justice
26  to the patient-physician relationship "given the complexity of professional styles, patient
27  expectations and values, and contexts in which the relationship is established."[5]  For example,
28  patients treated for chronic diseases may have long-established relationships with their
29  physicians, or may be interacting with a specialist for a single consult.
30
31  Irrespective of the circumstances of the encounter between patient and physician, medical
32  ethicists have characterized it in terms of a moral activity.  This has been found to arise from the
33  condition that brings patients into contact with physicians, namely illness.  "Healing is sought for
34  concerns that go to the root of human existence: fears of death, deformity, and disability."[6]
35  Patients have been described in terms of their vulnerability, and consequently exploitable state,

---

[*] Reports of the Council on Ethical and Judicial Affairs are assigned to the Reference Committee on Constitution and Bylaws.  They may be adopted, not adopted, or referred.  A report may not be amended, except to clarify the meaning of the report and only with the concurrence of the Council.

© 2001 American Medical Association.  All Rights Reserved.

1  and their dependence on the medical expertise and the compassion of physicians.  In order to
2  maintain good health or to secure the treatments that will alleviate their ills, patients, or surrogate
3  decision-makers on their behalf, agree to enter into relationships with physicians.  At times, the
4  agreement to enter into a relationship is implied, such as when a patient is unconscious and in
5  need of emergency care, or when physicians provide a specific service at the request of the
6  treating physician (e.g. the services of a pathologist).  Physicians also agree to enter the
7  relationship; either directly, as agents, or by previous contractual arrangements to treat a group of
8  patients.  The relationship, therefore, is established by mutual agreement.  In some rare instances,
9  such as legally mandated treatment as described in Opinion 2.065, "Court-Initiated Treatments in
10  Criminal Cases,"[7] treatment may be provided by a physician even though a patient has not
11  consented to entering into a relationship.  In such circumstances, physicians remain bound by the
12  same obligations.
13
14  Once the relationship has been established, patients should be confident that they are receiving
15  the best medical care their physicians can provide, uncompromised by external factors.  However,
16  the medical profession currently finds itself amidst tensions between physicians' altruistic
17  covenant to provide needed medical care to patients and the market ethos of profit-making.[8]
18
19  Ethical obligations of physicians
20
21  Trust is central to the patient-physician relationship.  Physicians provide specialized knowledge
22  and expert skills that are relied upon by patients.  Physicians also hold considerable control over
23  medical resources used for the benefit of patients.
24
25  Many ethicists have emphasized the obligation of fidelity that is owed whenever the physician
26  establishes a relationship with the patient.[9]  One important manifestation of this obligation of
27  fidelity is the ethical obligation not to abandon a patient, which would undermine physicians'
28  trustworthiness. CEJA Opinion 8.115, "Termination of the Physician-Patient Relationship"
29  embodies this obligation to ensure continuity of care.  Viewed from a different perspective,
30  medicine is an act of "profession" whereby physicians promise to use their knowledge to help and
31  to heal.[10]
32
33  The patient-physician relationship is held to high standards of conduct, as embodied in the *Code*
34  *of Medical Ethics*.  This characterization of the patient-physician relationship differs significantly
35  from the contractual view of the relationship in which patients seek care and physicians provide
36  it.[11]  Ethically, it would be insufficient to view health care as an ordinary service and to allow
37  care that patients request from physicians to be governed by the maxim "let the buyer beware."
38
39  However, much of the current health care delivery system operates according to the dynamics of
40  the market.  According to many participants in this system, profit-making is a legitimate goal and
41  financial incentives are important tools in controlling health care resources.  This reality confers
42  even greater importance onto the principal feature of the patient-physician relationship, which
43  require that patients' interests be given priority.  Therefore, external factors that may result in
44  compromising medical judgment deserve careful examination.
45
46  Conflicts of interest
47
48  Many ethicists have long argued that some effacement of self-interest is morally obligatory for
49  physicians.[8]  This notion is captured throughout the *Code of Medical Ethics*.
50

1  *Conflicts between physicians' and patients' interests*
2
3  Physicians' self-interest that may conflict with the interests of patients is addressed in
4  unambiguous terms in Opinion 8.03, "Conflicts of Interest: Guidelines," which states that "Under
5  no circumstances may physicians place their own financial interests above the welfare of their
6  patients (…)  If a conflict develops between the physician's financial interest and the physician's
7  responsibilities to the patient, the conflict must be resolved to the patient's benefit."
8
9  More troubling in this era of managed care are some of the methods used to accomplish cost
10 containment.  Specifically, various risk-bearing arrangements that affect physicians' incomes
11 according to their use of health care resources may lead to limitations that could be harmful to
12 patients.  In Opinion 8.054, "Financial Incentives and the Practice of Medicine," physicians are
13 advised to evaluate financial incentives included in managed care contracts to ensure that quality
14 of patient care is not compromised by placing physicians' payments at excessive risk or by setting
15 unrealistic expectations for utilization.  The Opinion also recommends that large financial
16 incentives should be limited in order to prevent physicians' personal financial concerns from
17 creating a conflict with their role as individual patient advocates.
18
19 *Conflicts between individual patients and patient populations*
20
21 Managed care's use of financial incentives to influence physicians' decision-making also has led
22 to a shift from patient-focused medicine to population-based medicine.  In order to stay within
23 budgetary limits, physicians are urged, often through financial and other incentives, to consider
24 the impact of the decisions they make on an entire group of patients, rather than on a single
25 patient.  Physicians who allow such incentives to color medical judgement become primarily
26 agents of the health plan rather than of individual patients.[12]  It would seem more likely that
27 patients' trust in physicians will be best preserved if those who are ill can expect their physicians
28 to be advocates for optimal care and not just some minimal standard.[12]  However, systemic
29 budgetary constraints may in fact prevent patients from obtaining access to the optimal level of
30 care necessary to treat a condition.  Faced with such prospects, patients must find allies who will
31 assist them in gaining access to the resources needed to treat their condition.  In an earlier
32 report,[13] the Council clearly identified that physicians have a duty of patient advocacy that should
33 not be altered by the system of health care delivery, and that requires physicians to advocate for
34 any care they believe will materially benefit their patients.
35
36 <u>Conclusion</u>
37
38 The medical profession must strive to preserve the trust patients hold in their physicians.  It
39 cannot abandon ethical standards to economic forces.  As individual physicians advocate for the
40 care their individual patients require, so must the medical profession advocate for access to care
41 for all.  Individual physicians must work to forge strong alliances with their own patients, and the
42 medical profession with the public, to preserve the integrity of the profession.
43
44 <u>Recommendations</u>
45
46 The Council recommends that the following be adopted and the remainder of the report be filed:
47
48         The practice of medicine, and its embodiment in the clinical encounter between a
49         patient and a physician, is fundamentally a moral activity that arises from the
50         imperative to care for patients and to alleviate suffering.  The relationship
51         between patient and physician is based on trust and gives rise to physicians'

1    ethical obligations to place patients' welfare above their own self-interest and
2    above obligations to other groups, and to advocate for their patients' welfare.
3
4    A patient-physician relationship is generally created by mutual agreement
5    between physician and patient (or surrogate).  In some instances the agreement is
6    implied, such as in emergency care or when physicians provide services at the
7    request of the treating physician.  In rare instances, treatment without consent
8    may be provided under court order (see Opinion 2.065).  Nevertheless, the
9    physician's obligations to the patient remain intact.
10
11    Within the patient-physician relationship, a physician is ethically required to use
12    sound medical judgment, holding the best interests of the patient as paramount.

CEJA Report 1-A-01 — page 5

# REFERENCES

[1] Baker RB.  The American Medical Ethics Revolution.  In: *The American Medical Ethics Revolution*. Baker RB, Caplan AL, Emanuel LL, Latham SR, eds. Baltimore, Md: Johns Hopkins University Press; 1999: 17-51.

[2] Bell J. Introduction to the 1847 Code of Ethics (Appednix B) In: *The American Medical Ethics Revolution*. Baker RB, Caplan AL, Emanuel LL, Latham SR, eds. Baltimore, Md: Johns Hopkins University Press; 1999:317-323.

[3] Pellegrino ED. Moral status and relevance of the code. In: *The American Medical Ethics Revolution*. Baker RB, Caplan AL, Emanuel LL, Latham SR, eds. Baltimore, Md: Johns Hopkins University Press; 1999:107-123.

[4] Council on Ethical and Judicial Affairs, Opinion 10.01, Fundamental Elements of the Patient-Physician. In Code of Medical Ethics: Current Opinions, 2000-2001.  AMA Press, Chicago, IL, 2000.

[5] Thomasma, DC. Beyond medical paternalism and patient autonomy: a model of physician conscience for the physician-patient relationship. *Ann Intern Med*. 1983; 98: 243-248.

[6] Engelhardt HT Jr. *The Foundations of Bioethics*. 2nd ed. New York, NY: Oxford University Press;1996.

[7] Council on Ethical and Judicial Affairs, Opinion 2.065, Court-Initiated Medical Treatments in Criminal Cases.  In Code of Medical Ethics: Current Opinions, 2000-2001.  AMA Press, Chicago, IL, 2000

[8] Pellegrino ED, Thomasma DC. *The Virtues in Medical Practice*. New York, NY; Oxford University Press:1993.

[9] Beauchamp TL, Childress JF. *Principles of Biomedical Ethics*.  4th ed. New York, NY; Oxford University Press; 1994.

[10] Pellegrino ED. Toward a virtue-based normative ethics. *Kennedy Institute of Ethics J*. 1995;5:253-277.

[11] Howard ML, Vogt LB. Physician-patient relationship. In *Legal Medicine*. 3rd ed. American College of Legal Medicine. (Mosby; Saint-Louis, Missouri, 1995).

[12] Kassirer JP. Managing care-Should we adopt a new ethic? *New Engl J Med*. 1998;339:XX.

[13] Council on Ethical and Judicial Affairs.  Ethical Issues in Managed Care. *JAMA*. 1995;273:330-335.

# AMA *Code of Medical Ethics*

### *3.1.1 Privacy in Health Care*

Protecting information gathered in association with the care of the patient is a core value in health care. However, respecting patient privacy in other forms is also fundamental, as an expression of respect for patient autonomy and a prerequisite for trust.

Patient privacy encompasses a number of aspects, including personal space (physical privacy), personal data (informational privacy), personal choices including cultural and religious affiliations (decisional privacy), and personal relationships with family members and other intimates (associational privacy).

Physicians must seek to protect patient privacy in all settings to the greatest extent possible and should:

(a)  Minimize intrusion on privacy when the patient's privacy must be balanced against other factors.

(b)  Inform the patient when there has been a significant infringement on privacy of which the patient would otherwise not be aware.

(c)  Be mindful that individual patients may have special concerns about privacy in any or all of these areas.

(d)  Be transparent with any inquiry about existing privacy safeguards for patient data but acknowledge that anonymity cannot be guaranteed and that breaches can occur notwithstanding best data safety practices.

*AMA Principles of Medical Ethics: I,IV*

1/4/25, 12:59 PM                    Anti-abortion groups have 2 asks. RFK Jr. is listening. - POLITICO

Case 2:24-cv-00228-Z    Document 50-1    Filed 01/17/25    Page 842 of 882    PageID 49627





**HEALTH CARE**

# Anti-abortion groups have 2 asks. RFK Jr. is listening.

Their support could make or break whether Senate confirms Kennedy for Trump's Cabinet.



Abortion opponents — concerned about Robert F. Kennedy's past comments supporting abortion access — have two major asks. | Rebecca Noble/Getty Images

By **MEGAN MESSERLY**, **ALICE MIRANDA OLLSTEIN** and **ADAM CANCRYN**
11/20/2024 12:00 PM EST

   

Robert F. Kennedy Jr. is on a mission to win over skeptical anti-abortion groups and their allies on Capitol Hill.

It could make or break whether the soon-to-be GOP-controlled Senate confirms him to serve as President-elect Donald Trump's Health and Human Services secretary.

Abortion opponents — concerned about Kennedy's past comments supporting abortion access — have two major asks: that he appoint an anti-abortion stalwart to a senior position in HHS and that he promise privately to them and publicly during his confirmation hearing to restore anti-abortion policies from the first Trump administration, according to four anti-abortion advocates

And Kennedy, according to a fifth person close to the Trump transition, is open to their entreaties.

The negotiations come amid growing recognition from Kennedy's inner circle and the broader Trump transition team that he needs to appease anti-abortion groups and those alarmed by his views on vaccines to secure the 50 votes needed for Senate confirmation. Trump's health secretary will play a key role in shaping abortion access, including through access to abortion pills, making the decision pivotal to anti-abortion advocates.

Kennedy, those close to him say, is chiefly focused on shaping the nation's public health and food policies. And because he has little personal interest in abortion policies, there's acknowledgment his confirmation could hinge on putting someone alongside him who does.

"He's all over the place on this issue," said one of the anti-abortion advocates.

Sen. James Lankford (R-Okla.), a prominent opponent of abortion who sits on the Senate Finance Committee, which will be responsible for advancing the nomination to a floor vote, has already made clear that he plans to press Kennedy on abortion-related issues.

"I have a lot of life questions," Lankford told POLITICO. "I want to know if the second Trump administration will have the same life perspective at HHS that the first one did. ... They were very, very good about all the different issues."

Appx. 843

A spokesperson for the Trump transition did not immediately respond to a request for comment.

Among those anti-abortion advocates pushing for the senior HHS post are Roger Severino, director of HHS' Office for Civil Rights during the first Trump administration, and Eric Hargan, former deputy HHS secretary during the last administration. Neither responded to requests for comment.

At a minimum, anti-abortion groups want to see the Trump administration rescind the policies Biden implemented that expanded abortion access, such as the update to HIPAA privacy rules to cover abortions, as well as FDA rules making abortion pills available by mail and at retail pharmacies.

"We eagerly anticipate the day when the abortion pill is recognized for the evil it is and prohibited, and we encourage the President-elect to, at a minimum, swiftly reverse these changes made by the Biden administration," Brent Leatherwood, president of the Ethics and Religious Liberty Commission, the political arm of the Southern Baptist Convention, wrote in a recent memo to the Trump transition team outlining several of those policy priorities.

The advocates are also demanding the return of several Trump-era abortion rules, including the so-called Mexico City policy that blocked federal funding for international non-governmental organizations that provide or offer counseling on abortions, anti-abortion restrictions on federal family-planning clinics and a federal ban on discriminating against health care entities that refuse to cover abortion services or refer patients for the procedure when taxpayer dollars are involved.

Appx. 844



Kennedy took a host of contradictory positions on abortion during his presidential campaign, which he suspended in July before endorsing President-elect Donald Trump. | Pool photo by Brandon Bell

"The accomplishments from President Trump's first term become the baseline for the second term," Susan B. Anthony Pro-Life America argued in its own memo, shared with POLITICO. "However, in order to even get to the baseline, there is much that must be undone from the Biden-Harris regime, which worked tirelessly to promote abortion in every nook and cranny of the federal government."

Kennedy took a host of contradictory positions on abortion during his presidential campaign, which he suspended in July before endorsing Trump. He said "every abortion is a tragedy" — but also that he identifies as "pro-choice" and believes "it is always the woman's right to choose." He hired an anti-abortion activist to his campaign and called for a national ban on abortion after 15 weeks of pregnancy and then reversed himself on that position.

The group Students for Life of America is less critical of Kennedy's abortion

The group's chief policy strategist, Kristi Hamrick, argued that the shift back in May is a sign that "he is someone who will listen" to their movement going

1/4/25, 12:59 PM       Anti-abortion groups have 2 asks. RFK Jr. is listening. - POLITICO

Case 2:24-cv-00228-Z    Document 50-1    Filed 01/17/25    Page 846 of 882    PageID 49631

forward.

"When faced with evidence, he changed his views," she said. "How intelligent, refreshing and unlike so many in the health care space."

The group is also betting that Kennedy's environmental background will make him amenable to their pitch that abortion pills pose a threat to the U.S. water supply, and they are working to set up a meeting with him to make their case on cutting off patient access to the drugs.

Still, Students for Life is part of the chorus pushing for Severino — the lead author of Project 2025's health care chapter — to hold a prominent role at HHS, with Hamrick calling him "someone who knows just how corrupt and biased the agency is and who has ideas to fix it."

"They need to balance the HHS ticket with experience" due to Kennedy's lack of familiarity with government bureaucracy and federal funding streams, she said, adding that they trust someone who worked for years at the agency, like Severino, to make sure all of the Biden-era programs expanding access to abortion are rolled back.

*Ben Leonard contributed to this report.*

**FILED UNDER:** ABORTION, ROBERT F. KENNEDY JR., DONALD TRUMP, (•••)

## Playbook

The unofficial guide to official Washington, every morning and weekday afternoons.

**EMAIL**

Your Email

**EMPLOYER**                               **JOB TITLE**

Employer                                   Job Title

By signing up, you acknowledge and agree to our Privacy Policy and Terms of Service. You may unsubscribe at any time by following the directions at the bottom of the email or by contacting us here. This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply.

SIGN UP

1/4/25, 12:59 PM                    Anti-abortion groups have 2 asks. RFK Jr. is listening. - POLITICO

Case 2:24-cv-00228-Z     Document 50-1     Filed 01/17/25     Page 847 of 882     PageID 49632

About Us

Advertising

Breaking News Alerts

Careers

Credit Card Payments

Digital Edition

FAQ

Feedback

Headlines

Photos

Press

Print Subscriptions

Request A Correction

Write For Us

RSS

Site Map

Terms of Service

Privacy Policy

_____

© 2025 POLITICO LLC

1/4/25, 12:59 PM
Trump's HHS nominee Robert F. Kennedy Jr. reassures pro-life senators with policy plans | Catholic News Agency

Case 2:24-cv-00228-Z    Document 50-1    Filed 01/17/25    Page 848 of 882    PageID 49633

Thursday, December 19, 2024   A service of EWTN News    CNA •••



CNA | Catholic News Agency

(search)  (•••)    Donate    ☰ MENU

# Trump's HHS nominee Robert F. Kennedy Jr. reassures pro-life senators with policy plans



Robert F. Kennedy Jr., President-elect Donald Trump's nominee to be secretary of Health and Human Services, arrives for meetings at the Hart Senate Office Building on Capitol Hill on Dec. 16, 2024, in Washington, D.C. | Credit: Chip Somodevilla/Getty Images

 **By Tyler Arnold**

Appx. 848

Case: 2:24-cv-00228-Z    Document 50-1    Filed 01/17/25    Page 849 of 882    PageID 49634

Washington, D.C. Newsroom, Dec 18, 2024 / 17:50 pm

Robert F. Kennedy Jr. is reassuring Republican senators that he will back certain pro-life policies if the Senate confirms him to lead the U.S. Department of Health and Human Services (HHS).

In November, U.S. President-elect Donald Trump **nominated Kennedy** to serve as the United States secretary of the HHS, a position that requires Senate confirmation. HHS oversees 10 agencies, including the Food and Drug Administration (FDA) and the Centers for Disease Control and Prevention (CDC).

Kennedy is a former Democrat. He **ran for president** as an independent in 2024 before **dropping out** and **endorsing Trump**.

Although Kennedy has supported legal abortion for his entire public career, he told pro-life senators in closed-door meetings that he would oppose taxpayer funds for abortion domestically and abroad and restore conscience protections.

"Today I got to sit down with [Kennedy] — we had a substantive discussion about American health care … [and] a good discussion, at length, about pro-life policies at HHS," Sen. Josh Hawley, R-Missouri, said in **a series of posts on X**.

According to Hawley, Kennedy told him that, if confirmed, he would reinstate **the Mexico City Policy**, which ends federal funding for overseas organizations that promote abortion. Trump reinstated the Mexico City Policy during his first term and said in **an October interview with EWTN News** that he would consider doing so again in a second term.

Hawley said Kennedy's plans include "ending taxpayer funding for abortions domestically" and "reinstating the bar on Title X funds going to organizations that promote abortion." He said that Kennedy also "pledged to reinstate conscience protections for health care providers."

Sen. Tommy Tuberville, R-Alabama, told reporters that he and Kennedy also talked about abortion, saying: "The big thing about abortion is that he's telling everybody … whatever President Trump [supports], I'm going to back him 100%."

Appx. 849

Case 2:24-cv-00228-Z    Document 50-1    Filed 01/17/25    Page 850 of 882    PageID 49635

"Basically, [Kennedy] and President Trump have sat down and talked about it and both of them came to an agreement," Tuberville said. "Roe v. Wade is gone, [abortion has] gone back to the states. Let the people vote on it."

Sen. Markwayne Mullin, R-Oklahoma, **told reporters** that Kennedy told him he "serves the will of the [incoming] president of the United States and he'll be pushing his policies forward."

"[Kennedy's] first thing is [that] we have too many abortions," Mullin said. "… His follow up to that is [that he is] serving at the will of the president of the United States. … I think that should clear up that question for anyone."

Sen. Tim Scott, R-South Carolina, said **in a post on X** that he also spoke with Kennedy about abortion.

"I had a productive discussion with Robert F. Kennedy Jr. this evening about the future of our nation's health care system, preventing taxpayer-funded abortion, and Americans' long-term well-being," Scott said.

During his independent presidential campaign, Kennedy **first endorsed** abortion in all stages of pregnancy, including late-term abortion. He later **retracted that position** and said he would back restrictions at the point of fetal viability.

Kennedy also said during his campaign that **he would support** a "massive subsidized day care initiative" to reduce abortion without limiting legal access.

## No word on chemical abortions

**(Story continues below)**

### Subscribe to our daily newsletter

Email*

Appx. 850

1/4/25, 12:59 PM                    Trump's HHS nominee Robert F. Kennedy Jr. reassures pro-life senators with policy plans | Catholic News Agency

Case 2:24-cv-00228-Z    Document 50-1    Filed 01/17/25    Page 851 of 882    PageID 49636



Tuberville, however, said that he did not speak with Kennedy about chemical abortions, which are regulated by the FDA. Trump himself **has said he will not** restrict access to **the abortion pill mifepristone**. Chemical abortions account for about half of all abortions in the country.

The FDA first approved mifepristone to be used in chemical abortions in 2000. Under current law, the drug is approved to abort an unborn child up to 10 weeks' gestation, at which point the child has a fetal heartbeat, early brain activity, and partially developed eyes, lips, and nostrils.

Mifepristone kills the child by blocking the hormone progesterone, which cuts off the supply of oxygen and nutrients. A second pill, misoprostol, is taken between 24 to 48 hours after mifepristone to induce contractions meant to expel the child's body from the mother, essentially inducing labor.

Pro-life advocates **have been urging** the incoming administration to restrict abortion drugs. Many activists have argued that the executive branch could prohibit the delivery of abortion drugs in the mail by **enforcing the Comstock Act** — a plan that has not been embraced by Trump.

1/4/25, 12:59 PM       Trump's HHS nominee Robert F. Kennedy Jr. reassures pro-life senators with policy plans | Catholic News Agency

Case 2:24-cv-00228-Z    Document 50-1    Filed 01/17/25    Page 852 of 882    PageID 49637

Tags: **Catholic News, President Donald Trump, HHS - Department for Health and Human Services, Abortion in the United States, Robert F. Kennedy Jr., Pro-Life News**



Tyler Arnold is a staff reporter for Catholic News Agency, based in EWTN News' Washington Bureau. He previously worked at The Center Square and has been published in a variety of outlets, including The Associated Press, National Review, The American Conservative, and The Federalist.

## Our mission is the truth. Join us!

Your monthly donation will help our team continue reporting the truth, with fairness, integrity, and fidelity to Jesus Christ and his Church.

Donate

### TRENDING

1 **Pope Francis: How to be 'pilgrims of hope' during 2025 Jubilee Year**

2 **Lord mayor of Westminster to receive papal knighthood, highest honor for lay Catholics**

3 **Pope Francis: Family dialogue defeats digital distraction**

4 **Christian faith a hallmark of former president Jimmy Carter's life**

5 **Relics of Canadian Martyrs will tour western Canada for jubilee year**



Photograph by Philip Montgomery for TIME

**POLITICS**   DONALD TRUMP

# How Far Trump Would Go

ERIC CORTELLESSA / PALM BEACH, FLA.   @EricCortellessa  |  April 30, 2024

**In exclusive interviews, the former President lays out a second-term agenda that would reshape America and its role in the world.**

*This feature was published in April 2024.*

Donald Trump thinks he's identified a crucial mistake of his first term: He was too nice.

We've been talking for more than an hour on April 12 at his fever-dream palace in Palm Beach. Aides lurk around the perimeter of a gilded dining room overlooking the manicured lawn. When one nudges me to wrap up the interview, I bring up the many former Cabinet officials who refuse to endorse Trump this time. Some have publicly warned that he poses a danger to the Republic. Why should voters trust you, I ask, when some of the people who observed you most closely do not?

Appx. 853

Case 2:24-cv-00228-Z    Document 50-1    Filed 01/17/25    Page 854 of 882    PageID 49639

As always, Trump presents such denigrating his former top advisers. But beneath the typical torrent of invective, there is a larger lesson he has taken away. "I let them quit because I have a heart. I don't want to embarrass anybody," Trump says. "I don't think I'll do that again. From now on, I'll fire."

Six months from the 2024 presidential election, Trump is better positioned to win the White House than at any point in either of his previous campaigns. He leads Joe Biden by slim margins in most polls, including in several of the seven swing states likely to determine the outcome. But I had not come to ask about the election, the disgrace that followed the last one, or how he has become the first former—and perhaps future—American President to face a criminal trial. I wanted to know what Trump would do if he wins a second term, to hear his vision for the nation, in his own words.



Photograph by Philip Montgomery for TIME

The former President, at Mar-a-Lago on April 12, is rallying the right at home and seeking common cause with autocratic leaders abroad.



Appx. 854

What emerged in two interviews with Trump, and conversations with more than a dozen
of his closest advisers and confidants, were the outlines of an imperial presidency that
would reshape America and its role in the world. To carry out a deportation operation
designed to remove more than 11 million people from the country, Trump told me, he
would be willing to build migrant detention camps and deploy the U.S. military, both at
the border and inland. He would let red states monitor women's pregnancies and
prosecute those who violate abortion bans. He would, at his personal discretion,
withhold funds appropriated by Congress, according to top advisers. He would be willing
to fire a U.S. Attorney who doesn't carry out his order to prosecute someone, breaking
with a tradition of independent law enforcement that dates from America's founding. He
is weighing pardons for every one of his supporters accused of attacking the U.S. Capitol
on Jan. 6, 2021, more than 800 of whom have pleaded guilty or been convicted by a jury.
He might not come to the aid of an attacked ally in Europe or Asia if he felt that country
wasn't paying enough for its own defense. He would gut the U.S. civil service, deploy the
National Guard to American cities as he sees fit, close the White House pandemic-
preparedness office, and staff his Administration with acolytes who back his false
assertion that the 2020 election was stolen.

Trump remains the same guy, with the same goals and grievances. But in person, if
anything, he appears more assertive and confident. "When I first got to Washington, I
knew very few people," he says. "I had to rely on people." Now he is in charge. The
arranged marriage with the timorous Republican Party stalwarts is over; the old guard is
vanquished, and the people who remain are his people. Trump would enter a second
term backed by a slew of policy shops staffed by loyalists who have drawn up detailed
plans in service of his agenda, which would concentrate the powers of the state in the
hands of a man whose appetite for power appears all but insatiable. "I don't think it's a
big mystery what his agenda would be," says his close adviser Kellyanne Conway. "But I
think people will be surprised at the alacrity with which he will take action."



- **The 7 States That Will Decide the Election**
- **A Guide to Kamala Harris' Views on Abortion, the Economy, and More**
- **See the Most Memorable Looks From the Republican National Convention**
- **How Far Trump Would Go**
- **Read the Full Transcripts of Donald Trump's Interviews With TIME**

The courts, the Constitution, and a Congress of unknown composition would all have a
say in whether Trump's objectives come to pass. The machinery of Washington has a
range of defenses: leaks to a free press, whistle-blower protections, the oversight of
inspectors general. The same deficiencies of temperament and judgment that hindered
him in the past remain present. If he wins, Trump would be a lame duck—contrary to the
suggestions of some supporters, he tells TIME he would not seek to overturn or ignore
the Constitution's prohibition on a third term. Public opinion would also be a powerful

Appx. 855

Case 2:24-cv-00228-Z Document 50-1 Filed 01/17/25 Page 856 of 882 PageID 49641

there. Amid a public outcry, Trump was forced to walk back some of his most draconian first-term initiatives, including the policy of separating migrant families. As George Orwell wrote in 1945, the ability of governments to carry out their designs "depends on the general temper in the country."

Every election is billed as a national turning point. This time that rings true. To supporters, the prospect of Trump 2.0, unconstrained and backed by a disciplined movement of true believers, offers revolutionary promise. To much of the rest of the nation and the world, it represents an alarming risk. A second Trump term could bring "the end of our democracy," says presidential historian Douglas Brinkley, "and the birth of a new kind of authoritarian presidential order."

---

**Trump steps onto** the patio at Mar-a-Lago near dusk. The well-heeled crowd eating Wagyu steaks and grilled branzino pauses to applaud as he takes his seat. On this gorgeous evening, the club is a MAGA mecca. Billionaire donor Steve Wynn is here. So is Speaker of the House Mike Johnson, who is dining with the former President after a joint press conference proposing legislation to prevent noncitizens from voting. Their voting in federal elections is already illegal, and extremely rare, but remains a Trumpian fixation that the embattled Speaker appeared happy to co-sign in exchange for the political cover that standing with Trump provides.

At the moment, though, Trump's attention is elsewhere. With an index finger, he swipes through an iPad on the table to curate the restaurant's soundtrack. The playlist veers from Sinead O'Connor to James Brown to *The Phantom of the Opera*. And there's a uniquely Trump choice: a rendition of "The Star-Spangled Banner" sung by a choir of defendants imprisoned for attacking the U.S. Capitol on Jan. 6, interspersed with a recording of Trump reciting the Pledge of Allegiance. This has become a staple of his rallies, converting the ultimate symbol of national unity into a weapon of factional devotion.

The spectacle picks up where his first term left off. The events of Jan. 6, during which a pro-Trump mob attacked the center of American democracy in an effort to subvert the peaceful transfer of power, was a profound stain on his legacy. Trump has sought to recast an insurrectionist riot as an act of patriotism. "I call them the J-6 patriots," he says. When I ask whether he would consider pardoning every one of them, he says, "Yes, absolutely." As Trump faces dozens of felony charges, including for election interference, conspiracy to defraud the United States, willful retention of national-security secrets, and falsifying business records to conceal hush-money payments, he has tried to turn legal peril into a badge of honor.



In a second term, Trump's influence on American democracy would extend far beyond pardoning powers. Allies are laying the groundwork to restructure the presidency in line with a doctrine called the unitary executive theory, which holds that many of the

Appx. 856

constraints imposed on the White House by legislators, or the courts, would be swept away in favor of a more powerful Commander in Chief.

**Read More:** *Fact-Checking What Donald Trump Said In His Interviews With TIME*

Nowhere would that power be more momentous than at the Department of Justice. Since the nation's earliest days, Presidents have generally kept a respectful distance from Senate-confirmed law-enforcement officials to avoid exploiting for personal ends their enormous ability to curtail Americans' freedoms. But Trump, burned in his first term by multiple investigations directed by his own appointees, is ever more vocal about imposing his will directly on the department and its far-flung investigators and prosecutors.

## [video id=FlgFvoZe autostart="viewable"]

In our Mar-a-Lago interview, Trump says he might fire U.S. Attorneys who refuse his orders to prosecute someone: "It would depend on the situation." He's told supporters he would seek retribution against his enemies in a second term. Would that include Fani Willis, the Atlanta-area district attorney who charged him with election interference, or Alvin Bragg, the Manhattan DA in the Stormy Daniels case, who Trump has previously said should be prosecuted? Trump demurs but offers no promises. "No, I don't want to do that," he says, before adding, "We're gonna look at a lot of things. What they've done is a terrible thing."

Trump has also vowed to appoint a "real special prosecutor" to go after Biden. "I wouldn't want to hurt Biden," he tells me. "I have too much respect for the office." Seconds later, though, he suggests Biden's fate may be tied to an upcoming Supreme Court ruling on whether Presidents can face criminal prosecution for acts committed in office. "If they said that a President doesn't get immunity," says Trump, "then Biden, I am sure, will be prosecuted for all of his crimes." (Biden has not been charged with any, and a House Republican effort to impeach him has failed to unearth evidence of any crimes or misdemeanors, high or low.)

**Read More:** *Trump Says 'Anti-White Feeling' Is a Problem in the U.S.*

Such moves would be potentially catastrophic for the credibility of American law enforcement, scholars and former Justice Department leaders from both parties say. "If he ordered an improper prosecution, I would expect any respectable U.S. Attorney to say no," says Michael McConnell, a former U.S. appellate judge appointed by President George W. Bush. "If the President fired the U.S. Attorney, it would be an enormous firestorm." McConnell, now a Stanford law professor, says the dismissal could have a cascading effect similar to the Saturday Night Massacre, when President Richard Nixon ordered top DOJ officials to remove the special counsel investigating Watergate. Presidents have the constitutional right to fire U.S. Attorneys, and typically replace their predecessors' appointees upon taking office. But discharging one specifically for refusing a President's order would be all but unprecedented.

Case 2:24-cv-00228-Z    Document 50-1    Filed 01/17/25    Page 858 of 882    PageID 49643



Trump's radical designs for presidential power would be felt throughout the country. A main focus is the southern border. Trump says he plans to sign orders to reinstall many of the same policies from his first term, such as the Remain in Mexico program, which requires that non-Mexican asylum seekers be sent south of the border until their court dates, and Title 42, which allows border officials to expel migrants without letting them apply for asylum. Advisers say he plans to cite record border crossings and fentanyl- and child-trafficking as justification for reimposing the emergency measures. He would direct federal funding to resume construction of the border wall, likely by allocating money from the military budget without congressional approval. The capstone of this program, advisers say, would be a massive deportation operation that would target millions of people. Trump made similar pledges in his first term, but says he plans to be more aggressive in a second. "People need to be deported," says Tom Homan, a top Trump adviser and former acting head of Immigration and Customs Enforcement. "No one should be off the table."

**Read More:** *The Story Behind TIME's 'If He Wins' Trump Cover*

For an operation of that scale, Trump says he would rely mostly on the National Guard to round up and remove undocumented migrants throughout the country. "If they weren't able to, then I'd use [other parts of] the military," he says. When I ask if that means he would override the Posse Comitatus Act—an 1878 law that prohibits the use of military force on civilians—Trump seems unmoved by the weight of the statute. "Well, these aren't civilians," he says. "These are people that aren't legally in our country." He would also seek help from local police and says he would deny funding for jurisdictions that decline to adopt his policies. "There's a possibility that some won't want to participate," Trump says, "and they won't partake in the riches."

As President, Trump nominated three Supreme Court Justices who voted to overturn *Roe v. Wade,* and he claims credit for his role in ending a constitutional right to an abortion. At the same time, he has sought to defuse a potent campaign issue for the Democrats by saying he wouldn't sign a federal ban. In our interview at Mar-a-Lago, he declines to commit to vetoing any additional federal restrictions if they came to his desk. More than 20 states now have full or partial abortion bans, and Trump says those policies should be left to the states to do what they want, including monitoring women's pregnancies. "I think they might do that," he says. When I ask whether he would be comfortable with states prosecuting women for having abortions beyond the point the laws permit, he says, "It's irrelevant whether I'm comfortable or not. It's totally irrelevant, because the states are going to make those decisions." President Biden has said he would fight state anti-abortion measures in court and with regulation.

Trump's allies don't plan to be passive on abortion if he returns to power. The Heritage Foundation has called for enforcement of a 19th century statute that would outlaw the mailing of abortion pills. The Republican Study Committee (RSC), which includes more than 80% of the House GOP conference, included in its 2025 budget proposal the Life at Conception Act, which says the right to life extends to "the moment of fertilization." I ask

Appx. 858

snap if he had wanted to, but it came to nothing. "I don't have to be thinking about vetoes," Trump says, "because we now have it back in the states."

Presidents typically have a narrow window to pass major legislation. Trump's team is eyeing two bills to kick off a second term: a border-security and immigration package, and an extension of his 2017 tax cuts. Many of the latter's provisions expire early in 2025: the tax cuts on individual income brackets, 100% business expensing, the doubling of the estate-tax deduction. Trump is planning to intensify his protectionist agenda, telling me he's considering a tariff of more than 10% on all imports, and perhaps even a 100% tariff on some Chinese goods. Trump says the tariffs will liberate the U.S. economy from being at the mercy of foreign manufacturing and spur an industrial renaissance in the U.S. When I point out that independent analysts estimate Trump's first term tariffs on thousands of products, including steel and aluminum, solar panels, and washing machines, may have cost the U.S. $316 billion and more than 300,000 jobs, by one account, he dismisses these experts out of hand. His advisers argue that the average yearly inflation rate in his first term—under 2%—is evidence that his tariffs won't raise prices.

Since leaving office, Trump has tried to engineer a caucus of the compliant, clearing primary fields in Senate and House races. His hope is that GOP majorities replete with MAGA diehards could rubber-stamp his legislative agenda and nominees. Representative Jim Banks of Indiana, a former RSC chairman and the GOP nominee for the state's open Senate seat, recalls an August 2022 RSC planning meeting with Trump at his residence in Bedminster, N.J. As the group arrived, Banks recalls, news broke that Mar-a-Lago had been raided by the FBI. Banks was sure the meeting would be canceled. Moments later, Trump walked through the doors, defiant and pledging to run again. "I need allies there when I'm elected," Banks recalls Trump saying. The difference in a second Trump term, Banks says now, "is he's going to have the backup in Congress that he didn't have before."

Case 2:24-cv-00228-Z    Document 50-1    Filed 01/17/25    Page 860 of 882    PageID 49645

# Inside Trump's world

*The former President has a more disciplined operation preparing to put his vision into action*



**Trump's intention to** remake America's relations abroad may be just as consequential. Since its founding, the U.S. has sought to build and sustain alliances based on the shared values of political and economic freedom. Trump takes a much more transactional approach to international relations than his predecessors, expressing disdain for what he views as free-riding friends and appreciation for authoritarian leaders like President Xi Jinping of China, Prime Minister Viktor Orban of Hungary, or former President Jair Bolsonaro of Brazil.

That's one reason America's traditional allies were horrified when Trump recently said at a campaign rally that Russia could "do whatever the hell they want" to a NATO country he believes doesn't spend enough on collective defense. That wasn't idle bluster, Trump tells me. "If you're not going to pay, then you're on your own," he says. Trump has long said the alliance is ripping the U.S. off. Former NATO Secretary-General Jens Stoltenberg credited Trump's first-term threat to pull out of the alliance with spurring other members to add more than $100 billion to their defense budgets.

But an insecure NATO is as likely to accrue to Russia's benefit as it is to America's. President Vladimir Putin's 2022 invasion of Ukraine looks to many in Europe and the U.S. like a test of his broader vision to reconstruct the Soviet empire. Under Biden and a bipartisan Congress, the U.S. has sent more than $100 billion to Ukraine to defend itself. It's unlikely Trump would extend the same support to Kyiv. After Orban visited Mar-a-Lago in March, he said Trump "wouldn't give a penny" to Ukraine. "I wouldn't give unless Europe starts equalizing," Trump hedges in our interview. "If Europe is not going

Appx. 860

as pay, why would they? They're much more greatly affected. We have an ocean in between us. They don't." (E.U. nations have given more than $100 billion in aid to Ukraine as well.)

**Read More:** *Read the Full Transcripts of Donald Trump's Interviews With TIME*

Trump has historically been reluctant to criticize or confront Putin. He sided with the Russian autocrat over his own intelligence community when it asserted that Russia interfered in the 2016 election. Even now, Trump uses Putin as a foil for his own political purposes. When I asked Trump why he has not called for the release of *Wall Street Journal* reporter Evan Gershkovich, who has been unjustly held on spurious charges in a Moscow prison for a year, Trump says, "I guess because I have so many other things I'm working on." Gershkovich should be freed, he adds, but he doubts it will happen before the election. "The reporter should be released and he will be released," Trump tells me. "I don't know if he's going to be released under Biden. I would get him released."

America's Asian allies, like its European ones, may be on their own under Trump. Taiwan's Foreign Minister recently said aid to Ukraine was critical in deterring Xi from invading the island. Communist China's leaders "have to understand that things like that can't come easy," Trump says, but he declines to say whether he would come to Taiwan's defense.

Trump is less cryptic on current U.S. troop deployments in Asia. If South Korea doesn't pay more to support U.S. troops there to deter Kim Jong Un's increasingly belligerent regime to the north, Trump suggests the U.S. could withdraw its forces. "We have 40,000 troops that are in a precarious position," he tells TIME. (The number is actually 28,500.) "Which doesn't make any sense. Why would we defend somebody? And we're talking about a very wealthy country."

Transactional isolationism may be the main strain of Trump's foreign policy, but there are limits. Trump says he would join Israel's side in a confrontation with Iran. "If they attack Israel, yes, we would be there," he tells me. He says he has come around to the now widespread belief in Israel that a Palestinian state existing side by side in peace is increasingly unlikely. "There was a time when I thought two-state could work," he says. "Now I think two-state is going to be very, very tough."

Yet even his support for Israel is not absolute. He's criticized Israel's handling of its war against Hamas, which has killed more than 30,000 Palestinians in Gaza, and has called for the nation to "get it over with." When I ask whether he would consider withholding U.S. military aid to Israel to push it toward winding down the war, he doesn't say yes, but he doesn't rule it out, either. He is sharply critical of Israeli Prime Minister Benjamin Netanyahu, once a close ally. "I had a bad experience with Bibi," Trump says. In his telling, a January 2020 U.S. operation to assassinate a top Iranian general was supposed to be a joint attack until Netanyahu backed out at the last moment. "That was something I never forgot," he says. He blames Netanyahu for failing to prevent the Oct. 7 attack, when Hamas militants infiltrated southern Israel and killed nearly 1,200 people amid acts of brutality including burning entire families alive and raping women and girls. "It happened on his watch," Trump says.

**On the second** day of Trump's New York trial on April 17, I stand behind the packed counter of the Sanaa Convenience Store on 139th Street and Broadway, waiting for Trump to drop in for a postcourt campaign stop. He chose the bodega for its history. In 2022, one of the store's clerks fatally stabbed a customer who attacked him. Bragg, the Manhattan DA, charged the clerk with second-degree murder. (The charges were later dropped amid public outrage over video footage that appeared to show the clerk acting in self-defense.) A baseball bat behind the counter alludes to lingering security concerns. When Trump arrives, he asks the store's co-owner, Maad Ahmed, a Yemeni immigrant, about safety. "You should be allowed to have a gun," Trump tells Ahmed. "If you had a gun, you'd never get robbed."

On the campaign trail, Trump uses crime as a cudgel, painting urban America as a savage hell-scape even though violent crime has declined in recent years, with homicides

falling 6% since his first year in 2017 and 12% since 2020. When I put the point to him, Trump tells me he thinks the data, which is collected by state and local police departments, is rigged. "It's a lie," he says. He has pledged to send the National Guard into cities struggling with crime in a second term—possibly without the request of governors—and plans to approve Justice Department grants only to cities that adopt his preferred policing methods like stop-and-frisk.

To critics, Trump's preoccupation with crime is a racial dog whistle. In polls, large numbers of his supporters have expressed the view that antiwhite racism now represents a greater problem in the U.S. than the systemic racism that has long afflicted Black Americans. When I ask if he agrees, Trump does not dispute this position. "There is a definite antiwhite feeling in the country," he tells TIME, "and that can't be allowed either." In a second term, advisers say, a Trump Administration would rescind Biden's Executive Orders designed to boost diversity and racial equity.



Trump's ability to campaign for the White House in the midst of an unprecedented criminal trial is the product of a more professional campaign operation that has avoided the infighting that plagued past versions. "He has a very disciplined team around him," says Representative Elise Stefanik of New York. "That is an indicator of how disciplined and focused a second term will be." That control now extends to the party writ large. In 2016, the GOP establishment, having failed to derail Trump's campaign, surrounded him with staff who sought to temper him. Today the party's permanent class have either devoted themselves to the gospel of MAGA or given up. Trump has cleaned house at the Republican National Committee, installing handpicked leaders—including his daughter-in-law—who have reportedly imposed loyalty tests on prospective job applicants, asking whether they believe the false assertion that the 2020 election was stolen. (The RNC has denied there is a litmus test.) Trump tells me he would have trouble hiring anyone who admits Biden won: "I wouldn't feel good about it."

Policy groups are creating a government-in-waiting full of true believers. The Heritage Foundation's Project 2025 has drawn up plans for legislation and Executive Orders as it trains prospective personnel for a second Trump term. The Center for Renewing America, led by Russell Vought, Trump's former director of the Office of Management and Budget, is dedicated to disempowering the so-called administrative state, the collection of bureaucrats with the power to control everything from drug-safety determinations to the contents of school lunches. The America First Policy Institute is a research haven of pro-Trump right-wing populists. America First Legal, led by Trump's immigration adviser Stephen Miller, is mounting court battles against the Biden Administration.

The goal of these groups is to put Trump's vision into action on day one. "The President never had a policy process that was designed to give him what he actually wanted and campaigned on," says Vought. "[We are] sorting through the legal authorities, the mechanics, and providing the momentum for a future Administration." That includes a

litany of bold actions, including right-wing policies, slashing taxes, boosting oil-and-gas funding and cutting climate and environmental regulations.

**Read More:** *Fact-Checking What Donald Trump Said in His 2024 Interviews With TIME*

Trump's campaign says he would be the final decision-maker on which policies suggested by these organizations would get implemented. But at the least, these advisers could form the front lines of a planned march against what Trump dubs the Deep State, marrying bureaucratic savvy to their leader's anti-bureaucratic zeal. One weapon in Trump's second-term "War on Washington" is a wonky one: restoring the power of impoundment, which allowed Presidents to withhold congressionally appropriated funds. Impoundment was a favorite maneuver of Nixon, who used his authority to freeze funding for subsidized housing and the Environmental Protection Agency. Trump and his allies plan to challenge a 1974 law that prohibits use of the measure, according to campaign policy advisers.

Another inside move is the enforcement of Schedule F, which allows the President to fire nonpolitical government officials and which Trump says he would embrace. "You have some people that are protected that shouldn't be protected," he says. A senior U.S. judge offers an example of how consequential such a move could be. Suppose there's another pandemic, and President Trump wants to push the use of an untested drug, much as he did with hydroxychloroquine during COVID-19. Under Schedule F, if the drug's medical reviewer at the Food and Drug Administration refuses to sign off on its use, Trump could fire them, and anyone else who doesn't approve it. The Trump team says the President needs the power to hold bureaucrats accountable to voters. "The mere mention of Schedule F," says Vought, "ensures that the bureaucracy moves in your direction."

It can be hard at times to discern Trump's true intentions. In his interviews with TIME, he often sidestepped questions or answered them in contradictory ways. There's no telling how his ego and self-destructive behavior might hinder his objectives. And for all his norm-breaking, there are lines he says he won't cross. When asked if he would comply with all orders upheld by the Supreme Court, Trump says he would.

But his policy preoccupations are clear and consistent. If Trump is able to carry out a fraction of his goals, the impact could prove as transformative as any presidency in more than a century. "He's in full war mode," says his former adviser and occasional confidant Stephen Bannon. Trump's sense of the state of the country is "quite apocalyptic," Bannon says. "That's where Trump's heart is. That's where his obsession is."



These obsessions could once again push the nation to the brink of crisis. Trump does not dismiss the possibility of political violence around the election. "If we don't win, you know, it depends," he tells TIME. "It always depends on the fairness of the election." When I ask what he meant when he baselessly claimed on Truth Social that a stolen election "allows for the termination of all rules, regulations and articles, even those

Case 2:24-cv-00228-Z   Document 50-1   Filed 01/17/25   Page 864 of 882   PageID 49649

scene in the courtroom." Trump responded by asserting he had suffered. He also complained about the "Biden-inspired" court case he faces in New York and suggested that the "fascists" in America's government were its greatest threat. "I think the enemy from within, in many cases, is much more dangerous for our country than the outside enemies of China, Russia, and various others," he tells me.

Toward the end of our conversation at Mar-a-Lago, I ask Trump to explain another troubling comment he made: that he wants to be dictator for a day. It came during a Fox News town hall with Sean Hannity, who gave Trump an opportunity to allay concerns that he would abuse power in office or seek retribution against political opponents. Trump said he would not be a dictator—"except for day one," he added. "I want to close the border, and I want to drill, drill, drill."

Trump says that the remark "was said in fun, in jest, sarcastically." He compares it to an infamous moment from the 2016 campaign, when he encouraged the Russians to hack and leak Hillary Clinton's emails. In Trump's mind, the media sensationalized those remarks too. But the Russians weren't joking: among many other efforts to influence the core exercise of American democracy that year, they hacked the Democratic National Committee's servers and disseminated its emails through WikiLeaks.

Whether or not he was kidding about bringing a tyrannical end to our 248-year experiment in democracy, I ask him, Don't you see why many Americans see such talk of dictatorship as contrary to our most cherished principles? Trump says no. Quite the opposite, he insists. "I think a lot of people like it." —*With reporting by Leslie Dickstein, Simmone Shah, and Julia Zorthian*

© 2025 TIME USA, LLC. All rights reserved.

Powered by WordPress VIP

Appx. 864

# Congress of the United States

## Washington, DC 20515

June 16, 2023

VIA Federal eRulemaking Portal

The Honorable Xavier Becerra
Secretary
U.S. Department of Health and Human Services
200 Independence Avenue, S.W.
Washington, D.C.  20201

RE: Comments on Proposed Rule: HIPAA Privacy Rule To Support Reproductive Health Care Privacy, 88 FR 23506 (April 17, 2023), RIN: 0945-AA20, Docket No. 2023-07517

Dear Secretary Becerra:

We write to express our concern regarding the U.S. Department of Health and Human Services (HHS) proposed rule, "HIPAA Privacy Rule To Support Reproductive Health Care Privacy," 88 Fed. Reg. 23506 published on April 17, 2023 (the "Proposed Rule"), and to urge you to withdraw it immediately.

Abortion is not health care—it is a brutal act that destroys the life of an unborn child and hurts women. Congress did not authorize HHS to extend special provisions for abortion such as these under the guise of "health care." The Proposed Rule unlawfully thwarts the enforcement of compassionate laws protecting unborn children and their mothers, and directs health care providers to defy lawful court orders and search warrants.

The Proposed Rule creates special protections for abortion that limit cooperation with law enforcement, undermine the ability to report abuse, restrict the provision of public health information, and erase the humanity of unborn children. The Proposed Rule would interfere with valid state laws protecting life, arbitrarily permit abortionists to disclose protected health information (PHI) to defend themselves while silencing others, and unlawfully infringe on Congressional power.

The Supreme Court's decision in *Dobbs v. Jackson Women's Health Organization* returned the power to regulate or prohibit abortion back to people and their elected representatives. Under the Proposed Rule, HHS attempts to undermine enforcement of Federal and State abortion laws, simply because this administration disagrees with the Court's decision.

As Members of Congress, we have a Constitutional interest in ensuring that in issuing regulations under the Health Insurance Portability and Accountability Act of 1996 (HIPAA), HHS does not exceed its Congressionally authorized power.

## I. Summary of the Health Insurance Portability and Accountability Act of 1996

Enacted by Congress in 1996, HIPAA mandated the development of national standards to prevent PHI from being disclosed without the patient's consent.[1]  As required under Title II of HIPAA, HHS developed

---

[1] Public Law 104-191.

the Privacy Rule to regulate the use and disclosure of PHI by covered health entities, including both health care providers and health plans.[2]

In certain circumstances, the HIPAA Privacy Rule permits, but does not require, covered entities to use and disclose PHI without authorization from the patient.  These circumstances include the following:

- **Exception for law enforcement purposes:** A covered entity may disclose PHI to a law enforcement official for a law enforcement purpose, including complying with a subpoena, a court order, or a warrant.[3]  It may provide PHI in specific criminal, civil, and administrative proceedings.

- **Exceptions for abuse:** A covered entity may report child abuse and neglect to the appropriate government authority authorized by law to receive these reports.[4]  It may also disclose PHI about an individual whom the covered entity reasonably believes to be a victim of abuse, neglect, or domestic violence to a government authority.[5]

- **Exception for serious and imminent threats to the health or safety of a person or the public:** A covered entity may disclose PHI if it believes the disclosure is necessary to prevent or lessen a serious or imminent threat to a person or to the public. [6]

- **Exception for public health data collection:** A covered entity may disclose PHI to a public health authority authorized by law to collect this information, including for the purpose of public health surveillance.[7]

## II. Summary of Key Changes Made by the Proposed Rule

**Definition of Reproductive Health Care**

The HHS Proposed Rule creates an arbitrary and capricious new category for abortion under the umbrella of "reproductive health care," which is defined as "care, services, or supplies related to the reproductive health of the individual,".[8]  The preamble to the Proposed Rule clarifies that this definition "applies broadly" and includes "non-prescription supplies" furnished either by a health care provider or an individual who is not a health care provider.[9]  Under the Proposed Rule "seeking, obtaining, providing, or facilitating reproductive health care," such as abortion, broadly "includes, but is not limited to, any of the following: expressing interest in, inducing, using, performing, furnishing, paying for, disseminating information about, arranging, insuring, assisting, or otherwise taking action to engage in reproductive

---

[2] HIPAA Administrative Simplification. Regulation Text. 45 CFR Parts 160, 162, and 164 (Unofficial Version, as amended through March 26, 2013).
https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/administrative/combined/hipaa-simplification-201303.pdf.
[3] 45 CRS § 164.512(f).
[4] Section 1178(b) of HIPAA [42 U.S.C. 1320d–7], 45 CFR § 164.512 (b)(1)(ii).
[5] 45 CFR § 164.512(c)(1)(i).
[6] 45 CFR § 164.512(j).
[7] 45 CFR § 164.512(b)(1)(i).
[8] Proposed 45 CFR § 160.103.
[9] 88 FR 23527.

2

health care; or attempting any of the same."[10]  In addition to including performing surgical and chemical abortion, this definition would encompass actions like mailing abortion drugs, promoting abortion, illicitly transporting minors or victims of sexual abuse to undergo abortions, and providing equipment intended to induce abortions, to name only a few examples.

The Proposed Rule would systematically undercut pro-life state laws in order to give abortion special protection.  As described below, the rule limits cooperation with law enforcement, restricts the provision of public health information, and strips unborn children from the scope of protections under the HIPAA Privacy Rule.

### *Changing the HIPAA Privacy Rule's Exception for Law Enforcement Purposes*

The Proposed Rule amends the Privacy Rule to prohibit covered entities from cooperating with law enforcement or even following a court order by using or disclosing PHI "for a criminal, civil or administrative investigation into or proceeding against any person in connection with seeking, obtaining, providing, or facilitating" an abortion, or to identify any person for the purpose of initiating such an investigation or proceeding,[11] if one or more of following three conditions are met ("Rule of Applicability"):[12]

(1) the abortion is provided "outside of the state where the investigation or proceeding is authorized" and the abortion "is lawful in the state in which it is provided."

(2) the abortion is "protected, required, or authorized by Federal law, regardless of the state in which such health care is provided."

(3) the abortion is "provided in the state in which the investigation or proceeding is authorized" and the abortion "is permitted by the law of that state."

HHS states that the purpose of this proposed Rule of Applicability is to "limit the application of the prohibition to circumstances in which the care [the abortion] is lawful under the circumstances in which such health care is provided."[13] As explained further on, however, the Rule of Applicability is premised on dubious and untested legal arguments that displace vast swaths of State abortion laws and inhibit States in carrying out their legitimate interests in protecting unborn children.

### *Changing the HIPAA Exceptions for Abuse*

This Proposed Rule interferes with, and exerts a chilling effect on, the investigation and reporting of child abuse and sexual abuse, protecting abusers instead of victims.

Consistent with Section 1178(b) of the Social Security Act (as added by HIPAA), the Privacy Rule allows covered entities to use or disclose PHI in reporting suspected child abuse or neglect to the appropriate government authority.[14]  The Privacy Rule also allows for the disclosure of PHI to the appropriate

---

[10] Proposed 45 CFR § 164.502(a)(5)(iii)(B).
[11] Proposed 45 CFR § 164.502(a)(5)(iii)(A).
[12] Proposed 45 CFR § 164.502(a)(5)(iii)(C)(1),(2),(3).
[13] 88 FR 23530-23531.
[14] 45 CFR § 164.512(b)(1)(i).

3

government authority when the covered entity "reasonably believes [an individual] to be a victim of abuse, neglect, or domestic violence," subject to certain other requirements.[15]

Under the Proposed Rule, neither of these longstanding exceptions to protect victims of abuse would permit disclosures of PHI for investigating or prosecuting any individual for providing or facilitating an abortion (in the applicable circumstances) "when the report of abuse, neglect, or domestic violence is *based primarily* on the provision of reproductive health care" (emphasis added).[16] The broad definition of "reproductive health care" means this provision not only protects abortions sought or coerced by abusers to cover up their abuse, but also covers cases where the reporting is based on the administration of rape kits and medical treatment for victims of sexual assault. Consequently, the Proposed Rule would protect abusers and abortionists who turn a blind eye to them, while exerting a chilling effect on the reporting of child and sexual abuse and the ability of States to prosecute perpetrators of abuse.

HHS openly admits that it intends for this provision to protect abortionists rather than victims in a bid to override the will of pro-life States: "The Department is concerned that *recent state actions* may lead regulated entities to think that they are permitted to make such disclosures of PHI when they believe that persons who provide or facilitate access to reproductive health care are perpetrators of such crimes" (emphasis added).[17]

### *Changing the HIPAA Privacy Rule's Exception for Serious and Imminent Threats to the Health or Safety of a Person or the Public*

The Privacy Rule allows a covered entity to disclose PHI when it is "necessary to prevent or lessen a serious and imminent threat to the health or safety of a person or the public" and is "to a person or persons reasonably able to prevent or lessen the threat, including the target of the threat."[18]

The Proposed Rule's redefinition limits the term "person" to a human being "who is born alive,"[19] wrongfully preventing the Privacy Rule's exception for a serious and imminent threat to the health or safety from applying to an unborn child. The use of this exception is appropriate for an unborn child because every pregnancy involves two patients, the unborn child and his or her mother. Both patients have their own DNA, sex, limbs, eye color, and heartbeat.  Abortion is the most serious threat imaginable to the health and safety of the child in the womb.

Congress has recognized the unborn child explicitly in several laws, including the Unborn Victims of Violence Act,[20] the Emergency Medical Treatment and Active Labor Act (EMTALA),[21] and the National

---

[15] 45 CFR § 164.512(c)(1)(i).
[16] Proposed 45 CFR 164.152(c)(3)
[17] 88 FR 23519.
[18] 45 CFR § 164.512(j).
[19] Proposed 45 CFR § 160.103.
[20] 18 U.S.C. § 1841 (establishing a separate offense for unborn children who are killed or injured through the commission of certain Federal crimes).
[21] 42 U.S.C. §§ 1395w-22(d)(B)(i), 1395dd(c)(1)(A)(ii), (c)(2)(A), (e)(1)(A)(i),(B)(ii) (recognizing threats to the health of the unborn child as well as the mother).

Childhood Vaccine Injury Act.[22] HHS regulations governing the Child Health Insurance Program similarly recognize the unborn child.[23]

The preamble to the Proposed Rule wrongly cites the Born Alive Infants Protection Act to limit the scope of protections in the Privacy Rule for unborn human beings. That law rightfully recognizes that children born alive, even after failed abortions, are "persons" under Federal law. However, the law did not thereby state that unborn children were not "persons."  In fact, to avoid this very misunderstanding, the law included a rule of construction that states: "Nothing in this section shall be construed to affirm, deny, expand, or contract any legal status or legal right applicable to any member of the species homo sapiens at any point prior to being `born alive' as defined in this section."[24] Therefore, HHS' use of this 2002 law exclude "unborn children" as persons is arbitrary and capricious.

### *Changing the HIPAA Exception for Public Health*

As directed by Section 1178(b) of the Social Security Act (as added by HIPAA), the Privacy Rule allows covered entities to use or disclose PHI in matters related to public health surveillance. The Proposed Rule arbitrarily thwarts legitimate public health oversight of the abortion industry. Specifically, the rule redefines "public health," to exclude "uses and disclosures for the criminal, civil, or administrative investigation into or proceeding against a person in connection with obtaining, providing, or facilitating" an abortion.[25] In addition, the Administration also clarifies that it believes state laws requiring the disclosure of PHI for purposes such as criminal, civil, or administrative investigations related to abortion are preempted by HIPAA.[26] It also states that public health reporting activities, including categories like "disease or injury," "birth," or "death," will exclude information about abortion for purposes of HIPAA.[27]

### III. Key Anti-Life Consequences of the Proposed Rule

### *The Proposed Rule Interferes with Valid State Laws Protecting Life*

The Proposed Rule interferes with the administration and enforcement of valid State laws that regulate or prohibit abortion. This is by design and in response to *Dobbs*, as HHS itself admits the rule would "create a conflict" with "some state laws."[28] HHS states that, in the circumstances when the Proposed Rule applies, "the state lacks any substantial interest in seeking the disclosure"[29] and elsewhere describes states as lacking even a "legitimate interest."[30]

Such assertions run directly counter to the ruling of the Supreme Court in *Dobbs*, which made clear that "[a] law regulating abortion . . . is entitled to a 'strong presumption of validity.'"[31] This presumption "must be sustained if there is a rational basis on which the legislature could have thought that it would serve legitimate state interests." Such legitimate interests "include respect for and preservation of

---

[22] 42 U.S.C. §§ 300aa-11(b)(2),(f) (applying the maternal immunization provisions to recognize children who were in utero when their mothers received a vaccine as "persons" who received a vaccine).
[23] 42 CFR § 457.10 (permitting States to consider the unborn child a "targeted low-income child" by defining "child" to include "an individual" during "the period from conception to birth").
[24] 1 U.S.C. 8(c).
[25]  Proposed 45 CFR § 160.103.
[26] 88 FR 23524.
[27] 88 FR 23524.
[28] 88 FR 23530.
[29] 88 FR 23522.
[30] 88 FR 23531.
[31] *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2284 (2022)

prenatal life at all stages of development, … the protection of maternal health and safety; the elimination of particularly gruesome or barbaric medical procedures; the preservation of the integrity of the medical profession; the mitigation of fetal pain; and the prevention of discrimination on the basis of race, sex, or disability."[32]

The Proposed Rule would contradict the presumption of validity of State abortion laws and massively expand the power of the Federal bureaucracy to undermine them. HHS would be empowered to launch investigations or impose crippling fines on health providers for obeying state laws, complying with state court orders, or cooperating with law enforcement.

Despite HHS claim that the Proposed Rule only applies when abortion related activities are lawful,[33] the rule will hamper the ability of states and the Federal government to investigate and enforce valid and enforceable pro-life laws.

This result stems from how each of the three prongs of the proposed Rule of Applicability is drafted:

1. ***Under the first prong of the Rule of Applicability, States that protect life would be unable to obtain PHI from health care providers to investigate the provision, trafficking or shipping of abortion drugs, or otherwise performing or facilitating abortion if the action begins, ends, or otherwise is connected with activities that occur in a State where abortion is legal.***

    HHS explains that "[t]he proposal is not limited to circumstances in which the health care has not yet been obtained, provided, or facilitated. It also includes situations *where the health care is ongoing* or has been completed" (emphasis added).

    Below is a non-exhaustive list of examples of circumstances where the prohibitions of the Proposed Rule appear to apply:
    - An out-of-State (or international) abortionist or abortion drug trafficker uses telemedicine or the mail to prescribe or transport an abortion drug.[34]
    - An abortionist begins the process of a late-term abortion in a State where abortion on demand is legal and he or another abortionist completes it in a State where abortion is prohibited (or vice-versa).
    - A child is trafficked across State lines without the consent of a parent to obtain an abortion. (Idaho recently enacted a law to prevent this.)[35]
    - A victim of sexual abuse is transported across State lines from a pro-life State to a pro-abortion State to undergo an abortion and cover up the abuser's crimes.

    It is arbitrary and capricious for the Proposed Rule to allow pro-abortion States to extend the reach of their radical abortion policies into pro-life States, while inhibiting pro-life States in enforcing laws that seek to do the contrary.

---

[32] Ibid.

[33] 88 FR 23531.

[34] Ibid., Footnote 270 further suggests HHS intends to protect the illegal interstate shipping of abortion drugs by citing the Department of Justice Office of Legal Counsel's misguided memo that seeks reinterpret longstanding Federal laws prohibiting the mailing and interstate carriage of abortion drugs.

[35] Idaho House Bill 242 (2023) https://legislature.idaho.gov/sessioninfo/2023/legislation/h0242.

To the extent State laws on abortion involve novel interjurisdictional issues between the States, it is the role of the Federal Courts, not HHS to adjudicate any constitutional questions that may arise in this context. HHS does not have the authority to declare that a sweeping category of State laws that protect life should not receive the presumption of validity that they are entitled to under *Dobbs.*

2. ***Under the second prong of the Rule of Applicability, HHS baselessly asserts that Federal law authorizes or even requires abortions that are prohibited under state law.***
   As an example, HHS cites the Department of Veterans Affairs (VA) interim final rule, which purports to authorize VA to provide abortions on demand even in defiance of State law.[36] HHS fails to acknowledge, however, that a 1992 Federal law expressly prohibits the VA from providing abortions.[37] Furthermore, under the Assimilative Crimes Act, it is a Federal crime to violate a State abortion law in a Federal enclave located within that State.[38] As a second example, HHS cites the Emergency Medical Treatment and Labor Act (EMTALA), which the Biden administration claims "requires" the performance of abortion when a woman's health is at risk, preempting State laws prohibiting elective abortions.[39] In reality, EMTALA explicitly recognizes the health of the unborn child alongside the mother's health.[40]

   We ask that HHS provide a complete list and justification of every Federal law it believes protects, requires, or authorizes abortion or abortion-related activities in violation of State law, and which State laws on abortion HHS believes are unenforceable by reason of Federal law.

3. ***Under the third prong of the Rule of Applicability, HHS prevents health care providers from disclosing PHI to law enforcement or a Court if the State has not made the abortion at issue unlawful.***
   The Proposed Rule would have a chilling effect on the ability of States to enforce their laws. HHS states: "if a state has not made the relevant reproductive health care unlawful, *it lacks a legitimate interest* in conducting a criminal, civil, or administrative investigation or proceeding into such health care where the investigation is centered on the mere fact that reproductive health care was or is being provided" (emphasis added).[41] This justification is without merit. States have a legitimate interest in investigating conduct that they have probable cause to believe may be unlawful. States that prohibit abortion except in limited circumstances, or only after the attainment of a certain gestational age or developmental milestone like a detectable heartbeat, must be allowed to investigate to determine whether or not a given abortion was lawful in the first place.

   Under the Proposed Rule, however, States would be forced to cede their powers to investigate criminal abortion-related activity to a health care provider (who may even be the subject of the investigation) and HHS' determination and understanding of State law. But in many cases, a violation of State law can only be determined through an investigation. HHS explains that a State investigation or proceeding regarding abortion could only obtain PHI "[w]here *the regulated entity determines* that the reproductive health care was provided under circumstances where it was unlawful"[42]

---

[36] 88 FR 23531.
[37] Section 106 of the Veterans Health Care Act of 1992 (38 USC 1710 note).
[38] 18 U.S.C. § 13.
[39] 88 FR 23531.
[40] 42 U.S.C. §§ 1395w-22(d)(B)(i), 1395dd(c)(1)(A)(ii), (c)(2)(A), (e)(1)(A)(i),(B)(ii).
[41] 88 FR 23531.
[42] Ibid.

(emphasis added). This makes the Proposed Rule completely unworkable and wrongfully assigns health care providers and HHS bureaucrats power to self-enforce and oversee, respectively, State abortion laws in manner unlike how any legitimate health care service is treated under the Privacy Rule. The Proposed Rule also creates confusion for health care providers, who could be subjected to crippling fines imposed by HHS for cooperating with legitimate State law enforcement activities and Court orders.

By tying its requirements to circumstances where the abortion is "permitted by the law of that state,"[43] the Proposed Rule unlawfully thwarts enforcement of Federal criminal laws on abortion, such as those mentioned below. Specifically, this prong would prohibit disclosures for purposes of enforcing Federal abortion laws in States where statutes permit the Federally-prohibited abortion or abortion-related activities at issue, such as partial-birth abortions.

### The Proposed Rule Arbitrarily Permits Abortionists to Disclose PHI to Defend Themselves

The Proposed Rule arbitrarily and capriciously permits abortionists and others who facilitate abortion to disclosure abortion-related PHI "to defend any person in a criminal, civil, or administrative proceeding where liability could be imposed on that person for providing such health care,"[44] while simultaneously inhibiting the ability of the state to obtain that same information as part of an investigation or proceeding. The aim of the Proposed Rule is not, therefore, about protecting "an individual's highly sensitive PHI," as HHS asserts in numerous places;[45] rather, it is about insulating the abortion industry from accountability.

### The Proposed Rule is Unlawful and Infringes on Congressional Power

The Proposed Rule is plainly unlawful, and, if finalized, would far exceed HHS' authorized power. HIPAA does not provide "clear authorization required by [the Supreme Court's] precedents" to promulgate regulations setting national policy on an issue of major political significance, which abortion surely is.[46] Moreover, the rule comes as Congress "conspicuously and repeatedly declined to enact" legislation similar in nature to the Proposed Rule.[47] The mere fact that HIPAA authorizes the preemption of contrary State laws does not change the fact Congress never authorized HHS to promulgate special protections for abortion, particularly, not to hinder valid criminal and civil investigations under State law.

Far from promoting abortion as the Proposed Rule would, Congress has on numerous occasions acted to limit abortion nationally and rejected attempts to use Federal law to expand or protect abortion. To the contrary, the Proposed Rule's attempt to create special protections for abortion unlawfully interferes with several Federal criminal laws that protect life and prohibit coercive family planning practices. These include: the Federal ban on partial birth abortions,[48] the Federal ban on the mailing and interstate shipment of abortion drugs,[49] the Assimilative Crimes Act (as explained above),[50] the Federal ban on trafficking in human fetal tissue,[51] the Federal ban on coercive abortion and sterilization in Federal

---

[43] Proposed 45 CFR § 164.502(a)(5)(iii)(C)(3).
[44] 88 FR 23532.
[45] 88 FR 23508.
[46] West Virginia v. EPA, 142 S. Ct. 2587, 2614 (2022).
[47] Ibid., *See* S.1656, H.R. 3420, 118th Congress.
[48] 18 U.S.C. § 1531.
[49] 18 U.S.C. §§ 1461-1462.
[50] 18 U.S.C. § 13.
[51] 42 U.S.C. § 289g-2.

programs,[52] and the Federal ban on Female genital mutilation.[53] Congress' enactment of laws that limit abortion demonstrates Congressional intent that it never intended HIPAA to be used to promote or create special protections for abortion.

## IV. Conclusion

This Proposed Rule far exceeds the power HHS was given by Congress to implement HIPAA. It massively expands the power of the federal bureaucracy to illegally override pro-life state laws and to undermine the decision of the Supreme Court in *Dobbs*. If finalized, the Proposed Rule will suppress compliance with Court orders and hamper necessary and legitimate investigations by law enforcement while protecting sex abusers and traffickers and individuals flooding the mail with deadly abortion drugs. We urge HHS to immediately withdraw this dangerous and irresponsible regulation.

Sincerely,


Cindy Hyde-Smith
United States Senator

Christopher H. Smith
Member of Congress


Roger Marshall
United States Senator

David Rouzer
Member of Congress


Mike Braun
United States Senator

Michelle Fischbach
Member of Congress


J.D. Vance
United States Senator

Andy Harris, M.D.
Member of Congress


James Lankford
United States Senator

Diana Harshbarger
Member of Congress

---

[52] 42 U.S.C. § 300a-8.
[53] 18 U.S.C. § 116.

9



Mike Lee
United States Senator

Jeff Duncan
Member of Congress

James E. Risch
United States Senator

Jim Banks
Member of Congress

Ted Cruz
United States Senator

John H. Rutherford
Member of Congress

Michael Guest
Member of Congress

Clay Higgins
Member of Congress

Keith Self
Member of Congress

Mike Ezell
Member of Congress

Ronny L. Jackson, M.D.
Member of Congress

Ben Cline
Member of Congress

Andrew Clyde
Member of Congress

Mary E. Miller
Member of Congress

10

Pete Sessions
Member of Congress

Randy Feenstra
Member of Congress

Brian Mast
Member of Congress

Robert Aderholt
Member of Congress

Tim Walberg
Member of Congress

Alex X. Mooney
Member of Congress

11

# Mandate *for* Leadership

## The Conservative Promise

## Project 2025

PRESIDENTIAL TRANSITION PROJECT

© 2023 by The Heritage Foundation
214 Massachusetts Ave., NE
Washington, DC 20002
(202) 546-4400 | heritage.org

All rights reserved.
Printed in the United States of America.

ISBN: 978-0-89195-174-2

2025 Presidential Transition Project

- **OCR should withdraw its Health Insurance Portability and Accountability Act (HIPAA)**[86] **guidance on abortion.** OCR should withdraw its June 2022 guidance[87] that purports to address patient privacy concerns following the *Dobbs* decision but is actually a politicized statement in favor of abortion and against *Dobbs*. HIPAA covers patients in the womb, but this guidance treats them as nonpersons contrary to law. The guidance is unnecessary and contributes to ideologically motivated fearmongering about abortion after *Dobbs*.

---

**AUTHOR'S NOTE:** The preparation of this chapter was a collective enterprise of selfless individuals involved in the 2025 Presidential Transition Project. All contributors to this chapter are listed at the front of this volume and include former officials in the U.S. Department of Health and Human Services and other agencies, as well as academics, attorneys, and experts in the health care and insurance fields.

## News *From The States*

A project of States Newsroom

<u>**ARIZONA**</u> | *News*

# How Trump nominees could make Project 2025 a reality

**GOV & POLITICS** | Jan 02, 2025 | 2:23 pm ET | By Amanda Becker/The 19th

SHARE    



Donald Trump, at the time president of the United States, listens to then-Office of Management and Budget Acting Director Russ Vought deliver remarks prior to Trump signing executive orders on Oct. 9, 2019, in the Roosevelt Room of the White House. Official White House Photo by Shealah Craighead

Republican President-elect Donald Trump spent the closing months of his campaign trying to distance himself from a blueprint for his second term known as Project 2025.

Then, in the days after his victory, Trump picked major architects of the Heritage Foundation's vision for key posts in his next administration, setting the stage for them to implement a conservative Christian agenda that has the potential to reshape the federal government and redefine rights long held by all Americans, though likely to disproportionately impact women, LGBTQ+ people and vulnerable populations like the elderly and disabled.

One of these architects is Russell Vought, whom Trump has again tapped to lead his Office of Management and Budget, or OMB, an under-the-radar entity to most Americans that wields immense influence over the federal government by crafting the president's budget. If confirmed by the Senate, a very likely outcome, Vought will

This article was originally published by The 19th,

1/16/25, 2:23 PM
How Trump nominees could make Project 2025 a reality | News From The States
Case 2:24-cv-00228-Z    Document 50-1    Filed 01/17/25    Page 880 of 882    PageID 49665

be optimally positioned to inject Project 2025's priorities — many of which reflect his career-long push to dismantle programs for low-income Americans and expand the president's authority — across the federal agencies and departments that OMB oversees.

Ben Olinsky, who advised Democratic former President Barack Obama on labor and workforce policy before joining the liberal-leaning Center for American Progress, where he works on issues related to the economy and governance, said that Vought's vision for OMB as presented in Project 2025 is "to basically change the plumbing so they can do whatever they want without any meaningful checks and balances" during Trump's second term.

a nonprofit newsroom covering gender, politics, and policy. The Arizona Mirror is a founding member of The 19th News Network.

"I think that it's important to really make sure [Americans] understand what the plans are for changing the plumbing," Olinsky said.

Vought has firsthand knowledge of the OMB's wide-ranging scope. During Trump's first term, he was OMB's deputy director, acting director and, finally, confirmed director. In those roles, he helped then-President Trump craft a plan to jettison job protections for thousands of federal workers and assisted with a legally ambiguous effort to redirect congressionally appropriated foreign aid for Ukraine.

In the years since, as Trump staved off legal threats and convictions to build a winning bid to return to the White House, Vought has refined his thinking and strategies about how to best force agencies to "come to heel and do what the president has been telling them to do," as he put it in a recent interview.

Vought has used two pro-Trump groups he founded — the nonprofit Center for Renewing America and its advocacy arm, America Restoration Action — to discredit structural racism as a driver for inequality and attempt to stymie diversity, equity and inclusion (DEI) efforts. In August, he told a pair of British journalists posing as potential donors that the Center for Renewing America is "an organization I helped turn into the Death Star," the fictional Star Wars space station that can destroy planets, and it "is accomplishing all of the debates you are reading about."

The chapter that Vought wrote for Project 2025 details how the Office of Management and Budget could be a vehicle to advance the Christian nationalist agenda he favors — and he has not hesitated to talk about it.

"I think you have to rehabilitate Christian nationalism," Vought told the British journalists at the Centre for Climate Reporting, which released video of the conversation that was recorded using hidden cameras.

In an interview with conservative activist Tucker Carlson shortly after Trump's reelection, Vought likened OMB to the "nerve center" through which a president can ensure their policy directives trickle down to the multitude of federal agencies and a civilian workforce of more than two million people.

"Properly understood, [OMB] is a President's air-traffic control system with the ability and charge to ensure that all policy initiatives are flying in sync and with the authority to let planes take off and, at times, ground planes that are flying off course," Vought wrote in Project 2025.

He sees two primary ways to ground wayward planes: by eliminating potential dissent within agencies and withholding money appropriated by Congress for projects and programs the president does not support.

Both would clear the way for Trump's next administration to implement many of the priorities detailed in Project 2025, which could essentially redefine rights, systems and cultural norms for all Americans.

Some of Project 2025's recommendations include restricting abortion access and supporting a "biblically based" definition of family, because the "male-female dyad is essential to human nature," by replacing policies related to LGBTQ+ equity with those that "support the formation of stable, married, nuclear families."

It also suggests transforming the FBI into a politically motivated entity to settle scores and barring U.S. citizens from receiving federal housing assistance if they live with anyone who is not a citizen or permanent legal resident, which would serve Trump's campaign promise to take extraordinary measures to crack down on illegal immigration. During remarks in September titled "Theology of America's Statecraft: The Case for Immigration Restriction," Vought justified the separation of families and condemned so-called sanctuary cities, or those that pass laws that limit their cooperation with federal immigration authorities. "Failing to secure the border is a complete abdication of [the government's] God-given responsibility," he said.

Olinsky explained that while many of the policies in Project 2025 have been floating around Republican circles in Washington for years without gaining much traction, the document is a detailed roadmap that shows how its authors believe they can finally deliver on key pieces of their conservative Christian agenda.

"One, it says all of the quiet parts out loud about the full scope of the agenda. And then the second thing, which I think is something folks should really pay attention to, is it says how they're going to accomplish it, practically, by using executive action," Olinsky said.

In many ways, Vought's approach to bending the federal government to a president's will began taking shape during Trump's first administration. In late 2020, as Trump's first term drew to a close, Vought helped him craft an executive order known as "Schedule F," which reclassified thousands of civil servants and, with that, stripped them of their job protections; Vought recommended that close to 90 percent of OMB's workforce be reclassified.

President Joe Biden rescinded the executive order on his third day in office. Project 2025 recommends reinstating it.

Former Trump officials, campaign advisers and others in his orbit have already identified as many as 50,000 federal employees who could be fired, according to published reports. And just last month, Senate Republicans blocked a Democratic effort to codify protections for these workers ahead of Trump's — and likely Vought's — return.

Sen. Tim Kaine of Virginia, a Democrat who sponsored the legislation to protect federal employees, warned of a "loyalty-based system that would impede the work of the federal government, expose people to intimidation and bring people into jobs that are not qualified to do them, thus risking the American public's safety and quality of life."

Vought is among the Trump loyalists who have been open about their desire to slash the federal workforce — as a route to purge critics, improve efficiency or both.

In the interview with Carlson, Vought said, "There certainly is going to be mass layoffs and firings, particularly at some of the agencies that we don't even think should exist." His language appeared to communicate an effort to ensure obedience and compliance. With the firings and layoffs, Vought said he wants to avoid having "really awesome Cabinet secretaries sitting on top of massive bureaucracies that largely don't do what they tell them to do."

Trump's transition team did not respond to requests to discuss Vought's selection for OMB or the chapter he wrote for Project 2025 about the agency. The 19th reached out to Vought through his Center for Renewing America, which likewise did not respond to a request for comment.

## Power of the Purse

During Trump's first term, OMB helped find money to begin building a small section of wall along the U.S.-Mexico border — a key campaign promise Trump made in 2016 — "because Congress wouldn't give him the ordinary money," Vought told Carlson.

Trump also enlisted OMB to withhold $400 million in military aid that Congress approved for Ukraine, as Trump and his associates tried to pressure the country to investigate Biden and his family. The move prompted the abuse-of-power case House Democrats made against Trump during his first impeachment, when Vought defied a subpoena to testify. The Government Accountability Office, a nonpartisan watchdog, concluded that the scheme violated the 1974 Impoundment Control Act. Days later, the Republican-led Senate acquitted Trump. (Trump had eventually released the aid.)

When Trump subsequently nominated Vought to lead OMB in 2020, Democrats opposed him because of his approach to impoundment authority. He was nonetheless confirmed.

Vought's path to confirmation is all but certain this time around: Republicans control the Senate, the congressional chamber charged with approving presidential nominations. Very likely to feature in his confirmation hearings is Vought's belief that the OMB can help Trump overcome opposition and implement policy priorities, possibly including those contained in Project 2025, by redirecting or refusing to spend funds appropriated by Congress, which under the Constitution holds the power of the purse.

"Making Impoundment Great Again!" Vought wrote in June on X, riffing on the "Make America Great Again" slogan that has come to define Trump's movement.

Trump spent his campaign insisting that he had not read Project 2025 and did not know its authors. "I have no idea who is behind it. I disagree with some of the things they're saying and some of the things they're saying are absolutely ridiculous and abysmal," he wrote in a July post on his Truth Social platform.

But of the more than 350 people who contributed to Project 2025, at least 60 percent are linked to the incoming president, according to a list of contributors and their ties reviewed by The 19th. They range from appointees and nominees from Trump's first administration, like Vought, to members of his previous transition team and those who served on commissions and as unofficial advisers.

Democrats, including Vice President Kamala Harris, seized on Project 2025 during their campaigns to highlight the dangers they believe are posed by a second Trump presidency. At 920 pages, it offers a vision of government that is far more detailed and specific than the policy proposals put forward by Trump directly. The "Agenda 47" on Trump's campaign website was a list of 20 bullet points that included vague policies like "end the weaponization of government against the American people" and "unite our country by bringing it to new and record levels of success."

When Trump announced Vought as his OMB pick, he said Vought "knows exactly how to dismantle the Deep State and end Weaponized Government." His other selections for OMB leadership posts include anti-abortion activist Ed Martin and Vought's colleague at the Center for Renewing America, Mark Paoletta, whom the president-elect praised as a "conservative warrior."

One question as Trump takes office on January 20 and Vought, if confirmed, helps him control the government's workforce and purse strings, is which version of the country they will promote and whose rights are — and aren't — protected.

---



**PUBLISHED ON**

**Arizona Mirror**

Phoenix, AZ

To republish this story, visit the Arizona website