Lauren Paulk, *pro hac vice pending*
lauren.paulk@ifwhenhow.org
Nina Dutta, *pro hac vice pending*
nina.dutta@ifwhenhow.org
If/When/How: Lawyering for Reproductive Justice
1714 Franklin Street #100-393
Oakland, CA 94612
T: (602) 883-8261
F: (602) 562-9449

**FILED**

**March 12, 2025**

KAREN MITCHELL
CLERK, U.S. DISTRICT
COURT

*Counsel for proposed Amici Curiae*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | |
|---|---|
| Carmen Purl, et al., <br>       *Plaintiffs* <br><br>    v. <br><br> United States Department of Health and <br> Human Services, et al., <br><br>       *Defendants*. | Case No. 2:24-CV-228-Z |

**Proposed Brief of *Amici Curiae* If/When/How: Lawyering for Reproductive Justice and Forty Organizations and Individuals in Support of Defendants' and Defendant-Intervenors' Dispositive Motions**

## Table of Contents

Table of Authorities ................................................................................................ iii

Interest of Proposed *Amici Curiae* .......................................................................... 1

Introduction & Summary of Argument ..................................................................... 2

Argument .................................................................................................................. 4

    I.   Protecting the privacy of reproductive health care information helps ensure patient safety. 4

       A.  The privacy of health information promotes patient trust in health care providers. ....... 5

       B.  Patients who fear criminalization avoid health systems and experience adverse outcomes. ................................................................................................................. 7

    II.  The 2024 Rule promotes patient safety by preventing reporting driven by confusion, stigma, or personal bias. ......................................................................................... 10

       A.  Abortion stigma and overregulation cause criminalization. ........................................ 11

       B.  Stigma around young people's reproductive decisions leads to the conflation of those decisions with child abuse. .................................................................................. 17

Conclusion .............................................................................................................. 19

## Table of Authorities

### CASES

*Access Indep. Health Servs., Inc. v. Wrigley*, No. 08-2022-CV-01608 (N.D. Dist. Ct. Sept. 12, 2024) ...................................................................................................................... 13

*Cahill v. State*, 178 P.2d 657 (Okla. Crim. App. 1947) ........................................................ 14

*Johnson v. State*, No. 18853 (Wyo. Dist. Ct. Mar. 22, 2023) ............................................... 13

*Matsumoto v. Labrador*, 122 F.4th 787 (9th Cir. 2024) ....................................................... 14

*Matsumoto v. Labrador*, 701 F. Supp. 3d 1032  (D. Idaho 2023) .......................................... 14

*Okla. Call for Reprod. Just. v. State*, 531 P.3d 117 (Okla. 2023) ......................................... 13

### STATUTES

Ala. Code § 26-23H-4 ............................................................................................................. 13

Ala. Code § 26-23H-5 ............................................................................................................. 14

Ark. Code Ann. § 5-61-304(c) ................................................................................................. 14

Ark. Code Ann. §§ 5-61-301-304 ............................................................................................ 13

Fla. Stat. § 390.0111 ............................................................................................................... 13

Ga. Code Ann. § 16-12-141 ..................................................................................................... 13

Idaho Code § 18-622(1) ........................................................................................................... 13

Idaho Code § 18-622(5) ........................................................................................................... 14

Idaho Code §§ 18-8807, 18-623 .............................................................................................. 14

Ind. Code § 16-34-2-1(a) ......................................................................................................... 13

Ind. Code Ann. § 35-41-3-12(a) .............................................................................................. 14

Iowa Code § 146E.2 ................................................................................................................ 13

Iowa Code § 146E.2(4) ............................................................................................................ 14

Ky. Rev. Stat. Ann. § 311.7705(4) ......................................................................................... 14

Ky. Rev. Stat. Ann. § 311.772 ................................................................................................ 13

La. Stat. Ann. § 40:1061(H) .................................................................................................... 14

La. Stat. Ann. §§ 14.87.7, 14.87.8, 40:1061 .......................................................................... 13

Miss. Code Ann. § 41-41-45 ................................................................................................... 13

Miss. Code Ann. § 41-41-45(4) ............................................................................................... 14

N.C. Gen. Stat. § 90-21.81B(2) ............................................................................................... 13

Ne. Const., art. I, § 31 ............................................................................................................. 13

Neb. Rev. Stat. § 71-6917 ....................................................................................................... 14

Okla. Stat. tit. 21, § 861 ..................................................................................................... 13, 14

Okla. Stat. tit. 63, § 1-745.35 .................................................................................................. 13

S.B. 2150, § 1, 68th Leg. Sess., Reg. Sess. (N.D. 2023) ........................................................ 14

S.C. Code Ann. § 44-41-680 ................................................................................................... 13

S.C. Code Ann. § 44-41-730 ................................................................................................... 14

S.D. Codified Laws § 22-17-5.1 ................................................................. 13, 14
Tenn. Code Ann. § 39-15-213 ......................................................................... 13
Tenn. Code Ann. § 39-15-213(e) ..................................................................... 14
Tex. Health & Safety Code Ann. § 170A.002 ................................................. 13
Tex. Health & Safety Code Ann. § 170A.003 ................................................. 14
Tex. Health & Safety Code Ann. § 171.208 ................................................... 13
Utah Code Ann. § 76-7-302 ........................................................................... 13
W. Va. Code §16-2R-3 .............................................................................. 13, 14
Wis. Stat. § 940.04(1) .................................................................................... 15

**OTHER AUTHORITIES**

45 C.F.R. § 164.512(c)(3) ............................................................................... 18
Abie Green et al., CRT2 Studio for L. & Culture, Colum. L. Sch., *CRT and Family Regulation System: Toward Abolition* (2021) .......................................... 12
Abigail R. A. Aiken et al., *Safety and Effectiveness of Self-Managed Medication Abortion Provided Using Online Telemedicine in the United States: A Population Based Study*, 10 Lancet Regional Health - Ams. Vol. 10, 100200 (2022) ......................................... 10
Abigail R. A. Aiken et al., *Self Reported Outcomes and Adverse Events after Medical Abortion Through Online Telemedicine: Population Based Study in the Republic of Ireland and Northern Ireland*, 357 BMJ j2011 (2017) ................................................. 10
Advancing New Standards in Reprod. Health, *Safety and Effectiveness of First-Trimester Medication Abortion in the United States* (Aug. 2016) .................................. 10
Alison J. Patev et al., *The Interacting Roles of Abortion Stigma and Gender on Attitudes Toward Abortion Legality*, 146 Personality & Individual Differences 87 (2019) ............... 12
Alison Norris et al., *Abortion Stigma: A Reconceptualization of Constituents, Causes, and Consequences*, Women's Health Issues, May–June 2011 ................................. 11
Am. Acad. of Pediatrics, Comm. on Adolescence, *The Adolescent's Right to Confidential Care When Considering Abortion*, Pediatrics, Sept. 2022 ................................... 17
Am. Civ. Liberties Union, *New Report Finds Harassment & Mistreatment Fuels Mistrust Among LGBTQ People Towards Police* (Apr. 30, 2024) ......................................... 9
Am. Coll. Obstetricians & Gynecologists, *Confidentiality in Adolescent Health Care*, Comm. Opinion No. 803, 135 Obstetrics & Gynecology e171 (2020) ................................ 17
Andrea J. Hoopes et al., *Elevating the Needs of Minor Adolescents in a Landscape of Reduced Abortion Access in the United States*, J. Adolescent Health, Nov. 2022 ................ 18
Anuradha Kumar et al., *Conceptualising Abortion Stigma*, 11 Culture, Health & Sexuality 625 (2009) ........................................................................... 11
Ashlee Banks, *The Dangers of Health Care Workers Reporting Self-managed Abortions to Law Enforcement*, Grio (Apr. 2, 2024) ............................................... 15
Ashley Nellis, *The Color of Justice: Racial and Ethnic Disparity in State Prisons*, Sentencing Proj. (2021) ......................................................................... 9

Austin Frakt, *Bad Medicine: The Harm That Comes from Racism*, N.Y. Times (Jan. 13, 2020) .. 4

Ava Cilia, *The Family Regulation System: Why Those Committed to Racial Justice Must Interrogate It*, Harv. C.R.—C.L. L. Rev. (Feb. 17, 2021) ....................................................... 12

Bradley E. Iott et al., *Trust and Privacy: How Patient Trust in Providers Is Related to Privacy Behaviors and Attitudes*, 2019 AMIA Ann. Symp. Procs. 487 (2020) ...................................... 6

Carrie Lippy et al., *The Impact of Mandatory Reporting Laws on Survivors of Intimate Partner Violence: Intersectionality, Help-Seeking and the Need for Change*, 35 J. Fam. Violence 255 (2020) ................................................................................................................................... 5

Christian De Vos et al., Physicians for Hum. Rts., *No One Could Say: Accessing Emergency Obstetrics Information as a Prospective Prenatal Patient in Post-*Roe *Oklahoma* (2023) ........ 5

Comm. on Advancing Equity in Obstetric & Gynecologic Health Care, Am. Coll. of Obstetricians & Gynecologists, *Self-Managed Abortion* (Dec. 2024) .................................... 10

Comm. on Patient Safety & Quality Improvement & Comm. on Health Care for Underserved Women, Am. Coll. of Obstetricians & Gynecologists, *Effective Patient-Physician Communication* (2014) ..................................................................................................... 4

Daniel Grossman et al., Advancing New Standards in Reprod. Health, *Care Post-Roe: Documenting Cases of Poor-Quality Care Since the* Dobbs *Decision* (Sept. 2024) ........ 5, 8, 15

Dr. Fleming, HeyJane, *How Safe Are At-Home Abortions?* (Dec. 18, 2024) ............................... 10

Ed Pilkington, *Murder Charges Dropped Against Texas Woman for 'Self-induced Abortion'*, Guardian (Apr. 10, 2022) .................................................................................................. 12

Emily Bridges, *Advocates for Youth, Abortion and Young People in the United States* (2019) .. 17

Greer Donley & Jill Wieber Lens, *Abortion, Pregnancy Loss, & Subjective Fetal Personhood*, 75 Vand. L. Rev. 1649 (2022) ................................................................................................ 9

HIPAA Privacy Rule to Support Reproductive Health Care Privacy, 89 Fed. Reg. 32976 (Apr. 26, 2024) (codified at 45 CFR pts. 160, 164) .................................................................. 3, 18

Ian Lopez, *HHS Urged to Wrap Transgender Care Into Abortion Privacy Plan*, Bloomberg L. (Aug. 1, 2023) .................................................................................................................. 7

If/When/How: Lawyering for Reprod. Just. & Physicians for Reproductive Health, *Talking to Health Care Providers After a First Trimester Miscarriage or Abortion* (Oct. 13, 2023) ....... 15

If/When/How: Lawyering for Reprod. Just., *Patient Confidentiality and Self-Managed Abortion: A Guide to Protecting Your Patients and Yourself* (2020) ...................................................... 13

Isaac Maddow-Zimet & Candace Gibson, Guttmacher Inst., *Despite Bans, Number of Abortions in the United States Increased in 2023* (May 10, 2024) ........................................................ 10

Janet Turan & Henna Budhwani, *Restrictive Abortion Laws Exacerbate Stigma, Resulting in Harm to Patients and Providers*, 111 Am. J. Pub. Health 37 (2021) ...................................... 12

Jennifer Fong Ha et al., *Doctor-Patient Communication: A Review*, 10 Ochsner J. 38 (2010) ..... 4

Jennifer M. Taber et al., *Why Do People Avoid Medical Care? A Qualitative Study Using National Data*, 30 J. Gen. Internal Med. 290 (2014) ............................................................... 4

Jill R. McTavish et al., *Children's and Caregivers' Perspectives About Mandatory Reporting of Child Maltreatment: A Meta-Synthesis of Qualitative Studies*, BMJ Open, Apr. 2019 ............ 5

Johanna Birkhäuer et al., *Trust in the Health Care Professional and Health Outcome: A Meta-Analysis*, PLoS One, Feb. 2017 ................................................ 5

Kate Coleman-Minahan et al., *Adolescents Obtaining Abortion Without Parental Consent: Their Reasons and Experiences of Social Support*, 52 Perspectives on Sexual & Reprod. Health 15 (2020) .................................................................... 17

Kavitha Surana, *Afraid to Seek Care Amid Georgia's Abortion Ban, She Stayed at Home and Died*, ProPublica (Sept. 18, 2024) ............................................ 16

Lakota People's L. Proj., *Native Lives Matter* (2015) ............................... 9

Laura Huss et al., If/When/How: Lawyering for Reprod. Just., *Self-Care, Criminalized* (Oct. 2023) ........................................................................ 12, 13

Lauren J. Ralph et al., *The Role of Parents and Partners in Minors' Decisions to Have an Abortion and Anticipated Coping After Abortion*, 54 J. Adolescent Health 428 (2014) .......... 17

Liza Fuentes et al., *Adolescents' and Young Adults' Reports of Barriers to Confidential Health Care and Receipt of Contraceptive Services*, 62 J. Adolescent Health 36 (2018) ..................... 7

Lori Freedman, *Forgiveness in the Abortion Clin*ic, 12 Atrium 6 (2014) .................................... 12

Lori Frohwirth et al., *Managing Religion and Morality Within the Abortion Experience: Qualitative Interviews with Women Obtaining Abortions in the U.S.*, 10 World Med. & Health Pol'y 381 (2018) ........................................................... 11

Lynn M. Paltrow & Jeanne Flavin, *Arrests of and Forced Interventions on Pregnant Women in the United States, 1973–2005: Implications for Women's Legal Status and Public Health*, 38 J. Health Pol., Pol'y & L. 299 (2013) ................................................ 9

M. Antonia Biggs et al., *Perceived Abortion Stigma and Psychological Well-being Five Years After Being Denied a Wanted Abortion*, PLoS One, Jan. 2020 ............................... 11

Mabel Felix et al., *What's Next for State Abortion Ballot Initiatives?*, KFF (Dec. 18, 2024) ...... 13

Martha Hostetter & Sarah Klein, *Understanding and Ameliorating Medical Mistrust Among Black Americans*, Commonwealth Fund (Jan. 14, 2021) .......................................... 6

Melissa Gira Grant, *The Growing Criminalization of Pregnancy*, New Republic (May 5, 2022) ........................................................................................ 13, 15

Mike Hixenbaugh et al., *Mandatory Reporting Was Supposed to Stop Child Abuse. It Punishes Poor Families Instead.*, ProPublica (Oct. 12, 2022) ................................... 5

Paige Nong et al., *Discrimination, Trust, and Withholding Information from Providers: Implications for Missing Data and Inequity*, SSM - Population Health, June 2022 ................. 6

Pamela Sankar et al., *Patient Perspectives on Medical Confidentiality: A Review of the Literature*, 18 J. Gen. Internal Med. 659 (2003) ........................................ 6

Paula Abrams, *Abortion Stigma: The Legacy of Casey*, 35 Women's Rts. L. Rep. 299 (2014) .. 12

Paula Abrams, *The Scarlet Letter: The Supreme Court and the Language of Abortion Stigma*, 19 Mich. J. Gender & L. 293 (2013) ................................................ 11

Pregnancy Just., *Pregnancy Justice Report Reveals Massive Scope of the Criminalization of Pregnant People* (Sept. 19, 2023) ................................................ 9

Priya R. Pathak & Adriana Chou, *Confidential Care for Adolescents in the U.S. Health Care System*, 6 J. Patient-Centered Rsch. & Revs. 46 (2019) ................................................ 17

Rebecca Adams, *Immigration Crackdown Raises Fears of Seeking Health Care*, Roll Call (Jan. 25, 2018) ................................................................................................................ 9

Rebecca J. Cook, *Stigmatized Meanings of Criminal Abortion Law, in Abortion Law in Transnational Perspectives: Cases and Controversies* (Rebecca J. Cook et al. eds., 2014).... 12

Roxanne Szal, *Rest in Power: A Running List of the Preventable Deaths Caused by Abortion Bans*, Ms. (Nov. 26, 2024) ................................................................................. 16

S.E. James et al., Nat'l Ctr. for Transgender Equality, *The Report of the 2015 U.S. Transgender Survey* (2016) .................................................................................................. 19

Spencer Donovan & Eric Connor, *SC Woman Arrested for Abortion. What Does This Mean as Ban Debate Continues?*, Post & Courier (Mar. 5, 2023) ................................................ 12

Stefanie Mollborn et al., *Delayed Care and Unmet Needs Among Health Care System Users: When Does Fiduciary Trust in a Physician Matter?*, 40 Health Servs. Res. 1898 (2005) ......... 6

Tara O'Neill Hayes & Margaret Barnhorst, Am. Action Forum, *Incarceration and Poverty in the United States* (June 30, 2020) ............................................................................. 9

Taylor L. Boyer et al., *Binary and Nonbinary Transgender Adolescents' Healthcare Experiences, Avoidance, and Well Visits*, 71 J. Adolescent Health 438 (2022) ...................... 19

Tracy A. Weitz & Katrina Kimport, *The Discursive Production of Abortion Stigma in the Texas Ultrasound Viewing Law*, 30 Berkeley J. Gender L. & Just. 6 (2015) .................................... 12

Vern Harner et al., *Transgender Patient Preferences When Discussing Gender in Health Care Settings*, JAMA Network Open, Feb. 2024 ............................................................. 19

Whitney R. Garney et al., *Adolescent Healthcare Access: A Qualitative Study of Provider Perspectives*, 15 J. Primary Care & Cmty. Health 1 (2024) ...................................... 7

Williams Inst., UCLA Sch. of L., *LGBQ People Six Times More Likely Than General Public to Be Stopped by Police* (May 19, 2021) ..................................................................... 9

## Interest of Proposed *Amici Curiae*

If/When/How: Lawyering for Reproductive Justice is a non-profit organization that works to transform the law and the legal profession in service of reproductive justice. As one of the leading legal advocacy organizations working to halt the criminalization of people in relation to pregnancy outcomes such as abortion, miscarriage, and stillbirth, If/When/How also regularly provides public education and technical assistance to medical providers on mandatory reporting laws, the Health Insurance Portability and Accountability Act of 1996 and its attendant rules ("HIPAA"), and the First Amendment. If/When/How advocates to ensure that young people have the legal rights and resources they need to make important decisions about their reproductive wellbeing and, through its Repro Legal Helpline, provides legal information, advice, representation, and lawyer referrals to young people seeking abortion care. If/When/How has also produced and co-produced widely cited reports on the phenomenon of pregnancy-related arrests; been invited to testify before federal, state, and local legislative bodies about the criminalization of abortion; and submitted reports about punishment of abortion in the United States to United Nations human rights experts. If/When/How receives thousands of calls every year from individuals about the legal risks they may face by seeking reproductive health care in the formal health care system. If/When/How's interest in the outcome of this case hinges on its deep dedication to confidential access to the full spectrum of reproductive health care without criminalization, including ensuring health care providers understand the privacy of care the law protects.

Twenty additional *amici* are organizations that provide healthcare services subject to HIPAA or are legal advocates whose focus includes the privacy of sensitive health information: Access Bridge, a program of the Bridge Center at the Public Health Institute; Advocates for

Trans Equality; Aria Medical Clinic; Center for Reproductive Rights; Doing Right By Birth;

Electronic Privacy Information Center; FemHealth USA; Legal Action Center; Movement for

Family Power; MYA Network; National Abortion Federation; National Center for Youth Law;

National Partnership for Women & Families; Nevada County Citizens for Choice; Physicians for

Reproductive Health; Positive Women's Network-USA; Possible Health; Reproductive Health

Access Project; Society of Family Planning; and UCSF Bixby Center for Global Reproductive

Health. Twenty additional *amici* are individual health care providers, law professors, and

researchers whose work provides unique insight to the importance of medical privacy: Dr. Aishat

Olatunde, MD, MS; Dr. Alexandra K. Fayne-Frederick, MD; Dr. Arianna Cassidy, MD; Dr. Cara

Heuser, MD, MS; Dr. Carrie Pierce, MD; Dr. Chris Creatura, MD; Professor David S. Cohen,

JD; Professor Greer Donley, JD; Dr. Jessica L. Rubino, MD; Dr. Josephine Urbina, MD; Dr.

Julia McDonald, DO, MPH; Dr. Juliana Friend, PhD; Dr. Lauren Carlos, MD, MS; Dr. Megan

Masten, MD; Dr. Mishka Terplan, MD, MPH, FACOG, DFASAM; Dr. Panna Lossy, MD, Dr.

Renee E. Mestad, MD, MSCI; Dr. Robin Schickler, MD; Dr. Zoe Taylor, MD, MBA; and Dr.

Yasaman Zia, PhD. While each *amicus* has distinct areas of focus, they share a common interest

in ensuring that all people in the United States, including young people, can safely access quality

reproductive health care without criminalization. These *amici*'s full statements of interest are

collected in **Appendix A**.

### Introduction & Summary of Argument

In the post-*Dobbs* landscape, and under increased threat of investigation, arrest, and

prosecution, patients in the United States are afraid to talk to their health care providers about

reproductive health care. That care may include basic sexual and reproductive health, gender-

affirming care, abortion, or care after a pregnancy loss. Young people are particularly hesitant to

2

seek this medical care when they fear their provider will violate their privacy. This fear is exacerbated by the fact that some providers believe the law requires them to report lawful reproductive health care to law enforcement or the family policing system. Put simply, it does not.

Reporting related to reproductive health care and related criminalization negatively impacts both patients and their providers. Criminalization has wide-ranging, even life-ending, consequences: it scares people away from seeking necessary medical care, subjects them to cruel and humiliating investigations in the midst of medical emergencies, and consigns them to lasting stigma and condemnation in their communities. These harms are disproportionately borne by people who are already discriminated against due to their race, sex, age, or socioeconomic status. Accordingly, it is critical to the Court's adjudication of the issues under consideration in this matter to understand the harms that people face when they are criminalized in relation to health care, as well as how medical privacy regulations can reduce those harms.

The HIPAA Privacy Rule to Support Reproductive Health Care Privacy ("2024 Rule")[1] is intended to send an important message to patients: Individuals should not be "afraid to seek health care from, or share important information with, their health care providers because of a concern that their sensitive information will be disclosed outside of their relationship with their health care provider."[2] The 2024 Rule mitigates harm by attempting to ensure that patients seeking lawful reproductive health care are not criminalized via investigations or reporting of lawful care provision. Understanding that federal law protects against unauthorized disclosures

---

[1] HIPAA Privacy Rule to Support Reproductive Health Care Privacy, 89 Fed. Reg. 32976 (Apr. 26, 2024) (codified at 45 CFR pts. 160, 164).
[2] *Id.* at 32977.

of confidential health information contributes to patients' sense of safety with and trust in their providers and gives patients more confidence to discuss sensitive care with those providers.

The 2024 Rule and HIPAA collectively protect the basic medical privacy of all patients—including those seeking reproductive health care. Now more than ever, while people are dying and suffering grievous injuries due to fear-driven care avoidance or denials, health care providers must respect reproductive health privacy. The 2024 Rule obligates that respect consistent with HIPAA's mandate, and the Court should grant Defendants-Intervenors' Motion for Summary Judgment and Defendant's Motion to Dismiss, or in the alternative, for Summary Judgment.

## Argument

### I.    Protecting the privacy of reproductive health care information helps ensure patient safety.

It is critical to public health that patients feel free to have unfettered discussions about reproductive health with providers, as candor contributes to higher-quality care and patient satisfaction.[3] Patients who are unable to trust their providers delay seeking or altogether avoid care, leading to adverse health outcomes.[4] Patient-provider trust has eroded in recent years as states increasingly restricted or criminalized reproductive health care, leading to elevated patient privacy concerns.

---

[3] *See* Comm. on Patient Safety & Quality Improvement & Comm. on Health Care for Underserved Women, Am. Coll. of Obstetricians & Gynecologists, *Effective Patient-Physician Communication* 1 (2014), https://tinyurl.com/9fbfdbb4; Jennifer Fong Ha et al., *Doctor-Patient Communication: A Review*, 10 Ochsner J. 38, 38–39 (2010), https://tinyurl.com/5by89ttn.

[4] *See* Jennifer M. Taber et al., *Why Do People Avoid Medical Care? A Qualitative Study Using National Data*, 30 J. Gen. Internal Med. 290, 296 (2014); Austin Frakt, *Bad Medicine: The Harm That Comes from Racism*, N.Y. Times (Jan. 13, 2020), https://tinyurl.com/yf755s5j.

The threat of mandatory and permissive reporting to police and the family policing

system has been shown to deter help-seeking behaviors.[5] This threat is exacerbated when the

care an individual is seeking is either stigmatized or subject to increased state scrutiny. Patient

trust is further strained when the threat of criminal charges pressures providers to seek legal

clearance before giving patients life-saving information or care–or to deny that care entirely.[6]

The 2024 Rule has restored some of this lost trust by reassuring patients that information about

their lawful reproductive health care is protected by law.

A. **The privacy of health information promotes patient trust in health care providers.**

Strong privacy protections for patients are a key part of dismantling the barriers to high

quality health care for all, as patient-provider relationships rooted in trust enhance health

outcomes. Patients need to trust their providers in order to disclose sensitive personal

information about their health and behavior, and patients who trust their providers ultimately

report better compliance with care plans, fewer symptoms, and greater quality of life.[7] In

---

[5] Carrie Lippy et al., *The Impact of Mandatory Reporting Laws on Survivors of Intimate Partner Violence: Intersectionality, Help-Seeking and the Need for Change*, 35 J. Fam. Violence 255, 260–62 (2020); Jill R. McTavish et al., *Children's and Caregivers' Perspectives About Mandatory Reporting of Child Maltreatment: A Meta-Synthesis of Qualitative Studies*, BMJ Open, Apr. 2019, at 6, 9, https://tinyurl.com/9w4n7zdv; *see also* Mike Hixenbaugh et al., *Mandatory Reporting Was Supposed to Stop Child Abuse. It Punishes Poor Families Instead.*, ProPublica (Oct. 12, 2022), https://tinyurl.com/4n6yyfys ("[Philadelphia City Councilmember] Oh said not enough has been done to mitigate the fear created by mandatory reporting, especially in poorer Black communities. 'In those neighborhoods, everyone knows about mandatory reporters. . . . [s]o when your child falls off a bike, you've got to think, "Do we take him to the hospital or not?"'").

[6] *See generally* Daniel Grossman et al., Advancing New Standards in Reprod. Health, *Care Post-Roe: Documenting Cases of Poor-Quality Care Since the Dobbs Decision* (Sept. 2024), https://tinyurl.com/5cw25cey; Christian De Vos et al., Physicians for Hum. Rts., *No One Could Say: Accessing Emergency Obstetrics Information as a Prospective Prenatal Patient in Post-Roe Oklahoma* (2023), https://phr.org/our-work/resources/oklahoma-abortion-rights/.

[7] *See* Johanna Birkhäuer et al., *Trust in the Health Care Professional and Health Outcome: A Meta-Analysis*, PLoS One, Feb. 2017, at 6–8, https://doi.org/10.1371/journal.pone.0170988; Bradley E. Iott et al., *Trust and Privacy: How Patient Trust in Providers Is Related to Privacy*

contrast, patients do not feel safe to share these details—which may be necessary for providers to run proper tests and recommend appropriate treatment—with providers that they do not trust with confidentiality.[8] When patients do not trust providers to maintain confidentiality, they withhold health information, delay care, or avoid care entirely, all of which can lead to adverse health outcomes.[9]

Patient trust is difficult to develop, particularly for groups that experience discrimination, lack financial resources, or have historically had their trust in the medical system abused.[10] One

---

*Behaviors and Attitudes*, 2019 AMIA Ann. Symp. Procs. 487, 487 (2020), https://pubmed.ncbi.nlm.nih.gov/32308842/ ("[P]atient concerns about the privacy of their health information can impede their access to health care and hinder disclosure to providers, creating incomplete medical records."); Stefanie Mollborn et al., *Delayed Care and Unmet Needs Among Health Care System Users: When Does Fiduciary Trust in a Physician Matter?*, 40 Health Servs. Res. 1898, 1898–99, 1910–11 (2005) ("Most patients who have a trusting relationship with their physicians are less likely than those with less trust to report having *unmet health care needs*.").

[8] *See* Iott et al., *supra* note 7, at 487 ("Complete information sharing by patients with providers is necessary to ensure the quality and accuracy of data available in health information systems. . . . One dimension, in particular, seems to matter more than others for ameliorating privacy concerns: trust in physician confidentiality." (footnotes omitted)).

[9] *See, e.g.*, Paige Nong et al., *Discrimination, Trust, and Withholding Information from Providers: Implications for Missing Data and Inequity*, SSM - Population Health, June 2022, at 2, https://doi.org/10.1016/j.ssmph.2022.101092 ("Patients are more likely to withhold information when they are concerned about specific aspects of provider behavior, their privacy, and who will have access to their information."); Iott et al., *supra* note 7, at 490 ("[T]rust in confidentiality is associated with lower odds of having ever withheld info . . . ."); Mollborn et al., *supra* note 7, at 1898, 1910–11 ("[T]rust in a physician is negatively associated with the likelihood of reporting delayed care and unmet health care needs among most patients."); Pamela Sankar et al., *Patient Perspectives on Medical Confidentiality: A Review of the Literature*, 18 J. Gen. Internal Med. 659, 659, 666 (2003) (noting that "[a] significant minority of patients distrust confidentiality protections, leading some to report that they delay or forgo medical care." Those patients will "delay or forego treatment, or alter stories about symptoms and onset of illness, to be sure those details never emerge publicly. . . . or decide[] to withhold information during clinical interactions. . . .").

[10] *See, e.g.*, Martha Hostetter & Sarah Klein, *Understanding and Ameliorating Medical Mistrust Among Black Americans*, Commonwealth Fund (Jan. 14, 2021), https://tinyurl.com/mrxb9mdf (describing medical mistrust in the Black community due to historical and present-day medical abuse and discrimination).

of these groups is young people,[11] who often have fewer privacy protections than their adult counterparts for the same forms of care.[12] Additionally, people seeking and receiving reproductive health care and medically necessary gender-affirming care, whose privacy concerns have intensified  as states continue to pass laws restricting access to that care, also have difficulty trusting health care providers.[13] Without assurance that their health care data will remain confidential, these groups will all suffer from reduced trust in their providers and are likely to experience worse health outcomes.

Strong health privacy regulations protect patient information, and protecting patient information allows for trusting patient-provider relationships and high quality health care. The 2024 Rule merely ensures that patients and providers can maintain that trust in an increasingly complex legal landscape via basic confidentiality protections for lawful care.

**B. Patients who fear criminalization avoid health systems and experience adverse outcomes.**

The *Dobbs* decision paved the way for normalizing the criminalization of abortion—both in terms of green-lighting state bans on abortion as well as investigations of people who end or lose pregnancies. Criminalization includes both making an activity explicitly illegal and treating it as illegal even though it is not. In the context of medicine, any uncertainty about whether

---

[11] Whitney R. Garney et al., *Adolescent Healthcare Access: A Qualitative Study of Provider Perspectives*, 15 J. Primary Care & Cmty. Health 1, 2, 7 (2024), https://doi.org/10.1177/21501319241234586 ("[A]dolescents often avoid initiating conversations about sensitive topics with their healthcare providers because of fear, stigma, embarrassment, and/or a lack of trust" and providers "stated that trust is a precondition to discussing sensitive topics with adolescents, yet it is difficult to establish.").
[12] *See* Liza Fuentes et al., *Adolescents' and Young Adults' Reports of Barriers to Confidential Health Care and Receipt of Contraceptive Services*, 62 J. Adolescent Health 36, 38, 42–43 (2018) (discussing confidentiality concerns and resource concerns among young people accessing health care).
[13] *See, e.g.*, Ian Lopez, *HHS Urged to Wrap Transgender Care Into Abortion Privacy Plan*, Bloomberg L. (Aug. 1, 2023), https://tinyurl.com/24w85pas.

providers or the state will view certain types of health care as "illegal" creates a climate of fear that may cause some individuals to delay or avoid seeking necessary medical care.[14]

Even during medical emergencies related to reproductive health, when the focus should be on accessing needed care, patients experience the fear and stigma that comes with possible law enforcement involvement. The *Care Post*-Roe report[15] is a compilation of stories demonstrating that clinical care worsened following *Dobbs* due to state abortion bans. In one heartbreaking example from the report, providers sent a patient who needed emergency care for a nonviable pregnancy home because of her state's ban.[16] As a result, she developed an infection and sepsis, and after returning to the emergency room to receive treatment that saved her life, she asked her doctor, "could [you or] I go to jail for this? Or did this count as life threatening yet?"[17]

Another patient started bleeding during a confirmed pregnancy in a state with an abortion ban, so she traveled out of state to obtain miscarriage care.[18] After returning home, she told her physician she had been "too scared to go to the hospital or her regular ob/gyn to confirm [the miscarriage] due to the current news and knowledge that her ob/gyn was openly religious and anti-choice."[19] She reported being "worried that the miscarriage would be misconstrued."[20]

The fear of criminalization related to health care is heightened for individuals who are more likely to be criminalized in general, including people who have insecure immigration

---

[14] *See, e.g.*, Grossman, *supra* note 6, at 20.

[15] *See generally id.*

[16] *Id.* at 7. The medical emergency in question was preterm prelabor rupture of membranes, or PPROM. *Id.* Regardless of state abortion law, denying stabilizing treatment to patients presenting with severe obstetric complications like PPROM violates the Emergency Medical Treatment & Labor Act (EMTALA). *See id.* at 23.

[17] *Id.*

[18] *Id.* at 18.

[19] *Id.*

[20] *Id.*

8

statuses; people of color, in particular Black and Indigenous people; people who are LGBTQ, in

particular transgender people; and people who have physical or mental disabilities.[21] One study

found that, among women seeking medical care related to pregnancy, women of color were

significantly more likely to be reported to law enforcement by health care providers—the very

people they turned to for help—than white women.[22] This type of discrimination results in

disproportionate punishment. In Florida, for example, Black people constituted only 15% of the

population, yet they accounted for 75% of pregnancy-related arrests.[23] In South Carolina, where

Black people constituted only 30% of the population, they accounted for 74% of arrests related

to pregnancy.[24] Women of color and women with low incomes are also more likely to experience

pregnancy loss, making them more likely to have their pregnancies criminalized.[25] This fear

---

[21] *See, e.g.*, Rebecca Adams, *Immigration Crackdown Raises Fears of Seeking Health Care*, Roll Call (Jan. 25, 2018), https://tinyurl.com/p9v7t7a9; Williams Inst., UCLA Sch. of L., *LGBQ People Six Times More Likely Than General Public to Be Stopped by Police* (May 19, 2021), https://tinyurl.com/ysm3bvwb; Am. Civ. Liberties Union, *New Report Finds Harassment & Mistreatment Fuels Mistrust Among LGBTQ People Towards Police* (Apr. 30, 2024), https://tinyurl.com/333uk9bc. Women of color and women with low incomes are significantly more likely to be arrested, charged, prosecuted, convicted, and more heavily punished than are white, wealthier women, and this holds true for pregnancy-related criminalization. Ashley Nellis, *The Color of Justice: Racial and Ethnic Disparity in State Prisons* 4–5, Sentencing Proj. (2021), https://tinyurl.com/mpkpdjsa (Black people are nearly five times likelier than white people to be imprisoned and Latinx people are 1.3 times as likely); Lakota People's L. Proj., *Native Lives Matter* 6 (2015), https://lakotalaw.org/resources/native-lives-matter (Native American women are imprisoned at six times the rate of white women); Tara O'Neill Hayes & Margaret Barnhorst, Am. Action Forum, *Incarceration and Poverty in the United States* (June 30, 2020), https://tinyurl.com/yc5daznh; Pregnancy Just., *Pregnancy Justice Report Reveals Massive Scope of the Criminalization of Pregnant People* (Sept. 19, 2023), https://tinyurl.com/5n6pf3k3.
[22] Lynn M. Paltrow & Jeanne Flavin, *Arrests of and Forced Interventions on Pregnant Women in the United States, 1973–2005: Implications for Women's Legal Status and Public Health*, 38 J. Health Pol., Pol'y & L. 299, 326–27 (2013).
[23] *Id.* at 311.
[24] *Id.* at 311–12.
[25] *See* Greer Donley & Jill Wieber Lens, *Abortion, Pregnancy Loss, & Subjective Fetal Personhoo*d, 75 Vand. L. Rev. 1649, 1654 (2022).

actively keeps people from accessing pregnancy-related health care and causes adverse health outcomes.

## II.    The 2024 Rule promotes patient safety by preventing reporting driven by confusion, stigma, or personal bias.

Regardless of state abortion restrictions, people still need abortion care, post-abortion care, and miscarriage management.[26] But abortion bans make it more difficult for individuals to access abortion and miscarriage care in the formal health care system. Individuals in states where abortion is banned who wish or need to have an abortion in a clinic or via telemedicine are forced to travel out of state for that care, and individuals who lack the resources to access this care will endure forced pregnancies. Still others will choose to self-manage their abortion,[27]

---

[26] *See* Isaac Maddow-Zimet & Candace Gibson, Guttmacher Inst., *Despite Bans, Number of Abortions in the United States Increased in 2023* (May 10, 2024), https://tinyurl.com/5br77x4k.

[27] A self-managed abortion is an abortion in which someone ends their own pregnancy outside of the formal health care system. These abortions are often supported by friends, family members, or partners. Studies have consistently shown that self-management with pills is as safe as clinically dispensed medication abortion. Less than one percent of all medication abortions— including self-managed abortions with pills—cause serious adverse events, meaning that abortion with pills is safer than taking Tylenol, Aspirin, or Viagra. *See* Abigail R. A. Aiken et al., *Safety and Effectiveness of Self-Managed Medication Abortion Provided Using Online Telemedicine in the United States: A Population Based Study*, 10 Lancet Regional Health - Ams. Vol. 10, 100200 (2022), https://doi.org/10.1016/j.lana.2022.100200 ("[S]erious adverse events [were] uncommon with 1% receiving a blood transfusion or intravenous antibiotics. No deaths were reported . . . ."); Abigail R. A. Aiken et al., *Self Reported Outcomes and Adverse Events after Medical Abortion Through Online Telemedicine: Population Based Study in the Republic of Ireland and Northern Ireland*, 357 BMJ j2011 (2017), https://doi.org/10.1136/bmj.j2011; Advancing New Standards in Reprod. Health, *Safety and Effectiveness of First-Trimester Medication Abortion in the United States* 1 (Aug. 2016), https://tinyurl.com/4twdn7pv; Dr. Fleming, HeyJane, *How Safe Are At-Home Abortions?* (Dec. 18, 2024), https://tinyurl.com/4a53n44b. However, self-managed abortion can carry legal risks for the abortion seeker and the family and community members who help them. *See* Comm. on Advancing Equity in Obstetric & Gynecologic Health Care, Am. Coll. of Obstetricians & Gynecologists, *Self-Managed Abortion* (Dec. 2024), https://tinyurl.com/nnvsm229 ("The majority of SMAs are completed safely with [pills]. . . . For many people, the greatest risk of harm related to SMA comes from the threat of criminalization. . . Criminalization makes people less safe and harms the confidential patient–practitioner relationship.").

which, though not a crime in the vast majority of states, is frequently treated as such, contributing to patient fear of seeking health care. Health care providers are often confused about what they must report, which the 2024 Rule clarifies. The 2024 Rule prevents providers' confusion, stigma, and bias from interfering with patient privacy and safety, consistent with HIPAA's mandate.

### A. Abortion stigma and overregulation cause criminalization.

Stigma around abortion contributes to patient and provider confusion about abortion's legality and related reporting requirements, and that in turn contributes to criminalization. Even in states where abortion is generally allowed under state law, people who have abortions frequently encounter stigma or fear encountering such stigma.[28] Abortion stigma is largely rooted in gender stereotypes, as it ascribes "negative attribute[s] . . . to women who seek to terminate a pregnancy that marks them . . . as inferior to ideals of womanhood."[29] American society expects and encourages women to be or want to be mothers, and accordingly, women who have an abortion or a miscarriage are seen as problematically nonconforming.[30] Stigma, or fear of its weaponization, may also be heightened for abortion-seekers due to religious beliefs in their families and communities.[31] Researchers have found that religious background, abortion

---

[28] Alison Norris et al., *Abortion Stigma: A Reconceptualization of Constituents, Causes, and Consequences*, Women's Health Issues, May–June 2011, at 49, 50 (citing research revealing that "two out of three women having abortions anticipate stigma if others were to learn about it; 58% felt they needed to keep their abortion secret from friends and family").

[29] Anuradha Kumar et al., *Conceptualising Abortion Stigma*, 11 Culture, Health & Sexuality 625, 628 (2009); Paula Abrams, *The Scarlet Letter: The Supreme Court and the Language of Abortion Stigma*, 19 Mich. J. Gender & L. 293, 299 (2013).

[30] M. Antonia Biggs et al., *Perceived Abortion Stigma and Psychological Well-being Five Years After Being Denied a Wanted Abortion,* PLoS One, Jan. 2020, at 2-3, https://doi.org/10.1371/journal.pone.0226417.

[31] *See, e.g.*, Lori Frohwirth et al., *Managing Religion and Morality Within the Abortion Experience: Qualitative Interviews with Women Obtaining Abortions in the U.S.*, 10 World Med. & Health Pol'y 381, 397 (2018), https://doi.org/10.1002/wmh3.289 (citing Lori Freedman,

stigma, and gender stereotypes interact to inform beliefs that abortion should be banned or criminalized.[32] Abortion regulations and bans, in turn, contribute to existing stigma by falsely exceptionalizing abortion as uniquely unsafe, and therefore wrong and harmful.[33]

Stigma and criminalization have led to confusion among health care providers and patients as to whether the provision of abortion care in any instance, including self-management, must be disclosed to law enforcement[34] or the family policing system.[35] Providers are generally not required to report the fact of a patient self-managing an abortion to law enforcement or the

---

*Forgiveness in the Abortion Clinic*, 12 Atrium 6, 6–8 (2014)) (noting that some abortion seekers spoke "to abortion clinic staff about their spiritual discomfort with their abortion decision . . . mainly because abortion was so stigmatized in their own communities . . .").

[32] *See* Alison J. Patev et al., *The Interacting Roles of Abortion Stigma and Gender on Attitudes Toward Abortion Legality*, 146 Personality & Individual Differences 87, 91 (2019).

[33] Janet Turan & Henna Budhwani, *Restrictive Abortion Laws Exacerbate Stigma, Resulting in Harm to Patients and Providers*, 111 Am. J. Pub. Health 37, 37–38 (2021); *see also* Paula Abrams, *Abortion Stigma: The Legacy of Casey*, 35 Women's Rts. L. Rep. 299, 301–02 (2014), https://lawcommons.lclark.edu/faculty_articles/20; Tracy A. Weitz & Katrina Kimport, *The Discursive Production of Abortion Stigma in the Texas Ultrasound Viewing Law*, 30 Berkeley J. Gender L. & Just. 6, 8–10 (2015), https://doi.org/10.15779/Z388K74W2H; Rebecca J. Cook, *Stigmatized Meanings of Criminal Abortion Law*, *in* Abortion Law in Transnational Perspectives: Cases and Controversies 349 (Rebecca J. Cook et al. eds., 2014) ("The criminal prohibition of abortion contributes to exceptionalizing women seeking abortion as deviant . . .  and supportive parents as 'negligent' or 'unfit.'").

[34] Laura Huss et al., If/When/How: Lawyering for Reprod. Just., *Self-Care, Criminalized* 30–32 (Oct. 2023), https://ifwhenhow.org/resources/selfcare-criminalized/; *see also* Ed Pilkington, *Murder Charges Dropped Against Texas Woman for 'Self-induced Abortion'*, Guardian (Apr. 10, 2022), https://tinyurl.com/3hbcdx2y; Spencer Donovan & Eric Connor, *SC Woman Arrested for Abortion. What Does This Mean as Ban Debate Continues?*, Post & Courier (Mar. 5, 2023), https://tinyurl.com/jm93sjb6.

[35] The system sometimes referred to as the "child welfare system" is referred to here as the "family policing system." *See* Abie Green et al., CRT2 Studio for L. & Culture, Colum. L. Sch., *CRT and Family Regulation System: Toward Abolition* (2021), https://tinyurl.com/zevb47bv ("Child Welfare System—the term itself implies that the system's purpose is to protect the welfare and best interests of children. But the reality of how the child welfare system functions— a system of surveillance, regulation, and family separation—makes this name a misnomer."); Ava Cilia, *The Family Regulation System: Why Those Committed to Racial Justice Must Interrogate It*, Harv. C.R.—C.L. L. Rev. (Feb. 17, 2021).

family policing system.[36] Despite that, 45% of known cases of self-managed abortion criminalization from 2000 to 2020 stemmed from a health care provider reporting a patient to law enforcement.[37] Though these reports sometimes stem from a provider's antipathy toward abortion itself and people who obtain abortions, more often health care providers are simply unclear about their state's laws and reporting requirements.[38]

The political climate post-*Dobbs* has further conflated abortion with criminality. Twelve states in the U.S. are enforcing total bans on abortion,[39] others enacted total bans that are enjoined pending litigation,[40] others are enforcing pre-viability bans,[41] and three states passed laws that purport to allow any person to civilly sue anyone who provides or helps another person have an abortion.[42] Subsequent media reporting on bans "criminalizing abortion" can

---

[36] If/When/How: Lawyering for Reprod. Just., *Patient Confidentiality and Self-Managed Abortion: A Guide to Protecting Your Patients and Yourself* 2 (2020), https://tinyurl.com/MandatoryReportingFactSheets. Though states may require, for example, reporting an injury that happened in the course of an unsafe self-managed abortion, the fact of the self-managed abortion is not reportable. *Id.*

[37] Huss, *supra* note 34, at 30.

[38] Melissa Gira Grant, *The Growing Criminalization of Pregnancy*, New Republic (May 5, 2022), https://newrepublic.com/article/166312/criminalization-abortion-stillbirths-miscarriages.

[39] *See* Ala. Code § 26-23H-4; Ark. Code Ann. §§ 5-61-301–304; Idaho Code § 18-622(1); Ind. Code § 16-34-2-1(a); Ky. Rev. Stat. Ann. § 311.772; La. Stat. Ann. §§ 14.87.7, 14.87.8, 40:1061; Miss. Code Ann. § 41-41-45; Okla. Stat. tit. 21, § 861; S.D. Codified Laws § 22-17-5.1; Tenn. Code Ann. § 39-15-213; Tex. Health & Safety Code Ann. § 170A.002; W. Va. Code §16-2R-3.

[40] *See, e.g.*, Order Granting Mot. for TRO, *Johnson v. State*, No. 18853 (Wyo. Dist. Ct. Mar. 22, 2023 (temporarily enjoining Wyoming's total abortion ban); Order on Def.'s Mot. for Summ. J., *Access Indep. Health Servs., Inc. v. Wrigley*, No. 08-2022-CV-01608 (N.D. Dist. Ct. Sept. 12, 2024) (finding North Dakota's total ban unconstitutional). Total bans passed by Arizona, Ohio, and Missouri were rendered unconstitutional by ballot measures. *See* Mabel Felix et al., *What's Next for State Abortion Ballot Initiatives?*, KFF (Dec. 18, 2024), https://tinyurl.com/w9umh5st.

[41] *See, e.g.*, Fla. Stat. § 390.0111 (six-week ban); Ga. Code Ann. § 16-12-141 (six-week ban); Iowa Code § 146E.2 (six-week ban); Ne. Const., art. I, § 31 (ban at second trimester); N.C. Gen. Stat. § 90-21.81B(2) (twelve-week ban); S.C. Code Ann. § 44-41-680 (six-week ban); Utah Code Ann. § 76-7-302 (eighteen-week ban).

[42] *See* Tex. Health & Safety Code Ann. § 171.208; Okla. Stat. tit. 63, § 1-745.35 (held unconstitutional in *Okla. Call for Reprod. Just. v. State*, 531 P.3d 117 (Okla. 2023)); Idaho

inadvertently suggest to the lay listener that these bans penalize people who have abortions, even though nearly every abortion ban explicitly exempts the abortion-seeker from criminal liability.[43] Yet, the aura of illegality taints people who seek to end their pregnancies and

---

Code §§ 18-8807, 18-623. Parts of the Idaho law are enjoined, but the provisions that prohibit transporting or sheltering minors are in effect. *See Matsumoto v. Labrador*, 122 F.4th 787 (9th Cir. 2024) (affirming in part and reversing in part *Matsumoto v. Labrador*, 701 F. Supp. 3d 1032 (D. Idaho 2023)).

[43] *See, e.g.*, Ala. Code § 26-23H-5 ("No woman upon whom an abortion is performed or attempted to be performed shall be criminally or civilly liable."); Ark. Code Ann. § 5-61-304(c) ("[T]his section does not … [a]uthorize the charging or conviction of a woman with any criminal offense in the death of her own unborn child"); Idaho Code § 18-622(5) ("Nothing in this section shall be construed to subject a pregnant woman on whom any abortion is performed or attempted to any criminal conviction and penalty"); Ind. Code Ann. § 35-41-3-12(a) ("It is a defense to any crime involving the death of or injury to a fetus that the defendant was a pregnant woman who committed the unlawful act with the intent to terminate her pregnancy."); Iowa Code § 146E.2(4) ("This section shall not be construed to impose civil or criminal liability on a woman upon whom an abortion is performed in violation of this section."); Ky. Rev. Stat. Ann. § 311.7705(4) ("A pregnant woman on whom an abortion is intentionally performed or induced" is not guilty of violating or conspiring to violate the law and cannot be held civilly liable); La. Stat. Ann. § 40:1061(H) ("Nothing in this Section may be construed to subject the pregnant mother upon whom any abortion is performed or attempted to any criminal conviction and penalty."); Miss. Code Ann. § 41-41-45(4) ("any person, except the pregnant woman" who provides an abortion can be held criminally liable.); Neb. Rev. Stat. § 71-6917 ("No woman upon whom an abortion is attempted, induced, or performed shall be liable for a violation of the Preborn Child Protection Act."); S.B. 2150, § 1, 68th Leg. Sess., Reg. Sess. (N.D. 2023) ("It is a Class C felony for any person, other than the pregnant female upon whom the abortion was performed, to perform an abortion."); Okla. Stat. tit. 21, § 861 (including no language suggesting applicability to a person who has an abortion); *see also Cahill v. State*, 178 P.2d 657 (Okla. Crim. App. 1947) (affirming that reading of Oklahoma statutory law); S.C. Code Ann. § 44-41-730 ("A pregnant woman on whom an abortion is performed or induced in violation of this article may not be criminally prosecuted for violating any of the provisions of this article or for attempting to commit, conspiring to commit, or acting complicitly in committing a violation of any of the provisions of the article and is not subject to a civil or criminal penalty based on the abortion being performed or induced in violation of any of the provisions of this article."); S.D. Codified Laws § 22-17-5.1 (including no terms indicating applicability to a person who has an abortion, because criminalizes "prescrib[ing] or procur[ing]"); Tenn. Code Ann. § 39-15-213(e) ("This section does not subject the pregnant woman upon whom an abortion is performed or attempted to any criminal conviction and penalty."); Tex. Health & Safety Code Ann. § 170A.003 ("This chapter may not be construed to authorize the imposition of criminal, civil, or administrative liability or penalties on a pregnant female on whom an abortion is performed, induced, or attempted."); W. Va. Code §16-2R-3 (applying only to performing or providing

provokes hostility toward them. Health care workers who hold anti-abortion beliefs may act upon them by violating patients' privacy and reporting them to law enforcement for lawful activity.[44] Though other hospital providers, staff, or administrators may intervene to prevent some would-be reports, they cannot protect every patient from criminalization.

Due to stigma, abortion bans, and the political and legal climate around self-managed abortion, some people feel unsafe sharing the details of a pregnancy loss with a medical provider, whether that loss was intended or unintended.[45] Providers also fear personal legal repercussions from discussing abortion with patients or treating abortion complications. Provider fears are reflected in the data collection for the *Care Post*-Roe report. One provider's reflection states:

> On the day [my patient] presented, the [state] legislature was in their second week of actively debating a 6-week ban on abortion and this was being covered widely in local media. She reports a [15-17] week pregnancy but there was no obvious fetus on arrival on ultrasound imaging. She states she 'does not remember' passing a fetus. On arrival, she was tachycardic [elevated heart rate], febrile, and sick. She was taken urgently to the operating room for a D&C where she was discovered to have an entire placenta in her uterus which was removed. The patient had significant bleeding and ended up being hospitalized for two days receiving IV antibiotics and ultimately also required a blood transfusion. It is our strong belief that the patient had tried to self-manage her abortion at home, unsuccessfully, but refused to share the details as [the state] has legislation that criminalizes self-managed abortion with documented prosecutions.[46]

Even if the unspecified state referenced here has since repealed their criminal penalties for self-managed abortion, patients of that state may still rightfully fear disclosing essential health

---

abortion to another person); Wis. Stat. § 940.04(1) ("Any person, other than the mother, who intentionally destroys the life of an unborn child is guilty of a Class H felony.").

[44] *See* Grant, *supra* note 38; Ashlee Banks, *The Dangers of Health Care Workers Reporting Self-managed Abortions to Law Enforcement*, Grio (Apr. 2, 2024), https://tinyurl.com/4d4mnsk6.

[45] *See* If/When/How: Lawyering for Reprod. Just. & Physicians for Reprod. Health, *Talking to Health Care Providers After a First Trimester Miscarriage or Abortion* 1 (Oct. 13, 2023); https://tinyurl.com/KYRHealthCare (last visited Feb. 9, 2025).

[46] Grossman, *supra* note 6, at 20 (second, fourth, & fifth alterations in original).

information to providers who might desire to report legal, non-abusive reproductive health care as abuse against them or an "unborn child."[47] Patients may also avoid asking questions about abortion or pregnancy loss due to fear of criminalization, which could lead to life-altering or even life-ending consequences.

2024 brought the dire consequences of the culture of fear around abortion criminalization to the forefront. Last year, the news was populated with stories of patients who experienced serious harm or died due to their fear of seeking care or their providers' fear of providing timely care. A running tally of known deaths due to abortion bans lists seven women who died after they were afraid to seek care or their providers were afraid to provide care.[48] All of them could have lived, including Candi Miller, who died at home next to her three-year-old daughter after attempting to terminate a life-threatening pregnancy.[49] She did not seek emergency care because she feared prosecution under Georgia's abortion ban.[50] Had the 2024 Rule been in place when Candi had her abortion, she may have been less afraid to access the care she needed. The 2024 Rule, when followed, will help to prevent the criminalization of lawful reproductive health care, increase patient-provider trust, and help alleviate some of the fear that patients and providers feel around discussing, seeking, or providing that care.

---

[47] *See, e.g.*, Compl. ¶¶ 67, 77–78, 91–92; Plfs.'s Br. in Supp. of Mot. for Summ. J. at 1 ("But to undermine state laws that protect unborn children and mothers from abortion[,] . . . HHS has put up special barriers . . . .").

[48] Roxanne Szal, *Rest in Power: A Running List of the Preventable Deaths Caused by Abortion Bans*, Ms. (Nov. 26, 2024), https://tinyurl.com/392ytw99.

[49] Kavitha Surana, *Afraid to Seek Care Amid Georgia's Abortion Ban, She Stayed at Home and Died*, ProPublica (Sept. 18, 2024), https://tinyurl.com/48a2b72m.

[50] *Id.*

**B. Stigma around young people's reproductive decisions leads to the conflation of those decisions with child abuse.**

Health care providers who assert that the 2024 Rule prevents them from reporting child abuse demonstrate the need for the 2024 Rule: providers' misunderstanding of reporting laws coupled with stigma and bias against reproductive health care leads to wrongful reporting that violates HIPAA itself. Anti-abortion stigma and bias are particularly pernicious in the context of young people's health care.

Young people caring for themselves by, for example, having an abortion or accessing gender-affirming care, is highly stigmatized by society. That stigma makes it harder for young people to access and receive confidential health care.[51] But leading scholars, medical experts, and medical organizations agree that young people seeking reproductive health care should have the right to confidential care, as they experience this care in a manner similar to adults and benefit from the same level of confidentiality.[52] And a young person accessing reproductive health care, including abortion—in Texas or elsewhere—rarely translates to child abuse. Young

---

[51] *See, e.g.*, Kate Coleman-Minahan et al., *Adolescents Obtaining Abortion Without Parental Consent: Their Reasons and Experiences of Social Support*, 52 Perspectives on Sexual & Reprod. Health 15, 15 (2020) ("Abortion stigma influences adolescents' disclosure of their abortion decisions and limits their social support."); Emily Bridges, Advocates for Youth, *Abortion and Young People in the United States* 2 (2019), https://tinyurl.com/yc35w7c3.

[52] *See* Am. Acad. of Pediatrics, Comm. on Adolescence, *The Adolescent's Right to Confidential Care When Considering Abortion*, Pediatrics, Sept. 2022, at 1, 5 ("Ultimately, the pregnant adolescent's right to decide whom to involve in the decision to seek abortion care should be respected."); *see also* Lauren J. Ralph et al., *The Role of Parents and Partners in Minors' Decisions to Have an Abortion and Anticipated Coping After Abortion*, 54 J. Adolescent Health 428, 432 (2014) ("[I]n many respects, minors experience abortion similarly to adults."); Am. Coll. Obstetricians & Gynecologists, *Confidentiality in Adolescent Health Care*, Comm. Opinion No. 803, 135 Obstetrics & Gynecology e171, e171 (2020), https://doi.org/10.1097/AOG.0000000000003770 ("Confidential care for adolescents is important because it encourages access to care and increases discussions about sensitive topics and behaviors that may substantially affect their health and well-being."); *see also generally* Priya R. Pathak & Adriana Chou, *Confidential Care for Adolescents in the U.S. Health Care System*, 6 J. Patient-Centered Rsch. & Revs. 46 (2019), https://tinyurl.com/58mnfywe.

people make the autonomous decision to travel to other states to have abortions, just as they autonomously decide to parent, both with and without parental support.[53] When health care providers report child abuse, the law does not ask them to report based on the *type* of care at issue. Rather, mandated reporting laws require a provider to report when they have reason to believe that a young person was abused or neglected, and a provider could not reasonably draw the conclusion that a young person under 18 making a decision about their own body is *per se* indicative of child abuse.

The 2024 Rule properly clarifies that providers cannot report the fact of a young person receiving reproductive health care as inherently abusive without evidence to suggest the care was coerced or performed in an abusive manner. Because the 2024 Rule applies where the protected health information ("PHI") in question is related to "solely . . . seeking, obtaining, providing, or facilitating reproductive health care,"[54] the 2024 Rule does not forbid or limit health care providers from reporting or sharing information about child abuse with Texas authorities.

Where child abuse is suspected or present, it is lawful to make a disclosure to proper authorities. The mere fact of suspected or actual child abuse means that the PHI at issue is no longer "solely" related to "seeking, obtaining, providing, or facilitating reproductive health care," but is now also related to and necessary to demonstrate child abuse.[55] This means that if a health care provider subjectively believes a young person is experiencing child abuse related to reproductive health care, that provider need not 1) make a determination as to whether the reproductive health care at issue was "lawful," nor does she need to 2) request an attestation

---

[53] *See* Andrea J. Hoopes et al., *Elevating the Needs of Minor Adolescents in a Landscape of Reduced Abortion Access in the United States*, J. Adolescent Health, Nov. 2022, at 2–3.
[54] HIPAA Privacy Rule to Support Reproductive Health Care Privacy, 89 Fed. Reg. at 330004.
[55] *See id.*; *see also* 45 C.F.R. § 164.512(c)(3) (applying similarly to other reports of abuse, neglect, or domestic violence).

from law enforcement or 3) determine if an attestation from law enforcement complies with the 2024 Rule. Providers can unquestionably share information about child abuse *without* also sharing information about unrelated and lawfully provided reproductive health care.

Despite that legal reality, young patients are at risk of having their lawful care reported as child abuse, including care provided to patients in states where it is legal. That risk injects fear into the patient-provider relationship—fear that causes patients to withhold essential medical information from their providers, to delay care, or to avoid it altogether.[56] This is precisely what the 2024 Rule aims to prevent by protecting the PHI of patients that seek or receive lawful reproductive health care.

The 2024 Rule, consistent with HIPAA's other requirements, will reduce overreporting of lawful reproductive health care and allow patients to more freely share their reproductive health information with providers without fear of criminalization. Further, the 2024 Rule is helping to protect patients from reporting of lawful reproductive health care, without more, as inherently abusive. Reporting lawful care to law enforcement contradicts federal law and demonstrates the potential weaponization of personal beliefs against patients in Texas.

### Conclusion

The increased stigmatization and criminalization of abortion post-*Dobbs* has created a climate of fear for both patients and providers. Stigma and fear of criminalization have

---

[56] *See supra* Section I.B.; *see also* Vern Harner et al., *Transgender Patient Preferences When Discussing Gender in Health Care Settings*, JAMA Network Open, Feb. 2024, https://tinyurl.com/mwbmfsej (describing transgender patient experiences withholding medical information); S.E. James et al., Nat'l Ctr. for Transgender Equality, *The Report of the 2015 U.S. Transgender Survey* 5 (2016), https://ustranssurvey.org/download-reports/ (finding that transgender people avoid accessing health care); Taylor L. Boyer et al., *Binary and Nonbinary Transgender Adolescents' Healthcare Experiences, Avoidance, and Well Visits*, 71 J. Adolescent Health 438, 439, 443 (2022) (finding health care delay and avoidance in transgender youth).

contributed to patient deaths and other adverse health outcomes. The 2024 Rule gives patients more confidence to discuss reproductive health care with their providers and instills a sense of safety and trust back into the patient-provider relationship, without interfering with providers making child abuse reports consistent with state law. By reducing reporting that is driven not by the law, but by confusion, stigma, and bias, the 2024 Rule may well save lives.

Dated: March 10, 2025                                Respectfully submitted,

                                                              /s/ Lauren Paulk
                                                              _____

                                                              Lauren Paulk, *pro hac vice pending*
                                                              New York Bar No. 5253752
                                                              Nina Dutta, *pro hac vice pending*
                                                              California Bar No. 327943
                                                              If/When/How: Lawyering for Reproductive Justice
                                                              1714 Franklin St. #100-393
                                                              Oakland, CA 94612
                                                              T: (602) 883-8261
                                                              F: (602) 562-9449
                                                              lauren.paulk@ifwhenhow.org
                                                              nina.dutta@ifwhenhow.org

                                                              *Counsel for proposed Amici Curiae*


                                                              Laura Copp
                                                              Texas Bar No. 24096246
                                                              Briar Wilcox Law Firm, PLLC
                                                              7450 Golden Pond Pl. Ste. 400
                                                              Amarillo, TX 79121
                                                              T: (806) 373-4047
                                                              F: (806) 418-6677
                                                              laura@wilcoxfamilylaw.com

                                                              *Counsel for proposed Amici Curiae*